**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNITED SERVICES AUTOMOBILE ASSOCIATION a Texas reciprocal inter-insurance exchange, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Civil Action No. 2:18-CV-366 |
| v. | ) ) | JURY TRIAL DEMANDED |
| WELLS FARGO BANK, N.A., a national banking association, | ) ) ) | |
| Defendant. | ) ) | |

---

## USAA'S OPENING CLAIM CONSTRUCTION BRIEF

---

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION................................................................................................3

II. LEVEL OF ORDINARY SKILL IN THE ART ..........................................................3

III. THE ASSERTED PATENTS ................................................................................4

    A.  U.S. PATENT NOS. 8,392,332, 9,224,136 AND 10,013,681 ......................4

    B.  U.S. PATENT NOS. 8,708,227 AND 10,013,605 ...........................................5

IV. DISPUTED TERMS ...........................................................................................6

    A.  "Deposit" Limitations ........................................................................6

        1.  Meaning Of The "Deposit" Limitations............................................12

    B.  "Device" Limitations.........................................................................19

        1.  "[Remote/Depositor Owned] Device"...............................................19

        2.  "[Portable/Mobile] Device" .............................................................22

        3.  "General Purpose [Computer/Image Capture Device]"................22

    C.  "Log File" Limitations .......................................................................25

        1.  "Log File" .........................................................................................25

    D.  "Identify Selected Points . . ." ..........................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Eaton Corp. v. Rockwell Intern. Corp.*,
  323 F.3d 1332 (Fed. Cir. 2003)......................................................................................9, 10

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
  739 F.3d 1367 (Fed. Cir. 2014)..........................................................................................10

*TomTom, Inc. v. Adolph*,
  790 F.3d 1315(Fed. Cir. 2015).............................................................................................12

*USAA v. Wells Fargo Bank ("USAA I"), N.A.*,
  2:18-cv-245-JRG (E.D. Tex.) ...................................................................................4, 10, 17

## I.      INTRODUCTION

United States Automobile Association ("USAA") respectfully requests that the Court enter the claim constructions as set out below. A background on the mobile remote check deposit technology at issue in the case is provided in paragraphs 31-50 of the concurrently submitted Declaration of Matt Calman.  Ex. 6.  Mr. Calman oversaw the implementation of the mobile check deposit system used by Bank of America, a system that was implemented after USAA introduced remote check deposit to the industry.

This is one of two cases pending before the Court relating to USAA's remote check deposit technology.  The first-filed case, *USAA v. Wells Fargo Bank ("USAA I"), N.A.*, 2:18-cv-245-JRG (E.D. Tex.), relates to USAA's second-generation auto-capture technology that has been employed in mobile check deposit systems throughout the industry.  This instant case relates to USAA's first-generation remote check deposit technology.   As one prominent commentator observed when this first-generation technology was launched, "***USAA represents the bleeding edge of mobile banking technology***."  Ex. 9, at 2-3.[1]

## II.     LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the field ("POSA") would be someone with at least one year of experience developing applications on mobile, portable, or customer-controlled devices for imaging. Ex. 6 (Calman Decl.), ¶¶ 14-19.  Wells Fargo's ("Wells'") claim construction expert has opined that a POSA would have had "at least two years of prior experience with image scanning technology involving transfer to and processing of image data at a server."  Ex. 8 (Saffici Decl.), at ¶ 17.  USAA's proposed constructions would still be correct even if the Court were to adopt Wells' proposed level of skill.

---

[1] All emphases in the brief are added unless otherwise noted.

### III.    THE ASSERTED PATENTS

The '332, '136, and '681 Patents are from the same patent family and have the same specification.  The '227 and '605 Patents are from the same patent family and have the same specification.  While the two families do not share an identical specification, they share a similar effective filing date and have largely overlapping disclosures.  Each of the Asserted Patents involves imaging of checks using mobile/portable devices and/or customer-controlled devices, which requires knowledge of the imaging capabilities of these devices implemented in camera hardware and software.

### A.    U.S. PATENT NOS. 8,392,332, 9,224,136 AND 10,013,681

The '332 Patent generally describes a system, and a method of using that system, for receiving an image of a check and additional data for a check deposit transaction and automatically processing the check deposit.  The '332 Patent claims describe a combination of functions implemented on a processor for processing a check deposit, including receiving a customer identification of an account for a deposit, receiving a first image of a front side of a check, creating a second image by converting said first image into a second file format, and generating a log file comprising said second image, an identification of said customer-controlled general purpose computer, and an identification of an image capture device that was used to capture said first image.  In dependent claims, it adds performing duplicate detecting by accumulating Magnetic Ink Character Recognition (MICR) data associated with said check along with MICR data associated with a plurality of other checks, and analyzing said MICR data for duplicate checks.  This combination of features allows a financial institution to receive image(s) of a check and information from a user's device and automatically process the check deposit.

The '136 Patent generally describes a system for receiving an image of a check and additional data for a check deposit transaction and automatically initiating a check deposit.  The '136 Patent claims describe receiving a check image captured by a camera, identification of the account for the deposit, and an indication of the amount of the check, performing optical character recognition on

the check image to determine a routing number, and validating the routing number. '136 cls. 1, 7. The '136 Patent claims also describe receiving an image of the front side and an image of the back side of a check from a remote device, processing the images, and generating a log file. '136 cl. 14. The dependent claims add determining the check amount from the image of the check, and comparing the amount determined with the customer's declared amount of the check. '136 cls. 6, 12, 18. The dependent claims also add initiating the check deposit by provisionally crediting the account. '136 cls. 2, 8, 15. Like the '332 Patent, this combination of features allows a financial institution to automatically process a remote check deposit.

The '681 Patent generally describes a system for assisting a user to capture an image of a check with the camera of a mobile or portable device, presenting the image of the check to the user, and transmitting a copy of the image for deposit. For example, all claims of the '681 Patent claim displaying a graphical illustration to assist the user in having the camera capture an image of the check and assisting the user in placing the camera at a proper distance away from the check for capturing the image. '681 cls. 1, 12, 30. The '681 Patent also claims performing OCR on the image, including determining an amount of the check and reading the MICR line of the check. '681 cls. 1, 30. The '681 claims add that the transmitted copy of the image is a modified version of the image captured by the digital camera, and that the transmitted copy has a different format than the image captured by the digital camera. '681 cls. 1, 24. This combination of features effectively transforms the user's mobile device – which is primarily a communication and entertainment device – into a mobile document scanner capable of accurately and effectively capturing negotiable images of checks which comply with the numerous technical image quality requirements governing electronic check image deposits.

### B.     U.S. PATENT NOS. 8,708,227 AND 10,013,605

The '227 Patent generally describes a system, and a method of using that system, for providing a remote deposit processing component to a depositor owned device that instructs a depositor to

capture an image of a check, receiving the image, analyzing the image, and initiating a deposit.   All claims of the '227 Patent claim the remote deposit processing component instructing the depositor to position the check to capture an initial image, to identify selected points of the initial image, and to approve a cropped portion of the initial image. ('227 cls. 1, 5, 9).  In all claims, the analysis of the image includes performing OCR, validating a routing number, determining whether the check was previously deposited, and comparing the customer's declared amount of the check to an amount determined by performing OCR. ('227 cls. 1, 5, 9).  The dependent claims add authenticating the customer, receiving an image of the back side of the check, and determining whether a signature appears on the back side of the check.

The '605 Patent is generally directed to a system including a downloaded software component or app for assisting a user to capture an image of a check with the camera of a user's portable or handheld mobile device, transmitting a copy of the image for deposit; processor(s) for performing optical character recognition to determine the amount of the check, initiating the deposit, and generating a log file; and another computer for updating the balance on the account.  All claims of the '605 Patent claim using the display of the user's device to assist the user in having the camera capture an image of the check. '681 cls. 1, 12.  The dependent claims add performing duplicate detection.

## IV.   DISPUTED TERMS

### A.   "Deposit" Limitations

Many of the claims of the Asserted Patents include limitations directed to processing or facilitating "check deposit," "depositing a check," and the like.   The parties have two disputes regarding these claim limitations: (1) whether certain claim preambles including the "deposit" language are limiting; (2) the meaning of check "deposit" in the context of the Asserted Patents.  Each dispute is addressed further below.

| Term(s) | Preamble Limitations |
|---------|----------------------|

|   | |
|---|---|
| | A system for processing a **check deposit** [’136 claim 14; ’332 claim 8][2] |
| | A processor-implemented method for processing a **check deposit** [’332 claim 1] |
| | A non-transitory computer readable medium bearing instructions for processing a **check deposit** [’332 claim 15] |
| | A system for facilitating **deposit of a check** [’227 claim 1] |
| | A processor-implemented method for facilitating **deposit of a check** [’227 claim 5] |
| | A system for allowing a customer to **deposit a check** using the customer's own mobile device with a digital camera [’681 claim 12] |
| | Non-Preamble Limitations |
| | initiate a **check deposit** [’136 claims 1, 7] |
| | initiate said **deposit** [’227 claims 1, 9] |
| | initiating said **deposit** [’227 claim 5] |
| | submitting the check for [mobile check] **deposit** [’605 claim 1, 12] |
| | confirming that the **deposit** can go forward [’605 claim 1] |
| | confirming that the **mobile check deposit** can go forward [’605 claim 12] |
| | confirming that a **deposit** can go forward after optical character recognition [(OCR)] is performed on the check [’681 claims 1, 12, 30] |
| | submitting the check for **deposit** after the user is authenticated, the electronic images of the check are presented to the user, and the portable device checks for errors [’681 claim 1] |
| | remote **deposit** processing component [’227 claim 1, 5, 9] |
| USAA | The preambles are limiting. |
| | Deposit a check is "providing a check image to a depository for presentment and clearing in order for money to be credited to an account." |
| Wells | The preambles are not limiting and no construction necessary. |
| | Alternatively, the scope of the term "deposit" should be construed as follows: provide a check image and/or check information to a depository (such as a bank) for money to be credited to an account. |
| | [’681 claim 12] Alternatively, the scope of "using [a/the] customer's own [handheld] mobile device with a digital camera" should be construed as follows: using a [handheld] mobile device with a digital camera, where the camera may be separate from the mobile device. |

---

[2] Where a claim term is present in both independent and dependent claims in a set of claims, only the independent claim is listed, for convenience.

### 1.    The "Deposit" Preambles Are Limiting

"In general, a preamble limits the [claimed] invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Eaton Corp. v. Rockwell Intern. Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).  For example, "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."  *Id.*  In each of the disputed claims, the "check deposit" limitations are essential to the claims and provide antecedent basis for subsequent claim limitations.

In the '136 and '332 Patents, the claims recite "[A system/A processor-implemented method/A non-transitory computer readable medium bearing instructions] for ***processing a check deposit.***"  *See* '136 Pat., cl. 14; '332 Pat., cls. 1, 8, 15.  Subsequent limitations refer back to "the check deposit" established in the preamble.  *See* '136 Pat., cl. 15 ("cause the plurality of processors to initiate the check deposit by provisionally crediting a financial account associated with the account identification number"); '332 Pat., cls. 1, 8, 15 ("receiving a customer identification of an account for a deposit").  Claim 12 of the '681 Patent, in the same family, begins "A system for allowing a customer to deposit a check," which is again referred back to later in the claim when "a downloaded app . . . control[s] submission of a check for deposit by causing the customer's mobile device to perform" various functions.  '681 Pat., cl. 12.  Moreover, as USAA's expert Mr. Calman explains, a POSA would understand the preamble language to be important to the claims as a system or process for "processing a check deposit" involves different considerations as compared to a system or process that captures images for non-check deposit purposes. Ex. 6, ¶¶ 49-64.  Similarly, in the '227 Patent, claims 1 and 5 recite, in the preambles, "[A system/A processor-implemented method] for facilitating **deposit of a check**," which provides antecedent basis for subsequent limitations, *e.g.*, "initiate ***said deposit of said check*** into said account."  '227 Pat., cls. 1, 5.  As with the preambles of the '136 and '332 Patents, a

POSA would understand that these preambles including the phrase "deposit of a check" are limiting and a part of their respective claims. *See Eaton*, 323 F.3d at 1339; Ex. 6, ¶¶ 125-136.[3]

The patent specifications in each family place great emphasis on the importance of successful check deposit to the inventions, further indicating that the recitation of "depositing" limitations in the claim preambles was intended to be limiting. *See Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1372 (Fed. Cir. 2014) ("[T]he preamble may be construed as limiting when it recites particular structure or steps that are highlighted as important by the specification."). For example, the titles of four of the five patents are either "Systems and method for mobile check deposit" or "Systems and methods for remote deposit of checks." The specifications repeatedly emphasize the importance of check depositing to the claimed features, such as analyzing the image of the front side of said check to determine whether said image meets at least one criterion, performing Optical Character Recognition (OCR) on the image of the front side of said check, validating a routing number, and comparing the amount of the check to an amount determined by performing OCR on the image. *See, e.g.*, '605 Pat., 2:20-32 ("[financial institution electronics] may be further configured for receiving an image of a front side of said check, and for analyzing said image to determine if it meets at least one criterion. The criterion could be, for example, image size, image legibility, image orientation, image format, presence of certain image features that indicate the image in fact represents a check, and so forth. Financial institution electronics may be also configured for determining if there is an error in a deposit transaction. Numerous errors are possible candidates for detection, and several exemplary errors are provided herein. If there are no errors that warrant aborting the transaction, then such

---

[3] In a recent decision denying Wells' CBM Petition for one of the patents asserted in *USAA I*, the PTAB found the "deposit" preambles limiting, even under the Broadest Reasonable Interpretation construction standard. Ex. 16, at 14. Wells contends that the "deposit" terms here have the same meaning as in the *USAA I* patent at issue in the CBM. *See* Ex. 8, ¶ 19; Ex. 14, 10:24-11:3; *see also* Ex. 15 ('605 CBM Petition), at 8.

electronics may be further configured to initiate a deposit of the check."); *Id.,* 10:65-11:8 ("Server 500 may further comprise a subsystem for analyzing said image of a front side of said check to determine if it meets at least one criterion. Subsystems 502 and 503 may for example perform such determining. In order to automate remote check deposits, it is desirable to configure server 500 to recognize that the image it receives is in fact a check, that the check is valid and not a duplicate, and that the received image can be used to further process the transaction. Image quality determination 502 may thus be provided to ensure that the received image can be used to further process the transaction."); *Id.,* 11:9-24 ("Image usability determination subsystem 503 may further require an image to meet additional criteria. For example, it may be required that the image is in a particular format, e.g. a Joint Photographic Experts Group (JPEG) format. While systems may be designed to handle checks in any format, it may be cost effective to require customers to send in only images of specified formats so as to lower development costs of the system. It may also be required that the image is of a predetermined size, or that the image has features indicating it is a negotiable instrument of a desired type. For example, almost all checks have certain features, such as a MICR line, a signature line, an endorsement area on the back, an amount box, a date, and so forth. Often such features are in a consistent location on the check. A subsystem such as 503 may ensure that such features are present prior to allowing the transaction to continue."); *Id.,* 13:51-57 ("For example, the component 600 may provide a subsystem 602 for instructing a customer, for example via a user interface visible on a display coupled to a customer-controlled general purpose computer 630, in utilizing an image capture device to generate an electronic image of a front side of a check, such that said electronic image of a front side of a check meets at least one first criterion"); '681 Pat., 9:27-32 ("In one embodiment, the OCR is conducted in real time, i.e. prior to confirming the deposit transaction for the customer, so as to validate some initial deposit information immediately, and thereby filter transactions that may result in errors were the OCR to be conducted at some later time."); *Id.,* 9:56-60 ("If the routing number determined using

OCR cannot be validated, an error may result 317, and the deposit transaction can be aborted. An error message can be delivered to the customer 314, explaining a reason that the transaction could not be processed."); *Id.,* 10:36-42 ("OCR may further be performed on a check amount location 306, and the amount as determined using OCR may be compared against the customer-entered amount received pursuant to step 303. If the amounts do not match, an error 316 can result, terminating the transaction and delivering appropriate information concerning the error to the customer 314.").

In the first-filed case, Wells has relied on *TomTom, Inc. v. Adolph*, 790 F.3d 1315(Fed. Cir. 2015) to support an argument that the pre-amble recitation of a system for depositing a check is not a limitation.  This is of no help.  In that case the Federal Circuit held that while only the term "mobile unit" appeared in both the preamble and the body of the claim, the entire phrase containing it — "destination tracking system of at least one mobile unit" — was limiting.  *Id.* at 1323 ("The district court correctly concluded—and the parties do not seem to dispute—the phrase 'destination tracking system of at least one mobile unit' is limiting.")  The dispute in *TomTom* was about whether the unconnected "generating language" (*A method for generating and updating data* for use in a destination tracking system of at least one mobile unit") – which provided no antecedent basis and was duplicative of the body of the claim – was limiting.  *Id.*, 1323-1324.  To extract "mobile unit" from its use as a "destination tracking system" would have meant that the claims were not directed at the life of the invention, which was an improvement over prior art destination tracking systems based on mobile devices.  Ex. 4, Abstract, 3:26-45.  The same analysis applies here.  The claims at issue recite improvements over pre-existing systems of check deposit.  To remove the concept of check from its context of a system for depositing checks ignores the life and purpose of the claims, which are improvements over previous methods of depositing checks.

### 1.      Meaning Of The "Deposit" Limitations

In the United States at the time of the patent (and today) check image deposit is a relatively involved technical process.  Mr. Calman discusses this at paragraphs 49-64, 112-119, 125-136, 161-163, and 182-187 of his declaration. Wells' expert in its Covered Business Method ("CBM") Review petitions, Mr. Alexander, who had extensive industry experience in check image deposit, testified that "as of the late 1990s ACH had created a standard system for processing and exchange of check images by banks." Ex. 13 at 38:17-21.  Given the nature of the process, the term is not amenable to a short construction, but is instead best explained to the jury via expert testimony.  However, during the meet and confer process it became apparent to USAA that Wells was intending to treat the "deposit" terms as effectively meaningless.  It is for this reason that USAA presents the underlying dispute for the Court.  Depositing a check is a meaningful act that has requirements in the United States beyond simply providing an to a bank.

The intrinsic record makes clear that "deposit" of a check is not a meaningless step of simply submitting an image to a bank.  The first sentence of the "SUMMARY" of the patents makes clear that the invention is focused on a transaction – "redeeming": "a system, method, and computer-readable medium with computer-executable instructions for remotely *redeeming a negotiable instrument*." '136 Pat., 2:40-43.  The summary draws a distinction between "delivery to the bank servers" of the "image" and the subsequent steps performed by the bank that result in deposit: "The *received information* and OCR information can be used in *completing the deposit*." *Id.,* 2:62-63. The summary teaches that a "log file" is sent with the image that contains "useful information for processing and/or trouble-shooting the *deposit transaction*." *Id.,* 3:4-8.  These passages make clear that deposit is a result that occurs after an image is received and processed by the bank.  The "DETAILED DESCRIPTION" continues to emphasize that deposit is not merely the transfer of an image, it is a "transaction": "If the routing number determined using OCR cannot be validated, an

error may result 317, and the ***deposit transaction*** can be aborted." *Id.,* 10:8-9; *see also id.,* 10:45-47 ("proceed with a deposit transaction."). The specification teaches that deposit is a transaction that results in the crediting of an account: "If the payor's bank and the payee's bank are the same, ***the transaction*** can be handled internally at the payor bank by simply debiting the account of one customer and ***crediting the account of another***." *Id.,* 12:3-7.

The claims of the patents also make clear that deposit is more than simply image submission. For example, the independent claims of the '227 patent recite "[a] system for facilitating a deposit of a check" in which steps are performed after the receipt of the image of the bank that then result in deposit: "receive from said depositor owned device said image of the front side of the check", "analyze said image", "determine whether there is an error . . . . initiate said deposit of said check into said account." The claim language makes clear that deposit involves processing after image submission.

As another example, independent claims 12 and 30 of the '681 patent recite "a system for allowing a customer to deposit a check . . . the system including . . . a computer associated with the bank programmed to update a balance of an account to reflect the check submitted for mobile check deposit in the bank". As this claim language makes clear "deposit" is something that occurs "in the bank" after the "check [is] submitted."

As another example, independent claim 12 of the '605 patent recites "[a] system for allowing a customer to deposit a check" in which the check image is first submitted and then processing occurs at the bank leading to deposit: "submitting the check for mobile check deposit in the bank." As this claim language makes clear "deposit" is something that occurs "in the bank" after "submitting the check."

The specification makes clear that presentment and clearing are part of the transaction that is deposit. *See, e.g.,* '136 Pat., 6:1-20 ("Aspects of the invention may also comprise systems and methods carried out by the financial institution 130 and their server 131 or other electronics ***that facilitate and***

***enable such deposit*** by the account owner 110 …. For example, the ***check may be cleared by***

***presenting the digital image*** to financial institution 140"); *Id.,* 9:13 ("FIG. 3 illustrates a method for

processing a check deposit."); *Id.,* Fig. 3 (including "Forward Image(s) to Payor Bank" (312) and

"Provisionally Credit Customer Account" (313)); *Id.,* 11:7-10 ("Appropriate images may be forwarded

to the payor bank for payment 312, and meanwhile, the customer's account may be provisionally

credited in the amount of the check 313.").  The specification explains that a deposit of a check is not

deemed "successful" until after the check has cleared:

> At 312, in one embodiment, the bank may forward an image or images to a payor bank.
> Provisionally crediting the customer account 513 and delivering a confirmation to the
> customer-controlled general purpose computer 514 may be done before, after, or
> contemporaneously with step 312. In general, a ***provisional credit is subject to the***
> ***check clearing***, e.g., by receiving at the payee bank some confirmation that the check will
> be satisfied from the payor bank. This confirmation from the payor bank can take some
> time. ***Provisionally crediting the customers account 513 and sending the***
> ***confirmation 514 can assure the customer that the transaction will proceed, even***
> ***though it may not ultimately be successful***.

*Id.,* 11:12-23. Wells has identified only two passages from the specification that it contends draws a

distinction between deposit and processing/clearing. Ex. 8, ¶ 20. Neither passage supports Wells'

proposed construction.  The first passage states:

> Therefore, the payee may not have access to the funds from the check until the payee
> deposits the check at the bank, the check has cleared and the funds have been credited
> to the payee's account."

*Id.,* 2:29-32.  This passage comes from the Background section of the specification, which is discussing

the prior art process of depositing ***paper checks*** by actually handing them to a bank teller. *See, e.g.,*

'136 Pat., 2:9-19. A paper check is legal tender. A check ***image*** is not legal tender unless it satisfies

technical criteria. Wells' lead engineer noted that "the check image needs to be of a certain quality to

pass the industry standard" and that "there are some technical criterias which needs to be satisfied."

Ex. 11 (Usapkar Tr.), 40:10-24. Well's expert admits this as well.  Ex. 14 (Saffici Tr.), 55:4-19 ("Q. [T]his section in column 1 and column 2 is describing some advantages and disadvantages of checks as a method of payment. Is that a fair characterization? A. I believe that's what this portion of the summary is showing. . . . Q. So that's referring to a traditional method of depositing a paper check at a bank? A. That's correct."). "Therefore," the patent explains, "there is a need for a convenient method of *remotely* depositing a check while enabling the payee to quickly access the funds from the check." '136 Pat., 2:34-36. As Wells noted in its CBM petitions, in the context of remote deposit using check images, there is a distinction between the transmission of information and deposit: "***transmit the information to a bank*** server for ***processing*** of the ***deposit transaction***."  Ex. 15, at 4.

> The second passage Wells relies on states:

> Account owner 110 may then send the image to financial institution 130 using the systems and methods described herein. Please refer to FIG. 2 and corresponding description for a detailed exemplary embodiment of systems and methods for facilitating and processing a check deposit transaction. Upon receipt of the image, financial institution 130 may credit the funds to account 160. Financial institution 130 may clear the check by presenting the digital image to an intermediary bank, such as a regional branch of the Federal Reserve, a correspondent bank and/or a clearinghouse bank.

*Id.,* 6:8-18. This passage also fails to support the contention that "depositing" a check is merely transferring a check image to the bank. It refers the reader to Figure 2, which illustrates an exemplary embodiment for "facilitating and processing a check deposit transaction." *Id.,* 6:8-18. But Figure 2 shows that the "deposit" transaction encompasses the end-to-end process of receiving and processing the check images; indeed, image transmission is depicted in the middle of the process at step 205. Similarly, Figure 3 illustrates a check deposit transaction that includes "receiv[ing] check image(s)" (at step 304) as well as processing steps, *e.g.,* "forward image(s) to payor bank" (step 312) and "provisionally credit customer account" (step 313). Wells' expert, Mr. Saffici, admitted that Figure 3

16

describes a "check deposit transaction" (Ex. 14, 67:6-12) and that step 312, *i.e.*, part of the deposit transaction, is "referring to the clearing and presentment process" (Ex. 14, 67:16-24).

"Deposit" must be more than just the transfer of the image because it is the bank server that determines whether the deposit may "go forward" or must "be aborted" depending on whether the delivered images and corresponding data are "sufficient." '136 Pat., 9:2-4 ("***If the server determines that the delivered images*** and any corresponding data ***are sufficient to go forward with the deposit***…"); *Id.,* 10:7-9 ("If the routing number determined using OCR cannot be validated, an error may result 317, and ***the deposit transaction can be aborted***."). Mr. Calman discusses the elements of deposit of check images at length. Ex. 6, ¶¶ 49-64, 112-119, 125-136, 161-163, 182-187.

The specification makes clear that presentment and clearing "facilitate and enable" deposit of a check: "compris[ing] systems and methods carried out by the financial institution 130 and their server 131 or other electronics ***that facilitate and enable such deposit*** by the account owner 110" including, for example, that "the ***check may be cleared by presenting the digital image*** to financial institution 140." '136 Pat., 6:1-20.  The term "may" is used because if the check image is sent to a bank that holds both the drawee and the depositor accounts, steps equivalent to clearing occur internally at the bank.  *Id.*, 12:3-9; Ex. 10, 21:5-21.

Wells' claim construction expert admitted at deposition that clearing and presentment are part of the processing that occurs on a check image at a depository bank.[4]  Ex. 10, 18:16-21 ("Part of the processing that occurs in a check image in the United States is presentment and clearing, correct?  A. Yes. Clearing and presentment technically."). Wells claims that presentment and clearing do not occur

---

[4] Wells' expert gave this testimony in *USAA I*, in which four other USAA patents are asserted; however, Wells' expert contends that the "deposit" limitations in the Asserted Patents here have the same meaning as the similar "deposit" limitations in the *USAA I* patents. 8, ¶ 19; Ex. 14, 10:24-11:3 ("Q. And your opinion regarding the deposit related terms in the 366 case is the same as your opinion regarding the deposit related terms in the 245 case? A. Yes.").

when a check is presented for deposit at a bank that holds the account of the check writer.  But this is a semantic argument, because in this situation Mr. Saffici admits that the equivalent of presentment and clearing occurs.  Ex. 10, 19:14-19 (discussing presentment); 19:20-20:5 (the components of presentment occur when the check is presented at the same bank as the account of the check writer); 20:6-21:3 (discussing clearing); 21:5-21 (the components of clearing occur when the check is presented at the same bank as the account of the check writer).  For example, Mr. Saffici describes a process where a bank "will take money from the drawee account and transfer it to the drawer account" and that when this occurs with checks that are not from an account at a depository "that's called clearing." Ex. 10, 21:5-21.

The specification repeatedly teaches that deposit occurs after successful clearing of a check: "a **provisional credit is subject to the check clearing**, e.g., by receiving at the payee bank some confirmation that the check will be satisfied from the payor bank. This confirmation from the payor bank can take some time. Provisionally crediting the customers account 513 and sending the confirmation 514 can assure the customer that **the transaction will proceed, even though it may not ultimately be successful**." *Id.,* 11:17-23.

The USAA inventors recognized this as well, specifically referencing Check 21 (which incorporates the ANSI standards that established technical criteria for electronic check image exchange).  See '136 Pat., 11:46-50 ("A substitute check is typically a paper reproduction of an original check and may be the legal equivalent of the original check. Substitute checks were authorized under The Check Clearing for the 21st Century Act, commonly known as Check 21."); *Id.,* 12:46-49 ("Currently, the image format required by Check 21 is the bi-tonal Tag Image File Format (TIFF)."). As one of Wells' executives admitted, she is "familiar with ANSI guidelines; you're familiar that there are standard specifications have to be met to deposit a check in the United States."  Ex. 12 (Knight Tr.), 34:16-20; 34:25-37:10.

Wells' claim construction expert, Mr. Saffici, conceded as much at his deposition:

> Q. I'm marking as Exhibit 6 a passage from the Code of Federal Regulations, Subpart D, Substitute Checks. You understand that when Check 21 came into effect the United States government specified certain minimum requirements for what could constitute a substitute check image, fair?
>
> A. Yes. […]
>
> Q. The [Check 21] standard is that the image accurately represent[s] all the information in the front and back of the check, correct?
>
> A. That's correct. […]
>
> Q. Persons of skill would understand that that was a requirement for the use of check images for deposit, fair?
>
> A. Yes.

Ex. 10, 39:2-40:13; *see also id.*, 43:25-44:10, 46:16-47:9 ("Q. The ANSI guidelines are the U.S. standards for electronic exchange of check images, correct? A. There are a group of ANSI standards that relate to check processing and image processing. . . . Q. Do you know of anyone anywhere in the United States who doesn't -- doesn't comply with the minimum technical requirements as set out in ANSI in the Check 21 regulations that we read before the bank?  A. I don't know of anyone.").

### B.    "Device" Limitations

### 1.    "[Remote/Depositor Owned] Device"

| Term | remote device<br>['136 Pat., claim 14]<br>depositor owned device<br>['227 claim 1, 5, 9] |
| --- | --- |
| USAA | A "customer-controlled general-purpose device." |
| Wells | "remote device": a general purpose computing device at a different location from the check processing system<br>"depositor owned device": No construction necessary. |

Claim 14 of the '136 Patent recites a system wherein a plurality of processors receive from a "remote device" "an image of a front side of a check captured by a camera" and "an image of a back

side of the check captured by the camera." '136 Pat., cl. 14.  The specification repeatedly makes clear

that the way "remote" deposit occurs is via a customer-controlled general purpose device:

> "The described embodiments contemplate a system, method and computer-readable
> medium with computer-executable instructions for **remotely** redeeming a negotiable
> instrument.  In an embodiment, the novel method may include delivering, via a publicly
> accessible computer network, a software component to a customer-controlled general
> purpose computer.  The customer is instructed to identify an account via said computer,
> and to provide at least a front side of a check. . . .  The image passes from the scanner
> or other image capture apparatus to the software component, which manages delivery
> to the bank servers."  Id., 2:40-46.

This embodiment is described in claim 14.  Claim 14 recites "a plurality of processors" (i.e., "the bank

servers") that "receive a customer identification" and "image" from the "remote device."  The remote

device is expressly described in the Summary: a "customer-controlled general purpose computer".

Indeed, all relevant references to "remote" in the specification are directed at systems with customer-

controlled general purpose devices.  9:19-26 ("if the customer is in fact eligible for a remote deposit

program, and ensuring the customer has an appropriate virtual machine environment installed on their

general purpose computer."); 12:12-16 ("receive a request for 'deposit at home' or 'remote deposit

capability 400A, and deliver a software component  to a customer's general purpose computer.")  In

all cases, "remote" is used not to define a location, but instead to flag that the customer-controlled

general purpose computer is being employed.

The specification repeatedly discloses receiving the images of the check from a customer-

controlled general purpose device.  *See, e.g., id.,* 2:66-3:2 ("receiving a first image of a front side of a

check, … wherein said first image is received from a customer-controlled general purpose

computer."); *id.,* 3:54-56 ("The account owner 110 may be utilizing a customer-controlled, general

purpose computer 111."); *id.,* 6:51-52 ("FIG. 2 illustrates a method for facilitating deposit of a check

from a customer-controlled general purpose computer.").  Indeed, in its CBM petitions, Wells argued

that all embodiments in the specification used customer-controlled general purpose computers.  Ex.

7 ('136 CBM Petition), 8 ("The embodiments disclosed in the '136 patent described the customer depositing a check with a 'customer-controlled, general purpose computer.'").

As explained in the patent specification, a customer-controlled general-purpose device is one where the customer "has the power to install programs and configure the computer as they wish," as contrasted with other devices that would not be considered customer-controlled, such as ATM machines or other devices that are controlled by a bank, based on "the scope of operations that a customer may perform using the machine, and extent to which the customer can reconfigure the machine in some way by adding software and/or hardware components." '136 Pat, 4:7-28. Again, in its petitions for CBM review, Wells' position was consistent with USAA's proposed construction here and distinguished the patented invention from "ATM computers." Ex. 7 ('136 CBM Petition) at 8 ("The patent contrasted such [customer-controlled, general purpose] computers against ATM computers where the customers' allowed uses of the machine were 'highly restricted.' *Id.*, 4:18-24.").

However, Wells' proposed construction of "remote device" here omits the term "customer-controlled" and instead focuses on the location of the device relative to the "check processing system" of the bank. Wells' intent in doing so is presumably to include bank computer systems, such as ATMs, within the scope of the claims simply because they are located at a "remote" location relative to the bank's central check processing systems. It would be inconsistent with the specification and claims to construe "remote device" to include non-customer-controlled, bank devices such as ATMs. For example, the specification discloses providing a "software component" to the user's device to manage delivery of the images and only a customer-controlled device would be capable of receiving such a software component. '136 Pat. 2:43-46 ("delivering, via a publicly accessible computer network, a software component to a customer-controlled general purpose computer. ... The image passes from scanner or other image capture apparatus to the software component, which manages delivery to bank servers."); *Id.,* 7:40-43 ("After downloading or otherwise accepting the software component, and

assuming the customer has an appropriate image capture device, the customer now has the capability to make deposits from his general purpose computer.").  This is consistent with the specification's description of the benefits of the invention: "A particular advantage of embodiments of the invention is its ability to operate in conjunction with electronics that **today's consumers actually own or can easily acquire**," which, of course, would not include an ATM.

Wells' proposed construction, which imposes a "location"-based restriction on the device, has no basis in the intrinsic record.  Wells cites only a single passage from the '136 Patent specification (at 3:51-4:6) in support of its construction, but this passage says nothing about the "location" of a "remote device;" rather, consistent with USAA's proposed construction, it refers to the device as a "customer-controlled, general purpose computer."  While the specification does note that an "***example system*** in which the described embodiments may be employed" "***may be located, for example***, at the customer's private residence," nothing in the specification ***requires*** that the system be located in a customer's private residence or any particular location.  *See* '136 Pat., 3:51-54.  Indeed, Wells' proposed construction would lead to the absurd result that a customer's mobile deposit-capable device (such as a smartphone) would cease to be a "remote device" when the customer walks into a bank branch.  A POSITA would not understand a device's character (*e.g.*, as a "remote device" or not) to be ever-changing based on the customer's present location.  6, ¶ 69.

## 2.    "[Portable/Mobile] Device"

| Term(s) | portable device ['605 claim 1, '681 Pat., claim 1]<br><br>mobile device ['605 claim 12, '681 claim 12, 30] |
|---------|-----------------------------------------------------------------|
| USAA    | No additional construction necessary.                           |
| Wells   | A device capable of being moved                                 |

USAA submits that the "portable device" and "mobile device" limitations need no further construction as their meaning is readily understandable to a jury, particularly in light of the other claim

limitations that specify the various components that the "[portable/mobile] device" comprises, such as a "general purpose computer including a processor coupled to a memory" storing software components for controlling camera and other functionality.  *See, e.g.,* '681 Pat., cl. 1.

Wells, by contrast, has proposed an overly broad construction of these terms that would encompass virtually any electronic device, so long as the device is "capable of being moved." Adopting Wells' construction would only invite confusion as to the scope of the claims; for example, a POSITA would clearly not consider large server or mainframe computer systems to be "mobile" or "portable" devices, yet those systems are literally "capable of being moved" (even if, in practice, they are rarely or never moved after their installation).

### 3.     "General Purpose [Computer/Image Capture Device]"

| Term | general purpose computer<br>['332 claim 1, 8, 15; '681 claim 1]<br>general purpose computer<br>['605 claim 1] |
|------|------------------|
| USAA | A general purpose computer excludes "specialized equipment as may be purchased by a business or other commercial enterprise, for example, for the specialized purpose of high-speed, high-volume check deposits." |
| Wells | No construction necessary.<br>Alternatively, the scope of this term should be construed as follows: a [customer-controlled] device that performs general computing functions, such as a laptop or desktop computer. |

Claim 1 of the '605 Patent and claim 1 of the '681 Patent both recite a "portable device comprising a ***general purpose computer*** including a processor coupled to a memory … storing" "camera software" and "a downloaded software component to control the camera software and to handle capturing electronic images … comprising instructions that, when executed by the processor, cause the portable device to perform" various functions.  Claims 1, 8, and 15 of the '332 Patent similarly recite a "customer-controlled ***general purpose computer***."

23

The patent specifications state that "[t]he term 'general purpose computer' **specifically excludes** specialized equipment as may be purchased by a business or other commercial enterprise, for example, for the specialized purpose of high-speed, high-volume check deposits. A particular advantage of embodiments of the invention is its ability to operate in conjunction with electronics that today's consumers actually own or can easily acquire, such as a general purpose computer, a scanner, and a digital camera." *See, e.g.*, '681 at 3:41-49.  A POSITA reading the specification would thus understand that a general purpose computer excludes "specialized equipment as may be purchased by a business or other commercial enterprise, for example, for the specialized purpose of high-speed, high-volume check deposits."

Wells' proposed construction, "a device that performs general computing functions, such as a laptop or desktop computer," is inconsistent with this clear definition of "general purpose computer" in the patent specifications.  Wells' construction would include specialized check scanning computers employed by businesses for the specialized purpose of high-speed, high-volume check deposits, so long as those devices can perform "general computing functions" – even though these systems were expressly excluded from the scope of the invention in the patent specifications.

| Term | general purpose image capture device<br>['227 claim 1, 5, 9] |
|------|--------------------------------------------------------------|
| USAA | "A device capable of capturing an image and with the ability to run applications that are written for and compatible with the device's operating system, excluding specialized equipment as may be purchased by a business or other commercial enterprise, for example, for the specialized purpose of high-speed, high-volume check deposits." |
| Wells | No construction necessary.<br>Alternatively, the scope of this term should be construed as follows: a device that performs general image capture functions, such as a camera or a scanner. |

Claims 1, 5 and 9 of the '227 Patent recite a "general purpose image capture device."  A POSITA would understand that a "general purpose image capture device" as recited in the claims is

capable of capturing an image of a negotiable instrument to be used for deposit.  *See, e.g.,* '227 Pat. cls. 1, 5, 9  ("instructing a depositor to: position said check with respect to said image capture device to produce an initial image including an image of a front side of said check."); *Id.,* 3:65-4:3 ("Customer 110 may use the image capture device 112 to generate an image of a negotiable instrument such as a check, and may send the image, along with any other data as appropriate, via a publicly accessible network 120 to financial institution 130 electronics such as server 131."); '227 Pat., Abstract ("Remote deposit of checks can be facilitated by a financial institution. A customer's general purpose computer and image capture device may be leveraged to capture an image of a check and deliver the image to financial institution electronics. Additional data for the transaction may be collected as necessary. The transaction can be automatically accomplished utilizing the images and data thus acquired.").

The "general purpose" limitation was also addressed during prosecution of the '227 patent. The applicant pointed to the description of general purpose in the specification, which, as discussed above, excludes specialized equipment such as that used for high-speed, high-volume check deposit processing by businesses: "A general purpose computer 111 may be in a desktop or laptop configuration, and generally has the ability to run any number of applications that are written for and compatible with the computer's operating system. The term "general purpose computer" specifically excludes specialized equipment as may be purchased by a business or other commercial enterprise, for example, for the specialized purpose of high-speed, high-volume check deposits. A particular advantage of embodiments of the invention is its ability to operate in conjunction with electronics that today's consumers actually own or can easily acquire, such as a general purpose computer, a scanner, and a digital camera."  15 (227 prosecution history excerpt), 8; '227 Pat., 4:19-34.

Wells' proposed construction, "a device that performs general image capture functions, such as a camera or a scanner," is again overly broad and ignores the express exclusion of specialized, high-volume check scanning machines in the specification and prosecution history.  Wells' construction

would include, for example, high-speed check scanning equipment or ATM deposit machines, all of which it may argue include "a camera or a scanner," in direct conflict with the teachings of the patent.

### C.      "Log File" Limitations

#### 1.      "Log File"

| Term | log file<br>['136 claim 14; '332 claims 1, 4, 6, 8, 11, 13, 15, 18, 20; '681 claims 1, 12]<br>log file<br>['605 claim 1, 12, 23] |
|------|--------------------------------------------------------------------------------------------------------------------------------|
| USAA | "Collection of data related to a check deposit transaction." |
| Wells | No construction necessary. |

Claims of the '136, '332, and '605 Patents each refer to a "log file" used to collect data related to a remote check deposit transaction.  For example, claim 14 of the '136 Patent recites "a plurality of processors … configured to execute instructions to … generate a *log file*, the *log file* comprising at least a portion of the deposit information for the check." '136 Pat. cl. 14.  Claim 1 of the '681 recites "a plurality of processors" that execute instructions to "cause the system to perform one or more additional operations including generating a *log file* for the deposit, the *log file* including a bi-tonal image of the check," and Claim 12 of the '681 Patent recites the system executing instructions "to generate a *log file* for the mobile check deposit, the *log file* including an image of the check submitted for mobile check deposit." '681 Pat. cls. 1, 12.  And all of the independent claims of the '332 Patent recite generating a "log file" that includes "said second image, an identification of said customer-controlled general purpose computer, and an identification of an image capture device that was used to capture said first image." '332 Pat. cls. 1, 8, 15.

A POSITA would understand the "log file" is a collection of data related to a check deposit transaction. *See, e.g.* '681 Pat., 2:46-49 ("A log file may be generated comprising one or more of said first image and said second image, in addition to a variety of other potentially useful information for

processing and/or troubleshooting the deposit transaction."); *Id.,* 8:40-44 ("A log file may be generated 209 to collect data for processing or troubleshooting the deposit transaction. The log file is discussed further in connection with FIGS. 4 and 5. The log file may be placed in the storage location along with the various images of the check."); *Id.,* 10:45-55 ("The server may further receive and modify a deposit transaction log file 310. Alternative versions of the images received may be generated an [sic] placed in the log file. Check 21 regulations require a bi-tonal TIFF formatted image, which is generally a low-quality image format as compared to other available image formats. Therefore, it is desirable in some embodiments to retain both a 'good' image in an initial format, e.g., in a JPEG format, as well as the modified bi-tonal TIFF required by Check 21. This way, if any troubleshooting is necessary, a good image of the check remains available.").

| Term | said log file comprising said second image, an identification of said customer-controlled general purpose computer, and an identification of an image capture device that was used to capture said first image<br><br>['332 claim 1, 8, 15] |
|------|------|
| USAA | "an identification of said customer-controlled general purpose computer" means "information related to the customer-controlled general purpose computer used to generate the image(s) of the check."<br><br>"an identification of an image capture device" means "information related to the image capture device used to generate the image(s) of the check." |
| Wells | The log file includes the second image, identifies the specific customer-controlled general purpose computer [from which the first image was received], and identifies the specific image capture device used to capture the first image. |

Claims 1, 8, and 15 of the '332 Patent recite further limitations regarding the "log file," in particular, "said log file comprising said second image, an identification of said customer-controlled general purpose computer, and an identification of an image capture device that was used to capture said first image." '332 Pat. cls. 1, 8, 15 (emphasis added). The parties disagree about the meaning of "an identification of said customer-controlled general purpose computer" and "an identification of an image capture device" that comprise the log file.

The specification explains that these "identifications" stored in the log file may comprise a variety of information relating to the "customer-controlled general purpose computer" and the "image capture device" that were used to generate the check images during the check capture process, consistent with USAA's proposed construction.  For example, it may include information regarding the make and model of the image capture device, or "other identification information," or may include information regarding the driver software, such as "TWAIN drivers" used with the capturing system. *See, e.g.* '681 at 12:52-61 ("In general, a log file can advantageously comprise an identification of an image capture device used to generate an image of a check, for example a scanner make and model, digital camera make and model, or other identification information such as an image capture device Global Unique Identifier (GUID). This identification information may also include an identification of software associated with the device, for example the familiar TWAIN drivers that can be used with scanners, digital cameras, and other image capture devices.").

Wells' proposed construction rewrites the claim limitation to require the "log file" itself to "identif[y] the specific customer-controlled general purpose computer [from which the first image was received]" and "identif[y] the specific image capture device used to capture the first image."  This construction is inconsistent with the claims and the description of the log file in the specification.

First, the claims recite that the "log file" "comprises" certain information, such as an image, and "an identification" of a general purpose computer and image capture device.  *See* '332 Pat., cls. 1, 8, 15.  The claims do not recite that the "log file" "identifies" a computer or image capture device, much less the "specific" devices recited in Wells' proposed construction.  As discussed above, the "log file" is simply a collection of data related to a check deposit transaction; thus, a POSITA would understand that it comprises data related to, among other things, the general purpose computer and image capture device used to capture the check images for that particular deposit transaction.

Second, nothing in the specification suggests that the log file "identifies **the specific** customer-controlled general purpose computer [from which the first image was received]," or "identifies **the specific** image capture device used to capture the first image."  To the contrary, the specification explains that the "identification of" an image capture device that was used to capture said first image can include information such as the make and model of the device, which a POSITA would understand is not necessarily unique to the particular device that captured the image.  *See, e.g.* '681 Pat., 12:52-61 ("In general, a log file can advantageously comprise an identification of an image capture device used to generate an image of a check, for example a scanner make and model, digital camera make and model, or other identification information such as an image capture device Global Unique Identifier (GUID). This identification information may also include an identification of software associated with the device, for example the familiar TWAIN drivers that can be used with scanners, digital cameras, and other image capture devices.").  A POSITA would not understand the claims to **require** the use of a unique identifier, which the specification describes as an alternative example of "other identification information" that may be used.  *See id.*

### D.     "Identify Selected Points . . ."

| Term | said instructions instructing a depositor to: … identify selected points of said initial image to enable cropping of said initial image beyond a boundary of the front side of said check [\'227 claim 1, 5, 9] |
|---|---|
| USAA | No construction necessary |
| Wells | Instructions to the depositor to identify points on the captured image to indicate where the image should be cropped. |

Claim 1 of the '227 Patent, recites "a processor" "provide[s] a remote deposit processing component to a depositor owned device" and "provide[s] instructions to the remote deposit processing component, **said instructions instructing a depositor to: … identify selected points**

*of said initial image to enable cropping of said initial image beyond a boundary of the front side of said check*." '227 Pat. cl. 1 (emphasis added).

Wells' proposed construction attempts to add a new limitation – that the identified "selected points" must "indicate where the image should be cropped." But the claims simply say that the identification of points "enable[s] cropping," not that cropping must occur precisely at that point. Wells' expert admitted cropping is simply "removing some portion of the image." Ex. 14, 84:11-17. For example, in a preferred embodiment the POSITA only identifies one point on the check image, not "points" as in Wells' construction.  From this one point, information is then extrapolated and it is this extrapolation that controls the actual cropping.  '227 Pat., 14:44-51 ("For example, an image as scanned may be presented to the customer, and the customer may be asked to select a bottom right corner of the check in the image. Assuming the top left corner of the check is also in the top left corner of the image, the customer selection of the bottom right corner of the check can be used to crop out any and all of the image that goes beyond the boundaries of the check.").  Ex. 6 (Calman Decl.) ¶¶ 176-177.

Dated:  May 17, 2019

Respectfully submitted,

**PARKER, BUNT & AINSWORTH, P.C.**

*/s/ Robert Christopher Bunt*
Robert Christopher Bunt  (TX #00787165)
Charles Ainsworth (TX #00783521)
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
Tel. (903) 531-3535
Fax (903) 533-9687
charley@pbatyler.com
rcbunt@pbatyler.com

**IRELL & MANELLA LLP**

Jason Sheasby (CA #205455), *pro hac vice*
Anthony Rowles (CA #301209), *pro hac vice*
1800 Avenue of the Stars, Suite 900

Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199
jsheasby@irell.com
trowles@irell.com

**Attorneys for Plaintiff United Services**
**Automobile Association (USAA)**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 17, 2019, a true and correct copy of the foregoing was

served to all counsel of record via CM/ECF.

<u>*/s/ Robert Christopher Bunt*</u>
Robert Christopher Bunt