01:34:22

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION

3   UNITED SERVICES AUTOMOBILE    )(
    ASSOCIATION
4                                 )(    CIVIL ACTION NO.

5   VS.                           )(    2:18-CV-366-JRG

6                                 )(    MARSHALL, TEXAS
                                        JANUARY 6, 2020
7   WELLS FARGO BANK, N.A.        )(    1:45 P.M.

8

9                  TRANSCRIPT OF JURY TRIAL

10                   AFTERNOON SESSION

11      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12              UNITED STATES DISTRICT JUDGE

13
    APPEARANCES:
14

15   FOR THE PLAINTIFF:

16
    JASON SHEASBY
17   ANTHONY ROWLES
    LISA GLASSER
18   IRELL & MANELLA
    1800 Avenue of the Stars
19   Suite 900
    Los Angeles, CA 90067-4276
20

21
    ROBERT CHRISTOPHER BUNT
22   PARKER, BUNT & AINSWORTH, PC
    100 East Ferguson
23   Suite 418
    Tyler, TX 75702
24

25

```
 1   FOR THE DEFENDANT:

 2

     THOMAS M. MELSHEIMER
 3   M. BRETT JOHNSON
     MICHAEL A. BITTNER
 4   J. TRAVIS UNDERWOOD
     WINSTON & STRAWN LLP
 5   2121 North Pearl Street
     Suite 900
 6   Dallas, TX 75201

 7

     E. DANIELLE T. WILLIAMS
 8   WINSTON & STRAWN LLP
     300 South Tyron Street
 9   16th Floor
     Charlotte, NC 28202
10

11   MATTHEW R. MCCULLOUGH
     WINSTON & STRAWN LLP
12   275 Middlefield Road
     Suite 205
13   Menlo Park, CA 94025

14

     JACK WESLEY HILL
15   WARD, SMITH & HILL, PLLC
     P.O. Box 1231
16   1507 Bill Owens Parkway
     Longview, TX 75606
17

18

     COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                        Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas  75670
22                        (903) 923-7464

23

     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

<pre>
01:45:19   1              P R O C E E D I N G S
01:45:19   2         (Jury out.)
01:45:20   3         COURT SECURITY OFFICER:  All rise.
01:45:21   4         THE COURT:  Be seated, please.
01:45:23   5         Counsel, where are we on -- with regard to the
01:45:33   6   stipulation that was being worked out over the lunch break?
01:45:35   7         MS. GLASSER:  We're happy to announce, we've
01:45:40   8   reached an agreement.
01:45:40   9         THE COURT:  All right.  Why don't you go to the
01:45:40  10   podium and read the stipulation into the record.
01:45:42  11         MS. GLASSER:  Our understanding is that we would
01:45:43  12   read it before the jury.
01:45:50  13         MR. BITTNER:  Our understanding is we're going to
01:45:50  14   read it in the record and you put it in the charge.
01:45:53  15         THE COURT:  My understanding was we'll read it
01:45:55  16   into the record and that would inform both demonstrative
01:45:57  17   slides that we talked about in chambers and other matters
01:45:58  18   going forward.
01:45:59  19         All right.
01:45:59  20         MS. GLASSER:  Well, we --
01:46:02  21         THE COURT:  Read it into the record, please,
01:46:06  22   counsel, slowly.
01:46:07  23         MS. GLASSER:  It is an established fact that the
01:46:10  24   system accused of infringement satisfies the following
01:46:13  25   limitations of the claims:
</pre>

01:46:15  1          '605 patent, Claim 1, an image capture and

01:46:21  2  processing system for use with a digital camera, the image

01:46:25  3  capture and processing system comprising a portable device

01:46:28  4  comprising a general purpose computer including a processor

01:46:32  5  coupled to a memory, the memory storing.

01:46:36  6          '605 patent, Claim 12, a system for allowing a

01:46:40  7  customer to deposit a check using a customer's own handheld

01:46:45  8  mobile device with a digital camera, the system configured

01:46:48  9  to authenticate the customer, the system including.  All

01:46:54  10  other instances in Claim 1 and Claim 12 of the '605 patent

01:46:58  11  of the term "mobile device" or "portable device."

01:47:02  12          '681 patent, Claim 12, a system for allowing a

01:47:06  13  customer to deposit a check using the customer's own mobile

01:47:10  14  device with a digital camera, the system configured to ask

01:47:14  15  the customer to log in using a user name and password, the

01:47:18  16  system including.

01:47:21  17          '681 patent, Claim 30, a non-transitory

01:47:25  18  computer-readable medium storing an app that when

01:47:28  19  downloaded and run by a customer's mobile device causes the

01:47:32  20  customer's mobile device to perform.  All other instances

01:47:38  21  in Claims 12, 20, and 30 of the '681 patent of the term

01:47:43  22  "mobile device."

01:47:47  23          THE COURT:  Does that complete the stipulation as

01:47:49  24  understood by the Plaintiff?

01:47:50  25          MS. GLASSER:  It does, Your Honor.

01:47:51   1            THE COURT:  Can Defendant confirm on the record

01:47:52   2   that that is their stipulation, as well?

01:47:55   3            MR. BITTNER:  Yes, Your Honor.

01:47:56   4            THE COURT:  All right.  Such stipulation is

01:47:59   5   accepted by the Court.

01:48:00   6            All right.  At this point I'm prepared to bring in

01:48:27   7   the jury and give them my preliminary instructions, to

01:48:30   8   proceed with opening statements thereafter.

01:48:34   9            Mr. Sheasby, I understand you're going to present

01:48:40  10   the opening statement for Plaintiff.

01:48:41  11            MR. SHEASBY:  Yes, Your Honor.

01:48:42  12            THE COURT:  And what warning would you like on

01:48:44  13   your time?

01:48:44  14            MR. SHEASBY:  15 and 5, Your Honor.

01:48:46  15            THE COURT:  When you've used 15 minutes and when

01:48:47  16   you have 5 minutes remaining?

01:48:51  17            MR. SHEASBY:  Yes, Your Honor.

01:48:51  18            THE COURT:  And, Ms. Williams, I understand you'll

01:48:54  19   present Defendant's opening?

01:48:55  20            MS. WILLIAMS:  Yes, Your Honor.

01:48:56  21            THE COURT:  What is your request for a warning?

01:48:59  22            MS. WILLIAMS:  Five-minute warning when I have

01:49:03  23   five minutes left, Your Honor.

01:49:04  24            THE COURT:  All right.

01:49:04  25

01:49:04  1          MS. WILLIAMS:  Thank you.

01:49:04  2          MR. MELSHEIMER:  Your Honor, for purposes of the

01:49:07  3  opening statement, would I be permitted to move my seat

01:49:10  4  over here?

01:49:11  5          THE COURT:  Over where?

01:49:12  6          MR. MELSHEIMER:  Right next to Mr. Johnson, Your

01:49:15  7  Honor.

01:49:15  8          THE COURT:  There is no need to ask permission to

01:49:18  9  move chair to chair at the counsel table.

01:49:18  10          MR. MELSHEIMER:  We had filled out a form -- a

01:49:21  11  chart.  I just wanted to make sure.

01:49:22  12          THE COURT:  That's fine.

01:49:23  13          MR. MELSHEIMER:  Thank you, Your Honor.

01:49:24  14          THE COURT:  That's fine, Mr. Melsheimer.

01:49:25  15          I would say that unless you've appeared in the

01:49:27  16  case as counsel, you need to be on the other side of the

01:49:29  17  bar.

01:49:30  18          MR. MELSHEIMER:  Yes, Your Honor.

01:49:31  19          THE COURT:  I'm not talking about you.

01:49:33  20          MR. MELSHEIMER:  Okay.  Your Honor, if it's that

01:49:37  21  easy to get out of this, I'm gone.

01:49:39  22          THE COURT:  There are a lot of other lawyers in

01:49:41  23  the room.  I'm just saying unless you've appeared in the

01:49:44  24  case, you need to be on the other side of the bar.

01:49:46  25          MR. MELSHEIMER:  Yes, Your Honor.

01:49:46   1           THE COURT:  At some risk, I'll ask if there's

01:49:49   2   anything else I need to hear before I bring in the jury.

01:49:51   3           MR. SHEASBY:  Nothing from Plaintiffs, Your Honor.

01:49:55   4           THE COURT:  All right.

01:49:55   5           MS. WILLIAMS:  Nothing from Defendants, Your

01:49:57   6   Honor.

01:49:57   7           THE COURT:  Let's bring in the jury, please,

01:50:02   8   Mr. Johnston.

01:50:46   9           COURT SECURITY OFFICER:  All rise.

01:50:47   10          (Jury in.)

01:50:47   11          THE COURT:  Welcome back from lunch, ladies and

01:50:50   12  gentlemen.

01:50:50   13          I have some preliminary instructions that I need

01:50:51   14  to give you at this time before we start with opening

01:50:52   15  statements from the parties through their counsel and then

01:50:55   16  get on to the evidence.

01:50:58   17          You've been sworn as the jurors in this case, and

01:51:01   18  as the jury, you are the sole judges of the facts, and as

01:51:05   19  such, you will determine what the facts are in this case.

01:51:09   20  And as the Judge, I will give you instructions on the law,

01:51:12   21  decide questions of law that arise during the trial, handle

01:51:17   22  matters pertaining to evidence and procedure, and I'm also

01:51:20   23  responsible for maintaining the flow of the trial, and

01:51:23   24  maintaining the decorum of the courtroom.

01:51:25   25          At the end of the evidence, I'll give you detailed

01:51:29   1   instructions about the law that you are to apply in

01:51:31   2   deciding this case, and I'll give you a list of questions

01:51:36   3   that you are then to answer.  This list of questions is

01:51:40   4   called the verdict form.

01:51:41   5        Your answers to those questions must be unanimous,

01:51:47   6   and your unanimous answers to those questions will

01:51:50   7   constitute the jury's verdict in this case.

01:51:56   8        I now want to briefly tell you what this case is

01:51:59   9   about.  This case involves a dispute regarding certain

01:52:02  10   United States patents.  Now, I know that you've all seen

01:52:05  11   the patent video this morning produced by the Federal

01:52:08  12   Judicial Center, but I want to give you some instructions

01:52:11  13   here and on the record about a patent and how one is

01:52:13  14   obtained.

01:52:13  15        Patents are granted or denied by the United States

01:52:16  16   Patent and Trademark Office, often, for short, simply

01:52:21  17   called the PTO.

01:52:22  18        A valid United States patent gives the

01:52:27  19   patentholder the right for up to 20 years from the date the

01:52:34  20   application is filed to prevent others from making, using,

01:52:34  21   offering to sell, or selling the patented invention in the

01:52:38  22   United States or from importing it into the United States

01:52:42  23   without the patentholder's permission.

01:52:44  24        A patent is a form of property called intellectual

01:52:49  25   property.  And like other forms of property, a patent can

01:52:51  1  be bought or sold.

01:52:53  2          A violation of the patentholder's rights is called

01:52:58  3  infringement.  A patentholder may try to enforce a patent

01:53:01  4  against persons it believes to be infringers by filing a

01:53:05  5  lawsuit in federal court, and that's what we have in this

01:53:08  6  case.

01:53:08  7          The process of obtaining a patent from the PTO is

01:53:12  8  called patent prosecution.  To obtain a patent, you must

01:53:16  9  first file an application with the PTO.  The PTO, as I've

01:53:21  10  said, is an agency of the United States Government, and it

01:53:25  11  employs trained examiners who review applications for

01:53:28  12  patents.

01:53:29  13          The application includes within it what's called a

01:53:34  14  specification.  The specification contains a written

01:53:38  15  description of the claimed invention telling what it is,

01:53:42  16  how it works, how to make it, and how to use it.

01:53:45  17          The specification ends, or concludes, with one or

01:53:50  18  more numbered sentences.  These numbered sentences that

01:53:53  19  follow the specification are called the patent claims.

01:53:58  20  When a patent is granted by the PTO, it's the claims that

01:54:02  21  define the boundaries of its protection and give notice to

01:54:06  22  the public of those boundaries.

01:54:08  23          Patent claims may exist in two forms referred to

01:54:13  24  as independent claims and dependent claims.

01:54:17  25          An independent claim does not refer to any other

01:54:20   1   claim in the patent.  It's independent.  It stands alone.

01:54:24   2   It's not necessary to look at any other claim to determine

01:54:27   3   what an independent claim covers.

01:54:29   4        On the other hand, a dependent claim refers to at

01:54:34   5   least one other claim in the patent.  A dependent claim

01:54:42   6   includes each of the limitations or elements of that other

01:54:44   7   claim or claims to which it refers, or as we sometimes say,

01:54:49   8   from which it depends, as well as the additional

01:54:51   9   limitations or elements recited within the dependent claim

01:54:56  10   itself.

01:54:56  11        Therefore, to determine what a dependent claim

01:55:00  12   covers, it's necessary to look at both the dependent claim

01:55:07  13   itself and any other independent claim or claims from which

01:55:11  14   it refers or from which it depends.

01:55:12  15        The claims of the patents-in-suit use the word

01:55:15  16   comprising.  Comprising means including or containing.  A

01:55:19  17   claim that includes the word comprising is not limited to

01:55:24  18   the methods or devices having only the elements that are

01:55:28  19   recited in the claim but also covers methods or devices

01:55:32  20   that add additional elements.

01:55:35  21        Take, for example, a claim that covers a table.

01:55:39  22   If a claim recites a table comprising a tabletop, legs and

01:55:45  23   nails, the claim will cover any table that contains these

01:55:50  24   structures, even if the claim -- excuse me, even if the

01:55:53  25   table also contains other structures such as leaves to go

01:55:58   1    in the tabletop or wheels to go on the ends of the legs.

01:56:01   2           Now, that's a very simple example using the word

01:56:04   3    comprising and what it means.  In other words, it can have

01:56:08   4    features in addition to those that are covered by the

01:56:10   5    patent.

01:56:10   6           Now, after an applicant files their application

01:56:14   7    with the PTO, an examiner is assigned, and that examiner

01:56:18   8    reviews the application to -- to determine whether or not

01:56:21   9    the claims are patentable, that is to say, appropriate for

01:56:26   10   patent protection, and whether or not the specification

01:56:30   11   adequately describes the invention claimed.

01:56:34   12          In examining the patent application, the examiner

01:56:37   13   reviews certain information about the state of the

01:56:42   14   technology that existed at the time the application was

01:56:45   15   filed.  The PTO searches for and reviews this type of

01:56:49   16   information that's publicly available or that is submitted

01:56:54   17   by the applicant.  This type of information is called prior

01:56:57   18   art.

01:56:57   19          The examiner reviews this prior art to determine

01:57:03   20   whether or not the invention is truly an advance over the

01:57:06   21   state of the art at the time.

01:57:10   22          Prior art is defined by law, and at a later time,

01:57:12   23   I'll give you specific instructions about what constitutes

01:57:16   24   prior art.  However, in general, ladies and gentlemen,

01:57:20   25   prior art includes information that demonstrates the state

01:57:22    1    of the technology that existed before the claimed invention

01:57:26    2    was made or before the application for a patent was filed.

01:57:30    3         A patent contains a list of certain prior art that

01:57:35    4    the examiner has considered.  The items on this list are

01:57:38    5    called the cited references.

01:57:41    6         Now, after the prior art search and examination of

01:57:46    7    the application, the examiner informs the applicant in

01:57:49    8    writing of what the examiner has found and whether the

01:57:53    9    examiner considers any claim to be patentable and thus

01:57:57   10    would be allowed.

01:57:58   11         Now, this writing from the examiner to the

01:58:00   12    applicant is called an Office Action.  If the examiner

01:58:04   13    rejects the claims, the applicant has an opportunity to

01:58:07   14    respond to the examiner to try and persuade the examiner to

01:58:10   15    allow the claims.  The applicant also has a chance to

01:58:14   16    change or amend the claims or to submit new claims.

01:58:18   17         Now, these papers generated during these

01:58:21   18    communications back and forth between the examiner and the

01:58:24   19    applicant is called the prosecution history.

01:58:28   20         Also, throughout this trial, you're going to hear

01:58:30   21    me say ladies and gentlemen because that's the way I'm

01:58:34   22    trained to say it.  I know we have one gentleman on the

01:58:37   23    jury and seven ladies, but if I use the plural, gentlemen,

01:58:42   24    instead of gentleman, please forgive me.  It will just be

01:58:45   25    simpler if I do it that way.

01:58:47  1        Now, this process can go back and forth between

01:58:49  2  the applicant and the examiner for some time until the

01:58:52  3  examiner is satisfied that the application meets the

01:58:55  4  requirements for a patent, and in that case, the

01:58:58  5  application issues as a United States patent, or in the

01:59:03  6  alternative, if the examiner ultimately concludes that the

01:59:05  7  application should be rejected in which case no patent is

01:59:09  8  issued.

01:59:10  9        Sometimes patents are issued after appeals within

01:59:10  10  the PTO to a Court.

01:59:17  11        Now, the fact that the PTO grants a patent does

01:59:19  12  not necessarily mean that any invention claimed in the

01:59:22  13  patent, in fact, deserves the protection of a patent.

01:59:25  14        While an issued United States patent is presumed

01:59:28  15  to be valid under the law, a person accused of infringement

01:59:33  16  has the right to argue here in federal court that a claimed

01:59:36  17  invention in a patent is invalid.

01:59:39  18        It's your job, ladies and gentlemen, as the jury,

01:59:42  19  to consider the evidence presented by the parties and to

01:59:45  20  determine independently and for yourselves whether or not

01:59:48  21  the Defendant has proven that the patents of the Plaintiff

01:59:52  22  are invalid.

01:59:53  23        Now, to help you follow the evidence, I'll give

01:59:56  24  you a brief summary of the positions of the parties.

01:59:59  25        As you all know, the person that brings a lawsuit

| | | |
|---|---|---|
| 02:00:05 | 1 | is called the Plaintiff.  The Plaintiff and the patent |
| 02:00:07 | 2 | owner in this case is United Services Automobile |
| 02:00:11 | 3 | Association, which you will hear routinely referred to |
| 02:00:14 | 4 | throughout the trial as USAA, or simply as the Plaintiff. |
| 02:00:20 | 5 | And as you all know, the person against whom a |
| 02:00:23 | 6 | lawsuit is brought is called the Defendant.  And in this |
| 02:00:26 | 7 | case, the Defendant is Wells Fargo Bank, NA, which you will |
| 02:00:31 | 8 | hear the parties refer to and the Court refer to simply as |
| 02:00:35 | 9 | Wells Fargo -- Wells Fargo or the Defendant. |
| 02:00:40 | 10 | Now, as I told you during jury selection, this is |
| 02:00:43 | 11 | a case of alleged patent infringement.  And as I may have |
| 02:00:45 | 12 | already mentioned, there are two patents at issue in this |
| 02:00:47 | 13 | case. |
| 02:00:51 | 14 | The first is United States Patent No. 10,013,605. |
| 02:00:56 | 15 | Now, patents are commonly referred to by their |
| 02:00:59 | 16 | last three digits, so I'll refer to this patent as the '605 |
| 02:01:03 | 17 | patent. |
| 02:01:03 | 18 | And the second patent at issue in this case is |
| 02:01:06 | 19 | United States Patent No. 10,013,681, which you'll hear |
| 02:01:14 | 20 | referred to throughout the trial again by its last three |
| 02:01:16 | 21 | digits as the '681 or the '681 patent. |
| 02:01:18 | 22 | These patents may refer to at various times |
| 02:01:23 | 23 | together as the patents-in-suit or as the asserted patents. |
| 02:01:28 | 24 | Those phrases mean these two patents, the '605 and the |
| 02:01:33 | 25 | '681. |

02:01:33  1          These patents generally relate to systems and

02:01:37  2  methods for mobile check depositing.  And you're going to

02:01:40  3  have a complete copy of each of these asserted patents, the

02:01:46  4  '605 and the '681, in your juror notebooks, and those

02:01:51  5  notebooks will be passed out to you in a few minutes.

02:01:54  6          Now, in the United States, a patentee is allowed

02:01:57  7  to file a later patent application with the PTO based on

02:02:01  8  the same specification as an earlier application but with

02:02:04  9  different claims.  When that happens, the original patent

02:02:09 10  application is sometimes called the parent application, and

02:02:13 11  the later applications are sometimes called the children

02:02:18 12  applications.

02:02:18 13          These applications and the patents that issue from

02:02:21 14  them are said to be in the same patent family.

02:02:25 15          Now, the '605 patent and the '681 patent are not

02:02:30 16  part of the same patent family.  They have similar patent

02:02:34 17  numbers because they were issued by the PTO around the same

02:02:38 18  time and not necessarily because they're related.

02:02:40 19          However, you're likely -- you'll likely hear

02:02:45 20  references throughout the trial to other members of the

02:02:48 21  '605 and the '681 patent families.

02:02:51 22          While patent -- while family members of the '605

02:02:54 23  and family members of the '681 patents may be relevant to

02:03:03 24  certain issues in this case, as I'll explain in more

02:03:05 25  details later, the ultimate issues of infringement,

02:03:08   1   invalidity, and damages must be determined for each

02:03:11   2   patent-in-suit individually and independent of its patent

02:03:16   3   family members.

02:03:16   4            The Plaintiff in this case, USAA, alleges that the

02:03:21   5   Defendant, Wells Fargo, is infringing claims -- pardon me

02:03:41   6   just a minute, ladies and gentlemen.  I want to give you

02:03:55   7   the specific claim numbers that are alleged to infringe.

02:04:00   8   There have been some recent changes in those asserted

02:04:03   9   claims, and I want to make sure I give you the right

02:04:05  10   numbers.  Let me verify that, please.

02:04:27  11            For the '605 patent, the actual asserted claims

02:04:31  12   that will be before you in this case are Claims 1, 3, 11

02:04:35  13   through 14, and 22.

02:04:37  14            For the '681 patent, the asserted claims that will

02:04:42  15   be before you in this case are Claims 12 through 14, 20,

02:04:47  16   22, and 30.

02:04:48  17            Thank you.

02:04:52  18            Now, you're going to hear these particular claims

02:04:56  19   referred to throughout the trial as the asserted claims.

02:05:00  20   You'll sometimes hear them as the claims in suit.

02:05:03  21            Now, USA -- USAA contends that Wells Fargo is

02:05:09  22   infringing these asserted claims by manufacturing, selling,

02:05:13  23   offering to sell, or importing into the United States Wells

02:05:21  24   Fargo's Mobile Deposit system, which you'll hear referred

02:05:26  25   to as the accused product.  USAA contends that this

02:05:31  1  infringement was willful, and USAA contends that it's

02:05:33  2  entitled to money damages as a result of this infringement.

02:05:36  3      Now, the Defendant, Wells Fargo, denies that it is

02:05:40  4  infringing any of the asserted claims and contends that the

02:05:44  5  asserted claims are invalid as being anticipated or obvious

02:05:49  6  in light of the prior art.

02:05:50  7      Wells Fargo also contends that the asserted claims

02:05:58  8  are invalid because the patent's specification does not

02:06:02  9  contain a sufficient written description of the invention.

02:06:04  10      And, finally, Wells Fargo contends that even if it

02:06:09  11  does infringe the asserted claims and those claims are

02:06:12  12  valid, any damages awarded to USAA should be limited.

02:06:21  13      Now, I know that there are many new words and

02:06:24  14  concepts that have been thrown at you, ladies and

02:06:26  15  gentlemen, as a part of these instructions and what you've

02:06:28  16  heard since you appeared for jury duty this morning.

02:06:30  17      I'm going to define a lot of these words and

02:06:34  18  concepts for you as we go through these instructions.  The

02:06:37  19  attorneys for both sides are going to discuss them in their

02:06:40  20  opening statements, and the witnesses are going to help you

02:06:43  21  through their testimony to understand these words and

02:06:46  22  concepts.

02:06:46  23      So, please, do not feel overwhelmed at this stage.

02:06:50  24  I promise you, it will all come together as we go through

02:06:53  25  the trial.

02:06:54  1            Now, one of your jobs in this case is to decide
02:06:58  2   whether or not the asserted claims have been infringed and
02:07:00  3   whether the claims are invalid.
02:07:02  4            If you decide that any of the asserted claims have
02:07:06  5   been infringed by the Defendant and are not invalid, then
02:07:10  6   you'll need to decide what amount of money damages should
02:07:13  7   be awarded to the Plaintiff as compensation for that
02:07:17  8   infringement.
02:07:18  9            Now, as I've said, my job is to tell you what the
02:07:22 10   law is, handle rulings on evidence and procedure, and to
02:07:25 11   oversee the conduct of the trial efficiently and to
02:07:29 12   maintain the decorum of the courtroom.
02:07:31 13            In determining the law, it's specifically my job
02:07:34 14   to determine the meaning of any claim language from within
02:07:38 15   the asserted patents that needs interpretation.
02:07:41 16            I've already determined the meanings of the claims
02:07:44 17   of the patents-in-suit, and you must accept the meanings or
02:07:48 18   interpretations that I give you and use those meanings when
02:07:52 19   you decide whether the asserted claims have or have not
02:07:56 20   been infringed.
02:07:58 21            And you're going to be given a document in a few
02:08:01 22   moments that reflects these meanings or constructions that
02:08:03 23   the Court has already reached, and that will be a part of
02:08:06 24   your juror notebooks that you'll receive shortly.
02:08:09 25            Now, for any term claim -- any language in the

02:08:12  1   claims for which I have not provided you with a definition,

02:08:16  2   then you should apply the plain and ordinary meaning of

02:08:19  3   that language.

02:08:20  4        If I have provided you with a definition, however,

02:08:24  5   you must apply the definition to those terms throughout the

02:08:27  6   case that I've given you.

02:08:29  7        However, my interpretation on the language of the

02:08:33  8   claims should not be taken by you as any indication that I

02:08:37  9   have a personal opinion or any opinion at all regarding the

02:08:40  10  issues such as infringement and invalidity.  Those issues

02:08:44  11  are yours and yours alone to decide, ladies and gentlemen.

02:08:47  12       Now, I'm going to provide you with more detailed

02:08:52  13  instructions on the meanings of the claims before you

02:08:54  14  retire to deliberate on your verdict.

02:08:57  15       In deciding the issues that are before you, you'll

02:09:00  16  be asked to consider specific legal rules, and I'll give

02:09:03  17  you an overview of those rules now.  And then at the

02:09:06  18  conclusion of the case, I'll give you more detailed

02:09:08  19  instructions.

02:09:09  20       The first issue that you will be asked to decide

02:09:12  21  is whether Wells Fargo has infringed the asserted claims.

02:09:18  22  And USAA, the Plaintiff, must show by a preponderance of

02:09:22  23  the evidence that the asserted claims have been infringed.

02:09:25  24       Now, there are a few different ways that a patent

02:09:28  25  can be infringed.  I'll explain the requirements for each

02:09:31  1  of these types of infringement to you in detail at the

02:09:35  2  conclusion of the case but, in general, a Defendant may

02:09:39  3  infringe an asserted patent by making, using, selling, or

02:09:42  4  offering for sale in the United States or importing into

02:09:46  5  the United States a product meeting all the requirements of

02:09:50  6  a claim of the asserted patent or a product that practices

02:09:55  7  a method or process covered by the asserted patent.

02:09:59  8       And I'll provide you with more detailed

02:10:00  9  instructions on the requirements for infringement at the

02:10:03  10  conclusion of the case.

02:10:04  11       Now, the second issue that you are going to be

02:10:08  12  asked to decide is whether the asserted claims are invalid.

02:10:11  13       Invalidity, ladies and gentlemen, is a defense to

02:10:16  14  infringement.  Therefore, even the PT -- even though the

02:10:19  15  PTO has allowed certain claims and even though an issued

02:10:23  16  patent is presumed to be valid, you, the jury, must decide

02:10:30  17  whether that claim is invalid after hearing the evidence

02:10:31  18  presented during the trial.

02:10:32  19       You may find a patent claim to be invalid for a

02:10:36  20  number of reasons, including because -- because it claims

02:10:40  21  subject matter that is not new.

02:10:43  22       For a patent to be invalid because it is not new,

02:10:47  23  the Defendant must show by clear and convincing evidence

02:10:51  24  that all of the elements of a claim are sufficiently

02:10:56  25  described in a single, previous printed publication or

02:10:59  1  patent.  We call these items prior art.

02:11:02  2       If a claim is not new, it is said to be

02:11:06  3  anticipated by that prior art.  You'll need to consider a

02:11:10  4  number of questions in deciding whether the invention

02:11:13  5  claimed in the asserted patents is anticipated.  And I'll

02:11:18  6  provide you with more detailed instructions on these

02:11:21  7  questions at the conclusion of the trial.

02:11:23  8       Now, another way that a claim can be found to be

02:11:28  9  invalid is that it may have been obvious.  Even though a

02:11:32  10  claim is not anticipated because every element of the claim

02:11:35  11  is not shown or sufficiently described in a single piece of

02:11:39  12  prior art, the claim may still be invalid if it would have

02:11:44  13  been obvious to a person of ordinary skill in the field of

02:11:47  14  the technology of the patent at the relevant time.

02:11:50  15       You'll need to consider a number of questions in

02:11:54  16  deciding whether the invention claimed in the asserted

02:11:58  17  patents is obvious, and I'll provide you with more detailed

02:12:00  18  instructions on these questions at the conclusion of the

02:12:03  19  trial.

02:12:03  20       One question you will need to consider in

02:12:07  21  determining whether a patent is anticipated or obvious in

02:12:11  22  light of the prior art is what references qualify as prior

02:12:16  23  art.

02:12:16  24       A reference is prior art if it predates the

02:12:22  25  priority date of the asserted patent.  In this case,

02:12:25  1   however, the parties disagree about the priority date of

02:12:30  2   the patents-in-suit.

02:12:31  3        The Plaintiff, USAA, contends that the

02:12:33  4   patents-in-suit are entitled to a priority date of October

02:12:37  5   the 31st, 2006, because the inventions claimed by the

02:12:42  6   patents were conceived and diligently reduced to practice

02:12:46  7   by that date.

02:12:46  8        Wells Fargo, the Defendant, on the other hand,

02:12:50  9   denies this and contends that the patents-in-suit are only

02:12:54  10  entitled to a priority date of July the 28th, 2017, which

02:12:59  11  is the date that the patents were filed in this suit -- I'm

02:13:05  12  sorry, the patents in this suit were filed when the

02:13:08  13  applications were filed with the PTO.

02:13:09  14       It will be up to you to decide and determine the

02:13:14  15  priority date for each patent-in-suit and thus what

02:13:19  16  references qualify or don't qualify as prior art as to each

02:13:23  17  of these two patents.  And I'll provide you with more

02:13:27  18  detailed instructions on these questions at the conclusion

02:13:30  19  of the trial.

02:13:31  20       Now, another way that a claim can be found to be

02:13:34  21  invalid is that there may be a lack of a written

02:13:39  22  description.  A patent may be invalid if its specification

02:13:43  23  does not describe the claimed invention in sufficient

02:13:47  24  detail so that one skilled in the art can reasonably

02:13:50  25  conclude that the inventor actually had possession of the

02:13:53  1  invention that they're claiming.

02:13:55  2       You'll need to consider a number of questions in

02:13:58  3  deciding whether the patents-in-suit contain sufficient

02:14:02  4  written descriptions, and I'll provide you with more

02:14:04  5  detailed instructions on these questions at the conclusion

02:14:07  6  of the trial.

02:14:08  7       Now, if you find that the asserted claims have

02:14:13  8  been infringed, you'll need to decide then what amount of

02:14:16  9  money damages will be awarded to the Plaintiff, USAA, to

02:14:20  10  compensate it for that infringement, and that also pre --

02:14:25  11  predisposes that you find the patents-in-suit are not

02:14:29  12  invalid.

02:14:29  13       Now, a damage award must be adequate to compensate

02:14:34  14  the patentholder for the infringement, and damages may not

02:14:37  15  be less than what the patentholder would have received had

02:14:41  16  it been paid a reasonable royalty for the use of its

02:14:45  17  patents.

02:14:45  18       However, the damages that you award, if any, are

02:14:50  19  meant to compensate the patentholder, and they are not

02:14:53  20  meant to punish the Defendant or the infringer.  You may

02:14:57  21  not include in any damages award an additional amount as a

02:15:02  22  fine or a penalty above what is necessary to fully

02:15:05  23  compensate the patentholder for the infringement.

02:15:10  24       Additionally, damages can't be speculative, and

02:15:15  25  USAA must prove the amount of its damages regarding the

02:15:18   1   alleged infringement by a preponderance of the evidence.

02:15:20   2        I'll give you more detailed instruction on the

02:15:24   3   calculation of damages for Defendant's alleged infringement

02:15:28   4   of the patents-in-suit at the conclusion of the trial by

02:15:31   5   giving you specific instructions regarding the calculation

02:15:35   6   of a reasonable royalty.

02:15:35   7        However, the fact that I'm instructing you on

02:15:40   8   damages does not mean that USAA is or is not entitled to

02:15:44   9   recover damages.

02:15:46   10        Now, ladies and gentlemen, you're going to be

02:15:49   11   hearing from a number of witnesses in this case over the

02:15:51   12   next several days, and I want you to keep an open mind

02:15:54   13   while you're listening to the evidence and not decide any

02:15:58   14   facts until you've heard all of the evidence.

02:16:00   15        This is important.  While witnesses are

02:16:04   16   testifying, remember that you, the jury, will have to

02:16:09   17   decide and judge the degree of credibility and

02:16:12   18   believability to allocate to each of the witnesses and all

02:16:16   19   of the evidence that's presented during the trial.

02:16:19   20        So while the witnesses are testifying, you should

02:16:22   21   be asking yourselves things like:  Does this witness

02:16:26   22   impress you as being truthful?  Does he or she have a

02:16:30   23   reason not to tell the truth?  Does he or she have any

02:16:33   24   personal interest in the outcome of the case?  Does the

02:16:36   25   witness seem to have a good memory?  Did he or she have an

02:16:41  1  ability and opportunity to observe accurately the things

02:16:44  2  that they testified about?  Did the witness appear to

02:16:47  3  understand the questions clearly and to answer them

02:16:50  4  directly?  And, of course, does the witness's testimony

02:16:53  5  differ from the testimony of any other witness?  And if it

02:16:57  6  does, how does it differ?

02:17:00  7          These are some of the kinds of things that you

02:17:02  8  should be thinking about while you're listening to each and

02:17:04  9  every witness over the course of the trial.

02:17:06  10         I also want to talk to you briefly, ladies and

02:17:09  11 gentlemen, about expert witnesses.  When knowledge of a

02:17:15  12 technical subject may be helpful to you, the jury, a person

02:17:18  13 who has special training and experience in that particular

02:17:20  14 technical field, we call them an expert witness, is

02:17:23  15 permitted to testify to you about his or her opinions on

02:17:28  16 those technical matters.

02:17:31  17         However, you're not to -- you're not required to

02:17:34  18 accept an expert witness's or any witness's opinions at

02:17:38  19 all.  It's up to you to decide who you believe and whether

02:17:41  20 you believe an expert witness, or any witness for that

02:17:45  21 matter, and whether you believe what they're testifying to

02:17:47  22 is correct or incorrect, whether or not you want to believe

02:17:50  23 what they have to say.

02:17:52  24         Now, I anticipate that they're going to be expert

02:17:56  25 witnesses testifying in support of each side in this case.

02:17:59   1   But when they do, it will be up to you, the jury, to listen

02:18:03   2   to their qualifications, and when they give you an opinion

02:18:06   3   and explain the basis for it, you'll have to evaluate what

02:18:09   4   they say and whether you believe it and to what degree, if

02:18:17   5   any, you want to give that opinion weight.

02:18:19   6         Remember, ladies and gentlemen, judging and

02:18:23   7   evaluating the credibility and believability of each and

02:18:26   8   every witness is an important part of your job as jurors.

02:18:29   9         Now, during the course of the trial, it's possible

02:18:42  10   that there will be testimony from one or more witnesses

02:18:45  11   that are going to be presented to you through what we --

02:18:48  12   through what we call a deposition.  In trials like this,

02:18:51  13   it's difficult to get all the witnesses together in the

02:18:55  14   same place at the same time so that they can testify in

02:18:58  15   person.

02:18:59  16         So lawyers for each side before the trial starts

02:19:05  17   take the depositions of the witnesses.  In a deposition,

02:19:07  18   the witness is present, they are sworn and placed under

02:19:12  19   oath, a court reporter is present, and counsel for the

02:19:14  20   parties are present, at which time the witness is asked

02:19:18  21   questions and under oath answers those questions, and both

02:19:21  22   the questions and the answers are transcribed and taken

02:19:26  23   down.

02:19:26  24         Sometimes they are not only taken down in writing

02:19:30  25   but they are transcribed with a video recording, as well.

02:19:33   1          Portions of these recordings of the questions and

02:19:36   2   answers that have been asked at the deposition can be

02:19:39   3   played back to you as a part of the evidence in this trial

02:19:42   4   so that you can see the witness and hear their testimony,

02:19:46   5   even though they're not physically present and testifying

02:19:49   6   from the witness stand like live witnesses will.

02:19:52   7          Now, this deposition testimony, ladies and

02:19:54   8   gentlemen, is entitled to the same consideration and,

02:20:00   9   insofar as possible, is to be judged as to its credibility,

02:20:04  10   weight, and otherwise to be considered by you, the jury, in

02:20:08  11   the same way as if the witness had been present in person

02:20:12  12   and testified live from the witness stand in open court.

02:20:15  13          Now, over the course of the trial, it's possible

02:20:19  14   that the lawyers from time to time will make certain

02:20:23  15   objections, and when they do, I will issue rulings on those

02:20:26  16   objections.

02:20:26  17          It's the duty of an attorney to object when the

02:20:29  18   other side offers testimony or other evidence that the

02:20:33  19   attorney believes is not proper under the orders of the

02:20:36  20   Court or the rules of the Court, including the rules of

02:20:39  21   civil procedure -- civil procedure and the rules of

02:20:41  22   evidence.

02:20:41  23          Now, upon allowing the testimony or other evidence

02:20:45  24   to be introduced over the objection of an attorney, the

02:20:48  25   Court does not, unless expressly stated, indicate to you

02:20:52   1   any opinion about the weight or effect of such evidence.

02:20:56   2   As I've said before, you, the jury, are the sole judges of

02:21:01   3   the credibility and believability of all the witnesses and

02:21:04   4   the weight and effect to give to all of the evidence.

02:21:07   5        Now, I'd like to compliment the parties in this

02:21:10   6   case, both Plaintiff and Defendant, because today, they

02:21:14   7   have worked with the Court very diligently to go through

02:21:20   8   and review with the Court all the possible exhibits that

02:21:23   9   will be used during the course of this trial.

02:21:25   10       That means, ladies and gentlemen, that with the

02:21:27   11  parties' cooperation, the Court has already considered any

02:21:31   12  and all objections regarding the admissibility of exhibits

02:21:34   13  that will be used during the course of the trial, and the

02:21:36   14  Court has ruled on those objections so that you do not have

02:21:40   15  to sit here over the course of the next week and listen to

02:21:43   16  those objections being raised, argued, and then the Court

02:21:46   17  ruling on them one-by-one, and there have been hundreds of

02:21:50   18  exhibits presented in this case.

02:21:54   19       So whether you understand it or not, all the rest

02:21:56   20  of us have saved you a lot of time by taking that up and

02:22:00   21  dealing with that before we got to this point today with

02:22:02   22  you in the jury box.  Through these pre-trial procedures,

02:22:06   23  the Court already made rulings about the admissibility of

02:22:10   24  all the exhibits, and this, I promise you, has saved you a

02:22:14   25  lot of time that has been achieved by the Court working

02:22:19   1   with the parties in advance of today.  That's why I want to

02:22:24   2   commend the parties for their cooperation with the Court in

02:22:27   3   this regard.

02:22:27   4        What this means is, during the course of the

02:22:28   5   trial, when the parties show you an exhibit, it means I

02:22:30   6   have already ruled on the admissibility of it.  And if I

02:22:34   7   have not approved its admissibility, you would not be

02:22:37   8   seeing it.

02:22:38   9        So they are simply able to show it to you without

02:22:41  10   going through the objection process because the Court's

02:22:43  11   already ruled on the admissibility, and it can be shown to

02:22:49  12   you and placed in its proper context without all the

02:22:52  13   predicate presentation that's otherwise required, because

02:22:55  14   we've already done that.

02:22:56  15        As I say, both sides have worked diligently to

02:22:59  16   streamline this process, and I promise you this will save

02:23:03  17   you a lot of time over the course of the next week.

02:23:05  18        However, it's still possible that over the course

02:23:08  19   of the trial, objections are going to arise during the

02:23:11  20   trial.

02:23:12  21        If I should sustain an objection to a question

02:23:15  22   addressed to a witness, then you must disregard the

02:23:19  23   question entirely, and you may draw no inference from its

02:23:23  24   wording or speculate about what the witness would have said

02:23:26  25   if I had allowed them to answer the question.

02:23:29   1          On the other hand, if I overrule an objection

02:23:34   2    addressed to a witness regarding a question, then you

02:23:38   3    should consider the question and the answer from the

02:23:40   4    witness just as if no objection had ever been made in the

02:23:43   5    first place.

02:23:44   6          Now, you should understand that the law of the

02:23:47   7    United States permits a United States District Judge to

02:23:50   8    comment to a jury, such as yourselves, regarding the

02:23:54   9    evidence in the case, but such comments by the judge on the

02:24:01  10    evidence are only an expression of the judge's opinion as

02:24:02  11    to that evidence, and the jury may disregard those comments

02:24:05  12    entirely.  Because as I've told you, you, the jury, are the

02:24:10  13    sole judges of the facts in the case, you are the sole

02:24:14  14    judges of the credibility and believable -- believability

02:24:17  15    of the witnesses, and you are the sole judges as to how

02:24:21  16    much weight to give to all the testimony in the case.

02:24:23  17          Even though the law permits me to make such

02:24:29  18    comments to you, as I've indicated to you earlier, it's my

02:24:32  19    intention not to do that and to work very hard not to

02:24:34  20    comment on any of the evidence presented over the course of

02:24:37  21    this trial.

02:24:40  22          Now, in front of me is our court reporter,

02:24:42  23    Ms. Holmes, and she is taking down everything that is said

02:24:45  24    by anybody in this courtroom throughout the entire trial.

02:24:49  25    But the written transcription of everything that's said,

02:24:52   1   both questions and -- and answers and arguments made and

02:24:56   2   rulings by the Court, everything that's said, the

02:24:59   3   transcription of all of that is not going to be available

02:25:02   4   to you to take with you to the jury room and to review when

02:25:06   5   you consider the questions in the jury -- excuse me, in the

02:25:09   6   verdict form.

02:25:10   7          So as a consequence, ladies and gentlemen, you're

02:25:12   8   going to have to rely on your memories of the evidence

02:25:16   9   that's presented over the course of this trial.

02:25:19  10          In a moment, you're each going to be given a juror

02:25:22  11   notebook.  You'll find in that notebook at the back a brand

02:25:26  12   new legal pad, and you'll find in the front pocket a brand

02:25:30  13   new pen that you may use to take notes over the course of

02:25:33  14   the trial with regard to the testimony and arguments that

02:25:36  15   are presented.  It's up to each of you to decide whether or

02:25:39  16   not you want to take notes, and if you do, how detailed you

02:25:43  17   want your notes to be.

02:25:44  18          But if you take notes, remember, those notes are

02:25:47  19   for your own personal use, and you're going to still have

02:25:52  20   to rely on your memory of the evidence, and that's why you

02:25:55  21   should pay close attention to the testimony of each and

02:25:58  22   every witness.

02:25:59  23          You should not abandon your own recollection

02:26:01  24   because some other juror's notes indicate something

02:26:04  25   different.  Notes are to reflect your recollection, and

02:26:10  1   that's the only reason you should be keeping them if you

02:26:12  2   decide to take notes over the course of the trial.

02:26:15  3          I'm now going to ask our Court Security Officer to

02:26:17  4   hand out these juror notebooks to each member of the jury

02:26:20  5   at this time.

02:26:49  6          In these notebooks, ladies and gentlemen, you'll

02:27:01  7   see that you each have a copy of each of the two asserted

02:27:04  8   patents that we've talked about.  You'll also find that

02:27:07  9   there's a section of pages for each witness who may testify

02:27:10  10  during the course of the trial, including a picture of that

02:27:14  11  witness and their name to help you remember and recall

02:27:17  12  their testimony.

02:27:17  13         You'll also find a list of the terms from the

02:27:21  14  claim language that the Court has already defined, or

02:27:24  15  construed, and those constructions that you must use in

02:27:28  16  deciding the issues that are presented to you.

02:27:30  17         And as I've indicated, at the back, you'll find a

02:27:35  18  new unused legal pad for note taking, and there should be a

02:27:38  19  pen in the front cover if you don't already have one.

02:27:41  20         Now, those juror notebooks, ladies and gentlemen,

02:27:44  21  should be in your possession at all times.  When you leave

02:27:48  22  for the day, you should take them to the jury room and

02:27:50  23  leave them closed on the table in the jury room, so that

02:27:53  24  they'll be there the next morning when you come back.

02:27:58  25  Otherwise, they should be in your possession.

02:28:00    1        Now, there may be times during the trial when

02:28:02    2    we're going to take a short recess, and I may simply say,

02:28:06    3    ladies and gentlemen, you may leave your notebooks in your

02:28:08    4    chairs.  In that case, you can just close them and leave

02:28:11    5    them in your chairs, and they'll be there when you get back

02:28:14    6    from recess.

02:28:20    7        But unless I give you instructions to the

02:28:20    8    contrary, they should either be in your possession, or they

02:28:21    9    should be in the jury room on the table, not otherwise left

02:28:25   10    around or available for anybody who shouldn't see them to

02:28:25   11    see them.

02:28:26   12        Now, in a moment, the lawyers are going to present

02:28:30   13    their opening statements to you, the jury.  These opening

02:28:35   14    statements are designed to give you a roadmap from each

02:28:37   15    side as to what they expect the evidence will show over the

02:28:42   16    course of the trial.

02:28:43   17        And you should remember, ladies and gentlemen,

02:28:45   18    throughout the trial, that what the lawyers tell you is not

02:28:48   19    evidence.  I'll say that again.  What the lawyers tell you

02:28:53   20    is not evidence.

02:28:54   21        The evidence is the sworn testimony that you're

02:28:58   22    going to hear from the witness stand from the witnesses who

02:29:01   23    are called to testify under oath and subject to

02:29:03   24    cross-examination.  And the evidence are those exhibits

02:29:05   25    which the Court has reviewed for their compliance with the

02:29:09  1   rules of evidence and their admissibility and the Court has

02:29:12  2   admitted into evidence.

02:29:13  3         Those two things constitute the evidence in this

02:29:16  4   case.  What the lawyers tell you is not evidence.  What the

02:29:23  5   lawyers tell you is their impression of what the evidence

02:29:26  6   is.  And they have a duty to point out to you what they

02:29:28  7   believe the evidence shows.  But, remember, what they tell

02:29:32  8   you is not evidence.

02:29:33  9         Now, after the opening statements have been made,

02:29:37  10  the Plaintiff, as I told you during jury selection, will

02:29:41  11  then call its witnesses and put on what's called its

02:29:43  12  case-in-chief.

02:29:44  13        And after all the Plaintiff's witnesses have

02:29:47  14  testified, it will rest its case-in-chief, and then the

02:29:50  15  Defendant will do the same thing.  The Defendant will call

02:29:53  16  its witnesses, present its evidence through what's called

02:29:57  17  the Defendant's case-in-chief.

02:29:58  18        When the Defendant rests or completes its

02:30:01  19  case-in-chief, then the Plaintiff has an opportunity to

02:30:04  20  call additional witnesses that are designated as rebuttal

02:30:08  21  witnesses, to rebut what the Defendants have shown.

02:30:10  22        If the Plaintiff calls rebuttal witnesses, when

02:30:13  23  those witnesses have finished testifying and the

02:30:17  24  Plaintiff's rebuttal case has been concluded, then you will

02:30:20  25  have heard all the testimony and the evidence in this case.

02:30:23   1          After you've heard all the evidence in this case,

02:30:28   2   I'll give you written instructions on the law as we've

02:30:31   3   talked about it, and I'll give you a copy of these written

02:30:36   4   instructions that I'll give to you orally at that time.  In

02:30:39   5   other words, I will give you an oral rendition of my final

02:30:43   6   instructions to you, but you will have your own written

02:30:46   7   copy of the same instructions that you'll be able to take

02:30:48   8   to the jury room when you deliberate on your verdict.

02:30:52   9          These instructions that I'll give you, first

02:30:57  10   orally and then in written form, to take with you to the

02:31:00  11   jury room are called the Court's charge to the jury.

02:31:03  12          And after I've given you those instructions, those

02:31:06  13   final instructions, then the lawyers will be able to

02:31:10  14   present to you their closing arguments, which are designed

02:31:12  15   to point out to you what they believe they proved through

02:31:15  16   the evidence that's been presented over the course of the

02:31:18  17   trial.

02:31:18  18          And when you've heard closing arguments from both

02:31:20  19   Plaintiff and Defendant, then I'll instruct you to retire

02:31:23  20   to the jury room and to deliberate on your verdict.

02:31:25  21          Let me remind you one more time how critical it is

02:31:37  22   that you not discuss or communicate about this case with

02:31:40  23   anyone, including among the eight of yourselves, until such

02:31:43  24   time as you retire to the jury room at my instruction and

02:31:47  25   begin your deliberations.  Then, you are required to

02:31:50  1   discuss the evidence you've heard over the course of the

02:31:53  2   trial among yourselves in attempting to reach a unanimous

02:31:56  3   decision on the questions set forth in the verdict form.

02:31:59  4        Let me also remind you, as I did earlier today,

02:32:04  5   that over the course of the trial when you come in close

02:32:06  6   contact with one or more members of each trial team or

02:32:10  7   witnesses or anyone associated with either side of this

02:32:13  8   case, they're not going to enter into conversation or speak

02:32:16  9   to you or be friendly, and that's not because they're rude.

02:32:19  10  It's simply because that's what the Court has required of

02:32:22  11  them.

02:32:23  12       And as I've indicated, it's because the sole

02:32:28  13  source of the information that you will ultimately draw on

02:32:34  14  to answer the questions in the verdict form must be limited

02:32:34  15  to the live testimony and deposition testimony that you

02:32:38  16  hear from witnesses under oath and subject to

02:32:41  17  cross-examination and the exhibits that the Court admits

02:32:45  18  into evidence.  That must be the sole source and the sole

02:32:50  19  universe of the information that you draw on when you

02:32:53  20  consider and answer the questions in the verdict form.

02:32:57  21       All right.  At this time, ladies and gentlemen,

02:32:59  22  we'll proceed to hear opening statements for the attorneys

02:33:01  23  for both of the parties.

02:33:04  24       Mr. Sheasby, you may now present your opening

02:33:07  25  statement for the Plaintiff.

02:33:08  1          MR. SHEASBY:  May it please the Court.

02:33:14  2          THE COURT:  Please proceed.

02:33:15  3          MR. SHEASBY:  Good afternoon, ladies and gentlemen

02:33:17  4   of the jury.  My name is Jason Sheasby.  And I have been

02:33:20  5   asked to speak on behalf of USAA.

02:33:22  6          Let me begin by thanking you for your service.  I

02:33:26  7   know each of you have obligations, each of you have things

02:33:29  8   that require doing, and this week you're giving your time

02:33:33  9   and your service to USAA, and we are very grateful.

02:33:37 10          I'd like to introduce myself.  I was born in

02:33:41 11   California.  I've lived my whole life in California.  My

02:33:44 12   wife and I have two girls, and we also raise a niece and

02:33:48 13   nephew.

02:33:48 14          We are here because of patent infringement.  And

02:33:55 15   the Court spoke about a very important constitutional

02:34:00 16   right, which is the right to a jury trial.  But there's

02:34:02 17   another right that was actually enshrined in our

02:34:06 18   Constitution from the beginning.

02:34:08 19          231 years ago, the founders of our nation granted

02:34:12 20   and specified that the Congress of the United States would

02:34:17 21   allow and create patent rights.  And the reason why our

02:34:20 22   founders did this was for a very particular reason.  231

02:34:24 23   years ago, they knew that this country would be strong and

02:34:28 24   powerful and protected if there was innovation.  And the

02:34:32 25   way you protect innovation is through patent rights.

02:34:36   1          Patent rights are an absolute constitutional
02:34:42   2    right.  And what that means is that when you file an
02:34:45   3    application with the United States Patent Office, anyone
02:34:50   4    can use the ideas in that patent application until
02:34:53   5    something occurs.
02:34:55   6          When the United States Patent Office grants you
02:34:58   7    your property right, when the United States Patent Office
02:35:02   8    grants you that patent, there is only two options.  If
02:35:07   9    someone is using your inventions, they must either vacate
02:35:11  10    or they must seek permission.  Those are the only two
02:35:14  11    options available to third parties, and the reason for that
02:35:18  12    is because the property right is absolute.
02:35:21  13          And we are here today because Wells Fargo is not
02:35:25  14    respecting that property right.
02:35:27  15          I'd like to introduce USAA to you.  USAA was
02:35:32  16    founded in 1922 by 25 Army officers.  And what they did is
02:35:37  17    they pooled substantial portions of their life savings
02:35:43  18    together to create a mutual insurance company.  And what a
02:35:46  19    mutual insurance company means is that the members insure
02:35:50  20    themselves.
02:35:51  21          Now, much has changed since 1922, but some things
02:35:55  22    remain the same.  To this day, USAA serves active military
02:35:59  23    members, honorably retired military members, and their
02:36:03  24    families.
02:36:03  25          And the second thing that has never changed is

02:36:07  1  that all of the money USAA has comes from its members.

02:36:13  2  Every dollar that was spent on the research and development

02:36:16  3  of this patent came from our members.  Who are our members?

02:36:21  4  Our members are the members of the armed services, retired,

02:36:25  5  and their family who we serve.

02:36:27  6          Now, I want to talk briefly, and you'll hear much

02:36:32  7  more, about the invention at issue in this case.  The

02:36:36  8  invention relates to the use of a powerful software system

02:36:40  9  to enable essentially any consumer device that has a

02:36:45  10  digital camera to capture a high quality image of a check

02:36:49  11  and to deposit in real-time.

02:36:50  12          Now, there's a paradox.  Things that are

02:36:53  13  incredibly easy for humans are incredibly difficult for

02:36:58  14  computers and vice versa.  So, for example, it's easy for

02:37:01  15  us to take a picture of a check, and it's easy for us to

02:37:04  16  interpret the information on that check.  It's actually

02:37:06  17  incredibly hard for a computer to do that.

02:37:08  18          But a computer must do that because it's computers

02:37:14  19  that analyze and deposits the billions of checks each year

02:37:18  20  that are processed.

02:37:19  21          USAA focused on creating this disruptive

02:37:24  22  invention.  And what I mean by disruptive is something that

02:37:27  23  has never been created before, consumer remote deposit

02:37:34  24  capture, using consumer devices.  And there's this phrase

02:37:37  25  that people use.  It's, necessity is the mother of

02:37:38   1   invention.

02:37:38   2          USAA serves military members throughout the world.

02:37:44   3   And in the 1980 -- in the 1980s, the military members asked

02:37:46   4   it to create a bank because they wanted cheap, low cost

02:37:49   5   banking.  But there was a problem.  USAA has no branches.

02:37:54   6   It has military members throughout the world, and it has no

02:37:57   7   branches.

02:37:58   8          So how do you solve that problem?  Well, the way

02:38:01   9   they decided to solve the problem was by connecting their

02:38:03  10   members to them digitally.  They would create what they

02:38:07  11   described as a virtual branch.

02:38:09  12          And consumer remote deposit capture was a critical

02:38:15  13   part of that virtual branch.

02:38:16  14          Now, they did something else which was very

02:38:19  15   important, which is they invested.  USAA created an elite

02:38:27  16   Applied Research Division, and that elite Applied Research

02:38:28  17   Division was solely focused on creating next generation

02:38:31  18   technology that would serve their members.

02:38:35  19          The vision that was associated with this is

02:38:40  20   described in an email from Chuck Oakes.  Chuck Oakes is an

02:38:45  21   inventor on these patents.  He has over a hundred patents

02:38:48  22   to his name, and he is also the head of Applied Research

02:38:51  23   during the relevant time period.  He's now retired from

02:38:54  24   USAA.

02:38:55  25          But you see in this effort from June 2006, he

02:38:58  1  said:  This effort can and will revolutionize the banking

02:39:04  2  industry.  I strongly believe that the effort of producing

02:39:07  3  this innovation is an example of what USAA is made of,

02:39:10  4  vision, strength, determination, member focused, and

02:39:14  5  commitment.

02:39:15  6       The Applied Research Division had this strong

02:39:19  7  vision of what they could create, and it turns out that

02:39:23  8  they were right.  USAA's technology was widely heralded

02:39:32  9  throughout the United States as ground-breaking and

02:39:34  10  powerful.

02:39:35  11       This is AdAge.  AdAge is a banking industry

02:39:39  12  publication.  And it announces that USAA recently launched

02:39:45  13  mobile check deposit technology which let's users deposit

02:39:49  14  checks anywhere using an iPhone.  This was the extension of

02:39:54  15  USAA's technology that occurred in 2009.

02:39:57  16       And what they say -- and this is very important --

02:40:00  17  they say USAA represents the leading edge of mobile banking

02:40:04  18  technology.  Leading edge -- cutting edge and the leading

02:40:07  19  edge.  USAA was at the forefront of this technology.

02:40:11  20       Counsel for Wells Fargo said something very

02:40:14  21  important.  Listen.  But listen to facts and listen to

02:40:20  22  documents.  And the facts and documents make clear that

02:40:25  23  USAA was the first.

02:40:27  24       Now, it wasn't just banking industry publications.

02:40:30  25  It wasn't just publications from Texas.  It was

02:40:33  1  publications from the East Coast recognized the powerful

02:40:37  2  nature of what USAA has created.  In fact, The New York

02:40:41  3  Times talked about it.

02:40:42  4       So they got one thing wrong.  They call us an

02:40:45  5  unlikely innovator.  They know nothing about our Applied

02:40:50  6  Research Division.  We're not an unlucky innovator.  We

02:40:51  7  innovate all the time through our members.

02:40:53  8       But they got one thing right, and what they got

02:40:55  9  right is that three years ago in 2007 (sic), USAA

02:40:59  10  introduced the first version of consumer remote deposit

02:41:05  11  capture.  And that laid the foundation for the

02:41:07  12  ground-breaking technology that's used today.

02:41:09  13       To this day, no one has created anything more

02:41:12  14  powerful.  No one has created anything better than what

02:41:17  15  USAA's Applied Research Division envisioned in 2006.

02:41:20  16       This is one of the two patents at issue in this

02:41:26  17  case, and I can actually show you the official patents.

02:41:29  18  These are signed by the Commissioner of Patents, who's

02:41:31  19  confirmed by the United States Senate, and these are the

02:41:34  20  official documents that are sent to us when the Patent

02:41:38  21  Office grants our patents.

02:41:40  22       And the patents, you'll see, were originally filed

02:41:46  23  in 2006.  And the applications at issue in this case were

02:41:48  24  filed in 2017.  Now, I want to explain to you why that

02:41:53  25  happens.

157

02:41:53   1          In the United States patent system, you'll file an

02:41:58   2    original application.  In this case, we filed the original

02:42:01   3    application in 2006.  A patent was granted based on that

02:42:04   4    original application, but the laws of the United States

02:42:07   5    allow you to file additional applications that have the

02:42:11   6    same specification as the original patent but have

02:42:16   7    different claims.  That's called a continuation

02:42:20   8    application, and that continuation application has the same

02:42:23   9    priority date as the original application in 2006.

02:42:26   10          And we did that, and we received additional

02:42:30   11   patents.  And you can do it multiple times.  And the

02:42:34   12   patents that are at issue today were patents that were

02:42:37   13   based -- that have that original specification from 2006,

02:42:39   14   and in 2017, we presented a set of claims to the United

02:42:44   15   States Patent Office and asked them to confirm that it

02:42:46   16   represented our constitutional property right.

02:42:50   17          And the patent examiners in this case, two

02:42:53   18   separate, independent patent examiners skilled in the

02:42:58   19   field, skilled in the law, both granted the property rights

02:43:03   20   at issue in this case.

02:43:04   21          The second patent at issue was the '605 patent.

02:43:08   22   It was also filed in 2006.  And you'll see it's granted to

02:43:12   23   the United States Automobile Association.

02:43:16   24          Here's the timeline of events that have occurred.

02:43:19   25   In 2004, the research program began at USAA.  In 2005, USAA

02:43:23   1   actually created its first working prototype using a common

02:43:27   2   consumer three-in-one copier, scanner, fax machine, printer

02:43:35   3   from Lexmark that was bought at Best Buy.  We could use a

02:43:38   4   simple consumer device to allow the deposit of check

02:43:45   5   images.

02:43:45   6          The patent applications were filed in October of

02:43:49   7   2006 after we established the working system, and quickly

02:43:54   8   over time, we added new devices as they became popular.  We

02:43:58   9   added Macintosh in 2007.  We added an iPhone application in

02:44:02  10   2009.  We added an Android application in 2010.  We added

02:44:07  11   an iPad application in 2011.  And in September of 2011,

02:44:11  12   recognizing the explosion of consumer devices that had

02:44:15  13   digital cameras, USAA enabled technology so that any -- any

02:44:19  14   consumer device you have, if it can go on the Internet and

02:44:23  15   if it has a digital camera, we can use it.

02:44:27  16          And that relates to something very powerful, a

02:44:31  17   value of USAA, which is we meet our members where they are.

02:44:35  18   And what I mean by that is we don't force them to buy

02:44:39  19   expensive devices, we don't force them to work with us, we

02:44:42  20   work with them.  We use what they have to create this

02:44:45  21   powerful tool.

02:44:46  22          The application at issue in this case became

02:44:50  23   publicly available to anyone who wanted to read it in 2011.

02:44:56  24   Anyone could read it at that point.

02:44:58  25          The other application at issue in this case became

02:45:01  1  publicly available in 2014.  At that point, anyone could
02:45:05  2  read it.  But in 2018 when the patents were granted, there
02:45:12  3  was only one option available to Wells Fargo, vacate or
02:45:17  4  seek permission.
02:45:18  5       So the Judge explained that you have a jury
02:45:22  6  notebook, and I explained to you that what's most important
02:45:30  7  is facts, not argument from lawyers.  And you see this
02:45:33  8  little yellow box down in the corner, that is an exhibit
02:45:36  9  number, and you can write down exhibit numbers.  And in
02:45:40  10  your deliberations, you can ask for them because they're
02:45:43  11  evidence.  They're not just argument.
02:45:44  12       And the evidence, I will respectfully submit to
02:45:49  13  you, speaks loudly.
02:45:50  14       Where was Wells Fargo while USAA was innovating?
02:45:55  15  Well, in 2009, they were watching.  They actually report on
02:46:01  16  USAA's use of its Deposit@Home system with iPhone, and they
02:46:06  17  note how popular it is.  Over a few months of time, over
02:46:11  18  40,000 customers had already used this.
02:46:13  19       This is an internal document at Wells Fargo.  It's
02:46:17  20  for Wells Fargo's executives.  It's confidential.  But we
02:46:20  21  were able to obtain it through this litigation process.
02:46:22  22       Now, why was Wells Fargo interested in what USAA
02:46:30  23  was doing?  Well, the reason is that Wells Fargo had made a
02:46:39  24  mistake.  They had decided to invest in a system in which
02:46:46  25  its businesses, they called it the CEO system, could

02:46:50  1    deposit checks using specialized scanning machines.  This

02:46:55  2    only does one thing.  It cost hundreds of dollars at the

02:46:59  3    time, and all it would do is image checks.

02:47:04  4         But after USAA had invented consumer remote

02:47:09  5    deposit capture system, they quickly realized their system

02:47:14  6    was unacceptable.  It was useless.  Consumers would not buy

02:47:18  7    a specialized scanner machine.  Consumers wanted to use the

02:47:22  8    devices they had available.  And over time, the pressure

02:47:26  9    increased on Wells Fargo.

02:47:26  10        In January of 2010, now USAA had over 125,000

02:47:34  11   downloads of its application.  It was the No. 1 ranked --

02:47:40  12   8th ranked application in popularity among finance

02:47:44  13   applications on the iPhone.  And the internal confidential

02:47:46  14   advice is that mobile RDC would play an important

02:47:50  15   transformative role in the bank.  It got more intense.

02:47:55  16        In 2011, the internal reports to the company was

02:47:58  17   that MRDC was table stakes.  I'm not a gambler.  This is a

02:48:02  18   gambling term that Wells Fargo is using.  Table stakes

02:48:06  19   means you must have it to be able to sit at the table.  The

02:48:09  20   internal records from Wells Fargo's executives made clear

02:48:13  21   they must have remote deposit check capture consumer based

02:48:20  22   services.  They must have it.

02:48:21  23        THE COURT:  15 minutes have been used, counsel.

02:48:24  24        MR. SHEASBY:  But there was another problem.  In

02:48:25  25   the candid advice to their executives, Wells Fargo made

02:48:28  1  clear in PX-14 that they did not have the internal ability

02:48:31  2  to create their own research and development program.  They

02:48:35  3  were already years behind USAA, and it would take them

02:48:38  4  another nine to 18 months to build their own.  And what's

02:48:43  5  worse, they had no R&D capability to sustain it, unlike

02:48:46  6  USAA's Applied Research division that continued to sustain

02:48:49  7  the system year after year after year.

02:48:51  8          In August of 2010, a candid report to Wells

02:48:59  9  Fargo's executives described the benefits of the USAA

02:49:03  10 system.  The incredible value to the bank, cost savings,

02:49:10  11 deposit growth, people would actually deposit more money in

02:49:14  12 the bank if they had mobile remote deposit capture.

02:49:22  13 Acquisition tool and cross-sell, people would use more of

02:49:22  14 the bank's services if they had mobile remote deposit

02:49:24  15 capture and the WOW/innovation factor.  Wells Fargo wanted

02:49:29  16 to be known as an innovator.

02:49:31  17         What did they do, on the left, is the 2010

02:49:36  18 assessment of the USAA system.  On the right is the

02:49:40  19 confidential plan of what Wells Fargo was going to do, and

02:49:49  20 it lists them doing the exact same thing that USAA's system

02:49:54  21 was doing.

02:49:54  22         Wells Fargo wanted what USAA had.  Wells Fargo

02:50:01  23 couldn't create what USAA had.  Wells Fargo coveted USAA's

02:50:06  24 Applied Research division.

02:50:08  25         Now, let's do the timeline for Wells Fargo.  In

02:50:13  1   2006, USAA launched our -- launches its system.  In 2009 to

02:50:18  2   2010, the system was fully built out such that any consumer

02:50:22  3   device with a digital camera and a down -- that could

02:50:25  4   download an application or access the Internet could use

02:50:28  5   it.  The patents were published first in January of 2011.

02:50:34  6   And after the publication of those patents, Wells Fargo

02:50:37  7   launched its own system.  And since 2012 to today, Wells

02:50:43  8   Fargo has continued to use that system.

02:50:46  9        Now, let me be clear, the law is the law.  From

02:50:50  10  the publication of that application to the grant of our

02:50:51  11  property right, Wells Fargo had the right to use our ideas.

02:50:56  12  But the moment the United States Patent Office granted our

02:51:00  13  property right, it had only two options, vacate or seek

02:51:06  14  permission.

02:51:07  15       The record will show that USAA actually in

02:51:10  16  December of 2016 told the public that its mobile remote

02:51:15  17  deposit capture system was protected by the families of

02:51:19  18  patents at issue in this case.  Remember, the Judge told

02:51:22  19  you about earlier patents that were in the same family.  We

02:51:25  20  marked our application, our mobile app with the patent

02:51:30  21  family numbers so that folks would know that this was our

02:51:34  22  property right.

02:51:35  23       In 2017 to 2018, we actually approached Wells

02:51:42  24  Fargo about licensing.  The PTO granted the rights in July

02:51:47  25  of 2018.  Once the rights were granted, we promptly filed

02:51:51  1   this suit, and here we are today.

02:51:54  2        The only damages we seek is for the period of time

02:52:00  3   the United States Patent Office granted our patents, and

02:52:02  4   that is the issues and the facts that we -- what we believe

02:52:06  5   the facts will show.

02:52:07  6        There are four questions you will be asked to

02:52:11  7   consider.  The first is infringement.  Infringement is

02:52:14  8   USAA's burden, and it's a burden by a preponderance of the

02:52:18  9   evidence.  And that means we must show if the Scales of

02:52:23  10  Justice tip ever so slightly in our favor, USAA prevails.

02:52:28  11       And in addition, for infringement, there's no

02:52:31  12  intent or knowledge or recklessness required.  This is a

02:52:35  13  constitutional property right.  It's strict liability.  It

02:52:36  14  doesn't matter if it was an accident.  It doesn't matter if

02:52:39  15  they were shocked to find out that we had a patent.  If

02:52:43  16  they're using our patent, they have an obligation.

02:52:47  17       I'll show you an example claim.  We will map the

02:52:49  18  claim to each element of Wells Fargo's system.  It

02:52:53  19  describes the use of a general purpose computer and a

02:52:56  20  digital camera.  It describes the use of a downloaded

02:52:59  21  application that will control the system.  It describes the

02:53:02  22  use of image assessment.  And we will march through Wells

02:53:06  23  Fargo's source code, the instructions for their system, and

02:53:10  24  establish that each of these elements are present in the

02:53:15  25  system.  We will show you the code, the actual code.

02:53:18   1          You'll note that the claims refer to a general

02:53:29   2    purpose computer and a digital camera.  That's what the

02:53:32   3    system is.  You'll also note that Wells Fargo's own

02:53:35   4    witnesses can see that the iPhones and the Android phones

02:53:38   5    that they use, what are they, they're general purpose

02:53:40   6    computers with digital cameras.

02:53:41   7          Wells Fargo has infringement defenses, lots of

02:53:49   8    defenses, lots of excuses, I would submit.  One of those is

02:53:53   9    that, oh, well, we do things different than USAA.  We do

02:53:58  10    something called OCR on the system, not on the phone, and

02:54:02  11    the claims require that it occur on the phone, not the

02:54:06  12    system.

02:54:06  13          But the claims, you will see, describe a system

02:54:10  14    for deposit.  They describe the use of a customer's

02:54:14  15    handheld device.  They describe the use of a computer

02:54:18  16    associated with the bank, separate from the handheld

02:54:20  17    device.  And they describe that the system performs image

02:54:27  18    quality analysis.

02:54:27  19          Now, Wells Fargo will tell you, oh, no, we don't

02:54:30  20    infringe because the phone doesn't do the image quality

02:54:34  21    analysis.  We do that at our servers.  But they're

02:54:38  22    contradicting the language of the claims that say -- and

02:54:41  23    this is an important insight that USAA found -- to create

02:54:44  24    the power, to create the processing power that's necessary,

02:54:50  25    we don't just use the phone.  We use a distributed system

02:54:52  1   that uses both the phones and servers.

02:54:55  2          There's another argument that Wells Fargo makes.

02:54:57  3   Wells Fargo said, oh, we're not the ones doing the

02:55:00  4   infringement.  No, no, no, no, no, it's our customers.

02:55:04  5   It's our customers that are doing the infringement.  They

02:55:07  6   call it a divided infringement problem.

02:55:11  7          Wells Fargo will argue that they don't benefit

02:55:14  8   from each and every element of the claims, and, therefore,

02:55:16  9   they shouldn't be held liable.  That's an argument they

02:55:18  10  will make to you.

02:55:19  11         Ladies and gentlemen of the jury, the facts will

02:55:22  12  establish that every single time a Wells Fargo customer

02:55:25  13  deposits a check using the system, Wells Fargo saves at a

02:55:29  14  minimum one dollar, and Wells Fargo is going to argue that

02:55:33  15  they're not responsible for the system, and they don't

02:55:36  16  benefit from each of these elements.

02:55:38  17         The second issue you'll be asked to decide is

02:55:41  18  validity.  Validity is Wells Fargo's burden.  Validity

02:55:46  19  requires clear and convincing evidence of invalidity.

02:55:50  20         Now, you may ask yourself why is that fair?  Why

02:55:53  21  does USAA have to only show infringement by 51 percent but

02:55:58  22  Wells Fargo must show invalidity by a much stricter burden?

02:56:04  23         Well, the answer is the following:  There actually

02:56:07  24  is an independent third party who looked at these patents.

02:56:11  25  It's the United States patent examiners.  There were two of

02:56:14  1  them.  They were trained in the art.  They analyzed the

02:56:17  2  applications, and they determined that they were valid.

02:56:20  3  And it's because of that effort by the expert, trained

02:56:24  4  patent examiners that we're entitled to the presumption of

02:56:28  5  validity.

02:56:29  6        Now, to be clear, we should look at the evidence,

02:56:38  7  and you will ask yourself, did the trained patent

02:56:41  8  examiners, expert in this field, get it wrong?

02:56:45  9        One of Wells Fargo's arguments is they say, oh,

02:56:48  10  well, you don't disclose consumer devices or mobile devices

02:56:52  11  or portable devices that have digital cameras.  You don't

02:56:56  12  disclose that limitation in your specification.

02:56:58  13        And you'll see here on the left-hand side it talks

02:57:01  14  about an image and processing system for use with a digital

02:57:07  15  camera or a portable device.

02:57:10  16        But the actual language in the specification

02:57:10  17  describes exactly that.  It describes the vision of USAA

02:57:11  18  from 2006 onwards, the use of electronics that consumers

02:57:15  19  actually owned with digital cameras.

02:57:19  20        It describes the use of cellular networks with

02:57:22  21  cellular phones.  It actually describes the use of various

02:57:26  22  digital devices including PDAs.

02:57:28  23        What are PDAs?  In 2006, PDAs were a combination

02:57:33  24  of general purpose computers, cameras, and wireless

02:57:39  25  capability.  The insight that USAA had from the beginning

02:57:42  1    and is reflected in these claims is that any device could

02:57:47  2    be used.  We would meet our members where they were.

02:57:49  3         The third question you'll be asked to decide is

02:57:51  4    willfulness.  The facts will establish that beginning in

02:57:55  5    2010, even before our patent was public, Wells Fargo had

02:58:00  6    found out that we had published -- that we had filed

02:58:04  7    applications on our mobile remote deposit capture system.

02:58:07  8    This is testimony from Alan Hecht.  He's their corporate

02:58:11  9    representative, and he admitted it under oath.

02:58:13 10         We were also able to access Wells Fargo's records,

02:58:19 11    their confidential records.

02:58:21 12         THE COURT:  Five minutes remaining.

02:58:23 13         MR. SHEASBY:  And what we found -- what we found

02:58:26 14    was an internal experimentation with USAA's application,

02:58:30 15    and we actually found -- looking at the patent marking

02:58:34 16    page.  This is from our application, that red arrow

02:58:39 17    pointing to our patents, that's a red arrow that they

02:58:43 18    added, not us.  It was in their records.

02:58:45 19         The fourth issue you'll be asked to decide is

02:58:47 20    damages.  The record will show that solely from the damages

02:58:50 21    period, Wells Fargo has generated 1.2 billion in profits

02:58:53 22    from the use of this system -- 1.2 billion in profits.

02:58:56 23         And we will ask for a reasonable royalty of no

02:59:00 24    less than 85 cents per successful mobile deposit.  We're

02:59:06 25    asking for less than they make every single time they use

02:59:09  1   this system.

02:59:11  2        At the beginning of this conversation, I talked

02:59:14  3   about one constitutional right, the right to a patent as

02:59:18  4   property.  I now want to go back to the other

02:59:21  5   constitutional right that Judge Gilstrap had, and I'd like

02:59:23  6   you to think about it in a different way.

02:59:26  7        So we talk about jury service.  We talk about jury

02:59:28  8   duty.  We talk about the fact that USAA has a right to a

02:59:32  9   jury.  But it's also your right.  When the founders of our

02:59:37  10  nation created this Constitution, they said that citizens

02:59:40  11  get to decide the important questions.

02:59:43  12        This is not just your duty.  This is your right.

02:59:48  13  It's your power.  You have the authority to make a decision

02:59:51  14  in this profoundly important matter.

02:59:53  15        Ladies and gentlemen of the jury, thank you for

02:59:55  16  your time and thank you for your service.

03:00:04  17        MR. MELSHEIMER:  May we approach briefly, Your

03:00:05  18  Honor?

03:00:05  19        THE COURT:  Approach the bench.

03:00:07  20        (Bench conference.)

03:00:20  21        THE COURT:  What's the problem?

03:00:21  22        MR. MELSHEIMER:  Your Honor, I want to raise a

03:00:22  23  potential motion in limine violation.  Remember, back in

03:00:25  24  chambers, we talked about the slides where we'd objected to

03:00:30  25  them as arguing copying.  And the Plaintiffs said, no, no,

03:00:33   1   we're going to argue commercial success.

03:00:36   2        And what he did when those slides were up is he

03:00:40   3   used the term "coveted."  He said Wells Fargo wanted and

03:00:44   4   coveted what he was saying they had.  I think that's a

03:00:47   5   violation of the Court's MIL.  He didn't seek leave to do

03:00:50   6   that.

03:00:50   7        And, in fact, it was represented that those slides

03:00:52   8   were going to be used for a different purpose.

03:00:54   9        THE COURT:  What's your response, Mr. Sheasby?

03:00:56  10        MR. SHEASBY:  Your Honor, covet is not the same as

03:00:58  11   copy.  That slide was clearly directed at the commercial

03:01:03  12   value of the technology, and there was no suggestion

03:01:05  13   whatsoever made.  It's not done in the willfulness section.

03:01:09  14   It was not done when we were talking about the use of our

03:01:12  15   application.  I don't believe there's been any violation of

03:01:15  16   our MIL.

03:01:16  17        THE COURT:  All right.  I'm going to overrule the

03:01:18  18   objection.

03:01:19  19        Let's proceed with --

03:01:19  20        MR. MELSHEIMER:  Thank you, Your Honor.

03:01:20  21        THE COURT:  -- opening statement.

03:01:25  22        MS. WILLIAMS:  Thank you, Your Honor.

03:01:26  23        (Bench conference concluded.)

03:01:28  24        THE COURT:  All right.  The Defendant may now

03:01:30  25   present its opening statement to the jury.

03:01:33   1          Ms. Williams, you may proceed.

03:01:35   2          MS. WILLIAMS:  May it please the Court.

03:01:37   3          This case is about respecting the rules, what the

03:01:39   4   law gives and also what it requires.

03:01:41   5          My name is Danielle Williams, and I represent

03:01:46   6   Wells Fargo.  Let me tell you a little bit about myself, as

03:01:49   7   you did earlier today.

03:01:50   8          I'm born and raised in North Carolina.  I live

03:01:52   9   there in my hometown with my husband -- he's a lawyer,

03:01:57  10   too -- and our two boys.  My parents live there, too.  They

03:02:00  11   celebrated their 50th wedding anniversary last year.

03:02:04  12          Last week, one son got his driver's license and

03:02:10  13   the other one finished driver's ed.  Getting a driver's

03:02:16  14   license has given me the opportunity to teach my sons about

03:02:20  15   something I think is really important, respect.  Respect

03:02:23  16   for people, respect for processes, and respect for rules.

03:02:27  17   They may not like sitting in 30 hours of driver's ed class,

03:02:34  18   and they may not like logging 60 hours of supervised

03:02:41  19   driving, but they will respect the process and the rules

03:02:44  20   for getting a driver's license.

03:02:45  21          This case is about respect.  And in the time I

03:02:49  22   want to -- in the time I have with you today, I want to

03:02:52  23   talk with you about three things.

03:02:54  24          First, I want to talk with you about respect for

03:02:59  25   property rights and their lawful extent, respect for the

03:03:04  1  process and place to assess those property rights, and,

03:03:09  2  lastly, respect for the value of those specific property

03:03:12  3  rights.

03:03:12  4      It can be frustrating when there isn't enough

03:03:17  5  respect.  We've seen trials on TV where lawyers are overly

03:03:21  6  dramatic, levelling accusations at each other, using sound

03:03:27  7  bytes, plain old-fashioned yelling.  They take things out

03:03:33  8  of context.  They use the sound bytes, and that's good for

03:03:37  9  drama, but it's not good for getting us to the truth.

03:03:44  10      And in that situation, it's not what Judge

03:03:46  11  Gilstrap so eloquently described earlier today about our

03:03:51  12  jury trial, tracing it from the Old Testament to the Magna

03:03:55  13  Carta to the Declaration of Independence, and finally to

03:03:58  14  our Constitution.

03:04:03  15      Respect is why we stand up for you when you come

03:04:03  16  in.  It's why we stand up for Judge Gilstrap when he comes

03:04:08  17  in.  And it's why we will call everyone Dr., Mr., Mrs.

03:04:12  18  during trial this week.

03:04:13  19      So let's talk first about respect for property

03:04:17  20  rights.  Our Constitution gives Congress the power to pass

03:04:24  21  laws relating to patents.  The right to a patent is not a

03:04:28  22  constitutional right.  It's a right that is created by

03:04:31  23  Congress and subject to the rules laid out by the Patent

03:04:34  24  Office that we must respect.

03:04:36  25      You heard about some of those in the video today,

03:04:39   1   as well as from Judge Gilstrap.  And as we heard and see on

03:04:42   2   the screen, a patent is an official grant by the United

03:04:48   3   States Government of exclusive rights to the invention

03:04:50   4   claimed in the patent.

03:04:52   5          Nothing less, but nothing more.

03:04:58   6          The law doesn't favor these exclusive rights or

03:05:03   7   monopolies, and for good reason.  Monopolies can make

03:05:07   8   things more expensive for everybody and can hurt

03:05:11   9   competition.

03:05:11   10          So the patent law requires -- requires that your

03:05:16   11   patent monopoly must be limited to what you specifically

03:05:20   12   described in your patent and not a square inch more than

03:05:25   13   that.

03:05:25   14          Just like the deed to a piece of property

03:05:31   15   describes the boundaries of the -- of the landowner's

03:05:34   16   property, the patent claims describe the boundaries of the

03:05:37   17   patent owner's property.

03:05:39   18          The landowner and the patent owner are limited to

03:05:44   19   what they described in their patent and described in their

03:05:49   20   deed.

03:05:50   21          The application submitted to the Patent Office

03:05:53   22   includes what is called a specification.  Judge Gilstrap

03:05:56   23   talked with us about that earlier today.  And the law

03:06:00   24   requires that the specification contain a written

03:06:04   25   description of the claimed invention telling what the

03:06:06  1  invention is.

03:06:10  2        And this is true for the two patents that are

03:06:12  3  asserted in this case against Wells Fargo.  The '605 patent

03:06:17  4  and the '681 patent, both are in your notebooks.

03:06:20  5        So let's look at the first page of these two

03:06:24  6  patents.  Here we have them on the screen.  The first page

03:06:28  7  tells us that both patents issued on July 3rd, 2018, just a

03:06:35  8  few weeks before USAA filed this lawsuit on August 17th,

03:06:40  9  2018.

03:06:42  10        The first page also tells us that USAA filed both

03:06:48  11  applications on July 28th, 2017, and claimed that they were

03:06:58  12  continuations of some old, earlier filed -- earlier filed

03:07:02  13  applications from Halloween of 2006.

03:07:05  14        So dates are important in this case.  So let's

03:07:07  15  look at these dates and some other ones on a timeline.

03:07:12  16        USAA just told you that they claimed these patents

03:07:17  17  filed in July 2017 and issued in July 2018 get the benefit

03:07:24  18  of the filing date of some old patents -- patent

03:07:29  19  applications filed in October 2006.

03:07:35  20        And as you can see, that is more than 10 years.

03:07:38  21  There's a 10-year gap between the October 2006 application

03:07:45  22  and the July 2017 application.

03:07:51  23        A lot can happen in 10 years.  The evidence will

03:07:56  24  show the first iPhone was available in 2007.  Wells Fargo

03:08:03  25  was the first bank to offer mobile banking in 2007.  Wells

03:08:07  1  Fargo began offering mobile deposit in 2012, right along

03:08:14  2  with the rest of the industry, and years before USAA filed

03:08:16  3  for the patents asserted in this case in July of 2017.

03:08:19  4          Now, you might ask yourself, how can USAA file

03:08:28  5  patents in 2017 and claim they invented it in 2006?  Well,

03:08:36  6  the law allows USAA to file new applications on these old

03:08:43  7  original applications but only if -- only if those 2006

03:08:52  8  specifications describe the full scope of the invention in

03:08:57  9  the new claims.

03:08:57  10          That means for USAA to get the benefit of the

03:09:02  11  October 31st, 2006, date, the original 2006 applications

03:09:09  12  have to include a written description of the invention

03:09:14  13  claimed in the 2018 patent.

03:09:18  14          The law will not allow claims to something that

03:09:23  15  was not written down.

03:09:27  16          The evidence will show USAA did not write down in

03:09:32  17  2006 what they claimed to invent in 2018.  The claims in

03:09:36  18  the 2018 patents for the first time -- for the first time

03:09:41  19  talk about using a mobile device with a digital camera for

03:09:46  20  check deposit.

03:09:47  21          But none of that specificity was or ever has been

03:09:52  22  in those October -- was or have -- none of that specificity

03:09:57  23  was or ever has been in those October 2006 applications.

03:10:01  24          The old 2006 specifications only describe using a

03:10:09  25  desktop or a laptop computer connected to a separate camera

03:10:15  1   or scanner.  And as you see on our timeline, this is from

03:10:19  2   Figure 1 of both the '605 and the '681 patents.  This is

03:10:24  3   all that is described.

03:10:25  4        You'll have the chance to look at the 2006

03:10:30  5   specifications which are the same as the 2018

03:10:34  6   specifications.

03:10:35  7        If you look at the '605 patent, for example,

03:10:37  8   everything from where the pictures start to the beginning

03:10:42  9   of the claims on the second to the last page is the

03:10:48  10  specification from 2006.  The first page and the claims are

03:10:54  11  the new part from 2017.  And it's the same for the '681

03:11:00  12  patent.

03:11:00  13       So what happened between October 2006 and July

03:11:12  14  2017?  Well, the iPhone happened.  Mobile banking happened.

03:11:19  15  Mobile deposit happened.  And not just at Wells Fargo.  The

03:11:23  16  evidence will show USAA and its witnesses claim October

03:11:31  17  2006 as their invention date.  But without the written

03:11:32  18  description and the 2006 specifications, USAA can't claim

03:11:36  19  these more than 10 years of innovation as its own.

03:11:41  20       The patent laws don't allow an inventor to add or

03:11:44  21  expand claims.  Just like we can't expand our property line

03:11:48  22  to include our neighbor's new house, we can't secure a

03:11:52  23  Lotto ticket after the winning numbers have been announced.

03:11:57  24       Here we are limited to the property rights

03:12:01  25  described in the deed originally before the new house was

03:12:06  1   built, before the Lotto winner was announced, and before

03:12:11  2   banking moved to mobile phones.

03:12:14  3          The evidence will show that in 2006, USAA didn't

03:12:19  4   write down what it is now claiming its invention is.  So

03:12:23  5   its 2018 patents are not valid.

03:12:31  6          Well, so what is USAA saying about this?  Well,

03:12:33  7   we've heard from USAA.  They're pointing to PDAs as it's

03:12:41  8   used in the '605 patent.  PDA is an old term, personal

03:12:46  9   digital assistant.  And in 2006, they weren't smartphones,

03:12:49  10  and they weren't mobile phones.  More importantly, the '605

03:12:54  11  patent mentions PDAs exactly two times.

03:12:58  12         And here we see those two times on the screen.

03:13:02  13  And the context is important.  We talk -- the patent talks

03:13:08  14  about PDAs in the context of network or distributed

03:13:15  15  computing environment, and in the same breath as MP3

03:13:21  16  players and televisions.

03:13:26  17         The context is important in life, and it's

03:13:29  18  important in patent law.  And when we look at the context

03:13:32  19  here, we see PDAs are in the same list as MP3 players and

03:13:39  20  televisions.

03:13:40  21         The '605 patent doesn't say MP3 players or PDAs

03:13:46  22  and televisions have cameras, and it doesn't say that PDAs

03:13:53  23  and MP3 players and televisions are used for check deposit.

03:14:01  24  And the '605 patent is about check deposit.

03:14:02  25         What about the '681 patent?  Well, it doesn't

03:14:07  1   mention PDAs at all.  So when you look at what they're

03:14:12  2   pointing to, PDAs, and we think about it in the context,

03:14:21  3   the specifications from 2006 did not include what they're

03:14:22  4   trying to claim today.

03:14:26  5          Now, as you heard in the video, the patent system

03:14:31  6   works because the inventor is required to describe the

03:14:34  7   invention in clear and specific terms so that the public

03:14:39  8   knows what the boundaries of the invention are.

03:14:44  9          And the evidence will show that USAA is claiming

03:14:44  10  it wrote down its invention in 2006.  But there's nothing

03:14:49  11  in the 2006 specification to support that.  It's not enough

03:14:53  12  to find the word PDA, like it's a game of word search.  The

03:15:00  13  rules require USAA to write down the invention in clear and

03:15:04  14  specific terms, and the evidence will show they didn't do

03:15:09  15  that.

03:15:09  16         That leads me to respect for the process, the

03:15:15  17  process in place to assess property rights.  The video that

03:15:19  18  Judge Gilstrap showed you, the Federal Judicial Center

03:15:23  19  created that just for you, especially for you, to explain

03:15:29  20  why there are disputes about patents that require your

03:15:33  21  help.  You are a critical part of the process.

03:15:37  22         As Mr. Hill talked with you about earlier today,

03:15:40  23  as well, a part of the process that we greatly respect.  As

03:15:45  24  the video told us, a party accused of infringement is

03:15:48  25  entitled to challenge the accusation of infringement and is

03:15:52  1   entitled to challenge the patentability of the patent.

03:15:55  2   These aren't excuses as USAA suggested.  This is the

03:16:03  3   process in place to assess the property rights that we must

03:16:06  4   respect.

03:16:09  5        We heard also in the video why you're being asked

03:16:13  6   to review these questions.  Here, prosecution of a patent

03:16:19  7   application takes place without input from other people.

03:16:24  8   And so it's important to give other people the opportunity

03:16:27  9   to challenge it in court.

03:16:29  10       And, second, of course, of course, there's an

03:16:37  11  opportunity for mistakes to be made and for information to

03:16:41  12  be overlooked.  As we learned -- as the video told us,

03:16:46  13  examiners have a lot to work -- a lot of work to do, and no

03:16:51  14  process is perfect.

03:16:52  15       Just like the law allows us to contest the

03:17:03  16  property tax bills from the county appraisal district that

03:17:07  17  Mr. Hill talked with you about earlier today, anyone

03:17:11  18  accused of infringement is entitled to contest -- to

03:17:16  19  contest the accusation of infringement and to contest the

03:17:19  20  validity of that patent, and that process includes you.

03:17:22  21       Of course, mistakes can be made and information

03:17:27  22  can be overlooked by the Patent Office.  Your role in the

03:17:29  23  process is to be the check and balance on that Patent

03:17:32  24  Office.  The evidence will show mistakes were made here,

03:17:36  25  and catching and fixing those mistakes is exactly what our

03:17:39   1   patent system includes and depends on this very proceeding.

03:17:44   2       So let's go back to our timeline.  The evidence

03:17:49   3   will show USAA paid to put the patent applications on

03:17:53   4   Track 1, meaning the Patent Office had to act on them

03:17:59   5   within a year.  You heard in the video that it takes an

03:18:01   6   average of three years for the Patent Office to act on a

03:18:04   7   patent.

03:18:04   8       Here in the one year preceding -- in the one --

03:18:17   9   the evidence will show that during the one year preceding,

03:18:18  10   the Patent Office gave no express indication that they

03:18:21  11   looked at the 2006 specifications to confirm or to see

03:18:25  12   whether mobile phones were described during that one-year

03:18:29  13   process.

03:18:29  14       Now, in response, we heard, well, there were two

03:18:31  15   patent examiners who reviewed that and who issued the

03:18:37  16   patents.  Well, but that doesn't answer the debate.  That

03:18:43  17   doesn't end the discussion.  Here Wells Fargo is entitled

03:18:49  18   to challenge the patentability because mistakes can be made

03:18:52  19   and because information can be overlooked, and that's

03:18:55  20   exactly why we are here and why you are part of the process

03:19:02  21   to be the check and balance on the Patent Office.

03:19:04  22       You will have the opportunity to see those old

03:19:06  23   2006 specifications for yourself and use your common sense

03:19:11  24   to determine what is in there and what is not in there.

03:19:14  25       Respect for the process includes giving you the

03:19:17   1   information through documents and witnesses so you can

03:19:20   2   decide for yourself, and that is our plan to give you the

03:19:25   3   information.

03:19:29   4          In addition to the absence of written description,

03:19:32   5   Wells Fargo is going to present evidence that mobile

03:19:38   6   deposit does not infringe the patents.  USAA cannot prove

03:19:41   7   that Wells Fargo Mobile Deposit practices every element of

03:19:45   8   the claims that they're asserting.

03:19:46   9          So for the '681 patent, the claims require that

03:19:51  10   certain things happen on the mobile phone, including OCR,

03:19:54  11   or optical character recognition.  And the OCR must be

03:20:02  12   performed of the amount.  OCR is a -- an old technology

03:20:09  13   from the 1980s.  It is technology that allows a computer to

03:20:13  14   read the words and numbers on a document as the document is

03:20:18  15   being scanned.

03:20:19  16          Here -- here, the evidence will show that Wells

03:20:24  17   Fargo's system does not do what the claims require as far

03:20:28  18   as OCR of the check amount.

03:20:31  19          The evidence will also show that as to the '605

03:20:35  20   and the '681 patents, that USAA cannot prove infringement

03:20:38  21   because of the way that they chose to write its claims.

03:20:41  22   And you'll hear a lot more of that later.

03:20:43  23          Members of the jury, sometimes in a patent case,

03:20:51  24   as was mentioned in the video, jurors may feel that they

03:20:57  25   are somehow not qualified enough or lack expertise to judge

03:21:00  1   technical issues.  And there are three reasons why that

03:21:07  2   should not be of any concern for you in this case.

03:21:10  3          First, much of what you need to decide in this

03:21:14  4   case is in your notebooks.  The 2006 specification does not

03:21:18  5   include what USAA is trying to claim their invention is

03:21:23  6   today.

03:21:24  7          Second, we have brought you experts who will talk

03:21:28  8   with you about the technical issues, and they will be able

03:21:31  9   to explain to you all of the technology in a way that can

03:21:37  10  be understood by all.

03:21:40  11         And, third, you will be able to assess the

03:21:43  12  credibility and the believability of the witnesses that

03:21:45  13  come before you based on your common sense, your own

03:21:49  14  experiences, and your judgment about who can be trusted and

03:21:53  15  who you need to be a little more cautious about.

03:21:56  16         Lastly, let's talk about respect for the value of

03:22:00  17  the property rights.  The evidence will show that the

03:22:07  18  patents are not valid and not infringed, but out of respect

03:22:10  19  for the process, as Mr. Hill told you earlier, Wells Fargo

03:22:13  20  will present evidence about the value of any legitimate

03:22:18  21  invention in the patents.  To be clear, the law allows USAA

03:22:21  22  to be compensated for the value of what it actually

03:22:28  23  invented and nothing more, and in this case, no earlier

03:22:32  24  than August 2018 when it filed its lawsuit.

03:22:39  25         Here the evidence will show USAA is trying to

03:22:42  1   broaden its invention to capture the value of things that

03:22:46  2   already existed in 2006.  USAA is claiming the value of

03:22:52  3   pre-existing technologies -- other people's property as its

03:22:56  4   invention.  So how -- how do we know that?

03:23:01  5        Well, you didn't hear much of this from USAA in

03:23:04  6   its opening, but you'll hear from their damages expert,

03:23:08  7   Mr. Weinstein, and he believes that the value of the

03:23:12  8   inventions in these patents are fraud prevention and fraud

03:23:16  9   detection.  And he relies on another USAA witness,

03:23:21  10  Mr. Calman.  I'm not sure whether you'll hear from him or

03:23:25  11  not in this case.

03:23:26  12       But they say that the value of the patents is

03:23:31  13  fraud prevention and fraud detection.  But when you look at

03:23:34  14  those patents, you won't see the word fraud, you won't see

03:23:39  15  the words fraud prevention, and you won't see the words

03:23:44  16  fraud detection.

03:23:44  17       One kind of fraud prevention is called duplicative

03:23:49  18  detection.  It's what banks use to make sure the same check

03:23:55  19  isn't deposited twice, whether by mistake or intentionally.

03:23:59  20  And there are many ways to do it, and the evidence will

03:24:02  21  show that Wells Fargo has been using duplicate detection

03:24:04  22  for decades, even before October 2006.

03:24:07  23       But Wells Fargo began as a bank in the 1850s.  As

03:24:12  24  you might imagine, a bank that's been around for nearly 170

03:24:16  25  years has many customers across the United States.  Wells

03:24:22  1   Fargo has over 5,500 branches, over 13,000 ATMs across the
03:24:27  2   United States to serve its customers, including members of
03:24:34  3   the armed forces, but Wells Fargo serves everybody.
03:24:36  4          In addition to these physical locations, Wells
03:24:39  5   Fargo offers online banking, and the evidence will show
03:24:45  6   that Wells Fargo was -- was first in Internet banking,
03:24:48  7   first in remote deposit capture, and first in mobile
03:24:55  8   banking.
03:24:55  9          Wells Fargo has never been sitting on the
03:24:57  10  sidelines.  It has never been watching for innovation.
03:25:01  11  Wells Fargo has been an innovator and an innovator in
03:25:08  12  online technology since the beginning.
03:25:09  13         Now, let me introduce you to one of Wells Fargo's
03:25:12  14  engineers Mr. Byron Chun.
03:25:14  15         Mr. Chun, will you please stand up?  Thank you.
03:25:20  16         Mr. Chun has been a software engineer for 23 years
03:25:25  17  at Wells Fargo.  In 2004, Mr. Chun created an online
03:25:29  18  website for Wells Fargo for its customers to use with an
03:25:32  19  existing scanner so they could deposit checks without
03:25:36  20  having to go to the branch and deposit them in person.
03:25:40  21  This service is called Desktop Deposit.
03:25:43  22         By March 2005, Desktop Deposit was launched
03:25:50  23  nationwide, and it is still in use today.  At the time,
03:25:54  24  Desktop Deposit was available in 2004.  Duplicate
03:25:57  25  detection, amount verification, customer authentication,

03:26:02  1  logging, endorsement checking, these fraud prevention --

03:26:11  2  these fraud prevention measures were already in place at

03:26:16  3  the time Desktop Deposit was made nationwide in 2005.

03:26:18  4       So all of the fraud benefit -- excuse me, all the

03:26:22  5  fraud prevention and detection benefits that USAA points to

03:26:26  6  as the value of these patents was already in place at least

03:26:34  7  by 2005 when this Desktop Deposit was launched nationwide.

03:26:39  8       THE COURT:  You have five minutes remaining.

03:26:42  9       MS. WILLIAMS:  Thank you, Your Honor.

03:26:42  10      Now, USAA may point to the language and the claim

03:26:44  11  that duplicate detection is performed.  Well, the patent

03:26:47  12  claims don't describe any particular approach or method for

03:26:50  13  duplicate detection, just that it occurs.  And so let me

03:26:54  14  give you an illustration.

03:26:57  15      And here we have on the screen a patent that

03:27:00  16  has -- or is not a patent.  It has never been issued.  But

03:27:05  17  just to give you an illustration of what I'm talking about.

03:27:07  18      If you got a patent on landing on the moon and the

03:27:09  19  first step was getting into a rocket ship, the second is

03:27:14  20  flying the rocket ship to the moon and the second is

03:27:16  21  landing on the moon, well, that second step, flying the

03:27:19  22  rocket ship, is a little more complicated than just flying

03:27:23  23  the rocket ship.

03:27:25  24      And that's exactly what we have here.  We've got

03:27:28  25  duplicate detection and these other fraud prevention

03:27:32    1    methods just simply stated in the patent.  But there's no

03:27:36    2    description of any new method.  It can just be any old way

03:27:39    3    of doing those.

03:27:42    4            Now, we're surprised in this case to hear that

03:27:49    5    USAA is saying Wells Fargo should pay for the benefit of

03:27:51    6    duplicate detection and these other features, especially

03:27:57    7    since Wells Fargo has been doing duplicate detection and

03:27:59    8    these other fraud prevention measures since well before the

03:28:02    9    patent applications were filed, and certainly before 2006.

03:28:07   10            And since USAA didn't actually do any of the work

03:28:14   11    inventing any of those fraud prevention features, and we're

03:28:18   12    certainly surprised to hear Wells Fargo -- excuse me, hear

03:28:21   13    USAA say that the inventions are worth over a hundred

03:28:25   14    million dollars and 85 cents per deposit because the

03:28:28   15    evidence will show we're not using it.  USAA didn't invent

03:28:30   16    these fraud prevention features.  And nobody, nobody has

03:28:34   17    ever paid USAA to license these patents.

03:28:38   18            Here, USAA is trying to take credit for work it

03:28:43   19    didn't do and for value it doesn't provide.

03:28:48   20            So let's talk about what happens now.  USAA is

03:28:51   21    going to go first and present its witnesses.  As Mr. Hill

03:28:54   22    mentioned this morning, we will have the opportunity to

03:28:57   23    cross-examine them.  We will respect your time by bringing

03:29:01   24    out information that's important to our case.

03:29:03   25            Now, some questioning will be longer and others

03:29:07  1  will be shorter, but we will take the time to bring out the

03:29:11  2  information that's important to this case.

03:29:13  3      Then we will present our witnesses, and let me

03:29:17  4  just take a minute to introduce a few of those I expect you

03:29:20  5  may meet this week if time permits.

03:29:23  6      So Mr. Al Hecht, will you please stand up?

03:29:26  7      So Mr. Hecht has spent nearly his 35-year career

03:29:32  8  all in check processing.  He has been at the forefront of

03:29:35  9  all check processing technology during his career.  And I

03:29:39 10  think you will be surprised to hear what USAA is claiming

03:29:43 11  in this case after you hear from Mr. Hecht.

03:29:46 12      Mr. Bill Saffici, will you please stand up?

03:29:51 13  Mr. -- thank you.

03:29:53 14      Mr. Saffici will talk with you about why the

03:29:55 15  patents are invalid and what he has looked at.  He has

03:29:59 16  spent his entire 50-year career in check processing, and I

03:30:04 17  think that you will find him very refreshing.  He has

03:30:10 18  hands-on experience all of those 50 years, and will be --

03:30:13 19  bring that practical objective perspective to you.

03:30:15 20      Dr. Villasenor, will you please stand up?  Thank

03:30:22 21  you.

03:30:22 22      This is Dr. Villasenor.  He has taught me the

03:30:24 23  technology in this case, and he will teach you the

03:30:27 24  technology in this case as well.

03:30:29 25      And then, lastly, Mr. Chris Gerardi, will you

03:30:35  1   please stand up?  Thank you.

03:30:37  2        Mr. Gerardi has over 25 years experience in

03:30:40  3   valuing patents, and he will talk with you about the proper

03:30:44  4   measure of damages, if any, in this case.

03:30:47  5        Members of the jury, this case is about respect

03:30:50  6   for rules.  If you didn't write down your invention in

03:30:56  7   2006, you can't claim it in 2018.  If you can't prove

03:31:01  8   infringement element-by-element, then you haven't proven

03:31:07  9   infringement.  It's that simple.

03:31:10  10        Thank you for your time, and we look forward to

03:31:12  11   presenting our case to you.

03:31:16  12        THE COURT:  All right.  Ladies and gentlemen of

03:31:19  13   the jury, you've now heard the opening statements from both

03:31:21  14   Plaintiff and Defendant.

03:31:23  15        Before we proceed with the Plaintiff's

03:31:24  16   case-in-chief and they call their first witness, we're

03:31:27  17   going to take a short recess.

03:31:29  18        This is one of those times when you can simply

03:31:31  19   close your juror notebooks and leave them in your chairs.

03:31:34  20   My intention is to have you back shortly, and we'll

03:31:37  21   continue then with the Plaintiff's first witness.

03:31:39  22        Remember, during this recess, not to discuss the

03:31:41  23   case among yourselves.  Follow all the instructions I've

03:31:44  24   given you.  Get a drink of water, stand up, shake your legs

03:31:48  25   around, and then come back in, and we'll continue with the

```
03:31:51    1    Plaintiff's first witness.

03:31:52    2            The jury is excused for recess.

03:32:11    3            (Jury out.)

03:32:14    4            THE COURT:  Be seated, please.

03:32:19    5            Off the record.

03:32:34    6            (Pause in proceedings.)

03:32:34    7            THE COURT:  Back on the record.

03:32:37    8            Couple of things.  I know that Judge Payne denied

03:32:42    9    granting an order in limine on describing and making

03:32:47   10    reference to the PTO.  I just heard enough of making them

03:32:54   11    angels and devils at the same time to lead me to tell you

03:32:57   12    all I don't want to hear about the expert, trained

03:33:00   13    examiners who are flawless anymore, on the PTO.  And I

03:33:04   14    don't want to hear about the crazy, sloppy, they're always

03:33:07   15    wrong examiners, from the other side, of the PTO.  I do not

03:33:11   16    want to hear descriptions or characterizations of the

03:33:14   17    United States Patent and Trademark Office or its examiners

03:33:17   18    any further in this trial unless you come and get prior

03:33:20   19    permission from me at the bench.  All right?

03:33:23   20            I'm, in effect, granting that order in limine from

03:33:26   21    the bench now because of what I heard from both sides

03:33:29   22    during opening statements.

03:33:30   23            Secondly, I want to remind Defendants of something

03:33:35   24    we talked about in chambers this morning when I precluded

03:33:40   25    them from using a demonstrative slide under their written
```

03:33:43  1  description defense that called for a requirement of an

03:33:47  2  integrated camera which I struck and told them they

03:33:51  3  couldn't use that slide with that language in it because

03:33:53  4  that was really a description of the product, not the claim

03:33:57  5  language.

03:33:57  6       Your written description defense is going to have

03:34:00  7  to hew to the claim language, not to the products that may

03:34:03  8  have presented themselves in the marketplace later.  You

03:34:06  9  can't take old language and then say because some new

03:34:10  10  product that we say falls within that broad language isn't

03:34:16  11  fitting the description, then we win on written

03:34:17  12  description.  You're going to have to live or die by the

03:34:19  13  language of the claims and not any products or their

03:34:22  14  descriptions or their absence from the actual language in

03:34:26  15  the specification.

03:34:27  16       And I want to reiterate that on the record, and

03:34:30  17  I'm doing it now, because I see a tendency for the

03:34:32  18  Defendants to go away from the claim language and toward

03:34:38  19  products that are beyond the scope of the claim language

03:34:41  20  with regard to this written defense -- written description

03:34:44  21  defense.  And I want to make it crystal clear on the record

03:34:47  22  that that's not permissible, and I'm going to instruct the

03:34:49  23  Defendants to avoid that going forward.

03:34:54  24       I thought we covered that off the record in

03:34:56  25  chambers this morning, but I am concerned about that,

| | | |
|---|---|---|
| 03:35:00 | 1 | having heard the opening arguments that I just heard. |
| 03:35:02 | 2 | All right.  With those clarifications, we're going |
| 03:35:04 | 3 | to take about a five-minute recess, then we'll come back in |
| 03:35:06 | 4 | and proceed with Plaintiff's first witness. |
| 03:35:08 | 5 | The Court stands in recess. |
| 03:35:11 | 6 | COURT SECURITY OFFICER:  All rise. |
| 03:35:12 | 7 | (Recess.) |
| 03:46:04 | 8 | (Jury out.) |
| 03:46:05 | 9 | COURT SECURITY OFFICER:  All rise. |
| 03:46:06 | 10 | THE COURT:  Mr. Sheasby, the Plaintiff's first |
| 03:46:08 | 11 | witness is Brady; is that correct? |
| 03:46:09 | 12 | MR. SHEASBY:  Yes, Your Honor. |
| 03:46:10 | 13 | THE COURT:  What's your expected time for direct |
| 03:46:12 | 14 | examination? |
| 03:46:13 | 15 | MR. SHEASBY:  An hour and 15 minutes, Your Honor. |
| 03:46:14 | 16 | THE COURT:  All right.  And, Mr. Hill, you're |
| 03:46:16 | 17 | going to cross? |
| 03:46:18 | 18 | MR. HILL:  I am, Your Honor. |
| 03:46:19 | 19 | THE COURT:  What's your best guess on time to |
| 03:46:22 | 20 | cross? |
| 03:46:22 | 21 | MR. HILL:  It could be 60 to 90 minutes, Your |
| 03:46:26 | 22 | Honor. |
| 03:46:26 | 23 | THE COURT:  How long is the Oakes deposition, both |
| 03:46:30 | 24 | designations and counters, estimated? |
| 03:46:41 | 25 | MS. GLASSER:  18 minutes. |

| | | |
|---|---|---|
| 03:46:42 | 1 | MR. SHEASBY:  18 minutes. |
| 03:46:43 | 2 | THE COURT:  It doesn't look like we're going to |
| 03:46:45 | 3 | get to Mr. Conte today.  I understand that we have disputes |
| 03:46:48 | 4 | that are still unresolved.  We'll have to do that either |
| 03:46:51 | 5 | after I send the jury out or tomorrow morning. |
| 03:46:51 | 6 | My -- my question was calculated to determine |
| 03:46:56 | 7 | whether we realistically were going to get to Conte today |
| 03:46:58 | 8 | or not.  It does not look like it. |
| 03:47:01 | 9 | Anybody see it differently? |
| 03:47:03 | 10 | MR. HILL:  No, sir. |
| 03:47:03 | 11 | MR. SHEASBY:  No, Your Honor. |
| 03:47:04 | 12 | THE COURT:  Okay. |
| 03:47:04 | 13 | MR. SHEASBY:  Your Honor, there are a couple of |
| 03:47:05 | 14 | issues, with your permission. |
| 03:47:07 | 15 | THE COURT:  All right.  What have you got? |
| 03:47:08 | 16 | MR. SHEASBY:  One, we would like to invoke the |
| 03:47:10 | 17 | Rule, if you would allow us to do so. |
| 03:47:15 | 18 | THE COURT:  I intend to ask you that as soon as we |
| 03:47:16 | 19 | get the jury back in the box. |
| 03:47:16 | 20 | MR. SHEASBY:  The second issue is, we did want to |
| 03:47:17 | 21 | flag two issues relating to limine.  One, that we had an |
| 03:47:21 | 22 | express agreement in front of Judge Payne that Wells Fargo |
| 03:47:25 | 23 | would only say there are no licenses to the asserted |
| 03:47:28 | 24 | patents. |
| 03:47:28 | 25 | THE COURT:  You need to go to the podium, |

03:47:30  1   Mr. Sheasby.  When you turn and look at your notes and

03:47:32  2   start talking, I don't hear you.

03:47:34  3        MR. SHEASBY:  I apologize.

03:47:35  4        We had an express agreement with Judge Payne that

03:47:38  5   the only description of licensing was, quote, no licenses

03:47:42  6   to the asserted patents.  Counsel referred to no one has

03:47:46  7   paid for a license to the asserted patents.  And may -- I

03:47:49  8   understand you made -- it is of particular sensitive to us,

03:47:54  9   and we just request that the actual language that Judge --

03:47:57  10  Judge Payne used be used in the future.  That's our first

03:48:00  11  concern.

03:48:01  12       The second concern is that there was reference

03:48:03  13  made to a fast-track process, that the Patent Office only

03:48:08  14  had a year to -- to conduct the examination, and I don't

03:48:12  15  believe that's proper.  This is not about angels versus

03:48:16  16  devils.  I take the Court's admonition, but that was

03:48:19  17  clearly not proper to suggest that somehow the Patent

03:48:24  18  Office -- this got railroaded through or that because we

03:48:27  19  used this procedure, that there was something improper.

03:48:30  20  And there was reference to that in the opening.

03:48:33  21       I'm not so concerned -- I don't want to ask for a

03:48:36  22  curative instruction at this point, but I am concerned that

03:48:38  23  it will continue in Mr. Brady's deposition --

03:48:44  24  cross-examination.

03:48:44  25       And then the third issue that I have is there was

03:48:47   1   reference to monopolies increasing the prices on -- on

03:48:50   2   customers.

03:48:50   3           And, once again, I don't want a limine

03:48:54   4   instruction, but that has no place in this case to suggest

03:48:58   5   that somehow this patent right is going to increase cost on

03:49:01   6   customers.  I don't think that's a proper argument.  And --

03:49:04   7   and I would just want to state for the record my objection

03:49:06   8   to those three points, Your Honor.

03:49:07   9           THE COURT:  All right.

03:49:17  10           MR. HILL:  May I respond, Your Honor?

03:49:19  11           THE COURT:  You may respond briefly.

03:49:20  12           MR. HILL:  Thank you.

03:49:21  13           Your Honor, with regard to the licenses issue,

03:49:24  14   that's cutting it pretty thin.  He's seeking to

03:49:28  15   micromanage, not keep a skunk out of the jury box, the

03:49:32  16   purpose of a limine, but micromanage how the same fact is

03:49:34  17   delivered to the jury.

03:49:35  18           Saying the patents have not been licensed or no

03:49:37  19   one has licensed or no one has paid USAA for a license,

03:49:41  20   Your Honor, all state the same fact.  None in a more

03:49:46  21   inflammatory way than another.

03:49:49  22           And so we would ask for the freedom to try our

03:49:50  23   case, both having different perspectives, since that

03:49:53  24   doesn't implicate any concerns that ought to be of concern

03:49:54  25   to confusing or creating some unfairness properly for a

03:49:58    1    limine issue.

03:49:59    2           On the fast-track issue, Your Honor -- fast track

03:50:01    3    was not said -- let's be clear about that -- in the opening

03:50:05    4    statement.  What was said is that they were given Track

03:50:09    5    1 -- a Track 1 request was made and that that required that

03:50:11    6    it occur within a year.

03:50:12    7           Your Honor, part of our defense, properly so, is

03:50:15    8    that we believe a mistake was made.  We have to say that.

03:50:19    9    We -- we get to say that.  And as part of common sense,

03:50:24   10    when things happen faster, sometimes mistakes are made.

03:50:27   11    That's the whole basis of the -- of putting that forward

03:50:30   12    for the jury to consider.  It's also a plain fact of record

03:50:34   13    that appears in the prosecution history.

03:50:37   14           And so we don't believe there's anything improper

03:50:39   15    about pointing out the timeline as part of the holistic

03:50:44   16    picture of the issuance of these patents.

03:50:46   17           Final issue, Your Honor, on the issue of

03:50:49   18    monopolies, the Georgia-Pacific factors reference the

03:50:53   19    patent monopoly.  The patent videos themselves discuss this

03:50:56   20    exclusive right.  It is what it is.  There's nothing

03:50:57   21    pejorative about discussing that a patent is a monopoly.

03:51:03   22           And if -- so beyond that, there's been references

03:51:05   23    by both parties to cost associated with -- they say it

03:51:09   24    saves us lots of money.  As such, that, you know, it saves

03:51:12   25    consumers money, saves -- and for us to suggest that the

03:51:16   1   patent monopoly -- a patent monopoly in the abstract used

03:51:20   2   improperly could drive up prices is not improper.

03:51:24   3          THE COURT:  All right.  Well, I don't want to hear

03:51:31   4   any more argument.  There was an agreement worked out

03:51:34   5   before Judge Payne during the pre-trial process on precise

03:51:37   6   language.  I want that precise language used.

03:51:40   7          MR. HILL:  And, Your Honor, that's where I

03:51:41   8   quarrel.  I don't believe that there is a stipulation of

03:51:44   9   precise language before Judge Payne.  Judge Payne said,

03:51:46  10   when we asked, can we say that the patents have never been

03:51:51  11   licensed, he said, yeah.  It wasn't as if we stipulated to

03:51:55  12   a text of a stipulation.

03:51:56  13          THE COURT:  All right.  Then I'll give you a

03:51:57  14   stipulation right now or I'll give you guidance right now.

03:52:00  15          You can say that there are no licenses.  You're

03:52:03  16   not going to say that someone didn't pay for a license.

03:52:07  17   The language you're -- both sides will use is that there

03:52:11  18   are -- there is not a license.  Simple fact.  Don't

03:52:19  19   characterize it.  Don't put the word "paid," "rejected,"

03:52:19  20   "offered," no characterization.  Simply the statement,

03:52:21  21   there are no -- there is no license.  And that's how I want

03:52:25  22   it handled from this point forward.

03:52:28  23          Part of my instruction after the jury left for

03:52:41  24   recess after openings with regard to denigrating the PTO

03:52:45  25   had to do with this Track 1 or fast-track process.  It's

| | | |
|---|---|---|
| 03:52:49 | 1 | clear that these patents were submitted to the PTO under |
| 03:52:53 | 2 | that Track 1 procedure. |
| 03:53:03 | 3 | But at this point I do not and I'm not going to |
| 03:53:03 | 4 | permit a characterization of that procedure as inherently |
| 03:53:05 | 5 | flawed or -- or error-ridden or some other denigrating way |
| 03:53:11 | 6 | to describe it.  It is what it is.  These applications were |
| 03:53:14 | 7 | submitted under it.  And that's all that needs to be said |
| 03:53:18 | 8 | about that process. |
| 03:53:19 | 9 | That doesn't preclude the Defendant from saying |
| 03:53:22 | 10 | they think the Patent Office made a mistake.  You have the |
| 03:53:25 | 11 | right to say you think they made a mistake and to show why |
| 03:53:28 | 12 | you think they made a mistake. |
| 03:53:31 | 13 | But you don't get to say that the application |
| 03:53:32 | 14 | process is somehow rushed up, hurried, imprecise, improper, |
| 03:53:39 | 15 | inefficient, ineffective, whatever adjective you can put |
| 03:53:44 | 16 | with it.  I don't want to characterize the fast-track or |
| 03:53:47 | 17 | Track 1 process other than identify it for what it is. |
| 03:53:51 | 18 | Then separate and apart from that, if there's an |
| 03:53:54 | 19 | argument about a mistake made and a substantive basis for |
| 03:53:56 | 20 | it in the evidence, then we'll cross that bridge when it |
| 03:54:00 | 21 | comes to closing arguments about how you characterize it. |
| 03:54:02 | 22 | All right? |
| 03:54:03 | 23 | MR. HILL:  Your Honor, just out of -- out of full |
| 03:54:05 | 24 | disclosure -- well, I'll bring this up, Your Honor, after |
| 03:54:09 | 25 | we see Mr. Brady's direct examination. |

03:54:12   1          THE COURT:  If there are any questions about

03:54:14   2    following my instructions, come to the bench for

03:54:18   3    clarification.

03:54:18   4          MR. HILL:  Yes, sir.

03:54:18   5          THE COURT:  That goes to both sides.

03:54:20   6          And with regard to the monopoly character of a

03:54:23   7    patent as raising prices for consumers, that's -- that's no

03:54:31   8    more proper than the old arguments if you pay this much per

03:54:35   9    this component, then the price of your cell phone is going

03:54:38  10    to be $10,000.00.  Those arguments are -- are not proper.

03:54:44  11    They never have been.

03:54:45  12          There is a -- there is a monopoly characteristic

03:54:48  13    inherent for a set term as a part of the patent issuance

03:54:52  14    process.  We all know that.  That's a fact.  It doesn't

03:54:55  15    need to be characterized.  It doesn't need to be attributed

03:54:58  16    to higher prices or consumer impacts or anything either

03:55:03  17    overtly positive or overtly negative.  It needs to be

03:55:07  18    stated as a fact, if it's stated at all, but not

03:55:10  19    characterized.

03:55:10  20          MR. HILL:  Thank you, Your Honor.  And just --

03:55:11  21    just to make sure, because our goal, Your Honor, of course,

03:55:14  22    is to stay on the right side of everything with you, and so

03:55:18  23    I want to make sure that the issue is not saying the word

03:55:21  24    monopoly.  Are you telling us we can say that or we cannot

03:55:25  25    say that, I just want to be clear.

| | | |
|---|---|---|
| 03:55:27 | 1 | THE COURT:  As long as you're describing the |
| 03:55:28 | 2 | characteristics of an issued patent as granting a -- a |
| 03:55:36 | 3 | monopoly for a limited time. |
| 03:55:37 | 4 | MR. HILL:  Yes, sir.  Yes, sir.  That's all I |
| 03:55:39 | 5 | wanted to clarify. |
| 03:55:39 | 6 | THE COURT:  But that's all. |
| 03:55:40 | 7 | MR. HILL:  Thank you. |
| 03:55:41 | 8 | THE COURT:  All right.  Any questions about that |
| 03:55:43 | 9 | guidance from either Plaintiff or Defendant? |
| 03:55:44 | 10 | MR. SHEASBY:  Nothing from Plaintiffs, Your Honor. |
| 03:55:46 | 11 | MR. MELSHEIMER:  Well-understood, Your Honor. |
| 03:55:48 | 12 | THE COURT:  All right.  Mr. Sheasby, this is your |
| 03:55:51 | 13 | witness.  You can go to the podium and prepare. |
| 03:55:54 | 14 | While you're doing that, you can bring in the |
| 03:55:56 | 15 | jury, please. |
| 03:56:28 | 16 | (Jury in.) |
| 03:56:28 | 17 | THE COURT:  Welcome back, ladies and gentlemen. |
| 03:56:33 | 18 | Please be seated. |
| 03:56:33 | 19 | Counsel, does either party wish to invoke the Rule |
| 03:56:37 | 20 | at this time? |
| 03:56:37 | 21 | MR. SHEASBY:  Plaintiffs wish to invoke the Rule, |
| 03:56:40 | 22 | Your Honor. |
| 03:56:40 | 23 | THE COURT:  All right.  Is this request, counsel, |
| 03:56:45 | 24 | to exclude expert witnesses? |
| 03:56:47 | 25 | MR. SHEASBY:  It is not, Your Honor, only fact |

03:56:50  1   witnesses.

03:56:52  2          THE COURT:  No, the request to invoke the Rule

03:56:54  3   would exclude its application to expert witnesses.

03:56:57  4          MR. SHEASBY:  Yes, Your Honor.

03:56:58  5          THE COURT:  That's what I thought you meant.

03:57:00  6          Okay.  The Rule has been invoked.  That means

03:57:03  7   unless you are a corporate representative, a designated

03:57:06  8   expert witness, then you are to excuse yourself from the

03:57:12  9   courtroom and remain outside until you're called, which

03:57:15  10  categorically should leave fact witnesses -- fact witnesses

03:57:19  11  as those that are covered by the invocation of the Rule

03:57:21  12  here.

03:57:22  13         So if you're a fact witness in this case and

03:57:24  14  you're not an expert witness and you're not a corporate

03:57:27  15  representative, then you should excuse yourself and remain

03:57:30  16  outside until you're called to testify, and then only be

03:57:33  17  present in the courtroom during your testimony.

03:57:35  18         For the record, the Rule on that basis has been

03:57:38  19  invoked.

03:57:39  20         MR. SHEASBY:  Thank you, Your Honor.

03:57:40  21         THE COURT:  All right.  Plaintiff, call your first

03:57:43  22  witness.

03:57:43  23         MR. SHEASBY:  Your Honor, Plaintiffs call their

03:57:46  24  first witness, Mr. John Brady, USAA's corporate

03:57:49  25  representative.

03:57:49   1            THE COURT:  All right.  If you'll come forward and

03:57:51   2      be sworn by our courtroom deputy, please, Mr. Brady.

03:57:57   3            (Witness sworn.)

03:57:58   4            THE COURT:  Please come around, sir.  Have a seat

03:58:09   5      on the witness stand.

03:58:12   6            All right.  Counsel, you may proceed with your

03:58:25   7      direct examination.

03:58:25   8            MR. SHEASBY:  Thank you, Your Honor.

03:58:25   9                 JOHN BRADY, PLAINTIFF'S WITNESS, SWORN

03:58:25  10                      DIRECT EXAMINATION

03:58:26  11      BY MR. SHEASBY:

03:58:26  12      Q.  Good afternoon, Mr. Brady.  Can you introduce yourself

03:58:29  13      to the jury?

03:58:30  14      A.  Yes.  My name is John Brady.

03:58:32  15      Q.  Why are you testifying today, Mr. Brady?

03:58:35  16      A.  I was one of the technology leaders at USAA at the bank

03:58:39  17      when we initially implemented consumer remote deposit

03:58:45  18      capture.  I was also the technology sponsor or the

03:58:49  19      technology lead for the project.  And I -- I've been with

03:58:54  20      USAA for 15 years, and have been involved in pretty much

03:59:00  21      every technology project with the bank for the past 15

03:59:02  22      years.

03:59:03  23            MR. SHEASBY:  Can you turn to PX-1186 and PX-1187,

03:59:09  24      Mr. Huynh, can you put those on the screen?

03:59:11  25            THE WITNESS:  I forgot to bring my exhibits.  Can

| | | |
|---|---|---|
| 03:59:13 | 1 | I grab my exhibits, please? |
| 03:59:16 | 2 | MR. SHEASBY:  Your Honor, with your permission, I |
| 03:59:18 | 3 | will approach the witness with the exhibits. |
| 03:59:19 | 4 | THE COURT:  You may approach the witness. |
| 03:59:33 | 5 | THE WITNESS:  Thank you very much. |
| 03:59:34 | 6 | Q.  (By Mr. Sheasby)  We're looking -- Mr. Brady, do you |
| 03:59:37 | 7 | recognize PX-1186 and PX-1187? |
| 03:59:39 | 8 | A.  Yes, these are the two patents involved in the case, |
| 03:59:41 | 9 | the '605 patent and the '681 patent. |
| 03:59:43 | 10 | Q.  Can you point out USAA's name on both? |
| 03:59:46 | 11 | A.  USAA is listed as the assignee, which means that the |
| 03:59:53 | 12 | U.S. Government awarded those patents to USAA. |
| 03:59:55 | 13 | Q.  Can you tell us a bit about yourself, please? |
| 03:59:58 | 14 | A.  Sure.  I was -- I was born in Little Rock, Arkansas. |
| 04:00:05 | 15 | I -- I moved here around 15 years ago to go to work for |
| 04:00:09 | 16 | USAA.  I now live in San Antonio, Texas.  And I have a -- a |
| 04:00:15 | 17 | wonderful wife.  We've been married for 33 years.  And I |
| 04:00:19 | 18 | have a -- a son, who is now 28, and he is -- I'm very proud |
| 04:00:25 | 19 | of him. |
| 04:00:26 | 20 | Q.  What is your position at USAA? |
| 04:00:28 | 21 | A.  I am vice president of platform management at USAA. |
| 04:00:32 | 22 | Q.  Is that an executive-level position? |
| 04:00:34 | 23 | A.  Yes, it is an executive-level position.  I'm also an |
| 04:00:39 | 24 | officer of the company. |
| 04:00:40 | 25 | Q.  What is the size of the team that you lead at USAA? |

04:00:43   1   A.   Currently, my team is -- is just over a thousand

04:00:51   2   people.   That includes both contractors as well as

04:00:53   3   employees.

04:00:53   4   Q.   What is consumer remote deposit capture?

04:00:56   5   A.   Consumer remote deposit capture is a sophisticated set

04:01:04   6   of technologies that USAA has developed that allows a --

04:01:07   7   a -- one of our members to deposit a check using -- using a

04:01:12   8   portable device that can capture a digital image and then

04:01:17   9   deposit that check into their -- into their checking

04:01:21  10   account.

04:01:22  11   Q.   Can you show an example of USAA's current consumer

04:01:31  12   remote deposit capture system?

04:01:31  13   A.   Yes, I can.   I believe we have a video.

04:01:34  14           MR. SHEASBY:   Mr. Huynh, can we have PDX-06,

04:01:39  15   please?

04:01:39  16   A.   So here someone check -- clicks the deposit button.

04:01:39  17   They say they want to deposit a check.   At that point, the

04:01:43  18   app instructs them to take a picture of the front of the

04:01:47  19   check, and then it will ask them to turn the check over,

04:01:51  20   capture a picture of the back of the check, notice it does

04:01:54  21   it automatically, and then at that point, we asked them to

04:02:05  22   enter the -- verify the -- the check by looking at the

04:02:09  23   thumbnail images, and then looking at the checking account,

04:02:11  24   and then enter the amount of the check.

04:02:15  25           And then at this point, we call all of the

04:02:19   1   validation that's necessary to -- to make sure that we have

04:02:23   2   a good image quality, that we meet all the fraud checks at

04:02:27   3   that point, and that we are -- we are ready to accept the

04:02:31   4   check, and then we give that confirmation back to the -- to

04:02:34   5   our members.

04:02:35   6   Q.   (By Mr. Sheasby)   What -- what technology teams had a

04:02:37   7   role in the creation of consumer remote deposit capture?

04:02:40   8   A.   There were two technology teams.   There was our Applied

04:02:45   9   Research team, as well as our bank IT technology team.

04:02:49   10   Q.   What was the scale of the research budget at USAA in

04:02:54   11   the 2005 to 2009 time period?

04:02:56   12   A.   2005 to 2009?

04:02:58   13   Q.   Yes.

04:02:59   14   A.   We -- we actually do quite a bit of research and

04:03:06   15   development for a company our size.   During that time

04:03:09   16   frame, I would say that we spent probably close to

04:03:13   17   $1.5 billion in -- in technology and software development.

04:03:16   18   Q.   What is the Applied Research division at USAA?

04:03:19   19   A.   The -- the Applied Research division is actually a

04:03:25   20   subset of that overall research and development group, and

04:03:28   21   it is a group of research engineers that is specifically

04:03:32   22   focused on looking at more advanced technologies, more

04:03:37   23   forward thinking technologies, thinking longer term

04:03:40   24   about -- about some of those technologies and how we can --

04:03:43   25   how we can bring those -- those technologies to our

04:03:46  1  members.

04:03:48  2          MR. SHEASBY:  Mr. Huynh, can we put back up

04:03:51  3  PX-1186 and PX-1187?

04:03:53  4  Q.  (By Mr. Sheasby)  Mr. Brady, can you tell us who are

04:03:56  5  the inventors on the patents-in-suit?

04:03:57  6  A.  Yes.  They're actually spread across the two patents

04:04:02  7  here.  We have a total of 10 inventors, most of them are on

04:04:06  8  the '605 patent, the -- the one that is at the -- the top

04:04:13  9  left.  Let's see, let me start, Chuck Oakes, let me list

04:04:19  10 the people from our Applied Research team first.

04:04:21  11          Chuck Oakes is from our Applied Research team,

04:04:24  12 Randy Morlen is from our Applied Research team, Mike Morris

04:04:28  13 is from our Applied Research team, along with Rey Medina.

04:04:33  14 And then a couple of names down is a gentleman named Bharat

04:04:38  15 Prasad.  So those are the five members off of our -- our

04:04:41  16 Applied Research team.

04:04:42  17          We also have some members here from our bank IT

04:04:46  18 technology team.  We have Greg Harpel, who is about halfway

04:04:51  19 down on the -- on the top left.  We have Frank Major.  We

04:04:58  20 also have Jeff Pollack.  And then the other member of our

04:05:04  21 IT bank technology team is on the other patent, the '681

04:05:07  22 patent, he's down at the bottom, Troy Huth.

04:05:13  23          There's one other name on here that I want to

04:05:14  24 point out on here, as well, that's in the middle of the --

04:05:19  25 the one in the top -- top left corner, that is Gabe Gavia.

04:05:24  1  Gabe was a member of our business area that performed

04:05:28  2  check -- check processing.

04:05:29  3  Q.  Between the inventors, how many years of engineering

04:05:31  4  experience did they have at the time of the inventions?

04:05:34  5  A.  I would say this is a really talented group of these

04:05:41  6  10.  This -- we have close to a hundred -- 150 patents that

04:05:48  7  these -- these named -- these 10 people are listed as the

04:05:52  8  inventors on.  I think we're really lucky to have such a

04:05:55  9  great talented group at USAA.

04:05:57  10  Q.  Are these the only engineers who have worked in the

04:06:07  11  mobile remote deposit program between 2004 and 2009?

04:06:08  12  A.  No, they're not.  I would say that we had quite a --

04:06:12  13  excuse me -- quite a large group at times.  We had close to

04:06:15  14  40 people working on developing the technology.

04:06:17  15  Q.  How many years of engineering experience did the

04:06:20  16  inventors have?

04:06:21  17  A.  I believe that's 150, yes.

04:06:26  18  Q.  And to clarify, how many United States patents have

04:06:29  19  been issued --

04:06:30  20  A.  I'm sorry, I got that -- I -- I -- it's 239 patents

04:06:35  21  that they are listed as inventors on.

04:06:37  22  Q.  What is your professional background?

04:06:38  23  A.  I -- I have a Bachelor's degree and a Master's degree

04:06:43  24  in computer science.  I went to University of Arkansas at

04:06:48  25  Little Rock.  I -- I have been involved in bank technology

04:06:54   1   for 35 years building bank systems and -- and bank

04:06:59   2   software.  And I -- like I said earlier, I have worked at

04:07:03   3   USAA for 15 years.

04:07:04   4   Q.  You were here during the opening; is that correct, sir?

04:07:10   5   A.  Yes, I was.

04:07:11   6   Q.  Did you hear Wells Fargo state that they invented

04:07:14   7   mobile banking in 2007?

04:07:17   8   A.  I heard that, yes.

04:07:18   9   Q.  Do you know what feature Wells Fargo was offering in

04:07:20   10  2007?

04:07:21   11  A.  I'm not sure I do.

04:07:24   12  Q.  Do you know -- have you heard of an SMS text deposit

04:07:31   13  system?

04:07:31   14  A.  Yes, I have.

04:07:32   15  Q.  Do you know if Wells Fargo was operating -- offering

04:07:37   16  SMS text deposit in 2007?

04:07:40   17  A.  I'm not sure.

04:07:42   18  Q.  I'll move on.

04:07:42   19  A.  Okay.

04:07:43   20  Q.  During the development of consumer remote deposit

04:07:53   21  capture, what was your position at USAA?

04:07:53   22  A.  I was the chief architect of the bank, and the -- what

04:07:56   23  that -- what that means is that the chief architect is

04:07:59   24  responsible for setting the overall technology strategy of

04:08:04   25  the bank and then working -- in addition, I worked with a

04:08:08   1   lot of projects, almost every project, to ensure that those
04:08:12   2   projects were meeting and following the technology strategy
04:08:17   3   of the bank.  I -- I -- I was also one of the -- the -- the
04:08:22   4   technology leaders that helped influence our -- our -- our
04:08:28   5   business -- our business team to help -- to move forward
04:08:32   6   with -- with consumer remote deposit capture.
04:08:38   7   Q.  Mr. Brady, have you ever testified in court before?
04:08:46   8   A.  No, I haven't.  I'm a little nervous.  Sorry.
04:08:48   9   Q.  I'd like you to describe the history of USAA as you
04:08:53  10   describe it to outsiders when you talk about your job.
04:08:56  11   A.  Sure.  So USAA was founded in 1922 by a group of 25
04:09:03  12   Army officers.  They -- they met there in downtown
04:09:08  13   San Antonio to initially form the company.  They -- they
04:09:13  14   decide -- at -- with -- with the military, they often move
04:09:17  15   around a lot.  And as a result of moving around a lot,
04:09:22  16   they -- they often have trouble getting insurance.
04:09:24  17        So this group of 25 Army officers decided to come
04:09:27  18   together and -- and -- and insure themselves.  Even today,
04:09:33  19   USAA is -- is a member -- member-owned organization where
04:09:39  20   the members insure themselves.
04:09:41  21        We -- we are open to the -- to the -- to active
04:09:44  22   military, retired military, as well as their families.  We
04:09:47  23   also encourage employees to become members.
04:09:51  24   Q.  Who owns USAA?
04:09:52  25   A.  As I said, USAA is member-owned.  So it's the -- we

| | | |
|---|---|---|
| 04:09:59 | 1 | don't have shareholders.  We are not a public company.  And |
| 04:10:03 | 2 | so we actually come from -- the members own it, and the |
| 04:10:08 | 3 | members insure themselves. |
| 04:10:10 | 4 | Q.  What are the consequences, in your mind, of being |
| 04:10:13 | 5 | member-owned? |
| 04:10:14 | 6 | A.  The -- there's a couple of consequences.  First, I |
| 04:10:22 | 7 | believe since we don't have to answer to Wall Street and we |
| 04:10:25 | 8 | don't have to answer to quarter-by-quarter earnings, it |
| 04:10:29 | 9 | allows us to be a little more strategic in terms of the |
| 04:10:33 | 10 | thought process and -- and projects that we work on. |
| 04:10:35 | 11 | I believe the consumer remote deposit capture was |
| 04:10:37 | 12 | a real good example of that where we -- we were able to be |
| 04:10:40 | 13 | more strategic. |
| 04:10:40 | 14 | The other thing that it enables is for -- we do |
| 04:10:45 | 15 | things specifically to benefit our members.  And so since |
| 04:10:48 | 16 | our members are owners, we do things to benefit the |
| 04:10:53 | 17 | members. |
| 04:10:53 | 18 | So we -- a good example of that is with ATM fees. |
| 04:10:59 | 19 | If one of our members goes to another bank's ATM and -- and |
| 04:11:04 | 20 | withdraws money -- let's say they go to a Wells Fargo ATM |
| 04:11:07 | 21 | and withdraw money, they could be charged up to $3.50 for |
| 04:11:12 | 22 | the use of that ATM.  We -- we reimburse our members that |
| 04:11:16 | 23 | full fee of $3.50. |
| 04:11:20 | 24 | Q.  What is the source of the money that is used to run |
| 04:11:22 | 25 | USAA, for example, to invest in new technology? |

04:11:26   1   A.  It all comes from -- from the members themselves,

04:11:31   2   whether it's used for -- whether it's used for claims, for

04:11:34   3   loans to members to pay out claims, loans to members, or

04:11:38   4   for the research and development.

04:11:40   5   Q.  Do you have a financial interest in the outcome of this

04:11:43   6   lawsuit, sir?

04:11:44   7   A.  Indirectly, I do.  I am a member.  I've been a member

04:11:49   8   for 33 years now.  And every year, USAA takes a significant

04:11:54   9   portion of their -- of their profits and -- and we return

04:11:59  10   that -- that money to our members in terms of benefits

04:12:04  11   and -- and dividends.

04:12:06  12          And, for example, in 2018, we returned

04:12:11  13   approximately $1.8 billion to our membership.

04:12:15  14   Q.  How many members does USAA have?

04:12:18  15   A.  We have 12.4 million members.

04:12:22  16   Q.  How many employees does USAA have and where are they

04:12:25  17   located?

04:12:25  18   A.  We -- we have 32,000 employees.  Most of them are

04:12:31  19   located there at our headquarters in San Antonio.  We also

04:12:35  20   have -- we also have locations near -- near some military

04:12:42  21   bases -- for example, in Tampa.  We have -- we have

04:12:45  22   locations in Colorado Springs, Virginia, as well as some

04:12:51  23   overseas locations, such as Germany.

04:12:53  24   Q.  You said that USAA was founded by Army officers as an

04:12:56  25   insurance mutual.  Did USAA decide to create a bank at some

04:13:01  1   point?

04:13:01  2   A.  Yes -- yes, we did.  We decided to create a -- create

04:13:05  3   the bank in 1983.  And so we were hearing a lot from our

04:13:11  4   members at the time, that they were looking for a low cost

04:13:14  5   banking alternative.  And so at that point, we decided to

04:13:18  6   open up a bank.

04:13:20  7            Here we are now 35 years later, and we are now one

04:13:24  8   of the -- the larger banks in the U.S.  We -- we have been

04:13:28  9   growing pretty consistently at about 8 percent year over

04:13:31  10  year, which I believe is the -- twice -- around twice the

04:13:36  11  industry average.

04:13:37  12            Since I joined the company, we have tripled the

04:13:39  13  size of the bank.

04:13:40  14  Q.  In your role as chief architect of the bank, did you

04:13:45  15  come to understand the history of consumer remote deposit

04:13:48  16  capture at USAA?

04:13:48  17  A.  Yes.  I -- I have been involved with consumer remote --

04:13:55  18  remote deposit capture pretty much since the beginning.

04:14:01  19  Even when I -- even when I -- yeah, pretty much since the

04:14:04  20  beginning.

04:14:05  21  Q.  Can you describe the inspiration for consumer remote

04:14:09  22  deposit capture at USAA?

04:14:09  23  A.  So we -- you know, our -- our members are -- are active

04:14:20  24  military, retired military, and -- and their families.  We

04:14:23  25  have -- we actually have members all over the world.  We

| | |
|---|---|
| 04:14:26 | 1 |
| 04:14:30 | 2 |
| 04:14:36 | 3 |
| 04:14:38 | 4 |
| 04:14:43 | 5 |
| 04:14:46 | 6 |

1    have since we launched USAA as a bank in 1983 because we

2    were already a -- an insurance company.  So we -- we've

3    had -- we have members all over the world.  So it -- it

4    never has really made a lot of sense to us to build out a

5    branch network because we have members pretty much

6    everywhere.

7         So in -- instead, you know, we -- we've served --

8    we served our members through digital channels.

9    Q.  Why was it important to USAA to have rapid digital

10   deposit with consumer devices?

11   A.  So our -- our military members get paid through direct

12   deposit, for example, so the money is directly deposited

13   into their checking account on -- on payroll day.

14        We -- but even with that, we have a lot of members

15   that are living paycheck to paycheck.  A lot of them are

16   enlisted or E-1 level.  And so they are definitely living

17   paycheck to paycheck.  And so we -- we -- they -- they rely

18   on checks from other sources, such as, you know, spouse's

19   income, maybe second jobs.  They rely on -- on checks from

20   parents or other family members, grandparents.

21        And they need -- since they are living paycheck to

22   paycheck, they need access to those funds quickly.  And so

23   our real inspiration is how -- you know, how do we -- how

24   do we deposit those checks quickly without branches?

25   Q.  Did other banks offer ways to deposit checks other than

04:16:16  1  ATMs or tellers before your work?

04:16:18  2  A.  Before we did our consumer RDC project, other banks did

04:16:26  3  offer services to large businesses that allowed them to

04:16:29  4  deposit checks remotely, primarily using specialized

04:16:33  5  scanners.

04:16:33  6  Q.  Can you show a demonstrative of the specialized

04:16:38  7  scanners that were used before USAA's work?

04:16:39  8  A.  Yes, we have one here.  This -- this is actually one of

04:16:43  9  the -- one of the types of specialized scanners that would

04:16:46  10  be used by -- by, for example, a business.  And it has

04:16:51  11  actually a -- a special slot here where you feed the check

04:16:57  12  in.  It's got some rollers back here that -- that's

04:17:00  13  motorized that will -- that will load the check

04:17:02  14  automatically into a reader.

04:17:04  15       Within this environment, it's in a controlled

04:17:07  16  environment where we capture -- where they capture an image

04:17:09  17  of the check.  And it -- it also has a -- it makes sure

04:17:15  18  it's perfectly aligned when it goes in there because it --

04:17:18  19  it has the alignment to perfectly calibrate where the check

04:17:21  20  is.

04:17:24  21       Also, these -- these devices have a magnetic

04:17:27  22  reader inside of them that will read the magnetic ink off

04:17:30  23  the check so that it can extract the -- the data off the

04:17:34  24  check, things like the account number, routing number,

04:17:37  25  those kind of things.

04:17:38   1          And so the other -- the other thing that these

04:17:40   2   will do is they will physically alter the check either by

04:17:44   3   doing some sort of indelible ink.  I've seen -- I've seen

04:17:44   4   these in the past, too, that will punch holes in the bottom

04:17:49   5   of the check to make sure that it cannot be deposited

04:17:52   6   again.

04:17:52   7          These -- these do -- I mean, these - these do it

04:18:02   8   really well.  They scan the checks really well, but they

04:18:02   9   only do one thing.  And -- and so we -- it never has made

04:18:05   10  sense to ask our members to -- to purchase one of these

04:18:08   11  because, first of all, they are rather expensive, and they

04:18:12   12  only do one thing.

04:18:16   13  Q.  Other than specialized scanners, were there other

04:18:19   14  options that existed before USAA's work?

04:18:23   15  A.  We -- we knew about more industrial strength scanners.

04:18:31   16  In fact, there were -- you know, we have some -- we had

04:18:35   17  industrial-strength-type scanners even in our offices

04:18:39   18  where, you know, they -- they will -- they will read --

04:18:42   19  they will read multiple types of documents so they can be

04:18:44   20  used for multiple things, but they -- and then you can

04:18:48   21  adapt them to specific sizes of documents and adapt them to

04:18:53   22  a check size.

04:18:54   23          They have really good quality.  They -- they --

04:18:59   24  you know, they will -- they will align a document as it's

04:19:03   25  being pulled in.  They will -- they will crop the document

04:19:07  1   for you.

04:19:08  2         So they get a really good -- really good image.

04:19:12  3   But they are very expensive.  I would say hundreds to maybe

04:19:17  4   thousand of dollars.  And -- and -- and they're not

04:19:23  5   really -- I mean, they're -- they're very heavy, too.  The

04:19:26  6   other thing is they weigh several hundred pounds.  And so

04:19:30  7   they're not really -- they're not really movable.  They're

04:19:34  8   not portable.  You know, they're not -- they're not mobile.

04:19:37  9   And so those didn't really make sense to us either.

04:19:41  10        So what -- what we were looking for instead was,

04:19:52  11  you know, a -- devices that, first of all, did multiple

04:19:52  12  things so that our members, you know, may already have

04:19:55  13  something like that, like one of these devices.  It --

04:19:58  14  it -- and -- or they could use it for other things, as

04:20:03  15  well.

04:20:03  16        And then, you know, the other criteria that we

04:20:05  17  were looking for was something that was mobile or portable,

04:20:08  18  so that if they -- if they had, for example, a -- a

04:20:10  19  permanent change of station and were moved, it's -- it's

04:20:13  20  likely something they would move with them.

04:20:16  21        MR. SHEASBY:  Mr. Huynh, can you pull up PDX-11.1?

04:20:24  22        THE TECHNICIAN:  I couldn't hear you.

04:20:25  23        MR. SHEASBY:  PDX-11.1, Mr. Huynh.

04:20:39  24  A.  Yeah, this -- this is an example of one of those more

04:20:42  25  industrial-type scanners you can see.  And it's -- this is

215

04:20:46   1   the Fujitsu M4 model.  And you can see it's -- it's even

04:20:50   2   sitting on a crate.  So these are very heavy and very

04:20:53   3   expensive.

04:20:53   4   Q.  (By Mr. Sheasby)  What did USAA focus on for its

04:20:55   5   program?

04:20:55   6   A.  So -- so we focused on a -- on -- on getting a portable

04:21:02   7   device that could capture an image, and we wanted to be

04:21:05   8   able to use any -- any consumer device that had a -- a

04:21:11   9   general purpose computer, as well as could capture a

04:21:15  10   digital image, and then upload that -- that to -- to our

04:21:16  11   bank.

04:21:16  12   Q.  What does that mean in practical terms, what types of

04:21:20  13   devices?

04:21:20  14   A.  In practical terms, you know, it meant -- it -- it

04:21:25  15   meant -- it meant really any type of device that could --

04:21:28  16   that could capture an image of a check.  Practically, I

04:21:32  17   would say our members were using -- initially were using

04:21:37  18   digital cameras.  They were using home scanners.  They were

04:21:41  19   also using -- they were also using pretty much any device

04:21:45  20   that could -- that could capture -- capture an image.

04:21:48  21        We -- the first thing that we used was actually

04:21:51  22   the -- the -- a flatbed scanner which was the Lexmark.  We

04:21:56  23   used the -- the Lexmark initially.  So --

04:21:59  24   Q.  Where did you get the Lexmark from?

04:22:01  25   A.  We -- we actually bought the -- the Lexmark.  We sent

04:22:05  1  our team down to Best Buy to pick up the Lexmark.  It was

04:22:11  2  one of those all in one scanners that was a -- it was a

04:22:13  3  printer, a copier, a fax machine, as well as a scanner,

04:22:19  4  pretty much all in one.  It was a type of device that a lot

04:22:23  5  of consumers either already had in their home or -- or

04:22:27  6  would likely purchase.  So it was just an everyday

04:22:32  7  consumer-based scanner.

04:22:33  8  Q.  What was the long-term goal of the consumer remote

04:22:36  9  deposit capture program?

04:22:37  10  A.  Our long-term goal for the program was we -- we wanted

04:22:43  11  to create an infrastructure that would handle the images,

04:22:47  12  and then be able to adapt to new -- new devices over time.

04:22:50  13  We knew that devices were changing very quickly, and so we

04:22:53  14  wanted to -- you know, we wanted to have all the -- all the

04:22:57  15  pieces in place, and then -- then we knew -- we knew things

04:23:02  16  were changing, so we wanted to -- our long-term was to

04:23:05  17  adapt to new technologies.

04:23:06  18  Q.  When was a working prototype of consumer remote deposit

04:23:10  19  capture created?

04:23:10  20  A.  I -- I know it was created in 2005 because I saw a

04:23:16  21  demonstration of it down in our lab.

04:23:18  22  Q.  And what was the consumer device used with that -- was

04:23:18  23  that --

04:23:22  24  A.  That was the Lexmark, yes.

04:23:23  25  Q.  Did USAA face unique challenges when developing

04:23:28   1   consumer remote deposit capture?

04:23:29   2   A.  We had -- we had quite a number of challenges.  I mean,

04:23:32   3   we -- we didn't have -- you know, we didn't have physical

04:23:36   4   access to the check.  We had to worry about, you know, with

04:23:39   5   taking an image even, taking an image, you know, a -- the

04:23:44   6   check could be anywhere in the image, and so we had to deal

04:23:47   7   with, first of all, coming up with tools to help find where

04:23:52   8   the image was within the -- where the check was within the

04:23:56   9   image.

04:23:56   10       We also had to come up with tools to help us, you

04:24:02   11   know, deal with the check being at an angle, so, you know,

04:24:06   12   de-skewing the check.  Also, with -- with certain devices,

04:24:09   13   you may have, you know, a different angle that you're

04:24:12   14   holding the device at in order to capture the picture which

04:24:16   15   gives you a distorted view of the check and, you know, kind

04:24:19   16   of a prospective view, and so we had to deal with software

04:24:24   17   to handle that, as well.

04:24:28   18       Also, we didn't have physical access to the check,

04:24:31   19   so all the data that we gather off the check we have to get

04:24:37   20   off the image.  We can't rely on a magnetic ink reader like

04:24:42   21   these things have to read the data and the information off

04:24:45   22   the check.  So we had to rely on the image.  So getting a

04:24:48   23   really good quality image was extremely important to us.

04:24:51   24       At that time, well, we -- you know, and getting a

04:24:56   25   good quality image off -- getting a good quality check

04:25:00    1    image off of the overall check is a challenge, too, because

04:25:04    2    it may be on a -- it may be on a dark desktop.  It may be

04:25:09    3    on a light counter top, and so there's challenges involved

04:25:12    4    with that.

04:25:12    5          At that time, too, even now a lot of people like

04:25:19    6    to have backgrounds printed on their check.  Some of our

04:25:25    7    military members like to have military scenes printed on

04:25:27    8    the back of their checks.

04:25:28    9          At that time, those Care Bear checks were really

04:25:31   10    popular, and I specifically remember having to deal with

04:25:35   11    what are the issues that we've got to deal with reading the

04:25:38   12    data off of a Care Bear.  I mean, those turned out to be

04:25:41   13    kind of a nightmare.

04:25:41   14    Q.  Do you remember whose wife had Care Bear checks back

04:25:45   15    then?

04:25:46   16    A.  I believe it was Chuck -- Mr. Oakes, yeah.

04:25:49   17    Q.  Why was -- how did USAA solve these problems?

04:25:56   18    A.  We solved these problems by creating a sophisticated

04:26:00   19    set of software that allowed -- that allowed our members to

04:26:03   20    use consumer devices to capture the images and then have

04:26:08   21    them deposited into their checking account.

04:26:10   22    Q.  Why was USAA in a position to build this system?

04:26:12   23    A.  I would say we were in a position to build this system

04:26:17   24    because we invested in our Applied Research team.  I was

04:26:20   25    actually on the committee that helped prioritize the

04:26:24  1   projects that we worked on for that committee -- for that

04:26:28  2   team.

04:26:28  3   Q.  When did you make the first system fully available to

04:26:30  4   members?

04:26:31  5   A.  We -- we made the first system fully available June of

04:26:38  6   2006, and then we continued to roll that out 2006 into

04:26:44  7   2007.

04:26:44  8   Q.  What did the system work with by 2007?

04:26:47  9   A.  It worked with flatbed scanners, digital cameras, and

04:26:52  10  webcams, as well as -- by 2007?

04:26:55  11  Q.  Yes, yes, Mr. --

04:26:57  12  A.  By 2007, we also enabled any device that could take an

04:27:03  13  image of a check and then upload that check to our website.

04:27:07  14         MR. SHEASBY:  Mr. Huynh, can we pull up PX-0039

04:27:13  15  and can we pull up the top email?

04:27:17  16  Q.  (By Mr. Sheasby)  Mr. Brady, do you recognize this

04:27:18  17  email?

04:27:19  18  A.  Yes, I do.  This is a -- this is an email from Chuck

04:27:24  19  Oakes from June of 2006.  This was about three weeks before

04:27:28  20  we launched.

04:27:30  21  Q.  Who is Chuck Oakes?

04:27:32  22  A.  Mr. Oakes, he was the manager for our Applied Research

04:27:39  23  lab.  He -- Mr. Oakes is retired now.  He managed that team

04:27:43  24  for quite a number of years.  He retired a couple years

04:27:48  25  ago.

04:27:49  1          In -- in Mr. Oakes's time down in the lab, in the

04:27:53  2    research lab, he -- he was named inventor for over a

04:27:58  3    hundred different patents.

04:28:00  4    Q.  What is the context of this email?

04:28:02  5    A.  This -- this email, Mr. Oakes is discussing the vision

04:28:07  6    that we had.  If you look at the second line down, the

04:28:10  7    first sentence, starting with "this effort," he calls out

04:28:16  8    this effort can and will revolutionize the banking

04:28:20  9    industry, the virtual -- the virtual bank branch, that's

04:28:23  10   what we were trying to solve.

04:28:25  11         We didn't have -- you know, we didn't have

04:28:25  12   physical branches, and so we were trying to figure out how

04:28:28  13   do we put branches in our members' hands?  How do we create

04:28:33  14   a virtual branch?

04:28:34  15         And let me go down to the next line there, I

04:28:37  16   strongly believe -- Chuck goes on here:  I strongly believe

04:28:40  17   that the effort of producing this innovation is an example

04:28:42  18   of what USAA is made of, vision, strength, determination,

04:28:46  19   member focused, and commitment.  We've been told that this

04:28:49  20   product will not work, that it can't be done, you can't do

04:28:55  21   that, no one else is doing this, so we can't either.  I

04:28:59  22   believe this company can do anything.  I think this is a

04:29:02  23   great email.

04:29:03  24         THE COURT:  Mr. Brady, if I can ask you not to

04:29:05  25   refer to Mr. Oakes simply as Chuck or using first names

04:29:09   1   only.

04:29:09   2           THE WITNESS:  Thank you.  Yes, I will.

04:29:10   3           THE COURT:  All right.  Let's continue, counsel.

04:29:12   4           MR. SHEASBY:  Mr. Huynh, can you pull up PX-0036?

04:29:22   5   And if you could turn to Page 3 of that document.

04:29:26   6           Mr. Huynh, if you can pull up the bottom email

04:29:28   7   from Chuck Oakes dated October 25th, 2006.

04:29:32   8   Q.  (By Mr. Sheasby)  Mr. Brady, do you recognize this

04:29:34   9   email?

04:29:35  10   A.  Yes, I do.  This is another email from Mr. Oakes,

04:29:38  11   October 25th, 2006.  This was later.  This was after --

04:29:41  12   after we had launched the system.

04:29:48  13   Q.  What is the relevance of this email to you?

04:29:48  14   A.  So what -- what Mr. Oakes is calling out here is that

04:29:50  15   this is the first time one of our members had used a

04:29:54  16   digital camera to capture an image of a check, and we

04:29:58  17   actually -- we actually knew that it would work.

04:30:02  18           If you look down at the kind of second paragraph.

04:30:04  19   We knew it would work, but we -- because it was in the

04:30:10  20   original design that we had from a year -- from about a

04:30:13  21   year previous because we had talked about using digital

04:30:17  22   cameras even a year previous.

04:30:19  23           But then the second -- I guess the third line down

04:30:23  24   in the second paragraph, he's also calling out the use of a

04:30:26  25   camera to capture the check image and process it through

04:30:30  1   the Deposit@Home application can be a huge competitive

04:30:34  2   advantage.

04:30:35  3   Q.   What is the relationship between the date of this email

04:30:37  4   and the date of the filing of the patents?

04:30:39  5   A.   October 26th, that was about a week before we filed our

04:30:44  6   patents.

04:30:45  7   Q.   Did mobile phone digital cameras exist in 2006 that

04:30:51  8   could be used with the system?

04:30:52  9   A.   We -- there were several mobile phones that were on the

04:30:56  10  market that had a high enough pixel image resolution to be

04:31:01  11  used.  We -- we knew at the time those -- those phones were

04:31:06  12  more expensive and most of our members wouldn't have those,

04:31:09  13  though.

04:31:09  14  Q.   What was the first full end-to-end successful test of a

04:31:13  15  mobile phone image using the system?

04:31:14  16  A.   We -- we had the -- we had the infrastructure to handle

04:31:20  17  the images available in 2006.  We first started up a

04:31:25  18  project to begin working with -- with mobile phones in

04:31:32  19  2007, early 2007, and by -- by really the -- early 2007,

04:31:38  20  we -- we were successfully running end-to-end using mobile

04:31:42  21  phones.

04:31:42  22  Q.   You said the word project.  What does project mean at

04:31:47  23  Wells -- at USAA?

04:31:48  24  A.   For -- for me, a project is when we officially start up

04:31:50  25  a -- start up a project either in our Applied Research lab

04:31:54   1   or through -- through development.  We do a lot of

04:31:57   2   experimentation before that, but that's the -- that's what

04:32:00   3   I'm considering to be a project.

04:32:02   4        MR. SHEASBY:  Can you -- Mr. Huynh, can you turn

04:32:04   5   to Pages 1 to 2 of PX-36 and pull up the email from Troy

04:32:10   6   Huth?

04:32:11   7   Q.  (By Mr. Sheasby)  I'm showing an email from Troy Huth.

04:32:15   8   First, who is Troy Huth?

04:32:17   9   A.  Troy Huth was one of the inventors.  He was in our bank

04:32:21   10  technology team.

04:32:22   11  Q.  And the subject is use of a camera for Deposit@Home

04:32:25   12  check image --

04:32:26   13  A.  Right, this is a reply.  It's part of the same email

04:32:28   14  chain that we looked at just previously.

04:32:31   15  Q.  In your mind, what is the relevance of this document?

04:32:34   16  A.  So a couple of things, if you can go down to the third

04:32:37   17  paragraph, starting with Mike Morris, so this is still

04:32:41   18  talking about the use of a camera, and Mike -- Mike Morris

04:32:47   19  did check with the use -- Mike Morris did check and the use

04:32:50   20  of a camera to capture the image is included in our patent

04:32:55   21  application.  So I wanted to point that out.

04:32:57   22        Also, Mr. Huth in this email is discussing the use

04:33:00   23  of camera phones up in the first paragraph.  And while we

04:33:04   24  knew at the time that the camera phones would work, we also

04:33:09   25  knew that there were -- there would be challenges with the

04:33:14   1   pixel quality on some of those camera phones.  And so we

04:33:19   2   knew it would work, but we -- we needed to work on

04:33:23   3   improving the experience in order to make the experience

04:33:25   4   flawless for our members.

04:33:27   5   Q.  Okay.  Who is Mike Morris?

04:33:28   6   A.  Mike Morris was another one of the inventors.  Mike is

04:33:33   7   extremely talented.  He's a developer.

04:33:35   8   Q.  Did USAA have a complete working consumer remote

04:33:39   9   deposit capture system that could accept images from

04:33:41   10   consumer digital cameras by the time of the patent filing?

04:33:44   11   A.  Yes, we did.

04:33:46   12        MR. SHEASBY:  Can you turn to PX-0044, please?

04:33:51   13   Q.  (By Mr. Sheasby)  Do you recognize PX-0044?

04:33:54   14   A.  Yes, I do.  This is a -- this is the -- looks like the

04:34:02   15   last page of a -- of a status report from our Applied

04:34:08   16   Research team.  This is actually describing a project that

04:34:12   17   Rey Medina was working on.  Rey was another one of our

04:34:16   18   inventors.

04:34:16   19   Q.  How many patents does Rey Medina have?

04:34:19   20   A.  I believe Rey has close to 90 patents that he's the

04:34:24   21   inventor on.

04:34:24   22        THE COURT:  Mr. Brady, I'm going to ask you again

04:34:26   23   not to refer to individuals by first name.

04:34:29   24        THE WITNESS:  I apologize, I'm sorry.

04:34:30   25        THE COURT:  There's a reason for that.  At some

04:34:32    1  point, what's said in this courtroom may be reviewed on

04:34:37    2  appeal and it will be a written transcription of what was

04:34:40    3  said.  And if people are referred to by first name only,

04:34:43    4  we're going to end up with more than one person with the

04:34:46    5  same first name, and it's going to be unavoidably

04:34:49    6  confusing, so we try to not refer to any individuals by

04:34:52    7  first name only.

04:34:52    8          THE WITNESS:  I apologize, sir.

04:34:54    9          THE COURT:  Okay.

04:34:55   10          THE WITNESS:  I'll be mindful.

04:34:56   11          THE COURT:  Let's continue.

04:34:57   12  Q.  (By Mr. Sheasby)  What does this document show?

04:34:59   13  A.  This shows that Mr. Medina was working on a project

04:35:05   14  called remote check deposit via cellular phone camera.  It

04:35:10   15  shows -- it was from -- the date is April 9th of 2007.  It

04:35:16   16  also shows that it's an L3 project, which stands for a

04:35:19   17  Level 3 research project, which was the highest more

04:35:23   18  advanced type of research that we were working on at the

04:35:25   19  time.

04:35:26   20          And then if you look at the second and third

04:35:31   21  bullet there, it shows that he had a solution, a prototype

04:35:34   22  solution.  And then the last bullet shows that he was

04:35:36   23  working on knowledge transfer over to the execution team

04:35:40   24  who would then take this on to their -- bring it out to

04:35:44   25  members.

04:35:46  1         MR. SHEASBY:  Can you turn to PX-0043, Mr. Huynh?

04:35:49  2  Q.  (By Mr. Sheasby)  And do you recognize this document?

04:35:55  3  A.  Yes, this is a presentation from Bharat Prasad.  Bharat

04:36:00  4  was another one -- Bharat Prasad was another one of the --

04:36:03  5  the inventors, and this is from 2007.

04:36:09  6         MR. SHEASBY:  Can you turn to Page 12 of that

04:36:11  7  document, Mr. Huynh?

04:36:12  8  Q.  (By Mr. Sheasby)  Do you have an understanding as to

04:36:14  9  why the iPhone is listed as one of four cameras?

04:36:19  10  A.  Well, the -- the iPhone -- the iPhone is a camera.

04:36:22  11  It's a -- it's a digital camera, a phone, a general purpose

04:36:27  12  computer, and, you know, a wireless communication device

04:36:32  13  pretty much all in one.

04:36:33  14  Q.  Do you remember the dates on which USAA expanded to

04:36:36  15  different consumer devices?

04:36:38  16  A.  We -- yes, we -- we announced the -- the iPhone in May

04:36:47  17  of 2009.  We started rolling it out in June of 2009 to our

04:36:53  18  members, and continued to roll it out through -- through

04:36:56  19  August.  And in January of the following year, 2010, we

04:37:02  20  also introduced the -- the Android app, and then also in --

04:37:10  21  let's see, in 2011, we introduced the iPad application to

04:37:15  22  allow you to take a -- a picture of a check with a -- with

04:37:19  23  an iPad.

04:37:21  24         Also, in 2011, we did the Windows Mobile phone,

04:37:24  25  and we did -- we also enabled our mobile website so

04:37:29  1   that any -- any device that had access to our mobile

04:37:33  2   website and could capture an image could upload a check.

04:37:36  3   And so that covered things like BlackBerries, for example.

04:37:40  4   Q.  Did you continue to improve the image capture

04:37:44  5   software used with this system?

04:37:45  6   A.  The image capture software?

04:37:47  7   Q.  The image quality, yes.

04:37:48  8   A.  The image quality software, yes, we continued to

04:37:52  9   improve it.  We are even improving it today.  We're always

04:37:56  10  making enhancements to it.

04:37:58  11  Q.  Did you have team members assist you with mobile --

04:38:01  12  with consumer remote deposit capture?

04:38:01  13  A.  Yes, we did.  We expanded the team to include support

04:38:07  14  organizations, additional development organizations, as

04:38:10  15  well as we brought in additional executives.  And then at

04:38:15  16  some point, I ended up turning over the technical

04:38:18  17  sponsorship to a gentleman named Michael Bueche.

04:38:22  18  Q.  At some point did the name of the system change?

04:38:25  19  A.  When -- yes.  When we -- when we introduced the -- when

04:38:31  20  we introduced the iPhone -- the iPhone application, we

04:38:35  21  allowed our members to download the application from the

04:38:41  22  Apple App Store, rather than from our own USAA.com website.

04:38:46  23  So to reflect that new experience, we -- we changed the

04:38:52  24  name to Deposit@Mobile.

04:38:54  25         MR. SHEASBY:  Let's turn to PX-0143, Mr. Huynh.

04:38:58   1   Q.   (By Mr. Sheasby)   Do you recognize this document,

04:39:00   2   Mr. Brady?

04:39:02   3   A.   Yes, I do.   This is a -- this is an industry trade

04:39:09   4   article that talks about -- this was -- this was a good

04:39:11   5   example of the type of press we were getting right after we

04:39:14   6   released the -- the iPhone application.   And this is --

04:39:19   7   this is calling out the -- the application that we did.   I

04:39:26   8   think this -- can you zoom into the second paragraph there,

04:39:31   9   as well?

04:39:31  10          Yes, so -- yeah, this is calling out that the

04:39:38  11   military bank and insurance provider USAA recently launched

04:39:43  12   mobile check deposit technology.

04:39:43  13   Q.   Mr. Brady --

04:39:43  14   A.   Yes.

04:39:44  15   Q.   -- can I -- can I ask you to slow down for Madam Court

04:39:47  16   Reporter?

04:39:47  17   A.   Yes, I can, sorry.

04:39:49  18          And so it -- it talks about users being able to

04:39:54  19   deposit checks from anywhere using an iPhone.   Also, down

04:39:58  20   at the bottom -- bottom paragraph down there, it calls out

04:40:03  21   that right now, USAA represents the bleeding edge of mobile

04:40:07  22   banking technology, which means that we were ahead of

04:40:10  23   everybody -- ahead of everybody else here.

04:40:15  24          MR. SHEASBY:   Can you turn to PX-57, please?

04:40:17  25   Mr. Huynh?

04:40:18    1   A.  Can we go back to that for one -- one minute?

04:40:21    2   Q.  (By Mr. Sheasby)  Of course, Mr. Brady.

04:40:23    3   A.  There was one thing I also wanted to point out on here.

04:40:23    4        MR. SHEASBY:  Can we turn back to PX-143,

04:40:27    5   Mr. Huynh?

04:40:31    6        MR. HILL:  Your Honor, I'll ask that question to

04:40:31    7   be asked to elicit a response, rather than the witness

04:40:31    8   volunteering information.

04:40:31    9        THE WITNESS:  Okay.  Sure.

04:40:36   10        MR. SHEASBY:  Absolutely.

04:40:36   11        THE COURT:  Well, we're here for the lawyers to

04:40:37   12   ask questions and the witnesses to give answers, but we're

04:40:42   13   back there, so ask a question you want to ask on this

04:40:44   14   slide.  And then let's move forward, Mr. Sheasby.

04:40:47   15   Q.  (By Mr. Sheasby)  Mr. Brady, is there something else

04:40:50   16   you wanted to -- was there another relevant sentence on

04:40:54   17   PX-143?

04:40:54   18   A.  I did want to point out that they -- they actually

04:40:57   19   called out the fact that we -- the bank -- the bank only

04:41:00   20   has one branch located in San Antonio.

04:41:04   21   Q.  Turning now to PX-57, do you recognize this article,

04:41:10   22   Mr. Brady?

04:41:10   23   A.  Yes, I do.  This is -- the -- the last article was a --

04:41:19   24   was an industry trade journal.  This is actually The New

04:41:25   25   York Times, so this is actually a -- you know, a public

04:41:27   1   newspaper.  And so, again, this one is calling out -- and

04:41:29   2   this is from August -- yes, this is one is also calling out

04:41:32   3   and talking about when we -- when we launched the iPhone

04:41:35   4   application.

04:41:36   5   Q.  Is this article about USAA's --

04:41:40   6   A.  Yes, it is -- it is specifically about USAA's iPhone

04:41:43   7   application to deposit a check.

04:41:44   8   Q.  If you turn to Page 2 of that document --

04:41:46   9        MR. SHEASBY:  And, Mr. Huynh, can you pull up the

04:41:48  10   first two paragraphs?

04:41:50  11   Q.  (By Mr. Sheasby)  What is the article talking about

04:41:52  12   here?

04:41:53  13   A.  So it -- the first line, USAA may seem like an unlikely

04:41:59  14   inventor [sic] in mobile banking.  I -- again, I -- I think

04:42:03  15   they didn't know our -- our Applied Research team really

04:42:05  16   well.  I -- I think we have a lot of innovation in our

04:42:08  17   Applied Research team.

04:42:09  18        It also points out later in that paragraph that

04:42:13  19   we -- you know, we're a smaller bank.  We're just below the

04:42:16  20   top 20 banks.  And then also in -- yeah, the first -- the

04:42:21  21   first -- right there, yes.

04:42:23  22        Also, at the second paragraph, but with just one

04:42:28  23   branch in San Antonio and customers deployed all over the

04:42:32  24   world, the company has been aggressively developing an

04:42:36  25   anytime, anywhere banking strategy, which is, again,

| | | |
|---|---|---|
| 04:42:38 | 1 | exactly what we were trying to do. |
| 04:42:41 | 2 | Q.  The -- the article says:  Three years ago, it |
| 04:42:43 | 3 | introduced the option of depositing a check from home using |
| 04:42:46 | 4 | a scanner.  That laid the groundwork for the phone deposit |
| 04:42:49 | 5 | feature which USAA plans to offer on other phones this |
| 04:42:53 | 6 | year.  Do you know what that is referring to? |
| 04:42:55 | 7 | A.  That actually is -- is calling out our own long-term |
| 04:42:58 | 8 | strategy that we had to build an infrastructure that would |
| 04:43:01 | 9 | adapt to new technologies. |
| 04:43:03 | 10 | MR. SHEASBY:  Let's pull that down, Mr. Huynh. |
| 04:43:06 | 11 | Let's put up PX-0195. |
| 04:43:13 | 12 | Q.  (By Mr. Sheasby)  Do you recognize PX-0195, Mr. Brady? |
| 04:43:22 | 13 | A.  Yes, I do.  This is -- this -- this is discussing the |
| 04:43:29 | 14 | patents that we have pending. |
| 04:43:32 | 15 | Q.  Is this a page from USAA's public website? |
| 04:43:34 | 16 | A.  Yes, this is from our public website.  I believe this |
| 04:43:37 | 17 | went up in 2016. |
| 04:43:41 | 18 | MR. SHEASBY:  And, Mr. Huynh, if you could |
| 04:43:43 | 19 | highlight the numbers on the bottom. |
| 04:43:44 | 20 | A.  The '681 and the '605 patent. |
| 04:43:47 | 21 | Q.  (By Mr. Sheasby)  So the document says:  USAA's |
| 04:43:50 | 22 | Deposit@Mobile and Deposit@Home include innovative features |
| 04:43:53 | 23 | that are protected by multiple patents issued by the United |
| 04:43:56 | 24 | States Patent and Trademark Office. |
| 04:43:56 | 25 | Is that correct, sir? |

04:43:57  1   A.  That's correct.

04:43:57  2   Q.  And did USAA publicly identify the patents-in-suit in

04:44:01  3   this case as protecting its products?

04:44:07  4   A.  Yes, we did.  You can see here specifically we called

04:44:10  5   out the '681 and the '605 patent.  It says other patents

04:44:15  6   pending, as well.

04:44:16  7   Q.  Do you have personal knowledge about how the

04:44:17  8   Deposit@Mobile system at USAA works?

04:44:19  9   A.  Yes, I'm familiar with it.

04:44:21  10  Q.  Does it include a downloaded application that is run on

04:44:24  11  a customer's mobile device?

04:44:25  12  A.  Yes, it includes a downloaded application.

04:44:28  13  Q.  Does the system employ the use of mobile or portable

04:44:31  14  devices with digital cameras in general purpose computers?

04:44:34  15          MR. HILL:  Objection, Your Honor.  May we

04:44:35  16  approach?

04:44:36  17          THE COURT:  Approach the bench, counsel.

04:44:38  18          (Bench conference.)

04:44:50  19          THE COURT:  What's the objection, Mr. Hill?

04:44:52  20          MR. HILL:  Your Honor, this is improper opinion

04:44:54  21  testimony from a non-expert.  He is reading the claim

04:44:57  22  limitations and asking this witness whether or not the USAA

04:45:03  23  system meets the claim limitations.

04:45:05  24          He's doing a claim analysis.  And this witness

04:45:08  25  can't do that as a fact witness.  That necessarily requires

04:45:12  1  opinion testimony and necessarily requires an understanding

04:45:14  2  of the claim construction, application of claim

04:45:18  3  construction terms and definitions to answer these

04:45:20  4  questions.  It's expert opinion testimony and improper.

04:45:23  5          THE COURT:  Response?

04:45:24  6          MR. SHEASBY:  Your Honor, he's the corporate

04:45:26  7  representative.  A corporate representative was offered on

04:45:27  8  the exact issue of whether USAA's patents practice the

04:45:31  9  patent-in-suit.  He gave full technical testimony in the

04:45:34  10 subject.  He had a full opportunity to examine someone on

04:45:37  11 this subject.

04:45:38  12         Mr. Brady has personal knowledge of how this

04:45:40  13 system operates.  He's not comparing claim construction

04:45:43  14 to -- he's not putting up claim language.  He's merely

04:45:47  15 describing the factual information.

04:45:48  16         The only claim construction term that was in

04:45:51  17 dispute was mobile device and portable device, which they

04:45:54  18 concede are present.  There's no claim construction that is

04:45:56  19 being done.

04:45:57  20         We are right -- we are entitled to have a

04:45:59  21 corporate representative do this.

04:46:01  22         THE COURT:  Well, he may be asked a question based

04:46:05  23 on what the claim language calls for, but the question as

04:46:08  24 presented is a fact question that he's answered yes or no,

04:46:14  25 this is or isn't present in this product.  And he has

04:46:18   1   personal knowledge of what -- it appears to me to be a fact

04:46:19   2   question and one that does not call for an opinion.  He is

04:46:23   3   a fact witness.  He's not an expert witness.

04:46:24   4       And I will hold him to avoiding opinions or other

04:46:28   5   type of expert testimony.  But I'm going to overrule this

04:46:30   6   objection.

04:46:31   7       MR. HILL:  Your Honor, may I -- may I ask,

04:46:32   8   Your Honor, if I can get a running objection if he's going

04:46:34   9   to go through the entire list of these claim elements

04:46:38  10   because I don't want to have to object to each one?

04:46:40  11       THE COURT:  The claim elements may be the basis

04:46:42  12   for Mr. Sheasby's questions, but as to the witness and the

04:46:45  13   jury, he's just simply asked, does this have that, which is

04:46:48  14   a simple fact question.

04:46:49  15       Now, the claim language may be the reason why

04:46:52  16   Mr. Sheasby asked that question, but there's nothing

04:46:55  17   improper about that.

04:46:55  18       MR. HILL:  Your Honor, the reason it's misleading

04:46:57  19   to the jury is because -- and that's another basis for my

04:47:00  20   objection is because he necessarily -- to answer that

04:47:03  21   question and it have relevance, it has to be in the context

04:47:06  22   of the claim language, which means he has to apply the

04:47:08  23   Court's claim constructions.  Otherwise, the fact that

04:47:11  24   these things he reads, this witness says are present in

04:47:15  25   their product, the answer is not relevant.

235

04:47:18  1          THE COURT:  Every fact question asked of a fact

04:47:22  2   witness doesn't have to relate to the claim language to

04:47:22  3   have relevance.  I don't necessarily agree with that broad

04:47:24  4   of a statement.

04:47:24  5          MR. SHEASBY:  I'm fine with you having a running

04:47:26  6   objection, Mr. Hill.

04:47:29  7          THE COURT:  Well, that's not your call,

04:47:30  8   Mr. Sheasby.

04:47:30  9          MR. SHEASBY:  I apologize.  That was

04:47:33  10  disrespectful, Your Honor.  I was just trying to --

04:47:36  11         THE COURT:  You're free to make the same objection

04:47:38  12  as you think is necessary, Mr. Hill, but I'm going to

04:47:41  13  overrule this objection.

04:47:42  14         MR. SHEASBY:  I apologize for stepping on --

04:47:44  15         THE COURT:  Let's proceed.

04:47:48  16         (Bench conference concluded.)

04:47:49  17         THE COURT:  All right.  Counsel, let's proceed.

04:47:50  18  Q.  (By Mr. Sheasby)  As part of the process, does the

04:47:55  19  mobile application provide instructions to users?

04:47:58  20  A.  Yes, we provide instructions on how to best capture

04:48:03  21  the -- the best image of the check.

04:48:05  22  Q.  Does it instruct -- does the mobile application that

04:48:08  23  USAA produces instruct the customer to take the photos of

04:48:12  24  the front and back of the check?

04:48:13  25  A.  Yes, we instruct them to take photos of the front and

04:48:16   1   back.

04:48:16   2   Q.  Does the USAA system display a graphical illustration

04:48:20   3   to assist of the customer in having a digital camera take

04:48:23   4   the photos of the check?

04:48:24   5   A.  Yes.  Yes, we do.

04:48:25   6   Q.  Do -- does -- do the illustrations provided to the

04:48:28   7   customer assist the customer in placing the digital image a

04:48:33   8   proper distance away from the check for taking a photo, and

04:48:36   9   how do they do that?

04:48:37  10   A.  Yes, they -- they provide assistance.  They have a -- a

04:48:41  11   guide on there and they will review --

04:48:42  12          MR. HILL:  Objection, Your Honor.  He got his

04:48:45  13   answer started before I got my objection.  Improper opinion

04:48:50  14   testimony.

04:48:50  15          THE COURT:  Overruled.

04:48:56  16   A.  So they will -- the application will -- will give

04:48:57  17   guidance on are you too close in, are you too far out, do

04:49:02  18   you need to move up, do you need to move -- move back?

04:49:05  19   We -- we -- it will give the instructions on the screen of

04:49:08  20   the app.

04:49:09  21          We also have a technology that we released for --

04:49:15  22   for the visually impaired which gives them verbal

04:49:19  23   instructions on how to position the check.

04:49:20  24   Q.  (By Mr. Sheasby)  Does the application provide

04:49:22  25   assistance to ensure a proper image?

04:49:24   1   A.  Yes, it does.

04:49:25   2   Q.  Does the application present the captured images to the

04:49:28   3   user?

04:49:28   4   A.  Yes, it provides the images back to the user as

04:49:33   5   thumbnails for their verification.

04:49:36   6   Q.  Is there a transmission over a wireless network after

04:49:39   7   presenting and after the system checks for errors?

04:49:43   8          MR. HILL:  Objection, Your Honor.  Calls for

04:49:46   9   improper opinion testimony.

04:49:48   10          THE COURT:  Overruled.

04:49:49   11   A.  Yes, it does.

04:49:50   12   Q.  (By Mr. Sheasby)  Are the captured images sent to USAA

04:49:55   13   over a wireless network?

04:49:56   14   A.  They are -- yes, they are sent to USAA over a wireless

04:50:01   15   network, either WiFi or cellular.

04:50:04   16   Q.  Does the submission of the image only occur after the

04:50:04   17   user has been authenticated and presented with the approved

04:50:10   18   images?

04:50:10   19   A.  Yes, it occurs after the authentication, after we walk

04:50:14   20   our members through the process of capturing the check, and

04:50:18   21   then -- and then it is submitted.

04:50:22   22   Q.  Do USAA computers update the account balance based on

04:50:27   23   the check image provided?

04:50:30   24   A.  Yes, our -- our computers do update the account

04:50:33   25   balance.

04:50:34  1   Q.  Does USAA perform an OCR of the MICR line and a

04:50:38  2   separate OCR of the check amount?

04:50:40  3   A.  Yes.  Yes, we do.  We actually -- we've experimented

04:50:45  4   with that a little bit.  We -- we initially offered two

04:50:49  5   different OCRs of the -- of the check amount.  And we --

04:50:57  6   we've always offered OCR of the -- the MICR line, as well.

04:51:01  7   That's the -- the letters and the numbers in the bottom

04:51:05  8   left-hand corner.

04:51:07  9           For a period of time we decided to only do one OCR

04:51:11  10  for the amount, but after -- after we looked at it, you

04:51:18  11  know, I -- I actually learned that -- that that check

04:51:21  12  was -- the second OCR check on the amount was even more

04:51:25  13  important, and so we -- we have now added that back in.

04:51:30  14  Q.  Is there a confirmation step that is performed?

04:51:35  15  A.  Is there a confirmation step that is performed?

04:51:39  16  Q.  By the system, yes.

04:51:40  17  A.  Yes, the -- the mobile app will -- will call the --

04:51:45  18  will call a component for -- to do the OCR and confirm that

04:51:49  19  it's been done.

04:51:50  20  Q.  Does the system check for errors?

04:51:52  21  A.  Yes, it checks for -- checks for errors, checks for

04:51:57  22  image quality errors, checks for fraud errors, checks for

04:52:01  23  quite a number of errors.

04:52:02  24  Q.  Is there an initiation of deposit after confirmation?

04:52:07  25  A.  Yes, after confirmation.

| | | |
|---|---|---|
| 04:52:08 | 1 | Q.  Is there any data generated as part of the system? |
| 04:52:11 | 2 | A.  We -- we generate a log file that logs all of the data |
| 04:52:17 | 3 | that we extract off the image, plus the image of the check. |
| 04:52:26 | 4 | MR. SHEASBY:  Can you turn, Mr. Huynh, to PX-1187? |
| 04:52:29 | 5 | Q.  (By Mr. Sheasby)  Do you have personal knowledge of |
| 04:52:43 | 6 | when the specification of the '681 patent became publicly |
| 04:52:48 | 7 | available? |
| 04:52:50 | 8 | A.  Of the '681 patent? |
| 04:52:52 | 9 | Q.  Yes. |
| 04:52:56 | 10 | MR. SHEASBY:  Why don't we turn -- Mr. Huynh, if |
| 04:52:58 | 11 | you could turn to the -- let me do the following. |
| 04:53:04 | 12 | Q.  (By Mr. Sheasby)  First, do you have personal knowledge |
| 04:53:05 | 13 | of the specification of the '681 patent? |
| 04:53:07 | 14 | A.  I'm familiar with the specifications, yes. |
| 04:53:09 | 15 | Q.  And why is that? |
| 04:53:11 | 16 | A.  As -- as part of my job as chief architect, part of my |
| 04:53:18 | 17 | responsibility was to work with the developers and |
| 04:53:20 | 18 | engineers and make sure that they were patenting their |
| 04:53:23 | 19 | ideas.  We were obviously -- obviously spending a lot of |
| 04:53:27 | 20 | our members' money, and we wanted to make sure we protected |
| 04:53:31 | 21 | that. |
| 04:53:31 | 22 | Q.  When was the original patent specification for the '681 |
| 04:53:34 | 23 | patent filed? |
| 04:53:34 | 24 | A.  For the parent application or for -- |
| 04:53:39 | 25 | Q.  Yes, sir. |

04:53:40  1   A.  For the parent application, it was October -- October

04:53:44  2   31st of 2006.

04:53:46  3   Q.  Can you show this on the '681 patent?

04:53:49  4   A.  Yes.

04:53:51  5          MR. SHEASBY:  Mr. Huynh, could we have Page 3,

04:53:54  6   please?

04:53:54  7   A.  Page 3.  So you can see here in the related U.S.

04:53:58  8   application data, we have the -- the earliest date for the

04:54:04  9   parent application is October 31st of 2006.  That's the

04:54:11  10  '200 patent.

04:54:13  11  Q.  (By Mr. Sheasby)  Do you know -- so the original

04:54:16  12  application -- I withdraw the question.

04:54:18  13         Do you know when the '200 patent became publicly

04:54:22  14  available?

04:54:22  15  A.  I believe that was in 2011.  And at that point, anybody

04:54:26  16  could look at the specifications.

04:54:27  17  Q.  Have you looked at the specifications of the '200

04:54:30  18  patent that was filed on October 31st, 2006, and the

04:54:34  19  specification of the '681 patent?

04:54:36  20  A.  The specifications from the two patents are -- are

04:54:39  21  identical.

04:54:41  22         MR. SHEASBY:  Your Honor, may I -- may I approach?

04:54:43  23         THE COURT:  The witness?

04:54:44  24         MR. SHEASBY:  No.  May I approach the bench, Your

04:54:46  25  Honor?

04:54:46   1                THE COURT:  Approach the bench, counsel.

04:54:48   2                (Bench conference.)

04:55:00   3                MR. SHEASBY:  Your Honor, I would request

04:55:02   4    permission that I be allowed to ask Mr. Brady if he has

04:55:07   5    knowledge of the reason that USAA filed for patent

04:55:11   6    applications in 2017.  I don't believe this is -- he does

04:55:14   7    have knowledge, and I don't think it's a -- it's a

04:55:15   8    violation of Your Honor's admonition to not discuss patent

04:55:20   9    examiners.  But in the excess of caution, I did want to

04:55:23   10   approach before I did so.

04:55:24   11               THE COURT:  And the question you want to ask the

04:55:26   12   witness is what?

04:55:27   13               MR. SHEASBY:  If he has knowledge as to why USAA

04:55:29   14   filed the continuation applications in 2017.

04:55:33   15               THE COURT:  And what do you anticipate his answer

04:55:35   16   will be?

04:55:36   17               MR. SHEASBY:  He's going to say that -- he's going

04:55:39   18   to say that the reason the applications were filed is

04:55:41   19   because there was a change in the standards of

04:55:45   20   patentability, and there was a decision made at USAA to

04:55:49   21   re-present the -- or to present new claims to the Patent

04:55:52   22   Office.  And that was the reason why the applications were

04:55:54   23   filed in 2017.

04:55:57   24               THE COURT:  Is there an objection from the

04:55:58   25   Defendant?

04:55:59  1          MR. HILL:  Yes, Your Honor.  That's not relevant
04:56:00  2  to any issue in the case.  At most, it can -- at best, it
04:56:09  3  would inject confusion to the jury about standards for
04:56:09  4  patentability.  It certainly doesn't explain any reason for
04:56:10  5  why they waited as long as they did, why they didn't do it
04:56:14  6  sooner.
04:56:15  7          I just don't see the relevance, Judge.  I mean,
04:56:20  8  the fact is they filed it when they filed them.  And that's
04:56:23  9  going to be the basis of the written description defense.
04:56:25  10  The jury is going to have to decide the reasoning behind
04:56:27  11  why they filed when they filed.
04:56:29  12          THE COURT:  Okay.
04:56:29  13          MR. HILL:  It isn't going to help much.
04:56:30  14          THE COURT:  Well, if relevance is the objection --
04:56:34  15          MR. HILL:  403 and relevance, Your Honor.
04:56:36  16          THE COURT:  Pardon?
04:56:36  17          MR. HILL:  403 and relevance.
04:56:36  18          THE COURT:  Okay.
04:56:36  19          MR. HILL:  Confusion.
04:56:37  20          THE COURT:  I'll overrule that objection.
04:56:38  21          MR. SHEASBY:  Thank you, Your Honor.
04:56:41  22          THE COURT:  He's a corporate representative.  He
04:56:42  23  can speak for the reasons why the corporation acted.
04:56:44  24          All right.  Let's proceed.
04:56:46  25          (Bench conference concluded.)

04:57:01   1    Q.   (By Mr. Sheasby)   The continuation applications that

04:57:03   2    led to the '681 and '605 patents were filed in July 2007.

04:57:09   3    Do you have knowledge as to the reason USAA took this step

04:57:12   4    and filed continuation applications in July of 2017?

04:57:17   5    A.   The -- the standards for -- for patents -- for software

04:57:26   6    patents changed in 2016, and so as a result of that, we --

04:57:32   7    we went back and -- and refiled our patents at that point

04:57:38   8    to -- to make sure they complied with the new standards,

04:57:42   9    which they did because they have now been awarded to USAA

04:57:47  10    by the Patent Office.

04:57:48  11    Q.   Were there goals that USAA focused on in the research

04:57:52  12    program that led to the patents-in-suit?

04:57:56  13             THE WITNESS:   Yes, yes, there were.   We had -- I

04:57:59  14    believe I have a slide on this, Mr. Huynh.

04:58:08  15    A.   So the first goal was to -- we wanted to be able to

04:58:12  16    transform an everyday consumer device, like a digital

04:58:16  17    camera, or a -- or a smartphone into a check image capture

04:58:23  18    device that could -- that could capture a good quality

04:58:28  19    image of the check.

04:58:29  20             MR. SHEASBY:   Mr. Huynh, can you turn to PX-1186,

04:58:32  21    Page 21?   And can you pull up Column 4, Lines 1 through 9,

04:58:42  22    Mr. Huynh?

04:58:44  23    Q.   (By Mr. Sheasby)   Does this passage relate to the types

04:58:46  24    of devices -- does this passage from the '605 patent relate

04:58:51  25    to the types of devices that USAA was deploying in that

04:58:54  1  system?

04:58:55  2  A.  Yes.  If you look at the bottom three lines, starting

04:58:58  3  with electronics.  So we wanted to be able to use

04:59:03  4  electronics that today's consumers actually own or can

04:59:06  5  easily acquire, such as general -- such as a general

04:59:09  6  purpose computer, a scanner, and a digital camera.

04:59:12  7  I think up in the second line, we also called out

04:59:16  8  that we specifically exclude specialized equipment used for

04:59:21  9  check scanning.

04:59:22  10  Q.  Was it important to USAA that it focus on consumer

04:59:26  11  devices?

04:59:26  12  A.  It was very important for us.  We wanted to be able to

04:59:30  13  use devices that our members either already have or -- or

04:59:35  14  would likely -- likely want to have.

04:59:41  15  Q.  Mr. Brady, do you know if this same language from the

04:59:45  16  '605 patent occurs in the 2006 parent application?

04:59:48  17  A.  Yes, it does.

04:59:53  18  MR. SHEASBY:  Can you -- Mr. Huynh, can you turn

04:59:55  19  to Page 23 of the '605 patent?  And can you pull up

05:00:04  20  Column 8, Lines 27 through 34.

05:00:06  21  Q.  (By Mr. Sheasby)  Does this passage relate to USAA's

05:00:09  22  research program?

05:00:11  23  A.  Yes, it -- yes, it does, as well.  Let me -- if you

05:00:15  24  call out the -- the bottom three lines there, it calls out

05:00:19  25  that we were looking for various digital devices such as

05:00:24  1    PDAs, televisions, MP3 players, we knew televisions had --

05:00:29  2    there were televisions on the market that already had WiFi

05:00:32  3    connections, for example, and -- and MP3 players, as well,

05:00:37  4    and so, you know, this is -- this is pointing out

05:00:41  5    specifically that we knew devices were changing.  We knew

05:00:44  6    that there was a lot of -- a lot of these devices were

05:00:50  7    actually coming together in terms of the types of

05:00:52  8    technologies that they allowed and that convergence of all

05:00:56  9    these technologies was occurring.

05:00:58  10   Q.   What is the PDA that was being discussed in the

05:01:00  11   research program at USAA?

05:01:02  12   A.   PDA, personal digital assistant, it was actually one of

05:01:07  13   the -- the earlier terms for something like a smartphone

05:01:10  14   or -- or tablet, included a general purpose computer, a

05:01:17  15   wireless connectivity, and then also a digital camera.

05:01:21  16   Q.   Was it relevant to USAA what the physical box was

05:01:26  17   that -- that housed the digital camera or the general

05:01:30  18   purpose computer?

05:01:30  19   A.   That was not relevant to us.  We were interested in --

05:01:34  20   in supporting whatever types of devices our consumer -- our

05:01:38  21   members had.

05:01:38  22   Q.   Were there additional innovations in USAA's research?

05:01:42  23   A.   Yes.

05:01:44  24        THE WITNESS:  If -- Mr. Huynh, if you can go back

05:01:47  25   to my slide.

05:01:52   1   A.   The second -- the second item I wanted to call out was

05:01:54   2   we wanted to create an application that could be downloaded

05:02:00   3   on to the member's device in order to control that device

05:02:07   4   in the process in order to capture a quality image of the

05:02:12   5   check.

05:02:13   6              MR. SHEASBY:   Can you turn to the '605 patent,

05:02:23   7   Page 24, Mr. Huynh, Column 10, 23 to 27?

05:02:29   8   A.   Excuse me.   So --

05:02:30   9   Q.   (By Mr. Sheasby)   And let me ask a question, Mr. Brady.

05:02:32  10   A.   Yes.

05:02:32  11   Q.   Does this passage from the '605 patent relate to the

05:02:36  12   research program?

05:02:37  13   A.   There's a couple of words in here, the second line

05:02:41  14   down, we call out that we wanted the -- our members to

05:02:44  15   download a component, and then also the lines -- end of

05:02:54  16   Line 25, we wanted to effectively control certain aspects

05:02:57  17   of capturing the -- the image.

05:03:00  18   Q.   Mr. Brady, does this same language occur in the 2006

05:03:08  19   parent specification of the '605 patent?

05:03:08  20   A.   Yes, it does.

05:03:08  21              MR. SHEASBY:   And turning back to, Mr. Huynh,

05:03:12  22   1186, Page 23, and if you can pull up Column 8, Lines 27

05:03:32  23   through 34, Mr. Huynh.

05:03:34  24   Q.   (By Mr. Sheasby)   Mr. Brady, does this passage from the

05:03:36  25   '605 patent that discusses PDAs as alternatives to

05:03:40  1  computers appear in the original 2006 specification?

05:03:43  2  A.  Yes, it does, as well.

05:03:46  3  Q.  Did the use of a downloaded application influence the

05:03:51  4  type of devices that USAA considered could be used with its

05:03:55  5  system?

05:03:57  6  A.  We -- we wanted to be able to use any consumer device

05:04:01  7  that could download an application.  It would have a device

05:04:06  8  that had a general purpose computer, and we also wanted to

05:04:10  9  be -- the device to be able to capture an image and then

05:04:14  10  upload it to the -- to the bank.

05:04:16  11  Q.  Were there any additional innovations in the -- in the

05:04:19  12  research program?

05:04:19  13  A.  Yes.

05:04:23  14       THE WITNESS:  Mr. Huynh, if you can go back to my

05:04:25  15  slide, please?

05:04:25  16       THE COURT:  Mr. Brady --

05:04:25  17       THE WITNESS:  Yes.

05:04:26  18       THE COURT:  -- Mr. Huynh is not here to take

05:04:28  19  directions from you.

05:04:28  20       THE WITNESS:  Okay.

05:04:29  21       THE COURT:  The lawyers at the podium will direct

05:04:31  22  the IT people what to do.

05:04:31  23       THE WITNESS:  Okay.

05:04:33  24       THE COURT:  These are the lawyers' slides as

05:04:35  25  demonstratives to the jury.  They're not the witness's

| | | |
|---|---|---|
| 05:04:37 | 1 | slides.  Mr. Sheasby will have control of the use of those. |
| 05:04:38 | 2 | THE WITNESS:  Very good.  Thank you. |
| 05:04:39 | 3 | THE COURT:  You're here to answer questions, not |
| 05:04:40 | 4 | to give directions to anybody else. |
| 05:04:42 | 5 | THE WITNESS:  Sorry about that, sir. |
| 05:04:43 | 6 | THE COURT:  Let's proceed, Mr. Sheasby. |
| 05:04:45 | 7 | Q.  (By Mr. Sheasby)  Pulling up Demonstrative PDX-5.3, was |
| 05:04:50 | 8 | there a third innovation? |
| 05:04:51 | 9 | A.  The -- the third innovation was that we wanted to be |
| 05:04:53 | 10 | able to detect errors such as fraudulent -- fraudulent |
| 05:05:02 | 11 | duplicates, bad routing and account numbers, and image |
| 05:05:05 | 12 | quality, other types of errors all over a distributed |
| 05:05:08 | 13 | network. |
| 05:05:09 | 14 | Q.  Did USAA implement the distributed technique? |
| 05:05:13 | 15 | A.  Yes, we did implement the distributed technique.  We |
| 05:05:16 | 16 | had pieces running on the devices, as well as our servers. |
| 05:05:24 | 17 | Q.  Do you know where the OCR of the MICR line and CAR line |
| 05:05:32 | 18 | was done on USAA's system? |
| 05:05:35 | 19 | A.  For the OCR, the mobile device would actually invoke a |
| 05:05:39 | 20 | component, and then the component would be running on our |
| 05:05:42 | 21 | server. |
| 05:05:43 | 22 | Q.  Did consumer remote deposit capture introduce the |
| 05:05:47 | 23 | potential for increased fraud risks? |
| 05:05:51 | 24 | A.  Yes, I -- I believe it did.  The -- you know, again, we |
| 05:05:57 | 25 | didn't have access to the physical check, so we couldn't -- |

05:06:02  1  we couldn't mark it canceled.  We couldn't physically alter

05:06:06  2  the check.

05:06:06  3       So we knew that if -- if you take it to a -- to a

05:06:11  4  branch to deposit or to an ATM deposit, it's -- it's going

05:06:14  5  to physically alter the check in some way.  Plus, it

05:06:18  6  doesn't give the check back to you generally.

05:06:20  7       So we -- what we were telling our members to do is

05:06:24  8  to destroy the check after they had captured the image of

05:06:27  9  it.  We knew that a lot of -- you know, that there would be

05:06:33  10  mistakes that would be made.  Plus, we also knew that

05:06:36  11  fraudsters probably wouldn't destroy the check, and would

05:06:41  12  try to deposit the -- the image again.

05:06:45  13       Duplicate detection was a -- was a problem before

05:06:47  14  we introduced consumer remote deposit capture.  But what we

05:06:51  15  did with consumer remote deposit capture actually made the

05:06:54  16  problem about a thousand times worse than it was before

05:06:57  17  because now the -- the -- our members still had access to

05:07:02  18  the -- to the check and could -- could potentially deposit

05:07:07  19  again.

05:07:08  20  Q.  Can you describe the role that obtaining accurate

05:07:12  21  images of a check plays in fraud prevention?

05:07:14  22  A.  Obtaining an accurate image, I think, is -- you know,

05:07:18  23  is really -- everything is crucial.  Again, we don't have

05:07:21  24  physical access to the checks so we can't read -- read the

05:07:24  25  magnetic ink off of the check.

05:07:28  1    So the -- the entire process is actually relying
05:07:31  2  on capturing a good quality image off of a consumer device.
05:07:38  3  And once -- once you get the data off of those images, then
05:07:46  4  there's some, you know, traditional systems that bank
05:07:49  5  use -- banks use for doing fraud detection that are pretty
05:07:52  6  inexpensive.
05:07:53  7  Q.  What role does USAA's consumer remote deposit capture
05:07:59  8  system play in ensuring a good quality image?
05:08:03  9  A.  I think that's what our system is about is ensuring
05:08:06  10  that we get a good quality image off of -- off of a
05:08:09  11  consumer device.
05:08:10  12  Q.  Did you, USAA, employ any vendors to provide software
05:08:13  13  components for its systems?
05:08:15  14  A.  Yes.  Yes, we did.  Particularly, for some of the
05:08:21  15  commodity pieces like the -- the OCR, we -- we -- we used
05:08:25  16  some vendors.
05:08:27  17  Q.  Have you heard of a company Mitek?
05:08:28  18  A.  Yes, I -- I know of Mitek.  We used Mitek for a -- we
05:08:34  19  used a component of Mitek for the -- the OCR of the -- the
05:08:41  20  courtesy amount field, which is the handwritten numeral
05:08:46  21  amount of the check, also known as the CAR field, by the
05:08:49  22  way.
05:08:49  23  Q.  What was your experience using the Mitek software?
05:08:52  24  A.  We -- we ran into issues using the Mitek software.  It
05:08:56  25  was pretty obvious that they -- that they had not worked in

05:09:01  1  a real-time environment before, so we ran into issues

05:09:04  2  trying to invoke their -- their system from -- from the

05:09:07  3  mobile application or -- or other device in a real-time.

05:09:11  4  Q.  What happened as a result of these problems?

05:09:16  5  A.  So as -- as a result of having those problems, we

05:09:22  6  had -- we actually packaged up a set of -- a set of check

05:09:26  7  images that we were working with that we had been testing

05:09:28  8  with, and we sent those check images over to Mitek.  And

05:09:34  9  then we had a phone call with them -- I was actually on the

05:09:37  10  phone call at the time when -- and we started walking

05:09:40  11  through the issue we were having, and we were trying to get

05:09:44  12  them to duplicate the -- the problem.  They --

05:09:46  13          MR. HILL:  Objection, Your Honor.  We're getting

05:09:48  14  into hearsay testimony at this point if he's going to

05:09:50  15  describe the other end of a phone conversation.

05:09:53  16          THE WITNESS:  I was on the phone conversation.

05:09:55  17          THE COURT:  All right.  When an objection is made,

05:09:57  18  the witness is --

05:09:57  19          THE WITNESS:  I apologize.  I apologize.  Sorry.

05:09:58  20          THE COURT:  The Court rules.  I'm going to sustain

05:10:00  21  that objection.

05:10:01  22          Restate -- state your next question, Mr. Sheasby.

05:10:03  23  Q.  (By Mr. Sheasby)  Did you have any additional meetings

05:10:05  24  with Mitek?

05:10:07  25  A.  We -- yes, we ended up bringing Mitek on site, and

05:10:14   1   we -- we established a confidentiality -- confidentiality

05:10:19   2   agreement with Mitek.  We -- we had them sitting with our

05:10:25   3   developers.  The -- our developers were at a long table

05:10:30   4   where we had our developers, all the devices we were

05:10:34   5   testing with, the checks we were testing with, and then

05:10:36   6   the -- the Mitek engineer was there, as well.

05:10:40   7           And we worked with them to help them improve their

05:10:43   8   software.  Rey -- Rey Medina, in particular, one of our --

05:10:47   9   one of our researchers, one of the inventors worked

05:10:52  10   directly with the Mitek engineers to help them improve

05:10:56  11   their software.

05:10:56  12   Q.  Do you believe that Mitek knew that USAA was developing

05:11:01  13   a consumer remote deposit capture system?

05:11:01  14           MR. HILL:  Objection, Your Honor.  Calls for

05:11:03  15   speculation.

05:11:04  16           THE COURT:  Sustained.

05:11:05  17   Q.  (By Mr. Sheasby)  Did USAA publicly announce that it

05:11:08  18   had pending applications that protected Deposit@Mobile?

05:11:09  19   A.  Yes, we did.  We announced that both on our mobile site

05:11:12  20   and -- and website.

05:11:16  21           MR. SHEASBY:  Can you turn to PX-1062, Mr. Huynh?

05:11:19  22   Q.  (By Mr. Sheasby)  Do you recognize this document,

05:11:24  23   Mr. Brady?

05:11:24  24   A.  Yes.  This is a -- this is a document from what we call

05:11:30  25   our web content management system.  It's part of the code

05:11:35   1   deployment where we -- we will list static text that's

05:11:40   2   going to be displayed in the mobile app or -- or on

05:11:45   3   USAA.com.

05:11:45   4   Q.   The disclosure field, where does that language appear?

05:11:48   5   A.   That will appear directly -- this is the language that

05:11:52   6   will appear directly on the -- the -- our USAA mobile app,

05:11:58   7   as well as USAA.com.

05:11:59   8   Q.   And this is the language that existed as of December of

05:12:03   9   2016?

05:12:03  10   A.   Yes, it is.

05:12:04  11   Q.   What are the patents listed there?

05:12:08  12   A.   We have the '227 patent and the '136.   The '227 patent

05:12:14  13   is the parent of the '605 patent, and the '136 patent is

05:12:20  14   the parent of the '681 patent.

05:12:21  15   Q.   Has USAA's banking business changed since it created

05:12:26  16   consumer remote deposit capture?

05:12:26  17   A.   I would say, yes, we have changed very significantly

05:12:33  18   since we introduced consumer remote deposit capture.

05:12:37  19   Before we -- before we -- we launched consumer remote

05:12:42  20   deposit capture, we were about 25 billion in assets.   Now

05:12:47  21   we're almost triple that.   We're at over 75 billion in

05:12:50  22   assets.

05:12:53  23          At -- at that time, back in 2005, we had less than

05:12:57  24   a million checking accounts.   Now we have over 5 million

05:13:03  25   checking accounts.

| | | |
|---|---|---|
| 05:13:04 | 1 | When we initially launched the consumer remote |
| 05:13:06 | 2 | deposit capture system, we saw an immediate jump in terms |
| 05:13:14 | 3 | of the -- the number of checking accounts opened.  And so I |
| 05:13:16 | 4 | think that -- you know, we -- we -- and we've been growing |
| 05:13:18 | 5 | ever since, so I think this has been a huge -- a huge |
| 05:13:21 | 6 | impact on our business. |
| 05:13:23 | 7 | Q.  Thank you, Mr. Brady. |
| 05:13:23 | 8 | MR. SHEASBY:  I pass the witness, Your Honor. |
| 05:13:24 | 9 | THE COURT:  Cross-examination. |
| 05:13:26 | 10 | MR. HILL:  Thank you, Your Honor. |
| 05:13:50 | 11 | May I proceed, Your Honor? |
| 05:13:52 | 12 | THE COURT:  You may proceed, counsel. |
| 05:13:54 | 13 | MR. HILL:  Thank you, Your Honor. |
| 05:13:54 | 14 | CROSS-EXAMINATION |
| 05:13:55 | 15 | BY MR. HILL: |
| 05:13:55 | 16 | Q.  Mr. Brady, good afternoon. |
| 05:13:58 | 17 | A.  Good afternoon, Mr. Hill. |
| 05:13:59 | 18 | Q.  It's nice to meet you.  We had a chance to meet just a |
| 05:14:01 | 19 | few minutes ago for the first time. |
| 05:14:01 | 20 | A.  It's good to meet you. |
| 05:14:03 | 21 | Q.  Welcome to Marshall. |
| 05:14:04 | 22 | Mr. Brady, I have some questions I want to ask you |
| 05:14:06 | 23 | about your testimony.  But before I do that, I want to talk |
| 05:14:11 | 24 | about the significance of your role in this case as the |
| 05:14:14 | 25 | corporate representative, okay?  Are you with me? |

05:14:16   1   A.  Uh-huh.

05:14:16   2   Q.  All right.  Now, you're a special witness in the case

05:14:18   3   because you are a corporate representative for USAA.  Do

05:14:22   4   you know what that means?

05:14:23   5   A.  I think I have an understanding.

05:14:25   6   Q.  All right.  So you're not only a fact witness in the

05:14:27   7   case, but you're also the person that USAA has designated

05:14:31   8   as the face of the company, as the corporate representative

05:14:35   9   for purposes of this trial.  You understand that, don't

05:14:37   10  you, sir?

05:14:37   11  A.  I understand that.

05:14:38   12  Q.  And that means that you speak for the company for

05:14:43   13  purposes of its positions before this jury.  Do you

05:14:46   14  understand that, sir?

05:14:47   15  A.  I understand that.

05:14:48   16  Q.  And now, as a corporate representative, you get to sit

05:14:52   17  through all of the opening statements and the testimony of

05:14:56   18  the other witnesses, right?

05:14:58   19  A.  Yes, I do.

05:14:59   20  Q.  And that's different than the other fact witnesses in

05:15:02   21  this case who -- they have to sit outside the courtroom.

05:15:07   22  They don't get to sit and hear the other witnesses testify

05:15:09   23  or hear those -- those part of the proceedings.  Do you

05:15:12   24  understand that?

05:15:12   25  A.  I understand that.

05:15:13  1    Q.  And, Mr. Brady, you've been here in court today for the

05:15:18  2    openings, correct?

05:15:20  3    A.  Correct.

05:15:21  4    Q.  All right.  And I want to ask you about something we

05:15:25  5    saw in the opening statement earlier today, okay?

05:15:29  6            MR. HILL:  Can we get the opening slide,

05:15:39  7    Mr. Bakale, with the Constitution?

05:15:40  8    Q.  (By Mr. Hill)  Mr. Brady, do you recall seeing this

05:15:43  9    slide during the course of USAA's opening statements?

05:15:45  10   A.  Yes, I do.

05:15:46  11   Q.  All right.  And what this cites to is Article I,

05:15:53  12   Section 8, Clause 8 of the United States Constitution.  Do

05:15:59  13   you recognize that, sir?

05:15:59  14   A.  Yes, I do.

05:16:00  15   Q.  And were you here, Mr. Brady, when USAA said that

05:16:03  16   patent rights are absolute?  Do you recall hearing that?

05:16:06  17   A.  I -- I believe I do, yes.

05:16:10  18   Q.  And that they're a constitutional right.

05:16:12  19   A.  Uh-huh, yes.

05:16:13  20   Q.  Well, let's take a look at this slide, Mr. Brady, first

05:16:17  21   off, and let's look at what Article I, Section 8 of the

05:16:21  22   Constitution actually says.  Do you remember from your

05:16:23  23   government classes, Mr. Brady, how the Constitution is

05:16:27  24   actually broken up?

05:16:29  25   A.  If you can refresh my memory, that would be good.

05:16:31   1   Q.   Okay.   You may recall there's multiple articles to the

05:16:34   2   Constitution, right?

05:16:34   3   A.   Uh-huh.

05:16:35   4   Q.   And there's at least three articles that set out our

05:16:38   5   three separate branches of government.   Do you recall that?

05:16:41   6   A.   Yes.

05:16:42   7   Q.   Okay.   And so you've got Article I, which sets out the

05:16:47   8   powers of the legislative branch, which is the Congress,

05:16:51   9   correct?

05:16:51   10   A.   Okay.

05:16:51   11   Q.   You've got Article II which addresses the executive,

05:16:57   12   which would be the President?

05:16:58   13   A.   Uh-huh, yes.

05:16:59   14   Q.   And then you've got Article III which addresses the

05:17:03   15   judicial branch, which is what we're all here doing.   It's

05:17:06   16   the judiciary in the federal system.

05:17:08   17         Now, if we look at Article I, what does this say?

05:17:11   18   It says:   The Congress shall have the power to promote the

05:17:16   19   progress of science and useful arts by securing for limited

05:17:20   20   times to authors and inventors the exclusive right to their

05:17:22   21   respective writings and discoveries.

05:17:25   22         Did I read that correctly, sir?

05:17:27   23   A.   Yes.

05:17:28   24   Q.   So what this is doing, Mr. Brady, is this is among the

05:17:33   25   list of the powers that Congress can create laws around; do

05:17:41  1   you understand that?

05:17:41  2   A.  I understand that.

05:17:42  3   Q.  There's other sections of Article I that say things

05:17:48  4   like that they can raise revenue, you understand?

05:17:51  5   A.  Uh-huh, yes.

05:17:51  6   Q.  That they have the power to declare war, only Congress

05:17:55  7   has that?

05:17:56  8   A.  Yes.

05:17:56  9   Q.  And what this says is that Congress can create law

05:18:02  10  about patents, right?

05:18:05  11  A.  I would understand that.

05:18:10  12  Q.  And that's what Congress ultimately did, right?

05:18:15  13  A.  Yes.

05:18:15  14  Q.  So when we talk about a patent, this isn't from the

05:18:19  15  Bill of Rights, correct?

05:18:21  16  A.  Correct.

05:18:21  17  Q.  You know, at the end of the Constitution, we had a

05:18:25  18  later -- an amendment, a set of Bill of Rights; do you

05:18:31  19  recall that?

05:18:31  20  A.  I do.

05:18:31  21  Q.  And those give people actually constitutional rights,

05:18:33  22  agreed?

05:18:33  23  A.  Yes, yes.

05:18:34  24  Q.  Things like the right to freedom of religion, right to

05:18:39  25  freedom of the press?

05:18:41  1          THE COURT:  All right.  Mr. Hill, we don't need to

05:18:43  2   talk about all 10 of the Bill of Rights.  I appreciate the

05:18:47  3   civics lesson, but we need to limit it to what's relevant

05:18:51  4   here in the case.

05:18:52  5          MR. HILL:  Thank you, Your Honor.  Thank you, Your

05:18:54  6   Honor.

05:18:54  7   Q.  (By Mr. Hill)  But my point here is, Mr. Brady, a

05:18:55  8   patent right is a statutory right.  It's something Congress

05:18:59  9   creates under the law, right?

05:19:01  10  A.  I understand.

05:19:02  11  Q.  And Congress is authorized to do that by the

05:19:05  12  Constitution.  But what they do with that power is not a

05:19:08  13  constitutional right; it's ultimately up to Congress,

05:19:12  14  right?

05:19:12  15  A.  I understand.

05:19:13  16  Q.  And you understand that in the Congressional structure

05:19:18  17  for the patent laws, part of what Congress created were the

05:19:24  18  laws that authorizes juries to review the validity of

05:19:30  19  patents; do you understand that?

05:19:31  20  A.  I would agree with that.

05:19:32  21  Q.  And they do that because those juries are then a check

05:19:36  22  and balance on the bureaucracy that creates the patents,

05:19:45  23  correct?

05:19:45  24  A.  I understand.

05:19:45  25  Q.  So you have a Patent Office that grants patents, and

05:19:48   1   you have a jury system that serves as a check and balance

05:19:51   2   on that?

05:19:52   3           THE COURT:  Counsel, approach the bench.

05:19:55   4           (Bench conference.)

05:20:00   5           THE COURT:  If I'm not mistaken, Mr. Hill, you

05:20:02   6   just called the PTO a bureaucracy.  I'm very clear about

05:20:07   7   characterizing that agency of the government either in a

05:20:09   8   positive or a negative way, and calling it a bureaucracy is

05:20:13   9   not a compliment.

05:20:14   10           MR. HILL:  Okay.  I apologize, Your Honor.

05:20:15   11           THE COURT:  I want you to hew to a very clear line

05:20:17   12   on that.  You understand?

05:20:18   13           MR. HILL:  I do.  I do.

05:20:20   14           THE COURT:  Let's proceed.

05:20:21   15           (Bench conference concluded.)

05:20:25   16   Q.  (By Mr. Hill)  Now, Mr. Brady, at the end of this case,

05:20:28   17   when Judge Gilstrap gives the jury the law that it will

05:20:33   18   follow, the actual patent law, if it turns out that patent

05:20:37   19   rights are not, in fact, absolute, what should we make of

05:20:42   20   that?

05:20:45   21   A.  I'm not sure I get your point.

05:20:48   22   Q.  Well, should we chalk that up, that statement up to

05:20:51   23   overstatement, should we chalk that statement up to

05:20:57   24   mistake, or should we chalk that statement up to something

05:21:00   25   else?

| | | |
|---|---|---|
| 05:21:00 | 1 | A.  It seems like it could be one of any reasons. |
| 05:21:05 | 2 | Q.  Thank you. |
| 05:21:07 | 3 | MR. HILL:  You can take that down, Mr. Bakale. |
| 05:21:14 | 4 | Now, Your Honor, I have a board here that I would |
| 05:21:17 | 5 | like a chance to get positioned to use with Mr. Brady if |
| 05:21:21 | 6 | it's permissible with the Court. |
| 05:21:23 | 7 | THE COURT:  As a demonstrative? |
| 05:21:24 | 8 | MR. HILL:  Yes, Your Honor. |
| 05:21:25 | 9 | THE COURT:  Where do you have in mind to position |
| 05:21:27 | 10 | it, Mr. Hill? |
| 05:21:27 | 11 | MR. HILL:  Your Honor, I would ask that I could |
| 05:21:29 | 12 | put it in front of the podium.  I believe it could be seen |
| 05:21:32 | 13 | there, or I could get an easel and set it here beside the |
| 05:21:33 | 14 | podium. |
| 05:21:33 | 15 | THE COURT:  Let's see the board, and then I'll |
| 05:21:35 | 16 | give you further guidance. |
| 05:21:37 | 17 | MR. HILL:  Thank you. |
| 05:21:55 | 18 | Right around here. |
| 05:22:00 | 19 | THE COURT:  Where would you propose to position? |
| 05:22:02 | 20 | MR. HILL:  Your Honor, I could position an easel |
| 05:22:04 | 21 | here, or I could also, I believe, put it here.  And I need |
| 05:22:09 | 22 | to be able to indicate to it.  I believe the jury can see |
| 05:22:13 | 23 | it from there.  We tried to put the text up high. |
| 05:22:15 | 24 | THE COURT:  If you are going to write on it, you |
| 05:22:19 | 25 | need to put it on an easel. |

05:22:21  1          MR. HILL:  Okay.  Thank you, Your Honor.

05:22:22  2          THE COURT:  I think the first position by the

05:22:24  3  overhead projector is probably the best.

05:22:26  4          MR. HILL:  Over here?

05:22:27  5          THE COURT:  Yes.

05:22:28  6          MR. HILL:  Okay.  Thank you.

05:22:40  7          THE COURT:  Thank you for your help, Mr. Sheasby,

05:22:42  8  but the Defendants have plenty of lawyers.  You don't need

05:22:45  9  to help them put up their board.

05:22:48 10          MR. HILL:  Is this --

05:22:49 11          THE COURT:  That's fine.

05:22:49 12          MR. HILL:  Okay.  Thank you, Your Honor.

05:22:58 13          THE COURT:  All right.  Mr. Hill, let's proceed.

05:22:59 14          MR. HILL:  Thank you, Your Honor.

05:23:00 15  Q.  (By Mr. Hill)  Now, Mr. Brady, I'd like to see if we

05:23:04 16  can establish some dates together, okay?  Are you with me?

05:23:07 17  A.  Okay.

05:23:07 18  Q.  Now, USAA's Deposit@Home project -- product was

05:23:12 19  launched in the summer of 2006.  Did I understand that

05:23:15 20  correct from your testimony?

05:23:16 21  A.  That's right.  June of 2006.

05:23:18 22  Q.  All right.  And we've got this timeline here we have,

05:23:20 23  do you see it runs from the pre-2000s through the 2000s and

05:23:25 24  then through the 2010s?

05:23:27 25  A.  May I stand up?  I can't see it from here.

| | | |
|---|---|---|
| 05:23:30 | 1 | THE COURT:  Yes, you can stand if you need to. |
| 05:23:36 | 2 | A.  Okay. |
| 05:23:39 | 3 | Q.  (By Mr. Hill)  And then the date we have here is |
| 05:23:42 | 4 | October 31, 2006.  You see that? |
| 05:23:44 | 5 | A.  I see that, yes. |
| 05:23:45 | 6 | Q.  So the launch of that Deposit@Home product would have |
| 05:23:48 | 7 | been shortly before this October date on our timeline, |
| 05:23:52 | 8 | agreed? |
| 05:23:52 | 9 | A.  Agreed.  Several months before. |
| 05:23:55 | 10 | Q.  Now, USAA filed applications for its very first patents |
| 05:24:06 | 11 | based on the Deposit@Home product on Halloween on |
| 05:24:07 | 12 | October 31, 2006.  And that's the date we see here on the |
| 05:24:09 | 13 | timeline, correct? |
| 05:24:10 | 14 | A.  I'm not sure I would agree with that exactly. |
| 05:24:16 | 15 | Q.  Okay.  Can we take a look at the first page of the |
| 05:24:19 | 16 | patent?  Do you have the '605 patent there in front of you, |
| 05:24:22 | 17 | sir? |
| 05:24:22 | 18 | A.  I do. |
| 05:24:22 | 19 | Q.  Does it reflect the filing date?  Pardon me. |
| 05:24:34 | 20 | MR. HILL:  Pull that down.  And if we go to |
| 05:24:37 | 21 | Page 3. |
| 05:24:37 | 22 | Q.  (By Mr. Hill)  And we see the application data for what |
| 05:24:44 | 23 | was referenced earlier, the October 31 application date. |
| 05:24:47 | 24 | You don't believe that's the application date? |
| 05:24:49 | 25 | A.  I believe that's the application date, yes. |

05:24:50  1   Q.  Okay.  All right.  And USAA launched its Deposit Mobile

05:24:59  2   product that we discussed earlier, it launched that in

05:25:02  3   2009, correct?

05:25:02  4   A.  We launched the Deposit@Mobile brand in -- in May of

05:25:06  5   2009.

05:25:07  6   Q.  2009.  All right.  So that would have been several

05:25:10  7   years after the filing of the original application that

05:25:15  8   later would lead to the '605 patent, correct?

05:25:18  9   A.  That's correct.

05:25:19  10  Q.  All right.  Now, after USAA launched that Mobile

05:25:25  11  Deposit product in 2009, it got some pretty good press

05:25:29  12  coverage for that launch, didn't it?

05:25:30  13  A.  Yes, we did.

05:25:31  14  Q.  If we look, for instance, at Plaintiff's Exhibit 57,

05:25:35  15  that's a document you talked about a little earlier, do you

05:25:38  16  recall that?

05:25:38  17  A.  I do recall that.

05:25:39  18  Q.  And we see there on the first page, it was a New York

05:25:43  19  Times article, correct?

05:25:43  20  A.  Yes.

05:25:44  21  Q.  And in that New York Times article, it was predicted

05:25:47  22  that other banks would follow USAA and offer some type of

05:25:52  23  mobile deposit capability.  Do you recall that?

05:25:56  24  A.  Where is that?

05:25:57  25  Q.  If we look at the bottom of Page 2.

05:26:06  1   A.  Yes.

05:26:09  2   Q.  And Mr. Wayne Peacock, an executive at USAA, is quoted

05:26:17  3   in the article there in the middle of Page 2.  Let's take a

05:26:21  4   look at that.  And he says mobile is going to be a bigger

05:26:28  5   part of how people do commerce and how they interact with

05:26:31  6   their final institutions.  Do you see that, sir?

05:26:33  7   A.  Yes, I do see that.

05:26:35  8   Q.  That, again, was in 2009 after the specification for

05:26:41  9   these patents.  The original version of it had already been

05:26:43  10  filed with the Patent Office, correct?

05:26:44  11  A.  This article was in 2009, yes.

05:26:47  12  Q.  And what Mr. Peacock predicted there, Mr. Brady, that's

05:26:53  13  exactly what happened, isn't it?

05:26:56  14  A.  Mobile is a bigger part.

05:26:59  15  Q.  So later in 2009 --

05:27:01  16       MR. SHEASBY:  Your Honor.

05:27:01  17       THE COURT:  Just a minute.

05:27:02  18       MR. SHEASBY:  Your Honor, I object.  May we

05:27:04  19  approach briefly?

05:27:05  20       THE COURT:  Approach the bench.

05:27:14  21       (Bench conference.)

05:27:16  22       MR. SHEASBY:  Your Honor, an issue we had in the

05:27:21  23  last case was the repeated injection of issues regarding

05:27:24  24  other banks into the case.  And so if Mr. Hill wants to

05:27:29  25  talk about Wells Fargo, that's fine.  But speaking about

05:27:32  1  what lots of other banks are doing is simply not relevant

05:27:35  2  to any issue in this case.

05:27:37  3         THE COURT:  Mr. Hill?

05:27:38  4         MR. HILL:  Your Honor, the other banks, the

05:27:40  5  activity that goes on here that they just discussed in the

05:27:42  6  context of their own presentation and the success of their

05:27:45  7  invention, it shows the -- the progression of the

05:27:49  8  marketplace.

05:27:50  9         There's no limine on this in this matter.  And it

05:27:55  10 shows that the -- it goes to the relevant commercial

05:28:00  11 success of the features that they're claiming as an

05:28:02  12 invention, shows the progress of this technology over time,

05:28:05  13 and shows the development of this -- this industry that

05:28:08  14 they claim to have spawned.  I mean, he just walked through

05:28:12  15 this himself.

05:28:13  16        MR. SHEASBY:  Your Honor, first off, I said

05:28:14  17 nothing about what other banks were doing, in Mr. Brady's

05:28:18  18 testimony.  And this is -- this is a clear example of

05:28:20  19 trying to insert other banks.  We dealt with this issue in

05:28:25  20 the last case.  There are limines on the subject.

05:28:27  21        We're not talking about licensing other banks.

05:28:29  22 That's been limined out by Judge Payne.  And this is

05:28:33  23 connected to the violation of Payne's ruling by saying no

05:28:36  24 one's paid for a license.

05:28:37  25        Now, having said no one's paid for a license, now

05:28:40   1   they're going to talk about all the other banks that are

05:28:40   2   doing it so they can tie together a story that is just not

05:28:47   3   relevant to this case.  This is why they weren't allowed to

05:28:48   4   talk about licensing of other banks --

05:28:48   5        THE COURT:  Do you believe there's an applicable

05:28:50   6   order in limine here, Mr. Sheasby?

05:28:52   7        MR. SHEASBY:  The closest limine is that they

05:28:55   8   limined out any discussion of the USAA licensing program.

05:28:59   9   And I believe that was Motion in Limine -- that was one of

05:29:02  10   Plaintiff's motions in limine.  It was 4.

05:29:19  11        THE COURT:  All right.  I'm going to overrule this

05:29:22  12   objection, but, Mr. Hill, the focus of this examination

05:29:26  13   should be on the Defendant, not on other unnamed

05:29:30  14   institutions.

05:29:31  15        I understand -- I think you have not crossed the

05:29:34  16   line yet, but I think if you continue to go down this road,

05:29:37  17   you will reach a point where you will.  But at this point,

05:29:40  18   I'm inclined to let you pursue this as you have.

05:29:44  19        MR. HILL:  Okay.  Judge, I just want to make sure

05:29:48  20   I'm clear.  So you're saying the line is I can't discuss

05:29:53  21   what happened with regard to the industry between 2009 --

05:29:59  22        THE COURT:  I --

05:29:59  23        MR. HILL:  -- and the present?

05:30:00  24        THE COURT:  -- I don't have a problem with

05:30:00  25   discussing the industry.  I have a problem with you

| | | |
|---|---|---|
| 05:30:02 | 1 | focusing on other banks other than Wells Fargo. |
| 05:30:05 | 2 | MR. HILL:  Okay. |
| 05:30:06 | 3 | THE COURT:  As long as the industry is used in a |
| 05:30:09 | 4 | broad, generic sense that includes the Defendant -- |
| 05:30:12 | 5 | MR. HILL:  Uh-huh. |
| 05:30:13 | 6 | THE COURT:  -- it's less problematic than when you |
| 05:30:15 | 7 | sever out the Defendant from other financial institutions |
| 05:30:19 | 8 | and talk about other banks. |
| 05:30:20 | 9 | MR. HILL:  Okay. |
| 05:30:20 | 10 | THE COURT:  And, again, the thrust of your |
| 05:30:25 | 11 | evidence needs to focus on this Defendant, but I'm not |
| 05:30:28 | 12 | going to preclude you from including this Defendant as a |
| 05:30:32 | 13 | part of the broader financial industry in a relevant |
| 05:30:35 | 14 | question. |
| 05:30:36 | 15 | MR. HILL:  Uh-huh.  So -- and, Your Honor, the |
| 05:30:38 | 16 | reason I ask is, here would be my question.  My question |
| 05:30:41 | 17 | would be:  Now, Mr. Brady, what happened then is that |
| 05:30:47 | 18 | mobile deposit -- and I believe this has already come out |
| 05:30:50 | 19 | in his direct examination -- mobile deposit then became |
| 05:30:53 | 20 | successful and was adopted broadly by the industry.  I |
| 05:30:57 | 21 | mean, he's testified to this with a story he's already |
| 05:30:58 | 22 | told. |
| 05:30:58 | 23 | MR. SHEASBY:  He said nothing about this, and it |
| 05:31:01 | 24 | has no relevance to this case.  This is designed for -- |
| 05:31:03 | 25 | it's for them to suggest that everyone else uses this, no |

05:31:08   1   one else licenses it, and that they shouldn't have to pay

05:31:10   2   for it.  This has no relevance whatsoever to this case.

05:31:11   3   And what he just laid out makes it absolutely --

05:31:13   4            MR. HILL:  The opening in the case, Your Honor,

05:31:15   5   laid out the development in the industry or the widespread

05:31:19   6   use or adoption of MRDC in the industry.  I mean, that is

05:31:22   7   out in the -- in the case currently.

05:31:23   8            MR. SHEASBY:  There's nothing in the opening that

05:31:25   9   said anything about the adoption of MRDC by this industry,

05:31:30  10   nothing at all.  The words never appeared in the opening.

05:31:33  11   The only place they've appeared is in Mr. -- Mr. Hill's

05:31:36  12   examination of Mr. Brady.

05:31:37  13            THE COURT:  All right.  The question you just

05:31:38  14   posited to me, Mr. Hill, I think, goes too far.  I'm not

05:31:43  15   going to allow you to ask that question.

05:31:46  16            MR. HILL:  Your Honor, let me ask this just

05:31:46  17   because it's going to come to this.  When we get to the

05:31:47  18   damages experts, they're going to have to talk about the

05:31:49  19   industry and the development of the industry and the

05:31:51  20   commercial success of this product and all these other

05:31:55  21   things about the industry they factored into their

05:31:58  22   Georgia-Pacific analysis.  And if we're precluded from even

05:32:01  23   mentioning that, I don't -- I don't know how we address

05:32:03  24   those issues.

05:32:04  25            THE COURT:  The damages experts are going to

05:32:06  1  testify pursuant to their reports that are then subject to

05:32:11  2  Daubert practice.  The basis on which those experts have

05:32:16  3  relied upon others to reach their opinions is set forth in

05:32:16  4  their reports.  That's altogether different than what we're

05:32:19  5  talking about now.

05:32:19  6        MR. HILL:  Okay.  So I can bring it out through an

05:32:19  7  expert because he addressed it in his report, but I can't

05:32:23  8  address --

05:32:23  9        THE COURT:  You can ask an expert about what's in

05:32:25 10  their report.

05:32:26 11        MR. HILL:  I'm just trying to find the line,

05:32:28 12  Judge.  I'm not arguing with you.  I'm trying to make sure

05:32:30 13  I understand because I don't want to walk up there and do

05:32:32 14  something you're unhappy with, so...

05:32:34 15        THE COURT:  This is not about keeping me happy.

05:32:36 16  This is about following the rules of procedure --

05:32:39 17        MR. HILL:  I understand.

05:32:39 18        THE COURT:  -- and hewing to a line that tracks

05:32:42 19  relevant evidence and not irrelevant evidence.  There is

05:32:48 20  someplace for a discussion of the industry, but there is a

05:32:54 21  very real risk, and I think Plaintiff is right, that if it

05:32:57 22  goes very far, it's going to focus the jury on parties

05:33:00 23  other than the Defendant.  And it's going to lead them to

05:33:04 24  confusion and to consideration of other parties who are not

05:33:07 25  before the Court.  And that's not proper.  And I'm going to

05:33:10  1  try my best to avoid us getting to that point.  That's why

05:33:13  2  I'm giving you the instructions I'm giving you.

05:33:16  3       MR. HILL:  Yes, sir.  Let me ask this, Your Honor.

05:33:18  4  So in light of that, I need to do a little retooling on

05:33:23  5  some of the things I had in here.  This was not a granted

05:33:26  6  motion in limine in this case.  So it's not retooling I did

05:33:28  7  in advance, anticipating that I would be changing it.  It's

05:33:32  8  5:30 now.  I can continue to try to question him awhile and

05:33:32  9  avoid some of these topics, but if we're at a point where I

05:33:32  10  could -- we could stop and I could do that retooling, I'll

05:33:38  11  certainly do it.

05:33:38  12       THE COURT:  I don't anticipate you're going to

05:33:41  13  finish your cross before we break for the day, but I'm not

05:33:43  14  ready to quit right now.

05:33:45  15       MR. HILL:  Okay.

05:33:46  16       THE COURT:  If you've got some other areas, let's

05:33:51  17  pursue those.

05:33:51  18       MR. HILL:  All right.  Thank you, Your Honor.

05:33:52  19       (Bench conference concluded.)

05:33:56  20       THE COURT:  Let's proceed, counsel.

05:34:09  21  Q.  (By Mr. Hill)  Now, Mr. Brady, do you have an

05:34:14  22  understanding of when Wells Fargo launched its first Mobile

05:34:19  23  Deposit application?

05:34:19  24  A.  I do not.

05:34:20  25  Q.  That was at the end of 2012?

05:34:22   1   A.   Okay.

05:34:22   2   Q.   You weren't -- you weren't aware of that fact, sir?

05:34:24   3   A.   No.

05:34:25   4   Q.   All right.  Now, what we see here on the timeline that

05:34:30   5   we just talked about, the October 31, 2006, original

05:34:38   6   filings by USAA, and then we mentioned the 2009 launch of

05:34:47   7   the USAA mobile app.  We also mentioned the 2012 launch of

05:34:51   8   the Wells Fargo mobile app.  All of those things occurred,

05:34:53   9   sir, before 2017, correct?

05:34:54   10   A.   That's true.

05:34:56   11   Q.   And USAA then -- this is all before USAA applies for

05:35:03   12   the '605 and the '681 patents, correct?

05:35:08   13   A.   For the '605 and the '681.

05:35:11   14   Q.   Because those applications were filed July 2017,

05:35:17   15   correct?

05:35:17   16   A.   That's when those applications were filed.

05:35:19   17   Q.   So by the time that USAA filed for the two patents that

05:35:28   18   we're here about, Mobile Deposit had become a rolled out

05:35:36   19   capability for both USAA and for Wells Fargo, correct?

05:35:38   20   A.   For those two, yes.

05:35:40   21   Q.   So let's talk about those two patent applications a

05:35:52   22   little bit, Mr. Brady.

05:35:54   23        Now, USAA made a request to the PTO with each of

05:35:56   24   those applications for something that is called Track 1

05:36:02   25   requests.  Are you familiar with that?

05:36:04   1   A.   I do not know what that is.

05:36:05   2   Q.   All right.   Well, let me show you in the patent

05:36:08   3   application itself, Defendant's Exhibit 8 -- excuse me,

05:36:11   4   Defendant's Exhibit 8, at Page 542 -- excuse me, at Page --

05:36:25   5   yeah, 542.

05:36:27   6            MR. HILL:   I tell you what, first let's go to

05:36:29   7   Page 575, Mr. Bakale.

05:36:33   8            THE COURT:   I tell you what, while you're looking

05:36:35   9   for that, Mr. Hill, we're going to take this opportunity to

05:36:38   10   have a short recess, ladies and gentlemen.

05:36:39   11            I'm going to ask you simply to close your

05:36:41   12   notebooks, leave them in your chairs.   Follow all the

05:36:43   13   instructions I've given you, including not to discuss the

05:36:46   14   case among yourselves.

05:36:47   15            This will probably be the last recess for the day,

05:36:49   16   and we'll try to keep it short.   With that, the jury is

05:36:52   17   excused for recess.

05:36:53   18            COURT SECURITY OFFICER:   All rise.

05:37:11   19            (Jury out.)

05:37:18   20            THE COURT:   The Court stands in recess.

05:37:21   21            COURT SECURITY OFFICER:   All rise.

05:37:23   22            (Recess.)

05:46:18   23            (Jury out.)

05:46:19   24            COURT SECURITY OFFICER:   All rise.

05:46:21   25            THE COURT:   Be seated, please.

274

05:46:22   1          Are you prepared to continue with your

05:46:29   2   cross-examination, Mr. Hill?

05:46:30   3          MR. HILL:  Yes, sir.

05:46:32   4          THE COURT:  All right.  Then you may return to the

05:46:34   5   podium.

05:46:34   6          While that's going on, Ms. Denton, if you'll bring

05:46:37   7   in the jury.

05:46:39   8          COURT SECURITY OFFICER:  All rise.

05:46:59   9          (Jury in.)

05:47:00   10          THE COURT:  Please be seated.

05:47:05   11          All right.  Counsel, you may proceed with your

05:47:10   12   cross-examination of the witness.

05:47:11   13          MR. HILL:  Thank you, Your Honor.

05:47:12   14   Q.  (By Mr. Hill)  Mr. Brady, before we broke, we were

05:47:14   15   talking about Defendant's Exhibit 8 and the fact that USAA

05:47:18   16   had made what was known as a Track 1 request to the Patent

05:47:22   17   Office.  And I was looking specifically at Page 575 of that

05:47:25   18   document.

05:47:29   19          Are -- are you familiar with what it means to make

05:47:32   20   a Track 1 request?

05:47:33   21   A.  I am not.

05:47:34   22   Q.  Now, when USAA originally filed these --

05:47:50   23          MR. HILL:  Go ahead and take that down,

05:47:54   24   Mr. Bakale.  Thank you.

05:47:55   25   Q.  (By Mr. Hill)  When USAA originally filed these two

05:47:55  1   applications in 2017 that would lead to the '605 and '681
05:47:55  2   patents, it also did not ask the PTO, the Patent Office, to
05:48:01  3   consider these patents as children or grandchildren of any
05:48:05  4   earlier USAA patents?  Are you aware of that fact, sir?
05:48:08  5   A.   That -- that's not my understanding.
05:48:11  6   Q.   Okay.  Well, let's take a look at Defendant's
05:48:14  7   Exhibit 8.  And if we look at Page 585, and we look here at
05:48:22  8   the section toward the bottom of the page, what we see is a
05:48:29  9   section that allows for the applicant to claim benefit
05:48:32  10  under some statutes to other applications.  And you'll note
05:48:42  11  there's nothing filled in there.  Do you see that, sir?
05:48:42  12  A.   I do see that.
05:48:42  13          MR. HILL:  All right.  And, Your Honor, may we
05:48:44  14  approach, briefly?
05:48:44  15          THE COURT:  Approach the bench.
05:48:45  16          (Bench conference.)
05:48:57  17          THE COURT:  What is it, Mr. Hill?
05:48:58  18          MR. HILL:  Your Honor, just out of caution, I want
05:49:00  19  to ask about what I'm going to next, which is to point out
05:49:03  20  to this witness that the two applications were then
05:49:05  21  rejected in October of 2017 based on -- and at that time,
05:49:12  22  USAA made the request that they be -- relate back to the
05:49:17  23  original applications.  But before I did that, I wanted to
05:49:19  24  make sure that I wasn't going to -- the Court wouldn't view
05:49:23  25  that as improper.

05:49:24   1          THE COURT:  Is there an objection from the
05:49:26   2   Plaintiff?
05:49:26   3          MR. SHEASBY:  So he hasn't laid his foundation
05:49:29   4   that this witness has personal knowledge of the patent
05:49:31   5   prosecution history, if he has that expertise.  And so if
05:49:35   6   he's just going to be tested -- you know, giving argument
05:49:37   7   through a witness, that doesn't make any sense.  That's not
05:49:40   8   the purpose of cross-examination.  He should establish that
05:49:43   9   our corporate representative doesn't know about the
05:49:45  10   prosecution history, and he should move on.
05:49:47  11          MR. HILL:  Your Honor, the corporate
05:49:49  12   representative speaks for the company.  He can speak
05:49:51  13   outside his personal knowledge.  To the extent he knows,
05:49:53  14   I'm entitled to ask him.  He's already testified about his
05:49:56  15   familiarity with the specifications in these patents and
05:49:58  16   also with the filing timelines.  So...
05:50:02  17          THE COURT:  He's testified that he's not familiar
05:50:03  18   with the Track 1 process.
05:50:05  19          MR. HILL:  With the Track 1 process, yes, Your
05:50:07  20   Honor.  This is not the Track 1 process.  This is a request
05:50:10  21   that they now have the earlier patent application --
05:50:13  22          THE COURT:  You can ask him the question for the
05:50:15  23   prosecution history.  If he doesn't have any personal
05:50:17  24   knowledge of it, then you're going to need to drop it and
05:50:20  25   move on.

| | | |
|---|---|---|
| 05:50:20 | 1 | MR. HILL:  Okay. |
| 05:50:20 | 2 | MR. SHEASBY:  Your Honor, can I request that I get |
| 05:50:24 | 3 | copies of the exhibits so I can cross-examine -- redirect |
| 05:50:30 | 4 | the witness.  I don't know that they have them. |
| 05:50:31 | 5 | THE COURT:  Well, you should -- each side should |
| 05:50:32 | 6 | have the other one's exhibits long before now.  If they |
| 05:50:35 | 7 | don't, there's a problem. |
| 05:50:35 | 8 | MR. HILL:  We've exchanged exhibits, Your Honor. |
| 05:50:40 | 9 | They have our exhibits. |
| 05:50:40 | 10 | MR. SHEASBY:  I don't have the physical exhibits. |
| 05:50:44 | 11 | That's the problem.  We didn't get the binders. |
| 05:50:45 | 12 | THE COURT:  We're not -- we're not going to get to |
| 05:50:47 | 13 | redirect today, but we'll make -- make sure you do that |
| 05:50:49 | 14 | overnight. |
| 05:50:50 | 15 | MR. HILL:  Yes, Your Honor. |
| 05:50:51 | 16 | THE COURT:  Let's proceed. |
| 05:51:01 | 17 | Q.  (By Mr. Hill)  Now -- |
| 05:51:02 | 18 | THE COURT:  Let's proceed. |
| 05:51:03 | 19 | MR. HILL:  Thank you, Your Honor. |
| 05:51:04 | 20 | Q.  (By Mr. Hill)  Now, Mr. Brady, are you aware that in |
| 05:51:06 | 21 | response to that original application, the Patent Office |
| 05:51:08 | 22 | rejected the applications? |
| 05:51:10 | 23 | A.  I'm not aware of that. |
| 05:51:11 | 24 | Q.  And that after that, sir, are aware that USAA then -- |
| 05:51:13 | 25 | MR. SHEASBY:  Your Honor, objection.  This is |

05:51:15  1  exactly what I think we addressed.

05:51:20  2        MR. HILL:  Your Honor, I asked if the witness was

05:51:21  3  aware of the fact and he answered he was not --

05:51:23  4        THE COURT:  I'll overrule the objection.

05:51:31  5  Q.  (By Mr. Hill)  After that, Mr. Brady, are you aware

05:51:31  6  that USAA corrected its applications to claim priority to

05:51:33  7  the original 2006 filing?

05:51:35  8  A.  I'm not aware of that fact.

05:51:37  9  Q.  And you understand, Mr. Brady, that these two patents,

05:51:43  10  the '605 and the '681, were eventually issued, correct?

05:51:47  11  A.  Yes.

05:51:47  12  Q.  And they were both issued on July 3rd, 2018, correct?

05:51:54  13  A.  Yes.

05:51:55  14  Q.  And that's less than one year after their filing date;

05:51:58  15  isn't that right, sir?

05:51:59  16  A.  Yes.

05:52:01  17  Q.  And then do you also understand that USAA filed this

05:52:04  18  lawsuit against Wells Fargo on these two new patents about

05:52:08  19  a month later?

05:52:10  20  A.  I believe that's about when it was.

05:52:13  21  Q.  Now --

05:52:25  22        THE COURT:  Are you going to continue to use this

05:52:27  23  board with the witness, Mr. Hill?

05:52:28  24        MR. HILL:  Your Honor, I am going to come back to

05:52:30  25  it briefly, but I can set it down in the meantime if that

05:52:36  1   would be helpful.

05:52:37  2         THE COURT:  As long as you're going to come back

05:52:38  3   to it.

05:52:39  4         MR. HILL:  All right.

05:52:41  5   Q.  (By Mr. Hill)  Now I want to talk a little more,

05:52:43  6   Mr. Brady, about this idea that USAA's '605 and '681

05:52:46  7   patents relate back to the applications filed by USAA on

05:52:50  8   October 31, 2006, okay?  Are you with me?

05:52:54  9   A.  Okay.

05:52:54  10  Q.  All right.  What I understand that means is that the

05:52:57  11  specification for the '605 and the '681 patents were

05:53:02  12  originally submitted back in 2006.  Is that what you

05:53:06  13  understand it to mean?

05:53:07  14  A.  That's what I understand it to mean.

05:53:09  15  Q.  All right.  And are you familiar with the parts of a

05:53:12  16  patent, sir?

05:53:12  17  A.  Somewhat familiar, yes.

05:53:14  18  Q.  Okay.  Do you have a copy -- you talked about the

05:53:17  19  specification of the '605 and '681 in your direct

05:53:21  20  testimony.  Do you have a copy of those patents in front of

05:53:23  21  you, sir?

05:53:23  22  A.  I do, yes.

05:53:24  23  Q.  And if you'll take a look, the '605 and the '681

05:53:30  24  patents, each have some introductory pages, correct?

05:53:35  25  A.  Yes.

05:53:38   1            MR. HILL:  And can we get those up, Defendant's

05:53:41   2    Exhibit 4, please, Mr. Bakale.

05:53:44   3    Q.  (By Mr. Hill)  We'll look through it together.  So I'm

05:53:47   4    looking at the '605 patent, and it's got this initial front

05:53:51   5    page.  And if we thumb forward 10 or 12 pages, we get to

05:53:56   6    some figures.  Okay.  Do you see the first figure,

05:54:04   7    Figure 1?

05:54:04   8    A.  I see that.

05:54:05   9    Q.  All right.  Now, if we then look through the patent to

05:54:09   10   the very end, I believe in the '605 patent, it's going to

05:54:16   11   be in Column 15, and we can talk about patents, Mr. Brady,

05:54:22   12   in reference to the column numbers at the top of the page.

05:54:25   13   Are you familiar with that practice?

05:54:25   14   A.  I am familiar with that.

05:54:26   15   Q.  If we look in Column 15, we see a section that begins

05:54:32   16   "what is claimed"; do you see that?

05:54:33   17   A.  I see that, yes.

05:54:34   18   Q.  All right.  And so what appears between where those

05:54:37   19   figures start and where it says what is claimed, that's the

05:54:40   20   specification, isn't it?

05:54:41   21   A.  These -- no.

05:54:44   22   Q.  That's not the specification?

05:54:45   23   A.  It -- it's -- it -- it's informed by the specification.

05:54:52   24   Q.  Okay.  I'm talking about the actual physical part of

05:54:55   25   the patent, sir, that appears between where the figures

05:54:58   1   start?

05:54:58   2   A.   Oh, where the figures start.

05:55:00   3   Q.   Yes, sir and where we get to right here.

05:55:02   4   A.   Sorry, I misunderstood.

05:55:04   5   Q.   So going that way.

05:55:05   6   A.   Yes, those are the specification.

05:55:07   7   Q.   That's the specification, right?

05:55:09   8   A.   Yes.

05:55:09   9   Q.   And so if the jury wants to know what was filed in

05:55:13  10   2006, all they have to do is look in their notebook; isn't

05:55:13  11   that right?

05:55:21  12   A.   I don't know that they have the '200 patent in their

05:55:25  13   notebooks.

05:55:26  14   Q.   Well, didn't you -- did I hear you testify that that

05:55:29  15   specification is identical to the specification for the

05:55:32  16   '605?

05:55:32  17   A.   The specifications are identical, yes.

05:55:34  18   Q.   Okay.  And so if the jury wants to know what was filed

05:55:38  19   in 2006, all they have to do is look in their notebook,

05:55:43  20   correct?

05:55:43  21   A.   I partially agree with that.

05:55:46  22   Q.   Okay.  And what we will find in the notebook in the

05:55:51  23   '605 patent from where the pictures start to this spot

05:55:54  24   right here I've marked on the screen is the 2006

05:55:58  25   specification, correct?

05:56:00  1  A.  Yes.

05:56:05  2  Q.  All right.  And the same can be said, can't it, of the

05:56:08  3  '681 patent?

05:56:08  4        MR. HILL:  Can we go to Defendant's Exhibit 5,

05:56:12  5  Mr. Bakale.  Excuse me, Defendant's Exhibit 5, I believe it

05:56:25  6  is, is that the '681 patent -- oh, Exhibit 3, I apologize.

05:56:33  7  Q.  (By Mr. Hill)  This is our '681 patent, correct,

05:56:35  8  Mr. Brady?

05:56:36  9  A.  That's correct.

05:56:37  10  Q.  And, again, with the '681, if we flip forward a few

05:56:41  11  pages, we'll get to the figures.  All right.  There we have

05:56:48  12  Figure 1 again?

05:56:49  13  A.  Uh-huh, yes.

05:56:50  14  Q.  And if we go to near the end, we'll see the claims

05:56:55  15  begin in the '681 patent at the bottom of Column 13?

05:57:03  16  A.  Yes.

05:57:04  17  Q.  Isn't that right, sir?

05:57:05  18  A.  Uh-huh.

05:57:06  19  Q.  Right there.  So, again, going that way, everything

05:57:09  20  from where the picture started to where I've marked there

05:57:13  21  on the screen is the 2006 portion of the specification

05:57:17  22  which has been included identically in the '681 patent,

05:57:21  23  correct, sir?

05:57:21  24  A.  Yes, sir.

05:57:25  25  Q.  So the very first part of the patent, the first few

05:57:29  1   pages and then the claims at the end, those parts were

05:57:32  2   written in 2017, correct?

05:57:36  3   A.  I'm sorry, say that again.

05:57:37  4   Q.  Yes, sir.  The very first part of the patent, the

05:57:40  5   initial pages with the date of issuance and the abstract

05:57:45  6   and the name of the inventors, and then the claims at the

05:57:50  7   end, those portions of the patents were written in 2017,

05:57:57  8   correct, sir?

05:57:57  9   A.  I'm not sure that's entirely correct.

05:58:00  10  Q.  Well, they were filed with the Patent Office in 2017;

05:58:02  11  would you agree with that?

05:58:02  12  A.  Yes, I would agree with that.

05:58:03  13       MR. HILL:  Go ahead and take this down,

05:58:06  14  Mr. Bakale.

05:58:08  15  Q.  (By Mr. Hill)  And so in 2017, USAA submitted new

05:58:31  16  claims based on the 2006 specification, correct, sir?

05:58:37  17  A.  Yes.

05:58:38  18  Q.  And you understand it, Mr. Brady, is that something

05:58:43  19  that's allowed by the patent laws?

05:58:47  20  A.  I'm not a patent attorney.

05:58:49  21  Q.  Okay.  So you just don't know one way or the other?

05:58:52  22  A.  My understanding is it's allowed, but I'm not a patent

05:58:55  23  attorney, sir.

05:58:56  24  Q.  All right.  Are you aware of the fact, as USAA's

05:58:59  25  corporate representative in this case who's here to speak

05:59:01  1   for the company on the basis of its claims and defenses in

05:59:03  2   this case, are you aware of the fact that USAA contends

05:59:08  3   that what was filed in 2006 supports those later claims?

05:59:15  4   A.  You're saying what was filed in 2006 supports those

05:59:19  5   later claims?

05:59:19  6   Q.  Yes, sir.

05:59:20  7   A.  I believe it does, yes.

05:59:21  8   Q.  And are you aware of the fact, sir, that in order to be

05:59:25  9   entitled to that 2006 priority date, in fact, the claims

05:59:29  10  have to be supported by that 2006 specification?  Do you

05:59:34  11  understand that?

05:59:36  12  A.  Yes.

05:59:37  13  Q.  Because if the claims aren't supported by the 2006

05:59:41  14  specification, then they're invalid, correct?

05:59:45  15  A.  Again, I'm not -- I'm not a patent attorney.

05:59:48  16  Q.  And do you understand that that's the issue that USAA

05:59:54  17  asserts in the case, that that's the issue that it joins

05:59:57  18  with Wells Fargo in this case legally?

05:59:59  19  A.  I understand, yes.

06:00:00  20  Q.  And that's what's known as the written description

06:00:04  21  requirement of the patent laws; you understand that, sir?

06:00:06  22  A.  I have not heard that before.

06:00:08  23  Q.  And as USAA's corporate representative, are you here to

06:00:17  24  claim before this jury that you believe that the 2006

06:00:21  25  specification provides a written description of the full

06:00:27  1  scope of the claims for the 2017 filings of the '605 and

06:00:33  2  '681 patent?

06:00:33  3          MR. SHEASBY:  Your Honor, I object.  He testified

06:00:37  4  he doesn't understand the words written description.  I

06:00:41  5  request that counsel rephrase the question.  It's unfair to

06:00:43  6  the witness.

06:00:48  7          MR. HILL:  Your Honor, I'll --

06:00:49  8          THE COURT:  Just a minute, Mr. Hill.

06:00:50  9          MR. HILL:  Yes, sir.

06:00:51  10          THE COURT:  I think it calls for a legal

06:00:59  11  conclusion.  I'm going to sustain the objection.

06:01:01  12          You may rephrase it in some other fashion, or move

06:01:05  13  on.

06:01:06  14          MR. HILL:  Thank you, Your Honor.

06:01:07  15  Q.  (By Mr. Hill)  Well, Mr. Brady, let me just summarize

06:01:11  16  it this way:  As USAA's corporate representative, you

06:01:14  17  understand that the issue that's being joined in this

06:01:16  18  courtroom, the disagreement that Wells Fargo has with USAA

06:01:20  19  is over this issue of whether that 2006 specification

06:01:24  20  discloses the full scope of these 2017 patent claims.  Do

06:01:30  21  you understand that?

06:01:30  22  A.  I understand that's the issue.

06:01:33  23  Q.  And you understand Wells Fargo contends that it does

06:01:35  24  not, and USAA contends the opposite?

06:01:38  25  A.  Yes.

| | | |
|---|---|---|
| 06:01:40 | 1 | Q.  All right.  Now, Mr. Brady, in addition to claiming |
| 06:01:47 | 2 | that these patents were filed -- that its patents filed in |
| 06:01:52 | 3 | 2017 should get to count as having been filed in 2006, USAA |
| 06:01:56 | 4 | also claims in this case that these patents are worth a lot |
| 06:01:58 | 5 | of money, right? |
| 06:01:59 | 6 | A.  I believe so. |
| 06:02:00 | 7 | Q.  And USAA is going to ask the jury in this case, |
| 06:02:06 | 8 | Mr. Brady, for an award of over a hundred million dollars |
| 06:02:10 | 9 | in lawsuit damages just for the alleged inventions in these |
| 06:02:14 | 10 | two patents; isn't that right, sir? |
| 06:02:16 | 11 | A.  That is correct. |
| 06:02:17 | 12 | Q.  But would it be fair, Mr. Brady, for USAA to recover |
| 06:02:22 | 13 | money for things that USAA didn't invent in these patents? |
| 06:02:29 | 14 | A.  That would not be fair. |
| 06:02:31 | 15 | Q.  That wouldn't be right, would it, sir? |
| 06:02:34 | 16 | A.  Yes. |
| 06:02:37 | 17 | Q.  If USAA didn't invent it, they shouldn't be able to ask |
| 06:02:42 | 18 | that other people have to pay them for it; would you agree |
| 06:02:45 | 19 | with that? |
| 06:02:45 | 20 | A.  I would agree. |
| 06:02:48 | 21 | Q.  And are you aware, Mr. Brady, that the law actually |
| 06:02:51 | 22 | requires USAA to take care to only seek those damages that |
| 06:02:57 | 23 | are attributable to the claimed invention and nothing more? |
| 06:03:00 | 24 | A.  Again, I'm not -- |
| 06:03:02 | 25 |          MR. SHEASBY:  Your Honor, objection.  This calls |

06:03:04   1   for a legal conclusion.

06:03:04   2           MR. HILL:  I asked about his awareness, Your

06:03:08   3   Honor.

06:03:08   4           THE COURT:  Are you familiar with that portion of

06:03:10   5   the patent statute, Mr. Brady?

06:03:11   6           THE WITNESS:  I'm not a patent attorney.  I'm not

06:03:13   7   familiar.

06:03:13   8           THE COURT:  All right.  Let's move on.

06:03:16   9   Q.  (By Mr. Hill)  Well, Mr. Brady, would it make sense to

06:03:20  10   you for the jury to have an idea of what USAA claims to

06:03:24  11   have invented in these patents versus what existed before,

06:03:29  12   that they would need to have an idea of what USAA claims to

06:03:32  13   have invented in these patents, versus what you -- what

06:03:35  14   actually existed before the filing in October of 2006?

06:03:39  15   A.  I'm sorry, can you repeat that one more time?

06:03:42  16   Q.  And I apologize, sir.  I stumbled on that question.

06:03:44  17   A.  I'm following.

06:03:45  18   Q.  So, Mr. Brady, the jury has to have an idea of what

06:03:52  19   USAA claims to have invented in these patents versus what

06:03:56  20   existed before it filed the 2006 applications, right?

06:04:02  21   A.  Versus what existed before the 2006 patents?

06:04:07  22   Q.  Yes, sir.

06:04:08  23   A.  Yes.

06:04:08  24   Q.  And what that does is that helps the jury know whether

06:04:14  25   the claimed inventions in these two patents are a big deal

06:04:18   1   or a small step or just the assembling of known ideas,

06:04:23   2   doesn't it?

06:04:23   3        MR. SHEASBY:  Your Honor, I object.  This is

06:04:25   4   clearly outside the defenses that have been brought in this

06:04:27   5   case.  This violates a motion in limine.

06:04:30   6        THE COURT:  Approach the bench, counsel.

06:04:31   7        (Bench conference.)

06:04:40   8        THE COURT:  What limine does this violate,

06:04:43   9   Mr. Sheasby?

06:04:44  10        MR. SHEASBY:  They're trying to present a 103

06:04:48  11   defense.  What was known in --

06:04:50  12        THE COURT:  Slow down.

06:04:51  13        MR. SHEASBY:  What was known in 2006 has no

06:04:53  14   relevance whatsoever to damages.  It could only go to one

06:04:56  15   thing, which is to validity.  What matters for the

06:04:59  16   hypothetical negotiation is what the alternatives that were

06:05:02  17   available --

06:05:03  18        THE COURT:  I asked you for a MIL.  You said there

06:05:05  19   was a MIL violation.  I asked you what MIL you believe they

06:05:11  20   violated.

06:05:11  21        MR. SHEASBY:  We MIL'd out dropped defenses.  Both

06:05:15  22   of us agreed to it.  It was Defendant's MIL -- it was MIL

06:05:18  23   No. -- I believe it was their MIL against us.

06:05:21  24        MS. GLASSER:  And this is actually filed --

06:05:27  25        MR. SHEASBY:  It's Defendant's MIL.

06:05:45  1           MS. GLASSER:  It's 104.

06:05:53  2           THE COURT:  While she's looking for that,

06:05:55  3  Mr. Hill.

06:05:58  4           MR. HILL:  Your Honor, I'm not making a 103

06:06:00  5  anything.

06:06:01  6           THE COURT:  I understand, but you're asking

06:06:02  7  questions of a witness that are clearly beyond his personal

06:06:04  8  knowledge, and you're asking him not so much of the answers

06:06:08  9  in a yes or no so the jury can hear the question that

06:06:10 10  you've asked.  You need to pursue areas where this witness

06:06:13 11  has established a level of personal knowledge.

06:06:15 12           MR. HILL:  Absolutely.  Let me tell you what I'm

06:06:19 13  about to do, Judge, so you'll know.

06:06:22 14           THE COURT:  Let's make sure that we all talk one

06:06:24 15  at a time up here.

06:06:25 16           MR. HILL:  I'll tell you what I'm about to do.

06:06:25 17  So what I was asking him is, for the jury to assess the

06:06:29 18  patent's value, the difference over the prior art, which is

06:06:32 19  completely proper under Georgia-Pacific No. 9, they have to

06:06:35 20  know what existed before and what this added, the inventive

06:06:35 21  step.

06:06:40 22           And now what I'm about to do is go to a number of

06:06:42 23  things that have already been -- the jury has already seen

06:06:47 24  from opening statements, but I believe this witness, based

06:06:50 25  on his personal knowledge in the banking industry, will

06:06:52    1    agree were banking technologies that existed prior to 2006.

06:06:56    2            So when they get ready to value this invention,

06:07:00    3    they can't value that part.  It's apportionment argument,

06:07:02    4    Your Honor.

06:07:02    5            MR. SHEASBY:  Your Honor, that is absolutely

06:07:04    6    improper.  Rule No. 4 is dropped defenses.  They have no

06:07:10    7    102/103 defense based any prior art as to these patents.

06:07:12    8    What was relevant in -- what was known in 2006 has no

06:07:15    9    relevance to the issue of damages.  Damages would solely be

06:07:18   10    assessed from the time of the hypothetical negotiation.

06:07:20   11            This is a surreptitious 102/103 defense.  And

06:07:27   12    every -- that existed before 2006 is completely irrelevant.

06:07:27   13    They have to lay the foundation of what existed before 2006

06:07:30   14    was a non-infringing alternative, and then set it up that

06:07:32   15    way.

06:07:33   16            What he's doing right now is surreptitiously

06:07:37   17    trying -- it's irrelevant to damages.  Damages are judged

06:07:40   18    from the time of the hypothetical negotiation.  It's about

06:07:42   19    the non-infringing alternatives that would exist at the

06:07:45   20    time of the hypothetical negotiation.

06:07:47   21            And what's worse is that this was their request.

06:07:49   22    They want no dropped defenses.  And so what's going to

06:07:53   23    happen after he does this?  Am I going to get on the stand

06:07:56   24    and cross-examine Mr. Saffici --

06:07:56   25            THE COURT:  Slow down, Mr. Sheasby.  I'm trying to

| | | |
|---|---|---|
| 06:07:59 | 1 | follow what you say, but you're awfully fast. |
| 06:08:01 | 2 | MR. SHEASBY:  I am fast this evening, Your Honor. |
| 06:08:03 | 3 | It just opens up -- so now we have to talk about |
| 06:08:07 | 4 | the fact what was known and not known in 2006.  Why are we |
| 06:08:07 | 5 | fighting about -- |
| 06:08:07 | 6 | MR. HILL:  Here's what -- |
| 06:08:10 | 7 | MR. SHEASBY:  That's not relevant to damages.  He |
| 06:08:11 | 8 | should have asked about the state of the art in 2012 when |
| 06:08:15 | 9 | Wells Fargo launched their system or the state of the art |
| 06:08:17 | 10 | in 2018, which is the date of the hypothetical negotiation. |
| 06:08:22 | 11 | That would be the only relevant inquiry. |
| 06:08:25 | 12 | MR. HILL:  Your Honor, if he's telling me from an |
| 06:08:28 | 13 | apportionment argument that I can argue the things that |
| 06:08:31 | 14 | were post-priority date, that should be factored out |
| 06:08:36 | 15 | in an -- in an apportionment of the value of these patents |
| 06:08:39 | 16 | what they added over the prior art, I think that's wrong. |
| 06:08:39 | 17 | That'd make my case a lot easier. |
| 06:08:46 | 18 | But here's where the rubber meets the road, Judge. |
| 06:08:48 | 19 | Their damages expert says that the value of this invention |
| 06:08:51 | 20 | comes from its fraud detection features and its duplicate |
| 06:08:56 | 21 | detection features, all features that existed in banks and |
| 06:08:59 | 22 | in banking processes before these applications were ever |
| 06:09:02 | 23 | filed for. |
| 06:09:02 | 24 | And so it is directly relevant from setting up |
| 06:09:05 | 25 | their damages case, the fact that their damage experts |

06:09:09    1   point to the value of this invention as being its addition

06:09:12    2   of known features, known features that had existed before,

06:09:18    3   which we all know have to be --

06:09:21    4           THE COURT:  Known features --

06:09:21    5           MR HILL  -- apportioned.

06:09:22    6           THE COURT:  -- known features that are carried out

06:09:25    7   at a traditional brick and mortar bank versus known

06:09:28    8   features that are allowed to be done remotely?

06:09:28    9           MR. HILL:  Known features that were done

06:09:31   10   electronically in remote deposit capture channels, and this

06:09:37   11   witness can tell me about it because he's got the personal

06:09:40   12   knowledge.

06:09:40   13           MR. SHEASBY:  He should be talking solely about

06:09:45   14   the state of the art and the hypothetical negotiations.

06:09:45   15   That's relevant.  Talk about what existed before the patent

06:09:47   16   was filed.  He hasn't even laid the foundation that's a

06:09:50   17   non-infringing alternative.

06:09:51   18           This is completely a surreptitious 103 defense,

06:09:55   19   and it shouldn't be done.  It -- the non-infringing

06:10:01   20   alternative is something that they can discuss.  So let

06:10:04   21   them set out what the non-infringing alternative is, and

06:10:06   22   we -- and Mr. Brady can talk about that.

06:10:08   23           But simply listing things that were known in the

06:10:10   24   prior art before 2006, that has no relevance to damages.

06:10:16   25   There's no case law that suggests that's relevant to

06:10:18  1   damages, none.

06:10:18  2          MR. HILL:  Your Honor, that's just incorrect.

06:10:20  3   Georgia-Pacific Factor 9 says the jury -- the requirement

06:10:23  4   that the jury apportion damages --

06:10:25  5          THE COURT:  If you're going to apportion,

06:10:27  6   Mr. Hill, you don't apportion against the entirety of the

06:10:30  7   financial sector.  You apportion with regard to a

06:10:33  8   multi-component processor device as to the components that

06:10:37  9   do not bring value per the patents.  You don't go outside

06:10:42  10  that device or that process.

06:10:44  11         MR. HILL:  And that's it, Your Honor.  So what I'm

06:10:45  12  about to point out are portions of the patent.  These are

06:10:49  13  requirements of the patent in spots that they say do

06:10:52  14  duplicate detection.  That's one of the claim elements.

06:10:54  15         And the point is, duplicate detection has been

06:10:58  16  done for decades.  And so when you do value these patents,

06:11:02  17  whatever they invented, whatever it is that should be

06:11:03  18  valued for this invention, it shouldn't be that part.  If

06:11:10  19  it's -- if it's --

06:11:10  20         MS. GLASSER:  Question that analysis --

06:11:15  21         MR. HILL:  -- if it's -- if it's doing -- I lost

06:11:15  22  my point, Your Honor, from the interruption.

06:11:17  23         THE COURT:  If there's some portion of this device

06:11:19  24  or process that is not covered by these patents, then

06:11:22  25  that's a relevant item to point out for apportionment that

06:11:26  1  should not be included.  If it's -- if it's the part of a

06:11:32  2  cell phone that causes the image to slide sideways and that

06:11:39  3  has nothing to do with another component in the cell phone,

06:11:44  4  then it's proper to identify what's not to be included in

06:11:47  5  an award of damages to apportion out the actual accused

06:11:54  6  functionality.

06:11:55  7       But that doesn't give you the latitude to talk

06:12:00  8  about anything and everything else in the industry that may

06:12:03  9  have been known or unknown.  If there's -- if there's a

06:12:06  10 portion of this remote capture and deposit process that are

06:12:11  11 not covered by these patents that should be properly

06:12:18  12 segregated out and apportioned for appointment -- for the

06:12:18  13 establishment of damages, that's fine.  But that's not

06:12:21  14 nearly -- that's not nearly as broad a path as you simply

06:12:25  15 want to --

06:12:26  16      MR. HILL:  Your Honor, that's -- that's

06:12:27  17 effectively forcing us into an entire market value

06:12:30  18 situation is what that does.  These patents don't claim as

06:12:33  19 their invention duplicate detection.  They claim the

06:12:37  20 implementation of a deposit process through the use of

06:12:41  21 general purpose computer and image capture devices.  That's

06:12:44  22 what has to be valued.

06:12:46  23      And what we want to point out is what their damage

06:12:48  24 expert has done is he has taken the value of duplicate

06:12:51  25 detection and used it as a substitute for the actual

06:12:54  1  inventive step, which is the move to some more ubiquitous

06:13:00  2  device.

06:13:01  3          THE COURT:  Is this some kind of a 101 argument --

06:13:03  4          MR. HILL:  No, sir.

06:13:03  5          THE COURT:  -- where there's no inventive concept

06:13:05  6  here?

06:13:05  7          MR. HILL:  No, I'm not arguing there's an absence

06:13:07  8  of inventive concept.  What I'm arguing is what -- they

06:13:12  9  have to value the inventive concept and not things other

06:13:13  10  than the inventive concept.

06:13:13  11          MR. SHEASBY:  And, Your Honor, let me be very

06:13:15  12  clear.  The Patent Office has given us a right to a set of

06:13:17  13  elements that are combined together.  If he wants to do an

06:13:21  14  apportionment analysis, he can be asking about things that

06:13:24  15  are other than what those elements are that contribute to

06:13:29  16  remote deposit capture.  That's fair game.  For him to say

06:13:32  17  that individual elements in the claims are narrowing, that

06:13:32  18  is completely violative of -- of damages.  That is our

06:13:35  19  invention.  We own that altogether.

06:13:37  20          And so if there's something other than that,

06:13:39  21  that's valid from apportionment.  But the -- the idea that

06:13:43  22  there's elements that are in the prior art, that is not

06:13:46  23  relevant to damages because the Patent Office gave us all

06:13:49  24  those elements in combination.  This could only go to one

06:13:52  25  thing, which is derogating the value of this invention by

06:13:56  1  suggesting it's based on old subject matter, and that's

06:14:02  2  violative of the Federal Circuit precedent.

06:14:03  3       Old combinations together are -- can be novel.

06:14:05  4  And there's no case law that says you point out what

06:14:07  5  elements are in the prior art.  That case law does not

06:14:09  6  exist.

06:14:10  7       MR. HILL:  Your Honor, what he just argued to you

06:14:12  8  is that they have an entire mark value theory that they

06:14:17  9  don't have.  Their experts apportioned.  And the reason

06:14:19  10  their experts apportion and they apportion down to

06:14:22  11  duplicate detection value and fraud detection value, and

06:14:25  12  they say the entire market value rule is improper.

06:14:30  13       Now Mr. Sheasby tells you that if we want to show

06:14:32  14  that what their expert valued is the wrong thing because it

06:14:36  15  previously existed, that what -- we are cut off from that

06:14:40  16  because he had a system claim that covers the whole

06:14:42  17  machine, the whole process.

06:14:44  18       MR. SHEASBY:  But we got that --

06:14:45  19       THE COURT:  Tell me -- tell me why we are talking

06:14:47  20  about this with the Plaintiff's corporate representative

06:14:49  21  and not with the experts on damages.

06:14:50  22       MR. HILL:  Because, Your Honor, their expert -- in

06:14:53  23  particular their damage expert, Mr. Weinstein -- answered

06:14:56  24  incorrectly, I believe, in his deposition that he believes

06:15:02  25  these patents create new methods of duplicate detection.

06:15:05  1   That's wrong.  That's not the invention.  Nobody else in

06:15:08  2   this case claimed that was the invention.

06:15:10  3          And I asked him:  And that is what you valued?

06:15:13  4          And he says:  Yes, that's what I valued.

06:15:15  5          So they've now dumped Mr. Calman because they know

06:15:19  6   Mr. Calman would conflict with that.  He would say the

06:15:23  7   opposite because he has said differently about what the

06:15:26  8   invention is.  And what they're doing now is trying to

06:15:29  9   prevent me from showing the exact same idea that duplicate

06:15:32  10  detection --

06:15:33  11         THE COURT:  How is this witness supposed to have

06:15:35  12  any personal knowledge of that?

06:15:36  13         MR. HILL:  Because this witness knows when

06:15:38  14  duplicate detection in electronic image clearing systems

06:15:44  15  came into existence and became a common practice, and it

06:15:48  16  was well before anything to do with these patents.

06:15:50  17         MR. SHEASBY:  Your Honor, that is a prior art.

06:15:52  18  We've got a claim that says our system with duplicate

06:15:56  19  detection.  If he wants to say there's other things that

06:15:58  20  are contributing to value separate from that, he's entitled

06:16:01  21  to do that.  But he's not entitled to pick apart our claims

06:16:04  22  and say that this was known and this was known and this was

06:16:05  23  known.

06:16:05  24         THE COURT:  All right, counsel, we've been up here

06:16:07  25  probably 10 or 12 minutes already.  The jury is in the box.

```
06:16:10   1   I'm going to send the jury home for the end of the day.
06:16:13   2   We're going to get to the bottom of this, and we'll pick
06:16:15   3   back up with cross-examination tomorrow.
06:16:16   4           MR. SHEASBY:  Thank you, Your Honor.
06:16:17   5           MR. HILL:  Thank you, Your Honor.
06:16:18   6           (Bench conference concluded.)
06:16:22   7           THE COURT:  Ladies and gentlemen, we're at a point
06:16:27   8   where I need to spend some time with the attorneys, and I'm
06:16:29   9   not going to continue to let you sit there and watch us
06:16:32  10   talk here at the bench, hopefully not hearing what we have
06:16:35  11   to say.
06:16:36  12           So I'm going to recess for the day at this point.
06:16:39  13   We'll continue with the Defendant's cross-examination of
06:16:41  14   Mr. Brady in the morning.
06:16:43  15           I'm going to ask you to take your juror notebooks
06:16:45  16   with you as you leave the courtroom and leave them closed
06:16:48  17   on the table in the jury room.  I'm going to remind you of
06:16:51  18   all my instructions, including not to discuss the case with
06:16:54  19   anyone.
06:16:55  20           Again, remember, when you get home tonight,
06:16:57  21   whoever is there to meet you is going to ask about it.
06:17:00  22   Just don't go there.  Also, let me remind you, you're
06:17:03  23   welcome to bring your cell phones and leave them in your
06:17:06  24   vehicles.  I don't want cell phones brought back into the
06:17:09  25   courthouse tomorrow.  There's no problem with you checking
```

06:17:11  1  an email or a text message or something related to your

06:17:14  2  family or your business from your vehicle during the lunch

06:17:17  3  break or otherwise in the day, but I don't want those

06:17:20  4  devices in the jury room, please.

06:17:23  5          Travel safely to your homes, follow all the other

06:17:27  6  instructions I've given you.  Be prepared to start at 8:30

06:17:30  7  in the morning.  And with that, you're excused for the

06:17:32  8  evening.

06:17:33  9          COURT SECURITY OFFICER:  All rise.

06:17:34  10          (Jury out.)

06:17:35  11          THE COURT:  All right.  Be seated, please.

06:18:01  12          Counsel, let me remind you that before I bring the

06:18:11  13  jury in in the morning, I'm going to expect someone from

06:18:14  14  each side to go to the podium at the same time and jointly

06:18:19  15  present to the Court in the record the list of items from

06:18:23  16  the list of pre-admitted exhibits that have been used

06:18:25  17  during today's portion of the trial.  We'll have that

06:18:27  18  complete and in the record before I bring the jury in at

06:18:30  19  8:30 in the morning.

06:18:31  20          Let me also remind you, as I did in chambers this

06:18:35  21  morning, that if you have disputes overnight that aren't

06:18:37  22  resolved through the meet-and-confer process, the Court

06:18:40  23  needs to be notified not later than 10:00 p.m., not

06:18:46  24  11:30 p.m. like last night.

06:18:48  25          And if those disputes can't be resolved through

06:18:50  1  your continuing meet-and-confer efforts, then I'll meet

06:18:54  2  with you by or around 7:30 in the morning, and we'll take

06:18:57  3  them up during that intervening hour before we start with

06:19:01  4  the jury at 8:30.

06:19:01  5          All right.  Are there questions from either

06:19:03  6  Plaintiff or Defendant before we recess for the evening?

06:19:06  7          MR. SHEASBY:  Nothing from Plaintiffs, Your Honor.

06:19:08  8          MS. GLASSER:  Actually one very small procedural

06:19:10  9  issue.  Tomorrow we'll be doing the reading of the

06:19:13 10  Lockwood-Stein testimony, subject to resolution of the

06:19:16 11  objections, and we were wanting to -- for planning

06:19:18 12  purposes, to understand the Court's preferences as to

06:19:22 13  whether we just had someone read that into the record or

06:19:25 14  whether we actually did it live with a person sitting in

06:19:27 15  the witness stand?

06:19:31 16          THE COURT:  Actually, counsel, I don't think I

06:19:33 17  have a preference there.  Do you have a preference as to

06:19:35 18  how to present it.  Assuming we get there, because it's

06:19:38 19  your proposed evidence?

06:19:39 20          MS. GLASSER:  It's relatively short.  We can

06:19:41 21  probably just read it in.  But if Your Honor has no

06:19:44 22  preference, we'll reconvene and let you know.

06:19:46 23          THE COURT:  You let me know in the morning how you

06:19:49 24  want to do it.

06:19:50 25          MS. GLASSER:  Thank you, Your Honor.

06:19:50  1          THE COURT:  Mr. Melsheimer?

06:19:51  2          MR. MELSHEIMER:  Thank you, Your Honor.  May it

06:19:52  3  please the Court.

06:19:52  4          I just want to alert the Court that we're going to

06:19:55  5  be submitting a brief, a short trial brief on this written

06:19:59  6  description issue to clarify where I think we are and what

06:20:02  7  we believe the law is with respect to what we can and

06:20:05  8  cannot say, just so we don't have a continuing controversy

06:20:08  9  with the Court about it.  I expect that will be filed in

06:20:10  10  the next hour or so.

06:20:12  11          THE COURT:  Well, I don't expect you to have any

06:20:14  12  continuing controversy with the Court, but I'll be happy to

06:20:17  13  look at your brief.

06:20:19  14          MR. MELSHEIMER:  Thank you, Your Honor.

06:20:20  15          THE COURT:  All right.  We stand in recess until

06:20:21  16  tomorrow morning.

06:20:22  17          I'd like to see Mr. Sheasby and Mr. Hill in

06:20:24  18  chambers.

06:20:25  19          COURT SECURITY OFFICER:  All rise.

          20          (Recess.)

          21

          22

          23

          24

          25

1

2                          CERTIFICATION

3

4          I HEREBY CERTIFY that the foregoing is a true and

5   correct transcript from the stenographic notes of the

6   proceedings in the above-entitled matter to the best of my

7   ability.

8

9

10   /S/ Shelly Holmes                    1/6/2020
     SHELLY HOLMES, CSR, TCRR            Date
11   OFFICIAL REPORTER
     State of Texas No.: 7804
12   Expiration Date: 12/31/20

13

14

15

16

17

18

19

20

21

22

23

24

25