```
1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
2                       MARSHALL DIVISION

3   UNITED SERVICES AUTOMOBILE   )(
    ASSOCIATION
4                                )(    CIVIL ACTION NO.

5   VS.                          )(    2:18-CV-366-JRG

6                                )(    MARSHALL, TEXAS
                                       JANUARY 7, 2020
7   WELLS FARGO BANK, N.A.       )(    8:51 A.M.

8

9                   TRANSCRIPT OF JURY TRIAL

10                      MORNING SESSION

11      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12                 UNITED STATES DISTRICT JUDGE

13
    APPEARANCES:
14

15  FOR THE PLAINTIFF:

16
    JASON SHEASBY
17  ANTHONY ROWLES
    LISA GLASSER
18  IRELL & MANELLA
    1800 Avenue of the Stars
19  Suite 900
    Los Angeles, CA 90067-4276
20

21
    ROBERT CHRISTOPHER BUNT
22  PARKER, BUNT & AINSWORTH, PC
    100 East Ferguson
23  Suite 418
    Tyler, TX 75702
24

25
```

```
 1   FOR THE DEFENDANT:

 2

 3   THOMAS M. MELSHEIMER
     M. BRETT JOHNSON
     MICHAEL A. BITTNER
 4   J. TRAVIS UNDERWOOD
     WINSTON & STRAWN LLP
 5   2121 North Pearl Street
     Suite 900
 6   Dallas, TX 75201

 7

 8   E. DANIELLE T. WILLIAMS
     WINSTON & STRAWN LLP
     300 South Tyron Street
 9   16th Floor
     Charlotte, NC 28202
10

11   MATTHEW R. MCCULLOUGH
     WINSTON & STRAWN LLP
12   275 Middlefield Road
     Suite 205
13   Menlo Park, CA 94025

14

     JACK WESLEY HILL
15   WARD, SMITH & HILL, PLLC
     P.O. Box 1231
16   1507 Bill Owens Parkway
     Longview, TX 75606
17

18
     COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                        Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas   75670
22                        (903) 923-7464

23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

```
08:51:20    1                    P R O C E E D I N G S
08:51:20    2              (Jury out.)
08:51:21    3              COURT SECURITY OFFICER:  All rise.
08:51:22    4              THE COURT:  Be seated, please.
08:52:03    5              Are the parties prepared to read into the record
08:52:12    6     those items from the list of pre-admitted exhibits used
08:52:14    7     before the jury during yesterday's portion of the trial?
08:52:18    8              MR. BUNT:  Yes, Your Honor, we are.
08:52:19    9              THE COURT:  Please proceed.
08:52:21   10              MR. BUNT:  The following Plaintiff exhibits were
08:52:25   11     used yesterday:  No. 36 -- all these are Plaintiff's
08:52:33   12     exhibits -- No. 36, 39, 43, 44, 57, 143, 195, 1062, 1186,
08:52:46   13     and 1187.
08:52:48   14              THE COURT:  All right.  Is there any objection
08:52:52   15     from Defendant as to that rendition from Plaintiff?
08:52:55   16              MR. UNDERWOOD:  No objection, Your Honor.
08:52:56   17              THE COURT:  Does Defendant have anything to add?
08:52:59   18              MR. UNDERWOOD:  We do.  The following Defendant's
08:53:01   19     exhibits were used, DTX-3, DTX-4, and DTX-8.
08:53:07   20              THE COURT:  All right.  Does Plaintiff have any
08:53:11   21     objection to that offer from Defendant?
08:53:13   22              MR. BUNT:  No, Your Honor.
08:53:13   23              THE COURT:  All right, counsel.  Thank you.
08:53:16   24              MR. SHEASBY:  Your Honor, one issue before we
08:53:18   25     begin.  Can Mr. Brady have a copy of the exhibits he's
```

08:53:20   1   going to be cross-examined on, and can we have them, as

08:53:23   2   well?

08:53:23   3             THE COURT:  Do you not have them?

08:53:25   4             MR. SHEASBY:  We do not.

08:53:26   5             THE COURT:  I mean, that issue came up yesterday

08:53:27   6   at the bench, and I would assume it would have been

08:53:29   7   resolved.

08:53:31   8             MR. HILL:  Your Honor, what they're asking for is

08:53:33   9   special binders for the witness.  They have the exhibits.

08:53:36  10   I don't have to identify on cross which exhibits I want to

08:53:39  11   use with the witness in advance.  That's what's being

08:53:43  12   requested.

08:53:43  13             I will represent, though, to the Court I don't

08:53:44  14   think I'm going to hit any new Defendant exhibits.  I think

08:53:47  15   the only exhibits will be other Plaintiff exhibits that

08:53:50  16   have been used with the witness in his direct.  So I don't

08:53:53  17   think we're going to run into an issue.  But I'll -- I

08:53:56  18   mean, I can check and see, but it's -- that's the issue.

08:53:59  19   It's not that they don't have our exhibits.

08:54:01  20             MR. SHEASBY:  Your Honor, Mr. Brady is entitled to

08:54:03  21   have in front of him a physical copy of what he's going to

08:54:07  22   be examined on.  It's been the case in every other

08:54:10  23   examination in this trial and the last one.  And I do not

08:54:13  24   understand why this has become an issue.

08:54:15  25             THE COURT:  Typically, on direct and on cross,

08:54:17   1   each side gets up and passes out a bound binder that the

08:54:21   2   witness is going to have before them on the direct and then

08:54:23   3   on the cross.  Are we not doing that here for some reason?

08:54:27   4            MR. HILL:  Your Honor, I'm told it's right here,

08:54:30   5   and I can pass it over.  For cross-examination, that's not

08:54:32   6   my typical practice, Judge.  And even in this Court, and

08:54:35   7   I've done it this way many times without complaint, so...

08:54:43   8            THE COURT:  Well, if the witness is going to be

08:54:45   9   asked questions about specific documents, the witness needs

08:54:48   10  to have a copy of that document available to him.  If you

08:54:50   11  want to hand it up at the time so you don't telegraph where

08:54:54   12  you're going or if you want to put the binder up there so

08:54:57   13  that the witness can then turn to a specified page, the

08:55:00   14  witness is entitled to see what the witness is going to be

08:55:02   15  questioned about.

08:55:14   16           MR. HILL:  Hang on, Judge, I'm told there's a

08:55:17   17  discrepancy --

08:55:19   18           THE COURT:  If you're going to mutter in the back

08:55:21   19  of the room, it's not going to be picked up on the

08:55:23   20  transcript.  Either speak up or don't speak.

08:55:42   21           Do we have Mr. Brady here?  We do.  Do you want to

08:55:47   22  return to the witness chair, Mr. Brady?  I remind you you

08:55:51   23  remain under oath.

08:55:52   24           MR. HILL:  All right.  Judge, we have it coming

08:55:55   25  up.

08:55:56   1          THE COURT:  All right.  Before I bring the jury

08:55:57   2   in, I met with counsel this morning in chambers.  I gave

08:56:00   3   counsel specific guidance.  I'm going to review that on the

08:56:02   4   record at this time.  This relates to the lengthy

08:56:05   5   discussion that Mr. Sheasby and Mr. Hill had with the Court

08:56:10   6   at the end of the day yesterday at the bench about the

08:56:14   7   proper approach to cross-examining Mr. Brady by the

08:56:18   8   Defendant concerning the asserted claims and the other

08:56:28   9   issues that we discussed at the bench yesterday about the

08:56:30  10   continuing cross-examination.

08:56:31  11          My guidance in that regard is as follows:  The

08:56:34  12   Defendants should focus on non-infringing alternatives

08:56:39  13   which achieve the same or similar benefits as are described

08:56:42  14   by the patents.

08:56:43  15          Defendants may not describe how each element of

08:56:47  16   the patent is known in the prior art, however.  To do so

08:56:52  17   would risk the jury taking that testimony as evidence as

08:56:56  18   obviousness, even though the references being relied on by

08:56:59  19   the Defendant are not presently asserted as prior art.

08:57:01  20          Allowing the Defendant to probe non-infringing

08:57:05  21   alternatives, let's them fully explore Georgia-Pacific

08:57:07  22   Factor 9 and the additional value of the patent over the

08:57:10  23   prior art without risking jury confusion as to whether this

08:57:15  24   testimony or the references cited go to obviousness and

08:57:18  25   invalidity.

08:57:18   1          The Court notes that with the parties' approval

08:57:24   2   and consent, it instructed the jury yesterday on the

08:57:27   3   anticipation and obviousness and invalidity in general,

08:57:31   4   even though the Court was advised yesterday in the middle

08:57:34   5   of the trial that the posture of the parties with regard to

08:57:38   6   those invalidity defenses was substantially different.

08:57:41   7          The Court's mindful of the Exmark decision cited

08:57:45   8   by the Defendant and -- but finds it to be distinguishable

08:57:50   9   in this particular case.  In Exmark the Court found that

08:57:55   10  the patent, quote, made clear, close quote, that the

08:57:57   11  patented improvement was only related to a single element

08:58:00   12  and focusing on that element was appropriate.  That is not

08:58:03   13  the case here.  The Plaintiff has made no such concession,

08:58:10   14  and to follow that same approach, would be improper in the

08:58:12   15  Court's view.

08:58:12   16         The Court reaches the conclusion and gives this

08:58:15   17  guidance in large part based on the guidance and provisions

08:58:22   18  of Federal Rule of Evidence 403, finding that having

08:58:25   19  already instructed the parties on anticipation,

08:58:27   20  obviousness, and invalidity in general, the continued

08:58:30   21  examination by the Defendant as undertaken yesterday would

08:58:33   22  unavoidably create jury confusion and have a prejudicial

08:58:38   23  effect not otherwise easily cured.

08:58:41   24         That's the guidance, in essence, I gave the

08:58:43   25  parties in chambers.  That's the guidance I'm giving the

08:58:46  1  parties as to the continued cross-examination and redirect

08:58:48  2  of this witness, Mr. Brady.

08:58:50  3        All right.  With that, let's bring in the jury.

08:59:04  4        Mr. Hill, you may return to the podium if you'd

08:59:07  5  like.

08:59:07  6        MR. HILL:  Thank you, Your Honor.

08:59:09  7        COURT SECURITY OFFICER:  All rise.

08:59:44  8        (Jury in.)

08:59:45  9        THE COURT:  Good morning, ladies and gentlemen.

08:59:52  10  Please be seated.

08:59:52  11        Welcome back, members of the jury.  We will

08:59:57  12  continue this morning with the Defendant's

09:00:00  13  cross-examination of the witness, Mr. John Brady.

09:00:04  14        Mr. Hill, you may continue with your

09:00:05  15  cross-examination.

09:00:06  16        MR. HILL:  Thank you, Your Honor.

09:00:06  17      JOHN BRADY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

09:00:06  18              CROSS-EXAMINATION CONTINUED

09:00:06  19  BY MR. HILL:

09:00:06  20  Q.  Good morning, Mr. Brady.

09:00:10  21  A.  Good morning, Mr. Hill.

09:00:10  22  Q.  Mr. Brady, let's talk about how USAA moved from

09:00:16  23  scanners to mobile phones and when that occurred, okay?

09:00:21  24  A.  Okay.

09:00:21  25  Q.  Now, the very first prototype for the Deposit@Home

| | | |
|---|---|---|
| 09:00:27 | 1 | product was a flatbed scanner, correct? |
| 09:00:30 | 2 | A.  That was correct. |
| 09:00:31 | 3 | Q.  It wasn't a digital camera, right? |
| 09:00:33 | 4 | A.  It was a flatbed scanner. |
| 09:00:34 | 5 | Q.  All right.  Not a mobile phone? |
| 09:00:37 | 6 | A.  Flatbed scanner. |
| 09:00:39 | 7 | Q.  And that prototype was demonstrated to you by a |
| 09:00:42 | 8 | gentleman named Bharat Prasad in 2005; is that right? |
| 09:00:45 | 9 | A.  That's right. |
| 09:00:45 | 10 | Q.  And just so we're clear, Mr. Prasad, he's one of the |
| 09:00:49 | 11 | two inventors that are named on these two patents, right? |
| 09:00:52 | 12 | A.  He's one of multiple inventors. |
| 09:01:00 | 13 | Q.  I said one of the two.  I apologize.  He is named on |
| 09:01:00 | 14 | both, right? |
| 09:01:00 | 15 | A.  Yes, he is. |
| 09:01:00 | 16 | Q.  Okay.  And Mr. Prasad, he's still with USAA today, |
| 09:01:04 | 17 | correct? |
| 09:01:04 | 18 | A.  Correct. |
| 09:01:04 | 19 | Q.  Still works there? |
| 09:01:05 | 20 | A.  Correct. |
| 09:01:05 | 21 | Q.  All right.  Now, when it launched in the summer of |
| 09:01:09 | 22 | 2006, Deposit Home was still focused on flatbed scanners, |
| 09:01:20 | 23 | right? |
| 09:01:20 | 24 | A.  I'm not sure I would agree with that. |
| 09:01:20 | 25 | Q.  Okay.  Well, as of October 25th, 2006, in an email on |

312

09:01:21  1  which you were copied, USAA engineers said that they will

09:01:25  2  need to determine if we should allow devices other than

09:01:30  3  scanners.  Do you recall that email?

09:01:31  4  A.  I do.  I think there's more to it than that.

09:01:34  5  Q.  Okay.  Well, let's take a look at that email.  That's

09:01:37  6  Plaintiff's Exhibit 36.  I believe you talked about it in

09:01:39  7  your direct examination; do you recall it?  We've got it

09:01:43  8  here on the screen.

09:01:44  9       MR. HILL:  And if we can go to the last page of

09:01:50 10  it.

09:01:51 11  Q.  (By Mr. Hill)  And here's the portion of the email at

09:01:53 12  the top that I was referring to.  This appears on -- I

09:01:57 13  believe the top of the last page.

09:01:59 14       And it states:  Thought you might find this

09:02:04 15  interesting.  Looks like we have some creative members.  We

09:02:07 16  had discussed the fact that any TWAIN capable device should

09:02:10 17  work but had not tried this in the lab.  We will need to

09:02:14 18  determine if we should allow devices other than scanners

09:02:17 19  and, if so, what the risk/issues will be.

09:02:20 20       Do you see that, sir?

09:02:21 21  A.  I do see that.

09:02:22 22  Q.  And that email was sent on October 25th, 2006, correct?

09:02:27 23  A.  That is correct.

09:02:30 24  Q.  And if we look at the -- well, we'll check that in a

09:02:34 25  minute, but five days -- this date is five days before the

09:02:38  1  specifications that we're talking about in this case that

09:02:46  2  are at issue for these patents, five days before those?

09:02:50  3  This was just five days before it, right?

09:02:52  4  A.  Five days before October 31st, yes.

09:02:55  5  Q.  Right.  Five days before those specifications will be

09:02:58  6  filed with the Patent Office, correct?

09:02:59  7  A.  Yes.

09:03:01  8  Q.  And the USA engineer -- USAA engineers wrote to you and

09:03:09  9  they said, we will need to determine if we should allow

09:03:12  10  devices other than scanners, correct?

09:03:14  11  A.  I don't think that's completely accurate, no.

09:03:16  12  Q.  Let's see if you can answer my question, Mr. Brady.

09:03:19  13  The USAA engineers, they wrote to you --

09:03:23  14      THE COURT:  Mr. Hill, if you think the witness is

09:03:24  15  being non-responsive to your question, raise it with me.

09:03:28  16  Don't tell him, you think you can answer my question.

09:03:32  17      MR. HILL:  Yes, sir, Your Honor.

09:03:33  18      THE COURT:  All right.

09:03:33  19  Q.  (By Mr. Hill)  Mr. Brady, let's look at what they wrote

09:03:34  20  here.  The email writing to you says:  We will need to

09:03:35  21  determine if we should allow devices other than scanners,

09:03:39  22  correct?

09:03:39  23  A.  This was not one of our engineers.  That's what I'm

09:03:46  24  having trouble with.

09:03:48  25  Q.  All right.

09:03:48  1   A.   This is not one of our engineers.

09:03:50  2          MR. HILL:   Let's look at the top of this email,

09:03:51  3   the "to" line, if we can, Mr. Bakale.

09:03:55  4   Q.   (By Mr. Hill)   This is from a gentleman named Rickey

09:03:58  5   Burks; is that right?

09:03:59  6   A.   That's correct.

09:03:59  7   Q.   And who is Mr. Burks?

09:04:01  8   A.   Rickey was my manager at the time.

09:04:05  9   Q.   Your manager?

09:04:06  10  A.   Yes.

09:04:06  11  Q.   Okay.   And you were -- so he was your boss?

09:04:11  12  A.   Yes.

09:04:11  13  Q.   I'm with you.

09:04:12  14         THE COURT:   Mr. Brady, you remember yesterday me

09:04:14  15  asking you not to refer to individuals by first name only.

09:04:17  16         THE WITNESS:   I apologize again, I'm sorry.

09:04:19  17         THE COURT:   I understand this is the first time

09:04:21  18  you've testified in Court, and I understand that may not be

09:04:24  19  the usual way you speak, but it's important that we not

09:04:27  20  talk about individuals by first name only.

09:04:29  21         THE WITNESS:   I apologize.   I'm sorry.

09:04:31  22         THE COURT:   Okay.   Let's continue.

09:04:33  23  Q.   (By Mr. Hill)   And this entire email string, Mr. Brady,

09:04:41  24  five days before the first applications were filed was the

09:04:41  25  first time that someone had used something other than a

09:04:44   1   scanner in the Deposit@Home project, correct?

09:04:46   2   A.   It's the first time one of our members had used

09:04:53   3   something.

09:04:53   4   Q.   And that individual was not a USAA engineer; it was a

09:04:54   5   member, correct?

09:04:55   6   A.   That's correct.

09:04:55   7   Q.   And they used a digital camera, right?

09:04:57   8   A.   Uh-huh.

09:04:58   9   Q.   They didn't --

09:04:59   10   A.   Yes.

09:04:59   11   Q.   -- use a mobile phone?

09:05:03   12   A.   No.

09:05:04   13   Q.   And it was a digital camera, we know, that had to be

09:05:07   14   connected to a computer through a TWAIN driver, correct?

09:05:11   15   A.   That was the way we did it.

09:05:16   16   Q.   And a TWAIN driver, that's a piece of software that

09:05:20   17   connects two different devices together, right?

09:05:23   18   A.   That's a -- that's an example, yes.

09:05:25   19   Q.   For instance, if I have my printer and I've got my

09:05:29   20   computer, I'll have to have a driver usually to have those

09:05:33   21   two things communicate; isn't that right?

09:05:35   22   A.   It's often -- you often need a driver for

09:05:39   23   communication.

09:05:40   24   Q.   Now, at that same time in the same email string,

09:05:44   25   Mr. Brady, Plaintiff's Exhibit 36, a phone is brought up,

| | | |
|---|---|---|
| 09:05:48 | 1 | correct? |
| 09:05:48 | 2 | A.  That is correct. |
| 09:05:51 | 3 | Q.  So if we look at the next line up in the email, the |
| 09:05:56 | 4 | next piece of the string, we see an email from Mr. Luby. |
| 09:06:06 | 5 | Do you see that, sir? |
| 09:06:07 | 6 | A.  I see that. |
| 09:06:08 | 7 | Q.  Who is Mr. Luby? |
| 09:06:10 | 8 | A.  Mr. Luby was the -- the president of the bank. |
| 09:06:15 | 9 | Q.  And Mr. Luby was president of the USAA bank at the time |
| 09:06:21 | 10 | this was written? |
| 09:06:21 | 11 | A.  Yes. |
| 09:06:21 | 12 | Q.  All right.  And Mr. Luby is not an inventor on any of |
| 09:06:24 | 13 | these patents, is he? |
| 09:06:25 | 14 | A.  No, he is not. |
| 09:06:26 | 15 | Q.  And Mr. Luby says here in his email:  How about a |
| 09:06:32 | 16 | phone?  And asked:  Could we get enough resolution and a |
| 09:06:39 | 17 | TWAIN driver interface to a phonecam? |
| 09:06:43 | 18 |         Do you see that? |
| 09:06:43 | 19 | A.  That's what Mr. Luby is asking. |
| 09:06:47 | 20 | Q.  But then Mr. Huth, he replies back to Mr. Luby in the |
| 09:06:51 | 21 | next email up the chain, doesn't he? |
| 09:06:54 | 22 | A.  Yes, he does. |
| 09:06:57 | 23 | Q.  And if we look at that, he replies back, and he says |
| 09:07:00 | 24 | that camera phones aren't typically high quality enough |
| 09:07:05 | 25 | photos. |

09:07:10  1          Let that thing start moving around.  Sorry about

09:07:11  2   that, Mr. Brady.

09:07:11  3          That's what he says in his response, correct?

09:07:18  4   A.  That's what he says.

09:07:20  5   Q.  He goes on to say:  But there is software to enhance

09:07:27  6   that.  We would have to see how to automate that.

09:07:29  7          Do you see that?

09:07:30  8   A.  I see that.  We knew we needed to improve that for our

09:07:35  9   members.

09:07:35  10  Q.  And Mr. Huth, he is one of the inventors on the

09:07:43  11  patents, correct?

09:07:43  12  A.  Yes, he is.

09:07:44  13  Q.  Now, he makes mention to a piece of this email a little

09:07:49  14  further down where it references of Mike Morris.  You

09:07:52  15  talked about that yesterday, didn't you, sir?

09:07:53  16  A.  I did, yes.

09:07:55  17  Q.  He says:  Mike Morris did -- did check and use of a

09:07:58  18  camera to capture the image is included in our patent

09:08:00  19  application.

09:08:01  20          Do you recall that?

09:08:01  21  A.  I do.  Yes, it is.

09:08:03  22  Q.  And that's the patent applications that were ultimately

09:08:10  23  filed as part of this October 31, 2006, filing, correct?

09:08:12  24  A.  That is correct.

09:08:13  25  Q.  And it doesn't say Mr. Morris checked for the use of a

09:08:19  1  mobile phone, does it?

09:08:19  2  A.  Mobile phones have cameras.

09:08:22  3          MR. SHEASBY:  Your Honor, I object.

09:08:24  4          THE COURT:  State your objection.

09:08:25  5          MR. SHEASBY:  This is a violation of the Court's

09:08:28  6  ruling on proper written description.  The word "mobile

09:08:33  7  phone" did not occur in the claims of the patent.  Mobile

09:08:38  8  phone does not appear in the claims of the patent.

09:08:40  9          THE COURT:  You're going to have to speak up,

09:08:42 10  Mr. Sheasby.

09:08:42 11          MR. SHEASBY:  Sir, the word "mobile phone" does

09:08:44 12  not appear in the claims of the patent.  It's a mobile

09:08:47 13  device or portable device.  This could only go to a

09:08:50 14  stricken defense.  This has nothing to do with their

09:08:53 15  defense on written description.

09:08:54 16          THE COURT:  What's your response, Mr. Hill?

09:08:56 17          MR. HILL:  Your Honor, I'm asking a witness about

09:08:58 18  an admitted exhibit that he discussed in his direct

09:09:01 19  examination, and we're exploring what it says and what it

09:09:04 20  doesn't say.  I'm not making any argument about it.  I'm

09:09:07 21  not characterizing it in any way.  I'm establishing what is

09:09:11 22  the contents of a document.  That's proper

09:09:13 23  cross-examination.

09:09:14 24          THE COURT:  Restate your question for the witness.

09:09:16 25  Q.  (By Mr. Hill)  Mr. Brady, what he says here is we

| | | |
|---|---|---|
| 09:09:19 | 1 | checked for the use of a camera to capture the image is |
| 09:09:22 | 2 | included in our patent application.  What he does -- he |
| 09:09:24 | 3 | does not say a mobile phone, does he? |
| 09:09:27 | 4 | MR. SHEASBY:  Your Honor, objection.  The claims |
| 09:09:29 | 5 | do not require the use of a mobile phone.  This is |
| 09:09:32 | 6 | improper. |
| 09:09:32 | 7 | THE COURT:  I'm going to overrule the objection. |
| 09:09:35 | 8 | You can answer the question, Mr. Brady. |
| 09:09:37 | 9 | A.  That sentence, this -- this email is discussing mobile |
| 09:09:46 | 10 | phones.  That -- you're asking if that sentence has it. |
| 09:09:49 | 11 | That sentence does not, but this email is discussing mobile |
| 09:09:54 | 12 | phones. |
| 09:09:54 | 13 | Q.  (By Mr. Hill)  So, again, if we look at the comment |
| 09:10:00 | 14 | above from Mr. Huth -- Mr. Huth, excuse me, he says: |
| 09:10:05 | 15 | Camera phones aren't typically high quality photos. |
| 09:10:08 | 16 | Right? |
| 09:10:08 | 17 | A.  There were camera phones at the time that were high |
| 09:10:12 | 18 | enough quality.  That's what he says, yes. |
| 09:10:14 | 19 | MR. HILL:  Objection, nonresponsive, Your Honor. |
| 09:10:16 | 20 | Move to strike. |
| 09:10:20 | 21 | THE COURT:  The question, Mr. Brady, is:  Does it |
| 09:10:25 | 22 | say that the camera phones typically aren't high enough |
| 09:10:29 | 23 | quality? |
| 09:10:29 | 24 | And your answer was:  There were phones that were |
| 09:10:32 | 25 | high enough quality.  And that's non-responsive.  You need |

| | | |
|---|---|---|
| 09:10:37 | 1 | to -- I'm going to sustain the objection.  You need to |
| 09:10:40 | 2 | answer the question as asked. |
| 09:10:41 | 3 | Mr. Sheasby is going to get an opportunity to ask |
| 09:10:43 | 4 | you follow-up questions after Mr. Hill is finished.  And if |
| 09:10:47 | 5 | Mr. Sheasby thinks there's something that needs to be |
| 09:10:49 | 6 | revisited or clarified, he's certainly entitled to ask you |
| 09:10:51 | 7 | about it again.  So try to limit your answers to the |
| 09:10:54 | 8 | specific question that's asked, all right? |
| 09:10:55 | 9 | THE WITNESS:  Okay.  Thank you for the |
| 09:10:57 | 10 | clarification, sir. |
| 09:10:58 | 11 | Q.  (By Mr. Hill)  Mr. Brady, the email reads:  Camera |
| 09:11:01 | 12 | phones typically aren't high quality photos. |
| 09:11:04 | 13 | Correct? |
| 09:11:04 | 14 | A.  Yes, that's what it says. |
| 09:11:06 | 15 | Q.  And then when we look below, when he references Mike |
| 09:11:09 | 16 | Morris, he says:  Mike Morris did check, and the use of a |
| 09:11:14 | 17 | camera -- right?  That's what he says? |
| 09:11:20 | 18 | A.  That's what he says. |
| 09:11:21 | 19 | Q.  Doesn't say camera phone, does it? |
| 09:11:23 | 20 | A.  It says camera. |
| 09:11:24 | 21 | Q.  Now, USAA didn't start experimenting with digital |
| 09:11:36 | 22 | phones or camera phones until 2007; isn't that correct, |
| 09:11:39 | 23 | sir? |
| 09:11:39 | 24 | A.  Yes, we started up a project in 2007. |
| 09:11:41 | 25 | Q.  And 2007 was after the October 31, 2006, patent |

09:11:44  1  specifications had already been filed, correct?

09:11:47  2  A.  Yes, it was.

09:11:48  3  Q.  Now, in fact, Mr. Brady, let's talk about what else

09:12:02  4  happened at USAA after -- after the filing of these

09:12:09  5  applications on October 31, 2006.

09:12:10  6          Now, on -- in November 2006, again, after the

09:12:14  7  filing of these applications, USAA started to think about

09:12:18  8  Deposit@Home Phase 2; isn't that right?

09:12:22  9  A.  I'm sorry, the date again?

09:12:23  10  Q.  In November of '06?

09:12:25  11  A.  I believe that was about right, yes.

09:12:28  12  Q.  And let me -- let me show you an exhibit to help with

09:12:31  13  that.

09:12:34  14          MR. HILL:  Plaintiff's Exhibit 72, if we can,

09:12:37  15  Mr. Bakale.

09:12:38  16  Q.  (By Mr. Hill)  Do you recognize this document, sir?

09:12:40  17          MR. SHEASBY:  Your Honor, may the witness have a

09:12:42  18  copy of the exhibit?

09:12:43  19          MR. HILL:  Sure.  I'm sorry, Your Honor.

09:12:44  20          May I approach to hand the witness a copy?

09:12:48  21          THE COURT:  You may approach.  Hand the document

09:12:50  22  to the Court Security Officer.

09:12:54  23          THE WITNESS:  Thank you.

09:12:54  24  Q.  (By Mr. Hill)  Mr. Huth [sic], in that notebook there,

09:13:02  25  you'll find a copy of Plaintiff's Exhibit 72.  Let me know

| | | |
|---|---|---|
| 09:13:06 | 1 | when you've located it. |
| 09:13:09 | 2 | A.  Okay.  I see it. |
| 09:13:10 | 3 | Q.  Do you recognize that?  Can you tell me what that |
| 09:13:10 | 4 | document -- |
| 09:13:14 | 5 | A.  I don't -- I don't recall seeing this before, no.  But |
| 09:13:15 | 6 | I -- I see it. |
| 09:13:16 | 7 | Q.  Is this a document that USAA would have generated? |
| 09:13:20 | 8 | A.  This looks like one of our documents, yes. |
| 09:13:24 | 9 | Q.  And it state that it was a -- a draft presentation by |
| 09:13:28 | 10 | Troy Huth, correct? |
| 09:13:32 | 11 | A.  Yes, that's what it says. |
| 09:13:34 | 12 | Q.  And also a Mr. Mawyer?  Did I read that right? |
| 09:13:40 | 13 | A.  Yes, Mr. Mawyer. |
| 09:13:43 | 14 | Q.  Are both of those gentlemen named inventors on these |
| 09:13:47 | 15 | patents? |
| 09:13:47 | 16 | A.  Not both of them. |
| 09:13:52 | 17 | Q.  Just Mr. Huth? |
| 09:13:53 | 18 | A.  Just Mr. Huth. |
| 09:13:54 | 19 | Q.  All right.  And so in November 2006 when this document |
| 09:14:03 | 20 | was created, there's no mention whatsoever of phones, |
| 09:14:07 | 21 | mobile phones, or camera phones in this draft, is there, |
| 09:14:10 | 22 | sir?  Feel free to page through it. |
| 09:14:13 | 23 | We'll do the same. |
| 09:14:14 | 24 | MR. HILL:  Can we see the next page, Mr. Bakale? |
| 09:14:18 | 25 | This is the second page, third -- slow down, Mr. Bakale, |

| | | |
|---|---|---|
| 09:14:22 | 1 | please -- the fourth, the fifth.  I believe that's the end. |
| 09:14:35 | 2 | Q.  (By Mr. Hill)  No mention of phones, mobile phones, or |
| 09:14:39 | 3 | camera phones in that draft, is there, Mr. Brady? |
| 09:14:41 | 4 | A.  Are you asking about the word "mobile phone," or are |
| 09:14:43 | 5 | you asking about concepts related to mobile phone? |
| 09:14:46 | 6 | Q.  I'm asking does mobile phones, camera phones, or -- |
| 09:14:50 | 7 | MR. SHEASBY:  Your Honor, may we approach? |
| 09:14:52 | 8 | THE COURT:  Approach the bench. |
| 09:14:53 | 9 | (Bench conference.) |
| 09:15:02 | 10 | MR. SHEASBY:  Your Honor, I request a limiting |
| 09:15:04 | 11 | instruction.  The word "mobile phones," "camera phones" |
| 09:15:07 | 12 | appear nowhere in the patent.  This is an improper written |
| 09:15:09 | 13 | description argument, and it could only go to enablement, |
| 09:15:12 | 14 | which is not at issue in this case.  This is not proper |
| 09:15:14 | 15 | examination of this witness. |
| 09:15:16 | 16 | The only reason that use of mobile phone would be |
| 09:15:18 | 17 | relevant is if, one, that's what the claim required, or, |
| 09:15:21 | 18 | two, if it went to enablement.  They have no enablement |
| 09:15:25 | 19 | defense.  And the claims don't require this.  I would ask |
| 09:15:27 | 20 | respectfully for a limiting instruction to disregard all |
| 09:15:30 | 21 | this testimony.  The date on which a mobile phone was used |
| 09:15:33 | 22 | has no relevance to possession of a claim that relates |
| 09:15:36 | 23 | generically to a mobile device or -- |
| 09:15:40 | 24 | MS. GLASSER:  There's actually a motion in limine |
| 09:15:41 | 25 | on this exact topic to not bring enablement into the case. |

| | | |
|---|---|---|
| 09:15:46 | 1 | THE COURT:  All right.  First of all, if there's a |
| 09:15:50 | 2 | motion in limine, I need to hear about it from -- |
| 09:15:52 | 3 | Ms. Glasser, my point is, this is Mr. Sheasby's witness. |
| 09:15:58 | 4 | I'm not going to let the Defendants tag team me with six |
| 09:16:01 | 5 | different lawyers contributing to the objection.  And you |
| 09:16:03 | 6 | shouldn't contribute to Mr. Sheasby's.  If you want to |
| 09:16:06 | 7 | suggest to him that he raise something with me when he |
| 09:16:09 | 8 | comes to the bench, that's fine.  But we don't have time to |
| 09:16:12 | 9 | have a community communication. |
| 09:16:14 | 10 | What's your response, Mr. Hill? |
| 09:16:16 | 11 | MR. HILL:  Your Honor, this is a Plaintiff's |
| 09:16:19 | 12 | exhibit they've put into evidence and that I am questioning |
| 09:16:22 | 13 | a fact witness about its contents.  That is perfectly |
| 09:16:26 | 14 | permissible cross.  I haven't suggested anything in my |
| 09:16:28 | 15 | questions.  I've asked him:  What does the document reflect |
| 09:16:32 | 16 | and what doesn't it reflect? |
| 09:16:33 | 17 | Now, they may have arguments about what we can do |
| 09:16:36 | 18 | with that in argument later, but in terms of putting this |
| 09:16:39 | 19 | evidence that they've put in the record in front of their |
| 09:16:41 | 20 | witness and asked him about the contents of the document, |
| 09:16:44 | 21 | there is nothing objectionable about that. |
| 09:16:47 | 22 | And more importantly, it does not go to an |
| 09:16:49 | 23 | enablement defense.  What it goes to is to show its context |
| 09:16:53 | 24 | for our written description defense, Your Honor.  We say |
| 09:16:55 | 25 | they didn't write down the invention.  And there's a reason |

09:16:58  1  they didn't write it down.  They don't talk about it

09:17:01  2  anywhere.  And it's more credible that they didn't write it

09:17:04  3  down if they'd also -- don't seem to be talking about it

09:17:07  4  until after the fact.

09:17:08  5       That is circumstantial evidence of what was going

09:17:11  6  on, why they wrote what they wrote, how they wrote what

09:17:14  7  they wrote, and we say what they wrote doesn't reflect the

09:17:18  8  full scope of the invention.  And this document will

09:17:21  9  ultimately go to that.

09:17:23  10      Now, that's argument.  And I haven't made that

09:17:24  11  argument through this witness.  I've asked him fact

09:17:26  12  questions.

09:17:27  13      MR. SHEASBY:  He asked:  Does the word "mobile

09:17:29  14  phone" occur in the patent?  Sorry.  He asked:  Does mobile

09:17:33  15  phone occur in the patent?  It's out there.  I did not

09:17:35  16  introduce this document.  This only goes to enablement.

09:17:38  17  This is no -- written description is based on what is in

09:17:42  18  the specification.

09:17:42  19      THE COURT:  All right.  I've heard enough.  I've

09:17:43  20  heard enough, counsel.  I'm not going to instruct the jury

09:17:46  21  at this point.  I'm going to direct the Plaintiff to

09:17:48  22  address it in whatever manner the Plaintiff thinks is

09:17:52  23  proper through their redirect examination of the witness.

09:17:54  24      But at this point, I'm going to overrule the

09:17:56  25  objection.

09:17:57    1            MR. SHEASBY:  Thank you, Your Honor.

09:17:57    2            (Bench conference concluded.)

09:18:11    3            THE COURT:  All right.

09:18:12    4   Q.  (By Mr. Hill)  All right, Mr. Brady --

09:18:14    5            MR. HILL:  I'm sorry, Your Honor.

09:18:15    6            THE COURT:  Let's proceed.

09:18:16    7   Q.  (By Mr. Hill)  Mr. Brady, this document that I had you

09:18:21    8   looking at, Plaintiff's Exhibit 72, doesn't mention phones,

09:18:24    9   mobile phones, or camera phones, doesn't contain those

09:18:27   10   words, does it?

09:18:28   11   A.  I -- it does not contain the words.  I think it

09:18:31   12   contains concepts related to that.

09:18:34   13            THE COURT:  Mr. Brady, he didn't ask you if it

09:18:37   14   contained concepts related to that.  Again, limit your

09:18:43   15   answers to the questions asked.

09:18:44   16            THE WITNESS:  I apologize.

09:18:44   17            THE COURT:  Let's continue, Mr. Hill.

09:18:46   18   Q.  (By Mr. Hill)  And it's not until December 2007,

09:18:48   19   Mr. Brady, over a year after these specifications were

09:18:52   20   filed in 2006, that there is a reference to a mobile phone

09:18:56   21   for the first time in USAA's internal documentation.  Do

09:19:01   22   you know that, sir?

09:19:01   23   A.  December 2006?  Is that what you said?

09:19:05   24   Q.  No, sir.  I said it's over a year --

09:19:07   25   A.  What date did you say?

09:19:08  1    Q.  Until December 2007.

09:19:10  2    A.  I don't think that's accurate, no.

09:19:11  3    Q.  Well --

09:19:11  4         THE COURT:  Gentlemen, it's important that you

09:19:14  5    speak one at a time.  The court reporter can't accurately

09:19:18  6    transcribe what's said when both of you are talking at the

09:19:22  7    same time.  You both need to make sure the other is not

09:19:25  8    talking before you start talking, all right?

09:19:27  9    Q.  (By Mr. Hill)  Mr. Brady --

09:19:28  10        MR. HILL:  I'm sorry, Your Honor.

09:19:29  11        THE COURT:  Go ahead, Mr. Hill.

09:19:32  12        MR. HILL:  I'm talking over you now, I apologize.

09:19:34  13        THE COURT:  I don't want anybody talking over

09:19:36  14   anybody.

09:19:36  15        MR. HILL:  Yes, sir.

09:19:37  16   Q.  (By Mr. Hill)  If we look at Plaintiff's Exhibit 1152,

09:19:41  17   Mr. Brady, it's also in the notebook I handed you, this is

09:19:50  18   an email from Mr. Prasad -- or, excuse me, a presentation

09:19:55  19   by Mr. Prasad dated December 3rd, 2007; do you see that?

09:20:00  20   A.  I see that.

09:20:05  21   Q.  And if we look at Page 12, and this is discussing, it

09:20:13  22   said on the first page, Deposit@Home Next Generation.  Do

09:20:17  23   you recall what Deposit@Home Next Generation was?

09:20:20  24   A.  Yes, I do.

09:20:21  25   Q.  What was that?

09:20:22  1   A.  It was a continuation of our -- of our Deposit@Home

09:20:29  2   efforts.

09:20:29  3   Q.  And in this document, Mr. Brady, there is a reference

09:20:35  4   to an iPhone on Page 12; do you see that, sir?

09:20:40  5   A.  I see that.

09:20:41  6   Q.  Now, you previously admitted USAA -- admitted USAA did

09:20:57  7   not start experimenting with digital phones or camera

09:21:00  8   phones until 2007; isn't that right, sir?

09:21:02  9   A.  That is correct.

09:21:03  10  Q.  Now, Mr. Brady, earlier, you talked a little bit with

09:21:19  11  Mr. Sheasby yesterday -- it wasn't earlier today, but

09:21:23  12  yesterday -- you talked about with Mr. Sheasby some

09:21:24  13  portions of the patents in this suit; do you recall?

09:21:27  14  A.  Yes.

09:21:27  15  Q.  You talked about portions of the specifications from

09:21:32  16  the '605 and the '608 [sic] patents; do you remember that?

09:21:34  17  A.  I did, yes.

09:21:36  18  Q.  Well, in the context of that, Mr. Sheasby [sic], I

09:21:40  19  noticed, it seemed like you had a copy of patents that

09:21:42  20  looked a little different than my copy of the patents.  Do

09:21:45  21  you have a copy of those patents up there with you?

09:21:47  22  A.  The '681 and the '605 patents?

09:21:51  23  Q.  Yes, sir.

09:21:52  24  A.  I have -- I have copies, yes.

09:21:54  25  Q.  What I noticed were your copies of the patents seemed

| | | |
|---|---|---|
| 09:21:56 | 1 | to have a number of tabs throughout them; am I right? |
| 09:22:02 | 2 | A.   Yes. |
| 09:22:02 | 3 | Q.   Can you -- can you hold that up where we can see it? |
| 09:22:06 | 4 | A.   Yes. |
| 09:22:06 | 5 | Q.   What are those tabs? |
| 09:22:08 | 6 | A.   These are references to the specifications. |
| 09:22:13 | 7 | Q.   All right.  And are there -- are there notes in your |
| 09:22:18 | 8 | patents? |
| 09:22:18 | 9 | A.   There's maybe one or two notes, yes. |
| 09:22:23 | 10 | Q.   Okay.  And what are these notes? |
| 09:22:26 | 11 | A.   I'm -- these are notes to help me remember.  I -- I'm |
| 09:22:32 | 12 | getting a little older.  I don't always remember things. |
| 09:22:37 | 13 | Q.   Okay.  So this didn't come out in your direct |
| 09:22:39 | 14 | yesterday.  So in the testimony you were giving Mr. Sheasby |
| 09:22:41 | 15 | about the contents of this patent, you were basing that |
| 09:22:46 | 16 | upon a marked-up version of the patents that has your own |
| 09:22:50 | 17 | tabs and internal notes in it? |
| 09:22:52 | 18 | A.   I was looking at the exhibits. |
| 09:22:56 | 19 | Q.   How did you prepare those notes, Mr. -- Mr. Brady? |
| 09:22:59 | 20 | A.   I read through the patents. |
| 09:23:02 | 21 | Q.   And just -- that's just notes you made on your own? |
| 09:23:04 | 22 | A.   I made those notes on my own, yes. |
| 09:23:07 | 23 | Q.   Okay.  All right. |
| 09:23:08 | 24 |         MR. HILL:   All right.  Your Honor, may I approach |
| 09:23:10 | 25 | and retrieve those copies of the patents from the witness? |

330

09:23:13    1            THE COURT:  Is there objection?

09:23:14    2            MR. SHEASBY:  There's no objection, Your Honor.

09:23:18    3            THE COURT:  All right.  You may approach the

09:23:20    4    witness.

09:23:23    5            MR. HILL:  Thank you, Your Honor.

09:23:46    6    Q.  (By Mr. Hill)  Now, Mr. Brady --

09:23:50    7            MR. HILL:  If I can use the document camera,

09:23:52    8    Ms. Lockhart.  Thank you.

09:23:54    9    Q.  (By Mr. Hill)  Mr. Brady, if we look here, what I've

09:23:57    10    retrieved from you is a copy of the patent that you had in

09:24:06    11    hand, and we've got some underlining and a reference to

09:24:12    12    Troy Huth here on the first page, and we've got that series

09:24:15    13    of tabs that I noticed.  Do you see that?

09:24:17    14    A.  I do, yes.

09:24:17    15    Q.  And those are your tabs to flag what?

09:24:20    16    A.  They're to help me remember where -- where things are.

09:24:23    17    Q.  Okay.  And I noticed also here there's a number of --

09:24:29    18    this is Column 8.  Column 8 is a portion of the patent you

09:24:34    19    discussed yesterday, right?

09:24:37    20    A.  Yes.

09:24:40    21    Q.  And, in fact, if we look at this, what we see is

09:24:43    22    Column 8, this portion in here, we've got that reference to

09:24:47    23    PDAs; do you see that?

09:24:48    24    A.  I see that, yes.

09:24:49    25    Q.  You talked about that expressly, didn't you?

09:24:51  1   A.  I did, yes.

09:24:52  2   Q.  Talked about it there and there.  Now, what are these

09:24:59  3   numbers on the sides?

09:25:00  4   A.  Those are the line numbers.

09:25:04  5   Q.  Line numbers for the patent?

09:25:08  6   A.  Yes, you can see the line numbers going down the

09:25:11  7   bottom.  They're going down the middle.

09:25:12  8   Q.  You're corresponding with the center column there?

09:25:15  9   A.  Yes, yes.

09:25:16  10  Q.  Now, Mr. Brady, why did you need help remembering

09:25:29  11  what's in this specification?

09:25:31  12  A.  As I mentioned, I'm getting older, and I -- I -- I need

09:25:35  13  help refreshing my memory at times.

09:25:38  14  Q.  And just to make clear, you didn't participate in the

09:25:42  15  writing of this specification, did you?

09:25:43  16  A.  I did not write the words.

09:25:47  17  Q.  Because you're not an inventor on the patents, are you?

09:25:49  18  A.  I was not an inventor on those patents.

09:25:51  19  Q.  And if USAA wanted to bring an inventor here live to

09:25:56  20  testify, they could do that, right?

09:25:57  21  A.  We're going to have videos, but, yes.

09:26:01  22  Q.  Okay.  We may see some video from some of these

09:26:05  23  inventors?

09:26:05  24  A.  Yes.

09:26:06  25  Q.  But there's -- there's, what, 10 inventors on these two

| | | |
|---|---|---|
| 09:26:09 | 1 | patents -- these two patents? |
| 09:26:10 | 2 | A.  Yes, there are. |
| 09:26:12 | 3 | Q.  And of those, how many of them still work at USAA? |
| 09:26:16 | 4 | A.  I'm not sure I recall the number exactly.  There's |
| 09:26:26 | 5 | several people that have retired. |
| 09:26:28 | 6 | Q.  Okay.  All right. |
| 09:26:30 | 7 | MR. HILL:  Your Honor, can I approach and hand the |
| 09:26:31 | 8 | witness back this? |
| 09:26:33 | 9 | THE COURT:  Yes, hand it back to him. |
| 09:26:36 | 10 | Q.  (By Mr. Hill)  Now, Mr. Brady, I want to look at some |
| 09:26:43 | 11 | of those portions of the patents, as well. |
| 09:26:45 | 12 | MR. HILL:  If we can go back to our display |
| 09:26:48 | 13 | equipment, Ms. Lockhart.  Thank you. |
| 09:26:52 | 14 | Q.  (By Mr. Hill)  Mr. Brady, in particular, I want to pull |
| 09:26:55 | 15 | up the '605 patent and I want to look -- |
| 09:27:01 | 16 | THE COURT:  Is that a question, Mr. Hill? |
| 09:27:02 | 17 | MR. HILL:  I'm sorry, Your Honor. |
| 09:27:03 | 18 | THE COURT:  Don't tell him what you want to talk |
| 09:27:05 | 19 | about.  Ask him a question. |
| 09:27:06 | 20 | Q.  (By Mr. Hill)  Mr. Brady, can you take a look at |
| 09:27:08 | 21 | Column 8 of the '605 patent for me, sir? |
| 09:27:15 | 22 | A.  Yes, I can. |
| 09:27:16 | 23 | Q.  And let's look specifically at Lines 3 through 17.  Do |
| 09:27:23 | 24 | you see that section of the patent, sir? |
| 09:27:25 | 25 | A.  Yes, I do. |

| | | |
|---|---|---|
| 09:27:29 | 1 | Q.  And there we see in Column 8, Line 3 through 17, it |
| 09:27:34 | 2 | says:  Figure 4 provides a schematic diagram of an |
| 09:27:38 | 3 | exemplary network or distributed computing environment, and |
| 09:27:41 | 4 | it goes on to describe that. |
| 09:27:46 | 5 | And then it has reference down here further on to |
| 09:27:52 | 6 | different devices such as PDAs, audio/video, MP3 players, |
| 09:27:58 | 7 | personal computers, et cetera.  Do you see that? |
| 09:28:00 | 8 | A.  Yes, I do. |
| 09:28:03 | 9 | Q.  Those are portions of the specification that you |
| 09:28:05 | 10 | pointed to yesterday as a basis to say that this patent |
| 09:28:10 | 11 | disclosed mobile devices, correct? |
| 09:28:14 | 12 | A.  Yes. |
| 09:28:16 | 13 | Q.  Mr. Brady, is it USAA's position, as USAA's corporate |
| 09:28:22 | 14 | representative, that this material here is the inventive |
| 09:28:30 | 15 | work that the USAA inventors came up with and wrote down? |
| 09:28:36 | 16 | A.  That's my understanding, yes. |
| 09:28:40 | 17 | Q.  And you believe this was then written down by the USAA |
| 09:28:44 | 18 | inventors? |
| 09:28:45 | 19 | A.  I think they were involved in the writing, yes. |
| 09:28:55 | 20 | MR. HILL:  Your Honor, may we approach? |
| 09:28:56 | 21 | THE COURT:  Approach the bench. |
| 09:28:57 | 22 | (Bench conference.) |
| 09:29:10 | 23 | MR. HILL:  So, Your Honor, I approached because we |
| 09:29:14 | 24 | have a motion in limine that deals with unasserted patents. |
| 09:29:18 | 25 | What I plan to do here, what I just elicited from the |

09:29:21  1    witness is USAA's position that its inventors wrote down

09:29:26  2    this part of the spec, but its inventors created this part

09:29:31  3    of the spec, is what they're pointing to for their written

09:29:33  4    description defense.

09:29:34  5         Your Honor, this portion of the specification was

09:29:36  6    not by USAA's inventors and goes to the credibility of USAA

09:29:42  7    and its witness who's claiming their folks wrote this.

09:29:45  8         THE COURT:  When you say "this," and when you say

09:29:48  9    "this portion," you're talking about that list of --

09:29:48  10        MR. HILL:  I'm talking --

09:29:51  11        THE COURT:  -- devices that you've highlighted in

09:29:53  12   yellow?

09:29:54  13        MR. HILL:  Your Honor, I'm talking about that --

09:29:56  14   I'm talking about this entire column of the patent is a cut

09:30:02  15   and paste verbatim copy of old Microsoft patents, including

09:30:07  16   figures, the whole shebang.  And USAA has sponsored to this

09:30:13  17   jury now that they wrote it, that their inventors created

09:30:16  18   it and wrote it, and that's just not true.  And it goes

09:30:20  19   directly to the credibility of this witness.

09:30:23  20        And if USAA is -- he is their corporate

09:30:26  21   representative, that they come to court and they tell the

09:30:29  22   jury that the portion of the patent that supports our

09:30:32  23   written description and that our inventors wrote to write

09:30:37  24   down the invention, it's right here, and it's not -- it's a

09:30:41  25   cut and paste copy of other things --

09:30:45  1          THE COURT:  And you're asking for leave to
09:30:46  2  disclose those prior Microsoft patents?
09:30:48  3          MR. HILL:  Correct.  They have nothing to do with
09:30:51  4  prior art in this case.  They're not even related to a
09:30:53  5  banking system.  It is simply to show contradiction.
09:30:58  6  Impeachment by contradiction is what I'm doing, Your Honor.
09:31:01  7  That's proper impeachment.
09:31:02  8          THE COURT:  What's your response, Mr. Sheasby?
09:31:04  9          MR. SHEASBY:  Your Honor, first, it's a violation
09:31:06 10  of the motion in limines that have been granted by this
09:31:09 11  Court.
09:31:10 12          Second, it's actually not improper impeachment
09:31:12 13  because he didn't say the inventors wrote the words.  He
09:31:15 14  said they participated in the preparation.  And it's common
09:31:19 15  practice -- and we know it's common practice for patents to
09:31:22 16  be created in different ways through patent prosecutors.
09:31:26 17          And so this does not show that it's not their
09:31:28 18  invention.  In fact, this is -- this -- this has no
09:31:31 19  relevance whatsoever to the question of possession.
09:31:34 20  This -- this is not impeaching information.  This is
09:31:37 21  clearly going to confuse the jury.  It's highly
09:31:40 22  prejudicial.  He did not say the inventors wrote those
09:31:42 23  words.  This is not proper.
09:31:44 24          It's a violation of the motion in limine.  And
09:31:46 25  it's going -- now, we've already said that patent

```
09:31:50   1   prosecutors aren't coming, and the idea that we're now
09:31:53   2   going to have to explain to the jury in some way that
09:31:55   3   patent prosecutors craft applications in lots of different
09:31:58   4   ways.
09:31:59   5        In fact, it's -- he -- they're going to be
09:32:01   6   suggesting something that's the opposite.  The fact that
09:32:04   7   PDAs and these types of devices were ubiquitous is the
09:32:08   8   reason why you have these types of sections in -- in the
09:32:11   9   specification.
09:32:12  10        And so I don't believe this is proper impeachment.
09:32:15  11   I think it's highly, highly prejudicial.
09:32:17  12        THE COURT:  All right.  I'm going to have to see
09:32:19  13   what you're talking about.
09:32:20  14        MR. HILL:  Yes, Your Honor.
09:32:21  15        THE COURT:  I haven't seen it.  And to do this in
09:32:23  16   a way that I can clearly look at it --
09:32:25  17        MR. HILL:  Yes, sir.
09:32:25  18        THE COURT:  -- I'm going to send the jury out so
09:32:28  19   that I don't have a small space up here at the bench where
09:32:34  20   you're handing me documents.
09:32:35  21        MR. HILL:  Okay.
09:32:36  22        THE COURT:  All right.  Go back to your respective
09:32:37  23   places.  Let me send the jury out.
09:32:39  24        (Bench conference concluded.)
09:32:40  25        THE COURT:  Ladies and gentlemen, there's a matter
```

337

| | | |
|---|---|---|
| 09:32:51 | 1 | that's arisen that I need to take up with counsel outside |
| 09:32:55 | 2 | of your presence.  Consequently, I'm going to ask you to |
| 09:33:00 | 3 | retire to the jury room and simply close and leave your |
| 09:33:03 | 4 | notebooks in your chairs. |
| 09:33:05 | 5 | While you're in the jury room and outside of the |
| 09:33:07 | 6 | courtroom, follow all my instructions, including not to |
| 09:33:09 | 7 | discuss the case among yourselves.  Use this opportunity to |
| 09:33:13 | 8 | get a drink of water and stretch your legs while the rest |
| 09:33:16 | 9 | of us are in here working on this issue. |
| 09:33:18 | 10 | With that, ladies and gentlemen, please retire to |
| 09:33:19 | 11 | the jury room. |
| 09:33:21 | 12 | COURT SECURITY OFFICER:  All rise. |
| 09:33:22 | 13 | (Jury out.) |
| 09:33:51 | 14 | THE COURT:  All right.  Be seated. |
| 09:33:53 | 15 | MR. HILL:  Your Honor, may I make one other |
| 09:33:54 | 16 | request?  Since this concerns a matter of impeachment, |
| 09:33:58 | 17 | can I ask the witness also be excluded from this |
| 09:34:01 | 18 | conversation? |
| 09:34:01 | 19 | THE COURT:  I think that's appropriate until the |
| 09:34:06 | 20 | Court rules on this issue. |
| 09:34:07 | 21 | Mr. Brady, I'm going to ask you to step outside |
| 09:34:11 | 22 | the courtroom.  And if you'll stay close to those double |
| 09:34:13 | 23 | doors in the back, we'll have the Court Security Officer |
| 09:34:16 | 24 | come get you when it's the appropriate time for you to |
| 09:34:19 | 25 | return. |

| | | |
|---|---|---|
| 09:34:37 | 1 | THE WITNESS:  Okay. |
| 09:34:37 | 2 | THE COURT:  All right.  The witness is outside the |
| 09:34:39 | 3 | courtroom. |
| 09:34:39 | 4 | Let's continue this discussion, counsel, where we |
| 09:34:41 | 5 | left off at the bench. |
| 09:34:43 | 6 | MR. HILL:  Yes, sir, Your Honor. |
| 09:34:44 | 7 | THE COURT:  You need to show me what you're |
| 09:34:45 | 8 | intending to use, Mr. Hill. |
| 09:34:47 | 9 | MR. HILL:  Yes, sir.  Let me gather it and hand it |
| 09:34:50 | 10 | to you. |
| 09:34:50 | 11 | MR. SHEASBY:  And, Your Honor, if I may just |
| 09:34:52 | 12 | settle the record.  The question that was answered was:  I |
| 09:34:55 | 13 | think they were involved in the writing.  Not that they |
| 09:34:58 | 14 | wrote the specification.  So that's the question in which |
| 09:35:00 | 15 | he's seeking to show a patent that -- |
| 09:35:00 | 16 | THE COURT:  That's the answer the witness gave? |
| 09:35:02 | 17 | MR. SHEASBY:  That's the answer the witness gave. |
| 09:35:04 | 18 | THE COURT:  I understand. |
| 09:35:22 | 19 | MR. HILL:  All right.  Your Honor, if I may |
| 09:35:23 | 20 | approach? |
| 09:35:24 | 21 | THE COURT:  Hand them to the courtroom deputy. |
| 09:35:32 | 22 | MR. HILL:  Your Honor, I've handed you two |
| 09:35:34 | 23 | documents.  One is a copy of the impeachment material. |
| 09:35:36 | 24 | This is the patent dated 2009. |
| 09:35:42 | 25 | THE COURT:  The '943 patent? |

09:35:45  1              MR. HILL:  Yes, sir.  And the other item I've

09:35:47  2    handed you is a highlighted copy of the '605.

09:35:49  3              THE COURT:  All right.

09:35:50  4              MR. HILL:  Okay.  And, Judge, if you will flip to

09:35:52  5    Column 8.

09:35:53  6              THE COURT:  Of which patent?

09:35:55  7              MR. HILL:  Of the -- or, I'm sorry, Judge, let me

09:35:58  8    find it here.  If you will flip to Column 20 of the '943

09:36:03  9    patent, and then you flip to Column 8 of the '605 patent,

09:36:17 10    you will find a column and a half of identical material.

09:36:26 11              And just for reference, Your Honor, the -- the

09:36:31 12    '943 patent was filed in 2004, okay, so, well before the

09:36:40 13    filing of the '605 patent.

09:36:44 14              And if you take a look at them, Judge, they're

09:36:47 15    verbatim.  And if you also look in the figures to the '943

09:36:52 16    patent --

09:36:53 17              THE COURT:  Let me ask a question, Mr. Hill, of

09:36:56 18    Mr. Sheasby.

09:36:56 19              Mr. Sheasby, do you agree that these two sections

09:37:01 20    of these two different documents Mr. Hill's given me are

09:37:06 21    identical?

09:37:08 22              MR. SHEASBY:  I haven't even looked all the way

09:37:10 23    through, Your Honor.

09:37:10 24              THE COURT:  Well, now is the time for you to be

09:37:12 25    looking.  I'm looking, too.

09:37:16   1        MR. SHEASBY:  So, Your Honor, the question of

09:37:18   2  whether they're identical or not is not really the issue

09:37:20   3  though.

09:37:20   4        THE COURT:  Well, it's the question I asked you --

09:37:20   5        MR. SHEASBY:  So --

09:37:22   6        THE COURT:  -- and that's the question I'd like an

09:37:25   7  answer to.

09:37:25   8        MR. SHEASBY:  So -- so let's stipulate that

09:37:27   9  they're identical.

09:37:28  10        THE COURT:  All right.  Then I want to hear the

09:37:31  11  rest of Mr. Hill's statement.

09:37:32  12        MR. HILL:  Your Honor, if you'll also look at

09:37:34  13  Figure 2C of the '943 patent.  It is Figure 4 from the '605

09:37:48  14  patent.  The only differences, Your Honor, are the actual

09:37:56  15  numbering between the figures.

09:38:00  16        MR. SHEASBY:  And so that is a relevant

09:38:04  17  difference.

09:38:04  18        THE COURT:  All right.

09:38:05  19        MR. HILL:  But -- and the numbering then

09:38:07  20  corresponds, of course, with the numbering that is in

09:38:11  21  the -- in the respective portions of the specification.

09:38:14  22        MR. SHEASBY:  But that's exactly my point, Your

09:38:17  23  Honor.

09:38:17  24        THE COURT:  Gentlemen, I'm going to hear from the

09:38:18  25  Defendant first, and then I'm going to hear from the

09:38:21  1    Plaintiff.  I don't want this back and forth over each

09:38:23  2    other commentary.

09:38:25  3            Go ahead and finish your position, Mr. Hill.

09:38:28  4            MR. HILL:  And so, Your Honor, what we've seen

09:38:29  5    here is yesterday in his direct examination where Mr. Brady

09:38:34  6    referred to this portion of the specification demonstrating

09:38:37  7    what he said to the jury was their claimed invention and

09:38:41  8    their PDA -- the question was asked:  What is the PDA that

09:38:46  9    was being discussed in the research program at USAA?  And

09:38:50  10   he went on to answer that, describing it.

09:38:55  11           And then today, I presented him with it again.  I

09:38:59  12   asked him if it was USAA's position that this portion of

09:39:04  13   the specification represents their work that their

09:39:06  14   inventors wrote to contribute to this patent in writing

09:39:11  15   this patent.  I don't have the exact question in front of

09:39:12  16   me, Your Honor, from a live feed to read to you, but you

09:39:15  17   heard the questioning.  And he testified that it is.

09:39:19  18           They're claiming credit for this work.  And that

09:39:23  19   is relevant to show that USAA's credibility is questionable

09:39:26  20   here.  They have told the jury that these parts of the spec

09:39:31  21   are things they wrote, things they prepared.

09:39:35  22           And the fact is that's not true.  And the jury

09:39:40  23   should be able to consider that in the context of assessing

09:39:43  24   USAA's credibility by virtue of its corporate

09:39:46  25   representative that has sponsored that testimony to them.

09:39:48  1   And I should be entitled to impeach him with this and show

09:39:53  2   it to him.

09:39:53  3          THE COURT:  All right.  Now, I'll hear from you,

09:39:56  4   Mr. Sheasby.

09:39:57  5          MR. SHEASBY:  Thank you, Your Honor.  I start with

09:40:00  6   a couple of fixed points.  There is no written description

09:40:04  7   or derivation defense in this case -- there's no derivation

09:40:07  8   defense in this case.  It does not exist.

09:40:10  9          Second, Mr. Hill is not engaging in the testimony

09:40:16  10  that I -- that was actually given, which is I think they

09:40:19  11  were involved in the writing.

09:40:20  12         Third, what you see here is something that is

09:40:23  13  actually common in patents, which is there's a section that

09:40:26  14  talks about how you use digital devices.  That section was

09:40:31  15  used and renumbered and reconstructed so that it would work

09:40:36  16  with the '605 patent to create that same structure.

09:40:39  17         There is not a case law in the Federal Circuit

09:40:42  18  that says that you don't have possession of -- of an

09:40:45  19  invention because you're using a passage from a

09:40:48  20  specification that came from another patent.

09:40:50  21         In fact, that would suggest that prior art could

09:40:54  22  destroy written description or could destroy possession,

09:40:57  23  where it's just the opposite.  The fact that PDAs were so

09:41:02  24  ubiquitous, the fact that individuals used them, is

09:41:06  25  evidence that it was a common understanding.

09:41:08  1          You're allowed to put in your specification things

09:41:10  2    that are known in the art.  And so my concern about it is

09:41:13  3    I'm -- it's not lost on me exactly why Mr. Hill wants to do

09:41:17  4    it.  He didn't get the clean admission.

09:41:19  5          Mr. Brady has never seen this exhibit.  If he's

09:41:22  6    asked, have you seen this exhibit, he's going to say, I've

09:41:25  7    never seen it before.  So it's not proper impeachment on

09:41:28  8    that ground.  And it goes to something that is the exact

09:41:30  9    opposite of the law.

09:41:31  10         There's this connection, which is they're trying

09:41:34  11   to say that things were known in the art.  So using PDAs in

09:41:37  12   exchange of computers was known in the prior art.  That's

09:41:39  13   what this document shows, this Microsoft document.

09:41:43  14         That's not a challenge to written description.

09:41:45  15   That's not a challenge to any defense in this case.  What

09:41:48  16   they're trying to do is tar USAA because a patent

09:41:52  17   prosecutor did something which is allowed under the United

09:41:55  18   States patent law, which is take portions of specifications

09:41:58  19   and combine them together to create new inventions.

09:42:01  20         And the PTO concluded that this was a patentable

09:42:04  21   invention in its totality without separating out individual

09:42:08  22   elements.

09:42:08  23         The language is not identical.  The numbering is

09:42:11  24   different, and the numbering is different because it

09:42:13  25   connects to different elements of the specification.  It is

09:42:15   1   not proper impeachment.

09:42:17   2          And even if it were proper impeachment, it is not

09:42:19   3   a disclosed defense in this case.  There's no derivation in

09:42:22   4   this case.

09:42:23   5          And the third issue is, if this happens, it blows

09:42:28   6   open the door to an incredibly complicated explanation

09:42:34   7   about the fact that there is nothing wrong with taking

09:42:37   8   portions of a specification to construct another

09:42:41   9   specification.  It is absolutely -- there's no copyright in

09:42:42   10  United States Government documents.  You're entitled to do

09:42:43   11  this, and it's lawful under the law to do this.

09:42:46   12         THE COURT:  All right.  Do you have anything else,

09:42:47   13  Mr. Hill?

09:42:47   14         MR. HILL:  I do, Your Honor.

09:42:49   15         THE COURT:  Make it brief, please.

09:42:50   16         MR. HILL:  Your Honor, the point -- what is

09:42:52   17  unusual here -- it's not the fact that someone copies from

09:42:55   18  an old patent.  It's from the fact that a company corporate

09:43:00   19  rep takes the stand and tells the jury that they're the

09:43:03   20  genesis of this, that they authored it, that their -- their

09:43:08   21  inventors created it, that it's their work.

09:43:10   22         And that's what this goes to, Judge.  This isn't

09:43:12   23  some grand patent issue.  This is a basic issue of witness

09:43:15   24  credibility and the fact that a witness who claims this is

09:43:19   25  our work and it's not shouldn't be believed on other

09:43:24  1   matters.

09:43:24  2          And so that's what this demonstrates is that

09:43:27  3   Mr. Brady has testified that this is the work of USAA, and

09:43:33  4   it, in fact, is not.  And that impairs his credibility.

09:43:37  5          Your Honor, I'll make one last thing.  There's a

09:43:40  6   case out that you may be aware of called the Cioffi case

09:43:40  7   that Judge Payne had where he confronted something like

09:43:47  8   this.

09:43:47  9          In that instance, Your Honor, the -- the Defendant

09:43:50  10  was trying to use copied material like this that came from

09:43:55  11  the background section of the patent.  And Judge Payne said

09:43:57  12  to him in the context of that case, well, it's not as if

09:44:02  13  they're saying this is part of the invention.  And he

09:44:05  14  excluded it when it was background material.

09:44:08  15         Here, that's exactly what they've said.  They've

09:44:11  16  told the jury this is part of our invention, and they've

09:44:14  17  gone beyond that to say in the context of a written

09:44:17  18  description defense, and this is where our inventors wrote

09:44:20  19  it down.  I'm entitled to show they didn't write it and

09:44:23  20  that their claims are incredible and it impairs their

09:44:27  21  credibility.  I don't want it for some broader patent

09:44:30  22  issue.  I want it for a credibility issue.

09:44:32  23         THE COURT:  Go ahead, Mr. Sheasby.

09:44:34  24         MR. SHEASBY:  Your Honor, this is absolutely

09:44:35  25  improper.  No one said we invented PDAs.  We invented the

09:44:38   1   use of PDAs in a remote deposit capture system.  This

09:44:43   2   Microsoft document goes to not a single defense in this

09:44:45   3   case, not one.  This is absolutely improper impeachment,

09:44:49   4   and it doesn't relate to any single defense in this case.

09:44:51   5   It should not be -- it should not be allowed.

09:44:54   6          And, in addition, it's not even going to be

09:44:56   7   impeachment because he's going to say I've never seen the

09:44:58   8   document before.

09:45:00   9          THE COURT:  All right.  I've heard all I need to

09:45:02  10   hear.

09:45:03  11          The Plaintiff's objection to this line of proposed

09:45:11  12   impeachment is sustained.  I don't find that there's a

09:45:14  13   direct contradiction between what the witness testified to

09:45:16  14   and what Mr. Hill is purporting to present.

09:45:21  15          I also find that it's very typical to reproduce

09:45:25  16   sections of earlier patents.  The question was not, did

09:45:30  17   USAA originate this?  Did they come up with it as -- as

09:45:36  18   their original contribution?  The question was, did those

09:45:39  19   inventors write it?

09:45:40  20          And the witness said:  To the best of my

09:45:43  21   knowledge, they did.  Well, they did write it.  Whether it

09:45:45  22   had been written before or not, was not the question.

09:45:48  23   There's not a direct contradiction here.  This is highly

09:45:51  24   prejudicial, and it does not relate to the issue of written

09:45:55  25   defense that the Defendants have put forward in this case.

09:45:58  1          Whether the description in the patent is an

09:46:01  2   adequate description or not is not based upon whether the

09:46:05  3   written word originated with the patentee or was reproduced

09:46:13  4   from some earlier patent specification.  That is not a part

09:46:16  5   of the written defense.  It's not probative.  It's highly

09:46:19  6   prejudicial.  And I'm going to sustain the Plaintiff's

09:46:21  7   objection.

09:46:21  8          MR. HILL:  Your Honor, can I ask one question just

09:46:23  9   to save us time once Mr. Brady is up there?  If I were to

09:46:27  10  elicit from Mr. Brady an affirmative response that USAA

09:46:30  11  claims to have written -- to have authored this language,

09:46:34  12  would that change the Court's view of this?

09:46:37  13         THE COURT:  Given the lack of probative value and

09:46:42  14  the high level of prejudice, it probably wouldn't, but I'm

09:46:46  15  not going to preclude you from trying to ask that question,

09:46:49  16  Mr. Hill.

09:46:49  17         MR. HILL:  Thank you, Your Honor.

09:46:50  18         MR. SHEASBY:  And, Your Honor, to be clear, I will

09:46:53  19  instruct not to answer on that because it will reveal

09:46:57  20  privilege of how we got --

09:46:57  21         THE COURT:  So the question hasn't been asked yet,

09:47:00  22  so if it is, you have a right to assert a privilege if

09:47:00  23  you want to.

09:47:00  24         MR. HILL:  Your Honor, I do not want to force the

09:47:04  25  Plaintiff to assert a privilege in front of the jury.

09:47:06  1  That's unfair.  So -- but I don't understand the privilege

09:47:08  2  objection.  My question would be does he contend that

09:47:12  3  USAA's inventors actually authored this material.

09:47:16  4      MR. SHEASBY:  Your Honor, he's already said he

09:47:17  5  doesn't know.  What he said is that they participated in

09:47:20  6  the process.

09:47:20  7      THE COURT:  Well, they wrote it, Mr. Hill, and the

09:47:24  8  witness said, to the best of his knowledge, they wrote it.

09:47:27  9      But I can copy the first chapter of Genesis, and I

09:47:31  10  wrote it, too, but that doesn't mean I originated it.  And

09:47:35  11  that's the distinction here.

09:47:36  12      You've put on nothing to show that the witness has

09:47:38  13  indicated that USAA was the genesis of this and that they

09:47:43  14  originated it.  You're confusing origination and genesis

09:47:48  15  with the act of writing it, and that's the distinction that

09:47:52  16  the Court sees, and that's why it's not a direct

09:47:54  17  contradiction.

09:47:55  18      But even if it were a direct contradiction, it's

09:47:57  19  highly prejudicial with no real probative value that goes

09:48:00  20  to your written -- written description defense.  So on a

09:48:06  21  403 basis, I believe the Plaintiff's objection is well

09:48:09  22  taken.

09:48:09  23      MR. HILL:  And that was the nature of my question,

09:48:11  24  Your Honor.  If I ask him the origination question, are you

09:48:14  25  the genesis of this actual text --

| | | |
|---|---|---|
| 09:48:16 | 1 | THE COURT:  And that's why I said I don't think it |
| 09:48:19 | 2 | will change my ruling. |
| 09:48:19 | 3 | MR. HILL:  Okay.  Well then, I won't burn the |
| 09:48:20 | 4 | Court's time to do it.  That's why I wanted to ask. |
| 09:48:21 | 5 | THE COURT:  Well, the time that's being burned is |
| 09:48:25 | 6 | the parties' time, not the Court's time. |
| 09:48:28 | 7 | This issue is resolved as far as I'm concerned. |
| 09:48:38 | 8 | MR. SHEASBY:  May I bring Mr. Brady back in? |
| 09:48:41 | 9 | THE COURT:  Yes, you may bring the witness back in |
| 09:48:43 | 10 | and put him back on the witness stand. |
| 09:48:46 | 11 | Mr. Hill, if you'll approach, I'll hand you back |
| 09:48:49 | 12 | the documents. |
| 09:48:49 | 13 | MR. HILL:  Yes, sir. |
| 09:48:50 | 14 | THE COURT:  Ms. Lockhart? |
| 09:48:51 | 15 | Mr. Brady, if you'll return to the witness stand, |
| 09:48:54 | 16 | please, sir. |
| 09:49:04 | 17 | Are you prepared to continue, Mr. Hill?  Mr. Hill, |
| 09:49:08 | 18 | are you prepared to continue? |
| 09:49:09 | 19 | MR. HILL:  I am, Your Honor. |
| 09:49:10 | 20 | THE COURT:  Then let's bring in the jury, please, |
| 09:49:12 | 21 | Mr. Johnston. |
| 09:49:53 | 22 | COURT SECURITY OFFICER:  All rise. |
| 09:49:54 | 23 | (Jury in.) |
| 09:49:56 | 24 | THE COURT:  Thank you for your cooperation, ladies |
| 09:50:01 | 25 | and gentlemen of the jury.  Please be seated. |

09:50:03   1          We will continue with the Defendant's

09:50:06   2   cross-examination of the witness, Mr. Brady.

09:50:09   3          Go ahead, counsel.

09:50:10   4          MR. HILL:  Thank you, Your Honor.

09:50:12   5          Mr. Bakale, if we can go back to the '605 patent,

09:50:15   6   please, and we were at Column 8.

09:50:18   7   Q.  (By Mr. Hill)  Now, Mr. Brady, you were not involved in

09:50:30   8   the writing of these portions of the specification, were

09:50:32   9   you, sir?

09:50:33   10  A.  I was not involved.

09:50:35   11  Q.  But USAA has nine employees that remain in its employ

09:50:40   12  today who were involved, right?

09:50:49   13  A.  I don't believe that number is right, no.

09:50:53   14  Q.  How many of these inventors still work for USAA?

09:50:55   15  A.  I see four.

09:51:08   16  Q.  And the face of the company that USAA brought to

09:51:12   17  sponsor this invention was not any of those four but

09:51:16   18  instead was you, correct?

09:51:18   19  A.  That's correct.

09:51:20   20  Q.  Now, Mr. Brady, the hundred million dollars in damages

09:51:29   21  that USAA seeks in this case, that was just for the period

09:51:33   22  of August 2018 until today, about a year and a half.  Do

09:51:37   23  you understand that?

09:51:37   24  A.  That's what I understand.

09:51:41   25  Q.  You understand that USAA is not claiming in this case

| | | |
|---|---|---|
| 09:51:46 | 1 | damages before the patents issued, right? |
| 09:51:49 | 2 | A.  That's my understanding. |
| 09:51:50 | 3 | Q.  Because you can't do that, can you? |
| 09:51:51 | 4 | A.  That's my understanding, yes. |
| 09:51:52 | 5 | Q.  You can only seek damages for a patent once it exists. |
| 09:51:56 | 6 | Seem right? |
| 09:51:58 | 7 | A.  Okay.  Yes. |
| 09:51:58 | 8 | Q.  And -- but USAA isn't seeking damages just for that |
| 09:52:03 | 9 | period, is it? |
| 09:52:03 | 10 | A.  I don't know all the details. |
| 09:52:07 | 11 | Q.  All right.  What I'm asking, Mr. Brady, is, is USAA |
| 09:52:12 | 12 | trying to be bashful about the amount of money it's really |
| 09:52:16 | 13 | asking for or that it really says these inventions are |
| 09:52:19 | 14 | worth? |
| 09:52:19 | 15 | A.  I'm not -- I'm not sure what you're getting at, sir. |
| 09:52:22 | 16 | Q.  These patents don't expire today, do they? |
| 09:52:25 | 17 | A.  No. |
| 09:52:26 | 18 | Q.  When do they expire? |
| 09:52:28 | 19 | A.  My understanding is 20 years -- |
| 09:52:35 | 20 | Q.  Okay. |
| 09:52:36 | 21 | A.  -- from issue. |
| 09:52:37 | 22 | Q.  So what is USAA saying Wells Fargo should really pay |
| 09:52:40 | 23 | for the use of mobile check deposit? |
| 09:52:43 | 24 | A.  You know, I'm probably not the best one to -- to speak |
| 09:52:47 | 25 | to that.  I think we have other people that will be |

| | | |
|---|---|---|
| 09:52:49 | 1 | representing that. |
| 09:52:49 | 2 | Q.  Mr. Brady, there are no licenses to these patents, are |
| 09:52:58 | 3 | there, sir? |
| 09:52:59 | 4 | A.  What do you -- what do you mean by that? |
| 09:53:04 | 5 | Q.  Just that, there are no licenses to these patents, are |
| 09:53:07 | 6 | there, sir? |
| 09:53:08 | 7 | A.  I'm not aware. |
| 09:53:11 | 8 | MR. HILL:  I'll pass the witness, Your Honor. |
| 09:53:12 | 9 | THE COURT:  Redirect examination by the Plaintiff? |
| 09:53:20 | 10 | Counsel, are either of you going to continue to |
| 09:53:22 | 11 | use this easel during this witness's examination? |
| 09:53:25 | 12 | MR. HILL:  No, sir, Your Honor. |
| 09:53:26 | 13 | THE COURT:  Then I'd suggest somebody move it back |
| 09:53:28 | 14 | so it doesn't obstruct my view of the podium.  Thank you. |
| 09:53:36 | 15 | MR. SHEASBY:  Your Honor, may I approach counsel? |
| 09:53:38 | 16 | Counsel has inadvertently taken my notepad. |
| 09:53:41 | 17 | THE COURT:  You may have a moment to talk to |
| 09:53:43 | 18 | opposing counsel. |
| 09:53:44 | 19 | MR. HILL:  I'm sorry.  Sorry. |
| 09:54:08 | 20 | THE COURT:  All right.  Mr. Sheasby, you may |
| 09:54:09 | 21 | proceed with your redirect examination. |
| 09:54:09 | 22 | REDIRECT EXAMINATION |
| 09:54:12 | 23 | BY MR. SHEASBY: |
| 09:54:12 | 24 | Q.  Good morning, Mr. Brady. |
| 09:54:14 | 25 | A.  Good morning, Mr. Sheasby. |

| | | |
|---|---|---|
| 09:54:15 | 1 | Q.  It's nice to speak with you again. |
| 09:54:17 | 2 | A.  It's nice to speak with you. |
| 09:54:18 | 3 | Q.  Mr. Brady, do you have an understanding as to why you |
| 09:54:21 | 4 | were asked to speak on behalf of USAA about consumer remote |
| 09:54:25 | 5 | deposit capture? |
| 09:54:25 | 6 | A.  Yes, I do. |
| 09:54:26 | 7 | Q.  Why is that? |
| 09:54:28 | 8 | A.  I was -- I was -- when we first implemented consumer |
| 09:54:36 | 9 | remote deposit capture, I was the technology leader that |
| 09:54:39 | 10 | was the technical sponsor, and I led the team on a |
| 09:54:44 | 11 | day-to-day -- day-by-day basis as we were rolling out the |
| 09:54:48 | 12 | initial implementation. |
| 09:54:51 | 13 | MR. SHEASBY:  Mr. Huynh, can we turn to PX-1186, |
| 09:54:59 | 14 | which is the '605 patent.  And if you could pull up |
| 09:55:01 | 15 | Claim 1, Mr. Huynh.  And just pull up the talk about -- top |
| 09:55:19 | 16 | of that, Claim 1.  Right there, that's good enough. |
| 09:55:22 | 17 | Q.  (By Mr. Sheasby)  Now, counsel for Wells Fargo asked |
| 09:55:27 | 18 | you questions about whether Mr. Morris had said that mobile |
| 09:55:34 | 19 | phones appear in the patents.  Do you remember those |
| 09:55:38 | 20 | questions? |
| 09:55:38 | 21 | A.  Yes, he did ask that. |
| 09:55:40 | 22 | Q.  Do the claims that the United States Government granted |
| 09:55:45 | 23 | to USAA require the use of a mobile phone? |
| 09:55:50 | 24 | MR. HILL:  Objection, Your Honor.  Calls for a |
| 09:55:51 | 25 | legal opinion. |

09:55:55   1          MR. SHEASBY:  Your Honor, he's opened the door to

09:55:56   2   this by asking Mr. Brady whether the patent references

09:56:01   3   mobile phones.

09:56:01   4          MR. HILL:  Your Honor, I can't open the door to a

09:56:03   5   non-opinion witness giving opinions.

09:56:07   6          MR. SHEASBY:  Your Honor, if the question -- the

09:56:09   7   claims do not require mobile phones, the examination that

09:56:12   8   was done by Mr. Brady representing that whether mobile

09:56:16   9   phone does or does not appear in the patents goes directly

09:56:19   10  to the question of whether the claims require a mobile

09:56:21   11  phone, which they don't.

09:56:22   12         THE COURT:  Restate your question, Mr. Sheasby.

09:56:24   13  Q.  (By Mr. Sheasby)  Mr. Brady, you've examined the claims

09:56:30   14  of the patents, correct?

09:56:31   15  A.  Yes, I have.

09:56:33   16  Q.  In your examination of the claims of the patents, do

09:56:36   17  they require -- did you see any reference to a mobile

09:56:39   18  phone?

09:56:39   19  A.  I think they describe the concepts of a mobile phone.

09:56:45   20  Q.  Do they describe the -- do the patents describe the

09:56:49   21  concepts of a portable device?

09:56:50   22  A.  They describe the concept of a portable device.  They

09:56:54   23  describe the concepts of a digital camera.  I think they

09:56:58   24  describe all the concepts of a mobile phone.

09:57:00   25  Q.  Do the patents make reference to the use of cellular

09:57:04  1  technology?

09:57:04  2  A.  Yes, they also make reference to cellular technology in

09:57:10  3  the -- in the patents.

09:57:10  4  Q.  Now, Mr. Hill suggested to you that the -- well, let's

09:57:21  5  withdraw the --

09:57:22  6         MR. SHEASBY:  Let's go to PX-1186, and let's pull

09:57:24  7  up Column 21 -- I mean, Page 21 of that, Mr. Huynh.  And

09:57:36  8  let's go to Column 4, Lines 1 through 9.

09:57:40  9  Q.  (By Mr. Sheasby)  Now, this is a passage from the

09:57:49  10  formal specification of the '605 patent, correct?

09:57:52  11  A.  That's correct, yes.

09:57:53  12  Q.  Do you have an understanding as to whether this same

09:57:57  13  passage appears in the '681 patent?

09:57:58  14  A.  I believe it does.

09:58:00  15  Q.  Okay.  And this is the passage that was written by USAA

09:58:05  16  in 2006; is that correct?

09:58:07  17  A.  Yes, it's the same.

09:58:09  18         MR. SHEASBY:  And I want to highlight the last

09:58:12  19  sentence, Mr. Huynh, if you would.

09:58:14  20  Q.  (By Mr. Sheasby)  It said a particular advantage of the

09:58:19  21  embodiments of the invention is its ability to operate in

09:58:22  22  conjunction with electronics that today's consumers

09:58:25  23  actually own or can easily acquire, such as a general

09:58:30  24  purpose computer, a scanner, and a digital camera.

09:58:41  25         Did USAA have a view as to the -- withdraw the

09:58:46  1  question.

09:58:46  2       Let me ask it this way:  What was USAA's views of

09:58:51  3  the type of devices it member -- its members would use with

09:58:55  4  the platform it created in 2006?

09:58:56  5  A.  We wanted to be able to use everyday consumer devices

09:58:59  6  that they either already had or that they could easily go

09:59:03  7  out and acquire and that was -- we wanted to be able to

09:59:07  8  enable devices that they, you know, could use for other

09:59:10  9  things, as well.

09:59:12  10      And -- and these are -- this is a very descript

09:59:16  11  of -- of the type of devices that we were -- that we were

09:59:19  12  looking for.

09:59:20  13  Q.  The platform that USAA created in 2006, could it accept

09:59:25  14  digital images from mobile phone cameras?

09:59:27  15  A.  Yes, the infrastructure we developed definitely was --

09:59:30  16  was able to accept those -- those digital images.

09:59:34  17  Q.  The infrastructure that USAA created in 2006, did it

09:59:40  18  have the ability to accept images from PDAs?

09:59:46  19  A.  Yes, it did.

09:59:48  20  Q.  Did it have the ability to accept images from webcams?

09:59:53  21  A.  Yes, it did.

09:59:54  22  Q.  Is there any digital camera that the system in 2006

10:00:00  23  could not have accepted an image from that you're aware of?

10:00:03  24  A.  As long as the digital camera had a high enough pixel

10:00:08  25  quality, high enough resolution, it would -- it could

| | | |
|---|---|---|
| 10:00:11 | 1 | accept the image, yes. |
| 10:00:13 | 2 | Q.  When was USAA experimenting with capturing images using |
| 10:00:19 | 3 | mobile phones? |
| 10:00:20 | 4 | A.  We officially began a project in 2007 to start working |
| 10:00:24 | 5 | with -- with mobile phones. |
| 10:00:26 | 6 | Q.  And why did you -- why were you inspired to begin a |
| 10:00:30 | 7 | formal project in 2007? |
| 10:00:31 | 8 | A.  We knew mobile phones had digital cameras.  We knew |
| 10:00:36 | 9 | mobile phones were being used as cameras.  And so we -- we |
| 10:00:40 | 10 | specifically wanted to enable that for our members. |
| 10:00:43 | 11 | Q.  Now, Mr. Hill suggested to you that an engineer from |
| 10:00:50 | 12 | USAA had expressed concern about whether digital cameras |
| 10:00:55 | 13 | should be used and whether -- and that it had never been |
| 10:00:59 | 14 | experimented with before. |
| 10:01:00 | 15 | And you correct him and say:  That was an |
| 10:01:04 | 16 | executive.  Can you talk about Rickey Burks as an executive |
| 10:01:08 | 17 | and what -- what exactly his concern was? |
| 10:01:10 | 18 | A.  So Mr. Burks -- let me -- |
| 10:01:21 | 19 | Q.  I believe it's PX-36, Mr. Brady. |
| 10:01:21 | 20 | A.  As I mentioned, Mr. Burks was my manager.  Mr. Burks |
| 10:01:36 | 21 | was also Mr. Oakes's manager.  And his -- his -- and -- and |
| 10:01:46 | 22 | Mr. Oakes is the one that's actually named on the patent, |
| 10:01:49 | 23 | by the way. |
| 10:01:50 | 24 | But what Mr. Burks's concern was at the time we |
| 10:01:55 | 25 | had been working with -- it was important for us to do |

10:02:02   1   virus scans on the images that were coming back from --

10:02:06   2   from our -- our members' devices.  And so we -- we had --

10:02:15   3   we knew we had fully tested out all of our scanning for

10:02:20   4   the -- for the -- for the scanners.

10:02:25   5       Mr. Burks's concern here is have we done all the

10:02:33   6   virus scanning that we needed for the -- for the -- for

10:02:37   7   digital cameras.  And -- and I remember that because this

10:02:39   8   was a specific concern of Mr. Burks's.

10:02:42   9   Q.  Was Mr. Burks expressing questions as to whether Wells

10:02:45  10   Fargo -- USAA's system was technically capable?

10:02:45  11   A.  He was not expressing that concern.

10:02:48  12       MR. SHEASBY:  All right.  Let's scroll up in this

10:02:49  13   email to the part that discussed Troy -- Troy Huth.  I we

10:02:54  14   could go -- I believe it's between 2 and 3, Mr. Huynh.

10:02:58  15   Q.  (By Mr. Sheasby)  So just the -- to orient ourselves,

10:03:08  16   this is before the filing in the patent application,

10:03:10  17   correct?

10:03:10  18   A.  Yes, it is.

10:03:11  19   Q.  And it says, quote, Mike Morris did check on the use of

10:03:15  20   a camera to capture the image is included in our patent

10:03:17  21   application.

10:03:18  22       Do you see that, sir?

10:03:19  23   A.  Yes, absolutely.

10:03:20  24   Q.  Now, you said that you began a formal project with

10:03:24  25   mobile phones in 2007, correct?

10:03:27  1   A.  Yes, we kicked off a formal project in 2007 to start

10:03:31  2   working with mobile phones.

10:03:32  3   Q.  What platform was used for that formal project?

10:03:35  4   A.  It was the same underlying platform that -- that our --

10:03:41  5   all of our other consumer remote deposit capture was based

10:03:44  6   on.

10:03:44  7   Q.  And was that platform in existence in 2006?

10:03:47  8   A.  That was in existence in 2006.

10:03:49  9   Q.  Now, you were involved in a number of research and

10:03:52  10  development programs at USAA, correct?

10:03:54  11  A.  Correct.

10:03:55  12  Q.  And you're responsible for preparing and ensuring that

10:03:58  13  patents are sometimes prepared on inventions, correct?

10:04:00  14  A.  That's -- that's correct, yeah.  That's part of my --

10:04:03  15  my job.

10:04:03  16  Q.  In your experience, what comes first, the creation of

10:04:07  17  the commercial platform or the filing of the patent

10:04:11  18  application?

10:04:11  19  A.  The -- the -- what would come first would be the idea

10:04:16  20  and the filing of the patent.

10:04:16  21  Q.  And so in your experience as a research and development

10:04:19  22  executive, not just your 15 years at USAA, but your 35

10:04:23  23  years in the industry, first, you file the patent; is that

10:04:28  24  correct?

10:04:28  25  A.  That's correct.

360

| | | |
|---|---|---|
| 10:04:29 | 1 | Q.   And then you build out the infrastructure to launch it |
| 10:04:32 | 2 | to consumers; is that correct? |
| 10:04:33 | 3 | A.   That's the way we generally do things, yes. |
| 10:04:35 | 4 | Q.   Are you aware of any company in this field or any |
| 10:04:40 | 5 | technology company that first creates the system and then |
| 10:04:44 | 6 | writes the patent? |
| 10:04:45 | 7 | A.   I'm not aware of that, no. |
| 10:04:47 | 8 | Q.   Now, let's turn back to PX-39.  And let's look at the |
| 10:05:08 | 9 | top email exchange.  I'm going to go to the passage from |
| 10:05:16 | 10 | Mr. Oakes that says:  This effort can and will |
| 10:05:20 | 11 | revolutionize the banking industry...the virtual bank. |
| 10:05:24 | 12 |          Do you see that? |
| 10:05:25 | 13 | A.   Yes, I do.  That's calling out the vision around what |
| 10:05:28 | 14 | we wanted to accomplish. |
| 10:05:28 | 15 | Q.   And this is from 2006; is that correct? |
| 10:05:30 | 16 | A.   Yes.  This is before -- before we actually launched. |
| 10:05:33 | 17 | Q.   In that platform that was created in 2006, the platform |
| 10:05:37 | 18 | for the virtual bank, is that the same platform that was |
| 10:05:41 | 19 | the -- was -- was the foundation for the iPad app launch in |
| 10:05:47 | 20 | 2009? |
| 10:05:47 | 21 | A.   Yes, it was the same -- same platform we used for -- |
| 10:05:52 | 22 | for iPhone, Android, iPad, Windows Mobile, everything.  It |
| 10:05:57 | 23 | was all based on the same platform. |
| 10:05:59 | 24 | Q.   It improved over time, but it was the same core |
| 10:06:02 | 25 | platform? |

10:06:02  1   A.  Yes, yes.

10:06:03  2   Q.  And that platform existed in 2006, correct?

10:06:05  3   A.  Yes, it did.

10:06:06  4   Q.  And I want to go down, and I want you to just read the

10:06:10  5   last passage that says:  We have been told this product

10:06:13  6   will not work.  And ask you a question of:  What was the

10:06:19  7   industry's views of -- in your experience of the technology

10:06:22  8   when it was launched in 2006 and 2007?

10:06:24  9   A.  The -- the industry view?  Well, this -- this had never

10:06:31  10  been done before.  Even we -- internally, we all thought

10:06:35  11  this was -- this was not doable because it had never been

10:06:40  12  done before.  It seems pretty commonplace now, but back

10:06:43  13  then, it had never been done before.

10:06:45  14          And so we -- we had a lot of discussion about is

10:06:47  15  it even -- is it even going to be possible?  Is it going to

10:06:50  16  be -- you know, are we going to be able to work with the

10:06:54  17  regulators, which we did, to ensure that it -- that it met

10:06:57  18  the regulations?

10:06:58  19  Q.  Were you familiar with the types of devices that were

10:07:03  20  being used to capture images in 2006 in the research

10:07:09  21  laboratories at USAA?

10:07:10  22  A.  There were quite a number of them, yes.

10:07:12  23  Q.  Give me some examples.

10:07:14  24  A.  In 2006, in our -- in our Applied Research area.

10:07:16  25  Q.  Yes, not in a program but just experimenting in the

10:07:19   1    lab.

10:07:19   2    A.   Yeah, we -- we -- this is outside of an official

10:07:21   3    project, but we did have a lot of devices down in our

10:07:24   4    Applied Research lab.  We had a variety of different

10:07:27   5    scanners.  We also had -- had webcams.  We were -- we

10:07:33   6    were -- we were working -- we were taking pictures of

10:07:38   7    checks using -- using -- using mobile phones to see if the

10:07:41   8    quality was good enough.  But it wasn't until 2007 that we

10:07:43   9    officially kicked off that project.

10:07:45   10   Q.   And turning back to PX-36 -- actually, I withdraw that.

10:07:58   11        Mr. Brady, what has been the impact of consumer

10:08:02   12   remote deposit capture on USAA as a company?

10:08:04   13   A.   It -- it -- it has been -- it's been very -- I mean,

10:08:09   14   it's been huge.  It's been -- you know, I think I mentioned

10:08:13   15   yesterday, our -- our company has grown.  The bank has

10:08:17   16   tripled in size since we did this.  As soon as we

10:08:20   17   implemented it, we saw a -- a huge bump in the number of

10:08:24   18   checking accounts, a huge increase in the number of

10:08:26   19   checking accounts because it attracted more -- more members

10:08:30   20   to use us for banking services.  And it -- it's been

10:08:34   21   tremendous for us.

10:08:34   22   Q.   And to this day presently, are you aware of any mobile

10:08:41   23   device that can download an application, has a digital

10:08:44   24   camera, that cannot be used with USAA's platform?

10:08:47   25   A.   No.  They all work at this point.

10:08:49    1    Q.  And that's based on the research in 2006?

10:08:51    2    A.  That's based on what we did in 2006 and what we built

10:08:54    3    in 2006.

10:08:55    4         MR. SHEASBY:  No further questions.  I pass the

10:08:57    5    witness.

10:08:57    6         THE COURT:  Further cross-examination?

10:08:59    7         MR. HILL:  Briefly, Your Honor.

10:09:07    8         THE COURT:  Please proceed.

10:09:07    9                      RECROSS-EXAMINATION

10:09:07   10    BY MR. HILL:

10:09:08   11    Q.  Mr. Brady, for that 2006 system that's discussed in

10:09:11   12    that email we've looked at so often, you had to have a

10:09:14   13    TWAIN driver, didn't you?

10:09:16   14    A.  That was the implementation.  That was -- that's an

10:09:21   15    example of what we were doing.  That's an example of an

10:09:24   16    implementation, yes.

10:09:25   17    Q.  Mobile phones don't typically have TWAIN drivers, do

10:09:29   18    they, sir?

10:09:31   19    A.  I'm not aware if they do.

10:09:32   20    Q.  Are you familiar at all with homebuilding, Mr. Brady?

10:09:35   21    A.  Somewhat.

10:09:37   22    Q.  Okay.  Well, you understand -- let me ask -- before I

10:09:39   23    get to that, you understand the question in this case is

10:09:41   24    whether the spec supports the claims, right?

10:09:43   25    A.  I understand.

| | | |
|---|---|---|
| 10:09:47 | 1 | Q.  All right.  You know, you can build a house with |
| 10:09:50 | 2 | different kinds of foundations.  Have you ever heard of a |
| 10:09:52 | 3 | pier and beam foundation? |
| 10:09:54 | 4 | A.  Yes. |
| 10:09:54 | 5 | Q.  If I -- and effectively, a pier and beam foundation is |
| 10:09:57 | 6 | what, it's a platform, isn't it? |
| 10:10:00 | 7 | A.  You could call it multiple things. |
| 10:10:03 | 8 | Q.  And if I write you out a description of how to build a |
| 10:10:06 | 9 | pier and beam foundation, I haven't told you how to build |
| 10:10:10 | 10 | the house, have I? |
| 10:10:11 | 11 | A.  I think it's the -- I think it's the foundation for it. |
| 10:10:18 | 12 | MR. HILL:  Pass the witness, Your Honor. |
| 10:10:20 | 13 | THE COURT:  Any redirect? |
| 10:10:22 | 14 | MR. SHEASBY:  No redirect, Your Honor. |
| 10:10:23 | 15 | THE COURT:  Mr. Brady, you may step down and then |
| 10:10:26 | 16 | return to counsel table. |
| 10:10:28 | 17 | THE WITNESS:  Yes, sir. |
| 10:10:28 | 18 | THE COURT:  Counsel, approach the bench, please. |
| 10:10:32 | 19 | (Bench conference.) |
| 10:10:42 | 20 | THE COURT:  Oakes by deposition is next? |
| 10:10:48 | 21 | MR. SHEASBY:  Yes, Your Honor. |
| 10:10:49 | 22 | THE COURT:  And what's the length of this |
| 10:10:51 | 23 | deposition? |
| 10:10:51 | 24 | MR. SHEASBY:  I think it's 16 or 17 minutes, |
| 10:10:53 | 25 | Your Honor. |

| | | |
|---|---|---|
| 10:10:53 | 1 | THE COURT:  Total? |
| 10:10:54 | 2 | MR. SHEASBY:  Yes. |
| 10:10:55 | 3 | THE COURT:  Okay.  Let's proceed with that. |
| 10:10:56 | 4 | (Bench conference concluded.) |
| 10:11:06 | 5 | MR. SHEASBY:  Your Honor, Plaintiffs call as their |
| 10:11:08 | 6 | next witness Mr. Charles Oakes, one of the inventors, by |
| 10:11:12 | 7 | deposition. |
| 10:11:16 | 8 | THE COURT:  All right. |
| 10:11:28 | 9 | MR. HILL:  Your Honor, may we -- before that |
| 10:11:30 | 10 | starts, approach briefly.  I apologize. |
| 10:11:37 | 11 | THE COURT:  Approach the bench. |
| 10:11:38 | 12 | (Bench conference.) |
| 10:11:40 | 13 | MR. HILL:  Your Honor, I believe there was an |
| 10:11:41 | 14 | instruction -- |
| 10:11:42 | 15 | THE COURT:  I have the instruction.  I'm about to |
| 10:11:44 | 16 | give it. |
| 10:11:44 | 17 | MR. HILL:  Oh, I'm sorry.  I didn't -- I thought |
| 10:11:47 | 18 | we were starting the video. |
| 10:11:48 | 19 | THE COURT:  Okay. |
| 10:11:49 | 20 | (Bench conference concluded.) |
| 10:11:49 | 21 | THE COURT:  All right.  Mr. Oakes has been called |
| 10:11:52 | 22 | by deposition to testify in this case. |
| 10:11:53 | 23 | Ladies and gentlemen, during the trial you're |
| 10:11:56 | 24 | going to see witnesses presented by video deposition.  I |
| 10:12:00 | 25 | talked with you about that in my original instructions. |

| | | |
|---|---|---|
| 10:12:03 | 1 | I want you to be aware that when a witness is |
| 10:12:06 | 2 | presented by deposition, both Plaintiff and Defendant have |
| 10:12:10 | 3 | an opportunity to pick and choose portions of the recorded |
| 10:12:15 | 4 | questions and answers to include in what's shown to the |
| 10:12:19 | 5 | jury. |
| 10:12:19 | 6 | So regardless of whether the testimony is played |
| 10:12:22 | 7 | by the Plaintiffs in the Plaintiff's case-in-chief or by |
| 10:12:25 | 8 | the Defendant in the Defendant's case-in-chief, both the |
| 10:12:29 | 9 | Plaintiff and the Defendant have had an opportunity to |
| 10:12:32 | 10 | select portions of the testimony that you're being shown as |
| 10:12:36 | 11 | a part of this witness by video deposition.  I just want |
| 10:12:38 | 12 | that to be clear in your minds. |
| 10:12:40 | 13 | All right.  With that instruction, let's proceed |
| 10:12:42 | 14 | with the witness by deposition. |
| 10:12:48 | 15 | (Videoclip played.) |
| 10:12:48 | 16 | QUESTION:  Will you please state your name for the |
| 10:12:50 | 17 | record? |
| 10:12:50 | 18 | ANSWER:  Charles Oakes. |
| 10:12:51 | 19 | QUESTION:  And USAA is your current employer, |
| 10:12:54 | 20 | correct? |
| 10:12:54 | 21 | ANSWER:  No, I'm retired from USAA. |
| 10:12:55 | 22 | QUESTION:  When did you retire, sir? |
| 10:12:58 | 23 | ANSWER:  April 1st, 2016.  It's been over three |
| 10:13:02 | 24 | years. |
| 10:13:03 | 25 | QUESTION:  And what have you been doing in your |

10:13:05  1    retirement?

10:13:06  2         ANSWER:  Playing golf, teaching golf.  I teach

10:13:09  3    junior golf at my church, doing ministry work with my

10:13:12  4    church.  Doing a lot of reading and gardening and enjoying

10:13:16  5    retirement life.

10:13:21  6         QUESTION:  Prior to retiring on April 1st, 2016,

10:13:24  7    were you employed at USAA?

10:13:26  8         ANSWER:  Yes, I was.

10:13:26  9         QUESTION:  And how long prior to your retirement

10:13:29  10   had you been employed with USAA?

10:13:31  11        ANSWER:  I had been employed with USAA for 15

10:13:34  12   years.

10:13:34  13        QUESTION:  So from approximately 2001 to 2016?

10:13:38  14        ANSWER:  That's correct.

10:13:38  15        QUESTION:  When you were first named director of

10:13:43  16   Applied Research team again, you've spoken about the fact

10:13:46  17   that it was more of a paper-based research effort, correct?

10:13:49  18        ANSWER:  That is correct.  It was a paper-based

10:13:52  19   analysis of industry, when we would get a request from --

10:13:55  20   could be from the business, it could be from a technical,

10:13:58  21   to go evaluate this particular area to see the maturity of

10:14:03  22   it or not.

10:14:03  23        QUESTION:  So someone at USAA would have an

10:14:06  24   interest in -- in some area of the industry, correct, and

10:14:10  25   they'd come to you and your team and say, will you guys

10:14:13  1   look into this?  Is that a fair characterization?

10:14:17  2         ANSWER:  That is -- was one of the processes

10:14:19  3   associated with it.  We would get requests and then we

10:14:23  4   would take a look at it, did it fit, should we do it.  We

10:14:27  5   would have to do kind of a cost analysis, how long would it

10:14:31  6   take.  And then the result of that would end up being a

10:14:34  7   white paper analysis.

10:14:34  8         QUESTION:  Would you look at what the competitors

10:14:37  9   in the industry were doing?

10:14:38  10        ANSWER:  That wasn't our -- that wasn't our

10:14:40  11  mission, but in the analysis of the industry, we would take

10:14:42  12  a look at who were the leaders in the industry because

10:14:45  13  usually -- what I would call a sponsor, the sponsor that

10:14:49  14  requested it would ask who are the leaders in this industry

10:14:52  15  and what is the maturity of the industry.

10:14:55  16        QUESTION:  So part of your research would include

10:14:57  17  looking to see what companies that were out there in that

10:15:00  18  space and analyzing what they were doing, correct?

10:15:05  19        ANSWER:  We would take a look at as far as what

10:15:12  20  was out there in the industry and what their maturity

10:15:13  21  were -- associated with whatever aspect we were asked to

10:15:16  22  look at.

10:15:17  23        QUESTION:  And you were a named inventor on some

10:15:19  24  of those patents, correct?

10:15:22  25        ANSWER:  Correct.

10:15:22  1        QUESTION:  What was the work USAA was doing on

10:15:25  2   remote deposit capture in 2006?

10:15:26  3        ANSWER:  In 2006?  Really, we were developing an

10:15:31  4   application to be able to do remote capture of checks using

10:15:37  5   the scanner, which really started back in early -- or late

10:15:42  6   2004, early 2005.

10:15:49  7        That was the essence, as far as what we were

10:15:51  8   doing, to be able to use a consumer-based type of device,

10:15:56  9   to be able to capture an image of a check, to be able to

10:16:00  10  take that check and to do whatever work was necessary,

10:16:06  11  image type of correction, to try to make sure that that

10:16:09  12  check was going to be able to be deposited through the

10:16:13  13  clearing house process and the item processing.

10:16:16  14       QUESTION:  And did that product eventually have a

10:16:19  15  name?

10:16:19  16       ANSWER:  It was called Deposit@Home.

10:16:20  17       QUESTION:  Back in 2006, the primary thing that

10:16:25  18  you were working on related to Deposit@Home was to allow

10:16:31  19  consumers to use flatbed scanners, correct?

10:16:35  20       ANSWER:  At that point in time, our -- our focus

10:16:38  21  was to be able to get a scanner to be used to be able to

10:16:43  22  get an image of a check to be able to deposit it.

10:16:45  23       QUESTION:  Thank you.  Do you recall when the

10:17:10  24  prototype for Deposit@Home using a flatbed scanner was

10:17:16  25  built?

10:17:17  1          ANSWER:  Well, again, we're going back -- it

10:17:23  2   was -- it was launched in 2006, so prior to that was around

10:17:28  3   the late 2005 time frame.

10:17:36  4          QUESTION:  Do you know when USAA and your team

10:17:39  5   started working on Deposit@Home?

10:17:42  6          ANSWER:  We really started back in late 2004, 2005

10:17:48  7   time period.

10:17:49  8          QUESTION:  I'll hand you what we'll mark as

10:17:52  9   Exhibit 1 to your deposition, sir.  You see this is an

10:18:05  10  email dated September 15th, 2005?

10:18:09  11         ANSWER:  Okay.

10:18:34  12         QUESTION:  Do you see this is an email dated

10:18:36  13  September 15th, 2005?

10:18:38  14         ANSWER:  Correct.

10:18:38  15         QUESTION:  Does this refresh your recollection

10:18:41  16  about the time frame that USAA was building its prototype

10:18:43  17  for Deposit@Home?

10:18:44  18         ANSWER:  Yes, it does.  But there's -- if I could

10:18:49  19  explain when -- the definition of prototype as far as from

10:18:52  20  a research standpoint.  The Deposit@Home was divided into

10:18:58  21  three major sections associated -- of the entire

10:19:01  22  application.  The front end was the scanner.

10:19:08  23         So we had to be able to test it or prototype,

10:19:14  24  using the scanner to take control, and to be able to see

10:19:17  25  what kind of complexity that we're going to have and be

10:19:21  1  able to grabbing the image.  So that -- that's the front

10:19:24  2  end.

10:19:25  3       The middle part was what I would call the server

10:19:29  4  side.  So whatever image, because the intelligence wasn't

10:19:33  5  there in the scanner, would go to the server side to be

10:19:35  6  able to clean up the image, ensure -- even though it's a

10:19:40  7  semicontrolled environment, to make sure that that image

10:19:44  8  was where the CAR read or the amounts or the MICR line was

10:19:51  9  all there.  So that was mid-tier.

10:19:53 10       Then what we called a back end item processing,

10:19:56 11  that was already there.  Okay.  So what we needed to do was

10:20:01 12  to determine how to control the scanner to get the image,

10:20:03 13  what do we do in the middle part to be able to clean up the

10:20:06 14  image, and then hook into the back end system.  This here

10:20:13 15  is what they're talking about hooking into the back end

10:20:16 16  system, and so --

10:20:17 17       QUESTION:  Just so we're clear, in the 2005/2006

10:20:21 18  time frame when USAA was developing Deposit@Home, the back

10:20:23 19  end item processing systems were already in place, correct?

10:20:27 20       ANSWER:  That is a standard banking operation.

10:20:30 21       QUESTION:  Did you mean a standard banking

10:20:39 22  operation?

10:20:40 23       ANSWER:  Yes, in other words, for check clearing

10:20:41 24  item processing, it goes -- what did I say?

10:20:42 25       QUESTION:  I think you said "baking."

10:20:44   1         ANSWER:  That's my South Texas accent.  My

10:20:46   2    apologies.

10:20:46   3         QUESTION:  Completely understand.

10:20:48   4         ANSWER:  That was the -- that's been there

10:20:52   5    probably through the '60s and '70s.  It's what they call

10:20:54   6    the item processing that goes through the back end

10:20:58   7    clearing.  So that was there.  We didn't -- we didn't need

10:21:00   8    to develop that.

10:21:01   9         QUESTION:  Perfect.  So --

10:21:03  10         ANSWER:  We just needed to hook in.

10:21:05  11         QUESTION:  Perfect.  So in terms of your

10:21:07  12    development in 2005 and 2006 of Deposit@Home, you didn't

10:21:10  13    need to develop any new back end item processing systems,

10:21:13  14    those were already in place, correct?

10:21:14  15         ANSWER:  Those were in place, but what we had to

10:21:16  16    ensure is what we did on the front -- front end would be

10:21:19  17    accepted by the item processing because if it didn't, then

10:21:24  18    it would not clear through Chase and through the fed and

10:21:28  19    all that.  So that was -- we didn't want to redo that.

10:21:34  20    There was no sense rebuilding that.

10:21:36  21         QUESTION:  So at this point on October 27th or

10:21:40  22    around October 27th, 2005, you and your team felt the

10:21:44  23    development of the Deposit@Home was far enough along that

10:21:49  24    it should be shown to someone outside your team, correct?

10:21:53  25         ANSWER:  We felt at that point in time because of

10:21:56  1  John Brady's expertise in the banking industry, that if --

10:21:59  2  if we showed it to him of what we were able to accomplish

10:22:03  3  at that point in time and get his feedback of whether he

10:22:06  4  believed, from a banking standpoint -- because he was our

10:22:10  5  expert in that area.

10:22:12  6       If he basically said, hey, I think you've got

10:22:14  7  something here, here are some of the suggested changes,

10:22:19  8  then we would continue to go forward.  If he would have

10:22:23  9  come back and said, guys, this is not going to work, it's

10:22:26 10  not going to fly, we're not going to go anywhere

10:22:30 11  whatsoever, I don't give my recommendation in going

10:22:32 12  forward, we probably would have stopped.

10:22:33 13       But his expertise was very critical before we

10:22:39 14  showed the business, before we showed anybody else.

10:22:41 15  Because, again, this was something that was so radical and

10:22:44 16  disruptive to the industry that we knew that there was

10:22:48 17  going to be some folks that were not necessarily for it.

10:22:52 18  So we needed to get some feedback.

10:22:55 19       So that's what this official document talks about

10:23:00 20  is what we call the WAR report.  I don't even remember what

10:23:07 21  it stands for anymore.  But that's that demo that they're

10:23:10 22  talking -- speaking of that -- when John Brady, we showed

10:23:15 23  it to him.

10:23:15 24            QUESTION:  So prior to 2006, all of the images

10:23:19 25  that USAA processed through the production system would

10:23:22  1    have been using a TWAIN driver, correct?

10:23:25  2         ANSWER:  I'm sorry, repeat the question again.

10:23:28  3         QUESTION:  Prior to this email --

10:23:29  4         ANSWER:  Okay.

10:23:30  5         QUESTION:  -- had USAA ever processed an image

10:23:36  6    caught by something using anything other than a TWAIN

10:23:40  7    driver?

10:23:41  8         ANSWER:  We -- at that time, no, I don't believe

10:23:44  9    we did.

10:23:44  10        QUESTION:  When did USAA release Deposit@Home?

10:23:49  11        ANSWER:  Well, we released it, if I am correct,

10:23:53  12   to -- let me back up a little bit.

10:23:56  13   Whenever we get ready to launch or to deploy a new

10:24:01  14   application, we test it on employees first before we roll

10:24:06  15   it out to the membership because we want to make sure -- so

10:24:09  16   if I remember right, it was around the June time frame,

10:24:13  17   when we -- when we released it to employees.

10:24:16  18        QUESTION:  Okay.  And then how long after the

10:24:19  19   release to employees was it then released to the

10:24:21  20   membership?

10:24:21  21        ANSWER:  I believe it was August 2009.  I'm sorry.

10:24:27  22   I'm sorry.  2006.  Sorry, I was thinking of mobile.

10:24:33  23        QUESTION:  Is it fair to say that in the summer of

10:24:36  24   2006 and into August 2006, your primary focus was on the

10:24:42  25   Deposit@Home product?

10:24:43   1         ANSWER:  In 2006, as far as deploying to our

10:24:49   2    members at that time in a production environment, it was in

10:24:53   3    Deposit@Home.

10:24:53   4         QUESTION:  In October 2006, there wasn't any

10:24:56   5    active project at USAA that involved using a camera phone

10:25:00   6    to capture a check image, correct?

10:25:05   7         ANSWER:  There wasn't a development project, but

10:25:07   8    we were working on a project in research.  There is a

10:25:09   9    difference between the two.

10:25:10   10         QUESTION:  Prior to October 2006, what research

10:25:16   11    had USAA done that involved using a camera phone to capture

10:25:21   12    an image of a check?

10:25:23   13         ANSWER:  The initial research was using some of

10:25:26   14    the regular cameras, like a Canon or -- to see if we were

10:25:32   15    able to -- to -- what type of image that we were going to

10:25:36   16    be able to do.

10:25:36   17         So that way we could start making a determination

10:25:39   18    of what type work that we were going to have to do either

10:25:43   19    on the front end or the middle tier because it was going to

10:25:47   20    be a much, much more complex type of environment because

10:25:50   21    it's not going to be in a controlled environment like a

10:25:52   22    scanner.

10:25:53   23         So we started looking at that early on, as much as

10:25:55   24    we could at that point in time.  But it wasn't -- it wasn't

10:25:58   25    like a development project.

10:26:01  1        QUESTION:  Prior to October of 2006, had USAA done

10:26:07  2    any research using a camera phone, not a normal digital

10:26:15  3    like Canon camera, to capture an image of a check?

10:26:20  4        ANSWER:  We were looking -- there were cameras --

10:26:23  5    camera phones at that point in time.  There was like a

10:26:26  6    Simian, there was the -- Nokia-type devices that we were

10:26:32  7    starting to take a look at to see what we could do in a

10:26:36  8    mobile world.

10:26:36  9        QUESTION:  In terms of USAA's ability to write

10:26:39  10   applications using -- to a camera phone, when did USAA do

10:26:45  11   that work?

10:26:46  12       ANSWER:  It was early 2007.  I think it was -- I

10:26:48  13   believe it was.  That was one of the first projects that

10:26:52  14   Minya Liang started working on using the Simian OS on the

10:27:00  15   Nokia, I believe it was.  And I think it was early 2007.  I

10:27:05  16   may have my dates wrong, J2ME was -- was available.

10:27:11  17       QUESTION:  So prior to that October 2006 email,

10:27:15  18   what, if any, work in research had USAA done on mobile

10:27:22  19   phones and their ability to take an image of a check?

10:27:26  20       ANSWER:  Well, again, we were -- we were looking

10:27:29  21   at the various phones that were available at that time, to

10:27:34  22   determine what it was going to be able to take to be able

10:27:36  23   to capture an image and to be able to control that image

10:27:41  24   and to be able to pass it on.

10:27:43  25       QUESTION:  Do you recall whether prior to that

10:27:46   1   email anyone at USAA had actually taken a check image with

10:27:50   2   a mobile phone camera?

10:27:51   3          ANSWER:  That, I don't recall if we could or not

10:28:06   4   at that point in time.  Well, let me -- let me clarify --

10:28:10   5   can I clarify that, or not?  Okay.

10:28:16   6          QUESTION:  I'm sure your counsel will let you

10:28:17   7   if -- during his time, if he wants to.

10:28:19   8          ANSWER:  Well, as far as being able to take a

10:28:21   9   picture using -- a check of a mobile phone, that wasn't the

10:28:25  10   issue.  The issue was being able to get the image off of a

10:28:28  11   phone in a way that we could process it downstream.  So

10:28:31  12   I -- I thought that's what your question was.  I may have

10:28:34  13   misunderstood it.

10:28:36  14          QUESTION:  So prior to -- October 2006, USAA had

10:28:39  15   done -- had not done any work on processing an image of a

10:28:45  16   check taken with a mobile phone, correct?  Is that fair?

10:28:48  17          ANSWER:  As far as processing it through the

10:28:51  18   entire application at that point in time, no, other than

10:28:56  19   the one October in 2006.

10:28:58  20          QUESTION:  Which was a webcam?

10:29:01  21          ANSWER:  Which was a webcam, that is true.

10:29:05  22          QUESTION:  Did you participate in ANSI's

10:29:07  23   standard-setting efforts regarding check deposit or check

10:29:12  24   imaging?

10:29:12  25          ANSWER:  I did not participate in anything

10:29:14  1   associated with the standards body or ANSI.

10:29:16  2        QUESTION:  Do you know if anyone at USAA did?

10:29:18  3        ANSWER:  On the standards body?

10:29:20  4        QUESTION:  Uh-huh.

10:29:22  5        ANSWER:  Not to my knowledge, no.

10:29:23  6        QUESTION:  Did you participate in any other

10:29:27  7   standard-setting efforts related to check deposit during

10:29:32  8   your career?

10:29:33  9        ANSWER:  Never in my career, any standards bodies.

10:29:37  10       QUESTION:  Do you know if anybody that ever

10:29:41  11  reported to you in USAA's research and development team

10:29:45  12  ever participated in any standards-setting organizations or

10:29:48  13  efforts related to mobile check deposit?

10:29:50  14       ANSWER:  It's been a long time, but I don't recall

10:29:53  15  any of our folks being on any standards committees.

10:30:00  16       QUESTION:  Is it fair to say that taking images of

10:30:03  17  checks is not something USAA invented?

10:30:06  18       ANSWER:  I believe that the way that USAA takes

10:30:12  19  images -- captures images of checks in relation to the use

10:30:20  20  of scanners and the use of mobile -- mobile devices in the

10:30:25  21  auto capture is -- in the mobile is invented by USAA.

10:30:32  22       However, back end processing scanners that take

10:30:36  23  images of checks, USAA -- we didn't invent those.

10:30:39  24       QUESTION:  To be clear, other banks took images of

10:30:44  25  checks long before 2006, correct?

| | | |
|---|---|---|
| 10:30:48 | 1 | ANSWER:  Banks took images of checks in the item |
| 10:30:51 | 2 | processing and back end processing of -- of commercial type |
| 10:30:55 | 3 | of products. |
| 10:30:58 | 4 | QUESTION:  So the imaging of checks was invented |
| 10:31:04 | 5 | long before 2006, correct? |
| 10:31:06 | 6 | ANSWER:  The consumer-based imaging of check |
| 10:31:10 | 7 | captures was invented by USAA. |
| 10:31:12 | 8 | QUESTION:  The imaging of checks was done by banks |
| 10:31:19 | 9 | long before 2006, yes or no? |
| 10:31:20 | 10 | ANSWER:  The imaging of checks by banks prior to |
| 10:31:24 | 11 | 2006 was done by banks. |
| 10:31:25 | 12 | QUESTION:  So yes? |
| 10:31:27 | 13 | ANSWER:  So USAA did not invent that part of |
| 10:31:30 | 14 | imaging. |
| 10:31:31 | 15 | (Videoclip ends.) |
| 10:31:32 | 16 | THE COURT:  Does that complete this witness by |
| 10:31:36 | 17 | deposition? |
| 10:31:36 | 18 | MR. SHEASBY:  It does, Your Honor. |
| 10:31:38 | 19 | THE COURT:  All right.  Ladies and gentlemen, |
| 10:31:41 | 20 | before we continue with Plaintiff's next witness, we're |
| 10:31:43 | 21 | going to take a brief recess. |
| 10:31:45 | 22 | If you will simply close and leave your notebooks |
| 10:31:48 | 23 | in your chairs.  Follow all my instructions, including not |
| 10:31:51 | 24 | to discuss the case among each other.  And we'll be back |
| 10:31:54 | 25 | shortly to continue with the next witness. |

10:31:56    1            The jury is excused for recess at this time.

10:31:59    2            COURT SECURITY OFFICER:  All rise.

10:32:00    3            (Jury out.)

10:32:24    4            THE COURT:  Please be seated.

10:32:24    5            Counsel, the Court's persuaded that it would

10:32:30    6   benefit by a newly jointly resubmitted proposed final jury

10:32:38    7   instruction and verdict form, given the development of the

10:32:41    8   case, the evidence that's been presented so far in other

10:32:45    9   matters.

10:32:45   10            I think what you've initially presented and filed

10:32:48   11   probably needs to be updated.  I'm going to order the

10:32:51   12   parties to jointly meet and confer and prepare and file by

10:32:56   13   noon tomorrow a newly resubmitted proposed final jury

10:33:00   14   instruction and verdict form, indicating clearly any areas

10:33:04   15   of difference by either different font or coloring or

10:33:08   16   something where your competing and diverse positions on any

10:33:13   17   matter can be put side-by-side for the Court's review.

10:33:16   18            Also, I'm going to direct that you furnish a copy

10:33:19   19   of the same document, in addition to filing it on the

10:33:23   20   docket, to the Court by email in Word format.

10:33:26   21            All right.  We'll take a short recess and

10:33:29   22   continue.  The Court stands in recess.

10:33:31   23            COURT SECURITY OFFICER:  All rise.

10:45:30   24            (Recess.)

10:45:32   25            (Jury out.)

| | | |
|---|---|---|
| 10:45:33 | 1 | COURT SECURITY OFFICER:  All rise. |
| 10:45:33 | 2 | THE COURT:  Be seated, please. |
| 10:45:34 | 3 | Plaintiffs, are you prepared to call your next |
| 10:45:42 | 4 | witness? |
| 10:45:43 | 5 | MR. ROWLES:  We are, Your Honor. |
| 10:45:45 | 6 | THE COURT:  All right.  Let's bring in the jury, |
| 10:46:11 | 7 | please. |
| 10:46:11 | 8 | COURT SECURITY OFFICER:  All rise. |
| 10:46:14 | 9 | (Jury in.) |
| 10:46:31 | 10 | THE COURT:  Welcome back.  Please be seated. |
| 10:46:32 | 11 | Plaintiff, call your next witness. |
| 10:46:51 | 12 | MR. ROWLES:  Thank you, Your Honor.  Plaintiff |
| 10:46:53 | 13 | calls Professor Thomas Conte. |
| 10:46:57 | 14 | THE COURT:  All right.  Professor Conte, if you'd |
| 10:47:00 | 15 | come forward and be sworn by the courtroom deputy, please. |
| 10:47:04 | 16 | (Witness sworn.) |
| 10:47:17 | 17 | THE COURT:  Please come around and have a seat on |
| 10:47:19 | 18 | the witness stand, sir. |
| 10:47:22 | 19 | MR. ROWLES:  May I approach the witness with a |
| 10:47:24 | 20 | demonstrative before we begin, Your Honor? |
| 10:47:26 | 21 | THE COURT:  You may. |
| 10:47:32 | 22 | THE WITNESS:  Thank you. |
| 10:47:33 | 23 | THE COURT:  All right.  Mr. Rowles, you may |
| 10:47:37 | 24 | proceed with direct examination. |
| 10:47:38 | 25 | MR. ROWLES:  Thank you, Your Honor. |

| | | |
|---|---|---|
| 10:47:38 | 1 | <u>TOM CONTE, PH.D., PLAINTIFF'S WITNESS, SWORN</u> |
| 10:47:38 | 2 | <u>DIRECT EXAMINATION</u> |
| 10:47:38 | 3 | BY MR. ROWLES: |
| 10:47:40 | 4 | Q.  Good morning, Professor.  Could you please introduce |
| 10:47:44 | 5 | yourself to the jury? |
| 10:47:45 | 6 | A.  Good morning.  My name is Tom Conte.  I live in |
| 10:47:48 | 7 | Decatur, Georgia, with my wife and two grown children and |
| 10:47:53 | 8 | three large adopted dogs.  I am a professor at Georgia |
| 10:47:53 | 9 | Tech. |
| 10:48:00 | 10 | Q.  Professor Conte, why are you here to testify today? |
| 10:48:01 | 11 | A.  I'm here to present a technical analysis of the Wells |
| 10:48:06 | 12 | Fargo Mobile Deposit system. |
| 10:48:07 | 13 | Q.  How many hours have you spent working on this case, |
| 10:48:09 | 14 | roughly? |
| 10:48:10 | 15 | A.  I've worked approximately 300 hours on this case. |
| 10:48:15 | 16 | Q.  Are you being compensated for your time spent working |
| 10:48:19 | 17 | on this case? |
| 10:48:19 | 18 | A.  Yes, I am, at a customary rate for someone with my |
| 10:48:21 | 19 | experience, so the -- $600.00 per actual hour worked. |
| 10:48:23 | 20 | Q.  Is your compensation dependent in any way on the |
| 10:48:26 | 21 | testimony you're going to give or the outcome of the case? |
| 10:48:28 | 22 | A.  Not at all. |
| 10:48:29 | 23 | Q.  Could you tell the jury about your educational |
| 10:48:38 | 24 | background? |
| 10:48:38 | 25 | A.  Sure.  I grew up in Delaware.  I was a person who |

10:48:43   1   tinkered with things.  I took things apart.  So I knew I

10:48:47   2   wanted to be an engineer.

10:48:50   3        I rolled out of high school with a 2.4, so that

10:48:54   4   didn't look likely.  But, luckily, I grew up in a small

10:48:57   5   state that had built a university that was too big for the

10:49:00   6   members of the state, so I was able to get into the

10:49:03   7   University of Delaware as an applied math major.  And then

10:49:07   8   after a year of working hard, I -- I transferred to

10:49:10   9   electrical engineering.

10:49:10  10   Q.  What did you do after the University of Delaware?

10:49:12  11   A.  Well, when I was at the University of Delaware, I

10:49:16  12   realized I wanted to teach, so I got accepted to the

10:49:22  13   University of Illinois.  And there I got my Master's in '88

10:49:30  14   and then my Ph.D. in '92.

10:49:34  15   Q.  Could you tell the jury about your experience teaching?

10:49:36  16   A.  Well, even though it was a very tough job market, I was

10:49:39  17   lucky enough to get an academic position at the University

10:49:43  18   of South Carolina right after I graduated, in Columbia,

10:49:47  19   South Carolina.

10:49:47  20        And that's where I met my future wife.  And then

10:49:50  21   we moved to Raleigh-Durham, North Carolina, where I taught

10:49:56  22   at North Carolina State University until 2008.

10:49:59  23        My son is special needs.  He has severe autism,

10:50:03  24   and it turned out that Atlanta had much better services, so

10:50:06  25   we then moved to the Atlanta area.  And I teach now at

10:50:10  1    Georgia Tech where I'm a professor actually in two

10:50:15  2    departments, in computer science and intellectual and

10:50:19  3    computer engineering.

10:50:19  4    Q.  While you were teaching, did you do any consulting work

10:50:21  5    in industry?

10:50:22  6    A.  Yes.  I've been lucky to consult throughout my career.

10:50:25  7    When I was at the University of South Carolina, there was a

10:50:28  8    messenger NCR division there, so I consulted for NCR a day

10:50:33  9    a week.  I worked as an engineer there.  That's where we

10:50:36  10   built bank servers.

10:50:37  11          And then when I went to Raleigh-Durham, there's a

10:50:41  12   lot of companies there.  I was able to get a job a day a

10:50:45  13   week again, working at IBM.  In fact, IBM's largest site in

10:50:49  14   the company is actually in Raleigh-Durham.  You'd think it

10:50:51  15   was in New York, but it's in Raleigh-Durham.

10:50:54  16          And then a group of us went -- left IBM and did a

10:50:58  17   start-up.  We called it Billions of Operations Per Second,

10:51:02  18   Inc., or BOPS.  Our goal -- our stated goal was to design a

10:51:07  19   stated processor that was a super computer that could run

10:51:10  20   on two double A cells.

10:51:12  21          After that, then I -- with some of the people

10:51:17  22   again from IBM, went and joined Qualcomm, and we created

10:51:24  23   the Snapdragon mobile processor that's in a lot of Android

10:51:28  24   phones.

10:51:29  25          When I moved to Georgia Tech, I've continued to

10:51:33   1   consult.   I currently consult for Northrop Grumman

10:51:40   2   Corporation and for two national labs, Sandia and Oak Ridge

10:51:42   3   National Lab.

10:51:43   4   Q.   Have you received any recognitions for your work?

10:51:46   5   A.   Well, first, it's not listed here, but I've received a

10:51:50   6   number of teaching awards.   But I'm also a fellow of the

10:51:54   7   IEEE.   That's the Institute of Electrical and Electronics

10:51:56   8   Engineers.   That's my professional organization.   And it's

10:51:59   9   also the largest professional organization of its kind in

10:52:03   10   the world.

10:52:04   11          And fellow is their highest membership category,

10:52:08   12   and I was promoted in 2005 for my work on microprocessors

10:52:12   13   and on computer performance evaluation.

10:52:18   14          In around 2013, I was elected to be president of

10:52:21   15   the IEEE Computer Society.   That's the largest society in

10:52:26   16   IEEE.   And I served in that role in 2015.

10:52:30   17          In 2016, I was elected to be vice chair of the

10:52:35   18   International Roadmap For Devices and Systems, or IRDS, we

10:52:38   19   call it.

10:52:39   20          What the IRDS is, it's a collection of volunteers

10:52:42   21   from across the computer industry, about a hundred of us,

10:52:47   22   and we predict the future of computing.   We identify the

10:52:52   23   roadblocks to getting there, and we write up a report.   We

10:52:55   24   call it the roadmap.   We write it up in odd numbered years,

10:52:58   25   so we're just about to put out the 2019 one, and update in

10:53:03  1   the even numbered of years.  That report is used by

10:53:06  2   governments, industry, and academia worldwide to set

10:53:10  3   research and development priorities.

10:53:16  4              MR. ROWLES:  At this time, I tender

10:53:18  5   Professor Conte as an expert in the fields of computer

10:53:20  6   science and mobile and portable device technology.

10:53:20  7              THE COURT:  Is there objection?

10:53:22  8              MR. MELSHEIMER:  There is no objection,

10:53:22  9   Your Honor.

10:53:22  10             THE COURT:  Without objection, the Court will

10:53:24  11  recognize this witness as an expert in those designated

10:53:27  12  fields.

10:53:28  13             Continue, counsel.

10:53:30  14  Q.  (By Mr. Rowles)  Professor Conte, could you summarize

10:53:33  15  for the jury the opinions that you're going to testify

10:53:35  16  about today?

10:53:36  17  A.  Yes.  So I analyzed the '681 and the '605 patent.

10:53:41  18             I forgot to mention, I'm the inventor of 40

10:53:44  19  patents.

10:53:45  20             I analyzed the Wells Fargo Mobile Deposit system,

10:53:49  21  and then after the analysis I'll present today, I concluded

10:53:53  22  that the patented inventions are present in the Wells Fargo

10:53:57  23  Mobile Deposit system.

10:53:58  24  Q.  And what does an expert like yourself do to reach those

10:54:03  25  conclusions?

10:54:03  1   A.  Well, we do a number of things.  One is, if we can, we

10:54:07  2   experiment with the accused system.  And I'm, in fact, a

10:54:10  3   Wells Fargo customer.  So I had already experimented with

10:54:12  4   it, but I did more experimentation.

10:54:15  5         Also, the Court issues something called a

10:54:17  6   protective order.

10:54:19  7         Now, what this is, it's a document that if you

10:54:21  8   sign it, you're able to access proprietary information.  So

10:54:27  9   I was able to access proprietary documents from Wells

10:54:30  10  Fargo, proprietary witness testimony of Wells Fargo

10:54:34  11  engineers, and also the proprietary source code of the

10:54:39  12  Wells Fargo system itself.

10:54:41  13  Q.  And what legal rules did you apply in your analysis?

10:54:44  14  A.  Well, I applied the U.S. statute which is making,

10:54:48  15  using, selling, offering for sale, or importing into the

10:54:52  16  United States any patented invention without permission.

10:54:56  17  Q.  And could you orientate the jury to the different

10:54:59  18  components of a patent that you looked at?

10:55:01  19  A.  Yes.  I think we've heard a little about this, but I

10:55:04  20  thought it would be good to put it all together.  A patent

10:55:06  21  has three patents.  It has a cover page that tells you who

10:55:09  22  the inventors are, the name of the patent, when it was

10:55:14  23  filed, when it was issued, and it gives an abstract to

10:55:17  24  someone of skill in the art about what the patent is about.

10:55:20  25        And then there's this narrative called the

10:55:23  1  specification.  And that really describes what the

10:55:24  2  invention is.

10:55:26  3          And then at the end, there are these numbered

10:55:29  4  sentences that are the claims.  And those claims are the

10:55:34  5  specific definition of what the actual invention is that is

10:55:38  6  claimed.

10:55:40  7  Q.  And how did you go about determining whether the

10:55:44  8  claimed inventions in the USAA patents were present in the

10:55:49  9  systems accused of infringement in this case?

10:55:51  10  A.  Okay.  So what I've done here on the left is I've re --

10:55:56  11  recreated a claim from one of the patents.  In this case,

10:56:00  12  it's the 86 -- I'm sorry, the '681, Claim 12.  And I

10:56:07  13  divided into rows -- those are called elements.

10:56:10  14          Now, for each element, I look at the accused

10:56:13  15  system.  And if that element is present in the accused

10:56:15  16  system, then I mark it off.

10:56:16  17          If each and every element of a claim are present,

10:56:20  18  then the accused system infringes the claim.  It's really

10:56:24  19  that simple.

10:56:25  20  Q.  Did you have to consider whether Wells Fargo knew of

10:56:29  21  the patents or intended to infringe the patents in your

10:56:32  22  analysis?

10:56:33  23  A.  No.  No intent or knowledge is required for

10:56:36  24  infringement.

10:56:36  25  Q.  So could you begin by giving the jury a roadmap of the

| | | |
|---|---|---|
| 10:56:42 | 1 | topics that you're going to cover today? |
| 10:56:43 | 2 | A.   Sure.   So I'm going to start describing the USAA |
| 10:56:47 | 3 | patented inventions.   And then I'm going to give you my |
| 10:56:50 | 4 | analysis of the Wells Fargo Mobile Deposit system. |
| 10:56:54 | 5 | Now, with those two ingredients we can do that |
| 10:56:59 | 6 | analysis I just talked about.   So we'll do that |
| 10:57:00 | 7 | element-by-element analysis of each of the asserted claims. |
| 10:57:03 | 8 | Q.   So beginning with the USAA patents, could you briefly |
| 10:57:08 | 9 | describe what the USAA patents are about? |
| 10:57:09 | 10 | A.   Yes.   So these are about using a general purpose |
| 10:57:13 | 11 | computer.   You can find this description in your juror |
| 10:57:18 | 12 | notebooks in the '605 patent, Column 3.   It's about using |
| 10:57:23 | 13 | the -- the computers that people own or can easily acquire |
| 10:57:27 | 14 | to go ahead and deposit checks. |
| 10:57:31 | 15 | Q.   And how does this use of a general purpose computer to |
| 10:57:34 | 16 | deposit checks compare to other forms of depositing checks? |
| 10:57:38 | 17 | A.   Well, as you heard Mr. Brady say, and he held this -- |
| 10:57:41 | 18 | actually this apparatus I have a picture of here.   Prior to |
| 10:57:45 | 19 | this, you would have to go out and buy this specialized |
| 10:57:47 | 20 | scanner.   And it actually read the magnetic ink, you know, |
| 10:57:52 | 21 | if you -- if you look at a check that -- I happen to a have |
| 10:57:57 | 22 | one here.   That funny number on the bottom are magnetic ink |
| 10:58:01 | 23 | characters. |
| 10:58:01 | 24 | And so this thing actually goes through, and it |
| 10:58:04 | 25 | reads those characters.   So you'd have to use a device like |

10:58:06  1   that.   These are expensive.   They're usually purchased by
10:58:09  2   businesses or enterprises.   So the -- the invention here
10:58:12  3   does away with the need to do that or even have a magnetic
10:58:17  4   ink reader.
10:58:17  5   Q.   Is there a particular definition of general purpose
10:58:23  6   computer that you applied in your analysis?
10:58:25  7   A.   Yes, there is.   So a general purpose computer was
10:58:30  8   defined by the Court, and the definition that Your Honor
10:58:33  9   gave us was a computer that is not specialized for a
10:58:36  10  particular purpose.
10:58:36  11       So that's -- that's like your smartphone.   That's
10:58:40  12  a general purpose computer in there.   You can download any
10:58:42  13  apps you want and do anything you want.   I -- I do the
10:58:45  14  majority now of my email and actually even editing
10:58:49  15  documents on my smartphone these days.
10:58:51  16  Q.   And did you also consider the testimony of Wells Fargo
10:58:54  17  engineers about general purpose computers?
10:58:56  18  A.   I did.   So here is Mr. Nishant Usapkar.   He's a Wells
10:59:01  19  Fargo engineer.   He was asked under oath, and he said:   The
10:59:05  20  iPhone is a general purpose computer, yes.
10:59:07  21       So he agrees with me.
10:59:08  22  Q.   So could you give an example from the USAA patents of
10:59:13  23  how check deposit is accomplished using these consumer
10:59:19  24  devices?
10:59:19  25  A.   Yes.   So here's an excerpt.   This is from Column 10 of

10:59:23  1  the '605 patent.  And it talks about providing a software

10:59:25  2  component -- you see that 532, that's a reference to a

10:59:30  3  figure.  A lot of times when we read these, we skip over

10:59:32  4  them.  But anyway, a software component 532 to a computer

10:59:37  5  530.  That -- that's that software component.  That's that

10:59:40  6  downloadable app.

10:59:42  7  Q.  And what does the specification describe doing with

10:59:44  8  that downloadable component?

10:59:46  9  A.  Well, if we go a little later here -- thank you.  Thus,

10:59:50  10  while the computer 530 may be customer-controlled, the

10:59:54  11  customer downloads component 532 to facilitate deposit --

11:00:00  12  now, this is key -- thereby allowing the financial

11:00:03  13  institution to effectively control certain aspects of the

11:00:06  14  image generation and delivery process.

11:00:07  15       In essence, the financial institution is putting a

11:00:13  16  program in your phone that works like a teller at a bank.

11:00:17  17  Q.  Does the patent specification say anything else about

11:00:20  18  how this general purpose computer or consumer device can be

11:00:24  19  configured?

11:00:24  20  A.  Yes.  It talks about the general purpose computer may

11:00:27  21  be in a desktop or a laptop configuration.

11:00:31  22  Q.  And what is a laptop configuration in these patents?

11:00:33  23  A.  Yeah, you know, a laptop configuration, we all know, is

11:00:36  24  something that's self-contained, all the components in one

11:00:39  25  box, and it's battery-powered.

| | | |
|---|---|---|
| 11:00:44 | 1 | Q.  Does the patent give any particular examples of types |
| 11:00:47 | 2 | of computers that could be used with the invention? |
| 11:00:49 | 3 | A.  Yes.  Here's Figure 4 from the '605, and it's showing |
| 11:00:54 | 4 | some pretty conventional looking computers.  You'll see |
| 11:00:57 | 5 | that, right?  And it says:  The physical environment |
| 11:01:01 | 6 | depicted may show the connected devices as computers, such |
| 11:01:06 | 7 | as -- such illustration is merely exemplary.  And the |
| 11:01:09 | 8 | physical environment may be alternatively depicted or |
| 11:01:13 | 9 | described comprising various digital devices, such as a |
| 11:01:17 | 10 | PDA. |
| 11:01:17 | 11 | Q.  And what is a PDA -- or what was a PDA in 2006? |
| 11:01:20 | 12 | A.  We called handheld computers a personal digital |
| 11:01:27 | 13 | assistant back then. |
| 11:01:27 | 14 | Q.  And could you give an example of PDA that was available |
| 11:01:29 | 15 | in 2006? |
| 11:01:29 | 16 | A.  Yes.  I dug this up.  This is a picture of one that I |
| 11:01:33 | 17 | owned in 2006, and I was a proud owner of.  It was very |
| 11:01:41 | 18 | geek chic at the time.  It was a Palm TREO 700W smartphone. |
| 11:01:47 | 19 | It had a keyboard that you could enter things in.  It ran a |
| 11:01:47 | 20 | mini version of the Windows operating system.  It had a |
| 11:01:48 | 21 | touchscreen.  It had a D-pad, so you could move the mouse |
| 11:01:52 | 22 | around.  It had on the back a camera sensor so you could |
| 11:01:56 | 23 | take pictures.  And you could also download any app you |
| 11:01:59 | 24 | wanted into this phone. |
| 11:02:00 | 25 | THE COURT:  Dr. Conte, can you slow down a little |

11:02:04   1   bit?

11:02:05   2            THE WITNESS:  My apologies, Your Honor.  I might

11:02:06   3   have had too much coffee.  I will try --

11:02:09   4            THE COURT:  Well, no matter what you may or may

11:02:11   5   not have ingested, please slow down.

11:02:14   6            THE WITNESS:  I'm sorry, Your Honor.

11:02:16   7            THE COURT:  Go ahead, counsel.

11:02:17   8            MR. ROWLES:  I'll proceed, Your Honor.  Thank you.

11:02:21   9   Q.  (By Mr. Rowles)  Dr. Conte, is a PDA like this Palm

11:02:26   10  TREO you just spoke about a type of device that you could

11:02:27   11  have invented -- or, excuse me, could have implemented the

11:02:29   12  USAA invention with back in 2006?

11:02:30   13  A.  Yes.  In fact, at that time, there were also other

11:02:33   14  kinds of phones.  You know, the -- Apple didn't invent the

11:02:37   15  idea of a smartphone.  What happened was Apple is a great

11:02:42   16  company at marketing things.  And so Steve Jobs came out

11:02:45   17  wearing a turtleneck and jeans and held up this iPhone and

11:02:50   18  said, this is the iPhone.

11:02:51   19            But, honestly, that was a pretty bad smartphone

11:02:53   20  when it first came out.  A lot of us were shocked it didn't

11:02:57   21  have a keyboard.  You had to type on the glass.  And still

11:03:00   22  to this day, I can type faster on a physical keyboard than

11:03:03   23  I can on the iPhone.

11:03:06   24  Q.  Could you give some examples of types of devices that

11:03:10   25  could be used with the -- the USAA system described in

11:03:13   1   these patent specifications?

11:03:14   2   A.   Sure.   You know, the -- this system is durable.   It --

11:03:19   3   it really can be used with any consumer device.   All you

11:03:22   4   need is a general purpose computer and a camera.   And that

11:03:25   5   includes the Optimus -- LG Optimus Pro.   This looks a lot

11:03:32   6   like my dearly departed Palm TREO.   There is the Moto

11:03:33   7   Droid.   Here's an iPhone 11.   And -- and here's an iPad

11:03:38   8   Pro.   You'll see this thing looks -- essentially it's a

11:03:41   9   laptop.

11:03:43   10   Q.   And how do the consumer devices communicate with the

11:03:46   11   bank for check deposit?

11:03:48   12   A.   So the patent calls out -- and this is in Column 7.   It

11:03:52   13   calls out several different ways you can do communication.

11:03:56   14   And it goes through this list, Internet, Internet, one of

11:04:02   15   the ways it calls out is a cellular network.

11:04:05   16   Q.   Now, how -- we've talked about the general purpose

11:04:09   17   computer.   How is the general purpose computer in the USAA

11:04:13   18   patents connected to the -- the capture device?

11:04:15   19   A.   So the patent calls out that it's communicatively

11:04:20   20   coupled.   If I were to take a hammer and break apart my --

11:04:24   21   my Palm TREO -- well, it's not a Palm TREO.   I'm sorry, my

11:04:27   22   Google pixel here, you'll find the motherboard, and you'll

11:04:29   23   find the image sensor.   And it's connected with a ribbon

11:04:34   24   cable, with a wire to that motherboard.

11:04:36   25             And then the patent goes on and says:   The

11:04:38  1  computer may comprise software that allows the user to

11:04:41  2  control certain operations of the image capture -- capture

11:04:45  3  device.  You see this is just a sensor.

11:04:48  4        So there's software that runs on here.  In fact,

11:04:51  5  it's part of the Android operating system that let's you

11:04:54  6  read images off of that sensor.

11:04:57  7  Q.  Were you in the courtroom earlier today, Dr. Conte,

11:05:01  8  when there was discussion of a TWAIN diver or TWAIN

11:05:06  9  software?

11:05:06  10  A.  Yes.  TWAIN is a software object that let's you read

11:05:12  11  things off of an image sensor.  It's an acronym that stands

11:05:15  12  for technology without an interesting name.  I -- I kid you

11:05:21  13  not.

11:05:23  14        So TWAIN was one way to do it.  There's, of

11:05:26  15  course, a lot of different ways.  With the sensor

11:05:29  16  integrated in the phone, Android uses its own software

11:05:36  17  object to do that.

11:05:37  18  Q.  So to be clear, TWAIN software is one type of software

11:05:40  19  that could communicatively couple computers to capture

11:05:43  20  devices; is that right?

11:05:44  21  A.  Yeah, it's one kind.  I mean, the patent claims don't

11:05:46  22  say TWAIN.  So you can use any kind of software object.

11:05:55  23  Q.  Could you summarize for the jury the key features of

11:05:58  24  the USAA patents that we've just talked about?

11:05:59  25  A.  Sure.  So these are about check deposit using your own

11:06:02   1   devices.  And the bank controls that check deposit through

11:06:06   2   this downloadable app on your phone.  And you don't have to

11:06:08   3   go out and buy any specialized magnetic ink reader/scanner

11:06:16   4   kind of thing to do this.

11:06:17   5   Q.  Okay.  So what's the next step in your analysis?

11:06:19   6   A.  All right.  So now let's talk about the Wells Fargo

11:06:22   7   Mobile Deposit system.

11:06:32   8   Q.  So what is the system accused of infringement in this

11:06:32   9   case?

11:06:32  10   A.  It's shown here inside this red rectangle I have.  It

11:06:36  11   has servers that are back in the data center.  These are a

11:06:39  12   lot like the servers I built when I was at NCR.  And those

11:06:43  13   run specialized software that Wells Fargo wrote for

11:06:46  14   managing check deposits as they come in.

11:06:49  15           There's also a mobile app that runs on your phone

11:06:52  16   that talks to those servers.

11:06:55  17   Q.  And what role does the Wells Fargo software play in the

11:06:59  18   accused system?

11:07:00  19   A.  Well, the Wells Fargo software controls the entire

11:07:02  20   deposit process.

11:07:04  21   Q.  And so how in this case did you go about analyzing that

11:07:09  22   Wells Fargo software?

11:07:10  23   A.  Well, I analyzed the source code.

11:07:17  24           Now, what source code is, is what I teach computer

11:07:20  25   science students about.  It's really the set of

| | | |
|---|---|---|
| 11:07:24 | 1 | instructions that control a computer.  And I'm going to |
| 11:07:26 | 2 | show you some -- the pieces I'll show you I'll walk through |
| 11:07:30 | 3 | how they work. |
| 11:07:31 | 4 | The source code is really what allows the Wells |
| 11:07:34 | 5 | Fargo Mobile Deposit system to control your phone. |
| 11:07:36 | 6 | Q.  And what specific source code did you look at in this |
| 11:07:40 | 7 | case? |
| 11:07:40 | 8 | A.  So under direction of the Court, Wells Fargo produced |
| 11:07:46 | 9 | multiple copies of the source code for the Android version, |
| 11:07:50 | 10 | for the iPhone version, and for the server code.  And here |
| 11:07:54 | 11 | I'm showing all the versions I looked at.  I looked at all |
| 11:07:58 | 12 | of these versions. |
| 11:07:59 | 13 | I determined that all the versions use the USAA |
| 11:08:03 | 14 | patented technology we're talking about.  But I will focus |
| 11:08:09 | 15 | on versions that are the latest, which are 3.7.1 and 4.5.1, |
| 11:08:16 | 16 | since these are representative of all the other versions. |
| 11:08:19 | 17 | Q.  So are all of the different versions of the iPhone and |
| 11:08:21 | 18 | Android application and the server code software that were |
| 11:08:27 | 19 | reviewed all made by Wells Fargo? |
| 11:08:30 | 20 | A.  Yes. |
| 11:08:30 | 21 | Q.  And so who makes the Wells Fargo system, the system |
| 11:08:38 | 22 | accused of infringement? |
| 11:08:39 | 23 | A.  So Wells Fargo does.  Wells Fargo creates the Wells |
| 11:08:43 | 24 | Fargo Mobile Deposit system.  And the ingredients of that |
| 11:08:45 | 25 | are Wells Fargo's server -- their servers, right, both the |

11:08:49  1  hardware and the software.  And then the customer normal

11:08:54  2  device when it's under the direction of the Wells Fargo

11:08:57  3  created Mobile Deposit app.

11:08:58  4  Q.  And what does Wells Fargo do with the Wells Fargo

11:09:01  5  Mobile Deposit system?

11:09:01  6  A.  Well, using this system, Wells Fargo is able to accept

11:09:07  7  remote check deposits for mobile devices.  So Wells Fargo

11:09:10  8  ultimately controls all the software and hardware that is

11:09:13  9  used with the Wells Fargo Mobile Deposit system.

11:09:22  10  Q.  So that -- is that Wells Fargo software you looked at

11:09:25  11  sort of the glue that brings these pieces together?

11:09:28  12  A.  It's -- it's the glue that makes the system, yes.

11:09:32  13  Q.  Could you give some examples of how Wells Fargo

11:09:35  14  controls the Mobile Deposit process?

11:09:37  15  A.  Yes.  So here are some examples.  They come from two

11:09:40  16  different sources.  One is an Access FAQ that Wells Fargo

11:09:44  17  has on their website, and that's reproduced in PX-365 and

11:09:49  18  366.

11:09:50  19       Another is the Wells Fargo Online Access

11:09:53  20  Agreement.  That's in PX-1409 that you agree to when you

11:09:58  21  download the app.

11:10:00  22       So they say Wells Fargo customers must download

11:10:03  23  and install a compatible version of the Wells Fargo mobile

11:10:06  24  app from the App Store for their mobile devices.  If the

11:10:14  25  customer installs the app on an incompatible device, the

11:10:17    1    customer will not be able to mobile deposit checks.

11:10:21    2    Q.  So does Wells Fargo accept mobile deposits from mobile

11:10:25    3    devices that are not running the Wells Fargo application?

11:10:27    4    A.  No.  In fact, the agreement will tell you if you

11:10:31    5    attempt to do that, they can revoke your privilege to do

11:10:34    6    mobile deposit.

11:10:34    7    Q.  And did you find anything else in -- in these website

11:10:40    8    materials and -- and online agreement?

11:10:41    9    A.  Yes.  They say that Wells Fargo's customers must agree

11:10:45   10    to and abide by the Online Access Agreement in order to

11:10:49   11    make use of Wells Fargo's Mobile Deposit service.  Wells

11:10:54   12    Fargo's customers must follow Wells Fargo's instructions to

11:10:59   13    successfully mobile deposit checks with Wells Fargo.  And

11:11:02   14    the customer is required to submit images of sufficient

11:11:05   15    quality that can be processed for deposit.

11:11:11   16    Q.  Could you give the jury an overview of what this mobile

11:11:16   17    deposit process actually looks like in the accused system?

11:11:18   18    A.  Sure.  So what you do is you launch the app on your

11:11:20   19    phone.  And it will ask you to log in with a user name and

11:11:25   20    password.  Then after you do that, you can click these

11:11:28   21    three horizontal bars, and that opens a menu.  This menu

11:11:32   22    says things such as:  Go to account summary, deposit

11:11:36   23    checks, transfer and pay, account services, et cetera.

11:11:41   24         Let's say we choose -- oh, I'm sorry.

11:11:43   25    Q.  I apologize, Professor Conte, I didn't mean to speak

11:11:46  1   over you.

11:11:46  2           What happens if you select deposit checks?

11:11:48  3   A.  Okay.  By the way, the screenshots I'm going to

11:11:53  4   present, I believe, are in Exhibit 1402.

11:11:58  5           Let's say you select deposit checks.  What comes

11:12:01  6   up next is this screen.  And it asks you to choose a

11:12:04  7   deposit account.  Here I've chosen everyday checking.

11:12:11  8   Q.  What happens next?

11:12:12  9   A.  Next, it asks you to enter the deposit amount.

11:12:15  10  Q.  And what's the significance of the deposit button being

11:12:19  11  disabled at this point?

11:12:20  12  A.  So you cannot initiate deposit until after you've taken

11:12:25  13  a picture of the front and the back of the check.  That's

11:12:28  14  kind of like going through a drive-through at a bank and

11:12:31  15  you give them the deposit slip and you forget to give them

11:12:35  16  your check, they can't do the deposit, right?  So you can't

11:12:38  17  initiate that deposit until those two images are taken.

11:12:41  18  Q.  So how does the mobile device get the images of the

11:12:43  19  check?

11:12:43  20  A.  What it does is it has this direction here.  Take

11:12:47  21  photos of the front of check, back of check, and it has

11:12:50  22  some tips.  You can click on that.  It's a web link, and it

11:12:53  23  will pop up some tips.

11:12:55  24          And what you do is you press one of these two

11:12:58  25  buttons, either the -- the camera for the front of the

| | | |
|---|---|---|
| 11:13:01 | 1 | check or the camera for the back. |
| 11:13:02 | 2 | Q.  And what does that look like in the phone? |
| 11:13:04 | 3 | A.  So here's what shows up if you press front of check. |
| 11:13:09 | 4 | And what you'll see is it's the -- a camera app.  It says |
| 11:13:12 | 5 | front of check will take the photo or you can use the |
| 11:13:18 | 6 | camera button.  If you're too far away from the check, it |
| 11:13:20 | 7 | will say, hey, get closer. |
| 11:13:23 | 8 | Q.  And so once you've captured these check images or once |
| 11:13:28 | 9 | the mobile device has captured the check images, what |
| 11:13:33 | 10 | happens next? |
| 11:13:34 | 11 | A.  Okay.  When you capture both the front and the back of |
| 11:13:36 | 12 | the checks, it gives you pictures of that so you can see if |
| 11:13:38 | 13 | you want to retake them. |
| 11:13:39 | 14 | And now this is critical.  After you've done that, |
| 11:13:42 | 15 | in essence, you've given the bank your check.  So it |
| 11:13:45 | 16 | enables that deposit button. |
| 11:13:47 | 17 | Q.  And what happens after the deposit is submitted to the |
| 11:13:50 | 18 | bank? |
| 11:13:51 | 19 | A.  So let's say that you click that button.  Then what |
| 11:13:56 | 20 | comes back is a confirmation of deposit.  And this tells |
| 11:13:59 | 21 | you things, such as successfully deposited your check.  And |
| 11:14:03 | 22 | it gives a specific time, since Wells Fargo is a West Coast |
| 11:14:06 | 23 | bank.  It tells you the account that it's deposited into, |
| 11:14:10 | 24 | the amount.  It will tell you the date it's -- of deposit. |
| 11:14:16 | 25 | It will also tell you how much funds are available, and |

11:14:21  1  also the date they're available.  And then it gives you a

11:14:25  2  confirmation code.

11:14:27  3          So what this is, this is your receipt that you get

11:14:28  4  back from the teller, telling you you've successfully

11:14:32  5  deposited the check.

11:14:34  6  Q.  And did you prepare a video to -- excuse me, to

11:14:37  7  demonstrate those steps in practice?

11:14:39  8  A.  Yes.  I directed an actor to go ahead and deposit this

11:14:43  9  actual check we see here.  So we'll see this happen.

11:14:47  10          (Videoclip played.)

11:14:49  11  A.  So they're choosing deposit checks.  There's entering

11:14:52  12  the amount.  He enters $5.00.  Then he takes a picture of

11:15:04  13  the front of the check, says, hey, you're too far away, get

11:15:07  14  closer.  Then he's going to take a picture of the back of

11:15:13  15  the check.  Turns over the check.  It gives him a guide to

11:15:18  16  show him where the signature line should go.  Again, says

11:15:25  17  you're too far away.

11:15:30  18          Now, there are the two images.  And you see the

11:15:32  19  deposit button is enabled.  He presses that.  It

11:15:36  20  communicates with Wells Fargo's servers, and then there's

11:15:38  21  that confirmation receipt.

11:15:40  22  Q.  So what's the next step in your analysis?

11:15:43  23  A.  Well, now we're ready to go through the

11:15:46  24  element-by-element infringement analysis itself.

11:15:48  25  Q.  And what claims of the USAA patents did you analyze?

11:15:53  1   A.  I analyzed the claims that are asserted in this case.

11:15:57  2   Those are the '681, Claims 12, 13, 14, 20, 22, and 30.

11:16:05  3            And the '605, Claims 1, 3, 11, 12, 13, 14, and 20

11:16:12  4   [sic].

11:16:14  5   Q.  Was that 22, the last one?

11:16:15  6   A.  Yes, it was.  My apologies.  That was 22.

11:16:17  7   Q.  So let's look at Claim 12 of the '681 patent, and could

11:16:21  8   you please just orient the jury to the claim that you've

11:16:24  9   presented?

11:16:25  10  A.  Okay.  On the left is how the claim appears in your

11:16:28  11  juror notebook, if you look at the back of the patent.

11:16:31  12  It's pretty small writing.  It's kind of hard to parse.

11:16:35  13            So what I've done is I've broken that language out

11:16:37  14  into the table on the right.  And then I've labeled each

11:16:43  15  row of the table -- each of the elements A through K.

11:16:46  16  Q.  So before we begin in Claim 12, is there any particular

11:16:51  17  area of Claim 12 where there's some technical disagreement

11:16:54  18  between yourself and -- and Wells Fargo?

11:16:56  19  A.  Yes.  For Claim 12 of the 86 -- of the '681, there is

11:17:02  20  some disagreement about Element H.  So when we get to that

11:17:05  21  element, I'll tell you why I think the position of Wells

11:17:09  22  Fargo is incorrect.

11:17:10  23  Q.  And is it your understanding that there's no

11:17:18  24  disagreement that each of these other elements is present

11:17:20  25  in the system accused of infringement?

```
11:17:21   1   A.  Yes.  That's my understanding that Wells Fargo doesn't
11:17:23   2   contest that the other elements are present.
11:17:25   3   Q.  So let's begin with Element A.  What is Element A?
11:17:31   4   A.  So it's a system for allowing a customer to deposit a
11:17:34   5   check using the customer's own mobile device with a digital
11:17:38   6   camera, the system configured to ask the customer to log in
11:17:42   7   with a user name and password.
11:17:45   8           Now, the Court gave us a definition of mobile
11:17:48   9   device.  And that definition is:  Handheld computing
11:17:54  10   device.
11:17:55  11   Q.  And is it your understanding that that definition from
11:17:55  12   the Court, that that applies to the whole case; everyone
11:18:00  13   has to follow that definition?  Is that your understanding?
11:18:00  14   A.  Yes, that's my definition -- that's -- I'm sorry,
11:18:06  15   that's my understanding, yes.
11:18:07  16   Q.  Does Claim 12 of the '681 patent require a mobile
11:18:11  17   phone?
11:18:11  18   A.  No, just a mobile device.
11:18:12  19   Q.  Are there mobile devices that aren't mobile phones?
11:18:15  20   A.  Yes.  I showed you my -- my iPad here.
11:18:19  21   Q.  So what evidence did you look at for Element A of
11:18:23  22   Claim 12 of the '681 patent?
11:18:25  23   A.  Okay.  What I'm showing here is a table of devices that
11:18:29  24   Wells Fargo has tested that work with their mobile app.
11:18:33  25   And you'll see these testing procedures in PX-486 and
```

11:18:37  1   PX-487.

11:18:39  2         What you see on the right-hand column is what the

11:18:43  3   size of the digital camera sensor is.  And let me proudly

11:18:47  4   point out that that second line uses the 1.0 gigahertz

11:18:53  5   Scorpion.  That's the chip that I worked on.

11:18:56  6   Q.  So are all the devices used with the Wells Fargo system

11:18:59  7   mobile devices with digital cameras?

11:19:00  8   A.  Yes, they are.

11:19:01  9   Q.  And do Wells Fargo's engineers agree about that?

11:19:06  10  A.  Yes.  After Nishant Usapkar -- right after he said that

11:19:11  11  the iPhone is a general purpose computer, he was asked:

11:19:14  12  And it has a general-purpose camera on it, correct?

11:19:18  13        And he said:  Yeah, any mobile device will have a

11:19:23  14  general purpose camera on it, that's right.

11:19:26  15        So he agrees with me.

11:19:27  16  Q.  And what else did you look at for Element A of Claim

11:19:30  17  12?

11:19:30  18  A.  Also, this log-in using a user name and password.  And

11:19:33  19  when you first fire up the app, it's going to ask you for a

11:19:37  20  user name and password.

11:19:40  21  Q.  So is Element A of Claim 12 present?

11:19:43  22  A.  Yes, Element A is present in the Wells Fargo Mobile

11:19:47  23  Deposit system.

11:19:49  24  Q.  And so what did you analyze next?

11:19:51  25  A.  So next, let's move on to B, C, and D.  So B says:  A

11:19:57   1   customer's mobile device including:

11:19:59   2          C says:  Camera software that works with a digital

11:20:02   3   camera.

11:20:02   4          And D says:  A downloadable app associated with a

11:20:09   5   bank to work with the camera software, and it goes on to

11:20:11   6   say, to control submission of a check for deposit.

11:20:14   7          So let's talk about those two highlighted pieces.

11:20:17   8   Q.  So what did you look at in the Wells Fargo system

11:20:20   9   related to this downloaded app with -- with camera

11:20:24   10  software?

11:20:25   11  A.  Okay.  So let's say you want to make some money by

11:20:28   12  writing an iPhone app that you put in the Apple App Store.

11:20:33   13  What you do is you go to the document that's in the first

11:20:36   14  block here, that's called the developer's manual.  And what

11:20:38   15  it tells you is to use the camera, you have to use a

11:20:41   16  software object called AVCaptureSession.  That's the

11:20:47   17  equivalent of that TWAIN driver that we talked about.

11:20:50   18          In the next box, I'm showing you your first piece

11:20:53   19  of source code.  And let me just explain it quickly.

11:20:56   20          On the left you see that line number.  That's 594.

11:21:00   21  That's actually not part of the software.  That's just

11:21:02   22  there so I can reference the different lines.  But you'll

11:21:06   23  see that it uses that AVCaptureSession software.  Now

11:21:06   24  what's using that -- what's using that is the Wells Fargo

11:21:15   25  downloadable app, and it works with the camera software to

11:21:17    1    control submission of a check for deposit.

11:21:19    2    Q.  And is this software an example of that software that

11:21:25    3    communicatively couples the general purpose computer to the

11:21:28    4    image capture device that we talked about earlier?

11:21:30    5    A.  Yes, that's exactly what it is.

11:21:32    6    Q.  So are Elements B, C, and D present in Claim 12?

11:21:43    7    A.  Yes, they are.

11:21:43    8    Q.  And there's no dispute about that, right, to your

11:21:44    9    understanding?

11:21:44   10    A.  There's no dispute.

11:21:46   11    Q.  What is the next element that you looked at?

11:21:48   12    A.  This is instructing the customer to have a digital

11:21:51   13    camera take photos of the front and the back of the check.

11:21:54   14    Q.  So what did you look at for Element E?

11:21:57   15    A.  So I looked at two things.  One, we saw this screen

11:22:00   16    earlier, both in my walk-through and then in the video.

11:22:03   17    And this screenshot is in PX-1402.  But I also looked at

11:22:07   18    the code itself which is in DTX-11 to see where this screen

11:22:12   19    is built.  What this screen shows you is take photo, and

11:22:17   20    then it says front and back of check.

11:22:20   21    Q.  So is Element E present in the Wells Fargo system?

11:22:23   22    A.  Yes, it is.

11:22:24   23    Q.  And what about Element F, what did you look at for

11:22:27   24    that?

11:22:27   25    A.  So Element F says:  Displaying a graphical illustration

| | | |
|---|---|---|
| 11:22:31 | 1 | to assist the customer in taking the photos, the |
| 11:22:35 | 2 | illustration assisting the customer in placing the digital |
| 11:22:39 | 3 | camera a proper distance away from the check. |
| 11:22:43 | 4 | Q.  And is that done in the Wells Fargo system? |
| 11:22:45 | 5 | A.  Yes.  Again, we already saw this in both my |
| 11:22:49 | 6 | walk-through and then in the video.  And I also verified |
| 11:22:52 | 7 | that this is what's going on in the software itself in |
| 11:22:59 | 8 | DTX-11.  What it does is it gives you this frame, and it |
| 11:23:02 | 9 | will give you advice about the distance.  It will say, for |
| 11:23:06 | 10 | example, get closer. |
| 11:23:07 | 11 | Q.  And so what did you look at next? |
| 11:23:08 | 12 | A.  Next I looked at Element G, which is presenting the |
| 11:23:12 | 13 | photos of the check to the customer after the photos are |
| 11:23:14 | 14 | taken. |
| 11:23:15 | 15 | Q.  And does the Wells Fargo system do that, too? |
| 11:23:17 | 16 | A.  Yes, again, we saw that in the walk-through and the |
| 11:23:20 | 17 | video.  It presents photos of the check so that you can |
| 11:23:23 | 18 | decide whether or not they're good images.  And that I |
| 11:23:28 | 19 | verified by looking at the source code, DTX-11, and this |
| 11:23:32 | 20 | just shows you a little larger version of that, and it's |
| 11:23:35 | 21 | the same image. |
| 11:23:38 | 22 | Q.  So Element G, is that present in the Wells Fargo |
| 11:23:41 | 23 | system, as well? |
| 11:23:41 | 24 | A.  Yes, Element G is present, as well. |
| 11:23:44 | 25 | Q.  So what is Element H of Claim 12? |

11:23:48  1  A.  Element H is -- let's see if we can go through this.

11:23:53  2  Confirming that a mobile check deposit can go forward

11:23:55  3  after, and then the second part is, the system performs

11:24:00  4  optical character recognition on the check, where that

11:24:02  5  optical character recognition determines the amount of the

11:24:05  6  check and is going to read that -- that magnetic ink

11:24:09  7  character recognition number on the bottom of the check.

11:24:10  8  Q.  So, first, can you explain to the jury what optical

11:24:16  9  character recognition, or OCR, is?

11:24:17  10  A.  Yes.  I think I heard in Wells Fargo's opening that it

11:24:22  11  was old technology.  The only old technology is reading

11:24:25  12  printed text.

11:24:26  13      What OCR does is actually more like artificial

11:24:31  14  intelligence.  It has to be able to decode, as shown in

11:24:34  15  this example, the written by anybody penmanship for $5.00.

11:24:43  16  Imagine how many different people write the number 5 in

11:24:47  17  different ways.  It has to be able to determine all of

11:24:49  18  those.

11:24:49  19      It also determines the M-I-C-R line, the MICR, I

11:24:53  20  think if you -- I might say that, MICR instead of M-I-C-R.

11:24:57  21  That line is really the DNA of the check.  It gives you the

11:25:01  22  account number, it gives you the check number and the

11:25:03  23  routing number.  So every check is uniquely identified by

11:25:07  24  that MICR line.

11:25:08  25  Q.  And what -- what does the Wells Fargo system do with

11:25:14  1   this optical character recognition for check deposits?

11:25:17  2   A.  Well, imagine, if you will, that you entered $500.00 on

11:25:22  3   the form and then tried to submit a $5.00 check.  So what

11:25:26  4   the Wells Fargo system does is it looks at that and it very

11:25:32  5   politely says the amount you entered didn't match the

11:25:35  6   amount on the check photo.  But it could be that you either

11:25:38  7   accidentally or on purpose were trying to get away with

11:25:41  8   something.

11:25:42  9         It also looks at the MICR line, and if it can't

11:25:44  10  find that at all, it knows it isn't an image of a check

11:25:49  11  because all checks have that line on it.  So it will say,

11:25:52  12  couldn't process the check, take a new photo.  And these

11:25:54  13  are described in PX-1416, and, again, I verified where

11:26:00  14  these happened in the software itself in DTX-11.

11:26:04  15  Q.  So is the Wells Fargo's system validation of the check

11:26:09  16  amount and the MICR line part of its effort to prevent

11:26:14  17  fraud in mobile check deposits?

11:26:16  18  A.  I think so, yes, absolutely.  Like I said, imagine you

11:26:19  19  try to deposit a $5.00 check but you entered on the form

11:26:24  20  $500.00.  Wells Fargo will give you a credit of a hundred

11:26:27  21  dollars.  You've made $95.00 just by fooling the system.

11:26:31  22  Q.  Does this validation happen before that confirmation

11:26:35  23  message is displayed on the customer's device?

11:26:36  24  A.  Yes, it does.  So the validation message -- let's --

11:26:43  25  let's -- how to put this.

11:26:44  1          The optical character recognition is done before
11:26:48  2  you get the confirmation message.  So it's going to
11:26:52  3  check -- it makes sense, right?  It's going to check that
11:26:54  4  there aren't any errors in the check, that it can read the
11:26:58  5  account number, that the number you entered matches the
11:27:01  6  number on the check before it's going to do the deposit.
11:27:05  7  Q.  So if we think back to that video demonstration, this
11:27:10  8  validation is happening while the customer is kind of
11:27:12  9  waiting for that response back with the confirmation after
11:27:16  10  they've hit submit deposit; is that right?
11:27:18  11  A.  Yeah, that is exactly what's happening.
11:27:21  12  Q.  So this happens pretty quickly from the user's
11:27:23  13  perspective, right?
11:27:23  14  A.  Well, from the user's perspective, that's because the
11:27:27  15  servers are quite quick.
11:27:29  16  Q.  And so what happens after a successful validation of
11:27:35  17  the amount of the check and the MICR line?
11:27:37  18  A.  Okay.  So, as I said, you get that confirmation message
11:27:42  19  after those two things are done.
11:27:44  20          Wells Fargo, on their website, tells you, you'll
11:27:48  21  receive a confirmation message on your mobile device for
11:27:51  22  each successful deposit.
11:27:53  23          And sure enough, that's what we saw in both my
11:27:56  24  walk-through and in the video.  You get this confirmation
11:28:00  25  message.  This confirmation message is your receipt.

11:28:04   1   Q.  Is there a relationship between the confirmation

11:28:08   2   message that the mobile device displays and the optical

11:28:12   3   character recognition and analysis that happens on the

11:28:14   4   servers?

11:28:15   5   A.  Yes, there is.  So this is our first big piece of -- of

11:28:19   6   source code.

11:28:19   7   So let me describe and orient you to some of this.

11:28:24   8   You see what's in blue that's preceded with a double slash,

11:28:28   9   those are actually comments from the source code writer.

11:28:31  10   The source code writer puts in comments for other

11:28:34  11   programmers when they come along maybe to fix a bug.  And

11:28:38  12   it says, we load information from the server and use them

11:28:42  13   to populate the form.

11:28:43  14   Now, if you go some lines down, what I've done is

11:28:46  15   I've put, in this yellow rectangle, information that's

11:28:51  16   coming back from the server, and then I've highlighted how

11:28:54  17   it picks off the different pieces of that form.  You'll see

11:28:58  18   where it gets the account you deposit into, the amount, the

11:29:03  19   status, the confirmation code, the available amount data,

11:29:10  20   the available amount, et cetera.

11:29:11  21   Q.  Now, you mentioned earlier that Element H is one where

11:29:16  22   there's some disagreement or you understand there's some

11:29:18  23   disagreement by Wells Fargo.  Could you explain that?

11:29:20  24   A.  Wells Fargo says that the optical character recognition

11:29:25  25   doesn't happen on the server or can't happen on the server,

11:29:31  1  according to the claim.

11:29:32  2  Q.  Well, let me ask it this way:  Were you here during

11:29:36  3  opening statements, Dr. Conte?

11:29:37  4  A.  I was.

11:29:38  5  Q.  Do you recall when counsel for Wells Fargo described a

11:29:43  6  reason why they think the Wells Fargo system doesn't

11:29:46  7  infringe the USAA patents?

11:29:48  8  A.  I was.

11:29:49  9  Q.  And is it your understanding that their position is

11:29:53  10  they do this OCR on the server, and so that can't infringe

11:29:56  11  the patents?

11:29:58  12  A.  Yes, I understand that's their position.

11:30:00  13  Q.  And what's your response to that?

11:30:02  14  A.  Well, first, the patent calls out that it can happen on

11:30:09  15  the server.  Remember how I said this is a pretty

11:30:12  16  sophisticated algorithm.  You want to do it on your big

11:30:15  17  iron hardware.  You want to do it because it's going to

11:30:18  18  prevent someone from getting away with depositing a $5.00

11:30:21  19  check as a $500.00 check.  So you want to use the most

11:30:25  20  advanced version of software you've got.

11:30:27  21        Until fairly recently, mobile phones didn't have

11:30:31  22  that kind of computing power.  And so also, if I look at

11:30:37  23  the claim itself, it's clear that this happens or is

11:30:44  24  allowed to happen anywhere in the Wells Fargo system.

11:30:51  25  Q.  In Claim 12 of the '681 patent, what component of the

11:30:55  1  claim is required to perform the optical character

11:30:58  2  recognition on the check?

11:31:00  3  A.   The claim is really clear.   It says, the system.   It

11:31:04  4  doesn't say the customer's mobile device.   It says, the

11:31:08  5  system.

11:31:09  6  Q.   And what is the system in Claim 12?

11:31:11  7  A.   Well, read the claim.   It starts with a system for

11:31:20  8  allowing a customer to deposit a check, the system

11:31:22  9  including.   And it calls out the customer's mobile

11:31:27 10  device -- I've highlighted that here -- and a computer

11:31:29 11  associated with the bank.   That's the server.   So it's

11:31:30 12  saying anything in that red rectangle can do the optical

11:31:34 13  character recognition.   That's what the claim says.

11:31:36 14  Q.   So is there any problem with infringement of Claim 12

11:31:39 15  of the '681 patent based on doing OCR on a bank's server?

11:31:45 16  A.   No.

11:31:47 17  Q.   So is Element H of the claim -- of Claim 12 of the '681

11:31:52 18  patent present in the Wells Fargo system?

11:31:53 19  A.   It is.

11:31:54 20  Q.   And so what did you look at next?

11:31:56 21  A.   Next I looked at using a wireless network to transmit a

11:32:01 22  copy of the photos, and then submitting the check for

11:32:07 23  mobile deposit in the bank after the photos of the check

11:32:09 24  are presented to the customer.

11:32:10 25  Q.   And how does that work in the Wells Fargo system?

11:32:12  1    A.  Well, we saw that, right, that, first, when you take a

11:32:17  2    picture, it's not going to allow you to submit the copies

11:32:21  3    of the check until it's shown you the copies you've taken

11:32:27  4    of both sides of the check.

11:32:29  5           But another thing is that each time you take a

11:32:31  6    picture in the Wells Fargo system, it sends that picture to

11:32:34  7    the bank server.

11:32:38  8    Q.  And so what's the next element you looked at?

11:32:41  9    A.  The next element I looked at is a computer associated

11:32:44  10   with a bank.  That's the server -- programmed to update a

11:32:49  11   balance of an account to reflect the check submitted for

11:32:54  12   mobile check deposit.

11:32:55  13   Q.  And Element J specifically calls out a computer

11:32:59  14   associated with the bank; is that right?

11:33:01  15   A.  That's correct.

11:33:02  16   Q.  So when you analyze this claim element, updating a

11:33:04  17   balance of the account, that's something that has to happen

11:33:08  18   on a bank computer, right?

11:33:10  19   A.  That's correct.

11:33:12  20   Q.  And did you find that updating of account balances on

11:33:16  21   the Wells Fargo bank computers?

11:33:17  22   A.  Yes.  It would be no surprise to you that they actually

11:33:20  23   give you your money.  And this is where it happens.  This

11:33:22  24   is in DTX-11.  This is an excerpt from the source code on

11:33:25  25   the server's side.  And it says updateAccountInfo balance,

11:33:33   1   and that's what this code does.

11:33:33   2   Q.  So is Claim Element J present in the Wells Fargo

11:33:39   3   system?

11:33:39   4   A.  It is.

11:33:40   5   Q.  And what's the last element on your list there?

11:33:43   6   A.  So the last element is, the system configured to

11:33:45   7   generate a log file.  The -- the log file includes an image

11:33:48   8   of the check submitted for mobile deposit.

11:33:48   9   Q.  And did you find such a log file in the Wells Fargo

11:33:52   10  system?

11:33:52   11  A.  Yes.  Again, it's no surprise that Wells Fargo

11:33:55   12  maintains a log.

11:33:58   13  Q.  Let me ask.  Element K starts the system configured; is

11:34:03   14  that right?

11:34:03   15  A.  That's correct.

11:34:03   16  Q.  So is this another one of these elements where the

11:34:05   17  functionality could be on the mobile device or the bank

11:34:08   18  servers?

11:34:08   19  A.  Yes, it could be on the mobile device or the bank

11:34:14   20  server, anything in that red rectangle.

11:34:14   21  Q.  And in the Wells Fargo system, where does the log file

11:34:16   22  get generated?

11:34:17   23  A.  It gets generated on the server.  And I looked at the

11:34:21   24  source code, DTX-11.  And you'll see -- again, no surprise,

11:34:25   25  they keep a log of each check that gets deposited.  It

11:34:30  1  keeps a log of the customer account number, the check

11:34:33  2  amount -- that check DNA, the MICR information, the device

11:34:38  3  info, confirmation code, and then a bi-tonal TIFF check

11:34:45  4  image.

11:34:45  5  Q.  And what is a bi-tonal TIFF check image?

11:34:48  6  A.  So bi-tonal means black and white, and TIFF is a

11:34:52  7  specific format required by law for electronic deposits.

11:34:55  8  And so this is, in fact, the TIFF image of this check here.

11:35:01  9  Q.  And why does it have to be black and white?

11:35:03 10  A.  Because that's what the law says.

11:35:05 11  Q.  So are all the elements of Claim 12 of the '681 patent

11:35:13 12  present in the Wells Fargo system?

11:35:15 13  A.  Yes.  We've walked through each and every one, and I've

11:35:18 14  shown you my evidence.  They're all present.

11:35:20 15  Q.  And so what other claims did you look at in the '681

11:35:22 16  patent?

11:35:22 17  A.  Well, I looked at a number of other claims.  The good

11:35:28 18  news is, I think, that a lot of the evidence we just went

11:35:31 19  through is going to be the same evidence we need for the

11:35:34 20  other claims.  So the rest of what happens for all the

11:35:38 21  claims that come is going to happen a little faster.

11:35:40 22         I looked at Claim 13, 14, 20, and 22.  These are

11:35:45 23  dependent claims on Claim 12.  And then at Claim 30.

11:35:52 24  Q.  So what does Claim 13 add to Claim 12?

11:35:57 25  A.  So let's see, it says:  A system of Claim 12, wherein

11:36:00  1  the optical character recognition includes comparing the

11:36:03  2  determined amount to an amount indicated by the customer.

11:36:06  3      And we already saw that.  It does do that

11:36:09  4  comparison.  I verified that in the source code.  But also,

11:36:13  5  if it doesn't match, in my experimentation, you'll see this

11:36:18  6  error message pop up.

11:36:24  7  Q.  And so if the dollar amount you put in the application

11:36:24  8  doesn't match what's actually on the check, they're not

11:36:26  9  going to put that money in your bank account; is that how

11:36:29  10 it works?

11:36:29  11 A.  No, they -- they're not going to trust you on what you

11:36:31  12 said was on the check.

11:36:32  13 Q.  So is Claim 13 present in the Wells Fargo system?

11:36:38  14 A.  It is.

11:36:38  15 Q.  And so what does Claim 14 add to Claim 12?

11:36:41  16 A.  So Claim 14 adds:  Wherein the system is configured to

11:36:45  17 perform the update after it is determined that the -- that

11:36:49  18 there's some mark or signature on the back -- in the

11:36:53  19 endorsement location on the back of the check.

11:36:56  20 Q.  And does Wells Fargo look for a mark or signature in

11:37:00  21 that endorsement location?

11:37:02  22 A.  It does.  In fact, it looks for two things.  It looks

11:37:07  23 for a -- a customer signature, and but it also -- since

11:37:09  24 2018, checks have been showing up with this check box for

11:37:15  25 mobile remote deposit.  So it looks to see if you checked

| | | |
|---|---|---|
| 11:37:20 | 1 | that, as well. |
| 11:37:21 | 2 | Q.  So is Claim 14 present in the Wells Fargo system? |
| 11:37:26 | 3 | A.  It is. |
| 11:37:27 | 4 | Q.  And what's added in -- in Claim 20 to Claim 12? |
| 11:37:28 | 5 | A.  Claim 20 adds that the mobile app causes the customer's |
| 11:37:32 | 6 | mobile device to have an additional step of receiving input |
| 11:37:35 | 7 | from the user about the amount of the check. |
| 11:37:37 | 8 | Q.  And so are these dependent claims just sort of calling |
| 11:37:41 | 9 | out particular features of -- of the invention that might |
| 11:37:44 | 10 | be implemented? |
| 11:37:45 | 11 | A.  Yes, they are. |
| 11:37:46 | 12 | Q.  So let's look at Claim 22.  What -- what does Claim 22 |
| 11:37:52 | 13 | require? |
| 11:37:53 | 14 | A.  Claim 22 is the system of Claim 12 wherein the |
| 11:37:56 | 15 | confirming step takes place after a duplicate detection is |
| 11:38:00 | 16 | performed on the check. |
| 11:38:02 | 17 | Q.  And can you explain what duplicate detection is? |
| 11:38:05 | 18 | A.  Yeah.  The bank wants to make sure that someone doesn't |
| 11:38:10 | 19 | try to deposit the same check twice.  So what the bank does |
| 11:38:14 | 20 | is they look at the DNA, the MICR line, to see if that's |
| 11:38:17 | 21 | been already deposited. |
| 11:38:18 | 22 | Q.  And so a customer trying to deposit a check twice, is |
| 11:38:22 | 23 | that a type of fraud? |
| 11:38:24 | 24 | A.  Yes. |
| 11:38:24 | 25 | Q.  And is duplicate detection a way of preventing that |

| | | |
|---|---|---|
| 11:38:28 | 1 | fraud? |
| 11:38:28 | 2 | A.  Yes, absolutely. |
| 11:38:29 | 3 | Q.  Claim 22, that requires the duplicate detection to be |
| 11:38:38 | 4 | formed before confirming the deposit; is that your |
| 11:38:40 | 5 | understanding? |
| 11:38:40 | 6 | A.  Yes, that's my understanding. |
| 11:38:41 | 7 | Q.  And how did you determine that the Wells Fargo system |
| 11:38:45 | 8 | does that required duplicate detection? |
| 11:38:48 | 9 | A.  I did it two ways.  One is I looked in the source code, |
| 11:38:51 | 10 | and I found that it does that. |
| 11:38:53 | 11 |      The other way, though, is we have sworn testimony |
| 11:38:57 | 12 | of the Wells Fargo corporate representative, Mr. Arun |
| 11:39:04 | 13 | Darpally, and he said under oath, we look into our database |
| 11:39:07 | 14 | to see the same MICR line and the amount are already there |
| 11:39:12 | 15 | present in the database in the last 90 days.  If, yes, we |
| 11:39:16 | 16 | show the user the duplicate message. |
| 11:39:20 | 17 | Q.  Dr. Conte, I'm going to step back a couple slides, in |
| 11:39:23 | 18 | excess of caution, and ask you:  Is Claim 20 present in the |
| 11:39:26 | 19 | Wells Fargo system? |
| 11:39:27 | 20 | A.  Yes, Claim 20 was asking the user to enter an amount. |
| 11:39:31 | 21 | And, yes, that's present. |
| 11:39:33 | 22 | Q.  So what's the next claim in the '681 patent that you |
| 11:39:38 | 23 | looked at? |
| 11:39:38 | 24 | A.  I looked at Independent Claim 30. |
| 11:39:42 | 25 | Q.  And what does Claim 30 look like? |

11:39:44  1   A.  Well, in your notebook, it will look like this on the

11:39:48  2   left.  And what I've done again is I've used the larger

11:39:52  3   font.  And I've put it into a table, and I've labeled each

11:39:55  4   of the elements A through H.

11:39:58  5   Q.  And so what's the first element of Claim 30?

11:40:03  6   A.  The first element is a non-transitory computer-readable

11:40:07  7   medium storing an app that when downloaded and run by the

11:40:11  8   consumer's device, causes the customer's device -- the

11:40:14  9   customer's device to perform a mobile deposit.

11:40:17  10  Q.  And so this claim begins a little differently than

11:40:21  11  Claim 12 which started the system or a system; is that

11:40:23  12  right?

11:40:23  13  A.  Yeah.  My -- my understanding is that this is a way to

11:40:28  14  write a claim about a -- a piece of software.  And it

11:40:32  15  includes this idea of a non-transitory computer-readable

11:40:37  16  medium storing something -- storing an app.

11:40:39  17  Q.  And so are these Elements B through H, are those steps

11:40:44  18  that the Wells Fargo software causes the Wells Fargo system

11:40:51  19  to perform?

11:40:51  20  A.  Yes.  The Wells Fargo software causes the Wells system

11:40:53  21  to perform Steps B through H.

11:40:55  22  Q.  And did you determine if the Wells Fargo application is

11:40:57  23  stored on a computer-readable media?

11:41:00  24  A.  Yeah.  I tripled down on this.  So, first, it's stored

11:41:04  25  in non-transitory computer-readable media when it -- when

422

11:41:07  1    it's on your phone, right?  That's the flash storage on

11:41:10  2    your phone.

11:41:12  3         But, also, recall, you got that from an App Store.

11:41:15  4    Well, in the App Store, it's stored on a non-transitory

11:41:21  5    computer-readable media.  That's the disk on the server of

11:41:25  6    the App Store.

11:41:27  7         Now, a third example is, of course, the Wells

11:41:29  8    Fargo programmers stored the app on their own development

11:41:33  9    computer disk when they were developing the app.  So for

11:41:36  10   three different reasons Wells Fargo infringes this element.

11:41:41  11   Q.  And in that third example, is the Wells Fargo

11:41:44  12   application something that Wells Fargo makes?

11:41:45  13   A.  Yes.

11:41:46  14   Q.  And is the -- is Wells Fargo using a non-transitory

11:41:52  15   computer-readable medium to store that application?

11:41:54  16   A.  Yes, it is.

11:41:56  17   Q.  Would there be any way for Wells Fargo to distribute

11:42:02  18   its application to customers without doing that step?

11:42:04  19   A.  No, there would be no way.

11:42:05  20   Q.  So what did you look at next in Claim 30?

11:42:08  21   A.  Well, we could go through each of these, and you'll see

11:42:11  22   that it would be déjà vu.  So each of these elements are

11:42:17  23   present already, for reasons that I provided in Claim 12.

11:42:21  24   Q.  And can you explain for the jury how Claim 12 and

11:42:24  25   Claim 30 of the '681 patent match up?

11:42:27  1    A.  Yes.  What I've done here is with colors and arrows,

11:42:33  2    I've shown you how each element of Claim 12 that we already

11:42:37  3    showed infringed map to elements in Claim 30.

11:42:41  4            So, for example, E in 12 maps to B in 30.  And F

11:42:46  5    in 12 maps to C and D in 30, et cetera.

11:42:51  6    Q.  Is there a slight difference between how Element F, the

11:42:56  7    confirming limitation in Claim 30, is worded versus

11:43:01  8    Element H in Claim 12?

11:43:03  9    A.  Yes.  So actually, Element H is a little more

11:43:07  10   restrictive.  It says that the confirming happens after the

11:43:10  11   system performs optical character recognition.

11:43:13  12           F says just that the optical character recognition

11:43:15  13   is performed.

11:43:17  14   Q.  So it doesn't necessarily have to be performed by any

11:43:19  15   particular component in Claim 30?

11:43:21  16   A.  That's correct.

11:43:24  17   Q.  And so are -- are Claim Elements B through F met in --

11:43:29  18   in the Wells Fargo system, Claim 30?

11:43:30  19   A.  They are.

11:43:31  20   Q.  What's the next element that you looked at?

11:43:34  21   A.  It's Element G, which says, checking for errors.  Now,

11:43:38  22   we've already seen some of that, right?  We saw it check

11:43:42  23   for errors if the -- the check amount didn't match the

11:43:44  24   amount entered or if the MICR line wasn't on the check

11:43:49  25   image.

| | | |
|---|---|---|
| 11:43:49 | 1 | But also, there's other errors that it checks for. |
| 11:43:57 | 2 | Here's an example of an error that it checks for when it's |
| 11:43:59 | 3 | communicating with the server.  So this is on the mobile |
| 11:44:00 | 4 | app side.  And you'll see it says check for errors. |
| 11:44:04 | 5 | Q.  So is Element G present in the Wells Fargo system? |
| 11:44:06 | 6 | A.  Element G is also present. |
| 11:44:09 | 7 | Q.  And so what's the last element in Claim 30? |
| 11:44:12 | 8 | A.  The last element is, using a wireless network |
| 11:44:17 | 9 | transmitting a copy of photos over a public communication |
| 11:44:21 | 10 | network from the mobile device, submitting the check for |
| 11:44:25 | 11 | mobile deposit after the customer is authenticated, the |
| 11:44:29 | 12 | photos of the check presented to the customer, and the |
| 11:44:31 | 13 | customer's mobile device checking for errors. |
| 11:44:34 | 14 | So let's walk through that. |
| 11:44:36 | 15 | Q.  Well, how does that relate to Claim 12, or how does |
| 11:44:39 | 16 | that match up with what you've already talked about for |
| 11:44:45 | 17 | Claim 12? |
| 11:44:46 | 18 | A.  Well, that language about transmitting a copy of the |
| 11:44:48 | 19 | photos over a public communications network, that's also |
| 11:44:50 | 20 | present in Claim 12, Element I, and we saw that. |
| 11:44:53 | 21 | Q.  Are there some additional requirements in Claim H -- |
| 11:44:57 | 22 | or, excuse me, Element H of Claim 30? |
| 11:44:59 | 23 | A.  There are.  One is submitting the check for mobile |
| 11:45:04 | 24 | check deposit after the customer has authenticated.  So we |
| 11:45:08 | 25 | already went through that user name and password |

11:45:10    1    authentication.  And you can't submit until the photos are

11:45:17    2    presented because you don't have that button enabled,

11:45:22    3    right?  You can't even ask the teller inside your phone to

11:45:26    4    submit the check until it presents both images you took and

11:45:30    5    you can verify they're good images.

11:45:32    6            And also, the last piece of this is the mobile

11:45:36    7    device checks for errors.  And I just showed you that in

11:45:39    8    Element G.

11:45:40    9    Q.  Now, some of these steps you've talked about describe

11:45:47   10    different steps that happen during the mobile deposit

11:45:50   11    process in the Wells Fargo app, right?

11:45:52   12    A.  That's correct.

11:45:53   13    Q.  Are any of the elements of the claims in the '681

11:45:59   14    patent that you've analyzed steps that the customer

11:46:02   15    performs?

11:46:04   16    A.  No, none of these are -- are customer steps.

11:46:07   17    Q.  So what is actually performing these steps, like

11:46:10   18    presenting the photos or confirming the deposit in the

11:46:12   19    Wells Fargo system?

11:46:13   20    A.  The Wells Fargo software is doing this.

11:46:15   21    Q.  So is Element H of Claim 30 present in the Wells Fargo

11:46:19   22    system?

11:46:20   23    A.  Yes, it is.

11:46:21   24    Q.  And so could you summarize for the jury now what

11:46:26   25    conclusions you've reached with respect to the '681 patent

| | | |
|---|---|---|
| 11:46:30 | 1 | claims? |
| 11:46:30 | 2 | A.  All right.  So for all the evidence that I've shown |
| 11:46:33 | 3 | you, the asserted claims of the '681 patent I found were |
| 11:46:38 | 4 | present in the Wells Fargo Mobile Deposit system. |
| 11:46:41 | 5 | Q.  So moving on to the '605 patent, what claims did you |
| 11:46:45 | 6 | look at there? |
| 11:46:47 | 7 | A.  Here, I looked at Claim 12, 13, 14, and 22, and |
| 11:46:51 | 8 | Claim 1, 3, and 11.  And, again, you'll see much of the |
| 11:46:57 | 9 | same evidence I used in the '681 we can reuse here.  So |
| 11:47:04 | 10 | these will go a little faster. |
| 11:47:07 | 11 | Q.  So what does Claim 12 of the '605 patent look like? |
| 11:47:13 | 12 | A.  Claim 12 of the '605 is shown here.  It is labeled in |
| 11:47:22 | 13 | Rows A through N.  Again, on the left is how it appears in |
| 11:47:24 | 14 | your juror notebooks.  On the right, all I've done is I've |
| 11:47:27 | 15 | used a bigger font, made it a little easier to read. |
| 11:47:30 | 16 | Q.  And is it your understanding that for the -- for |
| 11:47:32 | 17 | Claim 12 of the '605 patent, there's actually no dispute |
| 11:47:37 | 18 | that any individual element is present in the accused Wells |
| 11:47:40 | 19 | Fargo system? |
| 11:47:41 | 20 | A.  That's correct.  It's my understanding that there's no |
| 11:47:43 | 21 | dispute about any of these claim elements. |
| 11:47:45 | 22 | Q.  Is there some correspondence between Claim 12 of the |
| 11:47:50 | 23 | '605 patent and the things you've discussed for the '681 |
| 11:47:54 | 24 | patent, as well? |
| 11:47:54 | 25 | A.  There is.  So on the left is the claim we're talking |

| | | |
|---|---|---|
| 11:48:00 | 1 | about.  On the right is Claim 12 of the '681.  And, again, |
| 11:48:04 | 2 | I've shown you a mapping using color coding and arrows of |
| 11:48:10 | 3 | how Element A through I of Claim 12 of the '605 patent map |
| 11:48:15 | 4 | to Element A through G and I of Claim 12 of the '681. |
| 11:48:20 | 5 | Q.  So are Elements A through I of Claim 12 of the '605 |
| 11:48:25 | 6 | patent present in the Wells Fargo system? |
| 11:48:26 | 7 | A.  They are. |
| 11:48:29 | 8 | Q.  So moving on to Elements J through N, how did that |
| 11:48:34 | 9 | correspond to the analysis you've done for the '681 patent? |
| 11:48:38 | 10 | A.  So J through N map to Elements H, J, and K in Claim 12, |
| 11:48:46 | 11 | and you can see that, for example, Element J is essentially |
| 11:48:50 | 12 | the same element.  Element K is -- of the Claim 12 is |
| 11:48:57 | 13 | divided into two parts here, K and N, in Claim 12 of the |
| 11:49:06 | 14 | '605, and then Element H is divided into two elements in |
| 11:49:13 | 15 | the '605 patent, Claim 12, L and M.  But they're all |
| 11:49:16 | 16 | present. |
| 11:49:17 | 17 | Q.  And do you see Element K says the system configured to |
| 11:49:22 | 18 | perform additional steps including; do you see that? |
| 11:49:24 | 19 | A.  Yes, I do. |
| 11:49:25 | 20 | Q.  And then what's the -- what's the Element L under that? |
| 11:49:28 | 21 | A.  The Element L is that confirming that the mobile check |
| 11:49:33 | 22 | deposit can go forward after performing optical character |
| 11:49:36 | 23 | recognition.  So that's saying -- calling out rather |
| 11:49:41 | 24 | explicitly that the system performs the optical character |
| 11:49:46 | 25 | recognition. |

11:49:46   1   Q.   And is that any different from that claim element we

11:49:50   2   looked at in '681 patent Claim 12?

11:49:52   3   A.   No, it's not.  The '681, again, calls out that the

11:49:58   4   system, that whole rectangular red box of the server and

11:50:00   5   the app running on the phone can perform optical character

11:50:04   6   recognition.  It can happen anywhere in that box.

11:50:06   7   Q.   But is it your understanding that Wells Fargo disagrees

11:50:11   8   about that element in Claim 12 but not in -- excuse me,

11:50:14   9   Claim 12 -- let me strike that and just start that over.

11:50:17  10        Is it your understanding that Wells Fargo

11:50:19  11   disagrees that the confirming limitation is met in Claim 12

11:50:23  12   of the '681 patent but has no such disagreement about the

11:50:28  13   same element in Claim 12 of the '605 patent?

11:50:30  14   A.   Yes, that's my understanding.

11:50:34  15   Q.   So are Elements J through N in the '605 patent Claim 12

11:50:39  16   present in the Wells Fargo system?

11:50:41  17   A.   They are.

11:50:41  18   Q.   And so what's the next independent claim that you

11:50:46  19   looked at in the '605 patent?

11:50:47  20   A.   I looked at Claim 1.

11:50:50  21   Q.   And can you give the jury a sense of what Claim 1 looks

11:50:54  22   like?

11:50:55  23   A.   Claim 1 is perhaps the longest claim here.  So you'll

11:50:59  24   see it on the left there, and, again, I've broken it into a

11:51:03  25   table with a bigger font, and I've given each of the rows,

11:51:06  1   each of the elements the label A through O.

11:51:10  2        THE COURT:  Let me interrupt.  Before we dive into

11:51:13  3   A through O, the jury's lunch is in the jury room, waiting

11:51:16  4   for them, I've been advised by the clerk.  So we're going

11:51:19  5   to take this opportunity to recess for lunch.

11:51:23  6        Ladies and gentlemen of the jury, if you'll take

11:51:24  7   your notebooks with you to the jury room over the lunch

11:51:27  8   hour.  If you'll follow all the instructions I've given

11:51:30  9   you, including, as you would expect me to remind you, not

11:51:33  10  to discuss the case with each other.  And we'll be back to

11:51:36  11  continue with this testimony after we break for lunch.

11:51:38  12        It's about 10 minutes until 12:00 now.  We'll

11:51:42  13  attempt to reconvene somewhere around 12:30, 12:40.

11:51:49  14        With that, the jury is excused for lunch.

11:51:52  15        COURT SECURITY OFFICER:  All rise.

11:51:53  16        (Jury out.)

11:51:54  17        THE COURT:  The Court stands in recess for lunch.

18        (Recess.)

19

20

21

22

23

24

25

430

```
 1                      CERTIFICATION

 2

 3        I HEREBY CERTIFY that the foregoing is a true and

 4   correct transcript from the stenographic notes of the

 5   proceedings in the above-entitled matter to the best of my

 6   ability.

 7


 8


 9    /S/ Shelly Holmes   _____        1/7/2020____
     SHELLY HOLMES, CSR, TCRR             Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```