12:44:22

1     IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF TEXAS
2       MARSHALL DIVISION

3 UNITED SERVICES AUTOMOBILE )(
 ASSOCIATION
4          )(  CIVIL ACTION NO.

5 VS.       )(  2:18-CV-366-JRG

6          )(  MARSHALL, TEXAS
             JANUARY 7, 2020
7 WELLS FARGO BANK, N.A.  )(  12:44 P.M.

8

9      TRANSCRIPT OF JURY TRIAL

10      AFTERNOON SESSION

11   BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12      UNITED STATES DISTRICT JUDGE

13

 APPEARANCES:
14

15 FOR THE PLAINTIFF:

16
 JASON SHEASBY
17 ANTHONY ROWLES
 LISA GLASSER
18 IRELL & MANELLA
 1800 Avenue of the Stars
19 Suite 900
 Los Angeles, CA 90067-4276
20

21
 ROBERT CHRISTOPHER BUNT
22 PARKER, BUNT & AINSWORTH, PC
 100 East Ferguson
23 Suite 418
 Tyler, TX 75702
24

25

```
 1    FOR THE DEFENDANT:

 2
      THOMAS M. MELSHEIMER
 3    M. BRETT JOHNSON
      MICHAEL A. BITTNER
 4    J. TRAVIS UNDERWOOD
      WINSTON & STRAWN LLP
 5    2121 North Pearl Street
      Suite 900
 6    Dallas, TX 75201

 7
      E. DANIELLE T. WILLIAMS
 8    WINSTON & STRAWN LLP
      300 South Tyron Street
 9    16th Floor
      Charlotte, NC 28202
10

11    MATTHEW R. MCCULLOUGH
      WINSTON & STRAWN LLP
12    275 Middlefield Road
      Suite 205
13    Menlo Park, CA 94025

14
      JACK WESLEY HILL
15    WARD, SMITH & HILL, PLLC
      P.O. Box 1231
16    1507 Bill Owens Parkway
      Longview, TX 75606
17

18
      COURT REPORTER:     Shelly Holmes, CSR, TCRR
19                        Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas  75670
22                        (903) 923-7464

23
      (Proceedings recorded by mechanical stenography, transcript
24    produced on a CAT system.)

25
```

| | | |
|---|---|---|
| | 1 | P R O C E E D I N G S |
| 12:44:23 | 2 | (Jury out.) |
| 12:44:23 | 3 | COURT SECURITY OFFICER:  All rise. |
| 12:44:50 | 4 | THE COURT:  Be seated, please. |
| 12:44:50 | 5 | Mr. Rowles, are you prepared to continue with your |
| 12:45:00 | 6 | examination of the witness? |
| 12:45:01 | 7 | MR. ROWLES:  We're ready to proceed, Your Honor. |
| 12:45:02 | 8 | THE COURT:  All right.  Then let's bring in the |
| 12:45:04 | 9 | jury. |
| 12:45:12 | 10 | COURT SECURITY OFFICER:  All rise. |
| 12:45:19 | 11 | (Jury in.) |
| 12:45:21 | 12 | THE COURT:  Welcome back, ladies and gentlemen. |
| 12:45:37 | 13 | Please be seated. |
| 12:45:37 | 14 | We will continue with the direct examination of |
| 12:45:46 | 15 | Dr. Tom Conte by the Plaintiff.  Mr. Rowles, you may |
| 12:45:52 | 16 | continue. |
| 12:45:53 | 17 | MR. ROWLES:  Thank you, Your Honor. |
| 12:45:53 | 18 | TOM CONTE, PH.D., PLAINTIFF'S WITNESS, PREVIOUSLY SWORN |
| 12:45:53 | 19 | DIRECT EXAMINATION CONTINUED |
| 12:45:55 | 20 | BY MR. ROWLES: |
| 12:45:55 | 21 | Q.  Good afternoon, Professor Conte. |
| 12:45:57 | 22 | A.  Good afternoon. |
| 12:45:57 | 23 | Q.  Before the lunch break we were about to get into the |
| 12:46:00 | 24 | '605 patent, Claim 1; is that right? |
| 12:46:02 | 25 | A.  That's correct. |

12:46:03  1   Q.  And so could you describe generally Claim 1 of the '605

12:46:08  2   patent?

12:46:08  3   A.  So what I've shown on the left here is the way it

12:46:14  4   appears in your juror notebooks, and on the right, again,

12:46:17  5   is a table where I made it larger and labeled it A

12:46:23  6   through O.

12:46:23  7   Q.  And Element B there mentions a portable device; do you

12:46:28  8   see that?

12:46:29  9   A.  I see that, yes.

12:46:29  10  Q.  Does Claim 1 of the '605 patent require a mobile phone?

12:46:33  11  A.  No, it does not.

12:46:34  12  Q.  Do any of the asserted claims of the USAA patents

12:46:40  13  require a mobile phone?

12:46:40  14  A.  No, they do not require that, no.

12:46:42  15  Q.  What's the first -- well, let me -- let me say this:

12:46:46  16  What's the correspondence between Claim 1 of the '605

12:46:50  17  patent and the '681 patent, Claim 12 analysis, that we

12:46:54  18  talked about before lunch?

12:46:56  19  A.  Well, I'm showing it here.  You can see that A, B, C,

12:47:03  20  and D correspond between both of the claims.  So does E.

12:47:11  21  F in Claim 12 is broken into two pieces, and Claim 1 of the

12:47:15  22  '605 patent, that would be F and G.

12:47:21  23        G in Claim 12 of the '681 is now H in the '605.

12:47:28  24  And then I is a little more wordy, but it's, in essence,

12:47:33  25  the same element as I and J in the -- in Claim 1 of the

| | | |
|---|---|---|
| 12:47:39 | 1 | '605. |
| 12:47:39 | 2 | Q.  So are Elements A through J of Claim 1 of the '605 |
| 12:47:42 | 3 | patent present in the Wells Fargo system? |
| 12:47:44 | 4 | A.  They are, although that's only half the claim, so... |
| 12:47:49 | 5 | Q.  And as to Elements A through J, is there any dispute |
| 12:47:53 | 6 | about that? |
| 12:47:53 | 7 | A.  No, there is no dispute. |
| 12:47:55 | 8 | Q.  And so what are the remaining elements of Claim 1? |
| 12:47:58 | 9 | A.  So there is Element K, and then there's Element L, M, |
| 12:48:06 | 10 | N, and O, and K, if you put together the evidence that I've |
| 12:48:12 | 11 | shown for Element B and -- and J in the -- I'm sorry, |
| 12:48:19 | 12 | Element B -- let me just go by the coloring. |
| 12:48:26 | 13 | So K and O match B and J in the Claim 12 of the |
| 12:48:30 | 14 | '681. |
| 12:48:30 | 15 | And then the claim elements L and M in Claim 1 of |
| 12:48:39 | 16 | the '605 I can show the same evidence as I showed in |
| 12:48:42 | 17 | Claim H of the '681. |
| 12:48:45 | 18 | And then, finally, there is this generating a log |
| 12:48:49 | 19 | file for deposit, we saw that, and that was K in Claim 12 |
| 12:48:55 | 20 | of the '681.  It's now also in N of Claim 1. |
| 12:49:00 | 21 | Q.  And so Claim 1 of the '605 patent also has one of these |
| 12:49:03 | 22 | confirming that the deposit can go forward limitations; is |
| 12:49:07 | 23 | that right? |
| 12:49:07 | 24 | A.  That's correct. |
| 12:49:07 | 25 | Q.  Are you relying on the same evidence for this claim as |

| | | |
|---|---|---|
| 12:49:10 | 1 | you did for the '681 patent earlier? |
| 12:49:13 | 2 | A.  I am. |
| 12:49:14 | 3 | Q.  But is it your understanding that there's not actually |
| 12:49:16 | 4 | any dispute about that confirming element in Claim 1 of the |
| 12:49:20 | 5 | '605 patent? |
| 12:49:20 | 6 | A.  Yes, that's my understanding. |
| 12:49:22 | 7 | Q.  So let me ask, are Elements K through O of Claim 1 |
| 12:49:28 | 8 | present in the Wells Fargo system? |
| 12:49:29 | 9 | A.  They are.  I prepared this presentation, and I should |
| 12:49:31 | 10 | have put a checkmark on O, as well. |
| 12:49:36 | 11 | Q.  So what -- what's left in the '605 patent to talk |
| 12:49:39 | 12 | about? |
| 12:49:40 | 13 | A.  We have some dependent claims to speak about, 13, 14, |
| 12:49:44 | 14 | 22, 3, and 11. |
| 12:49:46 | 15 | Q.  So could you speak first about Claims 3 and 14 of the |
| 12:49:53 | 16 | '605 patent?  What do those dependent claims require? |
| 12:49:56 | 17 | A.  3 and 14 are worded the same, but 3 refers to Claim 1, |
| 12:50:01 | 18 | and 14 to Claim 12.  And these are the -- the elements that |
| 12:50:04 | 19 | talk about the system configured to perform the update |
| 12:50:08 | 20 | after the system determines that some mark or signature is |
| 12:50:12 | 21 | present in an endorsement location on the backside of the |
| 12:50:15 | 22 | check in the electronic images. |
| 12:50:18 | 23 | Q.  And did you find that functionality in the Wells Fargo |
| 12:50:20 | 24 | system? |
| 12:50:20 | 25 | A.  I did, both in the code and also in experimentation, |

12:50:25  1  and you see that here.

12:50:26  2  Q.  So are Claims 3 and 14 of the '605 patent present in

12:50:32  3  the Wells Fargo system?

12:50:32  4  A.  They are.

12:50:33  5  Q.  And what does Claim 13 of the '605 patent require?

12:50:38  6  A.  It requires, the optical character recognition includes

12:50:41  7  comparing the determined amount to an amount indicated by

12:50:44  8  the customer.

12:50:45  9       And we saw this error message here.  I've -- where

12:50:51  10  before I blew up the error message part, I'm showing you

12:50:55  11  the whole screen, and it shows you the amount that the

12:50:58  12  customer entered, and then it says, hey, your amount

12:51:02  13  doesn't match what's on the check.

12:51:03  14  Q.  So is Claim 13 calling out that same mobile deposit

12:51:08  15  fraud prevention feature you looked at for the '681 patent?

12:51:10  16  A.  It is.  And, again, I verified all of this by going

12:51:14  17  through all the source code in DTX-11.

12:51:16  18  Q.  And so what do Claims 11 and 22 of the '605 patent

12:51:21  19  require?

12:51:22  20  A.  So these, again, have very similar wording.  Claim 11

12:51:27  21  is referring to Claim 1, and Claim 22 is referring to

12:51:32  22  Claim 12.  And they speak of wherein the confirming occurs

12:51:37  23  after performing a duplicate detection.

12:51:41  24  Q.  Is this the same duplicate detection process you talked

12:51:44  25  about for the '681 patent?

| 12:51:46 | 1 | A.  It is, and for the same reasons, including Wells |
| 12:51:49 | 2 | Fargo's corporate representative in his sworn testimony and |
| 12:51:54 | 3 | my review of the source code, that's present in the Wells |
| 12:51:58 | 4 | Fargo Mobile Deposit system. |
| 12:51:58 | 5 | Q.  So are Claims 11 and 22 of the '605 patent present in |
| 12:52:02 | 6 | the Wells Fargo system? |
| 12:52:03 | 7 | A.  Yes, they are. |
| 12:52:05 | 8 | Q.  So could you summarize for the jury what you concluded |
| 12:52:10 | 9 | about the asserted claims of the '605 patent? |
| 12:52:12 | 10 | A.  The asserted claims of the '605 patent are present in |
| 12:52:18 | 11 | the Wells Fargo Mobile Deposit system, and to my knowledge, |
| 12:52:20 | 12 | there are no disputed elements. |
| 12:52:23 | 13 | Q.  So based on all the technical analysis you've conducted |
| 12:52:26 | 14 | and presented today, what have you concluded about |
| 12:52:29 | 15 | infringement of the '681 and the '605 patents? |
| 12:52:31 | 16 | A.  So for all the reasons I've presented, the Wells Fargo |
| 12:52:36 | 17 | Mobile Deposit system infringes the '681 and the '605 |
| 12:52:41 | 18 | asserted claims. |
| 12:52:43 | 19 | Q.  Now, in the examples you walked through when we were |
| 12:52:47 | 20 | talking about the claimed functionality, the examples were |
| 12:52:51 | 21 | on sort of an iPhone-type device; is that right? |
| 12:52:54 | 22 | A.  The example was an iPhone device, yes. |
| 12:52:55 | 23 | Q.  Does the infringing Wells Fargo system work with other |
| 12:52:58 | 24 | types of mobile devices? |
| 12:52:59 | 25 | A.  It does.  It works on an -- on an iPad, as well.  For |

12:53:08  1  example, it works on a whole range of devices, Android

12:53:11  2  devices, devices with and without keyboards.

12:53:14  3  Q.  And so what do you make of that, that the claimed

12:53:17  4  systems work on this wide range of customer devices?

12:53:21  5  A.  So this matches the durability that I mentioned in the

12:53:28  6  USAA patented system.

12:53:31  7  Q.  Now, earlier today, we talked about some different

12:53:36  8  versions of the software applications and the server

12:53:39  9  software.  Do you remember that?

12:53:41 10  A.  I do.

12:53:42 11  Q.  Are these different -- these are versions of the

12:53:45 12  software that Wells Fargo produced in this case under that

12:53:48 13  protective order that you mentioned; is that right?

12:53:50 14  A.  Yes, under the protective order, and I reviewed all the

12:53:54 15  versions.  And just to reiterate, I found that all the

12:53:57 16  versions use the same technology.  And so based on my

12:54:02 17  analysis, all the versions also read against the USAA

12:54:08 18  patented inventions.

12:54:09 19  Q.  So just to be clear, you reviewed every version of the

12:54:14 20  iPhone and Android application, as well as the server code

12:54:17 21  that Wells Fargo made available to you and to USAA in this

12:54:21 22  case; is that right?

12:54:22 23  A.  That's correct.  There -- there were earlier versions,

12:54:24 24  I imagine, but they made versions available back to May of

12:54:28 25  2014.

| | | |
|---|---|---|
| 12:54:28 | 1 | Q.  And so looking at this chart, the earliest version that |
| 12:54:32 | 2 | was made available to you was this 2.0.6 version in May |
| 12:54:36 | 3 | 2014? |
| 12:54:36 | 4 | A.  Yes, and the server code -- code version of 3.4.2.2. |
| 12:54:41 | 5 | Q.  Now, were there versions of that Wells Fargo |
| 12:54:46 | 6 | application that were released after the patents issued in |
| 12:54:52 | 7 | July of 2018? |
| 12:54:53 | 8 | A.  Yes.  When the patent was issued, version 3.1.3 and 4.5 |
| 12:54:59 | 9 | of the server code were in effect, and then Wells Fargo |
| 12:55:02 | 10 | released version 3.7.1 for the iPhone and 3.7 for the |
| 12:55:08 | 11 | Android and then updated Android to 3.7.1.  And also the |
| 12:55:13 | 12 | server code was released as version 4.5.1, all after the |
| 12:55:19 | 13 | patents issued. |
| 12:55:20 | 14 | Q.  And has Wells Fargo been using the Wells Fargo Mobile |
| 12:55:23 | 15 | Deposit system continuously since July 2018? |
| 12:55:26 | 16 | A.  Yes, they have.  On average, they've made six million |
| 12:55:31 | 17 | successful deposits per month with this infringing Wells |
| 12:55:37 | 18 | Fargo Mobile Deposit system. |
| 12:55:37 | 19 | Q.  And just for the record, does that -- that data come |
| 12:55:43 | 20 | from Plaintiff's Exhibit 1399? |
| 12:55:45 | 21 | A.  It does.  I didn't come up with that number myself. |
| 12:55:48 | 22 | Q.  So each of those six million successful mobile deposits |
| 12:55:52 | 23 | per month with the Wells Fargo system, is it your opinion |
| 12:55:56 | 24 | that every one of those deposits uses all of that claimed |
| 12:55:58 | 25 | functionality that you discussed earlier today? |

441

```
12:56:00   1   A.  Yes, it is.

12:56:03   2   Q.  Thank you, Professor Conte.

12:56:06   3            MR. ROWLES:  I pass the witness.

12:56:07   4            THE COURT:  All right.  Cross-examination by the

12:56:08   5   Defendant.

12:56:12   6            MR. MELSHEIMER:  May it please the Court.

12:56:15   7            THE COURT:  Proceed when you're ready,

12:56:17   8   Mr. Melsheimer.

12:56:18   9            MR. MELSHEIMER:  Thank you, Your Honor.

12:56:18  10                      CROSS-EXAMINATION

12:56:19  11   BY MR. MELSHEIMER:

12:56:19  12   Q.  Dr. Conte, good afternoon.

12:56:21  13   A.  Good afternoon.

12:56:22  14   Q.  Let's see if we can agree on a few things, if that's --

12:56:26  15   if that's all right with you?

12:56:27  16   A.  Yes.

12:56:28  17   Q.  I want to talk to you about some things that the 13

12:56:34  18   claims in these patents do not claim to have invented.  Are

12:56:37  19   you with me?

12:56:37  20   A.  Okay.

12:56:41  21   Q.  All right.  So the patents in this case did not invent

12:56:44  22   the concept of checking accounts generally, right?

12:56:48  23   A.  That's correct.

12:56:48  24   Q.  Checking accounts have been around almost as long as

12:56:52  25   we've had banks; isn't that right, sir?
```

| | | |
|---|---|---|
| 12:56:53 | 1 | A.  I -- I wouldn't know.  I would assume so. |
| 12:56:57 | 2 | Q.  When did you get your first checking account? |
| 12:56:58 | 3 | A.  When I was 16. |
| 12:57:00 | 4 | Q.  Okay.  So that was about 10 years ago? |
| 12:57:03 | 5 | A.  Maybe a little more. |
| 12:57:05 | 6 | Q.  A little bit longer than that.  Maybe about 30 -- 40, |
| 12:57:08 | 7 | 50 years ago? |
| 12:57:09 | 8 | A.  I wouldn't want to speculate. |
| 12:57:10 | 9 | Q.  You're under oath, sir. |
| 12:57:13 | 10 | So I want to focus on -- on checking. |
| 12:57:17 | 11 | The patents in this case did not claim to invent |
| 12:57:22 | 12 | those odd-looking numbers at the bottom of the check that |
| 12:57:25 | 13 | you've described as the MICR line, right? |
| 12:57:27 | 14 | A.  That's correct. |
| 12:57:28 | 15 | Q.  What does MICR stand for, remind me? |
| 12:57:31 | 16 | A.  Magnetic ink character recognition. |
| 12:57:32 | 17 | Q.  And that is something -- USAA didn't invent that, |
| 12:57:38 | 18 | right? |
| 12:57:38 | 19 | A.  No. |
| 12:57:40 | 20 | Q.  And that was invented, as I understand it, many decades |
| 12:57:44 | 21 | ago in the late 1960s.  Does that sound right to you? |
| 12:57:48 | 22 | A.  I don't know the exact date.  But I'll accept that. |
| 12:57:50 | 23 | That sounds reasonable. |
| 12:57:51 | 24 | Q.  So once a check is deposited, Doctor, there's a lot of |
| 12:57:57 | 25 | item processing that goes along with that check.  Are you |

| | | |
|---|---|---|
| 12:58:00 | 1 | familiar with that concept? |
| 12:58:01 | 2 | A.  Yes. |
| 12:58:02 | 3 | Q.  Did you hear Mr. Oakes, one of the inventors who was |
| 12:58:07 | 4 | brought by video deposition, talk about this concept of |
| 12:58:11 | 5 | item processing? |
| 12:58:12 | 6 | A.  Yes, I did. |
| 12:58:14 | 7 | Q.  USAA didn't invent the concept of item or check |
| 12:58:19 | 8 | processing, right? |
| 12:58:21 | 9 | A.  I don't think that's entirely accurate. |
| 12:58:23 | 10 | Q.  Well, did you hear him say that there was this whole |
| 12:58:26 | 11 | back end of item processing once the check got into the |
| 12:58:32 | 12 | bank, that they didn't have to do over or start from |
| 12:58:35 | 13 | scratch with?  Do you remember that? |
| 12:58:37 | 14 | A.  I believe so.  I -- I'd need to look at the transcript. |
| 12:58:42 | 15 | I'm sorry. |
| 12:58:42 | 16 | Q.  Well, let's -- let's talk about some of the things |
| 12:58:44 | 17 | involved in that item processing.  Are you with me? |
| 12:58:47 | 18 | A.  Yes. |
| 12:58:47 | 19 | Q.  So you -- you mentioned having worked at one point for |
| 12:58:53 | 20 | IBM or worked -- consulted with IBM? |
| 12:58:55 | 21 | A.  Yes. |
| 12:58:55 | 22 | Q.  So you know that IBM makes these big check sorting |
| 12:59:01 | 23 | machines called reader/sorters, right? |
| 12:59:04 | 24 | A.  I wasn't in that division. |
| 12:59:06 | 25 | Q.  I'm sorry.  I didn't mean to ask you if you were -- if |

12:59:09   1   you were in that division, sir.  I'm asking you, did you

12:59:12   2   know that IBM made these big reader/sorter machines?

12:59:17   3   A.  Yes, I did.

12:59:18   4   Q.  Right.  Those are these machines that take up seemingly

12:59:22   5   almost a whole room with lots of different pockets that

12:59:27   6   read and sort checks.  Do I have that right?

12:59:31   7   A.  I believe so.  Again, I haven't reviewed the

12:59:34   8   functionality of those.

12:59:36   9   Q.  Have you heard of the IBM 3890 reader/sorter machine

12:59:41  10   that's involved in check processing?

12:59:43  11   A.  Yes, I've heard of that.

12:59:45  12   Q.  It can operate to process hundreds of thousands of

12:59:48  13   checks in a single day.  Did you know that?

12:59:50  14   A.  Yes, I believe I -- I heard that at one point.

12:59:52  15   Q.  USAA didn't invent those machines, right, sir?

12:59:55  16   A.  That's correct, they did not.

12:59:57  17   Q.  USAA didn't invent any physical improvements to those

01:00:01  18   machines, correct?

01:00:03  19   A.  My understanding is, no, they did not.

01:00:06  20   Q.  Those machines -- those big reader/sorter machines --

01:00:12  21   is that what they're called, sir, reader/sorters?

01:00:15  22   A.  I believe so.

01:00:16  23   Q.  So those reader/sorter machines were eventually

01:00:20  24   equipped with cameras that took pictures of the checks as

01:00:23  25   they were running through the machine at high speeds,

01:00:26    1    right?

01:00:26    2    A.  Yes, that's my understanding.

01:00:28    3    Q.  And USAA -- do you know when that happened, when those

01:00:35    4    cameras were put on those big IBM reader/sorter machines?

01:00:39    5    A.  I don't, sitting here today, recall the exact date.

01:00:42    6    Q.  Well, do you know that USAA didn't invent those cameras

01:00:45    7    that went on those machines?

01:00:47    8    A.  That's correct.

01:00:51    9    Q.  And they didn't invent any -- USAA didn't invent any

01:00:56   10    physical improvements to the cameras -- strike that.

01:01:01   11           To your knowledge, USAA hasn't invented any -- in

01:01:07   12    the claims in these patents, any physical improvements to

01:01:09   13    the actual camera device.  Do I have that right?

01:01:12   14    A.  That's my understanding, yes.

01:01:13   15    Q.  Cameras on mobile devices, for example, have gotten a

01:01:24   16    lot better over the years, true?

01:01:25   17    A.  I wouldn't characterize them as better, but they've

01:01:28   18    gotten denser.  They can take more -- more dense pictures.

01:01:31   19    Q.  Okay.  When I say better, I mean they can get better

01:01:35   20    pictures.  Or can we -- can we agree that that's a good

01:01:39   21    definition of "better" for a layman?

01:01:40   22    A.  Yes, that's fine.

01:01:41   23    Q.  All right.  Thank you.

01:01:42   24           So what I'm -- and what -- and I guess the point

01:01:45   25    you're making is, this -- this notion of pixels, if you get

| | | |
|---|---|---|
| 01:01:49 | 1 | more pixels in a picture, more information, more data, you |
| 01:01:52 | 2 | can get a clearer picture.  Do I have that about right? |
| 01:01:57 | 3 | A.  Not exactly. |
| 01:01:58 | 4 | Q.  Well, let's see if we can agree on this. |
| 01:02:02 | 5 | A.  Okay. |
| 01:02:03 | 6 | Q.  The camera on the first iPhone back in 2007 is not |
| 01:02:09 | 7 | nearly as good as the camera on the iPhone 11 that came out |
| 01:02:13 | 8 | last year.  Can we agree on that? |
| 01:02:14 | 9 | A.  Yes. |
| 01:02:15 | 10 | Q.  And over time, there have been various improvements to |
| 01:02:20 | 11 | the cameras on iPhones and Android phones that have made |
| 01:02:26 | 12 | certain other capabilities possible, right? |
| 01:02:31 | 13 | A.  What do you mean by other capabilities? |
| 01:02:33 | 14 | Q.  Well, like taking good pictures of a check, right? |
| 01:02:37 | 15 | A.  I would assume so. |
| 01:02:44 | 16 | Q.  Well -- and, again, you certainly know that USAA wasn't |
| 01:02:47 | 17 | in the camera business in developing physical improvements |
| 01:02:49 | 18 | to any of those cameras that go in any kind of mobile |
| 01:02:53 | 19 | phone, right? |
| 01:02:53 | 20 | A.  Yes, I believe that's correct. |
| 01:02:58 | 21 | Q.  Now, you've heard of this notion of scanners -- |
| 01:03:05 | 22 | scanners different from a camera, right? |
| 01:03:07 | 23 | A.  A scanner is a kind of camera. |
| 01:03:11 | 24 | Q.  Okay.  Well, a scanner is a -- is a kind of camera. |
| 01:03:14 | 25 | But is it different from the kind of cameras that are in |

01:03:16   1   our mobile phones today?

01:03:18   2   A.  Well, in what aspect?

01:03:22   3   Q.  Well, let me ask it a different way.

01:03:25   4        You've heard about these -- I think you held up or

01:03:28   5   you have a picture in one of your slides of a scanner, a

01:03:31   6   Panini scanner?

01:03:32   7   A.  That's correct.

01:03:33   8   Q.  Okay.  So that is a device that can be used to scan

01:03:39   9   documents like checks or other kinds of documents, right?

01:03:43  10   A.  I believe it's specific to checks, but, yes.

01:03:45  11   Q.  And the scanning technology is -- is different from the

01:03:50  12   technology in our mobile phones or -- or is it the same,

01:03:54  13   sir?

01:03:54  14   A.  Well, it has magnetic ink reading, so it is different.

01:03:59  15   Q.  Okay.  Magnetic ink reading, just like that MICR line

01:04:02  16   you were telling us about earlier?

01:04:04  17   A.  Yes.

01:04:04  18   Q.  Okay.  So USAA didn't invent the scanners that you

01:04:12  19   described in some of your slides either, right?

01:04:14  20   A.  They did not.

01:04:18  21   Q.  Now, we've heard a lot in the trial so far about mobile

01:04:29  22   banking, right?  You've been here the whole time?

01:04:31  23   A.  I have.

01:04:32  24   Q.  USAA did not invent a mobile phone, right?

01:04:34  25   A.  That's correct.

01:04:36   1   Q.  A smartphone?

01:04:36   2   A.  That's correct.

01:04:38   3   Q.  Or any other kind of mobile device, right?

01:04:41   4   A.  That's correct.

01:04:44   5   Q.  It didn't invent the operating system for a smartphone,

01:04:48   6   right?

01:04:48   7   A.  That's correct.

01:04:55   8   Q.  Sometimes that's referred to as the iOS for the iPhone.

01:05:00   9   That's something that Apple created, right?

01:05:02  10   A.  There's also -- yes, there's also Android and Simeon

01:05:07  11   that you heard about.

01:05:08  12   Q.  You're reading my notes here.  Also, Android is another

01:05:12  13   operating system, right, sir?

01:05:13  14   A.  It is.

01:05:13  15   Q.  And USAA didn't write that one either, right?

01:05:15  16   A.  I'm not aware that they were involved in it.  I think

01:05:18  17   they did have influence into iOS at one point.

01:05:22  18   Q.  But they didn't create the Apple iOS operating system,

01:05:26  19   right, sir?

01:05:26  20   A.  No.

01:05:27  21   Q.  And they didn't create -- I'm sorry, were you finished?

01:05:30  22   A.  It was created by Apple.

01:05:31  23   Q.  And they didn't create the Android operating system

01:05:34  24   either, right?

01:05:34  25   A.  That's correct.

01:05:35   1   Q.  Those operating systems are what makes -- or what

01:05:42   2   drives or runs an Android phone or an Apple phone, true?

01:05:46   3   A.  To some degree, yes.

01:05:48   4   Q.  USAA didn't create any improvement to the processor,

01:06:01   5   the brains of the computer in the phone, right?

01:06:05   6   A.  I don't -- I don't know one way or the other on that.

01:06:08   7   Q.  Well, those processors -- do you know this, sir?  Those

01:06:14   8   processors are made by companies like Intel and Qualcomm

01:06:17   9   and Texas Instruments.  Do I have that right?

01:06:20  10   A.  Among others, yes.

01:06:25  11   Q.  Okay.  And those are the -- the brains, if you will,

01:06:27  12   the microprocessors they're sometimes called, right?

01:06:31  13   A.  That's not precise.

01:06:33  14   Q.  Okay.  Processor, is that -- is that precise?

01:06:36  15   A.  That's actually a little imprecise, as well.

01:06:39  16   Q.  What do you want to call it?

01:06:40  17   A.  They're called either application processors or media

01:06:44  18   processors.

01:06:45  19   Q.  Okay.  I'm going to call them application processors.

01:06:47  20   Will that work?

01:06:48  21   A.  Yes.

01:06:49  22   Q.  So application processors are made by companies, among

01:06:53  23   others, Intel, Qualcomm, and Texas Instruments, right?

01:06:59  24   A.  Yes.

01:06:59  25   Q.  They go into the mobile phones, those kinds of

| | | |
|---|---|---|
| 01:07:05 | 1 | processors, to make the phones smart? |
| 01:07:11 | 2 | A.  That isn't the only reason they're smart. |
| 01:07:14 | 3 | Q.  But isn't that one of the reasons why they're smart, |
| 01:07:18 | 4 | sir? |
| 01:07:18 | 5 | A.  Sure.  Smart is not a technical term. |
| 01:07:20 | 6 | Q.  Now, you talked about OCR in your direct examination. |
| 01:07:28 | 7 | Do you remember that? |
| 01:07:29 | 8 | A.  Yes. |
| 01:07:29 | 9 | Q.  Now, that's a technology that enables a computer to |
| 01:07:34 | 10 | read text off a document.  Do I have that right? |
| 01:07:38 | 11 | A.  Among other things. |
| 01:07:39 | 12 | Q.  USAA didn't invent OCR, right? |
| 01:07:45 | 13 | A.  I'm not aware of whether they did or not invent some |
| 01:07:48 | 14 | aspect of the OCR they use. |
| 01:07:50 | 15 | Q.  In your work with USAA in this case, has anyone ever |
| 01:07:53 | 16 | told you from USAA's side, Dr. Conte, we invented OCR? |
| 01:07:59 | 17 | A.  Not exactly. |
| 01:08:02 | 18 | Q.  OCR is a technology that's been around for decades, |
| 01:08:06 | 19 | isn't it, sir? |
| 01:08:07 | 20 | A.  That's inaccurate. |
| 01:08:08 | 21 | Q.  Okay.  Was it well-known in banking, to your knowledge, |
| 01:08:13 | 22 | in the early 2000s? |
| 01:08:16 | 23 | A.  I would say some aspect of OCR was known. |
| 01:08:19 | 24 | Q.  I want to talk about -- a little bit more about the |
| 01:08:32 | 25 | user-facing process of mobile deposit.  Are you -- are you |

01:08:37   1   with me?

01:08:37   2   A.   I'm not sure what you mean by that.

01:08:39   3   Q.   Well, the part that shows up on your phone.

01:08:41   4   A.   Could you be just a little more specific?

01:08:47   5   Q.   Well, we're going to get to this in a minute, sir, but

01:08:51   6   there's -- your report talks about a bunch of computers

01:08:54   7   that are called servers that are remote from the user's

01:09:02   8   cell phone, right?

01:09:03   9   A.   Yes.

01:09:04  10   Q.   Okay.  So I want to focus on what the -- the user

01:09:10  11   doesn't see, for example, all the stuff that's going on in

01:09:13  12   the background at those bank servers, true?

01:09:17  13   A.   Mostly correct, yes.

01:09:18  14   Q.   Okay.  So I want to focus on just what the user sees

01:09:21  15   for my next couple of questions, sir.  Are you with me?

01:09:26  16   A.   Yes.

01:09:26  17   Q.   So there are features that are common to -- to banking

01:09:30  18   that these patents also did not invent.  For example,

01:09:35  19   opening up a new account online.  These patents don't claim

01:09:40  20   to have invented that, right?

01:09:41  21   A.   They do not.

01:09:42  22   Q.   Or transferring funds between accounts.  These patents

01:09:47  23   don't claim to have invented that either, right?

01:09:49  24   A.   It's not part of mobile deposit.

01:09:50  25   Q.   Or reporting a lost or stolen debit card.  These

| | | |
|---|---|---|
| 01:09:56 | 1 | patents don't claim to have invented that either, right? |
| 01:09:58 | 2 | A.  Can I amend my prior answer? |
| 01:10:01 | 3 | Actually, you could use a check deposit to move |
| 01:10:04 | 4 | funds from one account to another. |
| 01:10:06 | 5 | Q.  But the concept of transferring funds from your savings |
| 01:10:12 | 6 | account to your checking account, that's not something |
| 01:10:14 | 7 | that's invented by these patents, true? |
| 01:10:16 | 8 | A.  The abstract concept is not. |
| 01:10:18 | 9 | Q.  Or setting up paperless billing? |
| 01:10:22 | 10 | A.  No, it's not. |
| 01:10:23 | 11 | Q.  Or setting up alerts when one of your children |
| 01:10:30 | 12 | withdraws something from their account and it's over a |
| 01:10:33 | 13 | certain amount so you want to get notified about that. |
| 01:10:36 | 14 | These patents didn't invent that either, right? |
| 01:10:43 | 15 | A.  The withdrawing of large amounts, I don't believe so. |
| 01:10:47 | 16 | Q.  The alert? |
| 01:10:48 | 17 | A.  The alert of withdrawing a large amount, I do not |
| 01:10:51 | 18 | believe so. |
| 01:10:51 | 19 | Q.  So we've talked about -- a little bit about what |
| 01:10:59 | 20 | happens on the mobile device.  And, again, I want to talk |
| 01:11:03 | 21 | to you in a minute about what happens in these servers. |
| 01:11:06 | 22 | But are you familiar with the term "back end"? |
| 01:11:09 | 23 | A.  Yes, generally. |
| 01:11:10 | 24 | Q.  Okay.  And the back end is all those -- we've talked |
| 01:11:16 | 25 | about this a little bit.  The back end is all those |

01:11:19  1  internal systems at the bank in computers and other

01:11:25  2  equipment that process the check after it's been received

01:11:28  3  for deposit, right?

01:11:30  4  A.  Yes, that's my understanding.

01:11:33  5  Q.  Is it your understanding, sir, that the processing of a

01:11:37  6  check for deposit takes place in that back end system

01:11:42  7  whether the check is deposited on a mobile deposit, whether

01:11:47  8  it's deposited at an ATM, or whether you walk into the bank

01:11:52  9  and hand it to the teller?

01:11:55  10  A.  Depends on the piece of the back end we're talking

01:11:57  11  about.

01:11:58  12  Q.  Can you agree with me that there's some back end

01:12:02  13  processing that has to occur whether you deposit the check

01:12:07  14  from your mobile phone, from an ATM, or from a bank teller?

01:12:11  15  A.  Yes, sure.

01:12:12  16  Q.  These patents do not claim to have invented the

01:12:21  17  computers, the machines, the other devices necessary for

01:12:26  18  that so-called back end processing, fair?

01:12:30  19  A.  Not the hardware, no.

01:12:33  20  Q.  All right, sir.  I want to talk just a little bit about

01:12:44  21  the patent process.  Are you with me?

01:12:46  22  A.  Yes.

01:12:46  23  Q.  So you have a general understanding of how patents

01:12:51  24  work, right?

01:12:51  25  A.  Yes.

01:12:54  1  Q.  You've seen that video that His Honor played for the

01:12:58  2  jurors?

01:12:58  3  A.  No, I've never seen that video.

01:13:00  4  Q.  Never actually watched it yourself, okay.

01:13:02  5      Well, can we agree that the claims of the patent

01:13:06  6  are what give the public notice of the boundaries of the

01:13:09  7  invention, right?

01:13:10  8  A.  Yes, that's correct.

01:13:11  9  Q.  But you understand there's a dispute here between the

01:13:19  10  specifications of the '605 and the '681 patent and whether

01:13:23  11  those specifications adequately support or describe the

01:13:28  12  claims; do you understand that's the dispute?

01:13:31  13  A.  I understand that's the dispute, yes.

01:13:33  14  Q.  That's one of the disputes in the case, right?

01:13:35  15  A.  Yes.

01:13:36  16  Q.  Now, you have your own patents, right?

01:13:46  17  A.  I have 40, yes.

01:13:47  18  Q.  And when you wrote those patents, you understood that

01:13:52  19  it was important that you included this detailed

01:13:58  20  description of what you had invented so it would support

01:14:03  21  the invention you were claiming in the claims, true?

01:14:07  22  A.  Yes.

01:14:10  23  Q.  Now, some of your patents -- I looked at a couple of

01:14:15  24  them -- are what are known as continuations of earlier

01:14:19  25  patents, right?

| | | |
|---|---|---|
| 01:14:20 | 1 | A.  Yes, I have some continuations. |
| 01:14:22 | 2 | Q.  And you understand -- |
| 01:14:23 | 3 | THE COURT:  Counsel, approach the bench, please. |
| 01:14:33 | 4 | (Bench conference.) |
| 01:14:34 | 5 | THE COURT:  There's a limine order in this case |
| 01:14:36 | 6 | precluding the mention of unasserted patents.  We're going |
| 01:14:40 | 7 | right down a path of this witness's personal patents and |
| 01:14:44 | 8 | what they mean and what they do? |
| 01:14:45 | 9 | MR. MELSHEIMER:  No, sir, just the notion that you |
| 01:14:47 | 10 | can get a continuation and relate back to an earlier |
| 01:14:51 | 11 | application.  That's all I was trying to do.  I can do it |
| 01:14:53 | 12 | in a different way if the Court -- |
| 01:14:55 | 13 | THE COURT:  Do it without reference to his |
| 01:14:56 | 14 | personal patents. |
| 01:14:57 | 15 | MR. MELSHEIMER:  I'll do that, Your Honor. |
| 01:14:59 | 16 | (Bench conference concluded.) |
| 01:15:03 | 17 | THE COURT:  Let's proceed. |
| 01:15:06 | 18 | Q.  (By Mr. Melsheimer)  Dr. Conte, without regard to your |
| 01:15:09 | 19 | personal patents, you understand that it's possible to take |
| 01:15:17 | 20 | advantage of an earlier-filed date of a patent application, |
| 01:15:27 | 21 | just like what's happened in this case, right? |
| 01:15:28 | 22 | A.  I wouldn't quite describe it that way. |
| 01:15:31 | 23 | Q.  Well, and I'm not trying to use any -- any words to -- |
| 01:15:35 | 24 | to confuse you at all, sir. |
| 01:15:37 | 25 | But you understand that the patents in this case, |

01:15:42   1   for example, were filed in 2017, right?

01:15:45   2   A.  The continuations were, yes.

01:15:47   3   Q.  The continuations were.  And they were -- they purport

01:15:53   4   or claim to be continued from an original application that

01:15:58   5   was filed on Halloween in 2006.  Do you understand that,

01:16:02   6   sir?

01:16:02   7   A.  I never thought of it as Halloween, but...

01:16:08   8          And I don't think that's significant, but yes.

01:16:10   9   Q.  October 31st.

01:16:12   10  A.  Yes, I know when Halloween is.  Thank you.

01:16:15   11  Q.  All right.  So you understand that in order to get that

01:16:18   12  earlier date, that 2006 date, that the specification has to

01:16:33   13  describe the full scope of the claims claimed in 2017,

01:16:39   14  right?

01:16:39   15  A.  Yes.

01:16:39   16  Q.  You've heard that term full scope before --

01:16:43   17  A.  Yes.

01:16:44   18  Q.  -- in this context?

01:16:48   19  A.  I believe so.

01:16:49   20  Q.  And you understand specification, that the root of that

01:16:55   21  word is specific, right?

01:16:59   22  A.  Yeah, I suppose so.  I need to think back to my Latin.

01:17:05   23  Q.  You went through a portion of the specification on your

01:17:08   24  direct examination, right?

01:17:09   25  A.  I did.

01:17:14  1   Q.  And you did a report in this case that was in excess of

01:17:17  2   500 pages; do you remember that?

01:17:19  3   A.  It was long, yes.

01:17:20  4   Q.  You did not offer an opinion in your report about

01:17:23  5   whether the specification sufficiently describes the

01:17:27  6   claimed inventions, true?

01:17:28  7   A.  I don't -- I don't think that's exactly accurate, I'm

01:17:37  8   sorry.

01:17:37  9   Q.  You did not offer an opinion on the validity of these

01:17:40  10  patents, true?

01:17:42  11  A.  That's true.

01:17:42  12  Q.  Someone named Mr. Calman did that, right?

01:17:47  13  A.  Yes.

01:17:48  14  Q.  He was a consultant hired by the Plaintiffs in this

01:17:51  15  case?

01:17:51  16  A.  Much like me, yes.

01:17:54  17  Q.  Is he in court today, sir?

01:17:56  18  A.  I don't see him.

01:17:59  19  Q.  Has he been in court since the trial started to your

01:18:02  20  recollection?

01:18:02  21  A.  I don't believe so.

01:18:03  22  Q.  You know, he's permitted to be in court as an expert

01:18:08  23  witness and hear the testimony if he so desires, just like

01:18:13  24  you're here, correct?

01:18:14  25  A.  I'd assume so, yes.

| | | |
|---|---|---|
| 01:18:16 | 1 | Q. You've been here the whole time, haven't you? |
| 01:18:18 | 2 | A. Yes, I have. |
| 01:18:18 | 3 | Q. And you plan to stay until the trial is over, correct? |
| 01:18:22 | 4 | A. I suppose so. |
| 01:18:24 | 5 | Q. Don't look so excited about it, sir. |
| 01:18:28 | 6 | A. I'm sorry. |
| 01:18:30 | 7 | THE COURT: Let's move along. |
| 01:18:32 | 8 | Q. (By Mr. Melsheimer) Now, do you understand, sir, that |
| 01:18:38 | 9 | in making the determination of whether a specification |
| 01:18:45 | 10 | filed in 2006 describes claims made 11 years later, that |
| 01:18:52 | 11 | it's not simply a matter of pointing to words? |
| 01:19:03 | 12 | A. Oh, I think that's part of it. |
| 01:19:04 | 13 | Q. Well, but it's not simply pointing to words, sir, |
| 01:19:08 | 14 | right? |
| 01:19:08 | 15 | A. That's -- sure, you can do other things, as well, |
| 01:19:13 | 16 | absolutely. |
| 01:19:13 | 17 | Q. Well, for example, the term "college dormitories" is |
| 01:19:19 | 18 | used at Column 3, Line 58 of the '681 patent. Do you have |
| 01:19:22 | 19 | your patent there, sir? |
| 01:19:23 | 20 | A. I recall them referring to those, yes. |
| 01:19:25 | 21 | Q. Just because the words "college dormitories" are in the |
| 01:19:30 | 22 | patent doesn't mean this is a patent on college |
| 01:19:34 | 23 | dormitories, right? |
| 01:19:35 | 24 | A. It depends on what aspect of college dormitories are |
| 01:19:40 | 25 | claimed. |

01:19:40   1   Q.   So it's not just a mention of the words, right?

01:19:42   2   A.   It's the mention of the concepts.

01:19:43   3   Q.   And the context in which they're mentioned, right?

01:19:48   4   A.   Well, all concepts are in a context.

01:19:54   5   Q.   Look at column -- do you have the patent in front of

01:19:57   6   you, sir?

01:19:58   7   A.   Which patent are we speaking?

01:20:00   8   Q.    '681.

01:20:01   9        MR. MELSHEIMER:  Mr. Bakale, can we pull up the

01:20:04  10   '681, Column 12, Line 18?

01:20:21  11   Q.   (By Mr. Melsheimer)  And you see on Line 18 the word

01:20:24  12   "streaming"?

01:20:24  13        THE COURT:  Let him get to the patent.  You asked

01:20:26  14   him to turn to it.

01:20:28  15        MR. MELSHEIMER:   I apologize, Your Honor.

01:20:29  16   Q.   (By Mr. Melsheimer)  Mr. -- Dr. Conte, it's also on the

01:20:32  17   screen if that would be easier for you.

01:20:34  18   A.   Yeah, I was looking at the context, but, yes, I see it.

01:20:38  19   Q.   So we see the word "streaming," right?

01:20:40  20   A.   Yes.

01:20:41  21   Q.   Now, that doesn't mean -- just because "streaming" is

01:20:44  22   in there, doesn't mean that these patents can claim

01:20:48  23   Netflix, right?

01:20:48  24   A.   It's being used in a different way.

01:20:50  25   Q.   Different context, right?

460

01:20:51  1    A.  Yes.

01:20:56  2    Q.  And you know that because you're reading both around

01:20:58  3    those words but also what came before and what came after,

01:21:02  4    right?

01:21:02  5    A.  Yes.

01:21:08  6    Q.  Now, you -- you brought forth a couple of examples from

01:21:18  7    the specification, and I want to take a couple of ones with

01:21:22  8    you.  You didn't use "streaming" or "college dormitories,"

01:21:25  9    but let me pull out --

01:21:29  10          MR. MELSHEIMER:  If you would, sir, Mr. Bakale, do

01:21:30  11   we have Slide -- well, let's just go to the '605 -- '605

01:21:39  12   patent at Line -- Column 7, starting at Line 23.

01:21:43  13   Q.  (By Mr. Melsheimer)  Dr. Conte, the '605 patent --

01:21:48  14   A.  Yes, I'm there.

01:21:49  15   Q.  -- Column 7, Line 23.  Do you remember highlighting

01:21:58  16   this one in your -- in your direct examination, sir?

01:22:01  17   A.  I do.

01:22:01  18   Q.  And here it's talking about --

01:22:03  19          MR. MELSHEIMER:  -- starting with Line 23,

01:22:08  20   Mr. Bakale --

01:22:10  21   Q.  (By Mr. Melsheimer)  -- account owner?

01:22:11  22   A.  Yes.

01:22:11  23   Q.  It says:  Account owner may communicate with financial

01:22:18  24   institution by way of communication network which may

01:22:21  25   include -- and then there's a whole list of things that

461

01:22:23   1   follow, right?

01:22:24   2   A.   Yes.

01:22:24   3   Q.   Intranet, Internet, local area network, wide area

01:22:31   4   network, public switched telephone network, cellular

01:22:36   5   network.   It's basically a list of every common kind of

01:22:44   6   network that was around back in 2006, right?

01:22:47   7   A.   I wouldn't characterize it that way.

01:22:52   8   Q.   Well, it's -- can you characterize it, sir, as a list

01:22:55   9   of some common networks that were known in 2006?

01:22:59  10   A.   I wouldn't quite characterize it that way either.

01:23:03  11   Q.   Would you characterize it as different communication

01:23:08  12   protocols that were around in 2006?

01:23:10  13   A.   This isn't specific to protocols, so I wouldn't

01:23:14  14   characterize it that way either.

01:23:15  15   Q.   Well, how would you characterize it, sir?

01:23:20  16   A.   Well, these are different communication channels

01:23:23  17   available to a consumer.

01:23:24  18   Q.   Communication channels.   Can we agree on that?

01:23:27  19   A.   Available to a consumer, yes.

01:23:29  20   Q.   Okay.   So this is a list of communication channels

01:23:33  21   available to a consumer back in -- back in 2006, which

01:23:39  22   include picking up the telephone and calling your bank,

01:23:48  23   right?

01:23:48  24   A.   Well, I'd need to look at the context.   Of course, you

01:23:50  25   can use telephone line with a modem to transmit data.

01:23:53  1   Q.  Well, and I'm just -- I'm just reading it, and you tell

01:23:57  2   me if I'm reading it right.  Account owner may communicate

01:24:00  3   with financial institutions by way of a communication

01:24:02  4   network.

01:24:04  5         And then if you go down a little bit long --

01:24:07  6   farther along to Line 28:  Account owner may communicate

01:24:11  7   with financial institution by phone, email, instant

01:24:14  8   messaging, facsimile, and the like.

01:24:18  9         Right?

01:24:19  10  A.  Yes.

01:24:19  11  Q.  So that's just talking about ways the account owner can

01:24:22  12  communicate, including by picking up the phone to their

01:24:25  13  bank, right?

01:24:26  14  A.  Well, again, picking up the phone doesn't imply --

01:24:32  15  doesn't necessarily imply talking on the phone.

01:24:35  16  Q.  But it includes that?

01:24:35  17  A.  Yes, it does.

01:24:37  18  Q.  Email, right?

01:24:37  19  A.  Sure.

01:24:38  20  Q.  Texting, that's what instant messaging is, isn't --

01:24:46  21  isn't it?

01:24:46  22  A.  Back then, it was a form of texting.  It's not quite

01:24:50  23  the same.

01:24:50  24  Q.  And isn't it correct, sir, that this is the only point

01:24:54  25  in the spec of the '605 patent where there's any specific

| | | |
|---|---|---|
| 01:24:59 | 1 | mention of a cellular network? |
| 01:25:03 | 2 | A.  I haven't done a search. |
| 01:25:05 | 3 | Q.  Well, can you point us to -- based just on your |
| 01:25:10 | 4 | recollection, and you spent about -- did you say 300 hours |
| 01:25:14 | 5 | working on this? |
| 01:25:14 | 6 | A.  Yes, a long time reading source code. |
| 01:25:16 | 7 | Q.  Okay.  So in those 300 hours, do you recall another |
| 01:25:22 | 8 | mention of cellular or cell phone or cell in the '605 |
| 01:25:29 | 9 | patent? |
| 01:25:29 | 10 | A.  I don't recall one way or another.  I'd need to check |
| 01:25:32 | 11 | through this. |
| 01:25:32 | 12 | Q.  Now, let's take a look at another portion that you |
| 01:25:47 | 13 | showed the jury on your direct examination, sir.  And that |
| 01:25:52 | 14 | is in the -- this one is the '681 patent. |
| 01:26:06 | 15 |         MR. MELSHEIMER:  Might I have one moment, Your |
| 01:26:08 | 16 | Honor?  I'm having a little trouble reading this one. |
| 01:26:10 | 17 |         THE COURT:  You may have a moment, counsel. |
| 01:26:31 | 18 |         MR. MELSHEIMER:  May it please the Court. |
| 01:26:32 | 19 |         Mr. Bakale, can you call up Column 3, Line 37? |
| 01:27:05 | 20 | Q.  (By Mr. Melsheimer)  Actually, Dr. Conte, I'm sorry, I |
| 01:27:06 | 21 | want to pull up -- it's from your deck at 2.25. |
| 01:27:17 | 22 |         MR. MELSHEIMER:  I apologize for the delay, Your |
| 01:27:19 | 23 | Honor. |
| 01:27:19 | 24 | Q.  (By Mr. Melsheimer)  This was one of the slides you |
| 01:27:20 | 25 | used on your direct examination, sir? |

| | | |
|---|---|---|
| 01:27:22 | 1 | A.  Yes, it is. |
| 01:27:23 | 2 | Q.  Okay.  And you say referring back to Figure 1 -- or, |
| 01:27:31 | 3 | excuse me, the slide says:  An image device is |
| 01:27:34 | 4 | communicatively coupled to the computer. |
| 01:27:37 | 5 | Do you see that? |
| 01:27:37 | 6 | A.  Yes, I do. |
| 01:27:38 | 7 | Q.  Now, that is referencing a figure of the patent, right? |
| 01:27:40 | 8 | A.  Yes, it is. |
| 01:27:45 | 9 | Q.  You didn't show the jury this figure in your slides, |
| 01:27:47 | 10 | however, did you, sir? |
| 01:27:47 | 11 | A.  I did not. |
| 01:27:48 | 12 | MR. MELSHEIMER:  Let's pull up Figure 1 of the |
| 01:27:51 | 13 | '605 patent.  And the jurors have this in their notebook, |
| 01:27:59 | 14 | along with the -- both patents. |
| 01:28:03 | 15 | Q.  (By Mr. Melsheimer)  But this is Figure 1 of the '605 |
| 01:28:04 | 16 | patent. |
| 01:28:06 | 17 | Now, Figure 1 shows a -- the account owner or |
| 01:28:12 | 18 | person right on the left? |
| 01:28:15 | 19 | A.  Yes. |
| 01:28:16 | 20 | Q.  And they're at a desk with what looks like a computer, |
| 01:28:21 | 21 | right? |
| 01:28:21 | 22 | A.  That's what the illustration shows here. |
| 01:28:23 | 23 | Q.  And the illustration looks like that the image capture |
| 01:28:28 | 24 | device is sitting out to the right of the desktop computer. |
| 01:28:32 | 25 | Do you see that? |

01:28:33  1    A.  Yes.

01:28:33  2    Q.  They're shown as separate devices in this figure?

01:28:37  3    A.  In this figure, they are, yes.

01:28:41  4    Q.  Now, there are some differences, are there not, sir,

01:28:52  5    between the '605 specification and the '681 specification?

01:28:57  6    A.  Yes, they have different parents.

01:29:00  7    Q.  And -- and there's differences in some of the wording

01:29:05  8    between the '605 and the '681; is that correct?

01:29:09  9    A.  Yes, the specifications are different.

01:29:10 10    Q.  So one difference is, is the '605 specification in

01:29:17 11    Column 8, which we'll pull up.

01:29:32 12             MR. MELSHEIMER:  Starting with Figure 4,

01:29:33 13    Mr. Bakale, there -- the text on Figure 4 which I think is

01:29:38 14    Line 3.

01:29:39 15    Q.  (By Mr. Melsheimer)  So in Column 8 -- and the columns

01:29:43 16    are on the top of the page of the patent, Dr. Conte; is

01:29:46 17    that right?

01:29:46 18    A.  Yes, that's right.

01:29:47 19    Q.  And then the lines -- not -- not all the lines are --

01:29:52 20    are called out.  You have to kind of add up between the

01:29:55 21    numbers, right?

01:29:56 22    A.  And sometimes they don't line up, annoyingly, so, yes.

01:30:03 23    Q.  So looking at Column 8, starting with Figure -- the

01:30:08 24    line that begins Figure 4 on Line 3, it talks about

01:30:11 25    providing a schematic diagram.

| | | |
|---|---|---|
| 01:30:14 | 1 | And then if you go all the way down -- well, about |
| 01:30:16 | 2 | halfway down to Line 11, you see this reference to this |
| 01:30:21 | 3 | term PDAs, right? |
| 01:30:24 | 4 | A.  Yes. |
| 01:30:24 | 5 | Q.  Now, is it your recollection, sir, that the '681 |
| 01:30:34 | 6 | specification -- we're in the '605 -- but that the '681 |
| 01:30:39 | 7 | patent specification never once even uses the term "PDAs," |
| 01:30:47 | 8 | correct? |
| 01:30:47 | 9 | A.  Give me a moment. |
| 01:30:49 | 10 | I don't think it uses the specific term, no. |
| 01:30:55 | 11 | Q.  And if we can go back to the '605 where we're at now, |
| 01:31:01 | 12 | sir, there's only two mentions of PDAs there, and the other |
| 01:31:08 | 13 | one is a little bit farther down. |
| 01:31:16 | 14 | MR. MELSHEIMER:  Thank you, Mr. Bakale. |
| 01:31:19 | 15 | Q.  (By Mr. Melsheimer)  It is line -- starting on Line 33 |
| 01:31:27 | 16 | in Column 8.  Are you with me, sir? |
| 01:31:30 | 17 | A.  Yes. |
| 01:31:31 | 18 | Q.  And there it mentions PDAs for -- for the second time. |
| 01:31:36 | 19 | And it talks about them in a list of other devices which |
| 01:31:42 | 20 | include televisions? |
| 01:31:43 | 21 | A.  Yes. |
| 01:31:44 | 22 | Q.  And MP3 players? |
| 01:31:50 | 23 | A.  Yes. |
| 01:31:50 | 24 | Q.  MP3 players are generally used to listen to music, |
| 01:31:55 | 25 | right, sir? |

| | | |
|---|---|---|
| 01:31:55 | 1 | A.  An iPod would be an example, yes. |
| 01:32:00 | 2 | Q.  Kind of one of the original MP3 players, huh? |
| 01:32:05 | 3 | A.  One of them, yes. |
| 01:32:06 | 4 | Q.  And then television, of course, is what we use to |
| 01:32:08 | 5 | stream Netflix? |
| 01:32:10 | 6 | A.  Smart TVs have many applications. |
| 01:32:13 | 7 | Q.  Right.  But you couldn't put together the streaming |
| 01:32:19 | 8 | that we saw in that earlier section and the word |
| 01:32:23 | 9 | "television" here and come in and say that this patent was |
| 01:32:27 | 10 | a patent of Netflix, right? |
| 01:32:32 | 11 | A.  It's not in the claims.  There's no claim -- |
| 01:32:33 | 12 | Q.  It wouldn't be appropriate? |
| 01:32:34 | 13 | A.  -- there's no claim with respect to Netflix here. |
| 01:32:40 | 14 | Q.  Now, you showed the jury a slide of something called |
| 01:32:56 | 15 | the Palm Treo.  Do you remember that? |
| 01:33:02 | 16 | A.  Palm Treo 700w, yes. |
| 01:33:05 | 17 | Q.  Now, is it fair, sir, you never mentioned the Palm Treo |
| 01:33:10 | 18 | in your 500-plus-page report, did you, sir? |
| 01:33:12 | 19 | A.  I believe that's not accurate. |
| 01:33:14 | 20 | Q.  Well, see if I can say it this way.  You worked closely |
| 01:33:22 | 21 | with another consultant in this case named Mr. Calman, |
| 01:33:27 | 22 | right? |
| 01:33:27 | 23 | A.  Yes. |
| 01:33:28 | 24 | Q.  And he's the person I asked you about earlier who's not |
| 01:33:31 | 25 | in -- who's not in court and hasn't been in court during |

01:33:35   1   this trial, true?

01:33:35   2   A.   Yes.

01:33:36   3   Q.   Mr. Calman has worked in banking for decades, right?

01:33:41   4   A.   That's my understanding, yes.

01:33:42   5   Q.   You have not worked in banking for decades, right?

01:33:45   6   A.   Not for decades, no.

01:33:47   7   Q.   You relied on Mr. Calman for a lot of information about

01:33:52   8   banking operations and -- and similar subject matter, true?

01:33:56   9   A.   Yes, among other sources.

01:33:58   10   Q.   And it's Mr. Calman that mentioned the Treo in his

01:34:07   11   report, and you didn't call that out specifically, but you

01:34:10   12   did incorporate by reference pages of his report, correct?

01:34:15   13   A.   Well, as I've said under oath, we wrote certain

01:34:18   14   sections together.   Some ended up in my report, and some in

01:34:22   15   his.   And that was one of the sections we wrote together.

01:34:26   16   Q.   And do you recall that what Mr. Calman said or the

01:34:36   17   context in which he mentioned the Treo is that he said that

01:34:41   18   by 2006, Windows operating system included Windows mobile

01:34:48   19   phone for use with mobile portable devices.   Does that ring

01:34:54   20   a bell?

01:34:54   21   A.   Yes, I believe that's -- that's what we wrote.

01:35:11   22   Q.   I want to talk to you briefly about a couple of things

01:35:13   23   from the opening statement that you were here for.

01:35:20   24           MR. MELSHEIMER:   Do we have Plaintiff's Exhibit

01:35:23   25   18 -- 1.8 -- PDX-1.8?

01:35:28  1   Q.  (By Mr. Melsheimer)  Do you remember this was a slide

01:35:29  2   that was shown to the jury by USAA in opening statement?

01:35:32  3   A.  I remember this, yes.

01:35:33  4   Q.  Now, you understand that the Plaintiff in this case is

01:35:38  5   claiming that the 2017 filed patent claims that are subject

01:35:44  6   to this lawsuit were actually invented back in October of

01:35:51  7   2006, right?

01:35:52  8   A.  Yes, and I agree with them.

01:35:54  9   Q.  Okay.

01:35:58  10          MR. MELSHEIMER:  Your Honor, I'm going to object

01:36:00  11  to the last answer, "I agree with that," as non-responsive,

01:36:05  12  as well as outside the scope of his report.

01:36:09  13          THE COURT:  I'll sustain the non-responsive

01:36:11  14  objection.

01:36:12  15          MR. MELSHEIMER:  Can the -- can the answer be

01:36:14  16  struck, as well, Your Honor?

01:36:16  17          THE COURT:  I'll order it struck as

01:36:18  18  non-responsive.

01:36:19  19  Q.  (By Mr. Melsheimer)  Now, this is an opening slide

01:36:26  20  that's titled USAA created consumer device remote deposit.

01:36:32  21  Do you see that?

01:36:32  22  A.  Yes.

01:36:33  23  Q.  Now, this is from something that happened in 2 -- this

01:36:36  24  was from an article in 2009, correct?

01:36:38  25  A.  It says that, yes.

01:36:40  1   Q.  Not 2006, right?

01:36:42  2   A.  Yes.

01:36:43  3   Q.  Now, you also saw --

01:36:46  4         MR. MELSHEIMER:  Do we have Slide PDX-1.9?

01:36:51  5   Q.  (By Mr. Melsheimer)  Now, this is a New York Times

01:36:56  6   article from August 2009, right?

01:36:59  7   A.  Yes.

01:37:00  8   Q.  And it does reference 2006 indirectly, doesn't it, sir?

01:37:07  9   A.  Yes, it does.

01:37:13  10  Q.  It's highlight -- it's underlined in red, isn't it,

01:37:18  11  sir?

01:37:18  12  A.  Three years ago, yes.

01:37:20  13  Q.  Three years ago from 2009 is 2006.  But that sentence

01:37:27  14  is not talking about mobile phone deposit, right, sir?

01:37:31  15  A.  I don't quite agree.

01:37:34  16  Q.  Why -- why don't we read it together?

01:37:37  17         Three years ago -- are you with me?

01:37:39  18  A.  Yes.

01:37:40  19  Q.  It -- that's USAA, right?

01:37:42  20  A.  Yes.

01:37:42  21  Q.  Introduced the option of depositing a check from home

01:37:47  22  using a scanner, right?

01:37:50  23  A.  Yes.

01:37:51  24  Q.  Then it says that laid the groundwork for the phone

01:37:55  25  deposit feature which USAA claims to offer on phones this

| | | |
|---|---|---|
| 01:37:57 | 1 | year, which would be 2009, right? |
| 01:37:59 | 2 | A.  Yes. |
| 01:38:02 | 3 | Q.  All right.  I want to talk to you a little bit about |
| 01:38:06 | 4 | your infringement position, sir. |
| 01:38:07 | 5 | First of all, I assume it's your view that the |
| 01:38:12 | 6 | claims in this case are broad enough to cover a mobile or |
| 01:38:16 | 7 | smartphone, right? |
| 01:38:18 | 8 | A.  That's my opinion, yes. |
| 01:38:19 | 9 | Q.  That the claims of both patents are broad enough to |
| 01:38:26 | 10 | cover a mobile phone or smartphone, right? |
| 01:38:29 | 11 | A.  Well, they refer to a mobile device, and a smartphone |
| 01:38:32 | 12 | is a mobile device. |
| 01:38:33 | 13 | Q.  So you agree that the claims are broad enough to cover |
| 01:38:37 | 14 | a smartphone, right? |
| 01:38:37 | 15 | A.  Yes. |
| 01:38:38 | 16 | Q.  Now, I want to focus your attention on the '681 patent, |
| 01:38:52 | 17 | Claims 12 and 30.  Are you with me? |
| 01:38:55 | 18 | A.  Yes. |
| 01:38:55 | 19 | Q.  Okay.  I'm not going to pull them up at just this |
| 01:38:59 | 20 | moment, but that's where I'm headed, and I want you to have |
| 01:39:02 | 21 | that in your mind. |
| 01:39:03 | 22 | In -- in doing your analysis for this case, it was |
| 01:39:07 | 23 | important for you to understand where certain things |
| 01:39:11 | 24 | happened in Wells Fargo's system, right? |
| 01:39:15 | 25 | A.  Yes. |

01:39:16   1   Q.   That's because in MRDC, and that stands for mobile

01:39:21   2   remote deposit capture, right?

01:39:22   3   A.   Yes.

01:39:25   4   Q.   Some things happen on the user's device, true?

01:39:31   5   A.   Yes.

01:39:32   6   Q.   And some things happen on servers -- I'm going to say

01:39:44   7   back at Wells Fargo?

01:39:46   8   A.   Yes.

01:39:47   9   Q.   And those servers could be 10 miles away from the user,

01:39:53  10   a thousand miles away from the user, could be anywhere

01:39:56  11   remote from the user, right?

01:39:57  12   A.   Yes.   They're interconnected, of course.

01:40:00  13   Q.   Understood.   But, physically, the servers that are in

01:40:08  14   the Wells Fargo side of the house, those could be located

01:40:10  15   anywhere in the country, true?

01:40:11  16   A.   Yes.   I don't know if regulators allow them to be out

01:40:17  17   of the country or not.

01:40:19  18   Q.   And if you look -- can -- do you have your report

01:40:24  19   there, sir?

01:40:24  20   A.   I do.

01:40:24  21   Q.   Can you look at Paragraph 73 of your report?   And I'm

01:40:33  22   going to display the chart that you created, for the jury's

01:40:35  23   benefit.

01:40:36  24            MR. MELSHEIMER:   Mr. Bakale, if we can.

01:40:48  25   Q.   (By Mr. Melsheimer)   It's also on the screen.   Is

01:40:50  1  what's on the screen, sir, a -- an accurate representation

01:40:56  2  of what's in your report?

01:40:57  3  A.  It is a picture of what's in my report, yes.

01:41:00  4  Q.  Okay.  And so what you've got here is you've got on the

01:41:05  5  bottom left, you've got a picture of a phone, right?

01:41:07  6  A.  Yes.

01:41:07  7  Q.  And then you've got these various boxes that some of

01:41:11  8  them -- boxes that represent different servers, right?

01:41:16  9  A.  They're actually software components on the right, if

01:41:20  10  that's what you're referring to.

01:41:21  11  Q.  Well, you've got the TMS server, the OPSCON server --

01:41:21  12  A.  I see.

01:41:27  13  Q.  -- I'm just reading the words you used, sir.

01:41:29  14  A.  Yes.  Those are -- those are servers, the -- the titles

01:41:31  15  are referring to the software that they're running.

01:41:34  16  Q.  Okay.  Just so you and I are on the same page, those

01:41:38  17  boxes are servers with software that you've identified

01:41:44  18  running on those servers, right?

01:41:45  19  A.  That's correct.

01:41:46  20  Q.  And a server is a specialized computer, correct?

01:41:49  21  A.  It's a -- no, I would characterize it as a general

01:41:54  22  purpose computer.

01:41:54  23  Q.  Okay.  Let me rephrase the question, I'm sorry.

01:41:57  24          A server is a -- is a general purpose computer

01:42:03  25  that may be tasked with a specific role or function, fair?

01:42:06  1   A.  Running a certain app, yes.

01:42:08  2   Q.  And the apps that you have there are the ones titled

01:42:14  3   OPSCON and TMS?

01:42:19  4   A.  Yes.

01:42:19  5   Q.  Okay.

01:42:20  6   A.  Among others.

01:42:21  7   Q.  Among others.  You've got a server from a company

01:42:24  8   called Mitek, right?

01:42:25  9   A.  Yes, and then there's WIBTP CheckDeposit.

01:42:32  10  Q.  Those are all different softwares and pieces of

01:42:36  11  equipment that are separate from the mobile phone that you

01:42:39  12  have down there on the bottom left, right?

01:42:41  13  A.  Well, they are interconnected as a system, but, yes.

01:42:44  14  Q.  Right.  But you've got arrows going from one to the

01:42:48  15  other because they're in different places, right?

01:42:51  16  A.  Sure.

01:43:00  17  Q.  And, indeed, to your knowledge, there are multiple

01:43:03  18  servers at various Wells Fargo sites that are involved in

01:43:10  19  MRDC, right?

01:43:10  20  A.  There may be one or more, yes.

01:43:12  21  Q.  Now, you wanted to know how things worked in the

01:43:18  22  system, right?

01:43:19  23  A.  Yes.

01:43:20  24  Q.  So one of the things you did is you and some of your

01:43:25  25  colleagues or assistants looked at the Wells Fargo source

01:43:32  1   code, right?

01:43:33  2   A.  Correct.

01:43:33  3   Q.  And you made reference to something earlier called a

01:43:36  4   protective order, and I just want to make sure we're on the

01:43:38  5   same page about that.  That's an order that allows both

01:43:42  6   sides in a case like this to exchange information that

01:43:47  7   either side may view as confidential, right?

01:43:50  8   A.  Well, I -- I'm sorry.  Maybe I wasn't specific.  I was

01:43:54  9   referring to my aspect of the protective order that I

01:43:57  10  signed that gave me access to the other side's confidential

01:44:03  11  information.

01:44:03  12  Q.  But you know, sir, because you've done this before in

01:44:06  13  other lawsuits, you know that Dr. Villasenor, you see him

01:44:09  14  here in the front row?

01:44:11  15  A.  Yes.

01:44:12  16  Q.  He signed a protective order, too, right?

01:44:15  17  A.  It's my understanding, yes.

01:44:16  18  Q.  So that he could get information, if he wanted to, that

01:44:20  19  USAA said was confidential, right?

01:44:21  20  A.  Yes.

01:44:22  21  Q.  Right.  So I'm just trying to straight -- there's --

01:44:24  22  there's an equality here of -- of protections on both

01:44:28  23  sides, fair?

01:44:29  24  A.  Yes.

01:44:32  25  Q.  Just for a moment since we're on Dr. -- Dr. Villasenor,

476

| | | |
|---|---|---|
| 01:44:40 | 1 | teaches similar stuff to what you teach? |
| 01:44:42 | 2 | A.  Generally. |
| 01:44:46 | 3 | Q.  Works at a very reputable university? |
| 01:44:51 | 4 | A.  It's pretty good. |
| 01:44:52 | 5 | Q.  Not as good as Georgia Tech? |
| 01:44:54 | 6 | A.  No, but it's pretty good. |
| 01:44:56 | 7 | Q.  All right.  UCLA? |
| 01:44:57 | 8 | A.  Yeah. |
| 01:44:58 | 9 | Q.  He went to Stanford.  Is that pretty good? |
| 01:45:00 | 10 | A.  That's pretty good. |
| 01:45:01 | 11 | Q.  University of Virginia, that's pretty good? |
| 01:45:03 | 12 | A.  Yeah, pretty good. |
| 01:45:05 | 13 | Q.  So he's got -- same or similar credentials to what you |
| 01:45:09 | 14 | have -- let the record reflect that you're laughing. |
| 01:45:12 | 15 | A.  John is, too. |
| 01:45:13 | 16 | Q.  Same or similar credentials.  You don't -- you don't |
| 01:45:15 | 17 | question -- and we'll hear from Dr. Villasenor later -- but |
| 01:45:17 | 18 | you don't question any of his credentials to offer the |
| 01:45:21 | 19 | opinions he's going to offer in this case, you just |
| 01:45:23 | 20 | disagreed with them? |
| 01:45:24 | 21 | A.  Correct.  He's misguided. |
| 01:45:26 | 22 | Q.  And he thinks you're misguided? |
| 01:45:29 | 23 | A.  I haven't heard from him yet. |
| 01:45:31 | 24 | THE COURT:  Let's try to get a straight question |
| 01:45:33 | 25 | and a straight answer without all this editorial add-on |

| | | |
|---|---|---|
| 01:45:38 | 1 | from both sides, all right? |
| 01:45:40 | 2 | THE WITNESS:  Yes, Your Honor. |
| 01:45:41 | 3 | THE COURT:  Let's go forward. |
| 01:45:42 | 4 | MR. MELSHEIMER:  Yes, Your Honor. |
| 01:45:43 | 5 | Q.  (By Mr. Melsheimer)  You reviewed a lot of source code, |
| 01:45:46 | 6 | true? |
| 01:45:47 | 7 | A.  Yes, that's true. |
| 01:45:49 | 8 | Q.  You or people on your behalf did it, right? |
| 01:45:53 | 9 | A.  Yes, that's true. |
| 01:45:56 | 10 | Q.  And that is something that you -- that sort of -- you |
| 01:46:01 | 11 | did that among other work, and you came up with this |
| 01:46:06 | 12 | architectural diagram in Paragraph 78 of your report.  And |
| 01:46:11 | 13 | I'm going to ask you to look at that, sir. |
| 01:46:13 | 14 | A.  Yes, I did. |
| 01:46:14 | 15 | Q.  And are we showing the jury now a correct copy of -- or |
| 01:46:23 | 16 | an image of Paragraph 78 of your report? |
| 01:46:25 | 17 | A.  Yes. |
| 01:46:29 | 18 | Q.  So you've got three boxes here, right? |
| 01:46:35 | 19 | A.  Yes. |
| 01:46:35 | 20 | Q.  Probably got more than three boxes.  I'm talking about |
| 01:46:38 | 21 | the big ones that are shaded in blue? |
| 01:46:40 | 22 | A.  I assume that's what you meant. |
| 01:46:42 | 23 | Q.  And they're separated by some white space, correct? |
| 01:46:46 | 24 | A.  That's correct. |
| 01:46:46 | 25 | Q.  And on the left-hand side, you've got a box -- a square |

01:46:51    1    that says mobile device, and you've got a bunch of

01:46:54    2    components in that box, correct?

01:46:58    3    A.  Yes, those are different software components.

01:47:02    4    Q.  And then in the middle, you've got a rectangle that is

01:47:06    5    to check deposit server domain, and that's got a number of

01:47:11    6    components in it, as well, true?

01:47:13    7    A.  That's correct.

01:47:13    8    Q.  And then on the right-hand side, you've got these

01:47:17    9    remote servers with, again, a number of components --

01:47:22   10    again, separate from what you've connected to but separate

01:47:26   11    from the mobile device square on the far left, right?

01:47:31   12    A.  That's correct.

01:47:31   13    Q.  So what you're describing on the left is what we would

01:47:35   14    think of as our mobile phone or smartphone, right?

01:47:38   15    A.  Not exactly.

01:47:42   16    Q.  Well, you label it mobile device?

01:47:45   17    A.  Well, what I'm describing is the architecture of the

01:47:50   18    software that is executing on that device.

01:47:52   19    Q.  So on the left-hand side, you've got boxes for the

01:47:55   20    software that execute on the mobile device; is that -- is

01:47:58   21    that what you're telling us?

01:47:59   22    A.  Yes.

01:48:00   23    Q.  And on the right-hand side, you've got the software and

01:48:04   24    components that are being executed somewhere else, fair?

01:48:07   25    A.  On the servers, yes.

01:48:09  1   Q.  So let's take a look at the middle rectangle -- but the

01:48:18  2   Wells Fargo's check deposit server, that -- that does

01:48:22  3   things like, you've got here, holds the transaction

01:48:27  4   information and images.  Do you see that?

01:48:29  5   A.  Yes.

01:48:29  6   Q.  Is -- is that -- by transaction information, do you

01:48:33  7   mean things like the amount of the check, the date, things

01:48:37  8   of that nature?

01:48:38  9   A.  Yes, that log file.

01:48:45  10  Q.  And then you have something called a transaction

01:48:48  11  manager storing active transactions.  So is that all before

01:48:51  12  the deposit is finalized and -- and before -- and before

01:48:58  13  it's still -- the item is processed within the bank's

01:49:02  14  internal systems?

01:49:04  15  A.  It depends on the amount of the check.

01:49:10  16  Q.  So it could -- let's say it's a $10,000.00 check.  How

01:49:14  17  does that change your answer?

01:49:15  18  A.  Yes.  So there would be a certain amount credited in

01:49:21  19  the check deposit server, and then there would be a delay.

01:49:24  20  And then OPSCON and another server called Hogan would do

01:49:30  21  the actual depositing.

01:49:32  22          Just, since we're here, let me note that the red

01:49:34  23  blocks are areas where I did not get source code.

01:49:45  24  Q.  There's still other parts of the servers that handle

01:49:48  25  other parts of the process, like image analysis on the far

01:49:54   1   right.  Do you see that, sir?

01:49:55   2   A.  Yes.

01:49:55   3   Q.  And then the actual check submission process on the

01:50:02   4   OPSCON server; do you see that?

01:50:04   5   A.  Yes.

01:50:05   6   Q.  Now, this is not the entire architecture of the check

01:50:11   7   processing process, is it, sir?

01:50:12   8   A.  No, again, I didn't have all the software components

01:50:16   9   available to me.

01:50:17   10   Q.  Well, that's not really what I'm referring to, sir.

01:50:20   11        You had -- you had what you thought you needed to

01:50:26   12   make your conclusions in this case, right?

01:50:27   13   A.  I did the best I could with what I had on hand.

01:50:30   14   Q.  What I'm talking about is the architecture of the back

01:50:34   15   end systems that you and I talked about a minute ago.  You

01:50:36   16   don't have that laid out here in your report, correct?

01:50:38   17   A.  No, I don't think that's -- that's quite true.  Sorry.

01:50:45   18   I do talk about what happens in the back end in detail.

01:50:48   19   Q.  Right.  I'm -- I'm -- what I'm asking you, sir, though,

01:50:51   20   is these charts do not reflect all the different things

01:50:55   21   that are occurring, the components, the functionality in

01:50:59   22   the software in the back end system?

01:51:01   23   A.  Right.  I did not refer to anything I didn't need for

01:51:06   24   my analysis.

01:51:07   25   Q.  Fair enough.  But I just want to make sure you and I

01:51:10   1  are on the same page.  This chart on Paragraph 78 does not

01:51:14   2  include what you and I have agreed is the back end system

01:51:19   3  of item processing, fair?

01:51:20   4  A.  I don't think that's quite fair.

01:51:28   5  Q.  I want to make sure I'm being fair with you, sir.  So

01:51:32   6  let me -- let me -- let me rephrase the question a little

01:51:35   7  bit.

01:51:36   8          There are things that happen in the bank's

01:51:38   9  internal systems regarding item processing that you have

01:51:41  10  not documented here in Paragraph 78; is that fair?

01:51:45  11  A.  Yes.

01:51:45  12  Q.  Now, let's take a look at the '681 patent, Claim 30.

01:51:58  13          Now, it's -- it's a long claim, sir, but I want --

01:52:07  14  I want to focus you on the steps following the phrase,

01:52:14  15  causes the customer's mobile device to perform, in

01:52:18  16  Claim 30.  Do you see that, sir?

01:52:20  17  A.  I do.

01:52:21  18  Q.  So -- so you and I are communicating, a non-transitory

01:52:29  19  computer-readable medium storing an app, that's this

01:52:34  20  software program that you described on your direct

01:52:35  21  examination, right?

01:52:37  22  A.  Yes.

01:52:37  23  Q.  That when downloaded and run by a customer's mobile

01:52:43  24  device causes the con -- customer's mobile device to

01:52:49  25  perform, right?

01:52:50  1   A.   That's exactly what the claim says.

01:52:52  2   Q.   And then there are seven steps that follow that in

01:53:00  3   Claim 30, right?

01:53:01  4   A.   Yes.

01:53:01  5   Q.   There is, one, the instructing step.  You see that?

01:53:07  6   A.   Yes.

01:53:08  7   Q.   And, two, a displaying step?

01:53:11  8   A.   Yes.

01:53:12  9   Q.   Then a giving step?

01:53:13  10  A.   Giving an instruction.  Let's be --

01:53:17  11  Q.   You want to say, giving an instruction.

01:53:19  12            Presenting -- a presenting step?

01:53:21  13  A.   Presenting the photos, yes.

01:53:23  14  Q.   Confirming.  Do you see that?

01:53:27  15  A.   Yes.

01:53:27  16  Q.   Then there's a checking for errors step?

01:53:35  17  A.   Yes.

01:53:35  18  Q.   And then there's the final step, No. 7, using a

01:53:38  19  wireless network transmitting the check and submitting it

01:53:44  20  for deposit after certain things have happened, right?

01:53:47  21  A.   That's right.

01:53:54  22  Q.   So we -- to satisfy Claim 30, we need an app, a piece

01:53:57  23  of software, that causes the customer's mobile device to

01:54:03  24  perform those seven steps, right?

01:54:07  25  A.   That's correct.

483

01:54:11    1    Q.  Now, let's focus on one of those steps beginning with

01:54:14    2    the word "confirming."  I'm calling that Step 5, but we're

01:54:18    3    going to call it the confirming step.  Are you with me?

01:54:21    4    A.  Yes.

01:54:22    5    Q.  So this is confirming that the mobile check deposit can

01:54:27    6    go forward after optical character recognition is performed

01:54:33    7    on the check.  I'm going to pause there for a minute.  Did

01:54:36    8    I read that correctly?

01:54:37    9    A.  Yes, you did.

01:54:37   10    Q.  Optical character recognition, that's OCR, right?

01:54:40   11    A.  That's correct.

01:54:42   12    Q.  The optical character recognition -- continuing --

01:54:51   13    determining an amount of the check and reading a magnetic

01:54:59   14    ink character recognition line.

01:55:00   15         That's MICR, right?

01:55:02   16    A.  Yes.

01:55:02   17    Q.  Now, can we agree, sir, that this claim requires the

01:55:13   18    portable device to do the confirming?

01:55:17   19    A.  Yes.

01:55:19   20    Q.  And that's because, if we go up to the beginning, we've

01:55:23   21    got that language, "causes the customer's mobile device to

01:55:28   22    perform," and then this is one of the steps that is caused

01:55:31   23    to be performed, right?

01:55:33   24    A.  Yes.

01:55:34   25    Q.  And we can agree that in Wells Fargo's system, the OCR

01:55:43   1   of the amount of the check -- are you with me?

01:55:47   2   A.   Yes.

01:55:47   3   Q.   Is not performed on the portable device, true?

01:55:51   4   A.   I don't think that's quite accurate.

01:55:59   5   Q.   Comparing the OCR-determined amount to the amount

01:56:04   6   indicated by the user is not performed on the mobile

01:56:07   7   device; is that correct?

01:56:09   8   A.   I wouldn't say that was quite accurate.

01:56:11   9   Q.   Have you ever given a different answer?

01:56:13  10   A.   So the mobile device causes that to occur.

01:56:26  11   Q.   So, Dr. Conte, let me -- let me ask that question

01:56:30  12   again.

01:56:30  13        Have you ever given a different answer to that

01:56:33  14   question?

01:56:34  15   A.   I might have.

01:56:34  16   Q.   Okay.  Let me take a look at your deposition if you

01:56:37  17   would?  You have a copy --

01:56:38  18        MR. ROWLES:  Your Honor, I object.  It's not

01:56:40  19   proper impeachment.  No inconsistent statement has been

01:56:46  20   made.

01:56:46  21        MR. MELSHEIMER:  I just asked him to look at his

01:56:50  22   deposition, Your Honor.

01:56:52  23        THE COURT:  Yeah.  I think your objection is

01:56:55  24   premature, counsel.  It's overruled.

01:56:58  25        MR. MELSHEIMER:  Your Honor, may I have a moment?

01:57:00   1            THE COURT:  Take a moment.

01:57:11   2   Q.  (By Mr. Melsheimer)  Do you have your deposition up

01:57:12   3   there, sir?

01:57:12   4   A.  I don't believe so.

01:57:13   5   Q.  Okay.  Let me -- let me provide it to you.

01:57:35   6            MR. MELSHEIMER:  May I approach the Court Security

01:57:37   7   Officer, Your Honor, to hand these --

01:57:39   8            THE COURT:  You may -- you may approach.

01:57:51   9            MR. MELSHEIMER:  Now, without -- without

01:57:53  10   displaying anything, Mr. Bakale, I would like --

01:57:58  11   Q.  (By Mr. Melsheimer)  Dr. Conte, would you look at your

01:58:00  12   deposition?

01:58:00  13   A.  Which tab is that?

01:58:04  14   Q.  It's -- the tabs are identified on the side.  I don't

01:58:08  15   know which -- I don't know if they're numbered, but it

01:58:10  16   should say deposition.

01:58:11  17   A.  It's this, Tab 2?

01:58:27  18   Q.  Yes, sir.

01:58:27  19   A.  Okay.

01:58:28  20   Q.  Page 123, Lines 5 to 13.  And would you just read that

01:58:28  21   to yourself, Dr. Conte, and then tell me when you've

01:58:35  22   finished at Line 120 -- Page 123, Lines 5 to 13?

01:58:39  23   A.  Yes.  Okay.

01:58:55  24   Q.  Does that refresh your recollection, sir, that -- that

01:58:57  25   in the Wells Fargo product, comparing the OCR-determined

01:59:02  1  amount to the amount indicated by the user is not performed

01:59:06  2  on the portable device?

01:59:08  3  A.  Yes, I believe that's accurate.

01:59:10  4  Q.  Can we also agree, sir, that the portable device or the

01:59:24  5  mobile phone here does not include the logic that

01:59:29  6  determines whether or not the deposit can go forward?

01:59:32  7  A.  The logic?  Yeah, that's right, the logic is on the

01:59:48  8  server.  The confirming is on the phone.

01:59:50  9  Q.  The logic that determines whether or not the deposit

01:59:53  10  can go forward is done on the server; is that correct,

01:59:58  11  Dr. Conte?

01:59:58  12  A.  The logic is on the server, the confirming is on the

02:00:02  13  phone, so, yes.

02:00:03  14  Q.  In Wells Fargo's system, the only component that is

02:00:10  15  deciding whether or not deposit can go forward is the

02:00:16  16  server; isn't that right, sir?

02:00:18  17  A.  Again, the server has the logic, the phone confirms to

02:00:28  18  the user.

02:00:29  19  Q.  Let me ask this -- let me -- let me make sure I'm

02:00:33  20  understanding your answer, sir.

02:00:35  21        Isn't it true, Dr. Conte, that the only device

02:00:38  22  that is deciding whether or not the check deposit can go

02:00:42  23  forward is the server?

02:00:50  24  A.  The server does the decision.  I'm just -- I'm trying

02:00:53  25  to be -- no, I wouldn't exactly agree with that, I'm sorry.

| | | |
|---|---|---|
| 02:00:57 | 1 | Q.  All right, sir.  If you look at Page 128 of your |
| 02:01:00 | 2 | deposition, Line 24, to 129, Line 5. |
| 02:01:18 | 3 | A.  This -- this matches what I've been answering, sir. |
| 02:01:21 | 4 | Q.  Did you say that the only device that is deciding |
| 02:01:28 | 5 | whether or not the check deposit can go forward is the |
| 02:01:32 | 6 | server? |
| 02:01:32 | 7 | Yes, that's correct. |
| 02:01:33 | 8 | Was that your answer, sir? |
| 02:01:35 | 9 | A.  The decision, yes. |
| 02:01:49 | 10 | MR. MELSHEIMER:  All right.  Let's take a look at |
| 02:01:51 | 11 | Claim 12, which is a little bit shorter than Claim 30. |
| 02:01:56 | 12 | THE COURT:  Mr. Melsheimer, it really doesn't |
| 02:01:58 | 13 | serve any purpose for you to tell the jury whether it's |
| 02:02:01 | 14 | shorter or longer.  If we could just have questions and |
| 02:02:04 | 15 | answers, it would be helpful. |
| 02:02:06 | 16 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 02:02:06 | 17 | THE COURT:  If you'll avoid those kind of sidebar |
| 02:02:10 | 18 | comments, please. |
| 02:02:11 | 19 | MR. MELSHEIMER:  I will, Your Honor. |
| 02:02:14 | 20 | Q.  (By Mr. Melsheimer)  Let me know when you're at |
| 02:02:16 | 21 | Claim 12, sir. |
| 02:02:17 | 22 | A.  It's on the display. |
| 02:02:18 | 23 | Q.  Okay.  In Claim 12, there's this confirming step again. |
| 02:02:27 | 24 | Do you see that, sir? |
| 02:02:28 | 25 | A.  It's not the exact same step, sir. |

02:02:32  1   Q.  I didn't mean to suggest it was, sir.  But can you --

02:02:35  2   are you -- are you with me on the -- on the confirming

02:02:38  3   step?

02:02:38  4   A.  Could you be a little bit more precise?

02:02:42  5   Q.  The -- the clause of the -- of Claim 12 that starts out

02:02:49  6   "confirming" that I have highlighted -- are you with me?

02:02:51  7   A.  Yes.

02:02:53  8   Q.  So it says:  Confirming that the mobile check deposit

02:02:56  9   can go forward after the system performs optical character

02:03:03  10  recognition on the check, the optical character recognition

02:03:07  11  determining an amount of the check and reading a magnetic

02:03:13  12  ink character recognition MICR line.

02:03:13  13       Did I read that correctly?

02:03:15  14  A.  You did.

02:03:17  15  Q.  Now, the -- the -- so focusing on this confirming step,

02:03:23  16  the claims of the '681 patent require the portable device

02:03:29  17  to do the confirming; isn't that right, sir?

02:03:32  18  A.  Yes.

02:03:37  19  Q.  But in the Wells Fargo system, the portable device does

02:03:46  20  not include the logic that determines whether or not the

02:03:50  21  deposit can go forward; isn't that correct?

02:03:55  22  A.  That isn't the opposite of what you said.  So, no, I

02:04:00  23  can't agree to that.

02:04:01  24  Q.  Well, let me clarify it then if I -- if I -- focusing

02:04:05  25  on the Wells Fargo system, the portable device does not

02:04:09   1   include the logic that determines whether or not the

02:04:12   2   deposit can go forward; is that correct?

02:04:16   3   A.  It does not -- the portable device does not include the

02:04:19   4   logic, however, it's not here.

02:04:23   5   Q.  But the claims require the portable device do the

02:04:26   6   confirming.  Do I have that right?

02:04:30   7   A.  Those aren't the same thing.  I can't agree to that,

02:04:33   8   I'm sorry.

02:04:34   9   Q.  Let me make sure we're communicating.

02:04:37   10          The claims of the '681 patent require the portable

02:04:41   11   device to do the confirming; is that correct or is that not

02:04:44   12   correct?

02:04:45   13   A.  The claims do not require the logic to occur on the

02:04:51   14   portable device.

02:04:58   15          MR. MELSHEIMER:  Objection, nonresponsive, Your

02:05:00   16   Honor.

02:05:00   17          THE COURT:  Overruled.

02:05:16   18   Q.  (By Mr. Melsheimer)  The logic that does the deciding

02:05:36   19   with respect to whether a deposit can go forward is on the

02:05:39   20   Wells Fargo servers and not on the mobile device; is that

02:05:45   21   correct?

02:05:45   22   A.  Yes, that's correct.  The claims don't call out that

02:05:48   23   logic.

02:05:52   24          THE COURT:  Dr. Conte --

02:05:53   25          MR. MELSHEIMER:  I'm going to object --

02:05:54  1          THE COURT:  -- he didn't ask you if the claims

02:05:56  2  called out that logic.  You just added that.  You answered

02:05:59  3  the question when you said, yes, that's correct.

02:06:02  4          THE WITNESS:  I'm sorry, Your Honor.

02:06:02  5          THE COURT:  You're going to need to limit your

02:06:04  6  answers to the questions asked.  These -- these gratuitous

02:06:10  7  add-ons are just not helpful.  Mr. Rowles is going to get a

02:06:14  8  chance to ask you more questions, and we all know that.  So

02:06:17  9  let's rely on that and limit your answers to the questions

02:06:21  10  asked, okay?

02:06:22  11          THE WITNESS:  Yes, Your Honor.  My apologies.

02:06:24  12          THE COURT:  That's all right.

02:06:25  13          Go ahead, Mr. Melsheimer.

02:06:27  14  Q.  (By Mr. Melsheimer)  There are other claims in the '681

02:06:30  15  patent that you went over on your direct examination that

02:06:33  16  are what's called dependent claims, right?

02:06:34  17  A.  Yes.

02:06:35  18  Q.  Claim 12 and Claim 30 are so-called independent claims,

02:06:40  19  right?

02:06:40  20  A.  Yes, that's true.

02:06:42  21  Q.  So if a claim depends on Claim 12, and Claim 12 is not

02:06:54  22  infringed, then the dependent claim is not infringed

02:06:56  23  either.  Do I have that right?

02:06:58  24  A.  Yes, that's true.

02:06:59  25  Q.  And so if Claim 30 is not infringed, then any claim

02:07:03  1   dependent on Claim 30 is, by definition, not infringed

02:07:08  2   either.  Do I have that right?

02:07:09  3   A.  Hypothetically.

02:07:10  4   Q.  Now, you told us in your report that you're not an

02:07:25  5   attorney, but you -- you do have a -- some knowledge about

02:07:32  6   patent law, right?

02:07:33  7   A.  What has been explained to me, yes.

02:07:37  8   Q.  And you often rely on lawyers in a case you're working

02:07:41  9   on to help explain to you their understanding of the law,

02:07:44  10  fair?

02:07:44  11  A.  Fair.

02:07:47  12        MR. MELSHEIMER:  Your Honor, may I have just a

02:07:49  13  moment?

02:07:49  14        THE COURT:  You may.

02:08:33  15        Are you ready to proceed, counsel?

02:08:35  16        MR. MELSHEIMER:  I am, Your Honor.  May it please

02:08:36  17  the Court.

02:08:36  18  Q.  (By Mr. Melsheimer)  Just a few more things, Dr. --

02:08:45  19  Dr. Conte.  You understand that with respect to the '605

02:08:47  20  patent and the '681 patent, that in both of those patents,

02:08:52  21  there are steps done by different parties within the

02:08:56  22  claims, right?

02:08:56  23  A.  Yes, I -- there are items done by different parties,

02:09:05  24  yes.

02:09:05  25  Q.  And that's sometimes referred to as divided

02:09:09    1    infringement.  Have you heard that?

02:09:10    2    A.  I've become familiar with the term, yes.

02:09:14    3    Q.  And when you have multiple parties involved in an

02:09:18    4    infringement claim, there are certain legal rules that must

02:09:21    5    be applied.  Do you understand that?

02:09:25    6    A.  Yes.

02:09:26    7    Q.  You don't purport or claim to be an expert in those

02:09:30    8    legal rules, right?

02:09:31    9    A.  I am not.

02:09:32    10   Q.  You didn't -- you didn't purport on your direct

02:09:35    11   examination to apply any of those legal rules in the

02:09:39    12   divided infringement context, did you, sir?

02:09:42    13   A.  Let me -- thinking -- let me think back.  I don't think

02:09:50    14   that's accurate.

02:09:53    15   Q.  Well, do you recall -- on your direct examination, did

02:09:57    16   you, for example, do an element-by-element analysis of the

02:10:02    17   benefits of the -- the elements of the claimed system?  Did

02:10:08    18   you do that on your direct examination?

02:10:10    19   A.  On my direct examination, I believe I did.

02:10:15    20   Q.  You -- you think in your direct examination, you went

02:10:18    21   through each element and explained how it benefitted the

02:10:22    22   bank versus how it benefitted the customer?

02:10:24    23   A.  Oh, no, I didn't do that.

02:10:30    24   Q.  Okay.  So just a few final questions, sir.  You -- you

02:10:34    25   have a slide --

493

| | | |
|---|---|---|
| 02:10:36 | 1 | MR. MELSHEIMER:  Can we -- can we pull up |
| 02:10:46 | 2 | PDX-2.33? |
| 02:10:46 | 3 | Q.  (By Mr. Melsheimer)  This is -- was in your direct |
| 02:10:50 | 4 | examination, right? |
| 02:10:51 | 5 | A.  Yes. |
| 02:10:51 | 6 | Q.  And I just want to clarify something.  You said Wells |
| 02:10:56 | 7 | Fargo customers must download and install a compatible |
| 02:11:01 | 8 | version of the mobile -- the Wells Fargo mobile app.  What |
| 02:11:04 | 9 | you mean by that is, if they want to participate in mobile |
| 02:11:08 | 10 | banking, they have to do that, right? |
| 02:11:10 | 11 | A.  Specifically, mobile remote check deposit, yes. |
| 02:11:14 | 12 | Q.  You can be a Wells Fargo customer and never participate |
| 02:11:17 | 13 | in mobile banking, right? |
| 02:11:18 | 14 | A.  In mobile remote check deposit, yes. |
| 02:11:21 | 15 | Q.  If you decide as a customer that you don't want to |
| 02:11:24 | 16 | download that app to your phone, you don't have to do it, |
| 02:11:28 | 17 | right? |
| 02:11:28 | 18 | A.  That's correct. |
| 02:11:39 | 19 | MR. MELSHEIMER:  And if we go to Slide PDX-2.29. |
| 02:11:43 | 20 | Q.  (By Mr. Melsheimer)  This is another slide from your |
| 02:11:47 | 21 | direct examination, sir.  Do you recall it? |
| 02:11:49 | 22 | A.  Yes. |
| 02:11:49 | 23 | Q.  Now, the slide says:  Wells Fargo software controls the |
| 02:11:58 | 24 | entire deposit process.  I just want to ask you this |
| 02:12:01 | 25 | question:  There's no deposit unless the customer initiates |

494

| | | |
|---|---|---|
| 02:12:07 | 1 | an action to make a deposit, right? |
| 02:12:12 | 2 | A.  There's no deposit, that's correct. |
| 02:12:14 | 3 | Q.  I mean, that's just common sense, right, if you don't |
| 02:12:18 | 4 | try to deposit a check, it doesn't get deposited within the |
| 02:12:23 | 5 | mobile deposit or any channel at Wells Fargo, right? |
| 02:12:26 | 6 | A.  That's correct. |
| 02:12:27 | 7 | Q.  The customer has to make that decision themselves, |
| 02:12:33 | 8 | right? |
| 02:12:33 | 9 | A.  Correct. |
| 02:12:41 | 10 |         MR. MELSHEIMER:  Can we pull up Slide PDX-2.31? |
| 02:12:46 | 11 | Q.  (By Mr. Melsheimer)  It's your opinion, sir, that the |
| 02:13:04 | 12 | Wells Fargo Mobile Deposit product system infringes the |
| 02:13:08 | 13 | '605 and the '681 patents, as you've indicated, right? |
| 02:13:12 | 14 | A.  Yes. |
| 02:13:12 | 15 | Q.  And you contend that every version of the Wells Fargo |
| 02:13:19 | 16 | Mobile Deposit system dating back to 2014 infringes the |
| 02:13:25 | 17 | '605 and the '681 patent, right? |
| 02:13:27 | 18 | A.  That's not precise. |
| 02:13:28 | 19 | Q.  Well, take a look at May 2014, Version 2.0.6; do you |
| 02:13:37 | 20 | see that, sir? |
| 02:13:38 | 21 | A.  Yes. |
| 02:13:39 | 22 | Q.  And July 2014, Version 2.0.6? |
| 02:13:44 | 23 | A.  For Android, yes. |
| 02:13:46 | 24 | Q.  And the title of your slide is All Wells Fargo Mobile |
| 02:13:53 | 25 | Deposit Software Uses USAA Technology? |

02:13:56   1   A.   That is the title, yes.

02:13:57   2   Q.   And by -- what you mean by that is, is the claims of

02:14:02   3   the '605 and the '681 patent that you've identified for the

02:14:04   4   jury, true?

02:14:05   5   A.   No.   I'm saying that they use the patented technology.

02:14:15   6   I'm not making a determination about infringement.

02:14:19   7   Q.   Well --

02:14:21   8   A.   I can't.

02:14:23   9   Q.   The element-by-element analysis that you did on your

02:14:25   10  direct examination --

02:14:29   11  A.   Yes.

02:14:29   12  Q.   -- are you with me?

02:14:31   13  A.   Yes.

02:14:31   14  Q.   That would apply to the Wells Fargo product back in

02:14:36   15  2014 on the iPhone and July 2014 on the Android phone;

02:14:36   16  isn't that right?

02:14:41   17  A.   Yes, it is.

02:14:42   18  Q.   And so, sir, if, in fact, USAA is entitled only to the

02:15:02   19  filing date as a priority date for its two patents in this

02:15:06   20  case; are you with me?

02:15:07   21  A.   Yes.

02:15:08   22  Q.   If they're entitled to that July 28, 2017, date, then

02:15:17   23  isn't it the case, sir, that Wells Fargo's own product

02:15:21   24  would anticipate the asserted claims of these two patents?

02:15:25   25          MR. ROWLES:   I object, Your Honor.

02:15:26    1          MR. SHEASBY:  Can we approach, Your Honor?

02:15:27    2          THE COURT:  Approach the bench.

02:15:28    3          (Bench conference.)

02:15:37    4          MR. ROWLES:  This is introducing --

02:15:38    5          THE COURT:  Just a minute.

02:15:39    6          MR. ROWLES:  Yes, sir.

02:15:40    7          THE COURT:  Go ahead.

02:15:40    8          MR. ROWLES:  This is introducing an unasserted

02:15:44    9  anticipation defense.  No expert -- no -- no discovery

02:15:49   10  disclosure in this case that contends that the Wells Fargo

02:15:51   11  system --

02:15:51   12          THE COURT:  Speak up a little bit.

02:15:52   13          MR. ROWLES:  There's been no disclosure in this

02:15:54   14  case --

02:15:55   15          THE COURT:  All right.  Just a minute.  I can't

02:15:56   16  hear him while you're whispering to him.  Let's have one at

02:16:00   17  a time up here, gentlemen.

02:16:01   18          MR. ROWLES:  There's been no disclosure in this

02:16:03   19  case, Your Honor, at any point in discovery of a theory

02:16:05   20  that the Wells Fargo system prior to 2017 is invalidating

02:16:10   21  prior art for these patents at any point.  And to inject

02:16:12   22  that into this case at this point is just irrelevant and

02:16:17   23  highly prejudicial.

02:16:17   24          THE COURT:  It's not an elected prior art --

02:16:20   25          MR. ROWLES:  It is not.

02:16:20  1          THE COURT:  -- even if your priority date is later

02:16:20  2  in time?

02:16:23  3          MR. SHEASBY:  It is not an elected prior art

02:16:24  4  source, and it's not something that's in -- in their

02:16:26  5  contentions.

02:16:28  6          THE COURT:  Let me hear a response.

02:16:30  7          MR. MELSHEIMER:  It is -- can I let Mr. Bittner

02:16:30  8  respond, Your Honor?

02:16:30  9          THE COURT:  No, he's your witness.

02:16:30  10         MR. MELSHEIMER:  Thank you, Your Honor.

02:16:31  11         It is in our invalidity contentions, Your Honor.

02:16:35  12  I understand that this was the exact -- this was the exact

02:16:40  13  invalidity theory that I understand Your Honor understood

02:16:43  14  us to be asserting back in chambers last night, which is if

02:16:46  15  they're not entitled to this earlier priority date, then

02:16:50  16  there's intervening developed systems that invalidate their

02:16:53  17  patent.  That's the anticipation defense.

02:16:56  18         THE COURT:  My understanding was that if the

02:16:58  19  Plaintiffs are not entitled to the earlier 2006 priority

02:17:03  20  date, then there is elected prior art that might or might

02:17:06  21  not invalidate.  But -- but I've never specified what that

02:17:13  22  prior art would be.  It just opens the door to an

02:17:16  23  invalidity case based on anticipation or obviousness if we

02:17:20  24  don't have that earlier 2006 priority date.

02:17:25  25         But you all indicated to me for the first time at

02:17:27  1  the bench here yesterday afternoon that if the earlier

02:17:31  2  priority date did apply and the jury found that to be the

02:17:34  3  applicable priority date, then there was no anticipation or

02:17:36  4  obviousness defense.

02:17:38  5          MR. SHEASBY:  That's correct.

02:17:39  6          MR. MELSHEIMER:  Your Honor, it's in our --

02:17:40  7          THE COURT:  It's always been conditional.

02:17:44  8          MR. MELSHEIMER:  That's true.  That's true.

02:17:45  9          MR. ROWLES:  Your Honor, their only asserted prior

02:17:49 10  art is the earlier application -- very same patent --

02:17:51 11          THE COURT:  All right.  It is either is or it

02:17:51 12  isn't elected prior art.

02:17:51 13          MR. MELSHEIMER:  It's disclosed in our 35 U.S.C.

02:17:58 14  282 disclosures, Your Honor.

02:17:58 15          MR. SHEASBY:  I've never seen it.

02:18:00 16          THE COURT:  Do I need to send the jury out and

02:18:02 17  let's get to the bottom of this because I'm hearing black

02:18:05 18  and white.

02:18:06 19          MR. MELSHEIMER:  I'm happy to do that, Your Honor.

02:18:08 20          MR. SHEASBY:  Here's the issue, Your Honor, that I

02:18:09 21  have, which is that they only -- the pleadings are merged

02:18:14 22  and --

02:18:14 23          THE COURT:  And, Mr. Sheasby, I'm not going to let

02:18:16 24  Mr. Bittner argue for Mr. Melsheimer, and I'm not going to

02:18:19 25  let you argue for Mr. Rowles.  I have to hold a firm line

02:18:24  1  here, or I'll have 15 people up here talking at the same

02:18:27  2  time.

02:18:27  3          (Whispering.)

02:18:27  4          MR. ROWLES:  That's absolutely correct, Your

02:18:38  5  Honor.  The only invalidity theory identified by

02:18:42  6  Mr. Saffici with respect to the two patents at issue in

02:18:44  7  this case is their predecessor on which patent applications

02:18:48  8  which they contend anticipate or render obvious in view of

02:18:51  9  the priority date.  This is not an issue of invalidity.

02:18:54  10         MR. MELSHEIMER:  Can we -- maybe we -- maybe it's

02:18:55  11 appropriate to take a break and pull out the record on

02:18:58  12 this, Your Honor.  I don't want to say anything that's

02:19:00  13 inaccurate, and I don't want to waste your time up here.

02:19:02  14         THE COURT:  If we can't resolve whether the prior

02:19:06  15 art mentioned is properly elected prior art, then I'll send

02:19:09  16 the jury out, and we'll get to the bottom of it.  But it

02:19:12  17 will be on the clock, and it will be y'all's time that

02:19:15  18 somebody's going to waste to do it.

02:19:16  19         MR. MELSHEIMER:  And I'm -- I can -- I'm also --

02:19:17  20         THE COURT:  We're going to get -- we're going to

02:19:18  21 get this gentleman off the bench --

02:19:21  22         MR. MELSHEIMER:  I understand.

02:19:21  23         THE COURT:  -- off the witness stand.

02:19:22  24         MR. MELSHEIMER:  I've only got about three or four

02:19:24  25 more questions.  It's whatever the Court's pleasure is.

| | | |
|---|---|---|
| 02:19:26 | 1 | MR. SHEASBY:  I mean, here's the issue.  He can |
| 02:19:28 | 2 | ask the question.  He can give an answer.  We'll -- if -- |
| 02:19:32 | 3 | we're going to request a severe limiting instruction if he |
| 02:19:35 | 4 | wants to gamble that way.  And I think that's what we can |
| 02:19:38 | 5 | do. |
| 02:19:38 | 6 | THE COURT:  Well, there's -- you've raised an |
| 02:19:41 | 7 | objection, and that objection is before me, that it calls |
| 02:19:46 | 8 | for opinion based on unelected prior art. |
| 02:19:50 | 9 | And either you need to withdraw the question, you |
| 02:19:54 | 10 | need to withdraw the objection, or I need to determine |
| 02:19:55 | 11 | whether it is or isn't previously properly elected prior |
| 02:19:58 | 12 | art.  It's got to be one of those three things. |
| 02:20:00 | 13 | MR. MELSHEIMER:  Can I have a moment, Your Honor? |
| 02:20:08 | 14 | I'm not -- again, I want to answer accurately and |
| 02:20:08 | 15 | truthfully.  I need to consult or I need to move on and |
| 02:20:09 | 16 | take a break and then we can consult.  I just need to |
| 02:20:12 | 17 | understand -- I don't want to -- you've asked whether or |
| 02:20:15 | 18 | not we want to withdraw or move on.  I just want -- |
| 02:20:18 | 19 | THE COURT:  Who do you need to consult with? |
| 02:20:20 | 20 | MR. MELSHEIMER:  Mr. Bittner and -- and |
| 02:20:22 | 21 | Mr. McCullough. |
| 02:20:27 | 22 | THE COURT:  Well, why don't you bring whoever else |
| 02:20:29 | 23 | you need up here, and you all stand over there and talk for |
| 02:20:34 | 24 | just a minute.  I'm not going to send you back to your |
| 02:20:37 | 25 | benches and then bring you back up here -- back to your |

02:20:39   1   tables and bring you back up here.

02:20:40   2        MR. MELSHEIMER:  Okay.  Thank you.

02:21:33   3        (Pause in proceedings.)

02:21:33   4        THE COURT:  You've consulted.  What's your

02:21:33   5   position?

02:21:34   6        MR. MELSHEIMER:  Our position is, Your Honor, this

02:21:36   7   is both in our invalidity contentions and in our 282

02:21:39   8   disclosure that this theory was -- fair notice of it.

02:21:45   9        Now, there was -- look, this -- they dropped a

02:21:47  10   bunch of claims on Sunday.  This thing has been kind of a

02:21:51  11   shifting target, but there was no requirement that we drop

02:21:54  12   certain theories as long as -- just like there was no

02:21:57  13   requirement they had no deadline by which to drop claims.

02:22:00  14   It's in our original contentions.  It's incorporated by

02:22:03  15   reference in our 282 notice, and I think it's -- it's out

02:22:07  16   there.

02:22:07  17        THE COURT:  All right.  What's the Plaintiff's

02:22:08  18   posture on that?

02:22:09  19        MR. ROWLES:  I can read for you their invalidity

02:22:11  20   expert's deposition testimony which occurred before any

02:22:14  21   narrowing of the case.

02:22:15  22        The question is:  You don't identify any system,

02:22:19  23   any design anywhere in the world that anticipates or

02:22:21  24   renders obvious the '605 or '681 patents, correct?

02:22:25  25        Answer:  That's correct.

| | | |
|---|---|---|
| 02:22:26 | 1 | This is not a live invalidity theory. |
| 02:22:29 | 2 | MR. MELSHEIMER:  I agree, it's not in his report. |
| 02:22:31 | 3 | THE COURT:  We should have a -- we should have a |
| 02:22:33 | 4 | firm, fixed list of elected prior art that relates to |
| 02:22:38 | 5 | whatever the Defendant's invalidity theories are.  And this |
| 02:22:42 | 6 | is either -- what's been called for in the question that's |
| 02:22:46 | 7 | before the Court should either be on that list of elected |
| 02:22:49 | 8 | prior art or not on that list of elected prior art. |
| 02:22:49 | 9 | MR. MELSHEIMER:  There was no -- |
| 02:22:52 | 10 | THE COURT:  It doesn't mean -- I'm not concerned |
| 02:22:55 | 11 | about did we talk about it, do we know about it, did we |
| 02:22:57 | 12 | take a deposition on it.  We've got a fixed universe of |
| 02:23:00 | 13 | elect prior art somewhere, and it's either there, or it's |
| 02:23:03 | 14 | not. |
| 02:23:03 | 15 | MR. MELSHEIMER:  There was no requirement in this |
| 02:23:05 | 16 | case, Your Honor, to elect references, just like there |
| 02:23:07 | 17 | wasn't a deadline for claims.  So the original invalidity |
| 02:23:10 | 18 | contentions -- this is in their -- there's never been a -- |
| 02:23:14 | 19 | this pre-trial order did not have that requirement, as I |
| 02:23:18 | 20 | understand it. |
| 02:23:22 | 21 | And I agree that Mr. Saffici -- we're not going to |
| 02:23:24 | 22 | ask Mr. Saffici about this because he said he didn't have |
| 02:23:26 | 23 | an opinion about it. |
| 02:23:27 | 24 | MR. SHEASBY:  Your Honor, it's their burden.  If |
| 02:23:29 | 25 | they're not going to ask Mr. Saffici about a defense, |

02:23:31  1    that's their burden.

02:23:38  2         MR. ROWLES:  This is just a sideshow.  It's just

02:23:39  3    injecting something that's going to confuse the jury about

02:23:41  4    the issues to be decided in this case.

02:23:46  5         If Mr. Saffici gets up here and doesn't testify

02:23:49  6    about the invalidity theory that's actually disclosed and

02:23:52  7    gives this testimony and they're asserting that their own

02:23:55  8    product is somehow prior art, then there would be no

02:23:58  9    instruction.  It would be a directed verdict.  Their own

02:24:01  10   invalidity expert concedes that no system anywhere in the

02:24:04  11   world other than the patents he identifies --

02:24:07  12        MR. MELSHEIMER:  They're not -- I don't -- I don't

02:24:08  13   have to use my expert to do that.  I can adduce that

02:24:12  14   evidence any way I want to adduce it.

02:24:14  15        THE COURT:  Is this within the scope of Mr. --

02:24:16  16   Dr. Conte's report?

02:24:17  17        MR. ROWLES:  It's absolutely not.

02:24:18  18        MR. MELSHEIMER:  It's not in the scope of his

02:24:20  19   report, but -- that's true, but that wasn't the objection.

02:24:26  20        THE COURT:  Well --

02:24:27  21        MR. MELSHEIMER:  We did a claim-by-claim.  All I'm

02:24:29  22   simply asking him, Your Honor, is if --

02:24:32  23        THE COURT:  One at a time.  I don't know how to

02:24:34  24   make that any clearer.

02:24:35  25        MR. MELSHEIMER:  Your Honor, I simply said that

| | | |
|---|---|---|
| 02:24:37 | 1 | he -- I just drew a logical conclusion for what he's |
| 02:24:42 | 2 | saying.  I didn't say it was your opinion.  I didn't say it |
| 02:24:44 | 3 | was in your report.  I simply said, look, if all these |
| 02:24:48 | 4 | things are in the prior system and if they're not entitled |
| 02:24:51 | 5 | to that priority date, then I would anticipate.  That's all |
| 02:24:54 | 6 | I asked him. |
| 02:24:54 | 7 | THE COURT:  And that's -- that may well be the way |
| 02:24:56 | 8 | you got there, but expert witnesses are confined to the |
| 02:24:59 | 9 | scope of their report, both on direct and cross.  And if |
| 02:25:03 | 10 | it's not within the scope of his report, it's not a proper |
| 02:25:06 | 11 | question to ask him.  And on that basis, I'm going to |
| 02:25:10 | 12 | exclude it. |
| 02:25:13 | 13 | MR. ROWLES:  We'd ask for -- |
| 02:25:15 | 14 | THE COURT:  I heard the echo. |
| 02:25:18 | 15 | MR. ROWLES:  Because of the nature of the |
| 02:25:19 | 16 | question, we'd ask for an instruction. |
| 02:25:21 | 17 | MR. MELSHEIMER:  Hold on to that. |
| 02:25:23 | 18 | So here's the thing.  The testimony that the |
| 02:25:26 | 19 | elements of this earlier version are satisfied, okay, that |
| 02:25:32 | 20 | should not be struck.  He put up a slide to that effect. |
| 02:25:35 | 21 | THE COURT:  I'm not going to strike anything.  He |
| 02:25:39 | 22 | hasn't answered the question.  I'm not going to instruct |
| 02:25:41 | 23 | the jury.  I'm going to sustain the exclusion of the |
| 02:25:45 | 24 | outstanding answer to the question because it calls for an |
| 02:25:47 | 25 | opinion beyond the scope of this expert's report. |

505

```
02:25:47   1            MR. MELSHEIMER:  Okay.  Okay.
02:25:52   2            THE COURT:  And we're going to move on.
02:25:52   3            MR. MELSHEIMER:  Understood.
02:25:53   4            THE COURT:  And that's my ruling.
02:25:54   5            MR. MELSHEIMER:  Thank you, Your Honor.
02:25:54   6            (Bench conference concluded.)
02:26:00   7            THE COURT:  All right.  That objection is
02:26:01   8   sustained.
02:26:01   9            Ask your next question, counsel.
02:26:05  10            MR. MELSHEIMER:  Thank you, Your Honor.
02:26:05  11   Q.  (By Mr. Melsheimer)  Just a few final questions, sir.
02:26:10  12   You're not being put forth as an expert on damages in this
02:26:14  13   case, right?
02:26:15  14   A.  I am not.
02:26:17  15   Q.  You're not an economist or have any background in that
02:26:20  16   field, right?
02:26:20  17   A.  I do not.
02:26:21  18   Q.  And I think you've said you're not an expert on
02:26:23  19   principles of patent law, right?
02:26:25  20   A.  No.
02:26:26  21   Q.  And I believe you told me this at the beginning that
02:26:30  22   you -- you did not submit or file a report on the
02:26:34  23   validity -- on the validity of these patent claims that
02:26:37  24   were asserted here; that was done by someone else.  Right?
02:26:39  25   A.  That's correct.
```

| | | |
|---|---|---|
| 02:26:42 | 1 | MR. MELSHEIMER:  May I have one moment, Your |
| 02:26:44 | 2 | Honor? |
| 02:26:44 | 3 | THE COURT:  Yes, you may. |
| 02:26:52 | 4 | Q.  (By Mr. Melsheimer)  Dr. Conte, thank you for your |
| 02:26:54 | 5 | courtesies. |
| 02:26:55 | 6 | MR. MELSHEIMER:  I pass the witness, Your Honor. |
| 02:26:56 | 7 | THE COURT:  All right.  Redirect by the Plaintiff? |
| 02:27:00 | 8 | MR. ROWLES:  Yes, Your Honor. |
| 02:27:13 | 9 | Ready to proceed, Your Honor. |
| 02:27:16 | 10 | THE COURT:  You may proceed, counsel. |

REDIRECT EXAMINATION

| | | |
|---|---|---|
| 02:27:19 | 12 | BY MR. ROWLES: |
| 02:27:19 | 13 | Q.  Good afternoon, Professor Conte. |
| 02:27:20 | 14 | A.  Good afternoon. |
| 02:27:21 | 15 | Q.  You were asked some questions about infringement -- |
| 02:27:22 | 16 | about your infringement theories just a moment ago; is that |
| 02:27:25 | 17 | right? |
| 02:27:25 | 18 | A.  I recall, yes. |
| 02:27:26 | 19 | Q.  Were you asked any questions about infringement of the |
| 02:27:30 | 20 | '605 patent? |
| 02:27:30 | 21 | A.  I don't believe so. |
| 02:27:31 | 22 | Q.  Counsel asked you some questions about your review of |
| 02:27:37 | 23 | source code; do you recall that? |
| 02:27:37 | 24 | A.  Yes. |
| 02:27:38 | 25 | Q.  Could you just explain for the jury the actual process |

02:27:41   1   you went through, what you did to review the source code in

02:27:43   2   this case?

02:27:44   3   A.  Oh, wow.  So first, there was a set of programmers that

02:27:51   4   went out and they cataloged what everything was and what

02:27:55   5   the versions were.  And then I spent approximately 40 hours

02:27:59   6   at the law offices of Winston & Strawn where I reviewed the

02:28:05   7   code, tried to figure out each of the functionality.

02:28:07   8          When there was an aspect that I didn't understand,

02:28:12   9   I would then go back to that catalog those programmers

02:28:15  10   prepared to find the other piece and go back and forth

02:28:18  11   until I understood everything that was going on.  As I

02:28:21  12   indicated, there were some pieces missing.  So, luckily,

02:28:26  13   they did not impact any of what I needed to make the -- the

02:28:30  14   infringement decision.

02:28:31  15   Q.  And did you yourself sit in the chair in -- in the law

02:28:37  16   offices in Dallas, Texas, reviewing source code?

02:28:40  17   A.  Yes, yes, I did.

02:28:41  18   Q.  Do you have an estimate of how many hours you were

02:28:44  19   actually sitting there at the computer?

02:28:45  20   A.  I think it was about 40 hours.  It was -- it was a

02:28:48  21   week, at least.

02:28:49  22   Q.  Do you know whether or not Dr. Villasenor actually sat

02:28:54  23   down at that office and reviewed the same source code?

02:28:57  24   A.  I don't believe he did.

02:29:00  25          MR. ROWLES:  Mr. Huynh, can I get Slide 95,

02:29:02  1   please, from Dr. Conte's demonstratives?

02:29:06  2   Q.  (By Mr. Rowles)  You recall being asked some questions

02:29:25  3   about Claim 30 of the '681 patent on your

02:29:28  4   cross-examination, Dr. Conte?

02:29:29  5   A.  I do.

02:29:29  6   Q.  And so I want to direct your attention to what's

02:29:32  7   labeled Element -- Element F here, which begins confirming

02:29:36  8   that the mobile check deposit can go forward.  Do you see

02:29:40  9   that?

02:29:40  10  A.  Yes, I do.

02:29:40  11  Q.  Does the word "deciding" appear anywhere in Claim 30?

02:29:45  12  A.  It does not.

02:29:46  13  Q.  Could you explain what this step of confirming that the

02:29:51  14  mobile check deposit can go forward is?

02:29:55  15  A.  Well, as I said earlier, confirming means confirming to

02:29:59  16  the user.  It's like that receipt you get from the teller.

02:30:02  17  Q.  And is that something that's done by the mobile device

02:30:05  18  in the Wells Fargo system?

02:30:05  19  A.  Yes.

02:30:06  20  Q.  Is there any dispute about that?

02:30:08  21  A.  No.

02:30:12  22         MR. ROWLES:  And if I could get Slide 210, please,

02:30:15  23  Mr. Huynh.  210.

02:30:23  24  Q.  (By Mr. Rowles)  While we're waiting for that,

02:30:39  25  Professor Conte, does the mobile device confirm -- do that

02:30:43  1  confirmation before or after optical character recognition

02:30:46  2  is performed in the Wells Fargo system?

02:30:48  3  A.  It does it after optical character recognition is

02:30:55  4  performed.

02:30:56  5  Q.  And what happens before -- what happens in the system

02:30:58  6  before that confirmation, in terms of validating the check?

02:31:02  7  A.  Well, it both compares the amount written on the check

02:31:09  8  to the OCR results, that's that handwriting, and it also

02:31:17  9  looks at the MICR line.

02:31:20  10  Q.  Does that involve optical character recognition?

02:31:22  11  A.  Yes, it does.

02:31:23  12  Q.  Do you recall being asked some questions about whether

02:31:30  13  optical character recognition or OCR had been done before

02:31:30  14  the USAA patents?

02:31:32  15  A.  Yes.

02:31:33  16  Q.  And are you familiar with, as an example, when you

02:31:38  17  have -- are you familiar with a PDF document on your

02:31:41  18  computer, PDF?

02:31:42  19  A.  Yes.

02:31:42  20  Q.  Have you ever encountered the situation where maybe

02:31:46  21  you've copied some text from a PDF document, you paste it

02:31:50  22  into somewhere else, and it comes up sort of jumbled?  Are

02:31:55  23  you familiar with that?

02:31:55  24  A.  Yes, that happens a lot, in fact, with patents, when I

02:31:58  25  OCR patents.

02:31:59  1   Q.  So you might have something that's a 5 in the document

02:32:02  2   and you put it in your -- an email and it comes up as an S,

02:32:09  3   would that be an example of that?

02:32:09  4   A.  Yes.

02:32:09  5   Q.  Is that an example of a problem with an OCR process?

02:32:13  6   A.  Yes.

02:32:16  7   Q.  In the -- in the Wells Fargo mobile deposit system,

02:32:20  8   when does that OCR process happen?  Is it while the

02:32:21  9   customer is holding the phone waiting for the confirmation?

02:32:24  10  A.  It does happen while the customer is waiting for the

02:32:28  11  confirmation.

02:32:29  12  Q.  Does it take a long time or is it a pretty quick

02:32:32  13  process from the customer's point of view?

02:32:32  14  A.  It's a fairly rapid process.

02:32:34  15  Q.  And -- and what might happen if the -- if you didn't do

02:32:37  16  that optical character recognition on the check?

02:32:40  17  A.  Well, then, as I said, a user could write a check for

02:32:46  18  $5.00 and submit on the form $5,000.00, and it wouldn't be

02:32:51  19  detected.

02:32:53  20  Q.  At the beginning of your cross-examination, do you

02:32:56  21  recall being asked some questions about what the patents or

02:32:59  22  what USAA invented?

02:33:01  23  A.  Yes.

02:33:02  24  Q.  And there was a reference to the iPhone as something

02:33:05  25  that Apple created or invented; do you remember that?

| | | |
|---|---|---|
| 02:33:09 | 1 | A.  Yes. |
| 02:33:10 | 2 | Q.  In other words, Apple created the iPhone; is that |
| 02:33:14 | 3 | right? |
| 02:33:14 | 4 | A.  Apple created it.  I wouldn't say invented it. |
| 02:33:16 | 5 | Q.  Does the iPhone have a processor in it? |
| 02:33:20 | 6 | A.  Yes, it does. |
| 02:33:21 | 7 | Q.  Do you know who invented the processor? |
| 02:33:25 | 8 | A.  The microprocessor?  Carlos Fagan [sic], I believe is |
| 02:33:32 | 9 | the name of the guy. |
| 02:33:33 | 10 | Q.  Was it Apple? |
| 02:33:34 | 11 | A.  No. |
| 02:33:39 | 12 | MR. ROWLES:  If I could get Slide 25, please? |
| 02:33:42 | 13 | A.  Sorry, it's Frederico Faggin, my apologies. |
| 02:33:54 | 14 | Q.  (By Mr. Rowles)  Do you recall talking about this slide |
| 02:33:59 | 15 | on -- on both your direct examination and your |
| 02:34:02 | 16 | cross-examination? |
| 02:34:03 | 17 | A.  I do. |
| 02:34:04 | 18 | Q.  So could you just refresh the jury's memory about |
| 02:34:08 | 19 | what -- what is this passage of the patent talking about? |
| 02:34:11 | 20 | A.  Well, it's talking about two things.  Again, it's |
| 02:34:14 | 21 | saying that the -- the image capture device is coupled to |
| 02:34:18 | 22 | the general purpose computer.  And, as I said, if I were to |
| 02:34:20 | 23 | take a hammer and bust this up or I can go to Ifixit.com |
| 02:34:25 | 24 | and they've busted it up, I'd find there's a motherboard |
| 02:34:31 | 25 | here and then there's a wire from the sensor to that |

02:34:35  1  motherboard, so that's the communicatively coupled part.

02:34:38  2  Q.  And is that a description of the system claimed in the

02:34:40  3  USAA patents?

02:34:41  4  A.  Yes.

02:34:41  5  Q.  Now, you were asked some questions about Figure 1,

02:34:44  6  which is referred back to here.  Do you remember that?

02:34:46  7  A.  Yes.

02:34:46  8  Q.  Is this passage in the specification, is it only

02:34:50  9  describing Figure 1 in your understanding?

02:34:53  10  A.  No, it's describing the invention.

02:34:56  11  Q.  And so are there -- you were shown a picture of

02:35:02  12  Figure 1 that I think had an icon, sort of a stick figure

02:35:07  13  sitting at a desktop-type computer; do you recall that?

02:35:10  14  A.  Yes.

02:35:10  15  Q.  Is the invention limited to that type of computer?

02:35:13  16  A.  No, not at all.

02:35:14  17  Q.  And what is -- what did USAA invent in these patents?

02:35:17  18  A.  They invented a way to use consumer devices, including

02:35:23  19  a general purpose computer and a camera, to -- to do mobile

02:35:27  20  check deposit without needing to buy that expensive scanner

02:35:32  21  that does that optical character recognition or any of

02:35:34  22  that.

02:35:34  23  Q.  Do you remember being asked some questions about PDAs

02:35:40  24  and the Palm Treo?

02:35:41  25  A.  Yes.

513

02:35:41  1  Q.  Is -- is a PDA -- well, let me ask this:  This passage

02:35:47  2  that is shown on the screen here, the -- the image capture

02:35:52  3  device communicatively coupled to the computer, does that

02:36:00  4  passage appear in both patents?

02:36:01  5  A.  Yes, it does.

02:36:02  6  Q.  And does it apply to the systems in both of the

02:36:06  7  patents?

02:36:06  8  A.  Yes, it does.

02:36:07  9  Q.  And would a PDA be an example of a computer

02:36:08  10  communicatively coupled to an image capture device?

02:36:09  11  A.  PDA with a camera would be, yes.

02:36:12  12  Q.  Was a Palm Treo -- did the Palm Treo device you talked

02:36:16  13  about, that type of device?

02:36:17  14  A.  Yes.

02:36:26  15        MR. ROWLES:  Mr. Huynh, can you pull up the '681

02:36:29  16  patent, please?  And if -- could we take a look at

02:36:42  17  Column 4, starting at Line 4 -- I'm sorry, Column 3,

02:37:05  18  beginning at Line 45, I apologize.

02:37:12  19  Q.  (By Mr. Rowles)  Do you remember looking at this

02:37:17  20  passage, this sentence beginning "a particular advantage"?

02:37:21  21  Do you remember that, Dr. Conte?

02:37:23  22  A.  Yes, I do.

02:37:24  23  Q.  What -- what is this -- what is this sentence

02:37:28  24  describing?

02:37:28  25  A.  It's describing that the invention can work with

02:37:34   1   consumer electronics that a customer actually owns or

02:37:38   2   easily can acquire, such as a general purpose computer, a

02:37:41   3   scanner, and a digital camera.

02:37:42   4   Q.  And is this passage also in both of the patents?

02:37:49   5   A.  Yes, it is.

02:37:49   6   Q.  Was a PDA, like the Palm Treo, a type of electronic

02:37:57   7   that consumers actually owned or could easily acquire back

02:38:00   8   in 2006?

02:38:00   9   A.  It was.

02:38:01  10   Q.  In fact, I think -- did you say that you actually owned

02:38:05  11   one in that time period; is that right?

02:38:06  12   A.  I was very proud of mine.  I can't find it right now,

02:38:09  13   which made me sad.

02:38:13  14   Q.  Is that something that someone skilled in the art

02:38:16  15   reading this would readily understand?

02:38:20  16   A.  Yes.

02:38:20  17   Q.  Is there anything about the specifications of these

02:38:24  18   patents and in your review that requires particular

02:38:30  19   components to be in one box versus several boxes?

02:38:33  20   A.  No.  The -- the size of the box doesn't matter.

02:38:39  21   Q.  In terms of the operation of the inventions, the claims

02:38:42  22   that you analyzed, is there any difference in implementing

02:38:50  23   it in something like the Palm Treo versus something with a

02:38:55  24   more separate, connected by a wire camera?

02:38:57  25   A.  No.

02:38:58  1   Q.  Did you -- you mentioned you worked with Mr. Calman; is

02:39:02  2   that right?

02:39:02  3   A.  Yes.

02:39:02  4   Q.  And there was some reference to expert reports, in your

02:39:08  5   cross-examination.  Just to clarify, you prepared a written

02:39:11  6   report in this case setting out your opinions; is that

02:39:14  7   right?

02:39:14  8   A.  Yes, I did.

02:39:15  9   Q.  And did we actually look at some -- some pieces of that

02:39:19  10  on your cross-examination?

02:39:20  11  A.  Yes, some figures from that, yes.

02:39:21  12  Q.  And is it your understanding that Mr. Calman also

02:39:24  13  provided an expert report in this case?

02:39:25  14  A.  Yes.

02:39:27  15  Q.  And did you two work together collaboratively on parts

02:39:30  16  of those expert reports?

02:39:32  17  A.  Yes, we did.  I worked with Mr. Calman, and then we

02:39:38  18  made a decision of which sections would go in whose report,

02:39:41  19  and then we cross-referenced the others and incorporated

02:39:45  20  them in the other's report by reference.

02:39:47  21  Q.  And did you review, as you were working together,

02:39:53  22  Mr. Calman's opinions about what's described in the

02:39:55  23  specifications of these patents?

02:39:56  24  A.  Yes.

02:39:57  25  Q.  Do you agree with his opinions?

| | | |
|---|---|---|
| 02:39:58 | 1 | A.  Yes, I do. |
| 02:40:04 | 2 | Q.  Now, you -- you were asked some questions about the |
| 02:40:09 | 3 | patent prosecution process generally.  Do you remember |
| 02:40:12 | 4 | that? |
| 02:40:12 | 5 | A.  Yes. |
| 02:40:13 | 6 | Q.  And I think you said you yourself have a number of |
| 02:40:15 | 7 | patents and are -- and are generally familiar with that |
| 02:40:18 | 8 | process as a result; is that fair? |
| 02:40:21 | 9 | A.  Yes. |
| 02:40:21 | 10 | Q.  As part of your analysis in this case, did you review |
| 02:40:26 | 11 | what's called the prosecution history of the '681 and the |
| 02:40:31 | 12 | '605 patents? |
| 02:40:31 | 13 | A.  I did. |
| 02:40:32 | 14 | Q.  And is the concept of a prosecution history something |
| 02:40:38 | 15 | you have some general familiarity with? |
| 02:40:40 | 16 | A.  Yes. |
| 02:40:40 | 17 | Q.  All right.  So, for example, I think counsel asked you |
| 02:40:44 | 18 | whether when you filed for your own patents, you're careful |
| 02:40:49 | 19 | to provide a complete written description of what you may |
| 02:40:52 | 20 | want to claim in those inventions.  Do you remember that? |
| 02:40:56 | 21 | A.  Yes, I recall that. |
| 02:40:58 | 22 | Q.  And if you don't do that, you might hear back from the |
| 02:41:03 | 23 | Patent Office saying your written description was |
| 02:41:06 | 24 | incomplete; is that your understanding? |
| 02:41:08 | 25 | A.  Yes, that would be what would happen. |

02:41:11  1   Q.  And in your review of the prosecution history of the

02:41:15  2   patents in this case, did you find anything that informed

02:41:18  3   your views about the -- the written description of the

02:41:23  4   claimed inventions in the '605 and the '681 patents?

02:41:26  5   A.  Yes, I did.

02:41:27  6   Q.  What did you find?

02:41:30  7   A.  Well, I found that there were some objections raised by

02:41:36  8   the patent examiner, and then when the patent applicants

02:41:41  9   pointed out that it was a continuation --

02:41:43  10          MR. MELSHEIMER:  Excuse me, Your Honor.  May we

02:41:45  11  approach briefly?

02:41:46  12          THE COURT:  Approach the bench.

02:41:48  13          (Bench conference.)

02:41:57  14          MR. MELSHEIMER:  You know, his report --

02:41:59  15  Your Honor, my objection is that it's outside the scope of

02:42:02  16  his report.  It's 500 some-odd pages.  I don't remember

02:42:07  17  these opinions being offered in the expert report.

02:42:10  18          MR. ROWLES:  Your Honor, two points.  One is his

02:42:12  19  review of the prosecution -- prosecution history is in the

02:42:15  20  expert report.  But, second, this is directly responsive to

02:42:19  21  questions on cross-examination about his understanding of

02:42:22  22  the patent prosecution process and the importance of

02:42:25  23  providing an adequate written description when filing a --

02:42:28  24          THE COURT:  Where is his review of the prosecution

02:42:31  25  history stated in his report?

02:42:33   1          MR. ROWLES:  It's stated in the materials that he

02:42:35   2    considered an essential --

02:42:35   3          MR. MELSHEIMER:  Your Honor, so he's already

02:42:38   4    revealed that he doesn't offer this opinion.  He says he

02:42:41   5    reviewed it.  He doesn't offer the opinion he's about to

02:42:42   6    offer.

02:42:42   7          You cannot, quote, argue it's in response to

02:42:45   8    something that I did if it's not in his report.  You

02:42:48   9    wouldn't let me get into something a moment ago that wasn't

02:42:51   10   in his report.  So there's no opening the door, as I

02:42:53   11   understand it.

02:42:54   12         THE COURT:  Does his report offer the opinion that

02:42:57   13   you're about to call for?

02:42:58   14         MR. ROWLES:  It does not.

02:42:59   15         THE COURT:  Or does it just simply say he reviewed

02:43:02   16   the prosecution history?

02:43:03   17         MR. ROWLES:  The question --

02:43:04   18         THE COURT:  His testimony needs to be limited to

02:43:06   19   the scope of his report.

02:43:08   20         MR. SHEASBY:  We'll withdraw the question.

02:43:10   21         MR. ROWLES:  That's fine.

02:43:11   22         THE COURT:  Let's move on.

02:43:12   23         (Bench conference concluded.)

02:43:21   24         THE COURT:  You're withdrawing the last question,

02:43:24   25   counsel?

519

| 02:43:24 | 1 | MR. ROWLES:  That's correct, Your Honor. |

```
02:43:24   1              MR. ROWLES:  That's correct, Your Honor.

02:43:25   2              THE COURT:  Then ask your next question, please.

02:43:28   3              MR. ROWLES:  Thank you, Your Honor.

02:43:29   4    Q.  (By Mr. Rowles)  Professor Conte, when -- you generally

02:43:35   5    understand that after that patent prosecution process, that

02:43:38   6    you may get issued a patent by the government?

02:43:40   7    A.  Yes.

02:43:41   8    Q.  And you yourself have 40 issued patents; is that right?

02:43:44   9    A.  That's correct.

02:43:45  10    Q.  And is it your understanding that because of that

02:43:48  11    process, just generally speaking, an issued U.S. patent is

02:43:53  12    presumed to be valid?

02:43:53  13    A.  Yes.

02:43:57  14              MR. ROWLES:  I pass the witness, Your Honor.

02:43:59  15              THE COURT:  Do you have further cross-examination,

02:44:01  16    Mr. Melsheimer?

02:44:01  17              MR. MELSHEIMER:  I just have one question, Your

02:44:03  18    Honor.

02:44:03  19              THE COURT:  Go right ahead.  But I can count to

02:44:05  20    one.

02:44:05  21                        RECROSS-EXAMINATION

02:44:11  22    BY MR. MELSHEIMER:

02:44:11  23    Q.  Dr. Conte, are you familiar with what the Track 1

02:44:23  24    designation means in the patent prosecution context with

02:44:29  25    respect to the speed at which a patent must be reviewed
```

02:44:33    1   under Track 1?

02:44:35    2   A.  No, I'm not.

02:44:38    3           MR. MELSHEIMER:  Thank you, Your Honor.  No

02:44:39    4   further questions.

02:44:40    5           THE COURT:  All right.  Mr. Rowles, any further

02:44:42    6   direct?

02:44:42    7           MR. ROWLES:  Nothing further, Your Honor.

02:44:44    8           THE COURT:  You may step down, Dr. Conte.

02:44:46    9           THE WITNESS:  Thank you.

02:44:46   10           THE COURT:  And, ladies and gentlemen, we're going

02:44:48   11   to take a recess at this point.  I appreciate your patience

02:44:50   12   while we got this witness off the witness stand.  Please

02:44:53   13   leave your notebooks closed and in your chairs, follow all

02:44:55   14   my instructions, including not to discuss the case among

02:44:58   15   yourselves, and we'll be back shortly to continue.

02:45:01   16           The jury is excused for recess.

02:45:02   17           COURT SECURITY OFFICER:  All rise.

02:45:04   18           (Jury out.)

02:45:31   19           THE COURT:  Counsel, before we recess, do I

02:45:33   20   understand that Plaintiff has deposition witnesses to

02:45:35   21   present next?

02:45:36   22           MS. GLASSER:  That's correct.

02:45:37   23           THE COURT:  How many different deposition

02:45:38   24   witnesses do you have?

02:45:39   25           MS. GLASSER:  We have a total of six, one of which

02:45:42  1   is in part through the live reading.

02:45:45  2          THE COURT:  All right.  So five of them are video

02:45:50  3   and one of them you're going to have someone read the

02:45:53  4   transcription?

02:45:53  5          MS. GLASSER:  Well, one of the witnesses is both.

02:45:55  6   So there's actually going to be six video clips, and then a

02:45:59  7   very short reading from the podium.

02:46:01  8          THE COURT:  All right.  Do you know where in this

02:46:04  9   colloquy of six different witnesses by deposition the one

02:46:08  10  with actual reading is going to take place?

02:46:10  11         MS. GLASSER:  We had planned to do it at the end,

02:46:12  12  thinking that would be easiest.

02:46:14  13         THE COURT:  I just want to know where it comes

02:46:17  14  before it springs itself upon me.

02:46:20  15         All right.  With that, we'll take a short recess

02:46:23  16  and then we'll continue.

02:46:23  17         MR. MELSHEIMER:  I'm sorry, Your Honor, can I

02:46:24  18  raise one other thing before the recess?

02:46:26  19         THE COURT:  Well, you have, so what is it?

02:46:28  20         MR. MELSHEIMER:  Mr. Hecht is our first witness.

02:46:32  21  There are some pending objections to his slides and things.

02:46:36  22  I don't know if the Court's had time to -- we're happy to

02:46:39  23  hear the Court's rulings on that or further discuss them,

02:46:42  24  but I think we're going to get to Mr. Hecht before the end

02:46:44  25  of the day.

| | | |
|---|---|---|
| 02:46:46 | 1 | THE COURT:  Well, we've got these depositions |
| 02:46:48 | 2 | which are approximately an hour in length, and then we've |
| 02:46:51 | 3 | got the damages expert for Plaintiff. |
| 02:46:57 | 4 | MR. BUNT:  Yes, Your Honor. |
| 02:46:58 | 5 | THE COURT:  Mr. Weinstein. |
| 02:46:59 | 6 | MR. BUNT:  Yes, Your Honor. |
| 02:47:00 | 7 | THE COURT:  Do we have any kind of an estimate on |
| 02:47:02 | 8 | time both direct and cross for the damages expert? |
| 02:47:04 | 9 | MR. BUNT:  Probably 40 minutes, 40 to 45 minutes |
| 02:47:08 | 10 | on direct. |
| 02:47:08 | 11 | THE COURT:  Who is going to cross him? |
| 02:47:10 | 12 | MR. HILL:  Probably an hour, Your Honor, on |
| 02:47:12 | 13 | cross-examination. |
| 02:47:13 | 14 | THE COURT:  Okay.  Well, if we get to the point |
| 02:47:20 | 15 | where Plaintiff -- excuse me, where Defendant calls their |
| 02:47:22 | 16 | first witness, then before that person's called to the |
| 02:47:25 | 17 | stand, we'll address those outstanding issues. |
| 02:47:27 | 18 | In the meantime, we stand in recess. |
| 02:47:30 | 19 | COURT SECURITY OFFICER:  All rise. |
| 03:07:48 | 20 | (Recess.) |
| 03:07:49 | 21 | (Jury out.) |
| 03:07:50 | 22 | COURT SECURITY OFFICER:  All rise. |
| 03:07:51 | 23 | THE COURT:  Be seated, please. |
| 03:07:54 | 24 | MR. SHEASBY:  Your Honor, may I be heard briefly? |
| 03:07:57 | 25 | THE COURT:  What is it, Mr. Sheasby? |

523

03:07:58  1          MR. SHEASBY:  Your Honor, there are two issues

03:08:01  2   that I wanted to address.  One is that we've gotten to the

03:08:04  3   bottom of this issue of whether Wells Fargo Mobile Deposit

03:08:07  4   was disclosed as an invalidating prior art reference in the

03:08:13  5   invalidity contentions.  We don't believe it was.

03:08:16  6          We'd ask the Court's permission to serve a very

03:08:18  7   short brief on this subject.  And if we are, in fact,

03:08:21  8   correct, we believe there needs be some sort of consequence

03:08:24  9   for publishing this theory in front of the jury through the

03:08:27  10  question.

03:08:28  11         So with your permission, we'd like to serve

03:08:31  12  that -- serve a short brief clarifying this issue because

03:08:32  13  it sounds like something that may come up again in a couple

03:08:37  14  days.  But I can tell you, it is not an asserted prior art

03:08:40  15  reference to the '605 and '681 patents.  They may disagree,

03:08:43  16  but it's not.

03:08:44  17         THE COURT:  And I assume the Defendant does

03:08:47  18  disagree?

03:08:47  19         MR. SHEASBY:  They do disagree.

03:08:48  20         MR. BITTNER:  We disagree.

03:08:50  21         THE COURT:  Have you all discussed this option or

03:08:52  22  suggestion of --

03:08:52  23         MR. SHEASBY:  Well, we --

03:08:52  24         THE COURT:  -- doing a short brief?

03:08:53  25         MR. SHEASBY:  Well, I think we'd either be doing

03:08:55  1    it now or doing a short brief.

03:08:57  2         MR. BITTNER:  We -- I mean, it's a -- it's a

03:08:58  3    two-pager, max.  It's in there.  We can quote -- we can

03:09:01  4    quote Your Honor the language.  It's really --

03:09:03  5         THE COURT:  Let me have not more than two pages

03:09:05  6    from both of you before in the morning.

03:09:08  7         MR. SHEASBY:  Thank you, Your Honor.

03:09:09  8         MR. BITTNER:  All right.

03:09:09  9         MR. SHEASBY:  The second issue is, Mr. Melsheimer

03:09:11  10   has again made reference to the speed of prosecution

03:09:15  11   history with a witness who he said could not talk about the

03:09:18  12   prosecution history.  So, literally, we had a sidebar in

03:09:22  13   which Mr. Melsheimer objected to Mr. -- Professor Conte

03:09:25  14   discussing the prosecution history.

03:09:26  15        And then his last question was about Track 1 in

03:09:30  16   the prosecution history, discussing the timing of the

03:09:32  17   prosecution history.  We found a Federal Circuit case that

03:09:36  18   makes clear that it is totally improper to suggest in any

03:09:41  19   way that the conduct by the PTO reflects negatively on the

03:09:44  20   patent.

03:09:46  21        And this is happening multiple times, and I

03:09:48  22   believe it's getting out of hand.  And I would like

03:09:50  23   permission to file a short brief asking for a curative

03:09:53  24   instruction or some type of instruction to Wells Fargo --

03:09:57  25        THE COURT:  Where was your objection at the time

03:09:59  1  Mr. Melsheimer asked the question of the witness?

03:10:00  2       MR. SHEASBY:  Well, Your Honor, I didn't object

03:10:02  3  for a very particular reason.  And that reason is I didn't

03:10:05  4  want to draw -- draw more attention to it.  And I'm not

03:10:08  5  asking for it to be stricken, but I think it needs to stop.

03:10:11  6       THE COURT:  Well, I'm not going to -- I'm not

03:10:14  7  going to give any kind of curative instruction.  I am going

03:10:17  8  to hold the parties to my earlier directive not to

03:10:23  9  denigrate or unreasonably elevate the PTO in any way.

03:10:28  10  They're not to be praised as infallible, and they're not to

03:10:32  11  be attacked as being slipshod and unreliable.

03:10:37  12       MR. SHEASBY:  Your Honor, there's a deeper issue

03:10:38  13  here, which is saying they only did it in 12 months, the

03:10:42  14  Federal Circuit has said you can't do things like that.

03:10:44  15  You can't -- the only implication of that is that it was

03:10:47  16  done in a slipshod manner.  And I don't think it's proper

03:10:50  17  under Federal Circuit -- it could have taken them five

03:10:53  18  years.  It could have taken them three months.  You can't

03:10:56  19  comment on the conduct of a government officer based on how

03:10:59  20  the government officer conducts the process.

03:11:01  21       It's just -- it's not allowed under Federal

03:11:04  22  Circuit precedent.  In fact, the Federal Circuit has

03:11:07  23  expressly said unless it rises to the level of inequitable

03:11:10  24  conduct, you're not allowed to tell the jury, well, the

03:11:14  25  examiner did X or the examiner didn't do Y in terms of

03:11:18    1    failing to follow procedure.

03:11:20    2           THE COURT:  Mr. Sheasby, if you at the end of the

03:11:23    3    evidence feel this is still an issue, I'll entertain a

03:11:27    4    request to include something of your suggestion in the

03:11:29    5    final instructions to the jury.  But I'm not going to take

03:11:32    6    it up prior to then.

03:11:34    7           MR. SHEASBY:  I understand, Your Honor.  Thank you

03:11:35    8    for your time.

03:11:35    9           THE COURT:  All right.  Are we prepared to move

03:11:37   10    forward with Plaintiff's witnesses by deposition?

03:11:40   11           MS. GLASSER:  Yes, Your Honor.

03:11:41   12           THE COURT:  All right.  Let's bring in the jury,

03:11:42   13    please.

03:11:45   14           COURT SECURITY OFFICER:  All rise.

03:11:46   15           (Jury in.)

03:12:10   16           THE COURT:  Please be seated.

03:12:11   17           Plaintiff, call your next witness.

03:12:14   18           MS. GLASSER:  Thank you, Your Honor.

03:12:19   19           The Plaintiff calls Mr. Armin Ajami, a corporate

03:12:24   20    representative for Wells Fargo Bank by video deposition.

03:12:28   21           THE COURT:  Proceed with the witness by

03:12:30   22    deposition.

03:12:32   23           (Videoclip played.)

03:12:33   24           QUESTION:  Sir, can you state your full name for

03:12:35   25    the record?

| | | |
|---|---|---|
| 03:12:35 | 1 | ANSWER:  Sure.  It's Armin Ajami. |
| 03:12:39 | 2 | QUESTION:  Where are you employed, sir? |
| 03:12:40 | 3 | ANSWER:  Wells Fargo. |
| 03:12:40 | 4 | QUESTION:  When did you begin to work for Wells |
| 03:12:43 | 5 | Fargo? |
| 03:12:43 | 6 | ANSWER:  2004. |
| 03:12:43 | 7 | QUESTION:  What is your current position at Wells |
| 03:12:47 | 8 | Fargo? |
| 03:12:47 | 9 | ANSWER:  I'm a strategic planning manager. |
| 03:12:50 | 10 | QUESTION:  You told your managers that your |
| 03:12:54 | 11 | competitor's embrace of mobile check deposit had made it, |
| 03:13:02 | 12 | quote, a table stake capability, correct? |
| 03:13:04 | 13 | ANSWER:  Correct, yeah. |
| 03:13:05 | 14 | QUESTION:  In fact, it was listed as the No. 1 -- |
| 03:13:09 | 15 | its absence was listed as the No. 1 pain point in mobile |
| 03:13:13 | 16 | usage in your study, correct -- of December 2010? |
| 03:13:20 | 17 | ANSWER:  Sorry.  Let me take a look.  Yes, on this |
| 03:13:24 | 18 | paper.  Yes.  Yes, it was listed as No. 1 at that time. |
| 03:13:27 | 19 | QUESTION:  So you were telling your managers that |
| 03:13:29 | 20 | the absence of mobile check deposit was the No. 1 pain |
| 03:13:33 | 21 | point in mobile plan, correct? |
| 03:13:35 | 22 | ANSWER:  We -- yes, we were reporting that. |
| 03:13:37 | 23 | QUESTION:  Now, I want to talk about the benefits |
| 03:13:46 | 24 | that are associated with mobile check deposit capture. |
| 03:13:52 | 25 | One of the benefits that are associated with |

03:13:55   1   mobile check deposit capture is, if you're successful at

03:13:58   2   capturing the check image, it's cheaper to deposit using

03:14:04   3   mobile check deposit for Wells Fargo than via an ATM or a

03:14:09   4   bank teller, fair?

03:14:11   5          ANSWER:  Yes.  We looked at all channels, and it

03:14:15   6   was cheaper.  The marginal cost was cheaper for mobile

03:14:19   7   deposit.

03:14:19   8          QUESTION:  You told your superiors that there was

03:14:22   9   a dramatic shift in check deposit behavior after mobile

03:14:28  10   deposit adoption, correct?

03:14:29  11          ANSWER:  There was -- yes, there was a dramatic

03:14:32  12   shift in check deposit behavior by the people who adopted

03:14:35  13   the service.

03:14:36  14          QUESTION:  And what you told your superiors is

03:14:40  15   that when folks decided to use mobile tech -- check

03:14:45  16   deposit, there was a dramatic decrease in ATM usage and

03:14:51  17   teller usage to deposit checks, correct?

03:14:53  18          ANSWER:  Not -- I wouldn't phrase it the way you

03:14:57  19   just phrased it, right?  What we told our teams was the

03:15:00  20   people who adopted mobile check deposit, those folks,

03:15:05  21   right, their behavior for using the ATM or the teller line,

03:15:10  22   right, the -- the amount -- the frequency for them to use

03:15:13  23   those other channels decrease.

03:15:16  24          QUESTION:  You told your superiors that over a

03:15:19  25   very, very short period of time, there was a 15 percent

03:15:24  1  decrease in ATM usage and a 9 percent decrease in teller

03:15:29  2  usage among folks who used mobile check --

03:15:33  3         ANSWER:  Who adopted it.  Yeah, I believe those

03:15:35  4  numbers are correct.

03:15:36  5         QUESTION:  And those -- behavior shifting

03:15:41  6  continued over time, correct?  It didn't plateau there?

03:15:45  7         ANSWER:  That's a good question.  It plateaued at

03:15:53  8  some point.  It didn't go to zero.  I mean, what -- we did

03:15:55  9  see people continue to use all three channels -- again,

03:15:59 10  based on whatever was convenient for the customer.  But the

03:16:03 11  folks who did adopt mobile deposit -- their incidence rate

03:16:03 12  and there were factors in ATM, the number of checks that

03:16:03 13  were deposited --

03:16:03 14         COURT REPORTER:  I'm sorry.  The folks who did

03:16:03 15  mobile deposit --

03:16:09 16         ANSWER:  Yeah, the folks who adopted mobile

03:16:12 17  deposit, their usage of the ATM and teller line decreased

03:16:15 18  over time, and it did plateau at some point.  I think

03:16:19 19  this -- you're referring to some study we did, but I think

03:16:22 20  if you look at it longer term, it didn't -- it didn't drop

03:16:25 21  to zero, right, their usage with ATM or teller.  It stopped

03:16:30 22  at a certain percentage.

03:16:31 23         QUESTION:  Let's mark as the next exhibit in

03:16:37 24  order, Exhibit 9, which is mobile remote deposit capture

03:16:41 25  CBD stakeholder update which is from May 2011.  Do you

03:16:47   1   recognize Exhibit 9?

03:16:47   2        ANSWER:  I do.

03:16:48   3        QUESTION:  What is Exhibit 9?

03:16:50   4        ANSWER:  It's an internal presentation.  CBD

03:16:53   5   stands for consumer business deposits group.  So we're

03:16:57   6   giving our deposits group an update on the mobile deposit

03:17:04   7   capture project.  This is May 2011.  This is about a year

03:17:07   8   before we actually launched a product.

03:17:12   9        So this is a -- a version of our point of view

03:17:15   10   deck that we evolved over time.  A point of view deck which

03:17:22   11   we evolved -- evolved over time.  Sorry.

03:17:28   12        QUESTION:  And I want to turn to page -- and you

03:17:34   13   endeavored to make this document accurate, correct?

03:17:36   14        ANSWER:  Yes.

03:17:37   15        QUESTION:  It was a document that you gave to

03:17:39   16   executives, correct?

03:17:40   17        ANSWER:  It was.

03:17:43   18        QUESTION:  When Wells Fargo was making the

03:17:45   19   decision -- the business decision to launch mobile deposit,

03:17:49   20   it concluded that a successful mobile check deposit capture

03:17:55   21   would be 20 cents, and that an ATM would be more than

03:18:00   22   double the cost, and that a teller would be more than 10

03:18:03   23   times the cost.  That was the basis under which it was

03:18:06   24   making the decision, fair?

03:18:10   25        ANSWER:  At this time -- we're talking May 2011 --

03:18:13  1  that's what we were talking about.  It may have been

03:18:15  2  updated before a final decision was made, because we didn't

03:18:19  3  launch a product until May 2012, one year later.  So this

03:18:24  4  may have evolved.

03:18:25  5       So when the final decision was made, there may

03:18:28  6  have been a different number.  I don't know.  But at this

03:18:31  7  time, in May 2011, this is the number we were working with.

03:18:34  8  This is the assumption.

03:18:35  9       QUESTION:  You were the product manager for this

03:18:38  10  project through 2015, correct?

03:18:41  11       ANSWER:  I was the senior product manager for

03:18:45  12  service.  I had product managers who were running the

03:18:48  13  projects themselves.

03:18:49  14       QUESTION:  Do you have any better information

03:18:51  15  between when this document, Exhibit 9, was given to your

03:18:58  16  executives in May 2011 and when the decision was made to

03:19:05  17  launch --

03:19:06  18       ANSWER:  Okay.

03:19:06  19       QUESTION:  -- mobile check deposit --

03:19:11  20       ANSWER:  May 2012.

03:19:12  21       QUESTION:  -- other than what's on Page 5?

03:19:14  22       ANSWER:  I haven't seen anything else.

03:19:15  23       QUESTION:  Turning back to Exhibit 3, which is the

03:19:19  24  presentation you proposed on expanding who could use the

03:19:25  25  system.  In this document, you're reporting to executives

| | | |
|---|---|---|
| 03:19:30 | 1 | that the amount of fraud you were seeing was very low in |
| 03:19:35 | 2 | mobile check deposit, correct? |
| 03:19:38 | 3 | ANSWER:  Which slide are you referring to?  Sorry. |
| 03:19:41 | 4 | QUESTION:  Slide 2. |
| 03:19:43 | 5 | ANSWER:  Slide 2.  Yeah, we -- we -- we called it |
| 03:19:57 | 6 | manageable fraud, right?  So there was fraud, but it was |
| 03:20:00 | 7 | manageable. |
| 03:20:01 | 8 | QUESTION:  Well, to be clear, this is reporting |
| 03:20:03 | 9 | that the amount of fraud in the mobile check deposit space |
| 03:20:06 | 10 | was less than the amount of fraud in the ATM space, |
| 03:20:09 | 11 | correct? |
| 03:20:09 | 12 | ANSWER:  Where are you referring to?  Sorry. |
| 03:20:17 | 13 | QUESTION:  Sir, I'm looking at the 2013 |
| 03:20:19 | 14 | presentation that you gave to your bosses.  I'm looking at |
| 03:20:23 | 15 | Page 2 of that presentation.  And this reports that the |
| 03:20:26 | 16 | amount of fraud that you were seeing was less in mobile |
| 03:20:30 | 17 | check deposit than with ATM, correct? |
| 03:20:34 | 18 | ANSWER:  Sorry.  You're looking at the second |
| 03:20:37 | 19 | bullet?  No, I don't think it says that.  Sorry.  Can you |
| 03:20:48 | 20 | refer to where -- where -- where do you get that? |
| 03:20:51 | 21 | QUESTION:  Percent of returned items leading to |
| 03:20:54 | 22 | loss, in mobile it's 2.6 versus ATM, it's 2.8. |
| 03:20:58 | 23 | ANSWER:  Uh-huh. |
| 03:20:58 | 24 | QUESTION:  Percent of deposits that were outsorted |
| 03:21:02 | 25 | for additional risk review, it's 0.5 percent for mobile |

```
03:21:06   1   versus 1.52 percent for ATMs.
03:21:09   2          ANSWER:  Uh-huh.  Well, the percentages, right,
03:21:12   3   the amount of fraud, the dollar amount definitely is a lot
03:21:16   4   more than the ATM channels because of volume.  We're
03:21:18   5   talking percentages, right, of returned items that led to a
03:21:22   6   loss?  For mobile, it was -- yeah, 2.6 versus ATM, 2.8.
03:21:27   7          QUESTION:  And in the data that you presented to
03:21:29   8   your bosses on Page 2, it showed that the -- in 2013, the
03:21:36   9   risk of fraud in the mobile deposit space was less than the
03:21:40  10   ATM deposit space, yes or no?
03:21:43  11          ANSWER:  We said it was in line with ATM, and it
03:21:46  12   was a little bit lower, yeah.
03:21:48  13          QUESTION:  And this is the data that Wells Fargo
03:21:49  14   had in 2013, correct?
03:21:51  15          ANSWER:  In the first quarter of 2013.
03:21:54  16          (Videoclip ends.)
03:21:58  17          THE COURT:  Does that complete this witness by
03:22:00  18   deposition?
03:22:00  19          MS. GLASSER:  It does, Your Honor.
03:22:01  20          THE COURT:  Plaintiff, call your next witness.
03:22:04  21          MS. GLASSER:  USAA calls Mr. Arun Darpally of
03:22:12  22   Wells Fargo Bank, a corporate representative of Wells
03:22:13  23   Fargo.
03:22:14  24          THE COURT:  Proceed with this witness by
03:22:16  25   deposition.
```

03:22:16   1              (Videoclip played.)

03:22:17   2              QUESTION:  Good morning, sir.  Can you state your

03:22:21   3    full name for the record, please?

03:22:22   4              ANSWER:  My name is Arun Darpally.

03:22:25   5              QUESTION:  Are you an employee of Wells Fargo?

03:22:30   6              ANSWER:  Yes, I am.

03:22:31   7              QUESTION:  When did you begin to be employed by

03:22:34   8    Wells Fargo?

03:22:34   9              ANSWER:  Almost 10 years back.

03:22:37   10             QUESTION:  What is your position at Wells Fargo?

03:22:40   11             ANSWER:  I'm the lead developer for Wells Fargo.

03:22:42   12             QUESTION:  The lead developer for what at Wells

03:22:47   13    Fargo?

03:22:47   14             ANSWER:  Lead developer for the server side of the

03:22:51   15    mobile check deposit.

03:22:52   16             QUESTION:  Sir, when did you begin to be involved

03:22:56   17    in mobile remote deposit capture at Wells Fargo?

03:23:00   18             ANSWER:  I -- when I started looking into this

03:23:02   19    application, I started looking at the defects and then

03:23:04   20    started looking at the new requirements and then started to

03:23:07   21    lead the team.

03:23:09   22             QUESTION:  Yes, sir.  When did that occur?

03:23:11   23             ANSWER:  18 months back.

03:23:13   24             QUESTION:  So you began to be involved in MRDC

03:23:19   25    approximately 18 months back?

| | | |
|---|---|---|
| 03:23:21 | 1 | ANSWER:  That is right. |
| 03:23:21 | 2 | QUESTION:  You've been designated to speak on |
| 03:23:23 | 3 | behalf of the company as to certain topics today, correct? |
| 03:23:27 | 4 | ANSWER:  From the server side, yes. |
| 03:23:28 | 5 | QUESTION:  What topics are those? |
| 03:23:29 | 6 | ANSWER:  For the server side, those are the |
| 03:23:39 | 7 | cropping of the images and then the overall functionality |
| 03:23:42 | 8 | of the server side of the MRDC application. |
| 03:23:45 | 9 | QUESTION:  So what are the basis -- when you said |
| 03:23:48 | 10 | you reviewed the patents, what patents did you review? |
| 03:23:52 | 11 | ANSWER:  What patents? |
| 03:23:54 | 12 | QUESTION:  Yes. |
| 03:23:56 | 13 | ANSWER:  It was patents related to the check |
| 03:23:59 | 14 | deposit -- mobile check deposit. |
| 03:24:01 | 15 | QUESTION:  Was it USAA patents or Wells Fargo |
| 03:24:03 | 16 | patents? |
| 03:24:03 | 17 | ANSWER:  USAA patents. |
| 03:24:04 | 18 | QUESTION:  Why did you review those patents? |
| 03:24:10 | 19 | ANSWER:  So those patents were related to the |
| 03:24:14 | 20 | application I do and what is this about, so that's the |
| 03:24:17 | 21 | reason I looked into those patents. |
| 03:24:19 | 22 | QUESTION:  You felt that the USAA patents related |
| 03:24:22 | 23 | to the things that you do.  Is that what you just said? |
| 03:24:24 | 24 | ANSWER:  Can you repeat that, please? |
| 03:24:27 | 25 | QUESTION:  Yes.  You just said you felt the USAA |

03:24:30  1   patents relate to things that you do at Wells Fargo.

03:24:32  2           ANSWER:  No, this is -- so this is related to the

03:24:41  3   mobile check deposit.

03:24:41  4           QUESTION:  Yes, but can you just answer my

03:24:43  5   question yes or no?

03:24:43  6           ANSWER:  No.

03:24:43  7           QUESTION:  So you did not just testify that the

03:24:49  8   patents at USAA relate to things that you do at Wells

03:24:53  9   Fargo?

03:24:53  10          ANSWER:  Yes.

03:24:54  11          QUESTION:  How long did you spend reviewing the

03:24:57  12  patents?

03:24:58  13          ANSWER:  For last one week.

03:25:02  14          QUESTION:  Did you form opinions as to whether

03:25:05  15  Wells Fargo uses or does not use the USAA patents?

03:25:09  16          ANSWER:  I don't have much knowledge about the

03:25:11  17  patents, so hence I don't have any -- any opinion.

03:25:14  18          QUESTION:  How does the server side operation of

03:25:19  19  MRDC work?

03:25:24  20          So let me set the table.  I understand that after

03:25:28  21  authentication, after checking for errors, after the images

03:25:41  22  have been previewed by the customer, check images are then

03:25:48  23  submitted to the Wells Fargo server for deposit.  What

03:25:57  24  happens after that?

03:25:57  25          ANSWER:  So once the checks images are submitted

03:25:58  1  to the server side, we send these images to a software,

03:26:04  2  Mitek software.  We receive parts of the information back

03:26:08  3  from the Mitek, and then we send to another application

03:26:12  4  inside the Wells Fargo to deposit these checks.

03:26:14  5         QUESTION:  So you're not aware of anything that

03:26:17  6  happens before the check images are received by the Wells

03:26:24  7  Fargo server?

03:26:24  8         ANSWER:  That is correct.

03:26:24  9         QUESTION:  What -- what does this Mitek server

03:26:31  10  send back to you?

03:26:31  11         ANSWER:  Mitek sends us back the check amount,

03:26:34  12  check account number, check routing number, and the

03:26:38  13  threshold of the check.

03:26:39  14         QUESTION:  What do you mean by the threshold of

03:26:41  15  the check?

03:26:41  16         ANSWER:  Threshold of the check means, like,

03:26:45  17  whether they are able to deposit the check properly with

03:26:50  18  what confidence level.

03:26:53  19         QUESTION:  What do you do after receiving

03:27:02  20  information from Mitek?

03:27:03  21         ANSWER:  We receive the information from the Mitek

03:27:06  22  whether the check was successful or not.  If it is

03:27:10  23  successful, we send this information to another system

03:27:14  24  which is internal to Wells Fargo.

03:27:15  25         QUESTION:  Do you provide any information back to

03:27:37  1   the user?

03:27:38  2           ANSWER:  Once the other system in Wells Fargo

03:27:42  3   process it and provides success information, we provide the

03:27:47  4   confirmation number back to the user.

03:27:49  5           QUESTION:  What additional operations are

03:27:52  6   performed by the Wells Fargo server -- server once it

03:27:57  7   receives the data from Mitek?

03:28:02  8           ANSWER:  Once we receive the Mitek information, we

03:28:05  9   send that information back to the other system in Wells

03:28:11  10  Fargo.

03:28:11  11          QUESTION:  What is that other system that you send

03:28:15  12  it to?

03:28:15  13          ANSWER:  The application name is called TMS.

03:28:17  14          QUESTION:  What does TMS send back to you?

03:28:20  15          ANSWER:  It sends back with the successful or

03:28:23  16  unsuccessful.

03:28:24  17          QUESTION:  And what do you do with that

03:28:33  18  information?

03:28:33  19          ANSWER:  If it is successful -- if it is success,

03:28:36  20  we show the confirmation number back to the customer about

03:28:39  21  their check deposit is success.  If it is a failure, we

03:28:42  22  show the failure to the user.

03:28:45  23          QUESTION:  If it's a success, what happens next?

03:28:56  24          ANSWER:  In our application, that will be the end

03:28:57  25  of the processing.  We will not do anything after that.

| | | |
|---|---|---|
| 03:29:00 | 1 | QUESTION:  Did you determine whether there's any |
| 03:29:03 | 2 | server at Wells Fargo that does anything to check whether |
| 03:29:07 | 3 | the check was previously deposited? |
| 03:29:10 | 4 | ANSWER:  Yes, in our server side software, we do |
| 03:29:13 | 5 | the duplicate detection. |
| 03:29:14 | 6 | QUESTION:  So how does the code that you're |
| 03:29:18 | 7 | responsible for do a duplicate detection? |
| 03:29:20 | 8 | ANSWER:  So once we receive the information back |
| 03:29:22 | 9 | from Mitek, we look into our database to see the same MICR |
| 03:29:31 | 10 | line and the amount are already present in the database in |
| 03:29:35 | 11 | the last 90 days.  If yes, we show the user the duplicate |
| 03:29:40 | 12 | message. |
| 03:29:40 | 13 | QUESTION:  What information do you use to |
| 03:29:42 | 14 | determine whether the user is a safe user or user who is |
| 03:29:47 | 15 | associated with fraud? |
| 03:29:48 | 16 | ANSWER:  We send the user information and the |
| 03:29:51 | 17 | amount of the check. |
| 03:29:53 | 18 | QUESTION:  How do you identify the customer |
| 03:29:55 | 19 | associated with that check, sir? |
| 03:29:57 | 20 | ANSWER:  That information we receive as part of |
| 03:30:00 | 21 | the login. |
| 03:30:05 | 22 | QUESTION:  So as part of the login process for the |
| 03:30:11 | 23 | mobile remote deposit capture information, the |
| 03:30:12 | 24 | identification of the customer information is provided to |
| 03:30:14 | 25 | you? |

03:30:14  1          ANSWER:  That is correct.

03:30:27  2          QUESTION:  You identified two fraud checks that

03:30:29  3   are performed before the images are submitted for deposit

03:30:31  4   at TMS.  One relates to a duplicate check, and one relates

03:30:37  5   to whether the user is associated with fraud.  Are there

03:30:41  6   any others?

03:30:42  7          ANSWER:  I don't remember anything else.

03:30:48  8          QUESTION:  Now, for the duplicate check, that

03:30:53  9   requires you to have extracted the MICR information from

03:30:57  10  the check, correct?

03:30:58  11         ANSWER:  That information we receive from Mitek,

03:31:00  12  we send that information to the database to find out.

03:31:04  13         QUESTION:  I understand that.  My -- my point is,

03:31:08  14  is that you can't do the duplicate-based fraud check

03:31:11  15  without having the information on the MICR line and the

03:31:15  16  amount of the check, correct?

03:31:17  17         ANSWER:  We receive that information from the

03:31:21  18  Mitek.  Only once Mitek is successful, that information is

03:31:24  19  provided.  Then only we will go for the duplicate check.

03:31:30  20         QUESTION:  My point is, is that to do the

03:31:33  21  duplicate check, you are required to have the MICR line

03:31:35  22  information and the amount information for the check,

03:31:38  23  correct?

03:31:38  24         ANSWER:  If the Mitek response is successful, we

03:31:45  25  receive that information from Mitek, and if this is

03:31:47   1   successful, only we go to the duplicate detection.

03:31:51   2          QUESTION:  I understand that, sir.  But what I'm

03:31:54   3   trying to ask -- ask is to do the duplicate detection, it's

03:31:59   4   required that you have the MICR line information and the

03:32:04   5   amount information for the check, correct?

03:32:07   6          ANSWER:  For the duplicate detection, we use the

03:32:10   7   MICR line and the amount.

03:32:13   8          QUESTION:  Is there any other way to do the

03:32:16   9   duplicate detection that would not involve the MICR line

03:32:21  10   and the amount?

03:32:23  11          ANSWER:  Right now, there's nothing in the system

03:32:28  12   for the duplicate detection other than that.

03:32:29  13          QUESTION:  Can you think of any other way to

03:32:32  14   perform duplicate detection that does not involve the MICR

03:32:36  15   line and the amount?

03:32:37  16          ANSWER:  I can't think of anything right now.

03:32:42  17          QUESTION:  Is it possible to perform the

03:32:45  18   authentication function that you do involving the customer

03:32:47  19   without having the customer identification information that

03:32:50  20   you receive from the mobile application?

03:32:53  21          ANSWER:  I am not sure on that.

03:32:56  22          QUESTION:  Sitting here today, can you think of

03:32:58  23   any other way to perform the customer authentication

03:33:03  24   process that you've been describing that does not require

03:33:06  25   the receipt of customer identification information via the

03:33:11  1   mobile app?

03:33:11  2          ANSWER:  I can't think of anything right now.

03:33:14  3          QUESTION:  Sir, as Wells's corporate witness, do

03:33:21  4   you know whether it's the portable device or the -- Wells's

03:33:28  5   server that submits a check for deposit after the user is

03:33:32  6   authenticated, after electronic images are presented to the

03:33:36  7   user, and after the portable device checks for errors?

03:33:41  8          ANSWER:  I will not know about that.

03:33:43  9          (Videoclip ends.)

03:33:45  10         THE COURT:  Does that complete this witness by

03:33:51  11  deposition?

03:33:52  12         MS. GLASSER:  It does, Your Honor.

03:33:53  13         THE COURT:  All right.  Call your next witness,

03:33:55  14  please.

03:33:55  15         MS. GLASSER:  USAA calls Mr. Jeffrey Easley by

03:34:01  16  video deposition.  Mr. Easley is an associate vice

03:34:03  17  president and corporate representative of USAA.

03:34:06  18         THE COURT:  Proceed with this witness by

03:34:08  19  deposition.

03:34:08  20         (Videoclip played.)

03:34:09  21         QUESTION:  Will you please state your name for the

03:34:14  22  record?

03:34:14  23         ANSWER:  Jeff Easley.

03:34:16  24         QUESTION:  And who is your current employer,

03:34:19  25  Mr. Easley?

03:34:19  1          ANSWER:  USAA.

03:34:20  2          QUESTION:  And what is your current title at USAA?

03:34:22  3          ANSWER:  Current title is assistant vice

03:34:25  4  president, governance risk compliance programs.

03:34:29  5          QUESTION:  You understand that this deposition is

03:34:33  6  being taken both in your capacity as an individual and in

03:34:39  7  your capacity as a representative of the corporation, USAA?

03:34:42  8          ANSWER:  I understand.

03:34:43  9          QUESTION:  You understand that prior to this

03:34:47  10  deposition, my client, Wells Fargo, sent USAA a list of

03:34:53  11  topics that we wanted them to prepare a witness on.

03:34:58  12          ANSWER:  Yes.

03:35:00  13          QUESTION:  And when was Deposit@Home launched?

03:35:03  14          ANSWER:  Deposit@Home was launched in late summer

03:35:07  15  of 2006, August, September time frame.

03:35:13  16          QUESTION:  How many employees and members was

03:35:18  17  Deposit@Home offered to initially, in the phased launch?

03:35:23  18          ANSWER:  I don't recall the exact details.

03:35:25  19          QUESTION:  Hundreds?  Thousands?

03:35:27  20          ANSWER:  My guess would be hundreds.

03:35:32  21          QUESTION:  When was the full launch of

03:35:36  22  Deposit@Home to all eligible members?

03:35:42  23          ANSWER:  I would put that at January 2007.

03:35:46  24          QUESTION:  When it was launched in January 2007 to

03:35:48  25  all eligible members, it was a product to allow those

03:35:52  1  members to use a flatbed scanner and their home computer to

03:35:59  2  effect a check deposit?

03:36:00  3        ANSWER:  The first application was using their

03:36:07  4  computer to capture an image to effect a deposit.  In terms

03:36:16  5  of the --

03:36:17  6        QUESTION:  Let me -- go ahead.

03:36:19  7        ANSWER:  In terms of what was communicated to the

03:36:21  8  numbers, and I separate that from what we technically could

03:36:24  9  do in terms of the product presented, that was the first

03:36:29  10  use case communicated.

03:36:31  11        QUESTION:  And when you say members were using a

03:36:33  12  computer, you mean members using a computer connected to a

03:36:37  13  flatbed scanner, correct?

03:36:38  14        ANSWER:  Correct.

03:36:38  15        QUESTION:  And that's how it was launched in

03:36:41  16  January -- January 2007?

03:36:42  17        ANSWER:  Correct.

03:36:42  18        QUESTION:  And that's how it was launched during

03:36:44  19  the phase launch in August or September of 2006?

03:36:47  20        ANSWER:  Correct.

03:36:48  21        QUESTION:  Internally, sometime in October of

03:36:53  22  2006, a digital camera was used in place of a scanner,

03:36:56  23  correct?

03:36:56  24        ANSWER:  Correct.

03:36:56  25        QUESTION:  But that would have been kind of a

| | | |
|---|---|---|
| 03:37:04 | 1 | normal Canon or Nokia digital camera with button on top |
| 03:37:11 | 2 | that you press that would then -- you'd use a cable to |
| 03:37:15 | 3 | connect that to your computer to get the image out of the |
| 03:37:17 | 4 | camera and on your computer, correct? |
| 03:37:19 | 5 | ANSWER:  Technically, yes.  Anything that could |
| 03:37:25 | 6 | use a TWAIN driver connected to your PC -- TWAIN, |
| 03:37:31 | 7 | T-W-A-I-N, I think it's a technical protocol. |
| 03:37:34 | 8 | The distinction I made earlier was our |
| 03:37:40 | 9 | communication was, you know, use your scanner to put the |
| 03:37:45 | 10 | check on the glass. |
| 03:37:46 | 11 | The technical ability, and I believe the initial |
| 03:37:51 | 12 | launch was, as long as you had a device connected to your |
| 03:37:54 | 13 | PC that could take an image of a check, that could be |
| 03:38:00 | 14 | brought into our process for deposit. |
| 03:38:02 | 15 | QUESTION:  And just so we're clear, when you say |
| 03:38:06 | 16 | connected to, you mean via a physical cable, correct? |
| 03:38:09 | 17 | ANSWER:  Yes.  What I -- what I don't have details |
| 03:38:15 | 18 | of is, you know, was there wireless connectivity at that |
| 03:38:18 | 19 | time.  I'm not sure.  But -- |
| 03:38:20 | 20 | QUESTION:  But at the very least, we're talking |
| 03:38:23 | 21 | about two separate devices here.  We're talking about |
| 03:38:25 | 22 | computers, and we're talking about some sort of camera or |
| 03:38:28 | 23 | scanner.  And those would talk to each other via what you |
| 03:38:31 | 24 | called a TWAIN driver? |
| 03:38:32 | 25 | ANSWER:  Correct. |

03:38:32   1          QUESTION:   Okay.   But they were separate devices

03:38:34   2    in --

03:38:35   3          ANSWER:   Correct.

03:38:35   4          QUESTION:   -- between August -- August 2006 to

03:38:38   5    January 2007, correct?

03:38:40   6          ANSWER:   Correct.

03:38:40   7          QUESTION:   USAA did not begin experimentation

03:38:50   8    using a single integrated device, like a mobile phone with

03:38:54   9    a camera built in, until -- your notes state April 2007,

03:39:03  10    correct?

03:39:03  11          ANSWER:   Formally, correct.   What we had realized

03:39:06  12    was thanks to our members, this -- our technology could --

03:39:12  13    you know, at that time, could conceivably support any range

03:39:15  14    of digital image --

03:39:22  15          QUESTION:   In preparing for today's deposition,

03:39:24  16    did you find out when the very first test on a mobile phone

03:39:28  17    occurred?

03:39:28  18          ANSWER:   I found out as part of that formal

03:39:30  19    research effort that I believe that formally occurred

03:39:35  20    December 2007, or at least the briefing of the activity

03:39:43  21    occurred in December of 2007.   I don't recall the specific

03:39:47  22    date and time of the actual transaction.

03:39:52  23          QUESTION:   So a research effort was launched -- so

03:39:57  24    you were approved for a total of $900,000.00?

03:40:03  25          ANSWER:   Correct.

03:40:03  1        QUESTION:  You anticipated you would spend closer

03:40:06  2   to $1,094,000.00?

03:40:11  3        ANSWER:  Correct.

03:40:11  4        QUESTION:  And do you have any recollection as to

03:40:14  5   what the actual cost of the Deposit@Home research was?

03:40:17  6        ANSWER:  I do not.

03:40:18  7        QUESTION:  Do you have any reason to dispute that

03:40:23  8   it was -- is it fair to say that somewhere in the 2007/2008

03:40:27  9   time frame, there was a widespread industry recognition

03:40:33  10  that mobile banking would be a burgeoning trend?

03:40:44  11       ANSWER:  I don't think that would be fair to say.

03:40:55  12  My view is there were phones with digital cameras, and

03:41:00  13  maybe it's just because I'm an Apple fan, but I do believe

03:41:03  14  the success of the iPhone -- like I said, it's the same

03:41:09  15  time period.  I apologize.

03:41:10  16        Yeah, I think with the advent of that iPhone and

03:41:14  17  the ability for apps to be created opened the door to

03:41:20  18  mobile banking.  And I would say it's fair to say that's

03:41:23  19  when a lot of the conversations began.

03:41:28  20       QUESTION:  And is it fair to say those

03:41:30  21  conversations weren't limited to USAA?  The entire banking

03:41:32  22  industry was talking about mobile banking in the 2008 time

03:41:35  23  frame, following the iPhone launch?

03:41:36  24       ANSWER:  I would imagine banks that sought to be

03:41:39  25  competitive were talking about it.

03:41:41   1          QUESTION:  You would have expected your

03:41:45   2   competitors to be looking into mobile banking solutions

03:41:48   3   following the launch of the first iPhones?

03:41:49   4          ANSWER:  I would.  And -- from my experience with

03:42:05   5   the mobile deposit or even before the -- the RDC products,

03:42:10   6   my recollection of that time period was that mobile banking

03:42:16   7   was more of a way just to have your web banking on your

03:42:19   8   phone.

03:42:21   9          So what I recall from that time is mainly checking

03:42:25   10  your balance, funds transfers, transactions, web bill pay.

03:42:33   11         I still think at that time, we were recognized as

03:42:38   12  being very innovative and early with the ability to deposit

03:42:43   13  a check through a mobile device.

03:42:46   14         QUESTION:  Do you know what the total investment

03:42:50   15  cost to USAA was for the Deposit@Mobile product?

03:42:54   16         ANSWER:  I do not have that broken out just for

03:42:57   17  Deposit@Mobile.

03:42:59   18         QUESTION:  And you also do not know what the total

03:43:03   19  investment in Deposit@Mobile prior to November 2009 would

03:43:07   20  have been?

03:43:08   21         ANSWER:  Not specifically, no.

03:43:12   22         QUESTION:  Who would you talk to to find that out?

03:43:20   23  Would you turn your attention to Exhibit 3 again, the list

03:43:23   24  of 30(b)(6) topics?

03:43:29   25         ANSWER:  Yes.

03:43:30  1          QUESTION:  Topic 29, all analyses, studies,

03:43:36  2   materials, relating to any capital development requests,

03:43:40  3   authorizations, and approvals related to covered

03:43:44  4   technology, including but not limited to Deposit@Home and

03:43:46  5   Deposit@Mobile?

03:43:47  6          ANSWER:  Correct.

03:43:47  7          QUESTION:  Are you prepared to testify about this

03:43:49  8   topic today?

03:43:50  9          ANSWER:  I am.

03:43:50  10         QUESTION:  But you are not aware, sitting here

03:43:59  11  today, of the capital development costs prior to October

03:44:05  12  2006 for Deposit@Home?

03:44:09  13         ANSWER:  As of today, I do not have that specific

03:44:15  14  breakout of costs.

03:44:17  15         QUESTION:  And you were also not aware of the

03:44:20  16  capital development costs prior to November 2009 for

03:44:24  17  Deposit@Mobile?

03:44:25  18         ANSWER:  Not as of today, not readily available.

03:44:29  19         QUESTION:  Okay.  But have you prepared -- have

03:44:31  20  you come up with some sort of estimate of the expenses that

03:44:34  21  USAA put into the mobile deposit and home deposit?

03:44:39  22         ANSWER:  I have, yes.

03:44:39  23         QUESTION:  And can you explain to me how you came

03:44:42  24  up with that estimate?

03:44:43  25         ANSWER:  So my estimate for developing remote

03:44:52  1   deposit capture products is the activities that represented

03:44:57  2   major developments from 2004 through 2013.  An estimate of

03:45:03  3   the number of core engineers -- we estimated 30 core

03:45:08  4   engineers involved in that period, as well as a number of

03:45:12  5   other employees in a number of different departments that

03:45:21  6   also supported the development from cash operations to

03:45:28  7   finance to HR training, product management, project

03:45:32  8   management.

03:45:33  9        I have a list of around 15 or so departments that

03:45:39  10  also participated in the development over those years.  And

03:45:43  11  my estimation of that total activity for that 10-year

03:45:47  12  period is -- is somewhere north of $100 million in costs.

03:45:52  13       QUESTION:  Are you familiar with the economic

03:45:54  14  benefits that USAA associates with remote deposit capture?

03:46:00  15       ANSWER:  Yes, I am familiar.

03:46:02  16       QUESTION:  Can you tell us generally what those

03:46:04  17  benefits are?

03:46:05  18       ANSWER:  We see five economic benefits.  No. 1,

03:46:13  19  cost savings on check processing, from channels like check

03:46:23  20  by mail costing $1.21 per deposit, to remote deposit

03:46:28  21  capture deposit costing 4 cents per deposit.

03:46:34  22       No. 2, we see capital investment savings in

03:46:40  23  avoiding the building and maintaining of branches to

03:46:44  24  attract and collect more deposits, as is traditional

03:46:50  25  banking model.  That's a significant amount of capital to

03:46:54  1   build and maintain those.

03:46:56  2           QUESTION:  How does remote deposit capture,

03:46:58  3   whether it's by using mobile deposit or at home deposit,

03:47:03  4   how does that allow the bank not to have additional branch

03:47:11  5   offices?

03:47:11  6           ANSWER:  So the traditional banking model up and

03:47:16  7   to that point, still here today, but certainly remote

03:47:21  8   deposit capture is an innovation that -- that addresses

03:47:28  9   this.

03:47:29  10          The traditional model is to open branches in

03:47:35  11  geographical areas, given customers bank with someone who

03:47:42  12  is in their neighborhood or who has a physical presence,

03:47:46  13  and the branch, especially in those times, was the way in

03:47:50  14  which banks attracted new customers and the deposits that

03:47:53  15  they brought with them.

03:47:54  16          With remote deposit capture, that untethered the

03:48:04  17  ability to deposit a check from having to go to a branch to

03:48:09  18  do it.

03:48:10  19          QUESTION:  What other economic benefits does USAA

03:48:14  20  associate with remote deposit capture?

03:48:15  21          ANSWER:  Another economic benefit is the ecosystem

03:48:23  22  in which a member who has a checking account with us is

03:48:29  23  likely to be introduced to other products that USAA offers.

03:48:36  24          So the checking relationship, as we refer to it,

03:48:41  25  means a member experiences USAA, and a service like remote

03:48:49  1   deposit capture is a very valuable service in terms of

03:48:52  2   convenience and time savings for members.

03:48:54  3         So that, as we say internally, delightful

03:48:59  4   experience leads to an interest in other ways that USAA can

03:49:03  5   provide financial services to them.

03:49:04  6         So there is a path in which, typically, follows

03:49:08  7   the acquisition of a checking account where a member is

03:49:13  8   likely to pick up a savings account, an auto loan, or an

03:49:20  9   auto insurance product or credit card product as part of

03:49:25  10  that relationship path.

03:49:25  11        Each of those products have their own financials

03:49:29  12  to them.  So that's -- that's an economic benefit to USAA.

03:49:33  13        QUESTION:  Are you familiar with any comparable

03:49:36  14  license agreements that we could look to to analyze the

03:49:39  15  ecosystem benefits that you discussed?

03:49:42  16        ANSWER:  Yes, I would say a comparable licensing

03:49:47  17  agreement is our agreement with Zelle.

03:49:50  18        QUESTION:  Can you tell us what Zelle is?

03:49:51  19        ANSWER:  I can.  Zelle is, from a members'

03:50:00  20  perspective, a service offered to allow you to send money

03:50:03  21  to another person.  So that ecosystem benefit comparison is

03:50:14  22  as an access to money.  So if you need to get money to a

03:50:19  23  friend, family member, in this case, or another account you

03:50:22  24  have at another bank, this agreement with Zelle is a

03:50:28  25  service provided that gives you that access as a banking

03:50:32  1  member.

03:50:32  2       QUESTION:  And how does Zelle charge for its

03:50:35  3  services?

03:50:35  4       ANSWER:  Zelle is a service provided by Early

03:50:46  5  Warning Systems, which is a company that is owned by

03:50:50  6  several founding banks.  The founding banks -- well, let

03:50:56  7  me -- before I get to that.  The charge to USAA to allow

03:51:01  8  you to send money to another -- to someone at another bank

03:51:07  9  is 60 cents per transaction.  For us, we pay that fee to

03:51:17  10 Early Warning Systems.

03:51:18  11      The founding members of -- the founding banks of

03:51:22  12 that service receive ben -- economic benefit as a result of

03:51:27  13 us paying that fee.

03:51:28  14      So, for us, it's comparable in terms of the cost

03:51:35  15 that we -- we expend to allow our members the convenience

03:51:39  16 of sending money to -- to other people.

03:51:42  17      (Videoclip ends.)

03:51:46  18      THE COURT:  Does that complete this witness by

03:51:49  19 deposition?

03:51:51  20      MS. GLASSER:  There's actually a second volume to

03:51:54  21 him, but may we approach?  The parties would like to

03:51:56  22 propose something.

03:51:57  23      THE COURT:  Approach the bench.

03:51:58  24      (Bench conference.)

03:52:05  25      MS. GLASSER:  The parties -- we would propose, and

03:52:08  1  they have no objection, to breaking the depo videos and

03:52:11  2  calling Mr. Weinstein just so we make sure we get him on

03:52:14  3  and off today.  There's another over 30 minutes or so of

03:52:19  4  videos to go.

03:52:20  5          MR. MELSHEIMER:  Let the record reflect

03:52:21  6  Mr. Sheasby told me that the jury is falling asleep.  And I

03:52:24  7  agree to break things up because I'm so reasonable on

03:52:29  8  everything that I say, even though that was not the deal.

03:52:33  9  That's fine by me.

03:52:35  10          THE COURT:  So at this point, you want to call

03:52:40  11  Weinstein?

03:52:41  12          MR. BUNT:  Yes, Your Honor.

03:52:42  13          THE COURT:  And you're going to do the direct?

03:52:44  14          MR. BUNT:  Yes, Your Honor.

03:52:44  15          THE COURT:  You're going to cross?

03:52:46  16          MR. HILL:  Yes, sir.

03:52:46  17          THE COURT:  Okay.  That's fine with me.

03:52:48  18          MR. MELSHEIMER:  Thank you.

03:52:51  19          THE COURT:  I'll just call for the next witness.

03:52:54  20          (Bench conference concluded.)

03:52:58  21          THE COURT:  All right.  Having completed that last

03:53:00  22  witness by deposition, Plaintiff, call your next witness.

03:53:02  23          MR. BUNT:  At this point, Your Honor -- sorry.  At

03:53:05  24  this point, Your Honor, we're going to call Mr. Roy

03:53:08  25  Weinstein.

03:53:08  1            THE COURT:  All right.  Mr. Weinstein, if you'd

03:53:11  2    come forward and be sworn, please.

03:53:13  3            (Witness sworn.)

03:53:36  4            THE COURT:  Please come around, sir.  Have a seat

03:53:38  5    on the witness stand.

03:53:51  6            Mr. Bunt, you may proceed with direct examination

03:53:54  7    for the Plaintiff when ready.

03:53:56  8            MR. BUNT:  Thank you, Your Honor.

03:53:56  9            ROY WEINSTEIN, PLAINTIFF'S WITNESS, SWORN

03:53:56  10                    DIRECT EXAMINATION

03:53:57  11   BY MR. BUNT:

03:53:57  12   Q.  Good afternoon, sir.

03:53:59  13   A.  Good afternoon.

03:53:59  14   Q.  Would you mind stating your name for the jury, please,

03:54:04  15   sir?

03:54:04  16   A.  My name is Roy Weinstein.

03:54:05  17   Q.  Can you tell the jury a little bit about yourself?

03:54:08  18   A.  Sure.  I live in Los Angeles, California.  I'm an

03:54:10  19   economist and managing director at an economic research and

03:54:15  20   consulting firm called Micronomics.  I'm married with two

03:54:21  21   grown children and one grandchild.

03:54:22  22   Q.  And why are you here today, Mr. Weinstein?

03:54:24  23   A.  I'm here to talk about fair compensation to be paid by

03:54:32  24   Wells Fargo to USAA for use of the patents-in-suit during

03:54:38  25   the damages period.

03:54:41   1   Q.   Mr. Weinstein, we'll go over your analysis in detail in

03:54:45   2   a moment, but, first, can you provide the jury with your

03:54:48   3   conclusion as to the damages owed by Wells Fargo to USAA?

03:54:56   4        MR. BUNT:   Could we have the first slide,

03:54:58   5   Mr. Huynh?

03:55:00   6   A.   Yes.   Based on my work in this case, I have concluded

03:55:06   7   that damages owed to USAA by Wells Fargo from the period

03:55:10   8   August 17th, 2018, through January 6th, 2020, the start of

03:55:16   9   the trial, are no less than 85 cents per remote deposit, or

03:55:24   10  approximately $102.8 million during this damage period.

03:55:30   11  Q.   (By Mr. Bunt)   Mr. Weinstein, did you also summarize

03:55:34   12  benefits that you believe Wells Fargo obtained by using the

03:55:36   13  patents for the damage period in this case?

03:55:38   14  A.   Yes, sir, I did.   For the same period, I concluded that

03:55:46   15  Wells Fargo obtained profits of approximately     $1.2

03:55:52   16  billion in connection with mobile deposits made during this

03:55:56   17  period.

03:55:57   18  Q.   What is it that enables you to come up with that

03:56:02   19  figure?

03:56:02   20  A.   I'm an economist, and economists, among other things,

03:56:07   21  are trained to study financial performance in the market.

03:56:15   22  It starts with academic training, and it goes from there to

03:56:20   23  information about accounting records and generally,

03:56:26   24  economic, financial, and statistical information that

03:56:29   25  reflects the behavior of individuals and companies in the

03:56:34  1  marketplace.

03:56:35  2        So in -- in reaching my conclusions here, I relied

03:56:38  3  on my academic training, as well as my work experience

03:56:44  4  since leaving school.

03:56:46  5  Q.  How long have you been doing this type of work?

03:56:48  6  A.  50 years.

03:56:49  7  Q.  Mr. Weinstein, is your firm being compensated for the

03:56:52  8  work that you've done on this case?

03:56:53  9  A.  Yes, sir, it is.  My firm, Micronomics, is compensated

03:56:56  10  for time that I spend on this case at a rate of $750.00 per

03:57:03  11  hour.  It's also compensated for time spent by members of

03:57:08  12  my staff at Micronomics who helped me with this -- with

03:57:11  13  this engagement.

03:57:13  14  Q.  Is it routine for experts like yourself and Wells

03:57:17  15  Fargo's experts to be compensated for the time spent

03:57:20  16  analyzing problems like this?

03:57:22  17  A.  Yes, sir, it is.

03:57:23  18  Q.  Can you tell the jury about your educational

03:57:27  19  background?

03:57:27  20        MR. BUNT:  Next slide, Mr. Huynh.

03:57:29  21  A.  I attended City College New York and graduated with a

03:57:38  22  Bachelor of Business Administration degree with honors in

03:57:42  23  economics.

03:57:42  24        MR. BUNT:  Next slide, Mr. -- Mr. Huynh.

03:57:44  25  A.  From there, I went to the University of Chicago and

03:57:47  1   received a Master of Arts degree, also in economics.

03:57:52  2   Q.  (By Mr. Bunt)  And did you receive any honors and

03:57:54  3   awards in connection with your education?

03:57:56  4           MR. BUNT:  Next slide.

03:57:57  5   A.  Yes, sir, I did.  As an undergraduate, I received

03:58:01  6   certain awards for academic performance.  I received

03:58:04  7   fellowships at the University of Chicago while I was there,

03:58:09  8   as well.

03:58:09  9   Q.  (By Mr. Bunt)  Have you been honored, since leaving

03:58:12  10  school, for your work as a professional economist?

03:58:15  11  A.  I have.  About 10 years ago, I received something

03:58:19  12  called the career achievement award from the Business and

03:58:23  13  Economics Alumni Society at City College for work done

03:58:31  14  since leaving school in the field of economics.  I was the

03:58:33  15  first recipient of that award.

03:58:36  16  Q.  Can you identify for the jury some of the clients that

03:58:39  17  you've had over the course of your career?

03:58:41  18  A.  Yes.  I've worked for eBay, and Dell, Ericsson, Intel.

03:58:50  19  Back home in Los Angeles, I've done work for the Rose Bowl

03:58:55  20  in connection with the economic impact of the Rose Parade,

03:59:00  21  and also other local economic impact studies.

03:59:04  22           I've also been retained by Attorneys General for a

03:59:09  23  number of different states, and I've worked for a number of

03:59:13  24  small entities that I'd never heard of until being engaged.

03:59:18  25  Q.  (By Mr. Bunt) Have you --

03:59:23   1            MR. BUNT:  Next slide, Mr. Huynh.

03:59:25   2   Q.  (By Mr. Bunt)  Have you written or spoken about some of

03:59:27   3   the work that you've done relating to the subjects of

03:59:30   4   patents and patent damages?

03:59:30   5   A.  Yes.  The first article that I published in connection

03:59:30   6   with the calculation of patent damages was in the Journal

03:59:38   7   of the Patent and Trademark Office Society back in 1988.

03:59:40   8            I've subsequently published occasionally other

03:59:44   9   articles, including one at the Federal Circuit Bar Journal.

03:59:48  10   And I'm an occasional speaker at various seminars and --

03:59:54  11   and groups on the subject of patent damages.

03:59:59  12            MR. BUNT:  Your Honor, at this time, we would

04:00:00  13   offer Mr. Weinstein as an expert on the valuation of

04:00:04  14   intellectual property and the calculation of patent

04:00:07  15   damages.

04:00:07  16            THE COURT:  Is there objection?

04:00:08  17            MR. HILL:  No, sir, Your Honor.

04:00:09  18            THE COURT:  Then with no objection, the Court will

04:00:11  19   recognize this witness as an expert in those designated

04:00:14  20   fields.

04:00:14  21            Please proceed.

04:00:15  22            MR. BUNT:  Thank you, Your Honor.

04:00:16  23            Mr. Huynh, may I have Slide No. 8?

04:00:19  24   Q.  (By Mr. Bunt)  What materials did you consider in

04:00:22  25   reaching your conclusions in this case, Mr. Weinstein?

04:00:24  1    A.  I had access to three categories of -- of information

04:00:28  2    in connection with my work.  I started by reviewing the

04:00:35  3    patents-in-suit, and I had access to other information from

04:00:37  4    USAA, including internal correspondence and deposition

04:00:43  5    testimony and things of that sort.

04:00:47  6         I had access to information from Wells Fargo;

04:00:51  7    various internal presentations and correspondence, once

04:00:57  8    again testimony of company witnesses.  And then, finally, I

04:01:01  9    had access to information which I acquired myself at

04:01:06 10    Micronomics.  That's in the right-hand column.  Industry

04:01:11 11    analyst reports, trade press, publications that relate to

04:01:17 12    mobile deposits.  So to the industry generally, as well as

04:01:20 13    academic literature.  And I also had an opportunity to

04:01:24 14    speak with Mr. Calman and Mr. McKinley.

04:01:28 15    Q.  What is your understanding of why patent rights are

04:01:31 16    important in the United States?

04:01:34 17    A.  To me as an economist, patent rights are important, in

04:01:40 18    that they provide the patent owner with an absolute right

04:01:44 19    to exclude anyone else from using those patents without

04:01:49 20    permission.  The idea here is that by awarding those rights

04:02:00 21    to inventors, we encourage innovation, which ultimately is

04:02:04 22    good, not just for the inventor, but for consumers who

04:02:10 23    ultimately have access to those inventions.

04:02:14 24         So patent rights are designed to stimulate

04:02:18 25    invention, which ultimately will benefit all of us.

04:02:20  1  Q.  Is there a name for the agreements that are reached

04:02:24  2  between patentholders and the entities that wish to have

04:02:29  3  access to those patents?

04:02:30  4  A.  Yes, sir, there is.  The permission I talked about that

04:02:34  5  can be granted by a patentholder to an entity that wishes

04:02:39  6  to use that patent is called a license agreement.

04:02:43  7        And with a license agreement, the parties agree

04:02:47  8  that, while the patentholder will continue to own the

04:02:52  9  patent, the licensee, the entity that wishes to use it and

04:02:54  10  have permission to use it, will now have the right to use

04:02:59  11  it.  That's the permission.

04:03:01  12  Q.  And do these license agreements typically have payment

04:03:04  13  terms associated with them?

04:03:05  14  A.  Yes, sir, they do.  Sometimes permission is granted as

04:03:15  15  a -- in exchange for a lump sum payment, in other words,

04:03:17  16  payment all at once for that permission.

04:03:20  17        Sometimes the permission involves what are called

04:03:26  18  running royalty payments, in other words, payments over

04:03:28  19  time sometimes that are tied to the use that is made of the

04:03:31  20  invention.  And sometimes these agreements include a

04:03:34  21  combination of a lump sum payment, perhaps upfront, and

04:03:38  22  then running royalties over time.

04:03:40  23  Q.  How do these license agreements come into existence?

04:03:43  24  A.  They're negotiated by the parties.  So if -- if I'm an

04:03:51  25  entity and I'm aware of -- of patents or intellectual

04:03:54  1   property that I want to use, I can enter into a negotiation

04:03:57  2   with the inventor or the patentholder, and they work out

04:04:03  3   terms for permission.  So it's an actual real-world

04:04:06  4   negotiation.

04:04:07  5         MR. BUNT:  Mr. Huynh, if we could have Slide

04:04:09  6   No. 9.

04:04:10  7   Q.  (By Mr. Bunt)  And, Mr. Weinstein, if we could turn

04:04:12  8   back to your work in this case.  How do you go about

04:04:15  9   determining what determines fair compensation to USAA for

04:04:19  10  use of the patents-in-suit?

04:04:20  11  A.  In this case, I began with the -- the patent statute.

04:04:27  12  And what it says is that to compensate for infringement,

04:04:33  13  payment should be in no event less than a reasonable

04:04:38  14  royalty for use made of the invention by the infringer.

04:04:41  15        And so that's the starting point.  The starting

04:04:45  16  point says that payment should be at least a reasonable

04:04:52  17  royalty for use made of the invention.

04:04:54  18  Q.  How does one determine damages adequate to compensate

04:04:58  19  for infringement?

04:04:59  20  A.  Well, as I -- as I said earlier, in the real world, you

04:05:07  21  start with a natural negotiation for use of the -- of the

04:05:11  22  technology in question.

04:05:14  23        In -- in this case, in this situation, what you do

04:05:18  24  is -- is similar but not quite the same.  And instead of an

04:05:25  25  actual negotiation, what you do in this context is you put

04:05:29  1   the parties together in what's called a hypothetical

04:05:35  2   negotiation.  And it's called a hypothetical negotiation

04:05:36  3   because it didn't happen.  There was no agreement between

04:05:40  4   the parties.

04:05:41  5        But what you do in order to figure out what

04:05:44  6   adequate compensation for infringement would be is you have

04:05:48  7   the parties engage in this hypothetical negotiation at the

04:05:54  8   time of first infringement.

04:05:55  9        And so that's why this slide says July 2018.

04:06:02  10  That's when the patents issued.

04:06:04  11       And at the hypothetical negotiation, on one side

04:06:06  12  is USAA, and it has the patents and it's making them

04:06:09  13  available to Wells Fargo.  It's granting permission to

04:06:12  14  Wells Fargo.  It's why the arrow goes that way.

04:06:15  15       And, in exchange, Wells Fargo is going to

04:06:18  16  compensate USAA for use of these patents.  That's a

04:06:24  17  hypothetical negotiation, and it's that process that is

04:06:28  18  going to allow us to determine what fair compensation would

04:06:33  19  be.

04:06:33  20       And what I do as -- as an economist is I sort of

04:06:37  21  sit -- you can see me maybe in the lower right-hand corner

04:06:42  22  right above the exhibit number.  And I sit and I watch this

04:06:46  23  hypothetical negotiation.  I'm not -- I'm not there.  I'm

04:06:49  24  not part of it.  I just watch it and I look for the outcome

04:06:54  25  and that produces the result.

04:06:55   1   Q.  Mr. Weinstein, have you prepared a slide that puts this

04:06:59   2   hypothetical negotiation into context?

04:07:00   3   A.  Yes, sir, I have.  So this provides just some

04:07:07   4   background about the hypothetical negotiation.  And the

04:07:09   5   hypothetical negotiation itself will take place, on the

04:07:12   6   right-hand side, around July 2018 when the patents issued.

04:07:23   7   And the context for that negotiation is set forth in other

04:07:26   8   entries on the slide.

04:07:27   9        But, basically, Deposit@Home is launched by Wells

04:07:31   10   Fargo in 2006 -- excuse me, is launched by USAA in 2006,

04:07:40   11   Deposit@Mobile also by USAA in 2009.

04:07:41   12        Wells Fargo launches its Mobile Deposit product in

04:07:47   13   2012.  And the damages period -- the damages that I've

04:07:51   14   calculated begin in 2018 after the patents issue and -- and

04:07:58   15   run through to the -- to the trial itself, to now.

04:08:01   16   Q.  And does the fact that this hypothetical negotiation

04:08:04   17   takes place in 2018 have an impact on the outcome?

04:08:09   18   A.  Well, it -- it does in the -- in the sense that Wells

04:08:19   19   Fargo had launched its product in -- in 2012.

04:08:25   20        By 2018, we just saw deposition testimony from

04:08:32   21   Mr. Ajami that the product had become table stakes.  It had

04:08:37   22   become very important.  And so Wells Fargo has -- has

04:08:40   23   obtained benefits during this period from mobile deposits.

04:08:45   24        And, finally, under -- under the patent statute

04:08:51   25   and the -- and the process that we follow here, the damages

04:08:53   1    period, it's time to pay up for those benefits beginning

04:08:57   2    in -- in 2018.

04:09:00   3         MR. BUNT:  Can we go to the next slide?

04:09:02   4    Q.  (By Mr. Bunt)  Mr. Weinstein, between the date of Wells

04:09:04   5    Fargo's launch in 2012 of Mobile Deposit and the time of

04:09:09   6    the hypothetical negotiation, how did Mobile Deposit

04:09:11   7    perform in the market?

04:09:12   8    A.  Mobile Deposit significantly outperformed the initial

04:09:20   9    expectations of how that product would do.

04:09:24  10         What we have here on the left-hand side, the low

04:09:27  11    and the high bar, are forecasts that were done in 2011 by

04:09:34  12    Wells Fargo of the number of mobile deposits that were

04:09:38  13    predicted for 2018.

04:09:40  14         So there was a forecast done in 2011 for something

04:09:44  15    that was going to happen in -- seven years later, in 2018.

04:09:47  16    And the -- the low and the high forecast are under

04:09:51  17    30 million mobile deposits.

04:09:54  18         Actually, by 2018, there were something in the

04:09:58  19    neighborhood of 80 million mobile deposits.  In other

04:10:02  20    words, Wells Fargo's own internal forecast with respect to

04:10:06  21    this product was significantly outperformed.

04:10:17  22         MR. BUNT:  If we could go to Slide No. 13,

04:10:19  23    Mr. Huynh.

04:10:20  24    Q.  (By Mr. Bunt)  Are there certain assumptions necessary

04:10:23  25    for purposes of this hypothetical negotiation?

04:10:24  1    A.   Yes.   So if you think back to that negotiating table

04:10:27  2    that we just saw and the hypothetical negotiation, this is

04:10:31  3    the second interesting part about that negotiation.

04:10:36  4    Sitting across from one another at that table at that

04:10:43  5    negotiation, USAA and Wells Fargo agree that the patents

04:10:47  6    are actually valid, infringed, and enforceable.   As we know

04:10:53  7    in the real world, they do not agree about that.

04:10:57  8         But at this hypothetical negotiation, for purposes

04:11:00  9    of determining damages adequate to compensate for

04:11:05  10   infringement, there's no disagreement about that between --

04:11:07  11   between the parties.   They agree.

04:11:09  12        So that's -- that's a fundamental difference

04:11:12  13   between the hypothetical negotiation that we are required

04:11:17  14   to follow here and the real world.

04:11:19  15        Second, unlike a real-world negotiation where

04:11:23  16   either side can get up and leave without reaching an

04:11:27  17   agreement, here, they can't leave until they reach an

04:11:31  18   agreement.   We've got to get to the finish line.   And both

04:11:35  19   sides understand that.

04:11:37  20        And the third thing that's different between the

04:11:41  21   hypothetical and the real-world negotiation is that both

04:11:45  22   sides actually understand the importance of the technology

04:11:51  23   associated with the products accused for infringement.

04:11:56  24        MR. BUNT:   Mr. Huynh, if we could go to Slide No.

04:11:58  25   14.

04:12:04   1   Q.   (By Mr. Bunt)   When did USAA launch the mobile app for

04:12:09   2   customer remote deposit systems?

04:12:09   3   A.   That occurred in 2009.

04:12:11   4   Q.   And how was that launch described in the press?

04:12:14   5   A.   So this is a -- a press report by AdAge in September of

04:12:22   6   2009 describing the release by USAA of mobile check deposit

04:12:33   7   technology.

04:12:33   8          And at the bottom in -- in this press report, the

04:12:38   9   description is that USAA represents the leading edge of

04:12:43   10   mobile banking technology.   This is back in 2009 when it

04:12:46   11   was initially launched.

04:12:47   12   Q.   What does leading edge refer to?

04:12:50   13   A.   It's a combination of cutting edge and leading edge.

04:12:53   14   It's really important.

04:12:55   15   Q.   And this is Plaintiff's Exhibit 143; is that correct,

04:12:59   16   sir?

04:12:59   17   A.   Yes, sir.

04:13:01   18          MR. BUNT:   Next slide, please, sir, Mr. Huynh.

04:13:04   19   Q.   (By Mr. Bunt)   Is there evidence that the industry

04:13:06   20   recognized at the time that mobile deposit capture would be

04:13:11   21   important?

04:13:11   22   A.   Yes.   This is an industry trade press called Celent.

04:13:17   23   And it's an abstract from an article in 2009.   And it -- it

04:13:23   24   points out that mobile remote deposit capture is dis --

04:13:29   25   disruptive and that banks -- that's at the top -- and that

04:13:33   1    retail banks need to pay attention.

04:13:36   2    Q.  What does it mean when it says disruptive?  That

04:13:40   3    doesn't sound like a good thing.

04:13:41   4    A.  Well, to me as an economist, a technology that's

04:13:46   5    disruptive is one that's really going to change things in

04:13:49   6    the marketplace.  And in -- in this case, back in 2009 at

04:14:00   7    the time the product was introduced, there was at least

04:14:01   8    this recognition, that remote deposit capture could be

04:14:07   9    disruptive for retail banks and the industry.

04:14:10   10   Q.  Did the author also describe this technology as

04:14:13   11   transformational?

04:14:15   12   A.  It said that USAA has transformed the industry.

04:14:19   13   That's -- that's part of the discussion, and that's

04:14:21   14   consistent with disruptive.

04:14:24   15            MR. BUNT:  May I have Slide No. 16, Mr. Huynh?

04:14:28   16   Q.  (By Mr. Bunt)  Did consumers like USAA's mobile app?

04:14:30   17   A.  They did.  This is in 2009, abstract from San Francisco

04:14:37   18   Business Times article referencing the fact that USAA's

04:14:44   19   mobile deposit app had by then become Apple's most popular

04:14:51   20   financial app, as of August 2009.  That's roughly two years

04:14:56   21   after the iPhone was introduced.

04:15:00   22            MR. BUNT:  Next slide, Mr. Huynh.

04:15:02   23   Q.  (By Mr. Bunt)  Did Wells Fargo recognize the importance

04:15:04   24   of MRDC?

04:15:06   25   A.  Yes.  I think we just -- we just heard this testimony,

04:15:08  1  actually, from Mr. Ajami, who testified that mobile check

04:15:22  2  deposit had become a table stakes capability, which to me

04:15:26  3  means it was really important that they have it in order to

04:15:29  4  compete with other commercial banks, and that the absence

04:15:34  5  of mobile check deposit was a significant pain point for

04:15:39  6  Wells Fargo.

04:15:39  7  Q.  Can you remind the jury who Mr. Ajami is?

04:15:42  8  A.  He's a Wells Fargo senior vice president.

04:15:45  9       MR. BUNT:  Next slide, please.

04:15:47 10  Q.  (By Mr. Bunt)  Is there any other evidence that Wells

04:15:49 11  Fargo lacked the internal capability to create mobile

04:15:53 12  deposit, MRDC?

04:15:55 13  A.  Yes.  One of things that I do as an economist is I look

04:16:01 14  at other possibilities of creating the same product, and

04:16:08 15  that -- that could be relevant to the analysis -- typically

04:16:12 16  would be.

04:16:13 17       In this case, what I found in -- in a 2011 Wells

04:16:19 18  Fargo's planning document -- that's before Wells Fargo

04:16:22 19  actually released its mobile deposit product, but back in

04:16:27 20  2011, it was -- it was considering creating a product

04:16:32 21  itself.  And what it said in this document is that the time

04:16:37 22  to build would set the project back 9 to 18 months and that

04:16:41 23  the technology could get outdated because they didn't have

04:16:45 24  the kind of focused research and development support that

04:16:49 25  they would need.

04:16:50   1          So my takeaway as an economist from this was that
04:17:01   2   Wells Fargo thought about creating its own product but
04:17:03   3   decided not to pursue it for -- for several reasons.
04:17:04   4   Q.  Does the information on this slide come from
04:17:09   5   Plaintiff's Exhibit No. 14, Mr. Weinstein?
04:17:11   6   A.  It does.
04:17:12   7   Q.  Are you --
04:17:13   8          MR. BUNT:  Can we have the next slide, Mr. Huynh?
04:17:16   9   Q.  (By Mr. Bunt)  Are you aware of any evidence of whether
04:17:19  10   Wells Fargo viewed its specialized scanner system as a
04:17:19  11   commercially viable option instead of mobile deposit --
04:17:28  12   mobile remote deposit?
04:17:28  13   A.  Yes, we're -- we're still in the planning stage for
04:17:28  14   Wells Fargo.  This document, you can see on the left, is
04:17:31  15   January 2011 before the Wells Fargo mobile deposit product
04:17:35  16   had been released.  And they're considering other
04:17:45  17   alternatives -- in this case, a specialized scanning
04:17:48  18   system.
04:17:48  19          And the conclusion from this particular planning
04:17:54  20   study, you can see they've drawn an X over the scanner to
04:17:57  21   the right, is that pursuing that approach was not a viable
04:18:05  22   option for Wells Fargo.  It would cut their profitability
04:18:08  23   dramatically, and only roughly 20 percent of their
04:18:12  24   customers would even be eligible to use specialized
04:18:17  25   scanners.

04:18:17  1    So Wells Fargo, in addition to thinking about

04:18:20  2  creating its own system, considered specialized scanners

04:18:24  3  and rejected that idea.

04:18:25  4  Q.  And that document the jury's looking at is Plaintiff's

04:18:30  5  Exhibit No. 1296; is that correct?

04:18:31  6  A.  Yes, sir.

04:18:31  7  Q.  How did you decide what the parties would have agreed

04:18:34  8  upon back at the time of the hypothetical negotiation?

04:18:38  9    MR. BUNT:  If we could have Slide No. 20.

04:18:40  10 A.  So this is the third part of the hypothetical

04:18:47  11 negotiation framework.  You have a hypothetical

04:18:50  12 negotiation.  You have assumptions about the patents being

04:18:53  13 valid and infringed and enforceable and recognition that

04:18:57  14 the parties have to reach an agreement.

04:18:58  15    And then the third part is identified as the

04:19:04  16 Georgia-Pacific factors.  And the Georgia-Pacific factors

04:19:04  17 are a checklist of things that the parties to this

04:19:08  18 negotiation might want to consider as they negotiate for

04:19:15  19 permission to use the -- the technology in question.  It

04:19:19  20 comes from a -- a prior patent case many years back, and

04:19:25  21 it's -- it's just the checklist.

04:19:27  22    And the idea is that each side is going to be

04:19:30  23 thinking about these factors.  They're not all relevant

04:19:35  24 each time you -- you try and determine what fair payment

04:19:39  25 would be, but the idea is to consider them and think about

04:19:41   1   the ones that turn out to be relevant.  And both sides

04:19:44   2   would have access -- have these -- these factors in mind.

04:19:48   3   So it's called the -- a Georgia-Pacific analysis.

04:19:51   4   Q.  (By Mr. Bunt)  So are you saying that the -- these

04:19:54   5   Georgia-Pacific factors will also be used by Wells Fargo's

04:19:57   6   damage expert?

04:19:58   7   A.  Yes.   Wells Fargo's damage expert in this case uses

04:20:03   8   the same Georgia-Pacific analysis, the hypothetical

04:20:08   9   negotiation framework, and the assumptions about validity

04:20:14   10  and infringement.  And they need to reach an agreement, as

04:20:17   11  I do.  We -- we agree about the framework for getting to

04:20:21   12  what a reasonable royalty or a reasonable payment would be

04:20:24   13  in connection with this.  Both sides do agree about that.

04:20:28   14  Q.  So did you consider all 15 of these factors in

04:20:31   15  developing your reasonable royalty measure of damages?

04:20:33   16  A.  Yes, sir, I considered all 15.  Some were more

04:20:36   17  important than others in this case, and so I focus on

04:20:39   18  those.  But I considered them all.

04:20:40   19         MR. BUNT:  Let's go to Slide 21.

04:20:42   20  Q.  (By Mr. Bunt)  And why don't you tell us where you

04:20:44   21  began?

04:20:45   22  A.  So, as I said, this is a checklist of 15 factors.  I

04:20:49   23  began in this case with No. 6.  Could have begun with maybe

04:20:56   24  some -- some of the others, but No. 6 is a good starting

04:20:59   25  point.  And it's the effect of selling the patented product

04:21:03    1    and promoting the sales of other products of the licensee.

04:21:08    2    And so that's one of the things on this checklist that the

04:21:12    3    parties would think about.

04:21:16    4           And translating that into something else means

04:21:19    5    does selling -- does -- does access -- providing access to

04:21:25    6    mobile deposits benefit the entity that has access to

04:21:31    7    mobile deposits by allowing it to sell and make profits on

04:21:34    8    other things?  That's -- that's Item 6.

04:21:38    9    Q.  And the entity in question here would be Wells Fargo;

04:21:42   10    is that right?

04:21:42   11    A.  Yes, sir.

04:21:42   12    Q.  So, Mr. Weinstein --

04:21:45   13           MR. BUNT:  If we could go to Slide No. 22.

04:21:48   14    Q.  (By Mr. Bunt)  Mr. Weinstein, let me show you a 2012

04:21:51   15    Wells Fargo internal study in connection with mobile

04:21:54   16    deposits.  And can you tell me what information does this

04:21:57   17    provide in connection with your analysis of Georgia-Pacific

04:22:00   18    Factor No. 6?

04:22:01   19    A.  So this is another Wells Fargo planning document, and

04:22:06   20    here, what it says in the highlighted portions are:  Mobile

04:22:11   21    deposit customers are one and a half more times likely to

04:22:14   22    generate an annual product -- profit of $2,000.00 and have

04:22:19   23    higher deposit balances.  And it also says:  Mobile deposit

04:22:23   24    customers have an approximately 50 percent lower attrition

04:22:27   25    rate.  In other words, they're more likely to stay with the

04:22:31  1  bank.  So these are additional benefits associated with

04:22:33  2  having permission to use mobile deposits.

04:22:38  3          MR. BUNT:  For the record, that's PX-329.

04:22:42  4  Q.  (By Mr. Bunt)  And then this next slide, yes, was there

04:22:45  5  any other evidence that you considered regarding the

04:22:47  6  importance of MRDC to Wells Fargo?

04:22:51  7  A.  Yes.  This next one, November 2010, another Wells Fargo

04:22:57  8  planning document, points out that with mobile deposits,

04:23:01  9  there will be 20 percent new deposits.  In other words,

04:23:07 10  by -- by having the ability to offer the mobile deposit

04:23:13 11  channel, Wells Fargo will be able to increase its deposits

04:23:17 12  over and above what they would obtain if they just had ATMs

04:23:23 13  and bank tellers.

04:23:25 14  Q.  Mr. Weinstein, is that PX-1069 that you're reading

04:23:31 15  from?

04:23:31 16  A.  It is.

04:23:31 17  Q.  Did you also look at the other Georgia-Pacific factors?

04:23:33 18  A.  I did.  So the next two that I would talk about are

04:23:37 19  Factors 8 and 11.  I grouped them because they kind of

04:23:40 20  relate to the same thing, which is the profitability of the

04:23:45 21  product in question and the -- the use that's been made of

04:23:50 22  that product in this case by Wells Fargo.

04:23:52 23  Q.  What did you consider in your analysis of these

04:23:54 24  factors?

04:23:58 25          MR. BUNT:  Next slide, please.

04:24:00  1   A.   So here, I -- I was interested in seeing how successful

04:24:07  2   Wells Fargo had been in connection with offering this

04:24:09  3   product.   And so what I did is I tabulated the number of

04:24:15  4   Wells Fargo MRDC customers by year, and that's shown in the

04:24:21  5   second column working its way down, the profit per account.

04:24:26  6   And those figures came directly from Wells Fargo.   And on

04:24:30  7   the right-hand side are the profits from checking accounts.

04:24:35  8         And during the damage period, which isn't

04:24:37  9   precisely shown on here because this doesn't break out a

04:24:40  10  part of 2018 and a part of 2019, but the profits associated

04:24:46  11  with the number of accounts shown on the second column

04:24:56  12  times the profit per account, sum up to approximately

04:25:00  13  $1.2 billion.   That's just during the damage period.

04:25:08  14  Q.   (By Mr. Bunt)   Have you tabulated the number of mobile

04:25:11  15  deposits received by Wells Fargo since the infringing MRDC

04:25:15  16  system was launched?

04:25:16  17  A.   Yes.   This next slide contains that tabulation.   You

04:25:20  18  can see the -- that the volume -- the number of mobile

04:25:25  19  deposits over time has been increasing at Wells Fargo.

04:25:30  20  And, again, although it's not precisely shown, if you pro

04:25:34  21  rate the figures for 2018 beginning in -- during the damage

04:25:40  22  period and them come forward to roughly the time of trial,

04:25:43  23  it's approximately 120.9 million mobile deposits made

04:25:49  24  during that period.   We're up to a pace of close to

04:25:53  25  90 million mobile deposits per year by 2019.

04:25:57   1   Q.  And that number at the bottom, is that dollars or is
04:26:02   2   that mobile deposits that have actually been made?
04:26:04   3   A.  No, that's mobile deposits.  It's not dollars.  That's
04:26:08   4   just the number of mobile deposits.
04:26:10   5          MR. BUNT:  All right.  If we could go to Slide 27.
04:26:14   6   Q.  (By Mr. Bunt)  Did you also examine other
04:26:17   7   Georgia-Pacific factors?
04:26:18   8   A.  Yes.  The next two that I grouped together has -- has
04:26:21   9   to do with the relationship between Wells Fargo and USAA.
04:26:26  10   And other things equal, you would prefer not to give your
04:26:32  11   technology or permission to use your technology to a
04:26:34  12   competitor because it's going to have a direct impact on
04:26:37  13   you.  If you're talking about giving permission to an
04:26:42  14   entity that you don't compete with, you're -- you're more
04:26:48  15   ready to do something along those lines than to provide
04:26:51  16   permission to a competitor.
04:26:53  17          And so that's what these Georgia-Pacific factors
04:26:56  18   here address.
04:26:57  19   Q.  Are Wells Fargo and USAA competitors to one another?
04:27:01  20   A.  Yes, sir, they are.
04:27:04  21          MR. BUNT:  Next slide.  Thank you.
04:27:05  22   A.  This is actually a Wells Fargo ad.  It's a Wells Fargo
04:27:09  23   ad, and it shows that Wells Fargo is targeting members of
04:27:16  24   the USAA core constituency.  It's -- it's directing its
04:27:23  25   advertising right at USAA's core customer base.  So,

04:27:27   1   clearly, they're -- they're competitors.

04:27:30   2   Q.  (By Mr. Bunt)  And that's PX-1083, Mr. Weinstein?

04:27:33   3   A.  Yes, sir.

04:27:34   4   Q.  Again, why is that important to your analysis that

04:27:37   5   they're direct competitors?

04:27:38   6   A.  Well, other things equal, you don't want to help your

04:27:41   7   direct competitor.  And so other things equal, if you're

04:27:44   8   going to grant permission to use your technology to a

04:27:49   9   competitor, you're going to want to get more for it than if

04:27:52  10   you grant permission to an entity that is not operating in

04:27:56  11   the same space that you are.

04:27:58  12   Q.  Have you seen any other evidence that they compete?

04:28:01  13   A.  Yes.  This is testimony from Mr. Rosati at Wells Fargo.

04:28:06  14   And -- and he confirms what's -- what's fairly evident from

04:28:12  15   that last ad that we saw that USAA and Wells Fargo compete

04:28:16  16   with one another.

04:28:17  17   Q.  Does Wells Fargo charge USAA for services that it

04:28:20  18   provides to USAA members?

04:28:24  19   A.  Yes, it does.  We -- we saw a slide from, I believe,

04:28:28  20   Mr. McKinley, but Wells Fargo charges USAA each time a USAA

04:28:35  21   member uses Zelle, which is a method of basically wire

04:28:41  22   transferring money from one account to another.

04:28:46  23   Q.  Why is that important to your analysis?

04:28:48  24   A.  Well, it -- it -- it reflects the fact that Wells Fargo

04:28:51  25   is willing to accept what I call a running royalty for use

04:28:55   1    of its technology.  It charges each time that a USAA member

04:29:02   2    actually uses this -- this particular technology.

04:29:07   3    Q.  What were the next Georgia-Pacific factors that you

04:29:10   4    considered?

04:29:12   5    A.  The next ones I considered, again, I've grouped a few

04:29:15   6    together, relate to the benefits and advantages associated

04:29:21   7    with using the -- the property in question.  And so those

04:29:25   8    are GP Factors 9, 10, and 12.

04:29:30   9    Q.  Did you see any evidence whether Wells Fargo viewed its

04:29:35   10   specialized scanner system as a commercially viable option?

04:29:38   11   A.  Yes.  And this is a quick look at a slide that I

04:29:41   12   testified about previously.  They thought about commercial

04:29:45   13   scanners, this was in their 2011 planning document, and

04:29:47   14   crossed it out, rejected the idea as being not commercially

04:29:52   15   viable, too expensive, and not able to support their entire

04:29:57   16   customer base.

04:29:59   17         MR. BUNT:  Could we go to the next slide?

04:30:02   18   Q.  (By Mr. Bunt)  How much do these specialized desktop

04:30:06   19   check scanners cost?

04:30:08   20   A.  They were expensive.  And they cost from $500.00 to

04:30:15   21   considerably more.  And, clearly, that wouldn't be a viable

04:30:16   22   approach to -- to making mobile deposits.  This is

04:30:21   23   exhibit -- Plaintiff's Exhibit 240.

04:30:24   24         MR. BUNT:  And if we could go to Slide 34.

04:30:28   25   Q.  (By Mr. Bunt)  What would be the impact to Wells Fargo

04:30:30  1   of not offering MRDC?

04:30:33  2   A.  As we've seen, MRDC was table stakes.  That's what

04:30:41  3   Wells Fargo's vice president said, table stakes.

04:30:44  4         And what we find in this financial trade press is

04:30:50  5   that mobile check deposit capture users by 2015 had now

04:31:00  6   outnumbered those using specialized scanners by more than

04:31:04  7   40 to 1.  In other words, specialized scanners were only

04:31:11  8   used by roughly two and a half percent of mobile deposit

04:31:14  9   users, and the other 97 percent were making mobile deposits

04:31:19  10  from their devices.

04:31:23  11  Q.  What does that suggest about whether Wells Fargo would

04:31:26  12  lose customers to banks who did offer MRDC if it were

04:31:30  13  unable to offer it?

04:31:31  14  A.  Well, this would suggest that they'd lose 97 percent of

04:31:35  15  their customers to other banks.

04:31:37  16  Q.  Can we go --

04:31:39  17  A.  Which is consistent with what Mr. Ajami said about

04:31:43  18  mobile deposit being table stakes.  That means if you don't

04:31:46  19  have it, you're going to lose customers.

04:31:48  20         MR. BUNT:  Can we go to the next slide?

04:31:51  21  Q.   (By Mr. Bunt)  Did USAA customers find desktop

04:31:55  22  scanners acceptable over MRDC?

04:31:58  23  A.  No, this is from USAA data, not Wells Fargo data.  But

04:32:00  24  during the period May of 2014 to December 2018, roughly

04:32:06  25  3 percent of mobile deposit users were using desktop remote

580

04:32:15  1  scanners and -- and, by the way, these were not specialized

04:32:19  2  scanners.  These were off-the-shelf scanners.  But only

04:32:23  3  3 percent of the USAA's deposits came from remote scanners,

04:32:28  4  and 97 percent came from mobile devices.

04:32:36  5          MR. BUNT:  Can we go to the next slide?

04:32:38  6  Q.  (By Mr. Bunt)  What would be the impact on Wells Fargo

04:32:42  7  if it could not offer MRDC and 97 percent of its customers

04:32:43  8  did not accept the desktop scanners solution?

04:32:45  9  A.  Well, if Wells Fargo lost 97 percent of its customers,

04:32:50  10  it would lose the profits that it makes on those 97 percent

04:32:51  11  of those customers.  And during the -- the damage period,

04:32:55  12  that would -- that would amount to approximately $1.2

04:33:01  13  billion in profits associated with those customers that

04:33:09  14  would be lost if those customers went elsewhere.

04:33:11  15          MR. BUNT:  Next slide, please.

04:33:13  16  Q.  (By Mr. Bunt)  Did Wells Fargo consider duplicate fraud

04:33:16  17  to be a serious problem with respect to MRDC?

04:33:19  18  A.  Yes, it did.  It recognized that MRDC presented a new

04:33:28  19  kind of fraud risk that previously had not existed.  That

04:33:35  20  new kind of fraud risk is associated with the fact that the

04:33:38  21  consumer now kept the check.  Instead of depositing it in

04:33:42  22  an ATM or giving it to a teller, the consumer now had the

04:33:47  23  check, which provided opportunities or possibilities that

04:33:52  24  fraud would occur with that check still in the hands of the

04:33:56  25  consumer.

04:33:56    1        And so back in 2009 and 2010, when Wells Fargo was

04:34:03    2   still thinking about providing a mobile deposit product,

04:34:08    3   it's -- it's observing at the bottom that mobile deposits

04:34:12    4   generate additional risk to manage and monitor.  The

04:34:16    5   primary risk is of duplicate deposits.  In 2010, at the top

04:34:23    6   the same thing, the primary threat of MRDC is duplicate

04:34:27    7   deposits.

04:34:28    8        Wells Fargo recognized that because the consumers

04:34:33    9   still had the check, and to -- I'll stop there.

04:34:37   10   Q.  Can those Wells Fargo documents be found in Plaintiff's

04:34:41   11   Exhibit 436 and PX-1470?

04:34:45   12   A.  Yes, sir.

04:34:46   13   Q.  Is there testimony from Wells Fargo's corporate

04:34:49   14   representative about the importance of the claims of the

04:34:53   15   '605 patent with respect to duplicate detection?

04:34:56   16   A.  Yes, we -- we just saw this testimony from Mr. Darpally

04:34:59   17   who indicated that he couldn't think of any other way to

04:35:03   18   perform duplicate detection besides mobile deposits.

04:35:12   19   Q.  I'm sorry, were you done?

04:35:14   20        MR. BUNT:  Okay.  If we can have the next slide.

04:35:17   21   Q.  (By Mr. Bunt)  Did Mr. Darpally also provide testimony

04:35:23   22   regarding customer authentication?

04:35:23   23   A.  Yes, he did.  It was in that same deposition that we

04:35:26   24   just saw portions of in which he said that he couldn't

04:35:29   25   think of any other way to perform customer authentication

04:35:35  1  that does not involve receipt of that information from the

04:35:40  2  mobile app.

04:35:41  3  Q.  Would it be relevant if Mr. Darpally had provided

04:35:44  4  information about different ways to provide duplicate

04:35:48  5  detection or customer authentication?

04:35:51  6  A.  Yes, sir, it would.

04:35:52  7  Q.  And how so?

04:35:53  8  A.  As -- as I testified previously, one of the things that

04:35:59  9  I as an economist consider is whether or not you can

04:36:04  10  provide the benefits associated with the technology in

04:36:08  11  question through alternatives.  Because if you can, then

04:36:11  12  those alternatives will impact what you're willing to pay

04:36:15  13  for permission to use the technology in question.  So, yes,

04:36:18  14  that would have been relevant, but...

04:36:21  15  Q.  Do those non-infringing alternatives, if there is one,

04:36:24  16  do they provide a cap on the amount that an infringer would

04:36:28  17  pay for use of the patents?

04:36:31  18  A.  A commercially viable non-infringing alternative would

04:36:36  19  provide a cap.  By commercially viable, I mean, if -- if it

04:36:40  20  could provide the same benefits as the technology that

04:36:45  21  we're talking about and still be profitable -- as

04:36:51  22  profitable as the technology we're talking about, then that

04:36:54  23  would set a cap as to what one would pay for permission.

04:37:01  24  Because if you could do it some other way, you wouldn't pay

04:37:04  25  more.

04:37:05  1             MR. BUNT:  Next slide.

04:37:07  2    Q.  (By Mr. Bunt)  Have you seen any evidence showing that

04:37:09  3    bank customers had concerns about fraud with respect to

04:37:12  4    MRDC?

04:37:12  5    A.  Yes.  This is a 2017 report by a financial advisory

04:37:22  6    trade press firm called Futurion.  And by then, 2017,

04:37:29  7    mobile deposits had been in the market for -- for a while.

04:37:34  8             And what -- and what they say is FIs, financial

04:37:38  9    institutions, must unequivocally assure customers that

04:37:40  10   mobile deposit is every bit as secure as an ATM or bank

04:37:44  11   branch.  In other words, it's really important for the

04:37:52  12   banks and other financial institutions to provide assurance

04:37:58  13   to -- to their customers about security associated with

04:38:00  14   mobile deposits.

04:38:02  15            MR. BUNT:  And that's Plaintiff's Exhibit 5, for

04:38:05  16   the record.

04:38:05  17   Q.  (By Mr. Bunt)  Did Wells Fargo recognize the need for

04:38:09  18   mobile deposits to be as safe as ATMs in order to satisfy

04:38:12  19   customer concerns about fraud?

04:38:13  20   A.  Yes, sir.  Here we're still in the planning stage at

04:38:16  21   Wells Fargo.  August 2010.  And in their planning document,

04:38:21  22   they point out that a mobile banking customer who can

04:38:26  23   deposit checks at the ATM has to be comfortable about the

04:38:34  24   risk of duplicate deposits associated with retaining the

04:38:42  25   paper check.

584

04:38:44    1        And that's -- that's a concern that Wells Fargo is

04:38:47    2   indicating about the risk that it faces from -- from the

04:38:53    3   fact that the consumers keep their checks.

04:38:56    4   Q.  And is that Plaintiff's Exhibit No. 1471 that we're

04:39:00    5   looking at, Mr. Weinstein?

04:39:01    6   A.  It is, sir.

04:39:01    7        MR. BUNT:  If we could go to the next slide.

04:39:04    8   Q.  (By Mr. Bunt)  What was the performance of USAA's

04:39:06    9   patented MRDC system with respect to safety as compared to

04:39:11   10   ATMs?

04:39:11   11   A.  Well, safety of mobile deposits versus ATMs is

04:39:15   12   something that USAA monitored.  And in this slide, I have

04:39:22   13   monthly information from roughly December 2017 to December

04:39:29   14   2018.

04:39:31   15        The big -- the big reddish-brownish bars are the

04:39:37   16   percentage of accounts which were subject to ATM fraud

04:39:44   17   during the particular month.  And the bars near the bottom

04:39:49   18   are the percentage of accounts during the same months that

04:39:54   19   were subject to frauds associated with mobile deposit.

04:39:58   20        And what you can see is that while the experience

04:40:01   21   varies from month-to-month, the loss rate expressed as

04:40:06   22   those percentages was significantly better with respect to

04:40:11   23   mobile deposits than it was with respect to ATMs.  In other

04:40:15   24   words, despite the fact that the consumer keeps the check,

04:40:19   25   the fraud rates were lower.

04:40:22  1    Q.  Is there any evidence that Wells Fargo believed that

04:40:25  2    the performance of its MRDC system was as safe as ATMs?

04:40:30  3    A.  Yes, in 2 -- 2016, this is another one of those

04:40:35  4    Futurion Reports.  This is a screenshot at a Wells Fargo

04:40:44  5    ATM.  And what came up on the screen there is that Wells

04:40:48  6    Fargo's mobile deposits are secure, easy, and convenient.

04:40:54  7    In other words, Wells Fargo is encouraging -- encouraging

04:40:58  8    people who are making mobile -- ATM deposits to at least

04:41:03  9    consider the possibility of making a mobile deposit next

04:41:07  10   time.

04:41:07  11   Q.  And that's Plaintiff's Exhibit No. 206.

04:41:11  12         Have you also heard testimony from Wells Fargo's

04:41:13  13   corporate representative about the safety of MRDC as

04:41:16  14   compared to ATM?

04:41:17  15   A.  Yes.  We -- we just heard some testimony or saw some

04:41:21  16   testimony from Mr. Ajami about ATMs being roughly as safe

04:41:30  17   as mobile deposits.

04:41:32  18         MR. BUNT:  Could we go to the next slide?

04:41:35  19   Q.  (By Mr. Bunt)  Was Wells Fargo aware of other benefits

04:41:38  20   associated with MRDC?

04:41:39  21   A.  Yes.  This is, again, from a Wells Fargo planning

04:41:43  22   document before they released the mobile deposit project --

04:41:47  23   product.  It's 2011.  And we've highlighted four things on

04:41:53  24   this slide.

04:41:53  25         The first one is that Wells Fargo saves money with

04:42:03  1  mobile deposits relative to deposits at ATM channels and

04:42:09  2  deposits, quote, at the store, close quote, meaning with a

04:42:12  3  teller at the bank.  In other words, Wells Fargo increases

04:42:15  4  its profits every time a consumer makes a mobile deposit

04:42:19  5  instead of depositing it some other way.

04:42:22  6       Second, it talks about this wow factor, which, I

04:42:27  7  guess, most companies like to achieve, which is have

04:42:32  8  consumers think highly of your company generally and -- and

04:42:36  9  at least in this planning document, there was some -- some

04:42:40  10  thought given to the fact that offering mobile deposits

04:42:44  11  would create a wow factor in the minds of consumers for

04:42:48  12  Wells Fargo.

04:42:48  13       Nos. 3 and 4 that are highlighted, mobile deposits

04:42:53  14  are about 45 percent more profitable.  Mobile customers

04:42:58  15  are.  Than other Wells Fargo customers who have the app but

04:43:04  16  don't make a mobile deposit.

04:43:06  17       And then, finally, as -- as noted before, they're

04:43:09  18  much less likely to leave the bank.  They're likely to stay

04:43:13  19  longer.

04:43:13  20  Q.  Did you see evidence that Wells Fargo actually saved or

04:43:16  21  obtained cost savings in connection with mobile deposit?

04:43:20  22  A.  Yes, sir, I did.  Wells Fargo made available

04:43:24  23  information on the cost that it actually incurred in

04:43:28  24  connection with deposits made at each channel.  And so this

04:43:32  25  slide depicts a summary of those costs for the period 2014

04:43:38  1  to 2018.

04:43:41  2        Every time there's a deposit with a teller at a

04:43:45  3  bank, it costs Wells Fargo about $2.46.  If the deposit was

04:43:50  4  made at an ATM, it cost Wells Fargo about $1.41.  And if it

04:43:57  5  was a mobile deposit, it cost Wells Fargo about 36 cents.

04:44:01  6        And what that means on Line 2 is that the cost

04:44:04  7  savings per deposit during this period, 2014 to 2018,

04:44:11  8  varied between $1.06, if it was compared with an ATM

04:44:16  9  deposit, and $2.11, if it was compared with a teller

04:44:21  10 deposit.

04:44:22  11       And there were, finally, approximately

04:44:27  12 120.9 million mobile deposits made by consumers during the

04:44:32  13 damage period.

04:44:32  14 Q.  Are ATM deposits a perfect substitute for mobile --

04:44:37  15 mobile deposit?

04:44:37  16 A.  No, they're not, because they don't provide the same

04:44:42  17 flexibility to consumers that mobile deposits do.  You can

04:44:45  18 do a mobile deposit from far more locations than you can

04:44:52  19 even with a widespread ATM network.

04:44:55  20 Q.  At the hypothetical negotiation, Mr. Weinstein, how

04:44:58  21 would the parties consider the various benefits you've been

04:45:02  22 talking about?

04:45:04  23 A.  So if we come back to that hypothetical negotiation

04:45:09  24 with the parties sitting across one another at that -- at

04:45:12  25 that negotiating table, each side is trying to get the best

04:45:20  1   deal that it can.  And they're thinking about -- they're

04:45:22  2   thinking about the -- the profits that Wells Fargo makes

04:45:27  3   with respect to its mobile deposit customers who it -- most

04:45:32  4   of whom it would lose to other banks if it didn't offer

04:45:35  5   that product.

04:45:38  6        They're thinking about the cost savings that we

04:45:40  7   just looked at, and they're thinking about the benefits

04:45:43  8   that Wells Fargo brings to the table through its -- its

04:45:48  9   brand name and its ecosystem and its widespread network and

04:45:53  10  things like that.

04:45:54  11       And so they're sitting across the table at this

04:45:57  12  hypothetical negotiation, and they're each trying to get

04:45:59  13  the best deal they possibly can.

04:46:01  14  Q.  So how do you think the negotiation would play out?

04:46:04  15  A.  Well, as I said, I'm -- I'm sitting on the side there

04:46:09  16  invisible in the -- in the negotiating room, but I think,

04:46:16  17  as with all negotiations, they would reach some sort of

04:46:20  18  compromise position.  USAA wouldn't be able to get

04:46:23  19  $1.2 billion, all of those profits.  And, on the other

04:46:30  20  hand, they would insist upon fair payment.

04:46:33  21       What I think ultimately would happen is that the

04:46:37  22  parties would have looked at those cost differences between

04:46:40  23  ATMs and mobile deposits and the savings that Wells Fargo

04:46:47  24  gets from mobile deposits relative to ATMs and use that as

04:46:53  25  a surrogate for the benefits associated with mobile

04:47:03  1   deposits, and negotiate around those benefits.

04:47:04  2          MR. BUNT:  Can we go to the next slide?

04:47:06  3   Q.  (By Mr. Bunt)  So did you actually calculate a royalty

04:47:15  4   based on the cost savings benefits that Wells Fargo

04:47:15  5   received from the accused mobile deposit app?

04:47:15  6   A.  Yes, sir, I did.

04:47:18  7   Q.  Can you explain to us how you did that?

04:47:20  8   A.  This -- this slide contains the same information or

04:47:24  9   some of the same information that we just looked at.  It's

04:47:26  10  for the period of 2014 to 2018.

04:47:30  11         I have the average cost associated with an ATM

04:47:37  12  deposit, an average mobile deposit cost, and the difference

04:47:41  13  is about $1.06, and so that's -- in the first instance the

04:47:48  14  benefit that -- that goes to Wells Fargo from a consumer

04:47:52  15  who uses a mobile deposit instead of an ATM.

04:47:56  16         And then there's an additional fee to that entity,

04:48:00  17  EWS, that we heard about Early Warning Service, that has to

04:48:05  18  be paid in connection with each one of these deposits.  And

04:48:08  19  so after you subtract the full amount of that fee, the

04:48:11  20  difference is -- is about 97 -- 97 cents -- 97 or 98 cents.

04:48:20  21         And in the first instance, that's the benefit that

04:48:23  22  Wells Fargo gets from a mobile deposit relative to an ATM

04:48:28  23  deposit, which, of course, is smaller than the benefit that

04:48:33  24  they get if it's relative to a -- a deposit with a teller.

04:48:37  25         All right.  So that -- that gets us down to

| | | |
|---|---|---|
| 04:48:40 | 1 | that -- to that step.  That's the benefit. |
| 04:48:42 | 2 | Q.  And at that hypothetical negotiation, did you consider |
| 04:48:46 | 3 | both higher -- higher figures and lower figures as part of |
| 04:48:51 | 4 | your calculations? |
| 04:48:51 | 5 | A.  I did.  The higher figure has to do with profits on |
| 04:49:01 | 6 | MRDC customers that we saw that was close to a billion |
| 04:49:05 | 7 | dollars.  And the lower figure has to do with benefits |
| 04:49:10 | 8 | associated with reducing the amount of fraud.  And we saw |
| 04:49:14 | 9 | that mobile deposits are safer than ATMs.  And so that |
| 04:49:25 | 10 | would produce a -- a lower figure. |
| 04:49:26 | 11 | And so when I look at ATMs versus mobile deposits, |
| 04:49:28 | 12 | I'm -- I'm winding up sort of between the high end and the |
| 04:49:32 | 13 | low end, and I'm thinking that that difference would be a |
| 04:49:37 | 14 | valuable surrogate that measures the incremental benefits |
| 04:49:42 | 15 | associated with mobile deposits that the parties would |
| 04:49:46 | 16 | negotiate over. |
| 04:49:46 | 17 | MR. BUNT:  Can we go to the next slide, Mr. Huynh? |
| 04:49:49 | 18 | Q.  (By Mr. Bunt)  What is the next step in your analysis? |
| 04:49:51 | 19 | A.  Well, there was one -- there was one more step on |
| 04:49:54 | 20 | the -- on the last slide -- |
| 04:49:55 | 21 | MR. BUNT:  I'm sorry, go back. |
| 04:49:57 | 22 | A.  -- which involves how the parties -- how the parties |
| 04:49:59 | 23 | would actually split those benefits.  And the benefits that |
| 04:50:03 | 24 | I calculate as -- as between the difference and the costs |
| 04:50:07 | 25 | were about 97.6 percent. |

04:50:10  1          And so that's what's on this negotiating table

04:50:13  2   with respect to permission for this technology.  And the

04:50:18  3   question is, how would the parties at this hypothetical

04:50:22  4   negotiation split those benefits?  How would they decide

04:50:25  5   how much USAA gets and how much Wells Fargo gets?  And we

04:50:28  6   already know that they've wound up -- by looking at -- at

04:50:33  7   this cost difference, they've wound up somewhere in the

04:50:36  8   middle to begin with, as between various benefits that they

04:50:39  9   could have been negotiating over.

04:50:40  10          And so for purposes of the -- of the --

04:50:43  11  determining what the split would be, what I did as an

04:50:46  12  economist is I looked at the Wells Fargo annual return on

04:50:52  13  equity as it publishes it -- that information in its -- in

04:50:56  14  its annual reports each -- each year.

04:51:00  15          And what that does is it allows Wells Fargo to

04:51:02  16  make the same profits in connection with mobile deposits in

04:51:07  17  terms of return on equity that it makes on its other

04:51:12  18  investments.  It keeps Wells Fargo whole for any

04:51:16  19  investments that it's made in connection with mobile

04:51:19  20  deposits.

04:51:19  21          And so I determined that, based on that, Wells

04:51:22  22  Fargo would keep about 13.4 percent because that's its

04:51:29  23  return on equity.  And USAA would get about 86.6 percent of

04:51:33  24  the incremental benefit associated with mobile deposits.

04:51:37  25  And that produces a royalty rate of 85 cents per deposit.

04:51:42  1   Q.  (By Mr. Bunt)  All right.

04:51:43  2        MR. BUNT:  Now let's turn back to that next slide.

04:51:46  3   Q.  (By Mr. Bunt)  So what is the next step in your

04:51:47  4   analysis?

04:51:48  5   A.  So the final step is to take the number of mobile

04:51:54  6   deposits, approximately 120.9 million, and multiply that

04:51:59  7   number times the royalty per deposit of 85 cents.  And when

04:52:05  8   you do that math, I believe that the parties would have

04:52:10  9   wound up at the conclusion of the hypothetical negotiation

04:52:14  10  with agreement that Wells Fargo would pay reasonable

04:52:20  11  royalties of approximately $102.8 million.  And that would

04:52:26  12  be compensation for its use of the patents-in-suit during

04:52:33  13  the damage period.

04:52:35  14        MR. BUNT:  Mr. Huynh, can we have the next slide?

04:52:38  15  Q.  (By Mr. Bunt)  At this hypothetical negotiation, remind

04:52:40  16  us how the parties would split the benefits.

04:52:43  17  A.  So this is the same information, except depicted as --

04:52:47  18  as applied, it's been split.  And with the pie, USAA

04:52:54  19  obtains reasonable royalties of $102.8 million.  That's

04:52:58  20  what we would call damages adequate to compensate for

04:53:04  21  infringement, from roughly August 2018 to the present.

04:53:12  22        And Wells Fargo, based on its return on equity,

04:53:13  23  would get $15.2 million, plus, of course, it would get to

04:53:17  24  keep all those other benefits that I testified about.

04:53:19  25        MR. BUNT:  The last slide, Mr. Huynh.

04:53:22  1    Q.  (By Mr. Bunt)  One last time, Mr. Weinstein, could you

04:53:24  2    please summarize your findings for the jury?

04:53:25  3    A.  Yes.  I have concluded that damages adequate to

04:53:28  4    compensate for infringement from August 2018 to the present

04:53:34  5    amount to 85 cents per deposit or approximately

04:53:39  6    $102.8 million.

04:53:40  7    Q.  And are those damages in the form of a running royalty?

04:53:43  8    A.  The 85 cents per deposit would be a running royalty,

04:53:50  9    yes, sir.

04:53:50  10   Q.  Thank you.

04:53:51  11        MR. BUNT:  I'll pass the witness.

04:53:52  12        THE COURT:  All right.  Ladies and gentlemen,

04:53:53  13   before the Defendant cross-examines the Plaintiff's damages

04:53:57  14   expert, we're going to take a short recess.  This will

04:53:59  15   probably be our last one for the day.  If you will simply

04:54:02  16   leave your notebooks closed in your chairs, follow all the

04:54:04  17   instructions I have given you, including not to discuss the

04:54:06  18   case, and we'll be back in here shortly at which time the

04:54:09  19   Defendant will cross-examine the witness.

04:54:10  20        The jury is excused for recess.

04:54:13  21        COURT SECURITY OFFICER:  All rise.

04:54:14  22        (Jury out.)

04:54:14  23        THE COURT:  Let me see Mr. Sheasby and Mr. Bunt,

04:54:39  24   Mr. Melsheimer and Mr. Hill in chambers, please.

04:54:44  25        We stand in recess.

594

| | | |
|---|---|---|
| 04:54:45 | 1 | COURT SECURITY OFFICER:  All rise. |
| 04:54:45 | 2 | (Recess.) |
| 05:18:44 | 3 | (Jury out.) |
| 05:18:45 | 4 | COURT SECURITY OFFICER:  All rise. |
| 05:18:46 | 5 | THE COURT:  Be seated, please. |
| 05:19:21 | 6 | All right.  Mr. Hill, are you prepared to |
| 05:19:29 | 7 | cross-examine the witness? |
| 05:19:30 | 8 | MR. HILL:  Yes, sir, Your Honor. |
| 05:19:31 | 9 | THE COURT:  All right.  Let's bring in the jury, |
| 05:19:32 | 10 | please. |
| 05:19:33 | 11 | COURT SECURITY OFFICER:  All rise. |
| 05:19:34 | 12 | (Jury in.) |
| 05:20:00 | 13 | THE COURT:  Please be seated. |
| 05:20:01 | 14 | All right.  We'll proceed with cross-examination |
| 05:20:04 | 15 | of the witness by Defense counsel. |
| 05:20:06 | 16 | Mr. Hill, you may proceed. |
| 05:20:08 | 17 | MR. HILL:  Thank you, Your Honor. |
| 05:20:08 | 18 | CROSS-EXAMINATION |
| 05:20:09 | 19 | BY MR. HILL: |
| 05:20:09 | 20 | Q.  Good afternoon, Mr. Weinstein. |
| 05:20:11 | 21 | A.  Good afternoon. |
| 05:20:12 | 22 | Q.  Is it still afternoon or do we call this evening? |
| 05:20:14 | 23 | THE COURT:  I get the hint, Mr. Hill.  It's |
| 05:20:20 | 24 | afternoon. |
| 05:20:22 | 25 | MR. HILL:  Thank you, Your Honor. |

595

05:20:23   1   Q.   (By Mr. Hill)  Mr. Weinstein, I want to cover some of

05:20:25   2   the things that you talked about in your direct

05:20:28   3   examination.  I want to first do some of the things that

05:20:31   4   you showed us and a couple of things that were said, and

05:20:36   5   we'll start there; are you with me, sir?

05:20:38   6   A.   Yes, sir.

05:20:39   7   Q.   Now, you've been in a lot of patent cases over the

05:20:41   8   years, correct?

05:20:42   9   A.   I have.

05:20:42  10   Q.   Seen a lot of patents?

05:20:44  11   A.   I have.

05:20:44  12   Q.   Patents are often invalidated, aren't they,

05:20:47  13   Mr. Weinstein?

05:20:47  14   A.   They are, sir.

05:20:48  15   Q.   And you've seen cases that you've worked on before

05:20:52  16   where patents have been invalidated, correct?

05:20:55  17   A.   I have.

05:20:56  18   Q.   And so the notion that patent rights are absolute says

05:21:00  19   a little bit too much, doesn't it?

05:21:02  20   A.   No, they're absolute while they exist.  And then if

05:21:08  21   they don't exist, then they don't exist.

05:21:10  22   Q.   Certainly.  Patents aren't inextinguishable, are they?

05:21:16  23   A.   That's fair.

05:21:17  24   Q.   And you were asked to do your work here today based on

05:21:22  25   a couple of assumptions, right?

| | | |
|---|---|---|
| 05:21:25 | 1 | A.  Multiple assumptions, yes, sir. |
| 05:21:27 | 2 | Q.  And one of the key assumptions that you as a damages |
| 05:21:30 | 3 | expert start with is you start with an assumption of |
| 05:21:33 | 4 | validity; isn't that right? |
| 05:21:35 | 5 | A.  Yes, sir. |
| 05:21:35 | 6 | Q.  But you don't actually assess validity yourself, do |
| 05:21:38 | 7 | you, sir? |
| 05:21:39 | 8 | A.  I do not. |
| 05:21:39 | 9 | Q.  And you start with an assumption of infringement; isn't |
| 05:21:43 | 10 | that right? |
| 05:21:44 | 11 | A.  I do. |
| 05:21:44 | 12 | Q.  And you don't actually assess the infringement |
| 05:21:47 | 13 | question, do you, sir? |
| 05:21:48 | 14 | A.  That is correct. |
| 05:21:49 | 15 | Q.  And you have no opinion on those matters; is that |
| 05:21:52 | 16 | correct? |
| 05:21:52 | 17 | A.  I do not, no opinion. |
| 05:21:54 | 18 | Q.  And if the jury ultimately decides, Mr. Weinstein, that |
| 05:21:56 | 19 | these patents are invalid, your economic analysis becomes |
| 05:22:01 | 20 | unnecessary, doesn't it, sir? |
| 05:22:02 | 21 | A.  That is true. |
| 05:22:03 | 22 | Q.  Now, the same goes if they find the patents aren't |
| 05:22:08 | 23 | infringed, the economic analysis becomes unnecessary, |
| 05:22:11 | 24 | agree? |
| 05:22:11 | 25 | A.  Correct, sir. |

05:22:12  1  Q.  Now, Mr. Weinstein, I want to look at the timeline that

05:22:16  2  you had up earlier.

05:22:18  3       MR. HILL:  I think that was PDX-4.12, Mr. Bakale.

05:22:24  4  Q.  (By Mr. Hill)  Do you recall your timeline, sir?

05:22:29  5  A.  I do.

05:22:30  6  Q.  Now, you mentioned, and I wrote it down here, about

05:22:33  7  this period, that this was a period of benefits to Wells

05:22:37  8  Fargo and so, therefore, it was time to pay up.  Did I hear

05:22:41  9  that right?

05:22:41  10 A.  Well, it's time to pay up beginning in August of 2018,

05:22:46  11 yes, sir.

05:22:46  12 Q.  Well, so is it our fault that USAA waited 10 years to

05:22:52  13 file these patents?

05:22:53  14 A.  No, I'm not suggesting that.

05:22:55  15 Q.  Well, I mean, if it's time to pay up, you're not

05:22:58  16 suggesting that we owe anything for this period of time, do

05:23:01  17 you?

05:23:01  18 A.  I didn't calculate that you owed anything for that time

05:23:04  19 period.  There's nothing in that time period in my damages,

05:23:08  20 zero.

05:23:08  21 Q.  So to the extent there was any misunderstanding from

05:23:11  22 hearing that phrase, time to pay up, that you were

05:23:14  23 suggesting somehow that during this period of time here,

05:23:19  24 before the patents issued, that there would be any damages

05:23:22  25 due under the law or any money USAA would be entitled to,

05:23:27   1   that would have been a mishearing or a mistaken notion?

05:23:30   2   A.   For sure.   I calculate zero damages for that period.

05:23:36   3   Q.   Now, let's -- while we've got this timeline up here,

05:23:51   4   Mr. Weinstein.   This is the damage period through today,

05:23:55   5   correct?

05:23:55   6   A.   The -- the yellow at the right-hand side, yes, sir.

05:23:59   7   Q.   But that is not under the theory that you're

05:24:02   8   calculating necessarily the end of the damage period, is

05:24:05   9   it?

05:24:05  10   A.   Well, that's all I've calculated damages for, the

05:24:10  11   102 million and the 85 cents are for that period.

05:24:15  12   Q.   Thank you, sir.

05:24:16  13        Now, Mr. Weinstein, I saw the total number that

05:24:24  14   you put up at the end of your work, you started with it, as

05:24:30  15   well?

05:24:30  16        MR. HILL:   Can we look at PDX-4.2, please,

05:24:34  17   Mr. Bakale.

05:24:35  18   Q.   (By Mr. Hill)   That states the total number of

05:24:38  19   $102 million and some change there that you calculated and

05:24:42  20   said was your opinion on what the damages should be in the

05:24:44  21   case?

05:24:45  22   A.   Yes, sir.

05:24:45  23   Q.   That's the only number you told the jury, correct?

05:24:50  24   A.   That and the 85 cents, yes, sir.

05:24:53  25   Q.   But you've actually got two opinions on damages in this

05:24:56  1   case, don't you?

05:24:57  2   A.  Well, I have -- I have several calculations for various

05:25:02  3   time periods, yes, sir.

05:25:03  4   Q.  Well, you -- not just for other time periods, you've

05:25:06  5   got another damage calculation for this same time period

05:25:09  6   that's at issue from the issuance of these patents in 2018

05:25:13  7   through today, don't you?

05:25:14  8   A.  I could.

05:25:15  9   Q.  Well, you could or you do?

05:25:17  10  A.  Well, I haven't -- I haven't told the jury about any

05:25:20  11  others, but I -- I do have others in my report, yes, sir.

05:25:23  12  Q.  Okay.  Well, what's the other one?

05:25:24  13  A.  Well, I have some damages related to fraud prevention.

05:25:28  14  Q.  And what's that number?

05:25:29  15  A.  My recollection is that was in the neighborhood of, I

05:25:38  16  think, 37 cents per mobile deposit.  So if you did that

05:25:46  17  times 120, it would be around 40 million.

05:25:47  18  Q.  You didn't show that calculation to the jury, did you?

05:25:52  19  A.  Well, I wasn't asked to.

05:25:55  20  Q.  Do you not believe in that calculation?

05:25:58  21  A.  I absolutely believe in it.

05:26:03  22  Q.  Is it reliable?

05:26:04  23  A.  I think so.

05:26:05  24  Q.  It's a whole lot lower than $102 million?

05:26:10  25  A.  Sure.

```
05:26:10   1   Q.  Well, if there's nothing wrong with it and you believe
05:26:15   2   in it and you think it's reliable as an estimation in
05:26:19   3   damages in this case, were you just wanting to get the
05:26:22   4   higher number in front of the jury for USAA?
05:26:23   5   A.  No, that's wrong, actually.  As I testified, what I
05:26:29   6   said I think was pretty clear, that the parties would
05:26:32   7   negotiate and wind up in the middle, and USAA would not get
05:26:36   8   its super high number of 1.2 billion, nor would Wells Fargo
05:26:44   9   get its lower number associated with fraud.  That was
05:26:48  10   precisely my testimony.  Instead, they would wind up in the
05:26:50  11   middle.
05:26:50  12   Q.  Let's talk about that $1.2 billion number that you
05:26:54  13   mentioned.  That is a calculation of what you say are the
05:26:57  14   total profits from all the benefits of MRDC, generally,
05:27:00  15   isn't it?
05:27:00  16   A.  That's fair.
05:27:01  17   Q.  That's not even something that you can legally make a
05:27:09  18   claim for, is it, sir?
05:27:10  19   A.  Well, I -- I can't speak to that.
05:27:14  20   Q.  Well, certainly you understand the law surrounding
05:27:18  21   damages, don't you?
05:27:20  22   A.  To some extent, sure.
05:27:21  23   Q.  And you presented no number to this jury that has --
05:27:26  24   has a damage number that has any mathematical relationship
05:27:29  25   to that 102 -- $1.2 billion number, did you?
```

| | | |
|---|---|---|
| 05:27:37 | 1 | A. That's actually not correct. |
| 05:27:38 | 2 | Q. Well -- |
| 05:27:39 | 3 | A. The damage number that I provided to the jury is |
| 05:27:41 | 4 | roughly 10 percent of that number. |
| 05:27:44 | 5 | Q. Well, sure, you can do a percentage of anything, |
| 05:27:47 | 6 | though, Mr. Weinstein, but you don't use that $1.2 billion |
| 05:27:50 | 7 | number to figure the damages in this case, do you, sir? |
| 05:27:52 | 8 | A. Not specifically. |
| 05:27:56 | 9 | Q. And so it's an attempt to skew the damage horizon for |
| 05:28:00 | 10 | this jury by putting a big number in front of them, isn't |
| 05:28:03 | 11 | it? |
| 05:28:03 | 12 | A. No, sir, not at all. |
| 05:28:05 | 13 | Q. Certainly, a big difference between an alternative |
| 05:28:11 | 14 | number of $40 million and $100 million, right? |
| 05:28:17 | 15 | A. Sure. |
| 05:28:17 | 16 | Q. And also even a bigger difference between that and |
| 05:28:21 | 17 | $1.2 billion, right? |
| 05:28:22 | 18 | A. Absolutely correct. |
| 05:28:23 | 19 | MR. HILL: Now, let's take a look at your report |
| 05:28:25 | 20 | at Paragraphs 181 to 182, if we can, Mr. Bakale. |
| 05:28:32 | 21 | Q. (By Mr. Hill) Mr. Weinstein, you prepared a report in |
| 05:28:34 | 22 | this case, did you not? |
| 05:28:35 | 23 | A. I did. |
| 05:28:35 | 24 | Q. And an expert report, just so our jury understands, if |
| 05:28:40 | 25 | you're going to testify as an expert, you have to prepare |

05:28:42   1   in writing your opinions in advance and share those with

05:28:46   2   the other side; isn't that right, sir?

05:28:47   3   A.  Yes, sir.

05:28:48   4   Q.  And you have to explain the basis for your opinions,

05:28:50   5   and you have to completely lay out your opinions because

05:28:54   6   ultimately those are the only opinions you can sponsor as a

05:28:57   7   witness at a trial, correct, sir?

05:28:59   8   A.  Absolutely correct.

05:29:00   9   Q.  Now, if we look at your description at Paragraph -- and

05:29:04   10   do you have your report, Mr. Weinstein?  I can bring you a

05:29:09   11   copy if you need it.

05:29:11   12   A.  I do have it, yes, sir, thank you.

05:29:14   13        MR. BUNT:  Your Honor, could we approach for just

05:29:15   14   a moment?

05:29:16   15        THE COURT:  Approach the bench, counsel.

05:29:17   16        (Bench conference.)

05:29:24   17        MR. BUNT:  Your Honor, I just wanted to flag an

05:29:26   18   issue.  I have some concern about him posting up the

05:29:30   19   descriptions of the expert report because, as Your Honor

05:29:34   20   knows, that expert report still contains the older

05:29:37   21   information that was limined out by Judge Payne and by

05:29:41   22   yourself in the motion for reconsideration.  I'm concerned

05:29:43   23   about him putting up old information that has been limined

05:29:48   24   out.

05:29:49   25        THE COURT:  Mr. Hill?

05:29:50  1          MR. HILL:  And I haven't put up old information

05:29:52  2  yet, Your Honor, and I don't plan to.  We've got a type cut

05:29:57  3  intentionally of this piece of the report.  It's just these

05:29:59  4  two paragraphs, which are not the old information, and

05:30:01  5  that's what I plan to show.

05:30:03  6          THE COURT:  As long as it's not something that has

05:30:06  7  been addressed and covered by the Court in some way.

05:30:06  8          MR. HILL:  This is not -- this is the model he

05:30:11  9  just presented.  That is what I have got in front of me.

05:30:11 10          MR. BUNT:  That's actually not the model they just

05:30:13 11  presented, I don't think.

05:30:14 12          MR. HILL:  It's the ATM cost savings model.

05:30:16 13          MR. SHEASBY:  Can we look at the paragraph so we

05:30:18 14  have no concern about it?

05:30:19 15          MR. HILL:  Let me tell you where it is.  It's 182.

05:30:22 16  You got his report?  It's 181, 182.

05:30:26 17          MR. BUNT:  Okay.  That's fine.

05:30:28 18          MR. SHEASBY:  That's fine.  We understand.

05:30:30 19          THE COURT:  All right.

05:30:31 20          MR. BUNT:  Thank you, Judge.

05:30:32 21          THE COURT:  All right.  Let's proceed.

05:30:34 22          (Bench conference concluded.)

05:30:40 23  Q.  (By Mr. Hill)  Now, Mr. Weinstein, I was asking you

05:30:43 24  here about Paragraphs 181 and 182 of your report.  Do you

05:30:49 25  see that, sir?

| | | |
|---|---|---|
| 05:30:50 | 1 | A.  Yes, sir. |
| 05:30:50 | 2 | Q.  And you describe that as an ATM deposit cost as a |
| 05:30:50 | 3 | measure of patented fraud prevention value.  Do you see |
| 05:30:56 | 4 | that? |
| 05:30:56 | 5 | A.  I do. |
| 05:30:57 | 6 | Q.  And you describe it there in Paragraph 181 as an |
| 05:31:02 | 7 | alternative approach to damages. |
| 05:31:04 | 8 | A.  I do. |
| 05:31:05 | 9 | Q.  And the other -- what it's an alternative to is the |
| 05:31:13 | 10 | lower number we talked about a minute ago, isn't it? |
| 05:31:15 | 11 | A.  In -- in the context of fraud, yes. |
| 05:31:18 | 12 | Q.  And you say:  Given that ATM deposit systems adequately |
| 05:31:23 | 13 | address fraud, I have analyzed cost associated with ATM |
| 05:31:32 | 14 | deposits to value fraud loss prevented by the patented |
| 05:31:37 | 15 | functionality.  And you've calculated the difference |
| 05:31:40 | 16 | between ATM deposit costs and MRDC deposit costs, correct? |
| 05:31:44 | 17 | A.  Yes, sir. |
| 05:31:46 | 18 | Q.  All right.  Let me take my mark here. |
| 05:32:07 | 19 | Now, you say in the next paragraph -- we'll just |
| 05:32:11 | 20 | read them in full -- I have used the total cost of each |
| 05:32:15 | 21 | system because ATM is the least expensive deposit channel |
| 05:32:18 | 22 | available to Wells Fargo, other than MRDC, but does not |
| 05:32:22 | 23 | make use of the MRDC fraud prevention techniques nor the |
| 05:32:29 | 24 | MRDC techniques itself which involves a mobile device and |
| 05:32:34 | 25 | no access to the physical check by the bank. |

05:32:42   1        Did I read that correctly, Mr. Weinstein?

05:32:42   2   A.  You did.

05:32:42   3   Q.  All right.  So here, you say that ATM does not make use

05:32:48   4   of the MRDC fraud prevention techniques.  You see that?

05:32:54   5   A.  I do.

05:32:54   6   Q.  Okay.  So I want to know, what techniques are you

05:32:57   7   talking about?

05:32:57   8   A.  Talking about the techniques that allow a consumer to

05:33:04   9   make a deposit using a consumer device rather than a device

05:33:10  10   where the environment is controlled by the bank, such as

05:33:14  11   the case with specialized scanners or ATMs.

05:33:19  12        Instead, with the case of MRDC, we're talking

05:33:22  13   about using a consumer device to -- to make the deposit.

05:33:30  14   And we know from the documents that I cited in my -- in my

05:33:38  15   testimony that Wells Fargo was tremendously concerned about

05:33:43  16   fraud risks associated with using those devices which it

05:33:47  17   did not control.

05:33:50  18   Q.  Now, Mr. Weinstein, so let me make sure I'm hearing you

05:33:56  19   correctly.  You're saying that the use of a consumer device

05:34:00  20   is a fraud -- a fraud prevention technique?

05:34:05  21   A.  No, no.  I'm saying the fraud prevention techniques

05:34:09  22   associated with the use of a consumer device --

05:34:12  23   Q.  All right.

05:34:13  24   A.  -- are -- are different from the fraud prevention

05:34:17  25   techniques that previously had been used.

| 05:34:19 | 1 | Q.  And that's what I want to understand.  I want to know |
| 05:34:21 | 2 | what those different fraud protection techniques are. |
| 05:34:23 | 3 | A.  Well, for the first time, with the consumer device, you |
| 05:34:27 | 4 | had to be able to get a useable data to the bank from a |
| 05:34:35 | 5 | device that -- that Wells Fargo did not control.  And as a |
| 05:34:39 | 6 | consequence, they were very concerned about how to -- how |
| 05:34:45 | 7 | to do that and provide adequate real-time information so |
| 05:34:49 | 8 | that that device -- that deposit could be -- could be |
| 05:34:56 | 9 | effected -- could be completed. |
| 05:34:59 | 10 | And it was necessary to have a new set of -- of |
| 05:35:06 | 11 | techniques available in order to complete those kinds of |
| 05:35:11 | 12 | deposits.  That's -- that's absolutely clear from the |
| 05:35:13 | 13 | planning documents. |
| 05:35:14 | 14 | Q.  Okay.  And that's -- again, what I'm trying to hear, |
| 05:35:17 | 15 | Mr. Weinstein, is I want to hear what those fraud |
| 05:35:20 | 16 | prevention techniques are. |
| 05:35:22 | 17 | A.  Well, the fraud prevention techniques related to |
| 05:35:29 | 18 | providing information like the identity of the -- of the |
| 05:35:35 | 19 | person writing the check and the amount and the information |
| 05:35:42 | 20 | about the account and the bank routing number at the bottom |
| 05:35:45 | 21 | in ways that were going to be sufficiently adequate for the |
| 05:35:50 | 22 | bank to process that check when, in the past, the bank |
| 05:35:54 | 23 | actually had control of the check. |
| 05:35:57 | 24 | And so something new had to be developed to allow |
| 05:35:59 | 25 | the bank to do that, which did not exist before. |

05:36:06  1   Q.  Mr. Weinstein -- and I don't mean to -- to seem

05:36:11  2   difficult, but I -- that's something more than I'm after.

05:36:14  3   You say something more had to be done to ensure these

05:36:18  4   things, and I'm not hearing what that something more is.

05:36:20  5   A.  Well, the thing is this, I'm an economist.  I'm not a

05:36:23  6   technical expert.  And so what I've been talking about is a

05:36:28  7   result of my examination of the documents about which I

05:36:33  8   testified, which made it clear that there were new fraud

05:36:39  9   risks associated with mobile deposits that had not existed

05:36:43  10  in the past because the bank controlled the environment

05:36:45  11  from which the check came, and the bank had possession of

05:36:49  12  the check.

05:36:50  13       And before MRDC was implemented, there was

05:36:55  14  tremendous concern about those risks.  And the point of --

05:36:58  15  of my testimony as an economist is that they were able to

05:37:05  16  overcome those risks, something they were concerned that

05:37:07  17  they couldn't do, but they were able to overcome those

05:37:10  18  risks and actually implement MRDC.  And found in the end

05:37:14  19  that it was actually at least as safe as ATMs had been.

05:37:19  20       So there had to have been something more.  Now, I

05:37:23  21  can't tell you what that is exactly because I'm not an

05:37:25  22  engineer, but I approach it as an economist and I look at

05:37:29  23  what happened, their concern, and the results.

05:37:30  24  Q.  Okay.  So, Mr. Weinstein, are -- you're saying that

05:37:35  25  you've been told by technical folks or in technical

05:37:38   1    material you've looked at, that there are fraud prevention

05:37:42   2    techniques -- patented fraud prevention techniques, and you

05:37:51   3    accounted for those, but you can't tell me what they are?

05:37:51   4    A.  Well, I -- surely, I have been told about that, yes,

05:37:55   5    from technical people.  But as I've tried to explain, as an

05:38:00   6    economist, I can see that that was the problem and it was

05:38:03   7    overcome.

05:38:04   8    Q.  Mr. Weinstein, do ATMs do duplicate deposit checking?

05:38:08   9    A.  Yes, sir.  Not by themselves, but yes.

05:38:15   10   Q.  That's part --

05:38:17   11   A.  At the end of the game, yes.

05:38:18   12   Q.  That's part of the ATM system, correct?

05:38:21   13   A.  Yes, sir.

05:38:21   14   Q.  All right.  Do ATMs do endorsement verification?

05:38:24   15   A.  That's my understanding.

05:38:25   16   Q.  And let me make sure I'm clear about that.  ATMs today

05:38:31   17   are also image-based devices, aren't they, sir?

05:38:34   18   A.  As far as I know, yes, sir.

05:38:37   19   Q.  And do ATMs do customer authentication?

05:38:39   20   A.  I believe so.

05:38:40   21   Q.  And do ATMs take a good picture of the check?

05:38:43   22   A.  Yes.

05:38:44   23   Q.  And do ATMs do OCR?

05:38:50   24   A.  Yes.

05:38:50   25   Q.  And do ATMs do amount verification?

05:38:50   1   A.   Yes.

05:38:50   2   Q.   And do ATMs do MICR verification?

05:38:55   3   A.   Yes.

05:38:55   4   Q.   And the duplicate detection that the ATMs do, they do

05:39:02   5   it by using the comparison of the MICR line to other

05:39:05   6   information on the check, don't they, sir?

05:39:09   7   A.   I believe so.

05:39:10   8   Q.   And ATMs have done all those things for -- long before

05:39:15   9   these patents, right?

05:39:16   10   A.   Correct.

05:39:16   11   Q.   In fact, ATMs have done all of those things since even

05:39:22   12   before -- since probably the early 2000s, right?

05:39:26   13   A.   I believe so.

05:39:26   14   Q.   And yet what you say here is, Mr. Weinstein, in your

05:39:34   15   report at Paragraph 182, is you say that ATM does not make

05:39:42   16   use of the MRDC fraud prevention techniques which involve a

05:39:51   17   mobile device.

05:39:55   18          And so what I'm trying -- and that's what you

05:39:59   19   valued, right?

05:39:59   20   A.   That is -- that is in part what I value, yes, sir.

05:40:01   21   Q.   And what I'm trying to do, Mr. Weinstein, is put our

05:40:07   22   finger on what you valued that is any different than what

05:40:09   23   existed in that ATM network.  Can you -- can you tell us

05:40:13   24   that?

05:40:13   25   A.   I believe I have, but, yes, what I valued is the

05:40:21   1   ability of the patents to provide a system that solved the

05:40:27   2   problem that Wells Fargo was concerned about in all of

05:40:30   3   those planning documents before it implemented MRDC.  And

05:40:34   4   that concern was fraud associated with duplicates.  And the

05:40:40   5   reason that was such a great concern is that for the first

05:40:43   6   time, the consumer kept the check.

05:40:46   7           And, as I said, I'm not a technical expert, so I

05:40:49   8   can't explain exactly how all of this was accomplished.

05:40:56   9   But what I can say as an economist is that there was a

05:40:59   10  problem, the problem had to do with -- with avoiding fraud

05:41:02   11  associated with duplicates.  That was a much greater

05:41:06   12  problem than had existed in the past.  We heard that from

05:41:11   13  Mr. Brady.  And that somehow the patents solved that

05:41:13   14  problem because Wells Fargo ultimately, after all those

05:41:19   15  concerns, made the decision to go ahead and implement MRDC.

05:41:24   16          And it turns out both from Mr. Ajami and from the

05:41:28   17  USAA data, those bar charts that we looked at, that MRDC

05:41:32   18  actually turns out to be at least as safe and in some cases

05:41:39   19  clearly safer than -- than ATMs.

05:41:41   20  Q.  Mr. Weinstein, let's look at PDX-4.11, please.  You

05:42:01   21  talked about the hypothetical negotiation during the

05:42:01   22  context of your testimony, correct?

05:42:01   23  A.  Yes, sir.

05:42:01   24  Q.  And you put this slide up.  And I want to talk to you

05:42:06   25  about this a little bit.  The hypothetical negotiation is

05:42:08   1   this hypothetical construct that you use to -- to calculate

05:42:12   2   patent damages, isn't it?

05:42:13   3   A.   Correct.

05:42:14   4   Q.   And what we imagine in this hypothetical negotiation,

05:42:17   5   Mr. Weinstein, is we imagine that, before the infringement

05:42:21   6   started -- so before these patents issued or at the time of

05:42:25   7   that, at the time of first infringement, which would have

05:42:27   8   been the issue date of these patents, that Wells Fargo and

05:42:31   9   USAA sat down in a room and they negotiated a patent

05:42:36   10   license, right?

05:42:36   11   A.   That's -- that's precisely what I'm trying to depict

05:42:40   12   here, yes, sir.

05:42:40   13   Q.   Okay.   And they sit in that room and they negotiate

05:42:44   14   that patent license with the benefit of something we call

05:42:46   15   the book of knowledge, right?

05:42:47   16   A.   Yes, sir.

05:42:48   17   Q.   And what it means is, we assume -- of course, this

05:42:53   18   doesn't happen, so we have to assume it happened, but we

05:42:56   19   assume if it happened, they would sit in that room, and

05:42:59   20   they would have the benefit of all the information?

05:43:04   21   A.   They would.

05:43:04   22   Q.   That's that book of -- book of wisdom, right?

05:43:07   23   A.   Correct, sir.

05:43:08   24   Q.   And one of the things in that room, Mr. Weinstein, that

05:43:12   25   Wells Fargo is certainly going to know is they're going to

05:43:15  1   know what they already own, aren't they, sir?

05:43:17  2   A.  Yes, sir.

05:43:18  3   Q.  They're going to know what they've already used in

05:43:23  4   deployed deposit systems like ATM networks, aren't they,

05:43:26  5   sir?

05:43:26  6   A.  I agree.

05:43:27  7   Q.  And they're not going to agree to pay value for things

05:43:30  8   they've had for decades?

05:43:32  9   A.  I agree with that.

05:43:33  10  Q.  Now, you're an economist and not a technical expert,

05:43:40  11  right?

05:43:40  12  A.  Yes, sir.

05:43:40  13  Q.  And you don't have any banking experience, right?

05:43:42  14  A.  I don't.

05:43:43  15  Q.  You didn't do a technical analysis of the patents?

05:43:45  16  A.  Correct.

05:43:47  17  Q.  You didn't look at the patents and do an analysis of

05:43:50  18  which features or which portions of it are different from

05:43:58  19  prior art, did you?

05:43:58  20  A.  I did not, that's correct.

05:44:00  21  Q.  You didn't look at old fraud prevention methods, did

05:44:05  22  you?

05:44:05  23  A.  That's true.  That's fair.

05:44:09  24  Q.  And you didn't compare any alleged fraud prevention

05:44:12  25  methods in the patents to any fraud prevention methods that

05:44:17   1   would have existed in previous systems, did you, sir?

05:44:19   2   A.  Well, that's not quite correct because we -- we did

05:44:24   3   look at that bar chart that shows the difference in

05:44:27   4   performance between mobile and ATMs.  But beyond that, the

05:44:32   5   answer is, that's correct.

05:44:33   6   Q.  Well, that's certainly not a -- a technical comparison

05:44:37   7   of technology involved in old systems and the technology

05:44:40   8   involved in MRDC for fraud prevention?

05:44:41   9   A.  Sure.  But it's the kind of comparison that I make as

05:44:45   10  an economist.

05:44:46   11  Q.  And, Mr. Weinstein, the value that you assign to these

05:45:03   12  patents in this case is based on your understanding that

05:45:05   13  the patents invented a new duplicate detection method; is

05:45:10   14  that right?

05:45:10   15  A.  I'm fine with that, yes, sir.

05:45:11   16  Q.  And that's a fraud prevention method, right?

05:45:16   17  A.  It is.

05:45:16   18  Q.  Let's talk about -- what would -- what do you value in

05:45:30   19  a patent, let me ask that?

05:45:32   20  A.  You value the incremental contribution associated with

05:45:37   21  the patent.

05:45:38   22  Q.  Okay.  The incremental contribution associated with the

05:45:40   23  invention in the patent?

05:45:41   24  A.  Yes, sir, and what -- you value what's -- what's new

05:45:45   25  about the patent that didn't exist before.

05:45:46  1    Q.  Well, and when you do that to know what is new about

05:45:54  2    the patents, you have to know something about the patent

05:45:56  3    claims, right?

05:45:59  4    A.  Well, yes, you do.

05:46:01  5    Q.  Okay.  The value of the patent is set forth -- is what

05:46:05  6    is set forth in the claims, right?

05:46:08  7    A.  Well, the claims describe the property that's being --

05:46:15  8    that's being protected.  The value associated with those

05:46:18  9    claims is something that a person like myself, you know, is

05:46:23  10   trained to try and measure, but the claims define the

05:46:25  11   property right.

05:46:26  12   Q.  And you -- you -- I thank you, Mr. Weinstein.  I asked

05:46:29  13   a poor question.

05:46:30  14          The claims, the definition of the property

05:46:33  15   boundary, that's in the claims?

05:46:37  16   A.  Yes, sir.

05:46:37  17   Q.  And the only part of a patent, that a property owner, a

05:46:40  18   patent owner, has the right to try to enforce against

05:46:43  19   anybody is what's in the claims, right?

05:46:45  20   A.  That's my understanding, yes, sir.

05:46:46  21   Q.  And -- I'm sorry, sir, I didn't mean to talk over you.

05:46:48  22          And so you can have information in your

05:46:54  23   specification, but if you don't put that in the claims,

05:46:57  24   that's not part of your invention, is it?

05:46:59  25   A.  My understanding is it's the claims that -- that govern

05:47:05   1   the property rights, not the specification.

05:47:08   2   Q.  And, Mr. Weinstein, if you don't claim it in the

05:47:12   3   claims, a damages expert like yourself can't attribute

05:47:15   4   value to it, can you?

05:47:17   5   A.  Typically, I would not, that's correct, yes, sir.

05:47:19   6   Q.  And so if these patents claim new methods of duplicate

05:47:23   7   detection, we have to look for that in the claims, don't

05:47:27   8   we?

05:47:27   9   A.  We have to look at the property rights in the claims,

05:47:33   10  that is true.

05:47:34   11  Q.  And --

05:47:35   12  A.  And if we're talking about duplicate detection, that's

05:47:37   13  where we'd look.

05:47:37   14  Q.  And for you to assign value based on the invention of

05:47:40   15  new methods of duplicate detection, those new methods have

05:47:44   16  to be embodied in the claims, don't they, sir?

05:47:46   17  A.  That's fair.

05:47:48   18  Q.  Well, let's look at one of these patents,

05:47:52   19  Mr. Weinstein.

05:47:55   20         MR. HILL:  Can we look at -- we'll pick the '681

05:48:01   21  patent this time.  Mr. Bakale, can we get the '681 patent

05:48:04   22  on the screen, please.

05:48:08   23  Q.  (By Mr. Hill)  And if we look at Claim 22 of the '681

05:48:23   24  patent.  Do you have the patents with you, Mr. Weinstein?

05:48:26   25  A.  Is there an exhibit number?

| | | |
|---|---|---|
| 05:48:27 | 1 | Q.  I'm not sure about it.  Let me check.  I don't believe |
| 05:48:42 | 2 | you do.  Let -- let me get you a copy, Mr. Weinstein. |
| 05:49:17 | 3 | MR. HILL:  Your Honor, I apologize for the delay. |
| 05:49:21 | 4 | THE COURT:  Mr. Hill, I happen to have an extra |
| 05:49:21 | 5 | copy of both patents up here.  Would you like me to hand |
| 05:49:25 | 6 | them to the witness? |
| 05:49:25 | 7 | MR. HILL:  Your Honor, that is very user friendly. |
| 05:49:28 | 8 | I much appreciate that. |
| 05:49:29 | 9 | THE WITNESS:  Thank you, sir. |
| 05:49:32 | 10 | MR. HILL:  And I apologize for not having them at |
| 05:49:34 | 11 | the ready, Judge. |
| 05:49:34 | 12 | THE COURT:  All right.  He's got them now.  Let's |
| 05:49:36 | 13 | proceed. |
| 05:49:36 | 14 | MR. HILL:  Thank you. |
| 05:49:37 | 15 | Q.  (By Mr. Hill)  Mr. Weinstein, I'm looking at Claim 22 |
| 05:49:41 | 16 | of the '681 patent.  It appears in Column 16. |
| 05:49:49 | 17 | A.  I have it.  Thank you. |
| 05:49:52 | 18 | Q.  Okay.  And it says:  The system of Claim 12 -- now, |
| 05:49:57 | 19 | this is a dependent claim, right? |
| 05:49:59 | 20 | A.  Yes, sir. |
| 05:49:59 | 21 | Q.  And so that means you've got to satisfy all the steps |
| 05:50:03 | 22 | in 12, and then you've got to satisfy this additional step |
| 05:50:07 | 23 | in 22. |
| 05:50:09 | 24 | The system of Claim 12, wherein the confirming |
| 05:50:12 | 25 | step takes place after duplicate detection is performed on |

05:50:15   1   the check.

05:50:15   2           Do you see that?

05:50:20   3   A.  I do.

05:50:21   4   Q.  That mentions duplicate detection, doesn't it?

05:50:27   5   A.  It does.

05:50:27   6   Q.  Do the claims describe it in any more detail than that?

05:50:31   7   A.  I think that's the only place in the claims where the

05:50:34   8   words duplicate detection appears.

05:50:35   9   Q.  It just states that duplicate detection is performed,

05:50:40  10   correct?

05:50:40  11   A.  Well, it states a little more than that, but, yes.

05:50:44  12   Q.  It doesn't specify the method of doing duplicate

05:50:48  13   detection, does it?

05:50:48  14   A.  That's true.

05:50:49  15   Q.  The claim doesn't specify any new way of doing

05:50:53  16   duplicate detection, does it, sir?

05:50:54  17   A.  No, it just says what you've read.

05:51:02  18   Q.  And this is true for all the asserted claims that

05:51:05  19   mention duplicate detection, isn't it, Mr. Weinstein?

05:51:08  20   A.  I think that's correct, yes, sir.

05:51:11  21   Q.  None of those claims specify a type of duplicate

05:51:14  22   detection, do they, sir?

05:51:20  23   A.  They're -- they are limited to what you read, that's

05:51:25  24   true.

05:51:26  25   Q.  Now, Mr. Weinstein, as part of your valuation analysis

| | | |
|---|---|---|
| 05:52:01 | 1 | to assign value to these patented fraud prevention |
| 05:52:06 | 2 | techniques, you also believed that the patents invented a |
| 05:52:11 | 3 | new method of performing amount verification, didn't you? |
| 05:52:14 | 4 | A.  Yes. |
| 05:52:15 | 5 | Q.  That's a fraud prevention feature, isn't it? |
| 05:52:21 | 6 | A.  It is, it contributes, yes. |
| 05:52:22 | 7 | Q.  And you believe that these patents created a new method |
| 05:52:26 | 8 | of routing number validation, correct? |
| 05:52:29 | 9 | A.  Also true. |
| 05:52:30 | 10 | Q.  And you believe that these patents created a new method |
| 05:52:33 | 11 | of checking for the endorsement? |
| 05:52:37 | 12 | A.  I agree, yes, sir. |
| 05:52:38 | 13 | Q.  How do you check for the endorsement on a check? |
| 05:52:42 | 14 | A.  You read it and -- and you compare it with other |
| 05:52:46 | 15 | information that you've had. |
| 05:52:47 | 16 | Q.  So you turn it over, right? |
| 05:52:49 | 17 | A.  Yeah. |
| 05:52:50 | 18 | Q.  And it's either endorsed or it's not, fair? |
| 05:52:53 | 19 | A.  Sure. |
| 05:52:59 | 20 | Q.  You also stated that you -- your belief that these |
| 05:53:02 | 21 | patents created a new method of customer identification -- |
| 05:53:05 | 22 | or, excuse me, customer authentication? |
| 05:53:08 | 23 | A.  Yes, sir. |
| 05:53:12 | 24 | Q.  And, Mr. Weinstein, you agree that if there were |
| 05:53:15 | 25 | pre-existing fraud prevention benefits, you would need to |

05:53:19  1  apportion the value of the incremental improvement,

05:53:22  2  wouldn't you?

05:53:22  3  A.  If there were pre-existing benefits associated with the

05:53:28  4  things that you identified, you would need to apportion for

05:53:34  5  those benefits, yes.

05:53:36  6  Q.  And all of those things I just identified are in that

05:53:39  7  ATM network, aren't they, Mr. Weinstein?

05:53:41  8  A.  They are.

05:53:45  9  Q.  Now, Mr. Weinstein, in your slides earlier, another

05:54:13  10  thing I noticed that I'll -- is your reference to some

05:54:19  11  comments about Wells Fargo losing 97 percent of its

05:54:23  12  customers.  Do you recall that?

05:54:24  13  A.  I do.

05:54:26  14         MR. HILL:  Can we look at PDX-38, please,

05:54:38  15  Mr. Bakale?

05:54:41  16  Q.  (By Mr. Hill)  Do you remember this slide?

05:54:42  17  A.  Yes, sir.

05:54:44  18  Q.  And it shows here that Wells Fargo is going to lose all

05:54:49  19  this -- all these deposits, all these customers.  Presented

05:54:57  20  that on direct?

05:54:57  21  A.  Yes, we're talking about profits, but that's correct,

05:55:01  22  yes, sir.

05:55:01  23  Q.  And if we go to the previous slide, the slide right

05:55:04  24  before that, we see how you did the math there, but this

05:55:09  25  slide tells us a little more about what you were actually

05:55:13  1   looking at.  This says USAA experienced 3 percent of

05:55:22  2   digital customers accepted desktop solutions, right?

05:55:28  3   A.  Yes, sir.

05:55:29  4   Q.  So that 3 percent number comes from USAA's experience

05:55:32  5   with its scanner-based application, correct?

05:55:35  6   A.  It does, yes.

05:55:40  7   Q.  And --

05:55:42  8          MR. HILL:  If we can go back to the previous

05:55:45  9   slide.

05:55:48  10  Q.  (By Mr. Hill)  You then use that 3 percent from USAA to

05:55:53  11  project what would happen at Wells Fargo, right?

05:55:56  12  A.  Did you say I didn't?

05:55:59  13  Q.  You did?  You did?

05:56:01  14  A.  I did, yes.

05:56:02  15  Q.  Well, let's talk about the differences between USAA and

05:56:04  16  Wells Fargo, okay?

05:56:05  17  A.  Sure.

05:56:05  18  Q.  USAA doesn't have any branches except for one in San

05:56:10  19  Antonio, right?

05:56:11  20  A.  Correct.

05:56:12  21  Q.  USAA doesn't have a thorough distribution of ATMs

05:56:19  22  around the country for its consumers to use, does it?

05:56:21  23  A.  That's correct.

05:56:22  24  Q.  I mean, do you know how many they have at all?

05:56:26  25  A.  They have -- they have relatively few.  I knew that

621

05:56:30   1   number at one time.  It's relatively few.

05:56:32   2   Q.  So if you're USAA and you're a USAA customer, how do

05:56:39   3   you -- before this MRDC, how do you get checks to the bank?

05:56:43   4   A.  You use ATMs.

05:56:46   5   Q.  Well, they don't have any ATMs.

05:56:47   6   A.  Excuse me, you use somebody else's ATMs.

05:56:50   7   Q.  So you think somebody else's ATMs would accept deposits

05:56:54   8   for USAA customers?

05:56:56   9   A.  If -- if -- if that's part of the arrangement, sure.

05:56:59   10   Q.  Okay.  Well, how else would you get it there?

05:57:02   11   A.  They -- they'd either be direct deposited.

05:57:07   12   Q.  Well, that doesn't have anything to do with -- with RDC

05:57:11   13   or MRDC.

05:57:11   14   A.  I fully understand that.

05:57:13   15   Q.  Okay.  Well, how, if I'm a USAA customer before the

05:57:18   16   launch of this, how did I get my money to the bank?

05:57:20   17   A.  You could either use a scanner or have it direct

05:57:28   18   deposited.  That was -- those are basically the ways to do

05:57:30   19   it.

05:57:31   20   Q.  What choices did the USAA folk -- could they mail it

05:57:34   21   in?

05:57:34   22   A.  Excuse me?

05:57:35   23   Q.  Could they mail it in?

05:57:37   24   A.  I don't know.

05:57:37   25   Q.  Could they do mail deposits you think before they had

05:57:41  1  this other technology?

05:57:41  2  A.  I would think so, but I don't know.

05:57:44  3  Q.  And so if you're USAA and you have no other way for

05:57:49  4  your customers to get money to you and you look at a

05:57:57  5  situation where they can't use your mobile device, it makes

05:57:59  6  sense why you might lose 97 percent of your customers,

05:58:05  7  doesn't it?

05:58:06  8  A.  Sure does.

05:58:07  9  Q.  But if you're Wells Fargo and you have 5,500 branches

05:58:13  10  nationwide and 13,000 ATMs and business specialty devices

05:58:19  11  to accept business checks, if you can't do MRDC, if you

05:58:27  12  don't offer MRDC, it's not going to have the same impact,

05:58:31  13  is it?

05:58:31  14  A.  No, you're wrong, sir.  It was table stakes.

05:58:34  15  Q.  Well, if I've got -- Wells Fargo's got a branch within

05:58:39  16  five miles of almost everybody in America; did you know

05:58:41  17  that?

05:58:41  18  A.  Wouldn't surprise me.

05:58:44  19  Q.  They've got ATMs, 13,000 of them, biggest ATM fleet in

05:58:48  20  the country; do you realize that?

05:58:51  21  A.  Wouldn't surprise me.

05:58:53  22  Q.  And that's all hard investment that Wells Fargo has

05:58:56  23  made to serve its customers' needs that USAA didn't make,

05:59:00  24  right?

05:59:00  25  A.  Sure.

| | | |
|---|---|---|
| 05:59:01 | 1 | Q.  Just different business choices, true? |
| 05:59:04 | 2 | A.  Correct. |
| 05:59:06 | 3 | Q.  And those different business choices impact on the |
| 05:59:11 | 4 | effect of MRDC availability, doesn't it, sir? |
| 05:59:17 | 5 | A.  Not if it's table stakes. |
| 05:59:23 | 6 | Q.  Well, it's certainly hard to say that a comparison of a |
| 05:59:28 | 7 | bank with no branches to a comparison of a bank with the |
| 05:59:31 | 8 | biggest branch and ATM distribution across the country |
| 05:59:37 | 9 | might not be apples-to-apples.  You agree to that? |
| 05:59:40 | 10 | A.  I -- I do agree to that, but that was not the only |
| 05:59:43 | 11 | comparison. |
| 05:59:43 | 12 | Q.  Now, Mr. Weinstein, you analyzed licensing issues as |
| 05:59:52 | 13 | part of your work, correct? |
| 05:59:53 | 14 | A.  Yes, sir. |
| 05:59:54 | 15 | Q.  There are no licenses to the USAA patents in this case, |
| 06:00:01 | 16 | correct? |
| 06:00:01 | 17 | A.  Correct. |
| 06:00:04 | 18 | Q.  Also, USAA doesn't provide MRDC products or services to |
| 06:00:09 | 19 | other banks, correct? |
| 06:00:12 | 20 | A.  Correct. |
| 06:00:13 | 21 | Q.  If Wells Fargo or any other bank wants to offer mobile |
| 06:00:18 | 22 | deposit to their customers, they have to build it or hire |
| 06:00:23 | 23 | somebody to build it for them, don't they? |
| 06:00:26 | 24 | A.  Yes, sir. |
| 06:00:27 | 25 | Q.  USAA doesn't offer some MRDC product or service that |

624

06:00:31   1   another bank can buy to avoid building their own systems,

06:00:36   2   right?

06:00:36   3   A.  Correct.

06:00:37   4   Q.  And, at most, a license to USAA's patents, like you

06:00:44   5   would consider in the hypothetical negotiation analysis,

06:00:48   6   that's just a per -- permission slip, isn't it?

06:00:53   7   A.  Yes, sir.

06:00:53   8   Q.  It doesn't give you anything else, does it?

06:00:55   9   A.  Does not.

06:00:56   10   Q.  It's what economists like to call a bare patent

06:01:02   11   license?

06:01:02   12   A.  That's what it is.

06:01:06   13   Q.  And it doesn't give you any technology assistance,

06:01:06   14   right?

06:01:06   15   A.  Correct.

06:01:07   16   Q.  And it doesn't give you any access to back end systems,

06:01:09   17   does it?

06:01:09   18   A.  It does not.

06:01:10   19   Q.  And it doesn't give you any other products or services?

06:01:17   20   A.  Correct.

06:01:17   21   Q.  So any value of those things, how you actually build

06:01:23   22   and distribute an MRDC system, a value of just that bare

06:01:31   23   patent license can't include any of those things, can it?

06:01:35   24   A.  That's correct.

06:01:36   25   Q.  Now, you mentioned the Zelle -- the Zelle agreement

06:01:44  1   that USAA has.  That Zelle agreement USAA has is not a

06:01:47  2   patent license, is it?

06:01:48  3   A.  Correct.

06:01:49  4   Q.  It's an actual service?

06:01:52  5   A.  It is.

06:01:52  6   Q.  That they buy?

06:01:53  7   A.  Yes, sir.

06:01:54  8   Q.  And they pay for?

06:01:55  9   A.  They do.

06:01:56  10  Q.  And by buying it and paying for it, they actually get

06:02:00  11  access to a system that their customers can then use to

06:02:04  12  move money from each other, right?

06:02:05  13  A.  That's fair.

06:02:06  14  Q.  It's kind of like Venmo, right?

06:02:09  15  A.  Yes.

06:02:09  16  Q.  All right.  Now, Mr. Weinstein, I want to wrap up with

06:02:21  17  just a couple of questions about your engagement on this

06:02:25  18  case, okay?

06:02:26  19          You're -- you provided us with a resume in

06:02:30  20  connection with this work, right?

06:02:31  21  A.  I did.

06:02:31  22  Q.  And you were required to list prior engagements as an

06:02:36  23  expert witness, correct?

06:02:36  24  A.  Yes, sir.

06:02:38  25  Q.  And you listed 28 cases within the last four years that

06:02:44  1  I counted; is that right?

06:02:45  2  A.  That sounds right.

06:02:46  3  Q.  All right.  And only one time in those four years have

06:02:49  4  you testified for a Defendant; isn't that right?

06:02:50  5  A.  Correct.

06:02:51  6  Q.  Every other time you were testifying for the Plaintiff

06:02:54  7  like you're doing in this case for USAA, right?

06:02:56  8  A.  Yes, sir.

06:02:57  9  Q.  And that's usually the party that's asking for money,

06:03:00  10  correct, sir?

06:03:00  11  A.  Yes.

06:03:01  12  Q.  Just like here for USAA?

06:03:03  13  A.  Correct.

06:03:08  14  Q.  And you haven't done this engagement for charity, have

06:03:11  15  you, Mr. Weinstein?

06:03:14  16  A.  Well, you know, I'm an employee, but --

06:03:17  17  Q.  Sure.

06:03:18  18  A.  So I'm paid -- I'm paid by my company, but that has

06:03:21  19  nothing to do with this.

06:03:22  20  Q.  Well, you've been paid by USAA for your work, correct?

06:03:27  21  A.  No, I haven't.  My company gets paid.

06:03:29  22  Q.  All right.  And how much will your company ultimately

06:03:31  23  be paid for this engagement?

06:03:33  24  A.  It would be many hundreds of thousands of dollars,

06:03:36  25  probably -- I'm going to say 350 to $400,000.00.

627

06:03:43  1          MR. HILL:  Thank you, Your Honor.  I'll pass the

06:03:45  2  witness.

06:03:45  3          THE COURT:  All right.  Is there redirect,

06:03:46  4  Mr. Bunt?

06:03:47  5          MR. BUNT:  Yes, Your Honor.

06:03:48  6          THE COURT:  Please proceed.

06:03:48  7                    REDIRECT EXAMINATION

06:03:49  8  BY MR. BUNT:

06:03:49  9  Q.  Mr. Weinstein, let's start back with where Mr. Hill

06:03:57  10  left off.  Have you worked for companies that are both

06:04:03  11  Plaintiffs and Defendants in lawsuits in your career?

06:04:06  12  A.  Yes.  I mean, as I said at the outset, I've been doing

06:04:10  13  this for 50 years.  And over that time, I've worked for

06:04:14  14  both and Plaintiffs and Defendants.  It is true that in the

06:04:17  15  more recent years I -- I tended to be retained more often

06:04:21  16  by Plaintiffs.

06:04:22  17  Q.  Have you also consulted with companies that are not

06:04:25  18  involved in litigation at all?

06:04:26  19  A.  Yes, I do that.

06:04:28  20  Q.  And there was a question about your fees.  Again, are

06:04:35  21  all the technical and damage experts in this case being

06:04:40  22  paid for their time?

06:04:43  23  A.  As far as I know, all of the experts in the case are

06:04:48  24  either paid for their time or their companies are paid for

06:04:51  25  their time, which is true in my situation.

06:04:53   1   Q.  So your counterpart, Mr. Gerardi, Wells Fargo's damage

06:04:58   2   expert, is likely being paid for his time, as well?

06:05:01   3   A.  Yes, sir.

06:05:01   4   Q.  And while we're talking about Mr. Gerardi, he starts

06:05:06   5   with the same assumptions that you do, correct?

06:05:10   6   A.  Yes.  He -- he and I agree on the framework here,

06:05:16   7   namely, we agree that -- the way to answer the question as

06:05:18   8   to -- as to what fair payment for permission would be is

06:05:23   9   through a hypothetical negotiation between the parties at

06:05:25  10   around the time of first infringement, assuming the patents

06:05:29  11   are valid, infringed, and enforceable, and that the parties

06:05:35  12   have access to information about the -- the patents

06:05:39  13   themselves.

06:05:40  14   Q.  You're not here to testify about infringement or

06:05:42  15   validity, and Mr. Gerardi will not be testifying about

06:05:46  16   those aspects either, correct?

06:05:47  17   A.  Correct.

06:05:47  18   Q.  As a damage expert, though, can you generally explain

06:05:51  19   why you think the patents in this suit teach new fraud and

06:06:00  20   duplicate detection techniques?

06:06:02  21   A.  Yes.  And I approach it as an economist, not as a

06:06:06  22   technical expert.  But when I looked at the Wells Fargo

06:06:09  23   planning documents, some of which we used in connection

06:06:14  24   with my testimony --

06:06:16  25             MR. BUNT:  Mr. Huynh -- let me just stop you,

| | | |
|---|---|---|
| 06:06:18 | 1 | Mr. Weinstein.  Would you pull up Slide 37 from |
| 06:06:22 | 2 | Mr. Weinstein's direct examination slides? |
| 06:06:24 | 3 | A.  When I -- when I looked at those planning documents, |
| 06:06:28 | 4 | what I observed is that, in my view -- and I wasn't there |
| 06:06:33 | 5 | at the time -- but, in my view, the primary concern that |
| 06:06:37 | 6 | Wells Fargo had in connection with launching MRDC was this |
| 06:06:44 | 7 | threat of duplicate deposits, primarily because for the |
| 06:06:49 | 8 | first time the consumer would keep the check, and that was |
| 06:06:53 | 9 | not something that had been experienced before. |
| 06:06:55 | 10 | Instead of turning the check over or depositing it |
| 06:06:59 | 11 | through a controlled environment -- namely, an ATM or a |
| 06:07:02 | 12 | specialized scanner -- the consumer had the check.  And |
| 06:07:06 | 13 | that was a real tremendous concern for Wells -- Wells Fargo |
| 06:07:10 | 14 | and also for USAA. |
| 06:07:14 | 15 | And as an economist, I say, all right, they were |
| 06:07:17 | 16 | concerned about duplicates.  Ultimately, they launched it, |
| 06:07:23 | 17 | which meant they had to have been able to get past those |
| 06:07:29 | 18 | concerns.  And what we find is that, in fact -- in fact, |
| 06:07:33 | 19 | mobile deposits turn out to be even safer than ATMs in |
| 06:07:37 | 20 | terms of fraud. |
| 06:07:39 | 21 | Q.  Mr. Hill mentioned the fact that these ATMs had all |
| 06:07:45 | 22 | these duplicate detection devices and other fraud detection |
| 06:07:50 | 23 | features.  Do you agree with that? |
| 06:07:52 | 24 | A.  Well, they had -- they had their own fraud prevention |
| 06:07:54 | 25 | features, to be sure, so that the deposited check could be |

630

06:07:57   1   credited to the consumer's account.  There's no question

06:08:00   2   that those features existed.  But this was a new kind of

06:08:04   3   threat that required new kinds of -- new kinds of defect --

06:08:09   4   detection features in order to address fraud and -- and --

06:08:16   5   and keep it at -- at maintainable levels, which is exactly

06:08:21   6   what the patents did.

06:08:22   7   Q.  Looking at this slide in front of us, if ATMs had these

06:08:28   8   old fraud detection services and those old fraud detection

06:08:33   9   services were still available, why would Wells Fargo be

06:08:39   10  writing that it needed -- that it was concerned about this

06:08:41   11  threat of MRDC with duplicate deposits if it had the old

06:08:48   12  system available to it?

06:08:49   13        MR. HILL:  Objection, Your Honor, calls for

06:08:51   14  speculation.

06:08:51   15        MR. BUNT:  It's the same thing he's been

06:08:53   16  testifying about.

06:08:53   17        THE COURT:  He's an expert witness.  He can offer

06:08:58   18  opinion.  I'll overrule the objection.

06:08:59   19  A.  If -- if Wells Fargo already had these fraud detection

06:09:03   20  features, you wouldn't see this kind of language about the

06:09:05   21  primary threat of MRDC being duplicate deposits in -- in

06:09:09   22  their planning documents.  If they already had fraud

06:09:12   23  detection that would work for MRDC, that would not have

06:09:16   24  been the concern.  That was a tremendous concern.

06:09:25   25  Q.  (By Mr. Bunt)  Were the cost savings benefits the only

06:09:28   1   thing that you looked at in your analysis of this case,

06:09:30   2   Mr. Weinstein?

06:09:30   3   A.   No.   As I testified, I looked at the cost savings

06:09:35   4   benefits.   I looked at benefits associated with additional

06:09:39   5   profits on MRDC customers on the assumption that MRDC was

06:09:47   6   table stakes, meaning if you were going to compete with

06:09:51   7   other banks and financial institutions, you simply had to

06:09:55   8   have it.

06:09:57   9        MR. BUNT:   Can we go to Slide No. 46, Mr. Huynh?

06:10:05   10  Q.   (By Mr. Bunt)   Can you remind the jury how you

06:10:07   11  calculated the $1.2 billion number?

06:10:10   12  A.   Yes.   I looked at the profits that Wells Fargo made in

06:10:20   13  connection with MRDC customers.   I relied on that 3 percent

06:10:27   14  figure that Mr. Hill asked me about.   I also relied on the

06:10:30   15  two and a half percent figure that was published in that

06:10:34   16  financial institution publication, Celent, which was not

06:10:41   17  limited to USAA but which was based on a broad survey of

06:10:47   18  banks and financial institutions.

06:10:47   19        So it wasn't just USAA.   It was a broad-based

06:10:51   20  survey that showed that that -- that remote scanning simply

06:10:57   21  was not a viable alternative for consumers anymore.   But --

06:11:03   22  but mobile deposits were table stakes.

06:11:06   23  Q.   Mr. Hill asked you some questions about the Zelle

06:11:09   24  product that Wells Fargo offers.   Is it your understanding

06:11:12   25  that Wells Fargo charges USAA's customers when they use the

06:11:16  1  Zelle product?

06:11:17  2  A.  Yes, sir.

06:11:17  3  Q.  Do you think there's anything unreasonable about USAA

06:11:22  4  wanting to charge Wells Fargo when it's using USAA's

06:11:27  5  property?

06:11:27  6  A.  No, I do not.

06:11:29  7      MR. BUNT:  Could we turn to Slide No. 48,

06:11:36  8  Mr. Huynh?  Actually, I'm sorry, let's go to Slide No. --

06:12:01  9  the last slide in the deck, Mr. Huynh -- or the first one.

06:12:08  10  Yeah, there you go.  That's fine.

06:12:10  11  Q.  (By Mr. Bunt)  Can you remind the jury one more time

06:12:12  12  why is it that you -- well, first of all, how did you come

06:12:15  13  up with this number, the 85 cents per deposit?

06:12:18  14  A.  The 85 cents per deposit represents what I believe

06:12:24  15  would be the outcome of that hypothetical negotiation

06:12:26  16  between the parties sitting across the table negotiating

06:12:30  17  for permission to use these patents.

06:12:32  18      I calculated it based on the difference between

06:12:36  19  ATM and mobile deposit costs incurred by Wells Fargo

06:12:40  20  between the period 2014 and 2018 and subtracted EWS fees

06:12:48  21  from that cost, which I understand Wells Fargo incurs.

06:12:51  22      And the final step was to provide Wells Fargo with

06:12:55  23  its return on investment, which allows it to maintain its

06:13:05  24  standard profitability during this period.

06:13:07  25  Q.  And, to be clear, the 85 cents per deposit, when you

06:13:11   1    multiply that times the mobile deposits that have taken

06:13:14   2    place during the damage period, it comes up to

06:13:16   3    $102 million?

06:13:17   4    A.  Yes, sir.

06:13:18   5    Q.  And why do you think that that is a reasonable approach

06:13:21   6    to calculating damages in this case?

06:13:25   7    A.  Well, I think it's reasonable because this invention

06:13:29   8    was table stakes.  It was, in fact, disruptive to the

06:13:34   9    industry.  The industry is completely different now thanks

06:13:38  10    to mobile deposit from what it was when we just had banks

06:13:43  11    with tellers and ATMs.  Mobile deposits, as we've seen,

06:13:50  12    have grown dramatically.

06:13:51  13         It is disruptive, and I believe that $102 million

06:13:59  14    in the context of the fact that this was table stakes

06:14:06  15    recognized by Wells Fargo as being table stakes is an

06:14:10  16    amount that the parties would have agreed to at that

06:14:13  17    hypothetical negotiation.

06:14:13  18         MR. BUNT:  I'll pass the witness.

06:14:14  19         Thank you, sir.

06:14:16  20         THE COURT:  Further cross-examination, Mr. Hill?

06:14:17  21         MR. HILL:  Yes, Your Honor.

06:14:18  22         THE COURT:  Please proceed.

06:14:19  23         MR. HILL:  Thank you.

06:14:19  24                   RECROSS-EXAMINATION

06:14:20  25    BY MR. HILL:

06:14:20  1  Q.  Mr. Weinstein, I heard you say that there were new

06:14:24  2  threats requiring new fraud prevention features, a few

06:14:27  3  minutes ago.  Did I hear that correctly?

06:14:28  4  A.  You did.

06:14:29  5  Q.  I want you to show me where those new fraud prevention

06:14:35  6  features appear in the claims, and I will write them down

06:14:38  7  here.  Tell me what they are.

06:14:39  8  A.  The threats that I've been testifying about are threats

06:14:48  9  that Wells Fargo recognized in its planning documents.

06:14:50  10        MR. HILL:  Objection, nonresponsive, Your Honor.

06:14:52  11  A.  They're not in the claims.

06:14:54  12        THE COURT:  Overruled.

06:14:57  13  Q.  (By Mr. Hill)  Okay.  They're not in the claims?

06:14:58  14  A.  No, they're not in the claims that way.  They're in the

06:15:01  15  planning documents.  This was a huge impediment to

06:15:06  16  launching a product that was table stakes to Wells Fargo,

06:15:11  17  that was disruptive to the industry.  You wouldn't expect

06:15:13  18  to see it described that way in patent claims, but you

06:15:18  19  would expect to see it described that way in planning

06:15:20  20  documents, and that's exactly what we saw.

06:15:24  21  Q.  Mr. Weinstein, these new fraud prevention features that

06:15:29  22  you distinguished from ATMs and purport to value are not in

06:15:33  23  the claims; isn't that correct, sir?

06:15:37  24  A.  That's probably correct, yes, sir.

06:15:40  25  Q.  You mentioned Zelle.  USAA customers get a service that

06:15:47  1  cost money when they use Zelle, and they're charged for

06:15:52  2  that service, but they get the benefit of the service.

06:15:55  3  What service do you get from a bare patent license?

06:15:58  4  A.  You get the ability to use a table stakes product and

06:16:06  5  compete with the rest of the industry.

06:16:09  6  Q.  You get a service?

06:16:13  7  A.  Well, I don't know how you -- whether you use the word

06:16:17  8  "service" to describe mobile deposits.  You get the ability

06:16:20  9  to have access to -- to that product.

06:16:23  10  Q.  I can buy a license to a patent on a system personally,

06:16:28  11  and I still don't own that system, do I?

06:16:30  12  A.  That's true.

06:16:31  13  Q.  I gotta go build it, right?

06:16:34  14  A.  Yes, you need -- you need -- you need to be able to

06:16:39  15  operate the system.  That's certainly true.

06:16:41  16  Q.  And, finally, Mr. Weinstein, saying something is table

06:16:46  17  stakes does not tell us the economic value of it in the

06:16:52  18  context of the hypothetical negotiation, does it, sir?

06:16:55  19  A.  Gives us a big hint.

06:17:00  20          MR. HILL:  Pass the witness, Your Honor.

06:17:01  21          THE COURT:  Further direct, Mr. Bunt?

06:17:04  22          MR. BUNT:  No, Your Honor.

06:17:05  23          THE COURT:  All right.  You may step down,

06:17:08  24  Mr. Weinstein.

06:17:08  25          THE WITNESS:  Thank you, sir.

| | | |
|---|---|---|
| 06:17:14 | 1 | THE COURT:  Ladies and gentlemen, we're going to |
| 06:17:15 | 2 | use this juncture to recess for the evening.  I'm going to |
| 06:17:19 | 3 | ask you to close your notebooks and take them with you to |
| 06:17:21 | 4 | the jury room, leave them on the table there overnight. |
| 06:17:24 | 5 | Please follow all the instructions I've given you, |
| 06:17:27 | 6 | including, of course, not to discuss the case with anyone |
| 06:17:30 | 7 | or with yourselves.  I'll look for you to be back in the |
| 06:17:34 | 8 | morning so that we can start at approximately 8:30. |
| 06:17:36 | 9 | I will do my best to start more promptly tomorrow |
| 06:17:41 | 10 | than I did today.  There are things going on that you're |
| 06:17:44 | 11 | not aware of, and they take time.  But I'd like to have you |
| 06:17:48 | 12 | back so that we'll be prepared to start about 8:30 in the |
| 06:17:50 | 13 | morning.  Travel safely to your homes, have a good evening. |
| 06:17:55 | 14 | And with that, the jury is excused for the evening. |
| 06:17:57 | 15 | COURT SECURITY OFFICER:  All rise. |
| 06:17:59 | 16 | (Jury out.) |
| 06:17:59 | 17 | THE COURT:  Please be seated. |
| 06:18:16 | 18 | Just leave them there. |
| 06:18:21 | 19 | All right.  Counsel, I've given some directives |
| 06:18:30 | 20 | about additional filings, updated joint submissions on the |
| 06:18:36 | 21 | charge and verdict form.  I'll look for those as I've |
| 06:18:38 | 22 | indicated.  You've asked for the ability to brief some |
| 06:18:42 | 23 | issues.  I'll look for those briefs as indicated.  I do |
| 06:18:46 | 24 | want to cover one thing with you.  Throughout the trial |
| 06:18:49 | 25 | process, and it's a part of every trial process, there are |

06:18:53  1   times when the Court needs to communicate with the parties,

06:18:56  2   and that's typically done by an email from one of my law

06:18:59  3   clerks to both sides, that's given at my direction,

06:19:04  4   instructing the parties to either furnish information or to

06:19:06  5   provide materials or to do things that facilitate the trial

06:19:10  6   of the Court and the interaction between the Court and

06:19:13  7   counsel.

06:19:14  8        The email process, from what I've seen, with

06:19:17  9   copies that have been shown to me in this case, seems to

06:19:21  10  have devolved into an opportunity to present ongoing

06:19:25  11  arguments in emails going back and forth to the Court.

06:19:27  12       That's not the purpose of the emails from the

06:19:31  13  Court, and it shouldn't be the purpose of your responses.

06:19:33  14  If there are briefs with arguments in them, file them on

06:19:37  15  the docket or attach them to the emails, but the email

06:19:41  16  traffic is not an appropriate place to present ongoing

06:19:45  17  arguments.  We've been getting emails during the course of

06:19:48  18  the trial while people are on the witness stand.  That's

06:19:51  19  not appropriate.

06:19:51  20       I'm going to insist that the email process be more

06:19:57  21  respected than it has been.  When you get an email from the

06:20:00  22  Court through my staff asking for information, supply that

06:20:04  23  information.  Don't supply that information and give me an

06:20:08  24  ongoing argument as to why the information you gave me is

06:20:10  25  right and why the information the other side gave me is

06:20:14  1  wrong.  We'll have time to argue both sides of issues, but

06:20:17  2  the email traffic is not the place.

06:20:20  3          Also, I've been meeting with you, as is the

06:20:24  4  Court's practice, each morning before we begin with the

06:20:28  5  jury, in an effort to maximize your designated trial time

06:20:34  6  and allowing an opportunity to hear your arguments and

06:20:37  7  resolve unresolved issues so that time is not wasted when

06:20:41  8  the jury is in the box and we're on the record in open

06:20:44  9  court.

06:20:44  10          To do that, I've been getting copies of slides,

06:20:50  11  demonstratives, other things with competing objections and

06:20:56  12  arguments that I've been addressing with you before

06:20:59  13  beginning each day's trial.

06:21:01  14          Some of those are coming to us in a jumbled order.

06:21:05  15  Some of those are coming to the Court without appropriate

06:21:09  16  numbering so I can follow what your written objections are.

06:21:14  17  I want you to be careful that you give the Court workable,

06:21:17  18  discernible copies.  And I want you to do it so that they

06:21:24  19  follow the course and the pattern of the witnesses that are

06:21:26  20  expected to testify.

06:21:27  21          I've been getting materials on people that don't

06:21:30  22  testify until a day or two from when I'm meeting with you.

06:21:35  23  I need to have them staged so that the objections I get and

06:21:39  24  the submissions that you're not able to work out through

06:21:42  25  the meet-and-confer process deal with the witnesses that I

639

06:21:45  1   can expect to have that day, not the next day or the day

06:21:50  2   after that.  That would be very helpful.

06:21:54  3          All right.  With that, are there questions from

06:21:58  4   either side before we recess for the evening?

06:22:00  5          MR. SHEASBY:  Nothing from Plaintiffs, Your Honor.

06:22:02  6          MR. MELSHEIMER:  No, Your Honor.  Thank you.

06:22:03  7          THE COURT:  I'll be available in the morning as

06:22:05  8   usual.

06:22:05  9          With that, we stand in recess until tomorrow

06:22:08  10  morning.

06:22:08  11         COURT SECURITY OFFICER:  All rise.

          12         (Recess.)

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

```
 1                        CERTIFICATION

 2

 3           I HEREBY CERTIFY that the foregoing is a true and

 4    correct transcript from the stenographic notes of the

 5    proceedings in the above-entitled matter to the best of my

 6    ability.

 7

 8

 9    /S/ Shelly Holmes                    1/7/2020
      SHELLY HOLMES, CSR, TCRR             Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```