08:33:38  1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE EASTERN DISTRICT OF TEXAS
          2                         MARSHALL DIVISION

          3   UNITED SERVICES AUTOMOBILE    )(
              ASSOCIATION
          4                                 )(    CIVIL ACTION NO.

          5   VS.                           )(    2:18-CV-366-JRG

          6                                 )(    MARSHALL, TEXAS
                                                  JANUARY 8, 2020
          7   WELLS FARGO BANK, N.A.        )(    8:33 A.M.

          8

          9                    TRANSCRIPT OF JURY TRIAL

         10                         MORNING SESSION

         11       BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

         12                    UNITED STATES DISTRICT JUDGE

         13
              APPEARANCES:
         14

         15   FOR THE PLAINTIFF:

         16
              JASON SHEASBY
         17   ANTHONY ROWLES
              LISA GLASSER
         18   IRELL & MANELLA
              1800 Avenue of the Stars
         19   Suite 900
              Los Angeles, CA 90067-4276
         20

         21
              ROBERT CHRISTOPHER BUNT
         22   PARKER, BUNT & AINSWORTH, PC
              100 East Ferguson
         23   Suite 418
              Tyler, TX 75702
         24

         25

```
 1  FOR THE DEFENDANT:

 2

    THOMAS M. MELSHEIMER
 3  M. BRETT JOHNSON
    MICHAEL A. BITTNER
 4  J. TRAVIS UNDERWOOD
    WINSTON & STRAWN LLP
 5  2121 North Pearl Street
    Suite 900
 6  Dallas, TX 75201

 7

    E. DANIELLE T. WILLIAMS
 8  WINSTON & STRAWN LLP
    300 South Tyron Street
 9  16th Floor
    Charlotte, NC 28202
10

11  MATTHEW R. MCCULLOUGH
    WINSTON & STRAWN LLP
12  275 Middlefield Road
    Suite 205
13  Menlo Park, CA 94025

14

    JACK WESLEY HILL
15  WARD, SMITH & HILL, PLLC
    P.O. Box 1231
16  1507 Bill Owens Parkway
    Longview, TX 75606
17

18

    COURT REPORTER:     Shelly Holmes, CSR, TCRR
19                      Official Court Reporter
                        United States District Court
20                      Eastern District of Texas
                        Marshall Division
21                      100 E. Houston
                        Marshall, Texas  75670
22                      (903) 923-7464

23

    (Proceedings recorded by mechanical stenography, transcript
24  produced on a CAT system.)

25
```

643

1                     P R O C E E D I N G S

08:33:38    2            (Jury out.)

08:33:38    3            COURT SECURITY OFFICER:  All rise.

08:33:39    4            THE COURT:  Be seated, please.

08:33:44    5            All right.  Counsel, as we discussed in chambers,

08:33:55    6    an issue arose yesterday.  The Court has satisfied itself

08:33:58    7    and the Court has concluded that the accused product has

08:34:04    8    been properly disclosed as prior art in the case.

08:34:05    9            All right.  Are the parties prepared to read into

08:34:09   10    the record the items from the list of pre-admitted exhibits

08:34:12   11    used during yesterday's portion of the trial?

08:34:14   12            MR. BUNT:  Yes, Your Honor, we are.

08:34:16   13            THE COURT:  Please proceed.

08:34:17   14            MR. BUNT:  Your Honor, the following Plaintiff's

08:34:18   15    Exhibits were used yesterday.  Plaintiff's Exhibits No. 5,

08:34:23   16    8, 14, 72, 206, 220, 240, 329, 365, 366, 417, 436, 486,

08:34:43   17    487, 1069, 1083, 1152, 1296, 1399, 1402, 1409, 1416, 1470,

08:35:01   18    and 1471.

08:35:06   19            THE COURT:  Any objection to that offer from

08:35:07   20    Plaintiff -- given by Plaintiff, any objection from

08:35:11   21    Defendant?

08:35:11   22            MR. UNDERWOOD:  No objection from Defendant, Your

08:35:12   23    Honor.

08:35:12   24            THE COURT:  All right.  Does Defendant have a

08:35:14   25    similar rendition to offer?

| | | |
|---|---|---|
| 08:35:15 | 1 | MR. UNDERWOOD:  We do.  There was one Defendant's |
| 08:35:18 | 2 | Exhibit, DTX-11. |
| 08:35:19 | 3 | THE COURT:  Any objection from Plaintiff as to |
| 08:35:22 | 4 | that offer by Defendant? |
| 08:35:23 | 5 | MR. BUNT:  No, Your Honor. |
| 08:35:24 | 6 | THE COURT:  All right.  Thank you, counsel. |
| 08:35:29 | 7 | I understand Plaintiff is going forward at this |
| 08:35:32 | 8 | juncture with additional witnesses by deposition.  Are we |
| 08:35:35 | 9 | prepared to do that? |
| 08:35:36 | 10 | MS. GLASSER:  Yes, Your Honor. |
| 08:35:37 | 11 | THE COURT:  Please bring in the jury, please. |
| 08:36:01 | 12 | COURT SECURITY OFFICER:  All rise. |
| 08:36:02 | 13 | (Jury in.) |
| 08:36:03 | 14 | THE COURT:  Good morning, ladies and gentlemen. |
| 08:36:06 | 15 | Please be seated. |
| 08:36:08 | 16 | Welcome back. |
| 08:36:09 | 17 | Plaintiff, call your next witness. |
| 08:36:13 | 18 | MS. GLASSER:  Good morning, and may it please the |
| 08:36:19 | 19 | Court. |
| 08:36:19 | 20 | USAA calls Mr. Jeffrey Easley, associate vice |
| 08:36:24 | 21 | president and corporate representative of USAA, for the |
| 08:36:27 | 22 | second portion of his deposition. |
| 08:36:34 | 23 | THE COURT:  Proceed with the witness by |
| 08:36:36 | 24 | deposition. |
| 08:36:36 | 25 | (Videoclip played.) |

08:36:37  1          QUESTION:  Good morning, Mr. Easley.  Can you
08:36:40  2     state your full name for the record, please?
08:36:42  3          ANSWER:  Full legal name?
08:36:43  4          QUESTION:  Yes.
08:36:44  5          ANSWER:  Jeffrey Wilton Easley.
08:36:47  6          QUESTION:  And you understand that your deposition
08:36:48  7     is being taken today in both your personal capacity and
08:36:51  8     your capacity as a corporate representative for USAA?
08:36:53  9          ANSWER:  I understand.
08:36:53  10         QUESTION:  And based on your recollection of your
08:37:00  11    notes, when was the first moment in time that you believe
08:37:06  12    mobile devices had image capture capability?
08:37:08  13         ANSWER:  So I recall as early as 2004, certainly
08:37:18  14    mobile devices having digital cameras associated with them
08:37:27  15    or linked to them or part of their form factor.
08:37:31  16         QUESTION:  Any particular brand of phone that you
08:37:36  17    recall having a digital camera in 2004?
08:37:40  18         ANSWER:  I recall Nokia was the big player at the
08:37:43  19    time having -- having those devices.  I think there were
08:37:48  20    others, but I don't recall which brands.
08:37:51  21         QUESTION:  And then in terms of the scanners, what
08:37:55  22    is your recollection of the first time your members had
08:37:59  23    access to scanners?
08:38:00  24         ANSWER:  I know at the time in 2005, and 2004, as
08:38:06  25    we were developing these capabilities, that in general,

08:38:15  1  desktop scanners were very prevalent in the market, highly

08:38:26  2  adopted by our members.  And I know that was the beginning

08:38:26  3  of sort of smartphone development, smartphone -- I guess

08:38:31  4  I'm using the term to mean capabilities such as, you know,

08:38:36  5  cameras included on a mobile device and -- and other

08:38:39  6  software developments at the time.

08:38:41  7       As I recall, we saw that desktop scanners were

08:38:49  8  much more prevalent than -- in terms of members who

08:38:54  9  actually had them in their possession and used them in

08:38:57  10  terms of -- as opposed to the prevalence of a large number

08:39:01  11  of smartphones in their possession.

08:39:03  12       QUESTION:  So let's go back to your comment about

08:39:09  13  fraud detection.  What are some of the fraud detection

08:39:13  14  features in USAA's remote deposit capture product?

08:39:20  15       ANSWER:  Some of the features are MICR line

08:39:31  16  validation or magnetic ink character recognition

08:39:33  17  validation, which are the numbers at the bottom of the

08:39:37  18  check written in special font.

08:39:41  19       Certainly validation in terms of valid routing

08:39:46  20  number or check -- check digit logic and those kinds of

08:39:50  21  things.

08:39:50  22       Able to read that successfully for -- for

08:39:56  23  processing purposes with high accuracy, even though the

08:40:01  24  magnetic line, of course, is magnetically read when the

08:40:07  25  physical check item itself is -- is available.  But in this

08:40:11    1   case, this capability meant having to achieve high accuracy

08:40:16    2   through reading it optically through a digital image.  So

08:40:23    3   that's one of the validations.

08:40:25    4          QUESTION:  And in terms of Deposit@Mobile, when

08:40:30    5   did USAA first implement the ability or feature to read the

08:40:36    6   MICR line?

08:40:37    7          ANSWER:  When we developed the original remote

08:40:44    8   deposit capture capabilities, the first product was

08:40:48    9   Deposit@Home because some of the earlier comments, that's

08:40:52   10   what most members had in their homes was a desktop scanner.

08:40:56   11          However, the capabilities that allowed us to also

08:41:01   12   launch Deposit@Mobile with a mobile device were already in

08:41:05   13   place and contemplated back in the original product.

08:41:08   14          So I'm separating sort of product in terms of how

08:41:12   15   we communicated the service to you as a member and what

08:41:16   16   capabilities we had in place in order to provide -- provide

08:41:19   17   that service or that -- fulfill that product on the back

08:41:22   18   end.

08:41:23   19          So the capabilities, like I mentioned, the MICR

08:41:26   20   detection -- validation, were in place back in 2005, 2006.

08:41:37   21   It's just that from a market and member perspective, there

08:41:41   22   weren't enough phones out there in possession of our

08:41:44   23   members to make it a product, you know, to roll out

08:41:48   24   until -- that really took off mainly credit to the iPhone

08:41:51   25   around 2007.

08:41:52  1          So those same capabilities enabled us to safely

08:41:58  2    and securely operate Deposit@Mobile when the member

08:42:02  3    adoption sort of enabled us to in that time frame.

08:42:08  4          QUESTION:  And when did that happen?

08:42:10  5          ANSWER:  Deposit@Mobile, I believe, was initially

08:42:13  6    launched in August -- August/September of 2009.

08:42:20  7          Again, same technical capability framework that

08:42:23  8    was also processing the Deposit@Home transactions.

08:42:25  9          QUESTION:  And so when Deposit@Mobile was launched

08:42:28  10   in August/September 2009, it had the capability to do MICR

08:42:33  11   line validation?

08:42:35  12          ANSWER:  That's correct.

08:42:35  13          QUESTION:  But my question was, if I go into a

08:42:38  14   bank branch and I deposit a check through the traditional

08:42:41  15   way, through a brick and mortar branch, banks will do --

08:42:46  16   including USAA -- will do MICR line validation, correct?

08:42:49  17          ANSWER:  I believe they will do it in a

08:42:51  18   traditional branch -- batch process sort of at night, batch

08:42:55  19   up all the checks that were presented, run them through

08:42:58  20   high-speed machines that do magnetic -- you know, actual

08:43:02  21   magnetic reading of the physical item.  And, yes, I believe

08:43:07  22   those same validations are done.  They're just done after

08:43:10  23   the fact, if you will.

08:43:11  24          QUESTION:  And not only is the validation done

08:43:17  25   after the deposit is made, but when I make the deposit, the

08:43:21   1   teller actually has to know what my account number is in

08:43:24   2   order to deposit the check amount in my account, correct?

08:43:29   3          ANSWER:  That's correct.

08:43:30   4          QUESTION:  I'm just saying that if I go into the

08:43:33   5   USAA branch in San Antonio, the typical practice is I have

08:43:36   6   to fill out a deposit slip, correct?

08:43:39   7          ANSWER:  Correct.

08:43:39   8          QUESTION:  Okay.  On that deposit slip, I have to

08:43:41   9   list my account number, my name, and the amount of the

08:43:44  10   deposit, right?

08:43:45  11          ANSWER:  I would think so, yes.

08:43:46  12          QUESTION:  If I'm depositing a single check, the

08:43:48  13   amount that I'm depositing could be equal to the amount of

08:43:51  14   the check, correct?

08:43:54  15          ANSWER:  For it to be a successful transaction,

08:43:55  16   that amount needs to be the same.

08:43:57  17          QUESTION:  And what is your understanding of

08:44:03  18   duplicate detection?

08:44:03  19          ANSWER:  So the nature of remote deposit capture

08:44:08  20   is that, you know, really when we introduced it for the

08:44:16  21   first time in banking, that we were -- that we understood,

08:44:20  22   the physical check item was not in our possession or the

08:44:24  23   bank's possession.

08:44:26  24          That introduced a new risk by a member who's

08:44:38  25   making a deposit retains the physical check item.  That

08:44:41  1   risk really is what we call representment.

08:44:48  2        So if you were so inclined, after you performed

08:44:52  3   your Deposit@Home or Deposit@Mobile transaction in which an

08:44:58  4   image is sent to us of that check, it's -- it's a

08:45:01  5   fraudulent activity.  But if you engaged in that, you could

08:45:05  6   conceivably walk down to another bank and deposit that

08:45:10  7   check item again.

08:45:11  8        And so that's what I'm thinking of when we say

08:45:16  9   duplicate check, you know, prevention, meaning not allowing

08:45:20  10  the check to be redeposited for, you know, more than the

08:45:26  11  one time that it's already been, you know, presented for

08:45:29  12  deposit.

08:45:30  13       QUESTION:  And when was duplicate detection --

08:45:34  14  when was that feature added to Deposit@Home?

08:45:37  15       ANSWER:  My understanding is it was in place at

08:45:42  16  the very beginning.

08:45:43  17       QUESTION:  And how about for Deposit@Mobile, when

08:45:47  18  was that feature added?

08:45:48  19       ANSWER:  Since it was the same architecture, same

08:45:51  20  processing, it was in place at the very beginning, as well,

08:45:54  21  of that product.

08:45:55  22       QUESTION:  Has USAA valued the duplicate detection

08:46:01  23  feature in its Deposit@Home or Deposit@Mobile products?

08:46:06  24       ANSWER:  I would say it's of high value, yes.

08:46:09  25       QUESTION:  Have you assigned a numerical or

08:46:12  1  monetary value to that feature?

08:46:13  2        ANSWER:  I have not, but I would -- I would just

08:46:16  3  say the -- the ability to introduce this without the -- you

08:46:24  4  know, introducing this service without the ability to guard

08:46:27  5  against represenment of checks, would have made the

08:46:32  6  service commercially non-viable.

08:46:34  7        The potential for fraud loss there, the potential

08:46:38  8  for reputational damage, the potential for regulatory

08:46:42  9  scrutiny and action to, at worst, shut the service down

08:46:49  10  means in my mind it's an absolutely critical capability

08:46:53  11  that needed to be in place for us to safely introduce the

08:46:56  12  service.

08:46:58  13        QUESTION:  In terms of fraud loss, do you know how

08:47:02  14  much duplicate detection saves in terms of fraud loss?

08:47:06  15        ANSWER:  I do not have that detail.

08:47:08  16        QUESTION:  Has USAA valued -- valued the

08:47:12  17  capability for its RDC capture products to validate the

08:47:22  18  routing number?

08:47:22  19        ANSWER:  Not that I'm aware of.

08:47:24  20        QUESTION:  And based on your understanding and

08:47:25  21  experience in the industry, other banks were validating

08:47:31  22  routing numbers or had processes to validate routing

08:47:34  23  numbers via a check deposit through a teller at the time

08:47:42  24  remote deposit capture was developed, correct?

08:47:43  25        ANSWER:  In the traditional batch processing

08:47:46  1  environment, yes.

08:47:46  2      QUESTION:  Does USAA's remote deposit capture

08:47:52  3  product verify or authenticate the identity of the user?

08:47:55  4      ANSWER:  As part of user authentication for

08:48:03  5  accessing your accounts at USAA.com or through our mobile

08:48:06  6  app, that also served as a user authentication for the

08:48:12  7  remote deposit capture transaction.

08:48:13  8      QUESTION:  Was there identity authentication

08:48:21  9  feature for Deposit@Home?

08:48:23  10  ANSWER:  Deposit@Home was introduced on our

08:48:28  11  USAA.com platform, which authenticated any member who

08:48:38  12  wished to access account information or perform account

08:48:42  13  transactions.

08:48:42  14     QUESTION:  Has USAA valued the identity

08:48:47  15  authentication feature in its Deposit@Home and

08:48:50  16  Deposit@Mobile products?

08:48:51  17     ANSWER:  Not that I'm aware of.

08:48:53  18     QUESTION:  And does USAA's remote deposit capture

08:48:56  19  products verify the check amount?

08:48:58  20     ANSWER:  We verify -- and this was in from the

08:49:06  21  beginning, as well -- that the amount written on the check,

08:49:10  22  the numeric amount is read and verified that it matches the

08:49:16  23  amount that the user, the member, has typed into the

08:49:22  24  deposit amount field as part of the application.

08:49:24  25     QUESTION:  And when you say "was at the

08:49:38  1   beginning," what do you mean by "was at the beginning"?

08:49:40  2        ANSWER:  At the beginning of our remote deposit

08:49:44  3   capture products, which started with Deposit@Home.  So that

08:49:46  4   was in place at the beginning of Deposit@Home.  Then, of

08:49:51  5   course, remained in place and enabled us to also introduce

08:49:55  6   Deposit@Mobile.

08:49:55  7        QUESTION:  Has USAA valued amount verification in

08:50:03  8   its remote deposit capture product?

08:50:05  9        ANSWER:  Not that I'm aware of.

08:50:07  10       QUESTION:  And going back to the example that we

08:50:14  11  keep going back to, if a -- if a person goes into a -- or

08:50:18  12  the USAA branch in San Antonio to deposit a check, they

08:50:21  13  have to fill out a deposit slip.  Are there processes by

08:50:26  14  which the amount on the deposit slip is compared and

08:50:29  15  matched with the amount on the check?

08:50:30  16       ANSWER:  I believe there are, again, as part of

08:50:35  17  the batch process, not an on demand process.  I would also

08:50:40  18  think -- don't have detailed knowledge -- that also the

08:50:44  19  teller is able to look at what you wrote in your deposit

08:50:47  20  slip and what's on the check to -- to make a correction at

08:50:52  21  that point.

08:50:53  22       QUESTION:  And the teller's visual check, plus the

08:51:02  23  batch processes, those were in place prior to remote

08:51:06  24  deposit capture being developed by USAA, correct?

08:51:09  25       ANSWER:  In the batch environment, correct.

08:51:13  1          QUESTION:  Mr. Easley, I'm handing you what's been

08:51:16  2   marked as Exhibit 3.  It's an article from the New York

08:51:19  3   Times entitled, Bank Will Allow Customers to Deposit Checks

08:51:23  4   By iPhone.

08:51:24  5          Do you see that?

08:51:24  6          ANSWER:  I see that.

08:51:25  7          QUESTION:  What's the date on that article?

08:51:27  8          ANSWER:  The date is August 9th, 2009.

08:51:29  9          QUESTION:  Do you know Wayne Peacock?

08:51:32  10         ANSWER:  I do.

08:51:35  11         QUESTION:  It says here he's the USAA executive

08:51:38  12   vice president; is that correct?

08:51:39  13         ANSWER:  That's correct.

08:51:39  14         QUESTION:  Or at least was at the time in 2009?

08:51:42  15         ANSWER:  That's correct.

08:51:42  16         QUESTION:  Is Mr. Peacock still with USAA?

08:51:46  17         ANSWER:  He is still with USAA.

08:51:48  18         QUESTION:  And what is his position currently?

08:51:50  19         ANSWER:  He's the president of our property and

08:51:53  20   casualty company.

08:51:54  21         QUESTION:  Over the -- over your tenure at USAA,

08:52:05  22   did you have occasion to work with Mr. Peacock?

08:52:07  23         ANSWER:  I have, yes.

08:52:08  24         QUESTION:  Do you find him competent?

08:52:10  25         ANSWER:  I do.

08:52:11   1          QUESTION:   On the first page, Mr. Peacock is

08:52:32   2   quoted as saying:   We're essentially taking an image of a

08:52:36   3   check, and once you hit the send button, that image is

08:52:39   4   going into your deposit-taking system as any other check

08:52:42   5   would.

08:52:43   6          Do you see that?

08:52:44   7          ANSWER:   I see it.

08:52:45   8          QUESTION:   Is Mr. Peacock talking about the remote

08:52:47   9   deposit capture feature for USAA or product?

08:52:48   10         ANSWER:   He is.

08:52:52   11         QUESTION:   If you go to the second page, it's the

08:52:56   12  third paragraph down, Mr. Peacock is quoted as saying:

08:53:04   13  Mobile is going to be a bigger part of how people do

08:53:07   14  commerce and how they interact with our financial

08:53:09   15  institutions.   The great value that we see is the time

08:53:11   16  savings.

08:53:13   17         Do you see that?

08:53:14   18         ANSWER:   I do see that.

08:53:16   19         QUESTION:   Do you agree with Mr. Peacock as of

08:53:18   20  2009, the great value to remote deposit capture is through

08:53:22   21  time savings?

08:53:24   22         ANSWER:   What I believe he meant was saving our

08:53:30   23  members' time by not having to drive to a bank branch to

08:53:37   24  make a deposit.

08:53:38   25         QUESTION:   And do you agree with that?

08:53:39  1          ANSWER:  I do.

08:53:40  2          QUESTION:  And Mr. Peacock didn't mention anything

08:53:45  3   about fraud, did he, when he's talking about the great

08:53:47  4   value of the product?

08:53:48  5          ANSWER:  Again, I believe he's referring to value

08:53:53  6   to our members only.

08:53:55  7          QUESTION:  So in the paragraph I just read to you,

08:53:58  8   the ability reduced the potential of fraud is in the

08:54:00  9   context of customer eligibility, correct?

08:54:03  10         ANSWER:  I think it's "in the context of" that's

08:54:09  11  throwing me.  So that's my qualification, which is

08:54:16  12  introducing it to members of creditworthiness and insurance

08:54:24  13  members, as it's stated, is a way to reduce the potential

08:54:28  14  of fraud.

08:54:29  15         QUESTION:  So the methods that potentially reduce

08:54:35  16  fraud that we talked about earlier, MICR line validation,

08:54:44  17  you know, account number authentication, identity

08:54:46  18  verification, all those features, none of those are

08:54:51  19  mentioned in this article; is that right?

08:54:52  20         ANSWER:  They're not mentioned in this article.

08:54:54  21         QUESTION:  Any other things outside of the context

08:54:56  22  of mobile deposit check deposit that you can think of to

08:54:59  23  help reduce fraud for USAA?

08:55:01  24         ANSWER:  I would think your standard industry

08:55:03  25  practices are at play.  I'm just not --

08:55:05  1          QUESTION:  Can you give me some examples?

08:55:07  2          ANSWER:  So there are fraud prevention services

08:55:23  3    that have existed that are -- I don't know the proper term,

08:55:33  4    but where -- services are provided where bank customers may

08:55:38  5    have defrauded or taken other banks for a loss.  Their

08:55:44  6    information is collected and provided for a service to

08:55:48  7    banks as sort of the feed into their risk profile systems.

08:55:55  8          So -- so banks know if you have caused a lot of

08:55:58  9    damage somewhere else, your name and Social Security number

08:56:02  10   could be provided through a service as a -- as a way for

08:56:06  11   you to -- the customer bank of that service to know whether

08:56:10  12   this is a higher-risk profile than someone else.  But

08:56:14  13   that's the example I can think of.

08:56:16  14         QUESTION:  And a -- and a high-risk profile

08:56:19  15   meaning to -- to extend a loan or allow you to open an

08:56:24  16   account up?

08:56:25  17         ANSWER:  That's correct.

08:56:26  18         QUESTION:  Okay.  Are there also mechanisms by

08:56:29  19   which a customer, or -- strike that.

08:56:33  20         Are there also mechanisms by which the bank use to

08:56:40  21   screen -- to screen the customer before they're given a

08:56:43  22   loan or open an account to make sure that they're going to

08:56:47  23   be trustworthy?

08:56:49  24         ANSWER:  It depends on the product line, but,

08:56:55  25   effectively, lending products, credit cards, loans will

08:57:00  1  typically have an underwriting department for that purpose.

08:57:05  2       QUESTION:  What about a checking account?

08:57:07  3       ANSWER:  Many banks do.  I don't know that all

08:57:13  4  banks do, depending on their size and risk profiles.

08:57:18  5       QUESTION:  What about USAA?

08:57:19  6       ANSWER:  At the time of our remote deposit capture

08:57:24  7  products, I would say roughly 2000 -- in terms of offering

08:57:31  8  to members, 2006 through 2012, 2013, we developed a much

08:57:40  9  more robust deposits underwriting system that allowed us to

08:57:45  10 expand eligibility for the service well past where

08:57:49  11 Mr. Peacock mentioned in 2009.

08:57:58  12      QUESTION:  What about things like minimum

08:58:00  13 balances?  Does a minimum balance help prevent fraud?

08:58:06  14      ANSWER:  My experience was, minimum balance was a

08:58:12  15 typical product construct which we did not employ to

08:58:19  16 encourage use of the account versus just keeping a -- a

08:58:23  17 shell account open.

08:58:24  18      Could that reduce fraud?  I think it has a

08:58:32  19 potential, but I think the primary purpose was to reduce

08:58:35  20 inactive accounts and reduce -- you know, potentially

08:58:38  21 reduce just losses, as well.

08:58:41  22      QUESTION:  What about a maximum withdrawal limit

08:58:48  23 on a checking account?  Does USAA have those?

08:58:50  24      ANSWER:  USAA does have transaction limits in

08:58:52  25 place, yes.

08:58:52  1              QUESTION:  For checking accounts?

08:58:53  2              ANSWER:  For checking accounts.

08:58:54  3              QUESTION:  Does that reduce fraud?

08:58:55  4              ANSWER:  It can -- it helps reduce fraud, yes.  Or

08:59:07  5    fraud losses, effectively.

08:59:10  6              QUESTION:  But just -- can you make a comparison

08:59:13  7    of the value of those fraud-reducing features that we

08:59:19  8    talked about earlier with making it easier for customers to

08:59:21  9    do banking?  Which one is more valuable, in your view?

08:59:25  10             ANSWER:  I don't know that's a valid comparison

08:59:39  11   because no bank, even if they wanted to, can offer a

08:59:42  12   service that is unsafe and unsound.

08:59:45  13             The other side of it, the value to the customer is

08:59:52  14   implied by the product itself.  So I just see those as two

09:00:00  15   different dimensions.

09:00:02  16             QUESTION:  Has USAA done any studies or

09:00:04  17   comparisons or comparative value analysis of its

09:00:08  18   fraud-reducing features that we discussed, compared to any

09:00:13  19   other features in the asserted patents?

09:00:16  20             ANSWER:  Not that I'm aware of.

09:00:21  21             QUESTION:  Are the fraud-reducing features in the

09:00:24  22   asserted patents more or less valuable than reducing costs

09:00:27  23   for the bank?

09:00:29  24             ANSWER:  The fraud prevention features, as I call

09:00:45  25   them table stakes, are required to operate the service.

09:00:51  1  Without those features, the service, in my -- my view,

09:00:56  2  cannot be operated.  So that's what I mean by table stakes.

09:01:02  3       QUESTION:  Are you aware if anyone has taken a

09:01:05  4  license to USAA's patent portfolio?

09:01:07  5       ANSWER:  I am not aware.

09:01:08  6       QUESTION:  So prior to October 2006 when this --

09:01:17  7  when this email was written, which is Exhibit 5 to your

09:01:21  8  previous deposition, are you aware of a check deposit using

09:01:25  9  RDC capture via a camera?

09:01:28  10       ANSWER:  I'm not aware of a successful, what I

09:01:39  11  call live money deposits, prior to that period.

09:01:42  12       QUESTION:  Are you aware of a successful use of a

09:01:44  13  camera to capture an image that could be processed by the

09:01:48  14  RDC product at USAA prior to October -- prior to October of

09:01:57  15  2006?

09:01:58  16       ANSWER:  I'm not specifically aware whether we --

09:02:00  17  that team did that or not.

09:02:02  18       QUESTION:  But as we talked about before,

09:02:04  19  duplicate detection, amount verification, endorsement

09:02:06  20  checking, customer authentication, those are all things

09:02:10  21  done either via the teller or through some back end process

09:02:17  22  at the time of the asserted inventions?

09:02:21  23       ANSWER:  Yes.  And relied -- that process relied

09:02:27  24  upon physical possession of the check item.

09:02:30  25       QUESTION:  Do you have any understanding or belief

| | | |
|---|---|---|
| 09:02:34 | 1 | as to whether Wells Fargo copied USAA's remote deposit |
| 09:02:39 | 2 | technology? |
| 09:02:40 | 3 | ANSWER:  I don't have a -- I'm not aware if they |
| 09:02:44 | 4 | did or did not. |
| 09:02:46 | 5 | QUESTION:  As you sit here today, you don't have |
| 09:02:48 | 6 | any facts or documents or any other evidence to suggest |
| 09:02:52 | 7 | that Wells Fargo copied USAA's remote deposit capture |
| 09:02:56 | 8 | technology? |
| 09:02:57 | 9 | ANSWER:  I think all that we know is just publicly |
| 09:03:04 | 10 | available information in terms of what Wells Fargo offers. |
| 09:03:08 | 11 | It appears to be a very similar service, and I -- I can't |
| 09:03:11 | 12 | speak to whether there was actually copying or not. |
| 09:03:15 | 13 | (Videoclip ends.) |
| 09:03:18 | 14 | THE COURT:  Does that complete this witness by |
| 09:03:20 | 15 | deposition? |
| 09:03:21 | 16 | MS. GLASSER:  It does, Your Honor. |
| 09:03:22 | 17 | THE COURT:  All right.  Do you have additional |
| 09:03:23 | 18 | witnesses by deposition? |
| 09:03:24 | 19 | MS. GLASSER:  We do. |
| 09:03:25 | 20 | THE COURT:  Please proceed. |
| 09:03:26 | 21 | MS. GLASSER:  USAA calls Mr. Nathan McKinley, vice |
| 09:03:33 | 22 | president and corporate representative, by deposition. |
| 09:03:49 | 23 | THE COURT:  And, Ms. Glasser, this is vice |
| 09:03:51 | 24 | president and corporate representative for? |
| 09:03:53 | 25 | MS. GLASSER:  For USAA. |

| | | |
|---|---|---|
| 09:03:54 | 1 | THE COURT:  Thank you. |
| 09:04:00 | 2 | (Videoclip played.) |
| 09:04:02 | 3 | QUESTION:  Good morning.  Will you please tell us |
| 09:04:08 | 4 | your name? |
| 09:04:09 | 5 | ANSWER:  Good morning.  It's Nathan McKinley. |
| 09:04:11 | 6 | QUESTION:  Who is your current employer? |
| 09:04:13 | 7 | ANSWER:  USAA. |
| 09:04:14 | 8 | QUESTION:  What is your current title? |
| 09:04:15 | 9 | ANSWER:  Vice president, head of corporate |
| 09:04:21 | 10 | development. |
| 09:04:23 | 11 | Correct. |
| 09:04:23 | 12 | QUESTION:  And Zelle is offered by a company |
| 09:04:25 | 13 | that's owned in part by Wells Fargo, correct? |
| 09:04:27 | 14 | ANSWER:  It is. |
| 09:04:27 | 15 | QUESTION:  And how does Wells Fargo and its |
| 09:04:36 | 16 | co-owners charge USAA for the use of its technology? |
| 09:04:38 | 17 | ANSWER:  They charge us a lot.  So if a USAA |
| 09:04:44 | 18 | member -- you know, so an E-3 wants to send money to his |
| 09:04:48 | 19 | buddy in -- in Delaware and he happens to be at WSFS or a |
| 09:04:53 | 20 | local bank and he -- and that particular customer is not a |
| 09:04:58 | 21 | member of Zelle, USAA would have to pay 60 cents for that |
| 09:05:02 | 22 | one transaction.  And then you start doing the math, and |
| 09:05:06 | 23 | you start having millions and millions of these |
| 09:05:09 | 24 | transactions, it starts to become quite expensive, you |
| 09:05:12 | 25 | know, very quickly for a USAA member to send money to -- to |

09:05:15  1   somebody else.

09:05:17  2            (Videoclip ends.)

09:05:19  3            THE COURT:  That completes this witness?

09:05:21  4            MS. GLASSER:  It does, Your Honor.

09:05:22  5            THE COURT:  Call your next witness.

09:05:23  6            MS. GLASSER:  USAA calls Mr. Nishant Usapkar,

09:05:34  7   Wells Fargo mobile engineer, by deposition.

09:05:46  8            (Videoclip played.)

09:05:47  9            QUESTION:  Good morning.  State your name for the

09:05:50 10   record.

09:05:50 11            ANSWER:  My name is Nishant Usapkar.

09:05:52 12            QUESTION:  What's your position at Wells Fargo,

09:05:53 13   sir?

09:05:53 14            ANSWER:  I am an analytics manager at Wells Fargo.

09:05:58 15            QUESTION:  Were you involved in Wells Fargo's

09:06:04 16   mobile remote deposit capture program?

09:06:04 17            ANSWER:  I was involved with the wholesale Mobile

09:06:09 18   Deposit program.

09:06:14 19            QUESTION:  Is the answer to my question "yes" or

09:06:18 20   "no"?

09:06:18 21            ANSWER:  Are you talking -- referring to the --

09:06:21 22   there are two programs.  One is what is referred to as CEO

09:06:25 23   Mobile, Mobile Deposit program, which is for wholesale

09:06:28 24   customers.  Yes, I was involved if that's what your

09:06:31 25   question was.  I was not involved with the retail Mobile

09:06:35  1    Deposit program.

09:06:36  2            QUESTION:  So approximately in 2007, or

09:06:39  3    thereabouts, the CEO Mobile program became live, fair?

09:06:44  4            ANSWER:  CEO Mobile application, yes.  CEO, 2007

09:06:47  5    or 2008, I will say between that.

09:06:49  6            QUESTION:  And what is the CEO Mobile application?

09:06:51  7            ANSWER:  So CEO Mobile application is a mobile

09:06:55  8    channel, you could call it.  It's a web-based or mobile app

09:07:01  9    which allows our wholesale customers to be able to carry

09:07:03  10   out their functions, which they typically will do on a

09:07:07  11   desktop-based web application.

09:07:09  12           QUESTION:  Is there a mobile device app associated

09:07:13  13   with it?

09:07:13  14           ANSWER:  It -- there is now.  When the program

09:07:16  15   started initially, it was just a web-based.

09:07:20  16           QUESTION:  Now, in terms of -- that was the system

09:07:24  17   that would control the camera to take the picture and

09:07:27  18   acquire the image and input data.

09:07:29  19           What about the systems that evaluated the image,

09:07:36  20   processed the image, who was responsible for that?

09:07:40  21           ANSWER:  That was not my team.

09:07:41  22           QUESTION:  I understand that, sir.  Who was

09:07:42  23   responsible for it?

09:07:43  24           ANSWER:  So there was a team which is called

09:07:47  25   Desktop Deposit, which handled the browser-based

09:07:51  1  interaction, right, the web browser application, which was

09:07:55  2  there already, which was called Desktop Deposit.  The same

09:07:57  3  team managed the back end.

09:08:00  4      QUESTION:  Desktop Deposit was the system that

09:08:04  5  allows you to deposit checks using your desktop, correct?

09:08:07  6      ANSWER:  That's correct, yeah.  You need to have a

09:08:11  7  scanner.  At that time, it was called a Panini scanner.  At

09:08:16  8  that time, at least, they needed a scanner to scan the

09:08:18  9  checks.

09:08:19  10     QUESTION:  So you were tasked with developing a

09:08:21  11 system to acquire images of checks for the Mobile CEO [sic]

09:08:27  12 platform, fair?

09:08:28  13     ANSWER:  My team, yes.

09:08:29  14     QUESTION:  And Wells Fargo, before the point where

09:08:32  15 you were tasked with that in 2010/2011, had no historical

09:08:40  16 mobile app that was acquiring images, fair?

09:08:42  17     ANSWER:  Not to my knowledge.  We were the first

09:08:46  18 team in Wells Fargo which did build a mobile app.  There

09:08:51  19 were, obviously, a lot of desktop-based check image, but if

09:08:55  20 I remember correctly, wholesale was the first team in Wells

09:08:59  21 Fargo to build a mobile check capture.

09:09:01  22     QUESTION:  Check 21 is what motivated your team or

09:09:06  23 Wells Fargo to begin to develop mobile image acquisition;

09:09:13  24 is that correct?

09:09:13  25     ANSWER:  I won't frame it that way.  Check 21

09:09:17  1  happened long time back.  I don't even remember when Check

09:09:21  2  21 was done.  That was not -- it was just something which

09:09:24  3  enabled all banks to do it.  So that was not the driving

09:09:28  4  factor.

09:09:29  5          QUESTION:  Okay.  So Check 21 was not the driving

09:09:31  6  factor for the mobile development program?

09:09:34  7          ANSWER:  I won't say that was the only driving

09:09:36  8  factor.

09:09:37  9          QUESTION:  Okay.  And, in fact, Check 21 was

09:09:39  10  passed many years before Wells Fargo became inspired to

09:09:42  11  create mobile device image capture in 2010 and 2011, fair?

09:09:47  12          ANSWER:  Check 21 was passed some years back.  I

09:09:51  13  don't know the exact date when it was passed.

09:09:53  14          QUESTION:  Did the consumer mobile development

09:09:57  15  take advantage of the wholesale development?

09:10:01  16          ANSWER:  Yeah, so at that time, they were -- and I

09:10:15  17  don't know how the team is now, but wholesale and consumer

09:10:18  18  were totally different tech teams supporting two totally

09:10:22  19  different organizations.  So we didn't interact much with

09:10:25  20  that team.

09:10:25  21          QUESTION:  When you were developing your mobile

09:10:29  22  check deposit app, did you examine mobile check deposit

09:10:35  23  apps of any other companies?

09:10:36  24          ANSWER:  No, I did not.

09:10:38  25          QUESTION:  Now, you stated that in 2008 or

09:10:44  1  thereabouts, the first iPhone came into existence, fair

09:10:49  2  point?

09:10:50  3          ANSWER:  2008?  That's what I remember, 2008,

09:10:53  4  right.  That's when iOS was launched, or 2007, one of those

09:10:57  5  years.

09:10:57  6          QUESTION:  Did you ask any members of your team to

09:11:00  7  investigate whether it violated any other company's

09:11:04  8  intellectual property?

09:11:04  9          ANSWER:  I don't remember asking any of my

09:11:06  10  developers to do that kind of thing.

09:11:08  11          QUESTION:  In other words, to be clear, what you

09:11:11  12  did is -- the iPhone, before you developed your specialized

09:11:18  13  software for mobile check deposit, was just a general

09:11:23  14  purpose camera with a general purpose computer, correct?

09:11:25  15          ANSWER:  The iPhone is a general purpose computer,

09:11:30  16  yes.

09:11:31  17          QUESTION:  And it has a general purpose camera on

09:11:34  18  it, correct?

09:11:34  19          ANSWER:  Yeah, any mobile device will have a

09:11:38  20  general purpose camera on it, that's right.

09:11:40  21          (Videoclip ends.)

09:11:40  22          THE COURT:  Does that complete this witness,

09:11:42  23  counsel?

09:11:42  24          MS. GLASSER:  It does, Your Honor.

09:11:43  25          THE COURT:  Call your next witness.

| | | |
|---|---|---|
| 09:11:47 | 1 | MS. GLASSER:  USAA calls Ms. Margot |
| 09:11:51 | 2 | Lockwood-Stein, corporate representative for Wells Fargo. |
| 09:11:54 | 3 | This testimony will be presented in part by video |
| 09:11:57 | 4 | deposition, and then there was a portion of testimony that |
| 09:12:00 | 5 | was not videoed, which will be read into the record. |
| 09:12:03 | 6 | THE COURT:  All right.  Proceed.  We'll begin with |
| 09:12:08 | 7 | the video portion. |
| 09:12:10 | 8 | (Videoclip played.) |
| 09:12:11 | 9 | QUESTION:  Good morning, ma'am.  Can you state |
| 09:12:13 | 10 | your full name for the record? |
| 09:12:13 | 11 | ANSWER:  Sure.  It's Margot Lockwood-Stein. |
| 09:12:17 | 12 | QUESTION:  Are you employed at Wells Fargo? |
| 09:12:18 | 13 | ANSWER:  Yes, I am. |
| 09:12:19 | 14 | QUESTION:  How long have you been involved with |
| 09:12:23 | 15 | mobile remote deposit capture at Wells Fargo? |
| 09:12:24 | 16 | ANSWER:  So I have been working on mobile remote |
| 09:12:32 | 17 | deposit capture since -- for a long time.  I -- I started |
| 09:12:38 | 18 | looking at mobile remote deposit capture when I was |
| 09:12:41 | 19 | managing the desktop deposit product team and digital |
| 09:12:46 | 20 | payments. |
| 09:12:48 | 21 | QUESTION:  When did -- when were you managing the |
| 09:12:51 | 22 | desktop deposit team? |
| 09:12:53 | 23 | ANSWER:  I managed the desktop deposit team for -- |
| 09:12:58 | 24 | from October 2008 until May of 2010. |
| 09:13:04 | 25 | QUESTION:  You understand that USAA is a financial |

| | | |
|---|---|---|
| 09:13:09 | 1 | institution that serves the military and their family, |
| 09:13:12 | 2 | correct? |
| 09:13:12 | 3 | ANSWER:  Yes. |
| 09:13:13 | 4 | QUESTION:  In March of 2010, Wells Fargo had no |
| 09:13:19 | 5 | mobile remote deposit capture system that was available for |
| 09:13:23 | 6 | retail customers, correct? |
| 09:13:24 | 7 | ANSWER:  So I -- I can't say what the definition |
| 09:13:31 | 8 | of mobile remote deposit capture was in March of 2010.  I |
| 09:13:41 | 9 | can tell you that I worked on the -- the desktop deposit |
| 09:13:44 | 10 | service, and, you know, when I would -- would be testing |
| 09:13:51 | 11 | the product, I would bring the scanner with me to work to |
| 09:13:55 | 12 | test it, at home to test it. |
| 09:13:58 | 13 | So I don't -- I don't really know what the |
| 09:14:01 | 14 | definition was at that time, but looking at the definition |
| 09:14:05 | 15 | today of, you know, mobile -- my -- my definition of a |
| 09:14:12 | 16 | mobile remote deposit capture system would be with a |
| 09:14:14 | 17 | smartphone, but I -- I don't know what the definition was |
| 09:14:17 | 18 | at the time. |
| 09:14:18 | 19 | QUESTION:  So your testimony is you don't know |
| 09:14:20 | 20 | what the definition of mobile remote deposit capture meant |
| 09:14:22 | 21 | in March of 2010, fair? |
| 09:14:26 | 22 | ANSWER:  Yeah.  That's correct. |
| 09:14:27 | 23 | QUESTION:  And -- and you wrote a document in |
| 09:14:29 | 24 | March of 2010 entitled Mobile Remote Deposit Capture, fair? |
| 09:14:34 | 25 | ANSWER:  I don't recall what my context was at |

09:14:42  1   that time.  It's -- it's been several years, so I can't

09:14:44  2   recall what the context was in 2010.  I don't recall what

09:14:51  3   smartphones were available.  I don't recall, you know, what

09:14:53  4   other mobile devices were available.  So I -- I don't

09:14:56  5   recall that context, yeah.

09:14:57  6        QUESTION:  Exhibit 7 is a Wells Fargo document

09:15:02  7   entitled Mobile Remote Deposit Capture, dated March 2010,

09:15:07  8   correct?

09:15:07  9        ANSWER:  That's correct.

09:15:11 10        QUESTION:  You're listed as one of the two

09:15:14 11   preparers of this document, correct?

09:15:16 12        ANSWER:  That's correct.

09:15:16 13        QUESTION:  In fact, you're listed as the first of

09:15:19 14   the two, correct?

09:15:20 15        ANSWER:  That's correct.

09:15:20 16        QUESTION:  And at that time and in this document,

09:15:25 17   the only commercial bank mobile remote deposit capture

09:15:31 18   system that you direct the reader to is USAA's system,

09:15:36 19   correct?

09:15:36 20        ANSWER:  So as I look at this document today and

09:15:39 21   as -- having skimmed it, it appears that USAA is the only

09:15:45 22   other bank that is mentioned in this document.

09:15:48 23        QUESTION:  And when you were exploring the

09:15:54 24   potential for mobile remote deposit technology, you never

09:16:00 25   contacted USAA, correct?

| | | |
|---|---|---|
| 09:16:01 | 1 | ANSWER:  That's correct. |
| 09:16:01 | 2 | QUESTION:  You never asked anyone to do a patent |
| 09:16:03 | 3 | search on USAA's patents, correct? |
| 09:16:05 | 4 | ANSWER:  I don't recall any.  I don't recall that. |
| 09:16:13 | 5 | (Videoclip ends.) |
| 09:16:16 | 6 | THE COURT:  All right.  Ms. Glasser, you want to |
| 09:16:17 | 7 | proceed with the remainder of this witness by deposition? |
| 09:16:20 | 8 | MS. GLASSER:  Yes, thank you, Your Honor. |
| 09:16:30 | 9 | QUESTION:  And so what we see here is that from |
| 09:16:32 | 10 | the very, very beginning, when mobile deposit was being |
| 09:16:36 | 11 | first considered at Wells Fargo, Wells Fargo recognized |
| 09:16:39 | 12 | that it could have key benefits, correct? |
| 09:16:43 | 13 | ANSWER:  That's right.  There were projected |
| 09:16:46 | 14 | benefits at the time. |
| 09:16:47 | 15 | QUESTION:  And the key benefits included cost |
| 09:16:53 | 16 | savings, correct? |
| 09:16:53 | 17 | ANSWER:  That's what's shown on the -- the |
| 09:16:57 | 18 | document, that's right. |
| 09:16:58 | 19 | QUESTION:  And they also included that MRDC would |
| 09:17:05 | 20 | improve retention and share of wallet, correct? |
| 09:17:08 | 21 | ANSWER:  That was what was in the document and |
| 09:17:11 | 22 | projected at the time, yes. |
| 09:17:12 | 23 | QUESTION:  And, in fact, Wells Fargo anticipated, |
| 09:17:17 | 24 | as well, that there would be a customer wow factor, that |
| 09:17:23 | 25 | having this type of technology would cause Wells Fargo to |

09:17:26  1  appear to be a leadership or an innovator, a leadership and

09:17:31  2  innovation company in the eyes of its customers, correct?

09:17:34  3       ANSWER:  That's right.  That was what was

09:17:37  4  projected at the time.

09:17:38  5       QUESTION:  And this was projected way back in

09:17:42  6  2010, and ultimately all of those things proved to be the

09:17:45  7  case, correct?

09:17:46  8       ANSWER:  No, I would disagree.

09:17:50  9       QUESTION:  Let's -- let's turn to the cost savings

09:17:54  10  information.

09:17:55  11       You do acknowledge that Wells Fargo has enjoyed

09:17:59  12  fairly substantial cost savings from the accused product,

09:18:03  13  correct?

09:18:03  14       ANSWER:  I do.

09:18:06  15       QUESTION:  And, in fact, in the year 2018 alone,

09:18:11  16  Wells Fargo processed 60 million checks just through Mobile

09:18:19  17  Deposit, correct?

09:18:19  18       ANSWER:  Yes, that's approximately right.

09:18:21  19       QUESTION:  Can you look at Exhibit 28, PX-28?

09:18:31  20       And this was a document that you put together and

09:18:34  21  produced in this case, correct?

09:18:36  22       ANSWER:  Yes, yes, it is.

09:18:40  23       QUESTION:  And so if we go to the 2018 column as

09:18:48  24  an example, we see that in 2018, in total costs, Wells

09:18:57  25  Fargo incurred more than $2.75 every single time a consumer

| | | |
|---|---|---|
| 09:19:01 | 1 | deposited a check at a teller; is that right? |
| 09:19:04 | 2 | ANSWER:  That's correct. |
| 09:19:08 | 3 | QUESTION:  And when a consumer deposited a check |
| 09:19:11 | 4 | through an ATM, the number was $1.58, a little bit more |
| 09:19:17 | 5 | than that, correct? |
| 09:19:18 | 6 | ANSWER:  That's correct. |
| 09:19:18 | 7 | QUESTION:  So when we look at those compared to |
| 09:19:27 | 8 | Mobile Deposit, which was about 35 cents, correct -- |
| 09:19:30 | 9 | ANSWER:  Yes, that's right. |
| 09:19:31 | 10 | QUESTION:  -- we can see that every single time a |
| 09:19:36 | 11 | consumer is depositing one of those 60 million checks in |
| 09:19:39 | 12 | 2018, they're saving Wells Fargo at least a dollar, |
| 09:19:44 | 13 | correct? |
| 09:19:44 | 14 | ANSWER:  Yes, that's right. |
| 09:19:47 | 15 | QUESTION:  And, in fact, there -- it's most likely |
| 09:19:53 | 16 | more than that because the teller ones are quite a bit more |
| 09:19:56 | 17 | expensive, correct? |
| 09:19:57 | 18 | ANSWER:  Well, it depends on the split, but, yes. |
| 09:20:02 | 19 | The teller ones are definitely more expensive. |
| 09:20:05 | 20 | QUESTION:  And so when we're talking about |
| 09:20:08 | 21 | 60 million mobile deposits per year, even just 1 or $2.00 |
| 09:20:16 | 22 | per check, it adds up to a pretty large number, correct? |
| 09:20:19 | 23 | ANSWER:  Yes, it does. |
| 09:20:20 | 24 | QUESTION:  And, specifically, it adds up to |
| 09:20:23 | 25 | somewhere between 60 and $120 million just for 2018, |

| | | |
|---|---|---|
| 09:20:30 | 1 | correct? |
| 09:20:30 | 2 | ANSWER:  Yes, that's correct. |
| 09:20:35 | 3 | (Videoclip ends.) |
| 09:20:35 | 4 | THE COURT:  That completes the testimony of this |
| 09:20:38 | 5 | witness? |
| 09:20:39 | 6 | MS. GLASSER:  It does, Your Honor. |
| 09:20:40 | 7 | THE COURT:  Do you have additional deposition |
| 09:20:41 | 8 | witnesses to present? |
| 09:20:42 | 9 | MS. GLASSER:  No, Your Honor. |
| 09:20:43 | 10 | THE COURT:  All right.  Plaintiff, call your next |
| 09:20:50 | 11 | witness. |
| 09:20:50 | 12 | MR. SHEASBY:  Your Honor, Plaintiff rests its |
| 09:20:53 | 13 | case. |
| 09:20:53 | 14 | THE COURT:  All right.  Plaintiff has rested its |
| 09:20:58 | 15 | case-in-chief. |
| 09:20:59 | 16 | We'll proceed to take up Defendant's |
| 09:21:01 | 17 | case-in-chief. |
| 09:21:01 | 18 | Is Defendant prepared to call its first witness? |
| 09:21:03 | 19 | MR. MELSHEIMER:  We are, Your Honor. |
| 09:21:04 | 20 | THE COURT:  Please do. |
| 09:21:05 | 21 | MR. MELSHEIMER:  Your Honor, the Defendant calls |
| 09:21:08 | 22 | Mr. Al Hecht. |
| 09:21:09 | 23 | THE COURT:  All right.  Mr. Hecht, if you'll come |
| 09:21:15 | 24 | forward and be sworn, please? |
| 09:21:17 | 25 | (Witness sworn.) |

675

09:21:18  1        THE COURT:  Please come around, sir, and have a

09:21:28  2  seat on the witness stand.

09:21:37  3        MR. MELSHEIMER:  Your Honor, may I approach the

09:21:40  4  Courtroom Security Officer to hand the witness a binder?

09:21:42  5        THE COURT:  You may approach.

09:21:51  6        Are there other copies to distribute?  Let's do

09:21:54  7  that.

09:21:54  8        MR. MELSHEIMER:  Yes, Your Honor.  May I?

09:22:02  9        THE COURT:  All right.  Counsel, you may proceed

09:22:03 10  when you're ready.

09:22:04 11        MR. MELSHEIMER:  May it please the Court.

09:22:04 12            AL HECHT, DEFENDANT'S WITNESS, SWORN

09:22:04 13                     DIRECT EXAMINATION

09:22:05 14  BY MR. MELSHEIMER:

09:22:05 15  Q.  Mr. Hecht, good morning.

09:22:12 16  A.  Good morning.

09:22:13 17  Q.  Would you please introduce yourself to the ladies and

09:22:17 18  gentleman of the jury?

09:22:18 19  A.  Yes, my name is Al Hecht.

09:22:20 20  Q.  Where are you employed, Mr. Hecht?

09:22:22 21  A.  I work for Wells Fargo Bank.

09:22:24 22  Q.  What is your title at Wells Fargo?

09:22:26 23  A.  I'm a senior vice president at Wells Fargo.

09:22:30 24  Q.  Are you serving as Wells Fargo's corporate

09:22:35 25  representative during this jury trial?

| | | |
|---|---|---|
| 09:22:36 | 1 | A.  Yes, I am. |
| 09:22:37 | 2 | Q.  Can you tell the jury your understanding of what that |
| 09:22:39 | 3 | means? |
| 09:22:39 | 4 | A.  I'm representing both myself and I'm also representing |
| 09:22:43 | 5 | Wells Fargo Bank. |
| 09:22:45 | 6 | Q.  How long, sir, have you worked in the banking business |
| 09:22:48 | 7 | as a whole? |
| 09:22:48 | 8 | A.  Over 30 years. |
| 09:22:53 | 9 | Q.  Since about 1985? |
| 09:22:55 | 10 | A.  That's correct, sir. |
| 09:22:56 | 11 | Q.  Let's start out with a little bit about your |
| 09:22:59 | 12 | background.  Would you tell the jury a little bit about |
| 09:23:01 | 13 | yourself personally, sir? |
| 09:23:02 | 14 | A.  Sure.  I live in California.  I am married.  I've been |
| 09:23:06 | 15 | married for 30 years.  I have two children, a 27-year-old |
| 09:23:10 | 16 | boy and a 22-year-old daughter. |
| 09:23:13 | 17 | Q.  Where were you born and raised, sir? |
| 09:23:15 | 18 | A.  I was born in Pittsburgh, Pennsylvania. |
| 09:23:18 | 19 | Q.  Big family or small family? |
| 09:23:21 | 20 | A.  A pretty large family. |
| 09:23:22 | 21 | Q.  What did your parents do for work? |
| 09:23:24 | 22 | A.  My parents -- my mother was a waitress, and my father |
| 09:23:28 | 23 | was a bus driver. |
| 09:23:29 | 24 | Q.  Did you go to college, Mr. Hecht? |
| 09:23:31 | 25 | A.  Yes, I did. |

| | | |
|---|---|---|
| 09:23:32 | 1 | Q.  Where did you go to college? |
| 09:23:33 | 2 | A.  I went to Clarion University in Pennsylvania. |
| 09:23:37 | 3 | Q.  Did you pay your own way to college? |
| 09:23:40 | 4 | A.  Yes, I did.  I paid my whole way through college. |
| 09:23:42 | 5 | Q.  When did you graduate? |
| 09:23:43 | 6 | A.  I graduated in 1985. |
| 09:23:46 | 7 | Q.  What type of degree did you graduate with, sir? |
| 09:23:49 | 8 | A.  I graduated with a degree in computer science. |
| 09:23:52 | 9 | Q.  What is computer science? |
| 09:23:54 | 10 | A.  Computer science is the study of the science of the |
| 09:23:58 | 11 | computer, as well as it's -- it's strongly based in math. |
| 09:24:03 | 12 | Q.  Are you good at math? |
| 09:24:04 | 13 | A.  Yes, I like math a lot. |
| 09:24:05 | 14 | Q.  Is that why you got into computer science? |
| 09:24:07 | 15 | A.  Yes, it is. |
| 09:24:08 | 16 | Q.  Do you know how to write what we've heard in this trial |
| 09:24:11 | 17 | as source code? |
| 09:24:11 | 18 | A.  Yes, I do. |
| 09:24:13 | 19 | Q.  What is source code? |
| 09:24:14 | 20 | A.  Source code is the code that controls the computer. |
| 09:24:19 | 21 | Q.  What sort of source code languages can you read, write, |
| 09:24:25 | 22 | and understand? |
| 09:24:25 | 23 | A.  It's a long list.  I can write in Fortran, Pascal, |
| 09:24:29 | 24 | COBOL, Assembler, C, C++, C#, and SAS and Java and |
| 09:24:39 | 25 | JavaScript. |

678

| | | |
|---|---|---|
| 09:24:39 | 1 | Q.  Mr. Hecht, have you helped me prepare some slides to |
| 09:24:43 | 2 | illustrate some points of your testimony for the jury? |
| 09:24:45 | 3 | A.  Yes, I have, sir. |
| 09:24:46 | 4 | Q.  Do we have a slide here that summarizes your employment |
| 09:24:51 | 5 | and professional background? |
| 09:24:51 | 6 | A.  Yes, we do. |
| 09:24:56 | 7 | Q.  Did you get a job after graduating from college with a |
| 09:24:59 | 8 | computer science degree in 1985? |
| 09:25:01 | 9 | A.  Yes, I did. |
| 09:25:02 | 10 | Q.  Where did you go to work? |
| 09:25:03 | 11 | A.  I went for -- I went to work for Mellon Bank in |
| 09:25:08 | 12 | Pittsburgh, Pennsylvania. |
| 09:25:08 | 13 | Q.  What did you do for Mellon Bank? |
| 09:25:10 | 14 | A.  I was a computer programmer on mainframe systems |
| 09:25:14 | 15 | developing a check processing system. |
| 09:25:15 | 16 | Q.  Did your work at Mellon Bank involve what we've called |
| 09:25:18 | 17 | check imaging? |
| 09:25:19 | 18 | A.  Yes, it did. |
| 09:25:20 | 19 | Q.  How did your work in 1985 involve check imaging? |
| 09:25:24 | 20 | A.  We were actually one of the first in the country to |
| 09:25:29 | 21 | capture check images in the process of our check processing |
| 09:25:32 | 22 | system. |
| 09:25:33 | 23 | Q.  Did you, in fact, build a check processing image system |
| 09:25:37 | 24 | from scratch for Mellon Bank? |
| 09:25:40 | 25 | A.  Yes, we did, sir.  We actually were charged to build on |

| | | |
|---|---|---|
| 09:25:45 | 1 | our own system and wrote a system -- a brand new system |
| 09:25:49 | 2 | from scratch. |
| 09:25:49 | 3 | Q.  Did that work involve working with any check imaging |
| 09:25:53 | 4 | machines, and is one shown on the slide? |
| 09:25:55 | 5 | A.  Yes.  It involved -- if you look on the slide on the |
| 09:26:02 | 6 | bottom left, that's called an IBM 3890 sorter.  It involved |
| 09:26:09 | 7 | controlling that sorter to process checks. |
| 09:26:09 | 8 | Q.  Are these big machines, sir? |
| 09:26:11 | 9 | A.  Yes, they're very large machines.  They take up a whole |
| 09:26:14 | 10 | room. |
| 09:26:14 | 11 | Q.  Are they called reader/sorters? |
| 09:26:17 | 12 | A.  Yes, sir, they're called reader/sorters. |
| 09:26:20 | 13 | Q.  Tell the jury, what is the reader part? |
| 09:26:22 | 14 | A.  Well, if you -- if you look to the left-hand side, the |
| 09:26:25 | 15 | images are put into a hopper, and they're actually -- on |
| 09:26:27 | 16 | the left-hand side, it reads the checks, and that's the |
| 09:26:30 | 17 | reader part of the reader/sorter. |
| 09:26:32 | 18 | Q.  What is being read? |
| 09:26:34 | 19 | A.  We read the MICR line, and then ultimately we'd capture |
| 09:26:37 | 20 | the image.  Those are the types of things that we'd read on |
| 09:26:41 | 21 | the -- on the right -- on the left-hand side of the |
| 09:26:44 | 22 | picture.  That's what the reader is. |
| 09:26:45 | 23 | Q.  You say MICR line.  Does that stand for magnetic image |
| 09:26:50 | 24 | character recognition? |
| 09:26:50 | 25 | A.  Magnetic ink character recognition. |

09:26:54  1  Q.  Ink?  Thank you, Mr. Hecht.

09:26:57  2        Which part is the sorter part of the

09:27:01  3  reader/sorter?

09:27:02  4  A.  The sorter part -- if you look, there's pockets on the

09:27:05  5  left there that go all the way down the machine, and we

09:27:08  6  would sort the checks into those pockets.

09:27:10  7  Q.  How long did you work at Mellon Bank, sir?

09:27:12  8  A.  I worked there for five years.

09:27:14  9  Q.  Where did you work after Mellon Bank?

09:27:16  10  A.  I went to IBM to work at IBM.

09:27:20  11  Q.  What did you do for IBM?

09:27:22  12  A.  I worked on a system at IBM called CPCS that was

09:27:27  13  basically the check processing control system that actually

09:27:31  14  controlled these sorters.

09:27:32  15  Q.  Is IBM the same company that made these reader/sorter

09:27:36  16  machines that you have in front of the jury?

09:27:38  17  A.  It is.  They made the sorters and the software.

09:27:40  18  Q.  What role did the software that you worked on play with

09:27:47  19  these big machines?

09:27:48  20  A.  Yes, it was the controlling software that many banks in

09:27:51  21  the country were using to control these machines.

09:27:52  22  Q.  Is that called CPCS?

09:27:56  23  A.  Yes, sir, it is.

09:27:57  24  Q.  Does that stand for check processing control system?

09:27:59  25  A.  Yes, that's exactly what it is.

| | | |
|---|---|---|
| 09:28:01 | 1 | Q.  What did that software do? |
| 09:28:02 | 2 | A.  Again, it -- it actually would control the sorters and |
| 09:28:07 | 3 | control all the processing of the checks throughout the |
| 09:28:12 | 4 | check processing process. |
| 09:28:13 | 5 | Q.  Were you personally involved in writing that software? |
| 09:28:15 | 6 | A.  Yes.  I was one of the authors of the software that |
| 09:28:19 | 7 | controlled that system. |
| 09:28:19 | 8 | Q.  Is CPCS still being used in banks today? |
| 09:28:23 | 9 | A.  Yes, it is. |
| 09:28:23 | 10 | Q.  Where did you go to work next? |
| 09:28:26 | 11 | A.  Next, I went to Norwest Bank. |
| 09:28:31 | 12 | Q.  Is that shown here on our slide? |
| 09:28:32 | 13 | A.  Yes, sir, it is. |
| 09:28:33 | 14 | Q.  What did you do at Norwest Bank starting in 1991? |
| 09:28:39 | 15 | A.  Norwest Bank was wanting to consolidate for multiple |
| 09:28:44 | 16 | check processing systems down to a single check processing |
| 09:28:48 | 17 | system on the CPCS, the check processing control system, so |
| 09:28:52 | 18 | I was one of the lead engineers actually putting them on to |
| 09:28:57 | 19 | a common system. |
| 09:28:57 | 20 | Q.  Were you involved at Norwest in something called |
| 09:29:00 | 21 | transaction or item processing? |
| 09:29:02 | 22 | A.  Yes, sir, I was. |
| 09:29:03 | 23 | Q.  What is that? |
| 09:29:04 | 24 | A.  So in addition to checks, the processes within the |
| 09:29:11 | 25 | bank, of course, have ATM machines, we had branches, we had |

```
09:29:16   1  debit cards, we had ACH, so all of those things had to be
09:29:20   2  pulled together and actually posted to the customers'
09:29:23   3  accounts so the customers would get their deposits, they
09:29:25   4  would get their checks, they would get their ATM
09:29:29   5  transactions.  So all those things had to come together,
09:29:31   6  and I built that system at Norwest.
09:29:34   7          THE COURT:  Mr. Hecht, would you slow down just a
09:29:36   8  little bit?
09:29:36   9          THE WITNESS:  Yes, sir.  Sorry, Your Honor.
09:29:37  10          THE COURT:  That's fine.  That's fine, but please
09:29:37  11  try to slow down.
09:29:39  12          Go ahead, counsel.
09:29:40  13          MR. MELSHEIMER:  Thank you, Your Honor.
09:29:41  14  Q.  (By Mr. Melsheimer)  What was the next project you
09:29:44  15  worked on at Norwest?  Was it something call the Hogan
09:29:48  16  system?
09:29:48  17  A.  Yes, sir, it was the Hogan system.
09:29:51  18  Q.  What is the Hogan system, as pointed out on this slide,
09:29:54  19  sir?
09:29:54  20  A.  Yes.  The Hogan system is a deposit system.  And so
09:29:57  21  your deposits and savings accounts were actually controlled
09:30:00  22  on the Hogan system.  And so you had all those things that
09:30:05  23  I mentioned before, like your debit card or your ATM
09:30:08  24  transactions or your transactions at the branch or wire
09:30:12  25  transfer.  All those things come together in the Hogan
```

| | | |
|---|---|---|
| 09:30:14 | 1 | system so that you can actually see it within your banking |
| 09:30:19 | 2 | system. |
| 09:30:19 | 3 | Q.  Is the Hogan system still in use today, sir? |
| 09:30:23 | 4 | A.  It is.  It's the core system that's used for deposits |
| 09:30:26 | 5 | and savings even still today. |
| 09:30:28 | 6 | Q.  Including at Wells Fargo? |
| 09:30:29 | 7 | A.  Yes, sir. |
| 09:30:30 | 8 | Q.  Now, did something happen in the mid-1990s that allowed |
| 09:30:36 | 9 | what's called interstate banking? |
| 09:30:39 | 10 | A.  Yes, sir. |
| 09:30:40 | 11 | Q.  What happened? |
| 09:30:40 | 12 | A.  There was a new law that allowed for interstate |
| 09:30:45 | 13 | banking. |
| 09:30:45 | 14 | Q.  What was the state, if you will, of interstate banking |
| 09:30:50 | 15 | before the passage of this law? |
| 09:30:51 | 16 | A.  Well, it was kind of weird.  Customers were not allowed |
| 09:30:55 | 17 | to cross state lines to make a deposit.  So what you had to |
| 09:31:02 | 18 | do is, if you had an account for a bank like Wells Fargo, |
| 09:31:05 | 19 | like you had an account in Texas and you had another |
| 09:31:08 | 20 | account in Louisiana, you would literally -- if you had to |
| 09:31:12 | 21 | make a deposit for the account in Texas, you would have to |
| 09:31:14 | 22 | go to a Texas branch.  And if you had to make your -- a |
| 09:31:18 | 23 | deposit for an account from Louisiana, you had to actually |
| 09:31:23 | 24 | go across the state line and make the deposit in Louisiana. |
| 09:31:25 | 25 | Q.  How did banking change after the passage of the |

09:31:28  1  interstate banking law?

09:31:29  2  A.  You were allowed now to make a deposit anywhere in the

09:31:34  3  U.S., so you didn't have to cross the state line, so it was

09:31:37  4  a big convenience for customers so that now you could make

09:31:40  5  your deposit anywhere -- wherever your bank was no matter

09:31:44  6  where your account was originally opened.

09:31:45  7  Q.  Now, how did the banks back in this time period that

09:31:49  8  you were at Norwest, how did the banks physically transport

09:31:54  9  the checks from one bank to another?

09:31:57  10  A.  Yeah, so the associated checks, it was planes, trains,

09:32:01  11  and automobiles.  So we literally had trucks and cars and

09:32:08  12  planes, both commercial and private planes that would move

09:32:12  13  the checks across the whole country.

09:32:14  14  Q.  Did this network that you just described for the ladies

09:32:18  15  and gentleman of the jury, remain in place even after the

09:32:21  16  passage of the interstate banking act?

09:32:24  17  A.  Yes.  As I mentioned, you could make the deposits

09:32:28  18  across the state lines, but the checks that were in your

09:32:30  19  deposit still had to be presented to the bank wherever they

09:32:32  20  were actually domiciled or wherever the bank was located.

09:32:39  21  Q.  Is that called check presentment?

09:32:42  22  A.  That's exactly what it was called, sir.

09:32:44  23  Q.  Now, at some point, sir, did the Norwest Bank merge

09:32:48  24  with Wells Fargo?

09:32:49  25  A.  Yes, they did.

| | | |
|---|---|---|
| 09:32:50 | 1 | Q.  Was that in the late 1990s? |
| 09:32:53 | 2 | A.  Yes, it was.  It was 1999. |
| 09:32:55 | 3 | Q.  Did you have any involvements in the merger between |
| 09:32:56 | 4 | Wells Fargo and Norwest? |
| 09:32:56 | 5 | A.  Yes.  I was one of the lead architects with that merger |
| 09:32:59 | 6 | between Norwest and Wells Fargo. |
| 09:33:02 | 7 | Q.  What does that mean, sir? |
| 09:33:03 | 8 | A.  What we did in that process and what it means is that |
| 09:33:08 | 9 | when you put together two large companies, you have to |
| 09:33:10 | 10 | figure out what the go-forward systems are going to be.  So |
| 09:33:14 | 11 | we had to choose what all the -- the major systems were |
| 09:33:17 | 12 | going to be, and I was part of that technical team that |
| 09:33:20 | 13 | actually was choosing -- choosing what the go-forward |
| 09:33:23 | 14 | systems were for the combined company. |
| 09:33:25 | 15 | Q.  Now, at some point, did you leave this Norwest/Wells |
| 09:33:30 | 16 | Fargo entity and go to work somewhere else? |
| 09:33:32 | 17 | A.  Yes, sir, I did. |
| 09:33:32 | 18 | Q.  What did you do next? |
| 09:33:34 | 19 | A.  I went to work for IBM again. |
| 09:33:37 | 20 | Q.  In 1999? |
| 09:33:38 | 21 | A.  Yes, in 1999. |
| 09:33:39 | 22 | Q.  Just very briefly, what did you do for IBM? |
| 09:33:42 | 23 | A.  IBM, I worked on e-commerce systems, and those |
| 09:33:48 | 24 | e-commerce systems are systems that allow customers to |
| 09:33:51 | 25 | actually do transactions online. |

09:33:53  1   Q.  Is that like what we would think of as a shopping

09:33:59  2   website like Amazon or something of that nature?

09:34:00  3   A.  Exactly right.  So it's one of the early types of

09:34:03  4   e-commerce sites where goods were actually displayed --

09:34:07  5   typically where we have to go to a -- to a store or brick

09:34:10  6   and mortar to actually buy the goods.  We put them online,

09:34:15  7   just like Amazon does.  You could choose the product that

09:34:17  8   you wanted, and you could have it delivered to your home.

09:34:20  9   Q.  Where did you go to work after you started work for IBM

09:34:22  10  in 1999?

09:34:23  11  A.  I went back to Wells Fargo Bank.

09:34:25  12  Q.  And was that in 2001?

09:34:27  13  A.  Yes, sir, it was.

09:34:28  14  Q.  Have you been there ever since?

09:34:29  15  A.  Yes, I have.

09:34:30  16  Q.  What was your role -- tell the jury, sir, what your

09:34:35  17  role was at Wells Fargo when you rejoined the bank in 2001?

09:34:39  18  A.  Yes.  I was a lead architect for the operations space

09:34:46  19  that included, again, check processing, transaction

09:34:49  20  posting, and image processing for the bank.

09:34:51  21  Q.  Sir, does that mean that you've been involved at Wells

09:34:55  22  Fargo with everything related to checks since 2001?

09:34:58  23  A.  Yes, sir.

09:34:59  24  Q.  Now, since you went back to work at Wells Fargo, have

09:35:04  25  you worked in Internet and mobile banking?

| | | |
|---|---|---|
| 09:35:07 | 1 | A.  Yes, I have. |
| 09:35:08 | 2 | Q.  Have you worked on Mobile Deposit? |
| 09:35:11 | 3 | A.  Yes, I have. |
| 09:35:12 | 4 | Q.  What roles have you had at Wells Fargo with respect to |
| 09:35:16 | 5 | Mobile Deposit? |
| 09:35:16 | 6 | A.  Well, I -- because I was the lead architect relative to |
| 09:35:21 | 7 | the checking process, everything related to check, |
| 09:35:24 | 8 | including Mobile Deposit, I was engaged and would educate |
| 09:35:29 | 9 | and then also make decisions as to how we'd actually |
| 09:35:32 | 10 | process checks. |
| 09:35:32 | 11 | Q.  When did Mobile Deposit begin at Wells Fargo? |
| 09:35:36 | 12 | A.  2012. |
| 09:35:38 | 13 | Q.  Did the bank begin exploring it before it was |
| 09:35:42 | 14 | implemented? |
| 09:35:43 | 15 | A.  Yes, we did. |
| 09:35:44 | 16 | Q.  Do you know exactly when the bank started exploring |
| 09:35:48 | 17 | Mobile Deposit? |
| 09:35:48 | 18 | A.  In the very early 2 -- 2000s. |
| 09:35:50 | 19 | Q.  Do you still currently consult on issues related to |
| 09:35:56 | 20 | Mobile Deposit? |
| 09:35:56 | 21 | A.  Yes, I do. |
| 09:35:57 | 22 | Q.  What are some of the areas connected with Mobile |
| 09:36:01 | 23 | Deposit that you've been personally involved in? |
| 09:36:03 | 24 | A.  So it was the standards as to, you know, how you would |
| 09:36:09 | 25 | actually process the images and -- and what the image |

09:36:13   1   quality was, all the ways that we would have to process

09:36:18   2   them to make sure that they were correct for our customers,

09:36:22   3   and also heavily involved in the fraud components of it.

09:36:25   4   Q.  When you say fraud components, we're going to get into

09:36:29   5   that in a little more detail, but at a high level, what do

09:36:33   6   you mean by you were involved in the fraud components?  I

09:36:35   7   assume you mean fraud prevention components.

09:36:38   8   A.  Yes.  Good call-out.  Yes.  The fraud prevention is

09:36:43   9   what we would focus on to make sure that the fraudsters

09:36:46   10  were not taking advantage of our customers.

09:36:48   11  Q.  Now, do you have any patents related to your work at

09:36:53   12  Wells Fargo in connection with check processing?

09:36:55   13  A.  Yes, sir, I do.

09:36:56   14  Q.  Are you a named inventor on 13 issued patents?

09:37:03   15  A.  Yes, it's 13.

09:37:05   16  Q.  Was it -- was it 12 up -- up until just a few days ago?

09:37:08   17  A.  Yes, I just got another one within the past few days.

09:37:12   18  Q.  And are you also named as an inventor on 61 different

09:37:17   19  patent applications that may still be pending?

09:37:20   20  A.  Yes, 61 patents that are still pending.

09:37:22   21  Q.  Does Wells Fargo have a patent hall of fame, as it

09:37:27   22  were?

09:37:28   23  A.  Yes, they do.

09:37:29   24  Q.  Are you in it?

09:37:30   25  A.  Yes.

09:37:30  1  Q.  Mr. Hecht, does Wells Fargo have a history of being an

09:37:39  2  innovator in the Internet and mobile banking sectors?

09:37:41  3  A.  Absolutely we do.

09:37:42  4  Q.  Do we have a slide to illustrate that?

09:37:45  5  A.  Yes.

09:37:46  6  Q.  So what are some of the innovations that Wells Fargo

09:37:51  7  has been the first to announce, if you could just summarize

09:37:55  8  the -- the three entries on this timeline.

09:37:58  9  A.  Yes.  We were the first in Internet banking.  We were

09:38:01  10  the first in deposit -- remote deposit capture.  And we

09:38:06  11  were the first in mobile banking.

09:38:08  12  Q.  So the Internet banking was in 1995, the first remote

09:38:14  13  deposit capture was 2004, and the first mobile banking was

09:38:18  14  2007?

09:38:19  15  A.  Yes, sir, that's correct.

09:38:20  16  Q.  So I want to ask you a few questions about each of

09:38:23  17  those, sir.  What are some of the services that Wells Fargo

09:38:27  18  offered through Internet banking?  And we have a slide

09:38:32  19  displayed for the jury, don't we, sir?

09:38:33  20  A.  Yes, we do.  So as part of the first Internet bank in

09:38:37  21  1995, we had checking, savings, credit card account

09:38:40  22  balances that you could see online.

09:38:43  23       You could see your transaction history, as opposed

09:38:45  24  to just seeing it on your statement, which is the way it

09:38:48  25  was before that.

09:38:49    1          And then we paid -- added paying bills in 1996 and
09:38:54    2    had a hundred thousand customers a month by 1999, and that
09:38:58    3    was over a million customers total at that time.
09:39:02    4    Q.  Is Internet banking a form of remote banking?
09:39:05    5    A.  It certainly is.
09:39:06    6    Q.  How is it?
09:39:06    7    A.  It was the first time that you really could transact
09:39:10    8    from your home or really anywhere and see online all your
09:39:15    9    transactions and all the things that are listed here.
09:39:18   10    Q.  Could the customer be anywhere in the world where they
09:39:21   11    had an Internet connection?
09:39:22   12    A.  Yes, sir, they could.
09:39:23   13    Q.  How would you describe Wells Fargo's introduction of
09:39:26   14    Internet banking back in 1995?
09:39:28   15    A.  It was extremely innovated and, again, we were leading
09:39:33   16    the way, back at that time.
09:39:34   17    Q.  Was this the beginning of personal banking over the
09:39:37   18    Internet?
09:39:37   19    A.  Yes, sir, it was.
09:39:38   20    Q.  Is remote banking the same or different from mobile
09:39:47   21    banking?
09:39:47   22    A.  Well, mobile banking is a form of remote banking.  So
09:39:55   23    mobile is, again, just one subset of the -- the capability.
09:39:59   24    Q.  Is it -- is mobile banking another way of the customer
09:40:03   25    doing banking without having to go to a physical location?

09:40:06  1   A.  Yes, sir, it is.

09:40:08  2   Q.  Okay.  Let's talk about remote deposit capture.  When

09:40:11  3   did Wells Fargo first offer a remote deposit capture

09:40:15  4   product?

09:40:16  5   A.  That was in 2004.

09:40:20  6   Q.  What was that product called?

09:40:21  7   A.  It was called Desktop Deposit.

09:40:23  8   Q.  Who was the engineer at the bank who developed the

09:40:27  9   Desktop Deposit product?

09:40:28  10  A.  It was Mr. Byron Chun.

09:40:34  11  Q.  Now, as the corporate representative, you've been

09:40:36  12  permitted to be present for the entire trial, sir?

09:40:39  13  A.  Yes, sir, I have.

09:40:41  14  Q.  Do you recall it being said that -- by USAA that the

09:40:46  15  Desktop Deposit product was only offered to large business

09:40:50  16  customers or primarily offered to large business customers?

09:40:52  17  A.  Yes, sir, I remember that.

09:40:53  18  Q.  Is that accurate?

09:40:54  19  A.  No, it's not accurate.

09:40:58  20  Q.  Can you explain why it's inaccurate?

09:40:59  21  A.  It's inaccurate because we offered it to both

09:41:03  22  commercial customers at the beginning and then quickly

09:41:06  23  thereafter, we made it available to small business

09:41:10  24  customers, and then also we had consumer customers that

09:41:13  25  used it also.

09:41:14  1   Q.  Now, we have a slide for that, sir, in front of the

09:41:17  2   jury.

09:41:18  3           Generally speaking, did Desktop Deposit involve

09:41:22  4   fraud prevention and reduction tools?

09:41:24  5   A.  Yes, it did.

09:41:25  6   Q.  Did it include things like duplicate detection and

09:41:28  7   customer authentication, amount verification, and things of

09:41:32  8   that nature?

09:41:33  9   A.  Yes, sir.

09:41:34  10          MS. GLASSER:  Objection, Your Honor.

09:41:35  11          THE COURT:  State your objection.

09:41:36  12          MS. GLASSER:  The basis discussed in chambers,

09:41:39  13  Your Honor, claim elements.

09:41:41  14          MR. MELSHEIMER:  May I respond, Your Honor?

09:41:42  15          THE COURT:  You may.

09:41:43  16          MR. MELSHEIMER:  I believe this slide was approved

09:41:45  17  by the Court to display to the jury, sir.

09:41:47  18          THE COURT:  All right.  I'll overrule the

09:41:49  19  objection.  But let's move on at a high level.

09:41:51  20  Q.  (By Mr. Melsheimer)  Did Wells Fargo ever expand its

09:41:58  21  mobile banking offerings beyond business customers to

09:42:01  22  include individuals?

09:42:03  23  A.  Yes, sir, we did.

09:42:06  24  Q.  Did Wells Fargo introduce something called Wells Fargo

09:42:17  25  mobile in 2007?

| | | |
|---|---|---|
| 09:42:18 | 1 | A.  Yes, sir, we did. |
| 09:42:20 | 2 | Q.  What type of services were offered at the launch of |
| 09:42:25 | 3 | Wells Fargo mobile, as displayed on the slide in front of |
| 09:42:29 | 4 | the jury, sir? |
| 09:42:29 | 5 | A.  Yes.  So starting off, CEO, our Commercial Electronic |
| 09:42:35 | 6 | Office, that offered treasury services.  That's basically |
| 09:42:38 | 7 | commercial services for large commercial customers. |
| 09:42:44 | 8 | But then subsequently, we provided mobile services |
| 09:42:47 | 9 | to our consumer banks, our consumer banking customers via |
| 09:42:52 | 10 | web browser, and then subsequently through an app.  And |
| 09:42:56 | 11 | that, again, we could -- you could check your balance or |
| 09:42:59 | 12 | you could see your transactions or you could transfer money |
| 09:43:02 | 13 | between your accounts. |
| 09:43:03 | 14 | Q.  When Wells Fargo first introduced mobile banking in |
| 09:43:06 | 15 | 2007, did it offer what's been called an app for your |
| 09:43:10 | 16 | mobile or smartphone? |
| 09:43:11 | 17 | A.  At the beginning, it was just on a web browser. |
| 09:43:17 | 18 | Q.  Why was it not offered on an app at the very beginning? |
| 09:43:20 | 19 | A.  Because the apps were just entering and really weren't |
| 09:43:24 | 20 | available yet, so we had to develop that subsequently. |
| 09:43:27 | 21 | Q.  When did the first broadly accessible App Store open |
| 09:43:32 | 22 | up, to your knowledge, sir? |
| 09:43:34 | 23 | A.  Yeah, it was 2007/2008 is when Apple launched the |
| 09:43:38 | 24 | iPhone and the Apple Store where you could actually |
| 09:43:43 | 25 | download apps and put them onto your device. |

09:43:45    1    Q.  So how could Wells Fargo offer mobile banking in 2007

09:43:52    2    on a smartphone without an app?

09:43:53    3    A.  Yeah.  So what we did, if you recall, on your desktop,

09:43:59    4    you had a very large screen.  And the websites at that

09:44:02    5    time, it was very hard to understand or see what was on

09:44:05    6    that, and so we changed the display so that on your mobile

09:44:09    7    device, you could actually see what you would see on a

09:44:13    8    large website and do processing just on a web browser on

09:44:17    9    your mobile phone.

09:44:20   10    Q.  Is using a web browser for mobile banking different

09:44:25   11    than using an app for mobile banking?

09:44:27   12    A.  Yes, sir, it is.

09:44:28   13    Q.  Can you give the jury an example of a mobile app

09:44:33   14    that -- that can also be used through your browser on your

09:44:36   15    computer?

09:44:37   16    A.  Sure.  A good example is Facebook.  So Facebook, you

09:44:40   17    can get on your browser and get on Facebook, and you can

09:44:43   18    see it, but you can also download the Facebook app.  You

09:44:46   19    can get on to Facebook and see the same thing in an app.

09:44:50   20    Q.  When did Wells Fargo first introduce an app for mobile

09:44:55   21    banking?

09:44:56   22    A.  I believe that was May 18th, 2009.

09:44:59   23    Q.  So the mobile banking availability was 2007 on your

09:45:07   24    computer, but the app was not released until May of 2009?

09:45:12   25    A.  That's what I remember, yes.

09:45:14  1  Q.  Mr. Hecht, can you give the jury some sense of why

09:45:22  2  Wells Fargo was the first bank to announce a remote deposit

09:45:27  3  capture product, the first bank to announce Internet

09:45:30  4  banking, and the first bank to announce mobile banking?

09:45:33  5  A.  Yes.  We are heavily engaged in innovation, and it's

09:45:37  6  been really important to us to provide services to our

09:45:42  7  customers early in the process.  And that's really why you

09:45:46  8  see all these things that we were first in.

09:45:48  9  Q.  Does Wells Fargo have an innovation lab?

09:45:51  10  A.  Yes, we have a very large innovation lab.

09:45:54  11  Q.  What can you tell the jury about Wells Fargo's

09:45:57  12  innovation lab?

09:45:57  13  A.  It's been around for a long time, and it, again, is a

09:46:03  14  place where we test new technologies, like some of the

09:46:07  15  things that are listed on the screen.  And we continue to

09:46:10  16  do that.  We did -- we've been doing that for many, many

09:46:13  17  years, since I've been at Wells Fargo.  We continue to do

09:46:16  18  it today.

09:46:16  19  Q.  How many computer engineers are employed by or

09:46:20  20  associated with the Wells Fargo innovation lab?

09:46:23  21  A.  Hundreds -- hundreds of engineers and also business

09:46:27  22  people.

09:46:27  23  Q.  Mr. Hecht, did you hear the opening statement, the

09:46:34  24  suggestion or implication made by counsel for USAA that

09:46:38  25  Wells Fargo was not innovative or was somehow on the

09:46:42   1   sidelines?

09:46:42   2   A.   Yes, I heard that.

09:46:43   3   Q.   Do you -- is that correct?

09:46:45   4   A.   It's absolutely not correct.

09:46:46   5   Q.   Do you recall it being suggested that Wells Fargo had

09:46:51   6   no internal capability to build or sustain a remote deposit

09:46:57   7   capture system?

09:46:58   8   A.   Yes, I heard that.

09:46:59   9   Q.   Do you agree with that?

09:47:01  10   A.   I absolutely do not --

09:47:02  11   Q.   Why not?

09:47:02  12   A.   -- agree with that?  Because we had a whole innovation

09:47:06  13   team that was the first to actually put a Desktop Deposit

09:47:11  14   product on the market.

09:47:12  15   Q.   Did you hear the opening statement where counsel for

09:47:19  16   USAA suggested that USAA was innovative because its

09:47:23  17   customers were military members who had unique or different

09:47:27  18   needs from Wells Fargo's customers?

09:47:28  19   A.   Yes, sir, I heard that.

09:47:30  20   Q.   Did that seem right to you?

09:47:31  21   A.   No, sir, it's not correct.

09:47:33  22   Q.   Why not?

09:47:34  23   A.   We have many military customers around the whole world.

09:47:38  24   Q.   And does Wells Fargo have customers throughout the

09:47:40  25   United States?

```
09:47:41   1   A.  Yes, sir.
09:47:41   2   Q.  And all over the world?
09:47:43   3   A.  All over the world, yes.
09:47:44   4   Q.  Mr. Hecht, if Internet banking came about in 1995, why
09:47:56   5   wasn't the first remote deposit product released until
09:48:01   6   2004?
09:48:02   7   A.  Because it wasn't legal.
09:48:04   8   Q.  Did the law change that made remote deposit capture
09:48:11   9   legal or permissible at some point?
09:48:13  10   A.  Yes, sir, it did.
09:48:14  11   Q.  When did that law change?
09:48:16  12   A.  It changed in 2004.
09:48:17  13   Q.  What was that law called?
09:48:20  14   A.  Check 21.
09:48:21  15   Q.  Can you tell the jury what Check 21 -- your
09:48:25  16   understanding of it was?
09:48:27  17   A.  Yeah.  So as I mentioned earlier, you had to actually
09:48:33  18   present the physical check to the bank, wherever the bank
09:48:38  19   was located, before Check 21.
09:48:41  20        After Check 21, it allowed for what was called a
09:48:46  21   substitute check, which means that instead of actually
09:48:50  22   presenting the physical check to the actual bank in the
09:48:53  23   state where that bank was located, or the presentment point
09:48:56  24   is what it was called, you could now deliver a substitute
09:49:03  25   check instead.  And so that was the key to that law.
```

09:49:06  1   Q.  Was there a tragic event in our country's history

09:49:09  2   that -- that caused a change in the law, sir?

09:49:11  3   A.  Yes, there was.  It was 9/11.

09:49:13  4   Q.  How did the 9/11 terrorist attacks against our country

09:49:21  5   cause a change in the financial industry and check

09:49:23  6   processing?

09:49:23  7   A.  Yes.  So when 9/11 happened, as I mentioned before, the

09:49:27  8   planes, both commercial planes and private planes, they

09:49:31  9   were grounded for a number of days.  And the financial

09:49:34  10  system really was -- was locked up during that period

09:49:37  11  because of that problem.

09:49:38  12  Q.  Why would the planes being grounded have affected so

09:49:44  13  much of the financial industry, Mr. Hecht?

09:49:46  14  A.  Yes.  The checks, again, were sitting in the area where

09:49:56  15  they were captured.  And, again, before Check 21, they had

09:49:56  16  to be presented, so they just didn't move.  So the checks

09:49:58  17  were stuck in airports, in bank operations areas, and they

09:50:03  18  were just sitting there waiting for the planes to fly

09:50:06  19  again.

09:50:06  20  Q.  Tell the jury how exactly the change in the law brought

09:50:12  21  about by Check 21 paved the way for remote check deposit?

09:50:19  22  A.  Sure.  So now since you could present a substitute

09:50:22  23  check or a copy -- it was called an IRD, or an image

09:50:23  24  replacement document -- what you could do is take an image

09:50:26  25  of a check and you could print it somewhere else

09:50:30   1   electronically.  That was the starting point.

09:50:35   2        And then subsequently, it actually enabled what

09:50:38   3   was called image exchange.

09:50:39   4   Q.  Did the banks -- after the passage or in connection

09:50:43   5   with the passage of Check 21, did the banks create

09:50:47   6   something called image exchange networks?

09:50:51   7   A.  Yes, that's what I just mentioned.  And, yes, those

09:50:54   8   image exchange networks were a fast follower to that

09:50:57   9   process of the substitute check.

09:50:58  10   Q.  What -- what were the image exchange networks?  Tell

09:51:03  11   the jury.

09:51:03  12   A.  Sure.  So they were a number of different networks that

09:51:06  13   were put together to actually allow all the banks in the

09:51:09  14   United States to actually set protocols and standards to

09:51:14  15   deliver, now, image files between the banks so that now we

09:51:18  16   would eliminate the problem that we had that was part of

09:51:21  17   the terrorist attack.  So if the planes got grounded, we

09:51:27  18   could now over a network.  We could deliver the images from

09:51:31  19   the place that they were presented, say in a branch or ATM

09:51:34  20   machine, we could image them, and then we could deliver

09:51:36  21   those images to wherever we needed to deliver them,

09:51:39  22   anywhere in the country via networks and files of those

09:51:42  23   images and the associated data to the bank that is the

09:51:46  24   receiving bank.

09:51:47  25   Q.  Mr. Hecht, were you involved -- personally involved in

09:51:51  1   the setting of standards or rules for the transmission of

09:51:57  2   check images and related documents?

09:51:58  3   A.  Yes.  I was the lead person on the technology side of

09:52:02  4   defining the specifications for Wells Fargo Bank in all the

09:52:08  5   conversations with all the other major banks in the -- in

09:52:11  6   the country.

09:52:11  7   Q.  Why did the banks need to have standards or rules for

09:52:17  8   this transmission and processing of images of checks?

09:52:23  9   A.  Yes.  As we've heard during this trial, the -- there's

09:52:28 10   a lot of different ways that images can be captured in

09:52:30 11   different quality of cameras and that type of thing.  It

09:52:35 12   was crucial that we actually had standards so that

09:52:37 13   customers could actually use the images.

09:52:39 14        So if it was a low-quality image or if it was a

09:52:42 15   problem with it that, you know, you didn't capture the

09:52:44 16   whole image or it could even be a technical problem, like

09:52:48 17   the format of the image was not something that the

09:52:51 18   receiving bank could use, so we had to set those standards

09:52:55 19   so that all the banks in the United States could actually

09:52:58 20   use the data to facilitate what they had put in place for

09:53:02 21   decades with the physical movement of checks.  And

09:53:06 22   everybody counting on the physical check, now we needed

09:53:10 23   to -- to allow the customers to do that same type of thing

09:53:13 24   and utilize the images.

09:53:16 25   Q.  You were personally involved in the committee set up to

09:53:20  1   agree upon and formulate these standards and rules?

09:53:23  2   A.  Yes, sir.

09:53:24  3   Q.  Are you familiar with an organization called the

09:53:31  4   American National Standards Institute?

09:53:34  5   A.  Yes, sir, I am.

09:53:35  6   Q.  Is that sometimes called ANSI?

09:53:37  7   A.  Yes, sir.

09:53:37  8   Q.  Was ANSI involved in image standards setting --

09:53:43  9   A.  Yes --

09:53:43  10  Q.  -- back in this time period?

09:53:46  11  A.  -- yes, sir.  Yes, we had a -- a subgroup underneath

09:53:49  12  that was called X9 that set these standards so that

09:53:52  13  everybody would have all the correct standards to use in

09:53:54  14  these image exchanges so that we could set that commonality

09:53:59  15  across all the banks in the United States.

09:54:00  16  Q.  Were you on that -- one of those committees?

09:54:04  17  A.  I was on many of those committees, yes.

09:54:05  18  Q.  Was Mr. Bill Saffici, who's in the courtroom, was he

09:54:11  19  also on those committees, sir?

09:54:13  20  A.  Yes.  Yes, sir, he was.

09:54:14  21  Q.  Those are the committees setting the standards for

09:54:18  22  check imaging?

09:54:19  23  A.  Yes, sir.

09:54:19  24  Q.  Were there other banking institutions involved in those

09:54:24  25  image standard committees, sir?

09:54:25  1   A.  Yes, there were.

09:54:26  2   Q.  Who were some of the banks?

09:54:28  3   A.  So it was Wachovia, Bank One, Bank of America, Chase,

09:54:35  4   U.S. Bank.  Those were some of the key banks that were

09:54:38  5   included in those groups that were setting the standards.

09:54:41  6   Q.  Was USAA, to your knowledge -- your personal knowledge,

09:54:45  7   involved in any of the committees that you were involved

09:54:48  8   in?

09:54:49  9   A.  No, sir, they were not.

09:54:50  10  Q.  Did you see them in any other committees that you

09:54:52  11  weren't involved in?

09:54:53  12  A.  No, sir, I did not.

09:54:54  13  Q.  Can you tell the jury how Check 21 and the associated

09:55:05  14  image exchange networks and all the standards setting that

09:55:08  15  you and others were personally involved in, how did that

09:55:13  16  lay the groundwork for what we know today is remote check

09:55:18  17  deposit?

09:55:18  18  A.  Yes.  Again -- so now that we have all those standards

09:55:21  19  and we had all -- we had the capability to electronically

09:55:25  20  deliver, it opened up another frontier where we now could

09:55:29  21  use Desktop Deposit to actually allow customers to

09:55:35  22  basically take -- they didn't only not have to go to an ATM

09:55:39  23  or branch anymore, they could do it from anywhere.

09:55:42  24  Anywhere that they had a connection and a way to scan the

09:55:45  25  item, they -- it basically opened that up for our

| | | |
|---|---|---|
| 09:55:47 | 1 | customers. |
| 09:55:48 | 2 | Q.  Is remote deposit capture one way of using the image |
| 09:55:55 | 3 | capability made possible by Check 21 and the standards |
| 09:55:59 | 4 | setting? |
| 09:55:59 | 5 | A.  Yes, that's one way. |
| 09:56:01 | 6 | Q.  Are there other ways? |
| 09:56:02 | 7 | A.  Yes, there's many other ways. |
| 09:56:03 | 8 | Q.  When did Check 21 take effect, sir? |
| 09:56:06 | 9 | A.  It was October 28th, 2004. |
| 09:56:11 | 10 | Q.  What day did Wells Fargo release its remote check |
| 09:56:17 | 11 | deposit product? |
| 09:56:18 | 12 | A.  October 28th, 2004. |
| 09:56:20 | 13 | Q.  Is that the same day? |
| 09:56:21 | 14 | A.  That's the same day. |
| 09:56:26 | 15 | Q.  Is that something that had been in the works with the |
| 09:56:29 | 16 | anticipation of the passage of the law? |
| 09:56:31 | 17 | A.  Yes.  It was a really important thing from an |
| 09:56:34 | 18 | innovation perspective that we hit the ground on the day |
| 09:56:38 | 19 | that it was legal to do Desktop Deposit.  We needed to hit |
| 09:56:42 | 20 | that day.  That was an internal imperative. |
| 09:56:46 | 21 | MR. MELSHEIMER:  Can we move to the next slide, |
| 09:56:49 | 22 | Mr. Bakale? |
| 09:56:52 | 23 | Q.  (By Mr. Melsheimer)  Mr. Hecht, are you familiar with |
| 09:56:54 | 24 | the check deposit systems used at Wells Fargo? |
| 09:56:56 | 25 | A.  Yes, sir, I am. |

09:56:56   1   Q.  Have you been familiar with those personally for over

09:56:59   2   20 years?

09:57:00   3   A.  Yes, sir.

09:57:01   4   Q.  Okay.  Are those sometimes referred to as the back end

09:57:04   5   processes?

09:57:04   6   A.  Yes, that's correct.

09:57:08   7          MR. MELSHEIMER:  We might move to the next slide,

09:57:10   8   Mr. Bakale.

09:57:11   9   Q.  (By Mr. Melsheimer)  What is this slide illustrating

09:57:18  10   for the jury, Mr. Hecht?

09:57:19  11   A.  Yes.  As part of this kind of revolution with the way

09:57:22  12   that we can process checks, we ended up with hundreds of

09:57:26  13   sources that come into our environment that are

09:57:30  14   electronified checks.

09:57:33  15   Q.  How many different ways can a check make its way to

09:57:38  16   Wells Fargo?

09:57:38  17   A.  It's literally hundreds of ways that the check can come

09:57:42  18   in electronically.

09:57:43  19   Q.  Can you at a high level, sir, describe some of the

09:57:47  20   examples shown on this slide of the ways that checks can

09:57:52  21   make their way into the bank processing system?

09:57:56  22   A.  Sure.  So if you look across the bottom, those --

09:57:59  23   that's a subset of some of the key ways.  So we can image

09:58:03  24   checks at a teller or a branch.  We image them at an ATM

09:58:08  25   machine.  Desktop Deposit, that I just mentioned earlier.

09:58:14  1   Mobile deposit, which we're talking about in this forum

09:58:16  2   here.  Electronic deposit, that's for our commercial

09:58:19  3   customers to be able to send us files of checks that they

09:58:24  4   may have captured in their environments.

09:58:26  5          Lockbox is like where you send in your electric

09:58:30  6   bill or your phone bill in the mail.  It gets processed

09:58:34  7   through what's called a lockbox, and we capture images in

09:58:37  8   that process.

09:58:37  9          Image exchange is what I talked about earlier

09:58:40  10  where the banks do image exchange between all the banks in

09:58:43  11  the country.  And then correspondent banks is where other

09:58:47  12  banks, we provide services to other banks to process their

09:58:50  13  checks on their behalf.

09:58:52  14  Q.  Do all these sources, sir, involve check imaging,

09:58:59  15  potentially?

09:59:00  16  A.  Yes, sir, they do.

09:59:01  17  Q.  And what, then, is the primary difference between these

09:59:06  18  sources?

09:59:06  19  A.  The primary difference is the front end process.  If

09:59:14  20  you think about that, your experience at an ATM machine or

09:59:18  21  a branch is much different, but the -- the process as you

09:59:21  22  move into the operations of the bank is exactly the same.

09:59:23  23  Q.  I want to make sure I'm clear about this.  You say

09:59:28  24  teller.  When someone goes to the bank with a teller and a

09:59:31  25  paper check, that seems like it's a piece of paper.  Are

09:59:35  1  you saying there's imaging involved, as well?

09:59:37  2  A.  Yes, sir, there is.

09:59:37  3  Q.  How is that?

09:59:40  4  A.  So if you walk into a branch within Wells Fargo, we

09:59:43  5  scan the deposited check at the teller, capture that image,

09:59:48  6  and then we deliver that image into the bank for

09:59:50  7  processing.

09:59:51  8  Q.  So after the check gets into the bank systems from one

10:00:01  9  of these sources, is the process of what the bank does

10:00:06  10  after that the same for all the sources or different?

10:00:09  11  A.  It's the same.

10:00:11  12  Q.  What do you mean by that?

10:00:13  13  A.  So the key thing is there's -- as I mentioned before,

10:00:18  14  just as we set standards throughout the industry, we've got

10:00:21  15  to normalize things so that customers -- we can't show them

10:00:25  16  a different type of image that was captured in the branch

10:00:27  17  or captured in the ATM machine.

10:00:30  18       The customers just know that their check made it

10:00:33  19  to them through some way, and they don't care whether their

10:00:36  20  friend that they wrote the check to deposited it at a

10:00:39  21  branch or whether they deposit it through Desktop Deposit

10:00:45  22  or Mobile Deposit.  It gets to them either way in a common

10:00:51  23  way.

10:00:51  24  Q.  Do you have a way that you describe the deposit

10:00:54  25  infrastructure and the processing of checks regardless of

| | | |
|---|---|---|
| 10:00:58 | 1 | where they come from within the bank? |
| 10:01:01 | 2 | A.  Yes, sir. |
| 10:01:02 | 3 | Q.  What do you call that? |
| 10:01:03 | 4 | A.  It's called funnels into funnels is what we call it. |
| 10:01:08 | 5 | So like front end processes that I just described, but then |
| 10:01:12 | 6 | we have to kind of aggregate those and then ultimately get |
| 10:01:15 | 7 | it into the common processes that are part of our |
| 10:01:17 | 8 | operations for check processing that have been there for a |
| 10:01:20 | 9 | long time. |
| 10:01:20 | 10 | Q.  Have you -- has the bank ever created any diagrams or |
| 10:01:28 | 11 | records demonstrating this funnels into funnels concept, |
| 10:01:32 | 12 | sir? |
| 10:01:32 | 13 | A.  Yes, sir, we have. |
| 10:01:33 | 14 | Q.  Can you look in your binder, sir -- |
| 10:01:35 | 15 | MR. MELSHEIMER:  And Mr. Bakale, please don't show |
| 10:01:38 | 16 | this just yet. |
| 10:01:42 | 17 | Q.  (By Mr. Melsheimer)  -- at Defendant's Exhibit DTX-230? |
| 10:01:45 | 18 | A.  Yes, sir, I have that. |
| 10:01:46 | 19 | Q.  Was this a document made at or near the time of the |
| 10:01:49 | 20 | events or conditions recorded? |
| 10:01:51 | 21 | A.  Yes. |
| 10:01:52 | 22 | Q.  Was this a document made in the regular course of Wells |
| 10:01:56 | 23 | Fargo's business? |
| 10:01:56 | 24 | A.  Yes. |
| 10:01:56 | 25 | Q.  Was this document kept in the regular course of Wells |

10:01:59  1   Fargo's business?

10:01:59  2   A.  Yes.

10:02:00  3   Q.  Was the information in the document made by or from

10:02:05  4   information transmitted by a person with knowledge of the

10:02:08  5   events or the conditions recorded?

10:02:10  6   A.  Yes, it was.

10:02:11  7          MR. MELSHEIMER:  Your Honor, I offer DTX-230.  It

10:02:15  8   was not pre-admitted, but there was a request that we lay a

10:02:19  9   business records foundation.  I offer it with that

10:02:21  10  foundation, Your Honor.

10:02:23  11         MS. GLASSER:  No objection, Your Honor.

10:02:24  12         THE COURT:  Well, it was pre-admitted conditioned

10:02:26  13  upon laying the business records prerequisite, which the

10:02:32  14  Court finds you have done, so I'll consider it appropriate

10:02:34  15  for publication to the jury.

10:02:36  16         MR. MELSHEIMER:  Thank you, Your Honor.

10:02:38  17         Mr. Bakale, you may now publish to the jury

10:02:42  18  DTX-230.

10:02:42  19  Q.  (By Mr. Melsheimer)  Mr. Hecht, when was this slide

10:02:49  20  deck created?

10:02:50  21  A.  It was created in 2010.

10:02:55  22  Q.  So -- and just so we're clear, this is a page out of a

10:03:01  23  larger slide deck?

10:03:03  24  A.  Yes, that's correct.

10:03:04  25  Q.  These PowerPoint decks that you typically use in -- in

| | | |
|---|---|---|
| 10:03:08 | 1 | business? |
| 10:03:08 | 2 | A.  Yes, correct. |
| 10:03:09 | 3 | Q.  It was prepared in 2010? |
| 10:03:13 | 4 | A.  Yes, sir. |
| 10:03:14 | 5 | Q.  And you said that there were diagrams of this funnel |
| 10:03:19 | 6 | into funnel's concept.  Is this an example of the funnels |
| 10:03:23 | 7 | into funnels concept? |
| 10:03:26 | 8 | A.  Yes, sir, it is. |
| 10:03:27 | 9 | Q.  Now, just at a high level, sir, can you describe what's |
| 10:03:31 | 10 | shown on the left-hand side of this particular exhibit? |
| 10:03:34 | 11 | A.  Sure, I can.  So on the upper left, it says EFATM; |
| 10:03:44 | 12 | that's envelope free ATM.  And, if you recall, many years |
| 10:03:45 | 13 | ago you used to have to put envelopes when you made a |
| 10:03:47 | 14 | deposit into an ATM machine.  So this is where we actually |
| 10:03:50 | 15 | can capture the image of the check when you put it into the |
| 10:03:55 | 16 | ATM machine. |
| 10:03:55 | 17 | MRDC is mobile remote deposit capture.  That's the |
| 10:03:59 | 18 | Mobile Deposit that we've been discussing. |
| 10:04:00 | 19 | BOB DTD, is business online banking.  That was our |
| 10:04:08 | 20 | small business and our consumer channel to allow for |
| 10:04:11 | 21 | scanners to actually process deposits. |
| 10:04:13 | 22 | And then CEO DTD, that's Commercial Electronic |
| 10:04:19 | 23 | Office DTD.  That's for our large commercial customers to |
| 10:04:24 | 24 | be able to process deposits. |
| 10:04:27 | 25 | Q.  Are there other front end sources of checks that are |

| | | |
|---|---|---|
| 10:04:31 | 1 | not listed on this particular document, sir? |
| 10:04:33 | 2 | A.  Yes, sir, as -- as we saw on the prior slide, there's |
| 10:04:35 | 3 | hundreds of these types of sources. |
| 10:04:37 | 4 | Q.  Why aren't these other sources listed on this slide, |
| 10:04:41 | 5 | sir? |
| 10:04:41 | 6 | A.  This document was created to compare in the Internet |
| 10:04:45 | 7 | services group the other remote deposit capture sources |
| 10:04:50 | 8 | that were prevalent at the time.  So these were put on to |
| 10:04:54 | 9 | the slide to describe how the -- these things were the same |
| 10:04:58 | 10 | and the different across those different input sources. |
| 10:05:01 | 11 | Q.  So it looks like, sir, there's a bunch of arrows at the |
| 10:05:05 | 12 | very end on the -- sort of the middle of the slide towards |
| 10:05:09 | 13 | the right-hand side, there's arrows moving from those boxes |
| 10:05:13 | 14 | that then move -- all seem to be flowing to four different |
| 10:05:18 | 15 | boxes on the right starting with PIES/Risk Review, |
| 10:05:26 | 16 | Image-Mark, CK/CCD Dupes, and Hogan Posts.  Do I have that |
| 10:05:35 | 17 | right? |
| 10:05:36 | 18 | A.  Yes, you do. |
| 10:05:36 | 19 | Q.  Is that reflecting that all of these check sources, |
| 10:05:39 | 20 | regardless of where they started from, end up in that back |
| 10:05:42 | 21 | end processing? |
| 10:05:43 | 22 | A.  Yes, that's correct. |
| 10:05:44 | 23 | Q.  At a high level, sir, can you just describe what those |
| 10:05:47 | 24 | boxes represent? |
| 10:05:47 | 25 | A.  On the right-hand side? |

| | | |
|---|---|---|
| 10:05:48 | 1 | Q.  Starting with PIES/Risk Review.  At a very general |
| 10:05:54 | 2 | level? |
| 10:05:54 | 3 | A.  Sure.  So PIES/Risk Review is -- is the input and |
| 10:05:59 | 4 | exception process where we actually can identify, as checks |
| 10:06:04 | 5 | come into the system in the common back end process, any |
| 10:06:07 | 6 | exceptions that we need to take action, like a fraudulent |
| 10:06:10 | 7 | transaction. |
| 10:06:14 | 8 | Image-Mark, the next one, there as you move right, |
| 10:06:19 | 9 | is a place where we do code line completion and things like |
| 10:06:22 | 10 | that where we correct the checks.  So if there's a problem |
| 10:06:25 | 11 | with the account number or there's a problem with the |
| 10:06:29 | 12 | amount or the transaction, say, is out of balance, say the |
| 10:06:32 | 13 | customer made the deposit for $100.00 but there was |
| 10:06:35 | 14 | actually $150.00, we would give them a $50.00 credit in |
| 10:06:40 | 15 | that process. |
| 10:06:40 | 16 | CK -- and then we also would do image quality |
| 10:06:46 | 17 | analysis in that -- in that box. |
| 10:06:47 | 18 | Q.  Let me stop and ask you a question, sir. |
| 10:06:49 | 19 | A.  Sure. |
| 10:06:50 | 20 | Q.  What does the CK/CCD box represent? |
| 10:06:54 | 21 | A.  Yes, that's cross channel duplicates.  And that is |
| 10:06:59 | 22 | where we actually identify duplicates from across many |
| 10:07:07 | 23 | channels. |
| 10:07:07 | 24 | Q.  And is -- is that a form of fraud prevention? |
| 10:07:09 | 25 | A.  Yes, sir, it is. |

| | | |
|---|---|---|
| 10:07:10 | 1 | Q.  Is checking on duplicates something that you have to do |
| 10:07:12 | 2 | in this back end process to help prevent fraudulent |
| 10:07:17 | 3 | transactions? |
| 10:07:17 | 4 | A.  Yes, it is. |
| 10:07:19 | 5 | Q.  And then, finally, what is Hogan, parentheses, Posts? |
| 10:07:23 | 6 | A.  That is where, again, we post the checks and the |
| 10:07:27 | 7 | deposits to the customer's account.  So at that point, the |
| 10:07:33 | 8 | customer gets them posted so that you can see them on -- |
| 10:07:37 | 9 | online or on your statement. |
| 10:07:38 | 10 | Q.  So, sir, we've mentioned the term front end and back |
| 10:07:45 | 11 | end.  I just want to make sure you and the jury are on the |
| 10:07:48 | 12 | same page.  What is the front end of processing with |
| 10:07:51 | 13 | respect to the bank? |
| 10:07:52 | 14 | A.  Yeah, the front end is everything to the left of PIES, |
| 10:08:00 | 15 | and then the back end is everything from PIES to the right. |
| 10:08:03 | 16 | Q.  Is the back end the operational pieces required to |
| 10:08:10 | 17 | successfully post and process a check? |
| 10:08:10 | 18 | A.  Yes, that is -- that's correct. |
| 10:08:10 | 19 | Q.  Now, I noticed that this slide back in 2010 has the |
| 10:08:15 | 20 | title, MRDC will leverage downstream -- sorry, I read that |
| 10:08:21 | 21 | inaccurately. |
| 10:08:22 | 22 | MRDC will leverage existing downstream |
| 10:08:31 | 23 | infrastructure.  Did I read that right? |
| 10:08:31 | 24 | A.  Yes, you did. |
| 10:08:31 | 25 | Q.  What does that mean? |

10:08:31  1   A.  On this slide, it actually means two things.  The

10:08:35  2   consolidator piece, if you look into the yellow shaded, was

10:08:39  3   existing, and there are multiple sources.  When I said

10:08:42  4   funnels -- into funnels earlier, there are multiple sources

10:08:47  5   that go into that consolidator.  And that was existing.

10:08:50  6         And then also the PIES Image-Mark, CCD, and Hogan

10:08:56  7   Posts all was existing.  And so all -- none of those things

10:09:00  8   needed to be built from the consolidator to the right to

10:09:02  9   implement MRDC.  They were all there.

10:09:05  10        THE COURT:  Counsel, approach the bench, please.

10:09:07  11        (Bench conference.)

10:09:18  12        THE COURT:  How much longer do you expect your

10:09:18  13  direct to be?

10:09:18  14        MR. MELSHEIMER:  Your Honor, I believe it's going

10:09:18  15  to be about another 30 to 35 minutes or so.

10:09:23  16        THE COURT:  I'm going let the jury have a recess

10:09:30  17  at this juncture.

10:09:30  18        MR. MELSHEIMER:  Do you think I'm going too

10:09:32  19  slowly, or do you want me to speak --

10:09:33  20        THE COURT:  I'm not commenting one way or the

10:09:33  21  other.

10:09:37  22        MR. MELSHEIMER:  Okay.  Thank you.

10:09:37  23        (Bench conference concluded.)

10:09:37  24        THE COURT:  Ladies and gentlemen, we're going to

10:09:37  25  take this opportunity to take a short recess.  Close your

| | | |
|---|---|---|
| 10:09:38 | 1 | notebooks.  You may simply leave them in your chairs. |
| 10:09:38 | 2 | Follow all the instructions that I've given you, including |
| 10:09:41 | 3 | not to discuss the case among yourselves.  And we'll be |
| 10:09:43 | 4 | back in here shortly to continue with this witness. |
| 10:09:47 | 5 | The jury is excused for recess at this time. |
| 10:09:49 | 6 | COURT SECURITY OFFICER:  All rise. |
| 10:09:52 | 7 | (Jury out.) |
| 10:09:52 | 8 | THE COURT:  Court stands in recess. |
| 10:30:33 | 9 | (Recess.) |
| 10:30:34 | 10 | (Jury out.) |
| 10:30:35 | 11 | COURT SECURITY OFFICER:  All rise. |
| 10:30:36 | 12 | THE COURT:  Be seated, please. |
| 10:30:36 | 13 | Mr. Hecht, if you'll return to the witness stand, |
| 10:30:44 | 14 | please. |
| 10:30:44 | 15 | Let's bring in the jury. |
| 10:31:01 | 16 | COURT SECURITY OFFICER:  All rise. |
| 10:31:02 | 17 | (Jury in.) |
| 10:31:03 | 18 | THE COURT:  Please be seated. |
| 10:31:18 | 19 | All right.  Counsel, you may continue with your |
| 10:31:22 | 20 | direct examination. |
| 10:31:22 | 21 | MR. MELSHEIMER:  May it please the Court. |
| 10:31:23 | 22 | Q.  (By Mr. Melsheimer)  Mr. Hecht, returning to -- if we |
| 10:31:28 | 23 | could return to DTX-230, which is where we left. |
| 10:31:33 | 24 | Were any changes made to the infrastructure that |
| 10:31:38 | 25 | you describe here on the right-hand side of the slide with |

| | | |
|---|---|---|
| 10:31:43 | 1 | the addition of mobile deposit as one of the sources of |
| 10:31:48 | 2 | check deposit? |
| 10:31:49 | 3 | A.  No, there were no changes to the infrastructure. |
| 10:31:50 | 4 | Q.  Is this infrastructure the general back end check |
| 10:32:00 | 5 | processing infrastructure that has been used at the bank |
| 10:32:03 | 6 | for decades? |
| 10:32:04 | 7 | A.  Yes, sir, it is. |
| 10:32:09 | 8 | Q.  Did you design certain of the systems within that back |
| 10:32:09 | 9 | end infrastructure? |
| 10:32:10 | 10 | A.  Yes, sir, I did. |
| 10:32:12 | 11 | Q.  What systems did you design, generally? |
| 10:32:16 | 12 | A.  Actually, all the ones on the right, so PIES, Image |
| 10:32:25 | 13 | Mark, CCD, and Hogan.  And then three of the consolidators, |
| 10:32:30 | 14 | the Retail CON, the Consolidator Ops, and the OPSCON in the |
| 10:32:36 | 15 | middle. |
| 10:32:36 | 16 | Q.  And remind us what the -- what that CON stands for on |
| 10:32:44 | 17 | Retail CON and OPSCON. |
| 10:32:45 | 18 | A.  Yeah, it's consolidator.  As I talked about earlier, |
| 10:32:50 | 19 | the consolidator is a funnel into funnel, so if you take, |
| 10:32:50 | 20 | say, an ATM transaction, you can't send them to the back |
| 10:32:53 | 21 | end one deposit and one check at a time.  We would |
| 10:32:56 | 22 | aggregate them primarily by time but also by volume and |
| 10:33:02 | 23 | bunch them up into batches and send them in to the back end |
| 10:33:04 | 24 | flow, similar to the way we process checks on that big 3890 |
| 10:33:07 | 25 | sorter. |

10:33:07  1  Q.  Is something called OCR performed within this back end

10:33:13  2  infrastructure?

10:33:13  3  A.  Yes, sir, it is.

10:33:15  4  Q.  Remind us what OCR is.

10:33:16  5  A.  It's optical character recognition.

10:33:18  6  Q.  What is the role of opt -- opt -- I'm trying to say

10:33:28  7  octopus character recognition -- what's the role of optical

10:33:31  8  character recognition in this process, sir?

10:33:32  9  A.  Yes.  It's very important to identify the information

10:33:35  10  on the check, like the information that's in the box, the

10:33:38  11  numbers that we write in, and then also the letters -- when

10:33:42  12  you write in what's called the legal amount, when you write

10:33:45  13  the amount of the check on line where you say what the

10:33:48  14  amount is.

10:33:49  15  Q.  I thought it was all done with check imaging now.  Why

10:33:52  16  would you need OCR?

10:33:53  17  A.  OCR takes that image data and actually takes both

10:33:57  18  the -- the numbers, handwriting or printed, and the letters

10:34:04  19  and converts them into numbers that we can use to validate

10:34:07  20  the amount.

10:34:07  21  Q.  And this OCR process occurs in this back end

10:34:13  22  architecture or infrastructure that you described?

10:34:15  23  A.  Yes, sir, it does.

10:34:16  24  Q.  Is it a new technology or an old technology?

10:34:18  25  A.  It's extremely old technology.

10:34:20  1    Q.  How long has it been around?

10:34:21  2    A.  Decades.

10:34:22  3    Q.  Why is it important to do OCR on this back end

10:34:28  4    infrastructure within the bank as opposed to on the

10:34:31  5    customer's device?

10:34:32  6    A.  Yes.  It's really important, and it goes along with

10:34:35  7    what I talked about earlier, because we need consistency.

10:34:38  8    So we invested the highest amount in this back end process.

10:34:45  9         So we've got multiple character recognition

10:34:48  10   capabilities that kind of provide diversity so we get

10:34:52  11   different answers, and we can compare those to make sure

10:34:55  12   that the amounts are correct.

10:34:56  13        And that's not new.  That is something that we

10:34:58  14   needed to do all the way back to the beginning of image

10:35:01  15   capture in those old 3890s.

10:35:02  16   Q.  Would you ever rely on deposit data in this -- in the

10:35:06  17   bank's processing infrastructure that's supplied by an

10:35:12  18   unknown capture device?

10:35:13  19   A.  I'm sorry, can you say that again?

10:35:15  20   Q.  Would you ever rely on deposit data that's being

10:35:18  21   supplied by an unknown capture device without getting

10:35:21  22   some --

10:35:21  23   A.  Yes.  No -- yes, that makes sense.  We -- we have to

10:35:24  24   recheck it.  It's really important because we've got

10:35:27  25   hundreds of sources, as I've talked about earlier.  Any one

10:35:32  1  of them, if they make a mistake on that front end process,

10:35:35  2  we've got to do it again on the back end to make sure that

10:35:38  3  it's right.

10:35:39  4         THE COURT:  Mr. Hecht, please make sure the

10:35:41  5  question is finished before you start your answer.

10:35:43  6         THE WITNESS:  Yes, sir.  Sorry, Your Honor.

10:35:44  7         THE COURT:  Go ahead, counsel.

10:35:44  8  Q.  (By Mr. Melsheimer)  Is duplicate detection performed

10:35:47  9  in this existing back end infrastructure?

10:35:50  10  A.  Yes, it is.

10:35:52  11  Q.  Has it always been so performed?

10:35:54  12         MS. GLASSER:  Your Honor, I'd like to approach.

10:36:03  13         THE COURT:  Approach the bench.

10:36:03  14         (Bench conference.)

10:36:04  15         MS. GLASSER:  So with respect to the OCR, counsel,

10:36:09  16  I think, stepped over the line and asked about the claim

10:36:13  17  element -- part of the claim element and asked if this is

10:36:15  18  old technology.  He got that answer.  And now I think he's

10:36:18  19  proceeding to be -- about to do that, marching through

10:36:23  20  duplicate detection, marching through some of the other

10:36:25  21  words that are in the claims.

10:36:26  22         And, you know, I didn't want to make a fuss in

10:36:28  23  front of the jury if it's just the one time, but if he's

10:36:32  24  now going to do it multiple times with other claim

10:36:34  25  elements --

10:36:35  1        THE COURT:  Mr. Melsheimer?

10:36:35  2        MR. MELSHEIMER:  Two things, Your Honor.  First of

10:36:37  3  all, you may recall Mr. Brady was allowed to talk about

10:36:41  4  what happened and where things happened, and so I'm simply

10:36:48  5  asking him a factual question.  I didn't show him the claim

10:36:48  6  or use the exact claim language.  I just talked about where

10:36:52  7  something occurred.

10:36:52  8        Now, we can argue from that, of course, but he's

10:36:54  9  not purporting to interpret the claim or offer

10:36:57 10  non-infringement testimony.

10:36:58 11        And then, secondly, this duplicate detection

10:37:02 12  question -- again, I don't think I'm going into -- I think

10:37:05 13  I'm -- I'm trying very hard, Your Honor, to follow your

10:37:08 14  instructions on not getting into great detail, but I think

10:37:12 15  it's important for him to say, look, we've done duplicate

10:37:16 16  detection for years --

10:37:17 17        THE COURT:  Slow down a little bit.

10:37:18 18        MR. MELSHEIMER:  Sorry, Your Honor.

10:37:19 19        We've done duplicate detection for years.

10:37:21 20  We've -- we've -- this is where we do it.

10:37:23 21        If you may recall, Your Honor, in the previous

10:37:25 22  depositions that were played, there were witnesses talking

10:37:29 23  all about this duplicate detection process, and they

10:37:31 24  weren't at all cabined by what the Court had said I was

10:37:36 25  limited to.

10:37:37   1          So I think it's fair game for this fact witness to

10:37:39   2   talk about what he knows of his own personal knowledge, and

10:37:42   3   I think there is minimal, and no risk really, of any

10:37:46   4   confusion about claim terms or getting into anything other

10:37:50   5   than apportionment and what was existing and what was not

10:37:54   6   existing.

10:37:54   7          Now, with respect to OCR, I think that was a fair

10:37:57   8   question to ask.  Because, again, Mr. Brady was allowed to

10:38:01   9   do the same thing.  So I -- I believe this is appropriate

10:38:04  10   and hasn't run afoul of any of the Court's guidance.

10:38:08  11          MS. GLASSER:  And to be clear, the one thing that

10:38:10  12   I think is absolutely so far over the line was asking, was

10:38:13  13   this old?

10:38:14  14          THE COURT:  Yeah, I noticed the -- the misreading

10:38:20  15   of the phrase and then going back to emphasize existing.  I

10:38:26  16   would have to wonder if that was an accident the way that

10:38:29  17   was presented.  But the kind of emphasis on chronological

10:38:34  18   age and what pre-dates the other, that's -- that's a

10:38:37  19   problem.

10:38:37  20          MR. MELSHEIMER:  Well, I understand, Your Honor.

10:38:39  21   And I guess -- again, please understand me.  I'm not trying

10:38:43  22   to, you know, overviolate anything the Court has said.  You

10:38:45  23   know I wouldn't do that intentionally.

10:38:46  24          THE COURT:  One thing that would help is if you

10:38:48  25   would ask this witness non-leading questions and make him

| | | |
|---|---|---|
| 10:38:51 | 1 | testify.  You have led him like a dog on a leash since he |
| 10:38:57 | 2 | went on the witness sides, but there's been no objection, |
| 10:38:58 | 3 | so... |
| 10:38:58 | 4 | MS. GLASSER:  I just -- I don't want to make a big |
| 10:39:00 | 5 | deal in front of the jury of the leading stuff, but I -- I |
| 10:39:04 | 6 | agree. |
| 10:39:04 | 7 | MR. MELSHEIMER:  Your Honor, I'm also trying to |
| 10:39:05 | 8 | avoid the problems that you're saying.  But I'll -- I'll -- |
| 10:39:08 | 9 | I can -- |
| 10:39:10 | 10 | THE COURT:  At a high level. |
| 10:39:11 | 11 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 10:39:13 | 12 | THE COURT:  Okay.  Let's proceed. |
| 10:39:14 | 13 | MS. GLASSER:  Thank you, Your Honor. |
| 10:39:15 | 14 | (Bench conference concluded.) |
| 10:39:23 | 15 | THE COURT:  Let's proceed. |
| 10:39:24 | 16 | Q.  (By Mr. Melsheimer)  Where is duplicate detection |
| 10:39:30 | 17 | performed in this chart that we have here on Exhibit 230, |
| 10:39:36 | 18 | Mr. Hecht? |
| 10:39:36 | 19 | A.  It's performed in the back end process, but it's also |
| 10:39:41 | 20 | performed on some of the front end process. |
| 10:39:44 | 21 | Q.  Has the issue of duplicate checks always been a problem |
| 10:40:00 | 22 | for the bank in check processing? |
| 10:40:02 | 23 | A.  Yes, duplicate detection has been an issue since checks |
| 10:40:06 | 24 | were created many, many, many years ago. |
| 10:40:08 | 25 | Q.  Are any of the back end features that you've been |

10:40:12  1  talking about in this slide and generally, Mr. Hecht, are

10:40:17  2  any of them specific to mobile remote deposit capture?

10:40:21  3  A.  No, none of them on this slide are specific to Mobile.

10:40:25  4  Q.  Can we return to DTX-223, which is a pre-admitted

10:40:35  5  exhibit, Mr. Hecht?  And I meant to bring this out earlier.

10:40:44  6        Is DTX-223 a -- a press release about Wells Fargo

10:40:49  7  announcing some new electronic deposit services?

10:40:54  8  A.  Yes, sir, it is.

10:40:55  9  Q.  And what does the highlighted sentence say?

10:40:57  10  A.  It says:  Wells Fargo is leading the way bringing

10:41:01  11  ability to deposit checks right from the customer's

10:41:05  12  desktop.  The Desktop Deposit service is the first product

10:41:07  13  in the industry to be available online.

10:41:09  14  Q.  Was this dated in 2005?

10:41:14  15  A.  Yes, sir.

10:41:15  16  Q.  Were the back end features that you were describing on

10:41:18  17  that other exhibit, were they also available in 2005?

10:41:22  18  A.  Yes, they were.

10:41:23  19  Q.  Remind us when Wells Fargo added mobile deposit as a

10:41:29  20  capability?

10:41:30  21  A.  2012.

10:41:31  22  Q.  In your experience, when you add a front end source

10:41:38  23  such as mobile deposit, does that result in more checks

10:41:41  24  being deposited at the bank?

10:41:42  25  A.  No, sir, it does not.

| | | |
|---|---|---|
| 10:41:43 | 1 | Q.  Why not? |
| 10:41:44 | 2 | A.  Because the checks just move.  If you think about it -- |
| 10:41:49 | 3 | if you have a check in your hand as a customer, you choose |
| 10:41:52 | 4 | where you want to deposit it so you don't get more volume |
| 10:41:55 | 5 | because you add a new channel.  If you go to the ATM |
| 10:41:59 | 6 | machine or the branch or mobile deposit or Desktop Deposit, |
| 10:42:00 | 7 | it's one check that should be deposited one time. |
| 10:42:02 | 8 | Q.  Would it be possible for Wells Fargo to have a |
| 10:42:07 | 9 | functioning mobile deposit system without all these back |
| 10:42:12 | 10 | end systems that you've described? |
| 10:42:13 | 11 | A.  No, it would not. |
| 10:42:13 | 12 | Q.  Did you make any changes to this back end |
| 10:42:16 | 13 | infrastructure after adding mobile deposit? |
| 10:42:18 | 14 | A.  No, sir, we did not. |
| 10:42:23 | 15 | Q.  Do you know how much it costs to develop, generally, |
| 10:42:26 | 16 | the back end infrastructure that you've described? |
| 10:42:29 | 17 | A.  Hundreds -- millions of dollars for all the back end |
| 10:42:35 | 18 | infrastructure. |
| 10:42:35 | 19 | Q.  Does the back end infrastructure comprise -- what does |
| 10:42:46 | 20 | it comprise in relationship to the front end |
| 10:42:53 | 21 | infrastructure?  Is it -- is it less than half?  More than |
| 10:42:56 | 22 | half? |
| 10:42:56 | 23 | A.  Percent-wise, it's -- it's more than 80 percent of the |
| 10:42:58 | 24 | processing happens on the back end process. |
| 10:43:02 | 25 | Q.   Now, Mr. Hecht, were you here for Mr. Weinstein's |

| | | |
|---|---|---|
| 10:43:17 | 1 | testimony? |
| 10:43:17 | 2 | A.  Yes, sir. |
| 10:43:18 | 3 | Q.  Do you recall Mr. Weinstein testifying yesterday that |
| 10:43:25 | 4 | USAA invented certain fraud detection and prevention tools? |
| 10:43:28 | 5 | A.  Yes, sir, I heard that. |
| 10:43:29 | 6 | Q.  Is that claim consistent with your experience working |
| 10:43:37 | 7 | at Wells Fargo and other banks? |
| 10:43:37 | 8 | MS. GLASSER:  Objection, Your Honor.  It calls for |
| 10:43:41 | 9 | opinion testimony from a lay witness not disclosed. |
| 10:43:41 | 10 | THE COURT:  Sustained. |
| 10:43:44 | 11 | Q.  (By Mr. Melsheimer)  Mr. Hecht, how long has Wells |
| 10:43:48 | 12 | Fargo employed these various fraud detection measures in |
| 10:43:52 | 13 | its deposit processing systems? |
| 10:43:54 | 14 | A.  Really, since the beginning of check processing. |
| 10:43:57 | 15 | Q.  When was the beginning of check processing? |
| 10:44:04 | 16 | A.  Decades ago. |
| 10:44:04 | 17 | Q.  In your experience, did Mobile Deposit create any brand |
| 10:44:10 | 18 | new kind of risk that wasn't already present with any |
| 10:44:15 | 19 | remote deposit system such as Desktop Deposit? |
| 10:44:17 | 20 | A.  No, it did not. |
| 10:44:18 | 21 | Q.  Now, were you here yesterday when Mr. Weinstein |
| 10:44:22 | 22 | suggested that Mobile Deposit created a new risk of fraud? |
| 10:44:26 | 23 | A.  Yes, I heard that. |
| 10:44:28 | 24 | Q.  Do you agree with that? |
| 10:44:29 | 25 | A.  No, I do not agree with that. |

10:44:30   1          MR. MELSHEIMER:  Can we pull up Plaintiff's
10:44:32   2   Exhibit 436?
10:44:33   3   Q.  (By Mr. Melsheimer)  Do you have that in your binder,
10:44:48   4   as well, Mr. Hecht?
10:44:49   5   A.  Yes, I do.
10:44:56   6   Q.  Is this one of the documents that Mr. Weinstein
10:45:00   7   addressed yesterday?
10:45:01   8   A.  Yes, it is.
10:45:02   9   Q.  Now, did he address the entire document or just certain
10:45:05   10   portions of it?
10:45:06   11   A.  Just certain portions.
10:45:08   12   Q.  Do you think it's important to understand the entire
10:45:11   13   document in context?
10:45:12   14   A.  It's really important --
10:45:14   15          MS. GLASSER:  Objection, argumentative,
10:45:17   16   Your Honor.
10:45:17   17          THE COURT:  Sustained.
10:45:18   18          MS. GLASSER:  Motion to strike the answer.
10:45:23   19          THE COURT:  I'll strike that question and answer.
10:45:30   20   Q.  (By Mr. Melsheimer)  Can we go to Slide 6, Mr. Hecht?
10:45:34   21          You see where it says:  Risks will be mitigated by
10:45:58   22   introducing new controls and leveraging existing ones?
10:46:01   23   A.  Yes, sir, I see that.
10:46:02   24   Q.  Now, Mr. Hecht, are you familiar with the processes
10:46:06   25   displayed on this page?

10:46:06   1   A.   Yes, sir, I am.

10:46:07   2   Q.   Are any of them new processes?

10:46:09   3   A.   No, all the processes on this page are existing.

10:46:12   4   Q.   Were they processes created for the bank for -- and

10:46:16   5   used in other sources of check deposit?

10:46:20   6   A.   Yes, they were created for other sources.

10:46:22   7   Q.   Such as what?

10:46:23   8   A.   Desktop Deposit, ATM, branches, all the deposit

10:46:30   9   sources, these were created for.

10:46:31   10  Q.   If these aren't new processes, sir, can you explain to

10:46:35   11  the jury what your understanding is of the title that says

10:46:40   12  New Controls?

10:46:41   13  A.   Yes.  So the processes existed for all those other

10:46:46   14  channels like ATM and branch and Desktop Deposit, but the

10:46:50   15  controls are varying.

10:46:52   16       As a matter of fact, we can -- we vary our

10:46:55   17  controls because fraudsters are always trying to steal from

10:46:59   18  our customers or the bank every day.  We literally make

10:47:01   19  adjustments as fraudsters come up with new schemes.

10:47:05   20       And so, especially when we introduce a new

10:47:09   21  channel, whether that be Desktop Deposit or whether that be

10:47:12   22  Mobile Deposit, we have to add new controls into the

10:47:17   23  existing processes.  So the processes are all the same, but

10:47:22   24  the controls were absolutely different when it came on, and

10:47:24   25  then they continued to be adjusted every single day.

10:47:27   1   Q.  What do you mean when you say you have to adjust the

10:47:34   2   controls frequently or every single day?  Tell the jury

10:47:37   3   what you're talking about.

10:47:37   4   A.  Sure.  So limits on -- and we have limits in ATM

10:47:43   5   machines, like the amount that you can withdraw.  Or we

10:47:46   6   have limits of the amount that you can deposit in a branch.

10:47:49   7   We have limits in the amounts that you can deposit in

10:47:55   8   mobile deposit.

10:47:55   9        And based on the risks that are happening, we

10:47:59  10   adjust those types of controls up and down because we've

10:48:05  11   got to measure customer experience with protecting the

10:48:08  12   customer's money and find that balance to make sure that

10:48:12  13   the fraudsters don't go -- go in and, again, take advantage

10:48:16  14   of our customers.

10:48:17  15   Q.  Well, what are some of the new controls that are shown

10:48:23  16   on Page 6 of this Exhibit 436?

10:48:27  17   A.  Yes.  So if you look on the left where it says under

10:48:34  18   real-time controls, the daily and 30-day rolling limits.

10:48:39  19        So, again, as I mentioned, we have limits and have

10:48:42  20   had limits for a long time in, like, ATM machines, but we

10:48:49  21   had to define what those limits were going to be for mobile

10:48:53  22   deposits, and we set both daily limits and rolling limits

10:48:57  23   as to what customers would be able to do to actually,

10:49:02  24   again, strike that balance between what was -- what the

10:49:06  25   customer wanted and then also what we could do from a risk

10:49:10   1   perspective.

10:49:10   2   Q.  Can you explain a little bit more what you mean by

10:49:14   3   that, adjusting the controls or the daily limits to balance

10:49:21   4   the risk to the bank and the customers' needs and desires?

10:49:27   5   A.  Sure.  So, again, as -- as things changes and we see

10:49:35   6   fraud schemes pop up, like what we would like to do is make

10:49:38   7   those limits unlimited because good customers, we want to

10:49:42   8   make that unlimited.

10:49:44   9        But if somebody steals your identity and comes in

10:49:48   10   and can drain your bank account, that's why we have a

10:49:52   11   limited like -- limiting to $300.00 is the amount you can

10:49:55   12   take out on a daily basis.

10:49:56   13        You can call in and say, hey, I'm doing a special

10:50:00   14   withdrawal, and I want to -- I want to withdraw $1,000.00

10:50:04   15   and we'll give you -- once we authenticate you, we will

10:50:07   16   give you that capability to do that withdrawal.

10:50:09   17        But if somebody gets your debit card and gets your

10:50:15   18   PIN, you don't want them to be able to drain your whole

10:50:18   19   account.  So we limit them in that particular example.

10:50:21   20   Q.  But what's an example -- so that's deposit -- excuse

10:50:24   21   me, that's withdrawals.  What's an example of a limit on

10:50:27   22   deposits that might be risk-based?

10:50:29   23   A.  Yes.  So on deposits, we would limit, say, to

10:50:33   24   $1,000.00.  That's exactly what we did at the beginning of

10:50:37   25   Mobile Deposit, the amount that you could deposit on a

10:50:38  1   daily basis for that same reason.  Because what fraudsters

10:50:42  2   will do is, you deposit a certain amount, and then they

10:50:46  3   wait for the amount of time until it becomes available, and

10:50:50  4   they suck that money out of your account.  So we would

10:50:53  5   limit the amount that you could put in, but we had higher

10:50:58  6   limits, obviously, for mobile, if you go to a branch or if

10:51:01  7   you go to an ATM machine.

10:51:02  8   Q.  Are the limits described there the application of an

10:51:07  9   existing process or a new process?

10:51:09  10  A.  It's an existing process because, again, we had limits

10:51:12  11  in the other channels also, like an ATM machine, we have

10:51:16  12  limits as to the amount that you can deposit, and that's

10:51:18  13  been that way for many, many years for the same reason.

10:51:22  14  Q.  If you'd look on the right-hand side of that slide,

10:51:29  15  Mr. Hecht, under the description Immediate Customer

10:51:35  16  Experience; do you see that?

10:51:36  17  A.  Yes, I see that.

10:51:37  18  Q.  And then it has zero dollar immediate availability,

10:51:42  19  primary fraud control, unlike ATM and BOB DTD today which

10:51:47  20  provides a hundred dollars immediately.  Do you see that?

10:51:49  21  A.  Yes I do.

10:51:50  22  Q.  What is your understanding of that and how does it

10:51:53  23  relate to risk?

10:51:54  24  A.  Yes.  So at this time, as it states, if you made a

10:51:59  25  deposit in Desktop Deposit for our small business customers

10:52:02    1    or retail, or if you made a deposit in the ATM machine, we

10:52:07    2    gave you a hundred dollars of immediate credit.  Meaning,

10:52:12    3    that right after you make that deposit, you can take out a

10:52:17    4    hundred dollars cash.

10:52:18    5           On the mobile deposit, that control, out of the

10:52:22    6    gate we set to zero.  Because, again, the process is the

10:52:25    7    same where we -- we have the control to set exactly what is

10:52:29    8    available to the customer to withdraw, but the values are

10:52:32    9    different by channel.  And at this point in time, it was

10:52:37   10    zero amount that we made available on mobile deposits.

10:52:40   11    Q.  Did that change over time?

10:52:44   12    A.  The zero on mobile deposit is still zero, but the other

10:52:47   13    ones are significantly changed.  ATM and Desktop Deposit

10:52:52   14    are now -- in many cases we give a hundred percent

10:52:56   15    availability because we have new fraud screening

10:52:59   16    capabilities.

10:52:59   17    Q.  So when -- when can a customer at Wells Fargo get

10:53:02   18    available funds after a mobile deposit under the current

10:53:05   19    controls?

10:53:05   20    A.  The current controls, it's typically the next day --

10:53:08   21    the next business day, so about -- approximately 24 hours,

10:53:11   22    but it's one business day.  But that could change, for

10:53:16   23    example, if we've seen fraud on the account recently.  We

10:53:19   24    can actually extend availability out before -- until we can

10:53:23   25    check to make sure that the -- the funds are good.

10:53:30  1          MR. MELSHEIMER:  Can we pull up, Mr. Bakale,

10:53:33  2  Plaintiff's Exhibit 1470?

10:53:35  3  Q.  (By Mr. Melsheimer)  Was this one of the documents that

10:53:44  4  Mr. Weinstein discussed a small portion of yesterday, sir?

10:53:48  5  A.  Yes, sir.

10:53:48  6          MR. MELSHEIMER:  Can we go to Slide 5 on Page 6,

10:53:52  7  Mr. Bakale?

10:53:53  8  Q.  (By Mr. Melsheimer)  And do you have a copy of this in

10:53:55  9  your binder, sir?

10:53:56  10  A.  Sorry, what's the number again?

10:53:57  11  Q.  1470.

10:53:59  12  A.  Yes.

10:53:59  13  Q.  PX-1470?

10:54:02  14  A.  I've got it.

10:54:03  15  Q.  Are you with me?

10:54:24  16  A.  Yes, I've got it.

10:54:25  17  Q.  So do you see where did says fraud risk?

10:54:27  18  A.  Yes.

10:54:28  19  Q.  And it says --

10:54:29  20          MR. MELSHEIMER:  Just highlight.

10:54:33  21  Q.  (By Mr. Melsheimer)  Mobile deposits does generate

10:54:34  22  additional risks to manage and monitor.  The primary risk

10:54:38  23  is of duplicate deposit.

10:54:38  24  A.  Yes, I see that.

10:54:40  25  Q.  Now, did you agree with the way that Mr. Weinstein

10:54:42  1   characterized this document?

10:54:43  2   A.  No, I did not.

10:54:44  3   Q.  What is your understanding of what it's saying?

10:54:47  4   A.  So there are additional risks, and really, the

10:54:53  5   duplicate risk was something that we were assessing at the

10:55:01  6   time, but it was not -- it was both duplicate and also

10:55:03  7   errors that we were focused on at this time.  So this was

10:55:06  8   just a point in time concern that was on this slide.

10:55:12  9   Q.  Now, is this looking at it after mobile deposit has

10:55:13  10  already happened, or is it looking at it as something that

10:55:16  11  is going to happen?

10:55:17  12  A.  Yeah, it was looking at it into the future, so trying

10:55:19  13  to predict what was going to happen in the future before

10:55:22  14  we'd actually deployed mobile deposit.

10:55:26  15  Q.  Now, are there solutions that are identified on the

10:55:30  16  left-hand side of the slide that were not shown or

10:55:36  17  highlighted yesterday?

10:55:36  18  A.  Yes, sir, there are.

10:55:37  19  Q.  All right.  Can you take a look at on the left-hand

10:55:40  20  side of the page under payment management infrastructure?

10:55:42  21  A.  Yes.

10:55:44  22  Q.  Have you and I been talking about that quite a bit this

10:55:47  23  morning?

10:55:47  24  A.  Yes, we have.

10:55:48  25  Q.  Can you read for the jury what we're going to highlight

| | | |
|---|---|---|
| 10:55:54 | 1 | under -- starting with "a robust"? |
| 10:55:57 | 2 | A.   Sure.   A robust infrastructure already exists for the |
| 10:56:01 | 3 | downstream processing of deposits from multiple channels, |
| 10:56:05 | 4 | such as Envelope Free ATM and DTD, which is Desktop |
| 10:56:10 | 5 | Deposit. |
| 10:56:10 | 6 | Q.   What is that saying, Mr. Hecht? |
| 10:56:12 | 7 | A.   It's basically saying we're going to leverage that |
| 10:56:15 | 8 | robust infrastructure that we were talking about |
| 10:56:18 | 9 | previously, all the different controls, including the fraud |
| 10:56:22 | 10 | controls. |
| 10:56:22 | 11 | Q.   Were you here for the videotape testimony of USAA's |
| 10:56:30 | 12 | inventor, Mr. Oakes? |
| 10:56:32 | 13 | A.   Yes, sir, I was. |
| 10:56:33 | 14 | Q.   Do you recall him saying that what we call back end |
| 10:56:35 | 15 | processing, that was already there? |
| 10:56:37 | 16 | A.   Yes, I recall that. |
| 10:56:38 | 17 | Q.   Is that consistent with your testimony that the back |
| 10:56:41 | 18 | end infrastructure was developed by the bank? |
| 10:56:44 | 19 | A.   Yes. |
| 10:56:48 | 20 | MR. MELSHEIMER:   Can we go to Page 9 and Slide 8 |
| 10:56:51 | 21 | of this particular exhibit? |
| 10:56:52 | 22 | Q.   (By Mr. Melsheimer)   Did Mr. Weinstein show the jury |
| 10:57:00 | 23 | this slide? |
| 10:57:01 | 24 | A.   No, he did not. |
| 10:57:03 | 25 | Q.   Do you see where it says "draft controls"? |

| | | |
|---|---|---|
| 10:57:06 | 1 | A.  Yes, sir. |
| 10:57:09 | 2 | Q.  What does draft controls mean? |
| 10:57:14 | 3 | A.  Those are the different categories of processes that we |
| 10:57:17 | 4 | have in place in all the different channels.  And that's |
| 10:57:21 | 5 | what that column represents. |
| 10:57:23 | 6 | Q.  So just to go through, you have their eligibility, |
| 10:57:28 | 7 | limits, online duplicates.  Can you just walk us through |
| 10:57:32 | 8 | generally just what those things mean at a high level? |
| 10:57:34 | 9 | A.  Sure can.  So eligibility is -- as it says, TOB, that's |
| 10:57:40 | 10 | time on the books.  That's -- it's -- in -- in layman's |
| 10:57:44 | 11 | terms, that's really just how long the account was open |
| 10:57:46 | 12 | because fraudsters typically open accounts quickly and |
| 10:57:50 | 13 | perpetrate fraud early on.  So the longer that we have |
| 10:57:53 | 14 | experience with a customer, the better. |
| 10:57:55 | 15 | And then limits are what we talked about before. |
| 10:57:58 | 16 | That's how much you can deposit on a daily basis, weekly |
| 10:58:04 | 17 | basis, monthly basis. |
| 10:58:07 | 18 | And then online duplicates, that's the process |
| 10:58:10 | 19 | where we actually look in channel -- and in channel, I mean |
| 10:58:16 | 20 | within, like, Desktop Deposit or Mobile, how long we're |
| 10:58:19 | 21 | going to look back to see if we've seen that check before. |
| 10:58:25 | 22 | Keep going down? |
| 10:58:27 | 23 | Q.  Please, and go -- |
| 10:58:27 | 24 | A.  So -- |
| 10:58:27 | 25 | Q.  -- just go through the next two if you would, sir. |

10:58:30   1   A.   Okay.   So holds, that's what I talked about before.   We

10:58:35   2   can extend the holds.   So if we have a reason to believe

10:58:38   3   that the check is suspect, we can hold it for -- and not

10:58:41   4   make it available for a longer period of time to protect to

10:58:44   5   make sure those funds are good.

10:58:46   6        And then cross-channel duplicates is slightly

10:58:49   7   different, and that's where a customer might deposit in

10:58:54   8   Mobile, but then also take that check and deposit it at a

10:59:02   9   branch, or they could actually take that check and deposit

10:59:02  10   it at Chase.   And so that's cross-channel, to be able to

10:59:05  11   detect whenever that type of scenario occurs.

10:59:07  12   Q.   Let me -- let me interrupt you.

10:59:09  13        Can that -- is that always an indication of fraud,

10:59:12  14   or could that be just an inadvertent mistake?

10:59:16  15   A.   No.   The majority of them are inadvertent mistakes.

10:59:19  16   Q.   And how does that happen?

10:59:21  17   A.   It's like -- I like to describe it as the customer/wife

10:59:26  18   scenario where the wife deposits a mobile deposit, leaves

10:59:30  19   it sitting on the counter, the husband comes home, and

10:59:33  20   takes that check to the bank because he thinks it hasn't

10:59:35  21   been deposited yet and deposits it again.   So it wasn't

10:59:40  22   fraud, but it was an accident, but that happens in large

10:59:43  23   volume every day.

10:59:44  24   Q.   Go through the next two draft controls, if you would,

10:59:48  25   sir, and briefly explain them.

10:59:50  1   A.   Yeah.   So the -- that first one was actually same day,

10:59:53  2   and that's a more common thing that we see -- kind of the

10:59:56  3   transactions happen within the same day.

10:59:58  4         And then the next one where it says cross-channel,

11:00:02  5   it's that same scenario, but it's over a longer period.

11:00:05  6   And that's -- when you get over a longer period because

11:00:11  7   fraudsters have figured it out, that's more likely to be

11:00:11  8   fraud.

11:00:11  9         So fraudsters are actually tracking the number of

11:00:14  10  days that we're looking for cross-channel duplicates.   And

11:00:17  11  they wait until the day after.   And then they make the

11:00:20  12  deposit to try and get the funds or get the check to be

11:00:24  13  cashed or get the money available.

11:00:25  14        And then additional is really just the obligatory

11:00:32  15  additional things that we do.   We do a ton of things in the

11:00:35  16  back end processes that we -- we are looking for to find

11:00:38  17  things that are out of patterns for customers or find

11:00:42  18  situations where we know that it's a transaction that we

11:00:45  19  should be looking for.   We call that a hot list type of

11:00:49  20  transaction that we look for.   So that's what the

11:00:51  21  additional is.

11:00:52  22  Q.   Were any of these controls created specifically for

11:00:59  23  mobile deposit, or had they been part of the bank systems

11:01:02  24  previously?

11:01:02  25  A.   Every single one of them is an existing process that

11:01:06   1   was there, and all we did was change the controls

11:01:10   2   specifically to the new channel.

11:01:11   3   Q.  Is mobile deposit the only source of checks within the

11:01:25   4   bank that require duplicate detection?

11:01:28   5   A.  No.  Every source requires duplicate detection.

11:01:31   6   Q.  Why does every source of checks require duplicate

11:01:35   7   detection?

11:01:35   8   A.  Because as I mentioned earlier, duplicates are

11:01:39   9   something that can happen since checks were created, and it

11:01:42  10   could have been just a problem inside the bank where they

11:01:45  11   processed the check twice.  That's happened.  That's

11:01:47  12   still -- that's an error that can happen.

11:01:49  13          But, again, it -- it did become more of a problem

11:01:52  14   whenever we -- whenever Check 21 went in and we started

11:01:55  15   with electronic deposits.  The biggest problem we had was

11:01:58  16   with other banks sending us files twice or sending us

11:02:02  17   substitute checks.  They -- they print more than once.

11:02:05  18          So those -- that's -- duplicate happens.

11:02:11  19   Especially in electronic world we really have to protect

11:02:14  20   our customers by looking to see if we have seen that check

11:02:18  21   before.

11:02:18  22   Q.  Did you have some experience in the early days of check

11:02:21  23   imaging, Mr. Hecht, where you would be getting thousands or

11:02:25  24   hundreds of thousands of duplicate checks from the Federal

11:02:29  25   Reserve?

| | | |
|---|---|---|
| 11:02:29 | 1 | A.  Yes, sir. |
| 11:02:30 | 2 | Q.  Explain to the jury how that could happen? |
| 11:02:32 | 3 | A.  So at the very beginning of this, I mentioned that, you |
| 11:02:35 | 4 | know, the law changed with Check 21 that you could present |
| 11:02:40 | 5 | a substitute check.  And with the substitute check, many |
| 11:02:44 | 6 | banks, especially the Federal Reserve, invested in large |
| 11:02:51 | 7 | printers all over the country to eliminate having to send |
| 11:02:54 | 8 | them on a plane. |
| 11:02:55 | 9 | And so what they would do is they would print -- |
| 11:02:58 | 10 | so they captured the check, say, in Atlanta and the check |
| 11:03:04 | 11 | was for California, they would try to print them as close |
| 11:03:08 | 12 | to California as they could so you didn't have to transport |
| 11:03:11 | 13 | them. |
| 11:03:11 | 14 | The problem that they had -- and if you just think |
| 11:03:13 | 15 | about like your printer at home, those things would jam, |
| 11:03:16 | 16 | and then they'd have to start it over.  And then they'd |
| 11:03:18 | 17 | print it again, and they've got a whole pile of checks that |
| 11:03:21 | 18 | they've already printed, and they were sending those same |
| 11:03:24 | 19 | checks and the new ones that they'd printed twice. |
| 11:03:26 | 20 | And so if you just think about that from a |
| 11:03:28 | 21 | customer perspective, we, as customers -- you know, if you |
| 11:03:32 | 22 | made your auto payment or your mortgage payment and it's |
| 11:03:35 | 23 | 300 bucks, 500 bucks, that money hits your account twice |
| 11:03:40 | 24 | and the money is gone until the bank figures it out and |
| 11:03:43 | 25 | adjusts that back out of your account when it's a |

| | | |
|---|---|---|
| 11:03:43 | 1 | duplicate. |
| 11:03:44 | 2 | So that -- that was a new thing that was created. |
| 11:03:46 | 3 | But, again, that could happen even before this |
| 11:03:49 | 4 | electronification. |
| 11:03:51 | 5 | But that printing process with -- that was |
| 11:03:52 | 6 | happening with the banks was a major problem where the |
| 11:03:56 | 7 | printers were jamming or they were just accidentally |
| 11:04:00 | 8 | running a print job twice and sending the printed checks |
| 11:04:03 | 9 | out twice.  I mean, that was obviously much different than |
| 11:04:06 | 10 | you had -- when you had to present the physical check. |
| 11:04:09 | 11 | Q.  In your binder, sir, there's a document marked as |
| 11:04:14 | 12 | DTX-267. |
| 11:04:14 | 13 | MR. MELSHEIMER:  And, Mr. Bakale, do not display |
| 11:04:17 | 14 | this to the jury. |
| 11:04:17 | 15 | Q.  (By Mr. Melsheimer)  But if you could pull it up, sir, |
| 11:04:20 | 16 | in your binder and look at it for me and tell me when |
| 11:04:22 | 17 | you're there. |
| 11:04:29 | 18 | A.  I am there. |
| 11:04:29 | 19 | Q.  Was the information in this document made by or from |
| 11:04:32 | 20 | information transmitted by a person with knowledge of the |
| 11:04:35 | 21 | events or conditions recorded? |
| 11:04:37 | 22 | A.  Yes. |
| 11:04:37 | 23 | Q.  Was this document made at or near the time of the |
| 11:04:43 | 24 | events or conditions recorded? |
| 11:04:45 | 25 | A.  Yes, it was. |

11:04:45  1  Q.  Was this document made or kept in the regular course of

11:04:49  2  Wells Fargo's business?

11:04:50  3  A.  Yes.

11:04:50  4  Q.  Let me say made and kept in the regular course of Wells

11:04:55  5  Fargo's business?

11:04:56  6  A.  Yes.

11:05:02  7          MR. MELSHEIMER:  Your Honor, we offer DTX-267

11:05:03  8  under the same proviso that was previously discussed.

11:05:06  9          THE COURT:  Is there objection?

11:05:07  10         MS. GLASSER:  There is.  It may be better

11:05:09  11 explained at the bench.

11:05:11  12         THE COURT:  Approach the bench.

11:05:13  13         (Bench conference.)

11:05:19  14         MS. GLASSER:  So, Your Honor, he said some of the

11:05:26  15 words from the business records foundation requirement, but

11:05:29  16 it's readily apparent from the document it's not a business

11:05:33  17 record of activities made at -- made in the course of

11:05:36  18 business of Wells Fargo.

11:05:37  19         These are the first two slides.  The business

11:05:42  20 about -- it appears to be some sort of an external

11:05:45  21 presentation rather than any sort of record of actual

11:05:50  22 business activities.  And so I think they want to show it

11:05:55  23 because it's got some statements like this, which, again,

11:05:57  24 are just going to be yet again making the same point, it's

11:06:02  25 old technology, right, which he's already made a couple of

11:06:05   1   times over Your Honor's admonitions.

11:06:08   2        THE COURT:  All right.  Well, let's -- let's turn

11:06:09   3   to whether or not they are actual records of the bank.

11:06:11   4        These photographs that say, my kids, those are

11:06:14   5   bank records?

11:06:15   6        MR. MELSHEIMER:  Yes, Your Honor.  It was a

11:06:17   7   presentation that he gave while employed by the bank at a

11:06:23   8   conference.  And it was -- it was an introduction to who he

11:06:27   9   is and things of that nature.

11:06:29  10        I'm not -- if the Court wants to excise those, I'm

11:06:32  11   not pushing those.  That's the whole PowerPoint, though.

11:06:37  12   He talks about -- the substance of it is in the other

11:06:43  13   slides, but this was maintained within the bank, and it was

11:06:46  14   a presentation he had given inside the bank.

11:06:48  15        MS. GLASSER:  And I don't dispute that it may have

11:06:51  16   been created while he was at the bank.  That's not records

11:06:54  17   of the bank's activities, so this is not a good example.

11:06:57  18   It's another -- it's sort of a retrospective diagram of, he

11:06:59  19   says, traditional check capture.

11:07:01  20        So whether it was created for some external

11:07:05  21   conference, it's clearly not a record of the business's

11:07:10  22   actual activities made at the time of those activities.

11:07:13  23        THE COURT:  If he's at a conference as a

11:07:15  24   representative of the bank while in the employment of the

11:07:17  25   bank and making a presentation, that's a part of his

| | |
|---|---|
| 11:07:20 | 1 |

11:07:20   1   employment.

11:07:25   2          MS. GLASSER:  Well, I agree with that.

11:07:26   3          THE COURT:  It doesn't have to transpire within

11:07:28   4   the four walls of the bank building to be a bank record.

11:07:31   5          MS. GLASSER:  It does need to be made -- recording

11:07:33   6   events at or about the time that they actually occurred.

11:07:36   7   And what this is is a hearsay document put together at some

11:07:39   8   later point in time about activities in the past.  The fact

11:07:42   9   that it was made while he was working doesn't satisfy that

11:07:45  10   part of the test.

11:07:47  11          THE COURT:  Are you saying that this PowerPoint

11:07:50  12   presentation was not created at or about the time he made

11:07:52  13   the presentation on behalf of the bank?

11:07:55  14          MS. GLASSER:  I have no idea about that.  But the

11:07:57  15   standard is you have to be -- the things that you're

11:08:02  16   recording in the document have to be things that are being

11:08:06  17   recorded at or about the time that they happened.  If it

11:08:09  18   was just -- it has to be made at or about the time it was

11:08:12  19   made, then every document made at work would satisfy.

11:08:14  20          But the idea it's supposed to be accurate in the

11:08:17  21   sense of somebody doing the regular business activities,

11:08:20  22   writing them down at that time, this is somebody maybe at

11:08:24  23   work, maybe not, writing down some activities that

11:08:28  24   happened, if at all, in the past.

11:08:30  25          MR. MELSHEIMER:  Your Honor, he's -- so that would

| | | |
|---|---|---|
| 11:08:34 | 1 | exclude from the business records exception of a lot of |
| 11:08:39 | 2 | documents. |
| 11:08:39 | 3 | THE REPORTER:  Judge? |
| 11:08:39 | 4 | THE COURT:  You're going to have to -- |
| 11:08:42 | 5 | MR. MELSHEIMER:  The point is, this is all stuff |
| 11:08:46 | 6 | that he put together.  Some of it is historical, some of it |
| 11:08:52 | 7 | is background information, but it is all his knowledge of |
| 11:08:54 | 8 | events and processes and how they work.  He didn't put them |
| 11:08:59 | 9 | together at or around the time that the document is being |
| 11:09:02 | 10 | communicated. |
| 11:09:03 | 11 | So I don't -- I really think there's an objection |
| 11:09:07 | 12 | to the business record predicate.  It's been laid.  He's |
| 11:09:11 | 13 | answered the questions to lay the predicate, which is a |
| 11:09:14 | 14 | pretty slim evidentiary basis to -- I mean, it's not a |
| 11:09:18 | 15 | heavy burden to satisfy that. |
| 11:09:20 | 16 | And so I would submit that the other objections |
| 11:09:23 | 17 | really go to relevance or some other issue, which was not |
| 11:09:25 | 18 | the basis for the objection, conditional.  The ruling by |
| 11:09:30 | 19 | the Magistrate, as I understand it, was if we could prove |
| 11:09:33 | 20 | this up as a business record, it would come in, not that |
| 11:09:36 | 21 | there's all these individual pieces of it that are somehow |
| 11:09:40 | 22 | inappropriate. |
| 11:09:40 | 23 | THE COURT:  I'm going to limit my consideration to |
| 11:09:43 | 24 | whether it does or doesn't fall within the business records |
| 11:09:46 | 25 | exception. |

11:09:46  1      If there were other substantive bases to challenge

11:09:50  2  it, they should have been challenged before the Magistrate

11:09:53  3  at the pre-trial ruling.  I'll assume because the

11:09:57  4  Magistrate indicated that it was pre-admitted if a business

11:10:01  5  record -- proper business records predicate could be laid,

11:10:04  6  that any other material or substantive objection either

11:10:08  7  wasn't urged or it's been urged and overruled.

11:10:11  8      MR. MELSHEIMER:  Correct.

11:10:12  9      MS. GLASSER:  And a document like this is kind of

11:10:14  10  the classic in addition to one of the children, right?

11:10:17  11  This is not a business -- a record of a business made at or

11:10:21  12  about the time of the business' activity.  This is just --

11:10:26  13      THE COURT:  I'm going to -- I'm going to find that

11:10:29  14  the business records predicate has been met.  You can

11:10:33  15  certainly challenge these kind of issues on

11:10:36  16  cross-examination.

11:10:38  17      MS. GLASSER:  Well, Your Honor, I think I'm just

11:10:40  18  going to be putting a giant spotlight on the problem if I

11:10:45  19  try to go into this in cross.  The jury doesn't know the

11:10:47  20  evidentiary rules.  The document says -- this is a claim

11:10:49  21  element, right?  It's pretty much the same -- it's existed

11:10:52  22  since the beginning.  This is not an at-the-time business

11:10:56  23  records statement.

11:10:58  24      MR. MELSHEIMER:  You're not going talk about the

11:11:02  25  patent claim at this time.  If she wants to --

| | | |
|---|---|---|
| 11:11:05 | 1 | THE COURT:  I think that the -- I think that the |
| 11:11:07 | 2 | Plaintiff's arguments on the business records exception are |
| 11:11:10 | 3 | overly narrow, and I think this probably falls within a |
| 11:11:14 | 4 | broader reading of the exception.  So I'm going to find |
| 11:11:16 | 5 | that the business records exception has been met. |
| 11:11:18 | 6 | Anything else about this should have been |
| 11:11:20 | 7 | challenged before now, and I'm not going to reopen that. |
| 11:11:23 | 8 | MR. MELSHEIMER:  Thank you. |
| 11:11:23 | 9 | THE COURT:  So you're permitted to proceed with |
| 11:11:25 | 10 | it. |
| 11:11:25 | 11 | MR. MELSHEIMER:  Thank you. |
| 11:11:26 | 12 | MS. GLASSER:  Thank you. |
| 11:11:27 | 13 | (Bench conference concluded.) |
| 11:11:37 | 14 | MR. MELSHEIMER:  May I have just a moment, |
| 11:11:39 | 15 | Your Honor? |
| 11:11:39 | 16 | THE COURT:  You may. |
| 11:11:54 | 17 | MR. MELSHEIMER:  Mr. Bakale, can we display for |
| 11:11:59 | 18 | the jury, DTX-267? |
| 11:12:06 | 19 | Q.  (By Mr. Melsheimer)  Mr. Hecht, what is Defendant's |
| 11:12:09 | 20 | Exhibit 267? |
| 11:12:10 | 21 | A.  This is a presentation that I did at BAI/ECCHO check |
| 11:12:20 | 22 | Image Conference in 2005. |
| 11:12:23 | 23 | Q.  Why did you prepare this presentation in 2005? |
| 11:12:27 | 24 | A.  It was really to talk to the industry -- the banking |
| 11:12:33 | 25 | industry and the financial services industry about |

11:12:36   1   duplicate detection and duplicate prevention.

11:12:39   2   Q.   What is BAI/ECCHO, or ECCHO?

11:12:47   3   A.   It's two banking organizations.  BAI, I forget what it

11:12:52   4   is, but, again, they are -- the rules -- the ECCHO is the

11:12:57   5   rules organization that was helping us to facilitate the

11:13:01   6   rules that we were going to use for image exchange and

11:13:05   7   image processing in general.

11:13:09   8           MR. MELSHEIMER:  Can you go, Mr. Bakale, to Page 4

11:13:11   9   of the presentation?

11:13:15   10  Q.   (By Mr. Melsheimer)  And just to remind the jury, sir,

11:13:17   11  what was the overall subject of this presentation that you

11:13:20   12  were giving back in 2005?

11:13:22   13  A.   Yeah, and it was duplicate prevention and duplicate

11:13:29   14  detection.

11:13:29   15  Q.   So you have a duplicate posting topics, and you have a

11:13:35   16  series of bullet points here, what is being illustrated on

11:13:39   17  this slide, sir?

11:13:40   18  A.   Yeah, so what I was talking about here is some of the

11:13:43   19  things that we were talking about before where, first of

11:13:47   20  all, we were describing what the problem was.

11:13:49   21           I talked earlier about the printing, and IRD is

11:13:54   22  the image replacement document or the substitute checks,

11:13:56   23  and that's what I was talking about where we had the

11:13:58   24  printing problem.

11:14:00   25           But because that was -- at this time, we had a

11:14:04  1  major issue, as I talked about before, with duplicate

11:14:08  2  print, and thousands of checks at a time coming in and

11:14:10  3  posting to customers' accounts, not because of fraud but

11:14:13  4  because of accidents that were happening at banks in the

11:14:16  5  printing process.  That's what the IRD was.

11:14:20  6  And then the next one was about that, you know,

11:14:23  7  duplicates have been around -- around for a long time, and

11:14:25  8  that's also what I was talking about before, even back at

11:14:28  9  the early days.

11:14:30  10  You could have a jam on one of those 3890 sorters

11:14:33  11  where the checks would all get stuck just like a printer,

11:14:37  12  and then the operator would have to pull those checks out

11:14:38  13  and put the ones that had been captured in so that they

11:14:43  14  don't get captured again, but it always -- not always, but

11:14:46  15  it frequently happened that the operator would not restart

11:14:48  16  it correctly and potentially run additional checks through,

11:14:51  17  and we got duplicates.  And, again, that is not -- that's

11:14:55  18  been there since the beginning of check processing.

11:14:59  19  And then prevention is really stopping the

11:15:02  20  duplicate before it happens.

11:15:04  21  So at Wells and other banks, we have this concept

11:15:07  22  of what's called in-channel duplicate detection where we

11:15:11  23  can actually look for the duplicates as they're going

11:15:14  24  through.

11:15:15  25  So if it's going through the teller system and the

11:15:17  1   teller actually scans the same check twice, we stop the

11:15:20  2   teller and tell them that, oh, you just scanned that check

11:15:23  3   twice, and we do that over many days because it could

11:15:27  4   happen across days.

11:15:29  5        So that's what prevention is.  You stop it before

11:15:32  6   it happens.

11:15:33  7        But detection is really what -- what I said in

11:15:37  8   this presentation is more important.  And that's the

11:15:41  9   husband and wife scenario that I talked about.  Because,

11:15:45  10  there again, it was just -- it wasn't that it was sitting

11:15:49  11  in front of them.  It's just that you go home, it's sitting

11:15:52  12  on the counter, and you say, oh, this needs to go to the

11:15:54  13  bank, and it goes through again.

11:15:56  14       So in that scenario, we were looking across

11:16:00  15  channels so if it came in through the branch and it came in

11:16:04  16  through mobile deposit or it came in through Desktop

11:16:07  17  Deposit, we would compare and find that, and it could be

11:16:11  18  weeks later.

11:16:11  19       So at the time we started this, it was 90 days for

11:16:14  20  the -- what we called cross-channel duplicates, and that's

11:16:18  21  90 business days.  Now we're up to almost nine months that

11:16:24  22  we do that on our process to actually do detection on the

11:16:27  23  back end to find whenever we see transactions or checks

11:16:30  24  that are coming in through multiple channels.

11:16:33  25       And then I've got -- when it says solving the

11:16:39  1   duplicate problems, we went to this conference to share

11:16:43  2   this with others so that they could see here's how you need

11:16:46  3   to solve the problem.  Because if you think about

11:16:48  4   duplicates in this new paradigm that we're dealing with in

11:16:52  5   Check 21, it was really important that all banks did this

11:16:54  6   because we were impacting each other's customers.

11:16:59  7        So, for example, if, you know -- I'll just pick on

11:17:03  8   Chase, if they're printing their checks and they print them

11:17:06  9   twice, they have checks in there for almost every bank, and

11:17:09  10  they print them twice.  So that means customers at every

11:17:12  11  bank in the country would be impacted.

11:17:15  12       And the same thing is true at Wells Fargo.  If we

11:17:18  13  print the checks twice, we could impact customers at every

11:17:22  14  bank in the country.

11:17:23  15       So it was really important for all the banks to

11:17:25  16  embrace this concept to protect our customers from the

11:17:30  17  duplicate phenomenon that was happening with this new

11:17:34  18  scenario with this substitute check and then subsequently

11:17:39  19  with the image processing where the customers and/or the

11:17:41  20  businesses could keep the checks instead of delivering them

11:17:44  21  to the bank.

11:17:45  22  Q.  Mr. Hecht, this presentation, remind the jury

11:17:53  23  chronology-wise where this presentation occurred in

11:17:58  24  relation to Wells Fargo's introduction of remote mobile

11:18:03  25  deposit.

11:18:03  1    A.  Yes, so as we mentioned before, we launched our Desktop

11:18:06  2    Deposit on October 28th, 2004, which was the first day it

11:18:10  3    was legal, and we had to have these duplicate protections

11:18:13  4    in early.  And so we were building this even before 2004

11:18:18  5    because we knew checks -- the Check 21 rule was coming, and

11:18:21  6    we knew that this phenomenon was about to become a big

11:18:25  7    problem, especially with the early printing process.  We

11:18:29  8    just knew that that was going to be an issue.

11:18:30  9          So we built -- we started building it, and then we

11:18:34  10   had it in place in 2005, fully in place, both the front end

11:18:40  11   duplicate detection where we would check at Desktop Deposit

11:18:43  12   to see if a customer was scanning on the Desktop Deposit

11:18:46  13   more than once, and then also this back end process that

11:18:50  14   was the cross-channel, to see if it was coming in from

11:18:54  15   multiple channels.  Or we would even -- we even detect it

11:18:57  16   if it comes in from another bank double.  Because a

11:19:01  17   customer could deposit it at one bank and then take that

11:19:03  18   check to a totally different bank.  It doesn't mean that it

11:19:06  19   would be Wells to Wells.

11:19:07  20         You could take that check, instead of going and

11:19:11  21   depositing it at Wells Fargo Mobile, you could take it to

11:19:15  22   Chase branch and deposit it there.  But if it's a Wells

11:19:20  23   Fargo check, it would come back to Wells Fargo.

11:19:21  24         And that's why it was really important to detect

11:19:23  25   that before it posted to the customer's account.  We didn't

11:19:27   1    want it to post twice and then have to wait days for the

11:19:31   2    customer to call back in and say, why did my mortgage

11:19:34   3    payment actually hit my account twice?  Because in that

11:19:37   4    time you don't have access to that money.  It's really

11:19:38   5    important to move that up and make sure that we could

11:19:41   6    detect that before it impacted the customer.

11:19:44   7    Q.  Mr. Hecht, I'm going to ask you just to remember the

11:19:46   8    Court's admonition to slow down a little bit.

11:19:49   9    A.  Oh, sorry about that.

11:19:50   10   Q.  Thank you.

11:19:51   11        I want to talk to you about a couple of other

11:19:56   12   fraud detection tools that were mentioned in the trial.

11:19:59   13        Have you heard of something called amount

11:20:01   14   verification?

11:20:02   15   A.  Yes, sir.

11:20:03   16   Q.  What is amount verification?

11:20:05   17   A.  Amount verification is where we validate that the

11:20:10   18   amount that was declared is the amount that's also in

11:20:14   19   what's called the courtesy box where you write the numbers

11:20:18   20   and also the legal amount on the check where you write out

11:20:22   21   the number or the amount of the check.

11:20:24   22   Q.  How long has Wells Fargo been verifying the amounts on

11:20:28   23   checks?

11:20:28   24   A.  Again, since the beginning of checking.  We have to

11:20:32   25   verify the amount, especially between those two fields

| | | |
|---|---|---|
| 11:20:37 | 1 | because the reason it's called the legal amount is, |
| 11:20:39 | 2 | although many people think that the most important thing is |
| 11:20:42 | 3 | writing the numbers out, legally what's important is the |
| 11:20:46 | 4 | legal amount where you write it out.  That is the |
| 11:20:49 | 5 | definitive number that the banks are held to when we clear |
| 11:20:52 | 6 | the check. |
| 11:20:52 | 7 | Q.  Was amount verification something that Wells Fargo was |
| 11:20:56 | 8 | doing -- |
| 11:20:58 | 9 | MS. GLASSER:  Objection, Your Honor.  Approach the |
| 11:21:00 | 10 | bench? |
| 11:21:01 | 11 | THE COURT:  Approach the bench, counsel. |
| 11:21:03 | 12 | (Bench conference.) |
| 11:21:06 | 13 | MS. GLASSER:  Your Honor, I'm not sure what to do. |
| 11:21:09 | 14 | I don't want to be disruptive jumping up every question, |
| 11:21:12 | 15 | but he's just doing exactly what he said he wouldn't do |
| 11:21:15 | 16 | with all the going through the claim elements, saying it's |
| 11:21:19 | 17 | old.  It just -- I don't know how we put a stop to it, but |
| 11:21:24 | 18 | I don't want to pop up every single question, but he's just |
| 11:21:26 | 19 | taking advantage of that and asking it over and over. |
| 11:21:29 | 20 | THE COURT:  There's some merit to this, |
| 11:21:31 | 21 | Mr. Melsheimer, you're well below a high level. |
| 11:21:33 | 22 | MR. MELSHEIMER:  I will try to -- |
| 11:21:35 | 23 | THE COURT:  I'm not sure if this witness knows how |
| 11:21:37 | 24 | to stay up out of the weeds.  He's that kind of a person. |
| 11:21:41 | 25 | MR. MELSHEIMER:  Oh, well, I believe I can fix |

11:21:43  1  that, Your Honor, in the next few questions if you'll

11:21:47  2  permit me to do so.

11:21:48  3          MS. GLASSER:  I -- literally, Your Honor, we

11:21:49  4  request -- he's gone -- he's gone so far beyond what he

11:21:51  5  told you in chambers he was going to do already.

11:21:54  6          THE COURT:  A lot of what we're doing is just

11:21:57  7  repetitive.

11:21:57  8          MR. MELSHEIMER:  Agreed, Your Honor.  But that's

11:21:58  9  what I'm saying, I think this is self -- self-solving.

11:22:00  10          THE COURT:  How much longer do you think it's

11:22:02  11  going to go?

11:22:03  12          MR. MELSHEIMER:  About five minutes.

11:22:04  13          THE COURT:  Let's proceed.

11:22:04  14          MR. MELSHEIMER:  Thank you.

11:22:05  15          (Bench conference concluded.)

11:22:11  16          THE COURT:  Let's proceed.

11:22:26  17  Q.  (By Mr. Melsheimer)  Mr. Hecht, I want to move on to a

11:22:28  18  different topic.

11:22:30  19          You told us at the beginning that you're here

11:22:33  20  as -- as Wells Fargo's corporate representative?

11:22:35  21  A.  Yes, sir.

11:22:36  22  Q.  And you've heard the various allegations that USAA has

11:22:42  23  made throughout the trial?

11:22:43  24  A.  Yes, sir.

11:22:44  25  Q.  Now, were you here in the opening statement when the

| | | |
|---|---|---|
| 11:22:54 | 1 | counsel for USAA suggested that Wells Fargo had copied work |
| 11:23:01 | 2 | that USAA had done because individuals at the bank had |
| 11:23:06 | 3 | looked at screenshots of USAA's mobile application?  Do you |
| 11:23:11 | 4 | recall that? |
| 11:23:12 | 5 | A.  Yes, I recall that. |
| 11:23:15 | 6 | Q.  Are screenshots of an application publicly available? |
| 11:23:17 | 7 | A.  Yes, sir, they are. |
| 11:23:19 | 8 | Q.  Based on your experience, can -- can you learn anything |
| 11:23:23 | 9 | about the internal features of the operation of a mobile |
| 11:23:29 | 10 | application simply by looking at a publicly available user |
| 11:23:32 | 11 | interface? |
| 11:23:33 | 12 | There's an objection, so don't answer. |
| 11:23:35 | 13 | MS. GLASSER:  Objection, Your Honor.  It calls for |
| 11:23:38 | 14 | expert testimony.  Also undisclosed. |
| 11:23:40 | 15 | THE COURT:  You're going to have to say that where |
| 11:23:42 | 16 | I can hear you, counsel. |
| 11:23:42 | 17 | MS. GLASSER:  Apologies, Your Honor.  It calls for |
| 11:23:45 | 18 | expert testimony and speculation.  It was also undisclosed. |
| 11:23:54 | 19 | THE COURT:  Restate the question, counsel. |
| 11:23:56 | 20 | Q.  (By Mr. Melsheimer)  Mr. Hecht, can -- can you learn |
| 11:24:00 | 21 | anything about the internal functions of the USAA mobile |
| 11:24:05 | 22 | application by looking at publicly available screenshots? |
| 11:24:08 | 23 | MS. GLASSER:  Same objection, Your Honor.  It's |
| 11:24:10 | 24 | calling for expert -- |
| 11:24:11 | 25 | THE COURT:  Sustained. |

11:24:19   1   Q.  (By Mr. Melsheimer)  Are you familiar with Wells

11:24:20   2   Fargo's mobile application?

11:24:23   3   A.  Yes, sir.

11:24:24   4   Q.  Do the -- do the Wells Fargo mobile application

11:24:29   5   screenshots provide insight into how the source code of the

11:24:34   6   product actually works?

11:24:37   7   A.  I know they do not.

11:24:39   8   Q.  Why not?

11:24:39   9   A.  Because the screenshots don't have any specific bearing

11:24:45  10   on exactly how we would code the underlying capabilities.

11:24:50  11   The screenshots are just the screenshots.

11:24:53  12   Q.  Are Wells Fargo's screenshots of its application, the

11:24:59  13   menus, the different aspects of it, are those confidential?

11:25:03  14   A.  They are not.

11:25:04  15   Q.  Where can you find screenshots or information about

11:25:21  16   Wells Fargo's mobile application?

11:25:24  17   A.  You can find them on YouTube, you can find them in the

11:25:29  18   Google Play Store, you can find them in the Apple store,

11:25:32  19   you can find them all over.  It's common and expected that

11:25:36  20   our Wells Fargo screenshots and all the things that we have

11:25:43  21   available to our customers are available online.

11:25:45  22   Q.  Have you seen screenshots and videos of other banks'

11:25:51  23   mobile applications in the places you describe?

11:25:53  24   A.  Yes, I have.  It's common.

11:25:54  25   Q.  Anything wrong with you looking at those?

11:25:56   1   A.   No, it's -- it's what all competitors do.   It's really

11:26:00   2   important to understand what your competitors are doing.

11:26:03   3   Q.   Are you bothered by anyone looking at Wells Fargo's

11:26:05   4   screenshots?

11:26:06   5   A.   No, it's -- again, it's expected that they'll look at

11:26:10   6   everything that we do.

11:26:17   7   Q.   Has it been your practice within the 30-plus years

11:26:21   8   you've been in the banking business to review publicly

11:26:24   9   available information from other banks?

11:26:26   10   A.   Yes, it's -- it's absolutely common.

11:26:28   11   Q.   Well, why?

11:26:29   12   A.   It's -- again, it's really just what you do in -- in

11:26:34   13   business.   You know, it's really important whether

11:26:38   14   you're -- you're in banking or anywhere else to understand

11:26:43   15   exactly what's happening.

11:26:44   16           So, you know, you can pick any industry.   Every

11:26:48   17   major company or even small companies -- you know, they'll

11:26:52   18   go and investigate, you know, what are my competitors

11:26:56   19   doing?   Is there something that I should be looking at for

11:26:59   20   my customers?   And, again, looking at publicly available

11:27:03   21   information, it's just commonplace across the business

11:27:08   22   landscape, period.

11:27:10   23   Q.   I want to go back to something just very briefly.

11:27:14   24   Two -- two quick topics, endorsement checking and customer

11:27:21   25   authentication   I just want to ask you a very narrow

11:27:24   1   question about that.

11:27:25   2          Are those controls, endorsement verification and

11:27:30   3   customer authentication, are those done in connection with

11:27:32   4   other channels of check deposit other than mobile deposit?

11:27:35   5   A.  Yes, sir.

11:27:36   6   Q.  Why do those things need to be done in other channels

11:27:45   7   of check deposit, meaning customer -- customer

11:27:50   8   authentication and endorsement checking?

11:27:52   9   A.  Yes.  Because those are requirements from a deposit

11:27:56   10  perspective for every channel.  So of the hundreds of

11:28:01   11  channels that we looked at, that's -- you have to know who

11:28:06   12  the customer is that's making the deposit.  It's really

11:28:08   13  important, again, going back to the fraud discussion that

11:28:12   14  we had earlier.

11:28:14   15         And then it's also important because it's the law

11:28:17   16  that the check must be endorsed on the back by whoever is

11:28:23   17  depositing it.

11:28:24   18         So both those things are a requirement both to

11:28:26   19  make sure that the transaction is safe and sound.

11:28:30   20  Q.  Mr. Hecht, just a couple more questions.  I want to go

11:28:33   21  back to this question about the back end versus the front

11:28:38   22  end and the relative cost of developing both.  Do you have

11:28:41   23  a sense based on your own --

11:28:46   24         MS. GLASSER:  Objection, sidebar, Your Honor.

11:28:48   25         THE COURT:  Approach the bench.

11:28:49  1          MS. GLASSER:  Oh, I'm sorry, I was just objecting

11:28:52  2  to the sidebar.

11:28:53  3          MR. MELSHEIMER:  Oh, I'm sorry.  I didn't

11:28:54  4  understand you.  I'm sorry.

11:28:55  5          THE COURT:  Well, Mr. Melsheimer, it's really not

11:29:04  6  proper to have a lengthy statement about what you want to

11:29:05  7  talk about, and then proceed to ask a question.

11:29:10  8          MR. MELSHEIMER:  I can rephrase the question, Your

11:29:11  9  Honor, if it please the Court.

11:29:13  10          THE COURT:  Let's -- let's go to the question

11:29:15  11  part, not the statement part.

11:29:16  12          MR. MELSHEIMER:  Yes, Your Honor.

11:29:17  13          THE COURT:  Ask your question.

11:29:18  14  Q.  (By Mr. Melsheimer)  What is the relative cost of

11:29:22  15  development of the back end processing systems that you

11:29:26  16  described versus the front end processing systems that you

11:29:29  17  described, if you know?

11:29:30  18  A.  Yes, it's much, much greater order of magnitude,

11:29:36  19  greater.

11:29:36  20  Q.  Can you give us any better number or a different

11:29:39  21  number?

11:29:39  22  A.  At least 80 percent more from the back end perspective.

11:29:44  23  Q.  Mr. Hecht, does Wells Fargo respect USAA's intellectual

11:29:47  24  property?

11:29:47  25  A.  Absolutely.

11:29:57   1   Q.  Do you expect USAA to respect your contributions, as

11:30:02   2   well?

11:30:02   3   A.  Yes.  It's -- it really is a two-way street.  You need

11:30:05   4   to respect everybody's property.

11:30:07   5   Q.  Including the contributions that have been made by you

11:30:10   6   and others at Wells Fargo?

11:30:11   7   A.  Absolutely, yes.

11:30:14   8              MR. MELSHEIMER:  May it please the Court.  May I

11:30:15   9   have a moment, Your Honor?

11:30:16   10              THE COURT:  Take a moment.

11:30:28   11   Q.  (By Mr. Melsheimer)  Thank you, Mr. Hecht.

11:30:29   12              MR. MELSHEIMER:  Your Honor, I tender Mr. Hecht

11:30:32   13   for cross-examination.

11:30:33   14              THE COURT:  All right.  You pass the witness?

11:30:36   15              MS. GLASSER:  May I have permission to approach

11:30:38   16   the witness?

11:30:39   17              THE COURT:  Well, before we start with

11:30:40   18   cross-examination by Plaintiff, we're going to break for

11:30:43   19   lunch.  So you can prepare over the lunch hour and be ready

11:30:46   20   to go when we come back.

11:30:48   21              MS. GLASSER:  Will do, Your Honor.

11:30:49   22              THE COURT:  Ladies and gentlemen of the jury, if

11:30:50   23   you'll simply close your notebooks, but please take them

11:30:53   24   with you over the lunch hour to the jury room.  Follow all

11:30:55   25   the instructions I've given you, including not to discuss

11:30:58   1   the case among yourselves.

11:31:01   2         It's 11:30.  We'll do our best to reconvene by

11:31:04   3   12:30 or before.

11:31:05   4         With that, the jury is excused for lunch at this

11:31:08   5   time.

11:31:08   6         COURT SECURITY OFFICER:  All rise.

11:31:10   7         (Jury out.)

11:31:10   8         THE COURT:  Counsel, we need to cover the existing

11:31:38   9   and unresolved disputes regarding demonstratives to be used

11:31:41  10   with Mr. Saffici.

11:31:43  11         I'd like those that are going to speak on those

11:31:47  12   issues from both sides of the case to meet me in chambers.

11:31:51  13   We'll do that as quickly as we can, and then we'll proceed

11:31:53  14   to lunch.

11:31:54  15         The Court stands in recess.

11:31:55  16         COURT SECURITY OFFICER:  All rise.

11:31:56  17         MR. MELSHEIMER:  Can I raise one question with the

11:31:59  18   Court before we break, just the Court's practice?

11:32:01  19         THE COURT:  What's your question?

11:32:02  20         MR. MELSHEIMER:  The question is, the witness,

11:32:04  21   I've tendered him for cross-examination.  I want to

11:32:06  22   understand what's the Court's practice with respect to what

11:32:10  23   communication I can have with the witness, given that the

11:32:12  24   cross-examination has not started.  I just need to

11:32:16  25   understand the Court's practice.

11:32:17  1          THE COURT:  You don't need to talk to him.

11:32:20  2          MR. MELSHEIMER:  Thank you, Your Honor.

11:32:21  3          THE COURT:  Leave him alone.

11:32:22  4          MR. MELSHEIMER:  Thank you.

11:32:23  5          THE COURT:  All right.  We stand in recess.

6          (Recess.)

7

8                    CERTIFICATION

9

10          I HEREBY CERTIFY that the foregoing is a true and

11  correct transcript from the stenographic notes of the

12  proceedings in the above-entitled matter to the best of my

13  ability.

14

15

16   /S/ Shelly Holmes                      1/8/20
    SHELLY HOLMES, CSR, TCRR              Date
17  OFFICIAL REPORTER
    State of Texas No.: 7804
18  Expiration Date: 12/31/20

19

20

21

22

23

24

25