12:44:06

1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
2                             MARSHALL DIVISION

3    UNITED SERVICES AUTOMOBILE    )(
     ASSOCIATION
4                                  )(     CIVIL ACTION NO.

5    VS.                           )(     2:18-CV-366-JRG

6                                  )(     MARSHALL, TEXAS
                                         JANUARY 8, 2020
7    WELLS FARGO BANK, N.A.        )(     12:44 P.M.

8

9                      TRANSCRIPT OF JURY TRIAL

10                         AFTERNOON SESSION

11        BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12                   UNITED STATES DISTRICT JUDGE

13

     APPEARANCES:
14

15   FOR THE PLAINTIFF:

16

     JASON SHEASBY
17   ANTHONY ROWLES
     LISA GLASSER
18   IRELL & MANELLA
     1800 Avenue of the Stars
19   Suite 900
     Los Angeles, CA 90067-4276
20

21

     ROBERT CHRISTOPHER BUNT
22   PARKER, BUNT & AINSWORTH, PC
     100 East Ferguson
23   Suite 418
     Tyler, TX 75702
24

25

```
 1   FOR THE DEFENDANT:

 2

     THOMAS M. MELSHEIMER
 3   M. BRETT JOHNSON
     MICHAEL A. BITTNER
 4   J. TRAVIS UNDERWOOD
     WINSTON & STRAWN LLP
 5   2121 North Pearl Street
     Suite 900
 6   Dallas, TX 75201

 7

     E. DANIELLE T. WILLIAMS
 8   WINSTON & STRAWN LLP
     300 South Tyron Street
 9   16th Floor
     Charlotte, NC 28202
10

11   MATTHEW R. MCCULLOUGH
     WINSTON & STRAWN LLP
12   275 Middlefield Road
     Suite 205
13   Menlo Park, CA 94025

14

     JACK WESLEY HILL
15   WARD, SMITH & HILL, PLLC
     P.O. Box 1231
16   1507 Bill Owens Parkway
     Longview, TX 75606
17

18

     COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                        Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas  75670
22                        (903) 923-7464

23

     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

```
              1              P R O C E E D I N G S
12:44:07      2          (Jury out.)
12:44:07      3          COURT SECURITY OFFICER:  All rise.
12:44:08      4          THE COURT:  Be seated, please.
12:44:08      5          Mr. Hecht, would you return to the witness stand?
12:44:16      6          MR. SHEASBY:  There are two issues with Mr. Hecht,
12:44:19      7   and we ask for him to be sequestered until the issues can
12:44:25      8   be resolved, Your Honor.
12:44:30      9          THE COURT:  All right.  Let's take them up now.
12:44:30     10   What do we have?
12:44:30     11          MR. SHEASBY:  The first issue is that while
12:44:32     12   Mr. Hecht was still on the stand at the lunch break, he was
12:44:34     13   looking at notes and printed materials in preparation for
12:44:37     14   his cross-examination.  Mr. Brady also had notes.  Counsel
12:44:42     15   required me to give those notes to him, which I did.
12:44:46     16          The notes that Mr. Hecht was looking at during the
12:44:49     17   examination are either privileged, in which case he
12:44:53     18   shouldn't be looking at them, or they're not privileged, in
12:44:56     19   which case we should have every right to look at them.  And
12:45:00     20   I had asked counsel for the courtesy of being able to
12:45:03     21   examine them and counsel declined that courtesy.
12:45:07     22          THE COURT:  All right.  What's Defendant's take on
12:45:08     23   this?
12:45:09     24          MR. HILL:  Your Honor, our take is the unknown to
12:45:13     25   some extent.  We weren't in the room when Mr. Hecht was
```

| | | |
|---|---|---|
| 12:45:15 | 1 | sitting here at the table by himself.  Mr. Sheasby was in |
| 12:45:19 | 2 | the room, and says he observed that Mr. Hecht was looking |
| 12:45:22 | 3 | at notes here on the table.  They're still there.  I don't |
| 12:45:26 | 4 | know what's in the man's notes.  I'm hesitant to touch any |
| 12:45:29 | 5 | of it, frankly. |
| 12:45:30 | 6 | THE COURT:  Do we know if these are notes that he |
| 12:45:32 | 7 | made or somebody else's notes? |
| 12:45:33 | 8 | MR. HILL:  There's a notepad of his handwritten |
| 12:45:36 | 9 | notes here, and there's a folder behind it of some |
| 12:45:40 | 10 | documents.  A witness looking at his own notes and |
| 12:45:43 | 11 | materials before cross-examination has been -- has begun is |
| 12:45:47 | 12 | materially different than a witness testifying on the |
| 12:45:49 | 13 | witness stand with notes in front of him, both during |
| 12:45:54 | 14 | direct and during cross-examination.  That's not what's |
| 12:45:56 | 15 | gone on.  There's no parity in that. |
| 12:45:59 | 16 | Frankly, Your Honor, I've never encountered that |
| 12:46:01 | 17 | as a lawyer, that somebody had notes on a witness stand. |
| 12:46:04 | 18 | That's unheard of.  And that's why I asked about it like I |
| 12:46:07 | 19 | did, and I wanted to look at them.  I didn't know what else |
| 12:46:10 | 20 | to do.  I think this is a materially different situation. |
| 12:46:11 | 21 | And, frankly, if we want to know what Mr. Hecht |
| 12:46:14 | 22 | was doing or what he was looking at, we ought to bring him |
| 12:46:17 | 23 | in here and ask him.  We haven't done that.  We weren't |
| 12:46:19 | 24 | present in the room.  And so we really kind of can't tell |
| 12:46:23 | 25 | you any more than those are the facts. |

| | | |
|---|---|---|
| 12:46:26 | 1 | THE COURT:  Where is Mr. Hecht now? |
| 12:46:29 | 2 | MR. HILL:  He's out in the hallway. |
| 12:46:30 | 3 | THE COURT:  All right.  Bring him in, please. |
| 12:46:42 | 4 | Mr. Hecht, let me ask you to go to the microphone |
| 12:46:46 | 5 | at the podium, please. |
| 12:46:47 | 6 | THE WITNESS:  Yes, sir. |
| 12:46:47 | 7 | THE COURT:  Mr. Hill, have a seat. |
| 12:46:50 | 8 | It's been suggested to the Court that during the |
| 12:46:52 | 9 | lunch break, you were at the counsel table for the |
| 12:46:54 | 10 | Defendant where you've been throughout the trial as the |
| 12:46:57 | 11 | Defendant's corporate representative, but that you were |
| 12:47:00 | 12 | looking at or reviewing certain notes. |
| 12:47:04 | 13 | Were you reviewing any documents over the lunch |
| 12:47:07 | 14 | break?  Were they your notes?  Were they somebody else's |
| 12:47:10 | 15 | notes?  Were they something else?  Tell me -- tell me what |
| 12:47:14 | 16 | are the facts with regard to your conduct over the lunch |
| 12:47:19 | 17 | hour at the counsel table. |
| 12:47:22 | 18 | THE WITNESS:  Yes, I pulled out my legal pad and |
| 12:47:25 | 19 | looked at the notes that I had on the last page. |
| 12:47:31 | 20 | THE COURT:  And these are notes that you made? |
| 12:47:34 | 21 | THE WITNESS:  Yes, they are. |
| 12:47:35 | 22 | THE COURT:  And when did you make them? |
| 12:47:36 | 23 | THE WITNESS:  I made them this morning. |
| 12:47:39 | 24 | THE COURT:  Okay.  Before you testified? |
| 12:47:42 | 25 | THE WITNESS:  Before I testified. |

12:47:43  1      THE COURT:  Okay.  And was that part of being

12:47:47  2  prepared to be cross-examined, or why were you looking at

12:47:49  3  notes from this morning?

12:47:50  4      THE WITNESS:  It was just in general to remind

12:47:52  5  myself of some general things that I wanted to think about

12:47:59  6  when I was up testifying.

12:48:03  7      THE COURT:  All right.  And these are notes that

12:48:04  8  you made yourself, they were not -- they were not made with

12:48:07  9  the participation of your counsel in the case; is that

12:48:13 10  right?

12:48:14 11      THE WITNESS:  That's right.

12:48:16 12      THE COURT:  Were you -- did you make your -- you

12:48:17 13  made these notes by yourself?

12:48:19 14      THE WITNESS:  Yes, sir.

12:48:21 15      THE COURT:  Okay.

12:48:22 16      All right.  I don't find there's anything improper

12:48:24 17  with that.  In the Court's view, it's a non-issue.

12:48:29 18      I indicated, as Mr. Melsheimer raised the question

12:48:34 19  right when we broke for lunch, that the witness should not

12:48:36 20  be prepped over the lunch break for cross-examination, and

12:48:39 21  I find no indication that that's happened.

12:48:42 22      Do you have anything else --

12:48:44 23      Thank you, Mr. Hecht.

12:48:45 24      Do you have anything else, Mr. Sheasby?

12:48:47 25      MR. SHEASBY:  Yeah, the second issue -- yes,

| | | |
|---|---|---|
| 12:48:53 | 1 | Your Honor, the second issue was that Mr. Hecht said on the |
| 12:48:54 | 2 | stand that -- unfortunately, I'd like Mr. Hecht to leave |
| 12:48:57 | 3 | for this, as well, because it relates to a door-opening |
| 12:49:01 | 4 | issue, Your Honor.  I can approach the bench as well. |
| 12:49:03 | 5 | THE COURT:  All right.  Please step outside, |
| 12:49:04 | 6 | Mr. Hecht. |
| 12:49:05 | 7 | We are wasting time, and I'm going to charge this |
| 12:49:09 | 8 | time to somebody's trial time. |
| 12:49:11 | 9 | MR. SHEASBY:  I understand. |
| 12:49:12 | 10 | THE COURT:  Go ahead, Mr. Sheasby. |
| 12:49:13 | 11 | MR. SHEASBY:  Mr. Hecht indicated that Wells Fargo |
| 12:49:17 | 12 | respects USAA's intellectual property.  He made it in a |
| 12:49:21 | 13 | general statement.  We believe that that is -- we'd like |
| 12:49:24 | 14 | guidance as to whether that's opened the door that they've |
| 12:49:28 | 15 | been previously adjudged an infringer of a valid United |
| 12:49:33 | 16 | States -- USAA patent. |
| 12:49:34 | 17 | It was a -- it was a bold statement just as saying |
| 12:49:35 | 18 | we respect intellectual property.  It was trying to paint |
| 12:49:37 | 19 | the -- the company in a good light.  He went on to say they |
| 12:49:40 | 20 | need to respect us and respect our contributions.  It was |
| 12:49:43 | 21 | not a passing statement.  It was the central aspect of his |
| 12:49:46 | 22 | testimony, and I do believe it's opened the door. |
| 12:49:49 | 23 | THE COURT:  All right.  Mr. Melsheimer, do you |
| 12:49:51 | 24 | have a response? |
| 12:49:51 | 25 | MR. MELSHEIMER:  Yeah, Your Honor, I don't -- it |

12:49:53   1   was a passing statement.  It was consistent with what we

12:49:55   2   said in the opening statement about respect.  He didn't say

12:49:58   3   anything about any particular patents or any particular

12:50:00   4   issue.  He didn't say, we've never been found not to

12:50:04   5   respect.  He just says, we respect it, we respect theirs,

12:50:07   6   we respect them to respect ours.  It was just a -- it's

12:50:11   7   certainly no opening the door and certainly not opening the

12:50:14   8   door to previous -- previous case.

12:50:18   9        MR. SHEASBY:  The exact testimony is:  We respect

12:50:20   10   USAA's intellectual property.  And they want us to respect

12:50:23   11   their contributions.  It seems that that has clearly joined

12:50:28   12   this issue, Your Honor.

12:50:28   13        You can't say -- you can't -- at some level, you

12:50:33   14   cannot suspend disbelief about what's happened in the past.

12:50:36   15   And for him to make that representation as the corporate

12:50:38   16   representative after what occurred two months ago, it was

12:50:41   17   reckless.

12:50:42   18        MR. MELSHEIMER:  Your Honor, I'd just add we had

12:50:44   19   good faith defenses in that case.  It's not final.  There's

12:50:47   20   still motions to be heard, motions to be adjudicated,

12:50:51   21   appeals to be heard.  It was no different than him saying

12:50:54   22   in the opening that we -- we looked at what they were doing

12:50:57   23   and copied it.  We talked about respect in our opening

12:51:02   24   statement.  It is in no sense intended to open the door and

12:51:05   25   should not be deemed to open the door to anything else.

| | | |
|---|---|---|
| 12:51:13 | 1 | THE COURT:  Well, on the one hand, I agree with |
| 12:51:19 | 2 | Mr. Sheasby that it was more than a passing statement.  It |
| 12:51:23 | 3 | was the final emphasis of the direct testimony, and it |
| 12:51:27 | 4 | probably does open the door to that issue. |
| 12:51:30 | 5 | On the other hand, I agree with Mr. Melsheimer |
| 12:51:33 | 6 | that to tell this jury two months ago this Defendant was |
| 12:51:39 | 7 | the subject of a $200 million verdict against it for patent |
| 12:51:43 | 8 | infringement would be highly prejudicial and would probably |
| 12:51:49 | 9 | be a disproportionate response to the door being opened. |
| 12:51:53 | 10 | I'm amenable to something as an alternative. |
| 12:51:57 | 11 | MR. SHEASBY:  Yes, Your Honor, we would never |
| 12:51:59 | 12 | bring up the verdict.  Our request is that we be allowed to |
| 12:52:03 | 13 | establish with Mr. Hecht that Wells Fargo has previously |
| 12:52:05 | 14 | been found to infringe a valid United States patent, |
| 12:52:08 | 15 | without any reference of the date in which it occurred or |
| 12:52:11 | 16 | the amount. |
| 12:52:13 | 17 | THE COURT:  I assume that this lawsuit and the |
| 12:52:15 | 18 | lawsuit that was reduced to verdict in this court two |
| 12:52:19 | 19 | months ago are not the only times in the history of Wells |
| 12:52:24 | 20 | Fargo Bank that it's been sued for patent infringement. |
| 12:52:26 | 21 | MR. SHEASBY:  I -- I -- I'm assuming that's |
| 12:52:28 | 22 | correct, Your Honor. |
| 12:52:29 | 23 | THE COURT:  Do you have any knowledge of that, |
| 12:52:30 | 24 | Mr. Melsheimer? |
| 12:52:31 | 25 | MR. MELSHEIMER:  Your Honor, I'm sure -- I'm sure |

| | | |
|---|---|---|
| 12:52:33 | 1 | there's been other lawsuits.  I don't know if there's been |
| 12:52:35 | 2 | any other judgments.  We would object to any other |
| 12:52:39 | 3 | reference to this issue.  It's highly prejudicial.  The |
| 12:52:42 | 4 | circumstances, what the case was, what it involved, this -- |
| 12:52:47 | 5 | this will be completely disproportionate to -- |
| 12:52:51 | 6 | THE COURT:  Here's -- |
| 12:52:52 | 7 | MR. MELSHEIMER:  Yes, Your Honor. |
| 12:52:52 | 8 | THE COURT:  Here's what I'm going to do, |
| 12:52:54 | 9 | Mr. Sheasby -- well, it's going to be Ms. Glasser, I |
| 12:52:57 | 10 | assume, who is cross-examining this witness. |
| 12:52:58 | 11 | Ms. Glasser, after I remind you to speak up, and |
| 12:53:02 | 12 | I'm reminding you to speak up, I'll allow you to ask the |
| 12:53:11 | 13 | witness on cross-examination that in response to his |
| 12:53:16 | 14 | statement that Wells Fargo respects intellectual property |
| 12:53:22 | 15 | rights, I'll allow you to ask him that this is not the only |
| 12:53:25 | 16 | time that Wells Fargo has been sued for patent |
| 12:53:28 | 17 | infringement.  You can ask him that question.  If that's |
| 12:53:30 | 18 | the case, then is this the first and only time Wells Fargo |
| 12:53:33 | 19 | has ever been sued for patent infringement? |
| 12:53:35 | 20 | And he'll either say I don't know, or he'll say, |
| 12:53:39 | 21 | no, it's not.  I don't think he's going to say, yes, it is. |
| 12:53:41 | 22 | But that's the extent of what you can go into.  You can't |
| 12:53:45 | 23 | go any further than that. |
| 12:53:47 | 24 | MS. GLASSER:  Thank you, Your Honor. |
| 12:53:48 | 25 | THE COURT:  All right. |

```
12:53:48    1           MR. MELSHEIMER:  And we object to that, Your

12:53:50    2    Honor.

12:53:50    3           THE COURT:  I know you do, Mr. Melsheimer, but you

12:53:53    4    pushed the envelope in your direct, and it was more than a

12:53:56    5    passing statement.  And it was emphatic and it was

12:53:59    6    repeated.  And the Court's -- the Court's not going to give

12:54:05    7    you that latitude on one side of the case and restrain the

12:54:08    8    other party from having the same latitude.  I think I've

12:54:10    9    given a restrained and a proportionate amount of latitude

12:54:17   10    to Plaintiff's counsel.  You can certainly object, but your

12:54:21   11    objection is overruled.

12:54:22   12           MR. MELSHEIMER:  Thank you, Your Honor.

12:54:22   13           THE COURT:  Do we have anything else before I

12:54:23   14    bring the jury back?

12:54:26   15           MR. SHEASBY:  Nothing for Plaintiffs, Your Honor.

12:54:27   16           THE COURT:  Well, let's get the Defendant's

12:54:29   17    corporate representative in the room and at the table.

12:54:31   18    Actually, let's get him on the witness stand.

12:54:36   19           MR. MELSHEIMER:  Your Honor, can I just raise one

12:54:38   20    more question outside of Mr. Hecht's presence?  So he's

12:54:42   21    been instructed on limines about the earlier case, and I'm

12:54:47   22    a little concerned that -- can I --

12:54:50   23           THE COURT:  You don't need to tell him anything.

12:54:51   24    If he doesn't -- if he's not sure he can answer the

12:54:55   25    question, I'll tell him he can answer the question.
```

12:54:58   1          MS. GLASSER:  Your Honor, I think we have a

12:54:59   2   potential solution to it, if Your Honor is amenable, which

12:55:02   3   is, if Mr. Melsheimer is concerned about that issue, when

12:55:06   4   the jury comes back in, it could be instructed that the

12:55:10   5   witness responded that Wells Fargo respects USAA's patent

12:55:16   6   rights and that that question and answer are stricken and

12:55:18   7   should be disregarded.

12:55:26   8          THE COURT:  You're offering that as an alternative

12:55:29   9   to the door opening?

12:55:30  10          MS. GLASSER:  Alternative to the particular

12:55:32  11   question Your Honor proposed, correct.

12:55:36  12          THE COURT:  Well, we have a suggested alternative,

12:55:40  13   Mr. Melsheimer.  Do you have a comment about that?

12:55:42  14          MR. MELSHEIMER:  We'd agree to that, Your Honor.

12:55:44  15          THE COURT:  All right.  So without objection, I'll

12:55:47  16   instruct the jury to disregard that statement.

12:55:49  17          MR. HILL:  Your Honor, may I ask one thing about

12:55:50  18   that, just to make sure this doesn't grow?  We would assume

12:55:55  19   that that would be the lone reference to it in the record;

12:55:57  20   that they wouldn't be able to argue in closing, the Court

12:56:00  21   instructed you, in ruling on an objection, to disregard

12:56:03  22   this, and elevate this yet again?  That's usually

12:56:06  23   inappropriate for a Court ruling striking the matter from

12:56:10  24   the record, and we would question whether that's --

12:56:12  25          THE COURT:  My intention is to tell the jury that

12:56:14  1   the parties that -- that Mr. Hecht was asked this question,

12:56:19  2   that his answer was, yes, Wells Fargo respects intellectual

12:56:22  3   property rights of others, including USAA, and that that

12:56:27  4   question and that answer should be struck, and they should

12:56:30  5   disregard it; period.

12:56:32  6        MR. HILL:  And -- my question is, Your Honor, will

12:56:34  7   the Plaintiff be allowed to comment on that instruction

12:56:37  8   later in the case?

12:56:38  9        THE COURT:  As a part of closing argument?

12:56:40  10       MR. HILL:  Yes, Your Honor.  Typically, an

12:56:43  11  instruction to disregard testimony is not something you can

12:56:45  12  comment on to a jury.  It'd be like commenting on an

12:56:50  13  objection.

12:56:51  14       THE COURT:  I assume you don't have any intention

12:56:53  15  of making that part of your closing argument, Mr. Sheasby?

12:56:55  16       MR. SHEASBY:  I should not be quoting Your Honor's

12:56:58  17  instructions to the jury that way in closing.  Of course,

12:57:01  18  if they did in closing say they respect USAA's intellectual

12:57:05  19  property --

12:57:06  20       THE COURT:  Well, if they go -- after all this, if

12:57:07  21  they go back down that road, then the door will be off the

12:57:11  22  hinges.

12:57:11  23       MR. SHEASBY:  Thank you, Your Honor.

12:57:11  24       THE COURT:  Okay.  Let's all have a seat.  Let's

12:57:14  25  get Mr. Hecht in the room, Mr. Hill.

```
12:57:16    1              MR. MELSHEIMER:  Your Honor, I just -- we can talk
12:57:19    2    about this later, but obviously, we -- we -- we've argued
12:57:21    3    about respect for property rights throughout the case.
12:57:24    4    You're not suggesting that we can't talk about respect in
12:57:27    5    the closing without opening the door?
12:57:28    6              THE COURT:  We'll talk about the parameters for
12:57:30    7    your closing arguments as part of the charge conference if
12:57:33    8    it's still necessary.
12:57:34    9              MR. MELSHEIMER:  Thank you, Your Honor.
12:57:34   10              THE COURT:  Let's get Mr. Hecht on the witness
12:57:36   11    stand.
12:57:37   12              I'll charge this time equally to Plaintiff and
12:57:40   13    Defendant.
12:57:41   14              If you'll have a seat on the witness stand,
12:57:43   15    Mr. Hecht.
12:57:44   16              THE WITNESS:  Yes, sir.
12:57:45   17              THE COURT:  I remind you, sir, you remain under
12:57:47   18    oath.
12:57:48   19              Ms. Glasser, you may go to the podium.
12:57:51   20              Are there any binders to be passed out as part of
12:57:55   21    cross-examination that haven't already been distributed?
12:57:57   22              MR. SHEASBY:  No, Your Honor.
12:57:58   23              THE COURT:  Then let's bring in the jury, please,
12:58:01   24    Mr. Johnston.
12:58:13   25              COURT SECURITY OFFICER:  All rise.
```

| | | |
|---|---|---|
| 12:58:14 | 1 | (Jury in.) |
| 12:58:28 | 2 | THE COURT:  Welcome back from lunch, ladies and |
| 12:58:30 | 3 | gentleman.  Please have a seat. |
| 12:58:31 | 4 | You recall we broke for lunch with the Defendant |
| 12:58:33 | 5 | having passed the witness after having a direct examination |
| 12:58:38 | 6 | of Mr. Hecht.  We'll now proceed with the Plaintiff's |
| 12:58:41 | 7 | cross-examination of Mr. Hecht. |
| 12:58:44 | 8 | Before we do that, members of the jury, at the end |
| 12:58:50 | 9 | of the direct examination of Mr. Hecht, he was asked, in |
| 12:58:55 | 10 | effect, does Wells Fargo respect the intellectual property |
| 12:58:58 | 11 | rights of others, including USAA? |
| 12:59:01 | 12 | And he answered, yes, to that question. |
| 12:59:04 | 13 | I'm instructing you to disregard that question and |
| 12:59:07 | 14 | to disregard his answer and to not let it be a part of your |
| 12:59:11 | 15 | deliberations or your considerations in this case. |
| 12:59:13 | 16 | Now, with that, we'll proceed with |
| 12:59:16 | 17 | cross-examination. |
| 12:59:18 | 18 | MS. GLASSER:  Thank you.  May it please the Court. |
| 12:59:21 | 19 | And good afternoon, ladies and gentlemen. |
| 12:59:21 | 20 | AL HECHT, DEFENDANT'S WITNESS, PREVIOUSLY SWORN |
| 12:59:21 | 21 | CROSS-EXAMINATION |
| 12:59:23 | 22 | BY MS. GLASSER: |
| 12:59:23 | 23 | Q.  Mr. Hecht, you were selected by Wells Fargo Bank to be |
| 12:59:28 | 24 | what they call a "face of the company" witness; is that |
| 12:59:30 | 25 | correct? |

12:59:30  1   A.  Corporate representative is my understanding, yes.

12:59:35  2   Q.  And the idea of that is that whether or not you have

12:59:36  3   any personal knowledge of the matters to which you testify,

12:59:39  4   you are sitting here on behalf of the company as a whole,

12:59:42  5   correct?

12:59:42  6   A.  That's correct.

12:59:44  7   Q.  And this case is about Wells Fargo's consumer remote

12:59:49  8   mobile deposit product, the one that it launched in 2012,

12:59:53  9   correct?

12:59:53  10  A.  Yes, that's my understanding.

12:59:56  11  Q.  You didn't talk very much about that product during

01:00:00  12  your testimony.  And when you did, you didn't show any

01:00:04  13  documents that had your own name on them, correct?

01:00:07  14  A.  I don't agree with the full question that you just

01:00:12  15  asked there.  Can you break it apart for me?

01:00:15  16  Q.  Sure.  Those documents that you showed the jury, the

01:00:18  17  few of them that actually referenced the product that's at

01:00:21  18  issue in this case, not a single one of those documents had

01:00:25  19  your own name on it anywhere, correct?

01:00:30  20  A.  Again, I'm not sure which documents you're referring

01:00:34  21  to.  Can you be specific?

01:00:36  22  Q.  Yes, sir.  I'm referring you to the documents that your

01:00:38  23  counsel showed you during your direct examination.  Are you

01:00:41  24  with me so far?

01:00:42  25  A.  Yes.

| | | |
|---|---|---|
| 01:00:43 | 1 | Q.  The few of those documents that referred to the product |
| 01:00:46 | 2 | at issue in this case, did anyone -- any of them have your |
| 01:00:50 | 3 | own name on them, yes or no? |
| 01:00:52 | 4 | A.  No. |
| 01:00:56 | 5 | Q.  And is it fair to say that you were not directly |
| 01:01:01 | 6 | involved in the front end design, development, or approval |
| 01:01:06 | 7 | of the accused Wells Fargo Mobile Deposit product? |
| 01:01:09 | 8 | A.  No, that is not true. |
| 01:01:11 | 9 | Q.  Is it fair to say, sir, that your direct involvement is |
| 01:01:16 | 10 | on the back end, and that your only role with respect to |
| 01:01:21 | 11 | Mobile Deposit was as a consultant? |
| 01:01:22 | 12 | A.  No, that's not correct. |
| 01:01:24 | 13 | Q.  Would you turn in your witness binder to your |
| 01:01:28 | 14 | deposition transcript?  I'd like to direct you to Page 53, |
| 01:01:41 | 15 | Lines 10 through 17.  And, actually, you can start at |
| 01:02:05 | 16 | Line 6, sir. |
| 01:02:06 | 17 | A.  Sorry, can you state the lines again?  I'm there now. |
| 01:02:09 | 18 | Q.  Page 53, Lines 6 through 17. |
| 01:02:28 | 19 | A.  Okay.  I'm there. |
| 01:02:30 | 20 | Q.  And does this refresh your recollection that you |
| 01:02:32 | 21 | testified differently under oath at your deposition? |
| 01:02:34 | 22 | A.  I'm sorry, I'm not seeing what you're referencing, |
| 01:02:55 | 23 | ma'am. |
| 01:02:55 | 24 | THE COURT:  Give him the page and line number |
| 01:02:57 | 25 | again. |

01:02:59  1   Q.  (By Ms. Glasser)   Page 53, Line 6 through 17, sir.

01:03:03  2   A.  Okay.

01:03:03  3   Q.  You know, you may be looking at the wrong transcript.

01:03:06  4   This is the September 13th.

01:03:13  5   A.  I'm looking at -- it says, Case 2 -- at Depo Case 2.

01:03:18  6   Should I be in Case 1?

01:03:18  7         THE COURT:  Counsel, if you have it, why don't you

01:03:20  8   approach and give him that section of the transcript.

01:03:23  9         MS. GLASSER:  Absolutely, Your Honor.

01:03:25  10        THE COURT:  That way we'll have no question that

01:03:28  11  he's looking at what you're looking at.

01:03:52  12        Let Ms. Glasser know when you've read that

01:03:55  13  section.

01:03:56  14        THE WITNESS:  Yes, I've read it.

01:03:57  15  Q.  (By Ms. Glasser)  Does that reflect your recollection

01:03:59  16  that you previously testified that your only knowledge

01:04:01  17  relative to the front end was consulting, as compared to

01:04:04  18  the back end where you had direct involvement?

01:04:07  19  A.  Yes, but my answer is still the same.

01:04:09  20  Q.  Sir?

01:04:10  21  A.  I'm sorry.

01:04:10  22  Q.  Does that refresh your recollection that you testified

01:04:14  23  differently under oath?

01:04:16  24  A.  I can see the words here, yes.

01:04:17  25  Q.  Now, as the corporate representative, you've been

01:04:23   1   involved in some of the litigation activities; is that

01:04:26   2   correct?

01:04:26   3   A.  Yes.

01:04:27   4   Q.  And are you aware that during the litigation, USAA made

01:04:31   5   a request -- a formal request through the Court procedures

01:04:34   6   for Wells Fargo to identify the persons involved in the

01:04:37   7   design, development, and approval of Wells Fargo Mobile

01:04:43   8   Deposit?

01:04:43   9   A.  No, I'm not aware of the details of that.

01:04:46   10  Q.  Are you aware that Wells Fargo identified Mr. Armin

01:04:53   11  Ajami, who we saw on the video earlier today, as its

01:04:56   12  corporate representative on that particular issue?

01:04:57   13  A.  Yes, I saw that in the testimony.

01:05:02   14          MS. GLASSER:  And could we go ahead and put up

01:05:04   15  PX-13, please?

01:05:05   16          THE COURT:  And, Ms. Glasser, if you could slow

01:05:07   17  down a little bit, that'd be helpful.

01:05:10   18          MS. GLASSER:  Absolutely.  Thank you.

01:05:13   19  Q.  (By Ms. Glasser)  And if we could turn here to the

01:05:15   20  bottom of the second page and the top of the third page.

01:05:23   21  And this document here, sir, you have in your binder or you

01:05:26   22  can see on the screen.

01:05:27   23          The top of the page says:  Mobile remote deposit

01:05:27   24  capture pilot.

01:05:33   25          Do you see that?

01:05:34   1    A.   Yes, ma'am, I see that.

01:05:36   2    Q.   And this is a document that Mr. Armin Ajami brought

01:05:39   3    with him to the deposition when he was asked to identify

01:05:45   4    for us through the Court procedures who were the actual

01:05:45   5    people at Wells Fargo who were involved in the design and

01:05:47   6    development and approval of the product at issue in this

01:05:50   7    lawsuit.  Do you understand that?

01:05:51   8    A.   Yes, ma'am.

01:05:54   9    Q.   And if you look at this document that Mr. Armin Ajami

01:05:58  10    brought on behalf of Wells Fargo to tell us who were the

01:06:00  11    people relevant to the product in this case, there are

01:06:03  12    quite a number of Wells Fargo employees listed; is that

01:06:07  13    fair?

01:06:07  14    A.   Yes.

01:06:08  15    Q.   And none of those people are you, we can agree?

01:06:11  16    A.   Yes.

01:06:12  17    Q.   And, in fact, none of those people will be coming here

01:06:15  18    into the court to testify; is that correct?

01:06:17  19    A.   Yes.

01:06:28  20    Q.   Now, we can agree that Wells Fargo views USAA as a

01:06:32  21    competitor, correct?

01:06:33  22    A.   Yes.

01:06:36  23    Q.   In fact, when Wells Fargo made the decision to adopt

01:06:40  24    the mobile deposit system that is at issue in this case,

01:06:44  25    Wells Fargo focused specifically on USAA's mobile remote

01:06:52   1   deposit technology solution, correct?

01:06:54   2   A.  No, I would not agree with that.

01:06:56   3          MS. GLASSER:  Let's go ahead and pull up PX-23 at

01:06:59   4   Page 7.

01:07:00   5   Q.  (By Ms. Glasser)  Did you speak with Mr. Ajami in

01:07:06   6   preparation for your testimony today, sir?

01:07:09   7   A.  No, I did not.

01:07:09   8   Q.  Did you speak with any of the folks who were listed on

01:07:12   9   that document we just looked at in preparation to testify?

01:07:15  10   A.  No, I did not.

01:07:16  11   Q.  Now, if we look at Page 7 of PX-23, you see here in

01:07:24  12   this 2010 document that Wells Fargo was listing its market

01:07:29  13   considerations, and, in particular, focusing on USAA,

01:07:34  14   correct?

01:07:34  15   A.  I would not agree with that characterization.

01:07:38  16   Q.  Do you see the words on the top of the page, "market

01:07:42  17   considerations"?

01:07:42  18   A.  Yes, I see those words.

01:07:46  19   Q.  And then you see that one of a small number of bullet

01:07:49  20   points of the market considerations is the fact that USAA

01:07:52  21   had had over 125,000 iPhone application downloads at that

01:07:58  22   point in time?

01:07:59  23   A.  Yes, I see those words on the page.

01:08:07  24          MS. GLASSER:  Now, could we put up PX-427 at

01:08:11  25   Page 3?

01:08:14   1   Q.   (By Ms. Glasser)   And while we're putting that up, sir,

01:08:16   2   would you agree with me that when Wells Fargo was

01:08:21   3   evaluating -- valuing the commercial value of Mobile

01:08:24   4   Deposit, when it was deciding whether to introduce this

01:08:27   5   technology, one of the things it was focused on was how

01:08:30   6   much profit it would bring to the bank?

01:08:34   7   A.   No, I wouldn't agree with that characterization.

01:08:37   8   Q.   Do you know one way or the other whether folks at Wells

01:08:40   9   Fargo were hoping that this Mobile Deposit program would be

01:08:45  10   profitable?

01:08:46  11   A.   Can you rephrase the question, please?

01:08:50  12   Q.   Did you speak with anyone in preparation for your

01:08:52  13   testimony who was actually involved with the launch, to

01:08:55  14   determine whether they were hoping that Mobile Deposit

01:09:00  15   would be profitable for Wells Fargo?

01:09:01  16   A.   No, I did not.

01:09:02  17   Q.   Now, if we look at this document here, this is an

01:09:08  18   actual Wells Fargo document, correct?

01:09:12  19   A.   Yes, it is.

01:09:15  20   Q.   And if we call out on the upper left-hand side of the

01:09:19  21   screen, what Wells Fargo was doing here is Wells Fargo was

01:09:24  22   specifically walking through, before Wells Fargo had a

01:09:30  23   mobile remote deposit product, some facts about USAA's

01:09:33  24   technology and its success, correct?

01:09:36  25   A.   I'm sorry, ma'am, I don't know what the date of this

01:09:38    1    is.  Can you show me that?

01:09:40    2    Q.  Sure.  The document is actually in your binder there.

01:09:43    3    They're in numerical order, and this is Exhibit PX-427.

01:09:50    4    A.  One second.

01:09:51    5    Q.  And the front page of the document is August 9th, 2010,

01:10:04    6    so right around this time that Wells Fargo was deciding

01:10:07    7    about whether it wanted to launch this type of technology,

01:10:15    8    correct?

01:10:15    9    A.  Yes, I think that's correct.

01:10:15   10    Q.  And at this point in time, we're about over a year,

01:10:15   11    actually, after USAA had its groundbreaking launch of

01:10:21   12    mobile remote deposit, correct?

01:10:22   13    A.  I'm not sure about the dates on that.

01:10:24   14    Q.  Do you know one way or the other?

01:10:26   15    A.  No, I do not.

01:10:28   16    Q.  Do you have any idea what date USAA came to market,

01:10:31   17    from your own personal knowledge?

01:10:32   18    A.  Only what I've heard here in trial.

01:10:34   19    Q.  And so the folks who work --

01:10:39   20         MS. GLASSER:  Can we put the document back up on

01:10:41   21    the screen, Mr. Huynh?

01:10:43   22    Q.  (By Ms. Glasser)  The folks at Wells Fargo who were

01:10:45   23    actually involved in the mobile project in 2010, what they

01:10:48   24    were focused on was USAA's technology and the value that it

01:10:53   25    would bring to the bank, correct?

01:10:57   1    A.   No, I wouldn't agree with that.

01:10:59   2    Q.   Do you see the words on the page "value to bank"?

01:11:01   3    A.   Yes, I see those words.

01:11:03   4    Q.   And do you believe that that relates to anything other

01:11:06   5    than the mobile remote deposit technology?

01:11:09   6    A.   It looks like it relates to mobile deposit technology.

01:11:16   7    Q.   And this part of the page is solely and entirely

01:11:19   8    focused on USAA, correct?

01:11:21   9    A.   No, I would disagree with that.

01:11:23  10    Q.   Do you see anything on that page at all that is related

01:11:26  11    to a company other than USAA?

01:11:28  12    A.   Wells Fargo.

01:11:34  13    Q.   I'm focusing you on the part that's up on your screen

01:11:38  14    here that is describing the USAA product.  Do you see that,

01:11:41  15    sir?

01:11:41  16    A.   Yes, I do see that.

01:11:42  17    Q.   And, here, when they're talking about the USAA product,

01:11:45  18    what the Wells Fargo folks are saying in the year 2010 is

01:11:49  19    they're saying that there would be at least these four

01:11:52  20    categories of value that this technology would bring to the

01:11:55  21    bank, correct?

01:11:56  22    A.   Yes, I see all four of those.

01:12:03  23    Q.   And those four factors are cost savings, correct?

01:12:05  24    A.   Yes, that's what it says.

01:12:06  25    Q.   Deposit consolidation, correct?

| | | |
|---|---|---|
| 01:12:09 | 1 | A.  Yes. |
| 01:12:10 | 2 | Q.  And in addition to cost savings, deposit consolidation, |
| 01:12:16 | 3 | Wells Fargo also viewed the USAA technology as being an |
| 01:12:20 | 4 | acquisition tool and bringing wow/innovation, correct? |
| 01:12:24 | 5 | A.  I don't agree with that characterization. |
| 01:12:26 | 6 | Q.  Do you agree that those words are on the page, sir? |
| 01:12:29 | 7 | A.  I agree that those words are on the page. |
| 01:12:32 | 8 | Q.  Now, you've come to appreciate, sir, that USAA owns the |
| 01:12:39 | 9 | two patents at issue in this case, correct? |
| 01:12:41 | 10 | A.  Yes. |
| 01:12:44 | 11 | Q.  And patents are part of the category known as |
| 01:12:47 | 12 | intellectual property, correct? |
| 01:12:49 | 13 | A.  Yes, they are. |
| 01:12:50 | 14 | Q.  Is it fair to say that you are not sure how to answer |
| 01:12:56 | 15 | the question of whether it's appropriate to use |
| 01:13:00 | 16 | intellectual property of others without compensation? |
| 01:13:04 | 17 | A.  I'm sorry, can you restate? |
| 01:13:07 | 18 | Q.  Is it fair to say that you don't know how to answer the |
| 01:13:09 | 19 | question of whether it's appropriate to use intellectual |
| 01:13:12 | 20 | property of others without compensation? |
| 01:13:15 | 21 | A.  It's never appropriate to use others' property unless |
| 01:13:21 | 22 | you're approved. |
| 01:13:22 | 23 | Q.  I'd like you to take a look in your binder at the July |
| 01:13:26 | 24 | 19th deposition transcript at Page 13. |
| 01:13:30 | 25 | A.  Okay.  What's the number again? |

01:13:31  1    Q.  It's the July 19th deposition transcript at Page 13.

01:13:45  2    A.  It's labeled first or second.  Can you tell me which

01:13:48  3    one it is, whether it's first or --

01:13:50  4    Q.  It's the first.

01:13:50  5    A.  Thank you.

01:13:53  6    Q.  The other is September.

01:13:54  7    A.  Page 6?

01:13:55  8    Q.  Page 13 at Lines 2 through 10.

01:14:00  9    A.  Got it.

01:14:01  10   Q.  And does that refresh your recollection that at least

01:14:08  11   as of July of last year, you were not sure how to answer

01:14:11  12   the question of whether it's appropriate to use

01:14:15  13   intellectual properties of others without compensation?

01:14:18  14   A.  Yes, I see that on here.

01:14:21  15          MR. MELSHEIMER:  Your Honor, optional

01:14:23  16   completeness.  I don't know if it's -- if this -- if she's

01:14:26  17   trying to say there's a different answer or not, but

01:14:28  18   there's -- if it is, I'd like to offer optional

01:14:31  19   completeness.

01:14:32  20          MS. GLASSER:  I was ready to move to the next

01:14:34  21   question.

01:14:35  22          MR. MELSHEIMER:  Thank you.

01:14:35  23          THE COURT:  Address it in your redirect.

01:14:37  24   Q.  (By Ms. Glasser)  Now, sir, you heard Mr. Brady from

01:14:39  25   USAA testify to a monumental research effort, an investment

| | | |
|---|---|---|
| 01:14:47 | 1 | of a large amount of USAA member funds that produced the |
| 01:14:51 | 2 | patents at issue in this case.  You recall that? |
| 01:14:53 | 3 | A.  Yes, I do. |
| 01:14:54 | 4 | Q.  And Wells Fargo understands that having invested its |
| 01:15:01 | 5 | members' funds into developing this ground-breaking |
| 01:15:05 | 6 | technology and having obtained its rights from the Patent |
| 01:15:09 | 7 | Office, that USAA is entitled to payment from Wells Fargo |
| 01:15:13 | 8 | if Wells Fargo is using it, correct? |
| 01:15:16 | 9 | A.  Well, I disagree with your characterization. |
| 01:15:19 | 10 | Q.  Do you agree, sir, that Wells Fargo needs to pay for |
| 01:15:22 | 11 | USAA's intellectual property if Wells Fargo is using it, |
| 01:15:26 | 12 | yes or no? |
| 01:15:26 | 13 | A.  Can you restate? |
| 01:15:31 | 14 | Q.  Sir, if Wells Fargo is using USAA's technology, should |
| 01:15:36 | 15 | Wells Fargo have to pay for it, yes or no? |
| 01:15:38 | 16 | A.  If we were using their technology, yes. |
| 01:15:42 | 17 | Q.  And, in fact, USAA approached Wells Fargo regarding |
| 01:15:47 | 18 | licensing of the USAA patents, correct? |
| 01:15:51 | 19 | A.  I don't have any knowledge of that. |
| 01:15:54 | 20 | Q.  I'll direct you in your binder to IX-102. |
| 01:16:13 | 21 | A.  Okay.  I'm there. |
| 01:16:14 | 22 | Q.  And could you turn to Paragraph 109?  Are you there, |
| 01:16:23 | 23 | sir? |
| 01:16:24 | 24 | A.  Not yet.  I'm sorry.  Yes, I'm there. |
| 01:16:34 | 25 | Q.  And does that refresh your recollection as a corporate |

01:16:37  1  representative of Wells Fargo that Wells Fargo has actually

01:16:39  2  already admitted that USAA approached Wells Fargo regarding

01:16:42  3  licensing of the USAA Mobile Deposit patents?

01:16:48  4  A.  Can you help me understand the context of this

01:16:52  5  document?  I've never seen it before.

01:16:54  6  Q.  Sure.  This is -- you can look at the end of the

01:16:56  7  document.  You'll see a signature there from the Wells

01:17:01  8  Fargo counsel over at the table there.  Do you see that?

01:17:03  9  A.  Yes, I do.

01:17:04  10  Q.  And you understand it's a formal legal document that's

01:17:07  11  binding on Wells Fargo?

01:17:08  12  A.  I didn't understand that until you said it, but, okay.

01:17:16  13  Q.  All right.  So even though -- you understand now,

01:17:17  14  looking at the document, that, in fact, USAA approached

01:17:19  15  Wells Fargo about licensing the patents, correct?

01:17:24  16  A.  I'm just going to read it here quickly.  Yes, I see

01:17:34  17  that on the page now.

01:17:35  18  Q.  And in all of your dealings, supervising the

01:17:40  19  litigation, getting ready for this trial, no one ever told

01:17:43  20  you -- none of the Wells Fargo employees or counsel ever

01:17:44  21  told you about that fact?

01:17:45  22  A.  I've never seen this document before.

01:17:47  23  Q.  What about the fact, sir?

01:17:48  24  A.  No.

01:17:49  25  Q.  And, in fact, even though USAA approached Wells Fargo,

01:18:00   1   whether or not you heard about it, sir, you understood that

01:18:04   2   there was a federal court lawsuit in which Wells Fargo was

01:18:08   3   being accused of infringing these two patents, correct?

01:18:10   4   A.   Yes, I'm aware of the lawsuit.

01:18:11   5   Q.   And when you took on the task of becoming the corporate

01:18:14   6   representative for this case, you made a decision to not

01:18:20   7   look very carefully at the patents; is that fair?

01:18:24   8   A.   No, it's not fair.

01:18:25   9   Q.   You reviewed the patents that have been asserted

01:18:29  10   against Wells Fargo very briefly, correct?

01:18:34  11   A.   That's not correct.

01:18:35  12   Q.   Could you turn to the same deposition transcript we

01:18:38  13   were just looking at -- at Page 9?

01:18:55  14   A.   Yes, I'm there.

01:18:56  15   Q.   And does that refresh your recollection that when you

01:18:59  16   had your deposition taken under oath, you testified to the

01:19:02  17   exact opposite of what you just told me?

01:19:04  18   A.   Could -- sorry, can you point me to the line number

01:19:07  19   that you're referencing?

01:19:09  20   Q.   Yes, Page 9, Lines 23 through 25.

01:19:18  21   A.   I'm in the wrong one.

01:19:24  22   Q.   Do you have the other one in your binder, sir?

01:19:27  23   A.   Yeah, I'm getting there.

01:19:37  24   Q.   Now, to set the stage of this July deposition, that was

01:19:40  25   a deposition you gave after you had already been designated

01:19:43   1   as a formal corporate representative for Wells Fargo,

01:19:48   2   correct?

01:19:48   3   A.  I'm -- I'm sorry, ma'am.  I'm not sure, because I had

01:19:52   4   two depositions, which one you're referring to.

01:19:53   5   Q.  You've been a corporate representative the whole time,

01:19:56   6   correct?

01:19:56   7   A.  I know I was a corporate representative on this -- this

01:19:59   8   case, but I'm not sure I was --

01:20:01   9   Q.  Yeah, these are both -- these are both cases -- these

01:20:03  10   are depositions taken by USAA counsel against Wells Fargo;

01:20:08  11   you understand that?

01:20:08  12   A.  I do now.

01:20:09  13   Q.  And in connection with the depositions that Mr. Sheasby

01:20:13  14   took of you under oath, you were testifying as a corporate

01:20:18  15   representative of Wells Fargo, true?

01:20:20  16   A.  Yes.

01:20:24  17   Q.  And have you located the passage yet, sir?

01:20:27  18   A.  I have.

01:20:27  19   Q.  Okay.  Does that refresh your recollection that when

01:20:29  20   you previously testified under oath at your deposition, you

01:20:33  21   acknowledge that you had only reviewed the patents that are

01:20:37  22   asserted against Wells Fargo very briefly?

01:20:39  23   A.  Yes, previously.

01:20:41  24   Q.  Have you at this point in time ever read the

01:20:49  25   prosecution histories of the patents?

01:20:51   1   A.  I've seen it in the trial.

01:20:56   2   Q.  And at the time of your deposition, you didn't feel it

01:21:02   3   was important to do more than just kind of skim the

01:21:05   4   patents; is that fair?

01:21:07   5   A.  I wouldn't characterize it that way, so, no.

01:21:09   6   Q.  Why did you review them only briefly?

01:21:13   7   A.  I reviewed them to prepare -- to prep for my

01:21:16   8   deposition.

01:21:17   9   Q.  Now, at that deposition, you were actually formally

01:21:22   10  designated by Wells Fargo to provide, quote, all facts

01:21:27   11  relating to Wells Fargo's knowledge of any of the

01:21:32   12  patents-in-suit, end quote.  Do you recall that?

01:21:34   13        MR. MELSHEIMER:  Your Honor, may we approach just

01:21:35   14  briefly?

01:21:36   15        THE COURT:  Approach the bench.

01:21:37   16        (Bench conference.)

01:21:46   17        MR. MELSHEIMER:  Thank you, Your Honor.  One of

01:21:49   18  the challenges I have here --

01:21:50   19        THE COURT:  Both of y'all need to speak up a

01:21:52   20  little bit more.

01:21:53   21        MR. MELSHEIMER:  Yeah.  One of the challenges I

01:21:53   22  have is she's asking about a deposition in the first case,

01:21:56   23  and she's asking about patents in the first case.

01:21:59   24        MS. GLASSER:  No, I'm not.

01:22:01   25        MR. MELSHEIMER:  Well --

01:22:03   1          MS. GLASSER:  These are just general questions,

01:22:05   2   right?  And in the second --

01:22:06   3          MR. MELSHEIMER:  But the problem is, Your Honor --

01:22:08   4   here's the problem.  Only she knows the intent of what

01:22:10   5   she's asking, but the point is there are two cases, there

01:22:13   6   are two different sets of patents.  So it's true that he

01:22:17   7   did not review the first case patents.  He did review those

01:22:23   8   briefly.

01:22:24   9          She's not -- and I -- I'm somewhat hamstrung here

01:22:26  10   on what I can do with this, and I don't want to bring up

01:22:28  11   the other case or the other patents.  He sort of said --

01:22:31  12          THE COURT:  Well, first of all, we need to make

01:22:34  13   sure that both the counsel and the witness clearly have the

01:22:39  14   right depositions --

01:22:39  15          MS. GLASSER:  Yeah.

01:22:41  16          THE COURT:  -- and there's no question.  I mean,

01:22:45  17   quite honestly, he's already made one reference to Case 2

01:22:48  18   that I'm sure everybody here had wished he had not made.

01:22:52  19          MR. MELSHEIMER:  Here's the problem, Judge, with

01:22:54  20   that.  The binder they've given him, that's Deposition

01:22:58  21   Case 1, Deposition Case 2.  I've just now noticed that when

01:23:01  22   they handed it to me.  So he's just using the nomenclature

01:23:05  23   that they given him.

01:23:07  24          And I'm not -- I'm not worried about that per se,

01:23:09  25   Your Honor.  I just think it's -- it's very misleading for

01:23:12  1  us to -- for this jury that he hasn't read these patents

01:23:17  2  when that is not what this question --

01:23:18  3          MS. GLASSER:  So this is about the second case --

01:23:18  4          THE COURT:  Wait a minute.  Wait a minute.

01:23:21  5  Wait -- wait a minute.

01:23:22  6          Now, we're going to talk one at a time up here,

01:23:24  7  and we're going to do it the way I say.  Do you understand

01:23:26  8  that?

01:23:26  9          MS. GLASSER:  Absolutely.

01:23:29  10          THE COURT:  Everybody understand that?

01:23:30  11          MR. MELSHEIMER:  I do, Your Honor.

01:23:31  12          THE COURT:  All right.  If you believe that the

01:23:34  13  questions she's posed relate to other patents than those

01:23:39  14  that are at issue in this case, then you can take that up

01:23:42  15  on redirect -- on redirect.  You can refer him back to the

01:23:47  16  earlier passage from his deposition that she asked him

01:23:50  17  about.  And if you can show that she tried to trick him by

01:23:54  18  asking if he'd read patents in another case, as opposed to

01:23:57  19  this case, you can do that.

01:23:58  20          MR. MELSHEIMER:  Of course, Your Honor.  The

01:24:00  21  problem with that is that it suggests that there was

01:24:02  22  another case.  That seems to put me in a rather Hobson's

01:24:09  23  choice.

01:24:09  24          THE COURT:  You can -- you can make it clear that

01:24:11  25  those are not the patents in this case.  Maybe they were

01:24:14  1   patents --
01:24:14  2         MS. GLASSER:  And to be clear, this second -- this
01:24:16  3   question I'm asking now, this is a topic he was designated
01:24:20  4   on in the second case.
01:24:21  5         THE COURT:  But -- and I want to get this clear.
01:24:23  6   Ms. Glasser, when you impeach a witness, you have them
01:24:26  7   review their prior sworn testimony that you believe is
01:24:30  8   inconsistent with the answer they've given.  And once
01:24:34  9   they've reviewed it, you ask them if they have the same
01:24:37  10  answer to the question, having reviewed that prior
01:24:41  11  deposition and refreshed their recollection.  And if they
01:24:44  12  give you -- they say, yes, my answer has not changed, then
01:24:48  13  you can publish that section of the prior inconsistent
01:24:53  14  statement to the jury.
01:24:53  15        You're telling the jury what you think that prior
01:24:55  16  inconsistent statement is.  You're telling the jury, well,
01:24:58  17  this doesn't refresh your recollection that such and such
01:25:01  18  time you said so and so.
01:25:03  19        MS. GLASSER:  Understood.
01:25:03  20        THE COURT:  You do not need to be characterizing
01:25:05  21  the deposition testimony if that's the prior inconsistent
01:25:07  22  basis.
01:25:08  23        You just need to publish it once he's had an
01:25:11  24  opportunity to refresh his recollection, and if he doesn't
01:25:13  25  change his answer.

| | | |
|---|---|---|
| 01:25:14 | 1 | MR. MELSHEIMER:  Your Honor, I would just ask |
| 01:25:16 | 2 | there to be caution here because -- I'm not casting any |
| 01:25:25 | 3 | aspersions here, but Mr. Hecht was not the corporate |
| 01:25:26 | 4 | representative in the first case.  This question in this |
| 01:25:29 | 5 | deposition that she tried to impeach him with is from the |
| 01:25:33 | 6 | first case. |
| 01:25:33 | 7 | She may say, well, that's not what I was asking |
| 01:25:35 | 8 | him, but the problem is she's creating the -- that it -- I |
| 01:25:40 | 9 | mean, I understand the Court's admonishment -- |
| 01:25:42 | 10 | THE COURT:  You can use a prior inconsistent |
| 01:25:45 | 11 | statement to impeach from any prior occurrence. |
| 01:25:48 | 12 | MR. MELSHEIMER:  But it can't -- of course, |
| 01:25:50 | 13 | Your Honor, but it can't be confusing the patents between |
| 01:25:53 | 14 | two cases. |
| 01:25:59 | 15 | THE COURT:  And I'm hearing you say that's what's |
| 01:25:59 | 16 | happened, and I'm hearing her say that's not what's |
| 01:26:02 | 17 | happened. |
| 01:26:02 | 18 | MR. MELSHEIMER:  Respectfully, Your Honor, that's |
| 01:26:05 | 19 | not what she's saying.  She's saying it was not her |
| 01:26:07 | 20 | question.  I'm saying the deposition excerpts she pulled |
| 01:26:10 | 21 | out were from the first case. |
| 01:26:11 | 22 | MS. GLASSER:  The pending question right now is |
| 01:26:12 | 23 | specifically about the second case, so the topic he was |
| 01:26:15 | 24 | designated on in the second case. |
| 01:26:18 | 25 | MR. MELSHEIMER:  She ought to just -- these |

| | | |
|---|---|---|
| 01:26:20 | 1 | patents -- the patents in this case, I think it's just |
| 01:26:22 | 2 | clearer that way. |
| 01:26:23 | 3 | MS. GLASSER:  That's fine.  I'm happy to do that. |
| 01:26:26 | 4 | THE COURT:  If there's going to be references to |
| 01:26:29 | 5 | patents in either the cross or the redirect, both sides -- |
| 01:26:32 | 6 | both of you all need to make abundantly clear that they are |
| 01:26:37 | 7 | these patents that are at issue in this case at this time. |
| 01:26:42 | 8 | MS. GLASSER:  Understood. |
| 01:26:43 | 9 | MR. MELSHEIMER:  And, of course -- thank you, Your |
| 01:26:45 | 10 | Honor.  Thank you. |
| 01:26:45 | 11 | THE COURT:  All right.  Let's proceed. |
| 01:26:46 | 12 | (Bench conference concluded.) |
| 01:26:52 | 13 | THE COURT:  Let's proceed. |
| 01:26:54 | 14 | Q.  (By Ms. Glasser)  All right, Mr. Hecht.  Now, in this |
| 01:27:00 | 15 | case, you were designated by Wells Fargo to testify as to |
| 01:27:05 | 16 | all facts relating to Wells Fargo's knowledge of any of the |
| 01:27:08 | 17 | patents-in-suit; is that right? |
| 01:27:09 | 18 | A.  Yes, I think that's right. |
| 01:27:11 | 19 | Q.  And there have been -- you mentioned earlier that there |
| 01:27:18 | 20 | were quite a number of folks that have worked at Wells |
| 01:27:22 | 21 | Fargo over the years on its deposit systems; is that right? |
| 01:27:25 | 22 | A.  Yes, ma'am. |
| 01:27:25 | 23 | Q.  And we looked at a document earlier that showed roughly |
| 01:27:29 | 24 | 20 people or so who Wells Fargo had identified to us, USAA, |
| 01:27:34 | 25 | in this case as having been involved.  Do you recall that? |

01:27:37  1   A.  The last Wells Fargo document that we looked at; is

01:27:39  2   that what you're asking?

01:27:40  3   Q.  The one that had the list of people who were involved

01:27:43  4   in developing and improving the product, yes.

01:27:46  5   A.  Yes.

01:27:46  6   Q.  And you didn't actually go and speak with any of those

01:27:51  7   people in order to determine what their knowledge was of

01:27:55  8   the patents at issue in this lawsuit, fair?

01:27:57  9   A.  Can you break that apart for me?

01:28:00  10  Q.  Did you talk with any of the people who were involved

01:28:03  11  in developing the Wells Fargo Mobile Deposit product, in

01:28:07  12  order to determine their level of knowledge of the patents

01:28:12  13  at issue in this lawsuit?

01:28:13  14  A.  No.

01:28:14  15  Q.  In fact, the only people that you spoke with when you

01:28:19  16  spoke as the voice of Wells Fargo on the extent of

01:28:23  17  knowledge of Wells Fargo on the patents, the only people

01:28:26  18  you spoke with were the Wells Fargo litigation team,

01:28:35  19  correct?

01:28:35  20  A.  I think I -- that's not correct.

01:28:46  21  Q.  Who else did you speak with, sir?

01:28:47  22  A.  Margot Lockwood-Stein.

01:28:48  23  Q.  And Margot Lockwood-Stein was someone who we heard from

01:28:52  24  earlier in the Court today; is that right?  We watched her

01:28:55  25  video and then had her testimony read into the record?

01:28:57  1   A.  Yes, that's correct.

01:28:58  2   Q.  And Margot Lockwood-Stein was somebody who, similar to

01:29:03  3   you, had never performed an evaluation of whether Wells

01:29:08  4   Fargo is actually practicing the patents at issue in this

01:29:10  5   case, fair?

01:29:12  6   A.  I don't have any knowledge of that.

01:29:15  7   Q.  What Ms. Lockwood-Stein testified to, which we heard

01:29:21  8   earlier in the court, is that Wells Fargo makes a

01:29:25  9   substantial sum of money from using the accused mobile

01:29:31  10  remote deposit product, correct?

01:29:32  11  A.  I don't recall her saying it that way.

01:29:34  12  Q.  Do you recall the testimony where she indicated that

01:29:38  13  just based on cost savings on an annual basis, Wells Fargo

01:29:44  14  is making at least roughly 60 million to $120 million per

01:29:49  15  year?

01:29:50  16  A.  Yes, I remember that as part of the back-and-forth, but

01:29:59  17  I don't remember her saying that directly.

01:30:01  18  Q.   Now, in terms of your own investigation here as the

01:30:12  19  corporate representative in this patent infringement

01:30:13  20  lawsuit, is it fair to say that you didn't do anything to

01:30:18  21  investigate whether Wells Fargo is actually using the

01:30:23  22  patents at issue in this lawsuit?

01:30:25  23  A.  No, that is not fair.

01:30:26  24  Q.  Please turn to your binder at your sworn deposition

01:30:30  25  testimony from September 3rd, 2019.

01:30:37   1    A.  Yes, I'm there.

01:30:38   2    Q.  Page 25, Lines 15 through 19.  Does reviewing that

01:30:55   3    testimony refresh your recollection, sir?

01:31:03   4    A.  I can see the words on the page, yes.

01:31:09   5    Q.  And looking at the words on the page, I'm going to ask

01:31:15   6    you the question again.  You personally didn't do anything

01:31:20   7    to investigate whether Wells Fargo is using the patents at

01:31:24   8    issue in this lawsuit, correct?

01:31:26   9    A.  At this time, yes.

01:31:32  10    Q.  You understand, sir, that the USAA patents do cover

01:31:36  11    mobile deposit, correct?

01:31:37  12    A.  Yes, I understand that.

01:31:42  13    Q.  Now, a lot of your testimony earlier today had to do

01:31:46  14    with issues about other systems.  Do you recall that -- a

01:31:53  15    2004 Desktop Deposit system using a scanner, a specialized

01:31:57  16    scanner, and then you talked about some mobile banking on

01:32:00  17    the Internet?  Do you recall that?

01:32:01  18    A.  Yes, I do.

01:32:01  19    Q.  And when you were talking about those old methods of

01:32:05  20    doing things, you didn't offer the jury any sort of

01:32:10  21    testimony indicating that Wells Fargo could have just

01:32:14  22    continued using those things instead of using the

01:32:18  23    accused -- the USAA mobile remote deposit technology, did

01:32:23  24    you?

01:32:24  25    A.  I wouldn't agree with that characterization.

| | | |
|---|---|---|
| 01:32:26 | 1 | Q.  Do you believe, sir, that instead of adopting the USAA |
| 01:32:28 | 2 | approach, Wells Fargo could have just offered to all of its |
| 01:32:34 | 3 | customers use of a specialized check scanner or offering |
| 01:32:38 | 4 | them the ability to go on the Internet and -- and check the |
| 01:32:42 | 5 | amount of their deposit? |
| 01:32:43 | 6 | A.  Again, I wouldn't agree with the characterization that |
| 01:32:46 | 7 | you just made there. |
| 01:32:47 | 8 | Q.  As an alternative to adopting the Wells Fargo product |
| 01:32:51 | 9 | at issue in this case, can we agree that it would not have |
| 01:32:58 | 10 | been commercially viable for Wells Fargo to simply stick |
| 01:33:01 | 11 | with the old specialized scanner approach of Desktop |
| 01:33:04 | 12 | Deposit? |
| 01:33:04 | 13 | A.  Again, the context of that is not correct. |
| 01:33:10 | 14 | Q.  Well, we'll come back to that, sir. |
| 01:33:13 | 15 | When we're talking about commercial viability and |
| 01:33:16 | 16 | we're talking about value, you did not mean, sir, to |
| 01:33:20 | 17 | suggest to the jury that you had done any analysis |
| 01:33:26 | 18 | whatsoever to put a number value on what is the impact of |
| 01:33:31 | 19 | mobile check deposit on Wells Fargo, did you? |
| 01:33:34 | 20 | A.  Can you restate that question, please? |
| 01:33:39 | 21 | Q.  You, sir, have done no analysis as to what is the |
| 01:33:43 | 22 | impact of mobile check deposit on Wells Fargo's business, |
| 01:33:46 | 23 | correct? |
| 01:33:46 | 24 | A.  That's incorrect. |
| 01:33:47 | 25 | Q.  Would you turn to your July 19th deposition transcript |

| | | |
|---|---|---|
| 01:33:50 | 1 | at Page 12? |
| 01:34:03 | 2 | A.  Okay.  I'm there. |
| 01:34:03 | 3 | Q.  Page 12, Line 7 through 10. |
| 01:34:09 | 4 | A.  Yes, I've read it. |
| 01:34:15 | 5 | Q.  Does that refresh your recollection? |
| 01:34:17 | 6 | A.  I can see the words on the page, yes. |
| 01:34:19 | 7 | Q.  All right.  I'm going to ask the question again. |
| 01:34:21 | 8 | You have done no analysis as to what is the impact |
| 01:34:25 | 9 | of mobile check deposit on Wells Fargo's business, correct? |
| 01:34:31 | 10 | A.  That is incorrect. |
| 01:34:33 | 11 | MS. GLASSER:  I'm going to ask permission from the |
| 01:34:35 | 12 | Court to read into the record the deposition testimony at |
| 01:34:37 | 13 | Pages 12, 7 through 10. |
| 01:34:38 | 14 | THE COURT:  You may show him what you believe to |
| 01:34:41 | 15 | be a prior inconsistent statement and ask him if he said |
| 01:34:43 | 16 | that earlier.  You're not going to just read it into the |
| 01:34:47 | 17 | record. |
| 01:34:47 | 18 | MS. GLASSER:  Understood.  And, actually, just to |
| 01:34:52 | 19 | make sure I have Your Honor's procedure, he -- he looked at |
| 01:34:55 | 20 | it already and said it did not refresh his recollection. |
| 01:34:59 | 21 | THE COURT:  He looked at it.  He didn't change his |
| 01:35:01 | 22 | answer.  If you believe it's inconsistent, you may publish |
| 01:35:05 | 23 | it on the overhead projector, or however you want, to the |
| 01:35:08 | 24 | jury as a prior inconsistent statement or this attempt at |
| 01:35:13 | 25 | impeachment. |

| | | |
|---|---|---|
| 01:35:13 | 1 | MS. GLASSER:  And, Mr. Huynh, can we play the |
| 01:35:15 | 2 | deposition video, please, Page 12, Lines 7 through 10? |
| 01:35:18 | 3 | Very, very quickly, with the Court's permission, |
| 01:35:50 | 4 | could we play it again? |
| 01:35:51 | 5 | THE COURT:  Do it again.  Get the volume right. |
| 01:35:54 | 6 | (Videoclip played.) |
| 01:35:55 | 7 | QUESTION:  Have you done any analysis as to what |
| 01:35:56 | 8 | is the impact of mobile check deposit on Wells Fargo's |
| 01:35:59 | 9 | business? |
| 01:36:01 | 10 | ANSWER:  No. |
| 01:36:01 | 11 | THE COURT:  Let's proceed. |
| 01:36:02 | 12 | Q.  (By Ms. Glasser)  Now, although you haven't personally |
| 01:36:05 | 13 | done the analysis, you're now sitting here as the |
| 01:36:08 | 14 | representative of the entire company.  And can we agree |
| 01:36:11 | 15 | that Wells Fargo is, in fact, generating significant |
| 01:36:15 | 16 | profits from remote deposit technology at issue in this |
| 01:36:19 | 17 | case? |
| 01:36:21 | 18 | A.  Right.  There were two things in there, and so it's not |
| 01:36:24 | 19 | correct. |
| 01:36:24 | 20 | Q.  Can we agree that Wells Fargo generates significant |
| 01:36:28 | 21 | profits from mobile remote deposit? |
| 01:36:33 | 22 | A.  I'm not sure what you mean by significant, so, no. |
| 01:36:37 | 23 | Q.  Well, so, for example, Mr. Weinstein yesterday showed |
| 01:36:41 | 24 | his calculation that Wells Fargo has generated at least |
| 01:36:45 | 25 | $1.2 billion in profits just since the patents issued.  Do |

804

| | | |
|---|---|---|
| 01:36:50 | 1 | you recall that? |
| 01:36:50 | 2 | A.  I recall that. |
| 01:36:52 | 3 | Q.  And do you, on behalf of Wells Fargo, consider |
| 01:36:55 | 4 | $1.2 billion to be a significant level of profit? |
| 01:37:00 | 5 | A.  I don't agree with Mr. Weinstein's characterization. |
| 01:37:03 | 6 | Q.  And you didn't, when you were on the stand, present any |
| 01:37:07 | 7 | alternative calculation? |
| 01:37:07 | 8 | THE COURT:  Wait a minute. |
| 01:37:09 | 9 | Mr. Hecht, she didn't ask you if you agreed with |
| 01:37:12 | 10 | Mr. Weinstein.  She said, Mr. Weinstein said it was |
| 01:37:15 | 11 | 1.2 billion, and she asked you if Wells Fargo considers |
| 01:37:18 | 12 | 1.2 billion a significant level of profit. |
| 01:37:22 | 13 | THE WITNESS:  I'm sorry, Your Honor. |
| 01:37:24 | 14 | THE COURT:  You should have answered it, yes, |
| 01:37:26 | 15 | Wells Fargo considers it a significant level of profit or, |
| 01:37:31 | 16 | no, Wells Fargo doesn't.  But to say, I don't agree with |
| 01:37:34 | 17 | Mr. Weinstein, is non-responsive.  You need to answer the |
| 01:37:36 | 18 | question as asked, all right? |
| 01:37:38 | 19 | THE WITNESS:  Yes, Your Honor, sorry. |
| 01:37:41 | 20 | THE COURT:  Let's proceed, Ms. Glasser. |
| 01:37:43 | 21 | Q.  (By Ms. Glasser)  Sir, does Wells Fargo consider |
| 01:37:45 | 22 | $1.2 billion to be significant or insignificant? |
| 01:37:51 | 23 | A.  That's significant. |
| 01:37:51 | 24 | Q.  And you did mention a moment ago that you didn't agree |
| 01:37:54 | 25 | with everything Mr. Weinstein had to say.  You did not |

01:37:57  1  present to the jury any alternative calculation of Wells

01:38:01  2  Fargo's profits, fair?

01:38:02  3  A.  I'm sorry, ma'am, are you asking me?

01:38:07  4  Q.  You, sir, did you present to the jury any alternative

01:38:10  5  calculation of Wells Fargo's profits?

01:38:13  6  A.  No, ma'am.

01:38:20  7      MS. GLASSER:  Let's go ahead and put up on the

01:38:21  8  screen -- let's put on the left-hand side of the screen

01:38:25  9  PX-427 that we were looking at a moment ago.  And if we

01:38:33  10  could put on the right-hand part of the screen PX-22 at

01:38:38  11  Page 5.

01:38:41  12  Q.  (By Ms. Glasser)  And so just to recenter us, we were

01:38:44  13  talking a moment ago about PX-427, an early Wells Fargo

01:38:48  14  document where Wells Fargo was calling out the USAA product

01:38:52  15  and the value to the bank of that product.  Do you recall

01:38:54  16  that?

01:38:54  17  A.  Yes.

01:39:00  18  Q.  And then what we have on the right-hand side of the

01:39:01  19  screen is a document talking about the key benefits.  Now,

01:39:06  20  the prior one was to USAA, and this document on the

01:39:09  21  right-hand side is now talking about the key benefits to

01:39:12  22  Wells Fargo.  Do you see that?

01:39:13  23  A.  I see those words, yes.

01:39:15  24  Q.  And do you see here that what Wells Fargo has done is

01:39:19  25  it has listed exactly the same key benefits that were

806

01:39:23  1  listed in relation to the USAA -- USAA product?

01:39:33  2  A.  Yeah, I see those -- I see those words.

01:39:35  3  Q.  And so whereas in the first document, Wells Fargo was

01:39:39  4  recognizing that USAA had achieved cost savings as a result

01:39:45  5  of its product, now we see Wells Fargo describing as a key

01:39:50  6  benefit to Wells Fargo the cost savings, correct?

01:39:57  7  A.  I see the words that you just highlighted, yes, on the

01:40:02  8  cost savings to Wells Fargo, yes.

01:40:04  9  Q.  And at the bottom, you'll recall that before Wells

01:40:08  10  Fargo launched, it had recognized that USAA had been able

01:40:12  11  to achieve this wow/innovation factor.  Do you recall that?

01:40:18  12  A.  Yes, I see that also.

01:40:20  13  Q.  And now what we see on the right-hand side from the

01:40:24  14  Wells Fargo document, Wells Fargo is talking about its own

01:40:28  15  product, and it's saying the key benefits to Wells Fargo

01:40:32  16  include customer wow, correct?

01:40:35  17  A.  It says customer wow, yes.

01:40:37  18  Q.  And these are the very same key benefits that Wells

01:40:41  19  Fargo associated at the very, very beginning when they saw

01:40:43  20  USAA's launch of its mobile remote deposit product,

01:40:49  21  correct?

01:40:49  22  A.  That's incorrect.

01:40:50  23  Q.  And, sir, the document we looked at on the left-hand

01:40:52  24  side, that's solely and exclusively in the called out box

01:40:56  25  about the USAA technology, correct?

| | | |
|---|---|---|
| 01:40:58 | 1 | A.  That is incorrect. |
| 01:40:59 | 2 | Q.  What do you see there on the left-hand side of the |
| 01:41:03 | 3 | screen that's about any technology other than USAA? |
| 01:41:06 | 4 | A.  The second part is Wells Fargo information. |
| 01:41:12 | 5 | Q.  So this document, you're saying, at the time when USAA |
| 01:41:16 | 6 | was the only bank on the market with this technology, |
| 01:41:20 | 7 | you're saying that Wells Fargo was discussing what value it |
| 01:41:26 | 8 | has to Wells Fargo; is that right? |
| 01:41:28 | 9 | A.  Well, the premise of your question I'm not sure I agree |
| 01:41:33 | 10 | with, so I disagree. |
| 01:41:34 | 11 | Q.  So back in 2009/2010, Wells Fargo wasn't on the market |
| 01:41:38 | 12 | with mobile remote deposit, correct? |
| 01:41:40 | 13 | A.  That is correct. |
| 01:41:41 | 14 | Q.  USAA was, correct? |
| 01:41:43 | 15 | A.  I've seen that in this trial, yes. |
| 01:41:44 | 16 | Q.  And so you understand that when we're talking about the |
| 01:41:47 | 17 | value to the bank as of 2009/2010, the only entity out |
| 01:41:54 | 18 | there as between USAA and Wells Fargo who was actually |
| 01:41:57 | 19 | enjoying that benefit at the time was USAA, correct? |
| 01:42:02 | 20 | A.  I've seen that USAA was in the market, in this trial, |
| 01:42:04 | 21 | at that time. |
| 01:42:05 | 22 | Q.  And, in fact, this concept of these key benefits to |
| 01:42:11 | 23 | Wells Fargo, the key benefits are worth -- they have a |
| 01:42:14 | 24 | financial value to Wells Fargo, correct? |
| 01:42:15 | 25 | A.  Yes, they do. |

01:42:19  1   Q.  And it's not just these two documents that talk about

01:42:23  2   these key values, there's actually many, many documents in

01:42:27  3   Wells Fargo's files that repeat these exact same lists of

01:42:31  4   key benefits, correct?

01:42:32  5   A.  I'm not sure.

01:42:33  6   Q.  And we put a couple of examples on the screen just to

01:42:37  7   see if it refreshes your recollection.  PX-429 at Page 5.

01:42:56  8        And we see it again there, sir?

01:42:59  9   A.  I'm sorry, I got to look at it here.  Go back up to the

01:43:03  10  beginning of the document.  You said PTX-429?

01:43:07  11  Q.  Yeah, and it's also pulled up on your screen, sir, the

01:43:07  12  exact same language.

01:43:07  13  A.  I need to see the front of the document.  So is it --

01:43:10  14  what is it, 429?

01:43:12  15  Q.  429, correct.

01:43:28  16  A.  Okay.  I'm looking at it.

01:43:30  17  Q.  And you see there again, Wells Fargo's emphasizing

01:43:33  18  those exact same key benefits, including cost savings,

01:43:36  19  including balance growth and retention, share of wallet,

01:43:41  20  and customer wow, correct?

01:43:41  21  A.  Yes, I see all that.

01:43:43  22  Q.  And it wouldn't surprise you if I had pulled out my

01:43:46  23  binder, many other documents that have extremely similar

01:43:50  24  language from Wells Fargo, would it?

01:43:51  25  A.  I don't know, I'd have to see it.

809

01:43:55  1   Q.  Would you be surprised, sir?

01:43:57  2   A.  I don't know.  I'd have to see it.

01:44:00  3   Q.  Now, in your testimony earlier today, I don't think I

01:44:03  4   heard you talk about the cost savings; is that right?

01:44:12  5   A.  I don't recall talking about the cost savings.

01:44:14  6   Q.  And I don't recall you talking about the added

01:44:21  7   profitability of mobile remote deposit.  Did you discuss

01:44:24  8   that at all?

01:44:25  9   A.  I have discussed that, yes, with --

01:44:31  10   Q.  Here in this courtroom, sir?

01:44:32  11   A.  In this courtroom today, no, not until just now.

01:44:35  12   Q.  And the one thing that you did talk about, though, you

01:44:39  13   did talk about the ability of this mobile remote deposit

01:44:45  14   technology to take advantage of the existing back end

01:44:49  15   system, correct?

01:44:49  16   A.  Yes, I did.

01:44:50  17   Q.  And, in fact, one of the really valuable things about

01:44:57  18   mobile deposit is you don't have to build a new back end

01:45:00  19   system, correct?

01:45:01  20   A.  That's correct.

01:45:03  21   Q.  Because if you had to build an entirely new back end

01:45:08  22   system in order to allow customers to deposit over the

01:45:13  23   mobile phone, that would potentially cost literally

01:45:16  24   hundreds of millions of dollars, correct?

01:45:21  25   A.  Yes.

01:45:24   1    Q.  Do you know, sir, approximately how many mobile

01:45:33   2    deposits are made per month currently using the Wells Fargo

01:45:37   3    application at issue in this case?

01:45:38   4    A.  No, I don't have that to memory.

01:45:42   5    Q.  Do you -- would it refresh your recollection if I told

01:45:45   6    you that it was roughly 80 million per year?

01:45:49   7    A.  I'd have to see it, but that could be right.

01:45:52   8    Q.  That sounds roughly correct?

01:45:54   9    A.  I just don't know.  I'd like to see it.

01:45:57  10    Q.  Have you ever spoken with Mr. Rosati about that topic?

01:46:01  11    A.  No.

01:46:07  12    Q.  And would Mr. Rosati and Ms. Lockwood-Stein be good

01:46:11  13    sources of information for us and for the jury if they

01:46:14  14    wanted to know how many deposits were being made through

01:46:18  15    the system and how much money per deposit Wells Fargo was

01:46:22  16    making on them?

01:46:23  17    A.  Yes, I think they would.

01:46:25  18    Q.  When you heard Ms. Lockwood-Stein testify this morning

01:46:35  19    via video and via the reading, did you have any

01:46:41  20    disagreement with the numbers she gave on behalf of Wells

01:46:44  21    Fargo in terms of the greater than a dollar per deposit

01:46:49  22    cost savings?

01:46:51  23          MR. MELSHEIMER:  May we approach, Your Honor, just

01:46:53  24    on this subject?

01:46:54  25          THE COURT: Are you objecting to this question?

| | | |
|---|---|---|
| 01:46:57 | 1 | MR. MELSHEIMER:  I'm objecting, yes, Your Honor, |
| 01:46:59 | 2 | I'm objecting to the question. |
| 01:47:00 | 3 | THE COURT:  Approach the bench. |
| 01:47:00 | 4 | (Bench conference.) |
| 01:47:09 | 5 | THE COURT:  What's your objection? |
| 01:47:10 | 6 | MR. MELSHEIMER:  Well, Your Honor, it's more of an |
| 01:47:12 | 7 | issue, something that's been limined out, and that is this |
| 01:47:15 | 8 | old data versus new data.  You remember there was this |
| 01:47:18 | 9 | dispute about the data that Ms. Lockwood-Stein relied upon, |
| 01:47:22 | 10 | and then we tried to supplement that, and then there's been |
| 01:47:25 | 11 | a ruling that, you know, she wasn't allowed to -- that the |
| 01:47:29 | 12 | testimony about the old data had to -- |
| 01:47:32 | 13 | MS. GLASSER:  I appreciate the issue.  I don't |
| 01:47:34 | 14 | want to accidentally elicit him giving the wrong data. |
| 01:47:37 | 15 | MR. MELSHEIMER:  Yeah, I just don't want him to -- |
| 01:47:39 | 16 | MS. GLASSER:  I can reask it. |
| 01:47:40 | 17 | MR. MELSHEIMER:  That's all I'm trying to do is I |
| 01:47:42 | 18 | know there's two sets of data out there, and I'm trying to |
| 01:47:44 | 19 | avoid a problem with that, Judge. |
| 01:47:44 | 20 | THE COURT:  Well, there was an original set of |
| 01:47:47 | 21 | data, there was a proposed amended set of data that |
| 01:47:50 | 22 | Judge Payne kept out, and then there was the supplemental |
| 01:47:53 | 23 | data from the end of the last set to the present, which he |
| 01:47:57 | 24 | let in.  Correct? |
| 01:47:58 | 25 | MS. GLASSER:  Yeah. |

812

01:47:59  1          MR. MELSHEIMER:  That's correct, Your Honor.  I'm
01:48:00  2   just -- I don't -- this witness may know that -- or have to
01:48:04  3   believe that the first data was inaccurate, so I don't want
01:48:06  4   to be saying --
01:48:06  5          THE COURT:  If you can restate the question and
01:48:08  6   clarify it, that will probably solve the problem.
01:48:09  7          MS. GLASSER:  I think so, too.
01:48:11  8          MR. MELSHEIMER:  So that's why I wanted to come --
01:48:13  9          MS. GLASSER:  Thank you for raising that.
01:48:15 10          THE COURT:  All right.  Let's do that.
01:48:16 11          (Bench conference concluded.)
01:48:23 12          THE COURT:  All right.  Restate the question,
01:48:24 13   please, counsel.
01:48:26 14   Q.  (By Ms. Glasser)  When Ms. Lockwood-Stein testified
01:48:28 15   earlier today and she gave her testimony under oath to the
01:48:32 16   jury about the cost savings to Wells Fargo, is Ms. Lockwood
01:48:40 17   an accurate and reliable source of information for the jury
01:48:46 18   to rely on in this case?
01:48:47 19   A.  Can I see the actual transcript?
01:48:52 20          THE COURT:  No, sir, you were here, you heard the
01:48:53 21   testimony.  Either you don't remember the testimony, you
01:48:56 22   agree, or you don't agree.
01:48:58 23          THE WITNESS:  Okay.
01:48:59 24          THE COURT:  Which is it?
01:49:01 25   A.  I think I agree.

01:49:03  1  Q.  (By Ms. Glasser)  And we can all agree that the cost to

01:49:10  2  Wells Fargo each and every time a Wells Fargo customer uses

01:49:12  3  the mobile deposit technology at issue, instead of the ATM

01:49:17  4  or a teller transaction, Wells Fargo is, in fact, saving

01:49:21  5  money, correct?

01:49:37  6  A.  Yes.

01:49:37  7      MS. GLASSER:  Could we put up on the screen

01:49:39  8  exhibit PX-1296, please?

01:49:44  9  Q.  (By Ms. Glasser)  And I'd like to ask you, sir, a few

01:49:46  10  questions about fraud detection, because in addition to the

01:49:49  11  cost savings, there's also been discussion in this case of

01:49:53  12  there being a fraud protection value to the patents.

01:49:58  13      Now, when you were describing the fraud protection

01:50:04  14  capabilities of the technology, at one point in time, I

01:50:08  15  think I wrote this down accurately, did you say:  All we

01:50:12  16  did is change the controls to a new channel, in terms of

01:50:21  17  fraud?

01:50:23  18  A.  Yes.

01:50:25  19  Q.  And -- now, so your testimony to the jury, did you mean

01:50:29  20  to imply that all it would take to ensure that mobile

01:50:35  21  deposit transactions were safe for the bank and safe for

01:50:39  22  consumers is simply hooking in any kind of mobile phone

01:50:43  23  into the existing back end channels?

01:50:46  24  A.  No, that's not what I said.

01:50:48  25  Q.  Because, in fact, in order for any of those important

814

01:50:52  1   fraud detections to actually succeed and take place and

01:50:58  2   protect the bank and the consumer, you have to have really

01:51:00  3   robust underlying technology on the mobile application,

01:51:04  4   correct?

01:51:04  5   A.  That is not totally correct, no.

01:51:11  6   Q.  Well, let's walk through it in detail then.

01:51:15  7          MS. GLASSER:  So let's go ahead and put up on the

01:51:16  8   screen Page 7.  So let's highlight the box with the MRDC

01:51:23  9   capabilities.

01:51:27  10  Q.  (By Ms. Glasser)  So this is a document where you were

01:51:29  11  talking about how Wells Fargo went about trying to ensure

01:51:33  12  that its mobile deposit system would not create substantial

01:51:37  13  fraud problems, correct?

01:51:39  14  A.  That is correct.

01:51:40  15  Q.  And you showed a very, very similar diagram during your

01:51:43  16  direct examination, correct?

01:51:44  17  A.  Yes, ma'am.

01:51:46  18  Q.  And when it talks about MRDC capabilities, that's not

01:51:49  19  talking about the back end, is it?

01:51:51  20  A.  Yes, it is.

01:51:54  21  Q.  So MRDC, it shows here up on the top of the screen, it

01:51:58  22  shows the mobile phone, correct?

01:52:01  23  A.  That is correct.  That's what's on the top of the page.

01:52:06  24          MS. GLASSER:  And, actually, if we could pull up

01:52:08  25  the screen a little bit.

815

| | | |
|---|---|---|
| 01:52:09 | 1 | Q.  (By Ms. Glasser)  That's actually shown totally |
| 01:52:11 | 2 | separately on the page from what you call the back end, |
| 01:52:13 | 3 | correct? |
| 01:52:13 | 4 | A.  Sorry.  Can you restate? |
| 01:52:15 | 5 | Q.  Sure.  The part on the mobile phone, that's different |
| 01:52:18 | 6 | from what you testified about earlier and called the back |
| 01:52:21 | 7 | end, correct? |
| 01:52:22 | 8 | A.  The question doesn't make sense, I'm sorry. |
| 01:52:28 | 9 | Q.  Is there a difference in your mind, sir, between what's |
| 01:52:31 | 10 | happening on the customer's phone and what's happening on |
| 01:52:33 | 11 | the back end servers? |
| 01:52:35 | 12 | A.  There is a difference between what's happening on the |
| 01:52:38 | 13 | phone and what's happening on the servers. |
| 01:52:40 | 14 | Q.  And what's shown here on the screen is the phone, |
| 01:52:43 | 15 | correct? |
| 01:52:43 | 16 | A.  That is not correct. |
| 01:52:45 | 17 | Q.  There's literally a box around -- |
| 01:52:47 | 18 | A.  Oh, you mean -- I'm sorry, I thought you meant the |
| 01:52:51 | 19 | whole page. |
| 01:52:51 | 20 | Q.  I apologize, sir.  So we've drawn a little box on the |
| 01:52:55 | 21 | screen to -- |
| 01:52:55 | 22 | THE COURT:  One at a time.  One at a time.  Slow |
| 01:52:58 | 23 | down, both of you, and speak one at a time.  Okay? |
| 01:53:04 | 24 | THE WITNESS:  Yes, sir. |
| 01:53:04 | 25 | MS. GLASSER:  Absolutely, Your Honor. |

| | | |
|---|---|---|
| 01:53:04 | 1 | THE COURT:  Let's go forward. |
| 01:53:07 | 2 | Q. (By Ms. Glasser)  So we're looking at a picture of a |
| 01:53:10 | 3 | phone.  You see that? |
| 01:53:10 | 4 | A.  Yes, I see that. |
| 01:53:11 | 5 | Q.  And MRDC, that stands for mobile remote deposit |
| 01:53:14 | 6 | capture, correct? |
| 01:53:14 | 7 | A.  That's correct. |
| 01:53:15 | 8 | Q.  And so focusing on this part of the questioning about |
| 01:53:17 | 9 | the mobile application itself, are you with me so far? |
| 01:53:20 | 10 | A.  Yes. |
| 01:53:22 | 11 | Q.  And at the bottom of the list of things that need to be |
| 01:53:25 | 12 | done, we talk about must read the dollar amount via OCR. |
| 01:53:31 | 13 | Do you see that? |
| 01:53:31 | 14 | A.  Yes, I do. |
| 01:53:33 | 15 | Q.  And there's actually code running on the mobile phone |
| 01:53:37 | 16 | application itself that triggers that function, correct? |
| 01:53:42 | 17 | A.  That is not totally correct. |
| 01:53:44 | 18 | Q.  And it's not totally correct because it works in |
| 01:53:46 | 19 | conjunction with the back end server, correct? |
| 01:53:51 | 20 | A.  No, that's not totally correct either. |
| 01:53:55 | 21 | Q.  Well, let's see if we can get some agreement here then. |
| 01:53:58 | 22 | So in order to read the dollar amount via OCR and |
| 01:54:01 | 23 | the item below to read the full MICR amount via OCR, you |
| 01:54:07 | 24 | need to have a really high quality image, correct? |
| 01:54:10 | 25 | A.  That is correct. |

817

01:54:11  1   Q.  And, in fact, that's something highlighted here, as

01:54:14  2   well.  It's very, very important that the image must meet

01:54:17  3   quality standards.  You see that?

01:54:20  4   A.  Yes, I see that.

01:54:21  5   Q.  And even though you didn't read the patents in great

01:54:25  6   detail, you do recall from the opening statements and from

01:54:29  7   Dr. Conte's presentation that quite a number of aspects of

01:54:33  8   the patent claims at issue in this case are all centered

01:54:37  9   around how do you go about actually having the consumer

01:54:40  10  take a high enough quality image to make this process

01:54:44  11  succeed, correct?

01:54:45  12  A.  I don't agree with the premise of what you just asked.

01:54:48  13  Q.  Do you understand, sir, that the patents at issue in

01:54:51  14  this case involve steps about, for example, giving

01:54:53  15  instructions to a user about how to take a high quality

01:54:57  16  image?

01:54:58  17  A.  Yes, ma'am.

01:54:59  18  Q.  And you understand that the patent claims at issue in

01:55:01  19  this case talk about, for example, ways to guide the user

01:55:07  20  in taking that picture so it's high quality?

01:55:10  21  A.  Yes, ma'am.

01:55:11  22  Q.  And all of those things are very important if you want

01:55:13  23  to get an image that you can actually do a MICR read on,

01:55:19  24  correct?

01:55:19  25  A.  That's correct.

01:55:19  1  Q.  And all of those things are very important so that you

01:55:22  2  can actually read the dollar amount, correct?

01:55:24  3  A.  That's correct.

01:55:27  4  Q.  And so when we talk about that there was an existing

01:55:30  5  back end system in place, you needed to have the upfront

01:55:36  6  mobile remote deposit technology in order to actually have

01:55:38  7  the inputs to make that back end system work; fair

01:55:41  8  statement?

01:55:41  9  A.  Not totally fair.  Get a bit more specific for me.

01:55:49  10  Q.  If you aren't able to capture an adequate image upfront

01:55:53  11  on the mobile device, you can't perform effective fraud

01:55:58  12  controls that involve reading the MICR line or the checking

01:56:02  13  amount of the check, correct?

01:56:03  14  A.  That's true.

01:56:07  15  Q.  Now, you talked for -- for quite a while in the morning

01:56:15  16  about these products called Desktop Deposit and something

01:56:19  17  that you referred to as mobile banking.  Do you recall

01:56:22  18  that?

01:56:23  19  A.  Yes, ma'am.

01:56:23  20  Q.  And there's a lot of words there that are similar to

01:56:25  21  the words in mobile remote deposit capture, but they're

01:56:29  22  different technologies, different products, correct?

01:56:32  23  A.  No, that's not correct.

01:56:33  24  Q.  Sir, the Desktop Deposit product, it's not a

01:56:38  25  downloadable -- we're talking about back end pre-2006.

819

| | | |
|---|---|---|
| 01:56:41 | 1 | It's not a downloadable application, correct? |
| 01:56:45 | 2 | A.  No, that's not correct. |
| 01:56:47 | 3 | Q.  It is a web-based device, sir, correct? |
| 01:56:50 | 4 | A.  That is not correct. |
| 01:56:51 | 5 | Q.  Back in 2006? |
| 01:56:52 | 6 | A.  We had two products. |
| 01:56:56 | 7 | Q.  I'm talking to you about the Desktop Deposit product |
| 01:57:00 | 8 | that hooked into the specialized scanner.  Are you with me |
| 01:57:04 | 9 | so far? |
| 01:57:04 | 10 | A.  I am with you. |
| 01:57:05 | 11 | Q.  That is not something that anyone could download onto a |
| 01:57:09 | 12 | portable device like a cell phone, correct? |
| 01:57:13 | 13 | A.  I'm having trouble with the way you're characterizing |
| 01:57:19 | 14 | it.  Can you restate in a different way? |
| 01:57:21 | 15 | Q.  Sure.  Let's just take a couple of steps back. |
| 01:57:24 | 16 | The Desktop Deposit product, that worked with |
| 01:57:26 | 17 | specialized check scanners in that time frame, correct? |
| 01:57:30 | 18 | A.  Yes. |
| 01:57:30 | 19 | Q.  And just to be clear, that's what we're talking about |
| 01:57:36 | 20 | when we say Desktop Deposit, correct? |
| 01:57:37 | 21 | A.  Well, which product, because there were two Desktop |
| 01:57:40 | 22 | Deposit products? |
| 01:57:41 | 23 | Q.  And I'm talking to you about the one that you provided |
| 01:57:44 | 24 | testimony on earlier and we saw the pictures with that |
| 01:57:48 | 25 | specialized scanner, the Panini.  Do you recall the Panini? |

01:57:53   1   A.   I do.

01:57:53   2   Q.   All right.  And so the other thing that you talked

01:57:55   3   about that has the word "mobile" in it, you said mobile

01:57:58   4   banking was introduced in 2007, correct?

01:58:00   5   A.   That's correct.

01:58:00   6   Q.   And when you said mobile banking, you meant things like

01:58:03   7   someone can go on an Internet website and check their

01:58:06   8   balance, correct?

01:58:07   9   A.   Yes, that's exactly what I said.

01:58:08  10   Q.   You were not trying to imply that Wells Fargo had an

01:58:11  11   MRDC product back in 2007, when you said mobile banking,

01:58:16  12   correct?

01:58:16  13   A.   That is absolutely correct.

01:58:28  14            MS. GLASSER:  Could we -- actually, could we put

01:58:30  15   back up on the screen PX-1296?  And could we go to Page 4,

01:58:44  16   please?

01:58:44  17   Q.   (By Ms. Glasser)  So maybe this is a helpful way to

01:58:47  18   talk about some of the differences between that Desktop

01:58:49  19   Deposit product and the product at issue in this case.

01:58:51  20            So when you look at the middle bullet point, Wells

01:58:56  21   Fargo actually evaluated did it need MRDC or could it just

01:59:01  22   use that DTD, which stands for Desktop Deposit, correct?

01:59:06  23   A.   That's correct.

01:59:07  24   Q.   And with this picture here of a scanner, I don't know

01:59:10  25   if it's the Panini, but something like that, correct?

| | | |
|---|---|---|
| 01:59:13 | 1 | A.  Yes, there's a scanner on here. |
| 01:59:16 | 2 | Q.  And that X there, I didn't put that there.  That's |
| 01:59:19 | 3 | something in the Wells Fargo document, correct? |
| 01:59:21 | 4 | A.  Yes. |
| 01:59:22 | 5 | Q.  And this is an official Wells Fargo document that we |
| 01:59:25 | 6 | received as part of the litigation process, correct? |
| 01:59:28 | 7 | A.  That's correct. |
| 01:59:29 | 8 | Q.  And what Wells Fargo concluded before it launched the |
| 01:59:36 | 9 | mobile deposit technology at issue in this case, that if it |
| 01:59:38 | 10 | had to use a system like that Desktop Deposit, it would |
| 01:59:42 | 11 | drastically cut product profitability, correct? |
| 01:59:45 | 12 | A.  That is not correct. |
| 01:59:49 | 13 | Q.  Sir, the words on the page say:  Drastically cuts |
| 01:59:53 | 14 | product profitability. |
| 01:59:55 | 15 | Correct? |
| 01:59:55 | 16 | A.  Yeah, there's additional context that's not here. |
| 01:59:57 | 17 | Q.  So far I'm just asking you -- are you with me so far on |
| 02:00:02 | 18 | the page?  It says:  MRDC bypasses the check scanner |
| 02:00:07 | 19 | requirement. |
| 02:00:08 | 20 | Do you see that? |
| 02:00:08 | 21 | A.  Yes, ma'am. |
| 02:00:09 | 22 | Q.  And then at the bottom it said:  Bank purchase of |
| 02:00:13 | 23 | scanners on behalf of customers drastically cuts product |
| 02:00:16 | 24 | profitability. |
| 02:00:18 | 25 | Correct? |

| | | |
|---|---|---|
| 02:00:18 | 1 | A.  That's what it says, yes. |
| 02:00:20 | 2 | Q.  And did you speak with Mr. Armin Ajami about all of the |
| 02:00:27 | 3 | reasons why he and his group decided that the desktop -- |
| 02:00:31 | 4 | that CEO technology, was not a commercially viable option |
| 02:00:36 | 5 | for ordinary consumers? |
| 02:00:37 | 6 | A.  I didn't speak to him about that. |
| 02:00:49 | 7 | Q.  Did you speak with Mr. Rosati or anyone else at Wells |
| 02:00:53 | 8 | Fargo in preparing to testify about the reasons why they |
| 02:00:57 | 9 | looked at screenshots of the Wells Fargo -- of the USAA |
| 02:01:02 | 10 | product when they were designing the Wells Fargo product? |
| 02:01:04 | 11 | A.  Yes. |
| 02:01:07 | 12 | Q.  All right.  Let's take a look at some of those |
| 02:01:09 | 13 | documents then. |
| 02:01:10 | 14 |       You are familiar with this, the fact that Wells |
| 02:01:13 | 15 | Fargo had looked at screenshots from the USAA application |
| 02:01:16 | 16 | in the design process? |
| 02:01:17 | 17 | A.  Yes, I'm familiar. |
| 02:01:22 | 18 |       MS. GLASSER:  Let's go ahead and put up PX-1182. |
| 02:01:27 | 19 | Q.  (By Ms. Glasser)  And you recognize this document, sir? |
| 02:01:29 | 20 | A.  Yes, I do. |
| 02:01:30 | 21 | Q.  This is a document that was produced from Wells Fargo's |
| 02:01:34 | 22 | files as part of the litigation process, correct? |
| 02:01:36 | 23 | A.  Yes. |
| 02:01:38 | 24 | Q.  And what we're looking at here is an image capture test |
| 02:01:58 | 25 | by Wells Fargo of the USAA Deposit@Mobile application, |

| | | |
|---|---|---|
| 02:02:05 | 1 | correct? |
| 02:02:05 | 2 | A.  Yes, that's what I understand. |
| 02:02:06 | 3 | Q.  And this document is actually from 2018, correct? |
| 02:02:12 | 4 | A.  I'm sorry, I don't remember the actual date. |
| 02:02:14 | 5 | Q.  Do you have a rough recollection of when this |
| 02:02:17 | 6 | particular analysis by Wells Fargo of the USAA application |
| 02:02:21 | 7 | took place? |
| 02:02:23 | 8 | A.  I think 2018 could be right. |
| 02:02:25 | 9 | Q.  And it was before this lawsuit was filed, correct? |
| 02:02:30 | 10 | A.  Correct. |
| 02:02:31 | 11 | Q.  And what we see here -- |
| 02:02:33 | 12 | MS. GLASSER:  If we could zoom in on some of the |
| 02:02:36 | 13 | ones in the middle. |
| 02:02:37 | 14 | Q.  (By Ms. Glasser)  What we see here is that Wells Fargo |
| 02:02:39 | 15 | was looking at exactly the type of user interface elements |
| 02:02:45 | 16 | that are described in the patent claims -- for example, |
| 02:02:46 | 17 | providing the instructions to the user in order to take a |
| 02:02:48 | 18 | good image and presenting the image to the consumer for |
| 02:02:55 | 19 | verification, correct? |
| 02:02:55 | 20 | A.  Yes, this shows the flow of the USAA -- yes. |
| 02:03:04 | 21 | Q.  And when we talk about the flow of the USAA product, |
| 02:03:09 | 22 | we're talking about aspects of the USAA application that |
| 02:03:14 | 23 | are protected by the patents, correct? |
| 02:03:15 | 24 | A.  No, I don't agree with that. |
| 02:03:18 | 25 | Q.  Were you here in court when Mr. -- Dr. Conte testified? |

02:03:23    1    A.  Yes, I was.

02:03:23    2    Q.  And you saw him put up on the screen screenshots of the

02:03:28    3    same steps of the process performed by the Wells Fargo

02:03:31    4    product, correct?

02:03:32    5    A.  Yes.

02:03:33    6    Q.  And do you recall him indicating that there was no

02:03:36    7    disagreement between him and between Dr. Villasenor on the

02:03:40    8    Wells Fargo side about the fact that the Wells Fargo

02:03:44    9    application actually satisfies each and every one of those

02:03:48   10    particular patent claims?

02:03:49   11    A.  I heard Mr. Conte say that, yes.

02:03:52   12    Q.  And you have no reason to believe that Dr. Villasenor

02:03:55   13    is going to come here and say anything different with

02:03:57   14    respect to those user interface-related claim elements, do

02:04:01   15    you?

02:04:01   16    A.  I'm not sure.

02:04:06   17    Q.  Now, one thing that's interesting about this is, if we

02:04:10   18    look at the top one, Wells Fargo is not just going through

02:04:14   19    and seeing how the product works, it's actually taking a

02:04:17   20    look at something called a patent marking page.  Do you

02:04:21   21    recall that?

02:04:27   22    A.  Yes, I recall that.

02:04:28   23    Q.  And you're aware -- this isn't the first time you've

02:04:30   24    seen this document -- you were aware that Wells Fargo

02:04:34   25    actually was looking at USAA's list of patents, correct?

```
02:04:40   1   A.   No, that's not correct.

02:04:42   2   Q.   This is the first time you've seen this, sir?

02:04:44   3   A.   I've seen this document, yes.

02:04:46   4   Q.   And this one is from just before the patents at issue

02:04:50   5   in this case were actually granted by the Patent Office,

02:04:54   6   you recall that?

02:04:54   7   A.   Yes, but I think we're out of context here.

02:05:00   8   Q.   And what we see here in the document is there is a

02:05:03   9   couple of patents specifically identified that the jurors

02:05:06   10  have heard about in this case, the '227 patent, which is,

02:05:12   11  of course, the original parent patent that we've seen

02:05:15   12  described in this case, correct, the one with the 2006

02:05:19   13  original filing?

02:05:23   14  A.   Yes.

02:05:23   15  Q.   And the '136 patent is also in the same patent family

02:05:27   16  with the patent asserted in this case, correct?

02:05:29   17  A.   Those are in the same patent family, yes.

02:05:31   18  Q.   And what the document says that Wells Fargo was looking

02:05:36   19  at -- and, actually, by the way, this red arrow, this is

02:05:40   20  also not something that I or our legal team added.  This

02:05:42   21  was actually in the original Wells Fargo document.

02:05:47   22  Correct?

02:05:47   23  A.   The red arrow is in the original document, yes.

02:05:49   24  Q.   And what it's pointing out is this patent marking where

02:05:53   25  it says, additional patents are pending, correct?
```

| | | |
|---|---|---|
| 02:05:55 | 1 | A.  That is absolutely incorrect. |
| 02:05:58 | 2 | Q.  It's just coincidental? |
| 02:06:00 | 3 | A.  It's absolutely incorrect. |
| 02:06:02 | 4 | Q.  So is it coincidental that Wells Fargo put a red arrow |
| 02:06:08 | 5 | pointing on its document pointing at the patent marking |
| 02:06:10 | 6 | page, yes or no? |
| 02:06:11 | 7 | A.  The answer is yes. |
| 02:06:12 | 8 | Q.  Now, I think we went over a moment ago, you're aware |
| 02:06:20 | 9 | that the patents in this case are what's called |
| 02:06:22 | 10 | continuation applications? |
| 02:06:23 | 11 | A.  Yes, ma'am. |
| 02:06:27 | 12 | Q.  And to the extent that the jury took away from anything |
| 02:06:29 | 13 | that the Wells Fargo lawyers said, some kind of impression |
| 02:06:33 | 14 | that a continuation patent is unusual or improper in any |
| 02:06:37 | 15 | way, that would be an incorrect impression, correct? |
| 02:06:43 | 16 |         MR. MELSHEIMER:  Your Honor, I'm going to object |
| 02:06:45 | 17 | to the argumentative and inaccurate characterization. |
| 02:06:51 | 18 |         THE COURT:  Approach the bench. |
| 02:06:52 | 19 |         (Bench conference.) |
| 02:07:02 | 20 |         THE COURT:  I'm going to overrule the objection, |
| 02:07:05 | 21 | but the question is argumentative.  I can't recall hearing |
| 02:07:10 | 22 | a more argumentative witness in many years than this |
| 02:07:15 | 23 | gentleman.  He is going to start giving straight answers to |
| 02:07:17 | 24 | questions or I'm going to call him down again in a way he |
| 02:07:21 | 25 | doesn't want.  You don't want me to call him down in front |

| | | |
|---|---|---|
| 02:07:23 | 1 | of this jury. |
| 02:07:24 | 2 | MR. MELSHEIMER:  Understood. |
| 02:07:25 | 3 | THE COURT:  And Ms. Glasser, you're not asking |
| 02:07:27 | 4 | questions, you are asking paragraphs.  They are so long and |
| 02:07:30 | 5 | convoluted I see Mr. Melsheimer's forehead wrinkle, and |
| 02:07:33 | 6 | mine is doing the same thing trying to figure out what your |
| 02:07:36 | 7 | questions are.  It would be so much more helpful if they |
| 02:07:40 | 8 | could be short, simple questions. |
| 02:07:42 | 9 | MS. GLASSER:  Will do, Your Honor. |
| 02:07:43 | 10 | THE COURT:  They're just awkward and long and |
| 02:07:45 | 11 | convoluted and at least part of why the witness may be as |
| 02:07:51 | 12 | outwardly argumentative as he is, because he may be |
| 02:07:54 | 13 | struggling to understand them as much as I am.  So if you |
| 02:07:57 | 14 | could ask simple questions and if he could give straight |
| 02:08:00 | 15 | answers, I would enjoy this process a whole lot more. |
| 02:08:03 | 16 | MR. MELSHEIMER:  I understand, Your Honor, I think |
| 02:08:04 | 17 | you've hit on I think part of the challenge. |
| 02:08:05 | 18 | THE COURT:  But your objection to her question is |
| 02:08:07 | 19 | overruled. |
| 02:08:08 | 20 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 02:08:09 | 21 | (Bench conference concluded.) |
| 02:08:12 | 22 | THE COURT:  Let's proceed. |
| 02:08:15 | 23 | Q.  (By Ms. Glasser)  Do you still have my question in |
| 02:08:18 | 24 | mind, sir? |
| 02:08:18 | 25 | A.  Could you still repeat it? |

02:08:19  1   Q.  If the jury took away anything from the argument of

02:08:23  2   Wells Fargo's counsel to the effect that there's something

02:08:25  3   wrong or improper or unusual about continuation patents,

02:08:30  4   that would be an incorrect impression, fair?

02:08:34  5   A.  Continuation patents are normal, yes.

02:08:38  6   Q.  Continuation patents are very normal, and there's

02:08:42  7   absolutely nothing improper about them, correct?

02:08:44  8   A.  Right, as long as they're done properly, yes.

02:08:48  9   Q.  And you know from your own experience in patents that

02:08:56  10  the way a continuation patent works is that the patent

02:08:59  11  examiner actually reviews it to see if it's supported by

02:09:02  12  the original specification, correct?

02:09:04  13  A.  That's correct.

02:09:05  14  Q.  And the patent examiner won't issue a continuation

02:09:13  15  patent unless the patent examiner has satisfied him or

02:09:17  16  herself that the written description requirement is

02:09:20  17  satisfied, correct?

02:09:20  18  A.  That is correct.

02:09:21  19  Q.  And in this case, USAA submitted these two applications

02:09:24  20  actually to two separate patent examiners, you understand?

02:09:27  21  A.  Yes.

02:09:28  22  Q.  And --

02:09:28  23         MR. MELSHEIMER:  Your Honor, excuse me, I'm going

02:09:30  24  to object to this as outside the scope of the direct

02:09:32  25  examination talking about what the Patent Office did and

02:09:38   1   the prosecution history.

02:09:38   2        THE COURT:  Do you have a response, Ms. Glasser?

02:09:43   3        MS. GLASSER:  He indicated that he was familiar

02:09:45   4   with patents, that he's the corporate representative in a

02:09:48   5   case where there's been a significant argument made by the

02:09:52   6   other side that needs to be clarified.

02:09:57   7        THE COURT:  Well, I don't think that opens the

02:09:59   8   door -- door to questions about the Patent Office.  I'll

02:10:01   9   sustain the objection.

02:10:03  10   Q.  (By Ms. Glasser)  Let me ask you about something in

02:10:05  11   your own personal knowledge regarding the patent

02:10:11  12   specifications.  You were here in opening statement when

02:10:15  13   the Wells Fargo attorney made the argument that the 2018

02:10:28  14   patents for the first time talk about using a mobile device

02:10:29  15   with a digital camera.  Do you recall words to that effect

02:10:33  16   from the Wells Fargo lawyer?

02:10:35  17   A.  Yes, ma'am, I do.

02:10:36  18   Q.  And, in fact, that's not true, is it, sir?

02:10:41  19   A.  I think it is true.

02:10:43  20   Q.  You, sir -- well, let's start here.  You're aware that

02:10:49  21   the '605 patent makes reference to, for example, PDAs,

02:10:54  22   correct?

02:10:54  23   A.  Yes, ma'am.

02:10:55  24   Q.  And you, sir, from your experience in the industry, you

02:11:02  25   understand full well that when you hear the word mobile

| | | |
|---|---|---|
| 02:11:05 | 1 | devices, that includes PDAs, correct? |
| 02:11:15 | 2 | A.  That's not totally correct. |
| 02:11:18 | 3 | Q.  Would you agree it is generally correct that when you |
| 02:11:21 | 4 | hear the word mobile devices, that includes PDAs, yes or |
| 02:11:28 | 5 | no? |
| 02:11:28 | 6 | MR. MELSHEIMER:  I'm going to object, Your Honor, |
| 02:11:29 | 7 | as also outside the scope and getting into the |
| 02:11:32 | 8 | specification which he did not discuss. |
| 02:11:34 | 9 | THE COURT:  No, that's overruled. |
| 02:11:36 | 10 | You can answer the question, Mr. Hecht. |
| 02:11:40 | 11 | A.  Can you repeat the question, please? |
| 02:11:42 | 12 | Q.  (By Ms. Glasser)  A person in the industry understands |
| 02:11:45 | 13 | when they hear the word mobile devices that it includes |
| 02:11:48 | 14 | PDAs, correct? |
| 02:11:55 | 15 | A.  I don't totally agree with that. |
| 02:11:58 | 16 | Q.  Could you turn in your binder to your September 13th |
| 02:12:01 | 17 | deposition transcript at Page 30?  Page 30, Lines 14 |
| 02:12:22 | 18 | through 21, please. |
| 02:12:27 | 19 | A.  Yes, I'm there. |
| 02:12:28 | 20 | Q.  And does that refresh your recollection, sir? |
| 02:12:30 | 21 | A.  Yes, that's what I said in the deposition. |
| 02:12:34 | 22 | Q.  So I'll ask you again, when you hear the word mobile |
| 02:12:37 | 23 | devices, you understand that would include things like |
| 02:12:42 | 24 | PDAs, correct? |
| 02:12:43 | 25 | A.  No, that's not correct. |

02:12:48   1          MS. GLASSER:  Mr. Huynh, could we play the

02:12:52   2   deposition, Page 30, Lines 14 through 21?

02:12:55   3          (Videoclip played.)

02:12:55   4          QUESTION:  In other words, when you hear the word

02:12:57   5   mobile devices, you understand that that would include

02:12:59   6   things like handheld devices and PDA devices which have now

02:13:04   7   evolved into tablets and smartphones, fair?

02:13:09   8          ANSWER:  I think that's generally correct.

02:13:11   9          (Videoclip ends.)

02:13:12  10   Q.  (By Ms. Glasser)  As Wells Fargo's corporate

02:13:23  11   representative, has Wells Fargo been aware since 2010 that

02:13:29  12   USAA had filed for patents in the MRDC space, yes or no?

02:13:36  13   A.  I don't know.

02:13:39  14   Q.  Would you turn in your binder to the September 13th

02:13:43  15   deposition at Page 22, Line 25?

02:14:06  16   A.  And is this the September one, I'm sorry.

02:14:08  17   Q.  Yes, the same one that we were just in.

02:14:12  18   A.  And once again, the page?

02:14:14  19   Q.  22, at the end, Line 25?

02:14:16  20   A.  I got it.  I was on the wrong page.

02:14:18  21   Q.  It spills over on to the next page?

02:14:22  22   A.  I see it now.

02:14:23  23   Q.  And does that refresh your recollection, sir, of how

02:14:25  24   you testified under oath?

02:14:27  25   A.  Yes, it does.

| | | |
|---|---|---|
| 02:14:35 | 1 | Q.  As Wells Fargo's corporate representative, Wells Fargo |
| 02:14:40 | 2 | has been aware since 2010 that USAA had filed for patents |
| 02:14:46 | 3 | in the MRDC space, correct? |
| 02:14:48 | 4 | A.  Yes. |
| 02:14:51 | 5 | MS. GLASSER:  I pass the witness. |
| 02:14:52 | 6 | THE COURT:  Redirect. |
| 02:14:53 | 7 | MR. MELSHEIMER:  Yes, Your Honor.  Thank you. |
| 02:15:06 | 8 | THE COURT:  Approach the bench, counsel. |
| 02:15:08 | 9 | (Bench conference.) |
| 02:15:12 | 10 | THE COURT:  For purposes of me judging when a |
| 02:15:16 | 11 | recess is appropriate, how long do you think your redirect |
| 02:15:18 | 12 | will go? |
| 02:15:19 | 13 | MR. MELSHEIMER:  You know, maybe 15 minutes, |
| 02:15:24 | 14 | Judge, or so. |
| 02:15:24 | 15 | THE COURT:  Okay.  That will be fine. |
| 02:15:26 | 16 | MR. MELSHEIMER:  Okay. |
| 02:15:26 | 17 | THE COURT:  Let's go. |
| 02:15:27 | 18 | (Bench conference concluded.) |
| 02:15:28 | 19 | THE COURT:  Let's proceed. |
| 02:15:29 | 20 | MR. MELSHEIMER:  May it please the Court. |
| 02:15:29 | 21 | REDIRECT EXAMINATION |
| 02:15:36 | 22 | BY MR. MELSHEIMER: |
| 02:15:36 | 23 | Q.  You were asked some questions about what your |
| 02:15:36 | 24 | responsibility was with MRDC.  Do you recall those |
| 02:15:37 | 25 | questions at the beginning, sir? |

| | | |
|---|---|---|
| 02:15:39 | 1 | A.  Yes, sir. |
| 02:15:39 | 2 | Q.  And did you have consulting responsibility for MRDC? |
| 02:15:47 | 3 | A.  I had consulting and also decision-making. |
| 02:15:50 | 4 | Q.  And what's the difference between consulting, |
| 02:15:57 | 5 | decision-making, and direct responsibility, in your mind? |
| 02:15:59 | 6 | A.  So I was responsible for everything check-related.  And |
| 02:16:03 | 7 | so that's why I answered the way that I did.  So I |
| 02:16:09 | 8 | consulted on everything check because the digital team that |
| 02:16:12 | 9 | was doing the work did not understand check at all because |
| 02:16:16 | 10 | they were mobile banking, Internet banking people.  And so |
| 02:16:22 | 11 | I worked with them and had decision-making ability on |
| 02:16:25 | 12 | anything related to check. |
| 02:16:27 | 13 | Q.  Did you have a different, more direct responsibility on |
| 02:16:30 | 14 | the back end processes? |
| 02:16:32 | 15 | A.  Yes.  As I had testified earlier, I had been working on |
| 02:16:36 | 16 | that for a couple of decades.  And so I had -- that's why I |
| 02:16:40 | 17 | had this deep understanding of check and was -- I needed to |
| 02:16:43 | 18 | consult with the new teams that were doing check via the |
| 02:16:47 | 19 | Internet. |
| 02:16:48 | 20 | Q.  You were asked a question about a list of people and |
| 02:16:51 | 21 | whether or not you were on that list.  Do you remember |
| 02:16:53 | 22 | that? |
| 02:16:53 | 23 | A.  Yes, I do, sir. |
| 02:16:55 | 24 | Q.  Now, was one of the people on that list a man named |
| 02:16:58 | 25 | Scott Thomas? |

| | | |
|---|---|---|
| 02:16:58 | 1 | A.   That's correct. |
| 02:16:59 | 2 | Q.   Does Scott -- who is Scott Thomas? |
| 02:17:01 | 3 | A.   Scott Thomas was one of my employees. |
| 02:17:03 | 4 | Q.   Does he report to you as a -- as a person who works at |
| 02:17:07 | 5 | Wells Fargo? |
| 02:17:07 | 6 | A.   He did.  He's retired now. |
| 02:17:12 | 7 | MR. MELSHEIMER:  Let's take a look at Plaintiff's |
| 02:17:13 | 8 | Exhibit 23. |
| 02:17:13 | 9 | Q.   (By Mr. Melsheimer)  I think it's in your binder, sir. |
| 02:17:20 | 10 | MR. MELSHEIMER:  And let's go to Page 7. |
| 02:17:23 | 11 | Q.   (By Mr. Melsheimer)  You were asked some questions |
| 02:17:26 | 12 | about this.  If you flip with me, sir, at Page 7, I think |
| 02:17:33 | 13 | it's Slide 6. |
| 02:17:53 | 14 | A.   Okay. |
| 02:17:53 | 15 | Q.   Now, you were asked a question about whether any of the |
| 02:17:58 | 16 | information on this page -- first of all, is this a |
| 02:18:02 | 17 | multi-page document? |
| 02:18:03 | 18 | A.   Yes, sir, it is. |
| 02:18:04 | 19 | Q.   Is this just one page of 12 pages? |
| 02:18:12 | 20 | A.   Yes, that's right. |
| 02:18:13 | 21 | Q.   What's the document called, Plaintiff's Exhibit 23? |
| 02:18:22 | 22 | A.   Check Deposit Services, DTD Mobile Concept, dash, SWOT |
| 02:18:33 | 23 | Analysis. |
| 02:18:33 | 24 | Q.   What does DTD mobile concept mean? |
| 02:18:36 | 25 | A.   Desktop Deposit mobile concept. |

835

| | | |
|---|---|---|
| 02:18:38 | 1 | Q.  Is that -- is that two different things or one thing? |
| 02:18:41 | 2 | A.  It's -- it's a combination of two things. |
| 02:18:44 | 3 | Q.  What are the two things it's a combination of? |
| 02:18:46 | 4 | A.  Desktop Deposit and mobile. |
| 02:18:51 | 5 | Q.  What is an SWOT analysis? |
| 02:18:55 | 6 | A.  Honestly, I'm not sure what that acronym means. |
| 02:19:07 | 7 | Q.  Well, take a look at Page -- the next page, the slide, |
| 02:19:11 | 8 | and look at the titles of the different boxes there, and |
| 02:19:14 | 9 | you -- tell me if that refreshes your recollection about |
| 02:19:17 | 10 | what SWOT stands for. |
| 02:19:19 | 11 | A.  Yes, it's strengths, weaknesses, opportunities, and |
| 02:19:23 | 12 | threats. |
| 02:19:23 | 13 | Q.  All right.  This is a document -- an internal document |
| 02:19:27 | 14 | at Wells Fargo in 2010 or so? |
| 02:19:29 | 15 | A.  Yes, sir. |
| 02:19:31 | 16 | Q.  Okay.  So you were asked some questions about -- |
| 02:19:34 | 17 |          MR. MELSHEIMER:  Let's move to Page 7. |
| 02:19:36 | 18 | Q.  (By Mr. Melsheimer)  And there's questions -- there's |
| 02:19:38 | 19 | issues about -- there on mobile banking services.  Do you |
| 02:19:41 | 20 | see that? |
| 02:19:42 | 21 | A.  Yes, sir. |
| 02:19:47 | 22 | Q.  And you were asked about -- well, first of all, is |
| 02:19:51 | 23 | this -- is this all information -- first of all, strike |
| 02:19:54 | 24 | that. |
| 02:19:55 | 25 |          MR. MELSHEIMER:  I apologize, Your Honor. |

| 02:19:56 | 1 | Q.  (By Mr. Melsheimer)   Is there information on here about |
| 02:19:59 | 2 | things other than USAA? |
| 02:20:02 | 3 | A.  Yes, sir. |
| 02:20:02 | 4 | Q.  In fact, there are -- how many different bullet points |
| 02:20:05 | 5 | are there on this page? |
| 02:20:06 | 6 | A.  Seven bullet points. |
| 02:20:08 | 7 | Q.  And how many relate to USAA? |
| 02:20:10 | 8 | A.  One. |
| 02:20:10 | 9 | Q.  And that information about USAA in the final bullet |
| 02:20:15 | 10 | point, was that public information, as far as you know? |
| 02:20:21 | 11 |         MS. GLASSER:  Object to leading. |
| 02:20:22 | 12 |         THE COURT:  Sustained. |
| 02:20:23 | 13 | Q.  (By Mr. Melsheimer)   Do you know if the -- if the -- do |
| 02:20:27 | 14 | you know whether or not the information that is contained |
| 02:20:30 | 15 | in this slide on this page in that bullet point was public |
| 02:20:33 | 16 | information or not public information? |
| 02:20:35 | 17 | A.  I believe it was public information. |
| 02:20:37 | 18 | Q.  All right.  Let's take a look at para -- Plaintiff's |
| 02:20:39 | 19 | Exhibit 427, which you were also asked about.  And is that |
| 02:20:48 | 20 | also a multi-page document? |
| 02:20:49 | 21 | A.  Yes, sir, it is. |
| 02:20:50 | 22 | Q.  Were you asked about all the pages? |
| 02:20:52 | 23 | A.  No, sir, I was not. |
| 02:20:53 | 24 | Q.  Is it almost 30 pages of documents, sir? |
| 02:21:01 | 25 | A.  Yes, sir. |

02:21:02  1  Q.  Now, let's take a look at the one slide that you were

02:21:06  2  asked about.  And it's the second slide, sir.  It's called

02:21:13  3  Mobile RDC Moving From Niche to Mainstream.

02:21:19  4          Now, first of all, is this slide itself, of the

02:21:22  5  30 or so, is it limited to USAA, just on its face?

02:21:27  6  A.  No, sir.

02:21:28  7  Q.  What other bank is just as plain as day on there?

02:21:32  8  A.  Chase.

02:21:32  9  Q.  And what other banks are listed in the -- in the bottom

02:21:35  10  box?

02:21:35  11  A.  It has Bank of America, PayPal, and then small banks

02:21:41  12  and credit unions.

02:21:45  13  Q.  You were asked about USAA's offer to give a license --

02:22:14  14  or negotiate or discuss a license with Wells Fargo.  Do you

02:22:19  15  know when that occurred?

02:22:21  16  A.  No, I do not.

02:22:22  17  Q.  Now, you were asked in your deposition -- you were

02:22:31  18  asked a question about whether or not you'd reviewed the

02:22:37  19  patents very briefly.  Do you recall that?

02:22:37  20  A.  Yes, I did.

02:22:38  21  Q.  Now, you were -- when was your deposition in this case?

02:22:41  22  When was one of your depositions in this case?

02:22:44  23  A.  There were two.

02:22:45  24  Q.  Was -- was one of them in July of 2019?

02:22:52  25  A.  That's correct.

| | | |
|---|---|---|
| 02:22:52 | 1 | Q.  In July of 2019, had you reviewed the patents very |
| 02:22:55 | 2 | briefly or had you reviewed them extensively? |
| 02:22:58 | 3 | A.  I had reviewed them very briefly. |
| 02:23:00 | 4 | Q.  What has happened since July of 2019 and today with |
| 02:23:03 | 5 | respect to your review of the patents? |
| 02:23:05 | 6 | A.  I've reviewed them extensively. |
| 02:23:08 | 7 | Q.  And has that included sitting here for the last few |
| 02:23:11 | 8 | days, as the patent has been discussed? |
| 02:23:14 | 9 | A.  Yes, sir. |
| 02:23:14 | 10 | Q.  You were also asked about whether or not you'd done any |
| 02:23:27 | 11 | investigation into additional facts about the case back in |
| 02:23:30 | 12 | your September of 2019 deposition.  Do you remember that? |
| 02:23:34 | 13 | A.  Yes, sir. |
| 02:23:34 | 14 | Q.  And you said you hadn't done much? |
| 02:23:36 | 15 | A.  In that deposition, yes. |
| 02:23:37 | 16 | Q.  Since September of 2019, have you done some more to |
| 02:23:41 | 17 | educate yourself about the issues you've told the jury |
| 02:23:44 | 18 | about? |
| 02:23:44 | 19 | A.  Yes, I've met with our experts many times. |
| 02:23:48 | 20 | Q.  And have you also talked to people at Wells Fargo that |
| 02:23:51 | 21 | you identified in your cross-examination? |
| 02:23:53 | 22 | A.  Yes, sir. |
| 02:23:59 | 23 | Q.  Have you made yourself available to the consulting |
| 02:24:03 | 24 | experts or the experts retained by Wells Fargo to answer |
| 02:24:06 | 25 | their questions about the bank systems and your knowledge |

02:24:10   1   of them?

02:24:10   2   A.   Yes, sir.

02:24:17   3   Q.   Let's take a look at Exhibit 22 that you were asked

02:24:19   4   about.   If you go to Page 5.

02:24:52   5           There's a -- there's a paragraph here you're asked

02:24:55   6   about the key benefits to Wells Fargo include.

02:24:59   7           Now, what is the purpose of this document, sir?

02:25:11   8   Take a look at the cover of it.

02:25:12   9   A.   Yeah, I was just doing that.   One second.

02:25:15  10           Yes, I believe this is a project definition

02:25:20  11   document.

02:25:20  12   Q.   Okay.   And is this a pilot program as -- for -- for the

02:25:25  13   bank's evaluation of mobile remote deposit?

02:25:28  14   A.   Yes, sir, that's what it is.

02:25:30  15   Q.   And are -- are these benefits -- are these things that

02:25:33  16   the bank was looking at back in 2010 when it was

02:25:36  17   considering mobile remote deposit?

02:25:39  18   A.   They are.

02:25:39  19   Q.   Take a look at Plaintiff's Exhibit 1296.   You were

02:25:47  20   asked about this, as well.

02:26:01  21           Now, what is Plaintiff's Exhibit 1296?

02:26:03  22   A.   It's a presentation about mobile remote deposit

02:26:09  23   capture.

02:26:09  24   Q.   Now, it's a multi-page document?

02:26:11  25   A.   Yes, sir, it is.

840

02:26:12   1   Q.  And were you -- were you asked about all the pages or

02:26:15   2   just limited pages?

02:26:16   3   A.  Limited, sir.

02:26:18   4   Q.  Okay.  Let's take a look at page -- well, first of all,

02:26:21   5   let's -- let's take a look at Page 4, because you were

02:26:24   6   asked about this one.

02:26:27   7          So it says:  Why mobile RDC given our remote --

02:26:34   8   sorry, why mobile RDC given our DTD experience.

02:26:40   9          Is that Desktop Deposit?

02:26:41  10   A.  Yes, sir, that is.

02:26:41  11   Q.  Is this document dated January 2011?

02:26:44  12   A.  Yes, it is.

02:26:45  13   Q.  What is being illustrated on this slide, sir?

02:26:47  14   A.  What it talks about is whether or not we can use the

02:26:54  15   experience in Desktop Deposit with the scanner as our go

02:27:00  16   forward experience for other customers.

02:27:04  17   Q.  And were you -- were you -- why is there an X over that

02:27:08  18   scanner?

02:27:08  19   A.  Because what we realized is that Desktop Deposit, while

02:27:10  20   it's still important, when you have a lot of checks, it's

02:27:14  21   still something that consumers still want.  So if you've

02:27:17  22   got 10 checks at home, it's very difficult to capture 10

02:27:21  23   checks by doing it with a mobile phone.  So we needed this

02:27:26  24   capability, but we also wanted to take advantage of the

02:27:28  25   smartphones because now those cameras and the capabilities

02:27:31    1    of the smartphone became way better than they were

02:27:35    2    previously.

02:27:35    3            So what it was saying is we're -- we're going to

02:27:38    4    not go forward with this as our go forward only solution,

02:27:43    5    but that we're going to add the capability for smartphones

02:27:47    6    so that you can do both single item capture of a check and

02:27:54    7    then multi-item capture of a check if you've got multiple.

02:27:57    8    Q.  Take a look at Page 7, sir, of this slide deck which

02:28:04    9    you were asked extensively about on your cross-examination.

02:28:04   10            So just give me a sense of what is being shown on

02:28:07   11    this slide.

02:28:07   12    A.  Yes.  So on the upper side, it shows the things that we

02:28:12   13    actually do as part of that mobile front end process, as

02:28:16   14    we've talked about earlier.  And then in the right-hand

02:28:20   15    side, it actually shows the back end processes that --

02:28:23   16    processes that we talked about earlier.

02:28:25   17            And then it gives you a comprehensive view of all

02:28:28   18    the things down below.  And it doesn't really totally

02:28:32   19    enumerate whether or not they're front end or back end

02:28:36   20    underneath even though they're on one side or the other.

02:28:39   21    So it basically is a mixture of that in totality.

02:28:44   22    Q.  So in terms of the phone that's shown there on the top,

02:28:47   23    is -- is everything next to the phone?  Is that

02:28:52   24    reflecting -- strike that.

02:28:53   25            Does this illustrate that everything next to the

02:28:57  1   phone is, in fact, on the phone?

02:28:58  2   A.   No, it is not on the phone.

02:29:01  3   Q.   Well, the good decisions plus EWS real-time, I think we

02:29:07  4   saw that in your direct examination.  Is that part of the

02:29:09  5   back end process or the front end process?

02:29:11  6   A.   It's part of the back end process.

02:29:13  7   Q.   And what do -- what is good decisions plus EWS

02:29:17  8   real-time?

02:29:17  9   A.   That's a service that we've had in place for many

02:29:21  10  years.  We built it probably over a decade before this to

02:29:26  11  actually process for the branch.  And we leveraged that

02:29:29  12  process, as I had spoke to earlier, with new controls in

02:29:34  13  place.  So that process is an old process from the back

02:29:38  14  end.

02:29:38  15  Q.   All right, sir.  Let me turn your attention to

02:29:46  16  Exhibit 1182.  You were shown this in your

02:29:58  17  cross-examination, sir.

02:30:00  18  A.   Yes.

02:30:00  19  Q.   I want to ask you some questions about it.

02:30:04  20       First of all, are these the kind of screenshots

02:30:13  21  that you could get of the Wells Fargo app off of YouTube or

02:30:15  22  the Internet that you described for us in your direct

02:30:19  23  examination before lunch?

02:30:20  24  A.   Yes.  You can go onto YouTube and all those different

02:30:24  25  places right now and get very similar information about

02:30:30   1   lots of our products.

02:30:31   2   Q.  Including this -- including the information about the

02:30:33   3   USAA product, right?

02:30:34   4   A.  Yes, sir.

02:30:35   5   Q.  And do these screenshots reveal anything to -- anything

02:30:39   6   about the technical workings of the USAA product?

02:30:44   7   A.  No, they do not.

02:30:46   8   Q.  And looking at these arrows, I want to make sure we --

02:30:52   9   we talk about this, because you were asked about this on

02:30:55   10  your cross-examination.  So, first of all, are these -- how

02:31:01   11  were these screenshots laid out based on your looking at it

02:31:05   12  and understanding it?

02:31:06   13  A.  If we're talking about the second one with the arrows,

02:31:11   14  if you look very closely at those, those little boxes that

02:31:18   15  are there are really buttons that show pop ups.  And if you

02:31:22   16  show the bottom one --

02:31:25   17          MR. MELSHEIMER:  I'm sorry, Your Honor.  I'm

02:31:31   18  sorry.  Could we approach?  I'm sorry.

02:31:36   19          (Bench conference.)

02:31:38   20          THE COURT:  Just a minute, Ms. Glasser.  You're

02:31:41   21  not going to start a conversation with opposing counsel at

02:31:44   22  the podium in the middle of the courtroom.

02:31:46   23          MS. GLASSER:  I'm so sorry.  Can we ask him to

02:31:49   24  take it down.  The '571 patent is up on the screen right

02:31:52   25  now from Case 1.  It's the wrong version.

| | | |
|---|---|---|
| 02:31:54 | 1 | MR. MELSHEIMER:  You're saying this -- I'm sorry, |
| 02:31:56 | 2 | Your Honor.  Are they suggesting it's the wrong -- this |
| 02:31:59 | 3 | isn't 1182? |
| 02:32:00 | 4 | MS. GLASSER:  It's the one from the last case. |
| 02:32:02 | 5 | MR. MELSHEIMER:  Okay.  So is there -- what was |
| 02:32:03 | 6 | the 1182 that you showed him? |
| 02:32:05 | 7 | MS. GLASSER:  The same one, but we redacted it for |
| 02:32:09 | 8 | this case. |
| 02:32:10 | 9 | THE COURT:  If you all have an issue, you approach |
| 02:32:10 | 10 | the bench.  You don't just start talking to each other in |
| 02:32:13 | 11 | the middle of the courtroom. |
| 02:32:13 | 12 | MS. GLASSER:  I'm so sorry. |
| 02:32:14 | 13 | THE COURT:  Don't do that again. |
| 02:32:15 | 14 | MS. GLASSER:  Okay.  I apologize.  I thought he |
| 02:32:17 | 15 | would want to know.  I'm so sorry. |
| 02:32:19 | 16 | MR. MELSHEIMER:  Your Honor -- |
| 02:32:21 | 17 | THE COURT:  Just pull up the slide that she used. |
| 02:32:23 | 18 | MS. GLASSER:  Our graphics guy can pull it up. |
| 02:32:26 | 19 | MR. MELSHEIMER:  I think I can, Your Honor. |
| 02:32:29 | 20 | THE COURT:  Let's just do that.  Let's proceed. |
| 02:32:31 | 21 | (Bench conference concluded.) |
| 02:32:35 | 22 | Q.  (By Mr. Melsheimer)  Mr. Hecht, we may be showing the |
| 02:32:37 | 23 | wrong slide. |
| 02:32:38 | 24 | MR. MELSHEIMER:  So might we pull up the USAA |
| 02:32:41 | 25 | slide that they showed you on this issue on your |

02:32:44  1   cross-examination, just so we're on the same page.

02:32:47  2   Q.  (By Mr. Melsheimer)  Are you with me, sir?

02:32:49  3   A.  Yes, sir.

02:32:54  4   Q.  All right.  So this is Plaintiff's Exhibit 1182, and I

02:32:57  5   believe you also have a copy of it in your binder, as well.

02:33:03  6         So let's reframe where we were.

02:33:06  7         What do you understand to be illustrated on this

02:33:10  8   slide, sir?

02:33:12  9   A.  Yes.  The -- the red boxes that are around the question

02:33:16 10   mark first on the bottom, what was illustrated here is to

02:33:20 11   be able to click on that and to cause the pop up to come

02:33:25 12   up, and that's what's down below.  It shows what pops up if

02:33:29 13   there's a -- if you click that question mark.

02:33:32 14         And then the top is the same thing.  So it shows

02:33:35 15   what pops up whenever you click that button, and then just

02:33:40 16   by chance, that arrow is pointing where it's pointing.  But

02:33:44 17   that is the actual pop up that happens when you click on

02:33:47 18   the top that pops up whenever you're going through the

02:33:51 19   screen flow.

02:33:52 20   Q.  Sir, you were asked a question, or it was suggested

02:33:56 21   that that arrow is just pointing right at those patent

02:33:59 22   numbers, and you were asked a question about is that a

02:34:03 23   coincidence, and I think you said -- I think you said, yes,

02:34:05 24   that's a coincidence.  What did you mean by that?

02:34:08 25   A.  Yes, so, again, it's really just a common practice when

02:34:11  1   you're showing screen flows, when you use a pop up, you

02:34:16  2   draw an arrow to show that it was a pop up and again,

02:34:17  3   there's a pop up on the bottom, it's got the same arrow and

02:34:19  4   the one on the top, it's a pop up, and it's got that arrow.

02:34:23  5          So, again, if you click those two things that are

02:34:25  6   in the red squares, they cause a new screen to pop up and

02:34:30  7   that's really what this was depicting.

02:34:32  8   Q.  Why is it important to understand when you look at an

02:34:35  9   app the different screens that are popping up when you do

02:34:39  10  different actions?  Why is that something that would be

02:34:41  11  important to know?

02:34:42  12  A.  It's, again, in our research when we look at

02:34:45  13  competitors or when competitors look at us, you want to

02:34:51  14  understand what the customer experience is, and that's

02:34:51  15  really what we were looking at here and what we look at in

02:34:54  16  other competitors as to how the screen flows go.

02:34:58  17  Q.  And I think, sir, that the patents that were -- to the

02:35:09  18  extent there's even patents on that screen, those aren't

02:35:13  19  the patents asserted in this case, are they, sir?

02:35:17  20  A.  No, sir.

02:35:25  21  Q.  You were asked a question in your deposition about

02:35:31  22  PDAs, and I wonder if you might -- we might turn back to

02:35:38  23  that, sir.

02:35:45  24          MR. MELSHEIMER:  I apologize, Your Honor.  It's

02:35:46  25  going to take me a minute to find this.

| | | |
|---|---|---|
| 02:35:48 | 1 | THE COURT:  Take a moment. |
| 02:36:17 | 2 | Q.  (By Mr. Melsheimer)  So, sir, can you take a look at |
| 02:36:18 | 3 | your deposition that you were asked about -- it's the |
| 02:36:23 | 4 | September deposition, September 13th, 2019, on Page 30, |
| 02:36:29 | 5 | Line 14 -- excuse me, Line -- starting on Line 8, going |
| 02:36:40 | 6 | through Line 21.  Let me know when you're there. |
| 02:36:46 | 7 | A.  Yes, I'm there. |
| 02:36:47 | 8 | Q.  Now, were you asked a question about whether or not |
| 02:36:50 | 9 | mobile devices are sometimes referred to as handheld |
| 02:36:53 | 10 | devices? |
| 02:36:53 | 11 | A.  Yes, sir. |
| 02:36:54 | 12 | Q.  And you said like a phone, yeah, or a tablet? |
| 02:36:58 | 13 | A.  Yes. |
| 02:36:58 | 14 | Q.  Right?  And the question that you were asked, that you |
| 02:37:01 | 15 | were asked about on cross-examination, is:  In other words, |
| 02:37:05 | 16 | when you hear the word mobile devices, you understand that |
| 02:37:09 | 17 | that would include things like handheld devices and PDA |
| 02:37:14 | 18 | devices, which have now evolved into tablets and |
| 02:37:18 | 19 | smartphones, fair? |
| 02:37:19 | 20 | A.  Yes, that's what it says. |
| 02:37:22 | 21 | Q.  And is that what you answered as being generally |
| 02:37:25 | 22 | correct? |
| 02:37:25 | 23 | A.  Yes, that's what I said, to be generally correct. |
| 02:37:28 | 24 | Q.  And tell the jury what -- okay.  Thank you. |
| 02:37:32 | 25 | So you're not changing or disagreeing with that |

| | | |
|---|---|---|
| 02:37:41 | 1 | answer, are you, sir? |
| 02:37:42 | 2 | A.  No, I still disagree with the answer. |
| 02:37:46 | 3 | Q.  The answer to which question? |
| 02:37:48 | 4 | A.  That -- the one that we just went through because |
| 02:37:51 | 5 | there's a differentiation between PDAs and smartphones. |
| 02:37:55 | 6 | Q.  You think a PDA is different from a smartphone? |
| 02:37:57 | 7 | A.  Yes, sir. |
| 02:38:10 | 8 | MR. MELSHEIMER:  Just one moment, Your Honor. |
| 02:38:39 | 9 | May I approach counsel, Your Honor? |
| 02:38:40 | 10 | THE COURT:  You may. |
| 02:39:24 | 11 | MR. MELSHEIMER:  We've taken a vote, Your Honor, |
| 02:39:26 | 12 | and I have -- I have no further questions of Mr. Hecht. |
| 02:39:30 | 13 | THE COURT:  You pass the witness? |
| 02:39:31 | 14 | MR. MELSHEIMER:  Yes, Your Honor. |
| 02:39:33 | 15 | THE COURT:  Is there additional cross-examination? |
| 02:39:35 | 16 | MS. GLASSER:  No, Your Honor. |
| 02:39:36 | 17 | THE COURT:  You may step down, Mr. Hecht. |
| 02:39:38 | 18 | THE WITNESS:  Thank you. |
| 02:39:41 | 19 | THE COURT:  Ladies and gentlemen, we're going to |
| 02:39:43 | 20 | take a short recess at this time.  You can simply close and |
| 02:39:46 | 21 | leave your notebooks in your chairs.  Don't discuss the |
| 02:39:48 | 22 | case, follow all my other instructions.  We'll be back |
| 02:39:53 | 23 | shortly to continue.  With that, you're excused for recess. |
| 02:39:57 | 24 | COURT SECURITY OFFICER:  All rise. |
| 02:39:59 | 25 | (Jury out.) |

02:40:12   1         THE COURT:  Counsel, I understand that we had an

02:40:28   2  errant slide put on the screen earlier, but there's no

02:40:31   3  excuse for direct conversation in the well of the courtroom

02:40:35   4  with the jury in the box with the Court not knowing what

02:40:38   5  you're whispering back and forth about.  I don't want to

02:40:41   6  see that kind of conduct again.

02:40:42   7         If there's a problem, then you ask to approach the

02:40:45   8  bench, we'll discuss it up here, and we'll give directions

02:40:48   9  from the bench.  We're not going to have ongoing

02:40:50  10  conversations across the courtroom in the middle of the

02:40:53  11  trial.  It's disrespectful, and I don't expect it to happen

02:40:58  12  again.  If it does, there'll be severe consequences.

02:41:01  13         We stand in recess.

02:41:02  14         COURT SECURITY OFFICER:  All rise.

02:41:20  15         (Recess.)

03:07:40  16         (Jury out.)

03:07:41  17         COURT SECURITY OFFICER:  All rise.

03:07:42  18         THE COURT:  Be seated, please.

03:10:56  19         Defendants, are you prepared to call your next

03:11:05  20  witness?

03:11:07  21         MR. JOHNSON:  We are, Your Honor.

03:11:08  22         THE COURT:  All right.  Let's bring in the jury,

03:11:12  23  please.

03:11:12  24         COURT SECURITY OFFICER:  All rise.

03:11:16  25         (Jury in.)

```
03:11:32   1              THE COURT:  Welcome back, please be seated.
03:11:37   2              Defendant, call your next witness.
03:11:43   3              MR. JOHNSON:  Thank you, Your Honor.  The
03:11:44   4    Defendants call William Saffici.
03:11:47   5              THE COURT:  All right.  Mr. Saffici, if you'll
03:11:49   6    come forward and be sworn, please.
03:11:57   7              Counsel, are there binders to distribute with
03:12:00   8    regard to this witness?
03:12:02   9              MR. JOHNSON:  There will be, Your Honor.
03:12:04  10              (Witness sworn.)
03:12:08  11              THE COURT:  Please come around, sir.  Have a seat
03:12:11  12    on the witness stand.
03:12:13  13              MR. JOHNSON:  And, Your Honor, may I approach with
03:12:14  14    binders?
03:12:15  15              THE COURT:  You may.
03:12:17  16              MR. JOHNSON:  Thank you.
03:12:36  17              THE COURT:  All right.  Mr. Johnson, you may
03:12:38  18    proceed.
03:12:38  19              MR. JOHNSON:  Thank you, Your Honor.  May it
03:12:40  20    please the Court.
03:12:40  21              WILLIAM SAFFICI, DEFENDANT'S WITNESS, SWORN
03:12:40  22                     DIRECT EXAMINATION
03:12:41  23    BY MR. JOHNSON:
03:12:41  24    Q.  Mr. Saffici, will you introduce yourself to the jury,
03:12:44  25    please?
```

03:12:44  1  A.  Yes.  Good afternoon.  My name is William Saffici.

03:12:47  2  Q.  Mr. Saffici, where are you from?

03:12:49  3  A.  I live in a town called Garnet Valley, Pennsylvania,

03:12:56  4  which is a suburb just outside of Philadelphia.

03:12:56  5  Q.  How long have you lived there, sir?

03:12:57  6  A.  My entire life.  I was born in Philadelphia, and I have

03:13:02  7  lived either in the city for most of my life or suburban

03:13:07  8  area now.

03:13:07  9  Q.  And, Mr. Saffici, do you have children?

03:13:08  10  A.  Yes, I have two sons.  I have three granddaughters and

03:13:12  11  one grandson.

03:13:13  12  Q.  And what do you do for work, sir?

03:13:16  13  A.  I'm self-employed as a business consultant in check and

03:13:20  14  image processing, working with banks and companies who

03:13:22  15  provide services for banks.

03:13:24  16  Q.  And what areas do you provide consulting services in?

03:13:29  17  A.  It's primarily all related to check item processing

03:13:33  18  with the imaging aspect of it, as well.

03:13:37  19  Q.  Is your background in check processing?

03:13:39  20  A.  Yes, my entire career has been there.  And, in fact, I

03:13:42  21  started back when President Lyndon Johnson was in office.

03:13:47  22  Q.  Did you go to college to learn about check processing?

03:13:52  23  A.  No, unfortunately there isn't a college curriculum on

03:13:56  24  this subject.  So, basically, I've learned throughout my

03:13:59  25  entire career as I was involved in different initiatives,

03:14:02   1   as well as moving up the ranks in the business -- in the

03:14:06   2   various employers I had worked for.

03:14:09   3   Q.   And you said you'd been in the business since Lyndon

03:14:10   4   Johnson was President, but how many years have you been in

03:14:12   5   check processing?

03:14:12   6   A.   Well, I started in June of 1966, so that makes this 53

03:14:18   7   years.

03:14:18   8   Q.   Mr. Saffici, what is your role in this case?

03:14:23   9   A.   I was hired by Wells Fargo to provide an independent

03:14:27  10   evaluation of the validity of the patents in this case, as

03:14:32  11   well as to provide a response to some of Mr. Calman's

03:14:37  12   opinions on benefits of some of the claims.

03:14:39  13   Q.   Okay.  And have we seen Mr. Calman in court yet?

03:14:42  14   A.   No, I haven't seen him.

03:14:44  15   Q.   Okay.  Did you prepare some demonstratives to go with

03:14:49  16   your testimony to help the ladies and gentlemen of the jury

03:14:54  17   understand your testimony a little better?

03:14:55  18   A.   Yes, I have.

03:14:56  19   Q.   And we're starting to see those on the screen now?

03:14:59  20   A.   This is the first of them, yes.

03:15:01  21   Q.   First, will you tell the jury a little bit about your

03:15:06  22   experience in -- in banking and check processing and,

03:15:10  23   really, you know, when did you get started?

03:15:12  24   A.   Well, I got started in June of 1966.

03:15:16  25   Q.   How old were you?

03:15:17  1   A.  I was a few months shy of 18.

03:15:19  2   Q.  Now, Mr. Saffici, how does a 17-year-old get started in

03:15:24  3   banking?

03:15:24  4   A.  Well, during my high school years, I felt as though I

03:15:27  5   needed to take on a little part-time job to help with the

03:15:31  6   house -- family situation, so I was working for a food

03:15:35  7   services company, and each evening from 6:00 to 9:00 p.m.,

03:15:39  8   I served lunch to the nightshift check processing staff at

03:15:43  9   the Philadelphia National Bank.

03:15:45  10  Q.  And how did serving lunch at the folks at Philadelphia

03:15:49  11  National Bank's nightshift lead to a career in banking?

03:15:53  12  A.  Well, over the three years that I was doing that, I got

03:15:56  13  to engage with a lot of the staff, including the management

03:15:59  14  of the staff.  Plus, I was also inquisitive about what's

03:16:02  15  this check processing.  This is going back when it was

03:16:05  16  really very primitive.

03:16:07  17       And I guess showing some interest in interaction

03:16:10  18  with the folks, they asked me if I was looking upon

03:16:14  19  graduation of high school to move into the banking

03:16:18  20  industry.  I told them that I was enrolled in Penn State

03:16:22  21  University in the fall, so they offered me a part-time

03:16:24  22  position if I wanted to do that.

03:16:26  23  Q.  Okay.  And did you take that part-time job at

03:16:29  24  Philadelphia National?

03:16:30  25  A.  Yes, I did.  I actually started the day after I

03:16:33    1   graduated high school in June of '66.

03:16:35    2   Q.   Okay.   So Mr. Saffici, you've literally been in check

03:16:38    3   processing since high school?

03:16:39    4   A.   That's absolutely correct, yes.

03:16:41    5   Q.   Okay.   How long did you work for Philadelphia National

03:16:45    6   Bank?

03:16:45    7   A.   I was there over a period of 20 years, so from 1966 to

03:16:50    8   '86.

03:16:50    9   Q.   Okay.   Now, Mr. Saffici, do you see in front of you one

03:16:53   10   of your demonstratives is a timeline.   Is that on your

03:16:56   11   screen?

03:16:57   12   A.   Yes, it is.

03:16:58   13   Q.   Okay.   We're going to put your industry experience

03:17:00   14   across the top, okay?

03:17:01   15   A.   Yes.

03:17:02   16   Q.   All right.   Now, you were at Philadelphia National for

03:17:02   17   20 years, so did you eventually get a full-time job with

03:17:11   18   them?

03:17:11   19   A.   Yes.   I actually started full time then in February of

03:17:16   20   '67.   I went to Penn State for one semester, and then went

03:17:20   21   full time.   And then I went to evening at community

03:17:23   22   college.

03:17:23   23   Q.   What area of the Philadelphia National Bank were you

03:17:29   24   focused in for those 20 years?

03:17:31   25   A.   Entirely check processing.   Check processing is

855

03:17:34    1    multiple departments.  So I had my hands in a -- in a

03:17:38    2    number of initiatives and departments over those years.

03:17:42    3    Q.  Where did you start at Philadelphia National?

03:17:44    4    A.  I started at a very entry level position operating a

03:17:48    5    reader/sorter, and I think we saw some pictures.  And we'll

03:17:51    6    see some more of those right here.

03:17:52    7    Q.  Okay.  Mr. Saffici, are these three of the

03:17:55    8    reader/sorters that you worked with?

03:17:57    9    A.  Yes, I actually did operate all three of those.  The

03:18:00   10    one in the front and the one in the upper right, I was

03:18:02   11    actually involved in the implementation of those, as well.

03:18:05   12    Q.  Can you tell us the reader/sorter devices -- can you

03:18:11   13    kind of give us its role in check processing and benefits

03:18:14   14    back in the '60s and '70s when that's what you were working

03:18:18   15    on?

03:18:18   16    A.  Right.  As we heard, I think, a little bit from

03:18:21   17    Mr. Hecht, as well, back in those days, everything was

03:18:24   18    paper-based.  Everything had to be touched by a human.

03:18:27   19    Every -- every check did, before it was ready to be

03:18:29   20    processed on a reader/sorter.

03:18:32   21          And as its name implies, reader/sorter, it reads

03:18:36   22    and sorts checks.  So that little round circle area in the

03:18:41   23    middle picture here is showing you a check going through.

03:18:44   24    You'll see some of the numbers at the bottom, which I'm

03:18:48   25    sure you're familiar with.  And that information is being

03:18:50   1   read at that point.

03:18:52   2          And as the software receives that information, it

03:18:56   3   can make some decisions where -- in which pockets to put

03:19:02   4   those checks.

03:19:03   5          So in these earlier machines, you see we had fewer

03:19:10   6   numbers of pockets, but then when you look up at the upper

03:19:12   7   right there, now, that pocket -- that machine only had 24,

03:19:14   8   but it could go up to 36.  So when Mr. Hecht said they're

03:19:17   9   big, they are big.

03:19:19  10   Q.  Now, remind us, why would the checks need sorting back

03:19:24  11   at this time period?

03:19:24  12   A.  Right.  Because checks had to be -- those checks that

03:19:28  13   had to be presented to the paying bank, they had to get

03:19:32  14   there by truck or plane.  And banks, like the bank I was

03:19:37  15   with, we would send some checks maybe to the Federal

03:19:40  16   Reserve.  We might send others directly to the specific

03:19:45  17   paying bank.  We might have also used another bank like

03:19:49  18   Wells Fargo -- would send them groups of checks for, say,

03:19:53  19   West Coast banks.

03:19:54  20          So the decision that made to -- to do the sorting

03:19:58  21   was to pocket these checks so that they were ready then to

03:20:01  22   be bundled, put in bags, tagged, and so forth to be put on

03:20:07  23   trucks and planes to go to the paying bank.

03:20:10  24   Q.  Now, you started running a reader/sorter.  Can you kind

03:20:18  25   of give us a summary of your 20 years at Philadelphia

03:20:21  1    National?

03:20:21  2    A.  Well, I won't do all 20.  At a high level, as I said, I

03:20:24  3    moved through many of the areas in the umbrella of check

03:20:28  4    processing, and also was managing them at the same -- as I

03:20:33  5    was moving through them.

03:20:34  6         But my other focus was that as I moved in to take

03:20:38  7    over another department or add one on to my

03:20:41  8    responsibilities, I was also chartered with the automation

03:20:44  9    of it.  So not only was the check processing where we saw

03:20:47  10   reader/sorters, there were other -- there were about 10

03:20:50  11   departments and/or functions that I was directly involved

03:20:53  12   in the automation of during that 20-year period.

03:20:56  13        And when I left in '86, my title was assistant

03:20:59  14   vice president of operations.

03:21:01  15   Q.  Mr. Saffici, when you left Philadelphia National in

03:21:05  16   1986, this will kind of go back to our timeline, where did

03:21:10  17   you go?

03:21:10  18   A.  I was recruited by a company called Unisys, spelled

03:21:16  19   U-n-i-s-y-s.  They were looking for individuals with deep

03:21:20  20   industry experience because of some new innovations that

03:21:24  21   they were working on.

03:21:25  22   Q.  Okay.  What was -- before we get to those innovations,

03:21:28  23   what was Unisys?

03:21:30  24   A.  Well, Unisys is a technology company, providing both

03:21:33  25   hardware and software solutions to a variety of industries.

03:21:38   1   The airline industry, government, commercial, et cetera,

03:21:41   2   and banking, of course.  And that was the part that I

03:21:45   3   worked in was the banking division.

03:21:47   4   Q.  Okay.  What did you do for Unisys?

03:21:49   5   A.  Well, for Unisys, I had several roles.  I did sales

03:21:52   6   support.  I also was in program management.  And I provided

03:21:57   7   consultive services to our existing customers or

03:22:01   8   prospective customers on our products.

03:22:04   9   Q.  And what area of technology were you focused on at

03:22:07  10   Unisys?

03:22:07  11   A.  This, again, was all specific to check processing and

03:22:10  12   then imaging as it came out.

03:22:13  13   Q.  Mr. Saffici, you mentioned that there were some

03:22:14  14   innovations that occur when you began at Unisys.  Can you

03:22:19  15   tell the jury about those innovations that occur in the

03:22:23  16   mid-'80s as you're there?

03:22:24  17   A.  Yes.  And part of the reason they were looking for, you

03:22:27  18   know, experienced individuals, they were coming out with a

03:22:30  19   new check imaging system.  You saw that big reader/sorter

03:22:35  20   that I showed you and Mr. Hecht showed you.  And what they

03:22:37  21   were doing was -- Unisys had a similar type machine.  They

03:22:42  22   were -- we were getting ready to put cameras in the track

03:22:45  23   of those sorters so that as the checks were moving down the

03:22:50  24   track, we were taking pictures of them -- or images as we

03:22:53  25   call them.

03:22:54   1        And so that was the first big thing, plus there
03:22:58   2   was new software to a company that changed.  And one of the
03:23:03   3   pieces of software that was really critical to this process
03:23:06   4   was -- you heard the term OCR, or optical character
03:23:08   5   recognition.  That is the ability to read the amount or
03:23:14   6   other information from the face of the document.
03:23:17   7        So if it was a check, it was looking up at the
03:23:20   8   courtesy amount read only initially.  On a deposit ticket,
03:23:24   9   you could pick up a handwritten account number, other
03:23:29  10   internal documents, handwritten information, as well.
03:23:32  11   Q.  Mr. Saffici, why were the introduction of imaging,
03:23:36  12   cameras, and OCR an important innovation while you were at
03:23:42  13   Unisys?
03:23:42  14   A.  Right.  If you go back in time before this announcement
03:23:46  15   and release of product, every -- every process of check
03:23:50  16   processing was sort of like an assembly line, I guess you
03:23:54  17   would call it, where you went from Step A to Step B to
03:23:57  18   Step C, et cetera.
03:23:58  19        Now, with the introduction of imaging, we were
03:24:01  20   able to take the paper check, as soon as the trucks
03:24:06  21   arrived, take them out of the bags, create the image of the
03:24:09  22   check and then in a distributed manner, be able to perform
03:24:12  23   subsequent functions that had to be -- that were required
03:24:16  24   before we finally -- before we had a final disposition of
03:24:20  25   the item.

03:24:21  1  Q.  And how were you involved in these innovations?

03:24:24  2       MR. SHEASBY:  Your Honor, may we approach?  I have

03:24:26  3  an objection.

03:24:27  4       THE COURT:  Approach the bench.

03:24:28  5       (Bench conference.)

03:24:36  6       MR. SHEASBY:  He's going through elements of the

03:24:40  7  claims by this background, talking about distributed

03:24:42  8  systems and distributing OCR.  This slide was purported to

03:24:45  9  be Mr. Saffici's background, not a detailed dive into the

03:24:49  10  prior art technology relating to OCR and distributed

03:24:52  11  systems.

03:24:52  12       So I'm -- I want him to have -- to be able to tell

03:24:55  13  the jury his experience, but this is not -- this is not a

03:24:59  14  prior art case.  He should not be discussing the prior art

03:25:01  15  technology at that level of detail.

03:25:03  16       THE COURT:  Well, go ahead, Mr. Johnson.

03:25:06  17       MR. JOHNSON:  Your Honor, I'm -- I'm prepared --

03:25:07  18  we have gone as in-depth as I would go into it.  It's

03:25:12  19  really to show his familiarity with the technology.  We're

03:25:15  20  moving on to something else.

03:25:16  21       THE COURT:  Well, let's move along and get him

03:25:18  22  qualified as an expert.

03:25:20  23       MR. JOHNSON:  Thank you, Your Honor.

03:25:21  24       (Bench conference concluded.)

03:25:21  25       THE COURT:  Let's proceed.

861

| | | |
|---|---|---|
| 03:25:25 | 1 | Q.  (By Mr. Johnson)  Mr. Saffici, even though you'd had |
| 03:25:31 | 2 | these innovations and you were doing internal processing at |
| 03:25:35 | 3 | the bank with the images, were check images being exchanged |
| 03:25:39 | 4 | between banks yet? |
| 03:25:40 | 5 | A.  No, not yet.  The -- the paper check was still the |
| 03:25:44 | 6 | legal negotiable instrument that had to be presented to the |
| 03:25:47 | 7 | paying bank in order to collect payment from it. |
| 03:25:51 | 8 | Q.  So we're still planes and trucks? |
| 03:25:53 | 9 | A.  Yeah, yes. |
| 03:25:55 | 10 | Q.  Where did you work next, sir? |
| 03:25:57 | 11 | A.  I then joined a company called Fiserv.  I was actually |
| 03:26:00 | 12 | recruited by them, as well.  Fiserv is spelled F-i-s-e-r-v. |
| 03:26:04 | 13 | Q.  What was Fiserv? |
| 03:26:05 | 14 | A.  Fiserv is also a technology company providing software |
| 03:26:10 | 15 | and services to -- exclusively to the financial industry. |
| 03:26:15 | 16 | Q.  Okay.  What position did you hold with Fiserv? |
| 03:26:17 | 17 | A.  Positions I had there included program management, |
| 03:26:21 | 18 | product management, as well as industry liaison -- the |
| 03:26:27 | 19 | financial -- liaison into the financial industry dealing |
| 03:26:29 | 20 | with the standards organization you heard Mr. Hecht mention |
| 03:26:31 | 21 | earlier, and some other industry initiatives. |
| 03:26:35 | 22 | Q.  You were a part of ANSI? |
| 03:26:40 | 23 | A.  Yes, that's correct. |
| 03:26:41 | 24 | Q.  And what is ANSI? |
| 03:26:42 | 25 | A.  American National -- American National Standards |

03:26:48   1   Institute, yes.

03:26:48   2   Q.  And what was your focus with ANSI?

03:26:51   3   A.   I worked on the standards for the substitute check that

03:26:56   4   we heard Mr. Hecht talk about before, that was related to

03:26:59   5   Check 21, as well as the standard for the image file format

03:27:04   6   that allowed for the movement of images from bank to bank

03:27:08   7   or from customer to bank.

03:27:10   8   Q.  As we -- as you moved into the '90s with Fiserv, were

03:27:15   9   there some beneficial technology -- technological

03:27:19  10   advancements with the images in banks?

03:27:21  11   A.  Well, yes.  In addition to the use of the images for

03:27:26  12   the internal processing, banks continued to implement that

03:27:32  13   and gain that -- those benefits.  It was also around the

03:27:35  14   time that the Internet was becoming a break-through for use

03:27:40  15   of functions.

03:27:41  16   Q.  Okay.  And how did the Internet affect banking and your

03:27:45  17   role at Fiserv?

03:27:46  18   A.   Right.  So one of the things that -- that happened --

03:27:51  19   the use of the Internet -- and Mr. Hecht, again, mentioned

03:27:54  20   that earlier -- was Internet banking where Wells Fargo was

03:27:58  21   one of the first ones to have implemented that.  And -- and

03:28:04  22   as Mr. Hecht described, it was used for -- initially for

03:28:09  23   some of the rudi -- rudimentary things of looking at

03:28:13  24   balances or maybe looking at your transaction history

03:28:15  25   statements.

03:28:15   1          But from an image perspective, the banks were now

03:28:22   2   able to allow their customers to see their paid checks in

03:28:23   3   image form and thereby starting to reduce more of the

03:28:27   4   operational aspects of having to sort checks at the end of

03:28:30   5   the month and stuff them in a statement.  I think we all

03:28:35   6   remember receiving those in the past.

03:28:38   7   Q.  As we move into the 2000s, Mr. Saffici, what was the --

03:28:43   8   for you, the next big advancement in check processing

03:28:46   9   affecting your work?

03:28:47   10  A.  Well, the next big impact for the entire industry --

03:28:51   11  and, again, I'm going to be repeating a little bit of

03:28:53   12  Mr. Hecht -- but you heard Check 21 before, okay?  And that

03:28:59   13  was signed into law on October 28th of 2003, and then

03:29:06   14  implemented one year later on October 28th of 2004.  So

03:29:12   15  it -- I'm sorry.

03:29:13   16  Q.  Remind us why Check 21 was a big development in your

03:29:19   17  work.

03:29:20   18  A.  Right.  Check 21, you know, modernized now how banks

03:29:26   19  can present checks to the paying bank.  They were now able

03:29:29   20  to begin using an image because the image -- Check 21

03:29:33   21  allowed the image to be that negotiable item, if you want

03:29:37   22  to still call it an item, rather than the paper check.

03:29:41   23  Q.  Okay.  While at Fiserv, did you have particular

03:29:45   24  involvement in technologies to aid in the implementation of

03:29:49   25  Check 21?

864

03:29:49   1   A.   Yes.   I was one of the leads on the project to build a

03:29:53   2   Check 21 solution.   So we had about a year, you know, from

03:29:57   3   the signing to the implementation.   And we worked with --

03:30:02   4   we worked with software development to put together a

03:30:06   5   process that would allow us initially, as Mr. Hecht also

03:30:09   6   explained, print substitute checks.

03:30:15   7   Q.   And did you actually succeed in developing a Check 21

03:30:19   8   system that utilized images for presentment purposes?

03:30:22   9   A.   Yes, we did.   In fact, on the day of October 28th of

03:30:26   10  2004, a little different from Mr. Hecht's example, but what

03:30:33   11  we did with Fiserv working with another couple

03:30:35   12  organizations, we had a bank in Wichita, Kansas creating --

03:30:40   13  collecting -- sorry, creating some images from their

03:30:43   14  regular processing, and they sent a number of those images

03:30:47   15  that were going to -- that they would have normally sent to

03:30:50   16  the Atlanta Fed, they sent them through another network.

03:30:53   17        We received those images.   We printed the

03:30:56   18  substitute checks.   And just had them couriered to the

03:31:02   19  nearby Federal Reserve office.   This period from -- I mean,

03:31:04   20  this time frame from end-to-end was probably an hour or

03:31:07   21  less, but if the original paper route had taken place, it

03:31:10   22  might have been up to two days of collecting payment on

03:31:13   23  those items.

03:31:15   24  Q.   So when Check 21 came into being, how were the images

03:31:19   25  that you were working with captured?

865

03:31:20   1   A.   Initially, the images were being captured on the

03:31:27   2   reader/sorters that we've been talking about.

03:31:29   3   Q.   Did you eventually become -- begin working with

03:31:33   4   innovations around image capture?

03:31:35   5   A.   Yes.   We looked at -- the banks wanted to say now,

03:31:37   6   okay, I'm getting these benefits of processing my images in

03:31:40   7   a back office, being able to now to start using the image

03:31:44   8   to be sent, how can I now take some of this paper, the

03:31:47   9   checks, away from the back office.   So how can we look at

03:31:52   10  where checks are coming from to start image enabling and

03:31:56   11  let the checks stop at that place.

03:31:59   12  Q.   So in the mid-2000s, what were some of the innovations

03:32:03   13  that you were working with?

03:32:04   14  A.   Right.   There was actually three innovations that came

03:32:08   15  out.   First was corporate remote deposit capture.   The

03:32:13   16  second was image ATMs.   And then the third was the image

03:32:20   17  enablement of the branches at the teller or in the branch.

03:32:24   18  Q.   And what is corporate RDC?

03:32:26   19  A.   Right.   Corporate RDC is what we, again, heard

03:32:32   20  Mr. Hecht talk about the using the Desktop Deposit

03:32:36   21  application he referred to.   And I think the other day it

03:32:38   22  was Mr. Conte, I believe, or somebody had a -- or Mr. Brady

03:32:39   23  had a scanner up here, right, that processed checks.

03:32:44   24       So the corporate customer would have that in their

03:32:46   25  office, and checks that they would receive in payment each

03:32:49  1  day, which they would normally have, you know, someone take

03:32:53  2  them to the bank to deposit, they created the deposit right

03:32:56  3  there and electronically sent their deposit in in image

03:33:01  4  form to the bank.

03:33:02  5  Q.  And did you work --

03:33:07  6          MR. SHEASBY:  Your Honor, I object.

03:33:08  7          THE COURT:  State your objection.

03:33:09  8          MR. SHEASBY:  This is just -- I don't understand

03:33:13  9  what -- this is just a narrative discussion about the

03:33:16  10  industry.  I don't know what this has to do with

03:33:18  11  Mr. Saffici's qualifications.

03:33:20  12          THE COURT:  Well --

03:33:21  13          MR. JOHNSON:  May I respond, Your Honor?

03:33:22  14          THE COURT:  He's entitled to ask him questions

03:33:24  15  about which he has personal knowledge until he qualifies

03:33:28  16  him as an expert, after which he can ask him for opinions.

03:33:31  17  He hasn't asked for any opinions yet.  The man has personal

03:33:34  18  knowledge of what he's been asked so far.  I assume at some

03:33:38  19  point we're going to get this witness qualified as an

03:33:40  20  expert, but until that time, he's just a fact witness.

03:33:43  21          MR. SHEASBY:  I understand.

03:33:43  22          THE COURT:  And instead of an introduction, if he

03:33:45  23  wants to go through all this factual background, he's

03:33:47  24  entitled to do that.

03:33:49  25          MR. SHEASBY:  Thank you, Your Honor.

03:33:50  1          THE COURT:  Objection is overruled.  Let's

03:33:51  2  proceed.

03:33:52  3          MR. JOHNSON:  Thank you, Your Honor.

03:33:53  4  Q.  (By Mr. Johnson)  What is image ATM?

03:33:56  5  A.  Again, the ATM was another source of checks that would

03:33:58  6  make their way to the bank's processing center.  And,

03:34:01  7  again, as Mr. Hecht mentioned before, we used to use an

03:34:04  8  envelope to put the content in.

03:34:05  9          Now, by putting a camera and software into the

03:34:10  10  ATM, you only have to insert a check or, in most cases, you

03:34:13  11  can enter a group of checks.  So the images would then flow

03:34:18  12  to the back office operation, and the check would not have

03:34:21  13  to be moved from the ATM.  Eventually, it gets emptied to

03:34:26  14  be truncated or, I'm sorry, to be shredded.

03:34:29  15  Q.  And then branch teller capture, have we heard about

03:34:33  16  that, and did you work with it?

03:34:34  17  A.  Yes, I -- when I was at Fiserv, I worked with a

03:34:38  18  customer on a -- they had a number of remote branches that

03:34:41  19  were central in Chicago, but they had a number of remote

03:34:44  20  branches, and they wanted to be able to maximize the

03:34:49  21  benefit of getting those checks in a lot earlier to their

03:34:52  22  Chicago operation.

03:34:52  23  Q.  Now, once the image was captured, whether it was

03:34:55  24  captured at the -- the reader/sorter or one of these other

03:34:59  25  three devices, did you work with it in getting it to the

03:35:04   1   processing in the banks?

03:35:06   2   A.   Yes.   So what -- just as we heard before, the back

03:35:10   3   office-type processing environment, and that -- that

03:35:15   4   infrastructure started, you know, back in the '80s when we

03:35:20   5   started introducing the cameras and the software.

03:35:22   6        So that as these additional channels -- and that's

03:35:25   7   synonymous with Mr. Hecht's use of the word sources, as --

03:35:28   8   as they came about in the industry, the -- their images and

03:35:34   9   the rest of the process all occurred in the same

03:35:38  10   back-office operation.

03:35:38  11        We didn't really put all that descript --

03:35:41  12   description here, but as you recall, Mr. Hecht's five

03:35:48  13   dark-colored boxes I think on the right, that's what we

03:35:51  14   also called the back office operation.

03:35:52  15   Q.   Okay.   From your experience, did the -- did the back

03:35:58  16   office care from a technical perspective how the image was

03:36:01  17   captured?

03:36:01  18   A.   No, the capture source was, you know, separate.   But,

03:36:04  19   again, it had to meet the requirements that the back office

03:36:07  20   part required.   So that's what allowed the back office

03:36:11  21   piece to, you know, be -- didn't really care what -- what

03:36:17  22   source it was coming from.

03:36:18  23   Q.   So no matter how it was captured, the image was

03:36:21  24   processed through the same system in the same way?

03:36:25  25   A.   That's correct.

03:36:25  1    Q.  Mr. Saffici, how is it that you are knowledgeable about

03:36:30  2    all of these developments with images and checks?

03:36:33  3    A.  Well, I guess you can say that I've been somewhat

03:36:37  4    fortunate that over my years, going all the way back to the

03:36:40  5    bank, of being able to get involved in numbers of

03:36:43  6    technology projects, and, you know, through that, you're

03:36:45  7    constantly learning.  That was one source.

03:36:48  8            A second source was I worked on a number of

03:36:52  9    industry groups.  We heard about ANSI, but there were

03:36:56 10    several others that I was involved with who would be

03:36:58 11    looking to see as technologies were evolving.

03:37:02 12            And then the other is I was also chartered to stay

03:37:05 13    on top of industry activities through attending conferences

03:37:09 14    or reading, you know, publications on the banking industry

03:37:12 15    topics so that -- and that's particularly important when

03:37:15 16    you're in a product management role to be staying on top

03:37:20 17    of, you know, what new customer needs are and how -- how do

03:37:24 18    you accomplish that.

03:37:24 19    Q.  Mr. Saffici, returning to your timeline here at the

03:37:28 20    top, when you leave Fiserv in 2007, where do you go?

03:37:33 21    A.  I joined a company called Symcor, spelled S-y-m-c-o-r.

03:37:43 22    They were -- they were just starting to, quote, open up

03:37:45 23    their outsourcing business in the U.S.

03:37:48 24    Q.  And what were they focused on?

03:37:50 25    A.  They were focused also on check and item processing,

03:37:53   1   but this was services, not software.   So companies like

03:37:57   2   SunTrust outsourced to Symcor to let them do all their

03:38:02   3   processing.

03:38:04   4   Q.   And when you finished your assignments on check

03:38:06   5   processing with Symcor, where did you go?

03:38:09   6   A.   So the beginning of 2009, I decided, let me see what I

03:38:12   7   can do on my own, and that's when I started Saffici Payment

03:38:18   8   Consulting, my own business.

03:38:19   9   Q.   What do you -- what type of consulting do you do in

03:38:22  10   Saffici Payments?

03:38:24  11   A.   My consulting over these past 11 years has been, again,

03:38:27  12   all in the check and imaging aspects, working on business

03:38:32  13   problems or technological problems with banks and companies

03:38:36  14   that provide services to the banks.

03:38:39  15   Q.   Now, we've heard about remote capture with -- mobile

03:38:47  16   remote capture.   That would come along as you're in the --

03:38:52  17   late -- later in your career.   Was there anything about

03:38:55  18   mobile remote capture that differed in terms of the systems

03:38:59  19   that we've been talking about and your familiarity with

03:39:02  20   them?

03:39:02  21   A.   No, the mobile system -- the mobile application, the

03:39:05  22   mobile check deposit application became another channel,

03:39:08  23   another source channel, just as we see corporate, image ATM

03:39:14  24   and branch capture.   And, again, it was designed to be able

03:39:17  25   to feed into the existing infrastructure in the back office

03:39:20   1   process that the banks already had in place.

03:39:23   2   Q.  Mr. Saffici, is Saffici Payment Consultings being

03:39:30   3   compensated for your work in this case?

03:39:32   4   A.  Yes, I am.

03:39:33   5   Q.  Is your compensation for work in this case in any way

03:39:35   6   tied to either the results this jury reached or the

03:39:39   7   opinions you reached?

03:39:40   8   A.  Absolutely not.

03:39:40   9   Q.  Okay.  We're here in court and you're testifying and

03:39:44   10  you've provided services in this litigation, but what

03:39:48   11  portion of your engagements relate to legal -- parties and

03:39:53   12  legal disputes?

03:39:54   13  A.  Over the period of time that I have been in business

03:39:58   14  for myself, about 20 percent.

03:40:00   15  Q.  What does the other 80 percent of your work have to do

03:40:03   16  with?

03:40:03   17  A.  Well, the other 80 percent is the consulting type work,

03:40:07   18  as I mentioned, in the check area, check imaging area,

03:40:10   19  working with banks and the companies that provide services

03:40:13   20  to them.

03:40:13   21  Q.  Mr. Saffici, you mentioned that you started at night

03:40:16   22  school.  Did you ever finish your college degree?

03:40:18   23  A.  No.  I completed about 70 percent of my degree credits

03:40:23   24  at Drexel University evening --

03:40:23   25  Q.  Okay.

| | | |
|---|---|---|
| 03:40:27 | 1 | A.   -- but never finished. |
| 03:40:28 | 2 | Q.   Your experience in check processing, though, sir, have |
| 03:40:31 | 3 | we covered that in terms of your training and experience |
| 03:40:33 | 4 | that you've gotten on the job? |
| 03:40:35 | 5 | A.   Yeah, it's -- it's a continually evolving process. |
| 03:40:39 | 6 | I -- I -- one of these days I might stop -- oh, I'm sorry, |
| 03:40:44 | 7 | I apologize. |
| 03:40:45 | 8 | MR. JOHNSON:  Your Honor, at this time, I would |
| 03:40:47 | 9 | tender Mr. Saffici as an expert in check processing and |
| 03:40:49 | 10 | banking systems. |
| 03:40:50 | 11 | THE COURT:  Is there objection? |
| 03:40:51 | 12 | MR. JOHNSON:  Based on training and experience, |
| 03:40:53 | 13 | I'm sorry. |
| 03:40:53 | 14 | MR. SHEASBY:  No objection, Your Honor. |
| 03:40:54 | 15 | THE COURT:  All right.  Then the Court will find |
| 03:40:57 | 16 | and designate this witness as an expert in the identified |
| 03:41:00 | 17 | fields. |
| 03:41:00 | 18 | Let's continue, counsel. |
| 03:41:02 | 19 | MR. JOHNSON:  Thank you, Your Honor. |
| 03:41:03 | 20 | Q.   (By Mr. Johnson)  Mr. Saffici, just to be clear, we've |
| 03:41:09 | 21 | heard a lot about 2006 in this case because of the patents |
| 03:41:12 | 22 | that are involved.  Did all the technology and all of |
| 03:41:15 | 23 | the -- the experience that you've talked about, did all of |
| 03:41:17 | 24 | that pre-date 2006 other than remote capture -- or mobile |
| 03:41:23 | 25 | remote capture? |

03:41:24  1   A.  Yes.  All the infrastructure was in place to

03:41:28  2   accommodate what we see here on the screen, the various

03:41:30  3   image-enabled source channels.

03:41:33  4   Q.  So prior to 2006, banks could enjoy the benefits of

03:41:36  5   customers taking check images and submitting those into

03:41:39  6   banks for processing and payment?

03:41:42  7   A.  Yes, that's correct.

03:41:42  8   Q.  Prior to 2006, your experience, could they -- did they

03:41:49  9   have a platform, a system in place, for enjoying the

03:41:52  10  benefits of exchanging images with other banks rather than

03:41:55  11  paper checks?

03:41:56  12  A.  Yes, that was in place.

03:41:58  13  Q.  Okay.  And did it matter how the customer had captured

03:42:01  14  the check?

03:42:01  15  A.  No, the source did not matter -- did not matter.

03:42:04  16  Q.  Mr. Saffici, what issues specifically were you asked to

03:42:10  17  address in this case?

03:42:10  18  A.  I was asked to provide an independent evaluation of the

03:42:20  19  validity of the '605 and '681 patents and also to provide a

03:42:22  20  response to some of Mr. Calman's opinions of certain -- the

03:42:28  21  benefits of certain claims.

03:42:30  22  Q.  Now, as we turn to the issues of validity in the case,

03:42:37  23  we see a shot from the patent video that probably seems

03:42:43  24  like it's ages ago, but it was just Monday.

03:42:47  25       Can you remind the jury what their role is in

| | | |
|---|---|---|
| 03:42:49 | 1 | deciding issues of validity? |
| 03:42:50 | 2 | A.  Yes.  As the patent video tells us, the jury has the |
| 03:42:57 | 3 | final say to determine if a patent is invalid.  That puts |
| 03:43:02 | 4 | you as -- in a position to provide a check on the Patent |
| 03:43:07 | 5 | Office's power.  That's what you would have heard in that |
| 03:43:12 | 6 | video. |
| 03:43:13 | 7 | Q.  Mr. Saffici, what type of invalidity are you here to |
| 03:43:17 | 8 | talk with the jury about? |
| 03:43:18 | 9 | A.  There's two types.  The first is called written |
| 03:43:21 | 10 | description and the second is called anticipation. |
| 03:43:23 | 11 | Q.  Now, Mr. Saffici, are you a lawyer? |
| 03:43:28 | 12 | A.  No, I am not. |
| 03:43:28 | 13 | Q.  How is it that you know about the law on patent |
| 03:43:34 | 14 | validity? |
| 03:43:34 | 15 | A.  Well, it's common in -- in these type of cases that |
| 03:43:37 | 16 | expert witnesses are provided some instruction by counsel |
| 03:43:39 | 17 | on the applicable law and provide it -- you know, an |
| 03:43:46 | 18 | understanding of it, and then it's a matter of applying |
| 03:43:48 | 19 | that in the analysis that needs to be performed. |
| 03:43:51 | 20 | Q.  And did we hear from Dr. Conte and Mr. Weinstein the |
| 03:43:55 | 21 | same thing yesterday? |
| 03:43:55 | 22 | A.  Yes, I believe we did. |
| 03:43:57 | 23 | Q.  Now, in your report, did you describe what is known as |
| 03:44:03 | 24 | a person of ordinary skill in the art? |
| 03:44:04 | 25 | A.  Yes, I did. |

03:44:05   1   Q.  And, Mr. Saffici, if you look in front of you, I think

03:44:12   2   your report is -- is in the binder.  If you'd turn to

03:44:19   3   Paragraph 13.

03:44:29   4   A.  Yes, I'm there.

03:44:30   5   Q.  Okay.  Can you tell us how you describe a person of

03:44:35   6   ordinary skill in the art?

03:44:35   7   A.  Right.  For -- for purposes of my reporting -- and the

03:44:39   8   first thing is we -- we look at it from a point in time.

03:44:42   9   So we're talking about 2006.  And a person of ordinary

03:44:47  10   skill, from my perspective, is that it has -- he has at

03:44:52  11   least two years of prior experience with image scanning

03:44:58  12   technology involving the transfer to and the processing of

03:45:03  13   image data at a server.

03:45:05  14   Q.  Mr. Saffici, do you qualify under that standard?

03:45:13  15   A.  I believe I do.

03:45:14  16   Q.  Okay.  And did you use your experience as one of skill

03:45:17  17   in the art as you did your work in this case?

03:45:20  18   A.  I did.

03:45:21  19   Q.  Okay.  I want to now switch to what things you

03:45:25  20   considered in doing your work in this case.  What are the

03:45:26  21   materials you looked at in doing your work?

03:45:26  22   A.  Right.  So naturally, we need to start with the USAA

03:45:29  23   patents, '605 and '681, along with their file history.  And

03:45:34  24   we've heard, I think, a little bit of that already.

03:45:37  25          Second then is when you're looking to -- for

876

| | | |
|---|---|---|
| 03:45:40 | 1 | anticipation, you look for prior art.  We'll be talking a |
| 03:45:43 | 2 | little bit more about what that is. |
| 03:45:45 | 3 | I reviewed depositions of a number of the |
| 03:45:48 | 4 | witnesses in this case. |
| 03:45:49 | 5 | I reviewed a number of documents provided by both |
| 03:45:52 | 6 | parties. |
| 03:45:53 | 7 | And then the last part was the -- the Court |
| 03:45:57 | 8 | provides what's called claim construction, so these are the |
| 03:46:01 | 9 | five majors areas that I used in my analysis. |
| 03:46:04 | 10 | Q.  And you mentioned the Court claim construction.  Did |
| 03:46:06 | 11 | you apply the Court's claim constructions in your work? |
| 03:46:09 | 12 | A.  Yes, I did. |
| 03:46:10 | 13 | Q.  Okay.  And are those the -- are those the same claim |
| 03:46:13 | 14 | constructions that the jury has in their notebook? |
| 03:46:14 | 15 | A.  Yes, I understand it's in their notebook. |
| 03:46:16 | 16 | Q.  Okay.  And is that what they're going to have to be |
| 03:46:19 | 17 | asked to apply? |
| 03:46:20 | 18 | A.  Yes. |
| 03:46:21 | 19 | Q.  Before we get into each of your opinions, can you give |
| 03:46:24 | 20 | us an overview of your conclusions as to the asserted |
| 03:46:30 | 21 | claims in the two patents in this case? |
| 03:46:31 | 22 | A.  Yes.  The result of my analysis from an overall |
| 03:46:34 | 23 | perspective is that the claims of the '605 and the '681 |
| 03:46:38 | 24 | patent are invalid. |
| 03:46:40 | 25 | Q.  Okay.  Specific to the '605 patent, what are your |

03:46:43  1   opinions?

03:46:44  2   A.  For the '605 patent, I've identified, first, that they

03:46:50  3   are invalid for written description.

03:46:52  4           And, second, they're invalid for anticipation by

03:46:55  5   the Oakes '227 patent.

03:46:59  6   Q.  And because the '605 lacks written description, can it

03:47:03  7   maintain its priority date of 2006?

03:47:05  8   A.  No, it cannot.

03:47:07  9   Q.  What priority date does the '605 have to have?

03:47:09  10  A.  It would then have the filing date of the '605.

03:47:13  11  Q.  When is that?

03:47:13  12  A.  I'm sorry, that's July 28th, 2017.

03:47:18  13  Q.  Let's talk about the '681 patent.  What were your

03:47:21  14  opinions specific to the '681 patent?

03:47:23  15  A.  Right.  Specific to the '681 patent, again, I found it

03:47:28  16  invalid for written description.  And then, secondarily,

03:47:31  17  for it being anticipated by the Oakes '200 patent.

03:47:35  18  Q.  And, Mr. Saffici, same question.  Based on your opinion

03:47:40  19  that it -- that the '681 lacks written description, does it

03:47:43  20  maintain its priority date of 2006?

03:47:45  21  A.  No, it doesn't.  It gets the -- the filing date of July

03:47:49  22  28th, 2017.

03:47:51  23  Q.  Before we get into each opinion as to each patent, can

03:47:56  24  you give the jury a high level understanding of the

03:47:59  25  concepts of written description and anticipation, and start

| | |
|---|---|
| 03:48:01 | 1 |
| 03:48:03 | 2 |
| 03:48:08 | 3 |
| 03:48:13 | 4 |
| 03:48:17 | 5 |
| 03:48:21 | 6 |
| 03:48:26 | 7 |
| 03:48:31 | 8 |
| 03:48:36 | 9 |
| 03:48:39 | 10 |
| 03:48:42 | 11 |
| 03:48:44 | 12 |
| 03:48:51 | 13 |
| 03:48:52 | 14 |
| 03:48:54 | 15 |
| 03:48:55 | 16 |
| 03:48:56 | 17 |
| 03:48:59 | 18 |
| 03:49:01 | 19 |
| 03:49:03 | 20 |
| 03:49:08 | 21 |
| 03:49:14 | 22 |
| 03:49:17 | 23 |
| 03:49:20 | 24 |
| 03:49:24 | 25 |

1   with anticipation first, please?

2   A.  Right.  When -- when a patent is found to be invalid

3   due to anticipation, it says that it's not new.  It means

4   that one was able to find what's known as prior art,

5   something that existed prior to the date of the patent, and

6   this prior art is public information.  It could be another

7   patent.  It could be a system of some sort.  It could be

8   publications.  If they demonstrate that the claims of a

9   particular patent previously existed --

10          MR. SHEASBY:  Your Honor, I object.  This is --

11  it's improper for an expert to be instructing the jury on

12  legal standards for applying validity.  He can talk about

13  the standard he applied.

14          THE COURT:  I can't hear you --

15          MR. SHEASBY:  I'm sorry, Your Honor.

16          THE COURT:  -- Mr. Sheasby.

17          MR. SHEASBY:  I don't think it's an objection -- I

18  don't think it's appropriate for this witness to be

19  instructing the jury on the law.

20          THE COURT:  Well, the witness has qualified his

21  testimony by saying that these concepts, as he understands

22  them -- as he understands them, have been presented to him

23  through his consultation with counsel in the case.

24          Mr. Saffici, you understand that no matter what

25  you understand the law to be, nor what the other witnesses

03:49:27  1  in this case may have testified their understanding of the

03:49:30  2  law to be, the jury is going to be bound by my instructions

03:49:33  3  on the law, and the jury is to follow my instructions on

03:49:36  4  what the law is in this case.  You understand that?

03:49:38  5         THE WITNESS:  I do understand that, Your Honor.

03:49:39  6         THE COURT:  All right.  With that, the objection

03:49:42  7  is overruled.

03:49:43  8  Q.  (By Mr. Johnson)  And, Mr. Saffici, had you completed

03:49:49  9  your answer as to describing anticipation?

03:49:52  10  A.  Let me just do it real quick just to make sure -- I

03:49:55  11  forgot where I got interrupted.

03:49:57  12         So, again, if something is not new, that means --

03:50:00  13         THE COURT:  There's nothing wrong with you being

03:50:03  14  interrupted.  That's part of you being up there on the

03:50:04  15  witness stand.  And counsel can do it when they think it's

03:50:08  16  necessary, and I can do it, so no -- no implication that

03:50:11  17  there's anything wrong with being interrupted.

03:50:11  18         THE WITNESS:  I didn't mean that negatively,

03:50:13  19  Your Honor.

03:50:13  20         THE COURT:  Okay.  Let's proceed.

03:50:15  21         THE WITNESS:  Okay.

03:50:15  22  A.  So if -- if a patent is found to be invalid by

03:50:19  23  anticipation, that means that it's not new and it was

03:50:23  24  determined to be not new because something in prior art

03:50:27  25  shows that at least a single element of that patent was

| | | |
|---|---|---|
| 03:50:32 | 1 | found previously. |
| 03:50:35 | 2 | Q.  (By Mr. Johnson)  Mr. Saffici, I think you said single |
| 03:50:38 | 3 | element.  Do you mean single example? |
| 03:50:40 | 4 | A.  I'm sorry, single example.  I apologize. |
| 03:50:43 | 5 | Q.  Okay.  And does a piece of prior art, as you understand |
| 03:50:45 | 6 | it, have to include every way of doing a particular |
| 03:50:49 | 7 | invention, or can it invalidate if it has an example of one |
| 03:50:53 | 8 | way? |
| 03:50:53 | 9 | MR. SHEASBY:  Your Honor, outside the scope. |
| 03:50:59 | 10 | MR. JOHNSON:  Asking his understanding of -- of |
| 03:51:01 | 11 | the standards, Your Honor. |
| 03:51:02 | 12 | THE COURT:  Your objection is that this testimony |
| 03:51:04 | 13 | is outside the scope of this expert's report? |
| 03:51:07 | 14 | MR. SHEASBY:  Yes, Your Honor. |
| 03:51:07 | 15 | THE COURT:  Do you believe there's a basis within |
| 03:51:11 | 16 | the expert's report for this inquiry, Mr. Johnson? |
| 03:51:14 | 17 | MR. JOHNSON:  I do, Your Honor. |
| 03:51:15 | 18 | THE COURT:  Can you identify that for me? |
| 03:51:20 | 19 | MR. JOHNSON:  May we approach, Your Honor? |
| 03:51:21 | 20 | THE COURT:  Approach the bench, counsel. |
| 03:51:22 | 21 | (Bench conference.) |
| 03:51:37 | 22 | MR. JOHNSON:  In -- the prior art -- in 18 -- that |
| 03:51:39 | 23 | he only needs to find a single prior art reference.  And |
| 03:51:43 | 24 | throughout his work he finds a single example of the -- of |
| 03:51:46 | 25 | one way of completing the claims.  That is a general |

03:51:52  1  purpose computer with a separate camera.  That was his

03:51:53  2  basis for anticipation.

03:51:54  3          MR. SHEASBY:  Your Honor, I'm -- I'm happy to

03:51:55  4  explain my position.  He says that anticipation exists in

03:51:55  5  all of those claims as he found a single prior art

03:52:04  6  reference.  Now what he's trying to say --

03:52:04  7          THE COURT:  Just a minute.

03:52:06  8          Can you hear us all right, Ms. Holmes?

03:52:06  9          I rustled my papers.  I'm sorry.

03:52:14  10          MR. SHEASBY:  Now what he's trying to do is, he's

03:52:16  11  trying to say that you only have to find a specific example

03:52:19  12  of an element, not an actual element in prior art reference

03:52:23  13  to -- that's exactly what the question was.  So he

03:52:26  14  should -- he should hew exactly to what he said for

03:52:28  15  anticipation.

03:52:29  16          The reason why they're doing this is because

03:52:31  17  they're going to try to argue that they previously admitted

03:52:34  18  that each of the elements of the claims were in the Oakes

03:52:39  19  '227.  The standard for anticipation is different from

03:52:42  20  written description.  So they're trying to now change his

03:52:44  21  testimony to say, oh, I only meant one embodiment of the

03:52:47  22  claim that's in the '200 and '227.  And that's why they're

03:52:50  23  doing this different description of what anticipation

03:52:53  24  means.  And he should read directly from what his report

03:52:54  25  was.

03:52:54  1           MR. JOHNSON:  Your Honor --

03:52:54  2           THE COURT:  Go ahead, Mr. Johnson.

03:52:55  3           MR. JOHNSON:  Anticipation only requires one

03:52:57  4  example of one way of -- of completing all the elements of

03:53:02  5  the invention for invalidity.  It doesn't require all ways.

03:53:07  6  So a patent, for example --

03:53:09  7           THE COURT:  It requires a single prior art

03:53:10  8  reference which sets forth each and every element of the

03:53:13  9  claim.

03:53:13 10           MR. JOHNSON:  Yes, Your Honor.

03:53:15 11           THE COURT:  Well, I'm not going to require the

03:53:17 12  witness to read from his report.

03:53:21 13           MR. SHEASBY:  All I'm asking is that he be --

03:53:23 14  he -- he not change it.  This is what he said.  It's not

03:53:26 15  one single embodiment of a single element.  That's not in

03:53:30 16  his report.  That's what I'm trying to say.  It should just

03:53:34 17  be what's in his report.

03:53:35 18           THE COURT:  I don't think that's what he said, and

03:53:36 19  I don't think that's what the question calls for.  And it's

03:53:39 20  certainly something you can address on cross-examination.

03:53:41 21           And if we're going to have continuing trips to the

03:53:44 22  bench to dispute what's in and out of the report, I'll

03:53:47 23  probably end up having to send the jury out every time.

03:53:50 24  And we're going to burn a lot of time in this case doing

03:53:53 25  that.

| | | |
|---|---|---|
| 03:53:53 | 1 | MR. SHEASBY:  Thank you, Your Honor. |
| 03:53:54 | 2 | THE COURT:  Let's go forward. |
| 03:53:55 | 3 | MR. JOHNSON:  Thank you. |
| 03:53:57 | 4 | (Bench conference concluded.) |
| 03:53:57 | 5 | THE COURT:  All right.  The objection is |
| 03:54:01 | 6 | overruled. |
| 03:54:02 | 7 | Let's proceed. |
| 03:54:05 | 8 | Q.  (By Mr. Johnson)  Do you remember the question, |
| 03:54:07 | 9 | Mr. Saffici? |
| 03:54:07 | 10 | A.  Can you please repeat it? |
| 03:54:09 | 11 | Q.  Yes.  So does a prior art reference need to disclose |
| 03:54:11 | 12 | every embodiment or every way of doing a particular |
| 03:54:15 | 13 | invention for it to anticipate and invalidate the claims? |
| 03:54:19 | 14 | A.  No, it doesn't. |
| 03:54:21 | 15 | Q.  Okay.  Have you prepared an example for us? |
| 03:54:24 | 16 | A.  Yes.  Let me walk through this.  So if we have a |
| 03:54:27 | 17 | patent, the one on the right dated 2009, if we're trying to |
| 03:54:31 | 18 | examine this for anticipation, we see that this patent and |
| 03:54:37 | 19 | the claims -- remember, the claims are the invention -- it |
| 03:54:41 | 20 | tells us that this invention can be performed in the A |
| 03:54:45 | 21 | way -- I'll use that term -- or the B way. |
| 03:54:45 | 22 | Q.  Okay. |
| 03:54:48 | 23 | A.  So when looking for anticipation, we look back in time |
| 03:54:52 | 24 | prior to 2009.  And in this example here, we find a piece |
| 03:54:58 | 25 | of prior art that demonstrates the A way.  It doesn't have |

03:55:04   1   the B way in it, but having one of the two qualifies it as

03:55:09   2   anticipating the 2009 patent.  Therefore, in this example,

03:55:15   3   it would invalidate the 2009 patent.

03:55:18   4   Q.  Now, how is that different from written description in

03:55:21   5   what you're looking at?

03:55:22   6   A.  Right.  In written description, what would be

03:55:27   7   invalid -- I'm sorry, a patent would be invalid for written

03:55:31   8   description if the scope of the claims are not supported by

03:55:34   9   the specification.  So in this case here, we see the claims

03:55:40  10   again say that this invention can be done in either the A

03:55:43  11   way or the B way.

03:55:46  12          The specifications for it, which is the second

03:55:48  13   part of the patent we've seen, the specifications only

03:55:54  14   describe -- excuse me, describe the A way.  So because the

03:55:59  15   B way is not described in the specification, the claims

03:56:05  16   would be invalid for written description.

03:56:09  17   Q.  Mr. Saffici, are these at a very high level the

03:56:15  18   exercises you performed in this case?

03:56:16  19   A.  Yes, that's how I examined these patents.

03:56:20  20   Q.  Let's move to your written description opinion.

03:56:25  21   A.  Okay.

03:56:25  22   Q.  Can you explain, as you look at written description,

03:56:30  23   the two parts of the patent you're looking at, and let's

03:56:32  24   begin with the '605 patent.

03:56:33  25   A.  Right.  So the -- the little images that you see here

03:56:38   1   are all the pages of the '605 patent that the jury has in

03:56:42   2   their notebook, and when we -- we look at the two major --

03:56:45   3   the two parts of it, the specification, we see this

03:56:52   4   highlighted in blue, and included in that highlight are the

03:56:52   5   figures of the patent.  They're part of the specification.

03:56:58   6          And then at the end of the patent, we find the

03:57:02   7   claims.  And in this here, they're highlighted in the green

03:57:05   8   color.  So this re -- this -- this tells us how the

03:57:10   9   specification is the foundation for the claims.

03:57:15  10   Q.  Mr. Saffici -- Saffici, is -- as you understand it, is

03:57:19  11   written description some kind of technicality?

03:57:21  12   A.  No, it's not a technicality, but it's important.

03:57:24  13   Q.  Why is it important?

03:57:25  14   A.  Well, it's important because we want to keep inventors

03:57:28  15   honest about their work.  We don't want them to be able to

03:57:33  16   create a patent with new claims and new ideas but not have

03:57:39  17   it supported by the specifications if they were to be using

03:57:43  18   an earlier specification.

03:57:45  19   Q.  Let's go back to the '605 specifically.

03:57:48  20          Remind us when the '605 patent was -- was filed?

03:57:53  21   A.  It was filed on July 28th of 2017.

03:57:57  22   Q.  And when did USAA claim that it invented and disclosed

03:58:02  23   or described the inventions that it wrote new claims on in

03:58:06  24   2017?

03:58:07  25   A.  That's October 31st of 2006 in the '227 patent.

| | | |
|---|---|---|
| 03:58:15 | 1 | Q.  So about 11 years earlier? |
| 03:58:17 | 2 | A.  Yes, that'd be correct. |
| 03:58:19 | 3 | Q.  Well, what did USAA do to try to accomplish this? |
| 03:58:24 | 4 | A.  Right.  So USAA used the specification from the '227 |
| 03:58:31 | 5 | patent, which you see on the left, the blue area there, and |
| 03:58:34 | 6 | they used that specification verbatim in the '605 patent |
| 03:58:40 | 7 | that you see on the left, the one that was filed in 2017. |
| 03:58:48 | 8 | Q.  Go ahead. |
| 03:58:48 | 9 | A.  Okay.  I was going to say, but the 2017 patent, the |
| 03:58:54 | 10 | claims section has new claims in it.  So -- |
| 03:58:58 | 11 | Q.  Just -- |
| 03:59:00 | 12 | A.  I'm sorry. |
| 03:59:00 | 13 | Q.  Let me stop you there for a second here. |
| 03:59:02 | 14 | A.  Yeah. |
| 03:59:02 | 15 | Q.  So the specification that we see, that's all language |
| 03:59:05 | 16 | from 2006? |
| 03:59:06 | 17 | A.  That's correct, yes. |
| 03:59:08 | 18 | Q.  But these claims are new for 2017? |
| 03:59:15 | 19 | A.  That's correct. |
| 03:59:16 | 20 | Q.  So is there anything wrong with -- with doing this? |
| 03:59:27 | 21 | A.  Well, there's -- there's nothing wrong with what's |
| 03:59:30 | 22 | referred to as reaching back to use a specification from an |
| 03:59:35 | 23 | earlier patent with -- in a new patent. |
| 03:59:40 | 24 | Q.  Okay.  If the specifications are identical between the |
| 03:59:44 | 25 | 2006 and 2017 claims, any differences this jury should be |

03:59:49   1   aware -- aware of in the 2 -- in the '605 patent from the
03:59:54   2   2006 specification?
03:59:55   3   A.  Well, right, because these are new claims.  And, again,
04:00:00   4   as long as they're supported by the specification, that's
04:00:04   5   acceptable.  But if they're not, then the patent would fail
04:00:09   6   for written description.
04:00:11   7   Q.  And if it fails for written description, what happens
04:00:13   8   to the priority date?
04:00:14   9   A.  The priority date would be reset with the date of
04:00:19   10   filing of the '605, being the 2017 date, and not the
04:00:22   11   earlier date from which the specifications came.
04:00:27   12   Q.  Now, for written -- your work for written description
04:00:30   13   on the '605 patent, what did you do?
04:00:31   14   A.  I looked at the claims to see if the specification
04:00:37   15   provide description of the full scope of those claims.  So
04:00:43   16   the arrow here is pointing to the 2006 specification.  But,
04:00:47   17   again, it is the same that's in the 2017 specification.
04:00:51   18   Q.  So to understand your testimony, does the jury need to
04:00:54   19   look back at that 2006 application?
04:00:56   20   A.  No, in their jury notebook is the '605 patent.  So if
04:01:00   21   you look at the specification in there, excuse me, it's the
04:01:04   22   specification that was brought forward from the '227
04:01:08   23   patent.
04:01:09   24   Q.  Okay.  I believe that's Defense Exhibit 4.
04:01:11   25            When you made this comparison of the 2017 claims

04:01:15  1  to the specification of the 2017 patent that had come from

04:01:19  2  the earlier date, what was your conclusion?

04:01:23  3  A.  Well, my -- my conclusion is that the specification did

04:01:27  4  not provide description for the full scope of the claims;

04:01:32  5  therefore, the claims would be invalid.

04:01:35  6  Q.  Let's look at the specification of the '605 patent.

04:01:40  7         Can you provide us an overview of what is

04:01:44  8  described in the '60 [sic] specification?

04:01:48  9  A.  Right.  Because both specifications are identical,

04:01:50  10  they're providing description for a general purpose

04:01:55  11  computer -- and we'll talk more about the No. 111 -- and

04:01:59  12  they're talking about a separate image capture device which

04:02:02  13  can be either a flatbed scanner, as you see there, or a

04:02:08  14  camera.  And the labeling of it is No. 112, we'll learn

04:02:12  15  more about.

04:02:13  16  Q.  Okay.  What do the claims for -- and we're going to go

04:02:16  17  specifically to the claims next, but what do the claims in

04:02:22  18  the 2017 patent cover?

04:02:25  19  A.  So the claims provide both the general purpose computer

04:02:28  20  with a separate device, as well as a mobile device with a

04:02:33  21  digital camera.  So it's showing two ways that the patent

04:02:38  22  would meet its invention.

04:02:40  23  Q.  Okay.  Is mobile device sometimes referred to in the

04:02:43  24  claims as a portable device?

04:02:45  25  A.  Yes, that's correct.

889

04:02:46  1   Q.  And is there support for either mobile device with a

04:02:53  2   camera together or a portable device with a camera together

04:02:59  3   in the single unit?

04:03:00  4   A.  No, the specifications do not support that.

04:03:05  5   Q.  Okay.  Is that -- well, Mr. Saffici, let's dig into the

04:03:11  6   claims.

04:03:11  7          For the '605 patent, Claim 1, let's look at that

04:03:15  8   first.

04:03:15  9   A.  Right.

04:03:15  10  Q.  What do we see here in Claim 1 of '605?

04:03:19  11  A.  Well, Claim 1 is telling us that there's a portable

04:03:26  12  device, and it can control the digital camera -- pardon me.

04:03:31  13  Q.  Mr. Saffici, do you need to get some water?

04:03:33  14  A.  I do have water.  One second.

04:03:36  15          And I guess right above that, it tells us about a

04:03:41  16  digital camera or the image capture processing and the --

04:03:45  17  well, and the rest.  But the digital camera is the primary

04:03:48  18  part of it.

04:03:51  19  Q.  What does Claim 1 say about having the digital camera

04:03:57  20  as a separate stand-alone device versus a device that

04:04:02  21  resides with the general purpose computer?

04:04:04  22          MR. SHEASBY:  Your Honor, objection.  This relates

04:04:06  23  to the subject we discussed in chambers.

04:04:12  24          MR. JOHNSON:  May we approach, Your Honor?

04:04:13  25          THE COURT:  Approach the bench.

04:04:14   1            (Bench conference.)

04:04:28   2            THE COURT:  We've been over this multiple times.

04:04:30   3   This written description defense needs to focus on what the

04:04:35   4   specification says, not what the claims mean.

04:04:38   5            And I've heard nothing to tell this jury out of

04:04:44   6   this witness yet that this is a claim-by-claim analysis.

04:04:47   7   All I've heard is claims, plural, implying that they all

04:04:53   8   rise and fall together.  And I think that's a problem.

04:04:55   9            MR. JOHNSON:  Yes, Your Honor.

04:04:56  10            THE COURT:  And it needs to get corrected, or I

04:04:59  11   may have to correct it.

04:05:00  12            MR. JOHNSON:  Yes, Your Honor.  I intend to go

04:05:03  13   through the other claims which have a similar setup.  And

04:05:05  14   the reason that I'm doing it in this way is Claim 1 is

04:05:09  15   broad enough to encompass both the circumstance where the

04:05:14  16   general purpose computer and image capture device reside in

04:05:17  17   a single device or are separate.

04:05:20  18            Mr. Calman agreed with that in Paragraph 245 of

04:05:23  19   his report, and we know that from --

04:05:25  20            THE COURT:  Mr. Calman has not testified, and his

04:05:28  21   report is not in evidence.

04:05:29  22            MR. JOHNSON:  Yes, Your Honor.  But the patents

04:05:30  23   are in evidence.  And if we look at the patents, Claim 1 is

04:05:33  24   silent about whether they are together or separate.

04:05:37  25            But Claim 4, and I'm -- I'm hesitant -- I was

04:05:40  1  going to approach the bench before I got there, but

04:05:42  2  Claim 4, which is an unasserted claim, is a dependent claim

04:05:46  3  that says the devices of Claim -- or the system of Claim 1,

04:05:50  4  wherein the device -- the image capture device or camera is

04:05:53  5  separate.

04:05:54  6       So we know that Claim 1 is broad enough to

04:05:56  7  encompass both the circumstance where the camera is

04:06:00  8  together with the general purpose computer and separate

04:06:03  9  through claim differentiation.

04:06:05  10      I don't want to do that in front of the jury.  And

04:06:08  11 my understanding is that was never disputed in this

04:06:10  12 litigation.  But that's the broad -- that's the breadth of

04:06:13  13 the claims.  And then once the breadth is set, then the

04:06:16  14 question becomes, does the scope of the -- does the scope

04:06:20  15 of the specification support the full scope of that

04:06:25  16 breadth?

04:06:25  17      MR. SHEASBY:  Your Honor, a couple issues.  One,

04:06:27  18 Claim 4 is not in the case.  It's been dropped.  It's a

04:06:30  19 violation of the MIL.

04:06:33  20      Two, he should not be talking about any claim

04:06:37  21 differentiation because that's a tool that's used for claim

04:06:40  22 construction.  The claim says what the claim says.  If he

04:06:42  23 wants to talk about why those specifications don't appear

04:06:46  24 in the specification, he can.  But to say tell me what the

04:06:48  25 claim means, tell me what the claim is describing is just

04:06:51  1   not appropriate.

04:06:53  2           THE COURT:  I agree.  That calls for this witness

04:06:54  3   to engage in additional claim construction.

04:06:57  4           MR. JOHNSON:  And I'm --

04:06:58  5           THE COURT:  I mean, perhaps it may be the way the

04:07:00  6   question is being asked, but it's asking the witness to

04:07:03  7   construe the claims for the jury.  Tell -- tell us what

04:07:06  8   this means.

04:07:07  9           MR. JOHNSON:  Your Honor -- I mean, this is in his

04:07:09  10  report, and this was a joined issue with Mr. Calman in the

04:07:13  11  litigation.  That claim -- and for which there was no

04:07:16  12  dispute.

04:07:16  13          Claim 1 was broad enough to read on devices where

04:07:20  14  the camera is separate and devices where the separate --

04:07:23  15  where the camera is included.  And, therefore, it's both.

04:07:29  16  It covers both.  And that scope --

04:07:31  17          THE COURT:  Well, you may be able to establish

04:07:34  18  that as long as you hew to the language of his report.  But

04:07:39  19  when you begin a question with, tell the jury what this

04:07:42  20  claim means, that is asking for an improper opinion.  It's

04:07:48  21  asking for this witness to engage in claim construction.

04:07:52  22          So I'm not -- I'm not saying you can't get to

04:07:54  23  where you want to get to.  I think you're going down the

04:07:57  24  wrong path to get there.

04:07:59  25          MR. SHEASBY:  And to be clear for the record, this

| | | |
|---|---|---|
| 04:08:01 | 1 | claim covers lots of things.  It covers connected things, |
| 04:08:04 | 2 | unconnected things.  This arbitrary distinction of saying |
| 04:08:08 | 3 | it's either an integrated or non-integrated camera |
| 04:08:12 | 4 | versus -- they're trying to narrow the claim. |
| 04:08:15 | 5 | THE COURT:  As long as they present their evidence |
| 04:08:17 | 6 | through this witness consistent with his report, you'll |
| 04:08:21 | 7 | have to address that in cross-examination.  I'm not going |
| 04:08:24 | 8 | to constrain the Defendant from presenting its defense, but |
| 04:08:27 | 9 | I'm not going to sanction the Defendant asking the witness |
| 04:08:30 | 10 | for what's prefaced to be a claim construction opinion. |
| 04:08:34 | 11 | MR. JOHNSON:  Your Honor, how would you like me to |
| 04:08:38 | 12 | handle -- I mean, it is -- obviously, I do not want to put |
| 04:08:42 | 13 | Dependent Claim 4 up before the jury to show that it is a |
| 04:08:44 | 14 | separate device.  I think as a matter of law -- |
| 04:08:48 | 15 | THE COURT:  We don't want to -- we don't want to |
| 04:08:50 | 16 | put non-asserted claims before this jury. |
| 04:08:53 | 17 | MR. JOHNSON:  But he's putting me in that box by |
| 04:08:55 | 18 | saying I can't prove -- when the patent itself proves that |
| 04:08:58 | 19 | Claim 1 is broad enough to encompass circumstances where |
| 04:09:02 | 20 | the camera is both separate and -- |
| 04:09:04 | 21 | THE COURT:  Does this man say in his report that |
| 04:09:06 | 22 | they're broad enough? |
| 04:09:07 | 23 | MR. JOHNSON:  He does. |
| 04:09:08 | 24 | THE COURT:  Then ask him that question, but follow |
| 04:09:10 | 25 | the report.  That's your safe path, okay? |

04:09:14    1          MR. JOHNSON:  Thank you, Your Honor.

04:09:14    2          THE COURT:  Let's proceed.

04:09:22    3          (Bench conference concluded.)

04:09:25    4          THE COURT:  Let's proceed.

04:09:33    5    Q.  (By Mr. Johnson)  Mr. Saffici, did you analyze as a

04:09:36    6    part of your report whether the digital camera mentioned in

04:09:43    7    Claim 1 must be either separate from the portable device

04:09:50    8    general purpose computer or could be together within this

04:09:53    9    claim?

04:09:55   10    A.  This claim -- I -- I feel as though -- or not feel -- I

04:09:59   11    determined that this is written in a broad manner that

04:10:02   12    allows for it to be either separate or combined.

04:10:12   13          MR. JOHNSON:  And can we look at -- now can we

04:10:15   14    look at Claim 12?

04:10:24   15    Q.  (By Mr. Johnson)  Mr. Saffici, did you analyze Claim 12

04:10:29   16    as a part of your work in this case?

04:10:31   17    A.  Yes, each of the claims.

04:10:32   18    Q.  Okay.  What does Claim 12 speak of in terms of camera

04:10:36   19    and handheld mobile device?

04:10:38   20    A.  This tells us that the customer's own handheld mobile

04:10:43   21    device with a digital camera.

04:10:45   22    Q.  Okay.  And did you analyze whether this claim, as one

04:10:49   23    of skill in the art, requires that the camera be separate

04:10:53   24    or requires that the camera -- or allows for the camera to

04:10:57   25    be a part of the same device?

```
04:10:59   1   A.  Likewise, the same way --

04:11:01   2           MR. SHEASBY:  Objection.

04:11:02   3           THE COURT:  Just a minute.  Just a minute.

04:11:04   4           Do you have an objection?

04:11:05   5           MR. SHEASBY:  Same objection, Your Honor, that we

04:11:06   6   just had the bench conference regarding what the claim

04:11:13   7   requires.

04:11:17   8           THE COURT:  Are you contesting, Mr. Sheasby,

04:11:19   9   whether this is within the scope of the witness's report?

04:11:21  10           MR. SHEASBY:  I'm contesting the language that's

04:11:25  11   used to describe it this way.  I think the way that was

04:11:30  12   previously used was inappropriate, not using the word

04:11:36  13   "required."

04:11:36  14           THE COURT:  Overruled.

04:11:38  15           Let's -- you may answer the question now,

04:11:41  16   Mr. Saffici.

04:11:41  17   A.  Yes.  In this Claim 12, an independent claim, I find

04:11:46  18   this to be written in the same manner that it could be

04:11:49  19   taken as either together or separate.

04:11:55  20   Q.  (By Mr. Johnson)  Now, are Claim 1 and Claim 12 the

04:11:58  21   only independent claims at issue in the '605?

04:12:02  22   A.  Let me -- let me get my recollection of -- I don't

04:12:06  23   recall if this is the one that has another independent

04:12:09  24   claim -- or independent -- yeah, claim.  Yes, 1 -- 1 and 12

04:12:27  25   are the two independent claims.
```

04:12:31  1    Q.  And so are all of the remaining claims in the '605

04:12:35  2    patent dependent upon Claim 1 or Claim 12?

04:12:38  3    A.  Yes.  That's the nature of a dependent claim, to work

04:12:42  4    with its independent claim and take all the limitations of

04:12:46  5    it.

04:12:46  6    Q.  Did you analyze those dependent claims in light of what

04:12:50  7    they would allow for, in terms of placement of the camera

04:12:54  8    separately or together?

04:12:55  9    A.  Yes, I did.

04:12:57  10   Q.  And are they -- do they come out the same way as the

04:13:02  11   independent claims that they depend from, Claims 1 and

04:13:05  12   Claim 12?

04:13:06  13   A.  Say that again, please.

04:13:13  14   Q.  Did -- was your analysis the same for the dependent

04:13:13  15   claims of Claim 1 -- because it incorporates Claim 1, is it

04:13:17  16   also -- does it also allow for the camera to be either

04:13:20  17   separate or together with the portable device?

04:13:24  18   A.  Okay.  I understand your question.  No, for example, in

04:13:26  19   Claim 4 --

04:13:28  20   Q.  No, no, no, Mr. Saffici.

04:13:29  21   A.  Oh, oh.

04:13:30  22   Q.  Only the asserted claims in the case, sir.  Are all of

04:13:35  23   the remaining dependent claims of Claim 1 that are asserted

04:13:38  24   in the case, do these have a similar -- similar analysis --

04:13:44  25   A.  Oh, yes.  I'm sorry.  They do, yes.

04:13:47   1   Q.   Okay.   And for Claim 12, do the claims that depend from

04:13:52   2   it, the dependent claims, do they also allow for the camera

04:13:59   3   to be either separate or together with the handheld device?

04:14:02   4   A.   They allow for both.

04:14:04   5   Q.   Mr. Saffici, do -- so in order for the written

04:14:27   6   description support analysis to be completed, do you next

04:14:32   7   look at the specification?

04:14:33   8   A.   Yes, that's correct.

04:14:34   9   Q.   And what must be true of the specification in this

04:14:37   10  case?

04:14:37   11  A.   In this case, the specification would need to provide a

04:14:42   12  description for both ways, meaning the computer -- the

04:14:48   13  general purpose computer with separate capture device, as

04:14:53   14  well as --

04:14:54   15       MR. SHEASBY:   Your Honor, objection.   That is --

04:14:56   16  that is a statement of the law for the Court to instruct

04:14:58   17  on, not for this witness.

04:15:05   18       THE COURT:   He's testified in his opinion that the

04:15:10   19  claims allow -- at least that particular claim allows both

04:15:14   20  ways.   He can testify that the specification would need to

04:15:18   21  provide a description and support for that.   Going beyond

04:15:23   22  that, which is where he is now, is improper.

04:15:25   23       So I'll sustain the objection beyond the portion

04:15:31   24  of the answer where the witness says:   In this case, the

04:15:35   25  specification would need to provide description for both

| | | |
|---|---|---|
| 04:15:38 | 1 | ways, meaning the computer -- the general purpose computer |
| 04:15:44 | 2 | with separate -- no.  In this case the specification would |
| 04:15:47 | 3 | need to provide a description for both ways.  I'll accept |
| 04:15:50 | 4 | that as an appropriate answer, and I'll strike the |
| 04:15:53 | 5 | remainder of it. |
| 04:15:54 | 6 | MR. SHEASBY:  Thank you, Your Honor. |
| 04:15:55 | 7 | THE COURT:  Let's proceed. |
| 04:15:56 | 8 | MR. JOHNSON:  Thank you, Your Honor. |
| 04:15:57 | 9 | Q.  (By Mr. Johnson)  Mr. Saffici, what is actually |
| 04:16:06 | 10 | disclosed -- let's look at the specification. |
| 04:16:09 | 11 | Okay.  Now, is this the specification of the '605 |
| 04:16:17 | 12 | patent, Column 6, that you've used in your analysis? |
| 04:16:19 | 13 | A.  Yes, it is. |
| 04:16:20 | 14 | Q.  Column 6, Lines 27 through 38? |
| 04:16:26 | 15 | A.  That's correct. |
| 04:16:26 | 16 | Q.  Tell me -- tell the jury, please, what this -- to you |
| 04:16:31 | 17 | as one of skill in the art, what is this section of the |
| 04:16:35 | 18 | specification discussing? |
| 04:16:36 | 19 | A.  So this -- this language here is talking about |
| 04:16:38 | 20 | something called Figure 1.  And the yellow highlight is |
| 04:16:42 | 21 | telling us that in Figure 1, it tells -- it describes a |
| 04:16:46 | 22 | computer.  And it's labeled as 111.  And it also tells us |
| 04:16:52 | 23 | about an image capture device labeled 112. |
| 04:16:56 | 24 | And it tells us about those two -- this -- in the |
| 04:17:00 | 25 | description there, it's showing us that they're separate. |

04:17:03    1    Q.   Okay.

04:17:03    2    A.   Now --

04:17:04    3    Q.   What about this section of the specification indicates

04:17:07    4    to you that they are separate devices?

04:17:09    5    A.   Right.   The fact that it says that the computer can

04:17:14    6    contain software that allows the user to control certain

04:17:17    7    operations of the image capture device from the computer.

04:17:22    8              So, again, showing separation of the two.   And

04:17:27    9    then further below, it talks about the software that's

04:17:31   10    shipped with the digital cameras allowing for images to be

04:17:35   11    moved from the camera to the computer, again, illustrating

04:17:39   12    that the two units are separate.

04:17:42   13    Q.   Is that the sentence at Line -- I'm sorry, we don't

04:17:45   14    have the lines on here.

04:17:47   15    A.   Right.

04:17:47   16    Q.   Beginning:  Similarly, digital cameras often ship with?

04:17:51   17    A.   Yes.

04:17:51   18    Q.   Or ship along with.

04:17:53   19              Okay.   Does it give us some examples of image

04:17:59   20    capture devices 112 in this section of the specification?

04:18:00   21    A.   Yes.   I'm sorry.   The digital camera up here -- I was

04:18:09   22    looking -- yeah, the digital camera is an example of the

04:18:12   23    image capture device, as well as a scanner on the above

04:18:16   24    line.

04:18:18   25    Q.   Does it describe those as separate devices from the

04:18:22   1   general purpose computer?

04:18:23   2   A.  Yes.  Going back to the original yellow highlighted

04:18:27   3   area that I identified.

04:18:28   4   Q.  Let's -- you mentioned that this is describing

04:18:34   5   Figure 1.  Let's look at Figure 1 of the patent.

04:18:38   6          MR. JOHNSON:  Your Honor, may I have just a

04:18:40   7   moment?

04:18:40   8          THE COURT:  You may have a moment.

04:18:41   9          MR. JOHNSON:  Thank you.

04:18:54  10   Q.  (By Mr. Johnson)  Mr. Saffici, what are we looking at

04:18:57  11   here?

04:18:57  12   A.  Well, this portion of Figure 1 is showing us the two

04:19:01  13   components, the general purpose computer highlighted in

04:19:05  14   yellow depicted on top of a table with an individual, the

04:19:09  15   account owner, sitting there.  And then it also shows us an

04:19:16  16   image capture device, the blue numbered 112.  And it

04:19:19  17   depicts those as two separate devices.

04:19:22  18   Q.  So is this picture consistent with the discussion we

04:19:26  19   looked at in the prior column of -- Column 6 of the

04:19:32  20   specification that these are treated as separate devices?

04:19:34  21   A.  Yes, it corresponds with the language from Claim --

04:19:37  22   from the specification.

04:19:37  23   Q.  Now, sir, couldn't the connection between 111 and 112

04:19:42  24   just be internal?

04:19:44  25   A.  Well, there's nothing here that shows that, either in

04:19:47  1  the picture or in the specification.

04:19:49  2  Q.  What about in the context of the entire specification?

04:19:52  3  A.  In the context of the entire specification, I do not

04:19:56  4  find that.

04:19:56  5  Q.  What does that mean -- what did you conclude from your

04:20:02  6  analysis of the specification as compared to Independent

04:20:08  7  Claim 1, Independent Claim 12, and the dependent claims

04:20:11  8  that have incorporated those two independent claims?

04:20:15  9  A.  My analysis is that the specification does not provide

04:20:21  10  full -- description for full support -- scope, I'm sorry,

04:20:24  11  of the claims.

04:20:27  12  Q.  And what does that mean for the priority date of the

04:20:31  13  '605 patent?

04:20:31  14  A.  Right.  So by the claim -- by it invalidating -- by

04:20:36  15  that analysis invalidating the claims, it means that the

04:20:38  16  priority date of the patent becomes the file date of July

04:20:42  17  28th, 2017.

04:20:44  18  Q.  Now, as a part of preparing this case, has USAA

04:20:48  19  identified where it contends there is written description

04:20:52  20  support in the specification for a mobile device with a

04:21:00  21  camera and a single device or a portable device with a

04:21:02  22  camera and a single device, as those terms are used in the

04:21:05  23  claims?

04:21:05  24  A.  Yes, they did.

04:21:06  25  Q.  Okay.  How did they do that?

04:21:09   1   A.   So as part of patent suit process, early on in the

04:21:15   2   process, there's a period called discovery.  At that time,

04:21:20   3   Wells Fargo asks a number of questions of USAA, one of

04:21:25   4   which was about written description.  And USAA responded in

04:21:30   5   something that's called an interrogatory response to the

04:21:34   6   questions that were asked of them.

04:21:36   7   Q.   And did you review that USAA response as a part of

04:21:44   8   creating your report in this case?

04:21:45   9   A.   Yes, I did.

04:21:45   10   Q.   And what did USAA identify or point to in its response

04:21:48   11   as where it believes written description exists for

04:21:53   12   portable device with a camera or mobile device with a

04:21:56   13   camera in a single unit?

04:21:57   14   A.   All right.  So as I read through the interrogatory

04:22:00   15   response, I grouped the response into these four categories

04:22:04   16   that that was -- that was related to USAA's response on

04:22:08   17   written description.

04:22:13   18           The first is a reference to laptop configuration.

04:22:16   19           The second is a reference to PDAs in the

04:22:18   20   specification.

04:22:18   21           The third is the file history of the patents.

04:22:21   22           And the fourth was several other references that I

04:22:26   23   just grouped together because I didn't find them in the

04:22:30   24   specification.

04:22:30   25   Q.   Let's look at what USAA points to one at a time.

04:22:35   1          First of all, let's look at Column 3, Line 65,

04:22:39   2   through Column 4, Line 1, of the '605 patent.  Are you with

04:22:44   3   me?

04:22:45   4   A.  Yes, I am.

04:22:46   5   Q.  Okay.  Is this the area that USAA -- the area of the

04:22:50   6   specification that USAA pointed to for written description

04:22:54   7   support?

04:22:55   8   A.  Yes.  This is the first one where they identify laptop

04:22:58   9   configuration as being support.

04:23:01  10   Q.  What is this describing to you as one of skill in the

04:23:05  11   art?

04:23:05  12   A.  Well, if we look at the beginning of -- of the line

04:23:08  13   here, it's describing a general purpose computer, that

04:23:12  14   yellow highlighted No. 111 that we saw in Figure 1.  And it

04:23:16  15   says that it may be a desktop or a laptop.  Hopefully, we

04:23:23  16   all understand a desktop typically to be where you have a

04:23:26  17   number of components, a monitor, keyboard, et cetera.

04:23:30  18   Whereas a laptop would be more in one -- one unit, if you

04:23:34  19   will.

04:23:35  20   Q.  And does -- specifically for this patent specification,

04:23:41  21   does this section have any reference to the image capture

04:23:47  22   device 112 or a digital camera?

04:23:48  23   A.  No, there's nothing mentioned in this section.

04:23:52  24   Q.  So what is this saying about the general purpose

04:23:58  25   computer 111?

904

04:23:58   1   A.   Well, it's telling us it could have one of two form

04:24:02   2   factors.   As I mentioned, the desktop or the laptop form

04:24:07   3   factor.

04:24:07   4   Q.   In the context of the patent and this specification as

04:24:12   5   one of skill in the art, would you have understood laptop

04:24:14   6   to mean with a camera?

04:24:16   7   A.   No, I wouldn't understand it that way.

04:24:19   8   Q.   And does the -- does the specification specifically

04:24:23   9   describe cameras and image capture devices as an entirely

04:24:27  10   separate device 112?

04:24:28  11   A.   I'm sorry, please say that again, Mr. Johnson.

04:24:31  12   Q.   Does the specification specifically describe cameras or

04:24:33  13   the image capture device as an -- as a separate device 112?

04:24:37  14   A.   Yes, it does, just not right at this section.

04:24:40  15   Q.   So does this in -- in your opinion, does this provide

04:24:45  16   written description support for the claims we've been

04:24:49  17   discussing?

04:24:49  18   A.   In my opinion, it does not.

04:24:51  19   Q.   What is the next section of the specification that USAA

04:24:55  20   identifies?

04:24:56  21   A.   It's where they talk about PDAs.

04:24:58  22   Q.   Okay.   What are PDAs?

04:25:01  23   A.   PDA stands for a personal digital assistant.   I think

04:25:07  24   we've talked a little bit about it earlier in the trial

04:25:10  25   here.   These are some of the early handheld-type devices

04:25:14  1   that were used primarily for maybe keeping track of phone

04:25:18  2   numbers and calendars.  Some of them had phones built into

04:25:22  3   them back in the -- again, we're always talking about 2006

04:25:25  4   and prior.

04:25:26  5   Q.  How many times are PDAs mentioned in the '605

04:25:29  6   specification?

04:25:30  7   A.  They're only mentioned twice.

04:25:32  8   Q.  Okay.  Same page?

04:25:33  9   A.  Yes, we see the page highlighted here.

04:25:40  10        MR. JOHNSON:  Can we go to Column 8, Lines 3

04:25:43  11  through 17 of the '605 patent.

04:25:45  12  Q.  (By Mr. Johnson)  Is this the first place that USAA

04:25:50  13  pointed to where PDAs were mentioned?

04:25:56  14  A.  Yes, this is the first place.

04:25:56  15  Q.  As one of skill in the art, can you tell us, what is

04:25:58  16  this describing in this portion of the specification at

04:26:00  17  Column 8, Lines 3 through 17?

04:26:02  18  A.  Right.  This is a -- where they're starting -- the

04:26:06  19  specification is starting to talk about Figure 4, another

04:26:10  20  one of the figures in the past.  And it basically is

04:26:12  21  telling us that this figure is a diagram of an exemplary

04:26:17  22  network or distributed computing environment.

04:26:19  23        I know it's a lot of words there, but we'll see a

04:26:22  24  picture of it in a minute.  But a network is something that

04:26:26  25  is how data -- or, I'm sorry, how devices can be connected

04:26:30  1    to it.

04:26:32  2              For example, if you went into a Starbucks and you

04:26:36  3    had your laptop or just even your phone, you could connect

04:26:39  4    on to their WiFi network.  That would be an example of how

04:26:43  5    devices can plug into a network.

04:26:45  6              But it's telling us about these various devices

04:26:48  7    and these numbers.  You'll see them on the figure.  But

04:26:51  8    down here in the yellow highlighted area, it's telling us

04:26:54  9    that --

04:26:56  10   Q.  There --

04:26:56  11   A.  Oh, I'm sorry.

04:26:57  12   Q.  Mr. Saffici, hold on just a moment.

04:26:57  13   A.  My apologies, sorry.

04:26:59  14   Q.  Can you talk about the yellow highlighted area?

04:27:02  15   A.  Yes, I was just going there.

04:27:04  16             So at this portion in the specification, after

04:27:07  17   it's told us about some of these other devices, it tells us

04:27:11  18   that there are some others that can be added on to the

04:27:14  19   network, and it describes PDAs, audio/video devices, MP3

04:27:21  20   players, personal computer, and then other.

04:27:24  21   Q.  Okay.  So, again, how does the PDA referenced here and

04:27:35  22   relied on by USAA relate to network in Figure 4?

04:27:38  23   A.  My read of this is that it's a type of device that can

04:27:46  24   be connected into the network.

04:27:48  25   Q.  Does this say one way or the other whether the PDA has

04:27:52   1  a camera as a part of the device or not?

04:27:54   2  A.  There's no mention of that here.

04:27:56   3  Q.  Okay.  In this area of the specification, does it

04:28:01   4  relate PDAs to taking pictures of checks or check

04:28:08   5  processing?

04:28:08   6  A.  No, there's no mention of that.

04:28:12   7  Q.  You mentioned Figure 4?

04:28:17   8        MR. JOHNSON:  Mr. Goodin, can we look at Figure 4?

04:28:22   9  Q.  (By Mr. Johnson)  Is this the picture of the network

04:28:24  10  you were talking about?

04:28:24  11  A.  Yes, it is.  The network is described in the middle

04:28:26  12  there with the No. 470, and then you'll see these little --

04:28:29  13  we call them lightning bolts.  That's the way the devices

04:28:33  14  would electronically connect to the network.

04:28:36  15        So among this network are the devices you see

04:28:39  16  here, some not shown with a particular icon.  But when

04:28:43  17  going back to the prior part of the specification, this is

04:28:45  18  where it means that a PDA or an MP3 player or some of the

04:28:51  19  others that it mentioned could be dropped into the network.

04:28:55  20  Q.  Mr. Saffici --

04:28:55  21        THE COURT:  Just a minute, Mr. Saffici, the

04:28:58  22  question Mr. Johnson asked you was, is this a picture of

04:29:02  23  the network?

04:29:03  24        THE WITNESS:  Oh.

04:29:03  25        THE COURT:  And then you described the network.

04:29:05   1   So rather than tell us how to build a watch when somebody

04:29:07   2   asks you what time it is, just tell them what time it is,

04:29:10   3   and then they can follow it up with additional questions.

04:29:13   4            THE WITNESS:  Understood, Your Honor.

04:29:14   5            THE COURT:  Try to limit your answers to the

04:29:18   6   questions asked.

04:29:18   7            Let's proceed.

04:29:19   8            MR. JOHNSON:  Thank you, Your Honor.

04:29:21   9   Q.  (By Mr. Johnson)  Now, you mentioned MP3 players, what

04:29:25   10  are those?

04:29:25   11  A.  If we think about the iPod when that was out years ago,

04:29:28   12  it's a device that will play sound whether it's music or

04:29:32   13  other audio type files.

04:29:34   14  Q.  Is it treated in the specification the same way as a

04:29:37   15  PDA?

04:29:37   16  A.  It appeared right there in that same area with it, yes.

04:29:41   17           MR. JOHNSON:  Let's look at Column 8, Lines 27 to

04:29:45   18  34.

04:29:46   19  Q.  (By Mr. Johnson)  Okay.  Is this the other place in the

04:29:48   20  specification that mentions PDAs that USAA pointed to?

04:29:50   21  A.  Yes, it is.  This is the second identification of PDA.

04:29:54   22  Q.  Can you give us the context of what is related here at

04:29:59   23  Column 8, Lines 27 to 34?

04:30:01   24  A.  Right.  Well, this is just a little bit further down

04:30:05   25  from the -- in the specification from the other reference

04:30:09   1   of PDA.  So it's still within the context of Figure 4, and

04:30:14   2   here it's talking further about devices that can be

04:30:18   3   ultimately connected.

04:30:19   4        And here, it identifies various digital devices,

04:30:25   5   such as PDAs, again, televisions, MP3 players and others.

04:30:32   6   Q.  Is -- is there any indication here that there are --

04:30:37   7   that the image capture device or an image capture device or

04:30:40   8   camera is a part of any of these devices?

04:30:43   9   A.  I don't see any indication of that here.

04:30:46   10  Q.  And when you read PDA here, did that immediately call

04:30:50   11  to mind something with a camera?

04:30:55   12  A.  No, it didn't.

04:30:56   13  Q.  Does this section discuss how a PDA or any of the other

04:31:01   14  devices might relate to check imaging or depositing?

04:31:05   15  A.  No, they don't.

04:31:06   16  Q.  So, in your opinion, as one of skill in the art, does

04:31:09   17  this section provide written support as USAA contends?

04:31:15   18  A.  No, it doesn't.

04:31:17   19  Q.  Mr. Saffici, I think you said the next thing that

04:31:23   20  the -- was in USAA's response was the file history?

04:31:25   21  A.  That's correct.

04:31:26   22  Q.  Did you look at the file history of the '605 patent and

04:31:31   23  '681 patents?

04:31:31   24  A.  Yes, I did.

04:31:36   25  Q.  And remind us what the file history is.

04:31:40  1   A.  So a file history, or we also heard it referred to as

04:31:44  2   prosecution history, which is probably the more correct

04:31:48  3   term, it begins at the time when a file app -- a patent

04:31:54  4   application is filed.  So the patentee, in this case USAA,

04:31:58  5   is filing a patent with the Patent Office.

04:32:02  6            Every piece of correspondence that occurs

04:32:06  7   throughout the life of the -- from the filing time all the

04:32:11  8   way through to the granting of the patent, however many

04:32:16  9   years that might be, any correspondence that goes back and

04:32:20  10  forth between the patentee and the Patent Office is all

04:32:23  11  documented in the prosecution history, that process being

04:32:27  12  referred to as the prosecution of the patent.

04:32:30  13  Q.  Remind us, again, from the patent video, does the

04:32:37  14  prosecution between the patentee and the Patent Office, is

04:32:37  15  that a public or a private setting or proceeding?

04:32:39  16  A.  As -- as we would have seen -- as we saw in the patent

04:32:42  17  video, it tells us that it is a private event.  It's just

04:32:47  18  between the patentee and the Patent Office.

04:32:50  19  Q.  Okay.  So someone like yourself with -- with 53 years

04:32:54  20  of check processing experience or someone like Wells Fargo

04:32:58  21  who's accused of infringing patents, do they have the

04:33:02  22  opportunity in that patent prosecution process to be heard?

04:33:05  23  A.  No, they do not.

04:33:08  24            MR. SHEASBY:  Your Honor, may we approach?

04:33:10  25            THE COURT:  Approach the bench.

04:33:11   1              (Bench conference.)

04:33:18   2              THE COURT:  What's your objection?

04:33:19   3              MR. SHEASBY:  Your Honor, I believe that the door

04:33:21   4    to the CBM process has just been opened.  They now

04:33:24   5    emphasized that Wells Fargo repeatedly has not had the

04:33:28   6    opportunity to be heard.

04:33:29   7              Wells Fargo had the opportunity to be heard on

04:33:31   8    this exact written description issue.  It's happened

04:33:34   9    multiple times, and I would request the opportunity to

04:33:36  10    establish this with Mr. Saffici that Wells Fargo did

04:33:39  11    present its written description argument to the PTO.

04:33:43  12              MR. JOHNSON:  Your Honor, I do not believe a

04:33:45  13    general discussion about the patent process, is it a

04:33:48  14    private or public proceeding, do people get to weigh in on

04:33:50  15    it, opens the door in any way.  It repeated basically what

04:33:53  16    the patent video says.  That's why the patent video is

04:33:56  17    there, that people from industry do not participate.

04:33:58  18              THE COURT:  All right.  This is much the same

04:34:00  19    scenario that we had earlier in the day where perhaps there

04:34:04  20    is a good argument that Defendants opened the door, but the

04:34:07  21    remedy you've requested is disproportionately harsh and

04:34:12  22    prejudicial.

04:34:12  23              For me to allow you to tell the jury that the CBM

04:34:17  24    petition has been filed and denied and the Patent Office,

04:34:20  25    through that process, has determined there is no written

04:34:23   1   description defense, would be very disproportionately

04:34:28   2   prejudicial to the Defendant in light of that brief

04:34:32   3   reference at the end of the question about, you haven't had

04:34:35   4   a part of this process nor has Wells Fargo, Mr. Saffici.

04:34:39   5   I'm not going to grant that kind of a disproportional

04:34:45   6   punishment.

04:34:45   7           MR. SHEASBY:  May I make a suggestion, Your Honor?

04:34:46   8           THE COURT:  If you have something more reasonable,

04:34:48   9   I'm open to it.

04:34:50  10           MR. SHEASBY:  So two things.  One, I think I would

04:34:52  11   request that the jury be instructed that -- to disregard

04:34:56  12   the statement that Wells Fargo had the opportunity -- did

04:34:59  13   not have the opportunity to challenge this.  I think at a

04:35:02  14   minimum, that would be -- and -- and my preferred

04:35:07  15   instruction would be that these issues were before the

04:35:09  16   Patent Office, but you will have to consider them

04:35:11  17   separately.

04:35:13  18           MR. JOHNSON:  Your Honor, I think that is still

04:35:15  19   too prejudicial.  I would ask for an instruction that just

04:35:18  20   says the jury should disregard the statement as to Wells

04:35:20  21   Fargo --

04:35:20  22           THE COURT:  I'll do that, but that's all I'm going

04:35:22  23   to do.

04:35:23  24           MR. JOHNSON:  Thank you, Your Honor.

04:35:24  25           THE COURT:  Wait a minute, where are you as far as

| 04:35:26 | 1  | direct with this witness, Mr. Johnson?                |
|----------|----|-------------------------------------------------------|
| 04:35:28 | 2  |          MR. JOHNSON:  I would guess --               |
| 04:35:33 | 3  |          THE COURT:  Time-wise.                       |
| 04:35:33 | 4  |          MR. JOHNSON:  I would guess 15 to 20 minutes, max. |
| 04:35:35 | 5  |          THE COURT:  All right.  We may take a short  |
| 04:35:37 | 6  | recess.                                               |
| 04:35:38 | 7  |          MR. JOHNSON:  That's fine, Your Honor.       |
| 04:35:39 | 8  |          MR. SHEASBY:  I did want to flag, my cross is |
| 04:35:40 | 9  | going to be approximately two hours.                  |
| 04:35:43 | 10 |          THE COURT:  Two hours?                       |
| 04:35:45 | 11 |          MR. SHEASBY:  Yes, Your Honor.               |
| 04:35:45 | 12 |          THE COURT:  Then we'll definitely take a recess. |
| 04:35:49 | 13 |          (Bench conference concluded.)                |
| 04:35:53 | 14 |          THE COURT:  All right.  Ladies and gentlemen of |
| 04:35:54 | 15 | the jury, with regard to the last question and answer of |
| 04:35:58 | 16 | this witness by Defense counsel, you should disregard any |
| 04:36:04 | 17 | portion of that question and answer that indicated Wells |
| 04:36:07 | 18 | Fargo did not have an opportunity to be before the Patent |
| 04:36:09 | 19 | Office.                                               |
| 04:36:09 | 20 |          The remainder of the answer to the question you |
| 04:36:14 | 21 | may -- you may keep before you.                       |
| 04:36:16 | 22 |          All right.  This is a good point for us to take a |
| 04:36:21 | 23 | short recess, ladies and gentlemen.  This is probably our |
| 04:36:25 | 24 | last one for the day.  We'll see.                     |
| 04:36:26 | 25 |          Just close your notebooks and leave them in your |

04:36:30   1   chairs, if you will.  Follow all my instructions, including

04:36:33   2   not to discuss the case among yourselves, and we'll be back

04:36:37   3   in here shortly to continue.

04:36:38   4            The jury is excused for recess.

04:36:40   5            COURT SECURITY OFFICER:  All rise.

04:36:41   6            (Jury out.)

04:36:42   7            THE COURT:  The Court stands in recess.

04:37:04   8            COURT SECURITY OFFICER:  All rise.

04:51:14   9            (Recess.)

04:51:15  10            (Jury out.)

04:51:16  11            COURT SECURITY OFFICER:  All rise.

04:51:17  12            THE COURT:  Be seated, please.

04:51:20  13       Are you ready to continue with your direct

04:51:28  14   examination, Mr. Johnson?

04:51:29  15            MR. JOHNSON:  I am, Your Honor.

04:51:30  16            THE COURT:  Let's bring in the jury, please,

04:51:32  17   Ms. Denton.

04:51:35  18            COURT SECURITY OFFICER:  All rise.

04:51:36  19            (Jury in.)

04:51:55  20            THE COURT:  Please be seated.

04:51:59  21       We'll continue with the Defendant's direct

04:52:03  22   examination of the witness.

04:52:04  23       You may proceed, counsel.

04:52:06  24            MR. JOHNSON:  Thank you, Your Honor.

04:52:07  25   Q.  (By Mr. Johnson)  Mr. Saffici, when we left, we were

04:52:09   1    discussing the file history of the '605.  Do you recall
04:52:16   2    that?
04:52:16   3    A.  Yes.
04:52:17   4    Q.  Okay.  Can you tell the jury what happened in the file
04:52:23   5    history regarding the priority date of the '605 patent?
04:52:25   6    A.  So when the file history -- or when the -- the
04:52:30   7    application for the '605 and the '681 patents were first
04:52:34   8    made to the Patent Office, they used the date of July 28th,
04:52:40   9    2017, that you've seen already.
04:52:44   10          When the patent and the application was processed
04:52:48   11   initially by the Patent Office, there was a rejection of
04:52:53   12   the application.
04:52:54   13   Q.  What happened next?
04:52:55   14   A.  The next step was that --
04:52:58   15          MR. SHEASBY:  Your Honor, outside the scope of his
04:52:59   16   report.
04:53:01   17          THE COURT:  Do you have a response, Mr. Johnson?
04:53:05   18          MR. JOHNSON:  I believe it is within the scope of
04:53:08   19   the -- of the -- the report, but I can ask a different
04:53:12   20   question and get the same point, Your Honor.  Would you
04:53:15   21   like me to do so?
04:53:17   22          THE COURT:  Well, as with any other expert
04:53:20   23   witness, I want us to stay within the scope of his report.
04:53:22   24          MR. JOHNSON:  Understood.
04:53:23   25          THE COURT:  If you want to withdraw that question

04:53:25   1   and ask another one, you may.

04:53:27   2          MR. JOHNSON:  Sure.  Yes, Your Honor.

04:53:29   3   Q.  (By Mr. Johnson)  Did USAA ultimately file with the

04:53:31   4   Patent Office claiming the 2006 --

04:53:34   5          MR. SHEASBY:  Objection, outside the scope of his

04:53:35   6   report, Your Honor.

04:53:39   7          MR. JOHNSON:  May we approach, Your Honor?

04:53:40   8          THE COURT:  Ladies and gentlemen of the jury, this

04:53:42   9   is a matter I need to take up with counsel outside your

04:53:44  10   presence.  I know you just came back in from the jury room,

04:53:48  11   but I'm going to ask you to go back to the jury room.

04:53:51  12          Let me do this, and I'll have you back in here as

04:53:55  13   soon as possible.  You can simply close and leave your

04:53:57  14   notebooks in your chairs.  Follow all my instructions, and

04:54:00  15   we'll have you back in here as soon as possible.

04:54:03  16          The jury is excused to the jury room.

04:54:05  17          COURT SECURITY OFFICER:  All rise.

04:54:07  18          (Jury out.)

04:54:33  19          THE COURT:  Be seated.

04:54:34  20          Counsel, I trust that the remainder of the day and

04:54:38  21   this trial is not going to evolve into a series of

04:54:40  22   objections about the scope of expert witness's reports so

04:54:41  23   that the jury wears themselves out walking in and out the

04:54:45  24   courtroom.  If that's where we're headed, you're about to

04:54:49  25   have a very upset Federal District Judge up here.

04:54:53  1        It's highly disruptive, and there's no need for

04:54:56  2   it.  You're experienced counsel, and you've had these

04:54:58  3   reports.  You've had an opportunity to review them.

04:54:59  4   They've been through the challenge process at Daubert.  And

04:55:01  5   there's no reason that this witness can't be examined

04:55:04  6   consistent with the report and cross-examined consistent

04:55:07  7   with the report.

04:55:12  8        And unless you've got some reason I don't know

04:55:14  9   about, these kinds of simple questions shouldn't be either

04:55:22  10  unrecognized as within or without of the report.  And if

04:55:25  11  they're clearly within, I shouldn't be hearing this

04:55:29  12  objection.  And if they're clearly without, they shouldn't

04:55:31  13  be asked.

04:55:32  14       And I don't intend to be a referee calling every

04:55:37  15  ball and every strike by sending the jury in and out of

04:55:37  16  this courtroom to do it.  That's not how we're going to

04:55:41  17  complete the rest of this trial.  And we are going to

04:55:42  18  complete the rest of this trial.

04:55:44  19       Now, what's your objection, Mr. Sheasby?

04:55:46  20       MR. SHEASBY:  Your Honor --

04:55:46  21       THE COURT:  Give me specifics.

04:55:47  22       MR. SHEASBY:  -- Mr. Saffici has only two

04:55:49  23  paragraphs on the prosecution history in his report.

04:55:52  24  That's Paragraphs 106 and 107.

04:55:55  25       And what my concern is, is that Wells Fargo is

04:56:02  1  about to go down the realm to discuss the correction and to

04:56:07  2  discuss the fact that he -- he says that the issue was not

04:56:15  3  considered during -- during the prosecution history.

04:56:18  4         And I don't want to continue to disrupt the jury,

04:56:20  5  but I believe that -- that the -- that counsel is about to

04:56:23  6  go down the line to talk about that there was a rejection,

04:56:27  7  that there was a correction made, that then it overcame the

04:56:31  8  rejection.  None of that is actually in his report.  And

04:56:34  9  that's -- that's my -- that's why I stopped now.

04:56:37  10        In other words, in fairness to counsel, the

04:56:41  11 question is not just the originally find -- the promise --

04:56:46  12 I -- he's allowed to say they originally filed without,

04:56:50  13 he's allowed to say they then correct it, but after that,

04:56:55  14 none of -- there's nothing beyond that in his report, and

04:56:55  15 that's what my concern is about.

04:56:57  16        I'm not trying to disrupt it.  I'm just trying to

04:57:02  17 constrain -- to -- to say it was not in the priority claim,

04:57:04  18 and there was a priority claim, and that's as far as he

04:57:07  19 goes in his report.  And I think that's as far as he should

04:57:10  20 be able to go on his direct.  That's my only request.

04:57:13  21        THE COURT:  So are you telling me, Mr. Sheasby,

04:57:15  22 that I've just sent the jury out because of something that

04:57:18  23 hasn't happened yet that you're afraid might happen?  Is

04:57:22  24 this a premature objection that's caused a pretty serious

04:57:28  25 disruption of the trial process?

04:57:28  1          MR. SHEASBY:  I don't believe it's -- it was not

04:57:29  2   intended to be premature.  It was intended so we wouldn't

04:57:29  3   continue to have these disruptions -- me continuing to

04:57:34  4   stand up and object to it on this issue.  This was the

04:57:36  5   subject -- there was a prosecution history slide that was

04:57:39  6   withdrawn in front of the Court, and my concern is that now

04:57:42  7   they're just going back into the prosecution history that

04:57:45  8   was withdrawn.

04:57:45  9          So the Court is -- I accept the Court's --

04:57:48  10          THE COURT:  I have the report in front of me.

04:57:50  11   Now, you say it's Paragraphs 107 and 108?

04:57:56  12          MR. JOHNSON:  124 is what I'm relying on, Your

04:57:58  13   Honor.

04:57:58  14          MR. SHEASBY:  106, 107, and 124, Your Honor.

04:58:28  15          THE COURT:  We've had this argument in chambers

04:58:30  16   where in Paragraph 124, the witness says in his report

04:58:33  17   there's no indication that the examiner considered the

04:58:36  18   specific issues I discussed, i.e., whether the patents

04:58:40  19   disclose a device with an integrated camera.

04:58:42  20          I told you in chambers, and I'm telling you now,

04:58:46  21   it's improper to presume what was in the mind of the

04:58:50  22   examiner.  And even if the examiner did not expressly call

04:58:52  23   something out as being present or absent, the absence of a

04:58:56  24   discussion about it does not imply or indicate that the

04:59:00  25   examiner made a mistake.  We had that discussion in

04:59:04    1    chambers, Mr. Johnson.

04:59:06    2            MR. JOHNSON:  We did, Your Honor, and I was not

04:59:08    3    going to -- my understanding --

04:59:09    4            THE COURT:  There's nothing else in this paragraph

04:59:11    5    that talks about a rejection at the PTO and then overcoming

04:59:14    6    the rejection.

04:59:16    7            MR. JOHNSON:  And I didn't say anything or ask

04:59:17    8    about anything about a rejection.  He said --

04:59:20    9            THE COURT:  He just told this jury the patent

04:59:22   10    applications were rejected.

04:59:24   11            MR. JOHNSON:  And that is what happened.  They

04:59:26   12    made it without --

04:59:27   13            THE COURT:  It may have been what happened, but

04:59:30   14    it's not what's said in his report.

04:59:32   15            MR. JOHNSON:  He says, Your Honor, that he filed

04:59:34   16    the applications without making a priority claim, and they

04:59:36   17    amended the application to claim priority.

04:59:38   18            THE COURT:  And that doesn't say these claims were

04:59:40   19    rejected, and that's what he just told this jury.

04:59:44   20            All right.  I'm going to sustain the objection.

04:59:47   21    I'm going to instruct the jury to disregard any statement

04:59:50   22    about the applications having been rejected.  I'm going to

04:59:54   23    charge this time to the Defendant.  And we are going to

05:00:00   24    continue in strict compliance with what's in this report.

05:00:04   25            I made it abundantly clear in chambers before we

05:00:08  1   got to this point, that the testimony -- that because the

05:00:10  2   Patent Office didn't say it did or didn't consider it, was

05:00:14  3   something that this witness could speculate about what was

05:00:16  4   in their mind or not in their mind.  The witness is not

05:00:19  5   going to speculate about what's in the mind or not in the

05:00:21  6   mind or what was considered or not considered by the Patent

05:00:24  7   Office.

05:00:25  8          MR. JOHNSON:  And, Your Honor, I want to stay on

05:00:26  9   the right side of that, and I apologize if I misunderstood.

05:00:28  10  I thought what the Court was saying is that he could not

05:00:31  11  comment on whether or not it was a mistake, and that's why

05:00:35  12  the Court denied our use of those slides.

05:00:39  13         Am I allowed to --

05:00:41  14         THE COURT:  The reason he can't comment on why

05:00:43  15  it's a mistake is because he can't speculate what's the

05:00:47  16  mental processes of the Patent Office about something the

05:00:49  17  Patent Office is silent on.  I made that abundantly clear.

05:00:53  18         MR. JOHNSON:  Okay.  And that -- I believe that

05:00:54  19  answers my question, that his report goes on to say there's

05:00:57  20  no indication that the examiner considered the specific

05:01:00  21  issues I discussed, whether the patents disclose a device

05:01:03  22  with an integrated camera.

05:01:04  23         What I'm understanding the Court is -- that I

05:01:07  24  cannot elicit that testimony from him?

05:01:12  25         THE COURT:  Say that again.

922

05:01:13   1          MR. JOHNSON:  The report says there is no
05:01:17   2   indication, referring to the file history, that the
05:01:20   3   examiner considered the specific issue I discussed, whether
05:01:23   4   the patents disclose a device with an integrated camera.
05:01:28   5   USAA does not contend otherwise.  And he says:  I don't
05:01:32   6   think the file history provides written description
05:01:34   7   support.
05:01:36   8          THE COURT:  I'm not going to reopen Daubert and
05:01:40   9   circumscribe this report.  You can say what's in that
05:01:44  10   paragraph.  But saying that the Patent Office rejected
05:01:47  11   these applications is not in this paragraph.
05:01:50  12          MR. JOHNSON:  Agreed, Your Honor.
05:01:51  13          THE COURT:  And this witness knows what's in his
05:01:53  14   report because he wrote it.  Or if he didn't write it, he's
05:01:56  15   in awfully big trouble representing to this Court that he
05:02:00  16   did.  And I want the testimony going forward in strict
05:02:02  17   compliance with the report.
05:02:09  18          MR. JOHNSON:  Absolutely, Your Honor.
05:02:09  19   Well-understood.
05:02:09  20          THE COURT:  All right.  Let's bring the jury back
05:02:10  21   in.
05:02:11  22          COURT SECURITY OFFICER:  All rise.
05:02:14  23          (Jury in.)
05:02:36  24          THE COURT:  Thank you for your patience, ladies
05:02:39  25   and gentlemen.  Please have a seat.

05:02:40    1          Before you left a minute ago, there was a

05:02:43    2   representation by the witness that there might have been an

05:02:47    3   initial rejection of these applications by the Patent

05:02:50    4   Office.  To the extent that was said, you should disregard

05:02:53    5   that and not consider it as a part of this case.

05:02:55    6          All right.  Counsel, you may go forward.  I

05:02:59    7   sustained Plaintiff's objection, for the record.

05:03:02    8          MR. JOHNSON:  May it please the Court.  Thank you,

05:03:04    9   Your Honor.

05:03:04   10   Q.  (By Mr. Johnson)  Mr. Saffici, did USAA originally file

05:03:08   11   the applications for the '605 and '681 patent without

05:03:11   12   making a claim of priority?

05:03:13   13   A.  That's correct.

05:03:14   14   Q.  Was that -- were those applications later amended to

05:03:20   15   claim priority to the 2006 applications that you indicated

05:03:23   16   in your earlier testimony?

05:03:24   17   A.  Yes, they were.

05:03:25   18   Q.  Is there any indication that the examiner considered

05:03:31   19   the specific issues that you discussed, i.e., whether the

05:03:35   20   patents disclose a device with an integrated camera in --

05:03:40   21   in your review of the history?

05:03:41   22   A.  I did not see indication of that.

05:03:44   23   Q.  Did USAA's reliance upon the file history -- do you

05:03:52   24   believe that -- did you have -- sorry.  In looking at

05:03:59   25   USAA's reliance on the file history, do you believe

05:04:03   1   that's -- changes your opinion?

05:04:05   2   A.   No, it does not change my opinion.

05:04:11   3   Q.   Mr. Saffici, now we're to the fourth category, which

05:04:16   4   you state were other types of evidence that USAA was

05:04:21   5   pointing to that you said is not in the specification, am I

05:04:25   6   correct?

05:04:25   7   A.   That's correct.

05:04:26   8   Q.   And what were -- what were -- what was it that USAA was

05:04:31   9   pointing to in its response on written description?

05:04:34   10   A.   Right.  So listed here are five items.  One is modern

05:04:41   11   smartphones, second is USA's -- USAA's product development,

05:04:47   12   laptops with webcams, PDAs with cameras, and phones with

05:04:53   13   cameras.

05:04:56   14   Q.   Did you review the specification of the '605 for

05:05:01   15   mention of any of these five categories of either devices

05:05:09   16   or product development?

05:05:12   17   A.   Yes, I did review the specification of the '605, and

05:05:17   18   they are not present.

05:05:19   19   Q.   So did -- and when you say not present, are these

05:05:23   20   things mentioned in the specification?

05:05:25   21   A.   Sorry, in the -- yeah, correct, they are not in the

05:05:28   22   specification.

05:05:29   23   Q.   So did -- do you believe that -- is it your opinion as

05:05:34   24   one of skill in the art that the -- this evidence of

05:05:38   25   devices and product development provides written

05:05:40  1   description support for the claims of the '605 patent we've

05:05:44  2   been discussing?

05:05:45  3   A.  No, it does not provide support for written

05:05:48  4   description.

05:05:48  5   Q.  And so as to written description in the '605 patent,

05:05:54  6   what is your opinion on written description?

05:05:57  7   A.  Again, the result of this analysis is that the '605

05:06:02  8   patent lacks written description.  Thus, the claims are

05:06:05  9   invalid.

05:06:06  10  Q.  So the specification did not demonstrate full scope of

05:06:10  11  the invention -- inventive claims; is that right?

05:06:14  12  A.  That's correct, yes.

05:06:15  13  Q.  Let's switch -- and is that true for Independent

05:06:18  14  Claims 1 and 12, the two that we looked at?

05:06:22  15  A.  Yes, that's correct.

05:06:23  16  Q.  Is it true for Claims 3 and 11 that depend from

05:06:29  17  Claim 1?

05:06:29  18  A.  Yes, it is.

05:06:30  19  Q.  And is it true also for Dependent Claims 13, 14, and 12

05:06:33  20  that also depend or refer to Claim 12?

05:06:37  21  A.  Yes, it does.

05:06:39  22  Q.  Let's move to the '681 patent.

05:06:42  23           When was the '681 patent filed?

05:06:49  24  A.  It was also filed on July 28th, 2017.

05:06:54  25  Q.  Okay.  And when does it -- when does USAA claim that it

| | | |
|---|---|---|
| 05:06:58 | 1 | described and invented the claims that it filed for in 2017 |
| 05:07:05 | 2 | in the '681 patent? |
| 05:07:05 | 3 | A.   It relied -- yeah, it relies on the '200 patent which |
| 05:07:10 | 4 | has a date of October 31st of 2006. |
| 05:07:14 | 5 | Q.   And how does it claim back to the 2000 -- to the USAA |
| 05:07:20 | 6 | Oakes '200 patent? |
| 05:07:22 | 7 | A.   I'm sorry, say that again, please? |
| 05:07:24 | 8 | Q.   How did USAA's '681 patent claim back to the '200 |
| 05:07:30 | 9 | patent? |
| 05:07:30 | 10 | A.   Well, again, here are the specifications from the '200 |
| 05:07:33 | 11 | patent and the '681 patent. |
| 05:07:38 | 12 | Q.   And like they did for the '605 patent, did they use the |
| 05:07:42 | 13 | specification from the 2006 '200 patent verbatim in the |
| 05:07:47 | 14 | '681 patent? |
| 05:07:47 | 15 | A.   Yes, the '200 patent is for the specification of the -- |
| 05:07:52 | 16 | from the '200 patent is verbatim in the '681 patent. |
| 05:07:55 | 17 | Q.   And what does the specification of the '681 patent |
| 05:07:59 | 18 | describe? |
| 05:08:00 | 19 | A.   It's describing a general purpose computer with a |
| 05:08:04 | 20 | separate image capture device being either a scanner or a |
| 05:08:07 | 21 | camera. |
| 05:08:08 | 22 | Q.   And what do the claims that USAA wrote in 2017 |
| 05:08:13 | 23 | describe? |
| 05:08:14 | 24 | A.   They show both a general purpose computer with a |
| 05:08:17 | 25 | separate image capture device being a camera or scanner, as |

| | | |
|---|---|---|
| 05:08:22 | 1 | well as a mobile device with a digital camera. |
| 05:08:26 | 2 | Q.  In certain claims, is the mobile device configuration |
| 05:08:31 | 3 | referred to as a portable device with a camera? |
| 05:08:32 | 4 | A.  Yes, it is. |
| 05:08:36 | 5 | Q.  Did you analyze the claims of the '681 patent? |
| 05:08:40 | 6 | A.  Yes, the same as I did with the '605. |
| 05:08:46 | 7 |         MR. JOHNSON:  Mr. Goodin, could we have Claim 12 |
| 05:08:50 | 8 | of the '681? |
| 05:08:54 | 9 | Q.  (By Mr. Johnson)  Is this Claim 12 of the '681 that you |
| 05:09:07 | 10 | analyzed as a part of your report in this case? |
| 05:09:09 | 11 | A.  Yes, it is. |
| 05:09:14 | 12 | Q.  Based on your review of the claim, what is described in |
| 05:09:19 | 13 | Claim 12 of the '681 patent? |
| 05:09:23 | 14 | A.  It talks about a customer being able to deposit a check |
| 05:09:26 | 15 | using the customer's own mobile device with a digital |
| 05:09:29 | 16 | camera. |
| 05:09:29 | 17 | Q.  Does the claim -- does the claim restrict whether or |
| 05:09:39 | 18 | not that digital camera is a part of a single device in |
| 05:09:44 | 19 | part of Claim 12, or does it describe it -- or could it |
| 05:09:48 | 20 | also be separate? |
| 05:09:50 | 21 | A.  I agree that it can be either separate or in -- |
| 05:09:55 | 22 | internal. |
| 05:09:56 | 23 | Q.  And is that analysis similar to what we did for Claim 1 |
| 05:10:00 | 24 | and Claim 12 of the '605? |
| 05:10:02 | 25 | A.  That's correct. |

05:10:03   1   Q.   Now, the '681, Claim 12, has four dependent claims,

05:10:09   2   Claims 13, 14, 20, and 22.   Did you analyze those claims?

05:10:14   3   A.   Yes, I did.

05:10:15   4   Q.   Because those claims depend from -- or depend on

05:10:20   5   Claim 12, do they contain similar breadth, in terms of

05:10:26   6   applying to a mobile device with a digital camera as a part

05:10:31   7   of a single device or where the digital camera is separate?

05:10:34   8   A.   They do contain the same breadth of the Claim 12.

05:10:42   9            MR. JOHNSON:   Let's go to Claim 30 of the '681.

05:10:46  10   Q.   (By Mr. Johnson)   What are we -- what did you analyze

05:10:55  11   or find in Claim 30 as part of your work in this case?

05:10:58  12   A.   So, again, here we're talking about a customer's mobile

05:11:04  13   device, and having a digital camera.

05:11:06  14   Q.   And does Claim 30 have a -- does it require either the

05:11:13  15   camera to be part of the single device, or can the camera

05:11:17  16   be separate?

05:11:18  17   A.   Again, it's written broadly enough that it can be in

05:11:21  18   either -- can be either situation.

05:11:24  19   Q.   Now, as we now turn from the claims of the '681 patent

05:11:33  20   to the specification, what must the specification describe

05:11:38  21   to provide full scope support to the Independent Claims 12

05:11:43  22   and 30, as well as the dependent claims we've discussed?

05:11:46  23   A.   The specification would need to provide support for

05:11:49  24   both -- or both methods, the device being -- I'm sorry, the

05:11:55  25   general purpose computer being separate from the image

| | | |
|---|---|---|
| 05:12:02 | 1 | capture device, as well as being with a mobile device with |
| 05:12:04 | 2 | a digital camera in it. |
| 05:12:11 | 3 | Q.  And did you compare the '681 specification and the '605 |
| 05:12:19 | 4 | specification, the specification of the two |
| 05:12:22 | 5 | patents-in-suit? |
| 05:12:22 | 6 | A.  Yes. |
| 05:12:24 | 7 | Q.  And are there any differences between the specification |
| 05:12:28 | 8 | of the '605 and the '681 patent? |
| 05:12:30 | 9 | A.  Well, there is -- there is a lot of similarity, but the |
| 05:12:35 | 10 | '681 definitely does not include PDA because that's not |
| 05:12:38 | 11 | part of the claim of the '681. |
| 05:12:41 | 12 | Q.  Let's look at the '681 specification, specifically |
| 05:12:47 | 13 | Column 4, Lines 37 to 48. |
| 05:12:49 | 14 | Looking at the '681 specification, Column 4, |
| 05:13:17 | 15 | Lines 37 to 48, do we see here the same language that we |
| 05:13:24 | 16 | saw regarding the computer 111 and image capture device 112 |
| 05:13:29 | 17 | that we saw back in the '605? |
| 05:13:31 | 18 | A.  Yes, that is the same language. |
| 05:13:34 | 19 | Q.  And what is it describing? |
| 05:13:37 | 20 | A.  Again, it's describing both a computer 111 and an image |
| 05:13:42 | 21 | capture device 112.  And the way it describes it there, |
| 05:13:47 | 22 | they are separate. |
| 05:13:48 | 23 | Q.  Does it maintain the language about digital cameras |
| 05:13:53 | 24 | shipping on their own with software? |
| 05:13:55 | 25 | A.  Yes, that same language is there, again, which |

05:13:59  1  describes the two -- the camera being separate from the

05:14:02  2  computer to move those images there.

05:14:06  3  Q.  Okay.  And does it discuss image capture devices as

05:14:12  4  scanners and digital cameras?

05:14:12  5  A.  Yes, that's the description right up top there.

05:14:18  6  Q.  Is -- does this -- as one of skill in the art, as you

05:14:22  7  look at the '681 specification in context of the patent,

05:14:31  8  did you find that there was written description support for

05:14:38  9  claims with a mobile device or portable device with a

05:14:43  10  digital camera as a single unit?

05:14:45  11  A.  No, it does not provide support for that.

05:14:47  12  Q.  Now, you mentioned there's no PDA discussion in the

05:14:58  13  '60 -- '681 specification, similar to what we had over in

05:15:02  14  the '605?

05:15:02  15  A.  That's correct, it's not mentioned in the '681.

05:15:05  16  Q.  In the '681, sir -- or in regards to the '681, did USAA

05:15:12  17  answer a similar interrogatory describing where they

05:15:15  18  believe written -- written description support is found for

05:15:20  19  the mobile device with a digital camera claims in the '681

05:15:27  20  patent?

05:15:27  21  A.  Yes, they did have an interrog -- interrogatory

05:15:31  22  response.

05:15:31  23  Q.  Did it rely upon the same passage -- same language in

05:15:41  24  the '681 as was relied on in the '605?

05:15:43  25  A.  Yes, with the exception of the PDA.

05:15:46  1   Q.  Would your analysis be the same for that language in

05:15:48  2   the context of the '681 specification as it was in the

05:15:51  3   '605?

05:15:51  4   A.  Yes, the analysis is the same.

05:15:53  5   Q.  So in -- in looking at the '681, the claims of the

05:16:07  6   '681, what is your opinion regarding written description

05:16:11  7   support -- excuse me -- for the full scope of the

05:16:17  8   inventions?

05:16:19  9   A.  That the '681 patent lacks written description because

05:16:24  10  the specifications do not provide the full scope of the

05:16:29  11  claims, thereby the claims would be invalid.

05:16:32  12  Q.  And what would happen to the priority date of the '681

05:16:35  13  patent?

05:16:35  14  A.  It would change from the October 31st, 2006, date to

05:16:41  15  the July 28th, 2017, which was the filing date of the

05:16:45  16  patent.

05:16:47  17  Q.  Mr. Saffici, I want to now leave written description

05:16:51  18  and go to anticipation very briefly.

05:16:54  19  A.  Okay.

05:16:55  20  Q.  Remind the jury what anticipation is.

05:17:02  21  A.  So anticipation, when we do the analysis for

05:17:05  22  anticipation, we want to find out if this patent is really

05:17:08  23  new.  And by looking at the prior art that we mentioned

05:17:10  24  earlier, we look to see if at least one sample -- or one

05:17:16  25  example of the system is found in prior art.  And if it

05:17:21  1   does, that says that that prior art anticipates and

05:17:26  2   invalidates the patent that we were examining.

05:17:28  3   Q.  And in this case, what were the dates of filing for the

05:17:34  4   '605 and '681 patents?

05:17:35  5   A.  The date of filing was October 28, 2017.

05:17:41  6   Q.  What is the priority date that they claim to in their

05:17:46  7   spec -- in their -- on the face of the patent?

05:17:49  8   A.  Right.  They were claiming the October 31st, 2006,

05:17:52  9   date.

05:17:56  10  Q.  And what is significant about the priority -- the claim

05:18:01  11  of when the priority date is for anticipation?

05:18:03  12  A.  Right.  The priority date is the date when you're

05:18:06  13  looking for anticipation, you look earlier than that date.

05:18:12  14  So for -- when looking for anticipation for the 2017 date,

05:18:19  15  we look earlier than that.

05:18:23  16  Q.  And based on your analysis in your report, has the --

05:18:28  17  are the -- is the '605 patent entitled to the priority date

05:18:32  18  of 2006 through the '227 patent?

05:18:37  19  A.  No, it is not.

05:18:38  20  Q.  For the reasons that we've discussed?

05:18:41  21  A.  Yes, for anticipation.

05:18:43  22  Q.  I'm sorry, you said anticipation.  Do you mean written

05:18:46  23  description?

05:18:46  24  A.  Oh, I'm sorry, yeah -- yeah, we just finished written

05:18:50  25  description.  So because it failed written description,

05:18:52   1   then it loses that priority date.

05:18:56   2   Q.   And this -- is the same true of the '681 patent?

05:19:01   3   A.   Yes, that's correct.

05:19:02   4   Q.   So now what is the priority date that we look back

05:19:05   5   from, for anticipation purposes, as to the two patents?

05:19:08   6   A.   The July 28th, 2017, date, again, looking backwards

05:19:11   7   from there.

05:19:12   8   Q.   Now, if you consider the 2017 priority dates and look

05:19:20   9   back, do you have opinions relating to prior art?

05:19:23  10   A.   Yes, I do.

05:19:25  11   Q.   And what is that opinion for the '605 patent?

05:19:28  12   A.   The opinion for the '605 patent is that it is

05:19:32  13   anticipated by the Oakes '227 patent.

05:19:38  14   Q.   And what about for the '681 patent?

05:19:41  15   A.   It is anticipated by the Oakes '200 patent.

05:19:47  16   Q.   Can you tell me, sir, how can the '227 patent be

05:19:56  17   described as anticipating if it does not provide a written

05:19:59  18   description?

05:20:00  19   A.   Well, because there are two different legal doctrines,

05:20:04  20   written description and anticipation.

05:20:05  21        And we -- we've gone through a discussion of that.

05:20:10  22   But on anticipation now, we want to look into a prior art

05:20:13  23   to see if it has -- if it discloses at least one example of

05:20:20  24   what this -- the '605 does.

05:20:22  25        So it did identify the -- I'm sorry, the image

| | | |
|---|---|---|
| 05:20:29 | 1 | capture -- I'm sorry, the general purpose computer or |
| 05:20:32 | 2 | laptop with an image -- separate image camera device, which |
| 05:20:38 | 3 | is what's in the '605.  That's one of the '605 claims, and |
| 05:20:43 | 4 | it didn't need to find the second way in which the '605 |
| 05:20:49 | 5 | claims. |
| 05:20:49 | 6 | Q.  So if it describes one example of -- of a system that |
| 05:20:53 | 7 | meets the claims, is that sufficient -- is that description |
| 05:20:58 | 8 | sufficient for anticipation? |
| 05:21:00 | 9 | A.  Yes, it is.  It only needs to find one. |
| 05:21:04 | 10 | Q.  And have you taken that same position before in your |
| 05:21:09 | 11 | report? |
| 05:21:09 | 12 | A.  Yes, I did. |
| 05:21:10 | 13 | Q.  And otherwise? |
| 05:21:11 | 14 | A.  Yes. |
| 05:21:13 | 15 | Q.  And by saying that the prior art describes the |
| 05:21:20 | 16 | limitations of these 2017 claims, does that have any |
| 05:21:24 | 17 | bearing on written description? |
| 05:21:25 | 18 | A.  No, because we're just looking at anticipation then. |
| 05:21:31 | 19 | Q.  Just so we are clear, sir, when -- and if we go to the |
| 05:21:43 | 20 | '681 patent, does the '681 patent -- likewise, is it |
| 05:21:49 | 21 | anticipated by the '200 patent? |
| 05:21:50 | 22 | A.  Yes, it is, the same reason. |
| 05:21:53 | 23 | Q.  Now, both of these are USAA patents that you're saying |
| 05:21:56 | 24 | anticipate or describe the systems that invalidate; is that |
| 05:22:01 | 25 | right? |

05:22:01  1    A.  That is correct.

05:22:02  2    Q.  Anything wrong with that?

05:22:04  3    A.  No, there's nothing wrong.

05:22:06  4    Q.  Prior art --

05:22:09  5    A.  Prior art is prior art.  I'm sorry to speak over you.

05:22:12  6    Q.  So for the '605 patent, did you find all of the

05:22:17  7    limitations of the claims -- asserted claims met in the

05:22:23  8    USAA '227 or Oakes '227 patent?

05:22:28  9    A.  I found one of them.  The general purpose computer and

05:22:33  10   separate device in the Oakes '227 that results in the

05:22:38  11   anticipation or the invalidation of the '605 patent for

05:22:45  12   anticipation.

05:22:45  13   Q.  And as you're working this case, did you find all of

05:22:48  14   these elements anticipate?

05:22:49  15   A.  Yes, I did.

05:22:50  16   Q.  Is that also true for Claim 12 of the '605 patent?

05:22:55  17   A.  That is also anticipated.

05:22:57  18   Q.  Okay.  All of the elements are found in the earlier

05:22:59  19   patent?

05:22:59  20   A.  Yes, all the elements.

05:23:01  21   Q.  And because Claims 3 and 11 depend from Claim 1 and

05:23:07  22   Claims 13, 14, and 22 depend from Claim 12, did you also

05:23:11  23   analyze those?

05:23:11  24   A.  Yes.  Likewise, they are anticipated.

05:23:15  25   Q.  So the dependent claims are likewise anticipated --

05:23:18    1   every element of the dependent claims are anticipated?

05:23:21    2   A.  That's correct.

05:23:21    3   Q.  When we switch to the '681 patent, what did you find?

05:23:28    4   A.  I found that Oakes '200 patent -- well, it anticipates

05:23:35    5   the '681 because it discloses a general purpose computer

05:23:39    6   with a separate image capture device.

05:23:43    7   Q.  Okay.  And does it otherwise find all of the

05:23:46    8   elements -- did you find all of the elements of Claim 30 in

05:23:49    9   the Oakes '200 patent?

05:23:51   10   A.  Yes, I did.

05:23:52   11   Q.  And Claim 30 was a -- an independent claim.  Did you

05:23:59   12   also do this same analysis for Claim 12, the other

05:24:02   13   dependent claim?

05:24:02   14   A.  Yes, I did.

05:24:03   15   Q.  Did you find all of the elements in the '200 patent of

05:24:11   16   the -- Claim 12 of the '681?

05:24:13   17   A.  Yes, I did.

05:24:14   18   Q.  And then there are four -- four dependent claims,

05:24:18   19   Claims 13, 14, 20, and 22; is that right?

05:24:21   20   A.  Yes, that's correct.

05:24:22   21   Q.  Did you analyze those claims in regards to the '200

05:24:25   22   patent?

05:24:26   23   A.  I did.

05:24:27   24   Q.  And did you find every element of those claims in the

05:24:32   25   Oakes '200 patent?

05:24:34   1    A.  Yes, I did.

05:24:35   2    Q.  So what is your conclusion about the '681 patent?

05:24:39   3    A.  My conclusion with the '681 patent is that it is

05:24:41   4    anticipated by the Oakes '200 patent, thereby invalidating

05:24:45   5    the claims of the '681 patent.

05:24:46   6    Q.  And, again, this is -- once the priority date moves to

05:24:56   7    2017; is that right?

05:24:57   8    A.  That's correct, yes.

05:24:58   9    Q.  Did USAA take issue with that in this case?

05:25:00   10   A.  I'm not aware of any dispute.

05:25:03   11          MR. JOHNSON:  May I have a moment, Your Honor?

05:25:05   12          THE COURT:  You may.

05:25:33   13          MR. JOHNSON:  Your Honor, at this time, I would

05:25:35   14   pass the witness.

05:25:36   15          THE COURT:  All right.  Is there cross-examination

05:25:38   16   by the Plaintiff?

05:25:38   17          MR. SHEASBY:  There is, Your Honor.

05:25:39   18          THE COURT:  Please proceed.

05:25:39   19                     CROSS-EXAMINATION

05:26:06   20   BY MR. SHEASBY:

05:26:06   21   Q.  Good afternoon, Mr. Saffici.

05:26:08   22   A.  Good afternoon, Mr. Sheasby.

05:26:09   23   Q.  It's nice to see you again.

05:26:11   24   A.  Oh, yes.

05:26:11   25   Q.  We've met before?

| | | |
|---|---|---|
| 05:26:12 | 1 | A.  A few times. |
| 05:26:15 | 2 | Q.  Mr. Saffici, you spoke about a person of ordinary skill |
| 05:26:21 | 3 | in the art, fair? |
| 05:26:22 | 4 | A.  That's correct. |
| 05:26:22 | 5 | Q.  And for the purposes of written description, the |
| 05:26:30 | 6 | analysis that the jury must do is whether the claims of the |
| 05:26:34 | 7 | patents-in-suit are described in the specification to a |
| 05:26:41 | 8 | person of ordinary skill in the art, fair? |
| 05:26:43 | 9 | A.  That's my understanding. |
| 05:26:45 | 10 | Q.  It's not my view of it.  It's the view of a person of |
| 05:26:49 | 11 | ordinary skill in the art, fair? |
| 05:26:51 | 12 | A.  As of a particular point in time, yes. |
| 05:26:53 | 13 | Q.  And as of 2006? |
| 05:26:55 | 14 | A.  In this case, yes. |
| 05:26:56 | 15 | Q.  Now, there is another expert in this case representing |
| 05:27:04 | 16 | Wells Fargo.  His name is Dr. Villasenor, correct? |
| 05:27:06 | 17 | A.  Yes. |
| 05:27:08 | 18 | Q.  Dr. Villasenor, counsel for Wells Fargo described him |
| 05:27:12 | 19 | as having gone to Stanford, correct? |
| 05:27:14 | 20 | A.  I don't know all of his background, to be honest. |
| 05:27:16 | 21 | Q.  He's -- he's a technical expert, fair? |
| 05:27:18 | 22 | A.  I understand that, yes. |
| 05:27:19 | 23 | Q.  And if you turn behind you, I've actually laid a box of |
| 05:27:25 | 24 | materials that we're going to be using today.  And on top |
| 05:27:29 | 25 | of that you'll see Dr. Villasenor's report.  And I'd like |

| | | |
|---|---|---|
| 05:27:31 | 1 | to ask you to turn to Paragraph 16 of his report. |
| 05:27:40 | 2 | A.  I am there. |
| 05:27:43 | 3 | MR. JOHNSON:  Jason, do you have a binder for |
| 05:27:45 | 4 | them?  Never mind. |
| 05:27:48 | 5 | A.  I'm there. |
| 05:27:49 | 6 | Q.  (By Mr. Sheasby)  I want you to read Paragraph 16 to |
| 05:27:51 | 7 | yourself.  Don't read it out loud. |
| 05:27:53 | 8 | A.  You said do or don't? |
| 05:27:55 | 9 | Q.  Do not read it out loud. |
| 05:27:57 | 10 | A.  Oh. |
| 05:28:15 | 11 | Q.  Just the first sentence, please. |
| 05:28:17 | 12 | A.  I'm sorry? |
| 05:28:18 | 13 | Q.  The first sentence of Paragraph 16.  Let me know -- |
| 05:28:20 | 14 | A.  Oh, just the first sentence? |
| 05:28:20 | 15 | Q.  Yes. |
| 05:28:21 | 16 | A.  I'm sorry.  I was reading the whole paragraph.  Yes, |
| 05:28:24 | 17 | I've read that. |
| 05:28:25 | 18 | Q.  Now, Dr. Villasenor is defining what a person of |
| 05:28:27 | 19 | ordinary skill in the art is, correct? |
| 05:28:28 | 20 | A.  That's what he does here, yes. |
| 05:28:30 | 21 | Q.  And he's defining it as a person who has a Bachelor's |
| 05:28:35 | 22 | of Science degree in electrical engineering, computer |
| 05:28:37 | 23 | science, computer engineering or a closely related field, |
| 05:28:40 | 24 | and at least two years of work or research experience in |
| 05:28:45 | 25 | portable device imaging, including communications with a |

05:28:48  1   server in relation to such imaging.  Fair?

05:28:50  2   A.  That's what it reads, yes.

05:28:52  3   Q.  That's not your definition of a person of ordinary

05:28:54  4   skill in the art, correct?

05:28:54  5   A.  That's correct.

05:28:55  6   Q.  You don't meet Dr. Villasenor's definition of a person

05:28:59  7   of ordinary skill in the art, fair?

05:29:00  8   A.  I don't meet that, that's correct.

05:29:04  9   Q.  And so when the jury considers what the patent

05:29:10  10  specification teaches to a person of ordinary skill in the

05:29:13  11  art, it's fair for them to take back into the jury room

05:29:18  12  that, although you have very extensive business experience,

05:29:22  13  you're not a technical expert, fair?

05:29:24  14  A.  I was not hired for that, that's correct.

05:29:26  15  Q.  You don't meet Professor Villasenor's definition of

05:29:32  16  what a person of ordinary skill in the art would be, fair?

05:29:33  17  A.  I would agree that I don't.

05:29:38  18  Q.  You have no patents, for example, fair?

05:29:40  19  A.  That's correct.

05:29:41  20  Q.  The patents at issue in this case, they relate to --

05:29:46  21  and the specification relates to mobile remote deposit

05:29:50  22  capture, fair?

05:29:51  23  A.  Yes.

05:29:51  24  Q.  The specification describes the technical aspects of

05:29:56  25  mobile remote deposit capture, fair?

| | | |
|---|---|---|
| 05:29:57 | 1 | A.  I disagree. |
| 05:30:10 | 2 | Q.  The patent claims at issue in this case are directed to |
| 05:30:13 | 3 | mobile remote deposit capture, fair? |
| 05:30:14 | 4 | A.  Yes. |
| 05:30:19 | 5 | Q.  You have no experience with the technical programming |
| 05:30:21 | 6 | of mobile device remote deposit capture systems, correct? |
| 05:30:29 | 7 | A.  I agree. |
| 05:30:30 | 8 | Q.  You have no -- you've had no role in actually designing |
| 05:30:33 | 9 | mobile capture systems that would be used for mobile |
| 05:30:34 | 10 | devices, correct? |
| 05:30:34 | 11 | A.  That's correct. |
| 05:30:35 | 12 | Q.  You've never designed a system that uses mobile devices |
| 05:30:39 | 13 | for remote deposit capture, correct? |
| 05:30:41 | 14 | A.  That's correct. |
| 05:30:42 | 15 | Q.  You've never had any role in designing the technical |
| 05:30:45 | 16 | criteria that images would have to satisfy for the |
| 05:30:47 | 17 | successful deposits of checks, correct? |
| 05:30:49 | 18 | A.  Can you say that again, please? |
| 05:30:51 | 19 | Q.  Sure.  You've never had any role in designing the |
| 05:30:54 | 20 | technical criteria that the images would have to satisfy |
| 05:30:57 | 21 | for the successful deposit of checks, correct? |
| 05:30:59 | 22 | A.  Can I ask you how you're defining "technical"? |
| 05:31:03 | 23 | Q.  Well, why don't you turn to Tab 1 of the binders behind |
| 05:31:07 | 24 | you.  And I think there's three binders, so you'll want to |
| 05:31:07 | 25 | find -- the binder that says -- |

| | | |
|---|---|---|
| 05:31:15 | 1 | A.  One of three? |
| 05:31:17 | 2 | Q.  Yes.  And if you turn to -- if you turn to Tab 1? |
| 05:31:23 | 3 | THE COURT:  Just a minute. |
| 05:31:24 | 4 | Ms. Denton, get the other two binders out and make |
| 05:31:28 | 5 | them available to the witness, please. |
| 05:31:33 | 6 | A.  I'm there, Mr. Sheasby. |
| 05:31:35 | 7 | Q.  (By Mr. Sheasby)  If you go to Page 12, Line 6 through |
| 05:31:39 | 8 | 11 -- go ahead and read that question to yourself. |
| 05:31:42 | 9 | A.  I'm sorry. |
| 05:31:45 | 10 | Q.  So it's little Page 12 because there's four pages |
| 05:31:49 | 11 | per -- |
| 05:31:50 | 12 | A.  Right, right, right.  And which line, please? |
| 05:31:56 | 13 | Q.  6 through 11. |
| 05:31:59 | 14 | A.  Okay.  I've read that. |
| 05:32:02 | 15 | Q.  You have -- you -- you have had no role in designing |
| 05:32:08 | 16 | the technical criteria that images would need to satisfy |
| 05:32:11 | 17 | for the successful deposit of checks, fair? |
| 05:32:13 | 18 | A.  That was my testimony, yes, sir. |
| 05:32:16 | 19 | Q.  You have no experience in designing software for mobile |
| 05:32:19 | 20 | applications, fair? |
| 05:32:20 | 21 | A.  That's correct. |
| 05:32:22 | 22 | Q.  You have no experience with developing the software |
| 05:32:24 | 23 | that's used in mobile devices so that they can participate |
| 05:32:28 | 24 | in remote -- remote deposit capture, correct? |
| 05:32:31 | 25 | A.  That's correct. |

05:32:32   1   Q.  You have no experience whatsoever in actually the

05:32:36   2   technical aspects of using mobile devices for remote

05:32:42   3   deposit capture, fair?

05:32:42   4   A.  That's correct.

05:32:43   5   Q.  Now, you were in the room for the -- well, let me

05:32:48   6   withdraw that.

05:32:48   7           You were in court for Mr. Brady's testimony,

05:32:57   8   correct?

05:32:57   9   A.  Yes, I was.

05:32:58   10  Q.  Mr. Brady has a Bachelor's and Master's degree in

05:33:03   11  computer science, correct?

05:33:04   12  A.  I don't recall all the details, but I know he has some

05:33:07   13  degrees, yes.

05:33:08   14  Q.  He's an engineer, fair?

05:33:10   15  A.  I think that was his background, yes.

05:33:12   16  Q.  And he talked about having 35 years of actually

05:33:14   17  building the technical systems that are used in banking,

05:33:18   18  fair?

05:33:18   19  A.  I believe that was it.

05:33:19   20  Q.  And Mr. Brady actually went through the specification,

05:33:25   21  in his testimony to the jurors, correct?

05:33:26   22  A.  Yes.

05:33:27   23  Q.  He pointed out passages from the specification.  He

05:33:31   24  spoke about the fact that he found in the specification the

05:33:35   25  disclosure of mobile devices in digital cameras in any

05:33:42   1   configuration.  Fair?

05:33:43   2   A.  I believe that was his testimony.

05:33:49   3   Q.  Who has more technical expertise, Mr. Brady or you?

05:33:51   4   A.  Depends on how you want to define technically.

05:33:55   5   Q.  Let's define it in the way Dr. Villasenor defined a

05:33:59   6   person of ordinary skill in the art.

05:34:00   7   A.  Well, to use that definition, then, no, I don't meet

05:34:06   8   that.

05:34:06   9   Q.  Mr. Brady does, fair?

05:34:08   10  A.  He seems to be close to it, yes.

05:34:11   11  Q.  Now, we also heard from Professor Conte, correct?

05:34:14   12  A.  Yes.

05:34:14   13  Q.  Professor Conte was the president of a major computer

05:34:20   14  society in the United States, fair?

05:34:21   15  A.  I saw his credentials, yes.

05:34:22   16  Q.  He a full professor at the Georgia Institute of

05:34:25   17  Technology, fair?

05:34:26   18  A.  Yes.

05:34:26   19  Q.  And you heard him testify that the patent discloses

05:34:31   20  every single limitation of the claim, correct?

05:34:34   21  A.  I believe that's what he said.

05:34:35   22  Q.  And he said the claims are about any type of

05:34:38   23  configuration of mobile device with general purpose

05:34:42   24  computer, fair?

05:34:43   25  A.  I don't recall exactly how he said it, but...

05:34:48   1   Q.  He said that the scope of the claims is fully disclosed
05:34:52   2   by the specification, correct?
05:34:53   3   A.  Again, I don't recall exactly, you know, what his words
05:34:56   4   were.
05:34:58   5          MR. JOHNSON:  Object to the extent it misstates
05:35:00   6   prior testimony, Your Honor.  I don't believe he took that
05:35:03   7   position.
05:35:05   8          MR. SHEASBY:  Your Honor, that's not a proper
05:35:06   9   objection.
05:35:13  10          THE COURT:  That's something you'll have to deal
05:35:15  11   with on redirect, Mr. Johnson.  I'm going to overrule it at
05:35:17  12   this time.
05:35:18  13          MR. JOHNSON:  Thank you, Your Honor.
05:35:19  14          THE COURT:  You're certainly free to explore it on
05:35:21  15   redirect.
05:35:23  16   Q.  (By Mr. Sheasby)  So why don't you turn to Tab 40 in
05:35:26  17   your binder.
05:35:30  18   A.  40?
05:35:30  19   Q.  Yes.
05:35:33  20   A.  4-0?
05:35:34  21   Q.  Uh-huh.
05:35:40  22   A.  Is that No. 3, by the way?
05:35:43  23   Q.  It should be, yes.  Yes, Mr. Saffici, it should be
05:35:47  24   Binder 3.
05:35:48  25   A.  Okay.

| | | |
|---|---|---|
| 05:35:59 | 1 | Q.  And tell me when you're there.  I don't want to rush |
| 05:36:01 | 2 | you. |
| 05:36:01 | 3 | A.  40, yes, I'm there. |
| 05:36:04 | 4 | Q.  Okay.  Turn to Page 513.  And why don't you just read |
| 05:36:12 | 5 | to yourself Page 513 to 514. |
| 05:36:37 | 6 | A.  513 to what, sir?  I'm sorry. |
| 05:36:40 | 7 | Q.  514, take your time.  Just 513 and 514. |
| 05:37:25 | 8 | A.  I understand. |
| 05:37:29 | 9 | Q.  Uh-huh.  You're reading a passage from |
| 05:38:33 | 10 | Professor Conte's sworn trial testimony, correct? |
| 05:38:36 | 11 | A.  Yes. |
| 05:38:36 | 12 | Q.  Professor Conte observed that the claims simply require |
| 05:38:41 | 13 | a digital camera and a mobile portable device, fair? |
| 05:38:45 | 14 | A.  Yes. |
| 05:38:45 | 15 | Q.  He looked in the specification and he felt that the |
| 05:38:48 | 16 | specification -- he concluded that the specification fully |
| 05:38:50 | 17 | disclosed the combination of a mobile device and a digital |
| 05:38:55 | 18 | portable camera in any configuration.  That's what |
| 05:38:58 | 19 | Professor Conte opined, fair? |
| 05:38:59 | 20 | A.  That's what he says. |
| 05:39:00 | 21 | Q.  Now, Professor Conte is a technical expert, correct? |
| 05:39:03 | 22 | A.  Yes. |
| 05:39:03 | 23 | Q.  He's an independent expert, correct? |
| 05:39:05 | 24 | A.  Yes. |
| 05:39:05 | 25 | Q.  He meets Dr. Villasenor's definition of a person of |

05:39:10   1   ordinary skill in the art, correct?

05:39:10   2   A.   I believe so.

05:39:11   3   Q.   You do not, fair?

05:39:12   4   A.   That's fair.

05:39:13   5   Q.   So, although you are very experienced in business, sir,

05:39:16   6   extremely experienced, it is fair for the jury when they

05:39:20   7   consider the question of whether the claims are disclosed

05:39:23   8   in the specification to weigh the fact that you are not a

05:39:27   9   technical expert, fair?

05:39:28   10   A.   I disagree.

05:39:30   11   Q.   It is fair for the jury to weigh the fact that

05:39:35   12   Mr. Brady and Professor Conte, both of whom meet Wells

05:39:39   13   Fargo's definition of a person of ordinary skill in the

05:39:42   14   art, concluded that the claims are fully disclosed in the

05:39:49   15   specification, fair?   The jury can consider that?

05:39:51   16   A.   Well, I think the jury has to consider a number of

05:39:53   17   things.

05:39:54   18   Q.   But the jury should consider what Professor Conte and

05:39:57   19   Mr. Brady felt, correct?

05:39:58   20   A.   They should consider what we all say.

05:40:00   21   Q.   And they should consider, for example, the fact that

05:40:06   22   Professor Villasenor's definition of a person of ordinary

05:40:10   23   skill in the art for these patents you do not meet, fair?

05:40:12   24   A.   I don't meet them.

05:40:14   25   Q.   And -- and to be clear, you are a highly, highly

05:40:20  1   experienced business person, correct?

05:40:21  2   A.   Yes.

05:40:21  3   Q.   But you are not a person of ordinary skill in the art

05:40:25  4   of these patents as Wells Fargo's technical expert,

05:40:29  5   Dr. Villasenor, has defined that, fair?

05:40:30  6   A.   We were hired for different reasons.

05:40:34  7          MR. SHEASBY:  Your Honor, objection,

05:40:36  8   nonresponsive.

05:40:36  9          THE WITNESS:  Okay.  I'm sorry.

05:40:37  10         THE COURT:  I'll sustain that.

05:40:38  11         You need to ask -- answer the question rather --

05:40:40  12         THE WITNESS:  I understand, Your Honor.

05:40:42  13         THE COURT:  -- Mr. -- Mr. Saffici.

05:40:46  14   A.   Ask your question again.

05:40:48  15         THE COURT:  Restate your question, counsel.

05:40:49  16   Q.   (By Mr. Sheasby)  The jury can consider the fact that

05:40:50  17   when you're telling them that the patent doesn't disclose

05:40:53  18   the claims, you are not a person of ordinary skill in the

05:40:58  19   art as it's defined by Wells Fargo's only technical expert,

05:41:01  20   which is Professor Villasenor, fair?

05:41:04  21   A.   I don't meet what he defined as a person of ordinary

05:41:10  22   skill in the art, but I meet what I define.

05:41:12  23         MR. SHEASBY:  Objection, Your Honor,

05:41:14  24   non-responsive.  And I move to strike.

05:41:16  25         THE WITNESS:  All right, Your Honor.  I'm sorry.

949

05:41:21   1          THE COURT:  I'm not going to strike it, but I am
05:41:24   2   going to instruct you to ask it one more time.
05:41:27   3          MR. SHEASBY:  Yes, Your Honor.
05:41:27   4   Q.  (By Mr. Sheasby)  The jury can consider the fact that
05:41:30   5   the definition of a person of ordinary skill in the art met
05:41:35   6   by -- described by Dr. Villasenor, you don't meet it, fair?
05:41:40   7   A.  That's fair.
05:41:42   8   Q.  And when patents are written, patents are written for
05:41:45   9   persons of ordinary skill in the art to understand, fair?
05:41:48  10   A.  I disagree.
05:41:53  11   Q.  You understand that when you do your written
05:41:56  12   description analysis, you're supposed to analyze the
05:42:00  13   disclosure in the specification from the standpoint of a
05:42:03  14   person of ordinary skill in the art, correct?
05:42:05  15   A.  Yes, I agree.
05:42:09  16   Q.  And so it doesn't matter what someone who doesn't have
05:42:13  17   that level of skill -- well, I withdraw the question.
05:42:16  18          The issues you talked about -- you talked about
05:42:28  19   anticipation, you talked about written description, you
05:42:30  20   talked about priority, you used all these words, but the
05:42:35  21   basic question is whether the claim language, a digital
05:42:39  22   camera and a mobile device, is present in the
05:42:43  23   specification.  That's the question the jury must answer,
05:42:45  24   fair?
05:42:46  25          MR. JOHNSON:  Objection, Your Honor.  Misstates

05:42:49  1    the law and misstates what the question is the jury must

05:42:53  2    answer.

05:42:56  3            THE COURT:  I'll allow the question.  But as I

05:42:58  4    said earlier, at the end of the day, this jury -- this jury

05:43:02  5    is going to follow the instructions on the law that I give

05:43:05  6    them, not that they hear from any witness and not that they

05:43:07  7    hear from any lawyer in this case.  But I'll permit the

05:43:10  8    question to be considered.

05:43:12  9            MR. JOHNSON:  Thank you, Your Honor.

05:43:12  10   Q.  (By Mr. Sheasby)  Would you like me to rephrase,

05:43:15  11   Mr. Saffici?

05:43:15  12   A.  Please.

05:43:17  13   Q.  The anticipation defense that you've crafted and the

05:43:21  14   written description defense that you've crafted are all

05:43:25  15   collapsed back into the same basic question, which is

05:43:28  16   whether the claims in the specification -- the claims of

05:43:32  17   the patent, as written, are disclosed in the specification,

05:43:35  18   correct?

05:43:35  19   A.  Disagree.

05:43:38  20   Q.  You told the jury that if the claims of the patent have

05:43:51  21   support in the 2006 specification, there's no anticipation,

05:43:55  22   fair?

05:43:56  23   A.  Say that again.

05:43:58  24   Q.  If the claims of the patents are described in the 2006

05:44:06  25   specification, your anticipation theories go away, fair?

951

05:44:09   1   A.   I disagree.

05:44:14   2   Q.   The anticipation theory you presented to the jury

05:44:42   3   requires that the jury accept that the specification of the

05:44:48   4   2006 application doesn't disclose the claims of the patent,

05:44:51   5   fair?

05:44:51   6   A.   I didn't say it doesn't disclose it.   Ask the question

05:45:01   7   again, please.

05:45:02   8   Q.   Sir, does the 2006 applications disclose the claims of

05:45:08   9   the patents at issue in this case?

05:45:09  10   A.   Discloses one of them -- I mean, one of the ways the

05:45:14  11   claims describe the invention.

05:45:17  12          MR. SHEASBY:  May I approach, Your Honor?

05:45:18  13          THE COURT:  You may.

05:45:36  14          THE WITNESS:  I'm going to put this here.

05:45:37  15          THE COURT:  That's fine.

05:45:39  16          THE WITNESS:  We'll put it here.

05:45:41  17          THE COURT:  I sometimes think, ladies and

05:45:43  18   gentlemen, we support the paper industry in East Texas.

05:45:47  19          Go ahead, counsel.

05:45:48  20          MR. SHEASBY:  Thank you, Your Honor.

05:45:49  21   Q.   (By Mr. Sheasby)   So I've handed you two large

05:45:54  22   collections of papers, correct?

05:45:56  23   A.   Yes.

05:45:56  24   Q.   And this is called the prosecution history of the

05:46:00  25   patents-in-suit, correct?

05:46:01  1    A.  Well, I don't know.

05:46:02  2    Q.  Why don't you look?

05:46:05  3    A.  Okay.  Yes.

05:46:06  4    Q.  And if it's easier to you -- let's do it -- the

05:46:13  5    prosecution history is the record the Patent Office makes

05:46:17  6    of its examination of the patents in this case, correct?

05:46:20  7    A.  That's correct.

05:46:21  8    Q.  In addition to these records in front of us, there's

05:46:25  9    actually many, many more records reflecting the hundreds of

05:46:28  10   references that the examiner considered as part of this

05:46:31  11   process, fair?

05:46:32  12   A.  Yeah.

05:46:33  13   Q.  If it's helpful to you, I have copies of the

05:46:47  14   prosecution histories in binders behind you.  I don't know

05:46:50  15   if it's going be more or less helpful to you.  Because

05:46:55  16   they're in binders, they may be easier.

05:47:00  17   A.  Which binder?

05:47:01  18   Q.  It will be Tab 3 of 3 is where we'd start.

05:47:06  19         THE COURT:  Let's start with a question, not a

05:47:11  20   discussion.

05:47:12  21   Q.  (By Mr. Sheasby)  Professor -- Dr. -- Mr. Saffici, you

05:47:16  22   understand that Patent Office examiners are required to

05:47:19  23   read the specification to determine if there is support in

05:47:25  24   a specification for the claims as part of the examination

05:47:28  25   process, correct?

| | | |
|---|---|---|
| 05:47:29 | 1 | A.  Yes, I would agree. |
| 05:47:32 | 2 | Q.  The question you are presenting to the jury is whether |
| 05:47:37 | 3 | the claims of the '605 and '681 patents are described in |
| 05:47:44 | 4 | the 2006 specification, correct? |
| 05:47:48 | 5 | A.  Say it again. |
| 05:47:50 | 6 | Q.  Sure.  The question that the jury -- that you're |
| 05:47:54 | 7 | presenting to the jury is whether the claims of the '605 |
| 05:47:57 | 8 | and '681 patents have priority to that 2006 application, |
| 05:48:03 | 9 | correct? |
| 05:48:03 | 10 | A.  Yes. |
| 05:48:04 | 11 | Q.  And priority is a way of saying, it's just -- it's |
| 05:48:08 | 12 | Patent Office jargon for the claims being disclosed in that |
| 05:48:12 | 13 | original specification, fair? |
| 05:48:16 | 14 | A.  Disagree. |
| 05:48:20 | 15 | Q.  Priority is describing whether the claims are fully |
| 05:48:25 | 16 | described in the original specification, correct? |
| 05:48:28 | 17 | A.  Disagree. |
| 05:48:33 | 18 | Q.  Let's turn to -- |
| 05:48:35 | 19 | A.  You're talking about anticipation, right? |
| 05:48:38 | 20 | Oh, I'm sorry, I can't ask questions. |
| 05:48:42 | 21 | Q.  Why don't you turn to Tab 3 of your report -- Tab 3 of |
| 05:48:49 | 22 | your binder which is your report. |
| 05:48:52 | 23 | A.  Which binder? |
| 05:48:53 | 24 | Q.  It should be in the first binder, Mr. Saffici. |
| 05:48:55 | 25 | A.  Binder 1? |

05:48:58  1    Q.  Yes, sir.

05:48:59  2    A.  Okay.  Tab 1?

05:49:05  3    Q.  Yes.  And why don't we turn to Paragraph 29.

05:49:11  4    A.  Paragraph -- Volume 1 of 3?

05:49:16  5    Q.  Volume 1 of 3, Tab 3 within that binder, which is your

05:49:20  6    report.

05:49:20  7    A.  Tab 3, I'm sorry.

05:49:22  8    Q.  And if you can go to Paragraph 29.

05:49:29  9    A.  Something wrong here, Mr. Sheasby.  Volume 1 of 3 --

05:49:33  10           THE COURT:  Just a minute.

05:49:34  11           Yes, Mr. Johnson?

05:49:35  12           MR. JOHNSON:  If I may, I believe the report is

05:49:38  13    actually at Tab 4.

05:49:39  14           MR. SHEASBY:  Thank you.

05:49:41  15           THE WITNESS:  Oh, okay.

05:49:42  16    A.  Mr. Sheasby, again, tell me which --

05:49:46  17    Q.  (By Mr. Sheasby)  Paragraph 29.

05:49:51  18    A.  I'm there.

05:49:52  19    Q.  And why don't you read the first two sentences of your

05:49:56  20    report to yourself to refresh your recollection.  And I'm

05:49:59  21    going to ask you a question.

05:50:23  22    A.  Okay.

05:50:24  23    Q.  The Patent Office considers the question of priority to

05:50:30  24    an earlier application, and that's the question of whether

05:50:33  25    there's written description for the claims in the earlier

| | | |
|---|---|---|
| 05:50:36 | 1 | application, correct? |
| 05:50:37 | 2 | A.  Yeah, I agree that's where you start. |
| 05:50:39 | 3 | Q.  And then why don't you turn to Paragraph 28 of your |
| 05:50:42 | 4 | report, and go ahead and read the first two sentences of |
| 05:50:44 | 5 | that section. |
| 05:51:08 | 6 | A.  The first two sentences, right? |
| 05:51:10 | 7 | Q.  Yes. |
| 05:51:11 | 8 | A.  Okay. |
| 05:51:11 | 9 | Q.  Written description, as you describe it, is whether the |
| 05:51:16 | 10 | patent claims are described in the specification, correct? |
| 05:51:20 | 11 | A.  That's correct. |
| 05:51:22 | 12 | Q.  And so when the Patent Office considers priority |
| 05:51:29 | 13 | questions, it's answering the question:  Are the claims |
| 05:51:33 | 14 | described in the specification? |
| 05:51:33 | 15 | Correct? |
| 05:51:34 | 16 | A.  Yes. |
| 05:51:41 | 17 | Q.  The Patent Office in the '605 prosecution record |
| 05:52:09 | 18 | considered the question of priority, correct? |
| 05:52:15 | 19 | A.  Yes. |
| 05:52:16 | 20 | Q.  The Patent Office expressly considered whether the |
| 05:52:22 | 21 | original -- whether the claims of the '605 patent could |
| 05:52:27 | 22 | claim priority to the 2006 application, correct? |
| 05:52:32 | 23 | A.  I don't know that I fully understand your question. |
| 05:52:35 | 24 | Q.  Why don't you turn to Tab 17 in your binder?  I believe |
| 05:52:46 | 25 | it's -- I believe it's Binder 2. |

05:53:00  1   A.   Right.

05:53:00  2   Q.   And why don't you turn to Page 199 of that tab,

05:53:12  3   PX-1266, Page 199, and the pages are on the bottom --

05:53:15  4   A.   Right, bottom right-hand corner.

05:53:19  5   Q.   Bottom right-hand corner, you've got it, Mr. Saffici,

05:53:22  6   bottom right-hand corner.

05:53:23  7   A.   I'm there.

05:53:24  8   Q.   Why don't you go ahead and read --

05:53:31  9   A.   The whole -- the whole paragraph, too?

05:53:35  10  Q.   Well, in this document that you're reading on Page 199,

05:53:39  11  it's describing -- it's a communication from the Patent

05:53:43  12  Office -- the United States Patent Office to USAA, correct?

05:53:47  13  A.   Yes.

05:53:48  14  Q.   And the communication states that the applicant, that's

05:53:56  15  USAA, has -- has established the priority date of the

05:54:01  16  instant application as October 31st, 2006.  Do you see

05:54:07  17  that, sir?

05:54:07  18  A.   That's what the words say, yes.

05:54:09  19  Q.   And just to unpack that jargon, the instant application

05:54:16  20  is the application that was filed in 2017 that became the

05:54:20  21  '605 patent, correct?

05:54:20  22  A.   I'm sorry, say it again.

05:54:22  23  Q.   The, quote, instant application that the PTO is

05:54:25  24  referring to is the 2017 application that became the '605

05:54:29  25  patent, correct?

05:54:32  1   A.  Right, it was filed with that date, yes.

05:54:34  2   Q.  And what the Patent Office is saying in this official

05:54:39  3   communication is that USAA has established its right to a

05:54:44  4   priority date of October 31st, 2006, correct?

05:54:48  5   A.  Those are the words that it says.

05:54:50  6   Q.  That's what the Patent Office decided.  You disagree

05:54:53  7   with them, but that's what they decided, correct?

05:54:55  8   A.  Well, I don't know if that's really a decision.  I

05:54:58  9   would disagree.

05:55:02  10  Q.  Okay.  The Patent Office goes on to say, quote, in

05:55:12  11  light of the new priority date.  Do you see that?

05:55:14  12  A.  Yes, I do.

05:55:15  13  Q.  And what the Patent Office did is, in light of the

05:55:19  14  priority date being established as 2006, it only considered

05:55:26  15  prior art references that existed before 2006, correct?

05:55:31  16  A.  I'm sorry, say that again.

05:55:33  17  Q.  The Patent Office said that there was a new priority

05:55:40  18  date for the application that became the 2000 -- the '605

05:55:44  19  patent, correct?

05:55:45  20  A.  Well, they're noting what USAA said to them.

05:55:50  21  Q.  And to be able to say that to them -- let me withdraw

05:55:54  22  the question.

05:55:55  23       To put it in context, the question that the PTO

05:56:01  24  was answering was what prior art it could use to compare

05:56:03  25  the patent claims to consider if they were novel and

05:56:10  1  non-obvious, correct?

05:56:12  2  A.   Yes.

05:56:14  3  Q.   And for context, the prior art that you can consider,

05:56:20  4  that the Patent Office considers, depends on the date of

05:56:22  5  priority of the application, correct?

05:56:24  6  A.   That's correct.

05:56:24  7  Q.   And if the date of the priority of the application is

05:56:29  8  2006, the Patent Office is forbidden from using any

05:56:32  9  references after 2006 to say that the invention in the --

05:56:37  10  in the patent was not novel or non-obvious, correct?

05:56:40  11  A.   You say after 2006?

05:56:41  12  Q.   Yes.

05:56:52  13  A.   Well, if they accept a new priority date, then I would

05:56:52  14  agree.

05:56:52  15  Q.   If they accept a new priority date, they do not use any

05:56:56  16  prior art from after 2006, correct?

05:56:59  17  A.   Correct.

05:57:03  18  Q.   After the Patent Office sent the official communication

05:57:09  19  to USAA, quote, establishing the new priority date of the

05:57:17  20  application is October 31st of 2006, the Patent Office

05:57:20  21  ceased rejecting -- the Patent Office ceased considering

05:57:25  22  any prior art dated after 2006, correct?

05:57:36  23  A.   Where specifically are you referring now, just so I'm

05:57:44  24  sure?

05:57:45  25  Q.   We'll do it in pieces.   The Patent Office said that, in

05:57:48    1    light of the new priority date -- why don't you turn

05:57:58    2    actually to Tab 3 of your -- Tab 3 of your binders?

05:58:02    3    A.   Tab 3.   Volume 1?

05:58:12    4    Q.   Uh-huh -- no, Volume 2.   So it will be Page 2,

05:58:18    5    Volume 2, which should be Tab 3 of your binder.

05:58:21    6    A.   I'm sorry, say it again, Mr. Sheasby, which volume?

05:58:26    7    Q.   It's Tab 3 of your -- of your -- of your binders, and

05:58:32    8    it should be Volume 2.

05:58:37    9    A.   There's a -- I mean, there's a Tab 3 in Volume 1; is

05:58:40   10    that the one you want me to go?

05:58:51   11    Q.   Yes.

05:58:52   12    A.   Tab 3 of Volume 1, okay.

05:58:56   13    Q.   And turn to Page 90, Page 83, Lines 20 -- 24 --

05:59:02   14    A.   I'm sorry, little Page 90?

05:59:05   15    Q.   No, I'm sorry, why don't you go to little Page 83 and

05:59:09   16    read through 84.

05:59:17   17    A.   I'm sorry, again, the pages to read?

05:59:19   18    Q.   Why don't you read Page 83:24 to 84:2?

06:00:21   19    A.   Sorry, again, where did you want me to stop?

06:00:24   20    Q.   84, Line 2?

06:00:27   21    A.   Line 2?

06:00:28   22    Q.   Yes, sir.

06:00:29   23    A.   All right.   I'm there.

06:00:33   24    Q.   So to set the context, as part of the patent process,

06:00:39   25    USAA took the position and told the PTO that we believe we

06:00:45  1    are entitled to our October 31st, 2006, priority date,

06:00:49  2    correct?

06:00:49  3    A.   That's what they did, yes.

06:00:51  4    Q.   The PTO noted that was the case, correct?

06:00:54  5    A.   In what we just looked at, yes.

06:00:58  6    Q.   The -- USAA said, in light of our October 31st, 2006,

06:01:03  7    priority date, we don't think it's proper for you to

06:01:06  8    consider any art published after October 31st, 2006, fair?

06:01:12  9    That's what USAA said?

06:01:13  10   A.   You're referencing back to Page 199?

06:01:24  11   Q.   Yes, sir.

06:01:24  12   A.   I don't see where it says USAA said that.  Is that what

06:01:31  13   you -- is that how you asked me, I'm sorry?

06:01:33  14   Q.   Why don't you go back to -- if you want to, you can go

06:01:37  15   back to Page 136 in the -- the prosecution history tab that

06:01:50  16   you're looking at.

06:01:53  17   A.   Okay.

06:01:54  18   Q.   So -- and you'll see where it says:  Applicants added a

06:02:06  19   priority benefit claim in this application establishing

06:02:10  20   continuity back to October 31st, 2006?

06:02:13  21   A.   I'm sorry, Mr. Sheasby, I'm not following you.

06:02:18  22   Page 136, whereabouts?

06:02:30  23   Q.   Go to Page 136.

06:02:31  24   A.   Yes, I'm there.

06:02:32  25   Q.   It's the first paragraph, it says:  After the

06:02:40    1    outstanding Office Action was -- was -- was issued.

06:02:44    2    A.  Okay.  I'm there.

06:02:45    3    Q.  Go ahead and read that to yourself.

06:03:34    4    A.  Okay.  I've read that.

06:03:36    5    Q.  So to set the context, USAA told the Patent Office

06:03:51    6    the -- USAA told the Patent Office that we are entitled to

06:03:56    7    our October 31st, 2006, priority date, and, therefore, you

06:04:00    8    should not consider any art dated after October 31st, 2006,

06:04:05    9    fair?

06:04:06   10    A.  Yes, that's --

06:04:08   11    Q.  The Patent Office, on Page 199, said, quote, in light

06:04:27   12    of the new priority date, examiner withdraws.  Do you see

06:04:32   13    that?

06:04:32   14    A.  Yes, I do.

06:04:32   15    Q.  And what the examiner withdrew was art dated after

06:04:36   16    October 31st, 2006, correct?

06:04:38   17    A.  That's what it appears this says.  Or I guess that's

06:04:49   18    what it says.

06:04:49   19    Q.  And so just so we're very clear, there was a

06:04:53   20    prosecution record -- a formal record that involved the --

06:04:56   21    the patent examiner in this case, correct, for this patent,

06:04:59   22    the '605 patent?

06:05:00   23    A.  Say it again, please.

06:05:02   24    Q.  We're dealing with the formal United States Government

06:05:04   25    prosecution record for the '605 patent, correct?

06:05:06  1    A.  Yes, that's correct.

06:05:07  2    Q.  In that formal prosecution record, USAA expressly told

06:05:13  3    the United States Government:  We are entitled to our

06:05:18  4    October 31st, 2006, priority date for our claims.

06:05:21  5            Fair?

06:05:22  6    A.  That's what they claimed, yes.

06:05:24  7    Q.  USAA said to the United States Government:  In light of

06:05:28  8    that, you cannot consider any art dated after October 31st,

06:05:32  9    2006.

06:05:32  10           Correct?

06:05:33  11   A.  That's what they claimed, yes.

06:05:35  12   Q.  And the United States Government -- the patent examiner

06:05:40  13   agreed that they should not consider any art after October

06:05:43  14   31st, 2006, when they examined this application, correct?

06:05:48  15   A.  Oh, I'm not sure if agree is -- is indicated here.

06:06:01  16   Q.  The United States Patent Office ceased considering any

06:06:07  17   art dated after October 31st, 2006, correct?

06:06:11  18   A.  Can you show me where it actually says that?

06:06:14  19   Q.  Sir, didn't you just testify to that?

06:06:17  20   A.  Yeah, but you're pointing to this document here.

06:06:21  21   Q.  Sir, you read the prosecution history, correct?

06:06:24  22   A.  Yes.

06:06:25  23   Q.  The prosecution history makes clear that after USAA

06:06:28  24   raised its requests that -- that it be accorded the October

06:06:33  25   31st, 2006, priority date, the Patent Office said:  In

06:06:37  1  light of that new priority date, examiner withdraws its

06:06:40  2  previous grounds of concern.

06:06:43  3        Correct?

06:06:43  4  A.  I agree that's what it says, yes.

06:06:45  5  Q.  And so what we know definitively is that USAA said it's

06:06:53  6  entitled to its 2006 priority date, stopped considering art

06:06:56  7  after October 31st, 2006, correct?

06:06:58  8  A.  That's what they asked for, yes.

06:07:02  9  Q.  And the United States Patent Office in a formal

06:07:04  10  document responded that, quote, applicant filed a response

06:07:10  11  to non-final Office Action establishing the priority date

06:07:14  12  of the instant application as 10/31/2006.

06:07:17  13        Do you see that, sir?

06:07:19  14  A.  I see that, yes.

06:07:20  15  Q.  And in light of that, the examiner said that -- quote,

06:07:26  16  in light of the new priority date, examiner withdraws its

06:07:29  17  previous concerns, correct?

06:07:30  18  A.  That is what he states.

06:07:32  19  Q.  And, in fact, not only did the examiner withdraw his

06:07:36  20  previous concerns, the examiner actually allowed every

06:07:42  21  single claim in this patent, correct?

06:07:47  22  A.  Well, it eventually was granted, if that's what you

06:07:51  23  mean.

06:07:52  24  Q.  So to be clear, USAA said:  We're entitled to our 2006

06:07:57  25  priority date.

06:07:58  1           Correct?

06:08:01  2           They said that in writing to the United States

06:08:03  3  Government, correct?

06:08:03  4  A.  Yes, they did.  Yes.

06:08:04  5  Q.  And the United States Government granted USAA a United

06:08:10  6  States patent after USAA took that position, correct?

06:08:13  7  A.  It was granted at some point.

06:08:17  8  Q.  And, in fact, if you look at the records before the

06:08:25  9  PTO, the PTO actually had that 2006 application available

06:08:32  10  to it, correct?

06:08:33  11  A.  I'm sorry, where are you?

06:08:36  12  Q.  Why don't you turn to Tab 3 of your deposition, sir?

06:08:40  13  A.  Okay.

06:08:43  14           THE COURT:  Counsel, approach the bench, please.

06:08:46  15           (Bench conference.)

06:08:53  16           THE COURT:  Mr. Sheasby, you fought very hard to

06:08:57  17  keep the Defendant from going through the prosecution

06:08:58  18  history, and we've been round and round and round the

06:09:02  19  prosecution history since you started the

06:09:05  20  cross-examination.

06:09:06  21           I've not heard an objection from the Defendant.

06:09:09  22  But I think this has been asked and answered several times.

06:09:14  23  I think it's time to move on.

06:09:15  24           MR. SHEASBY:  I'll move on, Your Honor.

06:09:17  25           THE COURT:  All right.

| | | |
|---|---|---|
| 06:09:17 | 1 | (Bench conference concluded.) |
| 06:09:22 | 2 | THE COURT:  Let's proceed. |
| 06:09:24 | 3 | Q.  (By Mr. Sheasby)  I'd now like to move on to the '681 |
| 06:09:29 | 4 | patent. |
| 06:09:29 | 5 | A.  Okay. |
| 06:09:32 | 6 | Q.  In the '681 patent, there was also a prosecution |
| 06:09:35 | 7 | record, correct? |
| 06:09:35 | 8 | A.  So where are you now? |
| 06:09:37 | 9 | Q.  I'm just asking you a question, Mr. Saffici. |
| 06:09:40 | 10 | A.  Oh, I'm sorry. |
| 06:09:41 | 11 | Q.  We just looked at the '605 patent prosecution history, |
| 06:09:44 | 12 | correct? |
| 06:09:44 | 13 | A.  Yes. |
| 06:09:44 | 14 | Q.  The '681 also had a prosecution associated -- history |
| 06:09:48 | 15 | associated with it, correct? |
| 06:09:49 | 16 | A.  That's correct. |
| 06:09:50 | 17 | Q.  And in the '681 patent prosecution history, USAA also |
| 06:10:01 | 18 | formally took the position that it had established |
| 06:10:06 | 19 | continuity back to October 31st, 2006, correct? |
| 06:10:09 | 20 | A.  Yeah.  Can you take me to that so I can refresh? |
| 06:10:12 | 21 | Q.  Sure.  Why don't you go to Tab 20? |
| 06:10:14 | 22 | A.  Tab 20? |
| 06:10:24 | 23 | Q.  Why don't you go to Tab [sic] 193? |
| 06:10:27 | 24 | A.  One second.  All right.  I'm at 20. |
| 06:10:34 | 25 | Q.  And Page 193, and you can look at the paragraph that |

966

| | | |
|---|---|---|
| 06:10:43 | 1 | says:  After that standing Office Action was issued. |
| 06:11:03 | 2 | A.  Yes, I've read that. |
| 06:11:04 | 3 | Q.  In the '681 patent prosecution record, USAA formally |
| 06:11:12 | 4 | took the position, and from the United States Government, |
| 06:11:15 | 5 | that it was entitled to the October 31st, 2006, priority |
| 06:11:20 | 6 | date, correct? |
| 06:11:21 | 7 | A.  Yes. |
| 06:11:21 | 8 | Q.  And the United States Government, after USAA took that |
| 06:11:25 | 9 | position, granted the patent, correct? |
| 06:11:28 | 10 | A.  It was granted at some point, yes. |
| 06:11:34 | 11 | MR. SHEASBY:  Your Honor, may I approach? |
| 06:11:36 | 12 | THE COURT:  You may. |
| 06:11:45 | 13 | Counsel, approach the bench. |
| 06:11:45 | 14 | (Bench conference.) |
| 06:11:50 | 15 | MR. SHEASBY:  Your Honor, I would now request |
| 06:11:52 | 16 | leave to ask the following question:  And you agree that |
| 06:11:56 | 17 | the patent examiner for these patents has more expertise in |
| 06:11:59 | 18 | the field that's the subject of this application than you |
| 06:12:01 | 19 | do? |
| 06:12:02 | 20 | At his deposition he answered, yes.  I don't |
| 06:12:04 | 21 | believe this is in violation of any instruction Your Honor |
| 06:12:06 | 22 | has given.  Because of the significant nature of this |
| 06:12:09 | 23 | question, I did want to preview it with Your Honor. |
| 06:12:12 | 24 | THE COURT:  Do you have an objection? |
| 06:12:14 | 25 | MR. JOHNSON:  Yes, I do, Your Honor. |

967

06:12:15   1          THE COURT:  State your objection, please.

06:12:17   2          MR. JOHNSON:  Lacks foundation and calls for --

06:12:19   3   calls for speculation and it's 403.

06:12:21   4          Plus, if he goes into the old angels and devils

06:12:25   5   debate about the patent examiner, and if I'm not allowed to

06:12:28   6   have the witness speculate about what was going on, surely

06:12:31   7   we're not going to speculate about the expertise of the

06:12:34   8   examiner versus this witness.  I thought the examiner's

06:12:38   9   expertise was off limits.

06:12:41  10          MR. SHEASBY:  Your Honor, I've been thinking a lot

06:12:42  11   about this, and the way that -- the reason why I come and

06:12:46  12   approach you about it is because -- you know, they kept

06:12:48  13   saying the Patent Office can make mistakes, the Patent

06:12:51  14   Office can make mistakes.  And I do believe it's relevant

06:12:53  15   that he concedes that he -- and the Patent Office didn't

06:12:56  16   consider everything or that Wells Fargo didn't have a

06:12:58  17   chance.  And I do think it's highly, highly relevant,

06:13:01  18   given --

06:13:01  19          THE COURT:  Lower your voice just a little bit.

06:13:06  20          MR. SHEASBY:  -- highly relevant given this --

06:13:06  21          MR. HILL:  I'm sorry to interrupt, Your Honor.

06:13:06  22   That was what I was coming in to tell you.  We could hear

06:13:07  23   everything going on out here.

06:13:08  24          THE COURT:  Well, we've got a sound curtain over

06:13:11  25   the jury.

06:13:12    1           MR. SHEASBY:  I think it is highly relevant

06:13:13    2    because I don't believe Mr. Saffici is an expert at all on

06:13:17    3    the subject on which he's testifying.  I think I've laid a

06:13:20    4    proper foundation for it.  And I think it's highly

06:13:22    5    significant that he conceded under oath that he has less

06:13:25    6    expertise than the Patent Office.  This is not a one-off.

06:13:28    7    I don't believe he's a person of ordinary skill in the art.

06:13:30    8           THE COURT:  He's admitted he's not a person of

06:13:32    9    ordinary skill in the art, at least as Dr. Villasenor would

06:13:35   10    define it.

06:13:35   11           MR. SHEASBY:  And now I'm getting the admission

06:13:38   12    that he has less expertise than even the patent examiner

06:13:42   13    did in this field.

06:13:44   14           MR. JOHNSON:  Your Honor, he would have no way to

06:13:44   15    say one way or the other -- any foundation for the

06:13:47   16    question -- nobody knows the examiners.

06:13:47   17           MR. SHEASBY:  But he's --

06:13:51   18           MR. JOHNSON:  This gets into the whole debate that

06:13:53   19    this Court tried to avoid.

06:13:55   20           THE COURT:  I understand.

06:13:55   21           MR. SHEASBY:  But he answered the question.  He

06:13:58   22    read the prosecution history.  It's under oath.  He said

06:14:00   23    it.  They tried to strike this passage, and Judge Payne

06:14:03   24    overruled them.

06:14:04   25           THE COURT:  This is -- this is from his

06:14:06  1  deposition?

06:14:06  2          MR. SHEASBY:  It is, Your Honor.

06:14:10  3          MR. JOHNSON:  And later in his deposition, he

06:14:12  4  explains that you've got the patent prosecution

06:14:18  5  procedures -- this seems highly prejudicial, Your Honor.

06:14:19  6          THE COURT:  I think -- I think under 403, it's

06:14:22  7  more prejudicial than it is probative.  I'm going to deny

06:14:25  8  your request.

06:14:27  9          MR. SHEASBY:  Thank you, Your Honor.

06:14:36  10         (Bench conference concluded.)

06:14:36  11  Q.  (By Mr. Sheasby)  The United States Government granted

06:14:40  12  both these patents after USAA formally requested that it --

06:14:45  13  and formally took the position that it was entitled to the

06:14:47  14  2006 priority date, correct?

06:14:48  15  A.  I know that the patents were granted.

06:14:54  16         MR. SHEASBY:  Objection, nonresponsive,

06:15:01  17  Your Honor.

06:15:01  18         THE WITNESS:  Can I ask a question?

06:15:03  19         THE COURT:  No, just a minute, Mr. Saffici.

06:15:05  20         I'll sustain the objection.  The answer doesn't

06:15:12  21  join the question that's asked.

06:15:15  22         Ask the question again, counsel.

06:15:17  23  Q.  (By Mr. Sheasby)  Mr. Saffici, the United States

06:15:20  24  Government granted the '605 and '681 patents after USAA

06:15:24  25  formally took the position that its claims were supported

```
06:15:29   1   by the original 2006 application, correct?
06:15:33   2          MR. JOHNSON:  Your Honor, may we -- may we
06:15:36   3   approach?  I have an objection to the question.
06:15:40   4          THE COURT:  Then approach the bench.
06:15:47   5          (Bench conference.)
06:15:47   6          THE COURT:  What's your objection?
06:15:48   7          MR. JOHNSON:  The question misstates the
06:15:51   8   prosecution history.  It did not immediately -- it did not
06:15:54   9   grant after they claimed the date.  There was significant
06:15:57  10   prosecution after, and there was an interview, there was a
06:15:59  11   significant period of activity afterwards.
06:16:02  12          MR. SHEASBY:  Your Honor, that's not --
06:16:04  13          THE COURT:  Well, then he can -- he can answer the
06:16:06  14   question no, if he's familiar with the prosecution history.
06:16:09  15   And you can revisit it on redirect.  I'm going to allow him
06:16:12  16   to answer the question.
06:16:14  17          MR. JOHNSON:  Thank you.
06:16:15  18          (Bench conference concluded.)
06:16:17  19          THE COURT:  You may answer the question,
06:16:21  20   Mr. Saffici.  I'm going to overrule that objection.
06:16:23  21          And I guess we'll have to have it asked for the
06:16:27  22   third time.  Go ahead, Mr. Sheasby.
06:16:28  23          MR. SHEASBY:  Yes, Your Honor.
06:16:29  24          THE COURT:  Ask the question again.
06:16:30  25   Q.  (By Mr. Sheasby)  Mr. Saffici, the United States
```

06:16:34  1   Government granted these patents after USAA formally

06:16:38  2   requested and took the position that it was entitled to the

06:16:41  3   October 31st, 2006, priority date, correct?

06:16:45  4   A.  I guess that's correct.

06:16:55  5   Q.  The '605 patent claims require the use of a portable

06:17:05  6   device or a mobile device that is a general purpose

06:17:08  7   computer, correct?

06:17:10  8   A.  I'm sorry, where are you?

06:17:11  9   Q.  Sir, I'm just asking you a question.

06:17:13 10   A.  All right.

06:17:15 11   Q.  The '605 patent requires the use of a portable device

06:17:19 12   or a mobile device that has a general purpose computer,

06:17:24 13   correct?

06:17:24 14   A.  I -- I'd need to look at the claims just to verify

06:17:28 15   that's where it is.  I know it's either in one or both.

06:17:30 16   Q.  Well, why don't you turn to Tab 3 of your deposition?

06:17:34 17   A.  Tab 3, oh.  I'm there.

06:17:46 18   Q.  And why don't you look at Page 44, Lines 1 through 8?

06:17:50 19   A.  Little Page 44?

06:17:53 20   Q.  Yes, sir.  And let me know when you've finished reading

06:18:12 21   that.

06:18:13 22   A.  I've read that.  I've read.

06:18:17 23   Q.  So the '605 patent claims require the use of a portable

06:18:20 24   device or a mobile device that is a general purpose

06:18:22 25   computer, correct?

```
06:18:23   1   A.   That is what I said in my testimony.

06:18:26   2           MR. SHEASBY:   And, actually, why don't we --

06:18:28   3   Mr. Huynh, let's actually pull up PX-1186 and let's turn to

06:18:42   4   Page 27.

06:18:49   5   Q.   (By Mr. Sheasby)   It's on the screen, Mr. Saffici?

06:18:51   6   A.   Okay.

06:18:52   7           MR. SHEASBY:   And let's highlight the first two

06:18:54   8   limitations, just up through -- that's fine.

06:18:58   9   Q.   (By Mr. Sheasby)   The claims of the '605 patent recite

06:19:01  10   the presence of a portable device and a digital camera,

06:19:06  11   fair?

06:19:08  12   A.   Yes.

06:19:10  13   Q.   The claims in the '605 patent don't say anything about

06:19:15  14   how the digital camera and portable device are connected,

06:19:18  15   correct?

06:19:18  16   A.   That's correct.

06:19:26  17   Q.   The claims of the -- of the -- the claims of the

06:19:32  18   patents-in-suit allow for any combination of digital camera

06:19:36  19   and portable device, correct?

06:19:39  20   A.   Repeat, please?

06:19:42  21   Q.   The claims of the '605 patent and the '681 patent, the

06:19:46  22   claims themselves just require the presence of a digital

06:19:50  23   camera and a portable or mobile device, correct?

06:19:55  24   A.   Yes.

06:19:56  25   Q.   The specification of the '605 and '681 patent
```

06:20:01   1   describes, you agree, a portable or mobile -- mobile

06:20:06   2   device, correct?

06:20:07   3   A.   I don't remember if that's how it's in the

06:20:10   4   specification.   Let me look.

06:20:20   5   Q.   Why don't you actually -- well, let me ask it this way:

06:20:25   6   You stand by your opinion that the specifications of the

06:20:29   7   patents describe mobile devices, correct?

06:20:31   8   A.   I want to confirm that mobile is in the specification.

06:21:00   9   Q.   Why don't you turn to Tab 3 of your deposition,

06:21:03   10   Mr. Saffici.

06:21:05   11   A.   All right.   I'm there.

06:21:06   12   Q.   So the question I asked you was:   You stand by your

06:21:09   13   opinion that the specifications of the patents-in-suit

06:21:12   14   describe mobile devices, correct?

06:21:15   15   A.   Where -- where are you on Tab 3?

06:21:17   16   Q.   That's just the question I asked you, correct, sir?

06:21:21   17   A.   That's why I said, I wanted to confirm that the

06:21:24   18   specification includes what you've asked me.

06:21:26   19   Q.   Why don't you go to Page 55 -- 51 of your deposition.

06:21:34   20   A.   I'm sorry, 51 or -5, did you say?

06:21:38   21   Q.   51, and read Lines 5 through 10.

06:21:53   22   A.   Yes, that was my testimony at the time.

06:21:54   23   Q.   So your testimony under oath at the time was that the

06:21:57   24   specification of the patents-in-suit describes mobile

06:22:02   25   devices, correct?

06:22:03   1    A.   That's what I said in my deposition.

06:22:05   2    Q.   And, in fact, you have no reason to change your

06:22:08   3    opinion.   You continue to agree that mobile devices are

06:22:12   4    disclosed within the specifications of the patents-in-suit.

06:22:14   5    Correct?

06:22:17   6    A.   That is my deposition -- or that is my deposition

06:22:23   7    testimony.

06:22:24   8    Q.   Now, today, in front of the ladies and gentlemen of the

06:22:26   9    jury, you provided a different opinion, correct?

06:22:42   10   A.   Can you recall my recollection of what I said today?

06:23:09   11   Q.   Sir, the specifications of the patents in this case

06:23:15   12   disclose the use of mobile devices with digital cameras,

06:23:23   13   correct?   That's what you testified to previously.

06:23:25   14   A.   That is -- that is what I testified to, yes.

06:23:27   15            THE COURT:   All right.   At this point, we're going

06:23:29   16   to break for the day, ladies and gentlemen.

06:23:31   17            This cross-examination has additional time to go,

06:23:35   18   and I'm not going to keep you any later.   I appreciate your

06:23:38   19   patience, and it's been a long day, but we will have you

06:23:42   20   back in the morning to continue.

06:23:43   21            As you leave the courthouse this evening, please

06:23:47   22   leave your notebooks on the table in the jury room.   Please

06:23:51   23   follow all my instructions, including, of course, not to

06:23:54   24   discuss the case with anyone or yourselves.

06:23:56   25            I'd like to have you back in the morning so we

06:23:58  1   could continue on our regular schedule, hoping to start as
06:24:02  2   close to 8:30 as possible.
06:24:03  3              With that, travel safely to your homes, and the
06:24:07  4   jury is excused for the evening.
06:24:09  5              COURT SECURITY OFFICER:  All rise.
06:24:10  6              (Jury out.)
06:24:10  7              THE COURT:  Please be seated.
06:24:30  8              You can step down, Mr. Saffici.
06:24:33  9              THE WITNESS:  Step down?
06:24:35  10             THE COURT:  You can step down.
06:24:37  11             THE WITNESS:  Okay.
06:24:37  12             THE COURT:  You're coming back tomorrow; don't
06:24:40  13  worry.
06:24:40  14             THE WITNESS:  Just leave everything there?
06:24:41  15             THE COURT:  Leave everything there.
06:24:44  16             Counsel, according to my records, the Plaintiff
06:24:55  17  has 4 hours and 1 minute remaining.  The Defendant has 2
06:24:58  18  hours and 36 minutes remaining.
06:25:02  19             Also, it's clear that this witness is in the
06:25:05  20  middle of cross-examination.  I expect there'll be redirect
06:25:09  21  tomorrow.  I'm anticipating and directing that the same
06:25:12  22  practice we followed throughout this trial be applied to
06:25:14  23  this witness, that he not be consulted with, prepped, or
06:25:19  24  otherwise prepared by his side until he's -- or throughout
06:25:26  25  the remainder of his testimony.

06:25:28  1         We're in the same position we were when

06:25:30  2    Mr. Melsheimer asked about it earlier in the day.

06:25:33  3         I have received your updated and joint submission

06:25:37  4    on the final jury instructions and charge.  Much like the

06:25:43  5    general contours of this case, there are quite a few

06:25:47  6    objections and disagreements.  We're going to have to work

06:25:50  7    through all of those.

06:25:52  8         I'll be in chambers by 7:30 in the morning.  We'll

06:25:59  9    follow the same practice of you meeting and conferring

06:26:02  10   about any disputes that arise overnight.  And I'll meet

06:26:05  11   with you then and before 8:30, if necessary, to resolve

06:26:09  12   those.

06:26:11  13        It would not hurt my feelings at all if you didn't

06:26:16  14   have any more disputes to resolve in the morning, but I

06:26:18  15   wouldn't bet the farm on it.  I'll be here either way.

06:26:22  16        Are there questions from either Plaintiff or

06:26:24  17   Defendant before we recess for the evening?

06:26:24  18        MR. SHEASBY:  Nothing from Plaintiffs, Your Honor.

06:26:25  19        THE COURT:  Anything from Defendant?

06:26:26  20        MR. MELSHEIMER:  No, Your Honor.

06:26:27  21        THE COURT:  All right.  Counsel, have a good

06:26:28  22   evening.  I will see you in the morning.  We stand in

06:26:31  23   recess.

06:26:32  24        MR. SHEASBY:  Thank you, Judge.

06:26:33  25        COURT SECURITY OFFICER:  All rise.

1          (Recess.)

2

3

4                         CERTIFICATION

5

6          I HEREBY CERTIFY that the foregoing is a true and

7    correct transcript from the stenographic notes of the

8    proceedings in the above-entitled matter to the best of my

9    ability.

10

11

12    /S/ Shelly Holmes                        1/8/2020
      SHELLY HOLMES, CSR, TCRR                 Date
13    OFFICIAL REPORTER
      State of Texas No.: 7804
14    Expiration Date: 12/31/20

15

16

17

18

19

20

21

22

23

24

25