<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3    UNITED SERVICES AUTOMOBILE   )(
      ASSOCIATION
 4                                 )(   CIVIL ACTION NO.

 5    VS.                          )(   2:18-CV-366-JRG

 6                                 )(   MARSHALL, TEXAS
                                         JANUARY 9, 2020
 7    WELLS FARGO BANK, N.A.       )(   8:30 A.M.

 8

 9                     TRANSCRIPT OF JURY TRIAL

10                         MORNING SESSION

11        BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

12                   UNITED STATES DISTRICT JUDGE

13
      APPEARANCES:
14

15    FOR THE PLAINTIFF:

16
      JASON SHEASBY
17    ANTHONY ROWLES
      LISA GLASSER
18    IRELL & MANELLA
      1800 Avenue of the Stars
19    Suite 900
      Los Angeles, CA 90067-4276
20

21
      ROBERT CHRISTOPHER BUNT
22    PARKER, BUNT & AINSWORTH, PC
      100 East Ferguson
23    Suite 418
      Tyler, TX 75702
24

25
</pre>

```
 1   FOR THE DEFENDANT:

 2

     THOMAS M. MELSHEIMER
 3   M. BRETT JOHNSON
     MICHAEL A. BITTNER
 4   J. TRAVIS UNDERWOOD
     WINSTON & STRAWN LLP
 5   2121 North Pearl Street
     Suite 900
 6   Dallas, TX 75201

 7

     E. DANIELLE T. WILLIAMS
 8   WINSTON & STRAWN LLP
     300 South Tyron Street
 9   16th Floor
     Charlotte, NC 28202
10

11   MATTHEW R. MCCULLOUGH
     WINSTON & STRAWN LLP
12   275 Middlefield Road
     Suite 205
13   Menlo Park, CA 94025

14

     JACK WESLEY HILL
15   WARD, SMITH & HILL, PLLC
     P.O. Box 1231
16   1507 Bill Owens Parkway
     Longview, TX 75606
17

18
     COURT REPORTER:      Shelly Holmes, CSR, TCRR
19                        Official Court Reporter
                          United States District Court
20                        Eastern District of Texas
                          Marshall Division
21                        100 E. Houston
                          Marshall, Texas  75670
22                        (903) 923-7464

23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 08:30:12 | 1  |                P R O C E E D I N G S                    |
| 08:30:12 | 2  |         (Jury out.)                                     |
| 08:30:13 | 3  |         COURT SECURITY OFFICER:  All rise.              |
| 08:30:13 | 4  |         THE COURT:  Be seated, please.                 |
| 08:30:27 | 5  |         Are the parties prepared to read into the record |
| 08:30:31 | 6  | those items from the list of pre-admitted exhibits used |
| 08:30:34 | 7  | during yesterday's portion of the trial?               |
| 08:30:36 | 8  |         MR. BUNT:  Yes, Your Honor, we are.             |
| 08:30:37 | 9  |         THE COURT:  Please proceed.                    |
| 08:30:38 | 10 |         MR. BUNT:  Your Honor, the following Plaintiff's |
| 08:30:40 | 11 | Exhibits came in during the trial yesterday:  13, 22, 23, |
| 08:30:48 | 12 | 28, 427, 429, 1182, 1265, and 1266.                   |
| 08:30:57 | 13 |         THE COURT:  Is there any objection to that      |
| 08:31:00 | 14 | rendition by the Defendant?                            |
| 08:31:02 | 15 |         MR. UNDERWOOD:  No objection, Your Honor.       |
| 08:31:03 | 16 |         THE COURT:  Do you have a similar rendition to  |
| 08:31:05 | 17 | offer, Mr. Underwood?                                   |
| 08:31:07 | 18 |         MR. UNDERWOOD:  We do.  The following Defendant's |
| 08:31:10 | 19 | Exhibits were used yesterday, DTX-5, DTX-38, DTX-223,   |
| 08:31:17 | 20 | DTX-230, and DTX-267.                                   |
| 08:31:20 | 21 |         THE COURT:  All right.  Any objection, Mr. Bunt? |
| 08:31:22 | 22 |         MR. BUNT:  No, Your Honor.                      |
| 08:31:23 | 23 |         THE COURT:  All right.  Counsel, thank you.     |
| 08:31:24 | 24 |         Mr. Saffici, if you're present, please return to |
| 08:31:29 | 25 | the witness stand, sir, and I remind you you remain under |

08:31:33  1  oath.

08:31:34  2          Counsel, do we have anything else we need to take

08:31:37  3  up before we proceed with the remaining cross-examination

08:31:39  4  of this witness?

08:31:40  5          MR. SHEASBY:  Nothing for Plaintiffs, Your Honor.

08:31:41  6          MR. JOHNSON:  Nothing for Defendants, Your Honor.

08:31:43  7          THE COURT:  All right.  You may go to the podium,

08:31:46  8  Mr. Sheasby.

08:31:46  9          MR. SHEASBY:  Thank you, Your Honor.

08:31:47  10         THE COURT:  Mr. Johnston, would you bring in the

08:31:49  11  jury, please?

08:32:07  12         COURT SECURITY OFFICER:  All rise.

08:32:08  13         (Jury in.)

08:32:08  14         THE COURT:  Good morning, ladies and gentlemen.

08:32:18  15  Welcome back.  Please have a seat.

08:32:19  16         It's 8:32.  I'm doing better.

08:32:25  17         All right.  We'll continue with the

08:32:26  18  cross-examination of Mr. William Saffici by the Plaintiff.

08:32:33  19         Mr. Sheasby, you may continue.

08:32:36  20         MR. SHEASBY:  Mr. Huynh, can we have PX-1187,

08:32:42  21  Page 22?

08:32:42  22  WILLIAM SAFFICI, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

08:32:42  23              CROSS-EXAMINATION CONTINUED

08:32:43  24  BY MR. SHEASBY:

08:32:43  25  Q.  Mr. Saffici, I'm going to show you a passage from the

08:32:49  1   '681 patent specification.  If you'll go to Column 4,

08:32:54  2   Lines 37 through 49?

08:32:57  3            THE COURT:  Mr. Sheasby, why don't you direct that

08:32:59  4   microphone so that it points in your direction better.

08:33:03  5   Thank you.

08:33:03  6            MR. SHEASBY:  Thank you, Your Honor.

08:33:04  7   Q.  (By Mr. Sheasby)  Now, this is a passage from the

08:33:07  8   specification of the '681 patent, fair?

08:33:11  9   A.  Yes.

08:33:11  10  Q.  This passage also is present in the '605 patent

08:33:16  11  specification, fair?

08:33:17  12  A.  Yes.

08:33:20  13           MR. SHEASBY:  Mr. Huynh, let's go ahead and

08:33:24  14  underline an image capture device may be communicatively

08:33:29  15  coupled to a computer; do you see that, sir?

08:33:32  16  A.  Yes, I do.

08:33:32  17  Q.  It says:  An image capture device may be, for example,

08:33:35  18  a scanner or digital camera; do you see that, sir?

08:33:37  19  A.  Yes, I do.

08:33:38  20  Q.  And yesterday, you told the ladies and gentlemen that

08:33:40  21  you felt that that was teaching to a person of ordinary

08:33:43  22  skill in the art, only a camera and a general purpose

08:33:46  23  computer that were in separate physical boxes, fair?

08:33:49  24  A.  That is what I said, yes.

08:33:50  25  Q.  But the reality is that this passage describes an image

08:34:00  1  capture device that is communicatively coupled to a general

08:34:04  2  purpose computer and does not place any limits on how that

08:34:08  3  coupling occurs, correct?

08:34:10  4  A.  Disagree.

08:34:13  5  Q.  Can you turn to Tab 3 of your binders, Mr. Saffici?

08:34:21  6  A.  Tab 3.  Yes, I'm there.

08:34:23  7  Q.  Can you turn to Page 62, Lines 24 to 63, Line 4?

08:34:37  8  A.  62, again, please?

08:34:38  9  Q.  62, Lines 24 to 63, Line 4.

08:34:48  10          The question starts:  Does the passage at

08:34:50  11  Column 4, Line 37; do you see that, sir?

08:34:53  12  A.  Right.

08:34:54  13  Q.  Go ahead and read that testimony to yourself.

08:35:06  14  A.  Yes, I read that.

08:35:07  15  Q.  Sir, the passage that we're showing at Column 4,

08:35:16  16  Lines 37 through 49 of this patent specification describe

08:35:20  17  an image capture device that is communicatively coupled to

08:35:23  18  a general purpose computer and does not place any

08:35:27  19  limitations on how the communicatively coupling occurs,

08:35:33  20  correct?

08:35:33  21  A.  My read of that was that it was separate because it was

08:35:39  22  supported with other information in the specification.

08:35:43  23  Q.  Sir --

08:35:44  24          MR. SHEASBY:  Your Honor, may I now publish his

08:35:46  25  testimony to the jury, which was -- which I believe was

| | | |
|---|---|---|
| 08:35:51 | 1 | inconsistent. |
| 08:35:52 | 2 | THE COURT:  You can complete the impeachment |
| 08:35:54 | 3 | process. |
| 08:35:54 | 4 | MR. SHEASBY:  Okay.  Mr. Huynh, can we have |
| 08:35:58 | 5 | Mr. Saffici's deposition, 2 -- Volume 2, 62:24, to 63:4, |
| 08:36:47 | 6 | please? |
| 08:36:47 | 7 | Q.  (By Mr. Sheasby)  Mr. Saffici, I took your deposition |
| 08:36:49 | 8 | under oath in this case, correct? |
| 08:36:51 | 9 | A.  Yes, sir. |
| 08:36:52 | 10 | Q.  Mr. Saffici, you were given an opportunity to correct |
| 08:36:57 | 11 | your deposition transcript, correct? |
| 08:37:00 | 12 | A.  Yes, I was. |
| 08:37:01 | 13 | Q.  Mr. Saffici, I asked you the question, quote:  Does the |
| 08:37:05 | 14 | passage at Column 4, Lines 37 through 49 in the '681 |
| 08:37:10 | 15 | describe -- '681 patent describe an image capture device |
| 08:37:14 | 16 | communicatively coupled to a general purpose computer, does |
| 08:37:15 | 17 | it place any limits on how the communicatively coupling |
| 08:37:22 | 18 | occurs? |
| 08:37:22 | 19 | Your answer was:  I do not see a limitation. |
| 08:37:26 | 20 | Correct? |
| 08:37:26 | 21 | A.  That was my testimony, yes. |
| 08:37:27 | 22 | Q.  And that's different from the testimony you gave the |
| 08:37:30 | 23 | ladies and gentlemen of the jury on direct examination, |
| 08:37:31 | 24 | correct? |
| 08:37:31 | 25 | A.  That's correct. |

08:37:36  1  Q.  And so when the ladies and gentlemen of the jury retire

08:37:38  2  to deliberate in this case, they can consider the fact that

08:37:43  3  under oath represented by your counsel, you gave the

08:37:48  4  testimony on the screen, you had an opportunity to correct

08:37:52  5  that testimony, you did not correct it, and you grave --

08:37:57  6  you gave a different answer to them yesterday, fair?

08:38:07  7  A.  Yes, I did.

08:38:08  8  Q.  Now, the claims of the '681 and '605 patents --

08:38:17  9       MR. SHEASBY:  You can bring that down, Mr. Huynh.

08:38:20  10  Q.  (By Mr. Sheasby)  The claims of the '681 and '605

08:38:24  11  patents require that there be communication between the

08:38:28  12  digital camera and the general purpose computer, fair?

08:38:29  13  A.  That's correct.

08:38:30  14  Q.  There are no limits in -- in the claims as to how that

08:38:35  15  communication occurs, correct?

08:38:36  16  A.  Not in the claims.

08:38:41  17  Q.  For example --

08:38:47  18       MR. SHEASBY:  Let's pull up Column 4, Line 37, of

08:38:56  19  the '681 patent, which is PX-1187, Mr. Huynh.  Let's pull

08:39:00  20  up that same passage.  It was Column 4, Lines --

08:39:24  21  Q.  (By Mr. Sheasby)  Now, a person of ordinary skill in

08:39:28  22  the art reading the '681 patent, Column 4, Lines 37, in

08:39:31  23  2006, would understand that the camera was -- was connected

08:39:35  24  to the computer in some way so that it could communicate,

08:39:40  25  correct?

08:39:40  1   A.  Yes.

08:39:40  2   Q.  Doesn't matter whether it's wireless or a wired

08:39:46  3   connection, correct?

08:39:46  4   A.  Yeah, that's correct.

08:39:47  5   Q.  When a mobile phone has a camera, there has to be an

08:39:51  6   interconnectivity between the two, correct?

08:39:53  7   A.  Ask me again, please.

08:39:56  8   Q.  Sure.  When a mobile phone has a camera within it,

08:40:00  9   there has to be a communication between the general purpose

08:40:05  10  processor in the mobile phone and the digital camera,

08:40:07  11  correct?

08:40:07  12  A.  I would agree.

08:40:09  13  Q.  There has to be a communicative coupling, correct?

08:40:14  14  A.  I believe that term would apply.

08:40:18  15       MR. SHEASBY:  Let's pull that down, Mr. Huynh.

08:40:27  16  Q.  (By Mr. Sheasby)  Now, you also showed the ladies and

08:40:31  17  gentlemen of the jury passages from the specification that

08:40:34  18  related to this question of what is the meaning behind the

08:40:38  19  phrase, a personal digital assistant, fair?

08:40:42  20  A.  Yes.

08:40:42  21  Q.  And we can pull up one of those passages.

08:40:45  22       MR. SHEASBY:  Let's turn to PX-1186.  Let's go to

08:40:55  23  Page 23 of that document, Mr. Huynh.  Let's go to Column 8,

08:41:01  24  Lines 3 through 17.

08:41:08  25  Q.  (By Mr. Sheasby)  So we're looking at a passage from

08:41:10  1  the '605 patent, correct?

08:41:11  2  A.  That's correct.

08:41:11  3  Q.  It talks about using PDAs as alternatives to computers,

08:41:17  4  correct?

08:41:17  5  A.  It says that can be such a device.

08:41:19  6  Q.  And the concept of a personal digital assistant to a

08:41:23  7  person of ordinary skill in the art would be a handheld

08:41:25  8  device that has a general purpose computer, correct?

08:41:29  9  A.  In 2006, I don't know that that was necessarily true.

08:41:40  10  Q.  Okay.  Can you turn to your deposition, again, at

08:41:45  11  Tab 3?  If you can turn to Page 65:23 to 66:4.

08:42:02  12  A.  Yes, I read that.

08:42:03  13  Q.  Sir, the concept of a personal digital assistant to a

08:42:09  14  POSA would be a handheld device that has a general purpose

08:42:14  15  processor, correct?

08:42:14  16  A.  That was my testimony.

08:42:16  17  Q.  And by POSA, we -- we mean person of ordinary skill in

08:42:22  18  the art?

08:42:22  19  A.  That's correct.

08:42:23  20  Q.  That was your testimony under oath, correct?

08:42:25  21  A.  That's correct.

08:42:26  22  Q.  And you gave different testimony just a few moments

08:42:29  23  ago, correct?

08:42:29  24  A.  I think I said --

08:42:31  25          MR. JOHNSON:  Objection, Your Honor, optional

08:42:36  1  completeness as to the passage if that's the line of

08:42:38  2  impeachment he's going to go through.

08:42:39  3          MR. SHEASBY:  I won't -- I don't -- I don't intend

08:42:42  4  to do anymore.  I'm not going to impeach him.  I'm not

08:42:46  5  going to read his testimony.

08:42:47  6          THE COURT:  You can address it on redirect.

08:42:49  7          MR. JOHNSON:  Thank you, Your Honor.

08:42:49  8          THE COURT:  Let's proceed.

08:42:51  9  Q.  (By Mr. Sheasby)  Now, you don't dispute that in 2006,

08:42:55  10  there were dozens of personal digital assistants and

08:43:00  11  smartphones that had general camera -- digital cameras

08:43:03  12  integrated with a general purpose computer in the same

08:43:05  13  physical box, correct?

08:43:06  14  A.  I disagree with how you -- what -- with the question.

08:43:10  15  Q.  By 2006, you recognize that there were personal digital

08:43:21  16  assistants and smartphones that existed that had digital

08:43:26  17  cameras integrated with a general purpose computer in the

08:43:28  18  same physical box, correct?

08:43:29  19  A.  I disagree.

08:43:30  20  Q.  Why don't you turn to Page 2, Volume 2 -- transcript,

08:43:36  21  66:9 through 15 in Tab 3?

08:43:42  22  A.  Sorry, Tab 2 --

08:43:44  23  Q.  Tab 3.

08:43:45  24  A.  Tab 3.

08:43:48  25  Q.  And why don't you turn to Page 66?

| | | |
|---|---|---|
| 08:43:51 | 1 | A.   I'm there. |
| 08:43:52 | 2 | Q.   Actually, why don't you turn to Page 67, Lines 14 |
| 08:43:56 | 3 | through 23 and read that testimony to yourself. |
| 08:44:14 | 4 | A.   Okay.  I read it. |
| 08:44:15 | 5 | Q.   You read Mr. Calman's report in this case, correct? |
| 08:44:18 | 6 | A.   Yes, I did. |
| 08:44:19 | 7 | Q.   And after reading that -- after reading his report, you |
| 08:44:23 | 8 | don't dispute that there were dozens of personal digital |
| 08:44:29 | 9 | assistants and smartphones that existed as of 2006 that had |
| 08:44:34 | 10 | digital cameras integrated with a general purpose computer |
| 08:44:38 | 11 | in the same physical box, correct? |
| 08:44:39 | 12 | A.   That wasn't my response to the testimony. |
| 08:44:41 | 13 | Q.   In 2006, there were at least some smartphones and |
| 08:44:56 | 14 | personal digital assistants that combine a general purpose |
| 08:45:01 | 15 | computer and digital camera in the same form factor, |
| 08:45:03 | 16 | correct? |
| 08:45:03 | 17 | A.   I disagree. |
| 08:45:04 | 18 | Q.   Okay.  Why don't you turn to Column 66, Lines 9 through |
| 08:45:12 | 19 | 15 of that same deposition, sir? |
| 08:45:13 | 20 | A.   Through 16 you said -- or 15? |
| 08:45:15 | 21 | Q.   66, Lines 9 through 15. |
| 08:45:24 | 22 | A.   Yes, I read it. |
| 08:45:25 | 23 | Q.   Sir, in 2006, there were at least some smartphones in |
| 08:45:30 | 24 | personal digital assistants that combine a general purpose |
| 08:45:36 | 25 | computer and digital cameras in the same form factor, |

990

08:45:38   1   correct?

08:45:38   2   A.  My answer didn't totally agree with that.

08:45:46   3        MR. SHEASBY:  Your Honor, may I now publish his

08:45:48   4   response?

08:45:49   5        THE COURT:  You may.

08:45:50   6        MR. SHEASBY:  Mr. Huynh, let's go to 66, Lines 9

08:45:54   7   through 15.

08:45:55   8   Q.  (By Mr. Sheasby)  So I asked you the question about

08:46:05   9   2006:  There are at least some smartphones and personal

08:46:09   10  digital assistants that combine the general purpose

08:46:12   11  computer and digital camera in the same form factor.

08:46:15   12        Do you see that, sir?

08:46:16   13  A.  Yes.

08:46:16   14  Q.  And you said:  Not having really analyzed it a lot, I

08:46:20   15  would generally agree?

08:46:21   16  A.  That's what I said, yes.

08:46:21   17  Q.  Okay.  So you've been elected by Wells Fargo to speak

08:46:23   18  on the subject of PDAs as they existed in 2006, correct?

08:46:26   19  That's one of the things you talked about under oath to the

08:46:29   20  ladies and gentlemen of the jury yesterday?

08:46:29   21  A.  I did.

08:46:30   22  Q.  And yesterday -- and when I just asked you the

08:46:33   23  question, whether PDAs existed and smartphones existed in

08:46:37   24  2006 that integrated digital cameras and general purpose

08:46:39   25  computers, you said you disagree, correct?

08:46:41  1   A.  I disagree with part of that.

08:46:43  2   Q.  Sir, the reality is that as Wells Fargo's expert, you

08:46:48  3   did not analyze the question of smartphones and PDAs that

08:46:54  4   existed in 2006 and whether they had digital purpose

08:46:59  5   cameras, correct?

08:46:59  6   A.  I'm sorry.  Say it again.

08:47:00  7   Q.  You did not analyze the question of whether smartphones

08:47:03  8   and PDAs in 2006 had integrated digital cameras, correct?

08:47:07  9   A.  No, I didn't analyze -- I didn't analyze the market and

08:47:13  10  what it had in it.

08:47:16  11  Q.  And you understand that to interpret the meaning of a

08:47:18  12  patent, you have to understand it from the standpoint of a

08:47:21  13  person of ordinary skill in the art, correct?

08:47:23  14  A.  I understand.

08:47:23  15  Q.  And a person of ordinary skill in the art would know

08:47:36  16  about the state of the market in 2006, fair?

08:47:38  17  A.  Possibly.

08:47:42  18  Q.  But you don't, fair?

08:47:43  19  A.  I do some of the market.

08:47:45  20  Q.  Well, in reality, in 2006, persons of ordinary skill in

08:47:51  21  the art knew that digital personal assistants and other

08:47:55  22  portable devices, laptops, for example, had integrated

08:47:58  23  digital cameras with general purpose computing power.

08:48:02  24  Generally that's correct, fair?

08:48:04  25  A.  There were devices -- some devices out there like that,

08:48:06   1   yes.

08:48:06   2            MR. SHEASBY:  Objection, nonresponsive, Your

08:48:09   3   Honor.

08:48:09   4            THE COURT:  Overruled.

08:48:09   5   Q.  (By Mr. Sheasby)  Sir, you agree that in 2006, it's

08:48:13   6   generally correct that persons of skill in the art knew

08:48:15   7   that personal digital assistants in other portable devices,

08:48:19   8   laptops, for example, had integrated digital cameras with

08:48:24   9   general purpose computing power, fair?

08:48:26   10  A.  I could agree with that.

08:48:29   11  Q.  When the patent --

08:48:51   12           MR. SHEASBY:  Mr. Huynh, can you pull up the '605

08:48:54   13  patent, Tab -- PX-1186, Page 16?  And pull up next to it

08:49:10   14  Column 6, Lines 39 through 56.  And it's -- of 1186,

08:49:55   15  Mr. Huynh, if that's of any assistance to you.  And it's

08:50:06   16  Column 6, Lines 39 through 56.

08:50:18   17  Q.  (By Mr. Sheasby)  So we're looking at passages from the

08:50:20   18  '605 patent, correct?

08:50:21   19  A.  That's correct.

08:50:22   20  Q.  And Figure 3 of the '605 patent is discussed in the

08:50:30   21  passage at right on the screen, correct?

08:50:32   22  A.  That's correct.

08:50:32   23  Q.  And this passage talks about the fact that the image

08:50:36   24  capture device itself can have a general purpose processing

08:50:41   25  unit, correct?

08:50:42  1    A.   That's what the passage says.

08:50:47  2    Q.   So the patent teaches a box, correct, in Figure 3?

08:50:55  3    A.   Yes.

08:50:55  4    Q.   Within that box there's an image capture apparatus,

08:50:59  5    correct?

08:50:59  6    A.   That's correct.

08:50:59  7    Q.   And within that box is a general purpose processing

08:51:03  8    unit, correct?

08:51:03  9    A.   Yes.

08:51:06  10   Q.   And the specification also discussed the fact that the

08:51:10  11   image capture device with the general purpose computer can

08:51:12  12   be in direct connection with the server, correct?

08:51:14  13   A.   Where is it showing that?  I'm sorry.  Oh.

08:51:24  14   Q.   Image capture device 300 --

08:51:26  15   A.   Right, right.  Okay.  It says may include

08:51:32  16   communications, right?

08:51:34  17   Q.   Yes.

08:51:34  18   A.   Okay.  Yes, I see that.

08:51:37  19   Q.   So we agree on one thing.  Figure 3 is describing image

08:51:41  20   capture device, correct?

08:51:41  21   A.   That's correct.

08:51:42  22   Q.   The image capture device is an image capture apparatus,

08:51:46  23   correct?

08:51:46  24   A.   Yes.

08:51:48  25   Q.   That would include, for example, a camera lens,

| | | |
|---|---|---|
| 08:51:51 | 1 | correct? |
| 08:51:51 | 2 | A.  Yes. |
| 08:51:52 | 3 | Q.  It also includes a general purpose processor, correct? |
| 08:51:56 | 4 | A.  Processing unit, it says. |
| 08:52:02 | 5 | Q.  The answer to my question is yes? |
| 08:52:06 | 6 | A.  Ask your question again. |
| 08:52:08 | 7 | Q.  The passage talks about the fact that the image capture |
| 08:52:13 | 8 | device itself can have a general purpose processing unit, |
| 08:52:16 | 9 | correct? |
| 08:52:16 | 10 | A.  I disagree. |
| 08:52:18 | 11 | Q.  Okay.  Why don't you turn to Volume -- why don't you |
| 08:52:21 | 12 | turn to Tab 3 again, 69, 10 through 16. |
| 08:52:33 | 13 | A.  I'm sorry, page, please? |
| 08:52:33 | 14 | Q.  Page 69, Lines 10 through 16, Mr. Saffici. |
| 08:52:41 | 15 | A.  I see my testimony. |
| 08:52:42 | 16 | Q.  The passage talks about the fact that the image capture |
| 08:52:48 | 17 | device itself can have a general purpose processing unit, |
| 08:52:51 | 18 | correct?  That's what it shows on Figure 3? |
| 08:52:52 | 19 | A.  Yeah, my testimony was yes. |
| 08:52:54 | 20 | Q.  So just for the ladies and gentlemen of the jury, under |
| 08:52:57 | 21 | oath in deposition, you admitted that Figure 3 describes a |
| 08:53:03 | 22 | box in which there is an image capture apparatus and a |
| 08:53:08 | 23 | general purpose computer -- withdraw the question. |
| 08:53:09 | 24 | For the ladies and gentlemen of the jury, you |
| 08:53:13 | 25 | admitted at your deposition that Figure 3, the processing |

08:53:18  1  unit 302, can be a general purpose computer, fair?

08:53:20  2  A.  That was my testimony.

08:53:22  3          MR. JOHNSON:  Objection, Your Honor.

08:53:23  4  Mischaracterizes the testimony.  That's not what he says

08:53:28  5  general purpose computer -- he's been saying general

08:53:31  6  purpose processor.

08:53:31  7          THE COURT:  Well, he's already answered the

08:53:34  8  question, Mr. Johnson.  You can review it with him when you

08:53:38  9  redirect.

08:53:39  10         MR. JOHNSON:  Thank you, Your Honor.

08:53:40  11 Q.  (By Mr. Sheasby)  And in front of this jury just a

08:53:43  12 couple minutes ago, you said the opposite, fair?

08:53:45  13 A.  Am I able to explain?

08:53:55  14         MR. SHEASBY:  Your Honor, can I ask him that he --

08:53:58  15 can I request that you instruct the witness to answer the

08:54:00  16 question?

08:54:01  17         THE WITNESS:  Okay.

08:54:03  18         THE COURT:  Restate the question.  And then,

08:54:06  19 Mr. Saffici, answer the question as it's presented.  As

08:54:09  20 I've made clear, Mr. Johnson is going to have a chance to

08:54:12  21 review anything he thinks is important with you when he

08:54:17  22 gets an opportunity to ask follow-up questions.

08:54:19  23         THE WITNESS:  Yes, Your Honor.

08:54:19  24         THE COURT:  So state your question.

08:54:22  25 Q.  (By Mr. Sheasby)  Figure 3, you testified under oath at

996

08:54:25  1  deposition, describes a general purpose processing unit --

08:54:29  2  general purpose processing unit, correct?

08:54:29  3  A.  That's -- testimony is correct, yes.

08:54:31  4  Q.  And you gave different testimony to the jury, correct?

08:54:34  5  A.  Yes.

08:54:41  6  Q.  Now, you talked about the '200 patent specification.

08:54:53  7  That's one of the earlier family members of the '681

08:54:56  8  patent, correct?

08:54:57  9  A.  That's correct.

08:54:57  10  Q.  And the '200 patent specification is identical to the

08:55:04  11  '681 patent specification, correct?

08:55:05  12  A.  Say it again, please.

08:55:07  13  Q.  The '200 patent specification is substantively

08:55:12  14  identical to the '681 patent?

08:55:13  15  A.  Oh, yes, that -- that's correct, yes.

08:55:15  16  Q.  So if there's something taught in this -- if you can

08:55:18  17  learn something from looking at the '200 patent

08:55:21  18  specification, you'll be able to learn that exact same

08:55:24  19  thing from looking at the '681 patent specification, fair?

08:55:27  20  A.  That's correct.

08:55:29  21  Q.  And why don't you turn to your deposition at Pages 9:22

08:55:54  22  through 10:1?

08:55:55  23  A.  I'm sorry.  Again, Mr. Sheasby?

08:55:57  24  Q.  Sure.  Page 9 --

08:56:00  25  A.  Oh, 9.

08:56:01  1   Q.  Lines 22 through Page 10.

08:56:12  2   A.  Starting where again?

08:56:16  3   Q.  Column -- Page 9, Line 22, through 10, Line 1.

08:56:35  4          MR. JOHNSON:  Your Honor, I would object.  There's

08:56:37  5   no pending question for which the witness is being

08:56:39  6   refreshed from recollection or impeachment.

08:56:42  7          THE COURT:  Approach the bench, please.

08:56:50  8          (Bench conference.)

08:56:50  9          THE COURT:  You're asking him to read a portion of

08:56:53  10  his prior --

08:56:54  11         MR. SHEASBY:  To refresh his -- his recollection,

08:56:56  12  and then I'm going to ask him --

08:56:58  13         THE COURT:  Are you -- you -- there's no reason to

08:57:00  14  refresh his recollection unless he's indicated a lack of

08:57:04  15  memory.

08:57:05  16         MR. SHEASBY:  I'll proceed, Your Honor.

08:57:06  17         THE COURT:  I mean, if he says I don't remember,

08:57:08  18  then that's certainly appropriate.

08:57:09  19         MR. SHEASBY:  Okay.

08:57:11  20         (Bench conference concluded.)

08:57:18  21         THE COURT:  Let's proceed.

08:57:23  22         MR. SHEASBY:  So let's pull up, Mr. Huynh, 1187,

08:57:32  23  Claim 1.  And let's pull up through the limitation -- the

08:57:50  24  preamble and the first limitation and the second two

08:57:58  25  limitations.  Right there.  That will be great.  So let's

08:58:07   1   put that all together.

08:58:11   2   Q.  (By Mr. Sheasby)  So one of the opinions you gave to

08:58:15   3   the ladies and gentlemen of the jury was that you don't

08:58:17   4   believe that the limitation --

08:58:28   5            MR. JOHNSON:  Your Honor, I would object.  I

08:58:31   6   believe Claim 1 of the '681 is not asserted.

08:58:34   7            MR. SHEASBY:  I'll pull it down.  We can go --

08:58:37   8   let's go to Claim -- Claim 12.

08:58:42   9            THE COURT:  That's sustained.

08:58:43  10            MR. JOHNSON:  Thank you, Your Honor.

08:58:51  11            MR. SHEASBY:  So let's pull up Claim 12, through a

08:58:55  12   downloaded software application, Mr. Huynh.

08:59:01  13   Q.  (By Mr. Sheasby)  So we're looking at Claim 12 of the

08:59:03  14   '681 patent.  And what you told the ladies and gentlemen of

08:59:07  15   the jury was that you don't think that the -- this -- these

08:59:11  16   limitations are disclosed -- strike that.

08:59:17  17            You told the ladies and gentlemen of the jury you

08:59:19  18   don't think these limitations are described in that common

08:59:22  19   specification shared by the '200 patent and the '681

08:59:26  20   patent, fair?

08:59:27  21   A.  Yes, that's what I said.

08:59:28  22   Q.  You gave the exact opposite testimony in your

08:59:33  23   deposition, correct?

08:59:34  24   A.  I don't recall.

08:59:37  25   Q.  Turn to Volume 2 -- turn to Pages 9:22, through 10:1 in

999

| | | |
|---|---|---|
| 08:59:45 | 1 | your deposition. |
| 08:59:46 | 2 | A.  Page 9, 20 -- |
| 08:59:49 | 3 | Q.  22 through 10:1. |
| 08:59:58 | 4 | A.  Yes, I see that. |
| 08:59:59 | 5 | Q.  In your deposition, you testified under oath that every |

08:59:45   1   your deposition.

08:59:46   2   A.  Page 9, 20 --

08:59:49   3   Q.  22 through 10:1.

08:59:58   4   A.  Yes, I see that.

08:59:59   5   Q.  In your deposition, you testified under oath that every

09:00:04   6   limitation we see on the screen in Claim 12 is described --

09:00:10   7   described in that common specification shared by the '200

09:00:15   8   patent and the '681 patent, correct?

09:00:17   9   A.  When we were talking about anticipation, yes.

09:00:20   10       MR. SHEASBY:  Objection -- Your Honor, objection.

09:00:23   11   I move to strike.  Non-responsive.

09:00:25   12       THE COURT:  "Yes" is the correct answer.  I'll

09:00:47   13   strike the portion of the response, except the word "yes."

09:00:54   14   Q.  (By Mr. Sheasby)  And, in fact, when I asked you the

09:00:59   15   question at your deposition whether the common

09:01:01   16   specification of the Oakes '200 patent and the '681 patent

09:01:06   17   describes the limitations on the screen before the ladies

09:01:10   18   and gentlemen of the jury, you just said:  That's my

09:01:14   19   opinion, yes.

09:01:17   20       Correct?

09:01:18   21   A.  That was my testimony.

09:01:20   22   Q.  It was unqualified, correct?

09:01:22   23   A.  At that point.

09:01:25   24   Q.  No ifs, buts about it, correct?

09:01:30   25   A.  Yes, that was my testimony.

09:01:31   1   Q.  And so when the ladies and gentlemen of the jury go

09:01:33   2   back to deliberate, it is fair for them to consider that

09:01:36   3   under oath, represented by your counsel, in a deposition

09:01:39   4   that you had the right to correct, you, without

09:01:42   5   qualification, said that every single limitation on the

09:01:46   6   screen right now, mobile device, digital camera,

09:01:50   7   communication together is described in that common

09:01:52   8   specification, correct?  They're allowed to consider that?

09:01:56   9   A.  That was my testimony at that point, yes.

09:02:05   10   Q.  The common shared specification between the Oakes '200

09:02:12   11   patent and the '681 patent describes a portable device

09:02:16   12   comprising a general purpose computer, including a

09:02:21   13   processor coupled to a memory, correct?

09:02:22   14   A.  I'm sorry.  Repeat that, please.

09:02:24   15   Q.  Sure.  The common specification, that 2000 [sic]

09:02:29   16   specification, describes a portable device comprising a

09:02:36   17   general purpose computer, including a processor coupled to

09:02:38   18   memory, correct?

09:02:38   19   A.  Can -- can you tell me where you're -- in the

09:02:44   20   specification you're reading from?

09:02:45   21   Q.  Sir, I'm -- I'm asking you your opinion as an expert.

09:02:54   22   A.  I disagree.

09:02:55   23   Q.  Turn to Volume 2 of your deposition, Lines 11, 14 --

09:03:03   24   Page 11, 14 through 18.

09:03:16   25   A.  Yes, I see my testimony.

09:03:18  1    Q.  Sir, it is your sworn opinion under oath that the

09:03:23  2    common specification of the Oakes '200 patent and the '681

09:03:26  3    patent describe a portable device comprising a general

09:03:31  4    purpose computer, including a processor coupled to memory,

09:03:38  5    correct?

09:03:38  6    A.  Yes.

09:03:41  7    Q.  Based on that testimony, it is not correct that the

09:03:45  8    2006 specification only describes using a desktop or laptop

09:03:49  9    computer connected to a separate camera, correct?

09:03:52  10   A.  Say it again, please.

09:03:54  11   Q.  Based on your testimony, it is not correct that the

09:03:58  12   2006 specification only describes using a desktop or laptop

09:04:05  13   computer connected to a separate camera, correct?

09:04:05  14   A.  Based on my testimony at that time, that's correct.

09:04:10  15   Q.  Now, you also talked about the Oakes '227 patent and

09:04:26  16   the '605 patent, correct?

09:04:31  17   A.  Yes.

09:04:32  18   Q.  And those, once again, are in that same family.  They

09:04:36  19   have the same common specification, correct?

09:04:37  20   A.  '227 and '605.

09:04:40  21   Q.  If -- if you can learn something from looking at the

09:04:43  22   '227 patent specification, you're going to be -- be able to

09:04:46  23   learn the exact same thing by looking at that '681 patent

09:04:49  24   specification, correct?

09:04:50  25   A.  That's incorrect.

09:04:53   1    Q.  Let me --

09:04:54   2    A.  I mean, I disagree.  I apologize.

09:04:56   3    Q.  Let me ask you the question.  The -- and I withdraw the

09:04:58   4    question because it was improper.

09:05:01   5         The '227 patent specification and the '605 patent

09:05:06   6    specification are identical, correct?

09:05:07   7    A.  That's correct, yes.

09:05:08   8    Q.  And, in fact, you conclude that the specification of

09:05:29   9    the '227 patent teaches that a handheld device may include

09:05:34  10    a digital camera, correct?

09:05:34  11    A.  Can you point me to where I said that, please?

09:05:41  12    Q.  Why don't you turn to Tab 4 --

09:05:43  13    A.  Tab 4.

09:05:44  14    Q.  -- which is your report.

09:05:50  15    A.  Okay.

09:05:50  16    Q.  Paragraph 209 of your report.

09:05:59  17    A.  209, right?

09:06:03  18    Q.  Yes, sir.

09:06:50  19    A.  And your question again was?

09:06:51  20    Q.  So you talk about what the Oakes '227 patent, quote,

09:06:56  21    teaches, correct?

09:06:57  22    A.  That's correct.

09:06:57  23    Q.  The Oakes '227 patent is the exact same specification

09:07:01  24    as the '605 patent, correct?

09:07:02  25    A.  Yes.

09:07:02   1   Q.   And you -- you agree that the Oakes '227 patent teaches

09:07:06   2   that the handheld device may include a digital camera,

09:07:10   3   correct?

09:07:10   4   A.   That is in my report, yes.

09:07:11   5   Q.   So in your report, you concluded that the Oakes '227

09:07:17   6   patent, which is the exact same specification as the '605

09:07:20   7   patent, teaches the use of a handheld device that may

09:07:25   8   include a digital camera, correct?

09:07:26   9   A.   Yes, it says that.

09:07:34   10   Q.   Mr. Saffici, would it be fair to say that after the

09:07:42   11   conversation we had yesterday and the conversation we had

09:07:47   12   this morning, that perhaps it's not as clear as you once

09:07:51   13   thought as to what's disclosed in the patents-in-suit?

09:07:54   14   Would that be a fair thing for someone to take away from

09:07:58   15   our conversation?

09:07:58   16   A.   I'm sorry, say -- say that again, please.

09:08:01   17   Q.   Do you think it'd be fair to take from our

09:08:05   18   conversations over the last two days on this subject that

09:08:10   19   what's in the specification is not necessarily something

09:08:13   20   that is clearly in your mind right now?

09:08:15   21   A.   I believe it's clearly in my mind.

09:08:19   22   Q.   And what's clearly in your mind is that in your report,

09:08:27   23   you said that the specification teaches that the handheld

09:08:30   24   device may include a digital camera, correct?

09:08:33   25   A.   I did say that, yes.

09:08:35   1   Q.   Mr. Saffici, you did not identify any third-party art

09:08:48   2   that calls into question the novelty of either the '681

09:08:58   3   patent or '605 patent, correct?

09:09:05   4   A.   I disagree.

09:09:06   5   Q.   Why don't you turn to your same deposition, Lines 23, 6

09:09:15   6   through 11?

09:09:29   7   A.   I'm sorry, what were the lines again?

09:09:31   8   Q.   23, Lines 6 through 11.

09:09:52   9   A.   Yeah, I see what I said.

09:09:53   10  Q.   Sir, you testified under oath that you do not identify

09:09:56   11  any third-party art that anticipates or renders obvious the

09:10:00   12  '681 and '605 patents, correct?

09:10:01   13  A.   Can I -- can I ask you to clarify third party?

09:10:11   14  Q.   Third party would exclude USAA's patents.

09:10:15   15  A.   Okay.  That's the confusion, sorry.

09:10:18   16  Q.   So I want to put aside the theory that you have on the

09:10:21   17  Oakes '200 and Oakes '227 patent.

09:10:24   18  A.   Right.

09:10:25   19  Q.   I'm talking about what folks -- what other folks did --

09:10:27   20  A.   Okay.

09:10:27   21  Q.   -- what Wells Fargo did or all those other companies

09:10:30   22  you talked about in your direct.  You don't identify any

09:10:32   23  third party, Wells Fargo or otherwise, that has prior art

09:10:36   24  that anticipates or renders obvious the patents-in-suit in

09:10:40   25  this case, correct?

09:10:40   1   A.   That's correct.

09:10:41   2   Q.   And you did a study on that, correct?

09:10:42   3   A.   I looked, yes.

09:10:43   4   Q.   You don't identify any system, any design anywhere in

09:10:49   5   the world that anticipates or renders obvious the '605 or

09:10:53   6   '681 patent, correct?

09:10:53   7   A.   That was my testimony then and now.

09:10:55   8   Q.   And, for example, you looked at Wells Fargo's --

09:10:57   9        THE COURT:   Let him finish his answer,

09:10:59  10   Mr. Sheasby.

09:10:59  11        MR. SHEASBY:   I apologize, Your Honor.

09:11:01  12   A.   All I was saying was that was in my answer in the

09:11:05  13   testimony, and it's still my answer.

09:11:07  14   Q.   (By Mr. Sheasby)  And you looked at Wells Fargo's CEO

09:11:10  15   Desktop system, correct, that system that uses the

09:11:14  16   specialized scanner and you analyzed that, correct?

09:11:16  17   A.   Yes.

09:11:26  18        MR. SHEASBY:   Now, why don't we -- Mr. Huynh,

09:11:30  19   let's go to PX-1187, Page 27, and let's look at Claim 12.

09:11:44  20   Claim 12, Mr. Huynh.  Let's go ahead and pull that up --

09:11:50  21   let's pull up the entire claim, if you would.

09:11:53  22   Q.   (By Mr. Sheasby)  Now, Claim 12 describes a system for

09:11:57  23   allowing a customer to deposit a check using the camera's

09:12:00  24   own mobile device with a digital camera, correct?  Let me

09:12:04  25   reask the question.

09:12:05  1      The '681 patent, Claim 12, describes a system for
09:12:08  2  allowing a customer to deposit a check using the customer's
09:12:11  3  own mobile device with a digital camera, correct?
09:12:13  4  A.  That's correct -- that's correct.
09:12:15  5      THE COURT:  Mr. Sheasby, you are going to have to
09:12:17  6  slow down.
09:12:17  7      MR. SHEASBY:  Yes, Your Honor.
09:12:18  8      THE COURT:  It does no good for you to ask things
09:12:21  9  so quickly that neither the Court nor the jury can follow
09:12:25  10  you.  Slow down, please.
09:12:28  11      MR. SHEASBY:  Thank you, Your Honor.
09:12:29  12  Q.  (By Mr. Sheasby)  At your deposition, that's described
09:12:34  13  as MRDC, correct?
09:12:35  14  A.  That mobile remote deposit capture, yes.
09:12:40  15  Q.  The '681 patent, Claim 12, describes what's known as
09:12:47  16  MRDC, correct, mobile remote deposit capture?
09:12:51  17  A.  Yes.
09:12:51  18  Q.  At your deposition, you were unable to think of any way
09:12:55  19  of implementing mobile remote deposit capture, other than
09:13:00  20  what's recited in Claim 12 of the '681 patent, correct?
09:13:03  21  A.  I don't recall.
09:13:04  22  Q.  Why don't you turn to Page 122, Lines 7 through 15?
09:13:10  23  A.  122 of my deposition?
09:13:12  24  Q.  Yes, sir.
09:13:13  25  A.  I'm sorry, lines again, please?

| | | |
|---|---|---|
| 09:13:24 | 1 | Q.  Yes, sir.  Lines 7 through 15. |
| 09:13:43 | 2 | A.  Okay.  I read my deposition. |
| 09:13:45 | 3 | Q.  Sir, at your deposition, you were unable to think of |
| 09:13:49 | 4 | any way of implementing mobile remote deposit capture other |
| 09:13:52 | 5 | than what's recited in Claim 12 of the '681 patent, |
| 09:13:56 | 6 | correct? |
| 09:13:56 | 7 | A.  You didn't actually categorize my answers the way it's |
| 09:14:03 | 8 | in my testimony. |
| 09:14:04 | 9 | Q.  Sir, at your deposition, you couldn't answer the |
| 09:14:08 | 10 | question as to whether there is any other way of |
| 09:14:10 | 11 | implementing mobile remote deposit capture, other than |
| 09:14:13 | 12 | what's described in Claim 12, correct? |
| 09:14:15 | 13 | A.  That's not totally correct. |
| 09:14:23 | 14 | Q.  At your -- in your trial testimony, did you describe to |
| 09:14:27 | 15 | the jury any alternative method of doing mobile remote |
| 09:14:31 | 16 | deposit capture beyond what's at issue -- what's described |
| 09:14:33 | 17 | in Claim 12? |
| 09:14:35 | 18 | A.  Here at trial, you said? |
| 09:14:36 | 19 | Q.  Yes. |
| 09:14:37 | 20 | A.  No, I didn't. |
| 09:14:50 | 21 | Q.  And you are an expert in remote deposit capture, |
| 09:14:50 | 22 | correct? |
| 09:14:50 | 23 | A.  That's one of my areas of expertise. |
| 09:14:53 | 24 | Q.  And you've been retained on this matter for close to 11 |
| 09:14:59 | 25 | months, correct, sir? |

```
09:15:01   1   A.   That's correct.
09:15:01   2   Q.   Now, you don't disagree -- you don't disagree that all
09:15:12   3   the claims of the patents-in-suit require the image that is
09:15:14   4   captured is in a form sufficient to allow money to be
09:15:17   5   credited to an account, correct?
09:15:19   6   A.   I agree.
09:15:19   7   Q.   And for a check image to be used as a substitute check
09:15:23   8   to be the legal equivalent of the actual physical check,
09:15:26   9   the image has to be of sufficient quality such that it's
09:15:29  10   accurately representing all the images on the original
09:15:31  11   check, correct?
09:15:34  12   A.   That's correct.
09:15:34  13   Q.   And the claims of the '605 and '681 patent talk -- talk
09:15:41  14   about displaying a graphical illustration to assist the
09:15:44  15   user in the digital camera capture process, correct?
09:15:46  16   A.   That's part of Claim -- of Claim 12, yes.
09:15:51  17   Q.   And it talks about giving instructions to the user to
09:15:53  18   ensure that the image is captured properly, correct?
09:15:58  19   A.   There's some instructions identified there.
09:16:02  20        THE COURT:  Approach the bench, counsel.
09:16:04  21        (Bench conference.)
09:16:10  22        THE COURT:  You are super fast.  Faster than
09:16:16  23   you've been this whole trial.  I don't know how much
09:16:19  24   caffeine you had this morning, but you have got to slow
09:16:22  25   down.
```

| | | |
|---|---|---|
| 09:16:23 | 1 | MR. SHEASBY:  I understand, Your Honor. |
| 09:16:24 | 2 | THE COURT:  I don't think the jury is following |
| 09:16:27 | 3 | your questions.  I'm having trouble keeping up with them. |
| 09:16:31 | 4 | It's a burden on the Court staff to take it down.  You're |
| 09:16:35 | 5 | going to have to slow down. |
| 09:16:37 | 6 | MR. SHEASBY:  I will, Your Honor. |
| 09:16:38 | 7 | THE COURT:  All right. |
| 09:16:38 | 8 | MR. SHEASBY:  Thank you, Your Honor. |
| 09:16:39 | 9 | THE COURT:  All right.  Let's proceed. |
| 09:16:40 | 10 | (Bench conference concluded.) |
| 09:16:46 | 11 | THE COURT:  Let's proceed. |
| 09:16:47 | 12 | Q.  (By Mr. Sheasby)  The patent specification talks -- |
| 09:16:50 | 13 | talked about giving guidance and instructions to the user |
| 09:16:54 | 14 | so that the -- an image of sufficient quality can be |
| 09:16:56 | 15 | captured, fair? |
| 09:16:58 | 16 | A.  That doesn't really talk about -- can I just say I |
| 09:17:14 | 17 | disagree with you. |
| 09:17:16 | 18 | Q.  Can you turn to Page 166, Lines 2 through 11 of your |
| 09:17:20 | 19 | deposition, sir? |
| 09:17:50 | 20 | A.  I've read it. |
| 09:17:52 | 21 | Q.  Sir, the specifications talk about giving guidance and |
| 09:18:04 | 22 | instructions to the user so that an image of sufficient |
| 09:18:09 | 23 | quality will be captured, correct? |
| 09:18:10 | 24 | A.  That was my testimony. |
| 09:18:11 | 25 | Q.  The claims talk about the same, correct? |

1010

| | | |
|---|---|---|
| 09:18:13 | 1 | A.  That was my testimony. |
| 09:18:16 | 2 | Q.  You did nothing to determine whether the USAA patents |
| 09:18:19 | 3 | have contributed to the commercial success of mobile remote |
| 09:18:23 | 4 | deposit capture, correct? |
| 09:18:23 | 5 | A.  I was not asked to do that. |
| 09:18:34 | 6 | Q.  Well, in your report, you stated that you were not |
| 09:18:36 | 7 | aware of any evidence of commercial success relating to the |
| 09:18:39 | 8 | specific systems and methods claimed in the asserted |
| 09:18:44 | 9 | patents, correct?  That's what you wrote in your report? |
| 09:18:46 | 10 | A.  Can you show me where that was, please? |
| 09:18:48 | 11 | Q.  Why don't you turn to 227 -- the same deposition, |
| 09:18:53 | 12 | 227:23 to 228:6? |
| 09:19:12 | 13 | A.  What was the lines again, please? |
| 09:19:15 | 14 | Q.  227, Lines 23, to 228, Line 6. |
| 09:19:27 | 15 | A.  Yes, I've read that. |
| 09:19:31 | 16 | Q.  Sir, in your report, you stated that you're not aware |
| 09:19:34 | 17 | of any evidence of commercial success relating to the |
| 09:19:36 | 18 | specific systems and claims -- methods claimed in the |
| 09:19:40 | 19 | asserted patents, correct? |
| 09:19:42 | 20 | A.  That is what I said. |
| 09:19:43 | 21 | Q.  But the reality is you did nothing whatsoever to |
| 09:19:47 | 22 | investigate that question, correct? |
| 09:19:48 | 23 | A.  I don't believe I did any extensive analysis. |
| 09:19:53 | 24 | Q.  Sir, you didn't do any -- |
| 09:19:55 | 25 | A.  I didn't any -- |

```
09:19:56   1   Q.  You didn't do any analysis?

09:19:58   2   A.  Didn't do any.

09:20:03   3        MR. SHEASBY:  Let's go to PX-7, Page 13.

09:20:07   4   Q.  (By Mr. Sheasby)  This is Tab 26 in your binder,

09:20:08   5   Mr. Saffici.

09:20:08   6   A.  I'm sorry, which?

09:20:09   7   Q.  PX-7, Lines 13.  This is Tab 7 in your -- Tab 26 in

09:20:14   8   your binder which you're absolutely welcome to look at, but

09:20:17   9   it will also be on the screen?

09:20:19  10   A.  You said 7?

09:20:21  11   Q.  Tab 26.

09:20:22  12   A.  Tab 26?

09:20:23  13   Q.  That will be in Binder No. 3.

09:20:26  14        MR. SHEASBY:  Let's put it up, Mr. Huynh.  7.

09:20:39  15   A.  That was Tab 26, right?

09:20:43  16   Q.  (By Mr. Sheasby)  Yeah.

09:20:47  17   A.  Is that right, Tab 26?

09:20:48  18   Q.  Tab 27 --

09:20:49  19   A.  Oh, 27?

09:20:50  20   Q.  Yes, sir.

09:20:51  21        MR. SHEASBY:  And we'll put it up on the screen.

09:20:54  22   Page 7, Mr. Huynh.

09:20:57  23   A.  Wait a minute.  I think these are mislabeled.

09:21:02  24   Q.  (By Mr. Sheasby)  Page 13, sorry.

09:21:04  25   A.  It's really Tab 26.
```

1012

| | | |
|---|---|---|
| 09:21:05 | 1 | Q.  It is Tab 26. |
| 09:21:07 | 2 | A.  Okay.  I'm there. |
| 09:21:14 | 3 | MR. SHEASBY:  Is this PX-7, Mr. Huynh? |
| 09:21:38 | 4 | Q.  (By Mr. Sheasby)  It's on the screen, Mr. Saffici. |
| 09:21:39 | 5 | A.  Yeah, I see it. |
| 09:21:40 | 6 | Q.  So this is a Wells Fargo presentation that talks about |
| 09:21:44 | 7 | MRDC as being table stakes, correct? |
| 09:21:46 | 8 | A.  That's what the title says, yes. |
| 09:21:48 | 9 | Q.  And you understand that Wells Fargo is stating that |
| 09:21:51 | 10 | MRDC is a table stakes capability, correct? |
| 09:21:54 | 11 | A.  That's the heading, yes. |
| 09:21:55 | 12 | Q.  And you can see that one definition of table stakes |
| 09:21:59 | 13 | capability means that it's a capability one must have to |
| 09:22:03 | 14 | compete, correct? |
| 09:22:04 | 15 | A.  I guess that's an acceptable definition. |
| 09:22:10 | 16 | Q.  Sir, is it fair for the ladies and gentlemen of the |
| 09:22:16 | 17 | jury to consider the fact that you're an RDC expert? |
| 09:22:19 | 18 | A.  Table stakes has nothing to do with RDC.  That's not a |
| 09:22:25 | 19 | term associated with RDC. |
| 09:22:27 | 20 | MR. SHEASBY:  Your Honor, non-responsive. |
| 09:22:32 | 21 | A.  Ask the question again, please. |
| 09:22:34 | 22 | THE COURT:  Just a minute. |
| 09:22:35 | 23 | THE WITNESS:  Oh, sorry. |
| 09:22:36 | 24 | THE COURT:  I'll sustain the objection. |
| 09:22:57 | 25 | Restate the question, counsel. |

09:22:57  1  Q.  (By Mr. Sheasby)  Sir, you -- you told the jury that

09:22:59  2  you're an expert in RDC, correct?

09:23:01  3  A.  That's among my expertise.

09:23:03  4  Q.  Sir, and you concede that one definition of table

09:23:07  5  stakes is a capability that one must have to compete,

09:23:09  6  correct?

09:23:09  7  A.  Is that on the screen?  That's what the yellow

09:23:16  8  highlight is?

09:23:17  9       THE COURT:  You need to answer the question,

09:23:19  10  Mr. Saffici, whether it's on the screen or not.

09:23:21  11       THE WITNESS:  Okay.

09:23:23  12  A.  Again, Mr. Sheasby.  Sorry.

09:23:26  13  Q.  (By Mr. Sheasby)  It's fair for the jury to conclude

09:23:29  14  that one reasonable interpretation of Wells Fargo's

09:23:31  15  description of MRDC as table stakes is that it is a

09:23:37  16  capability that it must have to compete, correct?

09:23:39  17  A.  I don't feel I could answer that.

09:23:47  18  Q.  Why don't we turn to Tab 35 in your binder?

09:24:11  19  A.  I'm there.

09:24:12  20  Q.  And why don't we turn to Paragraph 91?

09:24:25  21  A.  I'm there.

09:24:25  22  Q.  Now, Paragraph 91 of the binder is a portion of

09:24:35  23  Mr. Gerardi's expert report, correct?

09:24:38  24  A.  I see that from the cover page.

09:24:40  25  Q.  Mr. Gerardi is Wells Fargo's damages expert in this

| | | |
|---|---|---|
| 09:24:42 | 1 | case, correct? |
| 09:24:44 | 2 | A.  That's correct. |
| 09:24:44 | 3 | Q.  And he lists a set of bullet points of technical |
| 09:24:50 | 4 | modifications, correct? |
| 09:24:51 | 5 | A.  Yes. |
| 09:24:53 | 6 | Q.  You did nothing whatsoever to investigate whether |
| 09:24:56 | 7 | Mr. Gerardi's proposed technical modifications to Wells |
| 09:25:00 | 8 | Fargo's design were commercially viable, correct? |
| 09:25:03 | 9 | A.  I didn't have input into his report, no. |
| 09:25:10 | 10 | MR. SHEASBY:  Objection, nonresponsive. |
| 09:25:11 | 11 | THE WITNESS:  Okay.  That wasn't the answer to the |
| 09:25:13 | 12 | question. |
| 09:25:14 | 13 | Q.  (By Mr. Sheasby)  You did nothing -- |
| 09:25:15 | 14 | THE COURT:  Just -- just -- just a minute.  We're |
| 09:25:17 | 15 | going to get this examination back on track. |
| 09:25:23 | 16 | You're going to wait until he's finished before |
| 09:25:26 | 17 | you ask another question. |
| 09:25:27 | 18 | And you're not going to keep talking while he's |
| 09:25:29 | 19 | asking the question.  And the answer needs to respond to |
| 09:25:31 | 20 | the question.  And if you don't understand, it's perfectly |
| 09:25:34 | 21 | fine to say "I don't understand" or give a yes or a no or |
| 09:25:38 | 22 | an explanation, whatever the question's called for, but go |
| 09:25:42 | 23 | no further than what the question calls for. |
| 09:25:46 | 24 | And, Mr. Sheasby, you're going to have to slow |
| 09:25:48 | 25 | down and let the witness have time to respond before you |

09:25:51  1  move on to the next question.

09:25:52  2          Let's both of you try to see if we can do this in

09:25:56  3  a more orderly fashion going forward.

09:25:57  4          THE WITNESS:  Yes, Your Honor.

09:25:58  5          THE COURT:  All right.  Counsel, ask your next

09:26:01  6  question.

09:26:01  7  Q.  (By Mr. Sheasby)  You did nothing to investigate

09:26:05  8  whether there are any commercially viable non-infringing

09:26:08  9  alternatives to the patents-in-suit in this case, correct?

09:26:12  10  A.  That's correct.

09:26:27  11  Q.  And you did absolutely nothing to investigate whether

09:26:30  12  Wells Fargo had the focused R&D capability that would allow

09:26:34  13  it to create an alternative to USAA's MRDC system, correct?

09:26:38  14  A.  That's correct.

09:26:39  15  Q.  And you are the only remote deposit capture expert from

09:26:46  16  Wells Fargo that the jury is ever going to hear from at

09:26:48  17  this trial, correct?

09:26:49  18  A.  That's correct.

09:26:51  19          MR. SHEASBY:  I pass the witness, Your Honor.

09:26:53  20          THE COURT:  Redirect by the Defendant?

09:26:54  21          MR. JOHNSON:  Yes, Your Honor.  Sorry, Your Honor,

09:27:10  22  I need just a moment to reposition all this.

09:27:12  23          THE COURT:  That's fine.  Take a moment.

09:27:14  24          MR. JOHNSON:  Thank you.

09:27:39  25          THE COURT:  When you're ready, you may proceed.

09:27:41  1          MR. JOHNSON:  Thank you, Your Honor.  May it

09:27:41  2   please the Court.

09:27:41  3                    REDIRECT EXAMINATION

09:27:42  4   BY MR. JOHNSON:

09:27:42  5   Q.  Good morning, Mr. Saffici.

09:27:45  6   A.  Good morning, Mr. Johnson.  How are you?

09:27:48  7   Q.  Good.

09:27:48  8          I want to visit with you about a couple of things

09:27:50  9   that Mr. Sheasby has been talking to you about, and we're

09:27:53  10  going to talk about some very important foundational things

09:27:58  11  here upfront.

09:27:59  12         Mr. Saffici, have you ever met really intelligent

09:28:02  13  people who got that way through work, not through a college

09:28:04  14  degree or going to some Ivy League school?

09:28:15  15  A.  I can't recall.

09:28:16  16  Q.  Well, sir, people -- some people go to school and they

09:28:20  17  get their education through college, right?

09:28:20  18  A.  That's correct.

09:28:21  19  Q.  Other people, like you, go out and work for 53 years

09:28:24  20  and acquire expertise.  Are you aware of that?

09:28:27  21  A.  I am.

09:28:27  22  Q.  Okay.  In fact, that's what you've done, right, sir?

09:28:33  23  A.  That's correct.

09:28:33  24  Q.  Now, yesterday, Mr. Saffici, you were asked about the

09:28:37  25  fact that despite your 53 years of experience and having

09:28:41   1   been qualified as an expert by this Court, whether you met

09:28:45   2   a definition that Mr. Sheasby gave you of a person of

09:28:49   3   ordinary skill in the art.  Do you remember that right at

09:28:50   4   the beginning?

09:28:51   5   A.  Yes, I do.

09:28:52   6   Q.  Okay.  Well, I want to take a look at the questions

09:28:55   7   that you were asked, sir.

09:28:57   8           Do you remember that he referred you to

09:29:02   9   Dr. Villasenor's report?

09:29:04   10   A.  Yes.

09:29:05   11   Q.  Said it was behind you in some of these stacks?

09:29:08   12   A.  Yes.

09:29:22   13           MR. JOHNSON:  Can I have the document camera?

09:29:25   14   Thank you.

09:29:34   15   Q.  (By Mr. Johnson)  Okay.  Ask you to go to

09:29:41   16   Dr. Villasenor's report, Paragraph 16.  Do you see that?

09:29:48   17   A.  Yes.

09:29:48   18   Q.  Now, he gave you some very specific instructions about

09:29:51   19   how you should read that report, didn't he?

09:29:53   20   A.  I believe so.

09:29:54   21   Q.  Okay.  Number one, he said do not read it out loud?

09:30:00   22   A.  Yes.

09:30:01   23   Q.  Okay.  Second thing he asked you to do was what?

09:30:06   24   A.  Just the first sentence.

09:30:09   25   Q.  Okay.  The first sentence of Paragraph 16.  Did you do

| | | |
|---|---|---|
| 09:30:11 | 1 | that? |
| 09:30:12 | 2 | A.  Yes, I did. |
| 09:30:13 | 3 | Q.  Okay.  And when Mr. -- when you read that first |
| 09:30:22 | 4 | sentence, Mr. Sheasby read it to you, you candidly agreed |
| 09:30:26 | 5 | with the definition that was stated in that first sentence, |
| 09:30:29 | 6 | right? |
| 09:30:29 | 7 | A.  I did. |
| 09:30:29 | 8 |         MR. SHEASBY:  Objection, Your Honor, these |
| 09:30:31 | 9 | questions are leading. |
| 09:30:33 | 10 |         THE COURT:  Sustained as to leading. |
| 09:30:37 | 11 | Q.  (By Mr. Johnson)  Did you agree with Mr. Sheasby's |
| 09:30:39 | 12 | characterization of the first sentence of Mr. Villasenor's |
| 09:30:44 | 13 | report that you read? |
| 09:30:46 | 14 | A.  I'm sorry, Mr. Johnson, again. |
| 09:30:50 | 15 | Q.  Did you candidly agree with him about the first |
| 09:30:53 | 16 | sentence of Mr. Villasenor's report that he read to you? |
| 09:30:57 | 17 | A.  I did agree with him. |
| 09:30:58 | 18 | Q.  Okay.  Well, sir -- |
| 09:31:00 | 19 |         MR. JOHNSON:  Mr. Bakale, can we have |
| 09:31:05 | 20 | Mr. Villasenor's report, Paragraphs 15 and 16? |
| 09:31:08 | 21 |         MR. SHEASBY:  Your Honor, object.  He can't |
| 09:31:12 | 22 | publish a report.  That's hearsay.  I -- I was not allowed |
| 09:31:12 | 23 | to publish it either.  If he wants to show that report to |
| 09:31:15 | 24 | Mr. Saffici -- reports aren't evidence to be published with |
| 09:31:17 | 25 | the jury. |

```
09:31:19   1              THE COURT:  What's your response, Mr. Johnson?
09:31:21   2              MR. JOHNSON:  I'm not offering it for the truth of
09:31:23   3    the matter asserted.  This has been discussed before the
09:31:25   4    witness.  I'm offering it for context of the testimony.
09:31:34   5              THE COURT:  Approach the bench, counsel.
09:31:35   6              (Bench conference.)
09:31:42   7              THE COURT:  I think you're going to have to refer
09:31:44   8    the witness to the areas that you believe are appropriate
09:31:49   9    under the doctrine of optional completeness, and if he says
09:31:53  10    that additional text would cause him to change his answer,
09:31:56  11    then you can publish it.
09:31:58  12              MR. SHEASBY:  Your Honor, I'm concerned --
09:32:01  13              THE COURT:  That's like impeachment in reverse.
09:32:02  14              MR. SHEASBY:  I'm concerned that the suggestion
09:32:04  15    that I didn't show it to the jury, I instructed him not to
09:32:07  16    read it out loud because that would have been a violation
09:32:09  17    of the Court's rulings.
09:32:12  18              THE COURT:  That's not anything that rises to the
09:32:13  19    level of an objection at this point.
09:32:15  20              MR. SHEASBY:  Thank you, Your Honor.
09:32:15  21              THE COURT:  Okay.
09:32:20  22              (Bench conference.)
09:32:22  23              THE COURT:  Let's proceed.
09:32:26  24              MR. JOHNSON:  May I approach, Your Honor, please?
09:32:28  25              THE COURT:  You may.
```

09:32:30  1   Q.  (By Mr. Johnson)  Mr. Saffici, will you read the first

09:32:47  2   and the second sentence of Mr. Villasenor's Paragraph 16?

09:32:51  3   A.  To myself?

09:32:52  4   Q.  Yes.

09:33:06  5   A.  I've read the first and second sentences.

09:33:09  6   Q.  Do your answers -- do you -- are all your answers

09:33:14  7   regarding Mr. Villasenor's definition of person of ordinary

09:33:19  8   skill in the art and you, remain true, in light of the

09:33:23  9   second sentence?

09:33:25  10  A.  No, they do not remain true.

09:33:28  11      MR. JOHNSON:  May I now publish this to the jury,

09:33:30  12  Your Honor?

09:33:30  13      THE COURT:  You can recover the document from the

09:33:32  14  witness.

09:33:32  15      MR. JOHNSON:  Thank you.  May I publish it?

09:33:42  16      THE COURT:  You may.

09:33:43  17      MR. JOHNSON:  Thank you, Your Honor.

09:33:44  18      Can we have it up?  I don't want to...

09:33:49  19      Thank you.

09:33:50  20  Q.  (By Mr. Johnson)  So the jury is clear, Mr. Sheasby

09:33:53  21  read to you which -- or told you to read only which

09:33:56  22  first -- which sentence?

09:33:57  23  A.  Paragraph 16, first sentence that ends there with the

09:34:01  24  word "imaging."

09:34:03  25  Q.  Right.  And then you all had a long colloquy about

```
09:34:08   1   others that might meet that, but did you get the
09:34:10   2   implication that he didn't think you met that?
09:34:13   3   A.  Yes, definitely.
09:34:14   4   Q.  Now, sir, can you read the second sentence that he
09:34:18   5   wouldn't let you read?
09:34:19   6   A.  You want me to read it out loud?
09:34:22   7   Q.  Yes, sir.
09:34:22   8   A.  Oh.  It says:  More work experience could compensate
09:34:26   9   for less education, and vice versa.
09:34:29  10   Q.  Now, Mr. Sheasby didn't read that sentence to you, did
09:34:36  11   he?
09:34:36  12   A.  No, he did not.
09:34:38  13   Q.  Mr. Sheasby [sic], do you think 53 years in the real
09:34:42  14   world would be more work experience that could accomplish
09:34:44  15   that --
09:34:44  16           THE COURT:  Just a minute, counsel.
09:34:45  17           What are you up on your feet for, Mr. Sheasby.
09:34:45  18           MR. SHEASBY:  Objection, this is leading, Your
09:34:55  19   Honor.
09:34:55  20           MR. JOHNSON:  Given what has gone on, Your Honor,
09:34:58  21   I would ask for leniency.
09:35:02  22           THE COURT:  Restate your question, Mr. Johnson.
09:35:04  23   Q.  (By Mr. Johnson)  Mr. Saffici, how many years of
09:35:09  24   real-world experience do you have?
09:35:10  25   A.  53.
```

09:35:10  1    Q.  All in the areas that we're talking about?

09:35:12  2    A.  That's correct.

09:35:13  3    Q.  Okay.  Can you tell the jury whether having 53 years

09:35:18  4    experience might be a substitute, in your opinion, for all

09:35:23  5    these college degrees that were talked about by

09:35:25  6    Mr. Sheasby?

09:35:26  7    A.  I believe it's fair to consider it as a substitute.

09:35:31  8    Q.  And, sir, with the benefit -- and Mr. Sheasby -- did

09:35:37  9    Mr. Sheasby beat you up about not meeting that definition?

09:35:40  10           MR. SHEASBY:  Your Honor, objection.  This is

09:35:43  11   improper.

09:35:43  12           THE COURT:  Sustained.

09:35:43  13           MR. SHEASBY:  Absolutely improper.

09:35:44  14           THE COURT:  That's inflammatory language that's

09:35:48  15   not called for, Mr. Johnson.

09:35:50  16           MR. JOHNSON:  I'll rephrase.

09:35:52  17   Q.  (By Mr. Johnson)  Did you get the impression that

09:35:54  18   Mr. Sheasby was questioning your qualifications to sit on

09:35:57  19   that stand, just based on reading that first sentence?

09:36:00  20   A.  Yeah, I would say that's true.

09:36:03  21   Q.  With the benefit of the whole definition, do you now

09:36:06  22   believe you meet that definition, Mr. -- Dr. Villasenor set

09:36:10  23   out?

09:36:11  24   A.  I believe I do.

09:36:15  25   Q.  Mr. Saffici, do you recall yesterday that you and I

| | | |
|---|---|---|
| 09:36:20 | 1 | discussed at length your experience in this industry? |
| 09:36:23 | 2 | A.  Yes. |
| 09:36:26 | 3 | Q.  Okay.  And do you recall the part of the -- of the |
| 09:36:28 | 4 | trial where I tendered you as an expert to the Court for |
| 09:36:31 | 5 | approval? |
| 09:36:32 | 6 | A.  Yes, I do. |
| 09:36:34 | 7 | Q.  Do you recall, when asked for objections, what counsel |
| 09:36:37 | 8 | for the Plaintiff said? |
| 09:36:38 | 9 | A.  Yes, I do. |
| 09:36:39 | 10 | Q.  What did he say? |
| 09:36:41 | 11 | A.  He did not object. |
| 09:36:43 | 12 | Q.  Do you have any idea why Mr. Sheasby would not have |
| 09:36:51 | 13 | objected then and then try to do what he did with you with |
| 09:36:55 | 14 | the definition? |
| 09:36:56 | 15 |        MR. SHEASBY:  Your Honor, objection, it's |
| 09:36:56 | 16 | argumentative and it calls for -- calls for -- |
| 09:37:00 | 17 |        THE COURT:  It calls for speculation about what |
| 09:37:01 | 18 | was in Mr. Sheasby's mind.  And Mr. Saffici, I'm sure, has |
| 09:37:05 | 19 | no idea of what the answer to that is.  That's an improper |
| 09:37:10 | 20 | question, and I'll sustain. |
| 09:37:12 | 21 |        MR. JOHNSON:  I'll move on. |
| 09:37:14 | 22 | Q.  (By Mr. Johnson)  Now, Mr. Sheasby compared you with |
| 09:37:16 | 23 | some of the other witnesses who have taken the stand; do |
| 09:37:20 | 24 | you remember that? |
| 09:37:20 | 25 | A.  Yes, I do. |

09:37:20   1    Q.  Do you recall he claimed Mr. Brady had given opinion

09:37:24   2    testimony about whether the inventions at issue were

09:37:26   3    described in the specifications?

09:37:28   4    A.  Yes, I recall that.

09:37:29   5    Q.  Can you tell the jury whether Mr. Brady is a -- an

09:37:34   6    expert witness like you or a fact witness and corporate

09:37:38   7    representative like Mr. Hecht?

09:37:38   8    A.  He would be a fact --

09:37:40   9            MR. SHEASBY:  Your Honor, objection.  Can I

09:37:43   10   approach?

09:37:44   11           THE COURT:  Approach the bench, counsel.

09:37:45   12           (Bench conference.)

09:37:53   13           THE COURT:  What's your objection?

09:37:54   14           MR. SHEASBY:  Every single question that he's been

09:37:56   15   asking for the last seven minutes has been a leading

09:38:00   16   question.  If I stand up every time and say leading, I'm

09:38:03   17   going to get -- it's going to be very disruptive to the

09:38:06   18   jury.

09:38:06   19           This is not a cross-examination.  This is -- this

09:38:08   20   is not a redirect examination.  It's just him -- him

09:38:10   21   leading the witness to say yes or no so he can make an

09:38:13   22   argument.  This is just -- this is completely improper.

09:38:17   23           MR. JOHNSON:  Your Honor, I'm attempting to

09:38:18   24   correct some severe misrepresentations by counsel about the

09:38:21   25   content of factual testimony.  And giving fact witnesses

09:38:25  1  the impromptu of an expert -- I would ask for leniency, but

09:38:32  2  I will try to maintain.

09:38:33  3          THE COURT:  I -- at this point, the only criticism

09:38:39  4  I have of what Mr. Johnson is doing is the occasional use

09:38:42  5  of inflammatory language like, beating you up.  There's no

09:38:46  6  place for that.  I know what you're doing, I know why

09:38:48  7  you're doing it, and I think you have a right to do it.

09:38:51  8  There is a rule against leading questions.  You'll just

09:38:53  9  have to do the best you can.

09:38:54  10         MR. JOHNSON:  Okay.

09:38:55  11         THE COURT:  Let's proceed.

09:39:03  12         (Bench conference concluded.)

09:39:03  13         THE COURT:  Let's proceed.

09:39:08  14  Q.  (By Mr. Johnson)  Mr. Saffici, do you know if Mr. Brady

09:39:11  15  ever submitted an expert report in this case?

09:39:14  16  A.  I really don't know one way or the other.

09:39:16  17  Q.  Is Mr. Brady an inventor on these patents?

09:39:19  18  A.  I don't recall.  He indicated he was.

09:39:24  19  Q.  In fact, have we seen any of the inventors -- you've

09:39:29  20  been here the whole trial?

09:39:30  21  A.  Yes.

09:39:30  22  Q.  Have we seen any of the inventors take the stand like

09:39:34  23  you are?

09:39:34  24  A.  Not take the stand, no.

09:39:36  25  Q.  And, sir, do you think in your work if Mr. Brady had

09:39:42   1   done an expert report, is that something you would have

09:39:46   2   considered as a part of your work?

09:39:47   3   A.  Yes, I would.

09:39:48   4   Q.  Did you ever see --

09:39:51   5   A.  I'm sorry.

09:39:52   6   Q.  Did you ever see an expert report by Mr. Brady?

09:39:55   7   A.  No, I didn't.

09:39:56   8   Q.  And did you see Mr. Brady ever qualified as an expert

09:40:06   9   the way you were?

09:40:07   10   A.  No, I don't believe the qualification was there when he

09:40:11   11   was on the stand.

09:40:12   12   Q.  You have worked on this case how long, sir?

09:40:17   13   A.  About 11 months.

09:40:24   14   Q.  Okay.  Now, in Paris, where I come from, I've heard the

09:40:30   15   phrase, show your work.  Have you heard that phrase?

09:40:32   16   A.  Yes, I believe I've heard that, yeah.

09:40:34   17   Q.  Did you do -- did you show your work in this case?

09:40:37   18   A.  I believe I did.

09:40:38   19   Q.  Did you draft -- did you do that by writing a report?

09:40:40   20   A.  Yes, that's correct.

09:40:41   21   Q.  And have we been talking about the report?

09:40:45   22   A.  Yes, we have.

09:40:46   23   Q.  Okay.  Is this a copy of it?

09:40:48   24   A.  I believe that is.

09:40:52   25   Q.  How long is the expert report that you wrote in this

09:40:55   1   case?

09:40:55   2   A.  I don't have that memorized, but --

09:41:00   3   Q.  Estimate?

09:41:02   4   A.  I don't know, several hundred pages, I believe.

09:41:04   5   Q.  453 sound about right?

09:41:06   6   A.  Yeah, that's right, that's right.

09:41:08   7   Q.  How many hours of deposition did you have to sit

09:41:13   8   through defending your expert report?

09:41:15   9   A.  Oh, probably, between the two reports, about 12, I

09:41:22  10   guess; 12, 13.

09:41:24  11   Q.  And, sir, who do you recall wrote the report for

09:41:32  12   Plaintiffs to respond to your report?

09:41:36  13   A.  Mr. Calman.

09:41:37  14   Q.  Okay.  So Mr. Calman was the person on the Plaintiff's

09:41:41  15   side to respond to you, not Mr. Brady or Dr. Conte?

09:41:45  16   A.  That's correct.

09:41:48  17   Q.  Did you ever see an expert report from Dr. Conte, who

09:41:53  18   counsel represented gave testimony on written description?

09:41:56  19   Did he -- did you ever see a report by him on your issues?

09:42:02  20   A.  No, I didn't.

09:42:03  21   Q.  Now, Mr. Calman -- have we even seen Mr. Calman darken

09:42:09  22   the doors of this courthouse?

09:42:11  23          MR. SHEASBY:  Your Honor, objection, this is

09:42:12  24   argumentative and improper language before the Court.

09:42:16  25          THE COURT:  Overruled.  You may answer the

09:42:18  1  question, Mr. Saffici.

09:42:19  2  A.  No, I haven't seen Mr. Calman this week.

09:42:30  3  Q.  (By Mr. Johnson)  Mr. Saffici, I'd like to talk to you

09:42:48  4  really briefly about some of the other issues counsel has

09:42:51  5  tried to talk with you about in the context of what we've

09:42:54  6  been discussing.

09:42:58  7       MR. JOHNSON:  If we could pull up the '681 spec,

09:43:03  8  Paragraphs 4, 11 through 34, that you were discussing.

09:43:25  9       I'm sorry, Mr. Bakale, I think I've got the

09:43:29  10  wrong -- written down the wrong cite.  Actually, Lines 37

09:43:39  11  through 49.

09:43:45  12  Q.  (By Mr. Johnson)  Is this what you were discussing with

09:43:46  13  counsel earlier?

09:43:47  14  A.  Yes, that's the section.

09:43:48  15  Q.  And do you recall where you said that you gave a

09:43:53  16  different answer in your -- in your deposition about

09:44:01  17  whether or not these had to be -- whether there's a

09:44:05  18  limitation on -- whether these could be in the same box, I

09:44:09  19  believe is the phrase?

09:44:10  20  A.  Yes.

09:44:12  21  Q.  Okay.  Now, Mr. Saffici, do you analyze the con --

09:44:17  22  the -- the specification just in a -- in a single

09:44:21  23  paragraph, or do you look at it in the whole context?

09:44:24  24  A.  I look at it in the whole context.

09:44:27  25  Q.  Okay.  And can you explain why your answer was

09:44:29  1  different about whether they could be in the same box, the

09:44:34  2  image capture device and general purpose computer, at your

09:44:36  3  deposition in context of the whole specification?

09:44:40  4  A.  Well, because other areas in the specification also

09:44:44  5  talk about the devices and show them as being separate.

09:44:49  6  Q.  Including, for instance, this line, sir?

09:44:54  7  A.  Yes, that's one of them.

09:44:56  8  Q.  And the fact that it's telling you --

09:45:01  9  A.  Scanner or digital camera, yes.

09:45:03  10  Q.  In fact, does the specification ever show you an

09:45:10  11  example system of putting the general purpose computer and

09:45:13  12  the image capture device in the same box and using that for

09:45:17  13  check deposit or check imaging?

09:45:20  14  A.  I did not find that in the specification.

09:45:26  15  Q.  You were asked some questions about PDAs.  Do you

09:45:28  16  recall that?

09:45:29  17  A.  Yes.

09:45:30  18  Q.  Now, we went over this in some detail yesterday, but in

09:45:35  19  arriving at written description opinions, do you go out and

09:45:41  20  analyze what the market was, or do you look at something

09:45:45  21  else?

09:45:45  22  A.  I looked at the specification.

09:45:47  23  Q.  Regardless of what the market was having, what is the

09:45:51  24  invention limited to?

09:45:52  25  A.  The invention was limited to a general purpose computer

09:45:57   1   with a separate capture device.

09:46:03   2           MR. JOHNSON:  Let's look at the '605 patent,

09:46:05   3   Paragraph -- or Column 8, Lines 3 through 17.

09:46:09   4   Q.  (By Mr. Johnson)  Does -- did the inventors describe in

09:46:23   5   the specification PDAs in a way to one of skill in the art

09:46:26   6   who would indicate they are used in check processing?

09:46:29   7   A.  No, there's no description to that effect.

09:46:31   8   Q.  Remind the jury in the context of this patent what's

09:46:35   9   being described.

09:46:37  10   A.  Again, this portion of the specification is referring

09:46:40  11   to Figure 4, the exemplary network or distributed computing

09:46:46  12   environment.  And it talked about these numbers -- 400s

09:46:50  13   here as being types -- just describing devices that can be

09:46:54  14   on that network.

09:46:55  15           And then further down here, it talked about same

09:46:59  16   or different devices, such as -- and that's where it

09:47:02  17   enumerated the PDA, the audio/video -- audio/video devices,

09:47:09  18   MP3 player, personal computer, et cetera.

09:47:12  19   Q.  Does the patent disclose how an MP3 player can be used

09:47:21  20   in check processing?

09:47:22  21   A.  No, it doesn't.

09:47:23  22   Q.  Treat it the same as a PDA?

09:47:25  23   A.  I took it, because they're all similar here, that they

09:47:28  24   were treated in the same way.

09:47:33  25   Q.  Can we look at -- anything about your discussion with

| | | |
|---|---|---|
| 09:47:36 | 1 | counsel that changes your opinion about whether the |
| 09:47:39 | 2 | discussion of PDAs in the patents supports written |
| 09:47:41 | 3 | description of the full scope of the claims? |
| 09:47:43 | 4 | A.  Nothing changes them. |
| 09:47:45 | 5 | Q.  Okay.  I want to look at your discussion at Figure 3, |
| 09:47:47 | 6 | and I think that's Column 6, Lines 39 through 55. |
| 09:48:01 | 7 | Is this a section of the specification you were |
| 09:48:07 | 8 | discussing regarding the internal workings of the camera? |
| 09:48:11 | 9 | Do you recall that? |
| 09:48:11 | 10 | A.  Yes. |
| 09:48:12 | 11 | Q.  And that's seen -- the jury can see that in Figure 3? |
| 09:48:16 | 12 | A.  Right. |
| 09:48:17 | 13 | Q.  Now, is there a discussion here regarding the coupling |
| 09:48:22 | 14 | between the camera or image capture and the general purpose |
| 09:48:29 | 15 | computer, or is this solely about the camera? |
| 09:48:32 | 16 | A.  Well, it's talking about the image capture device. |
| 09:48:37 | 17 | Q.  Okay.  Now, is the only discussion -- will you look |
| 09:48:46 | 18 | here at the last line?  And what it says about the |
| 09:48:52 | 19 | communication connections that were discussed up here in |
| 09:48:56 | 20 | the processors that you discussed with counsel, what does |
| 09:48:59 | 21 | it say about those? |
| 09:49:00 | 22 | A.  Right.  It says that the communications -- the |
| 09:49:04 | 23 | connection, which refers to it as 308, can serve to |
| 09:49:09 | 24 | communicatively couple the device to a general purpose |
| 09:49:12 | 25 | computer as described in Figure 2. |

09:49:18  1          MR. JOHNSON:   Can we see Figure 3, Mr. Bakale?

09:49:23  2   Q.  (By Mr. Johnson)   Does Figure 3 have anything to do

09:49:35  3   with a discussion of the general purpose computer being

09:49:39  4   linked to the camera in the way that the claims require?

09:49:42  5   A.  No, this figure is just showing that image capture

09:49:46  6   device itself, not a general purpose computer.

09:49:55  7   Q.  Mr. Saffici, I would now like to -- do you remember

09:50:05  8   when -- now, I'd like to turn to -- to discussions with

09:50:08  9   counsel about what you could learn -- remember the

09:50:12  10  discussions about what you could learn from the '227 -- the

09:50:16  11  '200 specification and the '681 specification, that they

09:50:19  12  were the same thing?

09:50:20  13  A.  Yes.

09:50:21  14  Q.  And in that discussion, counsel referred you to some

09:50:28  15  deposition testimony at Page 9.  Let me get that for us.

09:50:36  16          MR. JOHNSON:   Your Honor, I apologize.  We have a

09:50:39  17  little water spill from Mr. Sheasby's water.

09:50:56  18  Q.  (By Mr. Johnson)   And I believe he referred you to

09:50:58  19  Page 9 --

09:50:59  20          MR. JOHNSON:   Thank you so much.

09:51:10  21  Q.  (By Mr. Johnson)   -- Page 9, Line 22, through 10:10.

09:51:22  22          MR. JOHNSON:   May I have the camera or can you --

09:51:24  23  okay.  Thank you.

09:51:25  24  Q.  (By Mr. Johnson)   Now, down here, sir, is what he

09:51:27  25  referred you to and asked you questions about in terms

09:51:30   1   of -- that all the elements of those claims are described

09:51:34   2   in the Oakes '200 patent, referring to the '681.  Do you

09:51:37   3   recall that?

09:51:38   4   A.  Yes.

09:51:38   5   Q.  And you agreed that they are, right, sir?

09:51:42   6   A.  I did.

09:51:42   7   Q.  Okay.  Now, you have two opinions in this case?

09:51:49   8   A.  Yes, I do.

09:51:50   9   Q.  What are those areas?

09:51:51  10   A.  Written description and anticipation.

09:51:54  11   Q.  Did we cover in your direct that those have very

09:51:58  12   different legal standards, very different things that you

09:52:01  13   look at?

09:52:02  14   A.  Yes, that's correct.

09:52:03  15   Q.  Okay.  In context of this quote, sir, what were you

09:52:07  16   discussing with Mr. Sheasby at the deposition when you gave

09:52:11  17   this testimony?

09:52:12  18   A.  Anticipation.

09:52:13  19   Q.  Okay.  And can we see that, if we just looked a few

09:52:16  20   lines up from where he was directing you?

09:52:18  21   A.  Yes, we can.

09:52:19  22   Q.  How do we do that, sir?

09:52:21  23   A.  Well, Mr. Sheasby had pointed me to Paragraph 246 in my

09:52:26  24   report.

09:52:28  25   Q.  Okay.  And if you look in your report, sir, what

| | | |
|---|---|---|
| 09:52:32 | 1 | section -- you don't have to look at it unless you need to. |
| 09:52:35 | 2 | A.  Oh. |
| 09:52:35 | 3 | Q.  What section of your report, in terms of opinions, is |
| 09:52:38 | 4 | Section 246 in? |
| 09:52:39 | 5 | A.  Part of Section B, which was showing the anticipation |
| 09:52:43 | 6 | of the Oakes '200 to the '681. |
| 09:52:47 | 7 | Q.  Anything about this testimony or that part of the |
| 09:52:51 | 8 | report that has anything to do with written description |
| 09:52:53 | 9 | opinions? |
| 09:52:54 | 10 | A.  No, it does not. |
| 09:52:56 | 11 | Q.  Were you asked the same questions about the '605 patent |
| 09:53:09 | 12 | specification? |
| 09:53:10 | 13 | A.  Yes. |
| 09:53:11 | 14 | Q.  And did you say that all elements -- in your |
| 09:53:14 | 15 | deposition, all elements of the '605 patent are described |
| 09:53:18 | 16 | in the Oakes '200 -- or, sorry, '227? |
| 09:53:25 | 17 | A.  Yes, I did. |
| 09:53:25 | 18 | Q.  And when counsel was having that colloquy with you and |
| 09:53:30 | 19 | talking about it, what area of the opinion did that |
| 09:53:34 | 20 | testimony have to deal with? |
| 09:53:35 | 21 | A.  We were still within Section B -- sorry, it wasn't B at |
| 09:53:39 | 22 | that point.  It was still anticipation. |
| 09:53:41 | 23 | Q.  Anything about that deposition testimony that bears on |
| 09:53:45 | 24 | written description? |
| 09:53:46 | 25 | A.  No, it doesn't. |

09:53:47  1  Q.  In fact, sir, what is the difference between

09:53:52  2  anticipation and written description in terms of whether

09:53:54  3  you have to find everything in a patent or an example?

09:53:56  4  A.  With written description, as we spoke yesterday, the

09:54:04  5  specification must describe all the ways that the claims

09:54:10  6  say that the invention works.

09:54:13  7       With anticipation, a prior art only needs to

09:54:16  8  identify one of the ways in which the claims of a patent

09:54:22  9  work.

09:54:26  10  Q.  Mr. Saffici, when you gave -- were talking about the

09:54:34  11  descriptions of elements in your testimony -- in your

09:54:39  12  deposition with counsel, what were you referring to in

09:54:42  13  terms of anticipation?

09:54:42  14  A.  That only one of the ways -- ask your question again,

09:54:50  15  Mr. Johnson, before I --

09:54:51  16  Q.  When you were -- when you were having these discussions

09:54:54  17  with counsel that ends up were about anticipation and not

09:54:57  18  written description, what were you referring to?

09:54:59  19  A.  Oh.  Well, I was referring to the -- to the rule around

09:55:02  20  anticipation that the specification would identify one of

09:55:07  21  the ways in which the claims work.

09:55:10  22  Q.  Do you recall discussions with counsel about

09:55:16  23  Paragraph 209 of your report?

09:55:18  24  A.  209?

09:55:20  25  Q.  Can you go there?

09:55:20   1    A.  Yes, let me go there.  Oh, yes.

09:55:26   2          MR. JOHNSON:  Mr. Bakale, can we have on the

09:55:27   3    screen the Oakes '227, which I believe is -- yes, the

09:55:40   4    patent.  Defense Exhibit 5.  Can we go to Paragraph 4, 30

09:55:52   5    through 34?  Sorry, Column 4, Line 30 to 34.

09:56:12   6    Q.  (By Mr. Johnson)  In your report when you're talking

09:56:19   7    about a customer can use a general purpose computer that

09:56:22   8    couples to image capture devices, is this part of the

09:56:26   9    specification that would inform that opinion?

09:56:29  10    A.  Yes, in the '227.

09:56:34  11    Q.  What are the examples of image capture devices that can

09:56:39  12    easily be coupled to or be -- what are the examples of the

09:56:55  13    image capture devices used in the -- in the context of the

09:56:58  14    specification?

09:56:58  15    A.  It talks about a scanner and digital camera.

09:57:03  16    Q.  And does that inform your reading of Columns 3, 59

09:57:09  17    through 64, that you were discussing in Paragraph 10 -- 209

09:57:14  18    of your pat -- of your report?

09:57:15  19    A.  Yes, it does.

09:57:16  20    Q.  Do you stand by your opinion that the patent does not

09:57:35  21    teach general purpose computer with a cam -- with a camera

09:57:41  22    in a single unit?

09:57:43  23    A.  I -- I do stand by my opinion.

09:57:50  24          MR. JOHNSON:  May I have a moment, Your Honor?

09:57:52  25          THE COURT:  You may.

| | | |
|---|---|---|
| 09:58:01 | 1 | Q.  (By Mr. Johnson)  Now, at the end of the day, sir, |
| 09:58:04 | 2 | yesterday, Mr. Sheasby and you were discussing your |
| 09:58:07 | 3 | deposition testimony about mobile devices and the |
| 09:58:09 | 4 | specification.  Do you recall that? |
| 09:58:10 | 5 | A.  Yes. |
| 09:58:15 | 6 | MR. JOHNSON:  And may I have the camera? |
| 09:58:17 | 7 | Q.  (By Mr. Johnson)  Mr. Sheasby asked you to look at |
| 09:58:23 | 8 | Line -- at Page 51 of your deposition, and you did that, |
| 09:58:26 | 9 | right, sir? |
| 09:58:27 | 10 | A.  Yes. |
| 09:58:28 | 11 | Q.  And what question did he ask you at Line 23? |
| 09:58:33 | 12 | A.  So your testimony under oath at that time was that the |
| 09:58:39 | 13 | specification of the patents-in-suit describe mobile |
| 09:58:42 | 14 | devices, correct? |
| 09:58:47 | 15 | Q.  And was that your testimony at Paragraph -- at Page 51, |
| 09:58:51 | 16 | Lines 5 through 10? |
| 09:58:52 | 17 | A.  I believe, yes, it was. |
| 09:59:06 | 18 | MR. JOHNSON:  Sorry, Your Honor. |
| 09:59:16 | 19 | Q.  (By Mr. Johnson)  Let's look at that. |
| 09:59:20 | 20 | Question at line 5:  Do you stand by the fact that |
| 09:59:43 | 21 | the specifications of the patent -- |
| 09:59:43 | 22 | THE COURT:  Slow down, Mr. Johnson. |
| 09:59:46 | 23 | MR. JOHNSON:  Sorry, Your Honor.  It's contagious. |
| 09:59:48 | 24 | THE COURT:  Well, you caught it. |
| 09:59:50 | 25 | Q.  (By Mr. Johnson)  Do you stand by the fact that the |

| | | |
|---|---|---|
| 09:59:55 | 1 | specifications of the patent describe as being -- as mobile |
| 09:59:59 | 2 | devices being within the scope of the purported invention? |
| 10:00:03 | 3 | What did you answer? |
| 10:00:05 | 4 | A.  Read it out loud? |
| 10:00:07 | 5 | Q.  Yes. |
| 10:00:08 | 6 | A.  I did when I wrote this, so my opinion stays the same. |
| 10:00:12 | 7 | Q.  Is there any mention of camera in that section of your |
| 10:00:16 | 8 | testimony? |
| 10:00:17 | 9 | A.  No, there isn't. |
| 10:00:21 | 10 | Q.  Yesterday, in the following questions after that |
| 10:00:24 | 11 | initial question that we looked at, Mr. Sheasby had |
| 10:00:30 | 12 | follow-up and confirmed:  Do you stand by the fact that the |
| 10:00:34 | 13 | specifications of the patent describe as being -- as mobile |
| 10:00:38 | 14 | devices being within the scope of the purported invention? |
| 10:00:41 | 15 | What did you respond to it? |
| 10:00:42 | 16 | A.  I don't believe I have reason to change that opinion. |
| 10:00:45 | 17 | Q.  Right.  Anything in that about cameras? |
| 10:00:49 | 18 | A.  No. |
| 10:00:49 | 19 | Q.  And was there anything in your testimony that you all |
| 10:00:53 | 20 | were referring to about cameras? |
| 10:00:54 | 21 | A.  No, there wasn't. |
| 10:00:55 | 22 | Q.  Sorry, this is the testimony -- the trial testimony. |
| 10:01:13 | 23 | Did you continue to refer to the deposition |
| 10:01:15 | 24 | testimony we've been referring to, in your questioning at |
| 10:01:17 | 25 | the end of the day? |

| | | |
|---|---|---|
| 10:01:18 | 1 | A.  Yes, it was continued. |
| 10:01:20 | 2 | Q.  Now, in the last question, what does Mr. Sheasby ask |
| 10:01:25 | 3 | you? |
| 10:01:27 | 4 | A.  Sir, the specifications of the patents in this case |
| 10:01:31 | 5 | disclose the use of mobile devices with digital cameras, |
| 10:01:36 | 6 | correct?  That's what you testified to previously. |
| 10:01:39 | 7 | Q.  Now, was that phrase "with digital cameras" in any of |
| 10:01:45 | 8 | the deposition testimony that you all had been referring? |
| 10:01:48 | 9 | A.  No, it was not. |
| 10:01:48 | 10 | Q.  Who put that in there? |
| 10:01:50 | 11 | A.  Mr. Sheasby. |
| 10:01:53 | 12 | Q.  And is that your testimony at deposition or at trial? |
| 10:01:58 | 13 | A.  No, it wasn't. |
| 10:01:59 | 14 | Q.  Did you feel a little misled, sir? |
| 10:02:01 | 15 | A.  Yes, I did. |
| 10:02:03 | 16 | MR. JOHNSON:  May I have a moment, Your Honor? |
| 10:02:05 | 17 | THE COURT:  You may. |
| 10:02:21 | 18 | MR. JOHNSON:  Mr. Bakale, can I have Slide 69, |
| 10:02:26 | 19 | please? |
| 10:02:26 | 20 | Q.  (By Mr. Johnson)  Mr. Saffici, what have you concluded |
| 10:02:35 | 21 | about the '605 patent after your 453 page report, hours of |
| 10:02:40 | 22 | deposition, and your testimony here today? |
| 10:02:41 | 23 | A.  My conclusion remains that the '605 patent first lacks |
| 10:02:47 | 24 | written description, and, second, is anticipated by the |
| 10:02:50 | 25 | Oakes '227 patent. |

10:02:54   1   Q.  Because of the written description, what priority date

10:02:56   2   applies to the '605 patent?

10:02:58   3   A.  The '605 patent then would get the priority date of

10:03:02   4   July 28th, 2017.

10:03:06   5   Q.  Does the full -- does the written description disclosed

10:03:09   6   to you, as one of skill in the art, that the full scope of

10:03:12   7   the invention was disclosed in the written description?

10:03:14   8   A.  It was not disclose -- fully disclosed.

10:03:17   9   Q.  As to the '681 patent, sir, what are your opinions?

10:03:21  10   A.  My opinions are still that the '681 patent lacks

10:03:25  11   written description and, secondarily, is anticipated by the

10:03:29  12   Oakes '200 patent.

10:03:31  13   Q.  And what priority date would apply to the '681 patent?

10:03:34  14   A.  The priority date then would change to July 28th, 2017.

10:03:37  15   Q.  And does the written description indicate to you as one

10:03:40  16   of skill in the art that the inventors possessed and

10:03:44  17   disclosed the full scope of the claims in this case for the

10:03:47  18   '681 patent?

10:03:47  19   A.  They do not provide full scope disclosure.

10:03:50  20   Q.  And do your opinions apply both to the independent and

10:03:53  21   dependent claims at issue in this case?

10:03:54  22   A.  Yes, they do.

10:04:00  23           MR. JOHNSON:  Moment, Your Honor?

10:04:01  24           THE COURT:  One more time, Mr. Johnson.

10:04:03  25           MR. JOHNSON:  Thank you.

```
10:04:05   1              Pass the witness, Your Honor.

10:04:08   2              THE COURT:  Counsel, approach the bench, please.

10:04:12   3              (Bench conference.)

10:04:15   4              THE COURT:  Any estimate on your additional cross

10:04:20   5    time?

10:04:20   6              MR. SHEASBY:  Seven minutes.

10:04:21   7              THE COURT:  Okay.  Let's go.

10:04:23   8              (Bench conference concluded.)

10:04:34   9              THE COURT:  All right.  We'll proceed with

10:04:37  10    additional cross-examination by the Plaintiff.

10:04:39  11              When you're ready, Mr. Sheasby.

10:04:39  12                        RECROSS-EXAMINATION

10:04:41  13    BY MR. SHEASBY:

10:04:41  14    Q.  Mr. Saffici, you have extraordinary experience in

10:04:45  15    remote deposit capture, correct?

10:04:46  16    A.  I believe so.

10:04:48  17    Q.  But, Mr. Saffici, you were not hired as a technical

10:04:53  18    expert in this case, correct?

10:04:54  19    A.  That's absolutely correct.

10:04:56  20    Q.  Mr. Saffici, you have extraordinary experience in

10:05:00  21    remote deposit capture, but you have no technical

10:05:03  22    experience actually designing mobile remote deposit capture

10:05:06  23    systems, correct?

10:05:08  24    A.  Designing from a technical point, I would agree.

10:05:11  25    Q.  Mr. Saffici, you are an extraordinarily experienced
```

10:05:18  1   individual, and you have the ability to analyze the value

10:05:20  2   of an MRDC system, correct?

10:05:22  3   A.  Yes, I could evaluate it.

10:05:26  4   Q.  But the one thing that you didn't do in this trial is

10:05:31  5   evaluate the value of USAA's patents, correct?

10:05:33  6   A.  Because I wasn't asked to.

10:05:39  7   Q.  And, Mr. Saffici, there's a presumption of validity

10:05:43  8   that is associated with the patents in this case, correct?

10:05:46  9   A.  Say it again, please.

10:05:48  10  Q.  There's a presumption of validity that is associated

10:05:51  11  with the patents in this case, correct?

10:05:52  12  A.  The fact that the patent was granted, yes.

10:05:55  13  Q.  And the jury must find by clear and convincing evidence

10:05:58  14  that the patent was -- is invalid, correct?

10:06:02  15  A.  That is correct.

10:06:02  16  Q.  And that's a dramatically different standard from the

10:06:05  17  standard for infringement, correct, sir?

10:06:10  18        MR. JOHNSON:  Your Honor, I would object to the

10:06:13  19  use of the phrase "dramatically."  The Court will obviously

10:06:17  20  instruct that it's a different standard.

10:06:19  21        THE COURT:  Rephrase the question, Mr. Sheasby.

10:06:21  22  Q.  (By Mr. Sheasby)  The standard for clear and convincing

10:06:23  23  evidence is significantly higher than the standard of

10:06:28  24  preponderance of the evidence, correct, sir?

10:06:30  25  A.  Since I didn't work on any of the infringement side of

10:06:33   1   it, I'm not in the position to really respond.

10:06:36   2   Q.  Mr. Saffici, thank you for your time these last two

10:06:40   3   days.

10:06:41   4           MR. SHEASBY:  I pass the witness, Your Honor.

10:06:43   5           THE WITNESS:  Thank you.

10:06:43   6           THE COURT:  Redirect?

10:06:45   7           MR. JOHNSON:  No, Your Honor.

10:06:45   8           THE COURT:  You may step down, Mr. Saffici.

10:06:48   9           THE WITNESS:  Thank you, Your Honor.

10:06:49  10           THE COURT:  You're welcome.

10:06:50  11       Ladies and gentlemen, we're going to take a short

10:06:53  12   recess at this time.  You may close and leave your

10:06:56  13   notebooks in your chairs.  Follow all the instructions I've

10:06:58  14   given you, including not to discuss the case among

10:07:00  15   yourselves.  And we'll be back shortly to continue with the

10:07:03  16   next witness for the Defendants.

10:07:05  17       The jury is excused for recess at this time.

10:07:08  18           COURT SECURITY OFFICER:  All rise.

10:07:09  19       (Jury out.)

10:07:32  20           THE COURT:  The Court stands in recess.

10:28:44  21       (Recess.)

10:28:45  22       (Jury out.)

10:28:46  23           COURT SECURITY OFFICER:  All rise.

10:28:49  24           THE COURT:  Be seated, please.

10:28:50  25       I understand Defendants have a witness or

10:29:12  1  witnesses by deposition at this juncture; is that correct?

10:29:15  2       MR. MELSHEIMER:  It is correct, Your Honor.

10:29:17  3       THE COURT:  All right.  How many witnesses by

10:29:18  4  deposition do you have?

10:29:19  5       MR. MELSHEIMER:  I believe we have three witnesses

10:29:21  6  by deposition at this time, Your Honor, and then a live

10:29:23  7  witness.

10:29:25  8       THE COURT:  And the approximate time on those

10:29:27  9  three deposition witnesses?

10:29:28  10      MR. MELSHEIMER:  I believe it's about 20 minutes

10:29:31  11  or so.

10:29:31  12      THE COURT:  All right.  All right.  I'll bring in

10:29:34  13  the jury, and we'll proceed with your first deposition

10:29:36  14  witness.

10:29:36  15      MR. MELSHEIMER:  Thank you, Your Honor.

10:29:37  16      THE COURT:  Let's bring in the jury, please.

10:29:45  17      COURT SECURITY OFFICER:  All rise.

10:29:47  18      (Jury in.)

10:30:04  19      THE COURT:  Please be seated.

10:30:05  20      Defendant, call your next witness.

10:30:13  21      MS. WILLIAMS:  Thank you, Your Honor.

10:30:18  22      Defendant calls Mr. Greg Harpel by deposition, a

10:30:25  23  USAA employee and inventor.

10:30:27  24      THE COURT:  All right.  Proceed with the witness

10:30:29  25  by deposition.

| | | |
|---|---|---|
| 10:30:30 | 1 | (Videoclip played.) |
| 10:30:31 | 2 | QUESTION:  Can you please state your name for the |
| 10:30:33 | 3 | record? |
| 10:30:33 | 4 | ANSWER:  Greg Harpel. |
| 10:30:35 | 5 | QUESTION:  When did you retire? |
| 10:30:37 | 6 | ANSWER:  October of 2015. |
| 10:30:41 | 7 | QUESTION:  Who did -- what company did you retire |
| 10:30:47 | 8 | from? |
| 10:30:47 | 9 | ANSWER:  USAA, or United Services Automobile |
| 10:30:48 | 10 | Association. |
| 10:30:48 | 11 | QUESTION:  What was your first involvement with |
| 10:30:55 | 12 | USAA's banking business? |
| 10:31:03 | 13 | ANSWER:  I worked -- the group that I was working |
| 10:31:09 | 14 | for or working with had responsibility for managing |
| 10:31:13 | 15 | research projects.  The -- I was assigned a research |
| 10:31:19 | 16 | project that was in the banking division. |
| 10:31:27 | 17 | QUESTION:  What time frame was this? |
| 10:31:28 | 18 | ANSWER:  That would have been about 2005. |
| 10:31:32 | 19 | QUESTION:  Did the product that this project |
| 10:31:36 | 20 | eventually became, did that have a commercial name that it |
| 10:31:39 | 21 | was sold or distributed under? |
| 10:31:41 | 22 | ANSWER:  The initial name was called Deposit@Home. |
| 10:31:45 | 23 | QUESTION:  Okay.  So this process flow was sort of |
| 10:31:48 | 24 | an overview of how the entire system would work and how you |
| 10:31:52 | 25 | could link it into USAA's existing banking system? |

10:31:57   1          ANSWER:  Correct.

10:31:57   2          QUESTION:  So parts of the diagram were

10:31:59   3   conventional banking processes that USAA already had for

10:32:03   4   other purposes, and parts were things that you needed to

10:32:06   5   modify for this project?

10:32:08   6          ANSWER:  Correct.

10:32:08   7          QUESTION:  What parts did you need to modify?

10:32:11   8          ANSWER:  I don't really know.  I mean, that would

10:32:15   9   be -- the parts that would be early on, the image capture

10:32:21  10   part would be the primary.  After that, I don't really know

10:32:25  11   how it all flowed through.  That's not my area of expertise

10:32:34  12   at all.

10:32:35  13          QUESTION:  So other than the image capture piece,

10:32:37  14   is there anything you can recall today that needed to be

10:32:42  15   changed in order to make this research project work?

10:32:46  16          ANSWER:  To -- to the best of my knowledge, it

10:32:49  17   could plug into our -- our existing systems.  Now I do

10:32:55  18   recall, though, that we had bank people that had to

10:32:58  19   evaluate what was being done and to see if it -- if it

10:33:06  20   had -- if changes were required.  But I don't specifically

10:33:09  21   recall any -- any that had changes required.

10:33:15  22          QUESTION:  All right.  How long did you work on

10:33:17  23   this project relating to remote deposit capture?

10:33:25  24          ANSWER:  I'd say probably a total of two and a

10:33:28  25   half months.

| | | |
|---|---|---|
| 10:33:28 | 1 | QUESTION:  After you left the project in either |
| 10:33:32 | 2 | 2005 or 2006, did you have any further involvement with |
| 10:33:36 | 3 | USAA's remote deposit capture efforts? |
| 10:33:38 | 4 | ANSWER:  No. |
| 10:33:44 | 5 | QUESTION:  Do your patents describe any computing |
| 10:33:50 | 6 | device with a camera integrated into the same device as the |
| 10:33:55 | 7 | computer processor? |
| 10:33:57 | 8 | ANSWER:  Do my patents?  You mean -- you mean '605 |
| 10:34:01 | 9 | in particular? |
| 10:34:03 | 10 | QUESTION:  Yes, either of the two patents that you |
| 10:34:04 | 11 | have in front of you, the '605 or the '227 patent.  Do |
| 10:34:09 | 12 | either of those patents describe any computing device with |
| 10:34:15 | 13 | a camera integrated into the same device as the computer |
| 10:34:18 | 14 | processor? |
| 10:34:18 | 15 | ANSWER:  A computing device, not that I'm aware |
| 10:34:22 | 16 | of. |
| 10:34:22 | 17 | QUESTION:  So I believe the way you just phrased |
| 10:34:25 | 18 | it was, is there a difference between the portable device |
| 10:34:29 | 19 | comprising a general purpose computer and the digital |
| 10:34:32 | 20 | camera? |
| 10:34:32 | 21 | ANSWER:  Yes, there is a difference. |
| 10:34:33 | 22 | QUESTION:  What's the difference? |
| 10:34:34 | 23 | ANSWER:  The digital camera is physically separate |
| 10:34:44 | 24 | from the portable device, and the digital camera is the |
| 10:34:47 | 25 | image capture.  But there -- there must be some |

10:34:51  1  communication pathway, whether it be a wire or through some

10:34:59  2  technology, like Bluetooth or something, to communicate

10:35:04  3  from the digital camera to the portable device.

10:35:06  4       QUESTION:  All right.  Can you take a look at

10:35:10  5  Claim 12, which starts in Column 16, Line 30 and read

10:35:16  6  through Line 34, please?

10:35:20  7       ANSWER:  Okay.  So that -- that's implying to me

10:35:24  8  that the phrase -- the term "system," which is what's

10:35:27  9  referred to in Claim 12, system includes both the digital

10:35:33  10  camera and the portable device.

10:35:36  11       QUESTION:  Okay.  And to be clear, in Claim 12 the

10:35:41  12  language that's actually used in the claims is handheld

10:35:44  13  mobile device, correct?

10:35:45  14       ANSWER:  System for allowing the customer to

10:35:47  15  deposit a check... using a customer's own handheld mobile

10:35:52  16  device with a digital camera.

10:35:55  17       QUESTION:  Okay.  And now I want to ask the same

10:35:59  18  question I asked about Claim 1.

10:36:01  19       Is there a difference between the handheld mobile

10:36:03  20  device and the digital camera in Claim 12?

10:36:05  21       ANSWER:  Difference between the handheld mobile

10:36:12  22  device and the camera.  Okay.  In -- in Claim 12, where it

10:36:21  23  says, using a customer's own handheld mobile device with a

10:36:25  24  digital camera, that sounds to me like the -- whatever a

10:36:30  25  handheld mobile device would be, could either be a camera

| | | |
|---|---|---|
| 10:36:37 | 1 | itself or could be some device within -- with a camera |
| 10:36:42 | 2 | inside it.  That's what I get out of Claim 12. |
| 10:36:48 | 3 | QUESTION:  Is there any example described in the |
| 10:36:53 | 4 | specification of the '605 patent of a handheld mobile |
| 10:36:57 | 5 | device with a digital camera integrated into the mobile |
| 10:37:02 | 6 | device? |
| 10:37:02 | 7 | ANSWER:  Well, right in that -- in that paragraph |
| 10:37:04 | 8 | you're referring to, it says, using a customer's own |
| 10:37:09 | 9 | handheld mobile device with a digital camera. |
| 10:37:14 | 10 | So that, to me, says -- that implies that the |
| 10:37:17 | 11 | handheld mobile device may have a camera with it, installed |
| 10:37:21 | 12 | in it, or as a part of it.  Integrated into it would be |
| 10:37:27 | 13 | right. |
| 10:37:27 | 14 | QUESTION:  Okay.  I'm trying to ask not about the |
| 10:37:30 | 15 | claim language.  So when I'm asking about the |
| 10:37:32 | 16 | specification, I mean the text -- the two columns of text |
| 10:37:35 | 17 | starting at Column 1 and continuing through Column 15, |
| 10:37:38 | 18 | Line 6. |
| 10:37:39 | 19 | So with that understanding of the specification, |
| 10:37:44 | 20 | is there any part of that specification, those |
| 10:37:49 | 21 | approximately 15 columns of text, that describe a handheld |
| 10:37:58 | 22 | mobile device with an integrated digital camera? |
| 10:37:58 | 23 | ANSWER:  Not that I know of, but I -- I don't |
| 10:38:03 | 24 | know.  I don't know one way or the other because I don't -- |
| 10:38:07 | 25 | I don't know what's in this 15 pages of text. |

10:38:13   1          You're talking about something that's 10 years ago

10:38:16   2  or 12 years ago, whatever.  Sorry, I didn't memorize 12 --

10:38:22   3  12 pages of text.

10:38:24   4          QUESTION:  Are you familiar with USAA's check

10:38:32   5  deposit processes that existed before Deposit@Home was

10:38:40   6  released?

10:38:40   7          ANSWER:  Only in very vague terms.  Very high

10:38:44   8  level.  Definitely don't know the details of their check

10:38:46   9  processing, no.

10:38:47  10          QUESTION:  And with that understanding, was

10:38:51  11  validating a routing number a part of USAA's existing

10:38:54  12  systems before it released Deposit@Home?

10:38:56  13          ANSWER:  I would think it would be a part of their

10:39:01  14  system, yes.  You'd have to identify that the check was

10:39:04  15  being presented to the correct bank.

10:39:06  16          QUESTION:  That would also be a standard process

10:39:09  17  in the banking industry generally, correct?

10:39:11  18          ANSWER:  Correct.

10:39:12  19          (Videoclip ends.)

10:39:13  20          THE COURT:  Does that conclude this witness by

10:39:17  21  deposition?

10:39:19  22          MS. WILLIAMS:  Yes, Your Honor, it does.

10:39:21  23          THE COURT:  Please proceed with your next witness.

10:39:23  24          MS. WILLIAMS:  Thank you, Your Honor.

10:39:23  25          Defendants call Troy -- Mr. Troy Huth by

| | | |
|---|---|---|
| 10:39:29 | 1 | deposition, another USAA inventor. |
| 10:39:31 | 2 | THE COURT:  Please proceed. |
| 10:39:34 | 3 | (Videoclip played.) |
| 10:39:35 | 4 | QUESTION:  Good morning.  Could you please state |
| 10:39:40 | 5 | your name for the jury? |
| 10:39:41 | 6 | ANSWER:  Yes, it's Troy Bartlette Huth. |
| 10:39:44 | 7 | QUESTION:  And in 1998, when you left Bank of |
| 10:39:47 | 8 | America, what did you do next? |
| 10:39:49 | 9 | ANSWER:  I -- that's when I joined USAA. |
| 10:39:51 | 10 | QUESTION:  So you said the next project was |
| 10:39:53 | 11 | Deposit@Home? |
| 10:39:53 | 12 | ANSWER:  Correct. |
| 10:39:53 | 13 | QUESTION:  So you said, we would test.  Did you |
| 10:39:56 | 14 | personally partake in any of these testing efforts? |
| 10:39:59 | 15 | ANSWER:  I did. |
| 10:40:02 | 16 | QUESTION:  Okay.  And do you recall what -- what |
| 10:40:04 | 17 | types of devices you tested? |
| 10:40:06 | 18 | ANSWER:  Me personally, probably just a number of |
| 10:40:10 | 19 | different brands and types of -- of either flatbed or |
| 10:40:16 | 20 | sheetfed scanners. |
| 10:40:17 | 21 | QUESTION:  And in your role as project manager, |
| 10:40:22 | 22 | did you ever experiment with any image capture devices that |
| 10:40:26 | 23 | were not scanners? |
| 10:40:27 | 24 | ANSWER:  I personally did not. |
| 10:40:29 | 25 | QUESTION:  I'm going to hand you what I've marked |

10:40:31   1   as Exhibit 1.

10:40:36   2          This is an email chain, looks like from 2006.

10:40:48   3   Have you seen this before?

10:40:49   4          ANSWER:  Yes, I have.

10:40:49   5          QUESTION:  And so you would have been able to see

10:40:55   6   this email from Mr. Oakes at that time that you were

10:41:00   7   included on the chain?

10:41:01   8          ANSWER:  That is correct.

10:41:03   9          QUESTION:  And he says:  We processed the first

10:41:07  10   check image captured by the use of a camera.  Do you see

10:41:12  11   that?

10:41:13  12          ANSWER:  Yes.

10:41:13  13          QUESTION:  Do you know of anyone at USAA

10:41:15  14   experimenting with the use of a camera with the

10:41:18  15   Deposit@Home service prior to October 25th, 2006?

10:41:34  16          ANSWER:  I'm not aware specifically.  I know we

10:41:36  17   had had discussion about different types of image capture

10:41:43  18   devices.  I was not involved in any of the testing with any

10:41:46  19   of those other devices.  And I don't know what all was

10:41:50  20   being done down in the innovation lab, as I was just

10:41:54  21   focused on and only a part of the Deposit@Home piece.

10:41:59  22          QUESTION:  When you say we had discussions, who is

10:42:07  23   "we"?

10:42:10  24          ANSWER:  Probably just sitting in a conference

10:42:11  25   room with some of the -- the technical team and -- and some

| | | |
|---|---|---|
| 10:42:14 | 1 | of the innovation team, just talking about what else could |
| 10:42:19 | 2 | be used and throwing ideas around.  What other types of, |
| 10:42:26 | 3 | you know, scanners have we not thought of?  What other |
| 10:42:29 | 4 | types of image capture devices? |
| 10:42:34 | 5 | I don't know if it was prior to this email.  I |
| 10:42:36 | 6 | remember the talk about could they use web cams and just |
| 10:42:39 | 7 | hold the check up to a webcam and snap the image that way. |
| 10:42:45 | 8 | I don't remember the timing of that, but I remember, you |
| 10:42:47 | 9 | know, webcams coming up in the conversation. |
| 10:42:48 | 10 | QUESTION:  When you say webcam, can you describe |
| 10:42:51 | 11 | what you mean by webcam? |
| 10:42:53 | 12 | ANSWER:  I would say back in the day, you know, |
| 10:42:58 | 13 | webcams would sit on the top of a monitor, and, you know, |
| 10:43:02 | 14 | could -- they hold up to that webcam that was plugged in, |
| 10:43:06 | 15 | you know, with a USB cable to a computer. |
| 10:43:12 | 16 | QUESTION:  And those would be devices that were |
| 10:43:14 | 17 | separate from the computer? |
| 10:43:16 | 18 | ANSWER:  I mean, it's plugged into it, but it |
| 10:43:19 | 19 | wasn't a part of the computer. |
| 10:43:32 | 20 | QUESTION:  You could take it off the computer? |
| 10:43:32 | 21 | ANSWER:  Unplug it. |
| 10:43:32 | 22 | QUESTION:  And then going on further in this |
| 10:43:38 | 23 | email, it says:  A member used his camera with a TWAIN |
| 10:43:42 | 24 | driver to capture the image and process it through the |
| 10:43:45 | 25 | Deposit@Home application.  The image was processed |

10:43:48   1   correctly.

10:43:49   2           Do you know what a TWAIN driver is?

10:43:51   3           ANSWER:  That's the driver that gets the image

10:43:58   4   from the device to the computer.  I wouldn't be able to

10:44:02   5   speak to it from a technical perspective, though.

10:44:05   6           QUESTION:  So it gets the image from the separate

10:44:09   7   image capture device over to the computer?

10:44:10   8           ANSWER:  Correct.

10:44:13   9           QUESTION:  Okay.  So, earlier, I think you

10:44:18   10  mentioned that you had overall knowledge of the banking

10:44:26   11  industry and -- and some -- some knowledge of the check

10:44:35   12  processing in the banking industry.

10:44:36   13          And that was sort of the expertise that you

10:44:43   14  brought to the table when were a project manager working on

10:44:48   15  Deposit@Home.  Is that a fair characterization?

10:44:52   16          ANSWER:  That's fair.

10:44:53   17          QUESTION:  And that would have been in 2006 or so?

10:44:56   18          ANSWER:  That's when I started work on

10:45:00   19  Deposit@Home project, but all of the experience I had

10:45:04   20  gotten with the check processing was prior to that.

10:45:06   21          QUESTION:  Okay.

10:45:07   22          ANSWER:  Yeah.

10:45:07   23          QUESTION:  So -- so at that time, was receiving an

10:45:13   24  account identification number a standard or conventional

10:45:19   25  banking process?

10:45:20  1          ANSWER:  When you say "receiving an account

10:45:22  2   identification number," are you talking about just -- just

10:45:24  3   the account number?

10:45:26  4          QUESTION:  Sure.

10:45:28  5          ANSWER:  I would say any time that you're going to

10:45:32  6   make a deposit or any type of transaction, they would need

10:45:37  7   to know what account that was going to be -- you would be

10:45:41  8   interacting with at that time.

10:45:43  9          QUESTION:  So is the answer yes?

10:45:51  10          ANSWER:  I would -- I would say yes.

10:45:53  11          QUESTION:  Okay.  What about receiving a check

10:45:58  12   amount indication, would that have been a standard or

10:46:01  13   conventional banking process in 2006?

10:46:04  14          ANSWER:  I would say it is a standard process, but

10:46:09  15   how that's done would differ depending on the channel.

10:46:13  16          QUESTION:  Okay.  But -- but that's something that

10:46:16  17   existed prior to remote deposit capture?

10:46:19  18          ANSWER:  Receiving a deposit amount?

10:46:23  19          QUESTION:  Receiving a check amount indication?

10:46:29  20          ANSWER:  A check amount indication?

10:46:35  21          QUESTION:  Yes.

10:46:36  22          ANSWER:  Again, depending on channel, I would say

10:46:38  23   if a teller was receiving it, they would get the indication

10:46:42  24   visually by eyeing the check.  So it -- it would differ

10:46:45  25   depending on the channel.

10:46:46  1          QUESTION:  But regardless of the channel or how it

10:46:49  2     differed, the fact of receiving it existed?

10:46:52  3          ANSWER:  Correct.

10:46:53  4          QUESTION:  What about receiving check images?

10:46:56  5     Was -- was that something that existed prior to remote

10:46:59  6     deposit capture?

10:46:59  7          ANSWER:  Receiving check images, I would say in a

10:47:06  8     consumer banking environment didn't really exist prior to

10:47:11  9     Deposit@Home because they would walk in and hand you a

10:47:14  10    paper check and you weren't receiving an image.

10:47:17  11         QUESTION:  What about optical character

10:47:20  12    recognition, is that something that existed prior to remote

10:47:27  13    deposit capture?

10:47:27  14         ANSWER:  Within, I guess, the industry and not

10:47:34  15    just banking, I guess optical character recognition as a

10:47:37  16    technology existed.  There was in the item processing

10:47:43  17    process.  And not knowing specifically, I would say there

10:47:54  18    was some OCR done in the batch processing of items, but I

10:48:00  19    wouldn't -- I wouldn't say specifically.

10:48:02  20         QUESTION:  But at some point in the process,

10:48:10  21    validation of the routing number occurred?

10:48:12  22         ANSWER:  At some point in the process, yes.

10:48:14  23    During the item processing process.

10:48:16  24         QUESTION:  Even before remote deposit capture?

10:48:20  25         ANSWER:  Yes.

1057

| | | |
|---|---|---|
| 10:48:20 | 1 | QUESTION:  And then, of course, check deposits |
| 10:48:23 | 2 | could be initiated even before remote deposit capture |
| 10:48:26 | 3 | existed, right? |
| 10:48:28 | 4 | ANSWER:  Yes. |
| 10:48:33 | 5 | QUESTION:  If there had been prior research at |
| 10:48:36 | 6 | USAA about capturing check images with cameras or camera |
| 10:48:40 | 7 | phones, who -- who would know about that? |
| 10:48:42 | 8 | ANSWER:  Probably Bharat Prasad.  Maybe Rey |
| 10:48:49 | 9 | Medina.  Chuck Oakes would probably know. |
| 10:48:52 | 10 | (Videoclip ends.) |
| 10:48:56 | 11 | THE COURT:  Does that complete this witness by |
| 10:48:58 | 12 | deposition? |
| 10:48:59 | 13 | MS. WILLIAMS:  Yes, Your Honor. |
| 10:49:00 | 14 | THE COURT:  Proceed with your next witness. |
| 10:49:02 | 15 | MS. WILLIAMS:  Thank you, Your Honor.  Defense |
| 10:49:03 | 16 | calls Mr. Randy Morlen, another USAA inventor. |
| 10:49:07 | 17 | THE COURT:  Proceed with the witness by |
| 10:49:08 | 18 | deposition. |
| 10:49:08 | 19 | (Videoclip played.) |
| 10:49:09 | 20 | QUESTION:  Good morning, Mr. Morlen.  Can you |
| 10:49:16 | 21 | please state your name for the jury? |
| 10:49:17 | 22 | ANSWER:  Randy Ray Morlen. |
| 10:49:20 | 23 | QUESTION:  And how -- how long were you in that |
| 10:49:22 | 24 | role as a lead analyst in the Applied Research group? |
| 10:49:25 | 25 | ANSWER:  From 2004 until, let me see -- so |

| | | |
|---|---|---|
| 10:49:30 | 1 | probably until 2010 or '11, something like that. |
| 10:49:41 | 2 | QUESTION:  When did you stop working at USAA? |
| 10:49:43 | 3 | ANSWER:  Four years ago, so 2015 -- about August |
| 10:49:46 | 4 | of 2015. |
| 10:49:48 | 5 | QUESTION:  So in 2005, you looked around for |
| 10:49:52 | 6 | solutions, you didn't find any.  What did you do next? |
| 10:49:57 | 7 | ANSWER:  When we -- so we -- I can't remember if |
| 10:50:02 | 8 | we had a scanner or we went out and bought a scanner.  We |
| 10:50:07 | 9 | hooked it up -- we had a little lab environment, and we |
| 10:50:10 | 10 | started doing development on being able to -- to scan a |
| 10:50:14 | 11 | check and putting it into a format that was |
| 10:50:18 | 12 | Check-21-compatible. |
| 10:50:19 | 13 | QUESTION:  What type of scanner was this? |
| 10:50:20 | 14 | ANSWER:  The cheapest one that we could find at |
| 10:50:24 | 15 | Walmart at the time.  I -- it might have been a Lexmark or |
| 10:50:27 | 16 | something like that.  I don't remember that specific. |
| 10:50:29 | 17 | QUESTION:  This was a scanner that one might put |
| 10:50:32 | 18 | in their home? |
| 10:50:33 | 19 | ANSWER:  Correct. |
| 10:50:34 | 20 | QUESTION:  And after you began experimenting with |
| 10:50:41 | 21 | it, when -- strike that. |
| 10:50:42 | 22 | After you began experimenting with it, did you |
| 10:50:46 | 23 | ever come up with a workable solution? |
| 10:50:50 | 24 | ANSWER:  Yes. |
| 10:50:52 | 25 | QUESTION:  When was that? |

1059

10:50:53   1          ANSWER:  I would -- I don't know specifics.  I

10:50:56   2   would imagine 2000 -- it was also in 2005.

10:51:00   3          QUESTION:  Did you ever start experimenting with

10:51:03   4   any other devices in place of a general purpose home

10:51:07   5   scanner?

10:51:07   6          ANSWER:  Yes.  We looked at any kind of

10:51:12   7   TWAIN-compatible device.  So we -- we had some regular

10:51:16   8   digital cameras, if you will, non-filmed cameras.  So we

10:51:19   9   took some digital cameras.  I believe we also had some flip

10:51:26  10   phones that you could plug in that would -- that were TWAIN

10:51:31  11   compatible.  When you -- when you plugged them in, it would

10:51:36  12   recognize it, you know, so you could pull the images off.

10:51:38  13   So we looked at that.

10:51:39  14          I don't remember what kind of phones they were at

10:51:41  15   the time.

10:51:41  16          QUESTION:  Okay.  So you mentioned you

10:51:45  17   experimented with digital cameras and flip phones?

10:51:47  18          ANSWER:  It was any -- and video cameras, like

10:51:50  19   webcams.

10:51:50  20          QUESTION:  Video cameras?

10:51:51  21          ANSWER:  Any kind of device that you could plug in

10:51:55  22   and could be controlled by TWAIN at the time.

10:51:57  23          QUESTION:  When did you first -- first experiment

10:52:02  24   with digital cameras?

10:52:03  25          ANSWER:  It would have been after we successfully

10:52:07  1  scanned a check with a scanner, so it would have probably

10:52:11  2  been late 2005 or early 2006, I'm guessing.

10:52:16  3      QUESTION:  Now, all of this work that we've just

10:52:19  4  been talking about, did it lead to the development of any

10:52:23  5  product that USAA released?

10:52:24  6      ANSWER:  It led to eventually Deposit@Home and

10:52:29  7  then after that, Deposit@Mobile.

10:52:32  8      QUESTION:  And you don't remember specifics as to

10:52:35  9  when you first started experimenting with one type of

10:52:38  10  device versus another device, you just know generally it

10:52:41  11  was in --

10:52:42  12      ANSWER:  Well, we definitely used flatbed scanner

10:52:45  13  first, and then everything else after that.

10:52:47  14      QUESTION:  Okay.  Let's go back to the '227

10:52:49  15  patent.  I believe that was the first one I handed you.

10:52:54  16      Does this patent discuss at all the use of mobile

10:53:01  17  devices for the remote deposit of checks?

10:53:04  18      ANSWER:  Specifically, no.  But generically with

10:53:09  19  image capture device, yes.

10:53:09  20      QUESTION:  And what do you mean by that?

10:53:11  21      ANSWER:  It does not use the words "mobile

10:53:13  22  device."  It does -- generically, it is any image capture

10:53:18  23  device, which is a mobile -- can be a mobile device.

10:53:22  24      Generically, it's an image -- it does reference

10:53:26  25  image capture device.  But, specifically, it does not say

10:53:31   1   a -- a mobile camera.  Image capture device would be a

10:53:33   2   mobile device -- or a mobile device would be an image

10:53:37   3   capture device.

10:53:37   4          QUESTION:  Looking at this patent as a whole, does

10:53:40   5   it have any discussion of a device that includes -- a

10:53:46   6   single device that includes both a camera and a processor?

10:53:50   7          ANSWER:  Specifically, no.  But any digital device

10:53:58   8   has a camera -- any digital imaging device has a camera and

10:54:02   9   a processor.

10:54:05  10          QUESTION:  Let's go to Figure 2 of this patent.

10:54:10  11   At the bottom of Figure 2, it's labeled 246, there is

10:54:13  12   depicted an image capture device, correct?

10:54:15  13          ANSWER:  Yes.

10:54:15  14          QUESTION:  And it looks to me like that's a

10:54:21  15   scanner.  Would you agree with that?

10:54:23  16          ANSWER:  The image for -- that they used for an

10:54:25  17   image capture device does appear to be a flatbed scanner.

10:54:29  18          QUESTION:  And that's separate and apart from a

10:54:31  19   computer that is also depicted in Figure 2, right?

10:54:33  20          ANSWER:  In this image, it does not show them as

10:54:39  21   one device.

10:54:39  22          QUESTION:  You see where it says, an image capture

10:54:44  23   device may be communicatively coupled to the computer?

10:54:48  24          ANSWER:  Yes.

10:54:48  25          QUESTION:  Does this describe an image capture

10:54:53   1   device that is separate from a computer?

10:54:55   2         ANSWER:  The example that they give shows them as

10:55:00   3   being separate devices.

10:55:06   4         QUESTION:  And you would agree that there's no

10:55:08   5   discussion in this patent of an integrated computer and

10:55:14   6   image capture device?

10:55:14   7         ANSWER:  In the -- the examples they give, I do

10:55:18   8   not see where it refers to that.

10:55:20   9         QUESTION:  Earlier, you mentioned that in your

10:55:24  10   role as a lead analyst in the Applied Research group, that

10:55:31  11   you looked at various different solutions which would allow

10:55:37  12   for USAA members to remotely deposit checks, in the 2005

10:55:45  13   time frame, and that you didn't find any; is that fair?

10:55:50  14         ANSWER:  Correct.  Yeah, so I didn't look -- look

10:55:52  15   at solutions.  I looked for solutions, and there were no

10:55:55  16   solutions at the time.

10:55:59  17         (Videoclip ends.)

10:55:59  18         THE COURT:  Does that complete this witness?

10:56:01  19         MS. WILLIAMS:  Yes, Your Honor.  And it completes

10:56:03  20   our witnesses by deposition at this time.

10:56:04  21         THE COURT:  All right.  Then Defendant, call your

10:56:07  22   next witness.

10:56:08  23         MR. MELSHEIMER:  May it please the Court, Your

10:56:08  24   Honor.

10:56:10  25         We call at this time Dr. John Villasenor.

| | | |
|---|---|---|
| 10:56:14 | 1 | THE COURT:  All right.  Dr. Villasenor, if you'll |
| 10:56:17 | 2 | come forward and be sworn by the courtroom deputy. |
| 10:56:22 | 3 | (Witness sworn.) |
| 10:56:31 | 4 | THE COURT:  Please come around and have a seat on |
| 10:56:35 | 5 | the witness stand, sir. |
| 10:56:42 | 6 | MR. MELSHEIMER:  Your Honor, may I approach the |
| 10:56:44 | 7 | Courtroom Security Officer and hand him a binder to provide |
| 10:56:50 | 8 | the witness? |
| 10:56:50 | 9 | THE COURT:  You may approach. |
| 10:56:51 | 10 | MR. MELSHEIMER:  Your Honor, the binders have been |
| 10:56:53 | 11 | provided to counsel. |
| 10:56:54 | 12 | THE COURT:  All right.  Then you may proceed with |
| 10:56:55 | 13 | your direct examination, Mr. Melsheimer. |
| 10:56:57 | 14 | MR. MELSHEIMER:  May it please the Court. |
| 10:56:57 | 15 | JOHN VILLASENOR, PH.D., DEFENDANT'S WITNESS, SWORN |
| 10:56:57 | 16 | DIRECT EXAMINATION |
| 10:56:58 | 17 | BY MR. MELSHEIMER: |
| 10:56:58 | 18 | Q.  Good morning, sir. |
| 10:57:01 | 19 | A.  Good morning, sir. |
| 10:57:02 | 20 | Q.  Please introduce yourself to the jury. |
| 10:57:04 | 21 | A.  My name is John Villasenor, and I am a professor at |
| 10:57:10 | 22 | UCLA.  I was born and raised in the Washington, D.C., area, |
| 10:57:16 | 23 | but I've lived in California for quite a number of years. |
| 10:57:19 | 24 | And I've been married for a little over 20 years |
| 10:57:22 | 25 | now, and I have a daughter who is recently gone off to |

10:57:25  1  college and a son that's nearly finished with high school.

10:57:27  2  Q.  Dr. Villasenor, what is your role in this case?

10:57:30  3  A.  I was retained to act as an independent expert on the

10:57:34  4  technical issues relating to infringement and to provide an

10:57:37  5  opinion on -- on that.

10:57:38  6  Q.  Did you prepare demonstratives to assist you in your

10:57:41  7  testimony today?

10:57:42  8  A.  Yes, sir, I did.  And the first of them is on the

10:57:45  9  screen now.

10:57:45  10  Q.  All right.  What is your current job or title?

10:57:47  11  A.  So as I mentioned a moment ago, I'm on the faculty at

10:57:52  12  UCLA, the University of California, Los Angeles.  And I'm a

10:57:55  13  professor in the electrical and computer engineering

10:57:58  14  department.

10:57:58  15  Q.  How long have you been a professor at UCLA?

10:58:00  16  A.  Since 1992, so I guess that's about almost 28 years

10:58:06  17  now.

10:58:06  18  Q.  Do we have a slide summarizing your educational

10:58:09  19  background, sir?

10:58:09  20  A.  Yes, sir, we do.

10:58:11  21  Q.  What is shown on this slide?

10:58:12  22  A.  I earned a Ph.D. at Stanford University in 1989, and a

10:58:20  23  Master's degree prior to that also at Stanford, and then

10:58:22  24  earlier than that, I earned my undergraduate degree in

10:58:26  25  electrical engineering at the University of Virginia.

10:58:29  1    Q.  Are all those degrees in the field of electrical
10:58:32  2    engineering?
10:58:32  3    A.  Yes, sir, they are.
10:58:33  4    Q.  Is that field also related to computers?
10:58:35  5    A.  Yes, in fact, my department at UCLA is called the
10:58:40  6    Department of Electrical and Computer Engineering.
10:58:42  7    Q.  How old were you, sir, when you got your Ph.D.?
10:58:44  8    A.  I was 24.
10:58:45  9    Q.  How did you do that?
10:58:48  10   A.  Well, I worked hard and did it pretty quickly.
10:58:50  11   Q.  What was your first job after getting your Ph.D.?
10:58:53  12   A.  My first job after getting a Ph.D. was I had a post doc
10:59:04  13   for a little while and then I was -- I worked at NASA at
10:59:06  14   the Jet Propulsion Laboratory, that's one of the NASA
10:59:10  15   laboratories and it's in Pasadena, California.
10:59:12  16   Q.  What kind of work did you do at NASA?
10:59:14  17   A.  At NASA I was working on ways to get digital images of
10:59:17  18   the earth from space, and then -- today that's not
10:59:19  19   considered too impressive.  You can go on Google and click
10:59:22  20   on, you know, Google Maps and get images.  But back then, a
10:59:25  21   lot of those technologies were a lot less accessible.
10:59:28  22   Q.  What did you do after your work at NASA?
10:59:31  23   A.  So immediately after working at NASA, I joined the
10:59:34  24   faculty at UCLA in the electrical engineering department.
10:59:38  25   Q.  What other professional experience do you have that's

10:59:41  1  reflected on this slide?

10:59:42  2  A.   This is just some examples.  So over the years, I've

10:59:46  3  done quite a bit of work funded by the United States

10:59:49  4  Department of Defense.  What I mean by funded by, that

10:59:53  5  means that they will provide funding to, for example, UCLA

10:59:57  6  or another institution I'm associated with, and I will

11:00:02  7  direct and conduct some research that they believe is

11:00:06  8  important.

11:00:06  9  Q.   Outside of your work in the academic sector, have you

11:00:10  10  also had some experience in the commercial sector?

11:00:12  11  A.   I've -- I've consulted for quite a number of technology

11:00:15  12  companies over the years.  I've also had quite a lot of

11:00:19  13  experience in what we call venture capital technology --

11:00:25  14  venture capital, and that's looking at startup companies

11:00:27  15  and deciding whether their proposals for new products and

11:00:30  16  services are likely to be successful and what the market is

11:00:32  17  and helping with those sorts of investment decisions.

11:00:36  18  Q.   All told, Doctor, how long have you been working in the

11:00:40  19  general field of imaging technology?

11:00:42  20  A.   I would say I started that when I was still working on

11:00:45  21  my Ph.D., so that's the mid-1980s.  So really about a third

11:00:50  22  of a century I've been working on those technologies and

11:00:53  23  others.

11:00:53  24  Q.   Do you teach courses in imaging technologies?

11:00:56  25  A.   I created at UCLA the graduate-level course sequence in

| | | |
|---|---|---|
| 11:01:02 | 1 | digital image processing as well as the undergraduate |
| 11:01:06 | 2 | course we have for undergraduates in image processing, and |
| 11:01:10 | 3 | I've taught those courses multiple times. |
| 11:01:12 | 4 | Q.  Have you ever testified before in a lawsuit? |
| 11:01:14 | 5 | A.  I've testified in several legal matters in the past, |
| 11:01:16 | 6 | yes. |
| 11:01:17 | 7 | Q.  Have you ever testified outside of court? |
| 11:01:19 | 8 | A.  Yes, I have. |
| 11:01:20 | 9 | Q.  Where? |
| 11:01:21 | 10 | A.  United States Congress. |
| 11:01:23 | 11 | Q.  What did you testify to the United States Congress |
| 11:01:26 | 12 | about? |
| 11:01:26 | 13 | A.  I've been asked, I think it's about five times, to |
| 11:01:29 | 14 | provide Congressional testimony.  An example is on digital |
| 11:01:33 | 15 | privacy, protecting privacy, given all the technology |
| 11:01:35 | 16 | advances that -- that sometimes put privacy at risk. |
| 11:01:39 | 17 | Q.  Are you an inventor on any of your own patents, sir? |
| 11:01:42 | 18 | A.  Yes, sir, I am. |
| 11:01:43 | 19 | Q.  How many? |
| 11:01:43 | 20 | A.  I think I'm -- I think it's about 20 issued U.S. |
| 11:01:47 | 21 | patents that I'm a named inventor on now. |
| 11:01:49 | 22 | Q.  Have you ever worked on any technology related to |
| 11:01:52 | 23 | banking? |
| 11:01:52 | 24 | A.  Yes, sir, I have. |
| 11:01:53 | 25 | Q.  What is that? |

11:01:54  1    A.  So, for example, at UCLA, I led a team where we

11:01:58  2    developed an app for helping people in countries -- in

11:02:04  3    developing countries where they don't have a formal banking

11:02:07  4    system nearly as developed as we have here, but they have

11:02:11  5    some phones and more often smartphones to helping them get

11:02:15  6    access to the kinds of services that the countries like the

11:02:17  7    United States would get through traditional banks.

11:02:19  8    Q.  Are you being compensated for your time working on this

11:02:22  9    case?

11:02:22  10   A.  Yes, sir, I am.

11:02:23  11   Q.  At what rate are you being compensated for the time

11:02:26  12   you're putting into this case?

11:02:27  13   A.  $800.00 per hour.

11:02:29  14   Q.  About how many hours do you think you've worked on this

11:02:32  15   case approximately?

11:02:33  16   A.  Somewhat over a hundred, although I don't have the

11:02:37  17   exact number, sir.

11:02:37  18   Q.  Did Wells Fargo hire you to arrive at a certain opinion

11:02:41  19   or conclusion?

11:02:41  20   A.  No, sir, they did not.  They asked for my independent

11:02:44  21   opinion.

11:02:44  22   Q.  Does your rate or compensation change in any way based

11:02:48  23   on what the jury ultimately decides?

11:02:51  24   A.  Not in any way, no.

11:02:54  25            MR. MELSHEIMER:  Your Honor, may it please the

| | | |
|---|---|---|
| 11:02:56 | 1 | Court.  I tender Dr. Villasenor as an expert in computer |
| 11:02:58 | 2 | engineering and imaging technologies. |
| 11:03:00 | 3 | THE COURT:  Is there objection? |
| 11:03:01 | 4 | MR. SHEASBY:  No objection. |
| 11:03:03 | 5 | THE COURT:  Without objection, the Court will |
| 11:03:05 | 6 | recognize this witness as an expert in those designated |
| 11:03:08 | 7 | fields. |
| 11:03:08 | 8 | You may continue, counsel. |
| 11:03:10 | 9 | MR. MELSHEIMER:  May it please the Court. |
| 11:03:11 | 10 | We have our next slide, Mr. Bakale. |
| 11:03:13 | 11 | Q.  (By Mr. Melsheimer)  What is the date that USAA alleges |
| 11:03:17 | 12 | its patents were invented? |
| 11:03:19 | 13 | A.  My understanding is that the alleged date is October |
| 11:03:23 | 14 | 31st, 2006. |
| 11:03:25 | 15 | Q.  Where do you get that date, sir? |
| 11:03:26 | 16 | A.  Well, if you look on the -- it's not quite the front |
| 11:03:30 | 17 | page, I think, but near the front of both patents, there is |
| 11:03:33 | 18 | a claim made that that is the -- the priority date. |
| 11:03:36 | 19 | Q.  Now, did you analyze whether the Plaintiff in this case |
| 11:03:40 | 20 | is actually allowed to legally claim priority to 2006? |
| 11:03:45 | 21 | A.  No, I was not asked to perform that work. |
| 11:03:48 | 22 | Q.  Who did that work? |
| 11:03:49 | 23 | A.  My understanding is that Mr. Saffici was -- was doing |
| 11:03:52 | 24 | that. |
| 11:03:52 | 25 | Q.  Were you here for Mr. Saffici's entire testimony? |

11:03:55   1   A.  Yes, sir, I was.

11:03:56   2   Q.  Now, did you hear the discussion about your opinion

11:04:02   3   about what it takes to -- to be a person of ordinary skill

11:04:05   4   in the art of the technology involved in these patents?

11:04:08   5   A.  Yes, I -- I did hear that.

11:04:10   6   Q.  Do you think that your opinion was used in a fair way

11:04:14   7   or a misleading way?

11:04:15   8   A.  I do not believe it was used in a fair way.

11:04:18   9   Q.  Why do you say that?

11:04:20   10  A.  Well, as came out in the re -- redirect of -- of

11:04:24   11  Mr. Saffici, I was very intentional to not only include an

11:04:28   12  education option, whether someone who could be a person of

11:04:32   13  ordinary skill in the art through formal college education,

11:04:35   14  but I also said that more experience can compensate for

11:04:39   15  less education, because in my own experience, including

11:04:42   16  with people -- relatives of my own, I've seen that people

11:04:46   17  can acquire extraordinary expertise without necessarily

11:04:51   18  having a formal degree.  And I think it's really important

11:04:54   19  to respect that that is an equally valid path to obtaining

11:04:59   20  expertise.

11:05:00   21  Q.  Did you hear about Mr. Saffici's 53 years of banking

11:05:03   22  experience?

11:05:03   23  A.  Yes, I -- yeah, I did hear about that.  Yes.

11:05:06   24  Q.  Do you think he is at least a person of ordinary skill

11:05:10   25  in the art in these patents?

11:05:11   1   A.  Yes, I'm just -- what I -- from perspective -- in terms

11:05:13   2   of experience and what I said, I was two years old when he

11:05:17   3   started working in banking.

11:05:19   4   Q.  Let's go back to what technology was like before 2006.

11:05:23   5          What were mobile phones like back in the early

11:05:26   6   '90s when you started at UCLA?

11:05:28   7   A.  In the early '90s, I didn't have a mobile phone because

11:05:32   8   I wasn't, I guess, at the leading edge, but I knew about

11:05:36   9   them.  And they were big, and they didn't do very much.

11:05:39   10   They allowed you to talk, but not usually much else.  And

11:05:43   11   they were slow, and they weren't very -- they aren't nearly

11:05:46   12   what they are today.

11:05:47   13   Q.  By 2006, what were mobile phones like?

11:05:49   14   A.  Mobile phones had gotten a lot more advanced.  They had

11:05:52   15   better processing power, and they were smaller and more

11:05:55   16   capable.  And -- and by that time, of course, you -- you

11:05:57   17   had -- it was routine for people to use mobile phones to

11:06:00   18   access the Internet, which really didn't happen nearly as

11:06:03   19   much in the early 1990s.

11:06:07   20   Q.  We've heard some discussions of apps in this trial,

11:06:09   21   sir.  What were apps like in 2006?

11:06:11   22   A.  There really wasn't much in the way of apps, and that's

11:06:14   23   because -- I think some other people have testified, as

11:06:18   24   well.

11:06:18   25          Apple launched their iPhone -- I think it was

11:06:22  1   2007 -- and I think they opened up their app system in

11:06:26  2   2000 -- around then or 2008.  And that was when they made

11:06:29  3   it possible for a lot of people to -- other people who

11:06:32  4   weren't at Apple to develop apps that could then be

11:06:34  5   provided through Apple, and that created this huge growth

11:06:39  6   in apps that we -- we still see today.  But I think that's

11:06:41  7   what really started the industry on the heading it is

11:06:44  8   today.

11:06:45  9   Q.  Generally speaking, Doctor, what do the patents in this

11:06:47  10  case describe?

11:06:48  11  A.  The patents -- the patents describe doing a check

11:06:53  12  deposit where you have a general purpose computer that's

11:06:55  13  connected to, for example, a scanner or a digital camera.

11:07:00  14  Q.  All right, sir.  At -- at a very high level, what are

11:07:08  15  you here to tell the jury about with respect to

11:07:10  16  infringement?

11:07:10  17  A.   I'm here to provide my conclusions regarding the

11:07:13  18  assertions of infringement that were made by the Plaintiff.

11:07:15  19  Q.  How did you come to understand what law you should

11:07:18  20  apply in reaching your infringement conclusions?

11:07:21  21  A.  So I was -- I've been informed that while I'm a

11:07:25  22  technical expert, not an attorney, in order to reach this

11:07:30  23  conclusion, we have certain legal frameworks, certain legal

11:07:34  24  standards that -- that -- that we must apply.

11:07:36  25           And so counsel for Wells Fargo has informed me of

11:07:39  1  those standards, and I've also done some other cases where

11:07:41  2  I've been informed of -- of standards.

11:07:44  3  Q.  When a lot -- when analyzing infringement, is it

11:07:47  4  important for you as an expert to apply the correct legal

11:07:51  5  standard?

11:07:52  6  A.  Yes, sir, it is.

11:07:53  7  Q.  Why is that important?

11:07:55  8  A.  Well, because if -- if -- even if the technical

11:07:58  9  analysis is correct, if you don't apply the correct legal

11:08:00  10  standard, you might reach an incorrect conclusion.

11:08:04  11  Q.  What legal standards did you apply in this case with

11:08:07  12  regard to non-infringement?

11:08:09  13  A.  Well, for example, I was told it's important to look at

11:08:14  14  the claim constructions that are provided by the Court, and

11:08:17  15  then to look at the claims more generally, of course,

11:08:20  16  including those constructions.  And then you compare each

11:08:25  17  asserted claim to the accused product, and you see if all

11:08:28  18  the elements are present.  And if there's one or more

11:08:32  19  elements that are not present, then -- then there's no

11:08:35  20  infringement.

11:08:35  21  Q.  If a claim has many elements and there is one element

11:08:40  22  missing in the accused product, what does that mean for the

11:08:44  23  infringement analysis?

11:08:46  24  A.  Well, that means that there isn't infringement because

11:08:48  25  all -- I've been instructed that all the elements must be

11:08:51  1  present.

11:08:54  2  Q.  Did you consider the meaning of the patents as of 2006?

11:08:59  3  A.  Yes, I did.

11:09:00  4  Q.  Why is that important?

11:09:02  5  A.  Well, I was told that the claim is that -- by USAA that

11:09:07  6  the priority date for these patents is fall -- October

11:09:10  7  2006.  And patents, as I've been instructed, should be

11:09:13  8  interpreted through the eyes of a person of ordinary skill

11:09:17  9  at the -- at the priority date.  And I was told that I

11:09:19  10  should use October 2006 as the priority date.

11:09:22  11  Q.  Why is it important to look at 2006, as opposed to

11:09:28  12  2017, when the patents in this case were actually filed

11:09:31  13  with the Patent Office?

11:09:31  14  A.  Well, it's very important because if you're not

11:09:35  15  attentive to that, you can end up using hindsight in a way

11:09:39  16  that's improper.  The technology has changed, of course, a

11:09:41  17  lot since -- between 2006 and 2017.  And so it's important

11:09:45  18  to put yourself in the frame of mind of somebody in 2006

11:09:49  19  without being -- having your mind sort of have in mind

11:09:54  20  things that happened in the decade after that.

11:09:56  21  Q.  We have a -- one more slide -- an additional slide.

11:10:00  22        Was there also legal standard you applied for a

11:10:03  23  system claim in a patent that involved multiple actors or

11:10:07  24  entities?

11:10:08  25  A.  Yes, and that's on this slide right here.

11:10:11    1   Q.  And what is this legal standard that you applied in

11:10:14    2   your understanding?

11:10:15    3   A.  Yes.  So I was informed that when there's a system

11:10:20    4   claim, which all of the claims, my understanding in these

11:10:22    5   patents are, and -- and it is allegedly infringed but that

11:10:31    6   infringement involves multiple entities, that to show

11:10:32    7   infringement, the Plaintiff must show that a single entity

11:10:34    8   does one of or more than -- at least one of the four things

11:10:38    9   that are listed there -- makes, sells, or offers to sell,

11:10:42   10   imports, or uses.  And there's a specific test for each one

11:10:45   11   of those, and I'll mention those later.

11:10:47   12   Q.  Did you apply these legal standards in your

11:10:53   13   infringement analysis, sir?

11:10:54   14   A.  Yes, sir, I did.

11:10:55   15        MR. MELSHEIMER:  All right.  We have another

11:10:56   16   slide, Mr. Bakale.

11:10:58   17   Q.  (By Mr. Melsheimer)  Tell the jury what else you did to

11:11:00   18   prepare your opinions in this case, using the legal

11:11:02   19   standards you just told the jury about.

11:11:04   20   A.  So, for example, of course, I reviewed the patents and

11:11:10   21   their file histories.  I looked at source code as -- as

11:11:13   22   appropriate.  I looked at -- I spoke with an engineer from

11:11:16   23   a company called Mitek named Mr. Andrew Wood.  I reviewed

11:11:22   24   some of the deposition transcripts.  Of course, I read the

11:11:24   25   report from Dr. Conte.  And I also read the report from

```
11:11:27   1   Mr. Calman.  And then, of course, I considered and applied
11:11:31   2   the constructions that were supplied by the Court for the
11:11:34   3   claim terms.
11:11:36   4          MR. MELSHEIMER:  If we might have the next slide,
11:11:38   5   Mr. Bakale.
11:11:38   6   Q.  (By Mr. Melsheimer)  Did the Court construe any of the
11:11:40   7   claim terms that you mentioned earlier?
11:11:43   8   A.  Yes, the Court did, and they're shown here.  I won't
11:11:46   9   read them out loud unless you want me to, but they're shown
11:11:50  10   here.
11:11:50  11   Q.  Did you apply them?
11:11:51  12   A.  Yes, sir, I did.
11:11:52  13          MR. MELSHEIMER:  The next slide, Mr. Bakale.
11:11:54  14   Q.  (By Mr. Melsheimer)  Can you give the jury an overview
11:12:02  15   of the conclusions you reached as to non-infringement?
11:12:02  16   A.  So there's -- there's two overarching reasons.  One is
11:12:04  17   that there's a confirming step that's recited in the '681
11:12:11  18   patent.  And the requirements of that step are not
11:12:14  19   satisfied.  And as a result, I do not believe that the '681
11:12:21  20   patent is infringed.
11:12:21  21          And, secondly -- and this second reason applies to
11:12:24  22   both the '681 patent and the '605 patent.  There's no proof
11:12:28  23   that Wells Fargo or users make, sell, offer to sell,
11:12:35  24   import, or use the invention according to the legal
11:12:37  25   standard I just mentioned a moment ago.
```

11:12:39  1  Q.  Well, let's into the '681 patent.  Let's start with

11:12:46  2  Claim 30.

11:12:47  3        Does Wells Fargo infringe Claim 30 of this patent

11:12:50  4  based on your analysis, sir?

11:12:52  5  A.  No, sir, it does not.

11:12:53  6  Q.  Why not?

11:12:56  7  A.  So what's shown on the screen here is Claim 30 is a

11:12:59  8  pretty long claim.  So what's shown here is -- is one of

11:13:03  9  the -- it's actually kind of a combination of a few parts

11:13:08  10  of that claim.

11:13:08  11        But if you look at the second line of the screen

11:13:10  12  there starting with the word "confirming," everything from

11:13:13  13  there on is -- is one of the elements or sub-elements of

11:13:19  14  the -- of the claim.  And the Wells Fargo system does not

11:13:22  15  do what's required in that claim element.

11:13:26  16  Q.  Is this the confirming step that I examined Dr. Conte

11:13:32  17  about earlier in the trial?

11:13:33  18  A.  For that claim, that's right.  Yes.

11:13:34  19  Q.  Confirming that the mobile check deposit can go forward

11:13:38  20  after optical character recognition is performed on the

11:13:41  21  check, and it continues?

11:13:44  22  A.  That's right, yes, sir.

11:13:44  23  Q.  What is optical character recognition?

11:13:49  24  A.  So optical character recognition -- there's some other

11:13:51  25  witnesses that have testified to that.  That's when a

11:13:53   1   computer can look at an image on a piece of paper, for

11:13:56   2   example, and it's got letters and numbers on it, and the

11:13:59   3   computer can read that just like we do as people and say

11:14:02   4   whether it's a -- whether it's a 1 or a 2 or an A or a B,

11:14:06   5   and a computer can do that automatically.  That's optical

11:14:12   6   character recognition.

11:14:12   7            MR. MELSHEIMER:  Let's move to the next slide,

11:14:14   8   Mr. Bakale.

11:14:14   9   Q.  (By Mr. Melsheimer)  How do you know from reading the

11:14:16   10  patent where the patent says this confirming step needs to

11:14:22   11  occur in the system it describes?

11:14:23   12  A.  So this is -- on the left, you see the entire claim.

11:14:29   13  And as I mentioned, it's a long claim.  So there's some

11:14:33   14  things that are highlighted and also put over on the right

11:14:35   15  of that slide.

11:14:35   16            And if you look on the lower right of the screen

11:14:38   17  there, there's -- there's at least a portion of the

11:14:41   18  confirming step, and it talks about optical character

11:14:45   19  recognition --

11:14:46   20            THE COURT:  Dr. Villasenor, could you slow down

11:14:48   21  just a little bit?

11:14:48   22            THE WITNESS:  Yes, Your Honor.  I apologize.

11:14:49   23            THE COURT:  Please do.  Thank you.

11:14:54   24  A.  So the -- the things in that confirming step have to be

11:14:57   25  done and -- on the mobile device.  And in the accused

11:15:01  1   system, for example, the optical character recognition to

11:15:03  2   determine the amount of the check is not done on the mobile

11:15:08  3   device.

11:15:08  4   Q.  (By Mr. Melsheimer)  When you say the accused system,

11:15:12  5   is that the Wells Fargo system that's accused of

11:15:13  6   infringement?

11:15:14  7   A.  Yes, sir, it is.

11:15:14  8   Q.  Now, what does Dr. Conte say is the -- the customer's

11:15:21  9   mobile device in this claim?

11:15:22  10  A.  So Dr. Conte points to the smartphone that's owned by

11:15:26  11  the user.

11:15:27  12  Q.  What does the claim require the mobile device to do in

11:15:35  13  the confirming step laid out on this slide?

11:15:38  14  A.  The claim requires that the mobile device performs

11:15:41  15  optical character recognition of the amount on the check,

11:15:44  16  and that -- and that's not what occurs.

11:15:46  17  Q.  Are you getting that from the language of the claim

11:15:48  18  that says:  Causes the customer's mobile device to perform?

11:15:54  19  A.  Among other things, yes.

11:15:56  20  Q.  And then the confirming step is listed as one of the

11:16:00  21  multiple steps listed in that claim, correct?

11:16:02  22  A.  Yes, sir.

11:16:03  23  Q.  In the Wells Fargo system, does the user's smartphone

11:16:13  24  perform the confirming step?

11:16:15  25  A.  Not as it's laid out in this claim.

| | | |
|---|---|---|
| 11:16:18 | 1 | Q.  Why do you say that, sir? |
| 11:16:19 | 2 | MR. MELSHEIMER:  Let's take a look at Slide -- the |
| 11:16:21 | 3 | next slide. |
| 11:16:22 | 4 | A.  So in the Wells Fargo system, the image is transmitted |
| 11:16:25 | 5 | to the server, the computer at Wells Fargo, without any |
| 11:16:30 | 6 | optical character recognition first having been performed |
| 11:16:32 | 7 | to find the amount on the check.  And it's only after the |
| 11:16:35 | 8 | image arrives at the server, the Wells Fargo server, that |
| 11:16:40 | 9 | then after that point, the -- the -- the OCR is performed |
| 11:16:44 | 10 | and the amount on the check is read, but that's not |
| 11:16:47 | 11 | happening on the mobile device. |
| 11:16:48 | 12 | Q.  (By Mr. Melsheimer)  What did Dr. Conte -- where did |
| 11:16:50 | 13 | Dr. Conte say that this -- the functionality for this |
| 11:16:56 | 14 | confirming limitation in the OCR occurs? |
| 11:16:59 | 15 | A.  My recollection is that Dr. Conte also testified that |
| 11:17:05 | 16 | the OCR of the amount occurs -- it is performed on the -- |
| 11:17:09 | 17 | on the server. |
| 11:17:10 | 18 | Q.  Does Dr. Conte say that the OCR of the amount occurs on |
| 11:17:14 | 19 | the smartphone or the server? |
| 11:17:17 | 20 | A.  My recollection is that he -- he said it occurs on the |
| 11:17:20 | 21 | server. |
| 11:17:20 | 22 | Q.  Does performing OCR on the server, that's that -- those |
| 11:17:25 | 23 | other computers in the system, separate from the mobile |
| 11:17:30 | 24 | phone? |
| 11:17:30 | 25 | A.  Yes, sir. |

11:17:30   1   Q.  Does performing OCR on the server meet or satisfy the

11:17:36   2   confirming limitation in this claim?

11:17:37   3   A.  No, I do not believe it does.

11:17:40   4   Q.  What does that mean for your conclusion about Claim 30

11:17:44   5   of the -- of the patent?

11:17:47   6   A.  That means that there would be no infringement of

11:17:50   7   Claim 30.

11:17:51   8   Q.  But what if the Wells Fargo system does all those other

11:17:55   9   elements?

11:17:55  10   A.  That doesn't matter in the sense that, as I mentioned

11:17:58  11   earlier, if there is any one element that isn't satisfied

11:18:03  12   that there's no infringement.

11:18:05  13        MR. MELSHEIMER:  Let's look at our next slide

11:18:07  14   which has Claim 12.

11:18:08  15   Q.  (By Mr. Melsheimer)  Does Claim 12 have a similar

11:18:10  16   confirming step to the claim we just looked at, sir?

11:18:14  17   A.  Yes, sir, it does.

11:18:15  18   Q.  Where is the confirming step required to happen in

11:18:20  19   Claim 12 of the patent?

11:18:21  20   A.  In the claim, it's required to happen at the mobile

11:18:24  21   device.

11:18:24  22   Q.  Is it one of the steps that's listed as happening on

11:18:29  23   the mobile device in Claim 12?

11:18:31  24   A.  Yes, sir.

11:18:32  25   Q.  Now, were you here for Dr. Conte's testimony?

| | | |
|---|---|---|
| 11:18:44 | 1 | A.  Yes, sir, I was. |
| 11:18:45 | 2 | Q.  Did -- did you hear him talk a lot about the Wells |
| 11:18:48 | 3 | Fargo system? |
| 11:18:49 | 4 | A.  I did. |
| 11:18:50 | 5 | Q.  Now, does the fact that the claim uses the word |
| 11:18:53 | 6 | "system," does that mean that Wells Fargo infringes? |
| 11:18:56 | 7 | A.  Not necessarily, no. |
| 11:18:58 | 8 | Q.  Why do you say that? |
| 11:18:59 | 9 | A.  Well, I think you have to look at the specifics of |
| 11:19:03 | 10 | what -- what's in the claim language, and I think as I read |
| 11:19:05 | 11 | it, the confirming step must occur on the -- on the mobile |
| 11:19:09 | 12 | device in the claim. |
| 11:19:11 | 13 | MR. MELSHEIMER:  Let's take a look at one of |
| 11:19:12 | 14 | Dr. Conte's demonstratives, PDX-2.69. |
| 11:19:17 | 15 | Q.  (By Mr. Melsheimer)  Do you remember this being used in |
| 11:19:20 | 16 | Dr. Conte's direct examination? |
| 11:19:22 | 17 | A.  Yes, I do. |
| 11:19:23 | 18 | Q.  And it -- it has the claim on the left? |
| 11:19:26 | 19 | A.  Yes, sir. |
| 11:19:26 | 20 | Q.  What's on the right? |
| 11:19:28 | 21 | A.  Well, on the right is a picture of a smartphone or a |
| 11:19:31 | 22 | phone, and above it, it says:  Optical character |
| 11:19:35 | 23 | recognition extracting text from digital image.  And on the |
| 11:19:39 | 24 | lower right, it says:  The check amount. |
| 11:19:41 | 25 | Now, in fact, that extraction, that reading is -- |

11:19:45  1  is not performed on the mobile device.  It's actually

11:19:48  2  performed -- the reading of the $5.00, for example, that's

11:19:51  3  actually performed at the server, even though it's shown

11:19:53  4  here on a picture on a phone.

11:19:56  5          MR. MELSHEIMER:  Let's look at another one of

11:19:57  6  Dr. Conte's demonstratives, PDX-2.73.

11:20:02  7  Q.  (By Mr. Melsheimer)  This is a slide.  Do you remember

11:20:06  8  this being used in his direct examination?

11:20:08  9  A.  Yes, sir, I do.

11:20:09  10  Q.  It says:  App only displays confirmation page after

11:20:15  11  deposit has been validated?

11:20:16  12  A.  Yes, that's right.

11:20:17  13  Q.  Is this the confirming step that we've been talking

11:20:19  14  about, or is this confirming?

11:20:22  15  A.  Well, this is informing the user that -- that a

11:20:27  16  confirmation has been made.  But if you look at the top of

11:20:30  17  the slide, it's underlined, we load information from the

11:20:33  18  server and use them to populate the form.

11:20:36  19          So the smartphone is getting that information

11:20:37  20  actually from the server, whereas it's where all the action

11:20:41  21  for doing the actual OCR is occurring.

11:20:44  22  Q.  Does this claim element use the term confirming or

11:20:48  23  validating?

11:20:49  24  A.  It uses the term confirming.

11:20:52  25  Q.  Are those the same things?

11:20:53  1    A.  I focused on confirming.

11:20:58  2    Q.  Where is all the work being done or the logic being

11:21:02  3    done with respect to the confirming step?

11:21:05  4    A.  It's the OCR reading the amount is -- at the server.

11:21:08  5    Q.  And does -- did Dr. Conte testify that the logic to do

11:21:12  6    that is all at the server?

11:21:14  7    A.  I believe that's what I heard him say.

11:21:21  8    Q.  Does every asserted claim of the '681 patent recite or

11:21:27  9    require a confirming step like the ones you've described?

11:21:29  10   A.  Yes, sir, it does.

11:21:30  11   Q.  Including Dependent Claims 13, 14, 20, and 22?

11:21:35  12   A.  Yes, sir.

11:21:36  13   Q.  Where do all the claims require the confirming step to

11:21:40  14   occur?

11:21:40  15   A.  On the mobile device.

11:21:41  16   Q.  Does Dr. Conte accuse anything differently for the

11:21:49  17   confirming step in any of the different claims that are

11:21:51  18   asserted in this case?

11:21:52  19   A.  No, my recollection is that he does not, sir.

11:21:55  20   Q.  What does he point to for every confirming step?

11:21:58  21   A.  He points to the same thing.

11:21:59  22   Q.  Which is what?

11:21:59  23   A.  He points to the -- the -- he points to this

11:22:02  24   confirmation that's shown on the screen here.

11:22:05  25   Q.  On the cell phone?

11:22:07  1    A.  Yes.

11:22:07  2    Q.  What is your conclusion about whether Wells Fargo's

11:22:11  3    system practices the confirming step of any claim of the

11:22:14  4    '681 patent?

11:22:14  5    A.  I conclude that Wells Fargo does not practice the

11:22:17  6    confirming step of any of the asserted claims of the '681

11:22:21  7    patent.

11:22:21  8    Q.  So, in your opinion, does Wells Fargo infringe any

11:22:24  9    claim of the '681?

11:22:24  10   A.  No, sir.

11:22:25  11   Q.  Okay.  I want to move on to -- do you have other

11:22:29  12   non-infringement positions in this case?

11:22:31  13   A.  Yes, sir.

11:22:32  14   Q.  Do you have a non-infringement opinion based on the

11:22:44  15   notion of what's called divided infringement?

11:22:46  16   A.  Yes, sir, I do.

11:22:48  17   Q.  Okay.  And which claims in the case does this concept

11:22:52  18   apply to?

11:22:53  19   A.  It applies to every single one of the asserted claims.

11:22:55  20   Q.  Which of the asserted claims are so-called systems

11:23:00  21   claims?

11:23:01  22   A.  My understanding is all of them are.

11:23:03  23   Q.  Do the asserted claims in this case involve multiple

11:23:08  24   entities or parties to perform different steps?

11:23:10  25   A.  Yes, as -- as USAA has accused Wells Fargo, yes.

11:23:16  1  Q.  How do you know that?  Give us an example.

11:23:17  2  A.  Well, for example, the claims recite a mobile device or

11:23:22  3  a portable device, and so this is an example of one of the

11:23:26  4  claims, and you can see I've highlighted a portable device,

11:23:30  5  and Dr. Conte has pointed to the user's smartphone as that

11:23:35  6  device.

11:23:36  7         And that's -- and then the claim also recites

11:23:38  8  another computer, remote from the portable device, and he

11:23:42  9  has pointed to the Wells Fargo servers.  So those are the

11:23:47  10  user's device, the user's smartphone is, of course,

11:23:50  11  distinct from the Wells Fargo's servers.

11:23:51  12  Q.  Well, who owns the portable device?

11:23:53  13  A.  Well, the user presumably owns the smartphone that

11:23:58  14  Dr. Conte pointed to.

11:23:59  15  Q.  Who owns and controls all those servers and computers

11:24:02  16  in the Wells Fargo system?

11:24:03  17  A.  Certainly not the -- not the consumer.  Wells Fargo

11:24:06  18  controls some of them.

11:24:07  19  Q.  Can you remind the jury on the next slide, sir, what

11:24:10  20  standard you applied for systems claims involving multiple

11:24:14  21  entities?

11:24:15  22  A.  So as I mentioned before, when a Plaintiff is -- well,

11:24:20  23  as I've been instructed, when a Plaintiff is accusing

11:24:24  24  infringement in a manner that involves multiple entities,

11:24:28  25  the Plaintiff must show that a single entity does one of

11:24:32  1   those following four things -- or more, makes, sells, or

11:24:35  2   offers to sell, imports or uses.

11:24:39  3   Q.  If the jury were to conclude that the Wells Fargo's

11:24:42  4   systems includes every element of the claims in these

11:24:47  5   patents, based on your understanding, is that enough to

11:24:49  6   show infringement?

11:24:50  7   A.  Well, they would have to -- this -- this -- the

11:24:54  8   requirements of this slide would -- would still need to be

11:24:56  9   satisfied.

11:24:56  10  Q.  Let's go through the type -- this type of infringement

11:25:00  11  one-by-one.

11:25:01  12        Did -- did Dr. Conte show that Wells Fargo makes

11:25:06  13  the invention in this case?

11:25:08  14  A.  Well, no, he did not.

11:25:09  15  Q.  What -- what -- what standard applies for making an

11:25:13  16  invention?

11:25:13  17  A.  Well, since he's accusing Wells Fargo of being the

11:25:17  18  infringer, he would need to show that Wells Fargo makes the

11:25:21  19  smartphone that he's accused of being part of the

11:25:23  20  infringing system and then combines that smartphone --

11:25:29  21        MR. SHEASBY:  Your Honor, I object.  I move to

11:25:30  22  strike.  It's outside the scope of his report.

11:25:35  23        MR. MELSHEIMER:  Your Honor, I believe this is in

11:25:37  24  his report, but I can rephrase.

11:25:39  25        THE COURT:  Rephrase.

11:25:40  1      MR. SHEASBY:  And, Your Honor, just to be clear,

11:25:43  2  will the Court strike that answer?

11:25:45  3      THE COURT:  I'll strike that answer.

11:25:47  4      MR. SHEASBY:  Thank you.

11:25:47  5      THE COURT:  Counsel may rephrase.

11:25:49  6  Q.  (By Mr. Melsheimer)  What is your understanding of the

11:25:51  7  legal standard for making a system?

11:25:57  8  A.  The accused infringer must make it and combine all the

11:26:03  9  claim elements.

11:26:04  10 Q.  Does -- did -- did -- in your review of Dr. Conte's

11:26:08  11 report, did he go through and make this analysis with

11:26:10  12 respect to making?

11:26:12  13 A.  I don't believe he asserted that Wells Fargo makes the

11:26:15  14 smartphone.

11:26:16  15      MR. SHEASBY:  Your Honor, I object.  Can we

11:26:19  16 approach?

11:26:20  17      THE COURT:  Approach the bench.

11:26:21  18      (Bench conference.)

11:26:27  19      MR. SHEASBY:  Your Honor, there is nothing in this

11:26:29  20 man's report that says that you have to make a smartphone.

11:26:33  21      THE COURT:  You're going to have to talk softer up

11:26:34  22 here, counsel.

11:26:34  23      MR. SHEASBY:  There's nothing in this man's report

11:26:36  24 that says you have to make a smartphone to infringe this

11:26:45  25 claim.  All he says is you have to combine -- absolutely --

| | | |
|---|---|---|
| 11:26:45 | 1 | THE COURT:  Speak into this. |
| 11:26:46 | 2 | MR. SHEASBY:  It is absolutely inappropriate for |
| 11:26:48 | 3 | him to be suggesting to this jury that you have to make a |
| 11:26:51 | 4 | smartphone to infringe this claim.  It's an undisclosed |
| 11:26:55 | 5 | point, and I would like a curative instruction for the jury |
| 11:26:58 | 6 | to ignore any discussion -- |
| 11:26:58 | 7 | THE COURT:  All right.  All right.  What's your |
| 11:26:59 | 8 | response? |
| 11:26:59 | 9 | MR. MELSHEIMER:  Your Honor, my response is as |
| 11:27:01 | 10 | follows. |
| 11:27:03 | 11 | THE COURT:  Why don't you find the page and quit |
| 11:27:05 | 12 | turning before you respond? |
| 11:27:11 | 13 | MR. MELSHEIMER:  Your Honor, may I hand the Court |
| 11:27:16 | 14 | this page of Dr. Villasenor's report?  It's Paragraph 161. |
| 11:27:41 | 15 | THE COURT:  All right. |
| 11:28:05 | 16 | MR. SHEASBY:  There's nothing in his report that |
| 11:28:07 | 17 | says you have to make a cell phone to infringe this claim. |
| 11:28:10 | 18 | That's exactly what he told the jury.  You have to make the |
| 11:28:13 | 19 | cell phone to infringe the claim. |
| 11:28:14 | 20 | MR. MELSHEIMER:  I think he said that Wells |
| 11:28:16 | 21 | Fargo -- if they want me to clarify that -- but there's |
| 11:28:19 | 22 | really no dispute that Wells Fargo doesn't make the user's |
| 11:28:23 | 23 | cell phone, Your Honor.  And so the point being if you want |
| 11:28:26 | 24 | me to clarify it, does Wells Fargo make the cell phone in |
| 11:28:29 | 25 | this case?  No. |

11:28:30   1          I don't -- I don't know why we're arguing.

11:28:33   2          MR. SHEASBY:  Your Honor, it is absolutely

11:28:35   3   irrelevant who makes the cell phone.  This is highly

11:28:38   4   prejudicial, and the jury should be instructed to ignore

11:28:41   5   that.  There's not any law that says you have to make a

11:28:44   6   piece of an element, you have to combine them together.

11:28:44   7   The idea of making a cell phone, which has now come out

11:28:46   8   twice -- and I believe it's come out intentionally by this

11:28:49   9   witness.  It's highly prejudicial and not disclosed in his

11:28:52  10   report.

11:28:55  11          MR. MELSHEIMER:  Your Honor, that's one of the --

11:28:57  12   that's one of the ways you can show infringement is making,

11:29:02  13   and they do not make the accused system.  They don't make

11:29:05  14   the cell phone.  They don't combine all the elements.  So I

11:29:09  15   don't -- I don't -- I think it's disclosed in his report,

11:29:13  16   and it's proper under the law.

11:29:14  17          MR. SHEASBY:  It is not the law that you have to

11:29:17  18   make a component to make a system.  That is undisclosed

11:29:21  19   non-infringement defense.  It's never been disclosed in

11:29:23  20   this case, ever.  And it should not happen.  It was done

11:29:26  21   intentionally in this examination.

11:29:28  22          MR. MELSHEIMER:  Your Honor, there's no -- nothing

11:29:30  23   done intentionally, other than try to draw out what the

11:29:34  24   legal standards he implies are, Your Honor.  I believe it's

11:29:37  25   disclosed in his report.  And we're -- no one is

11:29:40  1   disputing about the --

11:29:41  2        THE COURT:  All right.  It's 11:30.  I'm going to

11:29:43  3   send the jury to lunch, and then we'll get to the bottom of

11:29:46  4   this.

11:29:46  5        MR. MELSHEIMER:  Okay.  Thank you.

11:29:47  6        THE COURT:  Okay.

11:29:48  7        (Bench conference concluded.)

11:29:53  8        THE COURT:  Ladies and gentlemen of the jury, I

11:29:54  9   need to finish this discussion with counsel outside your

11:29:57  10  presence.  It's 11:30.

11:29:59  11       If your lunch is not there, it will be shortly in

11:30:02  12  the jury room.  So we're going to recess for lunch at this

11:30:04  13  time.

11:30:05  14       If you'll take your notebooks with you to the jury

11:30:08  15  room.  Follow all the instructions I've given you,

11:30:11  16  including not to discuss the case with each other.  And

11:30:14  17  we'll try to reconvene approximately 12:30.

11:30:18  18       With that, the jury is excused for lunch.

11:30:20  19       COURT SECURITY OFFICER:  All rise.

11:30:40  20       (Jury out.)

11:30:43  21       THE COURT:  Be seated, please.

11:30:44  22       All right.  Let me hear your argument one more

11:31:34  23  time, Mr. Sheasby.  From the podium, please.

11:31:45  24       MR. SHEASBY:  Yes, Your Honor.

11:31:45  25       THE COURT:  I've briefly reviewed the testimony

11:31:47  1   that's at issue.

11:31:48  2          MR. SHEASBY:  Dr. Villasenor opined in his report

11:31:51  3   that because the system involves a user's cell phone as

11:31:54  4   part of the system, it's not infringing.  And he's

11:31:57  5   perfectly welcome to make that argument.

11:31:59  6          But the idea that you have to make each element of

11:32:02  7   a claim to make the system is just not the law.  In fact,

11:32:08  8   in CENTRAK versus Sonitor Technologies, 915 F.3d 1360, a

11:32:13  9   final assembler can be liable for making infringing com --

11:32:17  10  combination even if it does not meet each individual

11:32:22  11  component element.

11:32:23  12         What they're trying to do through Villa --

11:32:25  13  Dr. Villasenor is, one, not in his report.  He never argued

11:32:25  14  that you have to make individual elements to infringe a

11:32:25  15  claim.

11:32:29  16         And, two, it violates black letter law.  The

11:32:33  17  suggestion that Dr. Villasenor has made twice on the stand

11:32:38  18  in -- in -- in reference to this, I believe, was -- I'm

11:32:41  19  very troubled by it, Your Honor.  I'm not going to --

11:32:43  20         THE COURT:  All right.  Let me hear a response.

11:32:45  21         MR. SHEASBY:  I'll stop there.

11:32:47  22         THE COURT:  Let me hear a response from

11:32:48  23  Mr. Melsheimer.

11:32:48  24         MR. MELSHEIMER:  Your Honor, I believe what is

11:32:50  25  disclosed in his report is what was asked of him.  If I

11:32:54   1   need to clarify it in some way, I'm happy to do that.  The

11:32:59   2   question is, we're going to go through each one of these

11:33:02   3   steps, and one of them is making --

11:33:04   4         THE COURT:  Take the section of the witness's

11:33:05   5   report that you showed me at the bench and put it on the

11:33:08   6   overhead projector, please, since I don't have a copy here

11:33:12   7   in front of me.

11:33:14   8         MR. MELSHEIMER:  He does not -- so the disclosure

11:33:25   9   is that -- he's saying what Dr. Conte did not do.  Does not

11:33:29   10  show that Wells Fargo infringes by making the accused

11:33:32   11  system.  Wells Fargo plainly does not combine all the

11:33:35   12  elements because its users, not Wells Fargo, provide the

11:33:42   13  smartphone accused as the remote device.

11:33:43   14        THE COURT:  All right.  Well, providing the

11:33:45   15  smartphone is not making the smartphone.  And the law is

11:33:47   16  pretty clear, as I see it, that a final assembler can be

11:33:56   17  liable for making an infringing combination, even if he

11:33:59   18  does not make each individual component element.  I think

11:34:03   19  that's the CENTRAK holding, relying on Cross Medical and

11:34:08   20  Lifetime.

11:34:08   21        The witness clearly told the jury in the testimony

11:34:12   22  I reviewed that the Defendant -- it doesn't infringe

11:34:19   23  because it does not make the cell phone.  Didn't say

11:34:22   24  because it failed to combine the cell phone with the other

11:34:26   25  elements.  It clearly uses the verb "did not make."  So I'm

11:34:33  1   going to sustain the objection.

11:34:34  2        Mr. Johnston, check with the jury.  If they're not

11:34:39  3   eating lunch, and I don't think it's been delivered yet,

11:34:39  4   bring them back in the courtroom, and I'm going to instruct

11:34:39  5   them right now.

11:34:42  6        COURT SECURITY OFFICER:  It's been delivered.

11:34:43  7        THE COURT:  It's been delivered?

11:34:43  8        COURT SECURITY OFFICER:  Yes, sir.

11:34:43  9        THE COURT:  Well, tell them to put their forks

11:34:46  10  down and come back in the courtroom.

11:34:48  11        Have a seat, counsel.

11:36:44  12        COURT SECURITY OFFICER:  All rise.

11:36:45  13        (Jury in.)

11:36:46  14        THE COURT:  Please be seated.

11:36:50  15        I apologize, ladies and gentlemen.  Only a Federal

11:36:56  16  Judge would have the temerity to interrupt eight people as

11:37:04  17  they're starting their lunch, but I wanted to correct this

11:37:04  18  before we went through the entire lunch break.

11:37:04  19        During the testimony with Dr. Villasenor just a

11:37:09  20  moment ago, he was asked:  What standard applies for making

11:37:13  21  an invention?

11:37:15  22        And his answer was:  Well, since he's accusing

11:37:18  23  Wells Fargo of being the infringer, he would need to show

11:37:21  24  that Wells Fargo makes the smartphone that he's accused of

11:37:26  25  being part of the infringing system and then combines that

11:37:29  1   smartphone.

11:37:30  2           That's an incorrect statement, and it's counter to

11:37:36  3   the law.  I have sustained the Plaintiff's objection.  And

11:37:40  4   there is no requirement that Wells Fargo must make the

11:37:46  5   smartphone.

11:37:48  6           They must combine all the elements in the claims

11:37:51  7   to achieve the claimed system.  But they do not have to

11:37:55  8   manufacture each item that is combined as called for in the

11:38:01  9   claims.  It's the combination or a lack of combination

11:38:04  10  that's required, not the actual manufacturing of the

11:38:09  11  smartphone by Wells Fargo.

11:38:11  12          That was an improper -- it's improper testimony,

11:38:14  13  and so I am instructing you to strike that from your

11:38:17  14  memories and disregard that question and that answer or

11:38:21  15  anything of a similar type.

11:38:24  16          All right.  With that, I will allow you to resume

11:38:27  17  your lunch.  Thank you for your patience and understanding.

11:38:31  18  The jury is excused for lunch break.

11:38:39  19          COURT SECURITY OFFICER:  All rise.

11:38:40  20          (Jury out.)

11:38:42  21          THE COURT:  All right.  Given that the jury is out

11:38:49  22  of the courtroom, we will recess for lunch and reconvene at

11:38:53  23  or near 12:30.

11:38:55  24          MR. MELSHEIMER:  Thank you, Your Honor.

11:38:55  25          THE COURT:  The Court stands in recess.

11:38:57   1          MR. SHEASBY:  Thank you, Your Honor.

11:38:58   2          COURT SECURITY OFFICER:  All rise.

11:39:00   3          (Recess.)

           4

           5                    CERTIFICATION

           6

           7          I HEREBY CERTIFY that the foregoing is a true and

           8   correct transcript from the stenographic notes of the

           9   proceedings in the above-entitled matter to the best of my

          10   ability.

          11

          12

          13    /S/ Shelly Holmes                        1/9/2020
               SHELLY HOLMES, CSR, TCRR                  Date
          14   OFFICIAL REPORTER
               State of Texas No.: 7804
          15   Expiration Date: 12/31/20

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25