```
12:24:17   1              IN THE UNITED STATES DISTRICT COURT
                            FOR THE EASTERN DISTRICT OF TEXAS
           2                      MARSHALL DIVISION

           3   UNITED SERVICES AUTOMOBILE   )(
               ASSOCIATION
           4                                )(   CIVIL ACTION NO.

           5   VS.                          )(   2:18-CV-366-JRG

           6                                )(   MARSHALL, TEXAS
                                                 JANUARY 9, 2020
           7   WELLS FARGO BANK, N.A.       )(   12:34 P.M.

           8

           9                  TRANSCRIPT OF JURY TRIAL

          10                    AFTERNOON SESSION

          11       BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP,

          12                  UNITED STATES DISTRICT JUDGE

          13
               APPEARANCES:
          14

          15   FOR THE PLAINTIFF:

          16
               JASON SHEASBY
          17   ANTHONY ROWLES
               LISA GLASSER
          18   IRELL & MANELLA
               1800 Avenue of the Stars
          19   Suite 900
               Los Angeles, CA 90067-4276
          20

          21
               ROBERT CHRISTOPHER BUNT
          22   PARKER, BUNT & AINSWORTH, PC
               100 East Ferguson
          23   Suite 418
               Tyler, TX 75702
          24

          25
```

```
 1   FOR THE DEFENDANT:

 2

     THOMAS M. MELSHEIMER
 3   M. BRETT JOHNSON
     MICHAEL A. BITTNER
 4   J. TRAVIS UNDERWOOD
     WINSTON & STRAWN LLP
 5   2121 North Pearl Street
     Suite 900
 6   Dallas, TX 75201

 7

     E. DANIELLE T. WILLIAMS
 8   WINSTON & STRAWN LLP
     300 South Tyron Street
 9   16th Floor
     Charlotte, NC 28202
10

11   MATTHEW R. MCCULLOUGH
     WINSTON & STRAWN LLP
12   275 Middlefield Road
     Suite 205
13   Menlo Park, CA 94025

14

     JACK WESLEY HILL
15   WARD, SMITH & HILL, PLLC
     P.O. Box 1231
16   1507 Bill Owens Parkway
     Longview, TX 75606
17

18

     COURT REPORTER:       Shelly Holmes, CSR, TCRR
19                         Official Court Reporter
                           United States District Court
20                         Eastern District of Texas
                           Marshall Division
21                         100 E. Houston
                           Marshall, Texas   75670
22                         (903) 923-7464

23

     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

P R O C E E D I N G S

12:34:51    (Jury out.)

12:34:51    COURT SECURITY OFFICER:  All rise.

12:37:56    THE COURT:  Be seated, please.

12:37:57    Dr. Villasenor, you may return to the witness
12:38:04  stand.

12:38:04    I remind you, you remain under oath.

12:38:10    MR. HILL:  Your Honor, may I broach one quick
12:38:13  housekeeping matter before we get started with the jury
12:38:15  again?

12:38:16    THE COURT:  You may, let's make it quick, though.

12:38:16    MR. HILL:  Very quick.  I just wanted to alert the
12:38:20  Court we've got an offer of proof we've been preparing that
12:38:22  we would need to file for purposes of our record.  We were
12:38:25  going to file it in writing.

12:38:27    I'm always hesitant to do that though without
12:38:27  telling the Court first, so you don't just see something
12:38:27  show up on your docket without thinking we raised it with
12:38:30  you first.

12:38:30    It covers things related to the motion in limine
12:38:33  process on exclusion, as well as a number of the things

| | | |
|---|---|---|
| 12:38:37 | 1 | we've talked about in chambers throughout the case.  We |
| 12:38:39 | 2 | just collected all those to do it at once. |
| 12:38:42 | 3 | I feel like we need to do that before our evidence |
| 12:38:44 | 4 | closes, or at minimum, alert the Court that we would be |
| 12:38:49 | 5 | doing it in writing and get your permission to do it that |
| 12:38:53 | 6 | way. |
| 12:38:53 | 7 | I'm happy to follow the Court's pleasure in that |
| 12:38:53 | 8 | regard, but I didn't want to let our case pass where we |
| 12:38:57 | 9 | stood past our case without at least alerting the Court. |
| 12:39:00 | 10 | THE COURT:  Is this offer of proof -- has it been |
| 12:39:02 | 11 | reduced to writing at this point? |
| 12:39:04 | 12 | MR. HILL:  Yes, Your Honor, it has. |
| 12:39:06 | 13 | THE COURT:  All right.  Is there some reason |
| 12:39:08 | 14 | you're waiting to file it at this point? |
| 12:39:10 | 15 | MR. HILL:  No, sir, just this -- we've just gotten |
| 12:39:12 | 16 | it ready.  Like I say, we were doing one cumulative, as |
| 12:39:17 | 17 | opposed to piecemeal. |
| 12:39:18 | 18 | THE COURT:  Why don't you file it on the docket. |
| 12:39:20 | 19 | That will be done before you rest your case, and it will |
| 12:39:25 | 20 | automatically be served on Plaintiff. |
| 12:39:27 | 21 | MR. HILL:  Yes, Your Honor, will do.  Thank you. |
| 12:39:28 | 22 | THE COURT:  All right.  Anything else before we |
| 12:39:29 | 23 | bring the jury in and continue with Dr. Villasenor? |
| 12:39:29 | 24 | MR. SHEASBY:  Nothing for Plaintiffs, Your Honor. |
| 12:39:31 | 25 | MR. MELSHEIMER:  No, Your Honor. |

| | | |
|---|---|---|
| 12:39:32 | 1 | THE COURT:  All right.  You may return to the |
| 12:39:34 | 2 | podium, Mr. Melsheimer. |
| 12:39:35 | 3 | MR. MELSHEIMER:  Thank you. |
| 12:39:57 | 4 | THE COURT:  Let's bring in the jury, Mr. Johnston. |
| 12:40:00 | 5 | COURT SECURITY OFFICER:  All rise. |
| 12:40:02 | 6 | (Jury in.) |
| 12:40:05 | 7 | THE COURT:  Please be seated. |
| 12:40:13 | 8 | All right.  Ladies and gentlemen, we'll continue |
| 12:40:14 | 9 | with the direct examination of Dr. John Villasenor by the |
| 12:40:19 | 10 | Defendant. |
| 12:40:19 | 11 | Mr. Melsheimer, you may proceed. |
| 12:40:20 | 12 | MR. MELSHEIMER:  May it please the Court. |
| 12:40:20 | 13 | JOHN VILLASENOR, PH.D., DEFENDANT'S WITNESS, |
| 12:40:20 | 14 | PREVIOUSLY SWORN |
| 12:40:20 | 15 | DIRECT EXAMINATION CONTINUED |
| 12:40:22 | 16 | BY MR. MELSHEIMER: |
| 12:40:22 | 17 | Q.  Good afternoon, Dr. Villasenor. |
| 12:40:24 | 18 | A.  Good afternoon. |
| 12:40:25 | 19 | Q.  All right.  I want to return to where we were talking |
| 12:40:27 | 20 | about when we broke.  Do you have Paragraph -- do you have |
| 12:40:30 | 21 | your report in your binder there? |
| 12:40:31 | 22 | A.  Yes, sir, I do. |
| 12:40:32 | 23 | Q.  Can you turn to Page 161? |
| 12:40:34 | 24 | A.  I'm sorry, do you mean Paragraph 161? |
| 12:40:41 | 25 | Q.  I meant Paragraph 161.  I did, sir, thank you. |

12:40:45  1   A.  Yes, sir, I'm there.

12:40:53  2         MR. MELSHEIMER:  May I get the ELMO?

12:40:57  3   Q.  (By Mr. Melsheimer)  Now, is this the version of the

12:40:59  4   slide we were looking at in your direct examination, sir?

12:41:02  5   A.  Yes, sir, it appears to be.

12:41:04  6   Q.  And does Paragraph 161, does that lay out your

12:41:08  7   understanding and your analysis of this divided

12:41:11  8   infringement issue?

12:41:13  9   A.  Yes, sir, it does.

12:41:14  10  Q.  And is that the testimony that you intend and want to

12:41:17  11  provide to the ladies and gentleman of the jury?

12:41:20  12  A.  If I'm asked to, I'm happy to provide that.

12:41:23  13  Q.  And you understand you write these things down in your

12:41:27  14  report, and you're both limited by that but you're also --

12:41:29  15  you can be refreshed by what you said before, right?

12:41:32  16  A.  My understanding is that's right.

12:41:34  17  Q.  Okay.  So with respect to this first notion of

12:41:38  18  infringement standard for system claims involving multiple

12:41:42  19  entities, that's where we are, right?

12:41:43  20  A.  Yes, sir.

12:41:44  21  Q.  Okay.  With respect to making the accused products, you

12:41:48  22  said in Paragraph 161 that Dr. Conte did not analyze any of

12:41:54  23  this in connection with his report or testimony; is that

12:41:58  24  right?

12:41:58  25  A.  That's paraphrasing.  I said he failed to prove any

| | | |
|---|---|---|
| 12:42:02 | 1 | claim of direct infringement, that's right. |
| 12:42:03 | 2 | Q.  Right.  So with respect to making the accused system, |
| 12:42:08 | 3 | is it your conclusion that Dr. Conte does not satisfy this |
| 12:42:13 | 4 | analysis because Wells Fargo does not combine all of the |
| 12:42:18 | 5 | claim elements because the users, not Wells Fargo, provides |
| 12:42:23 | 6 | the smartphone used in the accused device? |
| 12:42:24 | 7 | A.  With respect to the making part of this test, that's |
| 12:42:28 | 8 | correct. |
| 12:42:28 | 9 | Q.  And is that the words you used in your report, |
| 12:42:31 | 10 | "provide"? |
| 12:42:33 | 11 | A.  I -- |
| 12:42:33 | 12 | Q.  Provide the smartphone? |
| 12:42:35 | 13 | A.  Among other things, that right, yes. |
| 12:42:37 | 14 | Q.  Okay.  Now, with respect to -- so you didn't see any |
| 12:42:44 | 15 | analysis under this making step; is that right? |
| 12:42:46 | 16 | A.  That's correct. |
| 12:42:46 | 17 | Q.  So we can cross that off? |
| 12:42:49 | 18 | A.  Yes, sir. |
| 12:42:49 | 19 | Q.  All right.  What about selling or offering to sell? |
| 12:42:53 | 20 | A.  I opine -- I write that Dr. Conte does not allege that |
| 12:43:01 | 21 | Wells Fargo sells or offers to sells -- sell on a user's |
| 12:43:05 | 22 | smartphone's device processor. |
| 12:43:06 | 23 | Q.  Which are instead sold or imported by third parties? |
| 12:43:10 | 24 | A.  Correct, yes. |
| 12:43:11 | 25 | Q.  Okay.  So that would cover both sells and imports? |

12:43:19    1    A.  Yes, sir.

12:43:19    2    Q.  And by crossing these out, am I reflecting your

12:43:23    3    opinion, sir, that these are not satisfied by Dr. Conte's

12:43:28    4    analysis?

12:43:28    5    A.  Yes, sir.

12:43:29    6    Q.  And, finally, let's go to the final one with is --

12:43:33    7    which is users.  What's your understanding, looking at

12:43:36    8    Paragraph 162, the sentence beginning with "with respect to

12:43:43    9    use," what's your understanding of what Dr. Conte failed to

12:43:46   10    do in his report?

12:43:46   11    A.  My understanding is that Dr. Conte would have been

12:43:50   12    required to show that Wells Fargo, among other things,

12:43:54   13    obtains a benefit from each and every element of the claim,

12:43:57   14    and he did not attempt to do that.

12:44:00   15    Q.  So what you said was with respect to use, Dr. Conte

12:44:04   16    does not allege that end users control the entire system or

12:44:09   17    benefit from each and every claim element; is that what you

12:44:13   18    wrote in your report?

12:44:14   19    A.  Among other things, yes.

12:44:17   20    Q.  And did Dr. Conte address that in his report, based on

12:44:22   21    your review?

12:44:22   22    A.  I don't believe he did.

12:44:24   23    Q.  Did he address it in front of the ladies and gentleman

12:44:27   24    of the jury during this trial?

12:44:29   25    A.  No, in fact, I think I recall him testifying that he

| | | |
|---|---|---|
| 12:44:32 | 1 | did not do an element-by-element benefit analysis. |
| 12:44:35 | 2 | Q.  So can we cross that out, as well? |
| 12:44:38 | 3 | A.  Yes, sir. |
| 12:44:38 | 4 | Q.  Now, just to be clear, you did -- also did not do that |
| 12:44:42 | 5 | analysis? |
| 12:44:43 | 6 | A.  Yes, sir, that's correct. |
| 12:44:44 | 7 | Q.  Okay.  Do you understand that -- who -- who -- what's |
| 12:44:47 | 8 | your understanding in this trial of who has the burden of |
| 12:44:50 | 9 | proving infringement? |
| 12:44:52 | 10 | A.  My understanding is that the Plaintiff has the burden |
| 12:44:59 | 11 | to prove infringement. |
| 12:44:59 | 12 | Q.  And is -- and are -- are your opinions and analysis |
| 12:45:03 | 13 | with respect to this divided infringement issue, sir, are |
| 12:45:08 | 14 | they in Paragraphs 161 and 162 in your report? |
| 12:45:11 | 15 | A.  Yes, they are addressed in those paragraphs. |
| 12:45:13 | 16 | Q.  So if there's not making, selling, importing, or using |
| 12:45:30 | 17 | under the law, what does that mean with respect to whether |
| 12:45:33 | 18 | there is or is not infringement in the situation where you |
| 12:45:37 | 19 | have infringement involving multiple entities or parties? |
| 12:45:41 | 20 | A.  If I can -- it would be there -- means there's no |
| 12:45:46 | 21 | direct infringement as required under what I've been |
| 12:45:48 | 22 | instructed the standard is. |
| 12:45:51 | 23 | Q.  Now, does any of your analysis mean that either you or |
| 12:45:54 | 24 | Dr. Conte is accusing the Wells Fargo customers of |
| 12:45:58 | 25 | infringing? |

1106

| | |
|---|---|
| 12:45:59 | 1 |
| 12:46:00 | 2 |
| 12:46:02 | 3 |
| 12:46:04 | 4 |
| 12:46:07 | 5 |
| 12:46:11 | 6 |
| 12:46:13 | 7 |
| 12:46:15 | 8 |
| 12:46:19 | 9 |
| 12:46:21 | 10 |
| 12:46:22 | 11 |
| 12:46:24 | 12 |
| 12:46:24 | 13 |
| 12:46:25 | 14 |
| 12:46:37 | 15 |
| 12:46:39 | 16 |
| 12:46:43 | 17 |
| 12:46:46 | 18 |
| 12:46:50 | 19 |
| 12:46:54 | 20 |
| 12:46:57 | 21 |
| 12:47:00 | 22 |
| 12:47:03 | 23 |
| 12:47:06 | 24 |
| 12:47:08 | 25 |

MR. SHEASBY:  Objection, Your Honor, outside the scope of his report.

MR. MELSHEIMER:  Precise -- that's actually the point, Your Honor, that he doesn't say that and that Dr. Conte doesn't say that.  It was suggested -- we can approach if you'd like, Your Honor.

MR. SHEASBY:  Your Honor, this is just argumentative.  Dr. Villasenor has no discussion one way or another about the customer's responsibility.  That is not in his report.

MR. MELSHEIMER:  If I might -- if I might, Your Honor.  It was --

THE COURT:  Approach the bench, counsel.

(Bench conference.)

MR. MELSHEIMER:  Very straightforwardly, Your Honor, in the opening statement, Mr. Sheasby suggested that our theory was that our customers were infringing.  And I'm simply asking him does any of his analysis or any of Dr. Conte's analysis accuse the customers of infringing. Of course it's not in his report.  He didn't make that assertion.  Neither did Dr. Conte.  It's fair to respond to that.  It's not argumentative.  It's responsive to what was laid out in the opening statement.

MR. SHEASBY:  We know, because there's no report up here, that it's clearly not in his report.

1107

| | | |
|---|---|---|
| 12:47:11 | 1 | Dr. Villasenor provided no analysis whatsoever -- no |
| 12:47:13 | 2 | analysis whatsoever as to whether the customer would be |
| 12:47:17 | 3 | directly infringing the claims.  By providing no analysis |
| 12:47:20 | 4 | in his report, he's not entitled to provide any analysis |
| 12:47:22 | 5 | now.  This is just -- |
| 12:47:23 | 6 |           THE COURT:  I agree he's not entitled to put on |
| 12:47:25 | 7 | any analysis now.  He is entitled to say he didn't do any |
| 12:47:27 | 8 | analysis. |
| 12:47:28 | 9 |           MR. MELSHEIMER:  Or that Dr. Conte didn't do it |
| 12:47:30 | 10 | either. |
| 12:47:30 | 11 |           THE COURT:  To his knowledge. |
| 12:47:32 | 12 |           MR. MELSHEIMER:  Right.  Okay.  That's all I was |
| 12:47:34 | 13 | trying to do. |
| 12:47:35 | 14 |           THE COURT:  Overruled. |
| 12:47:35 | 15 |           MR. MELSHEIMER:  Okay.  Thank you. |
| 12:47:36 | 16 |           (Bench conference concluded.) |
| 12:47:38 | 17 |           THE COURT:  Let's proceed. |
| 12:47:40 | 18 | Q.  (By Mr. Melsheimer)  Did -- did you, sir, |
| 12:47:43 | 19 | Dr. Villasenor, or to your knowledge, Dr. Conte, do any |
| 12:47:48 | 20 | analysis in this case, either in front of the jury or in |
| 12:47:50 | 21 | your reports, accusing any Wells Fargo customers of |
| 12:47:56 | 22 | infringing the patents? |
| 12:47:56 | 23 | A.  No, sir, I did not do that analysis. |
| 12:47:58 | 24 | Q.  And did you hear Dr. Conte do that? |
| 12:48:00 | 25 | A.  I did not. |

```
12:48:01   1   Q.  Is the infringement analysis you did on this -- on --
12:48:08   2   strike that.
12:48:08   3           Is the infringement analysis that you told the
12:48:10   4   jury about before lunch on this confirming step with
12:48:15   5   respect to the '681 patent, is that separate and
12:48:20   6   independent from your analysis of this divided infringement
12:48:24   7   discussion that we just talked about?
12:48:25   8   A.  Yes, that's right.  That's a completely different point
12:48:29   9   with respect to non-infringement.  Although just to
12:48:32  10   clarify, the -- the screen that's on now applies to both
12:48:35  11   patents, in other words, the '605 and '681.  Whereas the
12:48:38  12   confirming step discussion only applies to the '681 patent.
12:48:41  13   Q.  The divided infringement analysis of making, selling,
12:48:44  14   importing and using, the legal standards for that, as you
12:48:48  15   understand it, apply to both patents, but the confirming
12:48:51  16   step analysis you did where you concluded that that step
12:48:54  17   was missing from the Wells Fargo system, that only applies
12:49:00  18   to the '681 patent; is that correct?
12:49:01  19   A.  Yep -- yes, sir, that's correct.
12:49:04  20   Q.  Were you asked to look at any other issues in this
12:49:07  21   case?
12:49:08  22   A.  Yes, sir, I was.
12:49:09  23   Q.  Were you asked to address non-infringing alternatives?
12:49:12  24   A.  Yes, sir, I was.
12:49:13  25   Q.  What is your understanding of what a non-infringing
```

12:49:17   1   alternative is?

12:49:17   2   A.  My understanding, as it's been explained to me, is that

12:49:21   3   if a system is deemed to infringe, a non-infringing

12:49:25   4   alternative is something where you could change something

12:49:28   5   about the system and in doing so make it so it no longer

12:49:33   6   infringes.

12:49:33   7   Q.  Now, does that change any of your analysis that you've

12:49:36   8   given the jury up to this point?

12:49:37   9   A.  Not at all.

12:49:39  10   Q.  Okay.  Did you identify some non-infringing

12:49:41  11   alternatives to the '605 and '681 patents?

12:49:43  12   A.  Yes, there's one.

12:49:45  13   Q.  All right.  Let's take a look at that, sir.

12:49:50  14          So can you describe for the ladies and gentleman

12:49:53  15   of the jury what is shown on Slide No. 25?

12:49:56  16   A.  So this slide shows one of the claims -- this, in fact,

12:50:00  17   is Claim 30 of the '681 patent, and in red.  And then

12:50:05  18   crossed out also, is a claim element relating to providing

12:50:08  19   instructions to a customer.  And even though the specific

12:50:12  20   wording of this claim element regarding instructions has

12:50:15  21   some variation across the claims, every one of the asserted

12:50:19  22   claims has such a requirement.

12:50:21  23          And so if -- if the instructions were removed from

12:50:25  24   the app, then it would clearly be non-infringing as -- and

12:50:31  25   also add that it is feasible to do this.  In fact, my

12:50:35   1   understanding is that USAA had a corporate representative

12:50:36   2   who testified that it was feasible to remove the

12:50:40   3   instructions to the user.

12:50:41   4   Q.  And are you just basing that -- basing that on -- on

12:50:45   5   his testimony?

12:50:46   6   A.  Well, his testimony corroborates what I understand,

12:50:49   7   independent also, that I understand it would be feasible.

12:50:52   8   Q.  Would it be -- would it -- technically feasible?

12:50:56   9   A.  Yes, sir, technically feasible.

12:50:58  10   Q.  And -- okay.  And would the cost of this alt -- we're

12:51:02  11   about to hear from Mr. Gerardi.  In your opinion, would the

12:51:05  12   cost of this alternative, if it was adopted, be less than

12:51:09  13   what Mr. Gerardi says the damages should be in this case if

12:51:13  14   there is infringement found?

12:51:15  15        MR. SHEASBY:  Objection, Your Honor.  Not in his

12:51:17  16   report.

12:51:20  17        MR. MELSHEIMER:  I believe it is, Your Honor.

12:51:22  18        MR. SHEASBY:  He can -- he can provide the number

12:51:24  19   of what he proposes to be --

12:51:26  20        MR. MELSHEIMER:  Paragraph 201, which I'm happy to

12:51:33  21   provide the Court.

12:51:34  22        THE COURT:  You'll need to do that.

12:51:36  23        MR. MELSHEIMER:  I'm sorry, Your Honor, did you

12:51:38  24   say please do that?

12:51:39  25        THE COURT:  You will need to do that.

| | | |
|---|---|---|
| 12:51:50 | 1 | Approach the bench, counsel. |
| 12:51:53 | 2 | (Bench conference.) |
| 12:52:01 | 3 | MR. MELSHEIMER:  There is a slight nuance to this, |
| 12:52:04 | 4 | Your Honor, which I'm happy to explain. |
| 12:52:07 | 5 | THE COURT:  Well, your question involved him |
| 12:52:09 | 6 | speculating about what Dr. Gerardi was going to say. |
| 12:52:13 | 7 | MR. MELSHEIMER:  Well, I think the objection is to |
| 12:52:14 | 8 | the -- Paragraph 201, which is what he's going to say it's |
| 12:52:18 | 9 | less -- this non-infringing alternative is less than |
| 12:52:23 | 10 | Mr. Gerardi's calculation of damages, which he knows what |
| 12:52:26 | 11 | it is.  There is some nuance, and I'm - I'm happy to |
| 12:52:28 | 12 | explain that. |
| 12:52:28 | 13 | THE COURT:  Well, let's start with the objecting |
| 12:52:30 | 14 | party's objection. |
| 12:52:32 | 15 | MR. SHEASBY:  He has nothing in his report about |
| 12:52:34 | 16 | Mr. Gerardi.  He can say that it would -- that he believes |
| 12:52:36 | 17 | it would cost less than $8.5 million to do this |
| 12:52:40 | 18 | design-around.  He's welcome to give that testimony. |
| 12:52:42 | 19 | Anything else is outside the scope of his report, |
| 12:52:44 | 20 | especially since he hasn't even testified yet. |
| 12:52:46 | 21 | THE COURT:  All right.  Now, what's your response? |
| 12:52:47 | 22 | MR. MELSHEIMER:  Here's the problem, Your Honor. |
| 12:52:49 | 23 | As you know, the Plaintiff dropped a number of claims at |
| 12:52:56 | 24 | the last minute which changed the damages analysis of |
| 12:52:57 | 25 | Mr. Gerardi.  And he had to do that based on these new |

12:53:00  1   claims, which was basically done -- you know, I want to say

12:53:03  2   literally over the weekend, but over the last few days.

12:53:07  3   His original number was this number.

12:53:09  4         So he -- he will say it's less than -- he will say

12:53:15  5   it's less than -- he doesn't know the new number.  We've

12:53:18  6   told him the new number, but he -- all he said in there was

12:53:21  7   8.5 million.

12:53:22  8         THE COURT:  He being whom?

12:53:25  9         MR. MELSHEIMER:  Dr. Villasenor.  And the point

12:53:26  10  is, he's not going to be able to say -- there's a new

12:53:31  11  number, which he's aware of.  That new number is not

12:53:35  12  written on this page because it couldn't have been written

12:53:38  13  on this page because he calculated this number --

12:53:41  14  Mr. Gerardi did.

12:53:41  15        THE COURT:  Is this number less than this number

12:53:43  16  that's on the page?

12:53:44  17        MR. MELSHEIMER:  Yes, it is.

12:53:45  18        THE COURT:  Then he can testify the number is less

12:53:47  19  than $8.5 million.

12:53:49  20        MR. SHEASBY:  And without reference to

12:53:50  21  Mr. Gerardi.

12:53:51  22        MR. MELSHEIMER:  But there's no -- it's got to

12:53:52  23  be -- the sole context for it, Judge, is that it's less

12:53:56  24  than what he said.  I don't understand what the problem

12:53:58  25  with Gerardi is.  He's about to testify.  He's an expert.

```
12:54:01   1   I don't understand why that's an issue.
12:54:03   2          MR. SHEASBY:  It's an issue because he should be
12:54:05   3   bound by what's in his report.  He didn't say Mr. Gerardi's
12:54:08   4   number last time, and he shouldn't say it this time.  He
12:54:11   5   should say what's in his report.
12:54:11   6          MR. MELSHEIMER:  Your Honor, of course, that is
12:54:14   7   not -- that is a hypertechnical distinction, given that
12:54:19   8   Mr. Gerardi has recalculated damages based on them taking
12:54:23   9   actions at the last moment.  I -- I don't --
12:54:27  10          THE COURT:  What is it you want this witness to
12:54:29  11   say, Mr. Melsheimer?
12:54:30  12          MR. MELSHEIMER:  I want him to say it's
12:54:32  13   substantially less than the number that Mr. Gerardi will
12:54:34  14   offer to the jury of alleged damages in the case.
12:54:39  15          THE COURT:  In light of his report,
12:54:41  16   notwithstanding the last minute changes, I'm not going to
12:54:43  17   let him say that.
12:54:44  18          MR. MELSHEIMER:  Okay.  But you will let him say
12:54:46  19   it's less than $8.5 million.
12:54:49  20          THE COURT:  He can say what's right there.
12:54:49  21          MR. MELSHEIMER:  Okay.  Thank you.
12:54:53  22          (Bench conference concluded.)
12:54:53  23          THE COURT:  All right.  The objection is
12:54:53  24   sustained.  Let's proceed.
12:54:54  25   Q.  (By Mr. Melsheimer)  If you'll look at Paragraph 201 of
```

| | | |
|---|---|---|
| 12:54:58 | 1 | your report, sir.  Just one -- one final question. |
| 12:55:00 | 2 | A.  Yes, sir. |
| 12:55:00 | 3 | Q.  Based on your experience, the alternatives that you |
| 12:55:03 | 4 | just described to the jury, would they cost substantially |
| 12:55:08 | 5 | less than $8.5 million? |
| 12:55:10 | 6 | A.  To implement. |
| 12:55:13 | 7 | MR. SHEASBY:  Your Honor, objection, |
| 12:55:16 | 8 | substantially. |
| 12:55:16 | 9 | THE COURT:  Sustained. |
| 12:55:17 | 10 | MR. MELSHEIMER:  Your Honor -- that is right out |
| 12:55:19 | 11 | of his report, Your Honor.  I can -- |
| 12:55:21 | 12 | THE COURT:  I just read the report.  It says less |
| 12:55:23 | 13 | than.  It doesn't say substantially less than, unless I |
| 12:55:27 | 14 | misread it. |
| 12:55:28 | 15 | MR. MELSHEIMER:  With all due respect, Your Honor, |
| 12:55:29 | 16 | it -- it does say substantially.  I'm happy to show it to |
| 12:55:32 | 17 | you. |
| 12:55:33 | 18 | THE COURT:  Do you disagree with that, |
| 12:55:36 | 19 | Mr. Sheasby? |
| 12:55:36 | 20 | MR. SHEASBY:  I withdraw the objection. |
| 12:55:45 | 21 | THE COURT:  All right.  Let's leave it where it is |
| 12:55:47 | 22 | then. |
| 12:55:48 | 23 | MR. MELSHEIMER:  Can I restate the question, Your |
| 12:55:49 | 24 | Honor? |
| 12:55:50 | 25 | THE COURT:  Restate the question, as closely as |

1115

| | | |
|---|---|---|
| 12:55:54 | 1 | you can to what you just asked him. |
| 12:55:57 | 2 | Q.  (By Mr. Melsheimer)  Based on your experience, sir, the |
| 12:55:59 | 3 | alternatives that you just described to the jury, would |
| 12:56:08 | 4 | those -- to implement, would those cost substantially less |
| 12:56:08 | 5 | than $8.5 million? |
| 12:56:09 | 6 | A.  Yes, sir. |
| 12:56:13 | 7 | MR. MELSHEIMER:  May I have a moment, Your Honor? |
| 12:56:14 | 8 | THE COURT:  Yes, you may have a moment. |
| 12:56:29 | 9 | MR. MELSHEIMER:  May it please the Court, |
| 12:56:30 | 10 | Your Honor.  We -- we pass the witness for |
| 12:56:32 | 11 | cross-examination. |
| 12:56:32 | 12 | THE COURT:  All right.  Cross-examination by |
| 12:56:34 | 13 | Plaintiff. |
| 12:56:34 | 14 | CROSS-EXAMINATION |
| 12:57:00 | 15 | BY MR. SHEASBY: |
| 12:57:00 | 16 | Q.  Good afternoon, Dr. Villasenor. |
| 12:57:02 | 17 | A.  Good afternoon. |
| 12:57:02 | 18 | Q.  It's nice to see you again.  We've met previously? |
| 12:57:05 | 19 | A.  Yes, sir, we have. |
| 12:57:08 | 20 | MR. SHEASBY:  Now, if we could have Slide 15 from |
| 12:57:11 | 21 | your presentation to the jury, please. |
| 12:57:29 | 22 | Q.  (By Mr. Sheasby)  One of the theories that you |
| 12:57:31 | 23 | presented to the jury is that Wells Fargo should not be |
| 12:57:33 | 24 | liable for infringement because all the claims in the |
| 12:57:36 | 25 | patents are system claims, which require the use of a |

| | | |
|---|---|---|
| 12:57:39 | 1 | user's cell phone application, fair? |
| 12:57:43 | 2 | A.  I've been instructed they're all system claims, yes. |
| 12:57:46 | 3 | Q.  Sir, you told the jury they're all system claims, |
| 12:57:51 | 4 | correct? |
| 12:57:51 | 5 | A.  Yes. |
| 12:57:52 | 6 | Q.  In fact, it's on the slide.  It says infringement of |
| 12:57:55 | 7 | system claims, correct? |
| 12:57:56 | 8 | A.  Yes, sir. |
| 12:57:56 | 9 | Q.  You told the jury that every claim in the patent that's |
| 12:58:01 | 10 | at issue in this case was a system claim, correct? |
| 12:58:03 | 11 | A.  Yes, sir. |
| 12:58:04 | 12 | Q.  But, in fact -- |
| 12:58:04 | 13 | MR. SHEASBY:  Why don't we pull up the '681 |
| 12:58:06 | 14 | patent, which is PX-1187, and let's turn to Claim 30. |
| 12:58:25 | 15 | Q.  (By Mr. Sheasby)  This is the '681 patent, Claim 30. |
| 12:58:28 | 16 | This is one of the patents that's asserted in this case, |
| 12:58:32 | 17 | correct? |
| 12:58:32 | 18 | A.  Yes. |
| 12:58:33 | 19 | Q.  And we can agree that the word "system," the actual |
| 12:58:38 | 20 | real-world system doesn't appear in this claim, correct? |
| 12:58:41 | 21 | A.  Yes, sir. |
| 12:58:41 | 22 | Q.  And Claim 13 recites, quote, non-transitory |
| 12:58:46 | 23 | computer-readable medium storing an app.  Do you see that, |
| 12:58:51 | 24 | sir? |
| 12:58:53 | 25 | A.  Yes. |

```
12:58:53   1   Q.  Claim 30 recites memory storing a software program,
12:58:56   2   correct?
12:58:56   3   A.  Among other things, yes.
12:58:58   4   Q.  Claim 30 is describing storing a software program in
12:59:08   5   non-volatile memory, correct?
12:59:10   6   A.  Yes.
12:59:13   7   Q.  Claim 30 is describing a software program stored on
12:59:18   8   memory, correct?
12:59:19   9   A.  Yes.  I've answered that.  Yes.
12:59:24  10   Q.  Wells Fargo's mobile application is a software program,
12:59:30  11   correct?
12:59:30  12   A.  Yes, sir.
12:59:34  13   Q.  And Wells Fargo stores its software program in
12:59:38  14   non-transitory memory, correct?
12:59:41  15   A.  I'm not sure if I agree with that.
12:59:45  16   Q.  Wells Fargo's mobile application is stored in
12:59:48  17   non-transitory memory, correct?
12:59:51  18   A.  Yes, that's right.
12:59:53  19   Q.  So for the ladies and gentlemen of the jury, Claim 30
12:59:56  20   doesn't use the word "system," correct?
12:59:58  21   A.  Yes, that's right.
01:00:00  22   Q.  Claim 30 is describing storing a software program on
01:00:03  23   non-volatile memory, correct?
01:00:05  24   A.  Yes.
01:00:06  25   Q.  Wells Fargo's mobile application is a software program,
```

```
01:00:10   1   correct?
01:00:10   2   A.   Yes.
01:00:10   3   Q.   And that software program is stored in non-transitory
01:00:12   4   memory, correct?
01:00:14   5   A.   Yes.
01:00:14   6   Q.   Who -- and the Wells Fargo mobile application is made
01:00:19   7   by Wells Fargo, correct?
01:00:20   8   A.   I believe so.
01:00:22   9   Q.   It's not made by the customer, correct?
01:00:24  10   A.   Yes, that's right.
01:00:26  11   Q.   And you told the ladies and gentlemen of the jury that
01:00:28  12   this claim was a system claim, correct?
01:00:30  13   A.   Yes.
01:00:31  14   Q.   And it doesn't say system anywhere, correct?
01:00:35  15   A.   That's right.
01:00:35  16   Q.   And the jury, when they go into the room to deliberate,
01:00:39  17   can take into account that you told the jury that this was
01:00:42  18   a system claim, Claim 30, correct?
01:00:43  19   A.   Yes.
01:00:44  20   Q.   And they can use their common sense and read the claim
01:00:47  21   to see if there's a reference to the word "system,"
01:00:50  22   correct?
01:00:50  23   A.   Of course.
01:00:51  24   Q.   They can use their common sense and hear your testimony
01:00:55  25   that this is -- claim is describing a software program on
```

| | | |
|---|---|---|
| 01:00:57 | 1 | non-volatile memory, correct? |
| 01:00:59 | 2 | A.  Yes. |
| 01:01:01 | 3 | Q.  Now, the other claims in the patent that are at issue |
| 01:01:12 | 4 | are system claims, correct? |
| 01:01:14 | 5 | A.  Yes.  The other claims are system claims, yes. |
| 01:01:17 | 6 | Q.  And if you examine -- |
| 01:01:25 | 7 | MR. SHEASBY:  Let's pull up Claim 12, for example, |
| 01:01:30 | 8 | in the '681 patent. |
| 01:01:31 | 9 | Q.  (By Mr. Sheasby)  If you examine each and every element |
| 01:01:40 | 10 | of the patents-in-suit, none of them recite elements that |
| 01:01:45 | 11 | are to be formed by a user, as opposed to by a downloaded |
| 01:01:49 | 12 | application or the back end server, correct? |
| 01:01:53 | 13 | A.  Yes.  The user is not performing the steps, that's |
| 01:01:56 | 14 | right. |
| 01:01:56 | 15 | Q.  None of the elements in any claim of the |
| 01:02:00 | 16 | patents-in-suit are performed by the user, correct? |
| 01:02:03 | 17 | A.  I think that's right, yes. |
| 01:02:05 | 18 | Q.  They're all performed by either the downloaded |
| 01:02:08 | 19 | application, correct, or the back end server? |
| 01:02:13 | 20 | A.  I think there's multiple things recited so that's -- |
| 01:02:17 | 21 | those are some of the things that are recited. |
| 01:02:19 | 22 | Q.  Sir, why don't you turn to Tab 2 of your deposition? |
| 01:02:23 | 23 | A.  I'm sorry? |
| 01:02:24 | 24 | Q.  Tab 2 of your binders, which is your deposition from |
| 01:02:27 | 25 | Case 2. |

| | | |
|---|---|---|
| 01:02:32 | 1 | A.  Yes. |
| 01:02:32 | 2 | Q.  And look at Line 69, 17 through 21. |
| 01:02:44 | 3 | A.  I'm sorry, Line 69 or page -- |
| 01:02:46 | 4 | Q.  Page 69, Line 17 through 21. |
| 01:02:50 | 5 | A.  Page 69, Line 17 through 21? |
| 01:02:53 | 6 | Q.  Sir, for the system claims of the '605 and '681 patent, |
| 01:02:59 | 7 | you cannot identify any element of the claims that require |
| 01:03:05 | 8 | steps performed by the user, correct? |
| 01:03:07 | 9 | A.  I think that's right, yes. |
| 01:03:08 | 10 | Q.  And, in fact, at your deposition, you couldn't recall |
| 01:03:15 | 11 | any element that was required to be -- be performed by the |
| 01:03:19 | 12 | user, as opposed to by the downloaded application or the |
| 01:03:24 | 13 | back end software, correct? |
| 01:03:25 | 14 | A.  I don't recall.  I think that's right, yes. |
| 01:03:28 | 15 | Q.  You have not offered any opinion the elements of the |
| 01:03:32 | 16 | system claims in the patents-in-suit are performed by the |
| 01:03:34 | 17 | user, correct? |
| 01:03:35 | 18 | A.  I think that's correct, yes. |
| 01:03:39 | 19 | Q.  The claims don't require that the user take any step |
| 01:03:43 | 20 | whatsoever, correct? |
| 01:03:44 | 21 | A.  I believe that's correct, yes. |
| 01:03:47 | 22 | Q.  Now, you spoke about the fact that an entity can be |
| 01:04:09 | 23 | liable for infringement if it makes or uses a system, |
| 01:04:13 | 24 | correct? |
| 01:04:13 | 25 | A.  Yes.  I mean, you're paraphrasing, but that's -- yes. |

01:04:21  1    Q.  And one of the ways you make a system is by assembling

01:04:25  2    it, correct?

01:04:27  3    A.  My understanding is that that can be assembling, yes.

01:04:31  4    Q.  And so the mobile application that's used in the system

01:04:40  5    is built by Wells Fargo, correct?

01:04:43  6    A.  I assume that's the case.  I don't -- haven't

01:04:47  7    investigated, but I assume that's the case.

01:04:49  8    Q.  So you understand that this case is about Wells Fargo's

01:04:52  9    mobile remote deposit capture application, fair?

01:04:54  10   A.  Yes, I understand that.

01:04:55  11   Q.  And you're the technical expert in this case, fair?

01:04:57  12   A.  Yes.

01:04:57  13   Q.  And you didn't investigate whether Wells Fargo made the

01:05:01  14   application that's at issue in this case?

01:05:03  15   A.  I didn't investigate whether they had third-party

01:05:07  16   contractors, for example.

01:05:09  17          THE COURT:  Dr. Villasenor, you're going to have

01:05:10  18   to speak up.

01:05:11  19   A.  Okay.  I didn't investigate whether they had

01:05:14  20   third-party solutions also involved in making the app.  I

01:05:19  21   don't know.

01:05:19  22   Q.  (By Mr. Sheasby)  Okay.  So you are providing testimony

01:05:21  23   to the ladies and gentlemen of the jury about whether Wells

01:05:25  24   Fargo makes this system, and you're saying it doesn't,

01:05:27  25   fair?

01:05:27  1    A.  No, that's not what I said.

01:05:36  2    Q.  You're taking the position that Wells Fargo doesn't

01:05:39  3    make the Wells Fargo mobile remote deposit capture system,

01:05:43  4    correct?

01:05:43  5    A.  Can you clarify what you mean by system?

01:05:46  6    Q.  Sir, the system accused of infringement in this case,

01:05:54  7    does Wells Fargo make that system or doesn't it?

01:05:55  8    A.  Well, to the extent that the system includes, as is

01:05:59  9    shown here, the customer's mobile phone, then, no.

01:06:02  10   Q.  You did nothing to investigate whether Wells Fargo is

01:06:13  11   directing or controlling the conduct of, for example, the

01:06:17  12   customer, correct?

01:06:20  13   A.  I didn't -- I don't recall specifically discussing

01:06:23  14   that.

01:06:28  15   Q.  You provided no analysis whatsoever as to whether Wells

01:06:41  16   Fargo benefits from the elements of the claims at issue,

01:06:46  17   correct?

01:06:46  18   A.  That's correct.

01:06:48  19   Q.  And so one of the ways that you can infringe a system

01:06:55  20   claim is if Wells Fargo benefits from the elements of the

01:06:59  21   claims, correct?

01:07:01  22   A.  I think if the proper test is conducted, each and every

01:07:06  23   element, I think that's right, yeah.

01:07:07  24   Q.  So the question is, does Wells Fargo benefit from each

01:07:10  25   and every element of the mobile remote deposit capture

01:07:12   1   system recited in the claims, correct?

01:07:14   2   A.  That is the question that can be asked, yes.

01:07:18   3   Q.  And, in fact, it's a question that will determine

01:07:19   4   whether Wells Fargo is infringing as a user of the system

01:07:24   5   claims under your theory of the case, correct?

01:07:26   6   A.  I don't actually agree.

01:07:31   7   Q.  Now, we do know some things.  We know that the Wells

01:07:36   8   Fargo mobile application at issue in this case will only

01:07:39   9   interface with Wells Fargo's servers; it won't interface

01:07:42  10   with the bank, correct?

01:07:43  11   A.  I'm sorry, I'm not sure what you mean by it won't

01:07:45  12   interface with the bank.

01:07:46  13   Q.  It won't interface with any other bank, sir?

01:07:49  14   A.  I think that's right, yes.

01:07:50  15   Q.  You don't identify any user parameters that the user

01:07:54  16   can control on Wells Fargo's Mobile Deposit system,

01:07:58  17   correct?

01:07:58  18   A.  Oh, I don't recall.

01:08:00  19   Q.  You don't identify any aspects of the rules or

01:08:03  20   processes that are used for Wells Fargo's Mobile Deposit

01:08:08  21   that can be set by the user, as opposed to the bank,

01:08:11  22   correct?

01:08:11  23   A.  I don't recall.

01:08:15  24   Q.  Sir, you told the ladies and gentlemen of the jury that

01:08:23  25   Wells Fargo must benefit from each and every element of the

| | | |
|---|---|---|
| 01:08:27 | 1 | claims of the patents, correct? |
| 01:08:30 | 2 | A.  I said that that was one of the tests. |
| 01:08:33 | 3 | Q.  You don't even know what the word "benefit" means, |
| 01:08:36 | 4 | correct? |
| 01:08:36 | 5 | A.  I -- I know in a legal -- in a general sense, but not |
| 01:08:40 | 6 | the legal definition. |
| 01:08:41 | 7 | Q.  You don't know what a benefit is for the purpose of |
| 01:08:45 | 8 | this analysis, correct? |
| 01:08:47 | 9 | A.  I don't have a specific opinion on what a benefit is, |
| 01:08:51 | 10 | that's correct. |
| 01:08:51 | 11 | Q.  For example, you don't know if saving $2.50 per check |
| 01:08:56 | 12 | every time a deposit is made is a benefit, correct? |
| 01:08:59 | 13 | A.  That sounds like a benefit. |
| 01:09:01 | 14 | Q.  So we agree that Wells Fargo, when it saves $2.54 every |
| 01:09:08 | 15 | time it deposits a check that would have otherwise gone |
| 01:09:11 | 16 | through the teller, that sounds like a benefit to you, |
| 01:09:13 | 17 | fair? |
| 01:09:13 | 18 | A.  If that number is correct in the broad sense, saving |
| 01:09:18 | 19 | money would be a benefit, yes. |
| 01:09:19 | 20 | Q.  Well, sir, you were in the court every single day, |
| 01:09:23 | 21 | correct? |
| 01:09:23 | 22 | A.  Yes, sir. |
| 01:09:24 | 23 | Q.  You heard Ms. Lockwood-Stein testify under oath that |
| 01:09:26 | 24 | every time a user deposits a check through mobile as |
| 01:09:31 | 25 | opposed to through a teller, they save $2.54, correct? |

01:09:36   1   A.   I actually didn't remember that number.

01:09:37   2   Q.   You don't remember the number?

01:09:39   3   A.   I haven't memorized every number I've heard in the last

01:09:42   4   week, no.

01:09:43   5   Q.   But we do know this, from a matter of common sense,

01:09:45   6   saving multiple dollars every time a check is deposited,

01:09:49   7   that sounds like a benefit, doesn't it, Professor

01:09:53   8   Villasenor?

01:09:53   9   A.   I think, in general, saving money would be a benefit,

01:09:56   10  yeah.

01:09:56   11  Q.   And you understand that the claims of the

01:09:59   12  patents-in-suit are directed to mobile remote deposit

01:10:02   13  capture systems, correct?

01:10:03   14  A.   I -- I understand that the claims are addressed there,

01:10:12   15  addressing systems, yes, with -- for -- with a computer and

01:10:15   16  an image acquired by a camera.

01:10:19   17  Q.   Sir, the claims are directed at mobile remote deposit

01:10:25   18  capture, correct?

01:10:25   19  A.   Again, the -- I don't think that phrase is used, but it

01:10:29   20  certainly addresses -- the claims address a portable device

01:10:32   21  and a mobile device.

01:10:32   22  Q.   Sir, do you know that the claims of the patents are

01:10:37   23  directed at mobile remote deposit capture?

01:10:38   24  A.   They -- well, they are in some cases, but it doesn't

01:10:44   25  mean that -- I want to be careful not to give an overly

01:10:48   1   broad answer that might be misconstrued.

01:10:50   2   Q.  Sir, can you answer the question as to whether the

01:10:53   3   claims are directed at the mobile remote deposit capture?

01:10:55   4   A.  They're directed to certain kinds of mobile remote

01:10:59   5   deposit capture.

01:10:59   6   Q.  And it's mobile remote deposit capture that is saving

01:11:04   7   Wells Fargo money every time a system is used, fair?

01:11:07   8   A.  Again, I don't have my own opinion on that, but I heard

01:11:14   9   testimony that it does save money, yes.

01:11:18   10   Q.  You don't have any own opinion as to whether Wells

01:11:21   11   Fargo benefits from the system it uses?

01:11:24   12   A.  I didn't -- I wasn't asked to do an -- an economic

01:11:28   13   analysis, so I didn't do that.

01:11:30   14   Q.  Sir, you've been testifying that one of the analyses

01:11:34   15   that needs to occur is to whether Wells Fargo benefits from

01:11:38   16   each and every element of the claims, correct?

01:11:41   17   A.  That's one -- it -- that's -- sort of.  It's one of the

01:11:46   18   tests for that particular infringement evaluation, but it's

01:11:50   19   not necessary if someone satisfies another product such

01:11:55   20   that it makes.

01:11:56   21   Q.  So you didn't do any analysis as to whether Wells Fargo

01:12:00   22   benefits from its system, correct?

01:12:01   23   A.  At the level of each element, that's correct, I did

01:12:07   24   not.

01:12:07   25   Q.  So you didn't do any analysis of whether Wells Fargo

```
01:12:10   1   benefits from its system, correct?
01:12:12   2   A.  That's probably right, yes.
01:12:14   3   Q.  Now, you also talked about what I'll call technical
01:12:20   4   infringement arguments, where you actually think particular
01:12:23   5   elements of the claims are not met, fair?
01:12:27   6   A.  Yes, that's right.
01:12:28   7   Q.  And, in fact, I think in your deposition, we called
01:12:30   8   them technical elements, fair?
01:12:32   9   A.  I don't recall.  That may be right.
01:12:35  10   Q.  Now, there are two patents at issue in this case.  One
01:12:39  11   is the '605 patent, fair?
01:12:40  12   A.  Yes.
01:12:40  13   Q.  And you put up no slide and said absolutely nothing
01:12:46  14   about the technical issues associated with the '605 patent,
01:12:49  15   correct?
01:12:49  16   A.  To use your terminology about technical issues, that's
01:12:54  17   correct, yes.
01:12:55  18   Q.  In fact, you're not disputing that in the systems,
01:12:58  19   which is the mobile app running the mobile phone -- app on
01:13:02  20   the mobile phone plus the back end servers, you're not
01:13:04  21   disputing that every single limitation of the '605 patent
01:13:08  22   is present, correct?
01:13:10  23   A.  I have not offered a technical opinion on the -- any of
01:13:14  24   those claim elements, that's right.
01:13:16  25   Q.  Sir, for the ladies and gentlemen of the jury, are you
```

01:13:20   1   disputing in your direct testimony that any element of the

01:13:26   2   '605 patent is not met?

01:13:27   3   A.  Putting -- putting aside the divided infringement

01:13:31   4   argument, I am not disputing that.

01:13:33   5   Q.  From a technical standpoint, you're not disputing that

01:13:36   6   every element of the claims of the '605 patent are met,

01:13:39   7   fair?

01:13:39   8   A.  Yes, that's right.

01:13:41   9   Q.  Now, for the '681 patent, there is only a -- one

01:13:46  10   element that you're asserting as not met, correct?

01:13:50  11   A.  Yes, sir, that's right.

01:13:57  12        MR. SHEASBY:  And why don't we pull up Slide 12 of

01:14:12  13   your demonstratives.

01:14:31  14        Actually, let's pull up Slide 11.

01:14:35  15   Q.  (By Mr. Sheasby)  Now, this is the slide you showed the

01:14:40  16   jury, correct?

01:14:41  17   A.  Yes, sir.

01:14:42  18   Q.  And what you told the ladies and gentlemen of the jury

01:14:46  19   is that the actual process of optical character recognition

01:14:51  20   determining an amount of the check must occur solely on the

01:14:54  21   mobile device, correct?

01:14:55  22   A.  I don't think I used that word, no.

01:15:00  23   Q.  Does it have to occur solely on the mobile device, or

01:15:03  24   can the server assist it?

01:15:04  25   A.  It must occur on the mobile device.

```
01:15:06   1    Q.   Okay.   Now --
01:15:09   2    A.   In the claim.   I just want to clarify, yes, in the
01:15:12   3    claim.
01:15:12   4    Q.   Now, I notice that there's part of that passage that
01:15:14   5    you didn't underline.
01:15:16   6             It says:   The system performs optical character
01:15:20   7    recognition.   Do you see that?
01:15:21   8    A.   Yes.
01:15:25   9    Q.   System performs optical character recognition?
01:15:30  10    A.   Yes, sir.
01:15:31  11    Q.   The word "system" is a different word from the word
01:15:37  12    "digital camera," correct?
01:15:39  13    A.   Yes, that's right.
01:15:40  14    Q.   And what this claim describes and what it says is that
01:15:43  15    the system performs optical character -- character
01:15:45  16    recognition, correct?
01:15:45  17    A.   That's what that highlighting says, yes.
01:15:48  18    Q.   And in the claims -- in Claim 12, the system
01:15:52  19    encompasses not just the mobile device, it encompasses the
01:15:58  20    downloaded app and the computer associated with the bank
01:16:01  21    that is not on the mobile device, correct?
01:16:02  22    A.   Yes, that's right.
01:16:06  23    Q.   So to level set, you told the jury that Claim 12
01:16:12  24    requires that the mobile device perform the optical
01:16:16  25    character recognition, fair?
```

1130

01:16:17  1   A.   That's what I believe the claim requires, yes.

01:16:19  2   Q.   You didn't highlight the portion of the claim that says

01:16:22  3   the system performs optical character recognition, correct?

01:16:25  4   A.   Yes, that's right.

01:16:26  5   Q.   And, in fact, you didn't tell the jury that in Claim

01:16:30  6   12, the system encompasses not just the mobile device, it

01:16:36  7   also encompasses the servers on the back end, correct?

01:16:41  8   A.   Actually, I believe I did describe the system as having

01:16:45  9   those -- both of those elements, I believe.

01:16:48  10  Q.   Sir, the word "system" encompasses not just the mobile

01:16:51  11  device.  It encompasses the downloaded application in a

01:16:54  12  computer associated with the bank --

01:16:56  13        THE COURT:  Slow down, Mr. Sheasby, please.

01:16:57  14        MR. SHEASBY:  Yes, Your Honor.

01:16:58  15  Q.   (By Mr. Sheasby)  Sir, the word "system" in Claim 12

01:17:04  16  encompasses not just the mobile device, it encompasses the

01:17:08  17  downloaded app in a computer associated with the bank that

01:17:11  18  is not on the mobile device, fair?

01:17:13  19  A.   Yes, I agree with that.

01:17:14  20  Q.   Now, one of the issues you talked about is source code.

01:17:21  21  You told the ladies and gentlemen of the jury that you've

01:17:22  22  read source code in preparation for your testimony, fair?

01:17:26  23  A.   I have looked at some source code, yes.

01:17:28  24  Q.   But you've actually never gone and read source code in

01:17:31  25  this case, correct?

| | | |
|---|---|---|
| 01:17:33 | 1 | A.  I have read some source code in this case. |
| 01:17:37 | 2 | Q.  Sir, you've never gone to the computer where the source |
| 01:17:40 | 3 | code is securely stored and read it, correct? |
| 01:17:42 | 4 | A.  I haven't read it on that computer, that's correct. |
| 01:17:44 | 5 | Q.  The only source code you ever read was the source code |
| 01:17:47 | 6 | that was in Professor Conte's report, correct? |
| 01:17:49 | 7 | A.  Yes, that's correct. |
| 01:17:50 | 8 | Q.  And, in fact, at your deposition, we noted the fact |
| 01:17:55 | 9 | that -- that you've made mistakes in your reading of source |
| 01:17:59 | 10 | code in the past, correct? |
| 01:18:00 | 11 | A.  I have made mistakes, yes. |
| 01:18:02 | 12 | Q.  And, in fact, in the preparation of your report in this |
| 01:18:05 | 13 | case, you made mistakes in your reading of source code, |
| 01:18:07 | 14 | correct? |
| 01:18:07 | 15 | A.  I'm only aware of one. |
| 01:18:10 | 16 | Q.  You made one mistake in the reading of the source code |
| 01:18:13 | 17 | in this case, correct? |
| 01:18:15 | 18 | A.  One that I can think of. |
| 01:18:16 | 19 | Q.  And, in fact, the mistake you made is you thought a |
| 01:18:20 | 20 | step was performed on the server when it was performed on |
| 01:18:23 | 21 | the device, correct? |
| 01:18:24 | 22 | A.  That's right, yeah. |
| 01:18:25 | 23 | Q.  And so it'd be fair to say, and the jury can balance |
| 01:18:28 | 24 | the fact, that you have historically made mistakes in your |
| 01:18:31 | 25 | written report about the operation of source code, fair? |

01:18:34  1   A.  I disagree.

01:18:37  2   Q.  You don't believe the jury should take into account

01:18:40  3   that you've made mistakes in your interpretation of source

01:18:43  4   code?

01:18:43  5   A.  I don't know what mistakes, plural, you're speaking of.

01:18:46  6   Q.  Do you believe the jury should take into account that

01:18:52  7   you made a mistake when you previously analyzed source code

01:18:56  8   in this case?

01:18:57  9   A.  I believe the jury can make its own decision.

01:19:00  10  Q.  Now, you told the ladies and gentlemen of the jury that

01:19:24  11  you thought there was a non-infringing alternative to the

01:19:26  12  patents-in-suit, correct?

01:19:28  13  A.  Yes, sir.

01:19:28  14  Q.  You told them you just don't need to give instructions

01:19:32  15  to the users, correct?

01:19:33  16  A.  I said that that was a non-computer term, but yes.

01:19:37  17  Q.  You told them it was viable, correct?

01:19:39  18  A.  I believe "feasible" is the word I used.

01:19:41  19  Q.  The reality is, is that you did nothing to investigate

01:19:45  20  whether what you describe as a non-infringing alternative

01:19:47  21  would be commercially viable, correct?

01:19:50  22  A.  That -- that's right.  I was focused on technical

01:19:54  23  feasibility, that's right.

01:19:55  24        MR. SHEASBY:  Your Honor, objection,

01:19:59  25  non-responsive.

1133

01:20:08    1          THE COURT:  The answer "that's right" is correct.

01:20:10    2    I'll strike the remainder of the answer.

01:20:13    3    Q.  (By Mr. Sheasby)  You did nothing to investigate

01:20:15    4    whether any of these alternatives you describe as

01:20:20    5    non-infringing are legal or even allowed under the

01:20:23    6    regulations that govern banking, correct?

01:20:26    7    A.  That's correct.

01:20:26    8    Q.  You don't even know whether building the non-infringing

01:20:30    9    system you're talking about would be within the risk

01:20:32   10    compliance standards set up by Wells Fargo, correct?

01:20:36   11    A.  I was not asked to investigate that, that's correct.

01:20:38   12    Q.  You did nothing to calculate the number of different

01:20:49   13    regulatory functions and surveillance functions and

01:20:54   14    operation parameters that would have to change for Wells

01:20:56   15    Fargo to remove the functionality that you describe,

01:21:00   16    correct?

01:21:00   17    A.  Yes, sir, that's correct.

01:21:03   18    Q.  You believe that somebody who is not aware of the

01:21:06   19    relevant laws probably shouldn't be in a position of

01:21:08   20    authority to make decisions about commercial systems in

01:21:12   21    banking, correct?

01:21:13   22    A.  I think that's a fair statement, yeah.

01:21:15   23    Q.  You're not in that position, correct?

01:21:17   24    A.  I'm sorry, I'm not sure I understand the question.

01:21:21   25    Q.  You're not aware of the laws and regulations and

01:21:24  1   procedures that would be necessary to consider as to

01:21:26  2   whether your non-infringing alternative would be

01:21:27  3   commercially viable, correct?

01:21:28  4   A.   I don't know all of the laws for the banking

01:21:31  5   regulations around that, that's right.

01:21:33  6   Q.   Do you know any of them?

01:21:34  7   A.   I'm familiar with some of the -- the laws, but I don't

01:21:38  8   know how they would necessarily relate to the

01:21:41  9   non-infringing alternative I mentioned.

01:21:43  10  Q.   Now, there is one person in this courtroom who could

01:21:48  11  have considered, from a business standpoint, whether the

01:21:53  12  system you describe was commercially viable, correct?

01:21:56  13  A.   I'm not sure who you're referring to.

01:21:58  14  Q.   Well, Mr. Saffici, he spent 40 years in his system.

01:22:02  15  He's an absolute expert in business, correct?

01:22:06  16  A.   I actually think that's incorrect.  I think he has

01:22:09  17  spent 53 years in the system.

01:22:11  18  Q.   Mr. Saffici has spent 53 years as a business expert in

01:22:13  19  this system, correct?

01:22:14  20  A.   In banking and checking, yeah, that's how long he's

01:22:17  21  spent, yes.

01:22:18  22  Q.   He did nothing to explain to you whether what you're

01:22:25  23  proposing to the jury was commercially viable or not,

01:22:29  24  correct?

01:22:29  25  A.   I didn't have a conversation with him about that, that

1135

| | | |
|---|---|---|
| 01:22:32 | 1 | I can recall. |
| 01:22:33 | 2 | Q.  You didn't ask him whether it's commercially viable or |
| 01:22:36 | 3 | not, correct? |
| 01:22:36 | 4 | A.  I think that's right, yeah. |
| 01:22:38 | 5 | Q.  So what we have is we have Mr. Hecht, Wells Fargo's |
| 01:22:43 | 6 | corporate representative, who testified.  We had |
| 01:22:47 | 7 | Mr. Saffici, who was a business expert in RDC, testify. |
| 01:22:51 | 8 | And not one of those people -- not one of those people that |
| 01:22:53 | 9 | have decades and decades and decades of experience in |
| 01:22:57 | 10 | banking testified that your non-infringing alternative is |
| 01:22:59 | 11 | commercially viable, fair? |
| 01:23:00 | 12 | A.  I don't believe they testified to that particular |
| 01:23:04 | 13 | point, that's right. |
| 01:23:05 | 14 | MR. SHEASBY:  I pass the witness, Your Honor. |
| 01:23:06 | 15 | THE COURT:  Redirect, Mr. Melsheimer? |
| 01:23:08 | 16 | MR. MELSHEIMER:  Just briefly, Your Honor. |
| 01:23:11 | 17 | THE COURT:  While he's going to the podium, |
| 01:23:14 | 18 | Dr. Villasenor, you're going to have to speak up.  You're |
| 01:23:17 | 19 | just really whispering over there.  I know you're close to |
| 01:23:20 | 20 | the microphone. |
| 01:23:21 | 21 | THE WITNESS:  I'm sorry. |
| 01:23:22 | 22 | THE COURT:  Just make it louder coming out of your |
| 01:23:25 | 23 | voice. |
| 01:23:25 | 24 | THE WITNESS:  I'm sorry, Your Honor. |
| 01:23:26 | 25 | THE COURT:  All right.  Mr. Melsheimer. |

<u>REDIRECT EXAMINATION</u>

01:23:26  1

01:23:27  2  BY MR. MELSHEIMER:

01:23:27  3  Q.  Dr. Villasenor, just a couple of questions.  Does

01:23:30  4  claim -- you were asked about Claim 30 and whether or not

01:23:32  5  it was a system claim?

01:23:34  6  A.  Yes, sir.

01:23:34  7  Q.  Does -- does Claim 30 involve multiple entities as

01:23:38  8  accused by Mr. -- as accused by Dr. Conte?

01:23:42  9       MR. SHEASBY:  Your Honor, may we approach?  I

01:23:48  10  have an objection.

01:23:49  11       MR. MELSHEIMER:  You know, I'll withdraw the

01:23:50  12  question in the interest of time, if that's all right.

01:23:51  13       THE COURT:  Then let's move on.

01:23:55  14  Q.  (By Mr. Melsheimer)  Is saving -- you were asked some

01:24:00  15  questions about benefits, Your Honor -- Dr. Villasenor, you

01:24:03  16  were asked some questions about saving money for the bank?

01:24:06  17  A.  Yes, sir.

01:24:07  18  Q.  Is saving money for the bank one of the claim elements

01:24:10  19  of the patents in this case?

01:24:12  20  A.  No, sir, there's no specific element that's -- recites

01:24:17  21  saving money.

01:24:18  22  Q.  Was it your job, as you understood it, to investigate

01:24:22  23  and prove up the benefits of each claim element in this

01:24:24  24  case?

01:24:24  25  A.  No, sir, that was not my job.

01:24:26  1    Q.  Whose job was that?

01:24:28  2    A.  My understanding is that the burden to establish

01:24:31  3    infringement falls on -- on the Plaintiff.

01:24:33  4    Q.  Now, with respect to this question you were asked about

01:24:36  5    the mistake that you made in the source code.  You -- you

01:24:40  6    made one mistake; is that your testimony?

01:24:43  7    A.  Yes, sir.

01:24:45  8    Q.  Okay.  And does that mistake that you made have

01:24:48  9    anything to do with what you told the jury this morning

01:24:53  10   about this confirming step analysis?

01:24:55  11   A.  Not at all.

01:24:56  12   Q.  Do you know why that was brought up?

01:24:59  13   A.  I can't speculate as to what Mr. Sheasby was thinking.

01:25:04  14          MR. MELSHEIMER:  May I have a moment, Your Honor?

01:25:05  15          THE COURT:  You may.

01:25:14  16          MR. MELSHEIMER:  No further questions, Your Honor.

01:25:16  17          Thank you, Dr. Villasenor.

01:25:17  18          THE COURT:  Do you have additional

01:25:18  19   cross-examination, Mr. Sheasby?

01:25:19  20          MR. SHEASBY:  Your Honor, no additional

01:25:21  21   cross-examination.

01:25:22  22          THE COURT:  Then you may step down,

01:25:23  23   Dr. Villasenor.

01:25:24  24          THE WITNESS:  Thank you, Your Honor.

01:25:24  25          MR. SHEASBY:  Your Honor, with your permission,

01:25:25  1    may I clear the binders?

01:25:27  2            THE COURT:  Pardon?

01:25:27  3            MR. SHEASBY:  May I clear the binders -- remove

01:25:30  4    the demonstratives for the next witness.

01:25:34  5            THE COURT:  Well, let's see what the Defendant's

01:25:36  6    next witness is.  I appreciate the offer.

01:25:39  7            But, Defendant, call your next witness.

01:25:43  8            MS. WILLIAMS:  Thank you, Your Honor.  We call

01:25:45  9    Mr. Chris Gerardi.

01:25:46  10           THE COURT:  All right.  If you'll come forward and

01:25:48  11   be sworn, please, Mr. Gerardi.

01:26:12  12           (Witness sworn.)

01:26:13  13           THE COURT:  Please come around, sir.  Have a seat

01:26:14  14   on the witness stand.

01:26:27  15           MS. WILLIAMS:  Your Honor, may I provide the

01:26:31  16   witness with a binder, as well as opposing counsel?

01:26:35  17           THE COURT:  You may approach.

01:26:37  18           THE WITNESS:  May I move these out of the way?

01:26:40  19           THE COURT:  The CSO will help you.

01:26:56  20           All right.  Ms. Williams, you may proceed.

01:26:59  21           MS. WILLIAMS:  Thank you, Your Honor.  May it

01:27:01  22   please the Court.

01:27:01  23        CHRIS GERARDI, DEFENDANT'S WITNESS, SWORN

01:27:01  24                   DIRECT EXAMINATION

01:27:01  25   BY MS. WILLIAMS:

01:27:04    1    Q.  Will you introduce yourself to the jury?

01:27:05    2    A.  Sure.  Good afternoon.  I'm Chris Gerardi.

01:27:07    3    Q.  Will you please tell us a little bit about yourself?

01:27:10    4    A.  Sure.  My wife and I live in the Jacksonville, Florida

01:27:11    5    area.  We've been married 30 years this year.  Three grown

01:27:12    6    children.

01:27:12    7             I grew up in Worcester, Massachusetts, one of

01:27:18    8    three boys to a single mom.  Spent my time working through

01:27:24    9    school at my uncle's plumbing shop, stocking shelves and

01:27:24   10    cutting pipe and doing any other odd jobs that were asked

01:27:27   11    of me.

01:27:27   12    Q.  You mentioned you went to school.  Where did you go to

01:27:29   13    college?

01:27:29   14    A.  My undergraduate degree I received from the University

01:27:32   15    of Massachusetts at Dartmouth in economics, and I received

01:27:36   16    my Master's degree in banking, finance, and money

01:27:41   17    management several years later from a school called Adelphi

01:27:44   18    University.

01:27:44   19    Q.  What is your role in this case?

01:27:46   20    A.  I've been asked to do three things.  One is to talk and

01:27:51   21    comment about the damages opinions presented by

01:27:53   22    Mr. Weinstein; two, is to comment on some of the damages

01:27:56   23    and opinions presented by Mr. Calman; and, three, is to

01:28:00   24    evaluate the damages should liability be found in this

01:28:04   25    matter that Wells Fargo may -- may be obligated to pay.

01:28:09   1    Q.  Let's talk about what qualifies you to provide those
01:28:11   2    opinions in this case.
01:28:12   3          Can you please tell the jury where you work?
01:28:16   4    A.  Sure.  Currently I'm a vice president with a company
01:28:19   5    called Charles River Associates.
01:28:24   6          We provide a variety of economic and financial
01:28:27   7    accounting type services to companies both in the
01:28:27   8    litigation and non-litigation typesetting.  Prior to that,
01:28:30   9    I spent 16 years with a company called FTI Consulting where
01:28:35  10    I co-led the disputes practice and the intellectual
01:28:38  11    property practice.
01:28:39  12          And, again, we provided the same types of
01:28:41  13    services, a variety of accounting and corporate finance,
01:28:45  14    accounting and finance services.  I was a partner at KPMG,
01:28:51  15    which is one of the largest accounting firms in the world,
01:28:53  16    before that.
01:28:54  17    Q.  During your time at Charles River Associates, FTI, and
01:29:01  18    KPMG, have you had experience in calculating damages in
01:29:05  19    patent matters such as this?
01:29:06  20    A.  Yes, I have.  I've worked north of 75 to a hundred
01:29:09  21    different types of intellectual property matters such as
01:29:12  22    this.
01:29:12  23    Q.  Have any of those involved the banking industry?
01:29:14  24    A.  Yes, several of them have.  I worked on matters for
01:29:19  25    banks such as Bank of America, Citibank, JPMorgan Chase,

| | | |
|---|---|---|
| 01:29:24 | 1 | HSBC, and several other banks. |
| 01:29:26 | 2 | Q.  Has your work involved assisting companies with valuing |
| 01:29:30 | 3 | intellectual property? |
| 01:29:31 | 4 | A.  Yes.  So even outside of the context of litigation, |
| 01:29:35 | 5 | when a company has intellectual property that it's looking |
| 01:29:38 | 6 | to license or do something with, I'll help them evaluate |
| 01:29:40 | 7 | the markets that they may be applicable to, identify |
| 01:29:44 | 8 | companies that they may be interested in talking to |
| 01:29:47 | 9 | licensing about, and helping them frame what the economics |
| 01:29:50 | 10 | of the licensing may look like so when they have those |
| 01:29:54 | 11 | negotiations, they have informed decisions about how to go |
| 01:29:57 | 12 | about that licensing discussion or that licensing |
| 01:29:59 | 13 | negotiation. |
| 01:29:59 | 14 | Q.  Have you given presentations or written articles about |
| 01:30:05 | 15 | intellectual property valuation? |
| 01:30:06 | 16 | A.  Yes.  Over the course of my 30 years, I have spoken at |
| 01:30:10 | 17 | many conferences.  I've authored chapters in books having |
| 01:30:16 | 18 | to do with the calculation of patent damages, presented at |
| 01:30:20 | 19 | various bar associations, and actually taught some courses |
| 01:30:23 | 20 | at some universities about this type of subject. |
| 01:30:24 | 21 | Q.  How many years have you been working in the area of |
| 01:30:29 | 22 | economic damages for intellectual property? |
| 01:30:30 | 23 | A.  I'm pushing 30 years now. |
| 01:30:34 | 24 | Q.  Have you ever been qualified as an expert in the area |
| 01:30:37 | 25 | of damages? |

| | | |
|---|---|---|
| 01:30:38 | 1 | A.  Yes, I have. |
| 01:30:40 | 2 | Q.  Is CR -- sorry, is Charles River Associates, the |
| 01:30:45 | 3 | company that you work for, being compensated for the work |
| 01:30:47 | 4 | that you're doing in this case? |
| 01:30:49 | 5 | A.  Yes, they are. |
| 01:30:50 | 6 | Q.  What is your -- what is the rate for your work that |
| 01:30:55 | 7 | Charles River Associates is being paid? |
| 01:30:55 | 8 | A.  CRA receives $725.00 an hour for my time. |
| 01:30:59 | 9 | Q.  Approximately how many hours have you spent on this |
| 01:31:02 | 10 | case? |
| 01:31:02 | 11 | A.  Myself, a hundred to 125 hours. |
| 01:31:08 | 12 | MS. WILLIAMS:  Your Honor, at this time we tender |
| 01:31:10 | 13 | Mr. Gerardi as an expert on the valuation of intellectual |
| 01:31:13 | 14 | property and the calculation of patent damages. |
| 01:31:15 | 15 | THE COURT:  Is there objection? |
| 01:31:16 | 16 | MR. SHEASBY:  No objection, Your Honor. |
| 01:31:19 | 17 | THE COURT:  Without objection, the Court will |
| 01:31:21 | 18 | recognize this witness as an expert in those designated |
| 01:31:23 | 19 | fields. |
| 01:31:24 | 20 | You may continue, counsel. |
| 01:31:26 | 21 | MS. WILLIAMS:  Thank you, Your Honor. |
| 01:31:26 | 22 | Q.  (By Ms. Williams)  Mr. Gerardi, let's turn to the work |
| 01:31:30 | 23 | you did in this case.  You mentioned that you were asked to |
| 01:31:33 | 24 | do -- to do three things.  What were those three things? |
| 01:31:36 | 25 | A.  Again, one, evaluate the report that was submitted by |

| | |
|---|---|
| 01:31:40 | 1 |
| 01:31:44 | 2 |
| 01:31:48 | 3 |
| 01:31:52 | 4 |
| 01:31:55 | 5 |

01:31:40  1  Mr. Weinstein; second, to evaluate the damages related to

01:31:44  2  the report submitted by Mr. Calman; and, then, third,

01:31:48  3  provide my own independent assessment of what the economic

01:31:52  4  damages would be should the jury find that USAA prevails on

01:31:55  5  its claims against Wells Fargo.

01:31:56  6  Q.  Are you providing any opinion on infringement?

01:31:59  7  A.  No, I'm not.

01:32:00  8  Q.  Are you providing any opinion on the invalidity of

01:32:04  9  these patents?

01:32:05  10  A.  No, I'm not.

01:32:06  11  Q.  So by providing your testimony today to the jury, are

01:32:10  12  you in any way suggesting that Wells Fargo should pay

01:32:14  13  damages in this case?

01:32:15  14  A.  No, I'm not.

01:32:16  15  Q.  All right.  Let's -- will you describe for us what

01:32:21  16  materials you asked for and what you reviewed in this case?

01:32:24  17  A.  Sure.  So in the course of conducting these types of

01:32:27  18  analyses, obviously, there's information you're going to

01:32:31  19  want to obtain from the parties.  And so documents from

01:32:34  20  both Wells Fargo and -- and USAA.  Since this related to

01:32:38  21  the banking aspect and the MRDC aspect of what Wells Fargo

01:32:41  22  is accused of doing, I asked for a variety of their related

01:32:46  23  information.  So I reviewed that information from -- from

01:32:51  24  Wells Fargo.

01:32:51  25         We obtained and saw some of the depositions you've

01:32:55  1  seen here from many of the parties, that were taken in this

01:32:58  2  case.  Obviously, I reviewed Dr. Villasenor's report,

01:33:02  3  Mr. Saffici's report, and that of Mr. -- Mr. Weinstein and

01:33:07  4  Mr. Calman.  Some publicly available information we

01:33:11  5  obtained on our own to fill in some -- some blanks there.

01:33:16  6      I spent a lot of time talking with Mr. Hecht.  And

01:33:18  7  spent some time with various other Wells Fargo's

01:33:24  8  employees:  Mr. Rosati, who was one of the product

01:33:27  9  managers; Ms. Lockwood-Stein, who I believe you saw on

01:33:29  10  videotape; Mr. Ajami.  And then, again, obviously spent

01:33:33  11  some time talking with Mr. Villasenor and Mr. Saffici.

01:33:37  12      And then I relied upon my experience in working on

01:33:39  13  several other patent matters, particularly some in the

01:33:40  14  banking industry having to do with various payment

01:33:42  15  processing systems.

01:33:44  16  Q.  Why did you speak with Dr. Villasenor?

01:33:48  17  A.  I'm not a technical expert.  I'm an economist.  So I

01:33:52  18  needed to understand from a technical perspective what was

01:33:56  19  being accused of infringement, as he described previously,

01:34:00  20  and I also spoke to him about the non-infringing

01:34:02  21  alternative that he identified.

01:34:03  22  Q.  You mentioned that you spoke with Mr. -- with

01:34:06  23  Mr. Hecht.  Why did you speak with Mr. Hecht?

01:34:09  24  A.  So in the context of ultimately preparing my damage

01:34:12  25  analysis, I needed to understand the Wells Fargo's systems

01:34:16  1   and I needed to understand how those front end systems that

01:34:19  2   we were talking about previously and those back end systems

01:34:21  3   you heard about, how they worked and how they were put

01:34:24  4   together and kind of the history of those.  And, obviously,

01:34:27  5   Mr. Hecht in his role as -- as one of the senior folks at

01:34:31  6   bank of -- at Wells Fargo, he also gave me some of that

01:34:35  7   information to help me form my opinions.

01:34:37  8   Q.  You also mentioned that you spoke with Mr. Saffici.

01:34:40  9   Why did you speak with Mr. Saffici?

01:34:42  10  A.  Mr. Saffici gave me, again, some -- some general

01:34:45  11  background as to that back end -- those back end-type

01:34:50  12  systems; how long they were there; what were banks doing

01:34:52  13  over the courses of years to help process those items.

01:34:55  14       So his item processing experience over the years

01:34:58  15  was helpful to me to understand and evaluate the damages in

01:35:01  16  this case.

01:35:02  17  Q.  Have you attended trial?

01:35:04  18  A.  Oh, yes, I've been here since the opening statements.

01:35:06  19  Q.  Are you prepared today to discuss the opinions that you

01:35:09  20  have in this case?

01:35:10  21  A.  Yes, I am.

01:35:11  22  Q.  All right.  Before we go into the details of your

01:35:13  23  opinions, can you please give us a high level summary of

01:35:17  24  what they are?

01:35:18  25  A.  Sure.  So -- and, again, this is something I think that

01:35:23  1   Mr. Weinstein and I both agree upon.  Our job as damages

01:35:25  2   experts is to evaluate the incremental benefit or the value

01:35:29  3   that's provided by the patented claims.

01:35:32  4          And so, first, the first opinion I have is in --

01:35:35  5   is that Mr. Weinstein, I believe, has failed to do that.

01:35:38  6          I think, as he testified to on Tuesday, much of

01:35:47  7   his analysis is based upon the fraud and fraud prevention

01:35:49  8   value.  But as he testified later, the fraud and fraud

01:35:54  9   prevention elements aren't in the claims of the patent.

01:35:55  10          And so, second, I'll walk you through my analysis

01:35:59  11   of what I did and -- and how I believe that if the patents

01:36:02  12   are found to be valid and infringed, that the damage amount

01:36:05  13   in this case is -- is, based upon my calculation, is

01:36:08  14   $3.98 million.

01:36:09  15   Q.  You mentioned that you were in court and have been here

01:36:20  16   for all of the testimony since opening statements.  Were

01:36:23  17   you here for Mr. Weinstein's testimony?

01:36:26  18   A.  Yes, ma'am.

01:36:26  19   Q.  And during Mr. Weinstein's testimony, did you confirm

01:36:29  20   that there were things that you and Mr. Weinstein agree on?

01:36:33  21   A.  Yes.

01:36:33  22   Q.  Will you please -- can you give us an example of what

01:36:38  23   you agree on?

01:36:39  24   A.  Sure.  So, again, in -- in the context of doing this

01:36:44  25   damage analysis, Mr. Weinstein I think did a good job of

01:36:48   1   presenting this hypothetical negotiation that we have to go

01:36:49   2   through.  We have to go back and put together what the

01:36:53   3   parties would have negotiated at the time of first

01:36:56   4   infringement or at the time of the hypothetical

01:37:02   5   negotiation.

01:37:02   6         We both agree that a reasonable royalty is an

01:37:04   7   appropriate measure of damage.  We both agree that the

01:37:08   8   hypothetical negotiation and the assumptions behind that

01:37:10   9   negotiation would have occurred in July of 2018.  We both

01:37:15  10   agree that the damages periods of when damages began to

01:37:19  11   accrue or when they began to start would be August 17th of

01:37:24  12   2018, and we've measured damages through today through the

01:37:26  13   end of trial.

01:37:27  14         There's case law out there called Georgia-Pacific

01:37:31  15   that lists a bunch of factors that experts in our field use

01:37:34  16   to kind of evaluate the hypothetical negotiation.  We both

01:37:40  17   agree that a commercially viable non-infringing alternative

01:37:43  18   would provide a cap to a royalty, and I'll explain that

01:37:46  19   later.

01:37:46  20         THE COURT:  Mr. Gerardi, would you slow down,

01:37:49  21   please?

01:37:49  22         THE WITNESS:  Yes, I'm sorry, Your Honor.

01:37:51  23         THE COURT:  Just take it a little slower.

01:37:53  24   A.  And then the other thing that we agree on, again, is

01:37:53  25   our job is to measure the incremental value provided by the

01:37:57   1   claims of the patent.  What are the claims that we're asked

01:38:00   2   to evaluate?  Because that's really what's at issue in the

01:38:02   3   matter.

01:38:04   4   Q.  So just so I understand, you and Mr. Weinstein agree

01:38:07   5   that you value the incremental contribution associated with

01:38:11   6   the patent?

01:38:11   7   A.  Yes, ma'am.

01:38:12   8   Q.  And you're supposed to value what's new about the

01:38:16   9   patent that didn't exist before?

01:38:18   10  A.  Yes, ma'am.

01:38:21   11  Q.  Now, do you have any areas of disagreement with

01:38:24   12  Mr. Weinstein?

01:38:24   13  A.  Yes, I do.

01:38:25   14  Q.  Can you just describe what those are to the jury,

01:38:29   15  please?

01:38:29   16  A.  Sure.  And, again, as Mr. Weinstein testified the other

01:38:35   17  day at trial, his analyses are based upon valuing the fraud

01:38:40   18  detection and fraud prevention elements, and those are the

01:38:43   19  bases of his calculations.  But as he testified to, on

01:38:48   20  Tuesday, those fraud prevention and fraud detection

01:38:53   21  elements aren't in the claims of the patents, so I think he

01:38:57   22  was valuing the wrong thing essentially.

01:38:59   23  Q.  Were you here yesterday for Mr. Hecht's testimony?

01:39:01   24  A.  Yes, ma'am.

01:39:02   25  Q.  Did you hear counsel for USAA suggest that

01:39:06    1    Mr. Weinstein has two damages theories, one based on cost

01:39:10    2    savings and one based on fraud prevention value?

01:39:12    3    A.   I heard that.

01:39:13    4    Q.   Do you agree with that?

01:39:15    5    A.   No, not at all.

01:39:16    6    Q.   Why don't you agree with that?

01:39:18    7    A.   Because my analyses of both of Mr. Weinstein's opinions

01:39:23    8    demonstrate that they're measuring the fraud prevention and

01:39:25    9    fraud detection elements; they're not measuring the claims

01:39:29   10    of the patents.

01:39:30   11    Q.   So -- so the cost savings model, is that based on the

01:39:38   12    fraud prevention value, as well?

01:39:40   13    A.   It's based upon the fraud prevention, that is titled

01:39:46   14    ATM measurement of the patented claims of fraud prevention.

01:39:49   15    So, again, it's not based upon a cost savings analysis.

01:39:52   16    Q.   And -- and what is your understanding about whether the

01:40:02   17    fraud prevention -- fraud prevention features are in the

01:40:08   18    claims from Mr. Weinstein's testimony?

01:40:11   19    A.   My understanding is that they're not, and I think on

01:40:14   20    testimony, he -- he confirmed that they're not.

01:40:17   21    Q.   All right.  Let's turn to your opinion that the measure

01:40:24   22    of damages in this case is -- is $3.98 million.

01:40:29   23          All right.  So before we go into the details of

01:40:32   24    your opinion, will you describe for us what your -- just a

01:40:36   25    high level overview of what your opinion is?

01:40:38   1   A.   Sure.   So, again, three things.   The first is based

01:40:42   2   upon the calculation that I'll walk you through.   The

01:40:46   3   damages I believe are 3.98 million.   I believe Wells Fargo

01:40:50   4   could have used a non-infringing alternative that cost less

01:40:54   5   than that amount, which would essentially set a cap on the

01:40:58   6   royalty rate.   And as we've heard, there are no licenses to

01:41:02   7   the patents in this suit.

01:41:04   8   Q.   Did you conduct a hypothetical negotiation like

01:41:08   9   Mr. Weinstein did?

01:41:09  10   A.   Yes, I did.

01:41:09  11   Q.   And what do we have here on -- on this screen?

01:41:17  12   A.   Just to summarize, again, the facts that -- that we

01:41:21  13   talked and that Mr. Weinstein, again, I think alluded to.

01:41:25  14   We're having this discussion in -- in June -- in July of

01:41:28  15   2018.   The ground rules -- we both agree that the

01:41:34  16   patents -- for our purposes of evaluating damages, we have

01:41:37  17   to assume that the patents are valid and enforceable and

01:41:40  18   that both parties want to have an agreement.

01:41:42  19        We both -- these Georgia-Pacific factors, there's

01:41:46  20   15 of them.   I put them into these four categories just

01:41:50  21   because I think they make more logical sense to evaluate.

01:41:54  22   Q.   Mr. Gerardi, let me interrupt you right there.   So --

01:41:57  23   so you've grouped the Georgia-Pacific factors into these

01:42:01  24   categories.   So you've -- you've walked us through the --

01:42:03  25   through the ground rules, and you and Mr. Weinstein agree

01:42:05   1   on the ground rules, correct?

01:42:07   2   A.  Yes, ma'am.

01:42:07   3   Q.  All right.  And so the first category you have is

01:42:09   4   licensing.  So what are the licensing factors for the --

01:42:13   5   for the analysis that you performed?

01:42:14   6   A.  Well, again, you look to see if there are -- there are

01:42:17   7   licenses for the patents-in-suit.  You'd look to see if

01:42:22   8   there are established licenses out there.  You look to see

01:42:26   9   the duration of those licenses and those types of things.

01:42:29  10   Q.  And what is the second category you have here?

01:42:31  11   A.  Nature and use.  So, again, you're looking at the

01:42:33  12   utility and the advantages of the patents.  What are the

01:42:37  13   claims actually saying that they provide in the -- in the

01:42:40  14   patent.  And then the benefits of those use, the nature and

01:42:46  15   extent of those -- of those users.

01:42:47  16   Q.  The next category that you've broken out is market

01:42:52  17   competition.  What do you mean by that?

01:42:53  18   A.  Again, who are the parties, what's the nature of the

01:42:56  19   competition or the nature of the relationship between the

01:42:57  20   parties, and, again, the -- their willingness to enter into

01:43:02  21   these negotiations.

01:43:02  22   Q.  And the fourth category you have is commercial success.

01:43:06  23   What do you mean by that?

01:43:08  24   A.  What's the economic -- what's the success of a product,

01:43:12  25   what's the profits of the product, and then, most

| | | |
|---|---|---|
| 01:43:15 | 1 | importantly, what's the apportioned profits.  So what are |
| 01:43:18 | 2 | the -- what's the portion of profits that's directly |
| 01:43:21 | 3 | attributable to the claims of the patent as opposed to the |
| 01:43:24 | 4 | other intellectual property or other technology that's used |
| 01:43:27 | 5 | to sell and deliver that product. |
| 01:43:30 | 6 | Q.  Did you use all four of these categories in performing |
| 01:43:34 | 7 | your analysis in this case? |
| 01:43:35 | 8 | A.  Yes, I considered all of them. |
| 01:43:38 | 9 | Q.  Okay.  And how did you go about determining what the |
| 01:43:45 | 10 | compensation would be under your analysis? |
| 01:43:47 | 11 | A.  Well, I think there's -- I'll say valuation and three |
| 01:43:51 | 12 | easy steps.  The first thing -- |
| 01:43:53 | 13 | Q.  All right.  What is the first step? |
| 01:43:55 | 14 | A.  We're talking about MRDC, so -- so -- so check |
| 01:43:59 | 15 | account -- checking information, getting checks into the |
| 01:44:02 | 16 | system.  So I started with the profits from the checking |
| 01:44:05 | 17 | account customers who use mobile banking. |
| 01:44:08 | 18 | Q.  And then what was the second step? |
| 01:44:09 | 19 | A.  The second step was to determine how much of that |
| 01:44:13 | 20 | overall profit comes from mobile banking. |
| 01:44:15 | 21 | Q.  And then what's the third step? |
| 01:44:18 | 22 | A.  How much of the general mobile banking profit comes |
| 01:44:23 | 23 | from this specific area called MRDC, mobile remote deposit |
| 01:44:26 | 24 | capture. |
| 01:44:26 | 25 | Q.  All right.  So I want to walk through each one of these |

1153

01:44:31  1    steps.  So let's go to the first step.  And tell us what it

01:44:39  2    is that you're trying to determine in the first step.

01:44:40  3    A.  Again, what's the size of the pile we're going to be

01:44:44  4    talking about.  So you're looking at the profitability or

01:44:46  5    the profits to Wells Fargo from all the customers who --

01:44:53  6    the MRDC customers, and, again, their checking account

01:44:57  7    profits -- the checking profits.

01:44:59  8    Q.  Why did you select that?

01:45:00  9    A.  Again, because MRDC is -- is mobile remote deposit

01:45:03  10   capture, you're getting checks into the system somehow.  So

01:45:07  11   I'm looking at the profits for checking account customers.

01:45:09  12   Q.  All right.  And then what is the next step that you

01:45:12  13   did?

01:45:12  14   A.  So, remember, mobile banking, which is more than

01:45:19  15   MRDC -- the mobile banking is one component of -- of

01:45:23  16   customers that deal with the bank, so I wanted to separate

01:45:24  17   out the mobile banking side of the pie from the other

01:45:30  18   banking activities, such as teller and ATM activities and

01:45:35  19   things that have nothing to do with mobile banking.

01:45:37  20   Q.  All right.  So just so I'm clear, mobile deposit is

01:45:41  21   part of mobile banking; is that -- do I have that right?

01:45:44  22   A.  Correct.

01:45:44  23   Q.  Okay.  And then there's other banking activity that

01:45:46  24   occurs at the teller and at the ATM that is not related to

01:45:51  25   mobile deposit?

01:45:51  1   A.  Correct.

01:45:52  2   Q.  All right.  And so that was the second step, to

01:45:55  3   separate out mobile banking from non-mobile banking?

01:46:00  4   A.  That's correct.

01:46:01  5   Q.  All right.  And so what was the third step?

01:46:03  6   A.  The third step is to look at mobile banking and seeing

01:46:06  7   all the activities that go within that platform, how much

01:46:11  8   of that has to do with MRDC.

01:46:13  9   Q.  So just so I have it clear, are you saying that there's

01:46:16  10  more than just mobile deposit that happens in mobile

01:46:19  11  banking at Wells Fargo?

01:46:20  12  A.  Absolutely.

01:46:21  13  Q.  Okay.  Can you give us some examples of what that

01:46:23  14  includes?

01:46:23  15  A.  So in mobile banking, you can go on and you can check

01:46:26  16  your balances, you can pay bills, you could transfer money,

01:46:30  17  you could send some texts, you could do a lot of different

01:46:36  18  things on there that have nothing to do with mobile remote

01:46:37  19  deposit capture.

01:46:37  20  Q.  Okay.  Does the analysis end here?

01:46:40  21  A.  No, ma'am.

01:46:41  22  Q.  Okay.  Well, then, what's the next step?

01:46:45  23  A.  So MRDC -- and I think Mr. Hecht described this

01:46:48  24  yesterday.  There's a lot of other things that go in to

01:46:51  25  process that item.  So once the image is taken and

1155

01:46:55  1  introduced into the system, there's a lot of other things

01:46:57  2  that happen.

01:46:58  3        The last step that I performed is to say how much

01:47:01  4  of those steps -- how much of that profit was coming from

01:47:03  5  the patents as opposed to all the other things that were

01:47:06  6  going on within that MRDC processing system.

01:47:11  7  Q.  And just so I'm clear, when you refer to MRDC, what

01:47:14  8  does that stand for?

01:47:15  9  A.  Mobile remote deposit capture.

01:47:17  10  Q.  And does that refer to Wells Fargo's Mobile Deposit

01:47:20  11  product?

01:47:20  12  A.  Yes, ma'am.

01:47:21  13  Q.  Okay.  And -- and why is it important as part of your

01:47:28  14  analysis to evaluate or value the patents in this case?

01:47:32  15  A.  Again, the job of my -- of experts is to evaluate

01:47:38  16  what's the contribution of the patents-in-suit and the

01:47:40  17  claims that are in the patents as opposed to all the other

01:47:43  18  things that are going into a product.

01:47:45  19        And so you need to be able to apportion out or

01:47:47  20  segment out the contributions in the patented claims.  So

01:47:51  21  what's at issue in this case specifically.

01:47:53  22  Q.  What is your understanding of what it is that USAA

01:47:57  23  is -- is entitled to be compensated for, in the event this

01:48:01  24  jury finds that the patents are infringed and valid?

01:48:05  25  A.  Only the contributions provided to those patents to the

01:48:08   1   overall system.

01:48:10   2   Q.  All right.  So let's look at the numbers that you

01:48:14   3   identified that go with each one of these steps.

01:48:17   4        All right.  So -- so you've got an illustration

01:48:22   5   here on the screen.  And so where -- where should we start

01:48:27   6   in understanding where you started your analysis?

01:48:29   7   A.  So this example is for the full year of 2018.  Now, we

01:48:35   8   talked about earlier, the damages began in August of 2018.

01:48:38   9   So later I'm going to prorate the numbers.

01:48:40  10   Q.  What do you -- what do you mean, prorate the numbers?

01:48:43  11   A.  Take the full 2018 number and prorate it down to the

01:48:48  12   period August 17 through December 31st.

01:48:51  13   Q.  All right.  So what do we see here on the screen as far

01:48:53  14   as the full year of 2018 before you've divided out January

01:48:57  15   through --

01:48:58  16   A.  So Wells Fargo produced in this case the number of

01:49:01  17   active customers -- they call it active 30-day customers --

01:49:06  18   who use MRDC, and that was over a period of months.  I

01:49:10  19   averaged that number.  So you have 2.8 million customers

01:49:13  20   essentially during 2018 who are MRDC customers, who are

01:49:18  21   actively using the MRDC system.

01:49:20  22        THE COURT:  Counsel, approach the bench, please.

01:49:23  23        (Bench conference.)

01:49:31  24        THE COURT:  Ms. Williams, is it my understanding

01:49:33  25   that after Mr. Gerardi steps down, that the Defendant has

| | | |
|---|---|---|
| 01:49:36 | 1 | something like 13 minutes of deposition testimony to play? |
| 01:49:39 | 2 | MS. WILLIAMS:  Yes, Your Honor, to the extent that |
| 01:49:40 | 3 | we have time, and it might be a good time for me to ask -- |
| 01:49:44 | 4 | THE COURT:  You have 30 minutes now.  That's -- |
| 01:49:44 | 5 | MS. WILLIAMS:  Yes, Your Honor. |
| 01:49:46 | 6 | THE COURT:  -- why you're up here, so I can make |
| 01:49:49 | 7 | sure you know. |
| 01:49:50 | 8 | MS. WILLIAMS:  Thank you.  I appreciate that. |
| 01:49:50 | 9 | THE COURT:  And if you need to take that into |
| 01:49:52 | 10 | account. |
| 01:49:53 | 11 | You have plenty of time, Mr. Sheasby. |
| 01:49:59 | 12 | MR. SHEASBY:  I'm going to give some back. |
| 01:49:59 | 13 | THE COURT:  That will be welcome. |
| 01:49:59 | 14 | All right.  Let's proceed. |
| 01:50:01 | 15 | MS. WILLIAMS:  Yes.  Thank you, Your Honor. |
| 01:50:08 | 16 | (Bench conference concluded.) |
| 01:50:08 | 17 | THE COURT:  All right.  Let's proceed. |
| 01:50:08 | 18 | MS. WILLIAMS:  Thank you. |
| 01:50:10 | 19 | Q.  (By Ms. Williams)  All right.  Mr. Gerardi, so you've |
| 01:50:13 | 20 | identified the MRDC customers, and then what did you do |
| 01:50:15 | 21 | next for this first step? |
| 01:50:17 | 22 | A.  The second step was to identify the profits that -- |
| 01:50:21 | 23 | that income that Wells Fargo receives from its checking |
| 01:50:24 | 24 | account customers. |
| 01:50:25 | 25 | Q.  Why did you use that? |

01:50:27   1   A.   So, again, you want to understand the profitability

01:50:30   2   overall for those banking customers, and so using that

01:50:34   3   times the number of MRDC customers, I'm able to determine

01:50:37   4   on a pre-tax basis the -- that -- the size of the pie that

01:50:41   5   ultimately needs to be apportioned down.

01:50:43   6          And so multiplying those two together, I came up

01:50:48   7   with $339.2 million of total profits for customers who use

01:50:55   8   banking activities -- mobile deposit customers who use

01:50:59   9   checking accounts at Wells Fargo.

01:51:00  10   Q.   So why did you use checking accounts?

01:51:03  11   A.   So, again, MRDC is having to do with depositing checks

01:51:10  12   into the banking system.  I didn't look at the mortgages or

01:51:14  13   their loans or auto loans or anything like that because

01:51:18  14   that has no direct connection to the -- to the -- to the

01:51:21  15   MRDC activities we're talking about here.

01:51:23  16   Q.   And after you identified the customers and identified

01:51:27  17   the pre-tax profits, did you -- what did your calculation

01:51:34  18   total?

01:51:34  19   A.   $339.2 million, again, for the full year of 2018.

01:51:39  20   Q.   And what does that number represent?

01:51:40  21   A.   Again, those are the total net income to the bank for

01:51:47  22   all of the MRDC customers who have checking account

01:51:48  23   activity.

01:51:48  24   Q.   Okay.  Did you end your analysis there?

01:51:52  25   A.   No, ma'am.

01:51:52   1   Q.  What was your next step?

01:51:53   2   A.  So the next step was to say, okay, how much of that pie

01:51:57   3   are we going to break out into that thing we talked about,

01:52:02   4   which is mobile -- mobile banking.

01:52:04   5   Q.  All right.  And so did you -- does this slide here

01:52:12   6   illustrate how you did that calculation?

01:52:14   7   A.  It does.

01:52:15   8   Q.  Okay.  Will you walk us through what we're seeing here

01:52:17   9   for your calculation?

01:52:18  10   A.  Sure.  So I call this my first apportionment factor.

01:52:22  11   So of the total pie, I want to figure out how much of it is

01:52:25  12   coming from mobile banking activities.  And to do that, I

01:52:30  13   identified the mobile deposit and money movement

01:52:36  14   transactions, basically everything that's happening on your

01:52:38  15   mobile app.  And I segmented that from the non-mobile

01:52:43  16   banking activity.  So all the activity that's happening

01:52:46  17   with the teller transactions or ATM transactions or all the

01:52:49  18   things -- the paper activity that's going on.

01:52:51  19          And as you can see here, the mobile deposit and

01:52:56  20   money movement transactions, I'm at about 32.7 percent of

01:53:01  21   the total amount of activity in 2018.

01:53:02  22          And so I took that number and applied it to the

01:53:07  23   checking account profits we just mentioned, to get my first

01:53:11  24   apportionment factor.

01:53:12  25   Q.  How did you go about determining the mobile deposit and

01:53:16   1   money movement transaction numbers that you -- that you

01:53:23   2   have here on the screen?

01:53:24   3   A.   So, again, Wells Fargo produced to us activities, both

01:53:32   4   for the teller transactions, for the ATM transactions, and

01:53:35   5   all their mobile banking activities, and we aggregated that

01:53:39   6   information into spreadsheets and performed these various

01:53:42   7   calculations.

01:53:43   8   Q.   And so the information that you relied on was Wells

01:53:46   9   Fargo's information?

01:53:47  10   A.   Yes, ma'am.

01:53:47  11   Q.   Okay.  And so what did you do next -- actually let me

01:53:52  12   ask you this question.  Let me back up.

01:53:54  13        When you applied the first apportionment factor,

01:53:57  14   what did you arrive at?

01:53:59  15   A.   So I took that 32.27 percent that I just mentioned to

01:54:03  16   you, multiplied it by the 339 million, and that results --

01:54:09  17   profits from mobile banking of $110.8 million

01:54:14  18   approximately.  So that was my first step to kind of break

01:54:17  19   that pie apart.

01:54:18  20   Q.   So your first step was to isolate the mobile banking

01:54:23  21   profits?

01:54:23  22   A.   Yes, ma'am.

01:54:24  23   Q.   Okay.  And so I -- did you go on to the second

01:54:28  24   apportionment factor?

01:54:29  25   A.   Yes.

| | | |
|---|---|---|
| 01:54:29 | 1 | Q.  Okay.  What was that? |
| 01:54:30 | 2 | A.  So the next step is -- and we talked about this. |
| 01:54:34 | 3 | Mobile banking has a lot of activity that's going on.  And |
| 01:54:37 | 4 | so if I look within the mobile banking platform, there is |
| 01:54:41 | 5 | these things called money movement counts. |
| 01:54:44 | 6 | And so if you look at the mobile banking platform, |
| 01:54:48 | 7 | there's things such as bill payments, M -- M2M transfers, |
| 01:54:57 | 8 | so you may be transferring money from your checking account |
| 01:54:58 | 9 | to your savings account or from your savings account to |
| 01:55:01 | 10 | your money market account or your savings account to |
| 01:55:01 | 11 | checking.  So I segmented out all the money movement counts |
| 01:55:06 | 12 | that occurred within that -- the mobile banking platform. |
| 01:55:09 | 13 | Q.  And let me just stop you right there.  So this -- this |
| 01:55:13 | 14 | money movement with the M2M, the P2P, and the -- and the |
| 01:55:21 | 15 | bill payments, these kinds that are described here on the |
| 01:55:25 | 16 | screen as far as your second apportionment factor, those |
| 01:55:29 | 17 | don't involve depositing a check? |
| 01:55:32 | 18 | A.  No, ma'am.  What involves depositing a check is the -- |
| 01:55:36 | 19 | is the number of checks scanned, which is right here. |
| 01:55:37 | 20 | Q.  Okay.  And so how did you go about excluding the money |
| 01:55:40 | 21 | movement accounts -- or isolating the mobile deposit |
| 01:55:42 | 22 | counts? |
| 01:55:44 | 23 | A.  So, again, looking at all the activity that occurs |
| 01:55:47 | 24 | within the mobile banking platform, I looked at the total |
| 01:55:51 | 25 | number of -- of MRDC checks that were deposited, and that's |

01:55:55   1   our number here, 80.6 million units, relative to all the

01:56:00   2   other things that were happening within the mobile banking

01:56:02   3   platform, and determined that that was 14.7 percent of the

01:56:05   4   total.

01:56:08   5   Q.  Okay.  And what did you -- how did you use the

01:56:11   6   14.7 percent?

01:56:13   7   A.  So if we go back to the -- to the schedule we were

01:56:17   8   looking at previously, I took the $110 million --

01:56:24   9   110.8 million that we were -- I had calculated for my first

01:56:28  10   apportionment factor, applied that 14.7 million --

01:56:31  11   14.7 percent attributed to mobile deposit, and came up with

01:56:37  12   $16.3 million of profit that's attributable to -- to mobile

01:56:42  13   deposit as a whole.

01:56:43  14        And, again, there's more that goes on within

01:56:46  15   mobile deposit that's beyond the patents-in-suit, but

01:56:49  16   that's my next starting point.

01:56:50  17   Q.  All right.  Well, so let's go to your next starting

01:56:54  18   point, and so is this the third apportionment factor?

01:56:58  19   A.  Yes, it is.

01:56:58  20   Q.  Okay.  So describe what we're seeing here on the screen

01:57:02  21   related to the third apportionment factor from DTX-230?

01:57:08  22   A.  Sure.  So you may recall Mr. Hecht had described that

01:57:11  23   front end platform -- or front end systems and the back end

01:57:14  24   systems.  And if you can see here, probably it's a little

01:57:18  25   small, those are those four back end systems that Mr. Hecht

01:57:21   1   had talked about that had been in existence for many, many

01:57:26   2   years prior to the patents.  In some cases decades prior.

01:57:29   3           And he mentions the funnel into funnel concept.

01:57:36   4   You have all these different sources of images coming into

01:57:39   5   the bank.  One of those sources now is MRDC.

01:57:42   6           And so if I look at what was pre-existing with

01:57:46   7   those systems there, the back end system, and I look at the

01:57:49   8   introduction of this new MRDC element, I look at that,

01:57:53   9   there's five components to that, and so I looked at it on a

01:57:57  10   mathematical basis and said one-fifth, 20 percent.

01:58:03  11           Mr. Hecht also confirmed yesterday that the

01:58:05  12   majority of the activity occurs on that back end.  About 80

01:58:08  13   percent of the activity to process an item occurs on that

01:58:11  14   back end.  So, again, 20 percent corresponds to what I have

01:58:15  15   done in terms of my third apportionment factor.

01:58:17  16   Q.  So let me be clear.  The 20 percent contribution of the

01:58:25  17   patents as a percentage of mobile deposit, you relied on

01:58:29  18   Wells Fargo's own documents as well as your conversations

01:58:31  19   with Mr. Hecht?

01:58:32  20   A.  Yes.

01:58:33  21   Q.  And you heard Mr. Hecht's testimony yesterday.  Was

01:58:37  22   there anything else in his testimony yesterday that -- that

01:58:40  23   confirms the 20 percent number to you?

01:58:44  24   A.  Yes.

01:58:44  25   Q.  What is that?

01:58:45  1   A.  He mentions in terms of the dollar spend, the order of

01:58:49  2   magnitude that Wells Fargo has invested in those front end

01:58:52  3   and back end systems, that Wells Fargo has invested

01:58:56  4   significantly more in those back end systems, again, about

01:58:59  5   80 percent of the back end systems, as opposed to the

01:59:02  6   dollar spend on those front end systems.

01:59:04  7   Q.  Mr. Gerardi, what is your conclusion regarding Wells

01:59:09  8   Fargo's 2018 profits attributable to the patents-in-suit?

01:59:13  9   A.  Well, so, again, I mentioned previously, this is for

01:59:16  10  all of 2018.  The damages in this case don't begin until

01:59:20  11  August 17th of this year.  So I had to prorate these

01:59:24  12  numbers down.

01:59:26  13       And so August 17th through December 31st is 137

01:59:30  14  days, which, again, 37.5 percent of the total, so I

01:59:36  15  multiplied the 3.2 million by the 37.5 percent to say for

01:59:41  16  this year for the damages period, $1.22 million are

01:59:47  17  attributable to the patents-in-suit in this case.

01:59:49  18  Q.  And that -- that's for the partial year for 2018?

01:59:51  19  A.  Correct.

01:59:52  20  Q.  Okay.  And then what about for 2019?

01:59:55  21  A.  I performed the same analyses for 2019, and again I

02:00:01  22  estimated for 2020.  So for 2019, the number would be $2.7

02:00:07  23  million, and for 2020, for the first six days of this year,

02:00:12  24  it would be $44,000.

02:00:13  25  Q.  And so if we add all of these up together, what is your

02:00:16   1   opinion about the total profit attributable to the patents?

02:00:21   2   A.  For the period August 27th, 2018, through January 6th,

02:00:26   3   2020, it would be $3.98 million.

02:00:29   4   Q.  And so in arriving at your -- and is this your opinion

02:00:32   5   about the damages in this case?

02:00:35   6   A.  Yes, ma'am.

02:00:35   7   Q.  Okay.  And in arriving at this $3.98 million damages

02:00:40   8   figure, in the event the jury finds that the patents are

02:00:43   9   infringed and not invalid, was there anything else that you

02:00:47  10   considered in arriving at this opinion?

02:00:49  11   A.  Yes.

02:00:50  12   Q.  What -- what was that?

02:00:52  13   A.  It would be the non-infringing alternative that

02:00:55  14   Dr. Villasenor had discussed previously.

02:00:58  15   Q.  Okay.  And how does the non-infringing alternative that

02:01:02  16   Dr. Villasenor talked about earlier today impact your

02:01:04  17   opinion in this case?

02:01:05  18   A.  So if you think about this hypothetical negotiation, if

02:01:10  19   there's an alternative out there that costs less to

02:01:14  20   implement than some other measure, that's going to set the

02:01:17  21   cap.

02:01:18  22       So, for example, if USAA is asking for, you know,

02:01:22  23   something here and your non-infringing alternative is

02:01:26  24   something less than that, you're not going to license --

02:01:29  25   you're not going to agree to a license for more than it

02:01:33   1   costs to implement that non-infringing alternative.

02:01:35   2         So what I looked at here is the $3.98 million that

02:01:39   3   I came up with is the cap.  That's the most, I believe,

02:01:41   4   that Wells Fargo will be willing to pay at the hypothetical

02:01:46   5   negotiation.  Again, because that cap or that

02:01:48   6   non-infringing alternative that Dr. Villasenor identified

02:01:51   7   would be less than that amount.

02:01:56   8   Q.  Mr. Gerardi, was there anything else that you

02:01:58   9   considered in arriving at your conclusion that Wells Fargo

02:02:01   10   would pay no more than $3.98 million in a lump sum?

02:02:06   11   A.  Well, again, that and the fact that USAA has not

02:02:09   12   licensed the patents -- has not received licenses to the

02:02:13   13   patents.

02:02:13   14   Q.  All right.  So based on your -- your review of the --

02:02:18   15   of the documents and the information and your

02:02:22   16   conversations, what is your conclusion in this case about

02:02:24   17   the damages Wells Fargo would pay should the jury determine

02:02:28   18   that the patents are infringed and -- and valid?

02:02:32   19   A.  That a lump-sum license would be $3.98 million for the

02:02:41   20   intellectual property for the claims of the patents at

02:02:43   21   issue.

02:02:43   22   Q.  And what if the jury finds that the patents in this

02:02:45   23   case are not infringed, what is the -- what are the -- what

02:02:49   24   is the appropriate amount of damages in this case?

02:02:51   25   A.  That would be zero dollars.

| | | |
|---|---|---|
| 02:02:53 | 1 | Q.  And what if the jury finds that the patents in this |
| 02:02:56 | 2 | case are invalid, what is the appropriate amount of damages |
| 02:03:00 | 3 | in this case? |
| 02:03:00 | 4 | A.  Zero dollars. |
| 02:03:02 | 5 | MS. WILLIAMS:  Your Honor, may I have a moment to |
| 02:03:04 | 6 | confer with counsel? |
| 02:03:06 | 7 | THE COURT:  You may. |
| 02:03:16 | 8 | MS. WILLIAMS:  Your Honor, I pass the witness. |
| 02:03:17 | 9 | THE COURT:  All right.  Cross-examination by the |
| 02:03:19 | 10 | Plaintiff. |
| 02:03:21 | 11 | MR. SHEASBY:  Your Honor, I'm going to have to |
| 02:03:22 | 12 | hand out binders. |
| 02:03:25 | 13 | THE COURT:  Let's go ahead and do that then.  If |
| 02:03:31 | 14 | you need some help, there are plenty of people at your |
| 02:03:34 | 15 | table. |
| 02:04:27 | 16 | Counsel, before we proceed with cross-examination, |
| 02:04:29 | 17 | go ahead and finish handing out what you need to, but |
| 02:04:34 | 18 | before we proceed with cross-examination, we're going to |
| 02:04:36 | 19 | take a short recess, and then we'll begin cross-examination |
| 02:04:40 | 20 | of this witness as soon as recess is complete. |
| 02:04:40 | 21 | Ladies and gentlemen of the jury, simply close |
| 02:04:41 | 22 | your notebooks and leave them there in your chairs, follow |
| 02:04:45 | 23 | all my instructions, and we'll have you back in here |
| 02:04:47 | 24 | shortly to continue.  Don't discuss the case among |
| 02:04:51 | 25 | yourselves. |

1168

| | | |
|---|---|---|
| 02:04:51 | 1 | The jury is excused for recess. |
| 02:04:53 | 2 | COURT SECURITY OFFICER:  All rise. |
| 02:04:55 | 3 | (Jury out.) |
| 02:04:56 | 4 | THE COURT:  Counsel, just for your purposes, the |
| 02:05:17 | 5 | Court's timekeeping indicates the Plaintiff has a total of |
| 02:05:23 | 6 | two hours and 23 minutes remaining. |
| 02:05:25 | 7 | The Defendant has 15 minutes remaining. |
| 02:05:27 | 8 | The Court stands in recess. |
| 02:05:29 | 9 | COURT SECURITY OFFICER:  All rise. |
| 02:32:43 | 10 | (Recess.) |
| 02:32:48 | 11 | (Jury out.) |
| 02:32:49 | 12 | COURT SECURITY OFFICER:  All rise. |
| 02:32:50 | 13 | THE COURT:  Please be seated. |
| 02:34:52 | 14 | Are you ready to proceed with cross-examination, |
| 02:34:57 | 15 | Mr. Sheasby? |
| 02:34:58 | 16 | MR. SHEASBY:  Yes, Your Honor. |
| 02:34:58 | 17 | THE COURT:  All right.  You may go to the podium. |
| 02:35:00 | 18 | Let's bring in the jury, please, Ms. Denton. |
| 02:35:04 | 19 | COURT SECURITY OFFICER:  All rise. |
| 02:35:04 | 20 | (Jury in.) |
| 02:35:27 | 21 | THE COURT:  Please be seated. |
| 02:35:28 | 22 | All right.  We'll proceed with cross-examination |
| 02:35:33 | 23 | of Mr. Gerardi by Plaintiff's counsel, Mr. Sheasby. |
| 02:35:37 | 24 | You may proceed. |
| 02:35:37 | 25 | CROSS-EXAMINATION |

1169

```
02:35:38   1    BY MR. SHEASBY:
02:35:38   2    Q.  Good afternoon, Mr. Gerardi.
02:35:41   3    A.  Good afternoon.
02:35:41   4    Q.  We've met before.
02:35:43   5    A.  Yes, we have.
02:35:45   6    Q.  It's nice to see you again.
02:35:46   7    A.  Thank you.
02:35:46   8    Q.  Mr. Gerardi, when Apple introduced the iPhone, it was
02:35:58   9    disruptive, fair?
02:35:59   10   A.  Generally speaking, I think that's a fair statement.
02:36:02   11   Q.  And Apple is now one of the most valuable companies in
02:36:05   12   the world, fair?
02:36:06   13   A.  Yes.
02:36:06   14   Q.  When Google introduced its search engine, that was
02:36:13   15   disruptive, as well, correct?
02:36:17   16   A.  It was popular.  I just don't know where it was
02:36:21   17   relative to other search engines.
02:36:23   18   Q.  You don't know if Google's search program was
02:36:26   19   disruptive, correct?
02:36:27   20   A.  At the time.  I know it is as of today.
02:36:30   21   Q.  Today Google's search engine is disruptive, fair?
02:36:34   22   A.  Fair.
02:36:35   23   Q.  Google is also one of the most valuable companies in
02:36:38   24   the world, fair?
02:36:38   25   A.  Fair.
```

02:36:39  1  Q.  As an economist, one of the things you absolutely need

02:36:44  2  to do when valuing a technology is consider whether it's

02:36:50  3  disruptive, fair?

02:36:51  4  A.  You value the technology and the components of the

02:36:59  5  technology and see how that plays into the overall product

02:37:02  6  itself.

02:37:02  7  Q.  As an economist, we should consider whether a

02:37:06  8  technology is disruptive, correct?

02:37:09  9  A.  When you say a technology, a technology could be one of

02:37:13  10  many pieces of technology that contribute to an overall

02:37:16  11  product.

02:37:17  12  Q.  Can you answer the question as to whether an economist

02:37:20  13  should consider whether technology is disruptive?

02:37:22  14  A.  And, again, when you say "the technology" -- what do

02:37:27  15  you mean when you say "the technology"?

02:37:29  16        MR. SHEASBY:  Your Honor, I object,

02:37:31  17  non-responsive.

02:37:34  18        THE COURT:  Restate the question.

02:37:36  19  Q.  (By Mr. Sheasby)  Mr. Saffici [sic], if a patented

02:37:40  20  technology --

02:37:41  21        THE COURT:  This is Mr. Gerardi.

02:37:42  22  Q.  (By Mr. Sheasby)  Mr. Gerardi, if a patented technology

02:37:45  23  is disruptive, that's something an economist should

02:37:48  24  consider, fair?

02:37:50  25  A.  In the context of valuation, yes, that's fair.

02:37:54    1    Q.   Now, I noticed that in your presentation, you didn't

02:38:02    2    show the jury any documents from Wells Fargo, fair?

02:38:05    3    A.   I showed extracts of documents that came from Wells

02:38:08    4    Fargo.

02:38:08    5    Q.   You didn't show any actual documents from Wells Fargo,

02:38:11    6    correct?

02:38:11    7    A.   That's fair.

02:38:14    8    Q.   You didn't show any third-party analysis about mobile

02:38:19    9    remote deposit capture, correct?

02:38:19   10    A.   Correct.

02:38:19   11    Q.   And you didn't discuss the fact that --

02:38:24   12              MR. SHEASBY:  Let's have Weinstein Demonstrative

02:38:30   13    4.15, please.  Go back one slide.  No, pull that down --

02:39:09   14    pull that down, Mr. Huynh.  That's the wrong --

02:39:10   15              Your Honor, may I have a moment, please?

02:39:12   16              THE COURT:  You may have a moment.

02:39:14   17              MR. SHEASBY:  Thank you.

02:39:39   18              MS. WILLIAMS:  Your Honor, may we approach?

02:39:41   19              THE COURT:  You may approach.

02:39:43   20              (Bench conference.)

02:39:48   21              MS. WILLIAMS:  Your Honor, I believe they just

02:39:50   22    showed a demonstrative from the first case, and we'd object

02:39:52   23    to that.  I mean, that -- that this demonstrative has not

02:39:56   24    been shown in this case.

02:39:57   25              MR. SHEASBY:  Yes.  Yes, we completely agree.  It

02:40:02   1   was absolutely a mistake, which is why I had him pull it

02:40:03   2   down immediately.

02:40:04   3          THE COURT:  All right.  And you haven't -- you

02:40:05   4   haven't asked any questions about it?

02:40:06   5          MR. SHEASBY:  Absolutely not.

02:40:07   6          MS. WILLIAMS:  We ask that the jury be instructed

02:40:11   7   to disregard what was just displayed on the screen.

02:40:14   8          THE COURT:  I mean, we're talking about a second

02:40:16   9   or less that it was on the screen?

02:40:18  10          MS. WILLIAMS:  Your Honor --

02:40:18  11          THE COURT:  That's fine.  I'll tell them to ignore

02:40:20  12   what they just saw or didn't see.

02:40:22  13          MS. WILLIAMS:  Thank you, Your Honor.

02:40:23  14          THE COURT:  All right.  Let's proceed.

02:40:23  15          (Bench conference concluded.)

02:40:23  16          THE COURT:  Ladies and gentlemen, there was a

02:40:24  17   slide that very, very momentarily flashed on the screen.  I

02:40:28  18   don't know if you saw it or not.  If you did see it, ignore

02:40:34  19   it.  It shouldn't have been shown to you.

02:40:35  20          Let's proceed.

02:40:40  21   Q.  (By Mr. Sheasby)  Were you in the courtroom for

02:40:42  22   Mr. Weinstein's testimony?

02:40:47  23   A.  Yes, I was.

02:40:48  24   Q.  And he showed a demonstrative of -- from Celent,

02:41:00  25   correct?

02:41:00   1   A.  Yes, I believe so.

02:41:02   2   Q.  And Celent is an industry analytics company, correct?

02:41:07   3   A.  I believe so.

02:41:07   4   Q.  And Celent wrote an article about USAA's MRDC system,

02:41:12   5   correct?

02:41:12   6   A.  I don't recall specifically what was on the screen.

02:41:14   7   Q.  Well, why don't we pull that up.  So this was

02:41:39   8   Mr. Weinstein's demonstrative, correct?

02:41:40   9   A.  Yes, I believe it was.

02:41:41   10   Q.  It's on USAA's mobile remote deposit capture

02:41:45   11   initiative, correct?

02:41:45   12   A.  Yes, it is.

02:41:46   13   Q.  It calls mobile RDC disruptive, correct?

02:41:52   14   A.  That's what it states, yes.

02:41:54   15   Q.  It calls it a compelling competitive advantage,

02:41:58   16   correct?

02:41:58   17   A.  Yes, it does.

02:42:10   18   Q.  You didn't engage at all with Mr. Weinstein's

02:42:16   19   presentation of independent third-party documentation

02:42:19   20   describing USAA's mobile remote deposit capture as

02:42:23   21   disruptive or bleeding edge or compelling competitive

02:42:29   22   advantage, you didn't discuss it at all in your direct

02:42:32   23   examination, fair?

02:42:33   24   A.  That's fair.

02:42:33   25   Q.  And so have you heard of the concept of an independent

| | | |
|---|---|---|
| 02:42:41 | 1 | third party? |
| 02:42:42 | 2 | A.  Generally, yes. |
| 02:42:48 | 3 | Q.  So, for example, although you're an expert not employed |
| 02:42:52 | 4 | by Wells Fargo, you've been paid a substantial amount of |
| 02:42:56 | 5 | money by Wells Fargo over the last couple of years, fair? |
| 02:42:57 | 6 | A.  My firm has been paid for the services we provide, |
| 02:43:01 | 7 | that's fair. |
| 02:43:01 | 8 | Q.  Your rate is $750.00 an hour, correct? |
| 02:43:03 | 9 | A.  725. |
| 02:43:04 | 10 | Q.  You had a team of technologists or you had a team of -- |
| 02:43:09 | 11 | of junior folks working with you, correct? |
| 02:43:10 | 12 | A.  Yes, that's fair. |
| 02:43:11 | 13 | Q.  Over the entire time over the last couple of years |
| 02:43:14 | 14 | you've been working for Wells Fargo, your company has |
| 02:43:18 | 15 | billed hundreds of thousands of dollars to Wells Fargo, |
| 02:43:21 | 16 | correct? |
| 02:43:21 | 17 | A.  On this matter, I would say approximately $200,000.00, |
| 02:43:24 | 18 | that's fair. |
| 02:43:24 | 19 | Q.  And can you tell me how much you've been paid by Wells |
| 02:43:28 | 20 | Fargo over the last three years, collectively? |
| 02:43:31 | 21 | MS. WILLIAMS:  Objection, Your Honor.  Can we |
| 02:43:32 | 22 | approach? |
| 02:43:33 | 23 | THE COURT:  Approach the bench. |
| 02:43:35 | 24 | (Bench conference.) |
| 02:43:40 | 25 | MS. WILLIAMS:  Mr. Sheasby's question is asking |

02:43:42  1   him to get into the work that he did on an -- on the

02:43:45  2   Case 1, and that is improper.

02:43:49  3          THE COURT:  I thought -- maybe I misheard, but I

02:43:51  4   thought the question was about how much money he'd been

02:43:53  5   paid for the work done.

02:43:55  6          MS. WILLIAMS:  He -- The question was how much has

02:43:57  7   he been paid in the last three years, which would encompass

02:44:02  8   Case 1.  And so that is highly inappropriate.  If he --

02:44:04  9   he's asked the question about how much money he's been paid

02:44:07 10   in this case, and that's the extent to which he should be

02:44:10 11   asked.

02:44:11 12          THE COURT:  If he has an ongoing relationship with

02:44:13 13   this client -- your client or your law firm, and he's been

02:44:15 14   paid sizeable amounts of money outside of this case by that

02:44:20 15   client or that law firm, that's still an appropriate area

02:44:24 16   of inquiry.  He cannot open the door to prior litigation or

02:44:27 17   what -- what those other tasks for which he was paid might

02:44:31 18   have been.

02:44:31 19          MS. WILLIAMS:  Yes, Your Honor, I understand that.

02:44:32 20   But I would like the Case 1 to be excluded from that.

02:44:36 21          THE COURT:  Well, it's excluded because it's not

02:44:39 22   mentioned.  There's no reason to mention it.  But whether

02:44:42 23   it includes -- whatever the work he did prior to this case,

02:44:47 24   if it's for your firm or your client and it shows an

02:44:51 25   existing relationship, that's a fair indication of

02:44:56  1   potential for bias.  And he's entitled to show that.

02:44:59  2       MS. WILLIAMS:  Yes, Your Honor.  But what I want

02:45:01  3   to be clear is that Mr. Sheasby must exclude from his

02:45:05  4   question anything that would elicit information about what

02:45:09  5   he's been paid for all of the USAA litigation because he

02:45:12  6   was our expert in our first case.  And so --

02:45:15  7       THE COURT:  I understand -- I understand that,

02:45:20  8   but...

02:45:21  9       Mr. Sheasby, you can ask a question that queries

02:45:26 10   the level of experience and relationship between this

02:45:31 11   witness and either the Winston & Strawn law firm or Wells

02:45:35 12   Fargo, without any mention of any particular work or cases

02:45:39 13   or litigation that may have predated this case.

02:45:43 14       MR. SHEASBY:  Right.  And to be --

02:45:45 15       THE COURT:  But I'm not going to make you do that

02:45:47 16   and then somehow exercise out whatever was related to

02:45:49 17   Case 1 that the jury is not aware of, and they're not going

02:45:53 18   to be aware of.

02:45:54 19       MR. SHEASBY:  And to be clear, I'm just going to

02:45:55 20   ask him what's the total amount of compensation he's

02:45:58 21   received of Wells Fargo over the last -- from Wells Fargo

02:45:59 22   over the last three years.

02:46:00 23       THE COURT:  That's a fair question.

02:46:02 24       I'm going to overrule your objection.

02:46:04 25       MS. WILLIAMS:  Yes, Your Honor.

| | | |
|---|---|---|
| 02:46:05 | 1 | THE COURT:  All right. |
| 02:46:06 | 2 | (Bench conference concluded.) |
| 02:46:09 | 3 | THE COURT:  Let's proceed. |
| 02:46:12 | 4 | The objection is overruled. |
| 02:46:13 | 5 | Q.  (By Mr. Sheasby)  Mr. Gerardi, what's the total amount |
| 02:46:15 | 6 | of compensation you've received from Wells Fargo over the |
| 02:46:18 | 7 | last four years?  Just give me a number. |
| 02:46:20 | 8 | A.  For clarification, do you mean me personally -- or the |
| 02:46:25 | 9 | firm? |
| 02:46:26 | 10 | Q.  Your firm, sir. |
| 02:46:27 | 11 | A.  I can't say specifically because I -- I moved firms |
| 02:46:31 | 12 | between these matters.  So I would think my prior firm, |
| 02:46:38 | 13 | approximately $350,000.00 or so.  But, again, I don't have |
| 02:46:42 | 14 | anything more specific than that. |
| 02:46:44 | 15 | Q.  So approximately $600,000.00 all in?  Would that seem |
| 02:46:48 | 16 | to be fair, sir? |
| 02:46:50 | 17 | A.  No. |
| 02:46:52 | 18 | Q.  You're saying your total compensation -- your company's |
| 02:47:01 | 19 | total compensation from Wells Fargo over the last three to |
| 02:47:02 | 20 | four years, including the company you were at previously |
| 02:47:03 | 21 | and the company you're at now, is approximately |
| 02:47:06 | 22 | $350,000.00? |
| 02:47:07 | 23 | A.  Approximately 350 to 400,000, approximately. |
| 02:47:11 | 24 | Q.  And so it would be fair to say that someone who has |
| 02:47:14 | 25 | received -- or a company that's received $400,000.00 from a |

02:47:16  1  client is not truly an independent third party, fair?

02:47:19  2  A.  I would disagree -- no, I'd disagree with that.

02:47:23  3  Q.  Okay.  But we know that someone who hasn't received any

02:47:28  4  money from Wells Fargo is Celent, correct?  We can see that

02:47:32  5  on Slide 15 of the Wells -- of Mr. Weinstein's

02:47:36  6  demonstratives, correct?  For example, Celent wasn't paid

02:47:43  7  $400,000.00 by USAA to write that its MRDC technology is

02:47:45  8  disruptive in a compelling, competitive advantage, fair?

02:47:48  9  A.  Sir, I have no idea how Celent prepared this and what

02:47:52  10  compensation they received, if anybody -- if anything for

02:47:55  11  that.

02:47:56  12       MR. SHEASBY:  Okay.  Let's go to Mr. Weinstein's

02:47:58  13  Slide 14.

02:48:00  14  Q.  (By Mr. Sheasby)  AdAge wasn't paid $400,000.00 by

02:48:07  15  Wells Fargo to write that USAA represents the bleeding edge

02:48:11  16  of mobile banking technology, fair?

02:48:14  17  A.  Again, sir, I have no -- no basis to say how -- how

02:48:16  18  AdAge received compensation and what it did or didn't do.

02:48:20  19       MR. SHEASBY:  Let's go to Slide 16.

02:48:22  20  Q.  (By Mr. Sheasby)  And Apple was not paid $400,000.00 by

02:48:29  21  USAA to announce that its mobile deposit application was

02:48:32  22  the most popular financial application on the iTunes store,

02:48:40  23  fair, App Store?

02:48:41  24  A.  Sir, just for clarification, that was something that

02:48:43  25  was reported in the San Francisco Business Times.

| | | |
|---|---|---|
| 02:48:45 | 1 | Q.  Do you dispute that USAA's mobile deposit application |
| 02:48:49 | 2 | was Apple's most popular financial app in August of 2009? |
| 02:48:54 | 3 | A.  No, I don't. |
| 02:48:55 | 4 | Q.  Did Apple -- did USAA pay Apple $400,000.00 to reach |
| 02:49:00 | 5 | that rank? |
| 02:49:01 | 6 | A.  I have no basis to say one way or the other. |
| 02:49:04 | 7 | Q.  Okay.  Now, we also know about another independent |
| 02:49:09 | 8 | third party who's considered issues in this case, and |
| 02:49:13 | 9 | that's the Patent Office, correct?  You were here for |
| 02:49:16 | 10 | Mr. Saffici's examination, correct? |
| 02:49:17 | 11 | A.  Yes, I was. |
| 02:49:18 | 12 | Q.  And we know that two separate patent examiners analyzed |
| 02:49:25 | 13 | the claims at issue in this case, and granted them, fair? |
| 02:49:28 | 14 | A.  Granted them in terms of the patents? |
| 02:49:32 | 15 | Q.  Yes. |
| 02:49:33 | 16 | A.  That's fair. |
| 02:49:34 | 17 | Q.  And you testified that when you perform a damages |
| 02:49:42 | 18 | analysis in this case, you have to analyze what the scope |
| 02:49:46 | 19 | of the patents are, fair?  Scope of the claims are? |
| 02:49:49 | 20 | A.  That's fair. |
| 02:49:50 | 21 | Q.  It's a crucial element of the case, correct? |
| 02:49:53 | 22 | A.  Yes. |
| 02:49:54 | 23 | Q.  It's the scope of the claims that defines what's at |
| 02:49:57 | 24 | issue in this case, correct? |
| 02:49:58 | 25 | A.  Yes, that's fair. |

02:49:59  1   Q.  But you don't know what's covered by the claims of the

02:50:07  2   patents-in-suit, correct?  It's a technical issue?

02:50:13  3   A.  It's a technical issue, I understand that.

02:50:16  4   Q.  Sir, and you don't know what the -- what's covered by

02:50:20  5   the claims of the patents-in-suit, fair?

02:50:21  6   A.  I have a general understanding.

02:50:23  7        MR. SHEASBY:  Can we turn to Tab 1?  Which is your

02:50:30  8   deposition at Page 43, Lines 21 through 23.

02:50:35  9   A.  43, I'm sorry, what?

02:50:39  10  Q.  Page 43, Lines 21 through 23.

02:50:51  11  A.  And the question, please?

02:50:53  12  Q.  You personally don't know what's covered by the claims

02:50:55  13  of the patents-in-suit, correct?

02:50:59  14  A.  Again, I have a general understanding.

02:51:03  15        MR. SHEASBY:  Your Honor, may I now publish the

02:51:06  16  deposition testimony to the jury?

02:51:08  17        THE COURT:  You may.

02:51:09  18        MR. SHEASBY:  Let's pull up Tab 1, Gerardi 2 depo,

02:51:19  19  Page 43, Lines 21 through 23.

02:51:28  20        THE COURT:  And, Mr. Sheasby, you don't need to

02:51:29  21  ask me each time you impeach a witness.  If you complete

02:51:32  22  the impeachment process, you're entitled to show the prior

02:51:35  23  statement.

02:51:36  24        MR. SHEASBY:  Thank you, Your Honor.

02:51:42  25        THE TECHNICIAN:  43?

| | | |
|---|---|---|
| 02:51:44 | 1 | MR. SHEASBY:  Gerardi 2 deposition, Page 43, Lines |
| 02:51:47 | 2 | 21 through 23. |
| 02:51:49 | 3 | MS. WILLIAMS:  Your Honor, under the rule of |
| 02:51:51 | 4 | completion -- of optional completeness, may we also have |
| 02:51:54 | 5 | Lines 16 through 20 shown? |
| 02:51:57 | 6 | MR. SHEASBY:  I'm happy to have that shown, Your |
| 02:51:59 | 7 | Honor. |
| 02:51:59 | 8 | THE COURT:  All right.  Then we'll do it that way. |
| 02:52:05 | 9 | Q.  (By Mr. Sheasby)  This is a deposition I took of you, |
| 02:52:08 | 10 | correct? |
| 02:52:08 | 11 | A.  Yes. |
| 02:52:09 | 12 | Q.  Question:  Did you have an understanding of what's |
| 02:52:12 | 13 | claimed by the patents-in-suit when you performed your |
| 02:52:15 | 14 | apportionment analysis? |
| 02:52:16 | 15 | Answer:  I've had what's listed -- I had what's |
| 02:52:19 | 16 | listed in my report, generally speaking. |
| 02:52:22 | 17 | Question:  Do you know what's covered by the |
| 02:52:23 | 18 | claims of the patents-in-suit? |
| 02:52:24 | 19 | Answer:  Again, I think that's a technical matter. |
| 02:52:28 | 20 | That was the testimony you gave under oath, |
| 02:52:31 | 21 | correct, sir? |
| 02:52:31 | 22 | A.  On those lines, that's correct. |
| 02:52:34 | 23 | MR. SHEASBY:  Let's take that down. |
| 02:52:36 | 24 | MS. WILLIAMS:  Your Honor, objection, that was -- |
| 02:52:39 | 25 | that was improper impeachment.  That is totally consistent |

02:52:45  1   with what Mr. Gerardi testified to, and we have not

02:52:48  2   shown -- and Mr. -- excuse me, counsel for USAA has not

02:52:53  3   shown otherwise.

02:52:54  4          THE COURT:  You may revisit the matter on

02:52:57  5   redirect.  We're going to go forward at this point.

02:52:59  6          MS. WILLIAMS:  Thank you, Your Honor.

02:53:00  7   Q.  (By Mr. Sheasby)  Now, the reality is that the

02:53:09  8   patents-in-suit are broad, correct?

02:53:13  9   A.  From my economic perspective, that's my general

02:53:16  10  understanding, yes.

02:53:16  11  Q.  The patents-in-suit claim remote deposit capture

02:53:24  12  aligned for the capture of check images using scanners and

02:53:28  13  digital cameras connected to a general purpose computer.

02:53:30  14  They do not just claim one particular implementation,

02:53:33  15  correct?

02:53:33  16  A.  Again, to my general understanding.

02:53:39  17  Q.  And you heard Mr. Saffici testify in his direct -- his

02:53:45  18  cross-examination that the claims of the patents-in-suit

02:53:54  19  cover MRDC, correct?

02:53:55  20  A.  A specific form of MRDC, yes.

02:53:59  21  Q.  You think he testified that they only covered a

02:54:03  22  specific form of MRDC?

02:54:04  23  A.  Yes, they cover MRDC, yes, that's fair.

02:54:08  24  Q.  The claims cover MRDC generally, correct, sir?

02:54:13  25  A.  Yes.

02:54:14   1   Q.   And so when the jury values these patents, the jury

02:54:20   2   needs to understand that these patents cover MRDC

02:54:23   3   generally, correct?

02:54:24   4   A.   That's fair.

02:54:26   5   Q.   They don't just cover some small fraud technique, fair?

02:54:30   6   A.   I don't -- I disagree with that.

02:54:57   7   Q.   Now, let's turn to Tab 40 in your binder.

02:55:17   8   A.   Okay.

02:55:18   9   Q.   So Tab 40 in your binder is DTX-230?

02:55:22   10        MR. SHEASBY:   And let's put that up on the screen,

02:55:24   11   Mr. Huynh.

02:55:24   12   Q.   (By Mr. Sheasby)   And let's turn to Page 9 of that

02:55:34   13   document.

02:55:37   14   A.   Okay.

02:55:40   15        MR. SHEASBY:   Go to Page 10, go one more page up,

02:55:44   16   Mr. Huynh.   Yes, let's pull that up.   So if you circle the

02:55:49   17   middle section, which is MRDC proposed concept, Mr. Huynh.

02:56:00   18   Q.   (By Mr. Sheasby)   So what you told the ladies and

02:56:02   19   gentlemen of the jury is that -- that these four boxes

02:56:15   20   are -- on the back end are non-infringing, correct?

02:56:18   21   A.   I said they were on the back end and they were in

02:56:23   22   existence for a period of time, well before the

02:56:28   23   patents-in-suit.

02:56:28   24   Q.   Well, at your deposition, you told me they were

02:56:31   25   non-infringing, correct?

| | | |
|---|---|---|
| 02:56:32 | 1 | A.  I may have, but what I was -- what I -- okay.  I may |
| 02:56:36 | 2 | have. |
| 02:56:36 | 3 | Q.  Well, why don't we turn to Tab 1, which is, again, your |
| 02:56:41 | 4 | deposition, and why don't you look at -- actually let's do |
| 02:56:54 | 5 | it this way. |
| 02:56:54 | 6 | Did you investigate whether these four boxes that |
| 02:56:57 | 7 | you removed from your valuation analysis are covered by the |
| 02:57:00 | 8 | claims of the patents-in-suit? |
| 02:57:04 | 9 | A.  Yes. |
| 02:57:10 | 10 | Q.  And you testified that Mr. Saffici told you they were |
| 02:57:13 | 11 | non-infringing, correct, these four in the back, correct? |
| 02:57:21 | 12 | A.  I may have at my deposition. |
| 02:57:23 | 13 | Q.  Why don't we look at Page 38, 2 through 10 of your |
| 02:57:27 | 14 | deposition.  You can look at that right now to refresh your |
| 02:57:29 | 15 | recollection, sir. |
| 02:57:35 | 16 | A.  I'm sorry, the line numbers, please? |
| 02:57:37 | 17 | Q.  38, Lines 2 through 10. |
| 02:57:48 | 18 | You told me at your deposition that you excluded |
| 02:57:52 | 19 | the 80 percent of the value of MRDC because those blocks |
| 02:58:00 | 20 | were not covered by the patents, correct? |
| 02:58:06 | 21 | A.  I stated that -- that those items had been around for a |
| 02:58:11 | 22 | significant period of time before the patents had issued. |
| 02:58:14 | 23 | Q.  Let's pull up your deposition testimony at 38, Lines 2 |
| 02:58:18 | 24 | through 10. |
| 02:58:19 | 25 | MS. WILLIAMS:  Objection, Your Honor.  The witness |

02:58:21  1   has not testified inconsistently with his deposition.  It

02:58:26  2   would be improper to show that.

02:58:27  3        MR. SHEASBY:  Your Honor, I believe it is an

02:58:29  4   inconsistent statement.

02:58:30  5        THE COURT:  It doesn't strike me as being

02:58:36  6   inconsistent, Mr. Sheasby.  It may be a slight variation on

02:58:39  7   the same thing, but it's not completely inconsistent.

02:58:43  8        MR. SHEASBY:  Okay.

02:58:44  9   Q.  (By Mr. Sheasby)  Mr. Saffici --

02:58:45  10       THE COURT:  I'll sustain.

02:58:47  11  Q.  (By Mr. Sheasby)  -- claim -- you claim that

02:58:50  12  Mr. Saffici told you those four boxes in the back were not

02:58:53  13  infringing and not covered by the claims, correct?

02:58:59  14  A.  I never stated that he -- he said that they were

02:59:02  15  non-infringing, in those lines that you're referring to.  I

02:59:05  16  stated that he told me that those items were -- those

02:59:08  17  components were around for a significant period of time.

02:59:11  18  Q.  And you're looking at Column 38, Lines 2 through 10 of

02:59:15  19  your deposition, sir?

02:59:15  20  A.  I was extending down to Line 15, too, I apologize.  If

02:59:28  21  I looked through Line 10, that's correct.

02:59:31  22  Q.  So to be clear, in your deposition in sworn testimony

02:59:35  23  under oath, you told me that Mr. Saffici told you that this

02:59:42  24  80 percent on the back end was not covered by the claims of

02:59:46  25  the patent, correct?

02:59:47   1          MS. WILLIAMS:  Objection, Your Honor.  It
02:59:49   2   mischaracterizes the deposition testimony and fails to
02:59:51   3   include what is continuing on to Page 38.  He's completely
02:59:54   4   taking this witness's testimony out of context in front of
02:59:57   5   the jury.
02:59:58   6          THE COURT:  He's entitled to ask the question he's
03:00:01   7   asked, Ms. Williams.  Overruled.  You're entitled to
03:00:09   8   address it later.
03:00:11   9   A.  The question again, please, I'm sorry.
03:00:11   10  Q.  (By Mr. Sheasby)  Mr. Saffici -- you told me at your
03:00:13   11  deposition, sworn to under oath, that Mr. Saffici told you
03:00:14   12  that 80 percent of those four or five boxes in the back
03:00:17   13  were non-infringing, correct?  That's what you testified to
03:00:20   14  under oath?
03:00:21   15  A.  For the lines you've just given me, that's correct.
03:00:25   16  Q.  That's what you said under oath, correct?
03:00:27   17  A.  For the lines that you have given me, that's correct.
03:00:30   18  Q.  The reality is that Mr. Saffici was not involved in
03:00:32   19  this infringement case at all, correct?
03:00:34   20  A.  That's correct.
03:00:34   21  Q.  It would have been impossible for Mr. Saffici to have
03:00:37   22  told you that those black boxes were not infringing,
03:00:46   23  correct?
03:00:46   24          THE COURT:  Counsel, approach the bench.
03:00:54   25          Mr. Melsheimer, join us up here.

1187

| 03:00:56 | 1 | (Bench conference.) |
| 03:00:59 | 2 | THE COURT:  I can hear you telling Ms. Williams |

03:00:56    1            (Bench conference.)

03:00:59    2            THE COURT:  I can hear you telling Ms. Williams

03:01:06    3    what to ask.  If you all are going to communicate, do it in

03:01:09    4    a way that's silent, pass notes, but I'm hearing the two of

03:01:13    5    you -- or I'm hearing you talk to her.

03:01:15    6            MR. MELSHEIMER:  I apologize.

03:01:16    7            THE COURT:  And if I can hear it, the jury can

03:01:19    8    hear it, so that needs to stop.

03:01:20    9            MR. MELSHEIMER:  I understand.

03:01:21   10            MS. WILLIAMS:  Your Honor, while we're here, may I

03:01:23   11    object to this line of questioning.  He is taking --

03:01:25   12    Mr. Sheasby is taking the witness's testimony completely

03:01:27   13    out of context and asking him questions.  In the very next

03:01:32   14    line he says Mr. Saffici did not provide -- did not provide

03:01:34   15    an infringement report.  He relied on Dr. Villasenor.  I

03:01:38   16    mean, this is categorically --

03:01:39   17            THE COURT:  Ms. Williams -- Ms. Williams, you can

03:01:41   18    address it on redirect.

03:01:42   19            MS. WILLIAMS:  Yes, Your Honor.

03:01:43   20            THE COURT:  And if you do it effectively, I'm sure

03:01:46   21    it will have a positive effect for your side of the case.

03:01:48   22    But standing up and making these narrative objections about

03:01:52   23    this is out of context and it does this, this -- those are

03:01:56   24    not objections.  That's why I said in front of the jury

03:01:59   25    last time he was entitled to ask the question.  Your

| | | |
|---|---|---|
| 03:02:01 | 1 | objections are mini speeches in front of the jury, and they |
| 03:02:06 | 2 | shouldn't be that.  If you've got a legal basis to make an |
| 03:02:09 | 3 | objection, raise the legal basis and I'll address it. |
| 03:02:12 | 4 | MS. WILLIAMS:  Yes, Your Honor. |
| 03:02:13 | 5 | THE COURT:  But right now, I'm overruling this |
| 03:02:14 | 6 | line of objections, and I'm telling you the appropriate way |
| 03:02:17 | 7 | is for you to take it back up.  If you think he's taking it |
| 03:02:21 | 8 | out of context, revisit it on redirect. |
| 03:02:24 | 9 | MS. WILLIAMS:  Yes, Your Honor. |
| 03:02:25 | 10 | THE COURT:  All right.  Let's proceed. |
| 03:02:26 | 11 | (Bench conference concluded.) |
| 03:02:30 | 12 | THE COURT:  Let's proceed. |
| 03:02:32 | 13 | Q.  (By Mr. Sheasby)  Mr. Saffici didn't perform any |
| 03:02:38 | 14 | infringement analysis, correct? |
| 03:02:39 | 15 | A.  That's correct. |
| 03:02:39 | 16 | Q.  Now, you were here for Dr. Villasenor's testimony, |
| 03:02:45 | 17 | correct? |
| 03:02:45 | 18 | A.  Correct. |
| 03:02:45 | 19 | Q.  Dr. Villasenor didn't testify to the ladies and |
| 03:02:48 | 20 | gentlemen of the jury that the four things that you removed |
| 03:02:51 | 21 | from the MRDC system were non-infringing, correct? |
| 03:02:54 | 22 | A.  That's correct. |
| 03:02:56 | 23 | Q.  So we know that Mr. Saffici couldn't have told you that |
| 03:03:01 | 24 | what you said was non-infringing was non-infringing, |
| 03:03:08 | 25 | correct? |

03:03:08   1    A.  Repeat your question, please.

03:03:11   2    Q.  You told me under oath that Mr. Saffici told you these

03:03:16   3    four things were non-infringing, correct?

03:03:23   4    A.  On those lines, that's correct.

03:03:24   5    Q.  Mr. Saffici has no infringement opinion whatsoever,

03:03:33   6    correct?

03:03:33   7    A.  That's correct.

03:03:33   8    Q.  Dr. Villasenor has provided no opinion on this question

03:03:36   9    either, correct?

03:03:37  10    A.  That's correct.

03:03:37  11    Q.  So where have you got that answer from that these are

03:03:42  12    non-infringing?  It could never have been from Mr. Saffici

03:03:45  13    or Dr. Villasenor, correct?

03:03:49  14    A.  I can't agree with that completely.  May I explain?

03:03:55  15    Q.  Let me ask it another way.  In your report, you don't

03:03:59  16    cite to any footnote in which Dr. Villasenor told you that

03:04:02  17    those four black boxes are non-infringing, correct?

03:04:07  18    A.  That's correct.

03:04:07  19    Q.  In your report, you don't cite to any footnote that

03:04:11  20    says Mr. Saffici told you those are non-infringing,

03:04:14  21    correct?

03:04:14  22    A.  That's correct.

03:04:14  23    Q.  And we agree that what words are used in depositions

03:04:17  24    under oath matter, correct?

03:04:19  25    A.  That's fair.

03:04:20   1   Q.  And in your testimony earlier, you told me that

03:04:23   2   Mr. Saffici told you they were non-infringing, fair?

03:04:26   3   A.  On the lines that you referenced, that's correct.

03:04:28   4   Q.  And you had an opportunity to correct your deposition,

03:04:32   5   correct?

03:04:32   6   A.  Yes.

03:04:32   7   Q.  And you understand this is an incredibly important case

03:04:34   8   for USAA, correct?

03:04:35   9   A.  Yes, I do.

03:04:36  10   Q.  And you understand that USAA views this technology as

03:04:40  11   incredibly important, correct?

03:04:41  12   A.  USAA what?  I can't hear you.

03:04:43  13   Q.  Views this technology as incredibly important, correct?

03:04:49  14   A.  Yes, they do.

03:04:49  15   Q.  And you understand why USAA believes it's important to

03:04:53  16   be precise in testimony under oath, fair?

03:04:55  17   A.  Yes.

03:04:56  18   Q.  Now, you also talk about non-infringing alternatives,

03:05:06  19   correct?

03:05:06  20   A.  I do.

03:05:07  21   Q.  And I think you said to the jury that non-infringing

03:05:15  22   alternatives represent a cap on damages, fair?

03:05:18  23   A.  I said they could be considered a cap in part of the

03:05:22  24   hypothetical negotiation, that's fair.

03:05:23  25   Q.  So if you can turn to Paragraph 90 -- 91 of your expert

```
03:05:27   1   report, which is in Tab 3.
03:05:45   2   A.   I see it.
03:05:46   3   Q.   Now, in Tab 3, you list a bunch of bullet points of
03:05:50   4   elements that you be -- you believe would reflect
03:05:53   5   commercially viable -- or non-infringing alternatives,
03:05:57   6   correct?
03:05:57   7   A.   Yes, I do.
03:06:03   8   Q.   And it includes the non-infringing alternative that
03:06:11   9   Dr. Villasenor discussed, correct?
03:06:12   10  A.   That's fair.
03:06:14   11  Q.   Now, all the alternative -- what you describe as
03:06:18   12  non-infringing alternatives that you list in your report,
03:06:21   13  you didn't speak to any independent expert as to whether
03:06:25   14  any of those are acceptable in the market, correct?
03:06:27   15  A.   That's fair.
03:06:30   16          MR. SHEASBY:  Your Honor, may I approach briefly
03:06:35   17  to seek guidance?
03:06:36   18          THE COURT:  Approach the bench?
03:06:38   19          MR. SHEASBY:  Yes, sir.
03:06:39   20          THE COURT:  Approach the bench, counsel.
03:06:45   21          (Bench conference.)
03:06:46   22          THE COURT:  What is it?
03:06:47   23          MR. SHEASBY:  In order to be a viable
03:06:49   24  non-infringing alternative, you had to have analyzed
03:06:51   25  whether it was covered by any other patents.  Mr. Gerardi
```

| | | |
|---|---|---|
| 03:06:53 | 1 | has not done that analysis. |
| 03:06:55 | 2 | In particular, he hasn't analyzed whether it's |
| 03:06:58 | 3 | covered by any other USAA patents.  It's relevant from a |
| 03:07:01 | 4 | legal damages standpoint, but it's complicated from your |
| 03:07:04 | 5 | MIL standpoint.  And I just wanted to get guidance if -- if |
| 03:07:08 | 6 | Your Honor -- I don't know what to do.  I feel like I have |
| 03:07:12 | 7 | to make my legal case because we are going to JMOL -- |
| 03:07:15 | 8 | THE COURT:  Tell me what you want to ask the |
| 03:07:17 | 9 | witness and what you want -- and what you want leave from |
| 03:07:19 | 10 | the existing orders in limine to ask the witness. |
| 03:07:22 | 11 | MR. SHEASBY:  Mr. Gerardi, you didn't analyze |
| 03:07:24 | 12 | whether your non-infringing alternative would infringe |
| 03:07:26 | 13 | other USAA patents? |
| 03:07:30 | 14 | THE COURT:  Does Defendant object to that? |
| 03:07:32 | 15 | MS. WILLIAMS:  Yes, Your Honor, we do object to |
| 03:07:33 | 16 | that. |
| 03:07:33 | 17 | Number one, it violates the MIL. |
| 03:07:35 | 18 | Number two, the analysis here does not -- does not |
| 03:07:39 | 19 | depend on -- on that question. |
| 03:07:41 | 20 | Mr. Sheasby can get the information that he needs |
| 03:07:44 | 21 | about the non-infringing alternative without talking about |
| 03:07:47 | 22 | the first case and any other patents that USAA has. |
| 03:07:50 | 23 | MR. SHEASBY:  This is a valid concern.  Here's the |
| 03:07:53 | 24 | issue.  I believe if I'm able to establish that he |
| 03:07:56 | 25 | doesn't -- hasn't done an analysis as to whether it |

| | | |
|---|---|---|
| 03:07:58 | 1 | infringes other USAA patents, they're not going to be able |
| 03:08:00 | 2 | to discuss the NIA in closing because a requirement of an |
| 03:08:04 | 3 | NIA is that it not infringe any other patents.  And so |
| 03:08:09 | 4 | that's -- so that's the issue I'm struggling with. |
| 03:08:12 | 5 | MS. WILLIAMS:  Your Honor, that is not a |
| 03:08:14 | 6 | requirement of the non-infringing alternative analysis. |
| 03:08:16 | 7 | THE COURT:  All right.  Let's get back to the |
| 03:08:17 | 8 | issue. |
| 03:08:18 | 9 | At this point, given the context of where we are, |
| 03:08:21 | 10 | I am not persuaded that I should grant the Plaintiff leave |
| 03:08:24 | 11 | to deviate from the MIL orders that are in place. |
| 03:08:28 | 12 | MR. SHEASBY:  I understand, Your Honor. |
| 03:08:30 | 13 | THE COURT:  All right. |
| 03:08:31 | 14 | MR. SHEASBY:  Thank you, Your Honor. |
| 03:08:31 | 15 | THE COURT:  While you two are here, how much |
| 03:08:33 | 16 | longer do you expect your cross to go, Mr. Sheasby? |
| 03:08:36 | 17 | MR. SHEASBY:  30 minutes. |
| 03:08:37 | 18 | THE COURT:  All right.  And are you going to have |
| 03:08:39 | 19 | redirect, Ms. Williams? |
| 03:08:40 | 20 | MS. WILLIAMS:  Yes, Your Honor, but it will be |
| 03:08:42 | 21 | very brief. |
| 03:08:48 | 22 | THE COURT:  All right.  Let's proceed. |
| 03:08:48 | 23 | (Bench conference concluded.) |
| 03:08:51 | 24 | THE COURT:  Let's proceed, counsel. |
| 03:08:54 | 25 | Q.  (By Mr. Sheasby)  And Dr. Villasenor didn't investigate |

| | | |
|---|---|---|
| 03:08:56 | 1 | whether any of these non-infringing alternatives you |
| 03:09:01 | 2 | identify are commercially viable, correct? |
| 03:09:04 | 3 | A.  I believe that's fair. |
| 03:09:05 | 4 | Q.  Dr. Villasenor didn't investigate whether any of what |
| 03:09:08 | 5 | is -- what he describes as non-infringing alternatives are |
| 03:09:13 | 6 | legal or even allowed under regulation, correct? |
| 03:09:15 | 7 | A.  I believe that's fair. |
| 03:09:16 | 8 | Q.  And you have no qualifications to assess banking and |
| 03:09:20 | 9 | regulatory laws in terms of risk management, correct? |
| 03:09:23 | 10 | A.  That's correct. |
| 03:09:24 | 11 | Q.  You've done no analysis whatsoever as to whether what |
| 03:09:27 | 12 | you told the jury was a commercially viable non-infringing |
| 03:09:31 | 13 | alternative is actually commercially feasible, correct? |
| 03:09:34 | 14 | A.  I can't completely agree with that. |
| 03:09:36 | 15 | Q.  You have no expertise building or running a remote |
| 03:09:43 | 16 | deposit capture system, correct? |
| 03:09:44 | 17 | A.  That's fair. |
| 03:09:45 | 18 | Q.  From a professional standpoint, you've never ran a |
| 03:09:49 | 19 | bank, never ran an MRDC system, correct? |
| 03:09:58 | 20 | A.  That's correct. |
| 03:09:59 | 21 | Q.  You testified at your deposition that Mr. Saffici told |
| 03:10:03 | 22 | you that the bullet points in your expert report that were |
| 03:10:08 | 23 | non -- that were non-infringing were commercially viable, |
| 03:10:14 | 24 | correct? |
| 03:10:14 | 25 | A.  I believe I said something to that extent in my |

```
03:10:17   1   deposition.
03:10:17   2   Q.  Why don't you turn to Tab 2, Lines 85, 15 through 23.
03:10:33   3   A.  85, I'm sorry, again, the lines?
03:10:36   4            MS. WILLIAMS:  Objection, Your Honor.  Tab 2 is --
03:10:40   5   is -- may we approach, Your Honor?
03:10:42   6            THE COURT:  Approach the bench.
03:10:47   7            (Bench conference.)
03:10:47   8            MS. WILLIAMS:  Your Honor, Tab 2 in the binder is
03:10:52   9   the deposition related to the first case and wouldn't have
03:10:57  10   any bearing on the non-infringing alternatives in this
03:10:58  11   case.
03:10:59  12            MR. SHEASBY:  It's not intending -- I'm taking him
03:11:02  13   to the Case 2 deposition.  So let me just go check the
03:11:05  14   binder number, but, no, Ms. Williams, I'm absolutely --
03:11:09  15            MS. WILLIAMS:  You said Tab 2.
03:11:10  16            THE COURT:  Speak quietly, counsel.
03:11:12  17            MS. WILLIAMS:  Yes, Your Honor.  Tab 1 -- Tab 1 is
03:11:13  18   the first --
03:11:14  19            MR. SHEASBY:  Okay.  So we'll go to Tab 1.  Thank
03:11:16  20   you for that.
03:11:16  21            MS. WILLIAMS:  All right.
03:11:17  22            THE COURT:  All right.  Let's proceed.
03:11:20  23            (Bench conference concluded.)
03:11:22  24            THE COURT:  Let's proceed.
03:11:30  25   Q.  (By Mr. Sheasby)  Let's actually go to Tab 1,
```

| | | |
|---|---|---|
| 03:11:33 | 1 | Mr. Gerardi. |
| 03:11:34 | 2 | A.  Okay. |
| 03:11:35 | 3 | Q.  And if we can look at Page 85, Lines 15 through 23. |
| 03:11:54 | 4 | A.  Okay. |
| 03:11:55 | 5 | Q.  You testified that Mr. Saffici told you that your |
| 03:11:58 | 6 | bullet points were non-infringing alternatives that were |
| 03:12:08 | 7 | commercially viable, correct? |
| 03:12:09 | 8 | A.  Which lines again?  I'm sorry, sir. |
| 03:12:11 | 9 | Q.  Sure.  85, Lines 15 through 23. |
| 03:12:17 | 10 | A.  My answer was:  Mr. Saffici advised me that from a |
| 03:12:21 | 11 | consumer standpoint, he didn't believe these would affect |
| 03:12:24 | 12 | the consumer's side of the liability equation. |
| 03:12:27 | 13 | Q.  You understand then when I asked Mr. Saffici whether he |
| 03:12:32 | 14 | had done any analysis of your bullet points, he testified |
| 03:12:34 | 15 | that he had not, correct? |
| 03:12:36 | 16 | A.  At his deposition, I believe that's correct. |
| 03:12:38 | 17 | Q.  In fact, Mr. Saffici test -- testified that he had done |
| 03:12:46 | 18 | nothing to investigate whether the bullet points that you |
| 03:12:48 | 19 | list are feasible non-infringing alternatives that were |
| 03:12:51 | 20 | actually commercially viable, correct? |
| 03:12:53 | 21 | A.  That's what he said at his deposition.  May I explain? |
| 03:12:57 | 22 | Q.  Mr. -- Mr. Gerardi -- |
| 03:13:00 | 23 | MR. SHEASBY:  Your Honor, I -- I object as |
| 03:13:02 | 24 | non-responsive. |
| 03:13:09 | 25 | THE COURT:  You -- you're not entitled to ask |

03:13:12   1   counsel if you can explain something.  You're here to

03:13:14   2   answer the questions.  Counsel for Wells Fargo will have an

03:13:17   3   opportunity to revisit it if they believe in their judgment

03:13:21   4   it needs to be readdressed.

03:13:22   5           THE WITNESS:  Yes, Your Honor.

03:13:24   6           THE COURT:  Let's proceed on that basis.

03:13:27   7   Q.  (By Mr. Sheasby)  So just so the record is clear, at

03:13:28   8   deposition you told me that Mr. Saffici had advised you

03:13:31   9   that a number of the bullet points that you list as

03:13:33   10  non-infringing alternatives, he didn't believe they'd

03:13:35   11  accept -- they'd affect the customer side of the liability

03:13:38   12  equation, correct?

03:13:39   13  A.  Correct.

03:13:39   14  Q.  And at deposition, Mr. Saffici testified that he did no

03:13:43   15  analysis whatsoever as to whether your bullet points were

03:13:47   16  commercially viable, fair?

03:13:48   17  A.  That's fair.

03:13:49   18  Q.  So Mr. Hecht, who was Wells Fargo's corporate

03:14:00   19  representative, didn't discuss your bullet points, correct?

03:14:05   20  A.  Which bullet points?

03:14:06   21  Q.  Your non-infringing alternatives, correct?

03:14:08   22  A.  That's fair.

03:14:09   23  Q.  He -- he testified that he had decades and decades of

03:14:14   24  experience in the banking industry, correct?

03:14:17   25  A.  Yes.

| | | |
|---|---|---|
| 03:14:18 | 1 | Q.  He never told you that your non-infringing alternative |
| 03:14:21 | 2 | was commercially viable, correct? |
| 03:14:23 | 3 | A.  No, he did not. |
| 03:14:26 | 4 | Q.  Mr. Villa -- Dr. Villasenor never told you it was |
| 03:14:34 | 5 | commercially viable, correct? |
| 03:14:36 | 6 | A.  That's correct. |
| 03:14:37 | 7 | Q.  And Mr. Saffici testified that he never told you that |
| 03:14:40 | 8 | it was commercially viable, correct? |
| 03:14:43 | 9 | A.  At his deposition, that's correct. |
| 03:14:48 | 10 | Q.  Now, you testified that Mr. Weinstein didn't perform |
| 03:14:52 | 11 | any type of cost savings analysis, fair? |
| 03:14:59 | 12 | A.  I believe I said something to that extent, yes. |
| 03:15:02 | 13 | Q.  If you go to slides -- Mr. Weinstein's demonstratives |
| 03:15:05 | 14 | at Slide 45. |
| 03:15:24 | 15 | Now, this is the slide that Mr. Weinstein showed |
| 03:15:27 | 16 | to the ladies and gentlemen of the jury, correct? |
| 03:15:29 | 17 | A.  Yes, it is. |
| 03:15:32 | 18 | Q.  He showed, that from 2014 to 2018, if mobile deposit |
| 03:15:37 | 19 | was going to go through a teller, it would be $2.46, |
| 03:15:42 | 20 | correct? |
| 03:15:42 | 21 | A.  That's what's listed on that slide. |
| 03:15:44 | 22 | Q.  If it was going through an ATM, it would be $1.41 |
| 03:15:50 | 23 | percent [sic], correct? |
| 03:15:50 | 24 | A.  $1.41, correct? |
| 03:15:52 | 25 | Q.  $1.41, correct? |

03:15:52   1    A.   Yes, that's what's on that slide.

03:15:54   2    Q.   And if it was MRDC, it would be 35 cents per deposit,

03:15:59   3    right?

03:15:59   4    A.   That's what's on his slide.

03:16:01   5    Q.   And that creates a cost savings of between a dollar and

03:16:05   6    $2.00 for every single deposit, correct?

03:16:07   7    A.   That's what he has listed on his slide.

03:16:09   8    Q.   And you didn't provide any alternative cost numbers,

03:16:12   9    correct?

03:16:12   10   A.   In response to that, no, I did not.

03:16:15   11   Q.   And so the only cost numbers the jury is going to hear

03:16:18   12   are the cost numbers that are on -- in Mr. Weinstein's

03:16:20   13   testimony and Ms. Lockwood-Stein's testimony, correct?

03:16:22   14   A.   I believe so.

03:16:23   15   Q.   And at your deposition we discussed what the

03:16:43   16   implication of these cost savings numbers are, correct?

03:16:46   17   A.   I believe so, yes.

03:16:49   18   Q.   And we discussed the fact that if you calculated only

03:16:55   19   the cost savings that Wells Fargo achieved by using MRDC

03:17:02   20   for just one year in 2018, it would be $100 million,

03:17:11   21   correct?

03:17:11   22             MS. WILLIAMS:   Objection, Your Honor.   May we

03:17:12   23   approach?

03:17:13   24             THE COURT:   What's your objection, counsel?

03:17:18   25             MS. WILLIAMS:   Your Honor, it is outside --

03:17:20  1   outside his report.  Mr. Gerardi did not do this

03:17:25  2   calculation.

03:17:32  3        MR. SHEASBY:  Your Honor, I'm happy to respond.

03:17:34  4        THE COURT:  What's your response?

03:17:35  5        MR. SHEASBY:  Well, one, Mr. Gerardi has

03:17:40  6   represented that Mr. Weinstein did not do a cost savings

03:17:42  7   analysis.

03:17:43  8        Two, I'm establishing that he did a cost savings

03:17:46  9   analysis.

03:17:47  10        And, three, I'm now going to establish that this

03:17:50  11   witness did his own -- calculated that cost savings would

03:17:54  12   actually be in excess of what Mr. Weinstein did.

03:17:57  13        THE COURT:  What's your response to the objection

03:18:00  14   that this is beyond the scope of this witness's expert

03:18:03  15   report?  That's the objection that's been raised, not --

03:18:06  16   not what you think you're going to do for the next 10 or 15

03:18:09  17   minutes.

03:18:09  18        MR. SHEASBY:  I understand, Your Honor.

03:18:10  19        My response is that Mr. -- Mr. Gerardi does

03:18:15  20   discuss cost savings in his report.

03:18:19  21        THE COURT:  And is this discussed by Mr. Gerardi

03:18:22  22   in his report?

03:18:23  23        MR. SHEASBY:  The underlying data is discussed in

03:18:25  24   his report, Your Honor.

03:18:26  25        THE COURT:  Are these conclusions discussed in his

03:18:28  1   report?

03:18:28  2          MR. SHEASBY:  They are not discussed in his

03:18:30  3   report.

03:18:30  4          THE COURT:  Then I'll sustain the objection.

03:18:32  5   Q.  (By Mr. Sheasby)  Now, I note that you -- you believe

03:18:57  6   that there are some patents that can be worth hundreds of

03:19:00  7   millions of dollars, correct?

03:19:01  8   A.  I'm sorry, repeat your question.

03:19:03  9   Q.  You believe that there are some patents that can be

03:19:07  10  worth hundreds of millions of dollars, correct?

03:19:10  11  A.  You mean in a general context?

03:19:12  12         MR. SHEASBY:  Your Honor, objection,

03:19:14  13  non-responsive.

03:19:15  14         THE COURT:  Overruled.  He's asking for

03:19:17  15  clarification.  He's entitled to do that.

03:19:20  16  Q.  (By Mr. Sheasby)  There are some patents that can be

03:19:24  17  worth hundreds of millions of dollars that you've been

03:19:26  18  involved with, correct?

03:19:28  19  A.  That I've been involved with over my career, yes,

03:19:31  20  that's -- that's true.

03:19:32  21  Q.  Now, in this case, you've -- telling the ladies and

03:19:39  22  gentlemen of the jury that for these 120 million deposits

03:19:45  23  that Wells Fargo has made using a system you must assume is

03:19:50  24  infringed, USAA would get how many cents per deposit under

03:19:55  25  your damages analysis?

03:19:56  1   A.  I haven't performed that calculation.

03:19:59  2   Q.  It's less than a cent, correct?

03:20:03  3   A.  I believe so.  But I haven't performed that

03:20:05  4   calculation.

03:20:06  5   Q.  It's -- it's .000 some cent, correct?

03:20:13  6   A.  Again, sir, I haven't performed the calculation.

03:20:16  7   Q.  So what we know is the following.  We know from the

03:20:18  8   testimony that Wells Fargo, through its EW -- EWS system,

03:20:24  9   charges USAA 60 cents for every out of network sale

03:20:30  10  transaction, correct?  That was -- that's in the record?

03:20:31  11  A.  I'm sorry.  Just repeat your question again.

03:20:34  12          THE COURT:  Counsel, are you still inquiring as to

03:20:37  13  this demonstrative?

03:20:37  14          MR. SHEASBY:  I am, Your Honor.

03:20:39  15          THE COURT:  All right.  Proceed.

03:20:41  16  Q.  (By Mr. Sheasby)  We know from testimony earlier this

03:20:47  17  week that Wells Fargo, through EWS, charges USAA 60 cents

03:20:53  18  per Zelle transaction, correct?  That was testified to?

03:20:56  19  A.  I don't know if I agree with that.

03:20:59  20  Q.  EWS charges USAA 60 cents for certain Zelle

03:21:05  21  transactions, correct?

03:21:06  22  A.  EWS charges for Zelle transactions.

03:21:09  23  Q.  It's approximately 60 cents, correct?

03:21:11  24  A.  I believe it -- depending on the type of transaction,

03:21:14  25  that's correct.

03:21:15  1   Q.  EW -- EWS is partially owned by Wells Fargo, correct?

03:21:18  2   A.  Partially owned, that's correct.

03:21:24  3   Q.  Mr. Brady testified that Wells Fargo charges USAA's

03:21:25  4   customers $3.50 when USAA's customers attempt to use Wells

03:21:36  5   Fargo's ATM, correct?  He testified to that?

03:21:37  6   A.  I believe that's what he said, yes.

03:21:38  7   Q.  And your conclusion in a hypothetical negotiation, with

03:21:40  8   120 million infringing transactions and cost savings

03:21:42  9   between a dollar and $2.00 per transaction, that USAA would

03:21:46  10  settle for less than one cent per transaction?  That's your

03:21:49  11  testimony to the jury, correct?

03:21:50  12  A.  Based upon my calculations, yes, absolutely.

03:21:53  13            MR. SHEASBY:  I have no further questions.

03:21:56  14            THE COURT:  You pass the witness?

03:21:57  15            MR. SHEASBY:  I pass the witness.

03:21:59  16            THE COURT:  All right.  Approach the bench,

03:22:12  17  counsel.

03:22:12  18            (Bench conference.)

03:22:12  19            THE COURT:  All right.  I want to discuss managing

03:22:19  20  the remaining time for trial with you all.

03:22:22  21            Plaintiff's got approximately two hours and two

03:22:30  22  minutes.  Defendant's got 15 minutes.  I understand

03:22:34  23  Defendant has 15 minutes of deposition -- 12 -- 13 minutes?

03:22:39  24            MR. MELSHEIMER:  We're not going to play that,

03:22:41  25  Judge.  We're just going to use it on Mr. Gerardi.

03:22:43  1          THE COURT:  All right.  Now, Plaintiff's going to

03:22:45  2   play depositions in rebuttal?

03:22:47  3          MR. SHEASBY:  Yes, Your Honor.

03:22:48  4          THE COURT:  Are there portions of that rebuttal

03:22:49  5   that are counter-designations chargeable to Defendant?

03:22:52  6          MR. SHEASBY:  There are.

03:22:54  7          MR. MELSHEIMER:  Less than a minute is what my

03:22:55  8   understanding is on --

03:22:56  9          THE COURT:  So you're planning to go forward with

03:22:58 10   redirect of about 14 minutes?

03:23:00 11          MR. MELSHEIMER:  About 14 minutes, Your Honor.

03:23:02 12          THE COURT:  Is that going to be adequate to

03:23:04 13   complete the process?

03:23:05 14          MR. MELSHEIMER:  Are you asking me if I want some

03:23:07 15   more time?

03:23:08 16          THE COURT:  I asked you if it's going to be

03:23:11 17   adequate to complete the process, and I want an honest

03:23:14 18   answer.

03:23:17 19          MR. MELSHEIMER:  Your Honor, we could use a few

03:23:21 20   more minutes, frankly.

03:23:22 21          MR. SHEASBY:  Your Honor, I can be clear, we're

03:23:24 22   not going to recut a deposition play for -- they don't need

03:23:27 23   to be concerned about that.  We'll play what's been

03:23:30 24   designated in the rebuttal case.  We're not going to recut

03:23:32 25   at this point.  They can have all the time they have left.

1205

03:23:35   1          MR. MELSHEIMER:  If that's the case, then I think
03:23:37   2     we can do it.
03:23:37   3          THE COURT:  Then let's do it.  Let's go forward
03:23:39   4     with what we have.  I just don't want a moving target and
03:23:41   5     somebody gets caught in -- caught in a bind.
03:23:44   6          MS. WILLIAMS:  Thank you, Your Honor.
03:23:44   7          THE COURT:  Let's proceed with redirect.
03:23:46   8          (Bench conference concluded.)
03:23:52   9          THE COURT:  Let's proceed with redirect by the
03:23:54  10     Defendant.
03:24:21  11          MS. WILLIAMS:  Your Honor, may I have a moment to
03:24:23  12     make some room for my binders, please?
03:24:28  13          THE COURT:  You may.  You may.
03:25:05  14          MS. WILLIAMS:  May it please the Court.
03:25:06  15          THE COURT:  You may proceed.
03:25:08  16          MS. WILLIAMS:  Thank you, Your Honor.
03:25:10  17     Q.  (By Ms. Williams)  Mr. Gerardi, you were asked some
03:25:13  18     questions about a Celent article from 2009; do you recall
03:25:15  19     those questions?
03:25:16  20     A.  Yes, I do.
03:25:17  21     Q.  Was that Celent article addressing MRDC generally, or
03:25:21  22     was it addressing the inventions in the patents in this
03:25:24  23     case?
03:25:25  24     A.  Generally speaking.  It wasn't addressing the patents
03:25:29  25     in this case.  It was I think nine years before the patents

03:25:31  1   in the case.

03:25:32  2   Q.  You were asked some questions about -- about

03:25:35  3   Mr. Weinstein's theories in this case.  The -- what is your

03:25:43  4   understanding as to the inventions that he valued,

03:25:46  5   regardless of the model that he used?

03:25:48  6   A.  He stated they're --  both of his models are based upon

03:25:54  7   fraud and fraud benefits as part of his calculations.

03:25:59  8   Q.  You were also asked some questions about whether you

03:26:04  9   relied on Mr. Saffici in preparing your analysis in this

03:26:11  10  case.  Do you recall those questions?

03:26:13  11         MR. SHEASBY:  Your Honor, I object.  That's an

03:26:14  12  argumentative statement.

03:26:15  13         THE COURT:  Overruled.

03:26:20  14  Q.  (By Ms. Williams)  Do you recall?

03:26:22  15  A.  Yes, I do.

03:26:22  16  Q.  Okay.  And then do you -- when you -- why did you speak

03:26:30  17  with Mr. Saffici in this case?

03:26:31  18  A.  Again, to get an understanding of those back end

03:26:34  19  systems and to see -- get an understanding of when they

03:26:39  20  have been in place and for how long they've been in place.

03:26:42  21  Q.  And what is your understanding based on your

03:26:44  22  conversations with Mr. Saffici about how long those have

03:26:46  23  been in place?

03:26:47  24  A.  Those back end systems have been in place for years, if

03:26:50  25  not decades, prior to the patents being issued.

| | | |
|---|---|---|
| 03:26:53 | 1 | Q.  Did you rely on Mr. Saffici to provide a |
| 03:26:57 | 2 | non-infringement analysis for you in this case? |
| 03:26:59 | 3 | A.  No, I did not. |
| 03:26:59 | 4 | Q.  Is that consistent or inconsistent with your deposition |
| 03:27:03 | 5 | testimony previously? |
| 03:27:04 | 6 | A.  It's consistent. |
| 03:27:07 | 7 | Q.  When you spoke with Mr. Saffici in this case, did you |
| 03:27:17 | 8 | speak with him about non-infringing alternatives? |
| 03:27:21 | 9 | A.  Not directly, no. |
| 03:27:23 | 10 | Q.  When you were being questioned by counsel for USAA, do |
| 03:27:32 | 11 | you recall being asked questions about being advised by |
| 03:27:35 | 12 | Mr. Saffici from a consumer standpoint that he didn't |
| 03:27:38 | 13 | believe that the non-infringing alternatives would affect |
| 03:27:41 | 14 | the customer side of the viability equation? |
| 03:27:44 | 15 | A.  Yes, I remember that. |
| 03:27:45 | 16 | Q.  Okay.  When did you speak with Mr. Saffici about that? |
| 03:27:48 | 17 | A.  After his deposition and before my deposition. |
| 03:27:50 | 18 | Q.  All right.  And does your -- does your number in this |
| 03:28:03 | 19 | case, the 3.98 million lump-sum number, depend in any way |
| 03:28:09 | 20 | on whether the non-infringing alternatives are correct or |
| 03:28:12 | 21 | not correct? |
| 03:28:14 | 22 | A.  No. |
| 03:28:14 | 23 | Q.  Your 3. -- |
| 03:28:15 | 24 | A.  It sets a cap for what I think the lump sum would be. |
| 03:28:27 | 25 | MS. WILLIAMS:  Your Honor, may I have a moment to |

03:28:29   1   confer with counsel?

03:28:30   2           THE COURT:  You may.

03:29:02   3           MS. WILLIAMS:  May it please the Court.

03:29:04   4   Q.  (By Ms. Williams)  Mr. Gerardi, you were asked some

03:29:06   5   questions about -- about Zelle.  Is -- what is your

03:29:10   6   understanding about Zelle?

03:29:12   7   A.  Zelle is a service that helps customers transfer money

03:29:19   8   between each other.  You can Zelle or via -- via your app

03:29:23   9   send money back and forth to each other.

03:29:26  10   Q.  And if -- and in the context of Zelle, there -- if --

03:29:30  11   if a customer uses it, they actually get a service, right?

03:29:33  12   A.  Correct.

03:29:33  13   Q.  And EWS provides that service?

03:29:36  14   A.  I believe that's the company that provides Zelle, yes.

03:29:38  15   Q.  And for providing that service, EWS charges?

03:29:42  16   A.  Oh, yes, they do.

03:29:45  17   Q.  Okay.  And how is -- in the context of -- of this -- of

03:29:51  18   this case, what -- would Wells Fargo get any services from

03:29:58  19   USAA?

03:29:58  20   A.  No, as you heard earlier, I think -- I forget which

03:30:03  21   witness, but basically is what they get is a permission

03:30:07  22   slip to use the patents.  Zelle is someone providing the

03:30:10  23   hardware, the software, the people, all the capital to make

03:30:13  24   that business run.  In this case, you're getting a

03:30:17  25   permission slip to use the patents.  So Wells Fargo would

03:30:19   1   have to do something with that permission slip.

03:30:22   2   Q.  Mr. Gerardi, do you stand by the opinions that you've

03:30:35   3   rendered in this case?

03:30:36   4   A.  Oh, absolutely.

03:30:36   5   Q.  And so what is the -- what is the amount that Wells

03:30:41   6   Fargo would -- would be willing to -- to pay in a

03:30:46   7   hypothetical negotiation?

03:30:47   8   A.  Based upon the analyses that I've performed, I believe

03:30:51   9   that the claims provided in the patent, a value of

03:30:54  10   $3.98 million.

03:30:55  11   Q.  Have you performed a per -- per unit royalty rate in

03:30:58  12   this case?

03:30:58  13   A.  No, I have not.

03:30:59  14   Q.  And so -- why not?

03:31:02  15   A.  Again, looking at my calculation, looking at the

03:31:05  16   totality of the lump sum that would come out of that

03:31:07  17   hypothetical negotiation, that would give Wells Fargo the

03:31:10  18   ability to continue offering their product.

03:31:14  19          MS. WILLIAMS:  Your Honor, I pass the witness.

03:31:16  20          THE COURT:  All right.  Further cross-examination

03:31:20  21   by the Defendant [sic].

03:31:23  22          MR. SHEASBY:  Briefly, Your Honor.

03:31:26  23          THE COURT:  Briefly, all right.  Let it so be

03:31:29  24   noted in the record.

03:31:31  25   Q.  (By Mr. Sheasby)  Mr. Gerardi, when you calculated your

03:31:33   1   $3.98 million number -- number, you didn't take into

03:31:41   2   account any profits or cost savings or ecosystem benefits

03:31:47   3   or wow benefits that Wells Fargo will continue to obtain if

03:31:55   4   it continues to use this technology through the dates of

03:31:57   5   its expiration, correct?

03:31:59   6   A.  My calculation is based upon, again, what I performed,

03:32:02   7   which I believe is the benefits of the claims of the

03:32:07   8   patent.

03:32:07   9   Q.  But your damages number that you listed to the jury is

03:32:11   10   for a set period of time, correct?

03:32:12   11   A.  It is.

03:32:13   12   Q.  You didn't take into account profits that would occur

03:32:15   13   after that set period of time, correct?

03:32:17   14   A.  For the reasons I've stated, no, I did not.

03:32:19   15   Q.  You didn't take into account the cost savings that

03:32:25   16   would occur after that set period of time, correct?

03:32:26   17   A.  Again, for all the reasons I've stated why I performed

03:32:29   18   my calculations and why I didn't, I didn't think it was

03:32:31   19   necessary to do that.

03:32:31   20   Q.  You didn't take into account the growth and profits

03:32:35   21   that mobile deposit would incur through 20 -- 2026 when

03:32:39   22   these patents expire, correct?

03:32:40   23   A.  Again, for the reasons I explained to you, no, I didn't

03:32:43   24   think that was necessary.

03:32:44   25   Q.  Now, you testified that it would be extremely

| | | |
|---|---|---|
| 03:32:50 | 1 | inexpensive for Wells Fargo to remove the infringing |
| 03:32:54 | 2 | functionality, correct? |
| 03:32:55 | 3 | MS. WILLIAMS:  Objection, Your Honor.  It's beyond |
| 03:32:57 | 4 | the scope of cross-examination. |
| 03:32:59 | 5 | THE COURT:  Overruled. |
| 03:33:00 | 6 | MS. WILLIAMS:  I mean, redirect, sorry. |
| 03:33:02 | 7 | THE COURT:  Overruled. |
| 03:33:03 | 8 | A.  Repeat your question. |
| 03:33:04 | 9 | Q.  (By Mr. Sheasby)  You said it would be extremely |
| 03:33:07 | 10 | inexpensive for Wells Fargo to remove the infringing |
| 03:33:09 | 11 | functionality in this case, correct? |
| 03:33:10 | 12 | A.  I don't think I stated that exactly.  I stated that it |
| 03:33:13 | 13 | would cost less than that amount to implement the |
| 03:33:16 | 14 | non-infringing alternative. |
| 03:33:16 | 15 | Q.  It would cost Wells Fargo less than $3.98 million to |
| 03:33:22 | 16 | implement a non-infringing alternative? |
| 03:33:24 | 17 | A.  Yes. |
| 03:33:25 | 18 | Q.  So you're telling me that -- you're telling the ladies |
| 03:33:32 | 19 | and gentlemen of the jury that we're here, we're having |
| 03:33:34 | 20 | this intense fight, and the reason for that is because, |
| 03:33:38 | 21 | apparently, Wells Fargo could just spend less than |
| 03:33:43 | 22 | $3.9  million and turn it off? |
| 03:33:44 | 23 | A.  I'm not going to opine upon what Wells Fargo will or |
| 03:33:48 | 24 | will not do with its business.  I'm going to give you my |
| 03:33:51 | 25 | opinion as to what I think the value is of the |

| | | |
|---|---|---|
| 03:33:54 | 1 | patents-in-suit in this litigation. |
| 03:33:55 | 2 | Q.  But one thing we know, Dr. Villasenor says it can be |
| 03:33:58 | 3 | turned off whenever Wells Fargo wants.  They just need to |
| 03:34:01 | 4 | write a check for less than $3.8 million to their engineers |
| 03:34:05 | 5 | and they can turn it off, correct? |
| 03:34:07 | 6 | A.  The cost to implement would be less than the numbers |
| 03:34:09 | 7 | I've calculated. |
| 03:34:10 | 8 | Q.  But the second thing we know is that Wells Fargo has |
| 03:34:13 | 9 | not turned it off, correct? |
| 03:34:15 | 10 | A.  I don't believe they have. |
| 03:34:16 | 11 | Q.  Thank you. |
| 03:34:18 | 12 | THE COURT:  You pass the witness? |
| 03:34:19 | 13 | MR. SHEASBY:  I pass the witness. |
| 03:34:20 | 14 | THE COURT:  Further direct, Ms. Williams? |
| 03:34:23 | 15 | MS. WILLIAMS:  No, Your Honor.  Thank you. |
| 03:34:24 | 16 | THE COURT:  You may step down, Mr. Gerardi. |
| 03:34:26 | 17 | THE WITNESS:  Thank you, Your Honor. |
| 03:34:27 | 18 | THE COURT:  Defendant, call your next witness. |
| 03:34:39 | 19 | MR. MELSHEIMER:  May it please the Court. |
| 03:34:41 | 20 | Your Honor, at this time Wells Fargo rests its case, |
| 03:34:43 | 21 | subject to the filings that we made earlier that Mr. Hill |
| 03:34:46 | 22 | discussed with the Court outside the jury's presence.  But |
| 03:34:50 | 23 | at this time, we rest our case. |
| 03:34:51 | 24 | THE COURT:  All right.  Defendants have rested |
| 03:34:53 | 25 | their case-in-chief. |

03:34:55  1          Does Plaintiff have a rebuttal case to present to

03:34:57  2  the jury?

03:34:57  3          MS. GLASSER:  We do, Your Honor.

03:34:58  4          THE COURT:  Proceed with Plaintiff's rebuttal

03:35:00  5  case.

03:35:00  6          MS. GLASSER:  Plaintiff, USAA, in rebuttal will be

03:35:05  7  calling two witnesses by deposition.  We will be recalling

03:35:10  8  Mr. Ajami, and that will be the last witness of the case.

03:35:15  9          The first witness that we will be calling is

03:35:18  10 Mr. Paul Rosati, corporate representative of Wells Fargo by

03:35:23  11 video deposition.

03:35:28  12         THE COURT:  All right.  Proceed with the witness

03:35:29  13 by deposition.

03:35:31  14         MR. HILL:  Your Honor, before we do that,

03:35:33  15 Mr. Rosati was not a corporate representative in this

03:35:35  16 deposition.  I just want to correct that for the record.

03:35:38  17 He was --

03:35:39  18         THE COURT:  Do we have a dispute about that,

03:35:42  19 Ms. Glasser?

03:35:44  20         MS. GLASSER:  My understanding is they had

03:35:46  21 represented him in this case as someone who had provided

03:35:49  22 information to the experts on behalf of Wells Fargo Bank,

03:35:52  23 but we don't have any substantive disagreement if they want

03:35:55  24 to call him by something different.

03:35:57  25         THE COURT:  All right.  Let's proceed with the

03:36:04   1   deposition.

03:36:04   2            (Videoclip played.)

03:36:04   3            QUESTION:  Can you state your full name for the

03:36:05   4   record?

03:36:05   5            ANSWER:  Paul Rosati.

03:36:07   6            QUESTION:  Where are you employed?

03:36:08   7            ANSWER:  Wells Fargo Bank.

03:36:09   8            QUESTION:  Sir, you understand that the wholesale

03:36:12   9   group at Wells Fargo had a mobile remote deposit capture

03:36:19   10  system, fair?

03:36:20   11           ANSWER:  I was not aware of what wholesale did or

03:36:23   12  didn't have.

03:36:24   13           QUESTION:  Are you aware today?

03:36:26   14           ANSWER:  Yes.

03:36:26   15           QUESTION:  What are you aware of?

03:36:27   16           ANSWER:  That they have a check capture product.

03:36:29   17           QUESTION:  Has there been any discussions at any

03:36:31   18  time, ever, about using the wholesale group's check capture

03:36:36   19  product?

03:36:36   20           ANSWER:  Not that I'm aware of.

03:36:38   21           QUESTION:  Do you have any basis to conclude that

03:36:40   22  the wholesale group's check capture product would be

03:36:44   23  sufficient for the needs of retail customers that Wells

03:36:47   24  Fargo seeks to serve with its mobile remote deposit capture

03:36:51   25  system that you're in charge of?

03:36:52   1           ANSWER:  I haven't looked into that.

03:36:54   2           QUESTION:  Sir, do you have any facts that would

03:36:59   3   lead you to believe that it would be appropriate?

03:37:01   4           ANSWER:  No.

03:37:02   5           QUESTION:  Have there been any discussions at any

03:37:04   6   time -- at any point that suggested or even discussed

03:37:10   7   whether the wholesale remote deposit capture system would

03:37:14   8   be appropriate for your retail customers?

03:37:16   9           ANSWER:  None that I've been involved in.

03:37:18  10           QUESTION:  You joined the mobile product deposit

03:37:22  11   group at Wells Fargo in 2014, correct?

03:37:25  12           ANSWER:  Yes.

03:37:25  13           QUESTION:  You've been in that project for five

03:37:31  14   years, correct?

03:37:33  15           ANSWER:  The product manager for five years, yes.

03:37:36  16           QUESTION:  At some point after the date of joining

03:37:39  17   that product, your group examined the user interfaces that

03:37:43  18   USAA uses for its mobile check deposit system, correct?

03:37:47  19           ANSWER:  Specific to manual and auto capture, and

03:37:53  20   specific to multiple check capture.

03:37:56  21           QUESTION:  Before this lawsuit began, you were

03:37:58  22   aware that USAA had announced licensing initiative relating

03:38:02  23   to its mobile check deposit capture patents, correct?

03:38:06  24           ANSWER:  I saw some press releases.

03:38:08  25           QUESTION:  You took no steps to approach USAA

03:38:17  1    about that process, correct?

03:38:20  2              ANSWER:  I read the press release.  That was it.

03:38:22  3              QUESTION:  You never told your superior about the

03:38:28  4    press release, correct?

03:38:28  5              ANSWER:  The superiors already knew.

03:38:30  6              QUESTION:  Who knew?

03:38:31  7              ANSWER:  Management in general.  Open press

03:38:35  8    release.

03:38:35  9              QUESTION:  To be clear, you were aware that USAA

03:38:42  10   had a -- had announced that it was expecting folks to take

03:38:46  11   a license to its intellectual property if they were using

03:38:49  12   it, fair?

03:38:49  13             ANSWER:  I read the press release, yes.

03:38:52  14             QUESTION:  Your superior, Margot Lockwood-Stein,

03:38:54  15   was aware of that, too, correct?

03:38:56  16             ANSWER:  Yes.

03:38:58  17             QUESTION:  Before the initiation of this lawsuit,

03:39:00  18   did you perform any investigation as to whether any of

03:39:06  19   USAA's patents were used by Wells Fargo's system?

03:39:09  20             ANSWER:  No.

03:39:09  21             QUESTION:  Did you request that any individual

03:39:14  22   perform that investigation?

03:39:15  23             ANSWER:  No.

03:39:15  24             QUESTION:  And to be clear for the record, you are

03:39:20  25   the manager of the remote deposit capture program for Wells

03:39:26   1   Fargo from the first quarter of 2014 through the present?

03:39:29   2          ANSWER:  Product manager, yes.

03:39:30   3          QUESTION:  Your mobile check deposit capture

03:39:35   4   system has front end and back end aspects of it, fair?

03:39:39   5          ANSWER:  Yes.

03:39:39   6          QUESTION:  The back end aspects of it, after the

03:39:46   7   images are received, is sort of shared infrastructure

03:39:49   8   that's used by a number of different deposit routes,

03:39:52   9   correct?

03:39:52   10         ANSWER:  Deposit's infrastructure.

03:39:53   11         QUESTION:  And it's shared by a number of

03:39:55   12   different deposit routes, fair?

03:39:56   13         ANSWER:  Yes.

03:39:57   14         QUESTION:  One of the things -- can you think of

03:40:02   15   any technology at Wells Fargo that is comparable to mobile

03:40:06   16   check deposit?

03:40:07   17         ANSWER:  Nothing comes to mind.

03:40:09   18         QUESTION:  USAA is a financial services company

03:40:16   19   that serves the military and its family, fair?

03:40:20   20         ANSWER:  Yes.

03:40:20   21         QUESTION:  In other words, you understand that its

03:40:22   22   banking division, USAA, is a competitor of Wells Fargo,

03:40:26   23   correct?

03:40:26   24         ANSWER:  Yes.

03:40:28   25         (Videoclip ends.)

```
03:40:32   1              THE COURT:  Does that complete this witness by
03:40:35   2    deposition?
03:40:36   3              MS. GLASSER:  It does, Your Honor.
03:40:37   4              THE COURT:  Call your next rebuttal witness.
03:40:39   5              MS. GLASSER:  May it please the Court.  USAA calls
03:40:42   6    its final witness, Wells Fargo corporate representative
03:40:45   7    Mr. Armin Ajami.
03:40:47   8              THE COURT:  Proceed with the witness by
03:40:48   9    deposition.
03:40:49  10              (Videoclip played.)
03:40:49  11         QUESTION:  Mark as the first exhibit in order
03:40:55  12    Exhibit 1.
03:40:55  13         Sir, I'm handing you Exhibit 1.  This is the email
03:40:58  14    that you wrote, correct?
03:40:59  15         ANSWER:  Uh-huh.  Let me read it.  Yes, I see the
03:41:03  16    email.
03:41:03  17         QUESTION:  And this is an email that you wrote to
03:41:05  18    your colleagues, correct?
03:41:06  19         ANSWER:  It is.
03:41:07  20         QUESTION:  It's relating to the mobile deposit
03:41:09  21    system that you folks were considering launching, fair?
03:41:13  22         ANSWER:  It's related to the user experience for
03:41:18  23    mobile deposit.
03:41:18  24         QUESTION:  Sir, if you can answer my question the
03:41:22  25    way I asked it, I'd appreciate it.  This is relating to the
```

03:41:26  1  mobile deposit product you folks were considering

03:41:28  2  launching?

03:41:29  3          ANSWER:  It's related to part of mobile deposit.

03:41:32  4          QUESTION:  This email, Exhibit 1, is relating to a

03:41:35  5  part of the mobile deposit --

03:41:37  6          ANSWER:  Uh-huh.

03:41:37  7          QUESTION:  -- system you were launching, fair?

03:41:39  8          ANSWER:  Yes.

03:41:39  9          QUESTION:  And it says that you're leveraging the

03:41:43  10  learnings that you derived from, amongst other entities,

03:41:46  11  USAA, fair?

03:41:47  12          ANSWER:  In the design of the product.  In the

03:41:53  13  design of the user experience.

03:41:55  14          QUESTION:  Sir, if you could answer my question

03:41:57  15  fairly, yes or no, I -- I would appreciate --

03:42:00  16          ANSWER:  Could you restate your question?  Sorry.

03:42:03  17          QUESTION:  Sure.  This is an email that you wrote

03:42:05  18  in 2010 regarding the mobile remote deposit capture system

03:42:09  19  that Wells Fargo was launching.

03:42:09  20          ANSWER:  Uh-huh.

03:42:11  21          QUESTION:  You stated that you were planning on

03:42:13  22  leveraging design learnings from USAA, fair?

03:42:16  23          ANSWER:  Yes, for design.

03:42:17  24          QUESTION:  Why don't we start there.  When was the

03:42:20  25  project team engaged to develop mobile check deposit?

| | | |
|---|---|---|
| 03:42:24 | 1 | ANSWER:  In mid to late 2009 is the first time we |
| 03:42:27 | 2 | started putting resources to look at the opportunity. |
| 03:42:30 | 3 | QUESTION:  And who made that decision? |
| 03:42:32 | 4 | ANSWER:  I did. |
| 03:42:35 | 5 | QUESTION:  Sir, to be clear, you don't recall if |
| 03:42:38 | 6 | you were aware that USAA had launched a mobile check |
| 03:42:43 | 7 | deposit system at the time you were planning on launching |
| 03:42:47 | 8 | one for Wells Fargo; is that your testimony? |
| 03:42:49 | 9 | ANSWER:  At the time -- yeah, I just -- I don't |
| 03:42:54 | 10 | remember.  I know we found out about it later.  I don't |
| 03:42:57 | 11 | know at the time when we were about to make a decision to |
| 03:42:59 | 12 | start looking at it in late 2009, whether USAA was in the |
| 03:43:04 | 13 | market or not. |
| 03:43:05 | 14 | I'm not clear on your definition of that term.  If |
| 03:43:08 | 15 | you're talking about the user experience, my team looked at |
| 03:43:11 | 16 | the user experience of whoever was in the marketplace at |
| 03:43:14 | 17 | the time, including USAA. |
| 03:43:14 | 18 | QUESTION:  Sir, your team examined USAA's |
| 03:43:22 | 19 | Mobile@Deposit [sic] check deposit system, fair? |
| 03:43:26 | 20 | ANSWER:  The user experience of that system, yeah, |
| 03:43:30 | 21 | we looked at it. |
| 03:43:31 | 22 | QUESTION:  You downloaded the app, correct? |
| 03:43:33 | 23 | ANSWER:  Actually, I don't have firsthand |
| 03:43:36 | 24 | knowledge of who downloaded the app, but we -- we may have |
| 03:43:39 | 25 | gotten it through a third-party research firm that may have |

03:43:43  1  produced some information regarding -- it was publicly

03:43:48  2  available information about USAA's system.

03:43:50  3       QUESTION:  Sir, Wells Fargo examined USAA's mobile

03:43:58  4  check deposit application while it was designing its

03:44:01  5  system, yes or no?

03:44:02  6       ANSWER:  Again, can you define examined?  Because

03:44:07  7  what I'm saying is we looked at the user experience.  So if

03:44:12  8  that's your definition of examined, then that's fine, but I

03:44:15  9  don't know what you mean by examined.

03:44:18  10       QUESTION:  You wanted people who used mobile

03:44:21  11  banking to continue to utilize ATMs and stores for check

03:44:25  12  deposits; is that correct?

03:44:26  13       ANSWER:  Our position -- our view -- our viewpoint

03:44:32  14  was customers should choose whatever channel they want to

03:44:35  15  choose that's most convenient for them.  Some people are

03:44:38  16  going to want to come into the stores and branches, visit

03:44:41  17  the ATM.  For some people, self-service using a digital

03:44:44  18  channel like mobile makes the most sense.  So ultimately,

03:44:47  19  it's customer choice.  We weren't forcing or incenting

03:44:51  20  anyone to use a mobile solution.

03:44:53  21       QUESTION:  Now, at the time of development of a

03:45:14  22  mobile check deposit system at Wells Fargo, Wells Fargo had

03:45:19  23  available to it a pre-existing Desktop Deposit solution,

03:45:24  24  fair?

03:45:24  25       ANSWER:  Yes.

03:45:25  1          QUESTION:  Your presentation concludes that that's
03:45:27  2  not a commercially viable option for the vast number of
03:45:32  3  consumers who your mobile product would be addressed to,
03:45:35  4  fair?
03:45:35  5          ANSWER:  Yes, for the retail bank, the retail side
03:45:39  6  of the business, we looked at our desktop solution, and
03:45:42  7  because that used a scanner solution, we didn't feel that
03:45:45  8  was an appropriate use for sort of the consumer segment.
03:45:52  9  That was -- that was tailored to a very small portion of
03:45:55  10  the small business customer base that Wells Fargo had.
03:45:56  11          QUESTION:  So the answer to my question is yes?
03:45:58  12          ANSWER:  Yes.
03:45:58  13          QUESTION:  You did not even consider those as
03:46:01  14  potential commercially viable alternatives when you were
03:46:03  15  developing the mobile deposit product?
03:46:08  16          And as to the small business solution --
03:46:08  17          ANSWER:  Right.
03:46:10  18          QUESTION:  -- you did consider that, and you
03:46:12  19  concluded as well that that would not be commercially
03:46:15  20  viable for a number of reasons.
03:46:15  21          ANSWER:  Yeah.  We worked in the -- we worked in
03:46:19  22  partnership with the team that managed that product or
03:46:22  23  service.  So they had a lot of expertise in the area.  We
03:46:26  24  jointly agreed that it was not -- using a desktop scanner
03:46:30  25  solution was not viable for a large retail consumer base,

03:46:33   1   so, yes.

03:46:34   2          QUESTION:  You had a very particular criteria for

03:46:37   3   choosing the type of mobile deposit system that you were

03:46:40   4   going to use, fair?

03:46:41   5          ANSWER:  That's fair.

03:46:41   6          QUESTION:  You wanted one that was going to

03:46:43   7   provide the simplest experience possible, correct?

03:46:45   8          ANSWER:  That's correct.

03:46:45   9          QUESTION:  You wanted one that would provide the

03:46:47  10   high -- the lowest rate of exceptions and rejected checks,

03:46:51  11   correct?

03:46:51  12          ANSWER:  I -- yes.  I think generally speaking,

03:46:54  13   yes.

03:46:55  14          QUESTION:  You told your bosses that if they

03:47:05  15   adopted mobile check deposit, it was going to cost less for

03:47:08  16   deposits to occur than if someone used a teller or an ATM,

03:47:12  17   fair?

03:47:12  18          ANSWER:  What we said is the marginal costs of

03:47:16  19   taking a check in the mobile channel is definitely lower

03:47:19  20   than the ATM and the teller line.  But then -- but then

03:47:23  21   we -- when we spoke to internal teams, there was -- they --

03:47:27  22   there was discussion, and we -- there was no agreement

03:47:34  23   there would actually be cost savings to the bottom line

03:47:37  24   because you're not -- the teller is still in the branch,

03:47:40  25   right?  So that's why it's a channel optimization story,

03:47:43  1  that you're freeing up a teller time to do other things

03:47:46  2  versus taking the cost, right?  Because the cost in the

03:47:49  3  teller line is a cost to the human, right?  Their average

03:47:53  4  salary.  How long does it take, right?

03:47:57  5       QUESTION:  Who at Wells Fargo had knowledge of

03:47:59  6  USAA's remote deposit services before this litigation was

03:48:06  7  initiated?

03:48:07  8       ANSWER:  Right.  And so I think we define remote

03:48:11  9  deposit services from USAA both as desktop and their mobile

03:48:14 10  solutions.

03:48:14 11       QUESTION:  Okay.  Let's start there.

03:48:16 12       ANSWER:  What's the definition?  Is it both?

03:48:19 13       QUESTION:  Let's do this:  Who at Wells Fargo had

03:48:24 14  knowledge of USAA's mobile deposit solutions before the

03:48:29 15  initiation of this lawsuit?

03:48:30 16       ANSWER:  Right.  I would, and the people on my

03:48:32 17  team would have, as well, who worked on mobile deposit.  We

03:48:36 18  included it, right, in our strategy decks.  So it was

03:48:41 19  listed that USAA was in the market with a mobile remote

03:48:47 20  deposit solution, as well.

03:48:49 21       Do you want to list all the names?  There's a lot

03:48:51 22  of people.

03:48:52 23       QUESTION:  As Wells Fargo's corporate

03:48:53 24  representative, who were the individuals at Wells Fargo who

03:48:56 25  were involved in launching Wells's mobile deposit system

03:49:01  1  who were familiar with USAA's mobile deposit system?

03:49:03  2       ANSWER:  Who were aware that -- yeah, for mobile

03:49:07  3  deposit.  So, generally, it would be on the business side.

03:49:10  4  So it would be my team, Armin Ajami, Justin Mehta, some

03:49:14  5  folks.  Pankaj Parekh, the project manager, would know.

03:49:22  6  Arah Erickson would know.  Secil Watson would know.

03:49:25  7       And then we had other business teams involved.  So

03:49:28  8  the team that managed Desktop Deposit would also know.  So

03:49:31  9  that would be Amity Curry who's listed here.  Her boss at

03:49:37 10  the time was Margot Lockwood-Stein.  So she would be aware.

03:49:39 11  And her boss was Ken Dennett, as well.

03:49:42 12       So I think on the business side, that core team

03:49:45 13  would -- would definitely know.  And then I think then

03:49:52 14  everyone who received the socialization deck -- because we

03:49:56 15  did talk about who else was in the marketplace, whether

03:49:59 16  it's other banks or USAA.  So they would have seen that, as

03:50:01 17  well.

03:50:02 18       QUESTION:  Do this perhaps in a more efficient

03:50:04 19  way.  So I'm marking as the next exhibit in order,

03:50:08 20  Exhibit 8, which is a 2010 document entitled Mobile Remote

03:50:13 21  Deposit Capture Pilot, Version 0.4.

03:50:22 22       So this document discusses USAA's systems,

03:50:26 23  correct?

03:50:26 24       ANSWER:  This document provides a link to USAA's

03:50:37 25  mobile deposit product page.  This is publicly available

| | | |
|---|---|---|
| 03:50:41 | 1 | information, and also provides a link to a YouTube demo |
| 03:50:44 | 2 | video of the -- of the product that USAA -- |
| 03:50:46 | 3 | QUESTION:  So let's -- |
| 03:50:48 | 4 | ANSWER:  -- provided. |
| 03:50:49 | 5 | QUESTION:  -- let's try do some level setting. |
| 03:50:51 | 6 | ANSWER:  Sure. |
| 03:50:51 | 7 | QUESTION:  Mobile Remote Deposit Capture Pilot, |
| 03:50:56 | 8 | this document, Exhibit 8, is sort of the baseline of what |
| 03:50:59 | 9 | the goals were for mobile check deposit, fair? |
| 03:50:59 | 10 | ANSWER:  Fair, yeah. |
| 03:51:00 | 11 | QUESTION:  And in this sort of baseline document, |
| 03:51:03 | 12 | which is listing all these people, one of the references |
| 03:51:06 | 13 | that you cite to, you actually cite to USAA's |
| 03:51:11 | 14 | Deposit@Mobile product page -- |
| 03:51:11 | 15 | ANSWER:  Uh-huh. |
| 03:51:12 | 16 | QUESTION:  -- and you cite to USAA's demo video? |
| 03:51:16 | 17 | ANSWER:  Right. |
| 03:51:17 | 18 | QUESTION:  Correct? |
| 03:51:17 | 19 | ANSWER:  Correct. |
| 03:51:20 | 20 | QUESTION:  And so when you were planning from this |
| 03:51:24 | 21 | foundational stage about mobile check deposit, you folks |
| 03:51:27 | 22 | were not just aware of the USAA system, you were actually |
| 03:51:32 | 23 | sending to your teams the links for them to go look at the |
| 03:51:36 | 24 | USAA system as it was publicly available, fair? |
| 03:51:40 | 25 | ANSWER:  Yeah, publicly available. |

03:51:42   1              QUESTION:  That was a yes?

03:51:44   2              ANSWER:  Yes, yeah.

03:51:45   3              QUESTION:  Sir, the only commercially available

03:51:48   4    system that you point to in your foundation document from

03:51:52   5    2010, Exhibit 8, was the USAA system in the references

03:51:58   6    section, correct?

03:51:59   7              ANSWER:  Let me look at this document.  Because

03:52:03   8    this is the -- the timing of this document is after another

03:52:06   9    bank had gone nationwide with their rollout.  So I know we

03:52:11  10    were looking at other things in the marketplace in

03:52:13  11    addition, but perhaps in this document -- just let me see

03:52:17  12    if there's any reference to this other launch that was out

03:52:19  13    there at the time.

03:52:21  14              Right.  So, yes, in this document, USAA is the one

03:52:26  15    that's listed, as well as Mitek.  But USAA is the one

03:52:30  16    that's commercially -- I think that's your question, right?

03:52:33  17    Is commercially viable, yeah.

03:52:35  18              QUESTION:  So in July of 2010, you formally

03:52:37  19    launched a program for mobile check deposit at Wells Fargo,

03:52:41  20    fair?

03:52:41  21              ANSWER:  In July 2000 -- yes.

03:52:43  22              QUESTION:  And in August of 2010, when you're

03:52:45  23    sending around the foundational document, the only

03:52:48  24    commercially available mobile check deposit system that was

03:52:51  25    circulated to the team was links to the USAA system, fair?

03:52:56   1           ANSWER:  In this document, yes.

03:52:58   2           QUESTION:  Okay.  So we're trying to collect

03:53:05   3   information that Wells Fargo had on USAA's patent holdings

03:53:13   4   in the mobile remote deposit space.  And as the corporate

03:53:18   5   representative, you are pointing to the fact that USAA

03:53:20   6   announced that it had patent holdings in the mobile deposit

03:53:26   7   space and was starting a licensing program, correct?

03:53:28   8           ANSWER:  Yes.

03:53:29   9           QUESTION:  And Wells Fargo was aware of that

03:53:30  10   announcement, correct?

03:53:32  11           ANSWER:  Wells Fargo became aware of that

03:53:33  12   announcement at some point.  I don't -- yeah.

03:53:35  13           QUESTION:  It became aware of that announcement

03:53:37  14   before this lawsuit was filed, correct?

03:53:39  15           ANSWER:  Yes.

03:53:39  16           QUESTION:  Now, Wells Fargo also discussed with

03:54:00  17   USAA employees USAA's mobile system before Wells Fargo

03:54:06  18   launched its mobile system, correct?

03:54:09  19           ANSWER:  I'm sorry.  You're saying Wells Fargo

03:54:13  20   spoke to USAA employees about their system before we

03:54:17  21   launched in 2012?

03:54:23  22           QUESTION:  Yes.

03:54:23  23           ANSWER:  So we were aware -- yeah, I think we

03:54:26  24   attended conferences -- I attended conferences personally

03:54:29  25   where there were USAA representatives there who were

03:54:32  1  speaking about their mobile deposit capture solution, the

03:54:36  2  results, customer experience, et cetera.  These were

03:54:41  3  specifically like trade shows, conferences.

03:54:43  4       QUESTION:  Sure.

03:54:44  5       ANSWER:  And Jeff Dennis -- I think it's Neff

03:54:49  6  Hudson is another person -- were speaking at the time.  I

03:54:52  7  don't recall speaking to them directly, but I was in the

03:54:55  8  audience when they were speaking about their own solution.

03:54:58  9       QUESTION:  So as Wells Fargo's corporate

03:55:01  10  representative, you're testifying that on multiple

03:55:04  11  occasions before Wells Fargo launched its product, Wells

03:55:07  12  Fargo employees attended public presentations, industry

03:55:11  13  conferences, where USAA was discussing its Mobile@Deposit

03:55:18  14  product?

03:55:19  15       ANSWER:  Yes.

03:55:19  16       QUESTION:  In fact, by 2013, there was an

03:55:22  17  indication that bringing folks into the mobile banking

03:55:26  18  sphere, getting people to use your mobile app, which has

03:55:28  19  lots of different products on it, was a benefit, an

03:55:32  20  ecosystem benefit, fair?

03:55:36  21       ANSWER:  I would say it was a way to deepen the

03:55:39  22  relationship with customers.  So by having mobile features,

03:55:43  23  they would interact with the bank more often, a

03:55:46  24  self-service channel.  And so that could have additional

03:55:49  25  benefits.  We weren't exactly sure, but it was part of an

03:55:52  1   entire -- you call it "ecosystem."  Would probably say

03:55:56  2   probably value proposition the bank provides.  All the

03:55:59  3   digital services we have, including mobile and mobile

03:56:01  4   deposit, are part of that value proposition.

03:56:03  5          QUESTION:  And mobile check deposit is one of the

03:56:08  6   elements that makes you a leader in the technology sphere

03:56:13  7   in banking, fair?

03:56:15  8          ANSWER:  Yeah, I would say from a mobile -- yeah,

03:56:17  9   from a technology perspective, mobile deposit's one of

03:56:24 10   the -- it's not the only thing, but it's definitely one of

03:56:24 11   the features that makes Wells Fargo a leader.

03:56:26 12          QUESTION:  In fact, your presentations describe it

03:56:29 13   as table stakes, required to compete, fair?

03:56:34 14          ANSWER:  We evolve, yeah, but towards -- before we

03:56:37 15   launch, yes, we, had that point of view that it was

03:56:40 16   becoming table stakes, and mobile deposit was a feature

03:56:42 17   that customers were starting to demand.

03:56:45 18          QUESTION:  Well, you do have some things to base

03:56:47 19   it on.  For example, you know that mobile check deposit

03:56:53 20   significantly shifts users to the lowest cost deposit

03:57:02 21   channel available at the bank, fair?

03:57:04 22          ANSWER:  Right.  Mobile deposit takes deposits out

03:57:07 23   of other channels and moves to the self-service channel,

03:57:11 24   yes, yeah.

03:57:12 25          QUESTION:  Out of much more expensive other

03:57:14  1  channels, correct?

03:57:15  2       ANSWER:  Yes.

03:57:18  3       QUESTION:  And you also know that mobile check

03:57:24  4  deposit is a table stakes requirement in today's banking

03:57:28  5  environment, fair?

03:57:29  6       ANSWER:  Mobile deposit as a whole, yeah, it's now

03:57:33  7  been established definitely as table stakes.

03:57:37  8       QUESTION:  And you also know that mobile deposit

03:57:40  9  is a way of making your customers stickier and more engaged

03:57:45  10  with you, fair?

03:57:46  11       ANSWER:  I think mobile deposit is one of many

03:57:51  12  ways we try and engage customers.

03:57:52  13       QUESTION:  Sir, in your presentations to

03:57:55  14  executives in 2011 and 2013, you quoted customers who said

03:57:59  15  they're going to leave Wells Fargo --

03:58:00  16       ANSWER:  Sure.

03:58:01  17       QUESTION:  -- if you don't offer mobile check

03:58:04  18  deposit, correct?

03:58:04  19       ANSWER:  Correct.  And we get that all the time

03:58:07  20  for a lot of features.  We don't know if they actually

03:58:10  21  leave or not, but it was bubbling up as a service people

03:58:13  22  wanted to have.

03:58:14  23       QUESTION:  It was not bubbling up.  It was the

03:58:16  24  No. 1 pain point among your customers in the mobile space

03:58:19  25  when you launched the feature.

03:58:21   1          ANSWER:  Right.

03:58:24   2          (Videoclip ends.)

03:58:24   3          THE COURT:  Does that complete this deposition

03:58:26   4   witness?

03:58:26   5          MS. GLASSER:  It does, Your Honor.

03:58:28   6          THE COURT:  Does this complete Plaintiff's

03:58:30   7   rebuttal case?

03:58:31   8          MS. GLASSER:  It does, Your Honor.

03:58:32   9          THE COURT:  Does -- subject to final instructions

03:58:34  10   and final argument, does the Plaintiff rest and close?

03:58:37  11          MS. GLASSER:  We do.  Thank you, Your Honor.

03:58:39  12          THE COURT:  Subject to final instructions and

03:58:40  13   final arguments, does the Defendant rest and close?

03:58:43  14          MR. HILL:  Yes, Your Honor.  Also, subject to

03:58:45  15   matters under Rule 50 which we would like to note and

03:58:48  16   preserve for the record which we know the Court will take

03:58:51  17   up later, we do rest and close.

03:58:53  18          THE COURT:  All right.  Ladies and gentlemen of

03:58:54  19   the jury, that means you have heard all the evidence in

03:58:56  20   this case.

03:58:58  21          There are certain matters the Court has to take up

03:59:03  22   with counsel in preparation for me giving to you my final

03:59:07  23   instructions on the law, which you've heard referred to as

03:59:10  24   the Court's charge to the jury, followed by counsel's

03:59:15  25   closing arguments.  There are things that have to be taken

03:59:17  1   up between counsel and the Court before we're ready to

03:59:20  2   proceed to that.

03:59:21  3          The good news is that that means you get to go

03:59:25  4   home at 4:00 o'clock today.  The not bad news is I still

03:59:32  5   need you back in the morning, and I'd like to have you back

03:59:34  6   at 8:30 ready to go, as we've been doing all week.

03:59:37  7          If things go as I anticipate the rest of the

03:59:41  8   evening -- and we may be up here a good while, but that's

03:59:45  9   no concern of yours -- if things go as I anticipate, then

03:59:51  10  when you're back in the morning and I bring you back into

03:59:53  11  the courtroom first thing, I'll proceed to give you my

03:59:57  12  final instructions on the law that you're to apply in this

04:00:00  13  case.  And then counsel for Plaintiff and Defendant will

04:00:02  14  present their closing arguments.

04:00:04  15         And after you've heard my final instructions and

04:00:06  16  counsel's closing arguments, then I will direct you to

04:00:10  17  retire to the jury room and to deliberate on the verdict in

04:00:14  18  this case.  I will send back to you in the jury room eight

04:00:19  19  written copies of those final instructions I'm going to

04:00:21  20  give you.

04:00:22  21         So while I'm giving them to you orally in the

04:00:26  22  morning, you can make notes if you want to, but you are not

04:00:31  23  required to and I want you to know you'll have your own

04:00:34  24  individual written copies of those instructions to review

04:00:36  25  in the jury room while you deliberate.

04:00:38   1          I will also send back to the jury room with you
04:00:40   2    one clean copy of the verdict form with the questions in
04:00:44   3    there that you will be asked to answer on a unanimous
04:00:46   4    basis.
04:00:47   5          So with that, ladies and gentlemen, I'm going to
04:00:49   6    excuse you for the day.  Follow all the instructions I've
04:00:52   7    given you.  We are getting close to the end of the process.
04:00:56   8    It would be a travesty if any of my instructions were
04:01:01   9    violated and what we've done so far was placed in jeopardy.
04:01:04  10    Don't discuss the case with anyone.  Don't discuss the case
04:01:07  11    with each other.
04:01:08  12          Please leave your notebooks closed on the table in
04:01:10  13    the jury room.  Travel safely, and we'll see you in the
04:01:13  14    morning.
04:01:13  15          The jury is excused for the evening.
04:01:15  16          COURT SECURITY OFFICER:  All rise.
04:01:20  17          (Jury out.)
04:01:36  18          THE COURT:  Counsel, we will take a short recess,
04:01:38  19    after which I'll return to the bench, and I'll take up
04:01:43  20    motions either party wishes to offer under Rule 50(a) of
04:01:46  21    the Federal Rules of Civil Procedure.
04:01:50  22          After we've completed the 50(a) process, I've
04:01:54  23    heard your arguments, which I hope will be succinct, and
04:01:57  24    I've given you my rulings, then I will conduct an informal
04:02:01  25    charge conference in chambers.

04:02:02   1          I've been working on the latest submission of the

04:02:06   2    parties' proposed charge and verdict form.  I'm more

04:02:09   3    optimistic about us being able to get through that in a

04:02:09   4    reasonable time than I was yesterday.

04:02:12   5          After we've completed an informal charge

04:02:16   6    conference in which counsel -- any and all counsel who've

04:02:21   7    appeared in the case are welcome to participate in, then

04:02:23   8    I'll conduct a formal charge conference on the record.  And

04:02:25   9    having completed the formal charge conference, I expect to

04:02:28   10   recess at that point and reconvene in the morning at 8:30

04:02:31   11   and proceed, as I've indicated to the jury.

04:02:33   12         Those of you that will be presenting closing

04:02:36   13   arguments for your respective sides are not required to

04:02:40   14   participate in the informal or formal charge conference or

04:02:43   15   the 50(a) conference.  If you'd like to begin preparing or

04:02:47   16   continuing your already begun preparations for closing

04:02:51   17   arguments, as long as each side is adequately staffed,

04:02:54   18   which I have no concerns about, you're free to be elsewhere

04:02:57   19   and use that time for other purposes.

04:02:59   20         Are there questions before we recess?

04:03:02   21         MR. SHEASBY:  Your Honor, there is one question

04:03:04   22   which is, are we going to use the same procedure for

04:03:06   23   closings as last time, which is all slides must be

04:03:09   24   disclosed, including all trial transcript testimony that's

04:03:13   25   going to be used, so we can hash out objections as to

| | | |
|---|---|---|
| 04:03:17 | 1 | whether -- |
| 04:03:17 | 2 | THE COURT:  I don't want objections in the middle |
| 04:03:19 | 3 | of closing arguments.  As I often say to the jury, closing |
| 04:03:23 | 4 | arguments are, in my view, the most serious part of a very |
| 04:03:27 | 5 | serious process.  If they can be avoided, I want to find a |
| 04:03:31 | 6 | way to avoid them.  We'll talk about that after the recess. |
| 04:03:35 | 7 | MR. SHEASBY:  Thank you. |
| 04:03:36 | 8 | THE COURT:  Anything further? |
| 04:03:37 | 9 | Court stands in recess. |
| 04:03:40 | 10 | COURT SECURITY OFFICER:  All rise. |
| 04:03:40 | 11 | (Recess.) |
| 04:34:44 | 12 | (Jury out.) |
| 04:34:44 | 13 | COURT SECURITY OFFICER:  All rise. |
| 04:34:46 | 14 | THE COURT:  Be seated, please. |
| 04:38:10 | 15 | All right.  Counsel, we'll proceed at this time to |
| 04:38:24 | 16 | take up any motions either party wishes to offer under Rule |
| 04:38:31 | 17 | 50(a) of the Federal Rules of Civil Procedure. |
| 04:38:33 | 18 | What I'd like is whoever is going to speak for |
| 04:38:36 | 19 | Plaintiff and Defendant both go to the podium. |
| 04:38:39 | 20 | I'd next like to identify substantively or |
| 04:38:44 | 21 | topically the areas where each party believes there's an |
| 04:38:45 | 22 | appropriate motion under 50(a) to be offered. |
| 04:38:46 | 23 | After those have been identified, then I'll give |
| 04:38:49 | 24 | you directions as to how I want to receive argument. |
| 04:38:52 | 25 | So who's going to speak for Plaintiff? |

| | | |
|---|---|---|
| 04:38:55 | 1 | Mr. Rowles? |
| 04:38:58 | 2 | Who's going to speak for Defendant? |
| 04:39:01 | 3 | MR. MCCULLOUGH:  Your Honor, we're going to split |
| 04:39:03 | 4 | it on issues. |
| 04:39:03 | 5 | THE COURT:  Well, for right now, you're it. |
| 04:39:03 | 6 | MR. MCCULLOUGH:  Yes. |
| 04:39:03 | 7 | THE COURT:  All right.  What areas topically or |
| 04:39:05 | 8 | substantively does Plaintiff wish to urge the Court to |
| 04:39:09 | 9 | consider judgment as a matter of law under Rule 50(a)? |
| 04:39:13 | 10 | MR. ROWLES:  Thank you, Your Honor.  There are |
| 04:39:14 | 11 | five issues; one related to infringement, willful |
| 04:39:17 | 12 | infringement, anticipation, written description, and |
| 04:39:24 | 13 | damages. |
| 04:39:25 | 14 | THE COURT:  All right.  What's Defendant's |
| 04:39:37 | 15 | position on matters appropriate for judgment as a matter of |
| 04:39:40 | 16 | law under Rule 50(a)? |
| 04:39:42 | 17 | MR. MCCULLOUGH:  Your Honor, we'll be moving for |
| 04:39:45 | 18 | judgment as a matter of law on infringement, willful |
| 04:39:47 | 19 | infringement, written description, anticipation, and |
| 04:39:51 | 20 | damages. |
| 04:39:56 | 21 | THE COURT:  All right.  Anything else? |
| 04:39:58 | 22 | MR. MCCULLOUGH:  Your Honor -- |
| 04:40:00 | 23 | THE COURT:  Go ahead. |
| 04:40:01 | 24 | MR. MCCULLOUGH:  -- one other issue, if I may. |
| 04:40:05 | 25 | So we understand the Court's ruling in the prior |

04:40:07  1    case with respect to 101, that it is not a proper subject

04:40:07  2    for a 50(a) motion.  We assume the Court's ruling would be

04:40:11  3    the same here, but I just want to note to the extent --

04:40:13  4         THE COURT:  If you urge it, you'll get my ruling,

04:40:16  5    but in all likelihood it will be the same.

04:40:18  6         MR. MCCULLOUGH:  I would just like to note for the

04:40:20  7    record, to preserve and avoid any possible waiver argument,

04:40:25  8    we'll move under Section 101.

04:40:27  9         THE COURT:  As Rule 50(a) clearly says, if a party

04:40:41  10   has been fully heard on an issue during a jury trial and

04:40:45  11   the Court finds a reasonable jury would not have a legally

04:40:48  12   sufficient evidentiary basis to find for the party on that

04:40:51  13   issue, the Court may grant a motion for judgment as a

04:40:54  14   matter of law.

04:40:54  15        Patentability is not an issue that either party

04:40:58  16   has been fully heard on as a part of this jury trial.  The

04:41:00  17   Court's not going to entertain a motion under Rule 50(a)

04:41:04  18   related to Section 101 patentability.

04:41:06  19        Any request by Defendant to that -- in that regard

04:41:09  20   is denied.

04:41:10  21        MR. MCCULLOUGH:  Understand, Your Honor.

04:41:11  22        THE COURT:  All right.  Have I fully heard from

04:41:13  23   both Plaintiff and Defendant otherwise?

04:41:15  24        MR. ROWLES:  You have, Your Honor.

04:41:17  25        MR. MCCULLOUGH:  Yes, Your Honor.

04:41:17    1          THE COURT:  All right.  These appear to be mirror

04:41:21    2    image issues.  I see no reason why we can't combine

04:41:24    3    argument on each of these five categories and hear from

04:41:27    4    both parties at the same time.

04:41:28    5          Let's start with the issue of infringement.  I'll

04:41:32    6    hear first from Plaintiff, and then I'll hear from

04:41:34    7    Defendant.

04:41:36    8          And I understand there are several members of the

04:41:38    9    Defendant's trial team that will divide these categories

04:41:42   10    up.  That's no problem.  And when the Court takes up an

04:41:46   11    issue that you've been assigned, simply step to the podium

04:41:50   12    and participate in the argument.

04:41:51   13          MR. MCCULLOUGH:  Thank you, Your Honor.

04:41:52   14          THE COURT:  What's Plaintiff's argument -- brief

04:41:54   15    argument on infringement under Rule 50(a)?

04:41:57   16          MR. ROWLES:  Thank you, Your Honor.

04:41:58   17          Plaintiff moves for -- for judgment as a matter of

04:42:00   18    law that no reasonable jury could find that Defendant has

04:42:04   19    not literally infringed Claims 12, 13, 14, 20, 22, and 30

04:42:11   20    of the '681 patent, and Claims 1, 3, 11 through 14, and 22

04:42:17   21    of the '605 patent.

04:42:19   22          Wells Fargo only disputes whether the Wells Fargo

04:42:23   23    Mobile Deposit system practices one element of the asserted

04:42:26   24    claims of the '681 patent.

04:42:28   25          And Wells Fargo does not dispute that the Wells

04:42:32  1   Fargo Mobile Deposit system practices every single element
04:42:34  2   of the asserted claims of the '605 patent.
04:42:39  3            The testimony of Professor Conte has shown that
04:42:41  4   the Wells Fargo Mobile Deposit system practices each and
04:42:44  5   every element of the asserted claims, including the
04:42:47  6   disputed element for the '681 patent.  No reasonable jury
04:42:50  7   could conclude that the only element disputed by Wells
04:42:52  8   Fargo is not literally present in the accused system.
04:42:55  9            The testimony of Professor Conte has also shown
04:42:58  10  that Wells Fargo makes the Wells Fargo Mobile Deposit
04:43:02  11  system accused of infringement and uses it in an infringing
04:43:05  12  manner.
04:43:07  13           Therefore, USAA respectfully requests that the
04:43:09  14  Court enter judgment in its favor on the issue of
04:43:12  15  infringement and hold the Defendants have infringed the
04:43:15  16  asserted claims of the '681 patent and the '605 patent.
04:43:19  17           THE COURT:  All right.  Let me hear from Defendant
04:43:23  18  on this same issue.
04:43:25  19           MR. MCCULLOUGH:  Your Honor, Defendant moves for
04:43:27  20  judgment as a matter of law because there is not
04:43:29  21  substantial evidence of direct infringement of any asserted
04:43:34  22  claims.
04:43:34  23           First, for the '681 patent, there is not
04:43:36  24  substantial evidence that the accused system meets the
04:43:39  25  confirming limitation which appears in each claim.  The

04:43:43  1  claims require and all experts agree that the confirming

04:43:47  2  step is performed by the mobile device.

04:43:49  3       It is also -- each of the confirming steps also

04:43:52  4  recite that OCR performed on the check amount.  It is

04:43:55  5  undisputed that OCR, the amount, only occurs at the server.

04:44:00  6       Dr. Villasenor testified as such, and Dr. Conte

04:44:03  7  did not provide any contrary evidence.  Because of that,

04:44:08  8  there's not substantial evidence to support that the

04:44:10  9  confirming limitation is met.

04:44:11  10      Furthermore, Dr. Conte admitted that the only

04:44:14  11  device that is deciding whether or not the check deposit

04:44:18  12  can go forward is the server.  Thus, this is -- the server

04:44:22  13  is the element that is confirming the deposit can go

04:44:26  14  forward and not the mobile device.  There is no evidence in

04:44:28  15  the record to the contrary.

04:44:30  16      Dr. Villasenor's testimony is consistent on this

04:44:37  17  respect.  And thus, there is not substantial evidence to

04:44:37  18  support that the accused product meets the confirming

04:44:39  19  limitation of each of the '681 patent claims.

04:44:44  20      Further --

04:44:45  21      THE COURT:  All right.  Go ahead.

04:44:46  22      MR. MCCULLOUGH:  Furthermore, we would move for

04:44:49  23  judgment as a matter of law because there is not

04:44:50  24  substantial evidence to support that Wells Fargo is liable

04:44:53  25  for infringement of the system claims.

04:44:57   1        USAA has not presented or proffered sufficient or

04:45:00   2   substantial evidence to support a finding that Wells Fargo

04:45:02   3   is liable under the doctrine of divided infringement.

04:45:06   4        Each claim that USAA has asserted is directed to a

04:45:10   5   system.  And for each claim, Dr. Conte's infringement

04:45:12   6   analysis accuses the system involving steps performed both

04:45:16   7   on the user's device, the smartphone, as well as steps

04:45:20   8   occurring on Wells Fargo's servers.

04:45:22   9        There is no evidence that Wells Fargo makes,

04:45:25  10   sells, offers to sell, imports, or provides smartphones,

04:45:29  11   and there's evidence they do not.

04:45:31  12        Dr. Conte did not testify or offer evidence that

04:45:35  13   Wells Fargo sells, offers to sell, or imports the claimed

04:45:39  14   inventions.  And, thus, there's no evidence to support a

04:45:42  15   verdict of infringement under those theories.

04:45:44  16        With respect to making the invention, no

04:45:47  17   reasonable jury could find that Wells Fargo makes the

04:45:49  18   accused system because there is no evidence that Wells

04:45:52  19   Fargo combines all of the claim elements as required by

04:45:58  20   Centillion.

04:45:58  21        Dr. Conte's testimony on this point is

04:46:00  22   insufficient.  Every asserted claim recites either a mobile

04:46:04  23   device or a portable device, and Dr. Conte did not testify

04:46:07  24   or present evidence that Wells Fargo combines the mobile

04:46:10  25   device with the system.

04:46:10   1          As to infringement by use of the accused system,

04:46:14   2   Dr. Conte did not testify or provide sufficient evidence

04:46:17   3   that Wells Fargo uses the claimed invention.  Centillion

04:46:23   4   requires that the direct infringer both control the system

04:46:26   5   as a whole and benefit from each and every element of the

04:46:28   6   claimed system, as interpreted by the Federal Circuit in

04:46:31   7   Intellectual Ventures versus Motorola.

04:46:33   8          Dr. Conte admitted he performs no

04:46:38   9   element-by-element analysis of benefits of the claims.

04:46:41  10   USAA's only other expert, Mr. Weinstein, admitted that he

04:46:44  11   valued features not in the claims.

04:46:47  12          USAA has adduced no other -- no other evidence of

04:46:50  13   benefits on an element-by-element basis.

04:46:53  14          Benefit from the system as a whole is not enough

04:46:56  15   under the law.  Again, that's the Intellectual Ventures

04:46:59  16   case.  And, thus, there is not substantial evidence to

04:47:03  17   support a finding of infringement.

04:47:06  18          Finally, one additional point.  Even assuming the

04:47:11  19   Akamai standard applies, as USAA has argued at certain

04:47:16  20   points in this case, the evidence would be insufficient to

04:47:19  21   support a finding of direction or control by Wells Fargo.

04:47:21  22          THE COURT:  All right.  Well, I've heard argument

04:47:23  23   from both Plaintiff and Defendant on these competing

04:47:26  24   motions under Rule 50(a).

04:47:27  25          I will note for the record, the Court does not

04:47:33   1   view the appropriate standard as substantial evidence, but

04:47:37   2   no legally sufficient basis -- evidentiary basis upon which

04:47:41   3   the jury could rule otherwise.

04:47:43   4        Nonetheless, having heard the argument from both

04:47:46   5   sides, Plaintiff's motion for judgment as a matter of law

04:47:54   6   on the issue of infringement is denied, as is Defendant's

04:47:54   7   motion for judgment as a matter of law regarding

04:47:55   8   infringement.

04:47:56   9        I'll next take up the parties' competing motions

04:48:02   10  under 50(a) regarding the issue of willful infringement or

04:48:06   11  willfulness.

04:48:06   12        Let me hear from Defendant first this time, and

04:48:08   13  then Plaintiff.

04:48:09   14        MS. MARCOM:  Good afternoon, Your Honor.

04:48:13   15        THE COURT:  Let me ask counsel to identify

04:48:15   16  themselves on the record since most of you probably haven't

04:48:17   17  participated in the trial so far.

04:48:19   18        MS. MARCOM:  Kate Marcom for Defendant, Wells

04:48:22   19  Fargo.

04:48:22   20        THE COURT:  At least participated on the record.

04:48:24   21        Go ahead.

04:48:25   22        MS. MARCOM:  Judgment as a matter of law for

04:48:27   23  Defendant is warranted on Plaintiff's claims of willful --

04:48:30   24  for willful infringement of the '605 and '681 patents

04:48:33   25  because there is no legally sufficient basis on which the

04:48:38   1   factfinder could conclude that Defendant willfully

04:48:41   2   infringed.

04:48:41   3          USAA has failed to establish that Wells Fargo knew

04:48:45   4   of the '605 and '681 patents prior to the filing date of

04:48:49   5   the suit.

04:48:50   6          USAA adduced no evidence at trial relating to

04:48:53   7   alleged knowledge of the '605 and '68 -- '681 patent

04:49:00   8   specifically.

04:49:01   9          USAA filed the asserted patents with

04:49:04  10   non-publication requests and, thus, the claims of the

04:49:07  11   asserted patents were not in the public domain or available

04:49:10  12   to Wells Fargo until they issued.  And there was no

04:49:11  13   evidence adduced at trial that Wells Fargo was aware of the

04:49:13  14   applications for the '605 and '681 patents prior to suit.

04:49:16  15          Nor was there evidence adduced that Wells Fargo

04:49:19  16   was aware of the specifications of the parent patents or

04:49:23  17   patent families, including the '227 or '200 patent prior to

04:49:28  18   suit.

04:49:29  19          Additionally, judgment as a matter of law is

04:49:32  20   warranted because USAA has failed to establish any

04:49:34  21   egregious conduct that would support a finding of willful

04:49:38  22   infringement, let alone conduct that is malicious,

04:49:41  23   deliberate, in bad faith, or that of a pirate.

04:49:43  24          The only evidence of alleged willfulness consists

04:49:47  25   of documents showing that Wells Fargo had access to

04:49:49  1   publicly available USAA -- publicly available USAA

04:49:53  2   application.  And some designers may have analyzed publicly

04:49:58  3   available USAA materials, but the Federal Circuit has held

04:50:01  4   that such evidence is not sufficient to establish knowledge

04:50:03  5   for willfulness purposes.

04:50:05  6        Additionally, Wells Fargo contends that there is

04:50:07  7   not evidence to support a finding that Wells Fargo copied

04:50:12  8   any elements of USAA's products specifically related to the

04:50:15  9   patented features -- features of the issued claims.

04:50:17  10        Additionally, even under an erroneous -- even

04:50:25  11   under an -- excuse me, Your Honor.  Even under an erroneous

04:50:32  12   willfulness standard, the evidence is insufficient to show

04:50:34  13   that Wells Fargo engaged in reckless behavior, was

04:50:38  14   deliberately indifferent, or that it reasonably should have

04:50:42  15   known it was infringing.

04:50:42  16        Additionally, there was no evidence adduced at

04:50:43  17   trial to show that Wells Fargo was willfully blind.

04:50:46  18        Accordingly, Defendant moves for judgment as a

04:50:48  19   matter of law on Plaintiff's claims for willful

04:50:50  20   infringement of the '605 and '681 patents.

04:50:54  21        THE COURT:  All right.  Let me hear competing

04:50:56  22   argument from Plaintiff on this issue.

04:50:58  23        MR. ROWLES:  Thank you, Your Honor.

04:51:01  24        Plaintiff moves for judgment as a matter of law

04:51:03  25   that no reasonable jury could find that Defendant has not

04:51:06  1  willfully infringed the asserted claims of the '681 and

04:51:11  2  '605 patents.

04:51:12  3          In particular, the testimony of

04:51:15  4  Ms. Lockwood-Stein, Mr. Hecht, and Mr. Ajami, as well as --

04:51:18  5  as well as Plaintiff's Exhibits PX-8, 14, and 1182, have

04:51:24  6  shown that Wells Fargo acted willfully when it infringed

04:51:26  7  the asserted claims, including by examining USAA's system

04:51:30  8  which USAA's employees testified practice claims of the

04:51:35  9  asserted patents.

04:51:36  10          Reviewing USAA's marking page, being aware that

04:51:40  11  USAA filed for patents in the MRDC space as early as 2010,

04:51:45  12  choosing affirmatively not to investigate USAA's patents,

04:51:48  13  leveraging design learnings from USAA when creating their

04:51:52  14  own infringing system, and being aware, at least as of the

04:51:56  15  filing of this complaint, of the '605 and '681 patents, no

04:51:59  16  reasonable jury could conclude, based on the evidence

04:52:02  17  adduced at trial, that Wells Fargo did not willfully

04:52:05  18  infringe the patents-in-suit and at least one asserted

04:52:11  19  claim.

04:52:12  20          Therefore, USAA respectfully requests that the

04:52:13  21  Court enter judgment in its favor as a matter of law on the

04:52:21  22  issue of willful infringement.

04:52:22  23          THE COURT:  All right.  Having heard the competing

04:52:24  24  arguments from the parties, the Defendant's motion with

04:52:24  25  regard to the issue of willfulness, seeking judgment as a

04:52:29   1   matter of law under Rule 50(a), is denied.

04:52:31   2        The Plaintiff's motion on the same subject,

04:52:33   3   seeking a different result, as a -- based on a judgment as

04:52:38   4   a matter of law under Rule 50(a) is also denied.

04:52:41   5        I'll next hear competing argument on the issue of

04:52:44   6   anticipation, and I'll hear first from Plaintiff's counsel.

04:52:49   7        MR. ROWLES:  Thank you, Your Honor.

04:52:51   8        On the issue of anticipation, Plaintiff moves for

04:52:54   9   judgment as a matter of law that each of the asserted

04:52:58  10   claims of the '681 patent and the '605 patent are not

04:53:02  11   invalid on the ground of anticipation.

04:53:04  12        No reasonable jury could find, based on the

04:53:07  13   evidence presented at trial, that Wells Fargo has proved by

04:53:11  14   clear and convincing evidence that the claims -- the

04:53:13  15   asserted claims of the '605 patent are anticipated by the

04:53:18  16   '227 patent or that the claims of the '681 patent are

04:53:21  17   anticipated by the '200 patent.

04:53:25  18        Anticipation requires the presence in a single

04:53:27  19   prior art disclosure of all elements of a claimed invention

04:53:30  20   arranged as in the claim.  Conclusory expert testimony is

04:53:33  21   insufficient to satisfy Defendant's burden to prove

04:53:36  22   anticipation.

04:53:38  23        Wells Fargo's expert, Mr. Saffici, failed to

04:53:40  24   engage with the claims and stated his opinions regarding

04:53:44  25   anticipation in a conclusory manner without supporting

04:53:47  1   analysis.  This type of general conclusory testimony does

04:53:50  2   not suffice as a matter law as evidence of invalidity.

04:53:55  3           As such, there is legally insufficient evidence

04:53:58  4   upon which a reasonable jury could find the asserted claims

04:54:02  5   of the '605 and '681 patents anticipated, and judgment must

04:54:08  6   be granted in USAA's favor.

04:54:10  7           THE COURT:  All right.  Let me hear argument from

04:54:12  8   Defendant on this subject.

04:54:14  9           MR. MCCULLOUGH:  Thank you, Your Honor.  Matt

04:54:15  10  McCullough for Wells Fargo.

04:54:16  11          Defendant moves for judgment as a matter of law on

04:54:19  12  anticipation.  No reasonable jury could find that the '227

04:54:24  13  and '200 specifications provide sufficient written

04:54:27  14  description to reasonably convey to a person skilled in the

04:54:32  15  art that the inventors had possession of the claimed

04:54:34  16  subject matter at the time of filing and, thus, supports

04:54:36  17  the full scope of the asserted '605 and '681 patent claims,

04:54:40  18  respectively.

04:54:41  19          For the '605 patent, Mr. Saffici testified that

04:54:46  20  Claims 1, 3, and 11 broadly recite a portable device and

04:54:49  21  digital camera without requiring any particular structural

04:54:52  22  relationship between them.  Thus, the device and camera

04:54:55  23  could be separate or together.

04:54:56  24          Claims 12, 13, 14, and 22 of the '605 patent

04:55:02  25  similarly recite a mobile device with a digital camera

04:55:07  1  without requiring any particular structural relationship.

04:55:08  2  Thus, the mobile device and camera could be separate or

04:55:11  3  together.

04:55:11  4         The '227 patent specification would be understood

04:55:14  5  by a person of ordinary skill in the art as only disclosing

04:55:17  6  separate computing devices in cameras.  There is no

04:55:20  7  disclosure of an integrated computing device with a camera.

04:55:24  8         None of USAA's cited evidence provides written

04:55:27  9  description support sufficient to support the claimed

04:55:30  10  priority date.  The disclosure of PDAs is not linked to

04:55:34  11  check deposit, nor does it describe having an integrated

04:55:37  12  camera.

04:55:38  13         The phrase "laptop configuration" simply refers to

04:55:41  14  a well-known form factor for a computer, but does not

04:55:44  15  support the claims.

04:55:45  16         The file history does not include any substantive

04:55:48  17  analysis of written description or comparison of the claims

04:55:51  18  to the specification.

04:55:52  19         As such, there is no objective evidence that the

04:55:55  20  Patent Office considered, or much less decided, the written

04:55:58  21  description defense.

04:55:59  22         As to the remaining evidence, USAA has looked

04:56:04  23  outside of the specification, but evidence outside the

04:56:08  24  specification cannot support that the claims have proper

04:56:10  25  written description support and are entitled to their

04:56:12  1    claimed priority date.

04:56:14  2           For the '681 patent, Mr. Saffici testified that

04:56:18  3    Claims 12, 13, 14, 20, and 22 broadly recite a mobile

04:56:23  4    device with a digital camera without requiring a particular

04:56:27  5    structural relationship.  Thus, the mobile device and

04:56:29  6    digital camera can be separate or together.

04:56:31  7           Claim 30 broadly recites a mobile device and a

04:56:36  8    digital camera without requiring a particular structural

04:56:39  9    relationship.  Thus, the mobile device and digital camera

04:56:41  10   could be separate or together.

04:56:43  11          The '200 patent specification, similar to the '227

04:56:47  12   specification, would be understood by a person of ordinary

04:56:49  13   skill in the art as only disclosing separate computing

04:56:53  14   devices and cameras.  There's no disclosure of integrated

04:56:57  15   computing devices.

04:56:58  16          USAA's cited evidence for the '681 patent is

04:57:00  17   substantially the same as for the '605 patent, except that

04:57:04  18   PDAs are not mentioned in the specification of the '681

04:57:06  19   patent.

04:57:06  20          Based on this analysis, no reasonable jury could

04:57:12  21   find that the asserted claims are entitled to claim

04:57:14  22   priority to any date earlier than July 28th, 2017, which is

04:57:18  23   the filing date of both the '605 and '681 patents.  Under

04:57:22  24   the 2017 priority date, the claims are anticipated and

04:57:26  25   Defendant is entitled to judgment as a matter of law.

04:57:30  1        Mr. Saffici testified that every element of the

04:57:33  2   '605 patent claims -- asserted claims are anticipated by

04:57:36  3   the Oakes '227 reference.

04:57:36  4        Mr. Saffici also testified that every element of

04:57:41  5   the '681 patent asserted claims are anticipated by the

04:57:43  6   Oakes '200 reference.

04:57:44  7        USAA did not dispute this or accuse any contrary

04:57:49  8   expert opinion.  As such, the claims are anticipated.

04:57:51  9        Additionally, the claims are anticipated for a

04:57:54  10  separate, independent reason.  To the extent the jury finds

04:57:58  11  infringement, Dr. Conte performed an element-by-element

04:58:01  12  analysis of the accused product and stated that his

04:58:04  13  analysis applied to every version of the Wells Fargo

04:58:06  14  product dating back to July 2014 on Android and 2014 on

04:58:11  15  iPhone.

04:58:11  16        Thus, if the jury finds infringement, it would

04:58:14  17  have necessarily found that the Wells Fargo product, which

04:58:17  18  would indisputably be prior art under the 2017 priority

04:58:21  19  date, teaches each and every limitation of the asserted

04:58:24  20  claims and, thus, would anticipate the claims.

04:58:27  21        THE COURT:  Let me ask you this, Mr. McCullough:

04:58:30  22  Given the argument that you've given me on anticipation,

04:58:33  23  you've covered a fair amount of what would otherwise be

04:58:36  24  part of the written description defense.

04:58:38  25        Do you have additional argument on written

04:58:40   1    description?

04:58:40   2              MR. MCCULLOUGH:  I have, I think, two extra

04:58:44   3    sentences.

04:58:45   4              THE COURT:  Why don't you give them to me now.

04:58:48   5              MR. MCCULLOUGH:  I will.  Defendant moves for

04:58:49   6    judgment as a matter of law for written description because

04:58:52   7    the specification of the '605 patent is identical to the

04:58:55   8    specification of the '227 patent.

04:58:58   9              The specification -- or the claims of the '605

04:59:00  10    patent are also not supported by the '605 specification and

04:59:04  11    would be invalid for failing written description.

04:59:07  12              And because the specification of the '681 patent

04:59:09  13    is identical to the '200 patent to which it claims

04:59:14  14    priority, the claims of the '681 patent are also not

04:59:16  15    supported by the specification and, thus, would be invalid

04:59:18  16    for failing the written description requirement.

04:59:21  17              THE COURT:  All right.  Thank you.

04:59:21  18              Mr. Rowles, do you have additional argument

04:59:24  19    related specifically to the written description issue?

04:59:27  20              MR. ROWLES:  I do, Your Honor.

04:59:28  21              THE COURT:  Please give me that at this time.

04:59:30  22              MR. ROWLES:  With respect to written description,

04:59:32  23    Plaintiff submits that no reasonable jury could find, based

04:59:36  24    on the evidence presented, that Wells Fargo has proved by

04:59:38  25    clear and convincing evidence either that the asserted

04:59:43  1  claims lack adequate written description and are invalid

04:59:46  2  under 35 U.S.C. Section 112 or are not entitled to claim

04:59:52  3  priority back to the October 31st, 2006, priority date for

04:59:55  4  which they claim, for two reasons.

04:59:57  5      First, the Federal Circuit has held that

05:00:02  6  originally filed claims are part of the original patent

05:00:04  7  disclosure for the purposes of written description.  The

05:00:07  8  original claims filed with the July 2017 patent application

05:00:10  9  that resulted in the '681 patent, which are in evidence at

05:00:13  10  Plaintiff's Exhibit 1265, beginning at Page 21, are

05:00:17  11  virtually identical to the issued claims of the '681

05:00:20  12  patent.

05:00:21  13      Similarly, the original claims filed with the July

05:00:25  14  2017 patent application that resulted in the '605 patent

05:00:27  15  which are in the record at Plaintiff's Exhibit 1266

05:00:31  16  beginning at Page 23, are virtually identical to the issued

05:00:35  17  claims of the '605 patent.

05:00:37  18      Wells Fargo has not introduced any evidence that

05:00:40  19  the originally filed claims of the '605 or '681 patents

05:00:43  20  failed to provide adequate written support for the claims

05:00:46  21  that issued and has, thus, failed to satisfy its burden to

05:00:49  22  prove invalidity under 35 U.S.C. Section 112.

05:00:53  23      Second, Wells Fargo's theory that the asserted

05:00:57  24  claims lack written description support or -- cannot claim

05:01:01  25  priority back to the 2006 filing date because one

05:01:04   1   particular species within the scope of the claims is not

05:01:07   2   expressly recited in the specification cannot support a

05:01:10   3   finding of invalidity as a matter of law.

05:01:12   4          Wells Fargo's only invalidity argument presented

05:01:15   5   at trial is that the claims lack written description

05:01:18   6   support because one particular species -- that is, a mobile

05:01:21   7   or portable device with a physically integrated digital

05:01:24   8   camera -- was not expressly recited in the specification.

05:01:28   9          It is settled law that a claim may be broader than

05:01:30  10   the specific embodiment disclosed in a specification, and a

05:01:35  11   patentee is not required to disclose every possible

05:01:39  12   embodiment of the claims.

05:01:40  13          The Federal Circuit has held that a claim does not

05:01:42  14   lack written description support when the difference

05:01:44  15   between an undisclosed embodiment covered by the claims and

05:01:47  16   an expressly disclosed embodiment in the specification is

05:01:50  17   not critical or important to the invention.

05:01:52  18          Wells Fargo has not introduced evidence upon which

05:01:56  19   a reasonable jury could find that this difference is

05:01:58  20   critical or important in any way.  Therefore, USAA requests

05:02:03  21   that the Court enter judgment as a matter of law, both that

05:02:07  22   Wells Fargo has not proved a lack of written description

05:02:11  23   under 35 U.S.C. Section 112 and, as well, has not

05:02:16  24   established that the claims are not entitled to claim

05:02:18  25   priority back to the claimed priority date of October 31st,

05:02:23   1    2006.

05:02:24   2         THE COURT:  All right.  Well, with regard to

05:02:26   3    Defendant's motions that the Court grant judgment as a

05:02:29   4    matter of law under Rule 50(a) finding that it has not --

05:02:38   5    excuse me, finding that the patents-in-suit are invalid

05:02:41   6    based upon anticipation, and/or in the alternative are

05:02:51   7    invalid based on a written description defense, those

05:02:53   8    motions are denied.

05:02:54   9         With regard to Plaintiff's motions under

05:02:56   10   Rule 50(a) that they are entitled to judgment as a matter

05:02:58   11   of law that the patents-in-suit are not anticipated and

05:03:00   12   valid for either anticipation or written description, those

05:03:06   13   motions are similarly denied.

05:03:08   14        That leaves us with the issue of damages, counsel.

05:03:11   15   Let me hear from Defendant on this first.

05:03:16   16        MR. UNDERWOOD:  Thank you, Your Honor.  Good

05:03:22   17   afternoon.  Travis Underwood for the Defendant.

05:03:25   18        THE COURT:  Good afternoon, Mr. Underwood.  Please

05:03:27   19   proceed.

05:03:28   20        MR. UNDERWOOD:  Judgment as a matter of law for

05:03:30   21   Defendant is warranted on damages because no reasonable

05:03:33   22   jury would have a legally sufficient evidentiary basis to

05:03:37   23   award the damages sought by Plaintiff.

05:03:39   24        Section 284 of the Patent Act entitles a patentee

05:03:44   25   to damages for infringement in an amount no less than a

05:03:48  1    reasonable royalty for the use made of the invention by the

05:03:52  2    infringer.

05:03:53  3         Mr. Weinstein, the Plaintiff's damages expert,

05:03:57  4    admitted that he had based his damages calculations on

05:04:01  5    fraud prevention benefits that are not tethered to or

05:04:05  6    recited in the claims.

05:04:07  7         Mr. Weinstein also erroneously attributed all of

05:04:10  8    the cost savings of using mobile remote deposit capture

05:04:16  9    over ATMs to the asserted patents without any

05:04:19  10   explanation -- that is, there was no apportionment of the

05:04:22  11   cost savings to the asserted patents.

05:04:23  12        The fact that the asserted patents in this case

05:04:27  13   cannot be responsible for 100 percent of the value of

05:04:31  14   mobile remote deposit capture is clear in light of the fact

05:04:34  15   that Mr. Weinstein already attributed 40 percent of mobile

05:04:40  16   remote deposit capture's value to a different set of

05:04:42  17   patents.  Thus, at least 40 percent of the value should be

05:04:46  18   excluded in a proper apportionment analysis.

05:04:49  19        Mr. Weinstein cannot avoid apportionment just

05:04:53  20   because he used the cost savings approach for a system

05:04:56  21   claim.

05:04:57  22        The Supreme Court has made clear that

05:05:00  23   patentholders who seek damages must in every case give

05:05:04  24   evidence tending to separate or apportion the Defendant's

05:05:08  25   profits and the patentee's damages between the patented

05:05:10   1   feature and the unpatented feature.  It is not enough to

05:05:13   2   compare the cost savings between using ATMs and mobile

05:05:18   3   remote deposit capture.

05:05:18   4          Also, as an independent problem here, there are

05:05:22   5   both -- they are both conventional -- excuse me,

05:05:26   6   Your Honor.  There are both conventional and non-patented

05:05:29   7   features in mobile remote deposit capture.

05:05:32   8          Mr. Weinstein was required to specifically tie the

05:05:35   9   cost savings to the incremental improvement of the asserted

05:05:39  10   patents, not mobile remote deposit capture as a whole.

05:05:41  11          Mr. -- additionally, Mr. Weinstein's use of Wells

05:05:45  12   Fargo's 1.2 billion in profit number from mobile remote

05:05:50  13   deposit capture was a violation of the entire market value

05:05:54  14   rule and was used only to skew the damages horizon.

05:05:58  15          And, finally, Mr. Weinstein's 86 percent versus 14

05:06:01  16   percent split is plucked from thin air and is unsupported

05:06:06  17   by the evidence.

05:06:06  18          And for those reasons, Your Honor, Defendant

05:06:08  19   submits that it is entitled to judgment as a matter of law

05:06:11  20   because there is no legally sufficient evidentiary basis to

05:06:13  21   award damages sought by Plaintiff.

05:06:16  22          THE COURT:  All right.  Let me hear argument

05:06:18  23   regarding this same issue from the Plaintiff, please.

05:06:22  24          MR. ROWLES:  Thank you, Your Honor.

05:06:22  25          And if it is amenable to the Court, I can respond

| | | |
|---|---|---|
| 05:06:28 | 1 | to the motion by Defendant, and then Plaintiff's motion is |
| 05:06:31 | 2 | on a topic that is not quite all square. |
| 05:06:35 | 3 | THE COURT:  I'm happy to hear whatever arguments |
| 05:06:37 | 4 | you think are necessary and appropriate. |
| 05:06:40 | 5 | MR. ROWLES:  Understood, Your Honor. |
| 05:06:41 | 6 | THE COURT:  As long as they're reasonably short. |
| 05:06:43 | 7 | MR. ROWLES:  Well, first, Your Honor, we -- we |
| 05:06:45 | 8 | oppose Defendant's motion.  USAA has presented evidence |
| 05:06:48 | 9 | upon which no reasonable jury could find damages in favor |
| 05:06:52 | 10 | of USAA. |
| 05:06:53 | 11 | Mr. Weinstein testified about his analysis of |
| 05:06:55 | 12 | various benefits obtained by Wells Fargo in connection with |
| 05:06:59 | 13 | its use of the infringing MRDC system from August 2018 |
| 05:07:03 | 14 | through the date of trial. |
| 05:07:04 | 15 | These benefits include increased profits, cost |
| 05:07:07 | 16 | savings, as well as benefits related to fraud prevention. |
| 05:07:12 | 17 | USAA also presented testimony from Defendant, as |
| 05:07:14 | 18 | well as Defendant's own documents, showing various benefits |
| 05:07:17 | 19 | associated with their use of the infringing product. |
| 05:07:20 | 20 | Mr. Weinstein supported his testimony with an |
| 05:07:24 | 21 | apportionment analysis, and calculated the contributions |
| 05:07:28 | 22 | specifically attributable to the patents-in-suit.  This |
| 05:07:37 | 23 | includes testimony that Wells Fargo saved considerable |
| 05:07:37 | 24 | costs based on its customers' use of the infringing MRDC |
| 05:07:39 | 25 | system, as opposed to other channels. |

05:07:41   1          Mr. Weinstein also testified that at the
05:07:43   2  hypothetical negotiation, the parties would consider a
05:07:45   3  range of benefits associated with reducing fraud, as well
05:07:48   4  as other points of input to that process, including
05:07:51   5  benefits associated with MRDC generally.
05:07:53   6          Wells Fargo's experts both admitted that the
05:07:57   7  asserted claims cover MRDC generally.  The jury is entitled
05:08:00   8  to weigh the evidence USAA has presented and, therefore,
05:08:03   9  USAA submits that Wells Fargo's motion for judgment as a
05:08:08  10  matter of law as to damages should be denied.
05:08:09  11          Additionally, Your Honor, there is a request from
05:08:14  12  Defendant for a verdict form that asks the jury to return a
05:08:17  13  verdict in an amount of a lump-sum damages figure.
05:08:20  14          Should that verdict -- verdict form be submitted
05:08:23  15  to the jury, USAA submits that, based on the evidence
05:08:27  16  adduced at trial, including Mr. Gerardi's admission that he
05:08:29  17  did not consider any future profits or future benefits
05:08:35  18  attributable to the patents and limited his damages
05:08:38  19  analysis to the period from their issuance to the date of
05:08:42  20  trial, there would be nothing upon which a reasonable jury
05:08:45  21  could find for a lump-sum damages award that would -- to
05:08:50  22  find that a lump-sum damages award would adequately
05:08:53  23  compensate USAA for Wells Fargo's infringement in this
05:08:55  24  case.
05:08:57  25          THE COURT:  All right, counsel.  Thank you.

05:09:00   1          Do you anything further on this, Mr. Underwood?

05:09:02   2          MR. UNDERWOOD:  I do, Your Honor.  Just a brief

05:09:04   3   response to the Plaintiff's motion on this issue.

05:09:06   4          As an initial matter, Your Honor, there is no

05:09:11   5   legal requirement that an expert consider damages after the

05:09:17   6   verdict in order to opine that a lump sum would be

05:09:21   7   appropriate.

05:09:21   8          Mr. Gerardi adequately supported his lump-sum

05:09:25   9   opinions, in particular, by noting that impartial reliance

05:09:31  10   on Dr. Villasenor, there were non-infringing alternatives

05:09:33  11   available.  And as Mr. Weinstein actually agrees, that

05:09:36  12   would place a cap on the amount of damages.  And he cited

05:09:40  13   to that evidence in support of his opinion that a lump sum

05:09:43  14   would be appropriate.

05:09:44  15          For that reason, Your Honor, we feel that his

05:09:46  16   theory should be submitted to the jury and that a verdict

05:09:48  17   finding a lump sum would be supported by the evidence.

05:09:52  18          THE COURT:  All right.  Well, thank you for your

05:09:55  19   competing argument, counsel.

05:09:56  20          With regard to the issue of damages, both as urged

05:09:59  21   by Plaintiff under Rule 50(a) and as urged by Defendant

05:10:03  22   under Rule 50(a), the Court denies both motions.

05:10:06  23          The Court will consider and has given considerable

05:10:12  24   thought to the best and most appropriate means of

05:10:17  25   submitting the damages question to the jury, and we'll

| | | |
|---|---|---|
| 05:10:21 | 1 | discuss the form of the verdict, as well as the form of the |
| 05:10:26 | 2 | Court's intended final jury instruction, or charge, outside |
| 05:10:31 | 3 | of this 50(a) hearing. |
| 05:10:33 | 4 | But for the record and for completeness, |
| 05:10:38 | 5 | Plaintiff's several motions seeking judgment as a matter of |
| 05:10:40 | 6 | law under Rule 50(a), as well as Defendant's several |
| 05:10:44 | 7 | motions seeking judgment as a matter of law under Rule |
| 05:10:48 | 8 | 50(a), are in their entirety denied by the Court. |
| 05:10:52 | 9 | That completes the hearing before the Court on |
| 05:10:54 | 10 | motions offered under Rule 50(a). |
| 05:10:58 | 11 | Counsel, I have prepared for your review from the |
| 05:11:05 | 12 | last submission that you jointly filed with the Court a |
| 05:11:08 | 13 | next draft of what I believe the final jury instructions |
| 05:11:12 | 14 | and the verdict form should look like.  I'll have those in |
| 05:11:14 | 15 | hard copy brought into the courtroom in a few minutes to be |
| 05:11:19 | 16 | given to you. |
| 05:11:20 | 17 | I'll afford each side an opportunity to review |
| 05:11:23 | 18 | that.  I don't think it's going to take a terribly long |
| 05:11:25 | 19 | period of time because I know you're intimately familiar |
| 05:11:29 | 20 | with the issues raised in those documents. |
| 05:11:30 | 21 | But after I've given you a reasonable time to |
| 05:11:33 | 22 | review that next draft from the Court, I'll meet with |
| 05:11:37 | 23 | counsel in chambers, and we'll conduct at that time an |
| 05:11:42 | 24 | informal charge conference where I invite input and comment |
| 05:11:47 | 25 | freely and informally from any counsel who participated in |

05:11:50   1   the trial or appeared in the case.

05:11:51   2          I don't see lead counsel here who I anticipate

05:11:56   3   will be presenting closing arguments tomorrow.  And as I

05:11:59   4   indicated, they're not required to be present.

05:12:01   5          After I've had full input from the parties

05:12:08   6   informally as a part of the informal charge conference,

05:12:12   7   I'll take into account that input and any comments

05:12:17   8   received, and I'll generate at that point what I believe

05:12:19   9   the appropriate and legally sufficient final jury

05:12:22  10   instruction and verdict form should be in this case.

05:12:25  11          I'll afford you an opportunity to review that, and

05:12:27  12   then I'll conduct a formal charge conference on the record,

05:12:31  13   at which time either party who believes that there's an

05:12:34  14   issue that has survived that process and they need to

05:12:36  15   formally object to, that objection can be made on the

05:12:39  16   record and ruled on by the Court.

05:12:41  17          All right.  With that, it is 12 minutes after

05:12:45  18   5:00.  The Court will stand in recess.  I'll have those

05:12:48  19   hard copies of the next draft of those documents brought in

05:12:51  20   to you shortly.  And then after I've given you some

05:12:54  21   reasonable period of time, I'll send for you, and we'll

05:12:57  22   meet in chambers and conduct an informal charge conference.

05:13:00  23          Ms. Glasser, I see you moved to the podium.  Do

05:13:04  24   you have something?

05:13:04  25          MS. GLASSER:  I sure do.  I was following

05:13:07   1   Mr. Hill.  He probably has the same issue.

05:13:08   2            MR. HILL:  We do, Your Honor.

05:13:09   3            MS. GLASSER:  I don't think we received resolution

05:13:09   4   from the Court on an issue the parties disagree about.

05:13:14   5   We're were hoping to report back to the folks at the

05:13:17   6   office, which has to do with what types of slides the

05:13:19   7   parties need to exchange tonight.

05:13:22   8            Plaintiff's proposal, as we mentioned earlier, is

05:13:24   9   to do the same thing that Your Honor endorsed in Case

05:13:27  10   No. 1, which was to eliminate any objections during the

05:13:30  11   opening itself, or at least minimize the possibility of any

05:13:33  12   objections, to have the parties actually disclose testimony

05:13:39  13   slides, as well as, you know, sort of purely graphical

05:13:42  14   slides so that there's not any people popping up with

05:13:45  15   completeness objections or anything of that nature.

05:13:49  16            MR. HILL:  And, Your Honor, our -- since --

05:13:51  17            THE COURT:  What's your position, Mr. Hill?

05:13:53  18            MR. HILL:  Your Honor, since we -- they get to go

05:13:55  19   last, if they want to show us everything, we'll certainly

05:13:59  20   look at it.  So we'll accept that.

05:14:01  21            We would also ask that it be extended to exhibits,

05:14:03  22   as well, to make sure documents aren't excerpted in a way

05:14:07  23   that would be misleading.

05:14:08  24            MS. GLASSER:  We don't have a disagreement.

05:14:10  25            MR. HILL:  As long as it includes exhibits, too.

1265

```
05:14:13   1              THE COURT:  It should include exhibits.

05:14:15   2              MS. GLASSER:  Absolutely.  I'm sorry, I thought we

05:14:18   3   had a disagreement.

05:14:19   4              THE COURT:  It should include any sections of the

05:14:22   5   transcribed testimony from the trial that you plan to show

05:14:22   6   during closing.

05:14:25   7              MR. HILL:  Yes, sir, Your Honor.

05:14:25   8              MS. GLASSER:  Yes, Your Honor.  Thank you.

05:14:27   9              MR. HILL:  The other thing, Your Honor, is the

05:14:28  10   Court's preference on timing for this.  We had obviously --

05:14:30  11   because of the work that goes into it, like to make the

05:14:33  12   exchange as soon as possible between the parties of our

05:14:34  13   respective closing slides.

05:14:35  14              THE COURT:  What do you suggest as to time?

05:14:39  15              MR. HILL:  Your Honor, if we could exchange those

05:14:42  16   by 10:00 o'clock?

05:14:42  17              MS. GLASSER:  That's too late for us.  That

05:14:42  18   doesn't work for us at all.

05:14:44  19              MR. HILL:  9:00 o'clock?

05:14:46  20              MS. GLASSER:  I think last time we did it at 6:30

05:14:47  21   or something like that, and I don't think we necessarily

05:14:50  22   need to do it that early, but we haven't -- Your Honor, as

05:14:51  23   you can tell, the parties haven't discussed this issue.  I

05:14:54  24   suggest maybe we try to work it out and report back if we

05:14:57  25   can't.  But 10:00 o'clock is way, way too late.  We'll be
```

| | | |
|---|---|---|
| 05:15:02 | 1 | meeting and conferring until midnight on something like |
| 05:15:05 | 2 | that. |
| 05:15:05 | 3 | MR. HILL:  I'm looking at the time currently, |
| 05:15:08 | 4 | Your Honor.  It's 5:00 o'clock now.  If -- |
| 05:15:09 | 5 | THE COURT:  Unless you can agree to something |
| 05:15:11 | 6 | different, 8:00 o'clock. |
| 05:15:12 | 7 | MR. HILL:  8:00 o'clock?  Okay. |
| 05:15:13 | 8 | MS. GLASSER:  Thank you, Your Honor. |
| 05:15:13 | 9 | MR. HILL:  And what time should we advise the |
| 05:15:15 | 10 | Court of any disputes, Your Honor? |
| 05:15:17 | 11 | THE COURT:  10:00 o'clock. |
| 05:15:18 | 12 | MR. HILL:  Standard time? |
| 05:15:19 | 13 | THE COURT:  Standard time. |
| 05:15:19 | 14 | MR. HILL:  Okay. |
| 05:15:20 | 15 | THE COURT:  And you well understand that doesn't |
| 05:15:20 | 16 | mean you stop trying to work them out. |
| 05:15:22 | 17 | MR. HILL:  Understood.  Is there anything |
| 05:15:24 | 18 | different you would like with regard to these types of |
| 05:15:26 | 19 | disputes, delivered for in the morning, other than just a |
| 05:15:29 | 20 | binder at 7:00 o'clock -- |
| 05:15:29 | 21 | THE COURT:  I don't think so, Mr. Hill. |
| 05:15:31 | 22 | MR. HILL:  All right.  Very good.  Thank you, |
| 05:15:34 | 23 | Your Honor. |
| 05:15:34 | 24 | THE COURT:  The fewer the better, and none at all |
| 05:15:36 | 25 | would be optimal, but we will see. |

05:15:39   1          Okay, counsel.  All right.  If you'll approach the
05:16:01   2   courtroom deputy, I have two sets of both the charge and
05:16:04   3   verdict form in its current version.
05:16:06   4          That's one set, Ms. Lockhart, and the one behind
05:16:09   5   you is the other set.  If you'll hand those to counsel.
05:16:13   6          MS. GLASSER:  Thank you.
05:16:14   7          THE COURT:  I'll give you 10 or 15 minutes to
05:16:16   8   review these and then I'll meet with you in chambers for
05:16:18   9   the informal charge conference.
05:16:18  10          MR. HILL:  Your Honor, may I be excused for the
05:16:20  11   remainder of the proceedings today?
05:16:22  12          THE COURT:  Unless you're going to participate in
05:16:24  13   those functions, you may.
05:16:26  14          MR. HILL:  Thank you, Your Honor.
05:16:27  15          THE COURT:  The Court stands in recess.
05:16:28  16          COURT SECURITY OFFICER:  All rise.
05:16:29  17          (Recess.)
06:59:21  18          (Jury out.)
06:59:22  19          COURT SECURITY OFFICER:  All rise.
06:59:27  20          THE COURT:  Be seated, please.
06:59:58  21          All right.  Counsel, as indicated previously,
07:00:00  22   after the Court concluded motions asserted under
07:00:03  23   Rule 50(a), the Court has conducted in chambers a robust
07:00:08  24   and fulsome discussion with counsel for the parties as an
07:00:12  25   informal charge conference in which both sides have had an

07:00:16  1   ample opportunity to offer any input or suggestion or

07:00:20  2   comment they might have as to the final jury instructions

07:00:24  3   and verdict form.

07:00:24  4        The Court had the opportunity to consider that

07:00:29  5   input from the parties after the conclusion of the informal

07:00:33  6   charge conference.  Considering the same, reviewing the

07:00:37  7   previous work already done, the Court has now generated a

07:00:41  8   current version of the final jury instructions and verdict

07:00:44  9   form, which it believes is accurate and appropriate.

07:00:50  10       That copy has been given to counsel for both of

07:00:53  11  the parties with an opportunity to review it and to see any

07:00:57  12  areas where the documents have varied from what they were

07:01:01  13  at the time we held the informal charge conference.

07:01:03  14       Having done that, the Court now will conduct a

07:01:07  15  formal charge conference on the record where either party

07:01:12  16  may, if it feels compelled in the interest of its client,

07:01:16  17  offer such formal objections to both the final jury

07:01:20  18  instructions and verdict form as they believe are

07:01:22  19  appropriate and necessary.

07:01:23  20       As is the Court's practice, I'll ask one

07:01:30  21  spokesperson from each party to go to the podium.  I'll

07:01:34  22  begin with the final jury instruction and review that

07:01:38  23  document on a page-by-page basis.

07:01:42  24       At any point in that process where we get to a

07:01:44  25  page that you believe something has been included that's

07:01:48    1  improper and you feel compelled to object, you may do so.

07:01:53    2  At any point that you feel something has been omitted,

07:01:56    3  which is necessary and you feel you should object, that's

07:01:59    4  also appropriate.

07:02:01    5          If at any point as we go through the document on a

07:02:04    6  page-by-page basis you believe an objection is appropriate,

07:02:08    7  I'll be glad to stop and hear your objection and then rule

07:02:11    8  on the same.  Once we've completed that page-by-page review

07:02:15    9  of the final jury instructions, we'll do the same for the

07:02:19   10  verdict form.

07:02:19   11          So at this time, whoever is going to speak for

07:02:21   12  Plaintiff, please go to the podium.  Whoever is going to

07:02:24   13  speak for Defendant, please go to the podium, as well.

07:02:29   14          It looks like Mr. Rowles and Mr. McCullough; is

07:02:33   15  that correct?

07:02:33   16          MR. ROWLES:  I think I'm the only one left, Your

07:02:36   17  Honor.

07:02:36   18          MR. MCCULLOUGH:  Yes, Your Honor.

07:02:37   19          THE COURT:  Let's begin with the final jury

07:02:40   20  instructions.  I'll start with the cover page or Page 1.

07:02:42   21          Is there any objection to anything on this page

07:02:45   22  from either Plaintiff or Defendant?

07:02:47   23          MR. ROWLES:  Nothing from Plaintiff, Your Honor.

07:02:48   24          MR. MCCULLOUGH:  Nothing from Defendant, Your

07:02:50   25  Honor.

| | | |
|---|---|---|
| 07:02:50 | 1 | THE COURT:  Turning then to Page 2, is there |
| 07:02:52 | 2 | objection here from either party? |
| 07:02:54 | 3 | MR. ROWLES:  Nothing from Plaintiff, Your Honor. |
| 07:02:56 | 4 | MR. MCCULLOUGH:  Nothing from Defendant. |
| 07:02:57 | 5 | THE COURT:  Page 3, is there any objection from |
| 07:03:01 | 6 | either party? |
| 07:03:01 | 7 | MR. ROWLES:  Nothing from Plaintiff. |
| 07:03:02 | 8 | MR. MCCULLOUGH:  No objection, Your Honor. |
| 07:03:03 | 9 | THE COURT:  Turning to Page 4, is there objection |
| 07:03:07 | 10 | here from either party? |
| 07:03:09 | 11 | MR. ROWLES:  Nothing from Plaintiff. |
| 07:03:10 | 12 | MR. MCCULLOUGH:  No objection, Your Honor. |
| 07:03:12 | 13 | THE COURT:  Page 5, is there objection from either |
| 07:03:14 | 14 | party? |
| 07:03:14 | 15 | MR. ROWLES:  Nothing from Plaintiff. |
| 07:03:19 | 16 | MR. MCCULLOUGH:  Nothing from Defendant. |
| 07:03:20 | 17 | THE COURT:  Page 6, is there objection from either |
| 07:03:22 | 18 | party? |
| 07:03:22 | 19 | MR. ROWLES:  Nothing from Plaintiff. |
| 07:03:24 | 20 | MR. MCCULLOUGH:  Nothing from Defendant. |
| 07:03:25 | 21 | THE COURT:  Page 7, is there objection from either |
| 07:03:27 | 22 | party? |
| 07:03:28 | 23 | MR. ROWLES:  Nothing from Plaintiff. |
| 07:03:29 | 24 | MR. MCCULLOUGH:  Nothing from Defendant. |
| 07:03:31 | 25 | THE COURT:  Page 8, is there objection from either |

07:03:34  1  party?

07:03:34  2          MR. ROWLES:  Nothing from Plaintiff.

07:03:37  3          MR. MCCULLOUGH:  Nothing from Defendant.

07:03:38  4          THE COURT:  Turning then to Page 9 of the final

07:03:42  5  jury instructions, is there objection here from either

07:03:46  6  party?

07:03:47  7          MR. ROWLES:  Nothing from Plaintiff.

07:03:48  8          MR. MCCULLOUGH:  Nothing from Defendant.

07:03:50  9          THE COURT:  Turning then to Page 10, is there

07:03:53  10  objection from either party?

07:03:54  11          MR. ROWLES:  Nothing from Plaintiff.

07:03:56  12          MR. MCCULLOUGH:  Nothing from Defendant.

07:03:57  13          THE COURT:  Page 11, is there any objection?

07:03:59  14          MR. ROWLES:  Nothing from Plaintiff.

07:04:00  15          MR. MCCULLOUGH:  Nothing from Defendant.

07:04:02  16          THE COURT:  Page 12, is there any objection?

07:04:04  17          MR. ROWLES:  There is from Plaintiff, Your Honor.

07:04:06  18          THE COURT:  State your objection.

07:04:07  19          MR. ROWLES:  The -- the last sentence on Page 12,

07:04:10  20  beginning, "a party obtains a benefit from a system," and

07:04:14  21  continuing onto Page 13, Plaintiff objects to this

07:04:18  22  instruction on the basis that it's inconsistent with the

07:04:22  23  controlling Centillion decision, which has held that a

07:04:26  24  system claim can be infringed by use of a system even if

07:04:31  25  the system is used and collectively engages every element

07:04:34  1   of the system.

07:04:35  2          We believe it's misleading and prejudicial to

07:04:37  3   instruct the jury specifically and suggest that an

07:04:41  4   element-by-element analysis identifying a particular

07:04:44  5   benefit for each claim element is required.  We'd object on

07:04:48  6   that basis.

07:04:49  7          And there's a second objection to this page,

07:04:54  8   moving on to Claim 13, which is based on --

07:04:57  9          THE COURT:  You mean Page 13?

07:05:00  10         MR. ROWLES:  Yes, Your Honor.

07:05:02  11         The -- the section that begins on Page 12 and

07:05:05  12   continues to Page 13, Plaintiff believes that there should

07:05:09  13   be an instruction to the jury regarding the principles of

07:05:12  14   vicarious liability.

07:05:14  15         Based on the Centillion decision, which held that

07:05:17  16   a -- the principles of vicarious liability that existed at

07:05:21  17   that time were applicable to system claims, and the Federal

07:05:25  18   Circuit's subsequent expansion of the vicarious liability

07:05:28  19   doctrine in the remanded Akamai decision, we believe it

07:05:31  20   would be appropriate to instruct the jury, as well, that a

07:05:34  21   party can be held vicariously liable for the actions of

07:05:38  22   another if they meet the direction and control standard as

07:05:43  23   expressed in Akamai, even for system claims.

07:05:46  24         THE COURT:  All right.  Those objections are

07:05:47  25   overruled.

| | | |
|---|---|---|
| 07:05:47 | 1 | Are there objections on Page 12 to anything from |
| 07:05:50 | 2 | the Defendant? |
| 07:05:52 | 3 | MR. MCCULLOUGH:  Nothing from Defendant. |
| 07:05:53 | 4 | THE COURT:  Anything from Defendant on Page 13? |
| 07:05:56 | 5 | MR. MCCULLOUGH:  Yes, Your Honor. |
| 07:05:58 | 6 | Defendant objects to the willfulness instruction |
| 07:06:01 | 7 | on the basis, first, that there's insufficient evidence to |
| 07:06:05 | 8 | submit willfulness to the jury, as explained in our 50(a) |
| 07:06:08 | 9 | motion. |
| 07:06:09 | 10 | Additionally, we object to the sentence in the |
| 07:06:12 | 11 | middle of the last full paragraph beginning "a Defendant is |
| 07:06:15 | 12 | indifferent to the rights of another."  We believe that |
| 07:06:18 | 13 | that's a misstatement of the law.  The correct standard for |
| 07:06:23 | 14 | willful blindness is stated on the next page, and so we |
| 07:06:26 | 15 | would request that that sentence be struck. |
| 07:06:28 | 16 | THE COURT:  All right.  That objection is |
| 07:06:31 | 17 | overruled. |
| 07:06:32 | 18 | Mr. Rowles, do you have any -- any other objection |
| 07:06:36 | 19 | on Page 13? |
| 07:06:36 | 20 | MR. ROWLES:  No, Your Honor. |
| 07:06:37 | 21 | THE COURT:  Then we'll turn to Page 14, and I'll |
| 07:06:41 | 22 | ask if either party has any objection to anything here? |
| 07:06:44 | 23 | MR. ROWLES:  Nothing from Plaintiffs, Your Honor. |
| 07:06:46 | 24 | MR. MCCULLOUGH:  Yes, Your Honor. |
| 07:06:47 | 25 | Defendants object in the first full paragraph, the |

07:06:50  1  first sentence, knowledge of the existence of a patent or

07:06:52  2  patent family can be relevant to willful infringement.

07:06:55  3         We object on the basis, we believe the law is that

07:06:59  4  knowledge of a patent is required in order to show willful

07:07:02  5  infringement.  And we do not believe knowledge of a patent

07:07:05  6  family is relevant in any way.

07:07:07  7         Additionally, we object to the next sentence which

07:07:12  8  states, the standard for willful blindness, and we believe

07:07:16  9  there's no basis to submit willful blindness to the jury.

07:07:19  10        THE COURT:  All right.  That's overruled.

07:07:20  11        Anything else from either party on Page 14?

07:07:23  12        MR. ROWLES:  Not from Plaintiff, Your Honor.

07:07:25  13        MR. MCCULLOUGH:  Nothing else from Defendant.

07:07:26  14        THE COURT:  Turning then to Page 15, is there any

07:07:29  15  objection from either party here?

07:07:30  16        MR. ROWLES:  No objection from Plaintiff,

07:07:32  17  Your Honor.

07:07:32  18        MR. MCCULLOUGH:  Your Honor, there was just one

07:07:34  19  thing we noticed.  We forgot to raise this in chambers.

07:07:37  20  The last -- the last full paragraph, the first sentence

07:07:41  21  reads a little awkwardly.

07:07:42  22        I think the sentence is maybe supposed to end

07:07:45  23  after PTO and end after the process of obtaining a patent.

07:07:49  24  But it doesn't seem to read correctly to us.

07:07:53  25        THE COURT:  All right.  Counsel, let me make sure

| | | |
|---|---|---|
| 07:07:59 | 1 | I'm at the same place where you are. |
| 07:08:02 | 2 | This is the last full paragraph on Page 15? |
| 07:08:06 | 3 | MR. MCCULLOUGH:  Yes, Your Honor. |
| 07:08:18 | 4 | MR. ROWLES:  If I may, Your Honor, it looks like |
| 07:08:20 | 5 | maybe something along the lines of the process of obtaining |
| 07:08:24 | 6 | a patent is omitted here.  The process of obtaining a |
| 07:08:28 | 7 | patent is called patent prosecution. |
| 07:08:40 | 8 | THE COURT:  All right.  Counsel, I think there's |
| 07:08:42 | 9 | merit to this -- I don't know if it's an objection, but at |
| 07:08:46 | 10 | least to this issue. |
| 07:08:47 | 11 | And my intention is to change the last full |
| 07:08:53 | 12 | paragraph at the bottom of Page 15 to read as follows:  As |
| 07:08:58 | 13 | previously explained, comma, to obtain a patent, comma, one |
| 07:09:03 | 14 | must first file an application with the United States |
| 07:09:05 | 15 | Patent and Trademark Office, period.  The process of |
| 07:09:09 | 16 | obtaining a patent is called patent prosecution, period. |
| 07:09:13 | 17 | That would be two sentences to replace the |
| 07:09:16 | 18 | existing one sentence that's there now. |
| 07:09:18 | 19 | Is there any objection to that change? |
| 07:09:20 | 20 | MR. ROWLES:  None from Plaintiff. |
| 07:09:21 | 21 | MR. MCCULLOUGH:  No objection, Your Honor. |
| 07:09:22 | 22 | THE COURT:  All right.  Anything else from either |
| 07:09:25 | 23 | party on Page 15? |
| 07:09:26 | 24 | MR. ROWLES:  No, Your Honor. |
| 07:09:27 | 25 | MR. MCCULLOUGH:  Nothing else from the Defendant. |

07:09:28   1          THE COURT:  All right.  Then moving to Page 16 of

07:09:32   2   the final jury instructions, is there objection here from

07:09:35   3   either party?

07:09:36   4          MR. ROWLES:  No objection from Plaintiff.

07:09:37   5          MR. MCCULLOUGH:  Yes, Your Honor.

07:09:38   6          Defendant objects in the second full paragraph to

07:09:41   7   the last two sentences.  We don't believe any information

07:09:45   8   about when the applications were published is relevant to

07:09:47   9   any issue in this case.

07:09:59   10          THE COURT:  All right.  That's overruled.

07:10:00   11          Anything else on Page 16 from Defendant?

07:10:02   12          MR. MCCULLOUGH:  Nothing else.

07:10:04   13          THE COURT:  Moving then to Page 17, is there any

07:10:07   14   objection here from either party?

07:10:09   15          MR. ROWLES:  There is from Plaintiff, Your Honor.

07:10:11   16          The sentence beginning:  However, the

07:10:13   17   specification must describe, Plaintiff objects to the

07:10:16   18   inclusion of this sentence as misleading and prejudicial,

07:10:20   19   particularly in view of statements that have been made

07:10:23   20   throughout the trial by Defendant and Defendant's witnesses

07:10:26   21   suggesting that if a claim covers two particular

07:10:31   22   embodiments, that both particular embodiments must be

07:10:34   23   disclosed, and the inclusion of this sentence suggests to

07:10:38   24   the jury that this is a different situation than it is.

07:10:42   25          We were not in a traditional genus/species

| | | |
|---|---|---|
| 07:10:47 | 1 | situation.  The defense theory is -- has identified only an |
| 07:10:50 | 2 | arbitrary distinction between devices where a computer |
| 07:10:53 | 3 | connected to a camera inside one physical box or -- or |
| 07:10:57 | 4 | similar devices with two physical boxes is not different in |
| 07:11:02 | 5 | any material way to the invention in suggesting that -- |
| 07:11:05 | 6 | with this language I think would mislead the jury.  And so |
| 07:11:09 | 7 | we object on that basis. |
| 07:11:10 | 8 | THE COURT:  All right.  That objection by |
| 07:11:11 | 9 | Plaintiff is overruled. |
| 07:11:13 | 10 | Anything else by either party on Page 17? |
| 07:11:18 | 11 | MR. MCCULLOUGH:  Yes, Your Honor. |
| 07:11:19 | 12 | Defendant objects to the sentence before that. |
| 07:11:21 | 13 | Although the following sentence does add a little bit of |
| 07:11:24 | 14 | context, we believe the statement that -- as one example |
| 07:11:27 | 15 | can support written description.  There's not enough |
| 07:11:30 | 16 | context, and there's an insufficient statement of the full |
| 07:11:34 | 17 | law relating to when a single example could potentially |
| 07:11:38 | 18 | provide written description support, so we think it's |
| 07:11:41 | 19 | prejudicial and should be excluded. |
| 07:11:43 | 20 | THE COURT:  All right.  Thank you, Mr. McCullough. |
| 07:11:44 | 21 | That objection is overruled. |
| 07:11:45 | 22 | Anything further, counsel, from either of you on |
| 07:11:48 | 23 | Page 17? |
| 07:11:49 | 24 | MR. ROWLES:  Nothing from Plaintiff, Your Honor. |
| 07:11:51 | 25 | MR. MCCULLOUGH:  Nothing from Defendant. |

| | | |
|---|---|---|
| 07:11:52 | 1 | THE COURT:  Turning next to Page 18, is there |
| 07:11:55 | 2 | objection here from either party? |
| 07:11:57 | 3 | MR. ROWLES:  No objection from Plaintiff. |
| 07:11:58 | 4 | MR. MCCULLOUGH:  Nothing from Defendant. |
| 07:12:00 | 5 | THE COURT:  Turning then to Page 19, is there any |
| 07:12:02 | 6 | objection here from either party? |
| 07:12:04 | 7 | MR. ROWLES:  No objection from Plaintiff. |
| 07:12:05 | 8 | MR. MCCULLOUGH:  Nothing from Defendant. |
| 07:12:07 | 9 | THE COURT:  All right.  Next Page 20, any |
| 07:12:11 | 10 | objection here? |
| 07:12:11 | 11 | MR. ROWLES:  No objection, Your Honor. |
| 07:12:13 | 12 | MR. MCCULLOUGH:  Nothing from Defendant. |
| 07:12:14 | 13 | THE COURT:  Page 21, any objection? |
| 07:12:17 | 14 | MR. ROWLES:  No, Your Honor. |
| 07:12:18 | 15 | MR. MCCULLOUGH:  No objection. |
| 07:12:19 | 16 | THE COURT:  I'll note, counsel, that beginning on |
| 07:12:24 | 17 | Page 21 and continuing on to Page 22, all 15 of the |
| 07:12:28 | 18 | Georgia-Pacific factors are set forth. |
| 07:12:30 | 19 | It's my understanding from our discussion in |
| 07:12:32 | 20 | chambers that both sides agree that the Court should |
| 07:12:35 | 21 | properly charge the jury on all 15 of those factors; is |
| 07:12:39 | 22 | that correct? |
| 07:12:39 | 23 | MR. ROWLES:  That's our understanding, Your Honor. |
| 07:12:42 | 24 | MR. MCCULLOUGH:  Yes, Your Honor. |
| 07:12:43 | 25 | THE COURT:  All right.  Any objection to anything |

| | | |
|---|---|---|
| 07:12:47 | 1 | on Page 22? |
| 07:12:49 | 2 | MR. ROWLES:  No, Your Honor. |
| 07:12:51 | 3 | MR. MCCULLOUGH:  No objection, Your Honor. |
| 07:12:52 | 4 | THE COURT:  Turning then to Page 23, is there an |
| 07:12:55 | 5 | objection from either party here? |
| 07:12:56 | 6 | MR. ROWLES:  No objection, Your Honor. |
| 07:12:58 | 7 | MR. MCCULLOUGH:  No objection. |
| 07:12:59 | 8 | THE COURT:  Page 24, any objection from either |
| 07:13:03 | 9 | party? |
| 07:13:03 | 10 | MR. ROWLES:  No objection, Your Honor. |
| 07:13:05 | 11 | MR. MCCULLOUGH:  No objection, Your Honor. |
| 07:13:07 | 12 | THE COURT:  And the last page, Page 25, is there |
| 07:13:10 | 13 | any objection here? |
| 07:13:11 | 14 | MR. ROWLES:  No objection, Your Honor. |
| 07:13:13 | 15 | MR. MCCULLOUGH:  No objection, Your Honor. |
| 07:13:14 | 16 | THE COURT:  All right.  Turning to the verdict |
| 07:13:16 | 17 | form. |
| 07:13:19 | 18 | MR. MCCULLOUGH:  Your Honor, with the Court's |
| 07:13:20 | 19 | permission, may I turn it over to Mr. Underwood? |
| 07:13:23 | 20 | THE COURT:  You may. |
| 07:13:24 | 21 | MR. MCCULLOUGH:  Thank you. |
| 07:13:25 | 22 | THE COURT:  Mr. Underwood, you're going to |
| 07:13:30 | 23 | represent the Defendant with regard to the formal charge |
| 07:13:32 | 24 | conference related to the verdict form? |
| 07:13:34 | 25 | MR. UNDERWOOD:  With the Court's permission, Your |

| | |
|---|---|
| 07:13:36 | 1 |
| 07:13:36 | 2 |
| 07:13:38 | 3 |
| 07:13:41 | 4 |
| 07:13:44 | 5 |
| 07:13:47 | 6 |
| 07:13:51 | 7 |
| 07:13:54 | 8 |
| 07:13:56 | 9 |
| 07:13:56 | 10 |
| 07:13:59 | 11 |
| 07:14:01 | 12 |
| 07:14:02 | 13 |
| 07:14:03 | 14 |
| 07:14:05 | 15 |
| 07:14:07 | 16 |
| 07:14:09 | 17 |
| 07:14:11 | 18 |
| 07:14:13 | 19 |
| 07:14:18 | 20 |
| 07:14:20 | 21 |
| 07:14:22 | 22 |
| 07:14:26 | 23 |
| 07:14:27 | 24 |
| 07:14:29 | 25 |

Honor.

THE COURT:  Permission is granted.

Let's begin, we'll follow the same format,
counsel.  The cover letter -- or, excuse me, the cover page
of the verdict form, which is not otherwise numbered, but
Page 1 is first, and I'll ask if either side has any
objection to anything either contained within or omitted
from the first page of the verdict form?

MR. ROWLES:  No objection from Plaintiff, Your
Honor.

MR. UNDERWOOD:  None from Defendant.

THE COURT:  Next is Page 2, is there objection
here from either party?

MR. ROWLES:  No, Your Honor.

MR. UNDERWOOD:  None from Defendant.

THE COURT:  Page 3, including instructions to the
jury, is there any objection from either party?

MR. ROWLES:  There's no objection, Your Honor, but
it looks like the word "complies" is missing an "i".

THE COURT:  Say that again, Mr. Rowles.

MR. ROWLES:  The word "complies" in the bottom
sentence, it's just a typo, I think, but there's an "i"
missing.

THE COURT:  Oh, I'll correct that to properly
spell the word "complies."

07:14:31  1          Any problem with that, Mr. Underwood?

07:14:33  2          MR. UNDERWOOD:  No, Your Honor.

07:14:34  3          THE COURT:  All right.  Unless there's something

07:14:37  4   else from either party, we'll move from Page 3 to Page 4 of

07:14:41  5   the verdict form where Question No. 1 is located.  Is there

07:14:44  6   objection here from either party?

07:14:46  7          MR. ROWLES:  None from Plaintiff.

07:14:47  8          MR. UNDERWOOD:  Yes, Your Honor.

07:14:49  9          Defendant does have an objection to the submission

07:14:53 10   of Question 1 in its current state, its -- its broad forum

07:15:00 11   state.  Defendant would submit that it would be more

07:15:03 12   appropriately submitted to the jury with a breakdown -- a

07:15:07 13   granular breakdown as to each of the asserted claims such

07:15:10 14   that the jury would answer yes or no with respect to each

07:15:13 15   of the asserted claims.

07:15:14 16          THE COURT:  Understood.  That objection is

07:15:16 17   overruled.

07:15:17 18          Turning then to Page 5 of the verdict form where

07:15:22 19   Question 2 is located.  Is there objection here from either

07:15:25 20   party?

07:15:26 21          MR. ROWLES:  No objection from Plaintiff, Your

07:15:28 22   Honor.

07:15:28 23          MR. UNDERWOOD:  None from Defendant.

07:15:29 24          THE COURT:  Turning next to Page 6 of the verdict

07:15:34 25   form where Question 3 is located, is there any objection

07:15:38   1   here from either party?

07:15:39   2          MR. ROWLES:  No objection from Plaintiff, Your

07:15:41   3   Honor.

07:15:41   4          MR. UNDERWOOD:  Yes, Your Honor.

07:15:42   5          Defendant would object to Question No. 3 on the

07:15:46   6   same grounds as previously stated with respect to Question

07:15:49   7   No. 1.

07:15:53   8          THE COURT:  All right.  That objection is

07:15:56   9   overruled.

07:15:56   10          Turning next to Page 7 of the verdict form where

07:16:01   11   Question 4 is located.  Is there any objection here?

07:16:03   12          MR. ROWLES:  No objection from Plaintiff, Your

07:16:06   13   Honor.

07:16:06   14          MR. UNDERWOOD:  Yes, Your Honor.

07:16:08   15          Defendant objects to the submission of Question

07:16:12   16   No. 4 with the language "and through the date of trial."

07:16:19   17   Defendant would submit that that language should not be

07:16:21   18   included because it is suggestive of the form of the

07:16:25   19   royalty and suggestive of the -- of perhaps a running

07:16:28   20   royalty, whereas the evidence has been adduced to support a

07:16:32   21   lump-sum royalty.  And on that ground, Defendant would

07:16:35   22   object to this question.

07:16:41   23          THE COURT:  All right.  That objection is

07:16:42   24   overruled.

07:16:43   25          Page 8 is the final page of the verdict form.  Is

07:16:47   1    there any objection here from either party?

07:16:50   2              MR. ROWLES:  None from Plaintiff, Your Honor.

07:16:51   3              MR. UNDERWOOD:  None from Defendant.

07:16:53   4              THE COURT:  All right.  Counsel, that completes

07:16:55   5    the formal charge conference.

07:16:58   6              It's my intention to reproduce both of these

07:17:02   7    documents with only the adjustments that have been set

07:17:06   8    forth in the record as a part of this formal charge

07:17:08   9    conference.

07:17:09  10              My intention, as earlier stated, is to produce

07:17:12  11    eight separately-printed copies of the final jury

07:17:16  12    instructions and one clean copy of the verdict form and to

07:17:21  13    have those ready to send back to the jury after they've

07:17:25  14    heard closing arguments and my final instructions at the

07:17:29  15    time I direct them to begin their deliberations.

07:17:31  16              Is either Plaintiff or Defendant aware of anything

07:17:38  17    further that needs to be taken up before we recess in the

07:17:42  18    morning -- recess until the morning with the understanding

07:17:44  19    that the Court intends to begin with its final jury

07:17:48  20    instructions and proceed to closing arguments at that time?

07:17:51  21              MR. ROWLES:  Nothing from Plaintiff, Your Honor.

07:17:53  22              MR. UNDERWOOD:  Nothing from Defendant.

07:17:54  23              THE COURT:  All right.  Thank you, gentlemen.

07:17:56  24              That should be it for the day.  And we stand in

07:18:01  25    recess until tomorrow morning.

07:18:03   1                    COURT SECURITY OFFICER:  All rise.

07:18:05   2                    (Recess.)

           3

           4

           5                              CERTIFICATION

           6

           7          I HEREBY CERTIFY that the foregoing is a true and

           8   correct transcript from the stenographic notes of the

           9   proceedings in the above-entitled matter to the best of my

          10   ability.

          11

          12

          13    /S/ Shelly Holmes                    1/9/2020
                SHELLY HOLMES, CSR, TCRR             Date
          14   OFFICIAL REPORTER
                State of Texas No.: 7804
          15   Expiration Date: 12/31/20

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25